# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| DAVID EARL MILLER | ) | |
| NICHOLAS TODD SUTTON | ) | |
| STEPHEN MICHAEL WEST | ) | No. _____ |
| TERRY LYNN KING | ) | |
| | ) | **Death Penalty Case** |
| Plaintiffs | ) | *Execution date Dec. 6, 2018* |
| | ) | *for David Miller* |
| v. | ) | |
| | ) | |
| TONY PARKER, Commissioner, | ) | |
| Tennessee Department of Correction, | ) | |
| in his official capacity, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TONY MAYS, Warden, | ) | |
| Riverbend Maximum Security | ) | |
| Institution, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiffs David Earl Miller, Nicholas Todd Sutton, Stephen Michael West, and Terry Lynn King, by and through counsel, file this Complaint for Injunctive Relief challenging Tennessee's July 5, 2018 Execution Protocol and Procedures under the *Ex Post Facto* Clause, Article I section 10 of the United States Constitution, the First, Eighth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983. Plaintiffs challenge Tennessee's July 5, 2018 Protocol ("July 5th Protocol") on its face and as applied. This cause of action arises from the recent Chancery Court fact-findings, facts from the executions of Billy Ray

Irick and Edmund Zagorski, and the *Ex Post Facto* Clause and related Eighth

Amendment challenge to Tennessee's Electrocution Protocol, as well as new facts

regarding alternative execution methods.

# **Table of Contents**

Complaint for Injunctive Relief .................................................................{i}

Table of Contents ..............................................................................{iii}

Incorporation of Allegations ................................................................{1}

Parties ...........................................................................................{1}

Jurisdiction and Venue .......................................................................{3}

Recent Background ...........................................................................{5}

General Facts and Allegations...............................................................{6}

Count One:
Death by lethal injection as required by Tennessee's July 5, 2018
Protocol violates the Ex Post Facto Clause of the
United States Constitution, Article I §10 ..............................................{15}

    I.    Punishment under Tennessee's midazolam-based
        three-drug protocol ..............................................................{15}

    II.    Punishment under Tennessee's electrocution protocol ...................{19}

Count Two:
Tennessee's electrocution protocol constitutes cruel and unusual
punishment in violation of the Eighth and Fourteenth Amendments .................{20}

    I.    Feasible and readily implemented alternative methods
        of execution that significantly reduce the substantial
        risk of severe pain and suffering under Tennessee's
        electrocution protocol .........................................................{21}

        A.    Firing squad ..........................................................{21}

        B.    Euthanasia Oral Cocktail ........................................{26}

  C.  One-drug pentobarbital ..........................................{29}

    i.  A one-drug pentobarbital protocol
       significantly reduces the risk of harm
       posed by Tennessee's current lethal
       injection protocol ..........................................{29}

    ii.  A one-drug pentobarbital protocol is available with
       ordinary good-faith effort ...............................{30}

    iii.  Provisions of a one-drug protocol ..................{36}

II.  Tennessee's electrocution protocol poses a substantial risk of
   unnecessary and severe pain, suffering, and mutilation ..................{44}

  A.  The background of Tennessee's electric chair .........................{44}

  B.  How Tennessee's Electrocution Protocol Operates..................{50}

  C.  Tennessee's Electrocution Protocol inflicts cruel
     and unusual punishment ..........................................{53}

III.  Electrocution violates evolving standards of decency .......................{57}

Count Three:
Tennessee's July 5, 2018 lethal injection protocol constitutes
cruel and unusual punishment in violation of
the Eighth and Fourteenth Amendments .............................................{61}

I.  Feasible and readily implemented alternative methods
   of execution that significantly reduce the substantial
   risk of severe pain and suffering under the July 5th
   lethal injection protocol ......................................................{62}

  A.  Firing squad ..................................................{62}

  B.  Euthanasia Oral Cocktail ........................................{67}

  C.  Two-Drug Method ...........................................{70}

D.     One-drug pentobarbital ........................................................{72}

         i.     A one-drug pentobarbital protocol significantly
              reduces the risk of harm posed by Tennessee's
              current lethal injection protocol ...................................{72}

         ii.     A one-drug pentobarbital protocol is available
              with ordinary good-faith effort ....................................{73}

         iii.     Provisions of a one-drug protocol ...................................{79}

II.     Allegations related to Plaintiffs' individual characteristics ..............{87}

     A.     Plaintiff David Earl Miller ......................................................{88}

     B.     Plaintiff Nicholas Sutton ........................................................{88}

     C.     Plaintiff Stephen West ...........................................................{89}

     D.     Risk of improper drug delivery ...............................................{90}

     E.     Risk of obstruction ...............................................................{100}

     F.     Risk of paradoxical effect .......................................................{102}

III.     Allegations related to Defendants' actual
         practice under the July 5th Protocol ...................................{104}

     A.     Unnecessary restraints increase the
           risk of serious harm .............................................................{104}

     B.     The failure to prepare a contingency dose
           of midazolam increases the risk of unnecessary
           and serious harm .................................................................{105}

     C.     The lack of proper transport and storage
           instructions and practices, temperature monitoring,
           and proper storage facilities for the execution drugs
           all increase the risk of unnecessary and serious harm .........{105}

      D.     The lack of specific drug administration time
               controls in the execution protocol increases the
               risk of unnecessary and serious harm ....................................{108}

   IV.   The July 5th Protocol poses a substantial risk of
        unnecessary and severe pain and suffering ......................................{110}

      A.     Midazolam ..........................................................................{113}

      B.     Vecuronium bromide ...........................................................{115}

      C.     Potassium Chloride .............................................................{117}

Count Four:
The July 5th Protocol deprives Plaintiffs of the opportunity
to challenge the constitutionality of electrocution because they
must elect electrocution to avoid the harsher punishment of
lethal injection, in violation of the Fourteenth Amendment ................................{118}

Count Five:
Tennessee law violates Plaintiffs' rights to access courts and counsel
by prohibiting more than one attorney to be present at an execution
and denying that attorney access to a telephone during the execution,
contrary to the First, Eighth, and Fourteenth Amendments ................................{121}

Prayer for Relief .........................................................................{122}

Signature ...................................................................................{125}

Index of Attachments ...................................................................{126}

## INCORPORATION OF ALLEGATIONS

All allegations in this Complaint are incorporated in all sections as if fully set forth therein.

## PARTIES

1.     Plaintiffs are Tennessee death row inmates who committed a capital offense and were sentenced to death prior to January 1, 1999.

2.     Plaintiff David Earl Miller is a United States citizen. He is a death sentenced prisoner residing in this District at Riverbend Maximum Security Institution, Nashville, Davidson County, Tennessee, and in the custody of the Tennessee Department of Correction.

3.     Mr. Miller was sentenced to death on February 13, 1987.

4.     Mr. Miller's execution is set for December 6, 2018.

5.     Plaintiff Nicholas Todd Sutton is a United States citizen. He is a death-sentenced prisoner residing in this District at Riverbend Maximum Security Institution, Nashville, Davidson County, Tennessee, and in the custody of the Tennessee Department of Correction.

6.     Mr. Sutton was sentenced to death on March 18, 1986.

7.     Plaintiff Stephen Michael West is a United States citizen. He is a death-sentenced prisoner residing in this District at Riverbend Maximum Security Institution, Nashville, Davidson County, Tennessee, and in the custody of the Tennessee Department of Correction.

8.     Mr. West was sentenced to death on March 25, 1987.

9.      Plaintiff Terry Lynn King is a United States citizen. He is a death-sentenced prisoner residing in this District at Riverbend Maximum Security Institution, Nashville, Davidson County, Tennessee, and in the custody of the Tennessee Department of Correction.

10.     Mr. King was sentenced to death on February 6, 1985.

11.     Defendant Tony Parker is the Commissioner of the Tennessee Department of Correction, the state agency located in Nashville, Tennessee, that adopted and will implement the July 5th Protocol challenged in this Complaint. Plaintiffs sue Commissioner Parker in his official capacity. Defendant Parker will oversee the administration of Plaintiffs' executions at Riverbend Maximum Security Institute (hereinafter, "RMSI"). Defendant Parker is a state actor acting under color of state law, and his actions in seeking to execute and/or executing Plaintiffs under the Lethal Injection Protocol, as described herein, violate Plaintiffs' constitutional and statutory rights, described herein. Plaintiffs sue Mr. Parker in his official capacity.

12.     Defendant Tony Mays is the Warden of Riverbend Maximum Security Institution in Nashville, Tennessee, at which Plaintiffs are held in custody under sentence of death and where Plaintiffs executions will occur. Plaintiffs sue Warden Mays in his official capacity. Defendant Mays is directly in charge of executing Plaintiffs at RMSI. Defendant Mays is a state actor acting under color of state law, and his actions in seeking to execute and/or executing Plaintiffs under the July 5th

Protocol, as described herein, violate Plaintiffs' constitutional and statutory rights, as described herein. Plaintiffs sue Mr. Mays in his official capacity.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), § 2201 (declaratory relief), and § 2202 (further relief). This action arises under Article I section 10 of the United States Constitution and the First, Eighth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

14.     Defendants are responsible for utilizing Tennessee's current lethal injection protocol to execute Plaintiffs at Riverbend Maximum Security Institution (RMSI) in Nashville, Tennessee, where this Court is located.

15.     As to exhaustion of administrative remedies, Defendants have denied any and all administrative remedies for challenges to the Electrocution Protocol and have failed to respond to a grievance regarding the midazolam-based three-drug lethal injection protocol.

16.     Plaintiffs do not concede a need to exhaust or engage in further or additional administrative remedies because any administrative process is futile.

17.     On May 7, 2007, a grievance was filed against Tennessee's Electrocution Protocol. The grievance was denied.

18.     Immediately upon receiving notice that Tennessee had adopted (on January 8, 2018) a new lethal injection protocol that included a midazolam-based

three-drug method of lethal injection, designated as Protocol B, a grievance was filed that objected to the use of Protocol B for executions.

19. The grievance was never acted upon.

20. Thereafter, Plaintiffs (but not Plaintiff King) filed suit in the Chancery Court for Davidson County, Tennessee, asking the Court to, *inter alia*, declare Protocol B unconstitutional in violation of the Eighth and Fourteenth Amendments of the Constitution of the United States. Defendants continued to engage in that conduct against which Plaintiffs sought administrative relief.

21. Notwithstanding Plaintiffs' grievances and the pendency of the state chancery court proceedings, Defendants adopted a new lethal injection protocol on July 5, 2018 ("July 5th Protocol") which is the subject of this action.

22. The July 5th Protocol removes Protocol A, the option to use an injection of a single drug, pentobarbital, to carry out Plaintiffs' executions.

23. The July 5th Protocol calls for Defendants to engage in conduct against which Plaintiffs had sought administrative relief, *i.e.* to use a midazolam-based three-drug lethal injection method of execution. It also added provisions allowing the use of compounded drugs, and removed other provisions which had formerly benefitted Plaintiffs.

24. On August 9, 2018, Defendants engaged in that conduct against which Plaintiffs sought administrative relief: they executed Billy Ray Irick using a midazolam-based three-drug lethal injection method of execution required by the July 5th Protocol.

{4}

25. On November 1, 2018, Defendants engaged in that conduct against which Plaintiffs sought administrative relief: they executed Edmund Zagorski using Tennessee's electric chair.

## RECENT BACKGROUND

26. On August 21, 2018, Plaintiffs Miller, Sutton, and West (not Plaintiff King) filed a complaint with this Court challenging Tennessee's new July 5, 2018 lethal injection protocol. *Miller*, *et. al. v. Parker*, *et al*, No. 3:18-cv-00781. Defendants did not answer the complaint.

27. Upon motion of Defendants, *id.* at R.16, the District Court stayed the proceedings. *Id.* at R.23. It found that, although the Tennessee Supreme Court had denied a challenge to Tennessee's lethal injection protocol, one plaintiff from that litigation had filed a petition for writ of certiorari "that was sufficiently similar to the August 21st complaint to constitute parallel litigation," and that time remained for other plaintiffs to petition the Supreme Court for review. *Id.* at R.23 p.3 (opining that disposition of the cert petition could "substantially affect" the plaintiffs' rights). The abeyance period (in other words: the time for seeking certiorari review of the Tennessee Supreme Court's October 15, 2018 opinion) extended beyond the date of Plaintiff Miller's December 6, 2018 execution date.

28. Subsequently, all Plaintiffs herein learned of a cause of action based on the recent Chancery Court findings, facts from the subsequent execution of Billy Ray Irick, and the *Ex Post Facto* Clause pending in another court in this district that also applies to them. They voluntarily dismissed the August 21st complaint to

avoid concurrent litigation in different forums (albeit on different issues), and moved to intervene in the case presenting the *ex post facto* claim in order to vindicate Plaintiffs' rights under Article I §10 of the Constitution.

29.    Plaintiffs' motion to intervene was denied. *Zagorski v. Haslam*, No. 3:18-cv-01035, R.13 (M.D. Tenn. Oct. 23, 2018). The order denying intervention indicated that Plaintiffs should have brought the *ex post facto* claim in front of a different judge and in the case that was being held in abeyance. *Id.* at p.3 (remarking that Plaintiffs did not seek to add to the *ex post facto* claim to the August 21st complaint at a later date).

## GENERAL FACTS AND ALLEGATIONS

30.    If the Commissioner of Correction (currently Defendant Parker) certifies to the governor that a drug essential to carrying out a lethal injection is unavailable through no fault of the department then the method of carrying out a death sentence is electrocution. Tenn. Code Ann. § 40-23-114(e)(2) (2000).

31.    If lethal injection is held to be unconstitutional then the method of carrying out a death sentence is electrocution.  Tenn. Code Ann. § 40-23-114(e)(1).

32.    If lethal injection or electrocution is held to be unconstitutional, Tennessee law provides for execution "by any valid method of execution." Tenn. Code Ann. § 40-23-114(d).

33.    At the time of Plaintiffs' crimes, trials, convictions and sentencings, the sole punishment to which they were exposed was death by electrocution. Tenn. Code 40-23-114 (1982). To Plaintiffs' knowledge, Tennessee's current execution protocol

for electrocution is dated March 13, 2017. Attachment 1, Electrocution Procedures 3/13/17.

34. In 2000, the Tennessee legislature amended its death penalty statute to require sentences of death imposed under Tennessee law to be carried out by means of lethal injection. Tenn. Code Ann. § 40-23-114(a). Any person who committed an offense prior to January 1, 1999, for which the person is sentenced to the punishment of death may elect to be executed by electrocution by signing a written waiver waiving the right to be executed by lethal injection. Tenn. Code Ann. § 40-23-114(b).

35. Tennessee's first lethal injection protocol utilized three drugs: sodium thiopental, pancuronium bromide, and sodium chloride. Under that protocol "it was undisputed that the injection of Pavulon [a paralytic] and potassium chloride would alone cause extreme pain and suffering." *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 307 (Tenn. 2005).[1]

36. On September 12, 2007, Tennessee executed Daryl Holton under its Electrocution Protocol.

37. On September 19, 2007, the federal district court for the Middle District of Tennessee held on the evidence before it that Tennessee's original three-drug (sodium thiopental) protocol was unconstitutional because it "presents a

---

[1] In that case, "all of the medical experts … agreed that a dosage of five grams of sodium Pentothal … causes nearly immediate unconsciousness … and an inmate would be unconscious in about five seconds … and would feel no pain prior to dying." 181 S.W.3d at 307-08.

substantial risk of unnecessary pain; that risk was know[n] to Commissioner Little, and yet disregarded." *Harbison v. Little*, No. 3:06-01206, ECF No. 147 p.56 (M.D. Tenn. Sept. 19, 2007).

38.     On November 22, 2010, the Chancery Court of Davidson County Tennessee held that Tennessee's original three-drug (sodium thiopental) protocol violates the Eighth Amendment's prohibition of cruel and unusual punishment because the evidence proved that "the protocol allows suffocation – death by suffocation while the prisoner is conscious." *West v. Ray*, No. 10-1675, Order Granting Declaratory Judgment p.10 (Tenn. Chancery Ct. Nov. 22, 2010). Attachment 2, Chancery Court Declaratory Judgment Order 11/22/10.

39.     It was in part because Tennessee officials had actual knowledge of the substantial risk of pain and suffering in relation to Tennessee's original three-drug (sodium thiopental) execution method that they made the decision to renounce any further use of a three-drug lethal injection protocol .

40.     In 2013, Tennessee officials adopted a different lethal injection protocol: an injection of a single drug, 5 grams of pentobarbital.

41.     In March 2017, the Tennessee Supreme Court found the one-drug protocol, "if administered properly, will likely cause death with minimal pain and a quick loss of consciousness." *West v. Schofield*, 519 S.W.3d 550, 562 (Tenn. 2017).

42.     On January 8, 2018, Tennessee officials adopted a new lethal injection protocol ("January 8th Protocol"). Attachment 3, Lethal Injection Protocol 1/8/18. It called for lethal injections to be carried out in one of two ways.

{8}

43. The first option in the January 8th Protocol, designated as Protocol A, was materially identical to Tennessee's one-drug pentobarbital-based protocol found to "likely cause death with minimal pain and a quick loss of consciousness" in the 2017 *West* decision.

44. The second option in the January 8th Protocol, designated as Protocol B, called for the sequential injection of three-drugs: midazolam, vecuronium bromide and potassium chloride.

45. On February 20, 2018, Plaintiffs Miller, Sutton and West and other death row inmates (but not Plaintiff King) filed a complaint for declaratory judgment in the Chancery Court for Davidson County, Tennessee. The Chancery Court plaintiffs alleged that, on its face, Protocol B in the January 8th Protocol creates a constitutionally-unacceptable risk of unnecessary pain and suffering, <u>and</u>, on its face, the January 8th Protocol contained a method of execution which had already been determined to cause death "with minimal pain and a quick loss of consciousness," *i.e.* Protocol A.

46. On March 15, 2018, the Tennessee Supreme Court set execution dates for two death row inmates and scheduled Plaintiff Miller's execution for December 6, 2018. Plaintiff Miller's execution date remains in effect.

47. Plaintiffs in the state court action ("Chancery Court Plaintiffs") amended their complaint twice, on April 13, 2018 and June 28, 2018. The amendments maintained that, the January 8th Protocol—on its face--contained a substantial risk of unnecessary and severe pain in the form of Protocol B, and that

{9}

Protocol A constitutes a feasible and readily implemented alternative method of execution that significantly reduces the risk of harm posed by Protocol B.

48.     The Chancery Court Plaintiffs sought discovery on the availability of pentobarbital for use in Protocol A. Plaintiffs were denied an opportunity to discover information from state actors and/or agents with personal knowledge of the issue.

49.     The Defendants maintained up to the eve of trial in the Chancery Court that they may obtain pentobarbital for the execution scheduled in August 2018.

50.     On July 5, 2018, four days before trial in the Chancery Court, Defendants adopted a new execution protocol ("July 5th Protocol" or "current protocol") which retained the three-drug midazolam-based protocol (former Protocol B) and removed Protocol A (the one-drug pentobarbital protocol). Attachment 4, Lethal Injection Protocol 7/5/18.

51.     Defendants' adoption of the July 5th Protocol substantial changed the nature of the Chancery-Court-Plaintiffs' facial challenge to the January 8th Protocol.

52.     The only method of lethal injection available on the face of Tennessee's current protocol (the July 5th Protocol) is the three-drug midazolam-based protocol.

53.     In addition to removing the first option in the January 8th Protocol, Protocol A (the one-drug pentobarbital method that plaintiffs pled and sought to prove as an alternative to Protocol B), the new July 5th Protocol expressly provides

{10}

that all drugs utilized in the three-drug midazolam-based protocol may be either manufactured or compounded.

54.    The July 5th Protocol does not provide an inmate with notice regarding the type(s) of drugs—manufactured or compounded—which will be used for his execution.

55.    The July 5th Protocol does not contain, on its face, instructions for the transportation, storage, and administration of compounded drugs.

56.    Different requirements exist for transportation, storage, and administration of drugs depending on whether they are manufactured or compounded. The differences, if not observed, can easily affect the efficacy of the drug(s). Attachment 5, Dr. Sasich declaration, ¶¶ 5-8.

57.    On July 9, 2018, counsel for the Chancery-Court-Plaintiffs Miller, Sutton and West stated before the Chancery Court that the new July 5, 2018 Protocol was not the subject matter of the lawsuit and requested an opportunity to file an amended complaint asserting causes of action against the new protocol and to be afforded due process on such causes of action. Counsel stated he had no objection to going forward with trial on the constitutionality of the January 8, 2018 Protocol because such a hearing would be capable of resolving factual disputes common to the two protocols.

58.    The Chancery Court did not rule upon the motion to amend.

59.    Trial in the Chancery Court began on July 9, 2018.

60.     On July 19, 2018, the Chancery Court entered an Order Applying Tennessee Civil Procedure Rule 15.02. Attachment 6, Chancery Court Order Applying Tenn. Civ. P. Rule 15.02 dated July 19, 2018.

61.     The Chancery Court's order incorporated its earlier oral denial of a motion by all the Chancery Court Plaintiffs to amend the pleadings to conform to the undisputed evidence about an alternative method of execution to replace the alternative method that Defendants removed from the execution protocol four days before trial. In particular, the Chancery Court deprived plaintiffs of the opportunity to be heard on a two-drug alternative method of execution that significantly reduces the risk of harm posed by the midazolam-based three-drug method.

62.     The Chancery Court's order also *sua sponte* amended the complaint to include a challenge to the new July 5, 2018 Protocol.

63.     On July 22, 2018, Plaintiffs Miller, Sutton and West moved the court to reconsider its order. The motion to reconsider asserted: (a) claims against the new July 5th Protocol were not properly before the Court; (b) only those claims expressly raised by Plaintiffs Miller, Sutton and West in the pending complaint should be resolved; (c) due process requires that Plaintiffs Miller, Sutton and West be allowed to file an amended complaint challenging the new July 5th protocol, including allegations about alternate methods of execution to replace the one-drug method (Protocol A in the January 8th Protocol) which Defendants removed as an option on the eve of trial; and, an amended complaint must be adjudicated in conformity with the requirements of due process.

{12}

64.     On July 24, 2018, the motion to reconsider was denied.

65.     On July 26, 2018, the Chancery Court denied relief and dismissed the complaint. Attachment 7, Chancery Court Order Dismissing Suit 7/26/18.

66.     The Chancery Court's order denying relief explicitly credited the testimony of the plaintiffs' expert witnesses, who were found to be well-qualified, eminent experts.

67.     The court further found: (a) midazolam does not elicit strong analgesic effects;[2] (b) the inmate being executed may be able to feel pain from the administration of the second and third drugs; (c) during midazolam executions in other states there were signs such as grimaces, clenched fists, furrowed brows, and moans indicative that the inmates were feeling pain after the midazolam had been injected; and, (d) after an average of almost 14 minutes and as long as 18 minutes, inmates will be declared dead under Tennessee's execution protocol.

68.     The sole basis for the Chancery Court's decision is the determination that the plaintiffs had not proven an alternative method of execution; in other words, the availability of pentobarbital.

69.     Chancery-Court-Plaintiffs Miller, Sutton, and West filed an appeal separate from the other Chancery Court Plaintiffs.

---

[2] Even the Defendants' expert testified that midazolam does not have pain-killing properties. Attachment 8, pp. 2148-54, Dr. Evans testimony. Because midazolam can't render a person insensate to the pain caused by vecuronium bromide or potassium chloride, Tennessee's drug supplier suggested Defendants "use … an alternative [drug]," such as a barbiturate, or include an opioid (a pain-killer) in the protocol. Attachment 9, Email from Drug Supplier, p. 1628.

{13}

70.     On appeal, the Tennessee Supreme Court did not disturb the Chancery Court's crediting of the expert testimony or the above-mentioned factual findings.

71.     The Tennessee Supreme Court's decision is based entirely upon its determination that plaintiffs failed to demonstrate the availability of pentobarbital. *Abdur'Rahman v. Parker*, No. M201801385SCRDOCV, 2018 WL 4858002 at *1 (Tenn. Oct. 8, 2018).

72.     On August 9, 2018, Defendants executed Billy Ray Irick using a three-drug midazolam-based protocol. The execution of Irick lasted twenty minutes. Attachment 10, Irick Execution Timeline.

73.     Witnesses to Irick's execution immediately reported reactions by Irick during the execution procedure which are consistent with pain and suffering. Attachment 11, News Articles. *See also* Attachment 12, Dr. Lubarsky Affidavit.

74.     On November 1, 2018, Defendants executed Edmund Zagorski using Tennessee's Electrocution Protocol.

75.     Under Tennessee law, Plaintiffs will be executed under Tennessee's July 5, 2018 three-drug midazolam-based lethal injection protocol.[3]

---

[3] This allegation is based on Plaintiffs' current knowledge. The State of Tennessee and Defendants have changed execution protocols in the midst of previous method-of-execution litigation. During the 2018 Chancery Court litigation that arose from the adoption of the January 8th, 2018 Protocol, for example, Plaintiffs learned in June 2018 of Defendants' decision in March 2018 to implement an unwritten protocol using compounded midazolam, vecuronium bromide and potassium chloride. The January 8th Protocol, on its face, only provided for the use of compounded pentobarbital under the Protocol A option. On July 5, 2018, Defendants again changed the protocol by removing the one-drug pentobarbital option (Protocol A), and by expressly providing for the use of three drugs: either manufactured or compounded midazolam, vecuronium bromide and potassium chloride.

**Count One:**
**Death by lethal injection as required by Tennessee's July 5, 2018**
**Protocol violates the *Ex Post Facto* Clause of the**
**United States Constitution, Article I §10.**

76.     Execution by lethal injection as required under the July 5th Protocol constitutes more prolonged and/or severe pain and suffering than execution by electrocution, the punishment to be inflicted upon Plaintiffs at the time of the crimes.

77.     The Chancery Court's factual findings and credibility determinations establish that the midazolam-based three-drug lethal injection protocol produces severe pain before resulting in death after an average of 14 minutes and for as long as 18 minutes. Attachment 7, pp. 25-26.

78.     Billy Ray Irick was executed using the July 5th Protocol and his execution lasted 20 minutes. Attachment 7, p. 2.

79.     Tennessee's Electrocution Protocol contemplates an execution lasting no longer than six minutes. Attachment 1, p.42.

80.     Execution under the July 5th Protocol increases the punishment to be inflicted upon Plaintiffs compared to punishment under Tennessee's Electrocution Protocol.

**I.      Punishment under Tennessee's midazolam-based three-drug protocol.**

81.     The observations of witnesses to the only execution carried out under Tennessee's July 5th Protocol, the execution of Billy Ray Irick, are consistent with the expert and lay witness testimony found credible by the Chancery Court.

{15}

82.     An inconsistency between the facts presented and found by the Chancery Court and the implementation of Tennessee's midazolam-based three-drug protocol is the length of Irick's execution, which exceeded the length of time considered by the state court.

83.     Under the July 5th Protocol, the first injection is of 100 ml of a 5mg/ml solution (a total of 500 mg) of midazolam. Attachment 4, pp. 39, 44-45, 66.

84.     Midazolam can induce sedation, i.e., deep sleep. Midazolam has no pain-killing properties. Unless a pain-killing drug is also administered, a noxious (or painful) stimulus will rouse persons sedated with midazolam. Attachment 13, pp. 1780-81, Dr. Lubarsky Testimony.

85.     Midazolam is acidic and damages lung tissue. After one circulation of midazolam, fluid begins to accumulate in the inmate's lungs making breathing more difficult. Attachment 14, Dr. Edgar Testimony.

86.     After midazolam was administered to Billy Ray Irick, Attachment 10, p. 4, witnesses to the execution observed his stomach pulsated up and down, his breathing become labored, he was gulping and puffing, and he emitted a snore-like sound. Attachment 11.

87.     If the July 5th Protocol is carried out in the same manner as the Irick execution, five minutes after the injection of midazolam begins, Defendant Mays will approach the inmate, brush his eyelashes, loudly call his name two times, and shake his shoulder. Attachment 10, p.4 (indicating the time the so-called "consciousness check" or "assessment of consciousness" was conducted). This

{16}

practice is a deviation from the written protocol which requires a trapezius squeeze, not a shake of the inmate's shoulder. Attachment 4, p. 66.

88.    After conducting the "assessment of consciousness," Defendant Mays will order the administration of the second drug: 100 ml of a 1 mg/ml solution (a total of 100 mg) of vecuronium bromide. Attachment 4, pp. 39, 44-45, 66. Vecuronium bromide is a paralytic.

89.    Throughout the preceding five minutes, fluid continues to accumulate in the inmate's lungs, causing labored breathing. Plaintiffs will feel their lungs filling with fluid.

90.    Before the vecuronium bromide fully paralyzes the inmate, there is a substantial risk that enough fluid will accumulate in the lungs so that the inmate will attempt to expel it by coughing and hacking.

91.    Before the vecuronium bromide fully paralyzes the inmate, there is a substantial risk he will react to the pain and terror caused by the vecuronium bromide. Experts credited by the Chancery Court described the experience like being buried alive. Attachment 14, pp. 1394-95.

92.    After (but not in response to) the Warden's "consciousness check," Billy Ray Irick's body jolted, he gasped for air, he hacked and coughed, his face turned deep purple and he moved his head. Attachment 11.

93.    Under the July 5th Protocol, after the vecuronium bromide paralyzes the inmate, he will become motionless.

94.    The administration of vecuronium bromide to Irick began six minutes into the execution and took three minutes to complete. Attachment 10, pp. 2, 4.

95.    After the time that vecuronium bromide was administered to Irick, witnesses observed that eventually he became motionless. Attachment 10, p.4.

96.    Under the protocol, though motionless, there is a substantial risk that the inmate is sensate and aware. Inmates will be aware and experience terror from the onset of involuntary paralysis and the ongoing suffocation caused by the use of vecuronium bromide until their deaths.

97.    The third drug administration under the protocol is 120 ml of a 2 mEq/ml solution (a total of 240 mEq) of potassium chloride. The purpose of potassium chloride is to induce cardiac arrest and permanently stop the inmate's heart.

98.    Experts credited by the Chancery Court testified that a rapid intravenous administration of a large dose of potassium chloride causes excruciating pain, described as "liquid fire" and "being burned alive from the inside." Attachment 13, pp. 1776-77.

99.    It took three minutes to complete the administration of potassium chloride during Irick's execution. Attachment 10, p.4.

100.    Under the protocol, there is a substantial risk that the inmate is sensate and aware of the severe pain caused by potassium chloride as it passes through his circulatory system and ignites nerve cells throughout the body.

{18}

101.    During the execution of Billy Ray Irick, eight minutes elapsed after the administration of potassium chloride and until he was pronounced dead. Attachment 10, pp. 2, 4.

102.    The Chancery Court found that inmates may be aware of the pain caused by the second and third drugs in Tennessee's midazolam-based three-drug protocol. Attachment 7, pp. 23, 28.

103.    The Chancery Court found that the average time of midazolam-based lethal injections conducted in other states was about 14 minutes, and the longest execution was 18 minutes. Attachment 7, pp. 25-26.

104.    The execution of Billy Ray Irick lasted 20 minutes. Attachment 10.

105.    Allegations pled under Count III are specifically incorporated in this Count.

## II.    Punishment under Tennessee's electrocution protocol.

106.    The punishment for Plaintiffs under Tennessee law at the time of the crimes—electrocution—involves a significantly shorter duration of pain and suffering than lethal injection under the July 5, 2018 Protocol.

107.    When the electrocution protocol is properly administered, the electrical console will deliver 1,750 volts at 7 amps to the electric chair in a 20 second time cycle, disengage for 15 seconds, and re-engage for 15 seconds. Attachment 1, p.42.

108.    Defendants should be preliminarily and then permanently enjoined from carrying out Plaintiff's execution under a midazolam-based, three-drug protocol, the July 5th Protocol. (Attachment 4).

109.   The face of this complaint demonstrates a substantial likelihood of success on the merits and Defendants should be enjoined from executing Plaintiff David Miller on December 6, 2018 until he is afforded due process on the issues presented.

110.   Electrocution is sure or very likely to cause severe thermal burns of the body as well as blunt force injury.

111.   After a five-minute waiting period a physician will examine the inmate to determine whether he is dead. *Id.*

112.   Under the Electrocution Protocol, death is caused by thermal heating, i.e., cooking of vital organs and asphyxiation.

113.   The duration of pain and suffering created by electrocution is substantially less than the pain and suffering created by the July 5th lethal injection protocol, therefore, the July 5th Protocol violates Art. 1 §10 of the United States Constitution.

114.   Allegations contained in Counts Two and Three are specifically incorporated in this Count.

<u>**Count Two:**</u>
**Tennessee's electrocution protocol constitutes**
**cruel and unusual punishment in violation of**
**the Eighth and Fourteenth Amendments.**

115.   Execution by electrocution violates the Eighth and Fourteenth Amendments because it creates a constitutionally-unacceptable risk of unnecessary and serious pain and suffering and mutilation.

{20}

**I.** **Feasible and readily implemented alternative methods of execution that significantly reduce the substantial risk of severe pain and suffering under Tennessee's electrocution protocol.**

116.   There exists one or more feasible and readily-available alternative methods of execution which substantially reduce the constitutionally-unacceptable risk of inflicting unnecessary and serious pain and mutilation created by the use of electrocution to carry out Plaintiffs' executions.

117.   Such alternatives include: (a) execution by means of a firing squad; (b) execution by means of the oral administration of midazolam, digoxin, morphine sulfate, and propranolol; (c) execution by means of the one-drug pentobarbital-based lethal injection protocol currently being carried out by the states of Texas, South Dakota and Georgia.

**A.**   **Firing squad**

118.   The Procedure for Military Executions, Army Regulations No. 633-15 (Apr. 7, 1959) (Attachment 15) provides a feasible and readily implemented alternative method of execution that significantly reduces the substantial risk of unnecessary pain and suffering posed by the July 5th Protocol.

119.   Upon information and belief, Defendants possess or have within their control, or could readily obtain, the firearms necessary to carry out an execution by firing squad as alleged in this Alternative.

120.   Upon information and belief, Defendants possess or have within their control, or could readily obtain, the ammunition necessary to carry out an execution by firing squad as alleged in this Alternative.

{21}

121.    Upon information and belief, Defendants employ or have within their control, or could readily obtain, the personnel necessary to carry out an execution by firing squad as alleged in this Alternative.

122.    Upon information and belief, Defendants employ or have within their control, or could readily obtain, persons who regularly train with firearms at the Big Buck Shooting Range located at Riverbend Maximum Security Institution.

123.    Upon information and belief, Defendants employ or have within their control, or could readily obtain, trained professional marksmen to carry out the execution.

124.    The use of trained and experienced professionals significantly reduces any error rate in firing-squad executions.

125.    The Procedures for Military Executions provide a back-up plan in case of human error or mistake—the "coup de grace." Attachment 15, § II, ¶ 12(c).

126.    Upon information and belief, this manner and method of execution is feasible and readily implemented under Tenn. Code Ann. § 40-23-114(d) because it constitutes "any constitutional method of execution."

127.    The Supreme Court has upheld the firing squad as a method of execution. *Wilkerson v. Utah*, 99 U.S. 130, 134-35 (1878).

128.    Upon information and belief, this manner and method of execution is feasible and readily implemented because the Big Buck Shooting Range is located on the grounds of Riverbend Maximum Institution and can easily accommodate

{22}

what little equipment is required for an execution by firing squad. *See* Attachment 15, § II, ¶ 12(c).

129. Upon information and belief, execution by this manner and method damages the heart and causes a near-immediate drop in blood pressure, including blood pressure in the brain. This will cause a loss of consciousness rapidly followed by death.

130. Execution by this manner and method would not permit Plaintiffs to experience any of the unnecessary and severe pain and suffering caused by pulmonary edema from the acidic midazolam injection, suffocation due to paralysis from vecuronium bromide, and the internal chemical burn caused by injection of potassium chloride that results from the July 5th Protocol.

131. Eliminating the substantial risk of unnecessary and severe pain and suffering posed by the July 5th Protocol, by definition, will significantly reduce the substantial risk of unnecessary and severe pain to which Plaintiffs are subjected by the current execution method.

132. The firing squad significantly reduces a substantial risk of unnecessary and severe pain when compared with the midazolam-based three-drug lethal injection protocol.

133. A study of executions from 1900 to 2010, for example, concluded that while 7.12% of the 1,054 lethal-injection executions and 1.92% of electrocution executions were "botched," none of the 34 firing-squad executions went awry. A. Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty*, 177

{23}

(2014). *See also Wood v. Ryan*, 759 F.3d 1076, 1103 (9th Cir. 2014) (the firing squad

is "foolproof"; lethal injection is "inherently flawed and ultimately doomed to

failure."); Attachment 16, p. 781, Deborah Denno Article (A "study of executions

from 1976 to 2001 failed to detect any botched firing squad executions, even though

other methods, including lethal injection, were consistently problematic.") (*citing*

Arif Khan & Robyn M. Leventhal, *Medical Aspects of Capital Punishment

Executions*, 47 J. Forensic Sci. 847, 849–50 (2002)). "Just as important, there is

some reason to think that [death by firing squad] is relatively quick and painless."

*Glossip*, 135 S. Ct. at 2796 (Sotomayor, J., dissenting). That contrasts sharply with

death by lethal injection, which, as shown throughout this Complaint, has caused a

number of prolonged and extraordinarily painful executions in recent years.

134.    Other states—Mississippi, Oklahoma, and Utah—include execution by

firing squad among their statutory manners of execution. *See* Miss. Code Ann. § 99-

19-51; Okla. Stat. Ann. tit. 22 § 1014; Utah Code Ann. § 77-18-5.5.

135.    Utah recently executed Ronnie Lee Gardner by firing squad. *Wilkerson

v. Utah*, 99 U.S. at 134-35. *See* Kirk Johnson, *Double Murderer Executed by Firing

Squad in Utah*, N.Y. Times, June 19, 2010, available at

https://www.nytimes.com/2010/06/19/us/19death.html.

136.    The firing squad is used around the world as a method of execution.

Approximately 28 countries conduct firing-squad executions.  *See* "Methods of

Execution," Cornell Center on the Death Penalty Worldwide (June 22, 2012),

*available at* goo.gl/uauqVF. Of the 58 countries retaining capital punishment, five

times as many use firing squads as use lethal injection. *See id.*; *see also* "Death Sentences and Executions: 2015," Amnesty Int'l Global Report, *available at* goo.gl/phBwa0.

137. For more than 400 years, the firing squad has been an available execution method in the United States. The first recorded firing squad execution took place in 1608, when the colony of Virginia executed George Kendall for conspiring with Spain. Attachment 16, p. 778. After the Supreme Court reinstated the death penalty in 1976 following a nine-year hiatus, *see Gregg v. Georgia*, 428 U.S. 153 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the first executed inmate died at the hands of a five-man firing squad just one year later. Kirk Johnson, *In Utah, Execution Evokes Eras Past*, N.Y. Times, June 16, 2010, *available at* goo.gl/p9D9k3. In all, firing squads have executed 144 American inmates. Attachment 16, p.778. Thus, the firing squad is clearly a known execution method.

138. Judges have noted the feasibility of the firing squad as an execution method. *See, e.g., Wood*, 759 F.3d at 1103 (Kozinski, C.J., dissenting from denial of rehearing en banc) (noting that "large-caliber rifle bullets fired at close range can inflict massive damage, causing instant death every time. There are people employed by the state who can pull the trigger and have the training to aim true. The weapons and ammunition are bought by the state in massive quantities for law enforcement purposes, so it would be impossible to interdict the supply.").

139. This manner and method of execution is feasible and readily implemented because the firing squad is a "constitutional method of execution." Tenn. Code Ann. § 40-23-114(d).

140. If required, the State "legislature could, tomorrow, enact a statute reinstating the firing squad as an alternative method of execution." *In re: Campbell*, 874 F.3d 454, 465 (6th Cir. 2017) (discussing Ohio's execution procedures). In the same way that Defendants obtained the lethal injection secrecy bill from the Tennessee General Assembly via ordinary effort, so too could Defendants obtain this alternative manner of execution.

141. In the event the Court finds Alternative A insufficient to satisfy the alternative-pleading requirement, then Plaintiffs offer the following alternative method of execution:

**B. Euthanasia Oral Cocktail**

**142. First method: oral administration of midazolam, digoxin, morphine sulfate, and propranolol in sweet liquid such as fruit juice.**

143. On July 3, 2018, the State of Ohio conceded the existence of another available method of execution: "Defendants admit that they possess, or have within their control, or could obtain with ordinary transactional effort, midazolam, digoxin, morphine sulfate, and propranolol... For oral administration." *In Re: Ohio Execution Protocol Litigation*, No. 2:11-cv-01016, R.1822 PageID#74251 (S.D. Ohio July 3, 2018).

144. **Second method: Defendants shall carry out Plaintiffs' execution using a lethal dose (no less than 9000 mg.) of secobarbital injected orally in four ounces of sweet liquid such as fruit juice.**

145. Either of these methods of execution are an available, feasible alternative as demonstrated by use as a method by States which have engaged in euthanasia under Death with Dignity laws.

146. Defendants must inject the lethal drugs orally and from bedside.

147. Defendants must inject the lethal drugs mixed with a sweet liquid such as fruit juice, because of a bitter taste that could initiate a gag reflex.

148. Execution by this method of lethal injection using a barbiturate or opiate will cause Plaintiffs' death while providing analgesic protection against Plaintiffs remaining sensate following oral injection.

149. Eliminating the substantial risk of severe pain posed by vecuronium bromide and potassium chloride, by definition, significantly reduces the substantial risk of severe pain caused by the July 5th Protocol.

150. Also as part of this Alternative, Defendants must employ a wedge-shaped cushion of sufficient height to prevent obstruction, like the one used by the State of Ohio, to prop Plaintiffs up at an angle during the execution.

151. Using that wedge-shaped cushion, by propping Plaintiffs up at an angle, will significantly reduce the sure or likely risk that Plaintiffs will obstruct after injection of the drugs by helping to ensure that the soft tissues in the back of the throat will not collapse into the airway when Plaintiffs lose muscle tension after

injection of the drugs. This prevents obstruction that will likely result from lying supine as currently required by Defendants' execution protocol.

152.    Using a wedge-shaped cushion is available and feasible, because Defendants possess or have within their control, or could obtain with ordinary effort, a wedge-shaped cushion similar to the one used by the State of Ohio.

153.    Accordingly, execution by this manner and method, when orally injected into an inmate who is propped up with a wedge cushion, does not permit him to experience any of the severe pain and suffering caused by obstruction, air hunger, suffocation by paralysis, or the injection and operation of potassium chloride, as posed by Defendants' currently selected three-drug method of lethal injection.

154.    Using oral injection is available and feasible because Defendants possess or have within their control, or could obtain with ordinary effort, the medical supplies necessary to inject the lethal drugs orally rather than through peripheral IV access.

155.    This Alternative will significantly reduce the substantial risk of severe pain to which Plaintiffs are subjected by the current execution method's requirement to carry out the injections via peripheral IV and Plaintiffs' unique characteristics alleged herein that increase the risk that Defendants will not be able to successful achieve and maintain peripheral IV access.

156.    Drugs used in this method are sold on the open market and are available for purchase by Defendants.

{28}

157. This manner and method of execution is an available, feasible alternative because Defendants possess or have within their control, or can obtain, a supply of drugs sufficient to carry out Plaintiffs' execution using this Alternative method of lethal injection.

158. This manner and method of execution is also available because it can be carried out under Tennessee law with ordinary effort within the Death Chamber inside RMSI.

159. In the event the Court finds Alternative B insufficient to satisfy the alternative-pleading requirement, then Plaintiffs offer the following alternative method of execution:

### C.  One-drug pentobarbital

**160.  Defendants shall use the one-drug, pentobarbital-only method, adopted by Defendants in 2013, and upheld as constitutional by the state courts. This method requires two five-gram doses of pentobarbital. Pentobarbital is lethal at a blood level of 10 – 169 ug/ml.**

**(i.)  A one-drug pentobarbital protocol significantly reduces the risk of harm posed by Tennessee's current lethal injection protocol.**

161. A one-drug pentobarbital method significantly reduces the substantial risk of pain caused by the July 5th Protocol (midazolam-based three-drug protocol) because it removes the pain-causing drugs (midazolam, vecuronium bromide and potassium chloride) from Tennessee's Execution Protocol.

162.    Plaintiffs allege that <u>eliminating</u> the substantial risk of severe pain posed by vecuronium bromide and potassium chloride, by definition, significantly reduces the substantial risk of severe pain caused by the July 5th Protocol.

**(ii.)    A one-drug pentobarbital protocol is available with ordinary good-faith effort.**

163.    Defendants retained a one-drug pentobarbital method as Protocol A in the January 2018 Execution Protocol.

164.    Defendants have claimed they are unable to obtain any pentobarbital to use for executions. But other states remain able to obtain pentobarbital or another barbiturate.

165.    This year, Texas has carried-out ten executions using a one-drug pentobarbital method. Attachment 17, Exhibit of Texas Executions; Attachment 18, 2018 Executions from Death Penalty Information Center.

166.    Georgia, also this year, carried-out two executions using a one-drug pentobarbital protocol. Attachment 18.

167.    Four days ago, on October 29, 2018, South Dakota executed Rodney Berget using a one-drug pentobarbital protocol. Attachment 18.

168.    Defendants delegated the search for pentobarbital to an employee of the Tennessee Department of Correction ("drug procurer").

169.    Defendants have no personal knowledge of the search or results of the search for pentobarbital that was conducted by the drug procurer.

{30}

170.    Defendants' knowledge regarding the search for pentobarbital and the results of the search for pentobarbital conducted by the drug procurer is based on what they have been told by another person(s).

171.    The drug procurer conducted a cursory and unnecessarily narrow search for pentobarbital.

172.    Upon information and belief, if the drug procurer conducted a good faith search, or searched with ordinary due diligence, Defendants would obtain a supply of pentobarbital for Mr. Miller's execution.

173.    In 2017, at least ten sources were willing to sell pentobarbital to the drug procurer. Attachment 19, Documents from the Drug Procurer, p.1477; Attachment 20, p. 1505, Handwritten Notes of the Drug Procurer (a source says "they sell us [TN] the compound").

174.    The drug procurer obtained information from one or more sources such as the cost of pentobarbital per execution, the availability of bulk pricing, the time pentobarbital will be available and a shipping date. Attachment 20, pp. 1503, 1506.

175.    Ten sources contacted by the drug procurer did not have 100 grams of pentobarbital, but a lesser amount was available. Attachment 19, p.1477.

176.    The drug procurer (and/or Defendants) declined to purchase an amount of pentobarbital that would be sufficient for Plaintiff Miller's execution. Attachment 20, pp. 1503, 1505, 1506.

177.    The drug procurer (and/or Defendants) sought instead to obtain enough pentobarbital for ten executions (100 grams). Attachment 19, pp.1493, 1496, 1497.

178.    Counsel for Defendants conceded before the Tennessee Supreme Court that Plaintiffs are not at fault for manufacturer-imposed distribution restrictions on pentobarbital. In other words, Plaintiffs have not hindered Defendants' acquisition of execution drugs. *Abdur'Rahman*, No. M2018-01385-SC-RDO-CV, oral argument (Tenn. Oct.3, 2018).

179.    Only twenty sources contacted by the drug procurer were "unwilling to supply Pentobarbital if it was to be used in lethal injection." Attachment 19, p.1477.

180.    Midazolam, vecuronium bromide, and potassium chloride are each subject to the same manufacturer-imposed restrictions as pentobarbital. Attachment 21, Parker Testimony (excerpt), pp.1309-10; Attachment 22, Parker Deposition (excerpt), pp.203-04, 245.

181.    Defendants have obtained drugs that are subject to manufacturer-imposed restrictions. Attachment 19, p.1310; Attachment 23, Inglis Testimony (excerpt), pp.1640-41.

182.    Defendants obtained quantities of midazolam on October 26, 2017, November 1, 2017, November 27, 2017, December 14, 2017 and December 28, 2017. Attachment 24, Invoices for Lethal Injection Drugs.

183.    Defendants obtained quantities of vecuronium bromide on October 26, 2017, November 1, 2017, November 27, 2017, December 14, 2017 and December 28,

2017. Defendants obtained these quantities after Defendants' Direct Source represented that vecuronium bromide was not available. Attachment 24; Attachment 25, Emails from the Drug Procurer.

184. Defendants obtained quantities of potassium chloride on October 26, 2017 and December 28, 2017. Attachment 24.

185. Defendants ignored a manufacturer's request to return midazolam obtained in violation of distribution controls, and Defendants kept the midazolam. Attachment 21, p.1309-10; Attachment 22, p. 243.

186. Pentobarbital is manufactured in the United States for human and animal use. Attachment 5, ¶19.

187. The drug procurer learned how to obtain pentobarbital through a veterinarian. Attachment 19, pp.1489-90.

188. The drug procurer has actual knowledge that pentobarbital (Nembutal) is widely available in the United States and Europe. Attachment 20, pp. 1513-14.

189. Pentobarbital is available in Mexico. Attachment 5, ¶19.

190. Pentobarbital is popular in the assisted suicide movement and can be purchased on line in powder, injectable and pill form. Attachment 5, ¶19.

191. For example, one online seller in the United States will supply 20 grams of pentobarbital powder for $500. Attachment 5, ¶20.

192. Plaintiffs have been denied access to the drug procurer.

{33}

193.     TDOC General Counsel concedes that certain companies specialize in supplying pharmaceuticals to departments of correction. Attachment 26, Inglis Deposition (excerpt), p.169.

194.     For example, one company—Clinical Solutions Pharmacy—is located in Franklin, Tennessee. http://clinicalsolutionspharmacy.com/. Another company, IHS Pharmacy, is located in Alabama and conducts business with correctional facilities in Tennessee. http://ihspharmacy.com/.

195.     Companies which specialize in supplying pharmaceuticals to departments of correction are sources of midazolam. Attachment 5, ¶23.

196.     Defendants have actual knowledge that the identity of any person or entity supplying drugs used for execution in Tennessee is confidential under state law.

197.     A Food and Drug Administration qualified outsourcing facility that produces high-risk compounded sterile drug products is not required to have an individual patient prescription but must adhere to federal GMP guidelines.

198.     Pentobarbital can be obtained through a prescription from a physician licensed to prescribe schedule 2 drugs. Attachment 5, ¶17.

199.     Defendants have a physician willing to write a prescription for execution drugs. Attachment 26, Debbie Inglis Deposition (excerpt), p. 138.

200.     A prescription for pentobarbital can be filled by any pharmacy with a DEA license to do so. If a pharmacy does not have pentobarbital in stock it could take 1-2 days to obtain it. Attachment 5, ¶17.

{34}

201.    Defendants have a pharmacy and pharmacist in their employment. Attachment 21, p.1314.

202.    When a prescription for drugs is submitted to a pharmacy it is not common for a pharmacy to inquire about its use. Attachment 5, ¶18.

203.    Pentobarbital is commonly used to treat seizure disorders and for use in an anesthetic cocktail. Attachment 5, ¶16.

204.    A supplier of an Active Pharmaceutical Ingredient (API) for a drug does not normally inquire about the purpose for the drug being compounded. Attachment 5, ¶18.

205.    Defendants have two valid contracts requiring two different drug sources to provide drugs for executions. Attachment 27, Contracts with Compounding Pharmacies.

206.    A corrections officer with the Missouri Department of Corrections purchased pentobarbital with cash and drove it across state lines for use in lethal injection executions. Attachment 5, ¶21.

207.    A Texas public records requires revealed the name of a compounding pharmacy that sold pentobarbital sodium for lethal injection executions. Attachment 5, ¶22.

208.    Defendants have not conducted an ordinary, diligent search for pentobarbital (Nembutal).

**209.** Upon information and belief, Defendants possess or have within their control, or can obtain, the pentobarbital to carry out executions under this Alternative.

**(iii.) Provisions of a one-drug protocol.**

**210.** Plaintiffs also allege as part of this Alternative, **that Defendants must employ a wedge-shaped cushion of sufficient height to prevent obstruction, like the one used in Ohio, to prop Plaintiffs up at an angle during the execution.**

211. Plaintiffs allege that the use of a wedge-shaped cushion to prop him up at an angle will significantly reduce the substantial risk of obstruction. If Plaintiffs are supine on the gurney there is a substantial risk that the soft tissues in the back of the throat will collapse into the airway when they lose muscle tension after injection of the drugs.

212. Plaintiffs allege that using a wedge-shaped cushion is an available and feasible alternative to obstruction and air hunger, because Defendants possess or have within their control, or could obtain with ordinary effort, a wedge-shaped cushion.

213. Plaintiffs allege that death caused by a lethal dose of pentobarbital when they are propped up with a wedge cushion will not involve any of the unnecessarily severe pain and suffering caused by obstruction and air hunger. In other words, using a wedge-shaped cushion for Plaintiffs' executions will significantly reduce a substantial risk of serious and unnecessary pain.

{36}

214.     Plaintiffs also assert as part of this Alternative, that **Defendants must inject the lethal drug bedside rather than from the Lethal Injection Executioner's Room through several feet of IV tubing filled with saline solution.**

215.     Bedside injection will protect Plaintiffs against receiving diluted execution drug(s), thereby ensuring the proper concentration and potency and the most rapid arm-brain circulation of the drug. Any reduction in time of death is a significant reduction of the substantial risk of a lingering death under the one-drug pentobarbital protocol.

216.     Bedside injection will aid in the detection of, and will significantly reduce the substantial risk of, pain from infiltration or a dislodged catheter caused by the bolus doses of drugs required under the one-drug pentobarbital protocol.

217.     This portion of this Alternative is feasible and readily implemented because Defendants already establish IV access on inmates in the Execution Chamber at bedside. Inserting and injecting a syringe of execution drug directly into a port in the IV catheter is no more difficult—indeed, is easier—than inserting and injecting a syringe of execution drug into a port connected to lengthy IV tubing. Some Defendants are already in the Execution Chamber at certain stages of the protocol even while the curtain to the witness room remains open. Any anonymous execution team members can disguise themselves in surgical garb, including masks, to resolve any concerns about identification.

218.    Also as part of this Alternative, and **in the event Defendants use compounded pentobarbital, Defendants must meet all of the following requirements**, otherwise said compounded drugs shall not be used:

219.    Defendants must use only those compounded execution drugs that are chemically and biologically identical to FDA-approved versions of said drugs as currently or formerly sold in the United States (*e.g.*, Nembutal).

220.    Defendants must use only those compounded execution drugs that are properly compounded in strict compliance with all requirements of USP <797>, and manufactured in strict compliance with all requirements of Current Good Manufacturing Practice Regulations ("CGMP") under the Food, Drug, and Cosmetic Act. Attachment 5, ¶¶ 8, 10.

221.    Defendants shall not use compounded execution drugs that are past their beyond-use date or that are otherwise adulterated. Attachment 5, ¶¶ 3, 4.

222.    For any compounded execution drugs that are to be used in Plaintiffs' execution, Defendants and/or the "Direct Source" must provide to Plaintiffs, at least 30 days in advance of the execution date:

a.    written, sworn verification of full compliance with all relevant manufacturing (CGMPs) or compounding (USP <797>) standards and requirements in the production of said execution drugs (including all requirements for matters such as sterile production, labeling, packing, shipping, storing, and using drug products as defined under the applicable set of standards), with such verification performed by a reputable, disclosed (to Plaintiffs' counsel), independent third party,

{38}

and such verification to include satisfactory assessment of all testing data and other

data generated in the manufacturing or compounding process under the relevant

standards;

b.      written, sworn verification of satisfaction of rigorous pre-execution

analytical testing of the execution drug at a reputable, disclosed (to Plaintiffs'

counsel), independent analytical testing laboratory to ensure the finished drug

product is in full compliance with USP <797> or CGMPs, as applicable; and

c.      written, sworn verification of having submitted to the federal FDA an

Investigational New Drug application for the use of the particular execution drug in

the form and dosage to be used against Plaintiffs, and/or provide Plaintiffs a

certified copy of that application.

223.    Defendants must additionally test the final product and its

components no more than two days before the scheduled execution, testing for

identity, contaminants, bacterial endotoxins, pyrogens, concentration, sterility,

proper pH level, potency, and purity. TDOC General Counsel testified about product

testing of drugs utilized in July 5th Protocol so this requirement should be easily

implemented.

224.    At least one other state, Ohio, requires testing of compounded

execution drugs for identity and potency.

225.    Defendants must provide that test data to counsel for Plaintiff

immediately upon receipt. TDOC General Counsel did not commit to this request

but testified she would consider it. Attachment 26, pp.138-39.

226.    If the data generated by that analytical testing is outside the level acceptable under the applicable USP Monograph and any other authoritative source of standards for the drug, Defendants shall not proceed with the scheduled execution of Plaintiff for at least 60 days.

227.    Each of these portions of this Alternative would significantly reduce the substantial risk of severe pain to which Plaintiff is subjected by the use of compounded pentobarbital, by ensuring that the drug used to execute Plaintiff meets the same rigorous standards applicable to all drugs to be administered to individuals in the United States.

228.    Each of these portions of this Alternative merely require that Defendants ensure that the controlling statutes, rules, regulations, and standards are followed even behind the curtain of secrecy that Defendants have obtained regarding the execution drugs, thereby protecting Plaintiffs against the pain, suffering, and lingering death that would be caused by using improperly compounded pentobarbital. Defendants' contract with a compounding pharmacy purports to require the same. Attachment 4, pp.99-104.

229.    Additionally, these portions of this Alternative are available with ordinary effort. They simply require that Defendants produce sworn documentation to confirm that all applicable statutes, rules, regulations, and standards are being followed in regards to the execution drugs. Any Tennessee-licensed pharmacy that is compounding execution drugs is already required by Tennessee law to follow the requirements in USP <797>, and those requirements include the testing processes

{40}

in production, the production of reports and other documentation, rigorous attention to quality control measures, and other such matters outlined above. If Defendants' drug source who is compounding follows the law, then it should be a simple matter for Defendants to produce to Plaintiff such sworn verification.

230. Upon information and belief, Defendants' drug source is located outside the state of Tennessee. Plaintiffs allege that the law of the State where the drug source is located also requires compliance with USP <797>. If Defendants' drug source who is compounding follows the law, then it should be a simple matter for Defendants to produce to Plaintiff such sworn verification.

231. The law governing IND Applications contains no exception for the use of drugs in an execution; regardless of whether such an application would be granted, Defendants can submit the IND Application with ordinary effort in the same way that myriad others submit such Applications, and producing verification of submitting that Application is available through ordinary effort as well.

232. Also as part of this Alternative, and **in the event Defendants use compounded pentobarbital, Defendants must meet all of the following compliance requirements**, otherwise said compounded drugs shall not be used:

a. Defendants must not use execution drugs obtained from a drug source who is non-compliant with the full scope of the alternative methods and procedures proffered here, and Defendants must present to Plaintiff in advance of execution, written, sworn verification of full compliance with all such alternative methods and procedures.

{41}

b.      Defendants must not use execution drugs obtained from a drug source who has been found to be non-compliant with USP <797> standards during any state inspection in the last five years.

c.      Defendants must identify the Direct Source to Plaintiffs' counsel in advance of execution so that counsel can ensure the relevant Direct Source has not been so found. Alternatively, if Plaintiffs are denied identification information for whatever reason, Defendants must present to Plaintiffs' counsel in advance of execution written, sworn verification that the Direct Source in question has not been found to not be in compliance with USP <797> standards during any state inspection in the last five years.

d.      Defendants must not use execution drugs obtained from a drug source who the FDA has found in the last five years to be non-compliant with CGMP standards. Defendants must identify the Direct Source to Plaintiffs' counsel in advance of execution so that counsel can ensure the relevant Direct Source has not been so found. Alternatively, Defendants must present to Plaintiffs' counsel in advance of execution written, sworn verification that the Direct Source has not violated CGMP standards during any FDA or state inspection in the last five years.[4]

_____

[4] Even if compounding pharmacies do actually follow USP-NF General Chapter 797 standards, those standards are less stringent, and produce less reliable drugs, than the FDA Good Manufacturing Practices. Jennifer Gudeman et al., *Potential Risks of Pharmacy Compounding*, Drugs in R&D vol. 13, iss. 1, at 4 (Mar. 23, 2013) (comparing the failure rate of <2% for 3,000 FDA-approved commercial products tested from 1996 to 2001 to the failure rates ranging from 11% to 34% for compounded drugs randomly tested by the FDA, Missouri, and Texas). Drugs compounded in accordance with USP-NF General Chapter 797 have a low standard of sterility assurance compared to the FDA standard. *Id.* ("USP <797> does not afford the same

{42}

233.    The parts of this Alternative alleged in the preceding sub-paragraphs will significantly reduce the substantial risk of severe pain caused by compounded drugs. These alternatives ensure that the compounded drugs used to execute Plaintiffs meet the same rigorous standards applicable to all drugs administered to individuals in the United States.

234.    Compliance with such standards significantly reduces the substantial risk of serious pain caused by compounded drugs which: are not true in identity, concentration, potency and purity; contain contaminants, bacterial endotoxins and/or pyrogens; are not sterile; and/or have an improper pH level.

235.    Each of these portions of this Alternative merely require that Defendants ensure that the controlling statutes, rules, regulations, and standards are followed even behind the curtain of secrecy that Defendants have obtained regarding the execution drugs, thereby protecting Plaintiffs against the pain and suffering that would be caused by using improperly compounded.[5]

236.    These compliance requirements are readily available because they simply require Defendants to obtain verification of their drug source's compliance with applicable safety rules and standards. It also simply requires that execution drugs WILL NOT be used if they are produced by a drug source who has been found wanting in that regard.

_____

degree of sterility assurance for compounded drugs that GMPs provide for FDA-approved sterile products").

[5] In its order of June 26, 2018, the Court posed questions to Defendants about the Direct Source that are similar in substance to Plaintiffs" suggested alternative.

237.    Plaintiffs are informed and believe that Defendants obtained drugs for Billy Ray Irick's August 2018 execution from a drug source that does not have the facilities required to compound high-risk sterile injectables. Attachment 29, Redacted Pharmacy Website Information.

238.    Plaintiffs are informed and belief that Defendants obtained drugs for Irick's August 2018 execution from a drug source that has been disciplined by a State Board of Pharmacy. Attachment 30, Redacted Pharmacist and Pharmacy Discipline Records.

239.    Disciplinary actions against a pharmacy or pharmacist are cause for concern regarding the quality, sterility and stability of a compounded sterile drug product. Attachment 5, ¶11.

240.    As part of this Alternative, Defendants shall not obtain drugs from the drug source utilized for Irick's August 2018 execution.

## II.    Tennessee's electrocution protocol poses a substantial risk of unnecessary and severe pain, suffering, and mutilation.

241.    Tennessee's electric chair is sure or very likely to inflict a gruesome and torturous death.

### A.    The background of Tennessee's electric chair.

242.    Fred A. Leuchter designed and manufactured the equipment Tennessee uses to execute prisoners by means of electrocution. Attachment 31, AP Article re: Tennessee Electric Chair.

243.    Almost thirty years ago, Leuchter created and installed the electrocution equipment at RMSI.

{44}

244.    Leuchter does not have, and never had, an electrical engineering license from any state.[6]

245.    Leuchter's claimed expertise in scientific matters has been rejected by trained scientists in the fields in which he claims expertise.[7]

246.    On or around April 16, 1994, Michael S. Morse tested the electrocution equipment Leuchter created. Morse opined that Leuchter's equipment did not deliver an adequate current to carry out an execution and did not have the capacity to do so. Morse made fourteen specific recommendations for modifications to Leuchter's electrocution equipment.

247.    On or around April 25, 1994, Jay Weichert tested the electrocution equipment Leuchter created. Weichert opined that Leuchter's equipment did not function properly. Weichert made seven specific recommendations for modifications to Leuchter's electrocution equipment.

248.    Tennessee made some, but not all, of the suggested modifications.[8]

---

[6] The State of Massachusetts entered into a Consent Decree with him, whereby he agreed to cease and desist from making such claims.

[7] For example, Leuchter claimed that the absence of trace elements of lethal gas on bricks he stole from the World War II Auschwitz concentration camp constituted evidence that the Nazi's did not operate a gas chamber at the death camp. The scientific community has universally rejected his theory. Indeed, Massachusetts required that he stop distributing his Holocaust denial report, entitled "An Engineering Report on the Alleged Execution Gas Chambers at Auschwitz, Birkenau, and Majdanek."

[8] After Morse and Weichert suggested modifications to Leuchter's electrocution equipment, they examined Florida's electric chair. Weichert concluded that Florida's electrocution equipment "looks excellent." In a subsequent Florida electrocution, however, the condemned prisoner survived after the executioner shut off the chair's power, taking ten deep breaths before dying. Before a medical doctor declared the prisoner dead, blood poured out from under the sheath covering the prisoner's face,

249.    Modifications included: (a) the equipment was modified from 4.5 amps

to 8 amps, with a 15-amp capability, and (b) the timing cycle was adjusted from

originally energizing for two periods of 1 minute each with a pause of 10 or 15

seconds between to 45 seconds on, 15 seconds off, and then 45 seconds on.

Attachment 33, Electric Chair Modification Letters, pp.3-4.

250.    The company that had acquired rights to Leuchter's technology, JVM

Custom Machinery Group, notified Tennessee that those modifications were

"improper and unsound[:]"

> … These modifications may result in 'tissue cooking' of the executee and
> further, fibrillation of the executees heart resulting in failure to execute
> and a brain dead vegetable at the conclusion of the execution procedure.
>
> Please be advised the Wiechert modifications void the Leuchter
> guarantee JVM has assumed. In addition it places the State of
> Tennessee at risk in terms of failing to properly execute. in the event of
> the use of said system [sic]. We bear no legal liability in this matter
> expcept to advise you of these conditions and the possibility of torture of
> the inmate if an execution is carried out with the modified equipment.

Attachment 33, pp.1-2.

251.    Apparently other modifications were subsequently made to

Tennessee's electric chair and, in 2007, the voltage of the chair was reduced from

2,640 to 1,750 and the amperage was raised from 5 to 7. Attachment 31.

252.    On September 12, 2007, Daryl Holton was electrocuted in Tennessee's

electric chair.

---

and blood on the prisoner's chest spread to the size of a dinner plate, oozing through
the buckle holes on the chest straps that harnessed him to the electric chair.
Attachment 32, Allen Lee Davis Execution Photos.

253.   On October 8, 2018, Edmund Zagorski elected execution by electrocution for his execution scheduled for October 11, 2018.

254.   Defendants had conducted a training under Tennessee's Electrocution Protocol on September 27, 2018 and they tested the electric chair on October 10, 2018.

255.   Had Defendants been capable of performing an execution in the electric chair on October 11th, Mr. Zagorski would have been dead on that date.

256.   Defendants did not execute Mr. Zagorski on October 11th. Instead, the Governor issued a ten-day reprieve for the stated purpose that Tennessee needed time to be prepared to use the electric chair.

257.   Defendants use a Test Load Box when they test the electrocution equipment.

258.   The purpose of the Test Load Box is to simulate a prisoner's body.

259.   Defendants place the Test Load Box in the Electric Chair's perforated seat and connect it to the power cable for the head electrode and the leg electrodes.

260.   After connecting the Test Load Box to the power cable for the head electrode and the leg electrodes, Defendants activate the Electric Chair and check to see if the transformer meter reads 1,750 volts and the amperage meter reads 7 amps.

261.   Ohm's Law establishes that for the electrocution equipment to maintain a circuit that delivers a current of 1,750 volts at 7 amps, the circuit must provide 250 ohms of resistance. (1,750 (volts)/7 (amps)= 250 (ohms)).

{47}

262. Defendants' testing procedure establishes only that when the Test Load Box is used to complete the circuit containing the Electric Chair, the Test Load Box provides resistance that creates a total circuit resistance of 250 ohms.

263. Defendants' testing procedure fails to establish that the electrocution equipment will maintain during the electrocution of a human being a circuit that delivers a current of 1,750 volts at 7 amps to the prisoner because:

a. For testing purposes, Defendants attach a tester lead from the Test Load Box directly to the power cable for the head electrode. During an execution, however, Defendants: (a) attach the power cable for the head electrode to the head piece; (b) put a sponge saturated with salt water on the prisoner's head; and, (c) attach the head piece to the prisoner's sponge-covered head. The interface between the head electrode/sponge and scalp of the prisoner's head presents a region of high electrical resistance unaccounted for in Defendants' testing procedure.

b. While the Test Load Box contains constant material and thereby reliably provides a constant resistance that creates a total circuit resistance of 250 ohms, the electrical resistance of human bodies varies widely. Factors affecting an individual's resistance to an electrical current include, but are not limited to: (1) the presence or absence of fatty tissue beneath his skin; (2) the distribution and activity of sweat glands; (3) the amount of oil in and on his skin; (4) the thickness of his skin; (5) the amount of hair on his body; (6) the thickness of his skull; (7) the location and size of any cranial skull fissures; and, (8) regional blood flow at the time of electrocution.

{48}

c. As a consequence of these factors, a prisoner's body may create a circuit resistance significantly higher or lower than the 250-ohm circuit resistance the Test Load Box creates and thereby significantly alter the voltage and/or current that Defendants apply to him.

d. Defendants make no effort to investigate the resistance individual prisoners present to electrical current.

264.    While conditions remain constant within the Test Load Box throughout the testing procedure, during an electrocution execution the resistance of the prisoner's body changes dramatically as his skin heats, perforates, vaporizes, burns, and chars and the saline solution in the sponges between the prisoner's body and the electrodes heats and vaporizes.

265.    Defendants' testing procedure fails to ensure that the electrocution equipment will minimize the pain it inflicts on a prisoner because:

a. Individual prisoners have different thresholds for the sensation of electrical current.

b. Individual prisoners have different thresholds for the perception of pain.

c. Individual prisoners experience different physiological effects to electrical current.

d. Individual prisoners will experience significant differences in the amount of electrical current required, and the amount of time for application of that current, to cause unconsciousness.

**B.     How Tennessee's Electrocution Protocol Operates.**

266.     On November 1, 2018, the State of Tennessee executed Edmond Zagorski by electrocution. Zagorski was strapped tightly to the electric chair. Restraints crisscrossed his torso, with a strap across his lap and each wrist. His feet did not reach the floor. Prison staff placed a very large wet sponge and a head piece on top of Mr. Zagorski's head. He grimaced each time saline solution ran down his face. Then his face and neck were completely covered with a large black shroud. As electricity was applied, Mr. Zagorski stiffened, his elbows raised off the arms of the chair, and he clenched his hands into fists. His arms turned red. His body made a sharp jolt upwards, lifting off the seat and thrusting up against the restraints. When the electricity stopped he slumped down. His hands remained clenched except for his pinkie fingers which appeared dislocated or broken. His stomach rose and fell during the pause. With the second application of electricity, Mr. Zagorski's body thrust upward as he rose even higher. Although restrained, he appeared to be standing up extremely straight with every muscle in his body tensed.

267.     Defendants maintain the electrocution equipment in an Execution Chamber and Executioner's Room located within the RMSI.

268.     The Execution Chamber contains the Electric Chair.

269.     The component parts of the Electric Chair include: (a) a head piece (a leather cranial cap lined with copper mesh inside - hereafter sometimes referred to as the head electrode); (b) two leg electrodes; (c) a junction box located behind a back leg of the Electric Chair; (d) a cable that runs from the junction box to the head

{50}

electrode; (e) two cables that run from the junction box to the leg electrodes; and, (f) a removable drip pan underneath a perforated seat.

270. The Executioner's Room adjoins the Execution Chamber. It contains: (a) an electrical console (the unit the executioner manipulates to carry out an electrocution); (b) a transformer (the device that transfers electricity to and from the Electric Chair); (c) an amp meter (a device that measures the number of amps in an electrical current); and, (d) a switch for activating an exhaust fan above the Electric Chair.

271. In preparing to activate the Electric Chair, Defendants connect a low voltage cable from the electrical console to the transformer and a high voltage cable from the transformer to the Electric Chair's junction box.

272. When activated, the transformer and the Electric Chair create an open alternating current electrical circuit. Any object that creates a connection between the head electrode and the leg electrodes closes, and becomes part of, the electrical circuit.

273. When the Electric Chair is activated and operates as intended, the transformer sends electrical current through the head electrode/sponge and onto the prisoner's head. The current exits the prisoner's body at the leg electrodes and travels back to the transformer, completing a circuit. The current alternates between traveling this direction and the opposite direction sixty times per second (60 HZ).

274.    The Tennessee Protocol for Execution Procedures for Electrocution provides that Defendants' electrocution equipment is designed to deliver to a prisoner for twenty seconds an alternating current of 1,750 volts at 7 amps, followed by a pause of fifteen seconds, followed by a fifteen second alternating current of 1,750 volts at 7 amps.

275.    Under Tennessee's Electrocution Protocol, the initial twenty-second application of electrical current will not provide a time long enough for a prisoner to die from asphyxiation because electrical current applied during an electrocution execution will not necessarily stop the prisoner's heart and the skeletal muscles the prisoner requires for respiration will relax when the current stops and air will flow into the prisoner's lungs.

276.    During the fifteen-second interval that follows, a prisoner's heart can circulate the newly oxygenated blood to the brain and the rest of the prisoner's body, keeping him alive, conscious, and sensate for the second application of electrical current.

277.    Because Tennessee uses an alternating electrical current for electrocution executions, the prisoner's extreme pain and suffering will repeat sixty times per second as the current alternates the direction it follows.

278.    The prisoner's perception of time during the electrocution process can become distorted so that he may perceive each of the sixty per second alternating cycles of electrical current and electrical trauma lasting dramatically longer than it would appear to a bystander.

279.    Because contact with high voltage electrical current causes muscle tetany, and because face is hidden behind a shroud a prisoner is harnessed tightly into the Electric Chair, during an electrocution execution a prisoner is unable to signal that he is experiencing pain and suffering.

280.    Because prisoners can remain alive at the conclusion of an electrocution execution, the Defendants' protocol provides that a medical doctor wait five minutes after the executioner shuts off power to the Electric Chair before the doctor examines a prisoner's body for signs of life. During this five-minute period, prisoners who survive the electrocution process die from thermal heating, i.e., cooking, of their vital organs, and asphyxiation.

281.    The original designer of Tennessee's electric chair, Fred Leuchter, is concerned that the chair will fail because of changes other made to it.

> "What I'm worried about now is Tennessee's got an electric chair that's going to hurt someone or cause problems. And it's got my name on it," Leuchter said. "I don't think it's going to be humane."

Attachment 31.

## C.    Tennessee's Electrocution Protocol inflicts cruel and unusual punishment.

282.    There is little debate that electrocution is a barbaric method of execution.

283.    Dr. John P. Wikswo, Jr., holds a Ph.D. in Physics from Stanford University and is the Founding Director of the Vanderbilt Institute for Integrative Biosystems Research and Education. He has researched judicial electrocution

{53}

protocols and electrocution equipment since 1992. Attachment 34, Dr. Wikswo Reports, PageID# 93-95.

284.   Dr. Wikswo states:

(1) prisoners can remain alive for some period of time during the electrocution for various reasons: the heart may not stop immediately when the current contacts the body; if the heart does stop, it may start again when the current ceases; this fibrillation over time during the electrocution will gradually reduce cardiac output until it is insufficient to maintain life; the electrical current causes the skeletal muscles required for breathing to tetanize (i.e., contract or spasm), such that the prisoner dies of asphyxiation; and/or organ damage as a result of thermal heating (i.e., cooking) produces death gradually;

(2) prisoners may remain conscious and sensate for some period of time during the electrocution: the skull somewhat protects the brain by providing greater resistance than the skin, so that the current will primarily travel down the perimeter of the head, down the torso and legs, until it leaves through the leg electrodes;

(3) because prisoners can remain alive, conscious, and sensate during at least a portion of the duration of a judicial electrocution event, for numerous reasons they can experience excruciating pain and suffering during the event: the high-voltage electrical current produces severe burns; the current thermally heats (i.e., cooks) the body and internal organs; the current directly excites most if not all nerves along its path; the current excites some brain neurons causing extreme pain as well

{54}

as sensations of sound, light, dread, and fear; the current tetanizes all muscles simultaneously; the tetanized breathing muscles cause the sensation of suffocating; time perception may be altered such that the prisoner experiences each cycle of current and/or perceives the electrical trauma as lasting dramatically longer than it would appear to a bystander;

(4) because contact with high voltage electrical current causes muscles to malfunction and because Tennessee inmates are harnessed tightly onto the electrocution equipment, a prisoner is unable to signal that he is experiencing pain and suffering during an electrocution execution;

(5) because of the unpredictability and variability of each prisoner's electrical resistance and that of the connections to his body during an electrocution execution, the current delivered to each prisoner will vary significantly from the currents delivered to other prisoners, such that the time an individual prisoner will remain alive, conscious, and sensate are unknown and will vary substantially from prisoner to prisoner;

(6) because prisoners can remain alive at the end of an electrocution execution and the medical doctor waits five minutes before examining the body for signs of life, an inmate who survives the electrocution process will die from thermal heating (cooking of their vital organs) and asphyxiation during this time.

285. Regarding Tennessee's use of Leuchter's electric chair, Dr. Wikswo reviewed various records and documents, including an autopsy of Daryl Holton, who Tennessee executed by electrocution in 2007, color photographs of Mr. Holton's body

and other items associated with his execution, and newspaper accounts of Mr. Holton's execution. Dr. Wickswo's expert opinion is that Tennessee's electric chair will cause excruciating pain, the likelihood of lingering death, and disfigurement of the body attendant to death by electrocution.

286.    In particular, the initial 20 second application of electrical current will not provide a long enough time for a prisoner to die because (1) it will not necessarily stop the heart, and (2) when the current stops and the skeletal muscles needed for respiration relax air will flow into the prisoner's lungs. During the 15 second "disengage period," a prisoner's heart can circulate the newly oxygenated blood to the brain and the rest of the prisoner's body, keeping him alive, possibly conscious, and possibly sensate for the second application of electrical current.

287.    Under Tennessee's Electrocution Protocol Mr. Holton received severe thermal burns all over his body. He incurred blunt force injuries and abrasions to the scalp, forehead, chin, foot, upper arms, and calf, which are consistent with the witness reports of Mr. Holton jerking against the straps and electrodes after application of the electric current and the resulting muscle contraction and tetany. Attachment 35, Daryl Holton Photographs; Attachment 36, Daryl Holton Autopsy.

288.    Dr. Wikswo concludes: to a reasonable degree of scientific certainty that there is a substantial risk that a prisoner electrocuted using Tennessee's Electrocution Protocol and electrocution equipment will remain alive, conscious, and sensate for some period of time during the electrocution process and, as a result, will experience for some period of time the excruciating pain and suffering

associated with the phenomena that occur when a high voltage electrical current contacts a human being. Attachment 34, PageID# 98.

## III. Electrocution violates evolving standards of decency.

289.   In 2001, the Georgia Supreme Court declared electrocution a cruel and unusual punishment because of the attendant "specter of excruciating pain" and the "certainty of cooked brains and blistered bodies." *Dawson v. State*, 554 S.E.2d 137, 144 (Ga. 2001). The *Dawson* Court found:

> death by electrocution involves more than the "mere extinguishment of life," and inflicts purposeless physical violence and needless mutilation that makes no measurable contribution to accepted goals of punishment. Accordingly, we hold that death by electrocution, with its specter of excruciating pain and its certainty of cooked brains and blistered bodies, violates the prohibition against cruel and unusual punishment.

*Id.* at 143-44.

290.   In 2008 the Nebraska Supreme Court declared electrocution a cruel and unusual punishment, finding that it causes "intolerable pain." *State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008).

> ... Electrocution as a method of executing condemned prisoners is an extremely violent method of accomplishing death. It includes some burning, smoke, and involves extreme contortion of muscles and tissue of almost every part of a person's body. It includes no effort at all to anesthetize the person into unconsciousness before the mechanisms of death are employed.
>
> ... [T]here is no question that the Nebraska practice of executing condemned prisoners exclusively by electrocution is unique, outdated, and rejected by virtually all the rest of the world; including practices for the euthanasia of nonhuman animals. There is also no question that its continued use will result in unnecessary pain, suffering, and torture for some, but not all of [the] condemned murderers in this state. Which ones or how many will experience this gruesome form of death and suffer

unnecessarily; and which ones will pass with little conscious suffering cannot be known.

*Id.* at 272. The *Mata* Court concluded that:

> Besides presenting a substantial risk of unnecessary pain . . . electrocution is unnecessarily cruel in its purposeless infliction of physical violence and mutilation of the prisoner's body. Electrocution's proven history of burning and charring bodies is inconsistent with both the concepts of evolving standards of decency and the dignity of man. Other states have recognized that early assumptions about an instantaneous and painless death were simply incorrect and that there are more humane methods of carrying out the death penalty. Examined under modern scientific knowledge, "[electrocution] has proven itself to be a dinosaur more befitting of the laboratory of Baron Frankenstein than the death chamber" of state prisons.

*Id.* at 278 (citation omitted).

291.    Every State that has ever mandated electrocution as a method of carrying out judicial executions which can be conducted without the express consent of the condemned inmate have withdrawn that mandate.

292.    In 1974, electrocution was the sole method of execution in Alabama, Arkansas, Connecticut, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Nebraska, New Jersey, New York, Ohio, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, and Virginia.

293.    In 1977 Texas abandoned electrocution. Tex. Crim. Proc. Code Ann. §43.14.

294.    In 1982 New Jersey abandoned electrocution. N.J. Stat. Ann. § 2C:49-2.

295.    In 1983 Illinois abandoned electrocution. 725 Ill. Comp. Stat. 5/115-5.

296.    In 1983 Arkansas abandoned electrocution as an imposed method of execution. Ark. Code Ann.§ 5·4·617.

297.    In 1984 South Dakota abandoned electrocution. S.D. Codified Laws §23-A-27A-32.

298.    In 1990 Louisiana abandoned electrocution. La. Rev. State. Ann. §15:569.

299.    In 1993 Ohio abandoned electrocution as an imposed method of execution. Ohio Rev. Code Ann. § 2949.22.

300.    In 1994 New York abandoned electrocution. N.Y. Correct. Law§ 658.

301.    In 1994 Connecticut abandoned electrocution. Conn. Gen. Stat. § 54-100.

302.    In 1994 Virginia abandoned electrocution as an imposed method of execution. Va. Code Ann. §§ 53.1-233, 53.1-234.[9]

303.    In 1995 Indiana abandoned electrocution. Ind. Code Ann. § 35-38-6-1.

304.    In 1995 South Carolina abandoned electrocution as an imposed method of execution. S.C. Code Ann. § 24-3-530.[10]

305.    In 1998 Kentucky abandoned electrocution as an imposed method of

---

[9] "Electrocution is a violent, torturous and dehumanizing act. Carrying out executions should not require the state to stoop to the same level as the criminal. The objective is death, not violent torture." (Stmt. of Sen. Edgar Robb). Electrocution is "a violent, torturous and, yes, dehumanizing way of carrying out the mandate of the people." (Stmt. of Delegate Phillip Hamilton).

[10] "The technology that was available for us at the turn of the century in South Carolina was electricity. . . . It's kind of cruel and inhumane." (Stmt. of Rep. Harry Hallman).

Case 3:18-cv-01234   Document 1   Filed 11/02/18   Page 65 of 134 PageID #: 65

execution. Ky. Rev. Stat. Ann. § 431.220.

306.  In 1998 Pennsylvania abandoned electrocution. Pa. Stat. Ann. Tit. 61, § 3004.

307.  In 1998 Tennessee gave prisoners sentenced to death before January 1, 1999, the ability to avoid electrocution by choosing instead lethal injection, with the default execution method being electrocution if the prisoner refused to select an execution method. In 2000, Tennessee abandoned electrocution as the default execution method for prisoner's sentenced to death before January 1, 1999. Tenn. Code Ann.§ 40-23-114(a).[11] Tennessee, however, retains electrocution as an imposed method of execution under certain circumstances. Tenn. Code Ann. § 40-23-114(e).

308.  In 2000 Florida abandoned electrocution as an imposed method of execution. Fla. Stat. Ann.§§ 922.10 & 922.105.

309.  In 2000 Georgia abandoned electrocution as a method for executing future death sentences, but left electrocution in place as the method for prisoners sentenced to death before the new legislation took effect. Ga. Code Ann. § 17-10-38. In 2001, the Georgia Supreme Court declared electrocution a cruel and unusual punishment. *Dawson v. State*, 554 S.E.2d 137, 143-44 (Ga. 2001).

310.  In 2001 Ohio abandoned electrocution.[12]

---

[11] "We have reason to be very suspect of the technology of our Electric Chair, the maintenance of our Electric Chair, modifications that have been performed to the Electric Chair, as to whether or not this is actually gonna result in a death that would be quite heinous and cruel." (Stmt. of Rep. Frank Buck).

[12] "Electrocution is no longer a human way of putting condemned prisoners to death." (Stmt. of Rep. Jim Trakas)

311. In 2002 Alabama abandoned electrocution as an imposed method of execution. Ala. Code § 15-18-82.[13]

312. In 2008 the Nebraska Supreme Court declared electrocution a cruel and unusual punishment. *State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008).

313. The federal government does not authorize electrocution as a method for carrying out a federal death sentence.

314. No other nation in the world executes persons by means of electrocution.

315. Defendants should be preliminarily, and then permanently, enjoined from carrying out Plaintiffs' execution by electrocution.

316. Because Plaintiff David Earl Miller has, on the face of this complaint, demonstrated a substantial likelihood of success on the merits,[14] Defendants should be preliminarily enjoined from carrying out his December 6, 2018 execution until such time as he has been afforded those rights and procedures afforded every other litigant by the Federal Rules of Civil Procedure and by due process as guaranteed in the Constitution of the United States.

**<ins>Count Three:</ins>**
**Tennessee's July 5, 2018 lethal injection protocol constitutes**
**cruel and unusual punishment in violation of**
**the Eighth and Fourteenth Amendments.**

---

[13] Electrocution is a "horrible way for us to put a person to death." (Stmt. of Rep. Thomas Jackson).

[14] The decisions of the Supreme Courts of Nebraska and Georgia establish that execution by electrocution creates a substantial risk of unnecessary pain. Plaintiffs will present proof similar to that presented to those courts. Further, those decisions establish a substantial likelihood that Plaintiffs can demonstrate, after being afforded due process, that electrocution is unconstitutional.

{61}

317.    Execution under the July 5th Protocol violates the Eighth and Fourteenth Amendments because it creates a constitutionally-intolerable risk of unnecessary pain and suffering and contravenes evolving standards of decency.

**I.    Feasible and readily implemented alternative methods of execution that significantly reduce the substantial risk of severe pain and suffering under the July 5th lethal injection protocol.**

318.    There exists one or more feasible and readily-available alternative methods of execution which substantially reduce the constitutionally-unacceptable risk of inflicting unnecessary and serious pain created by the use of electrocution to carry out Plaintiffs' executions.

319.    Such alternatives include: (a) execution by means of a firing squad; (b) execution by means of the oral administration of midazolam, digoxin, morphine sulfate, and propranolol; (c) execution by means of a two-drug lethal injection protocol removing vecuronium bromide from the July 5, 2018 Protocol; and, (d) execution by means of the one-drug pentobarbital-based lethal injection protocol currently being used by the State of Texas.

**A.    Firing squad**

320.    The Procedure for Military Executions, Army Regulations No. 633-15 (Apr. 7, 1959) (Attachment 15) provides a feasible and readily implemented alternative method of execution that significantly reduces the substantial risk of unnecessary pain and suffering posed by the July 5th Protocol.

321.  Upon information and belief, Defendants possess or have within their control, or could readily obtain, the firearms necessary to carry out an execution by firing squad as alleged in this Alternative.

322.  Upon information and belief, Defendants possess or have within their control, or could readily obtain, the ammunition necessary to carry out an execution by firing squad as alleged in this Alternative.

323.  Upon information and belief, Defendants employ or have within their control, or could readily obtain, the personnel necessary to carry out an execution by firing squad as alleged in this Alternative.

324.  Upon information and belief, Defendants employ or have within their control, or could readily obtain, persons who regularly train with firearms at the Big Buck Shooting Range located at Riverbend Maximum Security Institution.

325.  Upon information and belief, Defendants employ or have within their control, or could readily obtain, trained professional marksmen to carry out the execution.

326.  The use of trained and experienced professionals significantly reduces any error rate in firing-squad executions.

327.  The Procedures for Military Executions provide a back-up plan in case of human error or mistake—the "coup de grace." Attachment 15, § II, ¶ 12(c).

328.  Upon information and belief, this manner and method of execution is feasible and readily implemented under Tenn. Code Ann. § 40-23-114(d) because it constitutes "any constitutional method of execution."

{63}

329.    The Supreme Court has upheld the firing squad as a method of execution. *Wilkerson v. Utah*, 99 U.S. 130, 134-35 (1878).

330.    Upon information and belief, this manner and method of execution is feasible and readily implemented because the Big Buck Shooting Range is located on the grounds of Riverbend Maximum Institution and can easily accommodate what little equipment is required for an execution by firing squad. *See* Attachment 15, § II, ¶ 12(c).

331.    Upon information and belief, execution by this manner and method damages the heart and causes a near-immediate drop in blood pressure, including blood pressure in the brain. This will cause a loss of consciousness rapidly followed by death.

332.    Execution by this manner and method would not permit Plaintiffs to experience any of the unnecessary and severe pain and suffering caused by pulmonary edema from the acidic midazolam injection, suffocation due to paralysis from vecuronium bromide, and the internal chemical burn caused by injection of potassium chloride that results from the July 5th Protocol.

333.    Eliminating the substantial risk of unnecessary and severe pain and suffering posed by the July 5th Protocol, by definition, will significantly reduce the substantial risk of unnecessary and severe pain to which Plaintiffs are subjected by the current execution method.

{64}

334.    The firing squad significantly reduces a substantial risk of unnecessary and severe pain when compared with the midazolam-based three-drug lethal injection protocol.

335.    A study of executions from 1900 to 2010, for example, concluded that while 7.12% of the 1,054 lethal-injection executions and 1.92% of electrocution executions were "botched," none of the 34 firing-squad executions went awry.  A. Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty*, 177 (2014). *See also Wood v. Ryan*, 759 F.3d 1076, 1103 (9th Cir. 2014) (the firing squad is "foolproof"; lethal injection is "inherently flawed and ultimately doomed to failure."); Attachment 16, p. 781, Deborah Denno Article (A "study of executions from 1976 to 2001 failed to detect any botched firing squad executions, even though other methods, including lethal injection, were consistently problematic.") (*citing* Arif Khan & Robyn M. Leventhal, *Medical Aspects of Capital Punishment Executions*, 47 J. Forensic Sci. 847, 849–50 (2002)). "Just as important, there is some reason to think that [death by firing squad] is relatively quick and painless." *Glossip*, 135 S. Ct. at 2796 (Sotomayor, J., dissenting). That contrasts sharply with death by lethal injection, which, as shown throughout this Complaint, has caused a number of prolonged and extraordinarily painful executions in recent years.

336.    Other states—Mississippi, Oklahoma, and Utah—include execution by firing squad among their statutory manners of execution. *See* Miss. Code Ann. § 99-19-51; Okla. Stat. Ann. tit. 22 § 1014; Utah Code Ann. § 77-18-5.5.

337.    Utah recently executed Ronnie Lee Gardner by firing squad. *Wilkerson v. Utah*, 99 U.S. at 134-35. *See* Kirk Johnson, *Double Murderer Executed by Firing Squad in Utah*, N.Y. Times, June 19, 2010, available at https://www.nytimes.com/2010/06/19/us/19death.html.

338.    The firing squad is used around the world as a method of execution. Approximately 28 countries conduct firing-squad executions.  *See* "Methods of Execution," Cornell Center on the Death Penalty Worldwide (June 22, 2012), *available at* goo.gl/uauqVF.  Of the 58 countries retaining capital punishment, five times as many use firing squads as use lethal injection.  *See id.*; *see also* "Death Sentences and Executions: 2015," Amnesty Int'l Global Report, *available at* goo.gl/phBwa0.

339.    For more than 400 years, the firing squad has been an available execution method in the United States. The first recorded firing squad execution took place in 1608, when the colony of Virginia executed George Kendall for conspiring with Spain. Attachment 16, p. 778. After the Supreme Court reinstated the death penalty in 1976 following a nine-year hiatus, *see Gregg v. Georgia*, 428 U.S. 153 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the first executed inmate died at the hands of a five-man firing squad just one year later. Kirk Johnson, *In Utah, Execution Evokes Eras Past*, N.Y. Times, June 16, 2010, *available at* goo.gl/p9D9k3.  In all, firing squads have executed 144 American inmates.  Attachment 16, p.778. Thus, the firing squad is clearly a known execution method.

340. Judges have noted the feasibility of the firing squad as an execution method. *See*, *e.g.*, *Wood*, 759 F.3d at 1103 (Kozinski, C.J., dissenting from denial of rehearing en banc) (noting that "large-caliber rifle bullets fired at close range can inflict massive damage, causing instant death every time. There are people employed by the state who can pull the trigger and have the training to aim true. The weapons and ammunition are bought by the state in massive quantities for law enforcement purposes, so it would be impossible to interdict the supply.").

341. This manner and method of execution is feasible and readily implemented because the firing squad is a "constitutional method of execution." Tenn. Code Ann. § 40-23-114(d).

342. If required, the State "legislature could, tomorrow, enact a statute reinstating the firing squad as an alternative method of execution." *In re: Campbell*, 874 F.3d 454, 465 (6th Cir. 2017) (discussing Ohio's execution procedures). In the same way that Defendants obtained the lethal injection secrecy bill from the Tennessee General Assembly via ordinary effort, so too could Defendants obtain this alternative manner of execution.

343. In the event the Court finds Alternative A insufficient to satisfy the alternative-pleading requirement, then Plaintiffs offer the following alternative method of execution:

**B.    Euthanasia Oral Cocktail**

**344.    First method: oral administration of midazolam, digoxin, morphine sulfate, and propranolol in sweet liquid such as fruit juice.**

{67}

345.    On July 3, 2018, the State of Ohio conceded the existence of another available method of execution: "Defendants admit that they possess, or have within their control, or could obtain with ordinary transactional effort, midazolam, digoxin, morphine sulfate, and propranolol... For oral administration." *In Re: Ohio Execution Protocol Litigation*, No. 2:11-cv-01016, R.1822 PageID#74251 (S.D. Ohio July 3, 2018).

346.    **Second method: Defendants shall carry out Plaintiffs' execution using a lethal dose (no less than 9000 mg.) of secobarbital injected orally in four ounces of sweet liquid such as fruit juice.**

347.    Either of these methods of execution are an available, feasible alternative as demonstrated by use as a method by States which have engaged in euthanasia under Death with Dignity laws.

348.    Defendants must inject the lethal drugs orally and from bedside.

349.    Defendants must inject the lethal drugs mixed with a sweet liquid such as fruit juice, because of a bitter taste that could initiate a gag reflex.

350.    Execution by this method of lethal injection using a barbiturate or opiate will cause Plaintiffs' death while providing analgesic protection against Plaintiffs remaining sensate following oral injection.

351.    Eliminating the substantial risk of severe pain posed by vecuronium bromide and potassium chloride, by definition, significantly reduces the substantial risk of severe pain caused by the July 5th Protocol.

352.    Also as part of this Alternative, Defendants must employ a wedge-shaped cushion of sufficient height to prevent obstruction, like the one used by the State of Ohio, to prop Plaintiffs up at an angle during the execution.

353.    Using that wedge-shaped cushion, by propping Plaintiffs up at an angle, will significantly reduce the sure or likely risk that Plaintiffs will obstruct after injection of the drugs by helping to ensure that the soft tissues in the back of the throat will not collapse into the airway when Plaintiffs lose muscle tension after injection of the drugs. This prevents obstruction that will likely result from lying supine as currently required by Defendants' execution protocol.

354.    Using a wedge-shaped cushion is available and feasible, because Defendants possess or have within their control, or could obtain with ordinary effort, a wedge-shaped cushion similar to the one used by the State of Ohio.

355.    Accordingly, execution by this manner and method, when orally injected into an inmate who is propped up with a wedge cushion, does not permit him to experience any of the severe pain and suffering caused by obstruction, air hunger, suffocation by paralysis, or the injection and operation of potassium chloride, as posed by Defendants' currently selected three-drug method of lethal injection.

356.    Using oral injection is available and feasible because Defendants possess or have within their control, or could obtain with ordinary effort, the medical supplies necessary to inject the lethal drugs orally rather than through peripheral IV access.

357.   This Alternative will significantly reduce the substantial risk of severe pain to which Plaintiffs are subjected by the current execution method's requirement to carry out the injections via peripheral IV and Plaintiffs' unique characteristics alleged herein that increase the risk that Defendants will not be able to successful achieve and maintain peripheral IV access.

358.   Drugs used in this method are sold on the open market and are available for purchase by Defendants.

359.   This manner and method of execution is an available, feasible alternative because Defendants possess or have within their control, or can obtain, a supply of drugs sufficient to carry out Plaintiffs' execution using this Alternative method of lethal injection.

360.   This manner and method of execution is also available because it can be carried out under Tennessee law with ordinary effort within the Death Chamber inside RMSI.

**361.**   In the event the Court finds Alternative B insufficient to satisfy the alternative-pleading requirement, then Plaintiffs offer the following alternative method of execution:

### C.   Two-Drug Method

**362.   Defendants shall use a two-drug method consisting of two syringes containing 50 cc of midazolam (5 mg/mL solution), followed by a syringe of 50 cc of saline, followed by 60 cc of potassium chloride (50 mL of**

**2 mEq/mL solution) in each of two syringes for a total of 240 mEq/mL, followed by a syringe of 50 cc of saline.**

363.   This two-drug protocol significantly reduces the substantial risk of pain caused by the July 5th Protocol because it omits vecuronium bromide.

364.   Plaintiffs allege that <u>eliminating</u> the substantial risk of severe pain and suffering caused by suffocation via vecuronium bromide, as used in the July 5th Protocol, by definition, will significantly reduce the substantial risk of severe pain caused by the July 5th Protocol.

365.   Vecuronium bromide is a noxious stimulus.

366.   Defendants admit vecuronium bromide is not necessary to execute Plaintiffs. Attachment 21, pp. 1315-16.

367.   The pain and suffering caused by vecuronium bromide is not necessary to execute Plaintiffs.

368.   The inclusion of vecuronium bromide in the July 5th Protocol needlessly increases the risk that an execution will continue even as Plaintiffs are sensate to the severe pain and suffering caused by suffocation because it will cause paralysis and mask outward indications of such pain.

369.   The inclusion of vecuronium bromide in the July 5th Protocol needlessly increases the risk that an execution will continue even as Plaintiffs are sensate to the severe pain and suffering caused by potassium chloride because it will cause paralysis and mask outward indications of such pain.

{71}

370.    Removal of vecuronium bromide from the July 5th Protocol significantly reduces the substantial risk of unnecessary pain and suffering.

371.    This alternative is feasible and readily implemented.

372.    Defendant Parker admitted this alternative is feasible and readily implemented. Attachment 21, pp. 1315-16.

373.    When Plaintiffs proposed the two-drug alternative method, counsel for Defendants responded, "It sounds like to me it's certainly something we'd do." Attachment 42, Sutherland Representation re: Two-Drug Protocol.

374.    The United States District Court for the District of Arizona agreed. *First Amendment Coalition of Arizona, Inc., v. Ryan*, 188 F.Supp. 3d 940, 950, 960 (D. Arizona May 18, 2016).

375.     In the event the Court finds Alternative C insufficient to satisfy the alternative-pleading requirement, then Plaintiffs offer the following alternative method of execution:

**D.    One-drug pentobarbital**

**376.    Defendants shall use the one-drug, pentobarbital-only method, adopted by Defendants in 2013, and upheld as constitutional by the state courts. This method requires two five-gram doses of pentobarbital. Pentobarbital is lethal at a blood level of 10 – 169 ug/ml.**

**(i.)    A one-drug pentobarbital protocol significantly reduces the risk of harm posed by Tennessee's current lethal injection protocol.**

{72}

377. A one-drug pentobarbital method significantly reduces the substantial risk of pain caused by the July 5th Protocol (midazolam-based three-drug protocol) because it removes the pain-causing drugs (midazolam, vecuronium bromide and potassium chloride) from Tennessee's Execution Protocol.

378. Plaintiffs allege that eliminating the substantial risk of severe pain posed by vecuronium bromide and potassium chloride, by definition, significantly reduces the substantial risk of severe pain caused by the July 5th Protocol.

**(ii.) A one-drug pentobarbital protocol is available with ordinary good-faith effort.**

379. Defendants retained a one-drug pentobarbital method as Protocol A in the January 2018 Execution Protocol.

380. Defendants have claimed they are unable to obtain any pentobarbital to use for executions. But other states remain able to obtain pentobarbital or another barbiturate.

381. This year, Texas has carried-out ten executions using a one-drug pentobarbital method. Attachment 17; Attachment 18.

382. Georgia, also this year, carried-out two executions using a one-drug pentobarbital protocol. Attachment 18.

383. Four days ago, on October 29, 2018, South Dakota executed Rodney Berget using a one-drug pentobarbital protocol. Attachment 18.

384. Defendants delegated the search for pentobarbital to an employee of the Tennessee Department of Correction ("drug procurer").

385.   Defendants have no personal knowledge of the search or results of the search for pentobarbital that was conducted by the drug procurer.

386.   Defendants' knowledge regarding the search for pentobarbital and the results of the search for pentobarbital conducted by the drug procurer is based on what they have been told by another person(s).

387.   The drug procurer conducted a cursory and unnecessarily narrow search for pentobarbital.

388.   Upon information and belief, if the drug procurer conducted a good faith search, or searched with ordinary due diligence, Defendants would obtain a supply of pentobarbital for Mr. Miller's execution.

389.   In 2017, at least ten sources were willing to sell pentobarbital to the drug procurer. Attachment 19, Documents from the Drug Procurer, p.1477; Attachment 20, p. 1505, Handwritten Notes of the Drug Procurer (a source says "they sell us [TN] the compound").

390.   The drug procurer obtained information from one or more sources such as the cost of pentobarbital per execution, the availability of bulk pricing, the time pentobarbital will be available and a shipping date. Attachment 20, pp. 1503, 1506.

391.   Ten sources contacted by the drug procurer did not have 100 grams of pentobarbital, but a lesser amount was available. Attachment 19, p.1477.

392.   The drug procurer (and/or Defendants) declined to purchase an amount of pentobarbital that would be sufficient for Plaintiff Miller's execution. Attachment 20, pp. 1503, 1505, 1506.

{74}

393. The drug procurer (and/or Defendants) sought instead to obtain enough pentobarbital for ten executions (100 grams). Attachment 19, pp.1493, 1496, 1497.

394. Counsel for Defendants conceded before the Tennessee Supreme Court that Plaintiffs are not at fault for manufacturer-imposed distribution restrictions on pentobarbital. In other words, Plaintiffs have not hindered Defendants' acquisition of execution drugs. *Abdur'Rahman*, No. M2018-01385-SC-RDO-CV, oral argument (Tenn. Oct.3, 2018).

395. Only twenty sources contacted by the drug procurer were "unwilling to supply Pentobarbital if it was to be used in lethal injection." Attachment 19, p.1477.

396. Midazolam, vecuronium bromide, and potassium chloride are each subject to the same manufacturer-imposed restrictions as pentobarbital. Attachment 21, Parker Testimony (excerpt), pp.1309-10; Attachment 22, Parker Deposition (excerpt), pp.203-04, 245.

397. Defendants have obtained drugs that are subject to manufacturer-imposed restrictions. Attachment 19, p.1310; Attachment 23, Inglis Testimony (excerpt), pp.1640-41.

398. Defendants obtained quantities of midazolam on October 26, 2017, November 1, 2017, November 27, 2017, December 14, 2017 and December 28, 2017. Attachment 24.

399. Defendants obtained quantities of vecuronium bromide on October 26, 2017, November 1, 2017, November 27, 2017, December 14, 2017 and December 28,

{75}

2017. Defendants obtained these quantities after Defendants' Direct Source represented that vecuronium bromide was not available. Attachment 24; Attachment 25.

400.    Defendants obtained quantities of potassium chloride on October 26, 2017 and December 28, 2017. Attachment 24.

401.    Defendants ignored a manufacturer's request to return midazolam obtained in violation of distribution controls, and Defendants kept the midazolam. Attachment 21, p.1309-10; Attachment 22, p. 243.

402.    Pentobarbital is manufactured in the United States for human and animal use. Attachment 5, ¶19.

403.    The drug procurer learned how to obtain pentobarbital through a veterinarian. Attachment 19, pp.1489-90.

404.    The drug procurer has actual knowledge that pentobarbital (Nembutal) is widely available in the United States and Europe. Attachment 20, pp. 1513-14.

405.    Pentobarbital is available in Mexico. Attachment 5, ¶19.

406.    Pentobarbital is popular in the assisted suicide movement and can be purchased on line in powder, injectable and pill form. Attachment 5, ¶19.

407.    For example, one online seller in the United States will supply 20 grams of pentobarbital powder for $500. Attachment 5, ¶20.

408.    Plaintiffs have been denied access to the drug procurer.

409.    TDOC General Counsel concedes that certain companies specialize in supplying pharmaceuticals to departments of correction. Attachment 26, p.169.

410.    For example, one company—Clinical Solutions Pharmacy—is located in Franklin, Tennessee. http://clinicalsolutionspharmacy.com/. Another company, IHS Pharmacy, is located in Alabama and conducts business with correctional facilities in Tennessee.  http://ihspharmacy.com/.

411.    Companies which specialize in supplying pharmaceuticals to departments of correction are sources of midazolam. Attachment 5, ¶23.

412.    Defendants have actual knowledge that the identity of any person or entity supplying drugs used for execution in Tennessee is confidential under state law.

413.    A Food and Drug Administration qualified outsourcing facility that produces high-risk compounded sterile drug products is not required to have an individual patient prescription but must adhere to federal GMP guidelines.

414.    Pentobarbital can be obtained through a prescription from a physician licensed to prescribe schedule 2 drugs. Attachment 5, ¶17.

415.    Defendants have a physician willing to write a prescription for execution drugs. Attachment 26, p. 138.

416.    A prescription for pentobarbital can be filled by any pharmacy with a DEA license to do so. If a pharmacy does not have pentobarbital in stock it could take 1-2 days to obtain it. Attachment 5, ¶17.

{77}

417.    Defendants have a pharmacy and pharmacist in their employment. Attachment 21, p.1314.

418.    When a prescription for drugs is submitted to a pharmacy it is not common for a pharmacy to inquire about its use. Attachment 5, ¶18.

419.    Pentobarbital is commonly used to treat seizure disorders and for use in an anesthetic cocktail. Attachment 5, ¶16.

420.    A supplier of an Active Pharmaceutical Ingredient (API) for a drug does not normally inquire about the purpose for the drug being compounded. Attachment 5, ¶18.

421.    Defendants have two valid contracts requiring two different drug sources to provide drugs for executions. Attachment 27.

422.    A corrections officer with the Missouri Department of Corrections purchased pentobarbital with cash and drove it across state lines for use in lethal injection executions. Attachment 5, ¶21.

423.    A Texas public records requires revealed the name of a compounding pharmacy that sold pentobarbital sodium for lethal injection executions. Attachment 5, ¶22.

424.    Defendants have not conducted an ordinary, diligent search for pentobarbital (Nembutal).

425.    Upon information and belief, Defendants possess or have within their control, or can obtain, the pentobarbital to carry out executions under this Alternative.

{78}

**(iii.)   Provisions of a one-drug protocol.**

**426.**   Plaintiffs also allege as part of this Alternative, **that Defendants must employ a wedge-shaped cushion of sufficient height to prevent obstruction, like the one used in Ohio, to prop Plaintiffs up at an angle during the execution.**

427.   Plaintiffs allege that the use of a wedge-shaped cushion to prop him up at an angle will significantly reduce the substantial risk of obstruction. If Plaintiffs are supine on the gurney there is a substantial risk that the soft tissues in the back of the throat will collapse into the airway when they lose muscle tension after injection of the drugs.

428.   Plaintiffs allege that using a wedge-shaped cushion is an available and feasible alternative to obstruction and air hunger, because Defendants possess or have within their control, or could obtain with ordinary effort, a wedge-shaped cushion.

429.   Plaintiffs allege that death caused by a lethal dose of pentobarbital when they are propped up with a wedge cushion will not involve any of the unnecessarily severe pain and suffering caused by obstruction and air hunger. In other words, using a wedge-shaped cushion for Plaintiffs' executions will significantly reduce a substantial risk of serious and unnecessary pain.

430.   Plaintiffs also assert as part of this Alternative, that **Defendants must inject the lethal drug bedside rather than from the Lethal Injection**

**Executioner's Room through several feet of IV tubing filled with saline solution.**

431.   Bedside injection will protect Plaintiffs against receiving diluted execution drug(s), thereby ensuring the proper concentration and potency and the most rapid arm-brain circulation of the drug. Any reduction in time of death is a significant reduction of the substantial risk of a lingering death under the one-drug pentobarbital protocol.

432.   Bedside injection will aid in the detection of, and will significantly reduce the substantial risk of, pain from infiltration or a dislodged catheter caused by the bolus doses of drugs required under the one-drug pentobarbital protocol.

433.   This portion of this Alternative is feasible and readily implemented because Defendants already establish IV access on inmates in the Execution Chamber at bedside. Inserting and injecting a syringe of execution drug directly into a port in the IV catheter is no more difficult—indeed, is easier—than inserting and injecting a syringe of execution drug into a port connected to lengthy IV tubing. Some Defendants are already in the Execution Chamber at certain stages of the protocol even while the curtain to the witness room remains open. Any anonymous execution team members can disguise themselves in surgical garb, including masks, to resolve any concerns about identification.

434.   Also as part of this Alternative, and **in the event Defendants use compounded pentobarbital, Defendants must meet all of the following requirements**, otherwise said compounded drugs shall not be used:

435.    Defendants must use only those compounded execution drugs that are chemically and biologically identical to FDA-approved versions of said drugs as currently or formerly sold in the United States (*e.g.*, Nembutal).

436.    Defendants must use only those compounded execution drugs that are properly compounded in strict compliance with all requirements of USP <797>, and manufactured in strict compliance with all requirements of Current Good Manufacturing Practice Regulations ("CGMP") under the Food, Drug, and Cosmetic Act. Attachment 5, ¶¶ 8, 10.

437.    Defendants shall not use compounded execution drugs that are past their beyond-use date or that are otherwise adulterated. Attachment 5, ¶¶ 3, 4.

438.    For any compounded execution drugs that are to be used in Plaintiffs' execution, Defendants and/or the "Direct Source" must provide to Plaintiffs, at least 30 days in advance of the execution date:

a.    written, sworn verification of full compliance with all relevant manufacturing (CGMPs) or compounding (USP <797>) standards and requirements in the production of said execution drugs (including all requirements for matters such as sterile production, labeling, packing, shipping, storing, and using drug products as defined under the applicable set of standards), with such verification performed by a reputable, disclosed (to Plaintiffs' counsel), independent third party, and such verification to include satisfactory assessment of all testing data and other data generated in the manufacturing or compounding process under the relevant standards;

{81}

b.      written, sworn verification of satisfaction of rigorous pre-execution analytical testing of the execution drug at a reputable, disclosed (to Plaintiffs' counsel), independent analytical testing laboratory to ensure the finished drug product is in full compliance with USP <797> or CGMPs, as applicable; and

c.      written, sworn verification of having submitted to the federal FDA an Investigational New Drug application for the use of the particular execution drug in the form and dosage to be used against Plaintiffs, and/or provide Plaintiffs a certified copy of that application.

439.    Defendants must additionally test the final product and its components no more than two days before the scheduled execution, testing for identity, contaminants, bacterial endotoxins, pyrogens, concentration, sterility, proper pH level, potency, and purity. TDOC General Counsel testified about product testing of drugs utilized in July 5th Protocol so this requirement should be easily implemented.

440.    At least one other state, Ohio, requires testing of compounded execution drugs for identity and potency.

441.    Defendants must provide that test data to counsel for Plaintiff immediately upon receipt. TDOC General Counsel did not commit to this request but testified she would consider it. Attachment 26, pp.138-39.

442.    If the data generated by that analytical testing is outside the level acceptable under the applicable USP Monograph and any other authoritative source

of standards for the drug, Defendants shall not proceed with the scheduled execution of Plaintiff for at least 60 days.

443. Each of these portions of this Alternative would significantly reduce the substantial risk of severe pain to which Plaintiff is subjected by the use of compounded pentobarbital, by ensuring that the drug used to execute Plaintiff meets the same rigorous standards applicable to all drugs to be administered to individuals in the United States.

444. Each of these portions of this Alternative merely require that Defendants ensure that the controlling statutes, rules, regulations, and standards are followed even behind the curtain of secrecy that Defendants have obtained regarding the execution drugs, thereby protecting Plaintiffs against the pain, suffering, and lingering death that would be caused by using improperly compounded pentobarbital. Defendants' contract with a compounding pharmacy purports to require the same. Attachment 4, pp.99-104.

445. Additionally, these portions of this Alternative are available with ordinary effort. They simply require that Defendants produce sworn documentation to confirm that all applicable statutes, rules, regulations, and standards are being followed in regards to the execution drugs. Any Tennessee-licensed pharmacy that is compounding execution drugs is already required by Tennessee law to follow the requirements in USP <797>, and those requirements include the testing processes in production, the production of reports and other documentation, rigorous attention to quality control measures, and other such matters outlined above. If Defendants'

drug source who is compounding follows the law, then it should be a simple matter for Defendants to produce to Plaintiff such sworn verification.

446.    Upon information and belief, Defendants' drug source is located outside the state of Tennessee. Plaintiffs allege that the law of the State where the drug source is located also requires compliance with USP <797>. If Defendants' drug source who is compounding follows the law, then it should be a simple matter for Defendants to produce to Plaintiff such sworn verification.

447.    The law governing IND Applications contains no exception for the use of drugs in an execution; regardless of whether such an application would be granted, Defendants can submit the IND Application with ordinary effort in the same way that myriad others submit such Applications, and producing verification of submitting that Application is available through ordinary effort as well.

448.    Also as part of this Alternative, and **in the event Defendants use compounded pentobarbital, Defendants must meet all of the following compliance requirements**, otherwise said compounded drugs shall not be used:

a.    Defendants must not use execution drugs obtained from a drug source who is non-compliant with the full scope of the alternative methods and procedures proffered here, and Defendants must present to Plaintiff in advance of execution, written, sworn verification of full compliance with all such alternative methods and procedures.

{84}

b.     Defendants must not use execution drugs obtained from a drug source who has been found to be non-compliant with USP <797> standards during any state inspection in the last five years.

c.     Defendants must identify the Direct Source to Plaintiffs' counsel in advance of execution so that counsel can ensure the relevant Direct Source has not been so found. Alternatively, if Plaintiffs are denied identification information for whatever reason, Defendants must present to Plaintiffs' counsel in advance of execution written, sworn verification that the Direct Source in question has not been found to not be in compliance with USP <797> standards during any state inspection in the last five years.

d.     Defendants must not use execution drugs obtained from a drug source who the FDA has found in the last five years to be non-compliant with CGMP standards. Defendants must identify the Direct Source to Plaintiffs' counsel in advance of execution so that counsel can ensure the relevant Direct Source has not been so found. Alternatively, Defendants must present to Plaintiffs' counsel in advance of execution written, sworn verification that the Direct Source has not violated CGMP standards during any FDA or state inspection in the last five years.[15]

_____

[15] Even if compounding pharmacies do actually follow USP-NF General Chapter 797 standards, those standards are less stringent, and produce less reliable drugs, than the FDA Good Manufacturing Practices. Jennifer Gudeman et al., *Potential Risks of Pharmacy Compounding*, Drugs in R&D vol. 13, iss. 1, at 4 (Mar. 23, 2013) (comparing the failure rate of <2% for 3,000 FDA-approved commercial products tested from 1996 to 2001 to the failure rates ranging from 11% to 34% for compounded drugs randomly tested by the FDA, Missouri, and Texas). Drugs compounded in

{85}

449.    The parts of this Alternative alleged in the preceding sub-paragraphs will significantly reduce the substantial risk of severe pain caused by compounded drugs. These alternatives ensure that the compounded drugs used to execute Plaintiffs meet the same rigorous standards applicable to all drugs administered to individuals in the United States.

450.    Compliance with such standards significantly reduces the substantial risk of serious pain caused by compounded drugs which: are not true in identity, concentration, potency and purity; contain contaminants, bacterial endotoxins and/or pyrogens; are not sterile; and/or have an improper pH level.

451.    Each of these portions of this Alternative merely require that Defendants ensure that the controlling statutes, rules, regulations, and standards are followed even behind the curtain of secrecy that Defendants have obtained regarding the execution drugs, thereby protecting Plaintiffs against the pain and suffering that would be caused by using improperly compounded.[16]

452.    These compliance requirements are readily available because they simply require Defendants to obtain verification of their drug source's compliance with applicable safety rules and standards. It also simply requires that execution

---

accordance with USP-NF General Chapter 797 have a low standard of sterility assurance compared to the FDA standard. *Id*. ("USP <797> does not afford the same degree of sterility assurance for compounded drugs that GMPs provide for FDA-approved sterile products").

[16] In its order of June 26, 2018, the Court posed questions to Defendants about the Direct Source that are similar in substance to Plaintiffs" suggested alternative.

drugs WILL NOT be used if they are produced by a drug source who has been found wanting in that regard.

453.    Plaintiffs are informed and believe that Defendants obtained drugs for Billy Ray Irick's August 2018 execution from a drug source that does not have the facilities required to compound high-risk sterile injectables. Attachment 29.

454.    Plaintiffs are informed and belief that Defendants obtained drugs for Irick's August 2018 execution from a drug source that has been disciplined by a State Board of Pharmacy. Attachment 30.

455.    Disciplinary actions against a pharmacy or pharmacist are cause for concern regarding the quality, sterility and stability of a compounded sterile drug product. Attachment 5, ¶11.

**456.**    As part of this Alternative, Defendants shall not obtain drugs from the drug source utilized for Irick's August 2018 execution

457.    **Defendants shall use the one-drug, pentobarbital-only method, adopted by Defendants in 2013, and upheld as constitutional by the state courts. This method requires two five-gram doses of pentobarbital. Pentobarbital is lethal at a blood level of 10 – 169 ug/ml.**

458.    As part of this Alternative, Defendants shall not obtain drugs from the drug source utilized for Irick's August 2018 execution.

**II.    Allegations related to Plaintiffs' individual characteristics.**

459.    The July 5th Protocol fails to consider and account for Plaintiffs' individual medical conditions that increase the substantial risk of unnecessary and

{87}

serious pain caused by the midazolam-based three-drug protocol and very likely will result in a spectacle execution.

## A. Plaintiff David Earl Miller

460. Upon information and belief, Plaintiff Miller presents with individual characteristics that include, but are not limited to, high cholesterol, obesity, tuberculosis infection, a history of polysubstance abuse—including alcohol abuse—poor impulse control, anxiety, panic disorder and major depression with psychotic features.

461. It is sure or very likely that Plaintiff Miller's individual characteristics present a substantial risk that during the execution he will engage in movement similar to that of a dying fish, he will cough, vomit, choke, gulp, sputter and his skin may turn colors.

462. It is sure or very likely that Plaintiff Miller's individual characteristics present a substantial risk that he will experience unnecessary and serious harms of the type alleged throughout this Complaint if subjected to execution via the July 5th Protocol.

## B. Plaintiff Nicholas Sutton

463. Upon information and belief, Plaintiff Sutton presents with individual characteristics that include, but are not limited to, Chronic Obstructive Pulmonary Disorder (COPD), a history of polysubstance abuse, including alcohol abuse, and poor impulse control.

{88}

464.    It is sure or very likely that Plaintiff Sutton's individual characteristics present a substantial risk that during the execution he will engage in movement similar to that of a dying fish, he will cough, vomit, choke, gulp, sputter and his skin may turn colors.

465.    It is sure or very likely that Plaintiff Sutton's individual characteristics present a substantial risk that he will experience unnecessary and serious harms of the type alleged throughout this Complaint if subjected to execution via the July 5th Protocol.

### C.    Plaintiff Stephen West

466.    Upon information and belief, Plaintiff West presents with individual characteristics that include, but are not limited to, chronic diabetes-related illness, high cholesterol, has had high blood pressure, enlarged prostate, seizure activity, under active thyroid, type 2 diabetes a history of polysubstance abuse—including alcohol abuse, poor impulse control, anxiety and major depression with psychotic features.

467.    It is sure or very likely that Plaintiff West's individual characteristics present a substantial risk that during the execution he will engage in movement similar to that of a dying fish, he will cough, vomit, choke, gulp, sputter and his skin may turn colors.

468.    It is sure or very likely that Plaintiff West's individual characteristics present a substantial risk that he will experience unnecessary and serious harms of

{89}

the type alleged throughout this Complaint if subjected to execution via the July 5th Protocol.

**D.    Risk of improper drug delivery**

469.    Improper delivery of the execution drugs presents a risk that is sure or very likely to cause serious illness, needless suffering, and/or a lingering death.

470.    Plaintiff Miller has a history of high cholesterol, obesity and tuberculosis infection. Deep vein thrombosis is associated with tuberculosis infection. Each characteristic makes it significantly more difficult to achieve and/or maintain peripheral IV access on Plaintiff.

471.    Plaintiff West has a history of chronic diabetes-related illness, high cholesterol, high blood pressure and diabetes. Diabetes-related illnesses are associated with compromising of the circulatory system. These characteristics makes it significantly more difficult to achieve and/or maintain peripheral IV access on Plaintiff West.

472.    Proper peripheral IV access must be maintained to ensure proper delivery of the drugs in Tennessee's lethal injection protocol. There is a substantial risk that, because of individual characteristics, Plaintiffs will suffer additional unnecessary and serious pain as Defendants attempt to achieve IV access on him.

473.    Plaintiffs will suffer serious harm in the form of severe, needless physical pain and suffering as Defendants stab him with needles repeatedly and/or cut open his skin, and that substantial risk is arbitrary and capricious, or it is an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

474.    The July 5th Protocol lacks safeguards against improper drug delivery, including a review of the inmate's medical history and an assessment of the inmates' veins prior to execution.

475.    There is a substantial risk that, due to their individual characteristics, Plaintiffs will suffer unnecessary and serious pain when Defendants are unable to maintain peripheral IV access on them.

476.    Infiltration of drugs into the subcutaneous area of Plaintiffs' extremities will be painful.

477.    Any infiltration of drugs will substantially reduce the intended effectiveness of the drugs used in Tennessee's lethal injection protocol. Such reduction in effectiveness will result in added serious pain and suffering and a lingering death.

478.    There is a substantial risk that Plaintiffs' individual physical characteristics will interfere with the proper delivery of the drugs in the Execution Protocol.

479.    Improper delivery of the execution drugs presents a risk that is sure or very likely to reduce the efficacy of the drugs and Plaintiffs will move like a dying fish, they will cough, vomit, choke, gulp, sputter and their skin may turn colors.

480.    Improper delivery of the execution drugs presents a risk that is sure or very likely to cause serious illness, needless suffering, a spectacle execution, and/or a lingering death.

{91}

481.    "Pain" is not the only harm that can constitute impermissible cruelty in a method of execution. The Eighth Amendment also demands that a penalty accord with "the dignity of man." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002), quoting *Trop v. Dulles*, 356 U.S. at 100.

482.    The July 5th Protocol does not instruct the executioners on the risks attendant to certain individual physical characteristics that present their own risk of harm.

483.    Defendants fail to train for an execution scenario that contemplates the unique characteristics of the Plaintiffs (as alleged in this Complaint).

484.    Defendants fail to recognize Plaintiffs' unique characteristics as it relates to carrying out executions.

485.    Plaintiffs will suffer a sure or very likely risk of serious harm in the form of being the subject of an undignified, spectacle execution or attempted execution under the July 5th Protocol.

486.    The individual physical characteristics and conditions of Plaintiffs, as alleged in in this Complaint, create a substantial risk that achieving peripheral IV access on them will present a problematic situation. There is a substantial risk that Defendants will have trouble or be unable to readily obtain IV access. In turn, this creates a sure or very likely risk that Plaintiffs will suffer serious harm in the form of being subjected to an undignified, spectacle execution, a lingering death and an unwanted, non-consensual human experimentation during the attempted

{92}

executions as Defendants repeatedly stab Plaintiffs with needles and/or cut their skin.

487.    The July 5th Protocol violates the Eighth Amendment because Plaintiffs will suffer a sure or very likely risk of severe pain from the risk of maladministration or arbitrary administration of the protocol and that risk is arbitrary and capricious, or an objectively intolerable risk of such harm that Defendants unjustifiably ignore.

488.    Upon information and belief, the execution team is not trained in the proper use of compounded drugs.

489.    Upon information and belief, the execution team is not trained in the intravenous injection of compounded drugs.

490.    Upon information and belief, the execution team does not have substantial experience in the intravenous injection of doses of equal or greater volume to that called for by the new and unwritten protocol.

491.    Without training and substantial experience in the intravenous injection of compounded drugs in doses of equal or greater volume as required by the new and unwritten protocol, there exists a substantial risk that the intravenous catheter will not be fully seated in a vein or will be dislodged from the vein during the course of injection.

492.    In the event the catheter becomes dislodged or a vein is punctured, ruptured or missed, a portion of the compounded drugs required by the new

unwritten protocol will be injected into Plaintiffs' surrounding tissue and/or body cavities.

493.    Compounded midazolam is extremely acidic.

494.    In the likely event a portion of compounded pentobarbital is injected into Plaintiffs' surrounding tissue and/or body cavities, there is a substantial risk of damage to Plaintiffs' surrounding tissue and/or body cavities and severe pain.

495.    In the likely event a portion of midazolam is injected into Plaintiffs' surrounding tissue and/or body cavities, there is a substantial risk that they will be aware and sensate and suffer unnecessary and serious harm.

496.    In the likely event a portion of the drugs is injected into Plaintiffs' surrounding tissue and/or body cavities, there is a substantial risk that Plaintiffs will suffer a prolonged period of hypoxia, but will not experience the irreversible cessation of cardiac and/or brain activity, yet will suffer permanent impairment to other bodily organs.

497.    Defendants have failed to promulgate formal practices to respond to the numerous well-publicized problems and complications associated with administering the new unwritten protocol. Any practices that may have been promulgated are not formally part of a written protocol and thus are subject to arbitrary interpretations and implementation.

498.    These problems are repetitious and foreseeable.

499. Defendants have acted with deliberate indifference by failing to properly and adequately enact a written execution protocol with safeguards that are essential to alleviate constitutional concerns.

500. Problems arising from the July 5th Protocol are foreseeable and cannot be mere innocent misadventures for which no one is liable.

501. Defendants intend to go forward with Plaintiffs' executions using drugs and procedures that are similar in key respects with the circumstances in other problematic executions.

502. The July 5th Protocol fails to take into account Plaintiffs' physical health, mental health, and other individual characteristics that make him vulnerable to experiencing a sure or very likely risk of unnecessary and serious pain and/or an objectively intolerable risk of harm.

503. Plaintiff's individual physical and/or psychological characteristics and conditions, as alleged in this Complaint, create a substantial risk that achieving peripheral IV access will present a problematic situation. These problems are analogous to publicized executions where executioners were unable to readily obtain IV access.

504. Defendants know or should know of other executions using or attempting to use peripheral IV access on similarly physically compromised inmates and similarly skilled/qualified/trained execution team personnel that were unable to successfully establish and maintain proper peripheral IV access and resulted in serious harm. For example:

{95}

505.   On February 22, 2018, executioners in Alabama aborted the execution of Doyle Hamm after inserting needles multiple times on his left and right legs and ankles and attempting central venous access through his right groin. For two and a half hours, Mr. Hamm suffered serious physical and psychological harm including extensive bleeding and bruising of the ankles, feet and groin.

506.   On November 15, 2017, executioners in Ohio aborted the execution of Alva Campbell after assessing his veins for about an hour and then stabbing him with needles for 25-30 minutes to find a vein for IV access.

507.   On April 24, 2017, executioners in Arkansas struggled for 45 minutes to place a central line in Jack Jones' neck before placing it elsewhere.

508.   In 2014, during the execution of Clayton Lockett in Oklahoma, executioners labored 51 minutes to find a vein for IV access but the drugs saturated surrounding tissue rather than flowing into his bloodstream; his execution lasted one hour and forty-seven minutes. Mr. Lockett suffered at least 15 needles punctures, hemorrhaging, and contusions on his arms, wrist, ankle, foot and groin.

509.   Ohio in 2011 executed Kenneth Biros after executioners stabbed him with needles for about 30 minutes.

510.   Ohio executioners in 2009 inserted needles into Romell Broom for more than two hours as he cried in pain.

511.   Ohio executioners in 2007 stabbed Christopher Newton for nearly two hours attempting to find a usable vein for IV access.

{96}

512. In 2008, Georgia executed Curtis Osborne after executioners struggled for 35 minutes to find a vein.

513. Ohio in 2007 executed Christopher Newton after two hours and at least ten needle punctures.

514. In 2007, Georgia executed John Hightower with a three-drug sodium thiopental execution method after Hightower suffered 13 minutes of being stabbed with needles as nurses sought to obtain IV access. Fifteen minutes after the drug were administered, Hightower blinked rapidly for some time, yawned and heaved his chest.

515. In 2006, the execution of Angel Diaz in Florida lasted 34 minutes during which he grimaced, repeatedly squinted his eyes, lifted his chin, turned his head, and coughed. Mr. Diaz suffered a chemical burn on his right arm that was 12 by 5 inches and a chemical burn on his left arm that was 11 by 7 inches, both with numerous blisters and sloughing off of the skin after catheters were pushed through his veins.

516. Ohio executioners in 2006 stabbed Joseph Clark with needles for more than an hour; Mr. Clark remained aware and sensate after receiving thiopental in a collapsed vein and executioners had to find another vein before restarting his execution.

517. In 2001, Georgia executioners spent 39 minutes searching for a vein before sticking a needle into Jose High's hand. A doctor cut into his chest to place a central IV line.

518.   In 2000, the Texas execution of Claude Jones was delayed by about 30 minutes because of difficulties finding a vein in either arm to insert the drugs.

519.   In 2000, Florida had problems executing Bennie Demps by lethal injection because the execution team had difficulties finding a suitable vein. Before the lethal drugs were administered Mr. Demps stated that he was "butchered" and he was bleeding "profusely." According to the warden, a "surgical procedure" had to be performed to find a suitable vein.

520.   In 2000, Arkansas executed Christina Riggs after prison workers stuck her with needles over 18 minutes trying to find a suitable vein in her elbows. Ms. Riggs then agreed to take the needles at her wrists.

521.   In 1998, Texas executed Joseph Cannon. Mr. Cannon's vein collapsed and the needle came out during his execution causing Cannon to shout "it's come undone."

522.   In 1992, Arkansas executioners stabbed Ricky Ray Rector for 55 minutes before obtaining IV access.

523.   In 1988, Raymond Landry was executed in Texas after the catheter dislodged and flew through the air two minutes after injection of drugs into Mr. Landry's body. Executioners spent 14 minutes inserting it again and Mr. Landry was pronounced dead 40 minutes later.

524.   Defendants' failure to address the issue of individual characteristics and their effects on venous access in a written protocol and through adequate

{98}

training of the execution team constitutes deliberate indifference to the substantial risk of harm.

525. Defendants also are on notice of the botched executions of Ricky Gray and William Morva in Virginia that involved compounded midazolam and compounded potassium chloride. Attachment 37, News Articles.

526. Ricky Gray's execution was similar to a drowning or a sarin gas attack. He suffered acute pulmonary edema. Blood found on his lips indicated that blood entered Gray's lungs while he was still breathing. Attachment 37; Attachment 38, Ricky Gray Autopsy, p.4.

527. About three minutes after the execution of William Morva began, observers noted that Mr. Morva appeared to be speaking and made a loud noise that sounded similar to a hiccup and there were several sharp contractions of his abdomen. He, too, suffered acute pulmonary edema. There was a moderate amount of froth in Mr. Morva's upper airway and an abundant amount of froth in his lung tissue. Attachment 37; Attachment 39, William Morva Autopsy, p.4.

528. Because Plaintiffs are aware, or should be aware, of all of these matters, there is no longer just a substantial or objectively intolerable risk of severe mental or psychological pain, suffering, terror, and anguish; instead, there is the actual, current, objectively intolerable presence of severe mental or psychological pain, suffering, horrific anxiety, terror and anguish.

529. Plaintiffs are subject to the psychological pain and suffering of anticipating a horrific, painful death as alleged in this Complaint, which is different

{99}

than the ordinary mental pain from the anticipation of death or even the ordinary mental pain from anticipation of death by execution performed humanely.

530.    By their actions, Defendants are deliberately indifferent to and/or recklessly disregard, in violation of the Eighth Amendment, a sure or very likely risk of subjecting Plaintiffs to an unwanted, non-consensual human experimentation, severe, needless physical pain and suffering, severe mental or psychological pain, suffering and agony, a lingering death, and/or an undignified, spectacle execution.

### E.    Risk of obstruction

531.    The use of midazolam or compounded midazolam under the July 5th Protocol contains an inherent risk that Plaintiffs will suffer obstruction and air hunger during the execution.

532.    The July 5th Protocol lacks safeguards against obstruction, such as a wedge-shaped cushion that could prop-up Plaintiffs from the usual supine position on the gurney. The easy availability of this type of safeguard renders unnecessary any pain resulting from obstruction.

533.    Plaintiff Miller's characteristics of being a male, over the age of 50, Body Mass Index of greater than 35, neck size greater than 40 cm, snoring and Deep Vein Thrombosis establish several of the risk factors of the STOP-Bang test used to assess the risk of Obstructive Sleep Apnea (OSA). Plaintiff Miller's characteristics constitute a substantial risk that, during execution under the July

5th Protocol, he will obstruct and begin to suffocate and experience the painful sensations of air hunger while he remains aware or sensate.

534.    Plaintiff Sutton's characteristics of COPD increases the risk of apnea during the administration of midazolam and substantially increases the pain and suffering caused by the administration of vecuronium bromide. Plaintiff Sutton's characteristics constitute a substantial risk that, during execution under the July 5th Protocol, he will obstruct and begin to suffocate and experience the painful sensations of air hunger while he remains aware or sensate.

535.    Plaintiff West's characteristics of being a male, over the age of 50 with compromised circulation, establish several of the risk factors of the STOP-Bang test used to assess the risk of Obstructive Sleep Apnea (OSA).

536.    This unnecessary pain from air hunger will be substantial and will be superimposed on the serious pain caused by a bolus dose of midazolam, suffocation induced by vecuronium bromide and burning of the circulatory system caused by potassium chloride, as herein.

537.    As a result of obstruction and/or suffocation, it is very likely Plaintiffs will move like a dying fish, they will cough, vomit, choke, gulp, sputter and their skin may turn colors.

538.    There is a substantial risk that Plaintiffs' executions will result in a spectacle that fails to comport with basic concepts of the dignity of man.

{101}

## F.      Risk of paradoxical effect

539.    The use of midazolam or compounded midazolam under the July 5th Protocol contains an inherent risk that Plaintiffs will experience a paradoxical effect from the drug.

540.    Plaintiff Miller's individual characteristics of his age, his male gender, his history of anxiety and panic disorder, major depression with psychotic features, his history of polysubstance abuse—including alcohol abuse—and his history of poor impulse control and impulsive actions create a substantial risk that he will have a paradoxical reaction to the execution drug(s). Plaintiff Miller's individual mental/psychological characteristics increase the risk that he will have a paradoxical reaction to the execution drug(s).

541.    Plaintiff Sutton's individual characteristics of his age, his male gender, his history of polysubstance abuse—including alcohol abuse, and his history of poor impulse control and impulsive actions substantially increases the risk that he will have a paradoxical reaction to the execution drug(s).

542.    Plaintiff West's individual characteristics of his age, his male gender, his history of anxiety, major depression with psychotic features, his history of polysubstance abuse, including alcohol abuse, and his history of poor impulse control and impulsive actions substantially increases the risk that he will have a paradoxical reaction to the execution drug(s).

543.    Moreover, as an execution dates near, Plaintiffs will experience increased levels of stress and distress.

{102}

544.    Defendants have failed to properly prepare or train the execution team for any of the unique challenges Plaintiffs' current individual characteristics may present while carrying out the execution.

545.    A paradoxical reaction to the execution drug(s) will cause increased awareness for Plaintiffs and increases the substantial risk that they will experience the pain caused by the drugs utilized in the July 5th Protocol.

546.    A paradoxical reaction very likely will cause Plaintiffs to move like a dying fish, they will cough, vomit, choke, gulp, sputter and their skin may turn colors.

547.    Moreover, as their execution dates near Plaintiffs will experience increased levels of stress and distress. Plaintiffs may develop or may currently have additional physical and/or psychological characteristics increasing the sure or very likely risk of unnecessary and serious harm caused by the July 5th Protocol.

548.    The July 5th Protocol fails to account for any unique characteristics of inmates that may affect the efficacy of or the risk of harm caused by the July 5th Protocol. This increases the substantial risk of harm caused by the July 5th Protocol.

549.    Upon information and belief, Defendants have failed to properly prepare or train the execution team for any of the unique challenges that an inmate's individual characteristics may present while carrying out the execution. For example, Defendant Mays testified he has no knowledge about the paradoxical effect. Attachment 40, Mays Deposition (excerpt), pp.117-18.

{103}

550.    Because Defendants do not account for any individual characteristics Plaintiffs currently possesses or may develop before the scheduled execution dates, the substantial risk of unnecessary and serious harm is sure or very likely.

### III.    Allegations related to Defendants' actual practice under the July 5th Protocol.

551.    The July 5th Protocol, as applied, presents a substantial risk of unnecessary and serious pain and suffering to Plaintiffs.

552.    Defendants' arbitrary deviations from the written protocol increases the risk of unnecessary and serious harm.

### A.    Unnecessary restraints increase the risk of serious harm.

553.    Upon information and belief, before the execution of Billy Ray Irick began his hands and fingers were taped tightly to the gurney.

554.    This practice raises the inmate's level of anxiety and stress and increases heart rate and blood pressure thus increasing the level of panic and terror felt by the inmate and making it harder for midazolam to take effect. In turn, there is an increased risk that the inmate will physically respond to the execution drugs, he will experience increased pain and suffering, and there will be a spectacle execution

555.    The risk described in the prior allegation is compounded because Plaintiffs' individual physical characteristics, as pled in this complaint, make Plaintiffs more susceptible to panic and terror.

556.    Taping an inmate's hands and fingers to the gurney does not have any beneficial impact on administration of the drugs during the execution.

{104}

557.  Taping the fingers to the gurney constitutes a deviation from the July 5th Protocol.

558.  The practice of taping the fingers to the gurney and the use of vecuronium bromide serves one purpose: to mask the effect of the drugs used under the July 5th Protocol.

**B.  The failure to prepare a contingency dose of midazolam increases the risk of unnecessary and serious harm.**

559.  The July 5th Protocol requires preparation of two sets of lethal injection drugs. Attachment 4, pp.39-40. The second set is prepared for use if there is an interruption of the delivery of first set of drugs, if the inmate responds to the Warden's assessment o of consciousness, or if the inmate is not deceased after administration of the first set of drugs. Attachment 4, pp.66, 69.

560.  For the execution of Billy Ray Irick, Defendants deviated from the July 5th Protocol when they failed to prepare a second dose of midazolam.

561.  The deviation described in the prior allegation increases the risk that Plaintiffs will be aware of the severe pain caused by the execution drugs and will be unnecessarily aware and gratuitously suffer over a longer period of time.

**C.  The lack of proper transport and storage instructions and practices, temperature monitoring, and proper storage facilities for the execution drugs all increase the risk of unnecessary and serious harm.**

562.  On June 4, 2018, Defendant Mays testified he was unaware of what, if any, execution drugs are stored at RMSI. He did not know the last time he or

{105}

someone else conducted an inventory of execution drugs. Attachment 40, p. 26. This constitutes a deviation from Tennessee's protocol.

563.    On July 12, 2018, Defendant Mays testified that expired execution drugs are stored at RMSI; he hadn't yet disposed of them as required. This constitutes a deviation from Tennessee's protocol. Attachment 41, Mays Testimony, pp. 981, 984-85.

564.    For the execution of Billy Ray Irick, Defendants obtained compounded midazolam that should have been transported and stored in a frozen state.

565.    The date that Defendants obtained compounded midazolam, its Beyond Use Date, the manner in which it was transported, the required temperature logs, and the manner in which it was stored at RMSI has not been provided to counsel for Plaintiffs.

566.    Counsel for Plaintiffs is informed that the information described in the prior allegation does not exist.

567.    The failure to maintain records of the lethal injection drugs is another deviation from the July 5th Protocol. *See* Attachment 4, p.38 (accountability of LICs).

568.    The July 5th Protocol requires the lethal injection chemicals to be stored in the armory area at RMSI and in "unmovable heavy gauge steel containers." Attachment 4, p.37. The July 5th Protocol does not provide for a freezer to store a frozen lethal injection drug, such as compounded midazolam.

569. The July 5th Protocol does not include provisions for the monitoring and recording of storage temperature.

570. The allegations in this section violate provisions of United States Pharmacopeia ("USP") chapter 797 and constitute a further deviation from the written protocol which requires compliance with USP <797>. Attachment 4, pp.37, 44-45, 99-104.

571. The failure to properly transport and store drug(s) is likely to affect the efficacy of the drug(s). Attachment 5, ¶¶ 5-8.

572. Storage conditions affect any BUD, therefore, high-risk compounded sterile preparations must be kept in carefully prescribed conditions related to the stability and properties of the specific medicine in question. Stability "depends on the purity and concentration of specific ingredients, packaging and environmental exposure and storage (humidity, illumination and temperature), especially for solutions. Small changes in any one of those variables can cause rapid loss of drug strength or much shorter than expected shelf-life." David Newton & Bernard Dunn, *A Primer on USP Chapter 797 "Pharmaceutical Compounding-Sterile Preparations," and USP Process for Drug and Practice Standards*, *available at* http://www.nhia.org/members/documents/usp_797_primer.pdf. For example, difference by one pH unit in some solutions can decrease stability to less than 50% of the BUD time assigned. "[T]here can be danger in either assuming correct compounding or expecting a seemingly small formulation change to produce an insignificantly small stability change." *Id.* Thus, it is imperative to test both

{107}

stability and sterility not just shortly after it is compounded but multiple times over a drug's shelf life.

573. There are demonstrated risks posed by poor storage conditions of compounded execution drugs. For example, in March 2015, a syringe of compounded pentobarbital sodium in the Georgia Department of Corrections' possession appeared "cloudy" just hours prior to the scheduled execution of Kelly Gissendaner. The Georgia Department of Corrections sent the drug to a lab for analysis, and concluded that the likely cause of the precipitation was the temperature of the drugs, which were kept in poor storage conditions. Mark Berman, *After execution hiatus, Georgia says its lethal injection drugs were kept too cold*, Wash. Post (Apr. 16, 2015).

574. The failure to properly transport and store the execution drugs at the proper temperatures presents a risk that is very likely to affect the drug's stability and potency and constitutes a substantial risk of unnecessary and serious pain and/or spectacle execution.

**D. The lack of specific drug administration time controls in the execution protocol increases the risk of unnecessary and serious harm.**

575. A rapid injection rate of midazolam (higher than 0.2 ml/s) substantially increases the risk of paradoxical reactions to midazolam, even in the absence of other paradoxical reaction risk factors.

576. Defendants' typical injection rate, and the rate at which they will inject the execution drugs into Plaintiffs, is greater than 0.2 ml/s. During

{108}

Defendants' practice sessions and the execution of Billy Ray Irick each syringe was injected within one minute.

577.    The rapid rate at which Defendants will inject midazolam into Plaintiffs further elevates the risk that Plaintiffs will suffer a paradoxical reaction during the execution.

578.    Plaintiffs are already predisposed to a paradoxical reaction based on their individual physical and/or psychological conditions, (as set forth in this Complaint). This risk is very likely when Defendants inject the execution drugs at too fast a rate. A paradoxical reaction significantly increases the risk that Plaintiffs will be aware of severe pain as the execution proceeds, as well as the accordant risk of severe, horrifying mental pain and suffering.

579.    There is a sure or very likely risk that Plaintiffs will have a paradoxical reaction to the execution drug(s), thereby increasing the already substantial risk that he will be aware of unnecessary physical pain and agony upon injection of the execution drug(s).

580.    A paradoxical reaction will cause Plaintiffs to be aware and sensate to severe pain and result in a spectacle execution.

581.    Awareness under the new unwritten protocol (compounded high-risk drugs) is distinct, and in addition to, a generalized awareness or fear that Plaintiffs are being put to death. Awareness is the specific and acute terror that accompanies an attempt to draw breath, and a desire to breathe, when one is unable to; as well as the awareness that one is completely paralyzed and unable to act, yet still aware

and sensate to the suffocation and attendant pain gratuitously inflicted by vecuronium bromide.

582. Awareness under the new unwritten protocol (compounded high-risk drugs) is distinct, and in addition to, a generalized awareness or fear that Plaintiff is being put to death. It is the specific and acute burning and searing sensation of the circulatory system and attendant pain gratuitously inflicted by the potassium chloride.

583. The foregoing risks are substantial when compared to the known, feasible, readily implemented and available alternative execution method(s) identified in this Complaint that significantly reduce the substantial risk of Plaintiffs suffering the serious harms alleged in this Cause of Action.

## IV. The July 5th Protocol poses a substantial risk of unnecessary and severe pain and suffering.

584. Even if every step set forth in the July 5th Protocol is followed perfectly, there is a substantial risk Plaintiffs will experience unnecessary pain and suffering during their executions which is substantially greater than the pain and suffering caused by feasible and readily available methods of carrying out their sentences of death.

585. The Chancery Court found: (a) midazolam does not elicit strong analgesic effects; (b) the inmate being executed may be able to feel pain from the administration of the second and third drugs; and (c) during midazolam executions in other states there were signs such as grimaces, clenched fists, furrowed brows, and moans indicative that the inmates were feeling pain after the midazolam had

been injected. The execution of Billy Ray Irick – the only midazolam-based three-drug execution in Tennessee – lasted 20 minutes.

586.    There is a substantial risk the use of midazolam as the initial drug in a three drug protocol, followed by the use of a paralytic drug such as vecuronium bromide, followed by the use of potassium chloride, will cause Plaintiffs to experience unnecessary pain and suffering during their executions which is substantially greater than the pain and suffering caused by feasible and readily available methods of carrying out their sentences of death.

587.    No provision of the July 5th Protocol reduces such risk, more specifically:

588.    The use of a dose of midazolam in excess of the maximum therapeutic and/or clinically-studied dose of midazolam does not reduce the risk that Plaintiffs will experience unnecessary pain and suffering during their executions which is substantially greater than the pain and suffering caused by other feasible and readily available methods of carrying out their sentences of death.

589.    Unlike anesthetic drugs, the maximum effect of midazolam is reached when therapeutic and/or clinically studied doses have been administered. The administration of midazolam in amounts in excess of therapeutic and/or clinically studied doses has no effect.

590.    Midazolam, even at its maximum effect, will not prevent Plaintiffs from experiencing the pain and suffering caused by the subsequent injections of vecuronium bromide and potassium chloride required by the July 5th Protocol.

{111}

591.    The putative "assessment of consciousness" contained in the July 5th Protocol will not determine whether Plaintiffs will experience the pain and suffering caused by the subsequent injections of vecuronium bromide and potassium chloride.

592.    The putative "assessment of consciousness" contained in the July 5th Protocol will determine no more than whether Plaintiffs will physically respond in a manner detectable to Defendant Mays to the stimuli utilized during the "test."

593.    The putative "assessment of consciousness" contained in the July 5th Protocol, and all other tests dependent upon a person's physical response to noxious stimuli, are indicative of awareness only when used in conjunction with a drug capable of rendering a person unconscious.

594.    Midazolam at any dose is incapable of rendering Plaintiffs unaware of and insensate to the pain of the second and third execution drugs.

595.    Therefore, even if Plaintiffs do not physically respond in a manner detectable to Defendant Mays to the stimuli utilized during the "assessment of consciousness," they will not be unconscious.

596.    There is substantial risk that Plaintiffs will experience the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins and the pain and suffering caused by cardiac arrest.

597.    The pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest is

constitutionally unacceptable. *Baze v. Rees*, 553 U.S. 35, 53 (2008); *In Re: Ohio Execution Protocol* (*Fears v. Morgan*), 860 F.3d 881, 886 (6th Cir. 2017), *cert. denied sub nom. Otte v. Morgan*, 137 S. Ct. 2238 (2017).

598. Vecuronium bromide is not necessary to execute Plaintiffs, accordingly, the pain and suffering caused by vecuronium bromide is unnecessary.

599. Potassium chloride is not necessary to execute Plaintiffs, accordingly, the pain and suffering caused by potassium chloride is unnecessary.

**A.  Midazolam**

600. Midazolam is not a barbiturate.

601. Midazolam is a benzodiazepine.

602. Midazolam is not an anesthetic.

603. Midazolam is a sedative. Sedation is a state of calm or sleep.

604. Midazolam has no analgesic effects, *i.e.*, it does not stop an individual from feeling pain.

605. Midazolam, by its nature, cannot induce and/or maintain a state where a person is unaware or insensate to the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest.

606. Midazolam's inhibitory effect on the central nervous system is limited.

607. Midazolam, as a benzodiazepine, affects the central nervous system by facilitating the activity of GABA receptors, the primary effect of which is to reduce anxiety.

608. Gamma amino-butyric acid (GABA) is a primary neurotransmitter that inhibits central nervous system activity.

609. When inhibitory neurons of the brain release GABA onto other brain neurons, GABA binds to GABA-specific receptors. This binding causes chloride ion channels to open on the recipient neurons.

610. The influx of chloride ions through the channels causes those neurons to become more quiescent, to decrease in electrical activity, and to decrease the likelihood of neuronal firing, resulting in neuronal inhibition and central nervous system depression.

611. Midazolam, as a benzodiazepine, promotes the binding of GABA to GABA[A] receptors, which are ion channels with multiple binding sites that can be opened by GABA.

612. Once all GABA receptors are bound, additional midazolam does not have a pharmacological effect upon the central nervous system. Thus, there is a "ceiling effect" with midazolam.

613. Because of the ceiling effect, 500 mg of midazolam is no more effective than the minimum dose of midazolam required to bind available GABA receptors.

614. There is a substantial risk Plaintiffs will experience unnecessary pain and suffocation regardless of the quantity of midazolam injected.

{114}

615.     The July 5th Protocol does not include a procedure or instructions to determine whether Plaintiffs will experience the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest.

616.     The absence of such a provision increases the risk that Plaintiffs will become aware and/or sensate to the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest.

617.     The July 5th Protocol does not provide procedures or instructions for monitoring Plaintiffs' awareness of pain.

618.     The absence of such provisions needlessly increases the risk that Plaintiffs will experience the pain and suffering of involuntary paralysis and suffocation caused by vecuronium bromide, the pain and suffering caused by potassium chloride as it passes through their veins, and the pain and suffering caused by cardiac arrest.

**B.     Vecuronium bromide**

619.     Vecuronium bromide is the second drug used in the July 5th Protocol.

620.     Vecuronium bromide is a neuromuscular blocking agent that produces paralysis, including paralysis of respiratory muscles.

621.     A neuromuscular blocking agent blocks the receptor sites in muscle tissue that receive nerve impulses.

622.     When these sites are blocked, the nerve impulses have no effect on the muscle tissue, which means that the muscle tissue will no longer contract causing paralysis.

623.     A neuromuscular blocking agent has no effect on the central nervous system, and consequently it has no effect on consciousness or the sensation of pain and suffering.

624.     When the diaphragm and other muscles that control breathing are paralyzed, Plaintiffs will experience the sensation of suffocation without being able to respond.

625.     Plaintiffs will not be able to respond by breathing, by moving, or by facial or vocal expressions.

626.     The use of vecuronium bromide under the July 5th Protocol will render Plaintiffs unable to move.

627.     The use of vecuronium bromide under the July 5th Protocol will render Plaintiffs unable to breathe.

628.     The use of vecuronium bromide will prevent any pain responses from being observed.

629.     Midazolam will not prevent Plaintiffs from experiencing the pain and suffering of suffocation caused by Defendants' use of vecuronium bromide.

630. There is a substantial risk that Plaintiffs will be aware and sensate after administration of midazolam and trapped in their own bodies by the paralytic drug as the execution moves forward. This is a chemical entombment akin to being buried alive.

631. When Plaintiffs experience the pain and suffering of suffocation, their bodies will respond with an immediate and extreme spike in adrenaline and other stress hormones, yet the full effect of vecuronium bromide will prevent Plaintiffs from moving or communicating their distress.

632. The use of vecuronium bromide is unnecessary.

**C.    Potassium Chloride**

633. Potassium chloride, the third drug in the July 5th Protocol, is a metal halide salt composed of potassium and chloride.

634. Under the July 5th Protocol, the intravenous injection of potassium chloride will cause a searing, burning, sensation in the veins. This searing pain, like liquid fire, is the chemical equivalent of being burned alive.

635. Under the July 5th Protocol, midazolam will not prevent Plaintiffs from experiencing the searing, burning, sensation in the veins caused by the intravenous injection of potassium chloride.

636. Under the July 5th Protocol, the intravenous injection of potassium chloride will cause the involuntary cessation of Plaintiffs' cardiac activity, *i.e.*, a heart attack.

637. Under the July 5th Protocol, midazolam will not prevent Plaintiffs from experiencing the pain and suffering of a heart attack caused by potassium chloride.

638. The use of potassium chloride as part of a lethal injection protocol is unnecessary.

639. Death under a midazolam-based three-drug protocol is "dreadful and grim." Attachment 7, p.23.

640. Death under Tennessee's July 5th Protocol is prolonged compared to the length of executions in other States using a similar protocol.

641. During the execution of Billy Ray Irick, the only execution conducted under Tennessee's midazolam-based three-drug protocol, he responded to the severe pain created by the execution drugs.

642. Defendants should be preliminarily and then permanently enjoined from carrying out Plaintiff's execution under a midazolam-based, three-drug protocol (the July 5th Protocol (Attachment 4)).

643. The face of this complaint demonstrates a substantial likelihood of success on the merits and Defendants should be enjoined from executing Plaintiff David Miller on December 6, 2018 until he is afforded due process on the issues presented.

## Count Four:
**The July 5th Protocol deprives Plaintiffs of the opportunity
to challenge the constitutionality of electrocution because they must
elect electrocution to avoid the harsher punishment of lethal injection,
in violation of the Fourteenth Amendment.**

{118}

644.    All prior allegations are incorporated in this cause of action.

645.    Execution under the lethal injection protocol, which presents a substantial risk of unnecessary, severe pain will last twenty minutes, whereas, execution in the electric chair which also presents a substantial risk of unnecessary, severe pain will last approximately six minutes.

646.    If Plaintiffs wish to avoid a harsher punishment than the maximum punishment at the time of the crimes, the July 5th Protocol requires that they affirmatively choose to be executed by electrocution. Attachment 4, p.92 (affidavit concerning method of execution)

647.    The July 5th Protocol provides that 30 days before a scheduled execution an inmate will be presented with a form regarding the selection of a method of execution. Attachment 4, pp. 13, 92.

648.    Defendants deviated from this provision of the July 5th Protocol regarding Mr. Zagorski's execution.

649.    If the July 5th Protocol is followed, Defendants will present Plaintiff Miller with such a form on Tuesday, November 6th.

650.    Counsel for Plaintiff Miller has notified TDOC General Counsel of Miller's objections to the form and Defendants presentation of the form to him.

651.    The form provides for the selection of electrocution instead of lethal injection. Lethal injection is the default method of execution should an inmate refuse to fill out the form. Attachment 4, p.92.

652.    Because lethal injection is the default method of execution, Plaintiffs must elect electrocution in order to avoid a harsher punishment than the punishment provided by law at the time of the crimes.

653.    If Plaintiffs complete the affidavit required by the July 5th Protocol and indicate electrocution as the method of execution they may forfeit the right to challenge the constitutionality of electrocution under the Eighth Amendment.

654.    If Plaintiffs seek to avoid a harsher punishment they will be denied the opportunity to be heard on a less-harsh (quantified, at a minimum, by duration) yet nonetheless unconstitutional method of execution.

655.    The July 5th Protocol compels Plaintiffs to abandon the Eighth Amendment right not be tortured and mutilated in the electric chair, by threatening to subject them to the prolonged and excruciating pain of suffocation and internal chemical burns under the July 5th lethal injection protocol.

656.    The coercion caused by the July 5th Protocol leaves Plaintiffs without freedom to choose and preserve their constitutional rights.

657.    Absent such provisions in the protocol and Tennessee law, Plaintiffs would be punished in accordance with the punishment imposed at the time of sentencing (electrocution), and, Plaintiffs would have a right to be heard on the constitutionality of that punishment.

658.    Based on the above allegations, the July 5th Protocol constitutes a violation of the due process guarantee that punishment will be imposed in accordance with due process of law.

659.    Accordingly, this aspect of the July 5th Protocol violates the

Fourteenth Amendment.

660.    Defendants should be enjoined from presenting Plaintiffs, and

specifically Mr. Miller, with the election of execution method affidavit.

<u>Count Five:</u>
**Tennessee law violates Plaintiffs' rights to access courts and counsel
by prohibiting more than one attorney to be present at an execution
and denying that attorney access to a telephone during the execution,
contrary to the First, Eighth, and Fourteenth Amendments.**

661.    Plaintiffs have a constitutional right to access the courts when they

will be harmed or are harmed in violation of the Constitution and the laws of the

United States and Tennessee.

662.    Plaintiffs have a statutory right to counsel during an execution. 18

U.S.C. § 3599.

663.    There is a need to access the court should an execution not proceed

according to the July 5th Protocol or should the July 5th Protocol inflict

unnecessary and serious pain and suffering on an inmate.

664.    Tennessee law arbitrarily limits Plaintiffs' access to the courts by

prohibiting more than one defense attorney witness to an execution. Tenn. Code

Ann. §40-23-116.

665.    Defendants have arbitrarily limited Plaintiffs' access to the courts by

denying Plaintiffs' witnessing-attorney access to a telephone during the execution.

{121}

666. During his deposition, Defendant Parker agreed to provide telephone access for Plaintiffs' during the execution process. Attachment 22, pp. 271-74. After his deposition, that agreement was rescinded.

667. Defendant Parker testified that providing defense counsel with telephone access during an execution would not impede the execution or operations within RMSI. Attachment 21, pp.1116-17.

668. Defense counsel are prohibited from possessing a cell phone or other communication device within the buildings of RMSI and the witness viewing room immediately before and during an execution.

669. Cell phones are operable inside RMSI and, in particular, the execution chamber, witness viewing room and capital punishment unit.

670. Landline phones are available and/or can be connected to the area inside or outside the witness viewing room and within the capital punishment unit.

671. Plaintiffs' sole defense attorney designee for viewing the execution is not permitted to have a fellow attorney or support staff on the grounds of RMSI, including the parking lot.

672. If Plaintiffs' sole defense attorney designee needs to communicate with a court or their office about events occurring during the execution, the attorney must leave the witness viewing room and capital punishment unit (which requires a guard to unlock the door). The attorney must walk through two locked sally-ports and gates, each requiring a guard to open. After five to ten minutes, the attorney may reach the lobby of the prison and then must exit the administration building,

{122}

cross a roadway and run to his or her car to access a cell phone. Attachment 23, pp. 1649-53.

673.    When asked the reason for denying defense counsel access to a telephone, TDOC General Counsel responded under oath that TDOC does not want lawyers to call courts and provide information that might disrupt an execution. Attachment 23, p.1648.

674.    Should events transpire during the execution that cause and/or prolong unnecessary and severe harm to Plaintiffs, one defense attorney witness will be unable to meaningfully seek judicial intervention due to the unreasonable restrictions Defendants place on defense counsel.

675.    To provide adequate access to courts, two defense attorney witness must be present to view the execution. A cell phone or landline phone needs to be available inside or immediately outside of the viewing room. If one of the attorneys leaves the viewing room to use a phone outside the room, the second attorney must be allowed to communicate with the first attorney, so that the first attorney can inform the court of the current events and conditions in the execution chamber.

675.    On October 29, 2018, Defendants were enjoined from proceeding with Mr. Zagorski's execution unless his counsel is "provided with immediate access to a telephone during the time preceding and during the execution." *Zagorski v. Haslam*, No. 3:18-cv-01205, Memorandum and Order, R.15 PageID# 597 (M.D. Tenn. Oct. 29, 2018).

{123}

676.    Defendants should be enjoined from executing Plaintiffs unless they are allowed two defense witnesses with immediate access to a telephone, as set forth in this count.

## Prayer for Relief

WHEREFORE, Plaintiffs request that this Court:

(1) issue a preliminary injunction, followed by a permanent injunction, preventing Defendants from presenting Plaintiff David Earl Miller with the election of execution method affidavit;

(2) issue a preliminary injunction preventing Defendants from carrying out the December 6, 2018 execution of Plaintiff David Earl Miller during the pendency of this action, and thereafter enter a permanent injunction;

(3) issue a permanent injunction, preventing Defendants from carrying out the December 6, 2018 execution of Plaintiff David Earl Miller and carrying out the executions of all Plaintiffs utilizing Tennessee's July 5, 2018 midazolam-based three-drug lethal injection protocol;

(4) issue a permanent injunction, preventing Defendants from carrying out the December 6, 2018 execution of Plaintiff David Earl Miller and carrying out the executions of all Plaintiffs utilizing Tennessee's Electrocution Protocol;

(5) permanently enjoin Defendants from carrying out the December 6, 2018 execution of Plaintiff David Earl Miller and carrying out the executions of all Plaintiffs—in any manner—unless Plaintiffs are allowed two defense attorney

witnesses with immediate access to a telephone and each other during the time
preceding and during the execution.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY:   <u>s/Stephen M. Kissinger</u>
Stephen M. Kissinger, WY Bar 5-2342
Asst. Federal Community Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Phone: (865) 637-7979
Facsimile: (865) 637-7999
Stephen_Kissinger@fd.org

{125}

# Index of Attachments

Attachment
No.

1:      Electrocution Procedures 3/13/17

2:      Chancery Court Declaratory Judgment Order 11/22/10

3:      Lethal Injection Protocol 1/8/18

4:      Lethal Injection Protocol 7/5/18

5:      Dr. Sasich Declaration

6:      Chancery Court Order Applying Tenn Civ. P. Rule 15.02 Dated 07/19/18

7:      Chancery Court Order Dismissing Suit 07/26/18

8:      Dr. Evans Testimony

9:      Email from Drug Supplier

10:     Irick Execution Timeline

11:     News Articles

12:     Dr. Lubarsky Affidavit

13:     Dr. Lubarsky Testimony

14:     Dr. Edgar Testimony

15:     Military Executions/Procedures

16:     Deborah Denno Article

17:     Exhibit of Texas Executions
18:     2018 Executions from Death Penalty Information Center

19:     Documents from the Drug Procurer

20:    Handwritten Notes of the Drug Procurer

21:    Parker Testimony (excerpt)

22:    Parker Deposition (excerpt)

23:    Inglis Testimony (excerpt)

24:    Invoices for Lethal Injection Drugs

25:    Emails from the Drug Procurer

26:    Inglis Deposition (excerpt)

27:    Contracts with Compounding Pharmacies

28:    *(Omitted)*

29:    Redacted Pharmacy Website Information

30:    Redacted Pharmacist and Pharmacy Discipline Records

31:    AP Article re: TN Electric Chair

32:    Allen Lee Davis Execution Photos

33:    Electric Chair Modifications Letters

34:    Dr. Wikswo Reports

35:    Daryl Holton Photos

36:    Daryl Holton Autopsy

37:    News Articles

38:    Ricky Gray Autopsy

39:    William Morva Autopsy

40:     Mays Deposition (excerpt)

41:     Mays Testimony (excerpt)

42:     Sutherland Representation re: Two-Drug Alternative