IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE

STEPHEN MICHAEL WEST,                )
                                      )
            Plaintiff                 )
                                      )
BILLY RAY IRICK,                      )
                                      )        No. 10-1675-1
            Plaintiff/Intervener      )        DEATH PENALTY CASE
                                      )
                                      )        Chancellor Bonnyman
v.                                    )        EXECUTION SCHEDULED:
                                      )        November 30, 2010
GAYLE RAY, in her official capacity as )
Tennessee's Commissioner of           )
Correction, et al,                    )
                                      )
            Defendants                )

**ORDER GRANTING DECLARATORY JUDGMENT**

This matter comes before the Court upon the Plaintiff's Amended Complaint for

Declaratory Judgment and Injunctive Relief; his Motion for Temporary Injunction; and pursuant

to the November 6, 2010, order of the Supreme Court of Tennessee in Case No.

M2010-02275-SC-R11-CV, to, "tak[e] proof and issu[e] a declaratory judgment on the issue of

whether Tennessee's three-drug protocol constitutes cruel and unusual punishment because the

manner in which the sodium thiopental is prepared and administered fails to produce

unconsciousness or anesthesia prior to the administration of the other two drugs." The Court

subsequently granted without objection the motion to intervene of Plaintiff/Intervener Billy Ray

Irick.

On November 19-20, 2010, an evidentiary hearing was held in this matter. After

weighing the evidence presented therein and considering the arguments of counsel, the Court

issued its bench ruling, a certified copy of which is attached hereto. For the reasons stated in its bench ruling, which are hereby fully incorporated herein, the Court finds and declares that Tennessee's three-drug protocol violates the prohibition against cruel and unusual punishment contained in Article 1, section 16 of the Tennessee Constitution and the Eighth Amendment of the United States Constitution.

Pursuant to TENN. R. APP. P. 9(b), the Court finds that this matter is of great public importance and that review upon final judgment will be ineffective.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that Tennessee's three-drug protocol violates the prohibition against cruel and unusual punishment contained in Article 1, section 16 of the Tennessee Constitution and the Eighth Amendment of the United States Constitution.

CLAUDIA C. BONNYMAN,
Chancellor, Part I

Entered: _____

{2}

**Attachment 2**

**APPROVED FOR ENTRY:**

Stephen M. Kissinger
Dana Hansen Chavis
Stephen A. Ferrell
FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.
800 S. Gay St., Suite 2400
Knoxville, TN 37929
phone: 865-637-7979
fax: 865-637-7999


Roger W. Dickson, Esquire
MILLER & MARTIN LLP
832 Georgia Avenue, Suite 1000
Chattanooga, TN 37402
phone: 423-756-6600
fax: 423-785-8480


Howell G. Clements, Esquire
1010 Market St., Suite 401
Chattanooga, TN 37402
Phone: 423-757-5003
Fax: 423-756-9500


C. Eugene Shiles, Jr.
SPEARS, MOORE, REBMAN & WILLIAMS
P. O. Box 1749
Chattanooga, TN 37401-1749
Phone: 423-756-7000
Fax: 423-756-4801

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been sent via email and facsimile to:

Mark A. Hudson
Senior Counsel
Office of Attorney General
425 Fifth Avenue North
P. O. Box 20207
Nashville, TN 37243
Fax number: 615-532-2541

this 22nd day of November, 2010.

Stephen M. Kissinger

{4}

**Attachment 2**



**Attachment 2**

# IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE

STEPHEN MICHAEL WEST,       )
                            )
        Plaintiff,           )
                            )
vs.                          )No. 10-1675-I
                            )
                            )
                            )
GAYLE RAY, In her official   )
capacity as Tennessee        )
Commissioner of Corrections,)
et al.,                      )
                            )
                            )
        Defendants.          )
_____)

**ORIGINAL**

2010 NOV 22 PH 1:05
DAVIDSON CO.

## COURT'S RULING

        BE IT REMEMBERED that the
above-captioned cause came on for hearing this,
the 19th day of November, 2010, in the above
Court, before the Honorable Claudia C. Bonnyman,
Judge presiding, when and where the following
proceedings were had, to wit:

VOWELL & JENNINGS, INC.
Court Reporting Services
207 Washington Square Building
214 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935

APPEARANCES

FOR PLAINTIFF:


        STEPHEN M. KISSINGER
        STEPHEN FERRELL
        DANA HANSEN CHAVIS
        FEDERAL DEFENDER SERVICES OF EASTERN
        TENNESSEE, INC.
        800 Gay Street
        Suite 2400
        Knoxville, Tennessee 37929
        Telephone:  (865) 637-7979
        Email:

FOR PLAINTIFF:


        ROGER W. DICKSON
        MILLER & MARTIN, LLP
        832 Georgia Avenue
        100 Volunteer Building
        Chattanooga, Tennessee 37402
        Telephone:  (423) 756-8330
        Email:  Rdickson@millermartin.com


FOR INTERVEINING THIRD-PARTY PLAINTIFF; BILLY

IRICK:


        HOWELL CLEMENTS
        CLEMENTS & CROSS
        Monteagle Office
        1020 West Main Street
        P.O. Box 99
        Monteagle, Tennessee 37356
        Telephone:  (931) 924-2060


(Appearances Continued Page 2)

Attachment 2

APPEARANCES CONTINUED

FOR STATE OF TENNESSEE:

        MARTHA A. CAMPBELL
        MARK HUDSON
        STATE OF TENNESSEE ATTORNEY GENERAL
        2nd Floor, CHB
        425 5th Avenue, North
        Nashville, Tennessee 37219
        Telephone: (615) 532-2558
        Email: Martha.campbell@ag.tn.gov,
Mark.Hudson@ag.tn.gov

COURT REPORTING FIRM:

        LEILA ZUPKUS NOLAN
        Vowell & Jennings, Inc.
        214 2nd Avenue North
        Suite 207
        Nashville, Tennessee 37201
        Office: (615) 256-1935

* * * * * *

THE COURT: Please be seated.
Lawyers and citizens and court reporter, I
appreciate your patience.  I know this is not
easy on people to stay this late.

As I stated before this is the
Court's bench ruling, and a bench ruling is
sometimes pretty rough and this one will be
somewhat rough, but I'm hoping and trusting that
this will be an opinion that will be
understandable and will be useful.

The statement of the case: The
plaintiff is an inmate condemned to be executed
by order of Tennessee's Supreme Court on
November 30, 2010 because he murdered
15-year-old Sheila Romines and her mother Wanda
Romines.  He will be executed by the default
method of legal injection -- lethal injection.

The petitioner filed suit in the
Davidson County Chancery Court seeking
declaratory judgment that the method of his
execution is wrongful under the federal and
state constitutions.  An additional plaintiff

1  Mr. Irick was allowed to intervene in the case

2  because he faces execution on December 7, 2010

3  and he seeks the same relief against the same

4  defendants.

5          As in all situations involving

6  capital punishment the condemned plaintiff, or

7  inmate, has committed a heinous crime.  The

8  Tennessee legislature and many other state

9  legislatures have passed laws requiring that

10  when crimes are determined to be sufficiently

11  horrific, the ultimately penalty, death, will be

12  the punishment.  The Court may interfere only --

13  may only interfere with that process that

14  judgment and that penalty when that process runs

15  afoul of the Federal and State Constitutions.

16          The narrow focus of this Court is

17  upon Tennessee's 2007 lethal drug execution

18  method under its protocol and whether the

19  protocol violates the constitutional prohibition

20  against cruel and unusual punishments.  And as

21  for the issues in this case, the plaintiff

22  contends that the State's current protocol for

23  execution does not render the inmate unconscious

24  before the second and third lethal drugs are

25  administered, and for that reason the punishment

Attachment 2

1  for execution under the 2007 protocol is cruel

2  and unusual punishment.

3          The plaintiff argues that all three

4  drugs are separately intended to kill the

5  condemned man.  The plaintiff asserts that the

6  first drug is to render the person unconscious.

7  The second drug is to paralyze the lungs,

8  diaphragm, and the entire body, and the third

9  drug is to stop the heart.  According to the

10 plaintiff, the first drug, sodium thiopental,

11 does not function as represented by the State.

12 Instead, says the plaintiff, sodium thiopental

13 is an ultra fast acting drug, which cannot be

14 relied upon to keep the condemned man fully

15 unconscious or to render him dead before the

16 second drug, a paralyzing drug, begins its

17 effect of suffocation.

18          The plaintiff asserts that although

19 the second drug, pancuronium bromide, is

20 administered to prevent the condemned man from

21 moving or breathing or calling out, it is

22 actually the fatal element under the Tennessee

23 protocol and death is therefore by suffocation.

24 The plaintiff argues that the autopsy reports

25 and toxicology reports show postmortem serum

Attachment 2

1  levels of sodium thiopental from three

2  executions in Tennessee using the 2007 protocol,

3  and they are proof that the sodium thiopental

4  injection did not and does not keep the

5  condemned man unconscious, and in fact, says the

6  plaintiff the three executed men Henley,

7  Workman, and Coe were conscious, were aware of

8  and experienced their deaths by suffocation.

9          Further says the plaintiff, the

10  State personnel who administered the IVs and the

11  personnel who were executioners are not trained

12  adequately nor are they asked to specifically

13  insure the prisoner is unconscious.  According

14  to the plaintiff, Tennessee's 2007 protocol has

15  no safe guards or procedures to verify that the

16  prisoner is unconscious during the injection of

17  the pancuronium bromide and potassium chloride,

18  the third drug.  The plaintiff reasons through

19  his expert, Dr. Lubarsky, that the data

20  collected and studied so far, although limited

21  and imperfect, make available postmortem serum

22  thiopental levels as the best evidence to show

23  the inmate's consciousness, and this postmortem

24  data does show such consciousness when the

25  second and third drugs are injected -- when the

Attachment 2

1   second drug is injected.

2           The plaintiff does not proffer an
3   alternative to this cruel type of execution, but
4   instead looks at other State's protocols and
5   other State's efforts to reach humane execution.
6   The State has limited its contentions to those
7   which have been identified by the Supreme Court
8   of the United States and by the Tennessee
9   Supreme Court.  The State contends that our
10  federal courts have decided a three-drug lethal
11  injection protocol is consistent with standards
12  of decency.  The State asserts that Tennessee
13  shares its three-drug lethal injection method
14  with the majority of the states in which capital
15  punishment is allowed.

16          The State asserts that
17  Dr . Lubarsky's study focuses upon postmortem
18  serum levels of sodium thiopental to establish
19  that there was consciousness at the time of
20  execution but that the study has been rebutted
21  by sufficient questions that the study does not
22  have weight or legitimacy.  In fact, says the
23  State, no Court has given the study weight.  The
24  State argues it is the plaintiff's burden to
25  show that the amount of sodium thiopental

Attachment 2

1 mandated in the protocol, which is 5 grams
2 creates an objectively intolerable risk of harm
3 or suffering, and this the plaintiff cannot
4 show.  The State reasons that the expert medical
5 examiner, Dr. Li, is an autopsy expert and knows
6 better than the plaintiff's expert what occurs
7 in the blood after death.
8           The issues for the Court to decide
9 are:  One, whether the current amount and
10 concentration of sodium thiopental mandated by
11 Tennessee's 2007 lethal injection protocol are
12 insufficient to insure unconsciousness so as to
13 create an objectively intolerable risk of severe
14 suffering or pain during the execution.  Two, as
15 a factual matter, the Court is to decide at what
16 level -- what level of sodium thiopental is
17 sufficient to insure unconsciousness so as to
18 negate any objectively intolerable risk of
19 severe suffering or pain during the execution.
20 Number three, is there a feasible and readily
21 available alternative procedure which could be
22 supplied at execution to insure unconsciousness
23 and negate any objectively intolerable risk of
24 severe suffering or pain.  And, Four, did the
25 State refuse to adopt or adapt to this

Case 3:18-cv-01234  Document 1-3  Filed 11/02/18  Page 14 of 45 PageID #: 238
**Attachment 2**

1  alternative, and without justification adhere to

2  its current method. (CO)

3          And as for the summary -- a very

4  brief summary of the decision, the Court find

5  the current protocol for execution by lethal

6  injection execution is cruel and usual because

7  the plaintiff has carried its burden to show

8  that the protocol allows suffocation -- death by

9  suffocation while the prisoner is conscious.

10          And as for the facts that the Court

11  is finding as a result of the evidentiary

12  hearing, Number 1, Tennessee's 2007 lethal

13  injection protocol.  Tennessee's 2007 protocol

14  requires the administration of three drugs;

15  sodium thiopental, pancuronium bromide, and

16  potassium chloride through an intravenous

17  catheter in a rapid -- by use of 11 large and

18  rapid bolus injections.  Before the injection

19  process begins, according to the protocol,

20  catheters are inserted in both of the inmate's

21  arms by two technicians.  Once the lines have

22  been established, the technicians leave the

23  execution chamber and remain in an area where

24  they cannot see the inmate.

25          The only person with the inmate in

1  the execution chamber at the time the drugs are
2  administered is the warden of River Bend Maximum
3  Security Institution, the site of the execution
4  apparatus.  The -- the need for two catheters is
5  that the first catheter is used for the
6  injection, and the second catheter is a backup
7  in case the first one fails.  The executioner
8  first injects 5 grams of sodium thiopental,
9  which the protocol states is disbursed into four
10  syringes at a concentration of 2.5 percent with
11  1.25 grams of the drug in each syringe.  Sodium
12  thiopental is a rapid acting barbiturate
13  commonly used in anesthesia.  In the past,
14  sodium thiopental was administered in small
15  amounts during surgery, before surgery to induce
16  unconsciousness rapidly while other measures
17  were then used to deepen the level of
18  unconsciousness.  Sodium thiopental is now
19  used -- is not commonly used in surgery at this
20  time.
21          Continuing on with the protocol,
22  following a saline flush, the executioner
23  injects 100 milligrams of pancuronium bromide
24  into the IV lines.  Pancuronium bromide is a
25  muscle paralytic.  The drug completely paralyzes

Case 3:18-cv-01234   Document 1-3   Filed 11/02/18   Page 16 of 45 PageID #: 240
Attachment 2

1   the diaphragm, such that the prisoner cannot

2   breathe.  By itself, 100 milligrams of

3   pancuronium bromide would be sufficient to kill

4   a person by suffocation.  Pancuronium bromide

5   eliminates the involuntary muscle movements that

6   could be caused by the operation of the third

7   drug, potassium chloride, in the prisoner's

8   body.

9           If pancuronium bromide were

10  injected solely on its own, the prisoner would

11  experience and be aware of his death by

12  suffocation.  Following a second saline flush,

13  the executioner injects a third and final drug,

14  potassium chloride in the amount of 200

15  milligrams -- 200 MEQ.  The purpose of this drug

16  is to cause cardiac arrest.  If conscious, the

17  inmate would suffer a burning pain throughout

18  his body when the potassium chloride is

19  injected.  And I believe the parties agree about

20  this and I think they also agree that if

21  pancuronium bromide were given by itself the

22  death would be by conscious suffocation.  I

23  don't think there is a dispute about that.  Now,

24  the plaintiff does not focus on the third drug

25  in this lawsuit because the plaintiff

1  understands that the third drug is redundant and
2  the prisoner has already died by suffocation.
3            In this case, the plaintiff has
4  carried his burden to show that the first
5  injection of 5 grams of sodium thiopental
6  followed by rapid injection of the second drug
7  will result in the inmate's consciousness during
8  suffocation.  And as for further facts in the
9  case and the medical proof, both parties called
10 medical experts.  The Court found that both
11 experts could assist the finder of fact because
12 the issues in the case focus upon chemical
13 reaction to drugs in the body before and after
14 death.
15            In compliance with Rule 702 of the
16 rules of evidence both experts are medical
17 doctors.  Dr. Lubarsky called by the plaintiff
18 is a board-certified anesthesiologist, who is
19 both a clinician and a prolific academic
20 researcher and published writer.  Dr. Lubarsky
21 has been a tenured professor on medical ~~faculties~~
22 ~~factories~~ at excellent medical schools.  He is a
23 teacher accustomed to providing explanations in
24 the language of beginning and in the language of
25 experienced medical students.  It appears to the

1 Court than an expert anesthesiologist who is

2 also a teacher is an ideal expert for the

3 evaluation of consciousness and unconsciousness.

4         Dr. Li, a senior assistant medical

5 examiner contracted in Metro Government has also

6 been a teacher in the past.  He began his

7 medical education in his native China and then

8 continued with his residency in this country.

9 There is no reason to doubt his expertise based

10 upon his education and background.  It appears

11 to the Court that a medical examiner has

12 experience and knowledge about ~~toxicality~~

13 toxicology, pathology, pharmacology and other

14 matters in order to opine about the cause of

15 death and the manner of death.

16         And as for the medical proof, the

17 plaintiff carried his burden to show that the

18 Tennessee protocol does not insure that the

19 prisoner is unconscious before the paralyzing

20 drug; that is, the second becomes active -- is

21 injected and becomes active in the body.  The

22 petitioner, or plaintiff, has never conceded

23 that 5 grams of sodium thiopental ensures

24 unconsciousness or ensures unconsciousness by

25 death for any particular person because there

Attachment 2

1   are many variables which prevent such a safe

2   prediction which would prevent conscious death

3   of suffocation.

4             Dr. Lubarsky first explained that

5   breathing is a primary survival impetus for

6   humans.  It is extremely disturbing to a patient

7   when the patient is unable to get air.  Not to

8   be too simplistic, but life is about getting a

9   breath of air.  The body is tuned to need and

10   get air.  It is a primary survival issue.  There

11   is great suffering and pain if a patient were to

12   suffocate from lack of air.  Through

13   Dr. Lubarsky, the plaintiff was able to show

14   that because a paralyzing drug is used soon

15   after sodium thiopental is injected, no one can

16   tell if the prisoner is conscious or unconscious  *given Tennessee's protocols (A)*

17   and this is a tragedy given execution by

18   injection.

19             These factual statements made by

20   Dr. Lubarsky and found to be accurate by the

21   Court have increased the Court's comprehension

22   of the anticipated severity of the suffering.

23   Dr. Lubarsky explained the study that he

24   authored, which was published in the British

25   journal Lancet.  The study exams the level of

Case 3:18-cv-01234   Document 1-3   Filed 11/02/18   Page 20 of 45 PageID #: 244

**Attachment 2**

1  sodium thiopental in the blood serum through

2  autopsy, which of course, is after the prisoner

3  has been executed.  Dr. Lubarsky explained that

4  he and his co-authors had a difficult time

5  getting data on executed prisoners.  But they

6  did get data and they did explain -- they did

7  explain through their data and the study that

8  the level of sodium thiopental in the blood

9  serum, postmortem sometimes measures higher than

10 expected and somewhat lower but is fairly

11 equivalent to the level of sodium thiopental at

12 death; that is, at execution because this kind

13 of chemical is stable in the blood and does not

14 naturally increase or decrease much.

15             He admits that his study published

16 in the Lancet is not perfect, and he concedes

17 they could have used more data but they could

18 not get the data.  Dr. Lubarsky makes the very

19 good point that after this article was peer

20 reviewed and published, it was challenged.  But

21 following the author's response to the

22 challenges, the critics backed off and have not

23 countered with further criticism, nor have there

24 been other studies.

25             The Court finds that Dr. Lubarsky's

1   testimony is convincing, and his study is
2   convincing that the level of sodium thiopental
3   is used by different people in different ways,
4   and the reactions are variable -- are very
5   variable.  The study shows the amount of sodium
6   thiopental in the blood serum of prisoners
7   across the country were lower than one would
8   hope would be the case because the level was not
9   high enough to insure that the prisoners were
10  unconscious.
11          Dr. Lubarsky studied and reported
12  upon the autopsies of three Tennessee prisoners
13  who were executed using the protocol in
14  Tennessee that is the issue in this case.  They
15  were injected with 5 grams of sodium thiopental
16  as far as anyone is aware.  The level of this
17  drug in the blood measured through the
18  autopsies, however, shows the three men did not
19  have sufficient amounts of this drug to insure
20  unconsciousness.  Instead their levels were
21  10.2 milligrams per liter for Mr. Coe, 18.9
22  milligrams per liter in the Workman's case, and
23  8.31 milligrams per liter from the Henley
24  autopsy.  His research shows that with 50
25  milligrams per liter, half of the persons would

1  be conscious at that time and half would not be
2  conscious.
3            As for medical proof, continued,
4  Dr. Li opined that he believed that Mr. Coe,
5  Mr. Workman, Mr. Henley were unconscious at the
6  time of their deaths.  He based his opinion in
7  part on Winek's drug and chemical blood level
8  data.  This is Trial Exhibit 27.  This chart
9  shows levels for therapeutic or normal and then
10 for toxic and lethal.  The postmortem levels of
11 sodium thiopental in previous Tennessee executed
12 inmates sometimes fell within the range for
13 therapeutic or normal, as well as falling within
14 the range for toxic or lethal.  When asked to
15 explain why Mr. Workman's postmortem sodium
16 thiopental level was sufficiently higher --
17 significantly higher than Mr. Coe's and
18 Mr. Henley's even though his autopsy had not
19 been performed until ten days after his
20 execution and the other inmate's autopsies had
21 been performed seven hours after their
22 executions approximately, Dr. Li stated that
23 every human body is different and that these
24 differences have an effect on the drug level.
25            He also states that no single

Attachment 2

1    member such as the one -- no single number such

2    as the one used in Winek's can be used to

3    explain or calculate what the drug level would

4    have been at the time of the inmate's death.

5    Dr. Li stated that according to general theory,

6    levels of medication found in the blood

7    decreased postmortem but that this would depend

8    upon the medication.  The two experts agree --

9    appear to agree that the levels of sodium

10   thiopental will be used in the body depending

11   upon many variables.  This is a complex study,

12   and Dr. Li conceded or stated that he would need

13   to draw upon many disciplines and have many

14   factors to analyze before concluding how a

15   particular medication would act in the body

16   predeath and postdeath.

17          Now, the State called Mr. Voorhies

18   as a witness.  He is a department of corrections

19   experienced administrator from the State of

20   Ohio.  He testified about nine executions at

21   which he had been present, where 5 grams of

22   sodium thiopental were injected.  The fact that

23   5 grams of sodium thiopental is fatal or appear

24   to be fatal when allowed to work over 11

25   minutes, however, is not depositive of the

1    three-drug protocol issue which is presented

2    here.

3            And as for facts regarding the

4    failure to check for consciousness, the Florida

5    Department of Corrections which adopted new

6    lethal injection procedure effective for

7    executions after May 9, 2007 included the

8    following procedure to immediately follow the

9    sodium thiopental injections: ~~In quotes at this~~

10    ~~point~~, "At this point a member of the execution

11    team will assess whether the inmate is

12    unconscious.  The warden must determine after

13    consultation that the inmate is indeed

14    unconscious.  Until the inmate is unconscious

15    and the warden has ordered the executioners to

16    continue, the executioner shall not proceed to

17    Step 5, ~~close quote~~".  And this is from Florida

18    protocol hearing exhibit -- hearing and this is

19    exhibit -- Trial Exhibit 24 Page 8.

20            Proceeding on with the facts --

21    findings of fact under the subject, Failure to

22    check for consciousness, the Court finds that in

23    California's lethal injection protocol and

24    review, which was issued on May 15, 2007, the

25    California Department of Corrections review team

1   pointed out that earlier versions of this

2   protocol made no provisions of any objective

3   assessment of consciousness of the condemned

4   inmate following administration of the sodium

5   thiopental, and before the administration of the

6   other chemicals.

7             The State of California lethal

8   injection protocol review.  The California

9   committee noted that there are reliable but

10   relatively uncomplicated methods for effectively

11   assessing consciousness that have been

12   incorporated into California lethal injection

13   protocol.  Among them are talking to and gently

14   shaking the inmate as well as lightly brushing

15   eyelash.  For that reason, changes were made to

16   the California protocol to place staff in close

17   proximity to the condemned inmate throughout the

18   execution to assess and confirm the condemned

19   inmate is unconscious prior to and during the

20   administration of the pancuronium bromide and

21   the potassium chloride.  This is from Trial

22   Exhibit Number 25, Page -- I'm sorry -- Hearing

23   Exhibit 25 Page 20.  Number 25, Page 20.

24             The Tennessee protocol committee

25   appears to have been well aware of the necessity

Attachment 2

1  for checking consciousness under the three-drug

2  protocol option.  In a document prepared by the

3  chair of the committee, Julian Davis, that

4  listed the pros and cons of the various options

5  considered by the committee, the following

6  phrase appears as "con" under the three-drug

7  protocol:  Would likely need to add a method of

8  ascertaining consciousness after sodium

9  thiopental.  Hearing collective Exhibit Number 3

10 former trial Exhibit Number 7.  The April 19,

11 2007, minutes of the Tennessee Protocol

12 Committee state that Deputy Commissioner Ray

13 also mentioned having something that would

14 assure the unconsciousness of the inmate during

15 the execution procedure.  In addition, those

16 minutes reflect a conversation between Warden

17 Bell and Physician A in which Warden Bell

18 inquired about what would indicate the inmate is

19 unconscious after the first drug and a saline

20 flush are given, ~~in paren,~~ (three drug protocol,)

21 ~~close paren~~, so we can give the signal to go

22 ahead with the other drugs.  The physician

23 suggested looking at the inmate's eyes but also

24 stated that constricted pupils are not a

25 definitive sign of unconsciousness.  Therefore,

1    he also advised checking for an eyelash response

2    by brushing a finger across them, lifting up the

3    person's arm and a pin prick or pinching the

4    nipples. This Hearing Exhibit Collective 3,

5    former Trial Exhibit 29.

6            Ms. Gail Ray's notes from that same

7    meeting include the sentence: What if any

8    safeguards to insure a person is appropriately

9    anesthetized, with an arrow pointing toward any

10    monitoring by medicine, medical personnel,

11    question. Hearing Exhibit Collective 3, former

12    trial Exhibit 31 at Page 30. Mr. Elkins,

13    counselor to the Governor, verified that he had

14    taken notes concerning a telephone conversation

15    with Commissioner Little on April 20, 2007, in

16    which he had written ask them to introduce a

17    step to explicitly go over and check level of

18    sedation. Hearing Exhibit Collective Number 3;

19    former Trial Exhibit 5 at Page 7.

20            And also from Harbison versus

21    Little and Others, Exhibit Number 1, I'm going

22    to read into the record a brief testimony from

23    Debbie Inglis the Tennessee Department of

24    Corrections general counsel, Question posed to

25    her: One of the physicians which you consulted

```
 1    during the course of the committee's work
 2    advised the committee about a number of
 3    different ways to assess an inmate's anesthetic
 4    depth which wouldn't require the use of any
 5    machine; is that correct?
 6                    And her answer was:  A physician
 7    did recommend in response to our question to
 8    give us ways that we could actually sort of
 9    determine at a particular point whether there
10    was consciousness or not, but those weren't ways
11    of actively monitoring the anesthetic depth over
12    the process.
13                    Question:  Okay.  Did the physician
14    that told you that those were ways to assess
15    anesthetic depth, was he the one that told you
16    that wasn't -- that that wasn't adequate?
17                    Answer:  No.  What I'm saying is
18    the physician was telling us that at a
19    particular point you could maybe look at -- do a
20    pinprick or move something on the inmate's foot,
21    pinch them, and that right tell you at the time
22    that that inmate was unconscious at this point,
23    but I mean, I think it goes out saying that
24    unless you are -- that does not monitor the
25    anesthetic depth over the course of the
```

1    execution.

2              Question:  Did the physician tell

3    you you couldn't make a second check or third

4    check or a fourth check?

5              Answer:  No.

6              Question:  If it was needed?

7              Answer:  No.

8              Question:  Did the physician tell

9    the committee that there was some limitations on

10   how often these checks could be provided or

11   could be conducted?

12             Answer:  No.

13             Question:  So what is the basis of

14   your statement that these checks could not be

15   continued throughout the lethal injection

16   process?

17             Answer:  Well just that it wouldn't

18   be practical as you are carrying out the

19   execution to have someone standing there

20   pinching the inmate.  I mean, we didn't think

21   that would be appropriate, and our experts

22   didn't indicate that -- you know, that this was

23   a necessary step.  In any event, these

24   suggestions were simply in response to our

25   question of what could be done to check

1  consciousness.

2          Question:  You said before that

3  experts -- that you had experts who told you

4  that assessing anesthetic depth wasn't

5  necessary, but those same experts did advise you

6  of the critical importance of the inmate being

7  unconscious before the administration of the

8  second two drugs, did they?

9          Answer:  They certainly, yes,

10  indicated that that was the purpose of the first

11  drug and that that was important.

12          And that completes at this time the

13  findings of fact.  I'm going to move to the

   *principle of law. (B)*

14  ~~principles law.~~  And first the Court is looking

15  at Rule 702, testimony about experts.  If

16  scientific, technical, or other specialized

17  knowledge will substantially assist the trier of

18  fact to understand the evidence or to determine

19  a fact in issue, a witness qualified as an

20  expert by knowledge, skill, experience, training

21  or education, may testify in the form of an

22  opinion or otherwise.

23          Rule 703, basis of opinion

24  testimony by experts.  The facts or data in the

25  particular case upon which an expert bases an

**Attachment 2**

1     opinion or inference may be those perceived by

2     or made known to the expert at or before the

3     hearing.  If of a type reasonably relied upon by

4     experts in a particular field in forming

5     opinions or inferences upon the subject, the

6     facts or data need not be admissible in

7     evidence.  The Court shall disallow testimony in

8     the form or opinion or inference if the

9     underlying facts or data indicate *cb* lack of

10    trustworthiness.

11           As for principles of the law from

12    McDaniel versus CSX Transportation, which is 955

13    S.W. 2d 257, a 1977 opinion -- Supreme Court

14    opinion, in general, questions regarding the

15    admissibility, qualifications, relevancy and

16    competency of expert testimony are left to the

17    discretion of the trial court.  The specific

18    rules of evidence that govern the admissibility

19    of scientific proof in Tennessee are Tennessee

20    Rules of Evidence 702 and 703.

21           In Tennessee under the recent

22    rules, a Trial Court must determine whether the

23    evidence will substantially assist the trier of

24    fact to determine a fact in issue and whether

25    the facts and data underlying the evidence

**Attachment 2**

1  indicate a lack of trustworthiness.  The rules

2  together necessarily require determination as to

3  the scientific validity or reliability of the

4  evidence.  Simply put, unless the scientific

5  evidence is valid, it will not substantially

6  assist the trier of fact unless underlying facts

7  and data appear to be trustworthy, but there is

8  no requirement any rule be generally accepted.

9  Although we do not expressly adopt -- here the

10  Court is referring to the federal standard in

11  <u>Daubert</u>, The non-exclusive list of factors to

12  determine reliability are useful in applying our

13  Rule 702 and 703.  The Tennessee Trial Court may

14  consider in determining liability:  One, whether

15  scientific evidence has been testified and the

16  methodology with which it has been tested.  Two,

17  whether the evidence has been subjected to peer

18  review or publication.  Three, whether a

19  potential rate of error is known.  Four, whether

20  as formerly required by Frye the evidence is

21  general accepted in the scientific community.

22  And Five, whether the expert's research in the

23  field has been conducted independent of

24  litigation.

25            Although the Trial Court must

**Attachment 2**

1  analyze the signs and not merely the

2  qualifications, demeanor, or conclusions of

3  witnesses, the Court may not weigh or choose

4  between two legitimate but conflicting

5  scientific views.  The Court instead must assure

6  itself that the opinions are based on relevant

7  scientific methods, processes, and data and not

8  upon an expert's mere speculation.

9       And now the Court will continue with

10  principals of law from <u>Baze versus Rees</u>, which

11  is U.S. Supreme Court Case at 553 US35 rendered

12  in 2008.  The 8th Amendment to the Constitution

13  applicable to the states through the due process

14  clause of the 14th Amendment provides that

15  excessive bail shall not be required nor

16  excessive fines imposed, nor cruel or unusual

17  punishments inflicted.

18       We begin with a principle settled by

19  <u>Gregg versus Georgia</u> that capital punishment is

20  constitutional.  It necessarily follows that

21  there must be a means of carrying it out.  Some

22  risk of pain is inherent in method of execution

23  no matter how humane.  If only from the prospect

24  of error in following the required procedure,

25  it's clear then that the constitution does not

Case 3:18-cv-01234   Document 1-3   Filed 11/02/18   Page 34 of 45 PageID #: 258

**Attachment 2**

demand the avoidance of all risk of pain in
carrying out executions.  Our cases; that is,
those of the U.S. Supreme Court, recognize that
subjecting individuals to a risk of future harm,
not simply actually inflicting pain can qualify
as cruel and unusual punishment.

    To establish that exposure violates
the 8th Amendment, however, the conditions
presenting the risk must be sure or very likely
to cause serious illness and needless suffering
and give rise to sufficiently imminent dangers.
We have explained that to prevail on such a
claim, there must be a substantial risk of
serious harm, an objectively intolerable risk of
harm that prevents prison officials from
pleading that they were subjectively blameless
for purposes of the 8th Amendment.  Simply
because an execution method may result in pain
either by accident or is an inescapable
consequence of the death does not establish the
sort of objectively tolerable risk of harm that
qualifies as cruel and unusual.

    Given what our; that is, the U.S.
Supreme Court cases, have said about the nature
of the risk of harm that is actionable under the

Attachment 2

1    8th Amendment, a condemned prisoner cannot

2    successfully challenge the State's method of

3    execution merely by showing a slightly or

4    marginally safer procedure.  Instead the

5    proffered alternatives must effectively address

6    a substantial risk of serious harm.  To qualify,

7    the alterative procedure must be feasible,

8    readily implemented and in fact significantly

9    reduce the substantial risk of severe pain.  If

10   the State refuses to adopt such an alternative

11   in the face of these documented advantages

12   without legitimate penalogical justification for

13   justification for adhering to its current method

14   of execution, then the State's refusal to change

15   its method can be viewed as cruel and unusual

16   under the 8th Amendment.

17          And now the Court is reading from

18   Harbison, Sixth Circuit ruling, and the Court is

19   specifically distinguishing this current case

20   from the Baze ruling and reasoning and from the

21   Harbison ruling and reasoning.  Unlike Baze and

22   Harbison, there is no agreement in this case

23   that the level of sodium thiopental in the

24   protocol was constitutionally acceptable.  In

25   the Harbison case -- and this is a citation and

Case 3:18-cv-01234   Document 1-3   Filed 11/02/18   Page 36 of 45 PageID #: 260

Attachment 2

1  it is a principle of law from the <u>Harbison</u> case.

2  As in <u>Baze</u>, the inmate in Harbison concedes that

3  if the protocol were followed perfectly it would

4  not pose an unconstitutional risk of pain and

5  argues instead that maladministration of the

6  sodium thiopental would result in a severe risk

7  of pain from the subsequent drugs that could go

8  undetected.  Further -- and this is also from

9  <u>Harbison</u>, which I distinguish, but I still think

10  there is some principle of law here that will

11  both illuminate the distinguishing character of

12  <u>Baze</u> and <u>Harbison</u> and also will establish some

13  principles of law.  The District Court first

14  concluded that the amended protocol was

15  deficient because it did not provide a proper

16  procedure for insuring that the inmate was

17  unconscious before administering the pancuronium

18  bromide.  The Court noted that other states

19  required the execution team to determine if the

20  inmate is still conscious before proceeding with

21  this step.

22           The Tennessee protocol review

23  committee also have recommended that procedures

24  be put in place to insure that the inmate was

25  unconscious at this step.  Possible methods for

1 determining unconscious -- returning
2 consciousness included lightly brushing
3 eyelashes, lifting up an arm or pinching a
4 nipple.  Despite this recommendation, these
5 safeguards were not adopted in the amended
6 protocol.  Instead the prison warden who was in
7 the room with the inmate and the executioners
8 who would be able to see the inmate through a
9 one-way glass window monitored the prisoner
10 visually during the execution process, which the
11 State believed to be sufficient safeguard.
12          The District Court in Harbison
13 disagreed, holding that the failure to check for
14 consciousness greatly enhanced the risk the
15 inmate would suffer unnecessary pain.  Baze,
16 however, rejected the necessity of the
17 procedures relied upon by the District Court.
18 It noted at the outset that because a proper
19 dose of sodium thiopental would render any check
20 for consciousness unnecessary.  There was no
21 such agreement, however, in this case, as there
22 was in Baze and in Harbison that the protocol as
23 written if properly administered is
24 constitutionally acceptable.
25          Then I'm going back here to Baze

Case 3:18-cv-01234   Document 1-3   Filed 11/02/18   Page 38 of 45 PageID #: 262

Attachment 2

```
 1   for further principles of law and further
 2   analysis of this particular case.  And this is
 3   from the plurality decision in U.S. Supreme
 4   Court case in Baze.  The decent believes that
 5   rough and ready tests for checking
 6   consciousness; calling the inmate's name,
 7   brushing his eyelashes or presenting him with
 8   strong noxious odors could materially decrease
 9   the risk of administering the second and third
10   drugs before the sodium thiopental has taken
11   effect.  Again -- and this is from Baze, the
12   risk at issue is already attenuated, given the
13   steps Kentucky has taken to insure the proper
14   administration of the first drug.
15        And here this Court notes in Baze and in
16   Harbison, the parties had agreed that if
17   properly administered, the level of sodium
18   thiopental was constitutionally acceptable.
19   This case, this West (and Irick) case, differs
20   because there is no such agreement here and the
21   Court must therefore continue on and -- continue
22   on as I have done earlier in this decision to
23   analyze other factors and not stop at the Baze
24   and Harbison analysis.
25             I am going back now to the issues
```

Case 3:18-cv-01234   Document 1-3   Filed 11/02/18   Page 39 of 45 PageID #: 263

Attachment 2

1    that the Court must decide in the case, whether

2    the current amount and concentration of sodium

3    thiopental mandated by Tennessee's 2007 lethal

4    injection protocol are insufficient to insure

5    unconsciousness so as to create an objectively

6    intolerable risk of severe suffering or pain

7    during the execution.

8          This Court finds that the current amount

9    and concentration of sodium thiopental are

10    insufficient to insure unconsciousness because

11    the body's ability to and the body's actual use

12    of this drug depends on so many variables, and

13    both medical experts agree that that was the

14    case.

15          And Number Two is a factual matter.  The

16    Court is to decide at what level sodium

17    thiopental -- at what level is the sodium

18    thiopental sufficient to insure unconsciousness

19    so as to negate any objectively intolerable risk

20    of severe suffering or pain during the

21    execution.  And I should go back to issue

22    Number 1, and say the objectively intolerable

23    risk of severe pain -- suffering or pain during

24    the execution is the injection of the second

25    drug, the paralyzing drug after the first

1   inadequate and inefficient drug has been

2   injected; that is, to do so so quickly and to do

3   at all.

4        As a factual matter -- going on now to

5   issue Number 2, at what level is this particular

6   drug; that is, Number 1 -- sufficient to insure

7   unconsciousness.  And although Dr. Li testified

8   that 5 grams of sodium thiopental is fatal -- or

9   should be fatal, Dr. Li also agreed with

10  Dr. Lubarsky that the amount of sodium

11  thiopental which will -- can be -- can provide

12  an assurance that a particular level of this

13  drug will be effective in the body depends on

14  many, many variables.  And so although this

15  Court listened very closely to the experts'

16  opinions about this particular issue, this Court

17  is unable to find what level of sodium

18  thiopental is sufficient to insure

19  unconsciousness because I don't think there is

20  one, given the medical proof that the Court is

21  relying on; given the medical proof in the case.

22        Number 3, is there a feasible and

23  readily available alternative procedure which

24  could be supplied at execution to insure

25  unconsciousness and negate any objectively

Attachment 2

1  intolerable risk of severe suffering or pain?

2  It appears to this Court that there are feasible

3  and readily available alternative procedures

4  which could be supplied at execution to insure

5  unconsciousness and negate any objectively

6  intolerable risk of severe suffering or pain.

7  This Court should not say or find which of those

8  it would recommend, but I think the Court's

9  finding of fact regarding the ways -- the

10  various ways that unconsciousness can be checked

11  should be left to the State.

12       But the proof in the Harbison case

13  that was filed in this case, the -- the facts

14  that were gleaned from Mr. Voorhies' testimony

15  in which -- and from other state protocols in

16  which checks for consciousness were overt and

17  explicit and intentional indicate that there are

18  various ways to go -- to do that and it should

19  be done.

20       Number 4, did the State refuse to adopt

21  this alternative and without justification

22  adhere to its current method?  Well, the State

23  decided that its protocol of injecting sodium

24  thiopental in the measure that its protocol

25  requires; that is, 5 grams, did not require

Case 3:18-cv-01234   Document 1-3   Filed 11/02/18   Page 42 of 45 PageID #: 266

Attachment 2

1  checking for consciousness or unconsciousness,

2  and given the other protocols that have been

3  filed in with Court, given the approach taken

4  by -- taken in Ohio as testified to by

5  Mr. Voorhies, it does seem that the State should

6  have figured out some way -- some simple way,

7  should have adopted one of the simple ways which

8  appears to be used in other states to check on,

9  to make sure that the prisoner was unconscious,

10  and this Court cannot find a justification for

11  not checking on consciousness -- on

12  unconsciousness.  I just don't think there is a

13  justification that this Court can understand.

14        And back just for a moment to Issue

15  Number 2.  I think the Court should say that it

16  cannot state there is no level of sodium

17  thiopental sufficient to insure unconsciousness.

18  This Court does not find there is no level

19  whatsoever, but this Court does not know what it

20  would be.

21        And Lawyers is there anything else I

22  ought to do?  Is there anything -- any

23  housekeeping issue that should be addressed that

24  I have not addressed?

25              MR. KISSINGER:  Not that the

1    plaintiffs are aware of, Your Honor.

2              MR. HUDSON:  Nothing from the

3    defendants, Your Honor.

4              THE COURT:  Okay.  Lawyers, I will

5    be here on Monday and Tuesday to sign anything

6    that I need to sign.  Too late for me to sign

7    anything today, but like I said I will be here

8    Monday and Tuesday, and appreciate our patience.

9    We are now adjourned.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Attachment 2

```
1              COURT REPORTER'S CERTIFICATE
2    STATE OF TENNESSEE:
3    COUNTY OF DAVIDSON:
4    I, LEILA ZUPKUS, Court Reporter and Notary
5    Public, Davidson County, Tennessee, CERTIFY:
6    1.  The foregoing proceeding was taken before me
7    at the time and place stated in the foregoing
8    styled cause with the appearances as noted;
9    2. Being a Court Reporter, I then reported the
10   proceeding in Stenotype to the best of my skill
11   and ability, and the foregoing pages contain a
12   full, true and correct transcript of my said
13   Stenotype notes then and there taken;
14   3.  I am not in the employ of and am not related
15   to any of the parties or their counsel, and I
16   have no interest in the matter involved.
17            WITNESS MY SIGNATURE, this, the
18    22nd day of November, 2010.
19
20
21
22
23
24
25   LEILA ZUPKUS NOLAN, TLCR
     My commission expires: June 30, 2012
```

**Vowell & Jennings, Inc.  (615) 256-1935**