# IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART III

| | | |
|---|---|---|
| ABU-ALI-ABDUR'RAHMAN, LEE HALL, a/k/a LEROY HALL, BILLY RAY IRICK, DONNIE JOHNSON, DAVID EARL MILLER, NICHOLAS TODD SUTTON, STEPHEN MICHAEL WEST, CHARLES WALTON WRIGHT, EDMUND ZAGORSKI, JOHN MICHAEL BANE, BYRON BLACK, ANDRE BLAND, KEVIN BURNS, TONY CARRUTHERS, TYRONE CHALMERS, JAMES DELLINGER, DAVID DUNCAN, KENNATH HENDERSON, ANTHONY DARRELL HINES, HENRY HODGES, STEPHEN HUGUELEY, DAVID IVY, AKIL JAHI, DAVID JORDAN, DAVID KEEN, LARRY MCKAY, DONALD MIDDLEBROOKS, FARRIS MORRIS, PERVIS PAYNE, GERALD POWERS, WILLIAM GLENN ROGERS, MICHAEL SAMPLE, OSCAR SMITH, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | No. 18-183-II(III) |
| TONY PARKER, in his official capacity as Tennessee Commissioner of Correction, TONY MAYS, in his official capacity as Warden of Riverbend Maximum Security Institution, JOHN/JANE DOE EXECUTIONERS 1-100, JOHN/JANE DOE MEDICAL EXAMINER(S) 1-100, JOHN/JANE DOE PHARMACISTS 1-100, JOHN/JANE DOE PHYSICIANS 1-100, JOHN/JANE DOES 1-100, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

# **Table of Contents**

Ruling .................................................................................................................... 1

Case Summary ..................................................................................................... 3

Inmates' Causes of Action .................................................................................. 6

Count I: Cruel and Unusual Punishment ............................................................ 7
    Constitutional Law ........................................................................................ 7
    No Proof of Available Alternative ................................................................. 9
    Attempt to Expand the Law ........................................................................... 20
        Midazolam—The Experts .................................................................. 21
        Midazolam—The Case Law ............................................................... 22
        Midazolam—Official Documentation ................................................ 24
        Midazolam—Eye-Witnesses to Executions ....................................... 27
        Midazolam—Application of the Law .................................................. 28
        Midazolam—Deliberate Indifference ................................................. 29
        Vecuronium Bromide ......................................................................... 30
        Other Challenges to Protocol ............................................................. 31
        Reiteration—Failure to Prove *Glossip* Alternative Prong ............... 34

Count VIII: Substantive Due Process – Shocks the Conscience ...................... 34

Count IV: Procedural Due Process ..................................................................... 38

Count V: Right to Counsel and Access to the Courts ........................................ 41

i

# ORDER DISMISSING WITH PREJUDICE PLAINTIFFS' CHALLENGE TO TENNESSEE LETHAL INJECTION PROTOCOL, AND MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

## Ruling

The law of the United States requires that to halt a lethal injection execution[1] as cruel and unusual, an inmate must state in his lawsuit and prove at trial that there is another way, available to the State, to carry out the execution. That is, the inmate is required to prove an alternative method of execution. *Glossip v. Gross*, 135 S. Ct. 2726, 2732-33 (2015). Absent proof of an alternative method, an execution can not be halted.

This law at first seems odd: requiring an inmate to prove there is another way to execute him. Presumably the inmate does not want to be executed so why should he be required to prove there exists a method to do so. Yet, without this requirement, there is the potential that lawsuits contesting execution methods would render the death penalty a meaningless sanction, threatening, in the words of the United States Supreme Court, "to transform courts into boards of inquiry charged with determining best practices for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology" and "would substantially intrude on the role of state legislatures in implementing their execution procedures—a role that by all accounts the States have fulfilled with an earnest desire to provide for a progressively more humane manner of

---

[1] Tennessee law does provide a fall back method of execution. If the three-drug lethal injection protocol were held to be unconstitutional by this Court, Tennessee law provides the death sentence shall be carried out by electrocution. Tenn. Code Ann. § 40-23-114(e).

1

death." *Baze v. Rees*, 553 U.S. 35, 51 (2008). Secondly, requiring inmates to prove in their challenges to a State's execution method that the inmates have found another available method to execute them addresses the reality that drug companies are refusing to provide drugs to prisons for lethal injections and that there is a limited supply and choice of drugs for executions.

Thus, whether a lethal injection method is unconstitutional is a comparative analysis. To halt a lethal injection execution as cruel and unusual, an inmate must prove not only that there is a better drug for lethal injection but that the better drug is available to the State. That proof has not been provided in this case.

The Inmates who filed this lawsuit have failed to prove the essential element required by the United States Supreme Court that there exists an available alternative to the execution method they are challenging. On this basis alone, by United States law, this lawsuit must be dismissed.

It is therefore ORDERED that after considering the pleadings, studying the law and the evidence, and listening to arguments of Counsel, the Court finds that the Plaintiffs have failed to establish that Tennessee's three-drug lethal injection protocol issued July 5, 2018, is unconstitutional and/or unlawful, and dismisses the Plaintiffs' *Second Amended Complaint for Declaratory Judgment* with prejudice. Court costs are taxed to the Plaintiffs.

The findings of fact and conclusions of law on which this ruling is based are as follows.

## Case Summary

Lethal injection is the method adopted by the Tennessee Legislature to carry out the death penalty. TENN. CODE ANN. § 40-23-114. Devising the specific components of the lethal injection has been assigned by the Legislature to the Tennessee Department of Corrections ("TDOC").

Prior to July 5, 2018, TDOC's lethal injection protocol included the use of one drug, pentobarbital, as one of the methods of execution (trial exhibit 1). Inmates had previously challenged that method as unconstitutional, but in *West v. Schofield*, 519 S.W.3d 550, 565 (Tenn. 2017), the Tennessee Supreme Court held the method to be constitutional.

Thereafter, on July 5, 2018, TDOC revised its protocol to eliminate the alternative of one drug of pentobarbital, and to use a three-drug protocol which includes midazolam. TDOC asserts it had to eliminate using pentobarbital and use midazolam because TDOC is unable to locate a drug company that will supply pentobarbital. The United States Supreme Court has explained the diminishing supply of drugs used for lethal injections and the emergence of midazolam in lethal injections.

> *Baze* cleared any legal obstacle to use of the most common three-drug protocol that had enabled States to carry out the death penalty in a quick and painless fashion. But a practical obstacle soon emerged, as anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences.
> * * *
> After other efforts to procure sodium thiopental proved unsuccessful, States sought an alternative, and they eventually replaced sodium thiopental with pentobarbital, another barbiturate.
> * * *

3

**Attachment 7**

Unable to acquire either sodium thiopental or pentobarbital, some States have turned to midazolam, a sedative in the benzodiazepine family of drugs. In October 2013, Florida became the first State to substitute midazolam for pentobarbital as part of a three-drug lethal injection protocol [citations omitted]. To date, Florida has conducted 11 executions using that protocol, which calls for midazolam followed by a paralytic agent and potassium chloride [citations omitted]. In 2014, Oklahoma also substituted midazolam for pentobarbital as part of its three-drug protocol. Oklahoma has already used this three-drug protocol twice: to execute Clayton Lockett in April 2014 and Charles Warner in January 2015. (Warner was one of the four inmates who moved for a preliminary injunction in this case.)

*Glossip v. Gross*, 135 S. Ct. 2726, 2733–34 (2015).

Having eliminated pentobarbital, Tennessee's July 5, 2018 protocol now provides for a three-drug lethal injection for carrying out upcoming executions in this sequence and doses, quoting page 34 of the protocol (trial exhibit 2).

### CHEMICALS USED IN LETHAL INJECTION

The Department will use the following protocol for carrying out executions by lethal injection:

| | |
|---|---|
| **Midazolam** | 100 ml of a 5mg/ml solution (a total of 500mg) |
| **Vecuronium Bromide** | 100 ml of a 1mg/ml solution (a total of 100 mg) |
| **Potassium Chloride** | 120 ml of a 2 mEq/ml solution (a total of 240mEq) |

Chemicals used in lethal injection executions will either be FDA-approved commercially manufactured drugs; or, shall be compounded preparations prepared in compliance with pharmaceutical standards consistent with the United States Pharmacopeia guidelines and accreditation Departments, and in accordance with applicable licensing regulations.

The midazolam is to provide pain relief. Vecuronium bromide paralyzes the inmate.

Potassium chloride stops the heart within 30 to 45 seconds of injection.

4

**Attachment 7**

By eliminating pentobarbital as an alternative, the July 5, 2018 protocol revised the analgesic (pain relief) of its lethal injection from pentobarbital to midazolam; invoked that part of the protocol which allows for the use of compounded midazolam instead of a commercial supply, and follows the midazolam with injections of vecuronium bromide and potassium chloride.

By notice of July 23, 2018, TDOC has stated that the three-drug protocol issued July 5, 2018 is to be used in an upcoming, scheduled execution. It is the July 5, 2018 protocol which is challenged as unconstitutional and ruled upon herein.

This lawsuit was filed by 33 Inmates who have been convicted of aggravated crimes and who have been sentenced to death in Tennessee. Three of the Inmates have executions scheduled in 2018. One of those is set for August 9. In this lawsuit the Inmates assert that Tennessee's three-drug lethal injection method of execution is cruel and unusual, and in that and in other ways violates the United States and Tennessee Constitutions. The Inmates assert that the one drug, pentobarbital, should be used for the executions as a faster, less painful method, and that TDOC's claims that it can not obtain pentobarbital is not true. The immediate effect of a ruling in the Inmates' favor would halt the upcoming and subsequent executions using this three-drug lethal injection.[2]

The trial of this case was conducted from July 9, 2018 through July 24, 2018. The Inmates were represented by the United States Public Defenders' Office and private

_____

[2] As cited above, Tennessee law does provide a fall back method of execution. If the three-drug lethal injection protocol were held to be unconstitutional by this Court, Tennessee law provides the death sentence shall be carried out by electrocution. Tenn. Code Ann. § 40-23-114(e).

5

**Attachment 7**

Counsel. The Defendants were represented by the Office of the Tennessee Attorney General. In issue were portions of a complaint containing 764 paragraphs and 104 pages. 23 witnesses testified and 139 exhibits were admitted into evidence.

### Inmates' Causes of Action

The Inmates' causes of action stated in the July 3, 2018 *Second Amended Complaint for Declaratory Judgment* ("*Second Amended Complaint*") seeking to halt use of Tennessee's three-drug protocol as unconstitutional consist of the following:

1.  Count I: Eighth and Fourteenth Amendments of the United States Constitution and Article 1, § 16 of the Tennessee Constitution prohibiting the use of cruel and unusual punishment,

2.  Count IV: Fourteenth Amendment of the United States Constitution and Article 1, § 8 of the Tennessee Constitution of procedural due process,

3.  Count V: First, Eighth and Fourteenth Amendments of the United States Constitution and Article 1, §§ 8, 16, 17 of the Tennessee Constitution of the right to counsel and access to the courts, and

4.  Count VIII: Fourteenth Amendment of the United States Constitution and Article 1, § 8 of the Tennessee Constitution that the use of midazolam shocks the conscience.[3]

Addressed below first are items 1 and 4—the Inmates' claims at Count I and VIII—that Tennessee's three-drug protocol constitutes cruel and unusual punishment and shocks the conscience. After that item 2, Count IV of procedural due process, is addressed, followed by item 3, Count V of the right to counsel and access to the courts.

---

[3] These are the causes of action which remained for disposition after the May 4, 2018 ruling dismissing portions of the Plaintiffs' pleading.

**Attachment 7**

## Count I:  Cruel and Unusual Punishment

Constitutional Law

      The Tennessee Supreme Court has instructed this Court that it must examine two elements in deciding whether the three-drug lethal injection method in issue constitutes cruel and unusual punishment.  These elements have been established by the United States Supreme Court and are explained by the Tennessee Supreme Court as follows.

      To prevail on a claim that punishment is cruel and unusual,

> First, the inmates must establish that the protocol "presents a risk that is '*sure or very likely* to cause serious illness and needless suffering and give rise to sufficiently *imminent* dangers.' " *Glossip*, 135 S.Ct. at 2737 (quoting *Baze*, 553 U.S. at 50, 128 S.Ct. 1520) (internal quotation marks omitted). "To prevail on such a claim, 'there must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment.' " *Id.* (quoting *Baze*, 553 U.S. at 50, 128 S.Ct. 1520) (internal quotation marks omitted). Second, the inmates "must identify an alternative [method of execution] that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.' " *Id.* (quoting *Baze,* 553 U.S. at 52, 128 S.Ct. 1520); *see also Baze*, 553 U.S. at 61, 128 S.Ct. 1520 (stating that an inmate asserting an Eighth Amendment challenge to a state's lethal injection protocol must establish "that the State's lethal injection protocol creates a demonstrated risk of severe pain" and "that the risk is substantial when compared to the known and available alternatives").

*West v. Schofield*, 519 S.W.3d 550, 563–64 (Tenn. 2017).

      With respect to the second prong, the United States Supreme Court has adopted this requirement that, to contest a State's method of execution, the inmate must not only prove the State's method is cruel and unusual but must also prove that there is a known and available alternative method of execution.  It is not enough, the United States

7

Supreme Court has held, for the inmate to claim that the State's method of execution is cruel and unusual. The inmate must also make a claim in the lawsuit he files and must prove at trial in his case that there is a known and available method to execute him that, in comparison to the State's execution method, significantly reduces a substantial risk of pain. *Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268, 1303 (11th Cir. 2016), *cert. denied sub nom. Arthur v. Dunn*, 137 S. Ct. 725 (2017), *reh'g denied,* 137 S. Ct. 1838 (2017) ("The State need not make any showing because it is Arthur's burden, not the State's, to plead and prove both a known and available alternative method of execution and that such alternative method significantly reduces a substantial risk of severe pain. *Glossip*, 135 S.Ct. at 2737, 2739."). "Our decisions in this area have been animated in part by the recognition that because it is settled that capital punishment is constitutional, '[i]t necessarily follows that there must be a [constitutional] means of carrying it out.'" *Glossip v. Gross*, 135 S. Ct. 2726, 2732–33 (2015).

Proof by the inmate in his case of an alternative method of execution is particularly significant with the developing circumstances, recognized by the United States Supreme Court, of unavailability of lethal injection drugs. Unlike the drugs used routinely and effectively for painless surgical and medical procedures, prisons do not have these options. With drug options narrowing for prisons to use in executions, there are limited choices. Requiring inmates to prove, when they challenge a State's execution method, that other alternatives exist to a State's lethal drug protocol addresses these realities of unavailable drugs. As an Arizona District Court has observed "The pharmaceutical manufacturers' withdrawal of the best drugs from use in executions does

8

not end capital punishment." *First Amendment Coal. of Az. v. Ryan*, —— F. Supp. 3d ——, 2016 WL 2893413, at *5 (D. Az. May 18, 2016).

Thus, the United States Supreme Court has been clear that the constitutional analysis of a lethal injection method is not done in a vacuum. Whether a lethal injection method is unconstitutional is a comparative analysis. It is not enough for an inmate to provide proof of the painfulness of a State's method of execution. As the Tennessee Supreme Court has explained, the United States Supreme Court has held that in challenging a State's execution method an inmate must also plead in his lawsuit and prove that there is an alternative execution method that can be used to execute him which is known, available and significantly reduces the risk of severe pain. *West v. Schofield*, 519 S.W.3d 550, 563-64 (Tenn. 2017).

No Proof of Available Alternative

The Court finds that in this lawsuit the Plaintiffs have failed to prove the essential element that there exists an available alternative. On this basis alone, by United States law, this lawsuit must be dismissed.

In so concluding the Court's study of case law shows that unlike other cases where this element has been tried, the Inmates in this case presented none of their own witnesses to show that their proposed method of execution—pentobarbital—is available to the State of Tennessee. For example, in *Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268, 1278–80 (11th Cir. 2016), *cert. denied sub nom. Arthur v. Dunn*, 137 S. Ct. 725 (2017), *reh'g denied*, 137 S. Ct. 1838 (2017), the inmate's expert witness testified that he

9

**Attachment 7**

had expert knowledge of and had conducted internet searches and made personal contacts that demonstrated pentobarbital was available.

Dr. Zentner contended that there were "numerous sources" for both the active and inactive ingredients needed to compound pentobarbital, including professional drug sourcing services. He said that these ingredients were available for sale in the United States and could be found through an Internet search. For example, Dr. Zentner found pentobarbital sodium listed on a drug manufacturer's product listing, which listing indicated that the drug was produced in the United States. He stated that other manufacturers might offer it for sale or the drug could be synthesized in a lab. He said that he knew of one lab that would be willing to synthesize the drug and he suspected "all of them would be willing."

Dr. Zentner stated that he conducted an Internet search of sterile compounding pharmacies in Alabama from the listing available on the Accreditation Commission for Health Care's Web site, and found 19 such pharmacies, although two were essentially the same company. Dr. Zentner gave his list to the ADOC. Dr. Zentner contacted two of these pharmacies, and they said that they did perform sterile compounding. Dr. Zentner admitted that he did not ask them whether they would be willing to compound pentobarbital for use in an execution by the ADOC. In his deposition, Dr. Zentner clarified that he did not ask these two pharmacies any questions whatsoever regarding compounded pentobarbital.

Accordingly, Dr. Zentner could only give his opinion that (1) pentobarbital sodium is available for purchase in the United States, and (2) there are compounding pharmacies that "have the skills and licenses to perform sterile compounding of pentobarbital sodium."

On cross-examination, Dr. Zentner admitted that he had not contacted any drug companies at all about their willingness to sell pentobarbital to the ADOC for executions. He also admitted that he was unaware that the company that currently owned Nembutal had restrictions in place to keep that drug from being purchased for use in lethal injections. Dr. Zentner admitted that he had no knowledge of whether the pharmacies that he found would be able to procure pentobarbital, nor did he ever personally attempt to purchase the drug from a manufacturer. He stated that one drug synthesis company that he has a "long-term relationship" with was "willing to discuss" producing compounded pentobarbital. Dr. Zentner admitted that sodium thiopental is not listed in the FDA Orange Book, meaning it is not

10

an approved product in the United States, although he stated that it is "available offshore and conceivably could be imported."

Although the inmates in the above quoted case did not prevail, the case shows that it is not an impossible burden to provide such proof.

In this case no such proof was offered. Of the four expert witnesses the Inmates retained in this case, none were retained to investigate sources of pentobarbital to report to the Court the results of their search, e.g. whether they were rebuffed, whether the sources exist, etc., and none were able to provide any information on this critical element of the trial.

The Inmates also claim that for them to provide such proof, they would break Tennessee law requiring the identity of lethal drug suppliers to be confidential and would violate federal law prohibiting the procurement of such drugs. These excuses are unavailing. Tennessee provides methods for keeping matters filed in court confidential. Those could have been implemented for such proof, if necessary. As to the federal law, it is not implicated because Inmates' Counsel is not procuring drugs. No good reason was provided to the Court as to why the Inmates failed to provide such important proof. Instead, the Inmates' attempted to prove their case solely by discrediting State officials. This was not persuasive.

There was the testimony of the TDOC Commissioner, Assistant Commissioner for Administration (the "Assistant Commissioner"), and the Warden. In evaluating this testimony the Court is required to start with the principle that "public officials in Tennessee are presumed to discharge their duties in good faith and in accordance with the

11

law." *West I,* 460 S.W.3d at 131 (citing *Reeder v. Holt,* 220 Tenn. 428, 418 S.W.2d 249, 252 (1967); *Mayes v. Bailey,* 209 Tenn. 186, 352 S.W.2d 220, 223 (1961)). The Court finds that there was nothing in the demeanor of these witnesses nor the facts to which they testified to overcome this presumption. All of these individuals were credible in their testimony. They testified in cooperative, moderate tones. They were straightforward in their answers.

As to the Commissioner and Assistant Commissioner, they gave every appearance and indication that they have and would continue to discharge their duties of locating supplies of lethal injection drugs in good faith and in accordance with the law. Their testimony established that they proceeded reasonably as department heads to delegate the task of investigating supplies of pentobarbital to a member of their staff. From the work of that staffer, information was provided to them. Trial exhibit 105 in part is a PowerPoint presentation provided to the Commissioner and Assistant Commissioner on lethal injection drug supplies and the search for those.

The Court accredits the testimony of these TDOC officials and finds that their testimony is corroborated by the PowerPoint, which is quoted as follows, that TDOC does not have access to and/or is unable to obtain pentobarbital through ordinary transactional efforts. Trial Exhibit 105 contains the following PowerPoint text.

Tennessee Protocol:

Pentobarbital (Barbiturate) – compounded into an injectable solution. For each execution, there are 2 syringes, each containing a 5 gram compounded solution of Pentobarbital.

12

\* \* \*

Reached out to XXXXXXXXXX,[4] as it was understood that they had a source for Pentobarbital.  XXXXXX was unwilling to either share the identity of their source, or provide our contact information to their source. XXXXXX was also unwilling to offer any guidance as to how XXXXXXXXX was able to find its current source.

\* \* \*

- XXXXXXXXX assigned with task of locating source of Pentobarbital

- First step was to search by contacting compounding pharmacies to determine if they:  1) Had an inventory of Pentobarbital; or 2) Had a source of Pentobarbital and were willing to compound the LIC for the department

- Several pharmacies declined to be involved in any way.  Finally, a compounding pharmacy agreed to both compound the LIC and aid in the search for a source.

- Search involved cold calling U.S. based Active Pharmaceutical Ingredient (API) supply companies.

\* \* \*

Collectively, contact was made with close to 100 potential sources, including the 3 major U.S. chemical wholesalers.  None of these worked for one or more of the following reasons:

- Company did not have an inventory of Pentobarbital – apprx. 70%

- Company did not have sufficient quantities of the needed form of Pentobarbital and no source to obtain sufficient quantities – apprx. 10%

- Company unwilling to supply Pentobarbital if it was to be used in lethal injection – apprx. 20%

\* \* \*

---

[4] "X" indicates text that has been redacted as required by Tennessee Code Annotated TENN. CODE ANN. § 10-7-504(h) (West 2018).

13

**Attachment 7**

It appears there is no U.S. based source for Pentobarbital and so the search broadened into the possibility of importing the chemical from overseas:

- C.F.R. § 1312.13 grants the DEA the authority to issue permits for the importation of schedule II narcotics (i.e. Pentobarbital) when it is necessary to provide for a legitimate need of the U.S. and the domestic supply is inadequate

- At the meeting, the agents informed XXXXXX that XXXXXXXXXXX because, according to them, there is a supply of pentobarbital available in the United States.

- When told that the companies who do have a supply would not sell their supply for use in lethal injection, the XXXXXX agents explained that it didn't matter and that it was an issue to take up with the companies themselves.

\* \* \*

In the course of researching the possibility of importation, XXXXXXXX became aware of a federal case in Texas where the FDA had seized a shipment of drugs/chemicals being imported by the Texas Department of Correction. The Texas DOC filed suit in federal district court for the release of the shipment. To this date there has not been any resolution to this case.

XXXXXXX is now researching FDA regulations as a result of this case to determine what if any process can be undertaken to obtain FDA approval for the importation of Pentobarbital. Thus far the approval process appears to be very cumbersome unless an exception can be claimed to lessen the burden.

\* \* \*

Other states have had similar difficulty/inability in locating a source for the LIC.

- Arkansas attempted to perform 7 executions in the span of 10 days because their current supply of LIC was set to expire and the State did not have a source for additional LIC chemicals. Arkansas has subsequently obtained a supply of midazolam.

14

- South Carolina has stated, in connection with the recent conviction of Dylan Roof, that they do not have a supply of LIC and have not been able to find a supply.

- Indiana DOC was reprimanded for not following proper procedure in unilaterally trying to change their protocol to a new LIC due [sic] their inability to locate a supply of the current drug.

- Texas, in the case mentioned before, attempted to import a different LIC chemical than they currently use in executions. Presumably due to the potential unavailability of Pentobarbital even on an international level.

- Some states are using LIC chemicals that have some under harsh scrutiny, such as Alabama's use of Midazolam in the recent execution of Robert Melson.

- Florida is using a drug, etomidate, that has never been used in the United States for execution.

* * *

A few years ago approximately 13 states reached out to the Department of Justice seeking aid in locating a source for LIC chemicals and/or gaining access to any supply that the Federal Government currently had. This did not result in any action by DOJ.

There are circumstances where the Federal Government can step in and orchestrate the supply of chemicals in situations where supply is so low and the cost for the chemical so high as to make it virtually unavailable where there is a significant need.

In the face of this weighty evidence, the Inmates argue that a handwritten, undated note on bates numbered 36 of trial exhibit 105, indicating that an unknown supplier offered to sell pentobarbital, shows Tennessee had access to the drug. In the face of all the other information in trial exhibit 105 and the credible testimony of the Commissioner and the Assistant Commissioner, page 36 of trial exhibit 105 is not weighty evidence.

15

The Inmates further assert that Tennessee refused to purchase pentobarbital and, to use the words of Counsel, "began creating a record of unavailability" based on the following text message contained on bates numbered 19 in trial exhibit 105.

> Me
> I'm running around today so not sure when I'll be open for a call but in the meantime can u send me a list of all companies etc u reached out to about sourcing so I can have it for when we have to show it's unavailable? Thanks
>
> 8:49 AM

The Inmates argue this email shows TDOC was making up a record of unavailability of pentobarbital. Respectfully to Counsel, the Court finds the more likely inference – from the totality of the information in the PowerPoint and the credibility of the TDOC officials and that the note was handwritten – is that the note was a "lead", a possibility, that did not work out. As to the page 19 text message, it shows the staffer delegated to research sources was putting together a PowerPoint presentation for the boss/superior and the staffer's conclusion was there were no ordinary, transactional sources for pentobarbital. The Court finds that trial exhibit 105 and the testimony of the TDOC official establish that Tennessee does not have access to and is unable to obtain the drugs with ordinary transactional effort.[5]

---

[5] The Eighth, Eleventh and Sixth Circuits have recognized the "available" element referred to in *Glossip* means, respectively, the ability to access, or to obtain the drugs with ordinary transactional effort. *See, In re Ohio Execution Protocol*, 860 F.3d 881, 891 (6th Cir. 2017), *cert. denied sub nom. Otte v. Morgan*, 137 S. Ct. 2238 (2017); McGehee v. Hutchinson, 854 F.3d 488, 493 (8th Cir. 2017), cert. denied, 137 S. Ct. 1275 (2017); *Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268, 1300 (11th Cir. 2016), *cert. denied sub nom. Arthur v. Dunn*, 137 S. Ct. 725 (2017), *reh'g denied,* 137 S. Ct. 1838 (2017).

16

Another reason the Court accredits the testimony of these TDOC officials and that they convinced the Court that if pentobarbital were available the State would be using it is that the proof established the State has every reason to use pentobarbital. The pentobarbital protocol was upheld by the Tennessee Supreme Court and can clearly proceed. The pentobarbital is simpler in the sense that it involves only one drug. It defies common sense that the State would not make the effort to locate pentobarbital.

Additionally, with respect to the effort TDOC has to make, the term used by the United States Supreme Court, is "availability." As noted in footnote 5, that has been construed to mean access in an ordinary transactional effort. The following case law is instructive.

> Arthur would have us hold that if a drug is capable of being made and/or in use by other entities, then it is "available" to the ADOC. Arthur stresses that: (1) pharmacies throughout Alabama are theoretically capable of compounding the drug; (2) the active ingredient for compounded pentobarbital (pentobarbital sodium) is generally available for sale in the United States; and (3) four other states were able to procure and use compounded pentobarbital to carry out executions in 2015.
>
> We expressly hold that the fact that other states in the past have procured a compounded drug and pharmacies in Alabama have the skills to compound the drug does not make it available to the ADOC for use in lethal injections in executions. The evidentiary burden on Arthur is to show that "there is now a source for pentobarbital that would sell it to the ADOC for use in executions." Brooks, 810 F.3d at 820 (emphases added).
>
> To adopt Arthur's definition of "feasible" and "readily implemented" would cut the Supreme Court's directives in Baze and Glossip off at the knees. As this Court explained in Brooks, a petitioner must show that "there is now a source for pentobarbital that would sell it to the ADOC for use in executions." 810 F.3d at 820 (emphases added). This Arthur patently did not do. Arthur's own expert witness, Dr. Zentner, could not even identify any pharmacies that had actually compounded an injectable solution of compounded pentobarbital for executions or were willing to do so for the

**Attachment 7**

ADOC. And when ADOC attorney Hill actually asked the pharmacies identified by Dr. Zentner if they would be willing to compound pentobarbital for the ADOC, they all refused. What's more, Hill contacted no less than 29 potential sources for compounded pentobarbital—including numerous pharmacies and four states' departments of corrections. All of these efforts were unsuccessful.

And while four states had recently used compounded pentobarbital in their own execution procedures, the evidence demonstrated that none were willing to give the drug to the ADOC or name their source. As we have explained, "the fact that the drug was available in those states at some point ... does not, without more, make it likely that it is available to Alabama now." Brooks, 810 F.3d at 819. On this evidence, the district court did not clearly err in determining that Arthur failed to carry his burden to show compounded pentobarbital is a known and available alternative to the ADOC. An alternative drug that its manufacturer or compounding pharmacies refuse to supply for lethal injection "is no drug at all for Baze purposes." Chavez v. Florida SP Warden, 742 F.3d 1267, 1275 (11th Cir. 2014) (Carnes, C.J., concurring).

* * *

Under these record facts, we cannot fault at all the district court's finding that the procurement of compounded pentobarbital was not "feasible and readily implemented as an execution drug in Alabama, nor [was] it readily available to the ADOC."

* * *

Arthur also argues that the ADOC did not make a "good faith effort" to obtain pentobarbital. Glossip did not impose such a requirement on the ADOC. In Glossip, the Supreme Court upheld the district court's factual finding that the proposed alternative drugs were not "available." See Glossip, 135 S.Ct. at 2738. It continued, "[o]n the contrary, the record shows that Oklahoma has been unable to procure those drugs despite a good-faith effort to do so." Id. Nothing in Glossip changed the fact that it is not the state's burden to plead and prove "that it cannot acquire the drug." Brooks, 810 F.3d at 820. The State need not make any showing because it is Arthur's burden, not the State's, to plead and prove both a known and available alternative method of execution and that such alternative method significantly reduces a substantial risk of severe pain. Glossip, 135 S.Ct. at 2737, 2739.

18

As an alternative, independent reason for affirmance, we also conclude that even if <u>Glossip</u> somehow imposes a good-faith effort on the State, the ADOC made such an effort here by contacting 29 potential sources for the drug, including four other departments of correction and multiple compounding pharmacies.

*Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268, 1301–03 (11th Cir. 2016), *cert. denied sub nom. Arthur v. Dunn*, 137 S. Ct. 725 (2017), *reh'g denied,* 137 S. Ct. 1838 (2017) (footnotes omitted).[6]

The Court therefore finds that the greater weight and preponderance of the evidence is that pentobarbital is not available to the Defendants. Accordingly, the Inmates have failed to establish the grounds required by the United States Supreme Court to halt the executions using Tennessee's July 5, 2018 three-drug protocol. The Inmates have not demonstrated that there is an available alternative for carrying out their executions. The United States Supreme Court has stated that when "availability . . . of an alternative is more speculative, a State's refusal to discontinue executions under the current method is not blameworthy in a constitutional sense." *See Baze*, 553 U.S. at 67, 128 S. Ct. 1520 (Alito, J., concurring). Thus, in this case, except for electrocution which is not in issue in this case, the known and available method in Tennessee to carry out these executions is the July 5, 2018 three-drug lethal injection. On this basis alone, the Court dismisses the Inmates' claims.

---

[6] The reasoning in *Arthur* also does away with the Inmates' attempt to prove the availability of pentobarbital by citing to the recent execution of Christopher Young in Texas on July 17, 2018 using pentobarbital (trial exhibit 140). As stated by the *Arthur* Court "the fact that the drug was available in those states at some point…does not, without more, make it likely that it is available to" the Tennessee Department of Correction now.

19

Because the Inmates have failed to establish the *Glossip* prong of an available alternative, it is not necessary for this Court to make a finding on whether the Plaintiffs have demonstrated the other *Glossip* prong: that Tennessee's three-drug protocol is cruel and unusual. Nevertheless, because so much of the proof at trial was provided on this element the Court will address it.

Attempt to Expand the Law

In addition to their attempt to discredit State officials to satisfy the essential elements of proof required by the United States Supreme Court of proving an available alternative execution method, the Inmates attempted to develop and expand the law that this case is an exception and they should not have to prove an alternative method of execution because Tennessee's three-drug lethal injection method constitutes torture akin to being dismembered or burned at the stake. This Court's study of decisions of the United States Supreme Court is that no such exception has yet been recognized, and as an inferior trial court, this Court cannot so expand the law. If, however, the law were to be so expanded, the evidence in this case established that Tennessee's three-drug lethal injection protocol is not a drastic, exceptional deviation from accepted execution methods so as to be found to constitute torture, that is "sure or very likely to cause serious illness and needless suffering and give rise to sufficiently imminent dangers." *Glossip*, 135 S. Ct. at 2737.

20

Midazolam—The Experts

The Inmates presented the testimony of four well-qualified and imminent experts.[7]

The Court finds that these experts established that midazolam does not elicit strong analgesic effects and the inmate being executed may be able to feel pain from the administration of the second and third drugs.

The legal issue, then, is whether the United States Supreme Court would consider this finding to constitute torture and the deliberate infliction of pain so as to violate the

[7] The Inmates provided testimony of: Dr. Stevens, Dr. Greenblatt, Dr. Edgar and Dr. Lubarsky.

Dr. Craig W. Stevens testified on behalf of the Plaintiffs in the field of pharmacology. Dr. Stevens obtained a Ph.D. in Pharmacology in 1988 from the Mayo Graduate School of Medicine in Rochester, Minnesota. Dr. Stevens is currently employed as Professor of Pharmacology in the Department of Pharmacology and Physiology for the Oklahoma State University Center for Health Sciences, College of Osteopathic Medicine.

Dr. David J. Greenblatt testified on behalf of the Plaintiffs in the field of clinical pharmacology and the effects of Midazolam. Dr. Greenblatt received his Bachelor of Arts degree from Amherst College in 1966 and his medical degree from Harvard Medical School in 1970. He also served as a research fellow in Pharmacology at the Harvard Medical School from 1972-1974. Dr. Greenblatt testified that he has authored 775 peer reviewed articles in his career and published 12 books. He further testified that he has a Google Scholar H Index of 160 with over 65,000 citations to his articles. Dr. Greenblatt is currently employed as a Professor of Medicine, Psychiatry, Pharmacology, Experimental Therapeutics, and Anesthesia at Tufts University School of Medicine in Boston, Massachusetts. Dr. Greenblatt has written the definitive article on midazolam (trial exhibit 40).

Dr. Mark Allen Edgar testified on behalf of the Plaintiffs in the field of Pathology. Dr. Edgar received a Bachelor of Science degree from Dalhousie University in Halifax, Nova Scotia, Canada in 1984 and a Medical Degree from Dalhousie University in 1988. Currently, Dr. Edgar serves as the Assistant Director of Emory Bone and Soft Tissue Pathology Service and as an Associate Professor of Pathology at Emory University School of Medicine. Dr. Edgar testified that since 2010, he currently performs approximately one to two autopsies a month.

Dr. David Alan Lubarsky testified on behalf of the Plaintiffs in the field of Anesthesiology. Dr. Lubarsky received a Bachelor of Arts degree from Washington University in St. Louis, Missouri in 1980 and then obtained his Medical Degree from Washington University in 1984. In 1999, Dr. Lubarsky obtained a Master of Business Administration from Fuqua School of Business at Duke University in Durham, North Carolina. Until recently, Dr. Lubarsky served as the Chief Medical and Systems Integration Officer for the University of Miami Health System and the Emanuel M. Papper Professor and Chairman of the University of Miami Leonard M. Miller School of Medicine, Department of Anesthesiology. Dr. Lubarsky testified at trial that he had just been appointed in May of 2018 as the vice chancellor of human health sciences and chief executive officer of UC Davis Health, which includes the School of Medicine, School of Nursing, UC Davis Medical Center, and Primary Care Network.

The Defendants' two experts, while qualified, did not have the research knowledge and imminent publications that Plaintiffs' experts did.

21

**Attachment 7**

United States Constitution. This Court concludes that the United States Supreme Court would not find the facts established in this case to violate the Constitution for these reasons.

Midazolam—The Case Law

First, as reported by the United States Supreme Court, it has never invalidated a State's chosen method of execution.

> While methods of execution have changed over the years, '[t]his Court has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment.'

*Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2015).

Secondly, the United States Supreme Court has recognized and is aware of the risks of midazolam. Before the Supreme Court issued the *Glossip* decision, there were two horrible executions, using midazolam, where the death of the inmate was prolonged. The Supreme Court found those executions of limited probative value, citing to executions which were not prolonged.

> Fourth, petitioners argue that difficulties with Oklahoma's execution of Lockett and Arizona's July 2014 execution of Joseph Wood establish that midazolam is sure or very likely to cause serious pain. We are not persuaded. Aside from the Lockett execution, 12 other executions have been conducted using the three-drug protocol at issue here, and those appear to have been conducted without any significant problems. See Brief for Respondents 32; Brief for State of Florida as *Amicus Curiae* 1. Moreover, Lockett was administered only 100 milligrams of midazolam, and Oklahoma's investigation into that execution concluded that the difficulties were due primarily to the execution team's inability to obtain an IV access site. And the Wood execution did not involve the protocol at issue here. Wood did not receive a single dose of 500 milligrams of midazolam; instead, he received fifteen 50–milligram doses over the span

22

of two hours. Brief for Respondents 12, n. 9. And Arizona used a different two-drug protocol that paired midazolam with hydromorphone, a drug that is not at issue in this case. *Ibid.* When all of the circumstances are considered, the Lockett and Wood executions have little probative value for present purposes.

*Glossip v. Gross*, 135 S. Ct. 2726, 2745–46 (2015) (footnote omitted).

Next, midazolam's use in executions has never been held by the United States Supreme Court to be unconstitutional or pose an unacceptable risk of pain.

— The United States Supreme Court and several appellate courts have uniformly rejected challenges to lethal injection protocols that use midazolam as the first drug in a three-drug lethal injection protocol because the plaintiffs had not established that it poses a constitutionally unacceptable risk of pain. *See Glossip*, 135 S. Ct. at 2731; *Grayson v. Warden*, —— Fed.Appx. ——, 2016 WL 7118393, at *4–5 (11th Cir. Dec. 7, 2016) (explaining that "Supreme Court and 'numerous other courts' have concluded that midazolam is an adequate substitute for pentobarbital as the first drug in a three-drug lethal injection protocol" (citing *Brooks*, 810 F.3d at 822–24))). Based on the evidence in the immediate case, the Court fails to discern any reason to conclude otherwise.
*Gray v. McAuliffe*, No. 3:16CV982-HEH, 2017 WL 102970, at *11 (E.D. Va. Jan. 10, 2017), *appeal dismissed sub nom RICKY GRAY v. TERENCE MCAULIFFE* (Jan. 11, 2017).

Additionally, although dreadful and grim, it is the law that while surgeries should be pain-free, there is no constitutional requirement for that with executions.

• And because some risk of pain is inherent in any method of execution, we have held that the Constitution does not require the avoidance of all risk of pain. *Ibid.* After all, while most humans wish to die a painless death, many do not have that good fortune. Holding that the Eighth Amendment demands the elimination of essentially all risk of pain would effectively outlaw the death penalty altogether.
*Glossip v. Gross*, 135 S. Ct. 2726, 2732–33 (2015).

• An execution by lethal injection is not a medical procedure and does not require the same standard of care as one.

**Attachment 7**

*Walker v. Johnson*, 448 F. Supp. 2d 719, 723 (E.D. Va. 2006), *aff'd*, 328 Fed. Appx. 237 (4th Cir. 2009).

- But while surgeries should be pain-free, there is no constitutional requirement that executions be painless. *Baze, supra, Fears, supra*. The goal of the anesthetist and anesthesiologist is to make patients unconscious, unaware, and insensate to pain—which is properly described as being in a state of General Anesthesia. But the Eighth Amendment does not require General Anesthesia before an execution.

*In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2017 WL 5020138, at *17 (S.D. Ohio Nov. 3, 2017), *aff'd*, 881 F.3d 447 (6th Cir. 2018).

- The latter observation has little relevance in light of a passage from *Glossip* that does bind us here: "the fact that a low dose of midazolam is not the *best* drug for maintaining unconsciousness during surgery says little about whether a 500-milligram dose of midazolam is *constitutionally adequate* for purposes of conducting an execution." 135 S.Ct. at 2742 (emphasis in original).

*In re Ohio Execution Protocol*, 860 F.3d 881, 887 (6th Cir. 2017), cert. denied sub nom. *Otte v. Morgan*, 137 S. Ct. 2238 (2017).


Midazolam—Official Documentation

The United States Supreme Court requires that inmates must demonstrate with respect to the State execution method they are contesting that there is an "objectively" intolerable risk of harm. *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015).

Part of the analysis of whether a method of execution poses a constitutionally unacceptable risk of severe pain has to do with the duration of the execution. That is because one of the aspects of cruel and unusual punishment relates to prolongation, i.e., needless suffering. In the Tennessee three-drug protocol, it is undisputed that once administered, the last drug injected, potassium chloride, stops the heart within 30 to

24

45 seconds. Time is expended before that with injection of midazolam and vecuronium bromide.

With respect to executions the Inmates' witnesses testified to, the Court finds that the official documentation of the executions (the "Timelines" trial exhibits 22, 23, 24) and demonstrative aids provided by both sides (trial exhibits 133 and 148) establish that the average duration from the time the midazolam is injected until the time of death is 13.55 minutes, with the longest time being 18 minutes and the shortest time being 10 minutes.

In more detail, the proof established that six states – Alabama, Arkansas, Florida, Ohio, Oklahoma, and Virginia – have conducted executions by lethal injection using a three-drug protocol with midazolam serving as the anesthetic first drug in the protocol. Since October 15, 2013, these states have conducted a combined total of 30 executions using midazolam as the anesthetic in a three drug lethal injection protocol. Of those 30 executions, 20 official timelines from the Department of Corrections of Florida, Arkansas and Ohio were entered into evidence. There were no official timelines from the Department of Corrections for the other 10 executions conducted in Alabama, Oklahoma and Arkansas, and therefore no official minutes are known, as indicated below.

From these official timelines and the two demonstrative exhibits provided by the Plaintiffs and the Defendants, the following chart was prepared showing the name of the inmate, the date of the execution, and the number of minutes it took from the time the first drug was injected until the time of death.

25

**Attachment 7**

| Name | State | Date of Execution | Minutes To Death |
|---|---|---|---|
| 1.  William Happ | FL | 10/15/2013 | 14 minutes |
| 2.  Darius Kimbrough | FL | 11/12/2013 | 18 minutes |
| 3.  Askari Muhammad (Thomas Knight) | FL | 1/7/2014 | 15 minutes |
| 4.  Juan Chavez | FL | 2/12/2014 | 16 minutes |
| 5.  Paul Howell | FL | 2/26/2014 | 15 minutes |
| 6.  Robert Henry | FL | 3/20/2014 | 12 minutes |
| 7.  Robert Hendrix | FL | 4/23/2014 | 10 minutes |
| 8.  John Henry | FL | 6/18/2014 | 12 minutes |
| 9.  Eddie Davis | FL | 7/10/2014 | 12 minutes |
| 10. Chadwick Banks | FL | 11/13/2014 | 15 minutes |
| 11. Charles Warner | OK | 1/15/2015 | UNKNOWN |
| 12. Johnny Kormondy | FL | 1/15/2015 | 11 minutes |
| 13. Jerry Correll | FL | 10/29/2015 | 11 minutes |
| 14. Oscar Bolin, Jr. | FL | 1/7/2016 | 12 minutes |
| 15. Christopher Brooks | AL | 1/21/2016 | UNKNOWN |
| 16. Ronald Smith, Jr. | AL | 12/8/2016 | UNKNOWN |
| 17. Ricky Gray | VA | 1/18/2017 | UNKNOWN |
| 18. Ledell Lee | AR | 4/20/2017 | 11 minutes |
| 19. Jack Jones | AR | 4/24/2017 | 14 minutes |
| 20. Marcel Williams | AR | 4/24/2017 | 17 minutes |
| 21. Kenneth Williams | AR | 4/27/2017 | 13 minutes |
| 22. Thomas Arthur | AL | 5/26/2017 | UNKNOWN |
| 23. Robert Melson | AL | 6/8/2017 | UNKNOWN |
| 24. William Morva | VA | 7/16/2017 | UNKNOWN |
| 25. Ronald Phillips | OH | 7/26/2017 | 12 minutes |
| 26. Gary Otte | OH | 9/13/2017 | 15 minutes |
| 27. Torrey McNabb | AL | 10/19/2017 | UNKNOWN |
| 28. Michael Eggers | AL | 3/15/2018 | UNKNOWN |
| 29. Walter Moody | AL | 4/19/2018 | UNKNOWN |
| 30. Robert Van Hook | OH | 7/18/2018 | 16 minutes |

It is the results of these 20 executions for which there is an official timeline from the State's Department of Corrections that stated above is the average minutes from the time the first drug is injected injection until the time of death of 13.55 minutes, with longest time being 18 minutes and the shortest time being 10 minutes.

**Attachment 7**

Also significant from this chart is that 17 executions using a midazolam three-drug protocol have taken place since the United States Supreme Court decided *Glossip* on June 29, 2015, and none of those executions have been stopped from proceeding by the United States Supreme Court. Of the six states that have conducted an execution using a three-drug midazolam protocol, the United States Supreme Court has never held their protocol unconstitutional.

The Plaintiffs have pointed to the prolonged executions of Clayton Lockett and Joseph Wood[8] for proof that with the use of midazolam in a lethal injection protocol an inmate continues to feel pain and therefore an inmate will experience torture when administered the other two drugs vecuronium bromide and potassium chloride which inflict severe pain upon injection. But as discussed above, both the Wood and Lockett executions took place before the Supreme Court issued the *Glossip* decision. Despite the documented problems in these executions, the United States Supreme Court in *Glossip* found these executions were of little relevance.

Midazolam—Eye-Witnesses to Executions

There was also the testimony of attorneys who had witnessed their inmate clients' lethal injection executions in other states, including by use of midazolam. Eleven Federal Public Defenders and a law professor/self-employed attorney testified. These witnesses

---

[8] In addition to Lockett and Wood, the Plaintiffs provided proof of the Dennis McGuire execution on January 16, 2014. For the same reasons that the United States Supreme Court found the Lockett and Wood executions of little probative value, the Court also finds the McGuire execution of little probative value. It is undisputed that Dennis McGuire was executed prior to the *Glossip* decision and with a different lethal injection cocktail than the three-drug protocol the Defendants intend to use in this case.

27

**Attachment 7**

testified that there were signs such as grimaces, clenched fists, furrowed brows, and moans indicative that the inmates were feeling pain after the midazolam had been injected and when the vecuronium bromide was injected. These witnesses' calculations of the duration of the executions was within a plus one minute of the Official Documentation.

Midazolam—Application of the Law

Based upon

— the United States Supreme Court and other courts determining that the use of midazolam does not pose a constitutionally unacceptable risk of severe pain, even in light of the prolonged executions of Wood and Lockett,

— applying the context of an execution, not the standard of a medical procedure, that an execution is not required to be painless, and

— the 10 to 18 minute duration of most of the midazolam executions in evidence,

this Court concludes that the Inmates have not established the other *Glossip* prong that with the use of midazolam there is an objectively intolerable risk of harm, and, that, if the law were to be expanded to provide for a torture exception to the *Glossip* requirement for inmates to prove a known and available alternative method of execution, the Tennessee three-drug lethal injection protocol would not come within the exception.

**Attachment 7**

Midazolam—Deliberate Indifference

Lastly with respect to midazolam is that the Inmates contend that the State's use is deliberately indifferent because the State was warned in the procurement process of the risks of midazolam.

> Hello XXXXX
>
> That stuff is readily available along with potassium chloride. I reviewed several protocols from states that currently use that method. Most have a 3 drug protocol including a paralytic and potassium chloride. Here is my concern with Midazolam. Being a benzodiazepine, it does not elicit strong analgesic effects. The subject may be able to feel pain from the administration of the second and third drugs. Potassium chloride especially. It may not be a huge concern but can open the door to some scrutiny on your end. Consider the use of an alternative like Ketamine or use in conjunction with an opioid. Availability of the paralytic agent is spotty. Pancuronium, Rocuronium, and Vecuronium are currently unavailable. Succinylcholine is available in limited quantity. I'm currently checking other sources. I'll let you know shortly.
>
> Regards,

Having found above that midazolam's propensity was known to the United States Supreme Court in *Glossip*, TDOC's decision to use the drug is not deliberately indifferent. "As for the alleged risk of severe pain in Alabama's current protocol, 'it is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated.'" *Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268, 1303 (11th Cir. 2016), *cert. denied sub nom. Arthur v. Dunn*, 137 S. Ct. 725 (2017), *reh'g denied*, 137 S. Ct. 1838 (2017) (quoting *Baze*, 553 U.S. at 53, 128 S.Ct. at 1532.).

Vecuronium Bromide

In addition to challenging the use of midazolam in the three-drug lethal injection protocol, the Inmates also contest use of the second drug: vecuronium bromide. This drug acts to paralyze the inmate after the sedation of the midazolam has been injected and before the heart-stopping potassium chloride is injected. The Inmates cite to the 2003 decision of this Court which upheld as constitutional the lethal injection method being used at that time but which found that the State had not demonstrated a reason for injecting a paralytic like vecuronium bromide and therefore its use was arbitrary. In the 15 years since this Court's decision in 2003, several changes have occurred which make the 2003 decision of minimal use. First, reasons have been stated in the case law for injection of a paralytic like vecuronium bromide, one being to hasten death, to show its use is not arbitrary.

- First, as already noted, the Supreme Court in *Baze* found that the paralytic, which was used in the three-drug execution protocol of at least 30 states, 553 U.S. at 44, 128 S.Ct. 1520, serves two legitimate purposes, maintaining the dignity of the procedure and hastening death. *Id.* at 57–58, 128 S.Ct. 1520. Administration of a paralytic as the second drug after an effective agent of unconsciousness in a three-drug lethal injection protocol is not so arbitrary that it shocks the conscience. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.' ") (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)).

*First Amendment Coal. of Arizona, Inc. v. Ryan*, 188 F. Supp. 3d 940, 958 (D. Ariz. 2016).

- We do, however, pause to note our agreement with the district court's reasoning concerning Chavez's claim that the forcible administration of vecuronium bromide would violate his due process rights under *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), because it serves no medical purpose in the execution process. As the district court explained, the liberty interest in avoiding involuntary medical treatment that *Sell* identified does not apply in the context of

**Attachment 7**

capital punishment because "by its nature, the execution process is not a medical procedure, and by design, it is not medically appropriate for the condemned." Doc. 50 at 39. And "[u]sing drugs for the purpose of carrying out the death penalty does not constitute medical treatment." *Id.* at 42.

*Chavez v. Florida SP Warden*, 742 F.3d 1267, 1269, n. 2 (11th Cir. 2014).

- In *Chavez v. Florida SP Warden*, 742 F.3d 1267, 1269 n. 2 (11th Cir.2014), the Eleventh Circuit rejected the prisoner's argument that the forcible administration of the paralytic vecuronium bromide violated his due process rights because it served no medical purpose in the execution process. Affirming the district court, the court of appeals explained that "the liberty interest in avoiding involuntary medical treatment...does not apply in the context of capital punishment 'because by its nature, the execution process is not a medical procedure, and by design, it is not medically appropriate for the condemned,' and '[u]sing *959 drugs for the purpose of carrying out the death penalty does not constitute medical treatment.'" *Id.* (quoting *Chavez v. Palmer*, No. 3:14–cv–110–J–39JBT, 2014 WL 521067, at *22 (M.D.Fla. Feb. 10, 2014)); *see Howell v. State*, 133 So.3d 511, 523 (Fla.2014) (rejecting due process challenge to forced administration of paralytic).

*First Amendment Coal. of Arizona, Inc. v. Ryan*, 188 F. Supp. 3d 940, 958–59 (D. Ariz. 2016).

Secondly, this Court's 2003 decision was prior to the United States Supreme Court decisions: *Baze v. Rees*, 553 U.S. 35 (2008) and *Glossip v. Gross*, 135 S. Ct. 2726 (2015) which have been quoted extensively herein and which have decided the law in this area.

Other Challenges to Protocol

As to the other allegations of the Inmates that the July 5, 2018 three-drug lethal injection protocol creates a demonstrated risk of severe pain through: use of compounding, oral or written instructions from the compounder of the drug on handling and storage, and insufficient consciousness checks, the Court dismisses these based upon the following case law which has dismissed these claims under circumstances similar to this case.

31

- The experience of the U.S. Fifth Circuit Court of Appeals and a U.S. District Court in Virginia is that executions with compounded drugs have proceeded without incident.

The United States Court of Appeals for the Fifth Circuit recently rejected nearly identical arguments by a Texas death row inmate that "compounded drugs are unregulated and subject to quality and efficacy problems." *Ladd v. Livingston*, 777 F.3d 286, 289 (5th Cir. 2015); *see also Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1264–66 (11th Cir. 2014) (rejecting similar challenge to a compounded drug). The court concluded that such arguments are "essentially speculative," and "speculation cannot substitute for evidence that the use of the drug is *sure or very likely* to cause serious illness and needless suffering." *Ladd*, 777 F.3d at 289 (quoting *Brewer v. Landigran*, 562 U.S. 996, 996 (2010)). The Fifth Circuit explained that to succeed, an inmate must "offer some proof that the state's own process—that its choice of pharmacy, that its lab results, that the training of its executioners, and so forth, are suspect." *Id.* (citing *Whitaker v. Livingston*, 732 F.3d 465, 468 (5th Cir. 2013)). The court went on to observe that Texas was able to conduct its last fourteen executions with "a single-drug pentobarbital injection from a compounded pharmacy ... without significant incident." *Id.* at 290. This Court previously refused to halt the execution of a Virginia inmate, Alfredo Prieto, whose lethal injection protocol used a compounded drug as its first ingredient. *See Prieto v. Clarke*, No. 3:15CV587–HEH, 2015 WL 5793903 (E.D. Va. Oct. 1, 2015). Prieto's execution using the compounded drug was completed without incident.

\* \* \*

Less than a year ago, the Eleventh Circuit held that a prisoner has no procedural due process right "to know where, how, and by whom the lethal injection drugs will be manufactured, as well as the qualifications of the person or persons who will manufacture the drugs, and who will place the catheters." *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1292—93 (11th Cir.), *cert. denied sub nom. Jones v. Bryson*, 136 S. Ct. 998 (2016). The Fifth, Sixth, and Eighth Circuits have reached similar conclusion. *See Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016) ("Plaintiffs argue that HB 663 prevents them from bringing an effective challenge to Ohio's execution procedures. Specifically, they maintain that HB 663 'denies [them] an opportunity to discover and litigate non-frivolous claims.' But no constitutional right exists to discover grievances or to litigate effectively once in court." (internal quotation marks omitted) (citation omitted)); *Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir.), *cert. denied*, 135 S. Ct. 2941

(2015) ("[T]he Constitution does not require such disclosure. A prisoner's assertion of necessity—that [the State] must disclose its protocol so he can challenge its conformity with the Eighth Amendment—does not substitute for the identification of a cognizable liberty interest." (internal quotation marks omitted) (citations omitted)); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir.), *cert. denied*, 135 S. Ct. 41 (2014) ("A due process right to disclosure requires an inmate to show a cognizable liberty interest in obtaining information about execution protocols .... However, we have held that an uncertainty as to the method of execution is not a cognizable liberty interest." (citation omitted)). Likewise, this Court will adopt the same reasoning as the Fifth, Sixth, Eighth, and Eleventh Circuits in finding that Gray has no procedural due process right to discover information about Virginia's lethal injection drugs. Therefore, because Gray is unlikely to succeed on the merits of his procedural due process claim, this factor weighs strongly against granting a preliminary injunction.

*Gray v. McAuliffe*, No. 3:16CV982-HEH, 2017 WL 102970, at *20 (E.D. Va. Jan. 10, 2017), *appeal dismissed sub nom. RICKY GRAY v. TERENCE MCAULIFFE* (Jan. 11, 2017) (footnote omitted).

- It cannot be cruel and unusual punishment for the Department to fail to plan ahead for every minor contingency. If the inmates are challenging the Department's ability to exercise discretion even for minor, routine contingencies, that challenge fails. But the inmates' principal challenge is to the Department's failure to commit to, and its deviation from, central aspects of the execution process once adopted. Those unlimited major deviations and claims of right to deviate threaten serious pain.

*First Amendment Coal. of Arizona, Inc. v. Ryan*, 188 F. Supp. 3d 940, 951 (D. Ariz. 2016).

- Moreover, to the extent any accidental mishandling might have occurred, "[t]he risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review." *Reid v. Johnson*, 333 F. Supp. 2d 543, 553 (E.D. Va. 2004) (quoting *Campbell v. Wood*, 18 F.3d 662, 687 (9th Cir. 1994)).

*Gray v. McAuliffe*, No. 3:16CV982-HEH, 2017 WL 102970, at *14, n. 11 (E.D. Va. Jan. 10, 2017), *appeal dismissed sub nom. RICKY GRAY v. TERENCE MCAULIFFE* (Jan. 11, 2017).

Furthermore, as to the risk of compounding, Dr. Evans, the Defendants' expert

pharmacologist, established that if the July 5, 2018 protocol is followed as written, it

33

poses no risk. The Inmates' constitutional challenge being a facial one to the protocol, Dr. Evans' testimony on this issue is weighty.

Reiteration—Failure to Prove *Glossip* Alternative Prong

The foregoing findings concerning the use of midazolam must be considered as part of the comparative analysis required by the United States Supreme Court. The Court reiterates that for the death penalty to be an effective punishment, the United States Supreme Court requires inmates, challenging a State's method of execution as unconstitutional, to prove that there is a known and available alternative method of execution. With the realities of the supply of lethal injection drugs diminishing and drug options narrowing for prisons, requiring inmates, seeking to halt executions, to prove other alternatives exist addresses these realities. In this case the Inmates have not done this. They have not demonstrated that their proposed alternative of pentobarbital is available to the State of Tennessee for their executions. Under these circumstances, the law of the United States requires Count I of the *Second Amended Complaint* to be dismissed, and that use of the July 5, 2018 three-drug protocol may proceed.

## Count VIII: Substantive Due Process – Shocks the Conscience

For the same reasons above for dismissal of the Count I claim, the Inmates' Count VIII claim is dismissed. That is because the following case law establishes that the Count VIII claim is subsumed and decided by the foregoing cruel and unusual punishment analysis.

34

- Because we have "always been reluctant to expand the concept of substantive due process," *Collins v. Harker Heights, supra,* at 125, 112 S.Ct., at 1068, we held in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (plurality opinion of REHNQUIST, C.J.) (quoting *Graham v. Connor, supra,* at 395, 109 S.Ct., at 1871) (internal quotation marks omitted).

*Cty. of Sacramento v. Lewis,* 523 U.S. 833, 842 (1998).

- To support a viable substantive due process claim against executive action, a plaintiff must ordinarily demonstrate an "abuse of power ... [that] shocks the conscience." *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). But as a result of the amorphous nature of the case law in this area, the substantive due process framework is inappropriate where another constitutional amendment encompasses the rights asserted. *See Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). The Supreme Court has explained that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [the] claims." *Lewis,* 523 U.S. at 842, 118 S.Ct. 1708 (first alteration in original) (quoting *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion)). Accordingly, when a claimant alleges that a state actor unreasonably seized her property, a court should generally apply the Fourth Amendment reasonableness standard governing searches and seizures, not the substantive due process standard of conscience-shocking state action. *See, e.g., Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

*Partin v. Davis,* 675 Fed. Appx. 575, 581–82, 2017 WL 128559 (6th Cir. 2017).

- Plaintiff has not shown a substantial likelihood of success on the merits of his Fourteenth Amendment claim with respect to the use of vecuronium bromide as the second drug in the three-drug protocol. The Supreme Court has "always been reluctant to expand the concept of substantive due process[.]" *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Here, there is a particular Amendment, the Eighth Amendment, which " 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior [.]" *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443

35

(1989)). Therefore, the guide for analyzing Plaintiff's claim must be the Eighth Amendment, not the "generalized notion of substantive due process [.]" *Id.* (citation and internal quotation marks omitted)). To the extent Plaintiff is raising an Eighth Amendment claim, he has not shown a substantial likelihood of success on the merits of an Eighth Amendment claim with respect to the use of vecuronium bromide, a paralytic, in Florida's lethal injection protocol.[28]

*Chavez v. Palmer*, No. 3:14-CV-110-J-39JBT, 2014 WL 521067, at *23 (M.D. Fla. Feb. 10, 2014), *aff'd sub nom. Chavez v. Florida SP Warden*, 742 F.3d 1267 (11th Cir. 2014) (footnote omitted).

- Before leaving this point on appeal, we must address the Prisoners' assertion that the Midazolam protocol violates the substantive component of article 2, section 8 of the Arkansas Constitution because the lethal-injection procedure using Midazolam entails objectively unreasonable risks of substantial and unnecessary pain and suffering. On this issue, the circuit court ruled that the Prisoners need not satisfy the requirement of offering a feasible and readily implemented alternative to the Midazolam protocol. We agree with ADC's contention that this claim must be analyzed under the two-part test we have herein adopted for method-of-execution challenges. "If a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). In applying this principle, courts have concluded that an Eighth Amendment claim that is conterminous with a substantive due-process claim supersedes the due-process claim. *Curry v. Fed. Bureau of Prisons*, No. 05–CV–2781, 2007 WL 2580558 (PJS/JSM) (D.Minn. September 5, 2007) (collecting cases); *see also Oregon v. Moen*, 309 Or. 45, 786 P.2d 111, 143 (1990) (recognizing that "if the imposition of the death penalty satisfies the Eighth Amendment, it also satisfies substantive due process"). This claim also fails because, as we have discussed, the Prisoners failed to establish the second prong of the *Glossip* test.

*Kelley v. Johnson*, 496 S.W.3d 346, 360 (Ark. 2016), *reh'g denied* (July 21, 2016), *cert. denied*, 137 S. Ct. 1067 (2017), *reh'g denied*, 137 S. Ct. 1838 (2017) (footnote omitted).

- If a constitutional claim is covered by a specific constitutional provision, such as the Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043 (1998) (citations omitted). Thus, substantive due process analysis is inappropriate if Plaintiff's claim is covered by another constitutional

Case 3:18-cv-01234   Document 1-8   Filed 11/02/18   Page 38 of 51 PageID #: 520

**Attachment 7**

amendment. *Id.* In the instant case, Plaintiff's claim is covered by the Eighth Amendment; therefore, his due process claim should be dismissed.

*Gary v. Aramark Corr. Servs.*, No. 5:13-CV-417-RS-EMT, 2014 WL 3385119, at \*5 (N.D. Fla. July 10, 2014).

- A prisoner may not bring a substantive due process claim when another constitutional amendment "provides an explicit textual source of constitutional protection against" that claim. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Here, the Eighth Amendment clearly provides a source of protection for Plaintiff's claims. *See id.* Any due process claim thus fails.

*Norman v. Griffin*, No. 7:14-CV-185 HL, 2014 WL 7404008, at \*5 (M.D. Ga. Dec. 30, 2014).

- If he intended the former, the Court has analyzed his Eighth Amendment claims above. To the extent he intended the latter, substantive due process does not apply when another constitutional amendment explicitly provides a source of constitutional protection. *See Sacramento Cty. v. Lewis*, 523 U.S. 833, 842 (1998). A substantive due process analysis is appropriate only if Plaintiff's claims are not "covered by" the Eighth Amendment. *Id.* at 843. Because Plaintiff's claims are completely covered by the Eighth Amendment, his Fourteenth Amendment claims are superfluous.

*Niewind v. Smith*, No. 14-CV-4744 (DWF/HB), 2016 WL 3960356, at \*11 (D. Minn. May 24, 2016), *report and recommendation adopted*, No. 14-4744 (DWF/HB), 2016 WL 3962852 (D. Minn. July 20, 2016).

- Plaintiffs also argue that Mississippi's intention to execute them in a manner other than that described by § 99–19–51 "shocks the conscience" and that they are entitled to substantive enforcement of § 99–19–51 regardless of the state post-conviction relief procedures available to them. This argument sounds in substantive due process. According to the Supreme Court, "[t]he touchstone of due process is protection of the individual against arbitrary action of government." *County of Sacramento*, 523 U.S. at 845, 118 S.Ct. 1708. The Court has held that executive action violates a citizen's substantive due process rights when the action "shocks the conscience." *Id.* at 846, 118 S.Ct. 1708. The Court's test for the substantive component of the due process clause prohibits "only the most egregious official conduct," *id.*, and will rarely come into play. At the same time that the Court announced the "shocks the conscience" test it counseled judges against "drawing on our merely personal and private notions [to] disregard the limits that bind judges in their judicial function." *Rochin v. California*, 342 U.S. 165, 170–71, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

*Jordan v. Fisher*, 823 F.3d 805, 812–13 (5th Cir. 2016), *as revised* (June 27, 2016), *cert. denied*, 137 S. Ct. 1069 (2017).

**Attachment 7**

## Count IV:  Procedural Due Process

In Count IV of the *Second Amended Complaint*, the Plaintiffs allege that the Lethal Injection Protocol violates the Fourteenth Amendment to the United States Constitution and Tennessee Constitution Article 1, § 8.

In support of this claim, the Plaintiffs argue that the protocol fails to provide the Defendants adequate notice of which method of execution will be used and provides insufficient notice that compounded midazolam will be used rather than manufactured midazolam.  For the following reasons, the Court dismisses Count IV of the *Second Amended Complaint For Declaratory Judgment*.

On July 5, 2018, the Department of Correction issued a revised Lethal Injection Manual that eliminated a choice by TDOC.  The July 5, 2018 revision removed Protocol A providing for use of pentobarbital and provided that the Department would use Protocol B for carrying out executions by lethal injection.  Protocol B is the three-drug lethal injection protocol tried in this case.  Additionally, the July 5, 2018 revision made explicit that "[c]hemicals used in lethal injection execution will either be FDA-approved commercially manufactured drugs; or, shall be compounded preparations prepared in compliance with pharmaceutical standards consistent with the United States Pharmacopeia guidelines and accreditation Departments, and in accordance with applicable licensing regulations."

Thus, Plaintiffs' allegations, in paragraphs 363-378 and 702-723 of the *Second Amended Complaint For Declaratory Judgment* that the January 8, 2018 lethal injection protocol violated the Plaintiffs' procedural due process rights because "it does not

38

**Attachment 7**

provide any standards for the selection of one protocol versus another, does not provide for any notice of the selection of any protocol and denies plaintiffs a meaningful opportunity to be heard," are moot given the revisions in the July 5, 2018 Lethal Injection Manual. The July 5, 2018 revision explicitly provides that (1) Protocol B will be used and (2) commercially manufactured or compounded drugs may be used.[9]

Second, to the extent any portion of the Plaintiffs' Count IV – Procedural Due Process claim asserts a lack of notice in the July 5, 2018 Lethal Injection Manual of the method by which they will be executed, this claim must also be dismissed. On July 10, 2018, the Tennessee Supreme Court issued an *Amended Order* in the cases of Plaintiffs Billy Ray Irick, Edmund Zagorski and David Earl Miller which provided a date certain by which the Warden was required to notify the inmate of the method that the Tennessee Department of Correction will use to carry out the executions.

> Accordingly, under the provisions of Rule 12.4(E), it is hereby ORDERED, ADJUDGED AND DECREED by this Court that the Warden of the Riverbend Maximum Security Institution, or his designee, shall execute the sentence of death as provided by law on the 9th day of August, 2018, unless otherwise ordered by this Court or other appropriate authority. **No later than July 23, 2018, the Warden or his designee shall notify Mr. Irick of the method that the Tennessee Department of Correction (TDOC) will use to carry out the executions and of any decision by the Commissioner or TDOC to rely upon the Capital Punishment Enforcement Act.**

*State of Tennessee v. Billy Ray Irick*, No. M1987-00131-SC-DPE-DD, p. 1 (Tenn. July 10, 2018) (*per curiam*) (emphasis added); *State of Tennessee v. Edmund Zagorski*, No. M1996-00110-SC-DPE-DD, p. 1 (Tenn. July 10, 2018) (*per curiam*) ("No later than

---

[9] During the trial, Department of Correction General Counsel Debbie Inglis testified that the Department would use compounded midazolam in the upcoming executions.

39

**Attachment 7**

September 27, 2018, the Warden or his designee shall notify Mr. Zagorski of the method that the Tennessee Department of Correction (TDOC) will use to carry out the executions and of any decision by the Commissioner or TDOC to rely upon the Capital Punishment Enforcement Act."); *State of Tennessee v. David Earl Miller*, No. E1982-00075-SC-DDT-DD, p. 1 (Tenn. July 10, 2018) (*per curiam*) ("No later than November 21, 2018, the Warden or his designee shall notify Mr. Miller of the method that the Tennessee Department of Correction (TDOC) will use to carry out the executions and of any decision by the Commissioner or TDOC to rely upon the Capital Punishment Enforcement Act.").

Additionally, TDOC has complied, and as of July 23, 2018 issued the Notice.

By the Tennessee Supreme Court providing these certain deadlines for the inmates that currently have execution dates set and with TDOC's compliance, the Plaintiffs are provided sufficient notice of the method of execution while at the same time balancing the Commissioner's right to modify the protocol based on changing circumstances. *West v. Schofield*, 468 S.W.3d 482, 492 (Tenn. 2015) ("Even assuming TDOC is unable to obtain pentobarbital, the Commissioner may choose to modify the lethal injection protocol and designate a more readily obtainable drug instead of making a certification to the Governor under the CPEA.").

For all these reasons, the Count IV is dismissed with prejudice.

**Attachment 7**

## Count V:  Right to Counsel and Access to the Courts

The *Second Amended Complaint* contains 8 challenges to the set-up of the room where witnesses, including attorneys for the inmate being executed, view the execution.[10] These include challenges about the sight view and access of attorneys to a telephone, quoted as follows.

> 381.  The official witness room does not provide Plaintiff's lawyer with the ability to view the injection site for signs of extravasation or infiltration.
> 382.  The official witness room does not permit attorney observation of the syringes which is critical to ascertain the sequence and timing of the injection of the different syringes.
> 383.  The official witness room does not provide Plaintiff's lawyer with sufficient ability to observe signs of unnecessary pain and distress.
> 384.  The official witness room does not provide Plaintiffs with telephone access to the courts or co-counsel.
> * * *
> 386.  Defendants have the ability to provide Plaintiffs' counsel visual monitoring of the IV injection site throughout the execution process.
> 387.  Defendants have the ability to provide Plaintiffs' counsel visual observation of the operation of the syringes.
> 388.  Defendants have the ability to provide Plaintiffs with appropriate visual monitoring of their client during the execution process.
> 389.  Defendants have the ability to provide Plaintiffs' counsel with suitable telephone access to the courts and co-counsel during the execution process.
> * * *
> 726.  During his deposition, Defendant Parker agreed to provide telephone access for Plaintiffs' during the execution process.
> 727.  After his deposition, that agreement was rescinded.
> 728.  During her deposition, Debbie Inglis agreed to consider allowing Plaintiffs' counsel to access the telephone adjacent to the Death Watch cells during the execution process.

---

[10] The relief sought in this claim is not for the Court to order TDOC to allow the attorneys to have telephone access or to change the sight view.  The Inmates' claim is that because these items are not provided, the Inmates do not have access to the courts and counsel, and this is unconstitutional.  The effect of such a ruling is that the executions would be halted.

**Attachment 7**

729. During his deposition, Defendant Parker agreed to inquire about the installation of a monitor in the Official Witness Room that would broadcast the visual feed from the pan-tilt-zoom camera that is focused on the IV sites.

Based upon the following law, these challenges do not rise to the level of unconstitutional conduct. As for the testimony at trial of the Commissioner and Assistant Commissioner that they would not object to Counsel having access to telephones, this Court as stated in footnote 8, does not have the authority in this case to order that. But even so, there is no legal bar to the State and the Inmates' Counsel reaching an agreement on this. As far as the constitutional ramifications, however, Count V must be dismissed based upon the following law.

First, as a matter of law, all of the claims alleged in this lawsuit – including the access to courts claim – are facial challenges to the constitutionality of the July 5, 2018 protocol. Under Tennessee law, a facial challenge is the most difficult constitutional challenge to make. In order to succeed on their access to courts claim, the Plaintiffs must prove that no set of circumstances exist under which the July 5, 2018 Lethal Injection Protocol would be valid. *Lynch v. City of Jellico*, 205 S.W.3d 384, 390 (Tenn. 2006) ("Likewise, it is well recognized that a facial challenge to a statute, such as that involved here, is 'the most difficult challenge to mount successfully since the challenger must establish that no set of circumstances exist under which the Act would be valid.' Thus, the plaintiffs in this appeal have a heavy legal burden in challenging the constitutionality of the statutes in question.") (citations omitted).

42

Furthermore, "[t]he presumption of constitutionality applies with even greater force when a party brings a facial challenge to the validity of a statute. In such an instance, the challenger must establish that no set of circumstances exists under which the statute, as written, would be valid." *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009) (citations omitted).

In this case, the access to courts claim fails as a matter of law because it is premised and based on speculation that during the execution something will go wrong that would necessitate the need for access to courts. This type of speculation does not state a claim in a facial challenge as recognized by the Tennessee Supreme Court in *West v. Schofield.*

> Initially, we note that the trial court allowed the Plaintiffs to adduce proof about a variety of things that might conceivably go wrong in a compounded pentobarbital lethal injection execution as well as proof about the consequences of the Protocol being carried out in accordance with the Protocol's specific provisions. For instance, the Plaintiffs elicited expert proof about the risks associated with the LIC if it was compounded, transported, or stored improperly, i.e., in contravention of the Protocol, including the Contract. However, we view this proof as more appropriate to an as-applied challenge to the Protocol because the Protocol, on its face, does not provide for the improper preparation, transportation, or storage of the LIC. As the United States Court of Appeals for the Sixth Circuit has recognized, "[s]peculations, or even proof, of medical negligence in the past or in the future are not sufficient to render a facially constitutionally sound protocol unconstitutional." Cooey v. Strickland, 589 F.3d 210, 225 (6th Cir. 2009).

> Certainly, there are risks of error in every human endeavor. Indeed, as the United States Supreme Court has recognized, "[s]ome risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure." Baze v. Rees, 553 U.S. 35, 47, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (plurality opinion). However, " 'accident[s], with no suggestion of malevolence' [do] not give rise to an Eighth Amendment violation." Id. at 50, 128 S.Ct. 1520

43

(citation omitted) (quoting <u>Louisiana ex rel. Francis v. Resweber</u>, 329 U.S. 459, 463, 67 S.Ct. 374, 91 L.Ed. 422 (1947)).

> Again, this lawsuit consists of a facial challenge to the Protocol. A facial challenge does not involve a consideration of the Plaintiffs' list of things that *might* go wrong if the Protocol is not followed. Therefore, we need not itemize the substantial amount of proof in the record before us that relates only to potential risks that might occur from a failure to follow the Protocol rather than the proof of risks that are inherent in the Protocol itself.

*West v. Schofield*, 519 S.W.3d 550, 555–56 (Tenn. 2017), *cert. denied sub nom. West v. Parker*, 138 S. Ct. 476, 199 L. Ed. 2d 364 (2017), and *cert. denied sub nom. Abdur'Rahman v. Parker*, 138 S. Ct. 647, 199 L. Ed. 2d 545 (2018), *reh'g denied*, 138 S. Ct. 1183, 200 L. Ed. 2d 328 (2018); *see also Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 310 (Tenn. 2005) (rejecting the inmate's access to courts claim because "he has failed to show evidence that a scenario involving unnecessary pain and suffering is anything other than speculation.").

Additionally, the Count V claim is dependent upon the Inmates' succeeding on their Count I claim which they did not do.  On this basis, as well, Count V is dismissed.

- The plaintiffs also have not satisfied the pleading requirements of a method-of-execution claim because they have not identified a "substantial risk of serious harm" from the lack of access. *See Glossip*, 135 S.Ct. at 2737 (quotation marks and citations omitted). The plaintiffs point to the possibility of "botched executions" that access to counsel could address, but that is just the kind of "isolated mishap" that is not cognizable via a method-of-execution claim. *See Baze*, 553 U.S. at 50, 128 S.Ct. 1520. Finally, because the plaintiffs have not succeeded in pleading an underlying claim, their access-to-the-courts assertion fails as well. *Whitaker*, 732 F.3d at 467.

*Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1172 (2018).

- Second, even if there was some delay because of uncertainty on the part of the state as to how it would proceed with executions, plaintiffs' access-to-the-courts

44

argument still hinges on their ability to show a potential Eighth Amendment violation. One is not entitled to access to the courts merely to argue that there might be some remote possibility of some constitutional violation. Plaintiffs must plead sufficient facts to state a cognizable legal claim. *See, e.g., Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.... The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully.). Therefore, plaintiffs must show some likelihood of success on the merits of the Eighth Amendment claim. A plaintiff cannot argue that if only he had infinite time—or even just a little bit more time—*then* he might be able to show a likelihood of success. To hold otherwise would be to eviscerate the first requirement of the standard for preliminary injunctions.

*Whitaker v. Livingston*, 732 F.3d 465, 467 (5th Cir. 2013).

- Arthur's request for his counsel to take a cellular device into a prison while an execution is taking place is based on speculation that something might go wrong during the procedure. This theoretical basis for relief falls outside of the injury requirement stated in *Lewis. Cf. Whitaker v. Livingston*, 732 F.3d 465, 467 (5th Cir. 2013) ("One is not entitled to access to the courts merely to argue that there might be some remote possibility of some constitutional violation.").

*Arthur v. Dunn*, No. 2:16-CV-866-WKW, 2017 WL 1362861, at *7 (M.D. Ala. Apr. 12, 2017), *aff'd sub nom. Arthur v. Comm'r, Alabama Dep't of Corr.*, 680 Fed. Appx. 894 (11th Cir. 2017), *cert. denied sub nom. Arthur v. Dunn*, 137 S. Ct. 1521 (2017).

It follows, then, that because the Inmates' claims regarding cell phones and better sight views for Counsel while observing the executions, do not state a constitutional violation, this Court has no authority to order TDOC to make such changes.  In an analogous area, Tennessee case law provides that courts generally give great deference to an agency's interpretation of its own rules because the agency possesses special knowledge, expertise, and experience with regard to the subject matter of the rule.

*BellSouth Adver. & Publ'g Corp. v. Tennessee Regulatory Auth.*, 79 S.W.3d 506, 514

**Attachment 7**

(Tenn.2002) (quoting *Jackson Exp., Inc. v. Tennessee Pub. Serv. Comm'n*, 679 S.W.2d at 945).

The Tennessee Legislature has carefully regulated the persons who may attend an execution.[11]  Security measures are delegated to TDOC. TENN. CODE ANN. § 40-23-

---

[11] § 40-23-116. Capital punishment; procedure; witnesses

(a) In all cases in which the sentence of death has been passed upon any person by the courts of this state, it is the duty of the sheriff of the county in which the sentence of death has been passed to remove the person so sentenced to death from that county to the state penitentiary in which the death chamber is located, within a reasonable time before the date fixed for the execution of the death sentence in the judgment and mandate of the court pronouncing the death sentence. On the date fixed for the execution in the judgment and mandate of the court, the warden of the state penitentiary in which the death chamber is located shall cause the death sentence to be carried out within an enclosure to be prepared for that purpose in strict seclusion and privacy. The only witnesses entitled to be present at the carrying out of the death sentence are:

(1) The warden of the state penitentiary or the warden's duly authorized deputy;

(2) The sheriff of the county in which the crime was committed;

(3) A priest or minister of the gospel who has been preparing the condemned person for death;

(4) The prison physician;

(5) Attendants chosen and selected by the warden of the state penitentiary as may be necessary to properly carry out the execution of the death sentence;

(6) A total of seven (7) members of the print, radio and television news media selected in accordance with the rules and regulations promulgated by the department of correction. Those news media members allowed to attend any execution of a sentence of death shall make available coverage of the execution to other news media members not selected to attend;

(7)(A) Immediate family members of the victim who are eighteen (18) years of age or older. Immediate family members shall include the spouse, child by birth or adoption, stepchild, stepparent, parent, grandparent or sibling of the victim; provided, that members of the family of the condemned prisoner may be present and witness the execution;

(B) Where there are no surviving immediate family members of the victim who are eighteen (18) years of age or older, the warden shall permit up to three (3) previously identified relatives or personal friends of the victim to be present and witness the execution;

(8) One (1) defense counsel chosen by the condemned person; and

(9) The attorney general and reporter, or the attorney general and reporter's designee.

114(c) (West 2018) ("The department of correction is authorized to promulgate necessary rules and regulations to facilitate the implementation of this section.").

It is therefore the province of TDOC to use its special knowledge, expertise and experience, and if TDOC determines it is appropriate to allow the measures sought by the Inmates, TDOC may provide for that.

---

(b) No other person or persons than those mentioned in subsection (a) are allowed or permitted to be present at the carrying out of the death sentence. It is a Class C misdemeanor for the warden of the state penitentiary to permit any other person or persons than those provided for in subsection (a) to be present at the legal execution.

(c)(1) Photographic or recording equipment shall not be permitted at the execution site until the execution is completed, the body is removed, and the site has been restored to an orderly condition. However, the physical arrangement of the execution site shall not be disturbed.

(2) A violation of subdivision (c)(1) is a Class A misdemeanor.

(3) The department shall promulgate rules that establish criteria for the selection of news media representatives to attend an execution of a death sentence in accordance with the Uniform Administrative Procedures Act, compiled in title 4, chapter 5. In promulgating the rules, the department shall solicit recommendations from the Tennessee Press Association, the Tennessee Associated Press Managing Editors, and the Tennessee Association of Broadcasters. For each execution of a death sentence, applications for attendance shall be accepted by the department. When the number of applications require, lots to select news media representatives will then be drawn by the warden of the state penitentiary at which the death sentence is to be carried out. All drawings shall be conducted in open meetings and notice shall be properly given in accordance with § 4-5-203.

(d) If the immediate family members of the victim choose to be present at the execution, they shall be allowed to witness the execution from an area that is separate from the area to which other witnesses are admitted. If facilities are not available to provide immediate family members with a direct view of the execution, the warden of the state penitentiary may broadcast the execution by means of a closed circuit television system to the area in which the immediate family members are located.

**Attachment 7**

This concludes the findings of fact and conclusions of law from the trial of this case.


　　　　　　　　　　　　　　　　 *s/ Ellen Hobbs Lyle*
　　　　　　　　　　　　　　　　 ELLEN HOBBS LYLE
　　　　　　　　　　　　　　　　 CHANCELLOR


cc by U.S. Mail, email, or efiling as applicable to:

　　Kelley J. Henry
　　　　Attorney for Plaintiffs Abdur'Rahman, Bane, Black, Bland, Burns,
　　　　Carruthers, Chalmers, Dellinger, Duncan, Henderson, Hines, Hodges,
　　　　Hugueley, Jahi, Ivy, Johnson, Jordan, Keen, Middlebrooks, Miller, Morris,
　　　　Payne, Powers, Rogers, Sample, Smith, Wright, Zagorski

　　Dana C. Hansen Chavis
　　Stephen Kissinger
　　　　Attorney for Plaintiffs McKay, Miller, Sutton, and West

　　Bradley MacLean
　　　　Attorney for Plaintiff Abdur'Rahman

　　Carl Gene Shiles, Jr.
　　William J. Rieder
　　　　Attorneys for Plaintiff Irick

　　Kathleen Morris
　　　　Attorney for Plaintiff Hall

　　Scott C. Sutherland
　　Rob Mitchell
　　Charlotte M. Davis
　　　　Attorney for the Defendants

48

<u>Rule 58 Certification</u>

A copy of this order has been served upon all parties or their Counsel named above.

_____*s/ Justin F. Seamon*_____          _____July 26, 2018_____
Deputy Clerk
Chancery Court

**Attachment 7**