**49 U. Mich. J.L. Reform 749**

**University of Michigan Journal of Law Reform**
Summer 2016

Article

Deborah W. Denno [a1]

Copyright (c) 2016 Deborah W. Denno

# THE FIRING SQUAD AS "A KNOWN AND AVAILABLE ALTERNATIVE METHOD OF EXECUTION" POST-GLOSSIP

*In the future . . . some inmates may suggest the firing squad as an alternative [to lethal injection] . . . .* [1] *[S]uch visible yet relatively painless violence may be vastly preferable to an excruciatingly painful death hidden behind a veneer of medication.* [2]

## INTRODUCTION

In *Glossip v. Gross*, [3] the United States Supreme Court held 5-4 that three death row inmates failed to establish that the drug midazolam created "a substantial risk of severe pain" when used as the first of three drugs in Oklahoma's lethal injection procedure. [4] Writing for the majority, Justice Samuel Alito explained that the **\*750** evidence presented from both sides supported the district court's view: "midazolam can render a person insensate to pain" [5] and petitioners had failed to demonstrate midazolam's inadequacy under the Eighth Amendment's Cruel and Unusual Punishments Clause. [6] In addition, the Court provided "two independent reasons" to affirm the district court's determination: [7] first, petitioners could not "identify a known and available alternative method of execution that entails a lesser risk of pain, a requirement of all Eighth Amendment method-of-execution claims," [8] and second, they were unable to show that the district court committed clear error in rejecting petitioners' arguments. [9]

The Court's rationale concerning alternative methods of execution potentially represents *Glossip*'s broadest impact. Even though Richard Glossip's fate remains unknown [10] and the case's striking dissents captured much of the legal and media commentary, [11] this Article focuses on how *Glossip* may serve as Eighth Amendment precedent. Such an objective is particularly timely given states' ongoing frustrations in finding lethal injection drugs, despite the Court's approval of midazolam. [12]

*Glossip* is the second of two Supreme Court cases concerning lethal injection drugs decided in close succession. [13] In the first case, *Baze v. Rees*, [14] the Court held, in a highly splintered 7-2 decision **\*751** with a plurality opinion, [15] that Kentucky's use of a three-drug protocol, the most common lethal injection procedure in 2008, satisfied the Eighth Amendment's Cruel and Unusual Punishments Clause. [16] Defendants had failed to demonstrate that the protocol posed a "substantial" or "objectively intolerable" risk of "serious harm" [17] compared to "known and available alternatives." [18] The three-drug protocol at issue in *Baze* consisted of the following: sodium thiopental, a barbiturate anesthetic that

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:18-cv-01234 Document 1-17 Filed 11/02/18 Page 1 of 35 PageID #: 609

**Attachment 16**

brings about deep unconsciousness; pancuronium bromide, a total muscle relaxant that paralyzes all voluntary muscles and causes suffocation; and potassium chloride, a toxin that induces irreversible cardiac arrest. [19] According to *Baze*, states using "substantially similar" protocols would be on constitutionally safe ground. [20] As a result, many observers of the death penalty anticipated that *Baze* would quell execution method challenges. [21]

*Glossip*'s credibility rests on the belief that *Baze* "cleared any legal obstacle to the use of [this] three-drug protocol." [22] Yet there is no basis for that belief, quite the contrary. The three-drug protocol at issue in *Baze* is no longer viable due to ongoing and unpredictable shortages of lethal injection drugs during the years following the Court's decision. Indeed, these shortages have created far more litigation and upheaval than the wide range of lethal injection challenges that preceded *Baze*. [23] The litigation has also targeted two developments: first, the continual efforts by departments of corrections to seek never-tried lethal injection drugs and protocols and **\*752** second, a series of widely publicized botched executions, a disproportionate number of which have involved the use of midazolam. [24] Overall, then, states have adopted wholly inappropriate drug substitutes to keep executions going despite risky and chaotic results. [25] *Glossip* is the Court's effort to review yet another lethal injection protocol a mere seven years after *Baze*. [26]

This Article does not address the medical debate surrounding the role of midazolam in executions; the problems associated with using the drug have been persuasively argued elsewhere. [27] Nor does it question the soundness of the *Glossip* Court's "alternative method of execution" requirement. [28] Rather, this Article's proposed reform is a constitutionally acceptable alternative that meets the *Glossip* Court's standard, rendering moot--at least for the purposes of the following discussion--very real concerns regarding the validity of that dictate. [29]

Part I of this Article pinpoints several areas where the *Glossip* Court goes wrong in glaringly inaccurate or misleading ways, given the vast history and literature on execution methods and their **\*753** changes from the nineteenth century through the start of the twenty-first century. Part II analyzes the Court's "known and available alternative method of execution" standard as defined by both the majority opinion and Justice Sonia Sotomayor's dissent. Part III proposes that the firing squad is the most viable "known and available alternative" that meets the delineations, however meager, outlined by the Court. Indeed, the firing squad is the only current form of execution involving trained professionals, and it delivers a swift and certain death.

Justice Sotomayor's dissent touches on sound and convincing reasons why death row inmates considering the hazards associated with lethal injection may prefer the firing squad as an alternative method of execution. [30] This is not the first time that an argument for the firing squad has been made in recent years. [31] But previous justifications have primarily occurred before *Glossip* and within the confines of other cultural or doctrinal delineations of the Eighth Amendment. [32] *Glossip*'s "alternative method" requirement adds yet **\*754** another dimension to execution method challenges and it strengthens the seriousness and acceptability of the firing squad as an apt means of execution.

Justice Sotomayor is the first Justice to proactively and favorably compare the firing squad--or any other execution method--to lethal injection, albeit briefly. [33] Although legal commentators and the news media have all but bypassed Justice Sotomayor's firing squad comments, [34] her compelling analysis highlights the extent to which she questions the lethal injection process. [35] This Article further positions the role of the firing squad in the context of the Court's latest Eighth Amendment decision on execution methods. It also suggests a reform that may have some traction in light of states' ongoing challenges in securing acceptable lethal injection drugs.

## I. SOME WRONG TURNS IN *Glossip*

Case 3:18-cv-01234 Document 1-17 Filed 11/02/18 Page 2 of 35 PageID #: 610

Attachment 16

*Glossip* follows *Baze* as the Court's most recent decision on execution methods. Yet the *Glossip* Court's analysis is extraordinarily scant. Two primary examples of this deficiency are the way the Court examines the history of changes in execution methods over time, and the Court's explanation of why and how Oklahoma adopted lethal injection. Equally problematic is the Court's focus on "anti-death-penalty advocates" as the basis for states' current problems with lethal injection [36] because the argument ignores the reasons behind the extensive litigation that led to *Glossip*.

**\*755  A. Glossip's *Misuse of History***

For a topic as vast, historic, and significant as how this country executes its death row inmates, the *Glossip* Court spends remarkably little time explaining the past. In less than two pages, the Court reviews changes in the United States' five execution methods over the nineteenth and twentieth centuries, from hanging to electrocution to lethal gas to the firing squad and, finally, to lethal injection. [37] Yet at no time during this brisk review does the Court explain why states switched their methods of execution, except to say that each new method was "the most humane" (or words along those lines) relative to the method it replaced. [38] In addition, the Court mentions that each state's introduction of a new method rendered that new method constitutional. [39]

The complete history of execution method transitions, however, is far more extensive than the *Glossip* Court suggests. That history is replete with detailed accounts at the legislative, judicial, and correctional levels that explain why each new method failed so profoundly in its goal to be more humane than the method it replaced. [40] Hanging, lethal gas, and electrocution were adopted and initially used with great fanfare only to be criticized and replaced after decades of technical failures and botched executions. [41] As a result, lethal **\*756** injection, the latest method, is now used almost exclusively. [42] But this record of exclusivity is no victory for lethal injection. Regardless of the outcome in *Glossip*, lethal injection's dominance demonstrates only that other methods have failed. States seem to have exhausted alternative methods of execution, apart from changing the drugs and procedures of lethal injection itself.

The Court's brevity is not confined to recounting this country's changes in execution methods. For example, the Court explains that lethal injection was first enacted following a nine-year hiatus in capital punishment in the United States, spanning from 1967 to 1976; yet, the Court never mentions why the hiatus occurred. [43] According to historical accounts, however, starting in the 1960s, a number of legal organizations and advocates expressed concern about the degree of discretion that existed in the application of the death penalty, particularly among sentencing juries, and the resulting risk of arbitrariness, such as race discrimination. [44] Such groups made a strategic decision to halt all executions by way of strong and concerted legal challenges in all cases in which an execution seemed likely. The groups believed that a country that was execution-free could finally start to understand why the death penalty was no longer necessary. [45] As Michael Meltsner explains, "[i]t is not easy to trace the evolution of this change in policy, for it came about only after a number of complex, interrelated, tactical and moral considerations coalesced, but of its importance there can be no doubt." [46]

This execution ban, which started in 1967, thereby prompted an unofficial "de facto" moratorium on the application of the death penalty. [47] Such a hiatus would be perpetuated some years further **\*757** by the Court's 1972 decision in *Furman v. Georgia*. [48] In *Furman* and related cases, the Court held 5-4 that the imposition of the death penalty in the cases before it violated the Eighth and Fourteenth Amendments. [49] Because *Furman* comprised a per curiam decision of just one paragraph along with nine separate opinions, [50] however, the case had no singular message. [51] That said, the opinions indicated that most of the Justices were troubled by the degree of discretion given to sentencing juries along with the resulting arbitrariness in death-sentencing decisions. [52] While *Furman* was aimed toward striking down the procedures in Georgia and Texas, it ended up having a broad effect, essentially invalidating nearly every death sentencing system of every jurisdiction in the country. [53]

Case 3:18-cv-01234  Document 1-17  Filed 11/02/18  Page 3 of 35 PageID #: 611

**Attachment 16**

1. The Impact of *Gregg v. Georgia*

This stalemate, however, would quickly change four years later. In 1976, the Court decided *Gregg v. Georgia*, [54] holding that the death penalty is not per se a cruel and unusual punishment and that the guided discretion approach that many states had since adopted satisfied Eighth Amendment requirements. [55] Within seven months of the Court's decision, Utah executed Gary Gilmore by firing squad, [56] **\*758** thereby revitalizing this country's death penalty and ending a moratorium that had lasted nearly ten years. [57]

With *Gregg* the United States immediately had to grapple with the problem of how states were going to execute their death row inmates. Such a quandary appeared to spur an interest in a new execution technique for three primary reasons. First, states had encountered highly publicized problems and botched executions with the prior procedures, most particularly electrocution and lethal gas, and there were concerns about going back to them. Second, a public interest developed in the potential for having executions televised, in which case states would need a method that could appear humane and palatable to a viewing audience. Third, legislatures were troubled by the cost of refurbishing the electric chair and gas chamber and searched for the possibility of a cheaper method. Thus, lethal injection seemed to be the solution to all three issues: the method was billed as humane and botch-free, and the drugs recommended for an injection were far cheaper than electrocution or lethal gas. [58] While some form of injecting a deadly toxin into inmates had been considered as early as 1888 in this country and then decades later in Great Britain, *Gregg* fueled a rising interest in finally applying such an injection method. [59] In 1977, one year after *Gregg*, Oklahoma both created and adopted the three-drug protocol that would later dominate all lethal injection executions. [60]

The *Glossip* Court never explains why the United States turned to a new method of execution in 1976 over what had been the most popular method pre-*Gregg*--electrocution. [61] The *Glossip* Court mentions that Oklahoma "eventually settled" on the types of drugs that would be included in the protocol: [62] sodium thiopental, pancuronium bromide, and potassium chloride. [63] But the Court does not explain the process behind the method's adoption, which was exceptionally quick and slapdash: in late 1976, Jay Chapman, the Oklahoma Medical Examiner, and Bill Wiseman, an Oklahoma legislator, devised this three-drug method along with a draft of the **\*759** lethal injection statute itself within the course of a day. [64] By March 1977 the Oklahoma legislature intensely debated the wisdom of adopting Chapman's and Wiseman's lethal injection method and statute. According to reported accounts, the legislators believed that even if they approved the Chapman-Wiseman method, it would be replaced by newer and more appropriate drugs before it was ever actually used on any inmates. [65] Little did anyone know that after Oklahoma adopted the Chapman-Wiseman method in 1977, the same three-drug protocol would survive into the twenty-first century and dominate the execution process. In 2010, states started to change the Chapman-Wiseman protocol only because they could no longer procure the first of the three drugs. [66] The *Glossip* Court wholly ignores this critical backdrop, however, as it matter-of-factly describes Oklahoma's creation and adoption of lethal injection in just one paragraph. [67]

The *Glossip* Court also states that the Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." [68] That characterization is technically correct. But it is only part of a much longer story that the Court does not tell. Until 2008, in *Baze v. Rees*, [69] the Court had never reviewed evidence concerning whether any method of execution violates the Eighth Amendment's Cruel and Unusual Punishments Clause. [70] Legislative changes in execution methods during the nineteenth and twentieth centuries, however, demonstrate that states typically change their method of execution when they perceive that their current method is vulnerable to a constitutional challenge. [71] Indeed, in *Bryan v. Moore*, [72] the Court granted certiorari to review arguments concerning whether electrocution, as carried out in Florida, violated the Eighth Amendment at a time when Florida used only

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Attachment 16**

electrocution and no other **\*760** method. [73] The Court dismissed this grant as improvidently granted, however, because the Florida legislature subsequently enacted a statute that would allow an inmate to choose lethal injection as an alternative execution method. [74] The legislature's decision thereby enabled petitioners to forego using electrocution entirely.

California's employment of lethal gas further illustrates the complexities of this type of maneuver. In 1996, the United States District Court for the Northern District of California held, in *Fierro v. Gomez*, [75] that execution by lethal gas violated the Eighth Amendment even though the plaintiffs, San Quentin death row inmates, had the option of choosing lethal injection. [76] At that time, if inmates waived their right to choose the method by which they would be executed, the statute specified they would be executed by lethal gas. [77] The Ninth Circuit Court of Appeals unanimously upheld the *Fierro* district court's decision, concluding that California's statute authorizing execution by lethal gas is unconstitutionally cruel and unusual. [78]

The Ninth Circuit's determination in *Fierro* was groundbreaking, marking the first time in this country's history that a federal appeals court had held any method of execution unconstitutional. [79] Soon thereafter, the Court granted certiorari to review the merits of the Ninth Circuit's holding, [80] but the California legislature rapidly moved to preclude the possibility that the Court could strike down its execution method statute. Like the Florida legislature's actions preceding *Bryan v. Moore*, [81] the California legislature changed its statute so that those inmates who failed to choose between lethal gas or lethal injection would now be executed by lethal injection. [82] As a result, the Court vacated the Ninth Circuit's holding that lethal gas was unconstitutional in light of the California legislature's subsequent amendment of the state's death penalty statute; the Court **\*761** also remanded the case for reconsideration in light of the legislature's decision to change the statute and provide that lethal injection be administered unless the inmate requests lethal gas. [83] The power of the legislature's change would be evident three years later. In *Stewart v. LaGrand*, [84] for example, the Court held that the death row inmate waived his claim that execution by lethal gas violated the Eighth Amendment because the inmate chose to be executed by lethal gas rather than lethal injection. [85]

## 2. The Firing Squad and Electrocution Cases

The *Glossip* Court therefore skirts any discussion involving states' efforts to avoid the constitutional scrutiny of their execution methods. The Court also mischaracterizes prior cases that appear to constitutionally endorse the firing squad or electrocution under the Eighth Amendment. For example, the Court concludes that it "upheld a sentence of death by firing squad" [86] in *Wilkerson v. Utah*. [87] But *Wilkerson* was decided in 1878, nearly a century before the Court incorporated the Eighth Amendment into the Due Process Clause of the Fourteenth Amendment. [88] Therefore the Constitution's standard of Cruel and Unusual Punishments was not then applicable to the states. [89] Furthermore, in *Wilkerson*, the Court held in dicta only that shooting is not a cruel and unusual punishment under the Eighth Amendment. [90] The Court never reviewed evidence on the cruelty of shooting, nor did the plaintiff raise this issue. Rather, the plaintiff protested the application of a Utah statute authorizing the death penalty for first-degree murder. The plaintiff claimed that, because the statute did not specify the **\*762** method of execution, the trial court could not approve a death sentence that the plaintiff be publicly shot. [91] Therefore the Court affirmed the lower court's determination that the judiciary was authorized to prescribe an inmate's method of execution even though the legislature had failed to mention a particular method. [92]

The *Glossip* Court is also wrong to imply that the Court "rejected a challenge to the use of the electric chair" [93] in two cases--*In re* Kemmler [94] and *Louisiana* ex rel. *Francis v. Resweber*. [95] Significantly, like *Wilkerson*, the Court decided

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Attachment 16**

*Kemmler* and *Resweber* before 1962, the year when the Court determined that the Eighth Amendment did apply to the states. [96] In addition, neither *Kemmler* nor *Resweber* pertained to the constitutionality of electrocution per se. In *Kemmler*, for example, the Court held that the Eighth Amendment did not apply to the states, and deferred to the New York legislature's conclusion that electrocution was not a cruel and unusual punishment under the state's Electrical Execution Act. [97] Although courts have cited *Kemmler* to dismiss challenges to the constitutionality of electrocution, such reliance is incorrect. [98] Likewise, *Resweber* concerned the issue of whether petitioner Willie Francis should be executed at all since the first attempt to execute him by electrocution failed. [99] Even though the *Resweber* Court reviewed the facts and troublesome science of electrocution, the Court's focus was narrow and the case was decided fifteen years before the Eighth Amendment's incorporation. [100]

In sum, neither *Kemmler* nor *Resweber* involved challenges to electrocution per se, but instead raised narrower questions.

**\*763** Furthermore, the *Glossip* Court never mentions that two states, Nebraska [101] and Georgia, [102] have both held electrocution unconstitutional under their respective state statutes. In addition, the Court does not acknowledge that all former electrocution states now use lethal injection as either the sole method or a choice method because of the problems associated with electrocution. [103]

This backdrop is critical for examining the *Glossip* Court's viability as precedent for two reasons. First, the Court mischaracterizes the history of the constitutionality of execution methods, implying through omission or indirect assertion that the history is unproblematic, when it has long been plagued by botched executions and gross ineptitude on the part of legislatures, courts, and departments of corrections. [104] As a result of these problems, starting in the nineteenth century, states continuously switched from one method of execution to the next to search for the "more" or "most" humane method of execution as well as to avoid potential constitutional challenges to the method they sought to replace. [105] Second, the Court's veneer of acceptance of midazolam provides fuel for the Court's requirement that petitioners demonstrate "a known and available alternative method of execution" as a possible replacement to lethal injection. After all, if the Court has "never invalidated" any of the prior execution methods, including the three-drug procedure in *Baze*, such a track record spotlights the status quo's success. Any effort to change an accepted execution method should require petitioners to overcome steep obstacles. Yet the brief and one-sided story that the *Glossip* Court tells defies the long-documented case law and scholarship that offer a substantially different perspective. This contrast, among others, puts *Glossip* on shaky ground as precedent.

### \*764 B. Glossip's *Focus on "Anti-Death-Penalty Advocates"*

The *Glossip* Court's distorted history raises a third concern. If this country's experiences with execution methods have been primarily inconsequential, and the problems with lethal injection's three-drug protocol seemingly quelled by *Baze,* it is unclear how the issues in *Glossip* evolved. The Court's answer, in a nutshell, is "anti-death-penalty advocates." [106] After *Baze* had presumably fostered states' abilities to successfully carry out executions quickly and humanely--a fictional representation in and of itself--"anti-death-penalty advocates" introduced yet another vehicle of obstruction by "pressur[ing] pharmaceutical companies to refuse to supply the drugs used to carry out death sentences." [107]

The Court never identifies, however, who these "anti-death-penalty advocates" are. Nor does the Court explicate how these anti-death-penalty advocates possessed such extraordinary power to create the drug shortages that dismantled the original three-drug protocol validated in *Baze*. The Court also fails to explain how or why such shortages forced states like Oklahoma to acquire inappropriate drugs, such as midazolam, when these states could have chosen other types of drugs for their protocol. [108] While the Court focuses on the "anti-death-penalty advocate" explanation as it recounts all the factors driving lethal injection's troubles, the Court never mentions that three of the most highly influential factors had nothing to do with anti-death penalty advocacy.

WESTLAW Case 3:18-cv-01234 Document 1-17 Filed 11/02/18 Page 6 of 35 PageID #: 614

**Attachment 16**

The first factor, for example, reveals that post-*Baze* efforts to reignite the execution process were problematic from the start, even before the issues with drug shortages came about. [109] Rather than eliminating obstacles, the same sorts of impediments that have always accompanied lethal injection executions followed *Baze*--namely, inexperienced or incompetent prison personnel, and **\*765** vague protocols and constraints on execution witnesses. [110] A continuing wave of troubles also followed the *Baze* decision concerning the selection, training, preparation, and qualifications of the lethal injection team. The types and sources of drugs used in lethal injection executions are just a small part of the problem, since the entire process can be riddled with disorganization and preparatory mayhem irrespective of whatever is injected into the inmate. Lethal injection botches and ineptitude on all levels post-*Baze* have far exceeded the difficulties that existed pre-*Baze*. [111]

A second influential factor was that, at least initially, the depletion of sodium thiopental had nothing to do with the death penalty. In 2014, a report published by the Government Accountability Office documented a variety of drug shortages occurring throughout the country from January 2007, a year-and-a-half before *Baze* was decided, to June 2013. The report included a review of the shortages associated with the chemicals used to create sodium thiopental. [112] Thus, the start of the scarcity of sodium thiopental in the United States was wholly divorced from the so-called anti-death-penalty "movement." Rather, the lethal injection process was affected by a pharmaceutical fact of life: drugs can often become unavailable, at times unpredictably. These shortages can impact citizens' health and, in the case of lethal injection, their death.

The third, and perhaps most significant, factor concerns the District of Columbia Circuit Court's decision in *Cook v. FDA*. [113] In 2013, *Cook* held that the Food and Drug Administration ("FDA") must approve all drugs imported into the country, including the drugs used in lethal injection protocols. [114] This decision extinguished efforts by departments of corrections to purchase lethal injection drugs outside of the country because those drugs did not meet FDA standards, [115] a matter that is still the subject of dispute. For example, in May 2015, the FDA informed Nebraska that it could not **\*766** import sodium thiopental from India to use in the state's lethal injection executions even though the Nebraska Department of Corrections had paid $54,400 for the drug. [116] In October 2015, the FDA also stopped Texas and Arizona from importing sodium thiopental from India, and investigative reporters revealed that Harris Pharma had sold to all three states. [117] Investigators discovered that Chris Harris, the head of Harris Pharma, had no pharmaceutical training whatsoever, as well as a flawed record he could better hide in India, away from FDA scrutiny. [118] Once again, departments of corrections in key death penalty states were willing to buy and illegally use a death penalty drug from a grossly disreputable source, [119] all the while knowing that faulty drugs heighten the likelihood of a botched execution. [120] Yet Nebraska, Texas, and Arizona are still trying to get around the FDA ruling so that they can continue their executions using Harris Pharma's drugs, despite their very low likelihood of success. [121]

1. Who Are the "Anti-Death-Penalty Advocates"?

Overall, then, departments of corrections were not impacted directly by anti-death-penalty advocates when they purchased substitute drugs for lethal injection purposes. This circumstance prompts two questions: who are the anti-death-penalty advocates that the Court references, and what exactly did they do to the lethal injection process? One of the great frustrations of *Glossip* is that the Court never fully addresses nor answers these questions. Instead, the Court explains the troubles that these "anti-death-penalty advocates" created, even though scholars and the news media **\*767** documented both the continued quest by departments of corrections to seek drugs and the resulting protocol changes. [122]

One reason why the Court may have evaded answering these questions is because providing an explanation would require a detailed account of all the problems facing legislatures, courts, and departments of corrections in the time between

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Attachment 16**

*Baze* and the grant of certiorari to *Glossip*. These troubles include a host of terribly botched lethal injection executions documented by petitioners' briefs, academics, and the media, and the highly problematic efforts by departments of corrections to acquire the drugs necessary for execution. [123] Instead, the Court resolves this dilemma--in just a few pages--by scapegoating the "anti-death-penalty advocates" who supposedly created the shortages and, therefore, all of the problems with lethal injection that *Baze* had presumably cleared. [124]

The *Glossip* Court first points to the "activists" who "pressured" not only the company that made sodium thiopental (Hospira) in both the United States and Italy, but also the Italian government, in order to get both sources to stop selling sodium thiopental in the United States. [125] Later, activists also extended such pressure to Lundbeck, the Danish manufacturer of pentobarbital, the drug prisons used when sodium thiopental was no longer available. [126] These drug-blocking efforts came as no surprise to those who know that almost all European countries prohibit the death penalty, and that the European Union encourages banning the death penalty in all countries. [127] Anti-death-penalty advocacy groups in Europe, such **\*768** as Reprieve, are particularly focused on eliminating the death penalty by way of stopping lethal injection. [128] Yet these groups, as effective as they are, could not possibly have the degree of impact that the Court presumably attributed to them. There are additional forces at play. [129]

It appears the *Glossip* Court would include European countries and the European Union under its "anti-death-penalty advocates" umbrella given the extent of the Court's discussion of European blocks on lethal injection drugs. [130] But targeting European countries as disrupting the U.S. death penalty ignores the reality that each country has a right to refuse to sell drugs created for health to the United States, where they will be injected to cause death. Even if part of the pressure stems from a particularly influential anti-death-penalty advocacy group, such as Reprieve, these groups are often simply informational messengers to European drug companies and pharmacies. Frequently, drug companies are unaware of how their drugs are being used, and are disturbed and concerned when anti-death-penalty advocacy groups inform them. [131] In this sense, the Court's use of the term "pressure" is misleading: providing information is not pressure.

Of course a company's association with the death penalty also can have financially detrimental effects that can deter its willingness to sell lethal injection drugs to departments of corrections. Consumers may not want to purchase drugs that are linked to executions. [132] Regardless, even if the Court believed that European countries constituted some of the "anti-death-penalty advocates" the Court derides, *Cook v. FDA* [133] would still require the FDA to ban importation of these drugs from all countries, not just Europe.

 **\*769** Apart from Italy, England, and Denmark, what other sources might be included among the "anti-death-penalty advocates" the Court mentions? Ironically, the FDA has most likely contributed the most to the lethal injection drug shortages by way of *Cook*; yet, the Court would hardly include the FDA as an "anti-death-penalty advocacy" group nor as an institution that has been pressured by such groups. The FDA operates by its own standards, irrespective of what is happening to the death penalty.

2. The Role of Medical Professionals

The same reasoning that applies to the FDA could also apply to other groups that may not be traditionally considered anti-death-penalty advocates nor as organizations necessarily influenced by them. There is a broad net of potential sources. That net could encompass a range of medical professionals such as physicians, nurses, and pharmacists, because all three groups have been involved in lethal injection executions, either directly or indirectly. [134] Doctors and other medical professionals have long participated in carrying out all execution methods, most particularly lethal injection. [135] Doctors not only created the original three-drug protocol, but also advised legislatures, courts and prisons about the types and amounts of lethal injection drugs that should be used. [136] In a number of executions, doctors have directly

Case 3:18-cv-01234 Document 1-17 Filed 11/02/18 Page 8 of 35 PageID #: 616

**Attachment 16**

engaged in the actual implementation of the injection procedure. [137] During Oklahoma's horribly botched lethal injection of Clayton Lockett in 2014, for **770** example [138] --the execution that prompted *Glossip* [139] and now a blistering grand jury report [140] -- records show that both a doctor and an Emergency Medical Technician tried to inject Lockett with drugs under circumstances involving gross incompetence. [141]

The role of such medical professionals has long been controversial, however, and medical organizations and drug manufacturers have increasingly discouraged such participation on the basis that doctors and drugs should promote health rather than death. [142] The International Academy of Compounding Pharmacists has similarly discouraged its members from providing lethal injection drugs, the group's first official stance on the issue. [143] The most sweeping demonstration of this posture, however, is Pfizer Inc.'s May 2016 announcement that it had enforced restrictions on where its drugs **771** are distributed so that they could not be used in lethal injection executions. [144] Thus, the decision by Pfizer--one of the largest pharmaceutical manufacturers in the world--along with similar types of controls adopted by over twenty other drug companies, substantially hinders departments of corrections' efforts to get drugs. [145] While such companies provide "either moral or business reasons" for their decisions, [146] it would be a gross mischaracterization to say that they were buckling to pressure only by anti-death-penalty advocacy groups. According to Pfizer, for example, "medical principles and business concerns have guided their policies," not anti-death-penalty campaigns or Europe's block on exporting drugs. [147] Likewise, pressure from shareholders concerned about harm to the company's reputation for health has shown far more influence. [148] In essence, then, medical professionals and pharmaceutical companies do not need anti-death-penalty advocacy groups to tell them to avoid involvement in the death penalty process--they already know.

"Anti-death-penalty advocates" could also include the public itself. After all, drug companies seem to fear negative public perception above all else. [149] If the public links a company and its drugs to the death penalty process, the financial repercussions could be severe for the company [150] even in the United States, where a majority of individuals still support the death penalty. [151] Because a company's association with the death penalty may not be a good business model, a substantial number of states have enacted secrecy provisions that shield the identity of medical professionals, pharmaceutical companies, and pharmacies involved with the execution **772** process. [152] Yet Pfizer's decision may make it so that all these entities, especially compounding pharmacies, want to buck contributing to the process altogether, irrespective of the guarantee of secrecy. Regardless, states continue to have problems finding drug sources, [153] a circumstance suggesting that anonymity is not enough to keep these groups involved in the lethal injection process.

If members of the public and selected medical and pharmacy groups can be considered anti-death-penalty advocates, at some point the Court may have to face a growing reality: "anti-death-penalty advocates" may simply represent the general American public. With such a development, the Court may, yet again, be accused of being out of touch with mainstream America. [154] Because departments of corrections could be boxed into an execution methods corner if lethal injection becomes unworkable, they may ultimately need a drug-free alternative method of execution to help them escape. Finding a method that is also "a known and available alternative" may simply be a matter of states reverting to a more simplistic past execution method.

## II. THE "KNOWN AND AVAILABLE ALTERNATIVE" STANDARD

The *Glossip* Court affirmed Oklahoma's use of midazolam in part because "the petitioners failed to identify a known and available alternative method of execution that entails a lesser risk of pain, a requirement of all Eighth Amendment method-of-execution claims." [155] While no court set forth such a standard prior to *Baze*--and Justice Sotomayor

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Attachment 16**

provided a detailed critique of such a requirement [156] --the *Glossip* Court nonetheless accepted this dictate for evaluating the constitutionality of any execution method. This Article therefore abides by the alternative methods mandate for analysis purposes although it does not agree that it should be part of the Eighth Amendment doctrine for evaluating execution methods. [157]

### *773 A. The Standard's Meaning

A key question in assessing any execution method concerns what the "known and available" standard means in practical terms. *Glossip* turns to *Baze* for guidance. [158] According to *Baze*, petitioners "cannot successfully challenge a State's method of execution merely by showing *a slightly or marginally safer alternative*." [159] Rather, they must put forth an alternative method that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." [160] Thus, in *Baze* and *Glossip*, the Court proposed a two-part test that required petitioners to "establish both that [a state's] lethal injection protocol creates a demonstrated risk of severe pain and that the risk is substantial when compared to known and available alternatives." [161] Although it is a two-part test, the Court's language suggests that the first part, "risk of severe pain," depends on the second part because the risk is "compared to the known and available alternatives." [162] Because the Court made clear that the petitioners in *Baze* and *Glossip* never met either part of the test, there is no precedent for what kind of alternative the Court would find acceptable. Therefore, an alternative method argument relies on the Court's language and little more.

The other Justices do not add their own personal interpretation of this standard apart from Justice Sotomayor's dissent. Justice Stephen Breyer's thorough overview of the problems associated with the death penalty generally bypasses anything that the majority has to say about the "known and available" standard. [163] Of course, Justice Breyer does sign on to Justice Sotomayor's dissent and perhaps did not feel the need to discuss the matter in his own dissent. [164] Justice Antonin Scalia and Justice Clarence Thomas focus on Justice Breyer's dissent. Justice Scalia's concurrence [165] criticizes Justice Breyer's recommendation that there be broader consideration of whether the death penalty is unconstitutional; Justice Thomas's concurrence [166] questions the methodological challenges associated **\*774** with some of the studies Justice Breyer cites. As media commentators noted, Justice Breyer's lengthy dissent dominated *Glossip* and the public's discussion of the case's significance. [167]

### B. Justice Sotomayor's Dissent

Justice Sotomayor's dissent stands out as the primary vehicle for critiquing the "known and available alternative standard," by thoroughly explaining why it is unjustified for the *Glossip* Court to attribute this standard so substantially to *Baze*. [168] First, *Baze* never articulated such a mandate, much less one as conditionally dependent as the *Glossip* Court makes it out to be. Otherwise, the resulting message would have "[led] to patently absurd consequences." [169] As Justice Sotomayor notes, "[a] method of execution that is intolerably painful--even to the point of being the chemical equivalent of burning alive--will, the Court holds, be unconstitutional *if*, and only if, there is a 'known and available alternative' method of execution." [170] While the *Glossip* Court states that *Baze* precluded all arguments that would suggest otherwise, Justice Sotomayor stresses that "*Baze* held no such thing." [171] For example, the *Glossip* Court refers only to the *Baze* plurality opinion to support its version of the "known and available alternative" requirement; yet none of the *Baze* concurrences, which were needed to back the *Baze* Court's judgment, pronounced a comparable perspective. [172] Even the *Baze* plurality never stated "that *all* challenges" to a state's execution method must be subject to such a "comparative-risk" assessment. [173] As Justice Sotomayor states, "[r]ecognizing the relevance of available alternatives is not at all

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Attachment 16**

the same as concluding that their absence precludes a claimant from showing that a chosen method carries objectively intolerable risks." [174]

Justice Sotomayor nonetheless contributes an analysis of what "a known and available alternative method of execution" could be, **\*775** even though she doesn't agree with the requirement. As such, her approach provides potential guidance for future courts and litigators who seemingly have no choice but to operate within the confines of *Glossip*. What Justice Sotomayor proposes could turn *Glossip* on its head: condemned inmates might reject lethal injection and "suggest the firing squad as an alternative." [175] She hones this point by considering the evidence that would be most pertinent to inmates making this suggestion. For example, "the firing squad is significantly more reliable than other methods, including lethal injection" and "there is some reason to think that it is relatively quick and painless." [176] While the firing squad "could be seen as a devolution to a more primitive era," [177] and "the blood and violence that comes with it" a step in that direction, [178] those characterizations do not make the firing squad "unconstitutional." [179] That said, the method's "visible brutality" could potentially prompt Eighth Amendment arguments. [180]

Justice Sotomayor's final assessments of the firing squad are the most compelling because they consider the calculation of the method's cruelty versus visible violence through the eyes of a condemned inmate. As Justice Sotomayor explains, an inmate may view the "visible yet relatively painless violence" associated with the firing squad as "vastly preferable to an excruciatingly painful death hidden behind a veneer of medication." [181] With that statement, Justice Sotomayor rightly acknowledges that lethal injection may be even more gruesome than the firing squad if only we were allowed to see behind lethal injection's "curtain." [182] A substantial literature and case law suggest that she is correct. [183]

### C. The Court's Misinterpretation of Justice Sotomayor

Justice Sotomayor's dissent is detailed and comprehensive, covering a number of different topics and arguments. Yet it is intriguing that the *Glossip* majority focuses on her commentary about the firing squad, particularly given the commentary's brevity and **\*776** hypothetical posture. Indeed, the *Glossip* majority completely mischaracterizes what Justice Sotomayor says about the firing squad, and also inaccurately attributes her comments to other methods of execution. According to the Court, for example, Justice Sotomayor implies that any state that uses any of the four methods of execution existing prior to lethal injection would violate the Eighth Amendment. [184] This reasoning holds, says the majority, even though Justice Sotomayor concedes that "'there is some reason to think that [the firing squad] is relatively quick and painless.'" [185] While Justice Sotomayor mentions neither electrocution nor lethal gas, the Court nonetheless incorporates these other methods in its analysis of her statements. Indeed, the Court interprets Justice Sotomayor's arguments as implying that "it would be unconstitutional to use a method that 'could be seen as a devolution to a more primitive era.'" [186] Yet Justice Sotomayor says no such thing. Using this misguided approach, the Court suggests that Justice Sotomayor boxes in the choices of execution methods: past execution methods are unacceptable because they are "primitive," while present methods are unacceptable because there is no viable drug. [187] The end result, in the Court's view, is an argument siding with eliminating the death penalty. [188]

Justice Sotomayor, however, never makes the argument the majority attributes to her but argues just the opposite. She explicitly states that the brutality of a firing squad execution does not render the method unconstitutional and that it may be far preferable to the torment of lethal injection drugs. [189] In addition, she does not argue against the death penalty in general and notably did not join Justice Breyer's anti-death penalty dissent. Instead, Justice Sotomayor provides guidance for the most humane way to implement the death penalty within the context of *Glossip*. While Justice Sotomayor suggests that the firing squad may also be viewed as a "devolution" and may raise Eighth Amendment issues, [190] her concerns about the method are warranted. For example, neither she nor any other court has provided the kind of detailed

**Attachment 16**

analysis of the science or strategy behind the firing squad that would assuage **\*777** any and all Eighth Amendment questions. [191] Rather, Justice Sotomayor explains why the firing squad may be a viable alternative method of execution, thereby pointing in a direction that makes sense for legislatures and courts to consider.

## III. THE FIRING SQUAD ALTERNATIVE

This Part suggests that the firing squad could potentially meet *Glossip*'s "alternative method" requirements of being "known," "available," and "entail[[ing] a lesser risk of pain." [192] For example, the firing squad has a long history and world-wide application ("known"); [193] it is pervasive in many dimensions of our society ranging from law enforcement to self-protection ("available"); [194] and there is evidence suggesting it is the quickest, least painful, and most reliable method that currently exists ("a lesser risk of pain"). [195] As Chief Judge Alex Kozinski's dissent in *Wood v. Ryan* [196] suggests, the firing squad also satisfies an array of practical and constitutional concerns that counter the long-held problems associated with lethal injection procedures. While Judge Kozinski's observations were made nearly a year before *Glossip* was decided, [197] they firmly fit within the *Glossip* "alternative method" standard:

> The firing squad strikes me as the most promising [method]. Eight or ten large-caliber rifle bullets fired at close range can inflict massive damage, causing instant death every time. There are plenty of people employed by the state who can pull the trigger and have the training to aim true. The weapons and ammunition are bought by the state in massive quantities for law enforcement purposes, so it would be impossible to interdict the supply. And nobody can argue that the weapons are put to a purpose for which they are not intended: firearms have no purpose *other* than destroying their targets. [198]

**\*778** Chief Judge Kozinski acknowledges that "firing squads can be messy" because "we are shedding human blood." [199] Regardless, lethal injection can also be "messy" and bloody in ways that medical experts, lawyers, and scholars have increasingly documented despite departments of corrections' efforts to shield the entire process in secrecy. [200] As the following sections note, observers of modern firing squad executions do not describe "mess," "visible brutality," or "blood," but rather a process that may be far more "sterile" in perception and procedure than lethal injection.

### A. Firing Squad As A "Known" Method

The first documented firing squad execution occurred in Virginia in 1608. [201] Prior to 1789, there were thirty firing squad executions recorded, most in Louisiana and California. [202] Along with hanging, the firing squad is this country's oldest method of execution. While the military has conducted a substantial number of firing squad executions during our nation's history, [203] this Article focuses on civilian executions taking place in the United States. In total, American firing squads have executed 144 inmates. [204]

**\*779** Currently two states permit execution by firing squad: Oklahoma [205] and Utah. [206] In both states lethal injection is the predominant method and the firing squad is only an alternative. [207] In Oklahoma, the firing squad is an alternative only if a death sentence cannot be carried out by one of three other methods of execution, in descending order of priority: lethal injection, nitrogen hypoxia, and then electrocution. [208] In 2015, Oklahoma **\*780** adopted nitrogen gas, [209] a much criticized and risky method, [210] thereby making it even less likely that the state would use the firing squad unless it changed its execution methods statute. Utah, on the other hand, authorizes the firing squad only if the state is not able

to obtain lethal injection drugs or lethal injection is declared unconstitutional.[211] The legislature has not considered any other execution method.

For nearly three decades (from 1982-2009), Idaho also allowed the firing squad to be an alternative to lethal injection,[212] but only when lethal injection was "impractical."[213] After *Baze v. Rees* upheld the constitutionality of Kentucky's lethal injection protocol,[214] however, Idaho decided that the firing squad option was no longer necessary.[215] Besides, Idaho had never used the method.[216] In contrast, in 2015, Wyoming came close to adopting the firing squad as an alternative form of execution[217] but the bill failed.[218] Wyoming's **\*781** bill was unusual in that the inmate would have been anesthetized and rendered unconscious before being shot,[219] a requirement that appeared to resemble some aspects of lethal injection.

Even states' failed attempts to adopt the firing squad, however, have garnered publicity for the method and a national spotlight for its potential viability, especially given the problems with lethal injection.[220] For example, as Austin Sarat has documented, from 1910-2010, lethal injection had the highest botch rate of all execution methods (7.12%).[221] Another study of executions from 1976 to 2001 failed to detect any botched firing squad executions, even though other methods, including lethal injection, were consistently problematic.[222] While there have been only three firing squad executions since 1976, when *Gregg v. Georgia*[223] once again enabled executions,[224] all three executions went as predicted.[225]

### B. Utah's Firing Squad Procedure

The following overview of Utah's firing squad procedures, the most widely used and documented in this country, provides some context for the method's predictability. That said, officials do not release all details about the execution process. Therefore, this Article's account of Utah's firing squad procedure is based on a limited number of available sources, some of them official (Utah statutes and provisions), as well as books, articles, and newspaper accounts that describe past executions. Because a firing squad execution has not been conducted in Utah since 2010, some procedures and details may change if another such execution takes place.[226]

In Utah, all inmates sentenced after May 3, 2004, are executed by lethal injection,[227] with three court-determined exceptions: (1) "a defendant has a right to be executed by a firing squad;"[228] (2) lethal **\*782** injection is found to be either "unconstitutional on its face"[229] or "unconstitutional as applied;"[230] or (3) "the state is unable to lawfully obtain the substance or substances necessary" to perform a lethal injection execution thirty or more days prior to the death warrant.[231] According to statute, an execution will occur at "a secure correctional facility" and at a time set by the department.[232] Currently, the Utah Department of Corrections conducts executions at Utah State Prison in Draper, Utah.[233] The department's executive director or a "designee" chooses the five peace officers who comprise the firing squad.[234]

The Utah Department of Corrections provides details on who shall witness an inmate's execution, such as family members.[235] Members of the news media are permitted to be present,[236] although the director is "responsible for selecting" who they will be.[237] The regulations also make clear that "[i]f extraordinary circumstances develop"[238] or other conditions threaten "prison security, personal safety," the department may heighten restrictions or limitations on media coverage during the procedure.[239]

Case 3:18-cv-01234 Document 1-17 Filed 11/02/18 Page 13 of 35 PageID #: 621

**Attachment 16**

The last firing squad execution at Utah State Prison--that of Ronnie Lee Gardner in 2010--took place in the same room (chamber) created for lethal injection executions; therefore, the room contains both a lethal injection gurney and a firing squad chair for **\*783** the inmate to sit in depending on which method is selected. [240] Published articles, [241] Utah State Prison materials, [242] and eyewitness accounts of the last (2010) firing squad execution, [243] together describe the following set-up. The inmate, whose head is covered by a black hood, sits strapped to the firing squad chair, which is set against one wall surrounded by sandbags. [244] The sandbags prevent the bullets from ricocheting off the walls and throughout the room. [245] About twenty or twenty-five feet across from the inmate is the opposite wall with two slit-like openings. [246] The anonymous firing squad members stand behind this wall and put their high- **\*784** powered guns through the openings. [247] The observation areas for the witnesses are on the other two sides of the room. [248] A doctor then places a round white target on the inmate's chest. [249] There is also a pan available that catches any blood that the inmate may shed. [250] After the firing squad team leader provides a countdown, each member of the squad fires. [251] According to Utah Representative Paul Ray, "[s]hooters aim for the chest rather than the head because it's a bigger target and usually allows for a faster death." [252] Regulations state that a physician certifies the inmate's death. [253]

Early accounts of firing squad executions noted that the squad was comprised of five volunteer marksmen, yet only four would receive rifles with live rounds. A fifth rifle would contain a blank so that no single member of the squad would experience personal guilt for the killing. [254] The Utah statute and regulations do not state that this procedure is still followed and recent eyewitness accounts do not mention this tradition. Yet the Utah State Prison's Execution Procedures specify that one of the "five law enforcers" will have a rifle containing a blank round and that the Department of Corrections "pre-select[s]" the executioners who "must be law-enforcement certified" in the state. [255]

In 2015, a federal court judge denied an inmate's Eighth Amendment challenge to the constitutionality of Utah's firing squad without reviewing evidence about it. [256] Regardless of the merits of this particular challenge, it is regrettable that more is not known about the effects of shooting on the human body. That said, what is available suggests that the method appears substantially more humane and reliable than this country's other methods.

### *785 C. Evidence of Pain or Problems

It is unclear whether a correctly-performed shooting is physically painful. [257] The Royal Commission on Capital Punishment, [258] for example, considered the firing squad an inadequate method of execution, concluding in one sentence that "it needs a multiplicity of executioners and it does not possess even the first requisite of an efficient method, the certainty of causing immediate death." [259] However, the Royal Commission, which was published in 1953, never substantiated this determination; it also conflicts with evidence that the firing squad is far more certain and humane that other methods. [260] In addition, when given a choice, inmates have selected shooting over hanging, a pattern inconsistent with the Royal Commission's recommendation. [261]

More solid evidence suggests that a competently performed shooting may lead to nearly instant death. In 1938, in one unique case of human "experimentation," a Utah inmate condemned to death for murder allowed doctors to conduct an electrocardiograph (ECG) tracing during his execution. [262] The doctors attached **\*786** the ECG wires to the inmate's wrists and placed a small target over his heart, which was beating at nearly three times the normal rate. [263] After the bullets hit the target, the inmate's heartbeat stopped 15.6 seconds later, [264] yet he was not declared dead until two-and-a-half minutes after the shooting. [265] Likewise, Gary Gilmore, who was executed in 1977, "quivered" after four bullets entered his heart; he was pronounced dead two minutes later. [266]

**Attachment 16**

In one of the most medically thorough examinations of execution methods, British scientist Harold Hillman concluded that the firing squad had among the lowest levels of potential pain. [267] According to Hillman, "[p]ersons hit by bullets feel as if they have been punched--pain comes later if the victim survives long enough to feel it." [268] He graded shooting as having either "little" to "moderate" pain [269] in contrast to hanging, electrocution, lethal gas, or even beheading, all of which he classified as causing "severe" pain. [270] Hillman acknowledged the Royal Commission's brief dismissal of the firing squad as a viable execution method; but he also noted that "[t]hose giving evidence to the Commission frequently emphasized their belief that any method of execution that they recommended should be rapid, clean, and dignified." [271] The firing squad, on the other hand, can be considered "messy." [272]

There are experts, however, who would think lethal injection is far messier. Jonathan Groner, a pediatric and trauma surgeon, has, for over a decade, examined lethal injection cases and frequently testified in federal and state courts about the method's physical brutality. [273] He has also handled gunshot wound cases. [274] He contends that death by firing squad "'probably happens within **787** seconds.'" [275] While "'[t]here is no way to measure the pain . . . there's anecdotal evidence that 'it is less painful.'" [276]

An incompetently-performed shooting may well cause acute pain, [277] however rare such instances may be. Of the 144 civilian firing squad executions that have been recorded, [278] only two--the executions of Wallace Wilkerson and Eliseo Mares-- had any reported problems. [279] Wilkerson's 1877 execution departed from the normal procedure in ways that would not occur today. Not only were there reports that he may have been intoxicated, [280] but he refused to be tied to a chair or blindfolded and thus displaced the paper target pinned to his jacket when he flinched. [281] Three bullets hit the paper target, which had shifted to an inch above his heart, while a fourth bullet hit his left arm above his heart. [282] Reports estimate that Wilkerson took between fifteen and twenty minutes to die; officials considered having executioners shoot him again but he passed away before they made the decision. [283] Mares's 1951 execution also went awry; [284] all four executioners shot bullets into the wrong side of Mares's chest, apparently intentionally, and he bled to death. [285]

Again, such issues would not exist today; the firing squad is far more transparent than other execution methods and such signs of intentional misses would be clearer. Expert markspersons, situated so closely to the inmate, would be firmly secured and would not miss such a bold target on an inmate's heart unless the miss was deliberate.

### *788  D. Blood Atonement and Image

Since 1976, there have been only three firing squad executions, all in Utah: Gary Gilmore in 1977, John Albert Taylor in 1996, and Ronnie Lee Gardner in 2010. [286] According to the Utah Department of Corrections, the current (2016) Execution Policy is "under review," and the Department "anticipate[s] being able to put a public version of it on the Department's Web site in the near future." [287] Discussion regarding the state's firing squad procedure and the public reaction to it is thus both limited and dated. The history of the firing squad, however, can provide some perspective for how the method may be viewed today.

A number of scholars have traced the use of the firing squad in Utah to the Mormon religion's concept of "blood atonement." [288] Blood atonement is the historical Mormon idea that Jesus Christ spilled his blood for Christians' sins; in turn, some sinners are so heinous that, like Christ, they must shed their own blood to achieve a degree of forgiveness "in the next life." [289] Utah is unique in both its distinct Mormon heritage and its use of an execution method that actually "spills" blood. [290]

WESTLAW

**Attachment 16**

**\*789**  While the Mormon Church officially rejected the doctrine of blood atonement in 1978, [291] media fingers still point to the doctrine at the time of firing squad executions. A prime example is John Albert Taylor's highly publicized choice in 1996 to be executed by firing squad under what was then Utah's statute allowing inmates to choose between lethal injection and the firing squad. [292]  While Taylor's motivations for choosing the firing squad were unclear, the media interpreted them as an effort to embarrass the state and its connection to archaic Mormon beliefs. [293] Taylor's choice also spotlighted some of the challenges in administering the firing squad: the building of a viable execution chamber; devising a means to catch the inmate's blood in a safe and hygienic manner; countering the method's perceived brutality. [294]  For example, the Utah State Corrections Department spokesperson at the time of Taylor's execution stated that the firing squad was no "more gruesome than the more modern techniques we use." [295]  Yet he conceded that the method had an image problem: "[t]he public views lethal injections as less violent and more professional." [296]  Even in 1996, however, studies showed that the firing squad causes death faster than lethal injection. [297]

Regardless of any perceived link to blood atonement, opposition to the firing squad as an execution method seems to be based mainly on its image rather than on the procedure's humaneness. Utah used the firing squad as the only method of execution for just two years. [298]  In 1983, Utah joined other states by allowing the condemned inmate a choice between two methods. In Utah, the choice was either the firing squad or lethal injection, with lethal injection  **\*790**  as the fallback if the inmate did not choose. [299]  Controversy over the firing squad's purported "barbarity," however, prompted the Utah legislature to drop it in 2004 in favor of lethal injection. [300]  Yet, little more than a decade later, the state brought the firing squad back again (in 2015) as a substitute execution method when certain conditions were met. [301]  Thus, practicality trumped perceived barbarity in light of the state's concern that it may not be able to access lethal injection drugs.

In the context of execution methods, such exceptions to the norm can be enlightening. Since 1900, for example, all firing squad executions have taken place in Utah except for one, which occurred in Nevada. [302]  For eight years--between 1912 and 1920--Nevada allowed inmates to choose between firing squad and hanging as an alternative. [303]  During that period, only one defendant-- Andrija Mircovich in 1912--chose the firing squad. [304]  Because several guards balked at carrying out a sentence they thought resembled cold-blooded murder, marksmen from all over the world wrote to Nevada's warden to volunteer their efforts. [305]  The warden tried to convince Mircovich to consent to hanging, yet he refused. Mircovich was finally killed by a 1000-pound execution machine that fired three mounted rifles upon the cutting of three strings, only two of which fired the weapons with real bullets. [306]  Thus, the  **\*791**  three "executioners" never even had to see their victim. [307]  Although the machine performed successfully, it was never used again. [308]  In 1921, Nevada became the first state to enact lethal gas [309] in an effort to provide a more humane method of execution. [310]  Ironically lethal gas would become the most inhumane method of execution that any state has adopted. [311]

### E. A Balanced View

Of all the execution methods in this country, perceptions and application of the firing squad are among the most contradictory. On the one hand, there is substantial evidence to suggest that the firing squad is the most humane method of execution. In Justice Sotomayor's words, it is "more reliable" as well as "relatively quick and painless." [312]  For example, there is a consensus that Gary Gilmore's 1977 execution was swift, dignified, and consistent with protocol. [313]  The same can be said of the execution of Albert Lee Taylor nearly twenty years later. According to a corrections official who observed Taylor's execution, Utah's firing squad procedure "was carried out in as dignified a manner as [he had] ever witnessed." [314]  In addition, a *Salt Lake Tribune* reporter's description of the 2010 execution of Ronnie Lee Gardner

**Attachment 16**

found the scene more pristine and removed than he might have predicted. "Firing four bullets into a man's chest is, by definition, violent. If it can also be clinical and sterile, then that also happened in this execution." [315] This same reporter never saw blood, which seemed to pool instead under Gardner's shirt. While the reporter could not tell what Gardner was feeling or if he experienced pain, in his view this was not a "messy" execution. [316]

**\*792** Of course, Judge Kozinski's "messy" [317] reference goes beyond simply the spilling of blood. Rather, Judge Kozinski hones the point that we should also have a method that treats the firing squad as a true punishment, rather than a medical illusion: "[i]f we, as a society, cannot stomach the splatter from an execution carried out by firing squad, then we shouldn't be carrying out executions at all." [318] Together with the evidence of the firing squad's greater humaneness and sterility, this view balances Justice Sotomayor's concern that the firing squad "could be seen as a devolution to a more primitive era," [319] or a mark of "visible brutality" prompting Eighth Amendment arguments. [320]

Firing squad executions occur rarely. Some of the most accessible information derives from eyewitness accounts and historical anecdotes. That said, the consensus of opinion concerning firing squads comports with Justice Sotomayor's argument that they are swift and relatively pain free. While "image" may be a factor discouraging the use of firing squads, one can question lethal injection's image as well, at which point lethal injection's pretense of medical veneer can seem far more "primitive" than a pistol.

## IV. CONCLUSION

*Glossip v. Gross* [321] is the second time in seven years that the Supreme Court has had to step in to validate a state's lethal injection procedure. One of *Glossip*'s more controversial mandates, however, is the Court's two-part test that requires petitioners to "establish both that [a state's] lethal injection protocol creates a demonstrated risk of severe pain and that the risk is substantial when compared to known and available alternatives." [322] As for the test's first part, there is a substantial literature contending that lethal injection protocols, of various sorts and combinations, "create[] a demonstrated risk of severe pain," [323] and Oklahoma's protocol is **\*793** no exception. [324] This Article focuses on the second part of the test concerning "a known and available alternative." The discussion suggests that the firing squad, when compared to lethal injection, is the clear winner, as measured by speed, certainty, and humaneness. Although the firing squad appears saddled with a distinct image problem, respected jurists and public opinion are increasingly coming to its reputational rescue while also pointing to the disastrous experiment that lethal injection has become.

## Footnotes

[a1]     Arthur A. McGivney Professor of Law, Founding Director, Neuroscience and Law Center, Fordham University School of Law. © 2016, Deborah W. Denno. I am most grateful to Marianna Gebhardt, Phillip Earl, and Jonathan Groner for their contributions to this Article. For insightful comments on earlier versions of this Article I thank the participants in presentations given at Columbia University, Fordham University School of Law, Harvard Law School, the University of Michigan Law School, and the 2016 Annual Meeting of the American Association of Law Schools. Alissa Black-Dorward provided superb research support, along with Fordham Law School's library staff and research assistants Michelle Chipetine, Benjamin Chisholm, Michelle Christ, and Tal Finkel. Members of the *Michigan Journal of Law Reform*, Danielle Angeli and Lauren DesRosiers in particular, gave outstanding editorial assistance. For feedback and information about the Utah Department of Corrections (UDC) Execution Protocol, I thank UDC's Public Information Officer, Brooke Adams. I am indebted to research funding from Fordham Law School. No individual or organization acknowledged in this Article necessarily supports the Article's interpretations or conclusions. I take responsibility for any of this Article's mistakes or misjudgments.

[1]     *Glossip v. Gross*, 135 S. Ct. 2726, 2796 (2015) (Sotomayor, J., dissenting).

Case 3:18-cv-01234   Document 1-17   Filed 11/02/18   Page 17 of 35 PageID #: 625

**Attachment 16**

2    *Id.* at 2797.

3    *Id.* at 2796. Justice Samuel Alito announced the judgment of the Court and delivered an opinion in which Chief Justice John Roberts and Justices Antonin Scalia, Anthony Kennedy, and Clarence Thomas joined. *Id.* at 2730-46. Justice Scalia filed a concurring opinion, which Justice Thomas joined. *Id.* at 2746-50. Justice Thomas filed a concurring opinion, which Justice Scalia joined. *Id.* at 2750-55. Justice Stephen Breyer filed a dissenting opinion in which Justice Ruth Bader Ginsburg joined. *Id.* at 2755-80. Justice Sonia Sotomayor filed a dissenting opinion in which Justices Ginsburg, Breyer, and Elena Kagan joined. *Id.* at 2780-97. For an excellent discussion of the controversial complications that preceded the Court's granting of certiorari in *Glossip*, see Eric Freedman, *No Execution if Four Justices Object*, 43 HOFSTRA L. REV. 639 (2015) (analyzing the repercussions that occur in capital cases when four voting Justices are needed to grant a certiorari petition but five voting Justices are required to stay an execution).

4    *Glossip*, 135 S. Ct. at 2731 (affirming the rulings of the Oklahoma District Court and the Court of Appeals for the Tenth Circuit).

5    *Id.* at 2741 ("Based on the evidence that the parties presented to the District Court, we must affirm. Testimony from both sides supports the District Court's conclusion that midazolam can render a person insensate to pain.").

6    *Id.* at 2731. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII.

7    *Glossip*, 135 S. Ct. at 2731.

8    *Id.* (citing Baze v. Rees, 553 U.S. 35, 61 (2008) (plurality opinion)).

9    *Id.* For an excellent critique of the *Glossip* Court's use of the "clearly erroneous" standard of review, see David L. Faigman, *The Supreme Court's Confused Empirical Jurisprudence*, 15 EXPERT EVID. REP. (Bloomberg BNA), July 6, 2015, at 303.

10    *See, e.g.*, Glossip v. State, No. D-2005-310, at 1-2 (Okla. Crim. App. Oct. 2, 2015) (order issuing stay) (noting that Oklahoma Governor Mary Fallin issued a stay of execution for Richard Glossip and two other inmates because the Oklahoma Department of Corrections received an order of potassium acetate instead of the requisite drug of potassium chloride, which is "contrary to the written protocol," and the State needs "an indefinite period of time... to evaluate the events that transpired on September 30, 2015").

11    Deborah W. Denno, *Symposium: "Groundhog Day" Indeed*, SCOTUSBLOG (June 30, 2015, 2:31 PM), http:// www.scotusblog.com/2015/06/symposium-groundhog-day-indeed/; *see also infra* note 167 and accompanying text (discussing the impact of the *Glossip* dissents).

12    *See Lethal Injection*, DEATH PENALTY INFO. CENTER, http://www.deathpenaltyinfo.org/lethal-injection (last visited May 4, 2016) (reviewing the ongoing developments with lethal injection, most particularly the shortage of appropriate drugs).

13    *See infra* notes 14-21 and accompanying text.

14    553 U.S. 35 (2008) (plurality opinion).

15    *Id.* at 40-63. Chief Justice John Roberts announced the judgment of the Court and delivered an opinion in which Justices Anthony Kennedy and Samuel Alito joined. *Id.* Justice Alito filed a concurring opinion. *Id.* at 63-71. Justice John Paul Stevens filed an opinion concurring in the judgment. *Id.* at 71-87. Justice Antonin Scalia filed an opinion concurring in the judgment, which Justice Clarence Thomas joined. *Id.* at 87-93. Justice Thomas filed an opinion concurring in the judgment, which Justice Scalia joined. *Id.* at 94-107. Justice Stephen Breyer filed an opinion concurring in the judgment. *Id.* at 107-13. Justice Ruth Bader Ginsburg filed a dissenting opinion in which Justice David Souter joined. *Id.* at 113-23.

16    *Id.* at 41.

17    *Id.* at 50 (internal quotation marks omitted).

18    *Id.* at 61.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.  18

**Attachment 16**

[19]  Deborah W. Denno, *Lethal Injection Chaos Post-*Baze, 102 GEO. L.J. 1333, 1333-34 (2014) [hereinafter Denno, *Lethal Injection Chaos*].

[20]  *Baze*, 553 U.S. 35 at 61.

[21]  For an analysis of the different opinions in *Baze*, see generally Deborah W. Denno, *For Execution Methods Challenges, the Road to Abolition Is Paved with Paradox, in* THE ROAD TO ABOLITION? THE FUTURE OF CAPITAL PUNISHMENT IN THE UNITED STATES 183 (Charles J. Ogletree, Jr. & Austin Sarat eds., 2009) [[hereinafter Denno, *Paved with Paradox*].

[22]  *Glossip*, 135 S. Ct. at 2733.

[23]  *See* Denno, *Lethal Injection Chaos, supra* note 19, at 1346-81.

[24]  *See Lethal Injection*, DEATH PENALTY INFO. CENTER, *supra* note 12 (detailing the ongoing litigation over lethal injection and the use of new and never-used lethal injection drugs as well as botched lethal injection litigation).

[25]  *See generally* Ty Alper, *The United States Execution Drug Shortage: A Consequence of Our Values,* 21 BROWN J. WORLD AFF. 27 (2014); Denno, *Lethal Injection Chaos, supra* note 19, at 1346-82; Seema K. Shah, *Experimental Execution*, 90 WASH. L. REV. 147 (2015).

[26]  *See Glossip*, 135 S. Ct. 2731 (citing to the Eighth Amendment precedent of *Baze*).

[27]  *Id.* at 2780-97 (Sotomayor, J., dissenting); *see also* Brief for Petitioners at 28-38, Glossip v. Gross, 135 S. Ct. 2726 (2015) (No. 14-7955) (explaining how and why the substitution of midazolam for barbiturates creates the objectively intolerable risk prisoners will experience excruciating pain and suffering during their executions); Brief for the Louis Stein Ctr. for Law and Ethics at Fordham Univ. Sch. of Law as Amicus Curiae in Support of Petitioners, Glossip v. Gross at 12-25, 135 S. Ct. 2726 (2015) (No. 14-7955) (noting that the three-drug lethal injection protocol, developed in 1977 in Oklahoma and later adopted nationwide, lacked an adequate medical or scientific basis and that state prison officials have continued to pursue this same experimental pattern with other lethal injection drugs, including midazolam); Reply Brief for Petitioners at 4-15, Glossip v. Gross, 135 S. Ct. 2726 (2015) (No. 14-7955) (asserting that the lack of a scientific or medical consensus that midazolam alone can reliably prevent petitioners from experiencing significant pain renders it a constitutionally unacceptable anesthetic). For further discussion of *Glossip* in the context of the problems with midazolam and lethal injection drug experimentation, see generally Paul Litton, *On the Argument that Execution Protocol Reform is Biomedical Research*, 90 WASH. L. REV. Online 87 (2015).

[28]  *Glossip*, 135 S. Ct. at 2731 (noting that petitioners could not "identify a known and available alternative method of execution that entails a lesser risk of pain, a requirement of all Eighth Amendment method-of-execution claims").

[29]  I agree with Justice Sotomayor's criticism of the Court's stance on the "known and available alternative" requirement. *See id.* at 2792-97 (Sotomayor, J., dissenting). For a clever discussion of the contradictions arising during oral arguments in *Glossip* that bear on this alternative method requirement in the context of risks of severe pain, see Sherry F. Colb, *The Appearance and Reality of Cruelty in* Glossip v. Gross, VERDICT (May 19, 2015), https://verdict.justia.com/2015/05/19/the-appearance-and-reality-of-cruelty-in-glossip-v-gross.

[30]  *Glossip*, 135 S. Ct. at 2796-97 (Sotomayor, J., dissenting).

[31]  *See* Alexander Vey, Note, *No Clean Hands in a Dirty Business: Firing Squads and the Euphemism of "Evolving Standards of Decency,"* 69 VAND. L. REV. 545 (2016); Andrew Jensen Kerr, *Facing the Firing Squad*, 104 GEO. L.J. ONLINE 74 (2015); Deborah W. Denno, *Kill Lethal Injection and Bring Back the Firing Squad*, TIME (Apr. 28, 2015), http://time.com/3831515/execution-lethal-injection-supreme-court/. For discussions of the history and nature of the firing squad within the context of other methods of execution, see Deborah W. Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century*, 35 WM. & MARY L. REV. 551, 687-89 (1994) [hereinafter Denno, *Engineering of Death*]; Deborah W. Denno, *Getting to Death: Are Executions Constitutional?*, 82 IOWA L. REV. 319, 348-98 (1997) [hereinafter Denno, *Getting to Death*].

[32]  *See* Wood v. Ryan, 759 F.3d 1076, 1103 (9th Cir. 2014) (Kozinski, C.J., dissenting from denial of rehearing en banc) ("The firing squad strikes me as the most promising [method of execution]."); ROBERT BLECKER, THE DEATH OF

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

PUNISHMENT: SEARCHING FOR JUSTICE AMONG THE WORST OF THE WORST 181 (2013) ((favoring the firing squad over lethal injection because shooting resembles and represents a real punishment rather than a medical procedure); P. Thomas DiStanislao, *A Shot in the Dark: Why Virginia Should Adopt the Firing Squad as Its Primary Method of Execution*, *49 U. RICH. L. REV. 779, 782 (2015)* (contending that the state of Virginia should replace its current form of lethal injection execution with the firing squad because it is "a more effective means of execution"). For a thorough and informative overview of the history and use of the firing squad, see Christopher Cutler, *Nothing Less Than the Dignity of Man: Evolving Standards, Botched Executions and Utah's Controversial Use of the Firing Squad*, *50 CLEV. ST. L. REV. 335, 338-63 (2002-2003)*. Two post-*Glossip* publications have endorsed the firing squad in the context of *Glossip*: Vey, *supra* note 31, at 545; Kerr, *supra* note 31, at 74. Vey examines the firing squad as an alternative method of execution as well as an expression of state power to counter this country's euphemistic use of lethal injection as a punishment that looks like a medical procedure to soften the reality of state executions. Vey, *supra* note 31, at 575-84. Kerr effectively argues that the firing squad is more consistent with the government's goals of retribution and dignity, especially given all the challenges associated with lethal injection. Kerr, *supra* note 31, at 76-86.

33     *Glossip*, 135 S. Ct. at 2796-97 (Sotomayor, J., dissenting). Indeed, the *Baze* plurality considered the firing squad among the least modern methods of execution: "Our society has nonetheless steadily moved to more humane methods of carrying out capital punishment. The firing squad, hanging, the electric chair, and the gas chamber have each in turn given way to more humane methods, culminating in today's consensus on lethal injection." *Baze v. Rees, 553 U.S. 35, 62 (2008)* (plurality opinion).

34     Two legal commentators mentioned Justice Sotomayor's take on the firing squad but only briefly and in the context of other types of arguments. *See* Vey, *supra* note 31, at 579 (noting Justice Sotomayor's view toward the firing squad as an invitation to litigating lawyers); Kerr, *supra* note 31, at 84 n.74 (quoting Justice Sotomayor's perspective on the humaneness and efficiency of the firing squad). Two news articles discussed the matter but only in passing in the context of analyzing *Glossip* in general. *See* Ed Pilkington, *Controversial Oklahoma Lethal Injection Drug Approved by US Supreme Court*, THE GUARDIAN, (June 30, 2015, 10:09 AM), http://www.theguardian.com/us-news/2015/jun/29/midazolam-supreme-court-oklahoma; Barbara Leonard, *Supreme Court Upholds Execution Protocol Likened to Burning Alive*, COURTHOUSE NEWS SERVICE, (June 29, 2015, 8:32 AM) http://www.courthousenews.com/2015/06/29/supreme-court-upholds-execution-protocol-likened-to-burning-alive.htm.

35     *See infra* notes 168-183 and accompanying text.

36     *Glossip*, 135 S. Ct. at 2733.

37     *Id.* at 2731-32.

38     *Id.*

39     *Id.*

40     For detailed and documented overviews of these switches over the past two centuries for all death penalty states, see Denno, *Engineering of Death*, *supra* note 31, at 687-89; Denno, *Getting to Death*, *supra* note 31, at 348-98; Deborah W. Denno, *The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty*, *76 FORDHAM L. REV. 49, 51-101 (2007)* [hereinafter Denno, *Lethal Injection Quandary*]; Deborah W. Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, *63 OHIO ST. L.J. 63, 90-141 (2002)* [[hereinafter Denno, *When Legislatures Delegate*]; Denno, *Lethal Injection Chaos*, *supra* note 19, at 1333-34. For further discussion, see also SCOTT CHRISTIANSON, THE LAST GASP: THE RISE AND FALL OF THE AMERICAN GAS CHAMBER (2010) (providing a tour-de-force history of the gas chamber in the United States in the context of developments in national and international science, politics, and culture); AUSTIN SARAT, GRUESOME SPECTACLES: BOTCHED EXECUTIONS AND AMERICA'S DEATH PENALTY (2014) (analyzing all documented botched executions from 1890 to 2010); Eric Berger, *Lethal Injection Secrecy and Eighth Amendment Due Process*, *55 B.C. L. REV. 1367 (2014)* (discussing the constitutional implications of lower federal courts continually dismissing death row inmates' efforts to garner critical information about their lethal injection protocols); James Gibson & Corinna Lain, *Death Penalty Drugs and the International Marketplace*, *103 GEO. L.J. 1215 (2015)* (examining the link between the efforts of European governments and the increasing shortage of lethal injection drugs); Shah, *supra* note 25, at 147 (criticizing the use of experimental executions involving death

**Attachment 16**

row inmates as a result of the lethal injection drug shortage and correctional officials' attempts to substitute inappropriate drugs in lethal injection protocols).

41    For an overview of how hanging, lethal gas, and electrocution were initially hailed as successes only to be later deemed failures, see Denno, *Engineering of Death, supra* note 31; Denno, *Getting to Death, supra* note 31; Denno, *Lethal Injection Quandary, supra* note 40, at 51-101; Denno, *Paved with Paradox, supra* note 21; Denno, *When Legislatures Delegate, supra* note 40, at 90-141; Denno, *Lethal Injection Chaos, supra* note 19, at 1333-34.

42    *See generally* Denno, *Lethal Injection Chaos, supra* note 19, at 1333-34 (documenting how death penalty states turned to lethal injection either exclusively or as a choice method); *see Lethal Injection*, DEATH PENALTY INFO. CENTER, *supra* note 12 (providing the current status of lethal injection).

43    *See Glossip*, 135 S. Ct. at 2728.

44    For a discussion of how these groups came together see WILLIAM J. BOWERS, GLENN L. PIERCE & JOHN F. MCDEVITT, LEGAL HOMICIDE: DEATH AS PUNISHMENT IN AMERICA, 1864-1982 at 15-18 (1984); DANIEL MELTSNER, CRUEL AND UNUSUAL: THE SUPREME COURT AND CAPITAL PUNISHMENT 106-08 (1973); Jeffrey L. Kirchmeier, *Another Place Beyond Here: The Death Penalty Moratorium Movement in the United States*, 73 COLO. L. REV. 1, 11-15 (2002).

45    *See* MELTSNER, *supra* note 44 , at 106-25 ; *see also* Kirchmeier, *supra* note 44, at 11-15 (discussing the moratorium strategy).

46    MELTSNER, *supra* note 44, at 106.

47    *See* THE DEATH PENALTY IN AMERICA 24 (H. Bedau ed., 3d ed. 1982) (explaining that "[t]he de facto moratorium on executions [was] created in 1967 by the litigational efforts of the NAACP Legal Defense and Educational Fund"); MELTSNER, *supra* note 44, at 106-08 (describing the tactical forces at work); RAYMOND PATERNOSTER, CAPITAL PUNISHMENT IN AMERICA 18 (1991) (noting that the last execution before the hiatus began was that of Louis Jose Monge on June 2, 1967).

48    408 U.S. 238 (1972).

49    *Id.* at 239-40.

50    *Id.*

51    Kirchmeier, *supra* note 44, at 15 (noting that *Furman* had "no clear consensus"); Corinna Barrett Lain, *Furman Fundamentals*, 82 WASH. L. REV. 1, 11 (2007) ("[O]ne cannot help but wonder if the [*Furman*] Justices' inability to agree on a doctrinal basis for their ruling was due to the fact that one simply did not exist."); Carol S. Steiker & Jordan M. Steiker, *Sober Second Thoughts: Reflections on Two Decades of Constitutional Regulation of Capital Punishment*, 109 HARV. L. REV. 355, 362 (1995) ("The opinions [in *Furman*] presented a staggering array of arguments for and against the constitutionality of the death penalty and offered little means, aside from shrewd political prediction, of determining which arguments would dominate in the decision of any future cases.").

52    Kirchmeier, *supra* note 44, at 15; Lain, *supra* note 51, at 6-7; Steiker & Steiker, *supra* note 51, at 366-71.

53    *See Furman*, 408 U.S. at 411 (Blackmun, J., dissenting). For an earlier discussion of the impact of *Furman*, see Malcolm E. Wheeler, *Toward a Theory of Limited Punishment II: The Eighth Amendment After* Furman v. Georgia, 25 STAN. L. REV. 62 (1973).

54    428 U.S. 153 (1976).

55    *Id.* at 187.

56    PATERNOSTER, *supra* note 47, at 18; *see also infra* notes 267 and 314 (discussing the execution of Gary Gilmore).

57    *See supra* notes 42-46 and accompanying text.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

21

**Attachment 16**

58    *See generally* Denno, *Getting to Death, supra* note 31, at 373-74 (discussing these three rationales).

59    *Id.*

60    *See infra* notes 61-66.

61    *See generally* Denno, *Getting to Death*, *supra* note 31, at 373-75 (explaining the reasons why states turned to lethal injection as a new method of execution).

62    Glossip v. Gross, 135 S. Ct. 2726, 2732 (2015).

63    *See supra* note 19.

64    *See* Denno, *Lethal Injection Quandry*, *supra* note 40, at 65-70 (2007) (describing the creation of the protocol and the statute based on author's interviews with Jay Chapman and Bill Wiseman).

65    For an extensive overview of this history, see *id.* at 51-101.

66    *See generally* Denno, *Lethal Injection Chaos*, *supra* note 19, at 1333-34 (discussing the reasons for that change in the original Chapman-Wiseman protocol).

67    *Glossip*, 135 S. Ct. at 2732.

68    *Id.* (citation and internal quotation omitted).

69    553 U.S. 35 (2008) (plurality opinion).

70    Denno, *Getting to Death*, *supra* note 31, at 371.

71    *See* Denno, *Engineering of Death*, *supra* note 31, at 687-89; Denno, *Getting to Death*, *supra* note 31, at 348-98; Denno, *Lethal Injection Chaos*, *supra* note 19, at 1333-34; Denno, *Lethal Injection Quandary, supra* note 40, at 51-101; Denno, *When Legislatures Delegate*, *supra* note 40, at 90-141.

72    528 U.S. 960 (1999), *cert. dismissed as improvidently granted*, 528 U.S. 1133 (2000).

73    *Id.*

74    Bryan v. Moore, 528 U.S. 1133 (2000).

75    865 F. Supp. 1387 (N.D. Cal. 1994), *aff'd*, 77 F.3d 301 (9th Cir. 1994), *vacated on other grounds*, 519 U.S. 918 (1996) (remanded for reconsideration in light of changed statute).

76    *Id.* at 1415.

77    Former Cal. Penal Code § 3604(b) (West 1992) provided that "[i]f a person under sentence of death does not choose either lethal gas or lethal injection... the penalty of death shall be imposed by lethal gas."

78    Fierro v. Gomez, 77 F.3d 301, 309 (9th Cir. 1996).

79    *Id.* at 308.

80    Gomez v. Fierro, 519 U.S. 918 (1996).

81    528 U.S. 1133 (2000); *see also supra* notes 71-74 and accompanying text.

82    California's amended death penalty statute now provides that lethal injection shall be used unless the inmate requests lethal gas. Cal. Penal Code § 3604(b) (West 1996) (lethal gas or lethal injection at the condemned's election; lethal injection if the condemned fails to choose a method).

Case 3:18-cv-01234   Document 1-17   Filed 11/02/18   Page 22 of 35 PageID #: 630

**Attachment 16**

83   *Gomez,* 519 U.S. at 918 (1996). In his dissent, Justice Stevens noted the irony of the Court's remand given that it was clear that the inmate's only choice was lethal injection: "[U]nder either the terms of the new statute or the terms of the judgment of the Court of Appeals, lethal injections will be used to carry out these respondents' sentences." *Id.* at 919 (Stevens, J., dissenting).

84   526 U.S. 115 (1999).

85   *Id.* at 118-19 n.34.

86   Glossip v. Gross, 135 S. Ct. 2726, 2732 (2015).

87   99 U.S. 130 (1878).

88   Robinson v. California, 370 U.S. 660, 666 (1962) (holding that the Eighth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment).

89   *Wilkerson,* 99 U.S. at 130.

90   *Id.* at 135.

91   *Id.* at 131; *see also id.* at 132-37 (holding that, although the Utah Territory's legislature had made no provision for a method of execution in the 1876 Code, which superseded the 1852 law, the petitioner could properly be sentenced to death by shooting).

92   *Id.* at 137.

93   Glossip v. Gross, 135 S. Ct. 2726, 2732 (2015).

94   136 U.S. 436 (1890).

95   329 U.S. 459 (1947).

96   Robinson v. California, 370 U.S. 660, 666 (1962).

97   *Kemmler,* 136 U.S. at 443. For a broader analysis of the history and modern use of *Kemmler,* see Denno, *Engineering of Death,* *supra* note 31.

98   For an examination of cases that cite to *Kemmler* for such an incorrect proposition, see Denno, *Engineering of Death,* *supra* note 31, at 687-89.

99   *Resweber,* 329 U.S. at 459.

100  For an analysis of the history and legal backdrop of *Resweber* as well as the case's misuse in Baze v. Rees, 553 U.S. 35 (2008) (plurality opinion), see Deborah W. Denno, *When Willie Francis Died: The Disturbing Story Behind One of the Eighth Amendment's Most Enduring Standards of Risk,* *in* DEATH PENALTY STORIES 1, 17-94 (John H. Blume & Jordan M. Steiker eds., 2009).

101  In 2008, the Nebraska Supreme Court held electrocution to be unconstitutional. *See* State v. Mata, 745 N.W.2d 229, 278 (Neb. 2008). A year later, the Nebraska legislature adopted lethal injection. NEB. REV. STAT. § 83-964 (2010).

102  In 2001, the Georgia Supreme Court held electrocution to be unconstitutional. *See* Dawson v. State, 554 S.E.2d 137, 144 (Ga. 2001) (explaining that electrocution's "specter of excruciating pain and its certainty of cooked brains" constituted cruel and unusual punishment).

103  For an overview of how, when, and where these switches from electrocution to lethal injection occurred, see generally Denno, *Engineering of Death,* *supra* note 31; Denno, *Getting to Death,* *supra* note 31; Denno, *Lethal Injection Chaos,* *supra* note 19, at 1333-34; Denno, *Lethal Injection Quandary,* *supra* note 40, at 51-101; Denno, *Paved with Paradox,* *supra* note 21; Denno, *When Legislatures Delegate,* *supra* note 40, at 90-141.

104  *See supra* notes 58-103 and accompanying text.

Case 3:18-cv-01234   Document 1-17   Filed 11/02/18   Page 23 of 35 PageID #: 631

**Attachment 16**

105    *See supra* notes 37-40 and accompanying text.

106    Glossip v. Gross, 135 S. Ct. 2726, 2733 (2015).

107    *Id.*

108    *See supra* note 23 and accompanying text and *infra* notes 109-12 and accompanying text.

109    For a discussion of these post-*Baze* efforts to restart lethal injection, see generally Deborah W. Denno, *Introduction to The Lethal Injection Debate: Law & Science*, 35 FORDHAM URB. L.J. 701 (2008) [hereinafter Denno, *Lethal Injection Debate*]; Denno, *Lethal Injection Chaos*, *supra* note 19; Denno, *Paved with Paradox*, *supra* note 21; *Perspective Roundtable: Physicians and Execution--Highlights from a Discussion of Lethal Injection*, 358 NEW ENG. J. MED. 448 (2008) (with Deborah Denno, Atul Gawande, Robert D. Truog & David Waisael) [hereinafter *Perspective Roundtable*].

110    For an overview of these impediments, see generally Denno*, Lethal Injection Debate*, *supra* note 109; Denno, *Lethal Injection Chaos*, *supra* note 19; Denno, *Paved with Paradox*, *supra* note 21; *Perspective Roundtable*, *supra* note 109.

111    *See* Denno, *Lethal Injection Chaos*, *supra* note 19, at 1339-81. *See generally Lethal Injection, Politics, and the Future of the Death Penalty*, 49 RICH. L. REV. 671 (2015) (a symposium reviewing the wide range of problems surrounding lethal injection).

112    *See* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-14-194, DRUG SHORTAGES: PUBLIC HEALTH THREAT CONTINUES, DESPITE EFFORTS TO HELP ENSURE PRODUCT AVAILABILITY 14 fig. 4, 21 (2014).

113    733 F.3d 1 (D.C. Cir. 2013).

114    *Id.* at 12.

115    *See generally* Denno, *Lethal Injection Chaos*, *supra* note 19, at 1361-63 (discussing the *Cook* case).

116    Garrett Epps, *Out of Spite: The Governor of Nebraska's Threat to Execute Prisoners*, THE ATLANTIC (June 5, 2015), http://www.theatlantic.com/politics/archive/2015/06/a-governor-threatens-to-execute-prisoners-out-of-spite/394949/.

117    Chris McDaniel & Chris Geidner, *Arizona, Texas Purchased Execution Drugs Illegally Overseas, But FDA Halts the Import*, BUZZFEEDNEWS (Oct. 22, 2015), http://www.buzzfeed.com/chrismcdaniel/arizona-texas-purchased-execution-drugs-illegally#.xaxV8Jb32; Tasneem Nashrulla, Chris McDaniel & Chris Geidner, *Three States Bought Illegal Execution Drugs from Supplier in India*, BUZZFEEDNEWS (Oct. 23, 2015), http://www.buzzfeed.com/tasneemnashrulla/three-states-bought-illegal-execution-drugs-from-supplier-in#.qt42bx1av/.

118    Chris McDaniel & Tasneem Nashrulla, *This is the Man in India Who is Selling States Illegally Imported Execution Drugs*, B UZZFEEDNEWS (Oct. 20, 2015), http://www.buzzfeed.com/chrismcdaniel/this-is-the-man-in-india-who-is-selling-states-illegally-imp#.twR3doPG6.

119    *See infra* notes 108-53 and accompanying text.

120    *See supra* notes 22-27 and accompanying text.

121    McDaniel & Geidner, *supra* note 117; Nashrulla, McDaniel & Geidner, *supra* note 117.

122    Denno, *Lethal Injection Chaos*, *supra* note 19, at 1333-34; *Lethal Injection*, DEATH PENALTY INFO. CENTER, *supra* note 12.

123    For a discussion of these problems and botched executions, see generally Glossip v. Gross, 135 S. Ct. 2726, 2780-96 (2015) (Sotomayor, J., dissenting) (discussing the challenges with lethal injection generally and the particular problems associated with midazolam); Eric Berger, *The Executioners' Dilemmas*, 49 U. RICH. L. REV. 731, 731 (2015) (contending that states "do not devote sufficient care to their lethal injection procedures," thereby resulting in Eighth Amendment violations); Corinna Barrett Lain, *The Politics of Botched Executions*, 49 U. RICH. L. REV. 825, 827-43 (2015) (discussing the four major botched lethal injection executions of 2014 and the troubling and inadequate state responses); Joel Zivot, *Lethal Injection: States Medicalize Execution*, 49 U. RICH. L. REV. 711, 715-29 (2015) (noting that the Supreme Court neither understands the effects

Case 3:18-cv-01234 Document 1-17 Filed 11/02/18 Page 24 of 35 PageID #: 632

**Attachment 16**

of lethal injection drugs in the human body nor the impact of the *Baze* Court's decision on the medical profession and the practice of medicine).

124    Glossip, 135 S. Ct. at 2733 ("Baze cleared any legal obstacle to use of the most common three-drug protocol that had enabled States to carry out the death penalty in a quick and painless fashion.").

125    *See id.* (explaining that "anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences").

126    *See id.* at 2734.

127    *See generally* Gibson & Lain, *supra* note 40, at 1236-40.

128    *See Lethal Injection*, REPRIEVE, http://www.reprieve.org.uk/topic/lethal-injection/ (last visited May 4, 2016). Reprieve has a "Stop Lethal Injection Project" which "helps pharmaceutical manufacturers, investors, and regulators prevent the misuse of medicines in the execution of prisoners." *Id.*

129    *See infra* notes 130-54 and accompanying text.

130    *See Glossip, 135 S. Ct. at 2733-34.*

131    *See* Erik Eckholm, *Pfizer Blocks the Use of Its Drugs in Executions*, N.Y. TIMES, May 13, 2016, at A1 (quoting an expert's explanation that states have enacted strict secrecy provisions around how lethal injection is conducted and the sources of the drugs injected not in an effort to shield manufacturers from being exposed to public scrutiny but "'to keep the manufacturers in the dark about the misuse of their products'"); *Helping Pharmaceutical Companies Stop Their Medicines Being Used to Kill,* REPRIEVE, http://www.reprieve.org.uk/case-study/issues-helping-pharmaceutical-companies-stop-their-medicines-being-used-to-kill/ (last visited May 31, 2016) (noting that "the vast majority of affected drug manufacturers have acted to prevent their products being sold to prisons for use in executions by lethal injection").

132    Eckholm, *supra* note 131 (explaining that the companies that have restricted the use of drugs in executions have done so for "either moral or business reasons").

133    733 F.3d 1 (D.C. Cir. 2013).

134    *See* Denno, *Lethal Injection Quandary*, *supra* note 40, at 51-101 (detailing the extent to which medical professionals have been involved in lethal injection executions).

135    *See* Ty Alper, *The Truth About Physician Participation in Lethal Injection Executions*, 88 N.C. L. Rev. 11, 12-49 (2009); Denno, *Lethal Injection Quandary*, *supra* note 40, at 51-101.

136    *See* Alper, *supra* note 135, at 12-49; Denno, *Lethal Injection Quandary*, *supra* note 40, at 51-101.

137    *See* Alper, *supra* note 135, at 44-49; Ty Alper, *The Role of State Medical Boards in Regulating Physician Participation in Executions*, 95 J. MED. LICENSURE & DISCIPLINE 1, 3 (2008); Denno, *Lethal Injection Quandary*, *supra* note 40, at 65-91; Atul Gawande, *When Law and Ethics Collide--Why Physicians Participate in Executions*, 354 NEW ENG. J. MED. 1221, 1223-28 (2006); Shah, *supra* note 25, at 197. For an excellent and detailed overview of the problems with the Clayton Lockett execution, including accompanying documentation, reports, interviews, related stories, and updates, see Cary Aspinwall & Ziva Branstetter, *Records Reveal Lack of Protocol in Clayton Lockett's Oklahoma Execution*, TULSA WORLD (Mar. 16, 2015), http://www.tulsaworld.com/homepage1/records-reveal-lack-of-protocol-in-clayton-lockett-s-oklahoma/article_e4f17853-160c-530a-9f36-928a0fd9f605.html.

138    *See* Shah, *supra* note 25, at 148-50 (referring to the experimental dynamics of the Clayton Lockett execution); Aspinwall & Branstetter, *supra* note 137 (offering continual reports of the problems with the Clayton Lockett execution); *see generally* Interim Report Number 14 of the Grand Jury, In the Matter of the Multicounty Grand Jury, State of Oklahoma, Case No. SCAD-2014-70, at 4, 6, 22, 77, 100 (Okla. May 19, 2016) [hereinafter Interim Report] (detailing a review of the state's lethal injection protocol and procedural problems that contributed to the complications with the Clayton Lockett execution).

139    Glossip v. Gross, 135, S.Ct. 2726, 2735 (2015).

**Attachment 16**

[140]  Interim Report, *supra* note 138; *see also* Chris McDaniel, *Scathing Oklahoma Report Showcased Issues Common in Death Penalty States*, BUZZFEED.com, May 20, 2016, https://www.buzzfeed.com/chrismcdaniel/scathing-oklahoma-grand-jury-investigation-showcased-issues?utm_term=.lcX1bDkdl#.scKN9Xj0p (noting that the grand jury report on recent Oklahoma executions, including Clayton Lockett's, was "scathing" in the way it depicted Oklahoma's "carelessness and dismissive attitude toward established procedures and the inmates' rights" as well as the "extreme, and sometimes arbitrary, level of secrecy in how the department carries out executions"); Samantha Vicent, *Grand Jury Probe Shows Secrecy Used In Execution Process Caused Trouble, "Systemic Ineptitude,"* TULSA WORLD, May 23, 2016, http://www.tulsaworld.com/homepagelatest/grand-jury-probe-shows-secrecy-used-in-execution-process-caused/article_76ae109b-ebd8-5f93-8813-44d26ad47fd1.html (explaining that "[a] national expert on death penalty practices says the behavior of state officials highlighted in a grand jury report on Oklahoma's execution process is proof of 'systemic ineptitude that undermines public faith in government'").

[141]  *See* Aspinwall & Branstetter, *supra* note 137 (noting that a paramedic and doctor were rapidly trying to find a vein on Clayton Lockett and start an IV to deliver his lethal injection).

[142]  *See* Alper, *supra* note 135, at 44-49; Alper, *supra* note 137, at 3; Denno, *Lethal Injection Quandary*, *supra* note 40, at 65-91; Gawande, *supra* note 137, at 1223-28; Shah, *supra* note 25, at 197.

[143]  Press Release, *International Academy of Compounding Pharmacists, IACP Adopts Position on Compounding of Lethal Injection Drugs: Board Discourages Practice Among Members* (Mar. 24, 2015), http://www.deathpenaltyinfo.org/documents/IACPPressRelease.pdf. The Board of Directors of the International Academy of Compounding Pharmacists released the following statement summarizing its adopted position on the issue:
While the pharmacy profession recognizes an individual practitioner's right to determine whether to dispense a medication based upon his or her personal, ethical and religious beliefs, IACP discourages its members from participating in the preparation, dispensing, or distribution of compounded medications for use in legally authorized executions. "The issue of compounded preparations being used in the execution of prisoners sentenced to capital punishment continues to be a topic of significant interest. It is important to first understand the origin of this issue: states are turning to compounded preparations for this purpose because the companies that manufacture the products traditionally used have unilaterally decided to stop selling them for use in executions. IACP believes that a national discussion needs to be conducted on whether a pharmaceutical manufacturer can restrict the use of FDA approved products only to purposes that adhere to their corporate values.
*Id.*

[144]  Eckholm, *supra* note 131; Christopher Matthews & Ashby Jones, *Pfizer Tightens Controls to Block Use of Its Drug in Executions*, WALL ST. J., May 13, 2016, http://www.wsj.com/articles/pfizer-tightens-controls-to-block-use-of-its-drugs-in-executions-1463183996.

[145]  Eckholm, *supra* note 131; Matthews & Jones, *supra* note 144.

[146]  Eckholm, *supra* note 131.

[147]  *Id.*

[148]  *Id.*

[149]  *See* Mark Kessel, *Restoring the Pharmaceutical Industry's Reputation*, 32 NATURE BIOTECH. 983, 983-99 (2014).

[150]  Clare Algar, *Big Pharma May Help End the Death Penalty*, NEW REPUBLIC (Oct. 22, 2013), https://newrepublic.com/article/115284/big-pharma-may-end-death-penalty.

[151]  *See Public Opinion About the Death Penalty*, DEATH PENALTY INFO. CENTER, http://www.deathpenaltyinfo.org/ (last visited May 4, 2016).

[152]  For insightful discussions of the problems with state secrecy provisions and how depleting drugs can expand them even further, see Berger, *supra* note 40, 1388-440; Mary D. Fan, *The Supply-Side Attack on Lethal Injection and the Rise of Execution Secrecy*, 95 B.U. L. REV. 427 (2015).

Case 3:18-cv-01234   Document 1-17   Filed 11/02/18   Page 26 of 35 PageID #: 634

**Attachment 16**

153    See *supra* notes 112-20 and accompanying text.

154    For an overall discussion of the Court's proclivity to be out of touch, see generally BARRY FRIEDMAN, THE WILL OF THE PEOPLE: HOW PUBLIC OPINION HAS INFLUENCED THE SUPREME COURT AND SHAPED THE MEANING OF THE CONSTITUTION (2009).

155    See *Glossip v. Gross, 135 S. Ct. 2726, 2731 (2015).*

156    See *id.* at 2792-97 (Sotomayor, J., dissenting).

157    This Article agrees with the conclusion reached by Justice Sotomayor. *See id.*

158    *Id.* at 2731, 2737-38.

159    Baze v. Rees, 553 U.S. 35, 51 (2008) (emphasis added).

160    *Id.* at 52.

161    See *Glossip, 135 S. Ct. at 2737.*

162    *Id.*

163    *Id.* at 2755 (Breyer, J., dissenting).

164    *Id.* at 2780 (Sotomayor, J., dissenting).

165    See *id.* at 2746 (Scalia, J., concurring).

166    See *id.* at 2750 (Thomas, J., concurring).

167    For examples of key media articles focusing on Justice Breyer's dissent, see Adam Liptak, *Supreme Court Allows Use of Execution Drug*, N.Y. TIMES (June 29, 2015), http://www.nytimes.com/2015/06/30/us/supreme-court-execution-drug.html?_r=0; Charlie Savage, *Highlights from the Supreme Court Decision on Lethal Injection*, N.Y. TIMES (June 29, 2015), http://www.nytimes.com/interactive/2015/us/2014-term-supreme-court-decision-lethal-injection.html.

168    Glossip, 135 S. Ct. at 2792-97 (Sotomayor, J., dissenting).

169    *Id.* at 2795.

170    *Id.* at 2793.

171    *Id.*

172    *Id.*

173    *Id.* at 2794.

174    *Id.*

175    *Id.* at 2796.

176    *Id.*

177    *Id.*

178    *Id.* at 2797.

179    *Id.*

180    *Id.*

181    *Id.*

182    *Id.*

183    *See supra* notes 106-54 and accompanying text.

184    Glossip, 135 S. Ct. at 2739.

185    *Id.* (quoting Sotomayor, J., dissenting at 2796).

186    *Id.* (quoting Sotomayor, J., dissenting at 2796).

187    *Id.*

188    *Id.*

189    *Id.* at 2796-97.

190    *Id.*

191    As this Article notes, Wilkerson v. Utah, 99 U.S. 130 (1878), did not uphold the constitutionality of the firing squad under an Eighth Amendment analysis. *See supra* notes 86-92 and accompanying text.

192    *Glossip*, 135 S. Ct. at 2731.

193    *See infra* notes 201-03 and accompanying text.

194    *See infra* note 198 and accompanying text.

195    *See infra* notes 268-76 and accompanying text.

196    759 F.3d 1076, 1103 (9th Cir. 2014) (Kozinski, C.J., dissenting from denial of rehearing en banc).

197    *Id.*

198    *Id.*

199    *Id.*

200    *See supra* notes 24, 104, 111, 123, 138-41, 222 and accompanying text.

201    M. WATT ESPY & JOHN ORTIZ SMYKLA, EXECUTIONS IN THE UNITED STATES: 1608-1987 at i (1987) [hereinafter ESPY file]; *see also* GEOFFREY ABBOTT, EXECUTION 103 (2005) (referring to the execution of George Kendall, the first execution in the American colonies).

202    Cutler, *supra* note 32, at 398.

203    *Id.* at 337 n.5 (noting that "at least 185 men were executed by firing squad during the Civil War"). Historically, the military used the firing squad as a method of execution for those soldiers who engaged in desertion, mutiny, or other types of military offenses. *See* FREDERICK DRIMMER, UNTIL YOU ARE DEAD: THE BOOK OF EXECUTIONS IN AMERICA 89 (1990); *see also Firing Squad, in* ENCYCLOPEDIA OF CAPITAL PUNISHMENT IN THE UNITED STATES 189 (Louis J. Palmer, ed. 2008) (noting the use of the firing squad in the military). Of the 40,000 servicemen who deserted during World War II, only 49 received death sentences for desertion, and only one, Private Donald Edward Slovik, was actually executed. DRIMMER, *supra*, at 106-07. The Death Penalty Information Center provides data from a document discovered at the Pentagon that enumerates those executions governed by the military from 1945 through 1961. Most of those executions used hanging while the others used the firing squad or the method was unknown. *See Executions in the Military*, DEATH PENALTY INFO. CENTER, http://www.deathpenaltyinfo.org/executions-military (last visited May 11, 2016).

204    ESPY file, *supra* note 201, at 5. The Espy file documents all firing squad executions that took place in the colonies, the territories, and the states from 1608 through 1987, excluding military executions. *Id.* at i-iv. The Espy file lists 142 firing squad

**Attachment 16**

executions. *Id.* at 5. Since the time the Espy file was compiled, Utah executed two more inmates: John Albert Taylor in 1996, *see infra* notes 287-94, 315, and Ronnie Lee Gardner in 2010, *see infra* notes 241, 316-17. Thus, the total number of firing squad executions in the United States is 144.

205 The firing squad is the fourth execution method in Oklahoma. H.B. 1879, 55th Leg., Reg. Sess. (Okla. 2015). The Oklahoma statute provides as follows:

§ 1014 (A) The punishment of death shall be carried out by the administration of a lethal quantity of a drug or drugs until death is pronounced by a licensed physician according to accepted standards of medical practice.

(B) If the execution of the sentence of death as provided in subsection A of this section is held unconstitutional by an appellate court of competent jurisdiction or is otherwise unavailable, then the sentence of death shall be carried out by nitrogen hypoxia.

(C) If the execution of the sentence of death as provided in subsections A and B of this section is held unconstitutional by an appellate court of competent jurisdiction or is otherwise unavailable, then the sentence of death shall be carried out by electrocution.

(D) If the execution of the sentence of death as provided in subsections A, B and C of this section is held unconstitutional by an appellate court of competent jurisdiction or is otherwise unavailable, then the sentence of death shall be carried out by firing squad.

*Id.*

206 In 2015, Utah brought back the firing squad. Utah Code Ann. § 77-18-5.5 (LexisNexis 2015). The Utah statute provides as follows:

(1) (a) When a defendant is convicted of a capital felony and the judgment of death has been imposed, lethal intravenous injection is the method of execution.

(b) Subsection (1)(a) applies to any defendant sentenced to death on or after May 3, 2004, except under Subsections (2), (3), and (4).

(2) If a court holds that a defendant has a right to be executed by a firing squad, the method of execution for that defendant shall be a firing squad. This Subsection (2) applies to any defendant whose right to be executed by a firing squad is preserved by that judgment.

(3)(a) If a court holds that execution by lethal injection is unconstitutional on its face, the method of execution shall be a firing squad.

(b) If a court holds that execution by lethal injection is unconstitutional as applied, the method of execution for that defendant shall be a firing squad.

(4) The method of execution for the defendant is the firing squad if the sentencing court determines the state is unable to lawfully obtain the substance or substances necessary to conduct an execution by lethal intravenous injection 30 or more days prior to the date specified in the warrant issued upon a judgment of death under Section 77-19-6.

*Id.*

207 Okla. H.B. 1879 at § 1014 (A); Utah Code Ann. § 77-18-5.5 (1)(a).

208 Okla. H.B. 1879 at § 1014 (D).

209 *Id.* at (B). The firing squad used to be third in line in Oklahoma. Now, with the introduction of nitrogen gas, it is fourth in line. *See* Denno, *Getting to Death*, *supra* note 31, at 390 (describing the earlier execution-method hierarchy in Oklahoma).

210 *See* Scott Christiansen, *How Oklahoma Came to Embrace the Gas Chamber*, NEW YORKER (June 24, 2015), http://www.newyorker.com/news/news-desk/how-oklahoma-came-to-embrace-the-gas-chamber?intcid=mod-latest.

211 Utah Code Ann. § 77-18-5.5 (LexisNexis 2015).

212 Deborah W. Denno, *When Legislatures Delegate*, *supra* note 40, at 192-93; *Bill Removes Firing Squad As Execution Option*, KTVB. COM (Oct. 14, 2009), http://www.ktvb.com/story/news/local/2014/06/27/11478095/.

213 IDAHO CODE § 19-2716 (1987). The Idaho statute provides: "The punishment of death shall be inflicted by continuous, intravenous administration of a lethal quantity of an ultra-short-acting barbituate [sic] in combination with a chemical paralytic agent until death...." *Id.* The director of the department of corrections will decide which substances and procedures will be used. *Id.* However,

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.    29

**Attachment 16**

"[i]n any case where the director finds it to be impractical to carry out the punishment of death by administration of the required lethal substance or substances for the reason that it is not reasonably possible to obtain expert technical assistance, should such be necessary to assure that infliction of death by administration of such substance or substances can be carried out in a manner which causes death without unnecessary suffering, the sentence of death may be carried out by firing squad."

*Id.*

214    553 U.S. 35, 61 (2008) (plurality opinion).

215    K TVB.com, *supra* note 212.

216    *See Searchable Execution Database*, DEATH PENALTY INFO. CENTER, http://www.deathpenaltyinfo.org/views-executions?exec_name_1=&sex=All&sex_1=All&method[                                        ]=Firing+Squad&federal =All&foreigner=All&juvenile=All&volunteer=All (last visited Mar. 3, 2016) (showing that all three firing squad executions from 1976 to 2016 took place only in Utah).

217    Laura Hancock, *Wyoming House Passes Firing Squads Execution Bill*, CASPER STAR TRIBUNE (Feb. 13, 2015), http://trib.com/news/state-and-regional/govt-and-politics/wyoming-house-passes-firing-squads-execution-bill/ article_1c77faca-32f5-5f00-8369-34ba66b0572d.html.

218    Erin Jones, *Firing Squad Bill Fails*, WYO. PUB. RADIO (Mar. 12, 2015), http://wyomingpublicmedia.org/post/firing-squad-bill-fails.

219    S. File 13, 63rd Leg., 2015 Gen. Sess. (Wyo. 2015).

220    DiStanislao, *supra* note 32, at 798.

221    SARAT, *supra* note 40, at 177-78.

222    *See* Arif Khan & Robyn M. Leventhal, *Medical Aspects of Capital Punishment Executions*, 47 J. FORENSIC SCI. 847, 849-50 (2002).

223    428 U.S. 153 (1976).

224    *See supra* notes 54-57 and accompanying text.

225    *See infra* notes 314-17 and accompanying text.

226    *Searchable Execution Database*, DEATH PENALTY INFO. CENTER, http://www.deathpenaltyinfo.org/views-executions? exec_name_1=&sex=All&sex_1=All&method[ ]=Firing+Squad&federal =All&foreigner=All&juvenile=All&volunteer=All (last visited Mar. 3, 2016) (showing that the last firing squad execution conducted in this country was in 2010).

227    UTAH CODE ANN. § 77-18-5.5 (1)(a-b) (LexisNexis 2015).

228    § 77-18-5.5 (2).

229    § 77-18-5.5 (3)(a).

230    § 77-18-5.5 (3)(b).

231    § 77-18-5.5 (4).

232    UTAH CODE ANN. § 77-19-10(1) (LexisNexis 2015); UTAH ADMIN. CODE r. 251-107-4 (1) (2015) (location and procedures).

233    DRIMMER, *supra* note 203, at 91 ; Execution Procedures, Utah State Prison (n.d.) (on file with the author) (information released to the media at the time of the 2010 execution of Ronnie Lee Gardner). For a discussion of both the history and

early modern use of the firing squad, see generally L. KAY GILLESPIE, THE UNFORGIVEN: UTAH'S EXECUTED MEN (1991).

234  UTAH CODE ANN. § 77-19-10(3); UTAH ADMIN. CODE r. 251-107-4 (3).

235  UTAH CODE ANN. § 77-19-11 (2015); UTAH ADMIN. CODE r. 251-107-6.

236  UTAH ADMIN. CODE r. 251-107-7 (1).

237  UTAH ADMIN. CODE r. 251-107-7 (3).

238  UTAH ADMIN. CODE r. 251-107-7 (7).

239  UTAH ADMIN. CODE r. 251-107-7 (6).

240  Cutler, *supra* note 32, at 363-64; Execution Procedures, *supra* note 234. According to the Execution Procedures distributed at the time of the Ronnie Lee Gardner firing squad execution in 2010, the execution chamber or room was described as follows.
EXECUTION CHAMBER
The execution will take place at the Utah State Prison in Draper, Utah. The facility's execution chamber was completed in 1998. It has been used once--for a lethal injection execution in the 1999 case of State of Utah vs. Joseph Mitchell Parsons.
The scheduled execution will be the first performed by firing squad in the permanent chamber. The room is approximately 20 feet by 24 feet and is fitted with curtains to cover the windows in the adjacent witness rooms. The windows are complete with bullet-proof, reflective glass to protect witnesses from unintended ricochet, and to separate and protect the identities of the witnesses.
Execution Procedures, *supra* note 234.

241  One of the more documented accounts comes from Christopher Cutler. *See* Cutler, *supra* note 32, at 363-64.

242  *See* Execution Procedures, *supra* note 234.

243  Nate Carlisle, *Firing Squad: An Eyewitness Account of Gardner's Execution*, SALT LAKE TRIBUNE (Jan. 18, 2016), http://archive.sltrib.com/story.php?ref=/news/ci_15325356.

244  Cutler, *supra* note 32, at 363-64; Carlisle, *supra* note 244; Execution Procedures, *supra* note 234. The Execution Procedures distributed at the time of the Ronnie Lee Gardner firing squad execution in 2010 describe the set-up as follows.
FIRING SQUAD LOGISTICS
Executioners, pre-selected by the Department of Corrections, must be law-enforcement certified in the State of Utah. The five law enforcers remain anonymous, and will be stationed behind a gun ported brick wall in the execution chamber. The executioners will be armed with .30-caliber rifles, four of which will be loaded with live rounds. The weapon carrying the blank round will be unknown to the law enforcers.
The condemned will be secured to a chair, and a target will be placed over his heart and a hood over his head. At the conclusion of the condemned's last words, the execution team will commence fire. A physician will be on site to certify that death has occurred.
Execution Procedures, *supra* note 234.

245  Brady McCombs, *Utah's Firing Squad: How Does It Work?*, ABC NEWS (Mar. 24, 2015), http://www.msn.com/en-us/news/crime/5-questions-answered-how-do-firing-squads-work/ar-AA9VcKI.

246  Cutler, *supra* note 32, at 364; McCombs, *supra* note 246.

247  Cutler, *supra* note 32, at 363-64; Execution Procedures, *supra* note 234 (noting that the guns are .30 caliber rifles); McCombs, *supra* note 246.

248  Carlisle, *supra* note 244.

249  Cutler, *supra* note 32, at 363-64; Carlisle, *supra* note 244; Execution Procedures, *supra* note 234.

250  Cutler, *supra* note 32, at 364.

Case 3:18-cv-01234   Document 1-17   Filed 11/02/18   Page 31 of 35 PageID #: 639

**Attachment 16**

251   *Id.*

252   McCombs, *supra* note 246.

253   UTAH ADMIN. CODE r. 251-107-4 (4) (2015).

254   D RIMMER, *supra* note 203, at 91.

255   Execution Procedures, *supra* note 234.

256   *See* Lafferty v. Crowther, No. 2:07-CV-322, 2015 WL 6875393 (D. Utah Oct. 30, 2015) (dismissing inmates' arguments that the firing squad is cruel and unusual); *Utah: Challenging Firing Squad Execution*, N.Y. TIMES (Oct. 30, 2015), http://www.nytimes.com/2015/10/31/us/utah-judge-denies-appeal-challenging-firing-squad-execution.html?ref=us (discussing the *Lafferty* challenge to the firing squad).

257   *See* Martin R. Gardner, *Executions and Indignities-- An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment*, 39 OHIO ST. L.J. 96, 123 (1978) ("It is not certain whether death by firing squad causes physical pain."); Harold Hillman, *The Possible Pain Experienced During Execution by Different Methods* , 22 PERCEPTION 745, 745 (1993) ("It is difficult to know how much pain the person being executed [by firing squad] feels or for how long, because many of the signs of pain are obscured by the procedure or by physical restraints, but one can identify those steps which are likely to be painful."). Books on this topic do not discuss pain or physical suffering. *See, e.g.*, VINCENT J.M. DI MAIO, GUNSHOT WOUNDS: PRACTICAL ASPECTS OF FIREARMS, BALLISTICS, AND FORENSIC TECHNIQUES (1999) (providing no section where pain is discussed in terms of physical suffering).

258   ROYAL COMM'N ON CAPITAL PUNISHMENT, 1949-53 REPORT 251 (1953) [[hereinafter ROYAL COMM'N REPORT]. In 1949, the Queen of England appointed 12 individuals
[t]o consider and report whether liability under the criminal law in Great Britain to suffer capital punishment for murder should be limited or modified, and if so, to what extent and by what means, for how long and under what conditions persons who would otherwise have been liable to suffer capital punishment should be detained, and what changes in the existing law and the prison system would be required; and to inquire into and take account of the position in those countries whose experience and practice may throw light on these questions.
*Id.* at iii. To this day, the Royal Commission's report is cited as solid authority on methods of execution. *See, e.g.*, THE DEATH PENALTY IN AMERICA, *supra* note 47, at 5, 16, 22, 287, 315, 378; FRANKLIN ZIMRING & GORDON HAWKINS, CAPITAL PUNISHMENT AND THE AMERICAN AGENDA 11-12, 107-09 (1986).

259   ROYAL COMM'N REPORT, *supra* note 259.

260   *See* Khan & Leventhal, *supra* note 223, at 3; *see supra* notes 175-83 and accompanying text and *infra* notes 258-77 and accompanying text.

261   DRIMMER, *supra* note 203, at 117.

262   GILLESPIE, *supra* note 234, at 117 (discussing Deering's execution); Phillips H. Lord, *Public Guinea Pig No. 1*, SCRIBNER'S COMMENTATOR, 94, 94-98 (1940) (depicting Deering's life, crime, and death); Gladys Hobbs, *Science Benefits by Execution of Deering*, DESERET NEWS (Salt Lake City), Oct. 31, 1938, at 3 (describing details of the Deering execution); *Slayer's Heart Triples Beat As He Faces Death*, CHIC. DAILY TRIB., Nov. 1, 1938, at 8 [hereafter *Slayer's Heart*] (noting that the electrocardiograph of Deering's heart was "the first ever made of a man's heart as bullets pierced it").

263   Lord, *supra* note 263, at 97-98; Hobbs, *supra* note 263; *Slayer's Heart*, *supra* note 263.

264   *Slayer's Heart*, *supra* note 263.

265   Hobbs, *supra* note 263.

266   DRIMMER, *supra* note 203, at 119.

267   *See* HILLMAN, *supra* note 258, at 750.

**Attachment 16**

268    *Id.* at 745.

269    *Id*. at 749-50.

270    *Id.*

271    *Id.* at 745.

272    *See supra* notes 201-04 and accompanying text.

273    Josh Sanburn, *The Harsh Reality of Execution by Firing* Squad, TIME (Mar. 12, 2015)*,* http://time.com/3742818/utah-firing-squad-execution-lethal-injection/; Telephone Interview with Jonathan I. Groner, M.D., Interim Chief of the Department of Pediatric Surgery and Trauma Medical Director of the Level 1 Trauma Program at Nationwide Children's Hospital and a Professor of Clinical Surgery at The Ohio State University College of Medicine (Aug. 15, 2015).

274    Telephone Interview with Jonathan I. Groner, *supra* note 274.

275    Sanburn, *supra* note 274; Telephone Interview with Jonathan I. Groner, *supra* note 274.

276    Sanburn, *supra* note 274.

277    Gardner, *supra* note 258, at 123-24; Roberta Harding, *The Gallows to the Gurney: Analyzing the ( Unconstitutionality ) of the Methods of Execution,* 6 PUB. INT. L.J. 153, 170-71 (1996).

278    *See supra* notes 201-04 and accompanying text.

279    *See* Cutler, *supra* note 32, at 346-47, 356-57, 413.

280    *See id*. at 346.

281    *See id.* at 346-47.

282    GILLESPIE, *supra* note 234, at 49.

283    GILLESPIE, *supra* note 234, at 49; Cutler, *supra* note 32, at 346-67.

284    GILLESPIE, *supra* note 234, at 127-29.

285    *Id.* at 129.

286    *See Execution Database,*  DEATH PENALTY INFO. CENTER, http://www.deathpenaltyinfo.org/views-executions (last visited May 4, 2016).

287    Letter from Gina Proctor, Records Manager, Utah Dep't of Corr.-- Admin. Services Bureau, to author (Feb. 4, 2016) (on file with author).

288    *See infra* notes 289-97 and accompanying text.

289    GILLESPIE, *supra* note 234, at 12-13; Martin R. Gardner, *Illicit Legislative Motivation As a Sufficient Condition for Unconstitutionality under the Establishment Clause--A Case for Consideration: The Utah Firing Squad,* WASH. U. L. REV. 435, 440, 442 (1979).

290    GILLESPIE, *supra* note 234, at 12-13 (describing the evolution of the Mormon belief in "blood atonement," which proposes that "only through choosing a method of execution which results in blood being 'spilled' (or shed) can the condemned hope to receive forgiveness in the next life"); *see also* Gardner, *supra* note 290, at 440 (discussing blood atonement). Starting in 1851, when Utah (before statehood) enacted its first capital punishment statute, those found guilty of murder were to be executed by way of "firing squad, hanging, or beheading at the court's or condemned's election." 1852 Utah Terr. Laws tit. XII, pp. 142-43 § 125 ("General Definition and Provision as to Crimes and Offenses") (Mar. 6, 1852) (firing squad, hanging, or beheading at the court's or condemned's election). In 1898, Utah passed a capital punishment statute authorizing execution by firing squad

**Attachment 16**

or hanging, but not beheading, and allowing the defendant a choice of methods. Utah Rev. Stat. § 4939 (1898) (firing squad or hanging at the condemned's election; court's choice if the condemned fails to choose a method). Only two men elected to be hanged under the 1898 statute. *See* BOWERS, PIERCE & MCDEVITT, *supra* note 44, at 13 n.h. (1984). If the defendant did not choose, the statute authorized the courts to decide the method of execution. It appears that Utah was the first state to give the condemned a choice of method of execution. GILLESPIE, *supra* note 234, at 12.

291  Gardner, *supra* note 290, at 448.

292  *See* Denno, *Getting to Death*, *supra* note 31, at 395; *see also* 1983 Utah Laws 112 § 1 (the Utah statute in effect in 1996; firing squad or lethal injection at the condemned's election; lethal injection if the condemned fails to choose a method); Utah Code Ann. § 77-18-5.5 (1953) (amended 1984). The 1983 law did not expressly indicate retroactive operation.

293  Denno, *Getting to Death*, *supra* note 31, at 395; James Brooke, *Utah Hopes Next Execution Will Be Last by Firing Squad*, SUNDAY OREGONIAN, Jan. 14, 1996, at A21; Nora McCarthy, *All Ready to Kill / Utah Gets Calls for Firing Squad Volunteers*, NEWSDAY (New York), Jan. 16, 1996, at A07.

294  *See* Denno, *Getting to Death*, *supra* note 31, at 395 nn.462-63; *see also* Brian McGrory, *A Time of Executions; Firing Squad, Hanging Bring Issue to Forefront*, BOSTON GLOBE, Jan. 26, 1996, at A1; Brad Knickerbocker, *Death by Firing Squad Under the Gun*, CHRISTIAN SCIENCE MONITOR, Jan. 25, 1996, at 4; Ian Katz, *US Revives Firing Squad's Dying Art*, GUARDIAN, Jan. 25, 1996, at 2.

295  McCarthy, *supra* note 294, at A07.

296  *Id.*

297  Knickerbocker, *supra* note 295, at 4.

298  1980 Utah Laws 15 § 2 (firing squad). The 1980 law did not expressly indicate retroactive operation.

299  1983 Utah Laws 112 § 1 (firing squad or lethal injection at the condemned's election; lethal injection if the condemned fails to choose a method); Utah Code Ann. § 77-18-5.5 (1953) (amended 1984). The 1983 law did not expressly indicate retroactive operation.

300  H.B. 180, 60th Leg, Gen. Sess. (Utah 2014) (removing the right of the condemned to choose the method of execution and leaving lethal injection as the only remaining option in the state).

301  On March 23, 2015, Utah Governor Gary Herbert signed legislation reauthorizing the state to use the firing squad in the event that the drugs required for lethal injection are unavailable. Before this move , the firing squad was an option, but was only allowed for inmates who chose this method prior to its elimination in 2004. H.B. 11, 61st Leg., Gen. Sess. (Utah 2015).

302  Cutler, *supra* note 32, at 400.

303  Nev. Rev. Stat. p. 2039 § 7281 (1912) (hanging or firing squad at the condemned's election; the court's choice if the condemned fails to choose a method). The 1912 law did not expressly indicate retroactive operation. Before 1912, hanging was the only option. Nev. Gen. Stat. Ann. 21 § 4348 (1885).

304  Phillip I. Earl, *By the Knife: Tonopah's Gregovich-Mircovich Murder Case*, *in* HISTORY AND HUMANITIES: ESSAYS IN HONOR OF WILBUR S. SHEPPERSON 15, 35-38 (Frances X. Hartigan ed., 1989) [hereinafter Earl, *By the Knife*]; Phillip I. Earl, *Nevada's Execution Machine*, THE NEVADAN, Dec. 3, 1972, at 3 [[hereinafter *Nevada's Machine*]; *see also* CHRISTIANSON, *supra* note 40, at 62 (describing Mircovich's execution). The spelling of Mircovich's name varies depending on the source. *See* Earl, *Nevada's Execution Machine*, *supra*, at 3 ("Andrija Mirkovitch"), Earl, *By the Knife*, *supra*, at 18 ("Andrija Mircovich"), and Christianson, *supra*, at 62 ("Andriza Mircovich").

305  *See* Earl, *Nevada's Execution Machine*, *supra* note 305, at 3; Earl, *By the Knife*, *supra* note 305, at 30-31.

306  *See* Earl, *Nevada's Execution Machine*, *supra* note 305, at 3.

307  *See id.*

308    *See id.*; Earl, *By the Knife*, *supra* note 305, at 38.

309    1921 Nev. Stat. 246 § 1 (lethal gas). In 1921, in an attempt to prove the state humane, the Nevada legislature passed a law providing that lethal gas was to be administered "without warning and while (the inmate was) asleep in his cell." BOWERS, PIERCE & MCDEVITT, *supra* note 44, at 12. This procedure was never followed, however, because it was impossible to release the gas in a regular cell. *Id.* For a masterful discussion of the history and development of lethal gas and its use, see CHRISTIANSON, *supra* note 305.

310    *See generally* CHRISTIANSON, *supra* note 40; Denno, *Getting to Death*, *supra* note 31.

311    *See generally* CHRISTIANSON, *supra* note 40; Denno, *Getting to Death*, *supra* note 31.

312    Glossip v. Gross, 135 S. Ct. 2726, 2796 (Sotomayor, J., dissenting).

313    Cutler, *supra* note 32, at 362.

314    Mike Carter, *Bill Voiding Firing-Squad Option Dropped*, SALT LAKE TRIBUNE, Feb. 10, 1996, at E3.

315    Carlisle, *supra* note 244.

316    *Id.*

317    *See supra* notes 196-200 and accompanying text.

318    Wood v. Ryan, 759 F.3d 1076, 1103 (9th Cir. 2014). One reporter interviewing Judge Kozinski asked him if he was being serious about his recommendation of the firing squad. He replied that he "was quite serious," referring to all the problems with lethal injection drugs. See Patt Morrison, *Judge Alex Kozinski on Bringing Back Firing Squads: "No, I Wasn't Kidding"*, L.A. TIMES, July 30, 2014, http://www.latimes.com/opinion/op-ed/la-oe-0731-morrison-kozinski-20140729-column.html. Robert Blecker has also advocated for the firing squad on a range of levels. For a particularly eloquent discussion, see BLECKER, *supra* note 32.

319    Glossip v. Gross, 135 S. Ct. 2726, 2796 (Sotomayor, J., dissenting).

320    *Id.* at 2797.

321    *Id.* at 2726.

322    *Id.*

323    *See supra* notes 106-54 and accompanying text.

324    *See supra* note 27 and accompanying text.

49 UMIJLR 749

**End of Document**      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:18-cv-01234 Document 1-17 Filed 11/02/18 Page 35 of 35 PageID #: 643

**Attachment 16**