THE CHANCERY COURT
DAVIDSON COUNTY, TENNESSEE

HONORABLE ELLEN HOBBS LYLE, CHANCELLOR

MARIA M. SALAS, CLERK AND MASTER

FILED
AUG 2 2 2018
Clerk of the Appellate Courts
Rec'd By _____

ABU-ALI-ABDUR'RAHMAN, ET AL
Plaintiffs/Appellants

VOLUME 17 of 28



| CERTIFIED TRANSCRIPT OF Cause | Appearance No. 18-183-III CHANCERY COURT | Vs No. M2018-01385-SC-RDO-CV SUPREME COURT TRANSMITTED ON: August 21, 2018 | Execution No SUPREME COURT | APPEALED TO Next Term, 20 |

TONY PARKER, IN HIS OFFICIAL CAPACITY AS TENNESSEE COMMISSIONER OF CORRECTION, ET AL
Defendants/Appellees

Trial Transcript from July 16, 2018
Pages 1521 - 1671

Kelley J. Henry, #21113
Assistant Federal Public Defender
810 Broadway, Suite 200
Nashville TN 37202
(615) 736-5047

    *Attorney for Plaintiffs/Appellants Abu-Ali-Abdur'Rahman, John Michael Bane, Byron Black, Andre Bland, Kevin Burns, Tony Carruthers, Tyrone Chalmers, James Dellinger, David Duncan, Kenneth Henderson, Anthony Darrell Hines, Henry Hodges, Stephen Hugueley, Akil Jahi, David Ivy, Donnie Johnson, David Jordan, David Keen, Donald Middlebrooks, Farris Morris, Pervis Payne, Gerald Powers, William Glenn Rogers, Michael Sample, Oscar Smith, Charles Walton Wright and Edmund Zagorski*

```
 1  A.      Right.
 2  Q.      But it's your understanding that these are
 3  notes that were created by the drug procurer; is
 4  that correct?
 5  A.      Yes.
 6  Q.      All right.  And the -- strike that.
 7  Sorry.
 8          We're going to get back to that contract
 9  that you talked about when you had a pharmacy that
10  had a contract for creating pentobarbital or
11  providing pentobarbital?
12  A.      The 2014 contract?
13  Q.      The 2014 contract.
14  A.      Yes.
15  Q.      That contract, in fact, is still in
16  effect; is it not?
17  A.      Yes.
18  Q.      And that contract calls for the department
19  to pay $5,000 a year essentially as a retainer for
20  work from that pharmacist, correct?
21  A.      Correct.
22  Q.      And the department continues to pay that
23  pharmacist; is that correct?
24  A.      I'm not sure about the payments.
25  Q.      By its terms, it calls for continued
```

www.huseby.com        Huseby, Inc. Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
Case 3:18-cv-01234   Document 1-24   Filed 11/02/18   Page 2 of 11 PageID #: 1098

Attachment 23

```
 1  payments of $5,000 a year?
 2  A.      Yes.  I'm not familiar, though.
 3  Q.      But that -- that pharmacist and that
 4  pharmacy contract is not the one that we're
 5  talking about -- let's call is Source B, all
 6  right?
 7  A.      Correct.
 8  Q.      So when you look at the -- we're jumping a
 9  little bit ahead, but when you look at the January
10  2018 protocol, that protocol called for Protocol A
11  and Protocol B, right?
12  A.      Correct.
13  Q.      So the 2014 contract went with Protocol A?
14  A.      It was available for Protocol A.  The
15  subsequent contract was also -- would have
16  included Protocol A.
17  Q.      And then Protocol B was what we're calling
18  Source B, right?
19  A.      Yes.
20  Q.      So the contract to do -- let's forget
21  about the pentobarbital.  When you had the second
22  protocol that involved midazolam, that would have
23  been Source B that we've talking about, right?
24  A.      Well, Source B also helped us try to
25  obtain pentobarbital.
```

www.huseby.com    Huseby, Inc. Regional Centers    800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
Case 3:18-cv-01234   Document 1-24   Filed 11/02/18   Page 3 of 11 PageID #: 1099

**Attachment 23**

1  that was -- you didn't have in there -- not "you,"
2  but the protocol did not have specific
3  instructions about what you do with compounded
4  drugs, because at that point it was drafted it was
5  anticipated that that was manufactured, correct?
6  A.      Well, when it was issued, we did have some
7  manufactured midazolam, so that was the intent at
8  the beginning. But, again, the contract was
9  written -- protocol was written broadly enough to
10 include either one.
11 Q.      But the protocol, when it addressed
12 Protocol B, it didn't specifically say that that
13 was to be compounded?
14 A.      No, it did not.
15 Q.      But, in fact, the decision -- the
16 department had made that decision in April of
17 2018?
18 A.      Yes. In April we learned that Source B
19 had located a source for the API for midazolam.
20 Q.      Okay. So did Source B just decide that
21 they wanted to use the -- do it compounded rather
22 than getting manufactured, or was manufactured no
23 longer available for some reason?
24 A.      It was no longer available.
25 Q.      And was it no longer available because the

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
Case 3:18-cv-01234   Document 1-24   Filed 11/02/18   Page 4 of 11 PageID #: 1100
Attachment 23

```
 1  manufacturer demanded that the department return
 2  whatever was on hand?
 3  A.     I understand they made that demand.
 4  Q.     It wasn't returned, was it?
 5  A.     No.
 6  Q.     So your understanding in April of 2018 was
 7  that Source B could no longer get manufactured
 8  midazolam?
 9  A.     Correct.
10  Q.     At that point you were aware -- you had
11  read the plaintiffs' amended complaint; is that
12  right?
13  A.     Yes.
14  Q.     So you knew that plaintiffs were not aware
15  that compounded was what was contemplated?
16  A.     Well, no, I can't say I was aware.
17  Q.     Did you focus on it?
18  A.     Well, I really didn't focus on it, but I
19  also can't speak to what was intended by the --
20  contemplated by plaintiffs' counsel.
21  Q.     Of course.  Of course.
22         You have been involved over time, though,
23  with litigation on the protocols, correct?
24  A.     Correct.
25  Q.     And West versus Schofield was -- it came
```

www.huseby.com     Huseby, Inc. Regional Centers     800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
Case 3:18-cv-01234   Document 1-24   Filed 11/02/18   Page 5 of 11 PageID #: 1101

Attachment 23

1   A.      That's correct.

2   Q.      And you're aware, as general counsel from
3   doing research, that from time to time incidents
4   happen during executions which require the defense
5   attorney to reach out to the courts to try to stop
6   it. Are you aware of that?

7   A.      Yes, I'm aware that has happened.

8   Q.      Okay. You're aware that Commissioner
9   Parker -- well, are you aware that Commissioner
10  Parker has entertained the possibility of having a
11  phone in there available for a defense attorney to
12  be able to use during the execution?

13  A.      I believe he has, yes.

14  Q.      Do you see any problem with having a phone
15  in there for the defense attorney?

16  A.      I do see some issues.

17  Q.      What issues?

18  A.      Yes. I mean, there's not to be any
19  photographing or recording. That's one. The
20  other would be interruption of an execution
21  without knowing sort of -- the Court not having
22  enough information to make a decision about what
23  would happen if an execution was stayed in the
24  middle of it.

25  Q.      But would you agree that if a lawyer is

www.huseby.com    Huseby, Inc. Regional Centers    800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
Case 3:18-cv-01234   Document 1-24   Filed 11/02/18   Page 6 of 11 PageID #: 1102

Attachment 23

```
 1  not permitted to have a phone to call the Court if
 2  a problem comes up, that the execution may go
 3  forward in a manner that would be
 4  unconstitutional?
 5  A.      Well, no, I'm not going to agree with
 6  that, but the attorney can leave and call the
 7  Court.
 8  Q.      Okay.  Well, are you familiar with the
 9  length of time that is estimated to conduct that
10  execution, from the beginning of when the
11  injection -- the drug is first pushed to when the
12  inmate is expected to be dead?
13  A.      Well, I mean, there are a number of
14  periods in that time.  You've got the beginning,
15  the push of the drugs, two-minute wait,
16  consciousness check, pushing the remainder of the
17  drugs, a five-minute wait, and then a physician
18  examining the body.  And only at that point is the
19  inmate declared deceased and execution is over.
20  Q.      I'm not going to ask you for precise
21  periods of time.  Would you agree that it's going
22  to vary from execution to execution?
23  A.      It could.
24  Q.      Would you agree that under the protocol
25  that the expectation is that the execution
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
Case 3:18-cv-01234   Document 1-24   Filed 11/02/18   Page 7 of 11 PageID #: 1103

**Attachment 23**

1  shouldn't take more than 15 minutes?  When you add
2  all that time up, it really shouldn't take more
3  than 15 minutes?
4  A.      Oh, I don't know, 15, 20, 25.  I'm not
5  sure.
6  Q.      Okay.  So would you agree that you've got
7  a pretty good distance through a number of locked
8  doors between the execution chambers and the
9  administration building where a lawyer could then
10 hopefully retrieve a phone and make a call?
11 A.      Yes.
12 Q.      And what you're counting on when you're
13 leaving the witness room as a lawyer, you would be
14 counting on the person at control to be able to
15 respond instantaneously to your push of the buzzer
16 to ask to pass through the door?
17 A.      Yes.
18 Q.      And the lawyer doesn't have any control on
19 how fast that's going to happen, right?
20 A.      No.
21 Q.      The distance that the lawyer would have to
22 walk to the administration building is, what, a
23 couple hundred yards, as the crow flies?
24 A.      Yeah, no more.
25 Q.      And have you kind of thought through how

www.huseby.com        Huseby, Inc. Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
Case 3:18-cv-01234   Document 1-24   Filed 11/02/18   Page 8 of 11 PageID #: 1104
Attachment 23

```
 1   many locked doors the lawyer would have to go
 2   through after the person at control has responded
 3   to the buzzer?
 4   A.      No.
 5   Q.      It's more than one, right?
 6   A.      More than one, yes.
 7   Q.      Okay.  Probably fewer than 10?
 8   A.      Oh, definitely.
 9   Q.      And there's a point at which they go
10   through essentially a sally port?
11   A.      Yes.
12   Q.      With the sally port, what that means is
13   you have to wait for one gate to open, you step
14   past that, that gate's got to close and you wait
15   for the next one to open; is that right?
16   A.      That's right.
17   Q.      There's only one of those that you have to
18   go through, correct?
19   A.      That's right.
20   Q.      But ultimately, the lawyer would get back
21   to the administration building to try to make that
22   phone call, right?
23   A.      Right.
24   Q.      But you're aware that the rule there at
25   TDOC is you have to leave your phone in your car,
```

www.huseby.com        Huseby, Inc. Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
Case 3:18-cv-01234   Document 1-24   Filed 11/02/18   Page 9 of 11 PageID #: 1105

Attachment 23

```
 1   correct?
 2   A.      That's right.
 3   Q.      So getting into the administration
 4   building isn't really going to help this lawyer
 5   who is now concerned about his or her client going
 6   through pain and suffering and needing to call the
 7   Court, right?  Because they're at the
 8   administration building, and they still don't have
 9   a phone.
10   A.      Right.  They would have to go to their car
11   to get their cell phone.  There's probably a phone
12   in the administration building that could be used,
13   though.
14   Q.      But if there's a phone in the
15   administration building that could be used, that's
16   not provided for in the protocol, is it?
17   A.      No.
18   Q.      The lawyer now is going off to his or her
19   car and that would be another 50 yards, 75 yards?
20   A.      I'm not sure how far out you'd be parking.
21   Q.      But you agree that it's going to take more
22   than five minutes to make that trek?
23   A.      Well, it could be five minutes.
24   Q.      And while that five minutes is passing --
25   let's say it is only five minutes.  If what has
```

www.huseby.com         Huseby, Inc. Regional Centers         800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
Case 3:18-cv-01234   Document 1-24   Filed 11/02/18   Page 10 of 11 PageID #: 1106

Attachment 23

1  prompted the lawyer to go to the car, to get the
2  phone, to call the Court, is seeing a man
3  straining against straps, gasping for air, that
4  that's five minutes potentially that the lawyer --
5  that the inmate is now left there gasping and
6  straining and suffering.
7      Would you agree with that?
8  A.  If what you're saying took place, yes.
9  Q.  It's a hypothetical. And you think --
10 strike that.
11     So when a lawyer gets to the car, the
12 lawyer will call the Court and try to get the
13 Court on the phone, right?
14 A.  I would assume that would be the
15 intention.
16 Q.  And then once the Court gets on the phone
17 and the Court -- let's assume, for the sake of
18 argument, that the Court decides to stop the
19 execution or instructs the lawyer to go convey the
20 message to TDOC officials that this execution
21 needs to stop, the lawyer's got to get back to the
22 administration building, right?
23 A.  Well, I assume the Court would contact the
24 commissioner.
25 Q.  We don't know that that's going to happen,

www.huseby.com    Huseby, Inc. Regional Centers    800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco
Case 3:18-cv-01234   Document 1-24   Filed 11/02/18   Page 11 of 11 PageID #: 1107
**Attachment 23**