## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **DAVID EARL MILLER** | ) | |
| **NICHOLAS TODD SUTTON** | ) | |
| **STEPHEN MICHAEL WEST** | ) | **No. _____** |
| **TERRY LYNN KING** | ) | |
| | ) | **Death Penalty Case** |
| **Plaintiffs** | ) | *Execution date Dec. 6, 2018* |
| | ) | *for David Miller* |
| **v.** | ) | |
| | ) | |
| **TONY PARKER, Commissioner,** | ) | |
| **Tennessee Department of Correction,** | ) | |
| **in his official capacity,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **TONY MAYS, Warden,** | ) | |
| **Riverbend Maximum Security** | ) | |
| **Institution, in his official capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MOTION FOR TEMPORARY RESTRAINING ORDER
## (AFTER NOTICE) AND/OR PRELIMINARY INJUNCTION

COME NOW Plaintiffs in the above matter and, pursuant to Rule 65, Fed. R.

Civ. P., move this Court to enter an order enjoining Defendants, their agents, and

assigns from carrying out the execution of Plaintiff David Earl Miller presently set

for the 6th day of December, 2018, from presenting Plaintiff Miller with that

"Affidavit Concerning Method of Execution" contained in Tennessee's July 5, 2018

Lethal Injection Protocol, and from setting execution dates for Plaintiffs Sutton,

West, and King until such time as a final order has been entered herein.

In support hereof, Plaintiffs would show to the Court (1) Plaintiffs' likelihood they will prevail on each of their constitutional causes of actions; (2) the irreparable harm to Plaintiffs' profound interests (and the public's profound interest) in enforcement of the highest law in the land if Defendants are allowed to proceed; (3) the irreparable harm to Plaintiffs' interest in being free from the infliction of cruel and unusual punishments if Defendants are allowed to proceed; (4) the harm to Plaintiff Miller's interest in being free from being compelled to waive his right to be free from the infliction of a cruel and unusual method of punishment, death by electrocution, in order to prevent the infliction of a more cruel and unusual punishment, death under Tennessee's July 5, 2018 Lethal Injection Protocol ("July 5, 2018 Protocol"); (5) the harm to Plaintiffs' right to access to the courts; and, (6) the harm to all Plaintiffs' rights to the processes afforded every other federal plaintiff under the Federal Rules of Civil Procedure and the Due Process under the Fifth and Fourteenth Amendments of the Constitution of the United States if Defendants are allowed to proceed far outweigh Defendants' non-existent interests in carrying out Plaintiff Miller's scheduled execution, and/or moving forward toward carrying out the execution of the remaining Plaintiffs, in a manner which violates the *ex post facto* clause of, and/or the Eighth and Fourteenth Amendments to the Constitution of the United States. *Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017).

In further support hereof, Plaintiffs submit the following Memorandum of Law.

**MEMORANDUM OF LAW**

## I.    Introduction

The truth about the three-drug Midazolam-based protocol was revealed during a hearing held in the Chancery Court for Hamilton County, Tennessee between July 9, 2018, and July 23, 2018. The mask from behind which the Tennessee Supreme Court faulted death penalty opponents for creating artificial shortages of more effective anesthetizing drugs[1] and Plaintiffs for failing to meet their *Glossip*-imposed responsibility to advise their executioners of a better way to end their lives[2] lies in shatters. Dr. David Greenblatt of Tufts University, a man who was at the heart of the seminal studies into the mechanism of action of Midazolam and its effects on the human body and is among the most published authors on those subjects in peer-reviewed journals, has put the lie to the notion that Midazolam in any dose does, or even can, render an inmate insensate to the pain created by the drugs used in three-drug Midazolam based lethal injection protocols. Indeed, the very expert upon which earlier courts relied to find otherwise (as they allowed execution after execution to go forward under such protocols) was forced to admit that Dr. Greenblatt' work (which he had cited as one of the primary bases for his opinion) did not support that opinion at all.

---

[1] *Abdur'Rahman v. Parker*, No. M2018-01385-SC-RDO-CV, __ S.W.3d. __, 2018 WL 4858002, at *6 (Tenn. Oct. 8, 2018).

[2] *Id.* at *22.

This is the truth about what will happen when Tennessee uses its July 5, 2018 three-drug Midazolam-base lethal injection protocol to execute Messrs. Miller, Sutton, West, and King. While they remain sensate to pain, Midazolam in the concentration and amount required under Tennessee's protocol will cause fluid to accumulate in their lungs and they will feel as if they are being drowned. Vecuronium bromide will then paralyze their lungs and they will feel as if they had been buried alive. They will still be sensate when potassium chloride is injected into their veins and they will experience a burning pain equivalent to "being burned alive from the inside." Finally, they will be sensate when, after all that, a sufficient amount of potassium chloride reaches their heart to cause a massive heart attack and they will remain sensate until their heart has been stopped long enough for their brains to be deprived of so much oxygen that their synapses can no longer fire. This will not last for seconds, or even just a couple of minutes. It will last for 18 minutes or more. This is the truth here. This is the truth revealed by the expert testimony credited by the Chancery Court of Hamilton County and left wholly undisturbed by the Tennessee Supreme Court.

When Defendants respond to this motion, they will not credibly claim otherwise. They will not credibly claim that Plaintiffs cannot prove that any of the alternative methods of execution set out in Plaintiffs' complaint are feasible and readily implemented methods of execution that in fact significantly reduces a substantial risk of severe pain than the 18-20 minutes of pain and suffering they fully intend to inflict on David Earl Miller, Nicholas Todd Sutton, Stephen Michael

4

West, and Terry Lynn King. In fact, they will not even credibly claim that the only method of execution which could have been inflicted on Plaintiffs at the time they committed their crime would create substantially less pain and suffering than the protocol they now intend to carry out.

Instead, they will point to the Tennessee Supreme Court's decision in *Abdur'Rahman v. Parker*, No. M2018-01385-SC-RDO-CV, __ S.W.3d. __, 2018 WL 4858002 (Tenn. Oct. 8, 2018) and note Plaintiffs Miller, Sutton, and West were parties to that decision. They will claim that – even though Mr. King was not even a party to that action and even though the claims pled here were not the claims Miller, Sutton, and West pled in their state court complaint – "equity" requires this Court to stand by and let them do exactly what they intend, to inflict 18-20 minutes of what has been repeatedly recognized as nothing less than torture.

They will be wrong. Equity does require this Court to afford preclusive effect to a judgment which purports to decide the constitutionality of the July 5, 2018 Protocol when Plaintiffs did not file, and were denied any opportunity to file, a complaint challenging the July 5, 2018 Protocol. Equity does not require this Court to afford preclusive effect to a judgment which purports to decide the constitutionality of July 5, 2018 Protocol, without hearing (in a constitutional sense) evidence offered only days after that protocol was adopted. Equity does not require this Court to afford preclusive effect to a judgment which changes evidentiary rules during the middle of an appeal and applies them retroactively to an already-completed hearing to exclude material evidence. Finally, equity does not require

5

this Court to afford preclusive effect to a judgment to which Plaintiffs were made party by the court over their express objection and without any basis under state law for the court to assert personal or subject matter jurisdiction. Put simply, equity does not require this Court to ignore the fact that Defendants intend to torture the Plaintiffs to this action simply because the court in *Abdur'Rahman* did so.

## II. Plaintiffs are Entitled to Temporary and Preliminary and Injunctive Relief.

Here, Plaintiffs seek a temporary restraining order (following notice to Defendants and an opportunity for them to be heard) and preliminary injunctive relief enjoining Defendants from presenting Plaintiff David Earl Miller with that Affidavit Concerning Method of Execution contained in its July 8, 2018 Protocol (R.1, Attachment 4, p. 92), from carrying out Plaintiff Miller's December 6, 2018 execution, and from otherwise moving forward with the executions of any of the Plaintiffs. In order to determine whether Plaintiffs are entitled to such relief, the Court must consider: (1) Plaintiffs' likelihood of success on the merits; (2) whether irreparable harm will occur absent injunctive relief; (3) whether substantial harm to others will flow from the proposed injunction; and (4) the broader public interest. *Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d at 622. Each of these factor weigh in Plaintiffs' favor.

6

### A. Plaintiffs are likely to prevail on the merits.

1. ***Abdur'Rahman v. Parker*, No. M201801385SCRDOCV, 2018 WL 4858002 (Tenn. Oct. 8, 2018) is entitled to no preclusive effect.**

Whether a prior state court judgment is afforded preclusive effect is to be determined by the effect of that judgment under state law. *Gutierrez v. Lynch*, 826 F.2d 1534, 1537 (6th Cir. 1987). Under Tennessee law, the doctrine of *res judicata*, bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit. *Creech v. Addington*, 281 S.W.3d 363, 376 (Tenn. 2009). Unlike *res judicata*, the related doctrine of collateral estoppel bars only the re-litigation of issues actually and necessarily reached in the prior judgment. *Vandercook, By Vandercook v. Radcliff*, No. 01A01-9406-CV-00250, 1994 WL 697918, at *2 (Tenn. Ct. App. Dec. 14, 1994); *Taylor Grp. v. ANR Storage Co.*, 24 F. App'x 319, 323 (6th Cir. 2001). Neither is applicable here.

#### a) *Res judicata*.

##### i. Plaintiff present claims which were not, and could not have been, presented in *Abdur'Rahman*.

Under *Creech*, the first question in determining whether Plaintiffs' claims are barred under the doctrine of *res judicata* is whether the three Plaintiffs who are

7

parties to *Abdur'Rahman*[3] raised (and/or could have raised) the same causes of actions in that matter as they raise here.

The question of what causes of action are raised here is a simple one and it is answered in a simple manner, by looking to the face of their complaint. First, they claim Tennessee's July 5, 2018 Protocol violates the e*x post facto* clause of the United States Constitution because it inflicts a harsher punishment than the maximum punishment they could have received at the time of their crime, death by electrocution. Complaint, R. 1, Count 1, p. 15. Second, they claim that death by electrocution, a punishment they cannot receive unless the July 5, 2018 Protocol is declared unconstitutional, violates the Eighth and Fourteenth Amendments to the United States Constitution. Complaint, R. 1, Count 2, p. 20. Third, they claim Tennessee's July 5, 2018 Protocol violates the Eighth and Fourteenth Amendments to the United States Constitution. Complaint, R. 1, Count 3, p. 61. Fourth, they allege forcing them to submit to a method of execution prohibited by the Eighth Amendment of the United States Constitution to avoid the infliction of an even harsher punishment prohibited by <u>both</u> the *ex post facto* clause <u>and</u> the Eighth and Fourteenth Amendments violates the Fourteenth Amendment, which prohibits the imposition of any punishment without due process of law. Complaint, R. 1, Count 4,

---

[3] Plaintiff King was not a party to *Abdur'Rahman. See Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 329 (1971) ("Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position.").

p. 118. Finally, they allege Defendants will deny them access to the courts even as the constitutional violations set out in Plaintiffs' first three counts are occurring. Complaint, R. 1, Count 5, p. 121.

The question of what causes of action Plaintiffs Miller, Sutton, and West raised in *Abdur'Rahman* should be determined in the same manner, by looking to their last amended complaint. In their last amended complaint, Plaintiffs Miller, Sutton, and West raised no claims whatsoever against the July 5, 2018 Protocol, nor could they have as it was filed on July 3, 2018, two days before the July 5, 2018 Protocol was adopted. Vol. XI, p. 1416.

Because they could not have challenged the July 5, 2018 Protocol before it was even adopted, the question follows whether they did raise their current claims, or could have raised their current claims, against the July 5, 2018 Protocol after it was adopted. The answer to this question requires the Court to look to the state court record. That record shows Plaintiffs Miller, Sutton, and West tried, but were prohibited, from raising any claims against the July 5, 2018 Protocol.

On July 9, 2018, counsel for Plaintiffs Miller, Sutton, and West stated to the trial court the July 5, 2018 Protocol was not the subject matter of the lawsuit. They requested they be afforded an opportunity to file an amended complaint asserting causes of action against the new July 5, 2018 Protocol and to be afforded due process on such causes of action. Miller, Sutton, and West stated, however, they had no objection to going forward with trial on the constitutionality of the January 8, 2018 Protocol because such a hearing would be capable of resolving factual disputes

9

common to the two protocols, thus serving the interests of judicial economy and recognizing the substantial interests of another Plaintiff, Billy Ray Irick, in developing evidence to use in support of a motion to stay his impending August 9, 2018, execution. TE Vol. XXIV, pp. 32-39. The Chancery Court did not rule upon Plaintiffs Miller's Sutton's, and West's motion and trial began on July 9, 2018.

Following trial, Miller, Sutton, and West repeated their request, this time in their motion to reconsider the Chancery Court's *sua sponte* order purportedly amending the pending complaint over these Plaintiffs' explicit objection under a state rule allowing a party to move to amend their pleadings to conform to the evidence presented at trial. They stated: (1) the claims against the July 5, 2018 Protocol were not properly before the court; (2) the court should resolve only those claims raised in their pending complaint; and, (3) due process demanded Plaintiffs Miller, Sutton, and West be allowed to file an amended complaint challenging the July 5, 2018 Protocol – including allegations regarding alternate methods of execution to replace Protocol A ("Option A") which the July 5, 2018 Protocol removed from the face of Tennessee's lethal injection protocol – and to have that complaint adjudicated in conformity with the requirements of basic due process. The court denied their motion, refusing to allow Miller, Sutton, and West to amend their complaint. Vol. XV, pp. 2141, 2145, 2148-49 n.7; Vol. XVI, pp. 2216-27. On appeal to the Tennessee Supreme Court, Miller, Sutton, and West limited their arguments to the constitutionality of the January 8, 2018 Protocol and specifically informed that court that the Chancery Court had not allowed them to raise claims

10

against the July 5, 2018 Protocol. Br. of Pl.-Appellants, *in passim*; *Abdur'Rahman*

*v. Parker*, No. M2018-01385-SC-RDO-CV; *id*. at p. 42 n.29. Each time they were

denied.

To the extent Plaintiffs' argument that the *Abdur'Rahman* court's decision is

not entitled to preclusive effect under the doctrine of *res judicata* (because the court

did not, and could not, have reached the claims presented here) implicates the

correctness of the judgment entered in that decision, the *Rooker-Feldman* doctrine

does not limit this Court's jurisdiction.

The *Rooker-Feldman* doctrine has been described thusly:

> "[T]he *Rooker–Feldman* doctrine prevents the lower federal courts from
> exercising jurisdiction over cases brought by 'state-court losers'
> challenging 'state-court judgments rendered before the district court
> proceedings commenced.' " *Id.* at 1199 (quoting *Exxon Mobil Corp. v.
> Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The doctrine
> applies "only when a plaintiff complains of injury from the state court
> judgment itself." *Coles v. Granville*, 448 F.3d 853, 858 (6th Cir.2006).
> "If the source of the injury is the state court decision, then the *Rooker–
> Feldman* doctrine would prevent the district court from asserting
> jurisdiction. If there is some other source of injury, such as a third
> party's actions, then the plaintiff asserts an independent claim."
> *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir.2006).
> Additionally, the *Rooker–Feldman* doctrine "does not prohibit federal
> district courts from exercising jurisdiction where the plaintiff's claim is
> merely a general challenge to the constitutionality of the state law
> applied in the state action, rather than a challenge to the law's
> application in a particular state case." *Hood v. Keller*, 341 F.3d 593,
> 597 (6th Cir.2003).

*Abbott v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007).

The first question under *Rooker-Feldman* is whether the federal complaint

challenges the state court judgment itself. Here it does not. The only issue even

marginally relevant to these proceedings actually reached by the state court is

whether the plaintiffs to the state court action (assumed, for the purposes of this argument, to include Plaintiffs) had demonstrated the availability and feasibility of the former Option A, the one-drug pentobarbital-based protocol.

> After our review of the record and applicable authority, we conclude that the inmates failed to carry their burden of showing availability of their proposed alternative method of execution—a one-drug protocol using pentobarbital—as required under current federal and Tennessee law. *For this reason*, we hold that the inmates failed to establish that the three-drug protocol constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution or article I, section 16 of the Tennessee Constitution. *This holding renders moot the majority of the other issues before us.*

*Abdur'Rahman, et al.,* 2018 WL 4858002 at *1 (emphasis added).

Here, Plaintiffs not only assert additional alternative methods of execution not considered by the state court, they re-assert the issue specifically left unresolved by the state court judgment, whether the pain and suffering created by the three-drug Midazolam-based protocol satisfies the first prong of the *Glossip v. Gross*, 135 S. Ct. 2726 (2015) inquiry. Accordingly, judgment could be entered in Plaintiffs' favor without disturbing the state court's judgment in any way.

> We conclude that the Rooker–Feldman doctrine does not apply. Thomas complains of injury resulting from alleged retaliation, not from the state court's judgment. Also, the only state-court judgment at issue here is the Ingham County Court's dismissal, for failure to pay the filing fee, of Thomas's action seeking review of his misconduct conviction. The state court never had occasion to determine any issues relevant to this case, as it never reached the merits. Moreover, Thomas can win his retaliation claim without invalidating any aspect of the state court's judgment. See DLX, Inc. v. Kentucky, 381 F.3d 511, 517 (6th Cir.2004) (rejecting Rooker–Feldman bar when the federal court could find for plaintiff without concluding that the state court decided any issue wrongly), cert. denied, 544 U.S. 961, 125 S.Ct. 1733, 161

12

L.Ed.2d 603 (2005). For all these reasons, the Rooker–Feldman doctrine does not bar Thomas's claim.

*Thomas v. Eby*, 481 F.3d 434, 438 (6th Cir. 2007).

Moreover, *Rooker-Feldman* would not apply even if Plaintiffs' complaint could be viewed as an attack on the Tennessee Supreme Court's decision. To the extent the judgment rendered in *Abdur'Rahman, et al. v. Parker, et al.*, No. M2018-01385-SC-RDO-CV, Tennessee Supreme Court (Tenn. October 8, 2018) purports to adjudicate the constitutionality of the new July 5, 2018 Protocol (as to Miller, Sutton, and West) on the basis of the Chancery Court's Rule 15.02 order, it is void. Each of these Plaintiffs explicitly objected both before and after trial to the state court's consideration of the July 5, 2018 Protocol on due process grounds. TE Vol. XXIV, pp. 32-39; Vol. XV, pp. 2141, 2145, 2148-49 n.7.

Notwithstanding Plaintiffs' explicit objection, the trial court *sua sponte* ordered the state court plaintiffs' Second Amended Complaint to be amended to include the new protocol under Tenn. R. Civ. P. Rule 15.02,[4] apparently even as to the Plaintiffs here. On appeal, the Tennessee Supreme Court, without acknowledging Plaintiffs' repeated objections, affirmed.

---

[4] Tenn. R. Civ. P. Rule 15.02 provides, in the pertinent part, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to conform to the evidence and to raise these issues *may be made upon motion of any party . . .*" (emphasis added.) *See also*, *In re Tawanna H.*, 223 Wis. 2d 572, 581, 590 N.W.2d 276, 280 (Ct. App. 1998) (Juvenile defendant denied due process by trial court's *sua sponte* post-trial amendment of allegations of delinquency to conform to the evidence).

13

The trial court, however, lacked jurisdiction to decide claims related to the July 5, 2018 Protocol because they were not pled in Plaintiffs' Second Amended Complaint. Moreover, as to the Plaintiffs in this action, it could not obtain such jurisdiction under Tenn. R. Civ. P Rule 15.02 because (a) the plain language of Rule 15.02 does not permit a trial court to *sua sponte* amend the pleadings before it over the objection of the party whose pleading it purports to amend; and, more importantly, (b) even if the practice was allowed under state law, it nonetheless violates Plaintiffs' rights to due process. Moreover, to the extent that the Tennessee Supreme Court upheld the Chancery Court's assumption of jurisdiction on other grounds without addressing the jurisdictional issue, the *Rooker-Feldman* doctrine does not bar reconsideration of that decision in federal court.

Very nearly the identical situation was extensively discussed by the Fifth Circuit Court of Appeals in *Burciaga v. Deutsche Bank Nat'l Tr. Co.*, 871 F.3d 380 (5th Cir. 2017). There, Deutsche Bank filed a foreclosure action in state court against two Texas homeowners and judgment was granted in the bank's favor. After judgment was entered, the homeowners filed a motion to vacate the foreclosure order and to reopen the case and the motion was granted. *Id.* at 382-83. Deutsche Bank sought no review of this decision. The homeowners then filed suit against Deutsche Bank for trespass to try title and other state remedies. Deutsche Bank removed the suit to federal court and filed a counterclaim seeking declaratory judgment, quiet title and judicial foreclosure. The court entered summary judgment in favor of the bank. *Burciaga,* 871 F.3d 383. On appeal, the homeowners claimed

14

*Rooker-Feldman* deprived the federal court of jurisdiction to overturn the state court's order granting the homeowners' motion to reopen and setting aside the bank's prior foreclosure.

In resolving the issue, the Fifth Circuit first observed that Deutsche Bank was indeed asking the federal court to overturn the state court decision. *Id.* at 385. Nonetheless, it found *Rooker-Feldman* did not deprive the federal court of jurisdiction to do so. Looking to state law, the court observed Texas law did not permit a foreclosing court to reopen a prior foreclosure decision. It further found the state court's attempt to do so void. *Id.* at 386. Regarding the application of *Rooker-Feldman*, the court observed:

> Second, the Vacating Order is void under Texas Law, and we have said that *Rooker-Feldman* does not preclude review of void state court judgments. *See United States v. Shepherd*, 23 F.3d 923, 925 (5th Cir. 1994) (observing that the *Rooker–Feldman* doctrine would likely not bar federal court review of void state court judgments, although it would still preclude jurisdiction to review voidable state court judgments); see also *Truong* [*v. Bank of Am., N.A.*, 717 F.3d 377, 383 n.3 (5th Cir. 2013) (citing *Shepherd* for the proposition that "*Rooker–Feldman* prohibits a district court from voiding state foreclosure judgments, notwithstanding claims that the judgments were fraudulently procured" (emphasis added)); *Mosley v. Bowie Cty. Tex.*, 275 Fed.Appx. 327, 329 (5th Cir. 2008) (unpublished) (citing *Shepherd* for the proposition that, "[u]nder some circumstances, a federal court may review the state court record to determine if the judgment is void")

*Id.* at 385

Under Tennessee law, a judgment rendered upon matters outside of the pleading is void. *Lovelace v. Copley*, 418 S.W.3d 1, 19 (Tenn. 2013). Like the order granting the homeowners motion to reopen in *Burciaga*, the Chancery Court's

judgment rendered upon the July 5, 2018 Protocol (which was not, and could not have been added to the pleadings by the court as to these Plaintiffs after the close of evidence) was void. Moreover, because the Tennessee Supreme Court failed to consider whether Tenn. R. Civ. P. Rule 15.02 granted the trial court jurisdiction to consider claims not raised by these Plaintiffs over their explicit objection, this Court may, indeed it must, determine in the first instance whether the plain language of the rule, interpreted consistent with the due process clause of the 14th Amendment, confers such jurisdiction. *See Burciaga v. Deutsche Bank Nat'l Tr. Co.*, 871 F.3d at 385-387 (construing Texas law). It does not. *See*, *infra* at footnote 4.

> **ii.    The judgment rendered in *Abdur'Rahman* regarding the constitutionality of Tennessee's July 5, 2018 is not entitled to preclusive effect as to Plaintiffs Miller, Sutton, and West because they were not afforded a full and fair opportunity to present claims challenging the July 5, 2018 Protocol.**

While *res judicata* bars both claims actually presented, and those which could have been presented, in an earlier action, it does so only when the Plaintiff has been afforded a full and fair opportunity to present them. *Mangrum v. Wal-Mart Stores, Inc.*, 950 S.W.2d 33, 36 (Tenn. Ct. App. 1997). Plaintiffs Miller, Sutton, and West were afforded no such opportunity in *Abdur'Rahman*. Here, regardless of whether the Tennessee state courts determine the trial court had the power to force Miller, Sutton, and West to litigate the unpled issue of the constitutionality of the July 5, 2018 Protocol over their explicit objection, forcing them to do so four days after it

16

was adopted denied them an opportunity to be heard, *i.e.*, it denied them a full and fair hearing.

Miller's, Sutton's, and West's state court action was initiated when, on January 8, 2018, Defendant Tony Parker, the Commissioner of the Tennessee Department of Correction, issued a new execution protocol. Among other changes, the January 8, 2018 Protocol contained two options for carrying out a lethal injection. The first, Protocol A ("Option A"), was materially identical to the one-drug pentobarbital protocol contained in Tennessee's prior protocol. The second, Protocol B, was a new three-drug protocol utilizing Midazolam, vecuronium bromide, and potassium chloride. Vol. II, p. 141. Plaintiffs, and other Tennessee death row inmates, filed a complaint for declaratory judgment on February 20, 2018. The complaint raised a facial challenge to the new protocol. It alleged, *inter alia*, the new Protocol B (three-drug Midazolam protocol) ("Option B") violates the Eighth and Fourteenth Amendments to the United States Constitution. It also alleged Option A (the one-drug pentobarbital protocol the State had retained from its prior protocol) had been upheld as constitutional by the Tennessee Supreme Court and was a "known and available alternative method of execution" under *Glossip v. Gross*, 135 S. Ct. 2726 (2015).

Both Option A and Option B appeared on the face of Tennessee's protocol. Under Tennessee law, for the purposes of a facial challenge, a protocol is assessed on its face. Evidence to the contrary is irrelevant to the constitutionality of the protocol. *West v. Schofield*, 460 S.W.3d 113, 126 (Tenn. 2015) ("The Protocol must be

17

assessed on its face against the constitutional challenges levied by the Plaintiffs."). Plaintiffs' pled alternative, Option A, the one drug protocol, continued to appear on the face of Tennessee's protocol until October 5, 2018, four days before trial.

On October 5, 2018, Defendants adopted a new protocol. Unlike the January 8, 2018 Protocol, Option A did not appear on the face of the July 5, 2018 Protocol. Despite their request made before the start of trial, as outlined above, Plaintiffs were afforded neither the time, nor the process to pursue claims against a protocol which did not, as did the January 8, 2018 Protocol challenged in the complaint, contain on its face a constitutional alternate method of execution.

Instead, the trial court went forward with trial on Plaintiffs' complaint alleging the unconstitutionality of the January 8, 2018 Protocol and, after the evidence was closed, announced that what would actually be decided was the constitutionality of the July 5, 2018 Protocol.

For over 200 years, notice and an opportunity to be heard have been the *sine qua non* of due process. Its purpose is to afford a person from whom life and liberty are sought the opportunity to gather together the information necessary to defend themselves. *See Hagar v. Reclamation Dist. No. 108*, 111 U.S. 701, 708 (1884). As the Sixth Circuit has recognized, forcing a party to go to trial only days after the opposing party's conduct had imposed the burden of rebutting new defenses or claims constitutes a denial of due process. *N.L.R.B. v. Homemaker Shops, Inc.*, 724 F.2d 535, 548 (6th Cir. 1984) ("Company Counsel had only the period of Labor Day weekend in which to examine and investigate the new allegation, and to locate,

interview and secure the attendance of potential witnesses."); s*ee also Craddock v. Colorado State Bd. of Assessment Appeals*, 819 P.2d 1100, 1102 (Colo. App. 1991) (Due process requires opportunity for Plaintiff to evaluate and challenge new facts where opposing party altered facts three days prior to hearing.). Here, Defendants changed the face of the January 8, 2018 Protocol on the eve of the trial of its facial constitutionality to remove Plaintiffs' pled alternative. After the trial was complete, after it had ignored Miller's, Sutton's, and West's request to allow them to file an amended complaint challenging the new protocol, after it ignored their objection to going forward with a hearing on anything other than the January 8, 2018 Protocol, and after Plaintiffs' case in chief was closed, the Chancery Court announced that Plaintiffs had actually just finished a hearing on the July 5, 2018 Protocol adopted four days before trial. The process afforded in *Abdur'Rahman*did not afford Miller, Sutton, and West a full and fair opportunity to present the claims they present here.

### b)    *Collateral estoppel*

Under *Vandercook*, collateral estoppel bars only the re-litigation of those issues actually presented and decided in the prior action. Miller, Sutton, and West present no such issues here. In denying relief on Miller's, Sutton's, and West's Eighth Amendment challenge to Option B of the January 8, 2018 Protocol in *Abdur'Rahman*, the Tennessee Supreme Court determined <u>only</u> that the Plaintiffs had not demonstrated the availability of Option A, the one-drug pentobarbital-based lethal injection protocol appearing on the face of the January 8, 2018

19

Protocol. Here, Plaintiffs allege other feasible and readily implemented methods of execution that in fact significantly reduces a substantial risk of severe pain. They allege new facts not presented in *Abdur'Rahman* demonstrating the availability of pentobarbital. They allege additional facts in support of their Eighth Amendment claims based upon the manner in which Tennessee will apply the July 5, 2018 Protocol.

The doctrine has no applicability here.

### 2. It is likely Plaintiffs' can demonstrate the merit of each count alleged in their complaint.

#### a) Plaintiffs' First Count, violation of the ex post facto clause.

"It is settled, by decisions . . . so well known that their citation may be dispensed with, that any statute . . . which makes more burdensome the punishment for a crime, after its commission . . . is prohibited as *ex post facto*. *Beazell v. Ohio*, 269 U.S. 167, 169–70 (1925). It is likely Plaintiffs can establish the July 5, 2018 Protocol creates a substantial risk Plaintiffs will experience severe pain and suffering during their execution for a period of time many times longer than they would experience the severe pain and suffering created by the means of execution at the time of their crimes. Accordingly, it is likely they will prevail on their First Count.

The likelihood Plaintiffs can establish the 18-20 minutes of pain and suffering created by the July 5, 2018 Protocol flows from the fact the Chancery Court in *Abdur'Rahman* (even as it was holding the plaintiffs in that action had

failed to demonstrate the availability of pentobarbital) credited the testimony of those plaintiffs' experts regarding the three-drug Midazolam-based lethal injection protocol. And rightly so, as it included testimony from one of the most-respected experts in the mechanism of action, and effect, of Midazolam in the human body in the world, Dr. David Greenblatt; a detailed explanation of the biochemical processes associated with Midazolam compared to those of the barbiturates previously used for lethal injection; and, testimony describing the types of injuries inflicted by the drugs used in the July 5, 2018 Protocol and the pain associated with those injuries. Moreover, it contained the admission of the state expert witness whose testimony was credited by the district court in *Glossip* that one of the primary studies upon which he had relied did not support his opinion.

Dr. Greenblatt graduated from Harvard Medical School in 1970.TE Vol. XXVIII, p. 471; Greenblatt *Curriculum Vitae*, Ex. 38, Vol. V, p. 628. In 1979 he joined the faculty at Tufts University School of Medicine. [5] There he has taught and done research in clinical pharmacology for the 39 years. TE Vol. XXVIII, pp. 473-74; Ex. 38, Vol. V, p. 628. He is licensed to practice and board certified in clinical pharmacology. TE Vol. XXVIII, p. 474. Currently, he holds the position of Louis Lasagna Professor of Pharmacology and Experimental Therapeutics at Tufts University School of Medicine. Ex. 38, Vol. V, p. 628; TE Vol. XXVIII, p. 474-75. Dr.

---

[5] Counsel for Plaintiffs acknowledges that substantial credit for the descriptions of the *Abdur'Rahman* record contained at pages 21-33 of Plaintiffs motion must go to state court counsel for the Abdur'Rahman plaintiffs to that action.

Greenblatt has published more than 775 original research articles in peer-reviewed journals, including at least 200 on the benzodiazepine class of drugs and 30 on research specifically on Midazolam. TE Vol. XL, pp. 1534-35; Ex. 38, Vol. V, pp. 631-87. He has been editor in chief for The Journal of Clinical Psychopharmacology and Clinical Pharmacology in Drug Development, and a board member of many other scientific and medical research journals. TE Vol. XXVIII, p. 476; Ex. 38, Vol. 5, p. 630. In 1985, Dr. Greenblatt co-authored the article entitled "Midazolam: Pharmacology and Uses." Which reviewed the research on Midazolam at that time, including the research that was done in preparation to submit Midazolam for FDA approval. Ex. 40, Vol. 5, p. 711. It has been cited more than 1000 times. In addition, he was part of a group of researchers that developed a method for measuring levels of Midazolam in plasma in the early 1980's, TE Vol. XXVIII, p. 480, and participated in a number of studies of the drug including factors that influenced how it is distributed, metabolized, and cleared in the body. TE Vol. XXVIII, p. 481. He is, in short, one of the foremost experts on Midazolam in the entire world.

His testimony, which was credited by the Chancery Court and left undisturbed by the Tennessee Supreme Court in *Abdur'Rahman*, was unequivocal. Midazolam in any amount will neither prevent the pain created by Tennessee's three-drug Midazolam-based protocol from reaching Plaintiffs' brains, nor will it prevent their brains from experiencing that pain once it gets there. Every expert opinion claiming otherwise, including, specifically, the expert opinions relied upon

the district court in *Glossip* in reaching its decision, a decision which the Supreme Court credited in its opinion in *Glossip*, were, to put it bluntly, false.

Dr. Greenblatt testified Midazolam induces sedation (sleep) by increasing the frequency of the opening of the chloride channel in brain cells called GABA Receptors. He stated the effect is innately limited because the channel can only open so frequently. TE Vol. XXVIII, p. 499. Midazolam <u>only</u> alters the frequency of the opening of the chloride channel, it has no effect on how long the channel remains open. TE Vol. XXVIII, p. 493. The physical limitation of the frequency of the opening of the chloride channel in turn places a ceiling on the number of calming chloride ions that Midazolam can cause to enter the brain. He testified that the physical limitation of the operation of Midazolam in humans – the increased frequency of the pulsatile opening of the chloride channel in brain cells – and the consequent ceiling effect is the reason that Midazolam is not used by itself to induce general anesthesia in medical settings. TE Vol. XXVIII, p. 496. It is not capable of creating a state where a person would not awaken when painful sensations reach their brain. Critically, Dr. Greenblatt also testified Midazolam does nothing to prevent painful sensations from reaching the brain. TE Vol. XXVIII, p. 498.

Dr. Greenblatt testified that the injection of vecuronium bromide and potassium chloride would cause horrible pain. As a paralytic it has no effect on consciousness, so it does not render a person unaware of its effects. TE Vol. XXVIII, p. 508. "[B]asically you're suffocating and you want to breathe, but you can't because you can't work your muscles." TE Vol. XXVIII, p. 510. He added that

23

potassium chloride, the last chemical in the protocol, is "extremely painful" when injected in the concentration of solution called for under the protocol. TE Vol. XXVIII, p. 509. He stated he has injected potassium chloride in a clinical setting and said it has to be diluted "tremendously" and administered "very slowly. You cannot give a fast injection of high concentration [of potassium chloride] because it's terribly painful." TE Vol. XXVIII, p. 510. Dr. Greenblatt's ultimate opinion was that, due to Midazolam's inability to induce general anesthesia at any dose, and its complete lack of analgesic properties, the 500mg injection called for in the Tennessee lethal injection protocol would not render a person insensate to "extremely painful" effects of the injections of vecuronium bromide and potassium chloride called for by the protocol. TE Vol. XXVIII, p. 511.

In addition to describing Midazolam's ineffectiveness and the pain inmates would feel as a result of the lethal injection administered under the July 5, 2018 Protocol, Dr. Greenblatt explained how the use of Midazolam in the manner prescribed under the protocol would cause additional pain and suffering above and beyond that caused by vecuronium bromide and potassium chloride. He stated that in order to make Midazolam soluble in solution for purposes of injection, its pH had to be adjusted down to 3.5, the pH of strong acid. TE Vol. XXVIII, p. 495. After it is injected, the human circulatory system naturally buffers the pH of the solution to the normal 7.4. With clinical doses, this buffering process happens rapidly. TE Vol. XXVIII, p. 528-29. However, an injection as large as that called for in the Tennessee lethal injection protocol (500 mg) will take longer to buffer requiring a number of

24

complete circulations, each requiring approximately 60 seconds. TE Vol. XXVIII, p. 546. Upon venous injection in the arm, the half-liter of solution called for in the Tennessee lethal injection protocol would travel first to the heart and then directly to the lungs. TE Vol XXVIII, p. 541. When the 3.5 pH solution reaches the lungs, the effect is profound. As Dr. Greenblatt explained, the tissue in the lining of the lungs is "very delicate." A half-liter of pH 3.5 acid would immediately damage that thin tissue. Fluid from the blood stream would immediately begin to leak through the alveoli, causing pulmonary edema and making it increasingly difficult for Plaintiffs to breathe. TE Vol. XXVIII, pp. 541-42.

Dr. Greenblatt's testimony was confirmed and illuminated by Plaintiffs' other expert witnesses.

Dr. Craig W. Stevens, a Professor of Pharmacology from Oklahoma State University. TE Vol. XXIV 72-165; Curriculum vitae, Ex. 4, Vol. 3, pp. 319-32, also testified on Plaintiffs' behalf. Dr. Stevens received his Ph.D. from the Mayo Graduate School of Medicine. TE Vol. XXIV, p. 73; Ex. 4, Vol. 3, p. 319. He has published over one-hundred peer-reviewed articles, book chapters and reviews and is the co-author of the textbook, "Pharmacology," which is presently in its 5th Edition. TE Vol. XXIV, pp. 74-75; Ex. 4, Vol. 3, p. 329. His primary area of research is neuropharmacology, the study of how drugs affect the brain. TE Vol. XXIV, pp. 74-75. His testimony confirmed Dr. Greenblatt's description of the mechanism of action of Midazolam and its limitations. In addition, he described the difference between Midazolam and barbiturates, the class of drugs used for lethal injection

prior the adoption of Midazolam as the first drug in the three-drug lethal injection protocols.

Barbiturates have two different mechanisms of action at the GABA receptor. First, unlike Midazolam, they work with GABA and increase the duration that the ion channel remains open. Second, they work independently of GABA to open the ion channel. TE Vol. XXIV, pp 108-09. Their first mechanism of action lets in more chloride ions and has a greater calming effect than does Midazolam's mechanism of action. TE Vol. XXIV, p. 107. Their second mechanism of action also allows for the increased flow of chloride ions, but even without the presences of GABA, making them much more potent than benzodiazepines. TE Vol. XXIV, pp. 107-10. Barbiturates, however, have a third mechanism of action unconnected to the GABA receptor. They block glutamate, an excitatory neurotransmitter, from binding to glutamate receptors which transmit pain to the brain. TE Vol. XXIV, p. 111; *Neurotransmitters, Receptors and Effects on Neurons*, Ex. 10, Vol. 3, p. 354. This third mechanism of action, actually blocking pain, makes barbiturates much more powerful than Midazolam. TE Vol. XXIV, p. 111. According to Dr. Stevens, barbiturates, if given in sufficient quantity, with their three mechanisms of action, can bring a person to a plane of general anesthesia, or even into a coma. TE Vol. XXIV, pp. 115, 125. Midazolam and other benzodiazepines, with their limited mechanism, cannot do so. TE Vol. XXIV, pp. 115, 125.

Like Dr. Greenblatt, Dr. Stevens concluded, to a reasonable degree of scientific certainty, that Tennessee's three-drug protocol would cause "severe pain

and terror." TE Vol. XXV, p. 160. He explained that Midazolam was incapable of rendering an inmate insensate to pain, and thus inmates would suffer suffocation, and chemical burning. TE Vol. XXV, pp. 160-61. Midazolam is also incapable of rendering the inmate insensate to pulmonary edema. TE Vol. XXV, pp. 161-62.

Also like Dr. Greenblatt, he explained how vecuronium bromide is a muscle paralytic. TE Vol. XXV, p. 153. He further explained, pharmacologically, how vecuronium causes paralysis and how in human beings it causes progressive paralysis: "it starts with the smaller facial muscles, works its ways eventually to the skeletal muscles that…make our hands, arms and fingers move, and eventually goes to the more internal muscles like the diaphragm and the intercostal muscles that help you breathe." TE Vol. XXV, pp. 154-55. At sufficient doses, respiration will cease. TE Vol. XXV, p. 155. He added that if a person were not in a "state of general anesthesia, and you're using vecuronium, it can be quite horrific." TE Vol. XXV, p. 155. Midazolam is not capable of rendering the inmate insensate to suffocation, caused by the paralysis of the lung muscles. TE Vol. XXV, pp. 156-57. Finally, he confirmed Dr. Greenblatt's conclusion that, due to the ineffectiveness of Midazolam, an inmate injected with potassium chloride in the amount and concentration called for by the July 5, 2018 Protocol will suffer extreme pain. TE Vol. XXV, pp. 158-60.

The Plaintiffs' third expert credited by the Chancery Court was Dr. Mark Edgar, a diagnostic pathologist and associate professor of pathology at Emory University. TE Vol. XXXIX, pp. 1380-82; *Curriculum vitae* Ex. 116, Vol. 11, pp. 1630-45. Dr. Edgar received his M.D. from Dalhousie University in Halifax, Nova

27

Scotia, and underwent specialty training in neuropathology at Harvard Medical School. TE Vol. XXXIX, p. 1380; Ex. 116, Vol. 11, pp. 1630-45. Before joining the faculty at Emory, Dr. Edgar taught diagnostic surgical pathology at Cornell Medical School and worked at Sloan Kettering Cancer Center. TE Vol. XXXIX, pp. 1381, 1388. Dr. Edgar testified that he reviewed twenty-seven autopsies of inmates executed using Midazolam. TE Vol. XXXIX, pp.1386, 1455.

Dr. Edgar testified that all of the lungs were heavy. He stated, "There were none of them that were what I would expect, in the 350 to 400 grams range. But in addition to that, they all showed – not all but the majority of them, over 85 percent of them showed pulmonary edema. And that's certainly not expected in someone who dies instantaneously. And a good number of them showed fulminant pulmonary edema, which indicates it's sudden and severe." TE Vol. XXXIX, pp. 1391-93. He went on to describe the progression of pulmonary edema as fluid continues to accumulate in the lungs [as Dr. Greenblatt testified it would be due to the use of Midazolam in the concentration and volume required under the July 5, 2018 Protocol]. "[P]ulmonary edema, when it begins, the patients are short of breath. And they feel like they can't catch their breath, and they breathe a bit faster." TE Vol. XXXIX , p. 1394. He continued "As it gets worse, they may have the sense of air hunger and be gasping for air." TE Vol. XXXIX, p. 1394-95. Dr. Edgar testified that the pulmonary edema seen at autopsy would have caused the inmate distress and suffering. TE Vol. XXXIX, p. 1468. Further, his review of the autopsies indicated that the edema began some period of time before the inmates ceased to

28

breathe—i.e. before the paralytic took effect—indicating that the Midazolam itself is the likely cause of the edema.

Plaintiffs' fourth expert was Dr. David Lubarsky. Dr. David Lubarsky is Chief Executive Officer of UC Davis Health. He is also Vice Chancellor for Human Health Sciences at UC Davis. TE Vol. XLII, p.1718. He oversees the School of Medicine, School of Nursing, UC Davis Medical Center, and Primary Care Network. TE Vol. XLII, p. 1718; http://www.ucdmc.ucdavis.edu/leadership/index.html (last checked November 3, 2018). Prior to assuming his new position at UC Davis, Dr. Lubarsky was a tenured professor at the University of Miami where he served for 16 years in a number of roles, including chair of the Department of Anesthesiology. TE Vol. XLII, p. 1718; Lubarsky *Curriculum vitae,* Ex. 130, Vol. 14, p. 2017. At the time that Dr. Lubarsky accepted his position at UC Davis his primary academic appointment was Chief Medical and Systems Integration Officer, University of Miami Health System and Emanuel M. Papper Professor and Chairman Department of Anesthesiology, Perioperative Medicine and Pain Management, Professor of Anesthesiology with tenure, University of Miami Leonard M. Miller School of Medicine. Ex. 130, Vol. 14, p. 2017.

Dr. Lubarksy began his professional career at Duke University. At Duke, he advanced to Vice Chairman and tenured professor in the Department of Anesthesiology. TE Vol. XLII, p. 1721; Ex. 130, Vol. 14, p. 2018. There, he worked alongside Dr. Jerry Reves and Dr. Peter Bailey. TE Vol. XLII, p. 1721. Dr. Reves (who co-authored the classic research article on Midazolam with Dr. Greenblatt,

*Midazolam: Pharmacology and Uses*, 62 Anesthesiology 310 (1985)) and Dr. Lubarsky worked "very closely for a decade or so." TE Vol. XLII, p. 1721. He described Dr. Reves, Dr. Greenblatt's co-author, as "an extremely profound and advanced thinker … and did a lot of development around Midazolam[.]" TE Vol. XLII, p. 1722.

Dr. Lubarsky is the author of eight books on anesthesiology and co-wrote the chapter on Intravenous Anesthetics in several editions of *Miller's Anesthesia*, along with Dr. Reves and Peter Glass. TE Vol. XLII 1727. *Miller's Anesthesia*, a two-volume treatise, is considered the "definitive textbook" in anesthesiology. TE Vol. XLII, p. 1725. He has published 116 peer-reviewed journal articles, including publications in the top journals in the field of anesthesiology. TE Vol. XLII, pp. 1734-35. He serves on numerous editorial boards for journals in his field, has given more than 300 invited international presentations, has served as an officer in professional organizations in his field, has conducted research in the field of anesthesiology, and has received numerous professional accolades. TE Vol. XLII, pp. 1735-39; Ex. 130, Vol. 14, p. 2018-68. Finally, he is also certified in pain management. TE Vol. XLII, p. 1746.

Dr. Lubarsky testified he has used Midazolam in his practice and is familiar with its strengths and weaknesses and stated "[Midazolam] is one of the most studied, most understood drugs in the anesthesia [armamentarium] of drugs, because we know a lot about its receptors, the drugs, it's an agonist, its impact on single neurons as well as [whole] organisms. There's no debate about Midazolam at

all nor has there been for many years since – Dr. Greenblatt actually did a lot of the elucidating work on the drug." TE Vol. XLII, p. 1742. He testified Midazolam has no pain relieving properties. Midazolam cannot be used as a general anesthetic. After confirming the science described by Drs. Greenblatt and Stevens, Dr. Lubarsky went on to explain that there are "a known set of chemicals that work in opposition to GABA. So epinephrine, dopamine, serotonin, there's a bunch of neurotransmitters that are excited [by stimuli.]" TE Vol. XLII, p. 1753. Noxious stimuli will activate these excitatory neurotransmitters. "[T]he brain gets a signal wherever it is in the body and it says I'm going to fire some exciting stuff and it's going to overcome the inhibitory neurons … our job as anesthesiologists is to make sure that the inhibitory neurons are … the ones that are predominantly there." TE Vol. XLII, p. 1753. He testified that Midazolam is "absolutely not" the type of drug that can prevent a person from being roused by pain if it is the only drug being used. TE Vol. XLII 1755. "[T]his has been established in the literature." TE Vol. XLII, p. 1755. "Indeed, the scientific literature establishes that "people respond to noxious stimuli when they have just Midazolam on board. It is not a debatable point." TE Vol. XLII, p. 1756. Dr. Lubarsky testified specifically, "It will not make someone insensate and unresponsive to noxious stimuli." TE Vol. XLII, p. 1810.

Dr. Lubarsky also testified about the pain which would be experienced by a sensate inmate subjected to the three-drug Midazolam-based lethal injection protocol set out as Protocol B of the January 8, 2018 Protocol. Vecuronium bromide does not alter or enhance the mechanism of action of Midazolam. TE Vol. XLII, p.

1817. It does not protect the inmate from sensing noxious stimuli. Rather, "it paralyzes you and prevents anyone from seeing any sign of distress that you might voice or move or try to express." TE Vol. XLII, p. 1821. Vecuronium Bromide acts as a stimulus and increases the risk of pain. TE Vol. XLII, p. 1821. He described the effect of the administration of Vecuronium Bromide to a person who was not in a plane of general anesthesia as, "[L]ike burying someone alive. They lose the ability to communicate their distress. They lose the ability to breathe. They still have the air hunger. It's as if you're basically locked in a box and someone now has basically covered your mouth and you can't [breathe] and your lungs and your brain are screaming. TE Vol. XLII, p. 1774. As for the Potassium Chloride, Dr. Lubarsky testified he has observed that the administration of extremely small amounts of the drug "cause a patient to scream out in pain," TE Vol. XLII, p. 1776, and that administration of the massive amount of Potassium Chloride called for in Tennessee's protocol will be "akin to being burnt alive." TE Vol. XLII, p. 1776. Dr. Lubarsky testified that he agreed with Dr. Greenblatt and Dr. Edgar's opinion that Midazolam appears to be caustic to the pulmonary lining resulting in pulmonary edema. TE Vol. XLII, p. 1813. Dr. Lubarsky has attended patients with pulmonary edema. Dr. Lubarsky opined that severe pulmonary edema is a noxious stimulus that would rouse a deeply sedated inmate. "You feel like you can't draw breath." TE Vol. XLII, p. 1822.

Though unnecessary to establish a likelihood of success given the Chancery Court heard both sides' experts and credited Plaintiffs' experts, the record from

*Abdur'Rahman* demonstrates that Roscoe Lee Evans, the witness upon whose opinion the vast majority of cases upholding the three-drug Midazolam-based protocol has either directly or indirectly relied, including *Glossip*, was forced to retreat from his prior opinions. He admitted Midazolam is not an analgesic. TE Vol. XLV, p. 2148. He admitted that *Miller's Anesthesia* is an authoritative text and that it teaches that "benzodiazepines lack analgesic properties and must be used with NSAID drugs to provide sufficient analgesics." TE Vol. XLV, p. 2157. Evans admitted that Dr. Greenblatt is the one of the leading scholars in the area of benzodiazepines in the country. TE Vol. XLV, p. 2168. (Dr. Greenblatt's research is the research which establishes that Midazolam has a ceiling effect. Ex. 40, Vol. V, pp. 711-25.) Evans did not challenge Dr. Greenblatt's research and methodology, instead he deferred to it. TE Vol. XLV, p. 2168. Finally, he admitted that the only study he had offered to support his core opinion that the studies establishing ceiling effect did not consider the massive dose of Midazolam used in lethal injections, the Hall Study, actually suggests that, even with massive doses of Midazolam used in lethal injections, the ceiling effect limits its effectiveness just as determined in the research of Dr. Greenblatt and others. TE Vol. XLV, p. 2168.

Finally, the State of Tennessee's own records of the only execution carried out under Tennessee's July, 8, 2018 Protocol challenged here, the August 9, 2018 execution of Tennessee inmate Billy Ray Irick, lasted twenty minutes. Complaint, R. 1, Attachment 10.

It might be said that 20 minutes of the pain described by Plaintiffs' experts render Tennessee's July 5, 2018 Protocol more painful, (even when executed perfectly and upon an average, healthy inmate) than any method of execution carried out since the founding of our nation. The issue here, however, is only whether there is a likelihood Plaintiffs can demonstrate it is more painful than the method of execution at the time Plaintiffs committed the offenses of which they were convicted. *Beazell v. Ohio*, 269 U.S. 167, 169–70 (1925). That method was death through electrocution. Plaintiffs have alleged, and likely can demonstrate, *see* §III.B, electrocution inflict intolerable pain given the court's opinions in *State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008) and *Dawson v. State*, 554 S.E.2d 137, 144 (Ga. 2001). However, Tennessee's current electrocution protocol demonstrates it is likely Plaintiffs will suffer that pain for only six minutes. Complaint, R.1, Attachment 1, p. 42. In addition, those cases addressing the applicability of the *ex post facto* clause when a state adopts a harsher punishment for a past act, unlike those addressing Eighth Amendment challenges to a state's method of execution, do not require Plaintiffs to demonstrate a feasible and readily implemented method of execution that in fact significantly reduces a substantial risk of severe pain in order to prevail. Even if such a requirement were suddenly grafted on to existing *ex post facto* jurisprudence, Plaintiffs' have, as discussed further herein, alleged feasible and readily implemented methods of execution that in fact significantly reduce a substantial risk of severe pain inherent in electrocution, feasible and readily implemented methods of execution that in fact significantly reduces a substantial

34

risk of severe pain inherent in the July 5, 2018 Protocol, some of which reduce that risk as to both.

There is a likelihood Plaintiffs will prevail on their First Count.

> **b)** **Plaintiffs' Second Count, Plaintiffs' execution by means of electrocution violates the Eighth and Fourteenth Amendments.[6]**

Unlike Mr. Zagorski, who was executed by electrocution last night, Plaintiffs have not waived their right to claim that electrocution violates the Eighth and Fourteenth Amendments. As alleged herein, Defendants will carry out their executions should they elect electrocution, even though such an election would have been compelled by the credible threat of a harsher punishment than that which could have been inflicted upon them at the time of the crimes of which they were convicted (*i.e.* a punishment which cannot constitutionally be imposed upon him), their waiver would violate the Fourteenth Amendment's guarantee of substantive and procedural due process. *See* §III.D. *See also Garnica v. United States*, 361 F. Supp. 2d 724, 732 (E.D. Tenn. 2005) ("[A] guilty plea may be involuntary where induced by threats, misrepresentation, or promises 'that are by their nature improper.' *Mabry v. Johnson,* 467 U.S. 504, 509 (1984)"). Plaintiffs' claim against execution by electrocution not only was not, but could not have been, raised during *Abdur'Rahman. See West v. Schofield*, 468 S.W.3d 482, 494 (Tenn. 2015) ("The Electrocution Causes of Action depend entirely on future and contingent events that

---

[6] Plaintiffs note that their second count is alleged both as an independent cause of action and in support of the relief sought for its first count.

have not occurred and may never occur, and as a result, are unripe and nonjusticiable.") Accordingly, Plaintiffs' likelihood of success must be determined solely based upon the merits of their claim. Based upon its merits, there exists a likelihood Plaintiffs will prevail on their Second Count.

First, it is likely Plaintiffs' can demonstrate execution by electrocution poses a constitutionally unacceptable risk of unnecessary pain and suffering. In fact, the last two courts to hold full hearings on the constitutionality of electrocution so found. In *Dawson v. State*, the Georgia Supreme Court found electrocution "involves more than the mere extinguishment of life, and inflicts purposeless physical violence and needless mutilation" *Dawson v. State*, 554 S.E.2d 137, 143 (Ga. 2001). In *State v. Mata*, the Nebraska Supreme Court found "There is also no question that its continued use will result in unnecessary pain, suffering, and torture for some, but not all of [the] condemned murderers in this state." *State v. Mata*, 745 N.W.2d 229, 272 (Neb. 2008). Second, Plaintiffs have proposed three alternative methods of execution which feasible and readily implemented methods of execution that in fact significantly reduces a substantial risk of severe pain inherent in electrocution. *See* R1. Count Two, §I. Two of those methods are either currently recognized as methods of execution being used and/or available for use in other jurisdictions, *id.* at §I.A and §I.C and Plaintiffs have alleged facts demonstrating how they may be carried out in Tennessee. The third, *see* §I.B involves the administration of drugs available on the open market and which Tennessee's sister state, Ohio, has admitted they can obtain through ordinary transactional effort.

36

There is a likelihood Plaintiffs will prevail on Count Two.

> **c)** **Plaintiffs' Third Count, Plaintiffs' execution by means of the July 5, 2018 Protocol violates the Eighth and Fourteenth Amendments.**

Plaintiffs are also likely to prevail on their challenge to the constitutionality of Tennessee's July 5, 2018 Protocol. When Plaintiffs Miller, Sutton, and West challenged Protocol B of the January 8, 2018 Protocol, a three-drug Midazolam-based protocol similar to the July 5, 2018 Protocol Defendants intend to use to execute all Plaintiffs to this action, the testimony of Miller's, Sutton's, and West's experts was credited over the testimony of the experts offered by Defendants. It is likely that testimony, summarized above in §III.A., establishes the first *Glossip* prong. In addition to such evidence, Plaintiffs have alleged additional facts, supported by their prison medical records, demonstrating how their unique physical characteristics will increase the already-constitutionally intolerable pain they would have suffered during their executions even had those characteristics not existed.

The only basis provided by the *Abdur'Rahman* court for denying relief was its claim the plaintiffs to that action failed to provide sufficient facts to establish the availability of the pentobarbital required to carry out Protocol A of the January 8, 2018 Protocol. In this action, Plaintiffs have now alleged additional facts to establish the availability of pentobarbital. *See* Count Three, §I.C. Plaintiffs have also alleged three additional alternative methods of execution which feasible and readily implemented methods of execution that in fact significantly reduces a

substantial risk of severe pain inherent in electrocution. One of those methods is currently recognized as methods of execution being used and/or available for use in other jurisdictions. *See* Count Three §I.A. One of those methods involves the administration of drugs available on the open market and which Tennessee's sister state, Ohio, has admitted they can obtain through ordinary transactional effort. *See* Count Three §I.B. The final method involves nothing more than removing vecuronium bromide from Tennessee's current protocol. Un-contradicted evidence in the *Abdur'Rahman* record establishes the method reduces the period of torture Plaintiffs will experience under the July 5, 2018 Protocol.

There is a likelihood Plaintiffs will prevail on their Third Count.

### d) Plaintiffs' Fourth Count, coerced waiver of Eighth and Fourteenth Amendment Rights.

As set forth in Plaintiffs' Complaint, (R. 1, p. 119), Defendants will present Plaintiff David Earl Miller with an Affidavit Concerning Method of Execution electing electrocution (*see* R.1, Attachment 4, p. 92) on or before November 6, 2018, compelling him to either waive his rights to be free from punishments which violate Eighth Amendment or to suffer an even greater punishment prohibited under the *ex post facto* clause.

To obtain a waiver of constitutional rights through a credible threat of legally unjustified violence violates the Fifth and Fourteenth Amendments. *Arizona v. Fulminante*, 499 U.S. 279, 307 (1991); *United States v. Ray*, 803 F.3d 244, 265 (6th Cir. 2015). As set forth above, *see* §III.A., unless prevented from doing so by this Court, Defendants will execute Plaintiffs by a method of execution, the July 5, 2018

38

Protocol, more onerous than death by electrocution, the method of execution which was to be inflicted upon them at the time of the crimes of which they were convicted – a violation of the *ex post* facto clause. The only manner in which Plaintiffs may avoid that violation is by waiving their right to be free from the infliction of a punishment prohibited by the Eighth and Fourteenth Amendments by executing an Affidavit Concerning Method of Execution electing electrocution. R.1, Attachment 4, p. 92.

Defendants' threat to execute Plaintiffs in manner which violates the *ex post facto* clause unless they submit to a method of execution which violates the Eighth Amendment is, at a minimum, credible. On October 8, 2018, Defendants executed inmate Billy Ray Irick with a method of execution more onerous that electrocution, the July 5, 2018 Protocol, after he refused to execute an Affidavit Concerning Method of Execution. Defendants then attempted to execute inmate Edmond Zagorski under the July 5, 2018 Protocol, a method which violated the *ex post facto* clause, against his wishes because he had failed to execute an Affidavit Concerning Method of Execution. *See Zagorski v. Haslam et al.*, Case No. 3:18-cv-01035 (M.D. Tenn), R.8. (opposing Zagorski's motion for injunction). Only after Mr. Zagorski had taken actions sufficient to waive his right to challenge the constitutionality of electrocution[7] did Defendants' withdraw their threat. *See* Motion to Dismiss, *Zagorski*, Case No. 3:18-cv-01035 (M.D. Tenn. Oct. 22, 2018) R.12; *Id*. Motion for

---

[7] *See* Memorandum and Order, *Zagorski v. Haslam et al.*, Case No. 3:18-cv-01205 (M.D. Tenn. Oct. 26, 2018) R.8 (finding Mr. Zagorski had waived his right to challenge electrocution in Case No. 3:18-cv-01035)

Entry of Judgment, (Oct. 24, 2018) R.15. On November 1, 2018, following Mr. Zagorski's waiver, Defendants executed Edmond Zagorski by a method of execution which (as Plaintiffs here are likely to demonstrate) violates the Eighth and Fourteenth Amendments.

Defendants' threat, indeed their promise, to execute Plaintiffs by a method of execution which violates the *ex post* facto clause unless they submit to a method of execution which violates the Eighth Amendment by executing the Affidavit Concerning Execution is real and credible. Accordingly, there is a likelihood Plaintiffs will prevail on their Fourth Count.

> ### e) *Plaintiffs' Fifth Count, access to the courts during their executions.*

As set forth in Plaintiffs' Complaint, (R. 1, p. 121), Plaintiffs allege Defendants' refusal to afford their counsel who are present to observe their executions access to a telephone in order to make and/or maintain contact with the court deprives them of their rights of access to the court. Given that the court in *Zagorski v. Haslam et al.*, Case No. 3:18-cv-01205 (M.D. Tenn. Oct. 26, 2018) found Zagorski's counsel was entitled to essentially the relief here and Defendants voluntarily provided the same, there is a likelihood Plaintiffs will prevail on their Fifth Count.

### B. Because Plaintiffs can show a likelihood of success on the merits, the remaining Rule 65 factors also weigh in Plaintiffs' favor.

Plaintiff David Earl Miller's execution date is presently set for December 6, 2018, barely more than a month away. Obviously, that is an event which cannot be

undone should the Court eventually rule in Plaintiffs' favor. The Court, however, need not take a black and white approach in considering these factor in order to determine it weighs strongly in Miller's favor. This is because the likelihood of irreparable harm to Miller is intertwined with the likelihood described above Miller will prevail on the merits. *See Ramirez v. McCraw*, 715 F. App'x 347, 350 (5th Cir. 2017) ("Despite the obvious presence of irreparable harm, factors such as the likelihood of success on the merits must still be weighed, and the movant must present a substantial case on the merits.").

Because it is likely that Miller's execution can be carried out only by violating the Constitution, the harm he will suffer is great while the harm the state suffers is minimal

> Finally, and relatedly, the State's alleged harm is all the more ephemeral because the public has no interest in the enforcement of what is very likely an unconstitutional statute. As a panel of this Court recently explained, "[f]rustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation." *United States v. Alabama,* 691 F.3d 1269, 1301 (11th Cir.2012). In short, the injunction did not disserve the public interest.

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013).

Further, as *Odebrecht* observes, not only is the harm to Defendants minimal when it is likely the actions sought to be enjoined are unconstitutional, the public itself has no interest in the state going forward.

41

## III.   Conclusion

Plaintiffs have demonstrated they are likely to prevail. Given that fact, the remaining factors to be considered under Rule 65 weigh in favor of preliminary injunctive relief in order to afford this Court the opportunity to consider Plaintiffs' likely-meritorious claims just as it would any other action brought before this Court.

Counsel for Plaintiffs has reached out to opposing counsel seeking a date for an initial hearing on Plaintiffs motion. Opposing counsel responded by email that he is currently ill but will be available to discuss this matter on Monday, November 5, 2018. After conferring with opposing counsel, Counsel for Plaintiffs will promptly advise the Court of any agreed-upon hearing date.

WHEREFORE Plaintiffs pray this Court set this matter for hearing and thereafter enter a preliminary injunction enjoining Defendants, their agents, and assigns from carrying out the execution of Plaintiff David Earl Miller presently set for the 6th day of December, 2018, from presenting Plaintiff Miller with that "Affidavit Concerning Method of Execution" contained in Tennessee's July 5, 2018 Lethal Injection Protocol, from setting execution dates for Plaintiffs Sutton, West, and King and from denying Plaintiffs' counsel observing their executions telephone access during Plaintiffs' executions until such time as a final order has been entered herein.

Respectfully submitted,

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY:     s/Stephen M. Kissinger
        Stephen M. Kissinger, WY Bar 5-2342
        Asst. Federal Community Defender
        800 S. Gay Street, Suite 2400
        Knoxville, TN 37929
        Phone: (865) 637-7979
        Facsimile: (865) 637-7999
        Stephen_Kissinger@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2018, this Motion for Temporary Restraining Order and/or Preliminary Injunction was filed electronically. Defendants have not yet appeared in this case and will not be served via operation of the Court's electronic filing system. Notice of this filing was sent via email and regular U.S. Mail to Scott C. Sutherland who has agreed to accept service for the defendants. Parties may access this filing through the Court's electronic filing system.

> Scott C. Sutherland
> Assistant Attorney General
> Law Enforcement Division
> P.O. Box 20207
> Nashville, TN 37202
> (615) 741-2164
> Scott.Sutherland@ag.tn.gov

> s/Stephen M. Kissinger
> Stephen M. Kissinger

44