## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **TERRY LYNN KING,** | ) | |
| | ) | <u>**CAPITAL CASE**</u> |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO.  3:18-cv-01234** |
| | ) | |
| **TONY PARKER, et al.,** | ) | **JUDGE CAMPBELL** |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION**</u>

As this Court has now recounted on numerous occasions in recent years, Tennessee's statutory presumptive method of execution is lethal injection. *See, e.g., Sutton v. Parker*, No. 3:19-CV-00005, 2019 WL 4220896, at *2 (M.D. Tenn. Sept. 5, 2019), aff'd, 800 F. App'x 397 (6th Cir. 2020) (citing Tenn. Code Ann. § 40-23-114(a)).  Pursuant to that statute, the Tennessee Department of Correction (TDOC) has promulgated a series of lethal-injection protocols using various drugs, each of which has been unsuccessfully challenged as unconstitutional by groups of death row inmates. *Id*. at *3 (citing *West v. Parker*, No. 3:19-CV-00006, 2019 WL 2341406, at *4–6 (M.D. Tenn. June 3, 2019), aff'd, No. 19-5585, 2019 WL 3564476 (6th Cir. Aug. 6, 2019)). From 2013 until 2018 the protocols called for a lethal dose of the barbiturate pentobarbital. *Id.* Although the inmates' legal challenge to that protocol ultimately failed on January 8, 2018, when the United States Supreme Court denied certiorari after the Tennessee Supreme Court ruled against them, *West v. Schofield*, 519 S.W.3d 550, 552 (Tenn. 2017), *cert. denied sub nom. Abdur'Rahman v. Parker*, 138 S. Ct. 647 (2018), *reh'g denied*, 138 S. Ct. 1183 (2018), TDOC revised their protocol that same year to provide for execution by a combination of three drugs: midazolam, vecuronium bromide, and potassium chloride. *Sutton*, 2019 WL 4220896, at *3.  Plaintiff challenges the constitutionality of that protocol and alleges several alternatives.

The sole remaining claim in this case is that Tennessee's current lethal-injection protocol constitutes cruel and unusual punishment in violation of the Eighth Amendment as a result of the ineffectiveness of midazolam to alleviate the severe pain of the execution and other inadequacies in the manner in which Tennessee carries out its lethal injections. The parties dispute the extent of discovery necessary or appropriate to litigate that claim. As a result, Defendants filed a motion for protective order (Doc. No. 90), and Plaintiff filed a motion to compel. (Doc. No. 93.) Both motions have been fully briefed and are ripe for review.

## I.     STANDARDS

The scope of discovery is "within the sound discretion of the trial court." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008) (quoting *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981)). Generally, Rule 26 permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). Relevant evidence in this context is that which "'has any tendency to make a fact more or less probable than it would be without the evidence' if 'the fact is of consequence in determining the action.'" *Grae v. Corr. Corp. of Am.*, 326 F.R.D. 482, 485 (M.D. Tenn. 2018) (quoting Fed. R. Evid. 401). "Although a plaintiff should not be denied access to information necessary to establish her claim, neither may a plaintiff be permitted 'to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive.'" *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (quoting *Marshall v. Westinghouse Elec. Corp.*, 576 F.2d 588, 592 (5th Cir. 1978)).

A motion to compel discovery may be filed in several circumstances, including when a party fails to "answer an interrogatory submitted under Rule 33[,]" or "produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iii)–(iv). "[A]n evasive or incomplete

2

disclosure, answer, or response" is considered a "failure to disclose, answer, or respond." Fed. R.

Civ. P. 37(a)(4). "The court will only grant [a motion to compel], however, if the movant actually

has a right to the discovery requested." *Grae*, 326 F.R.D. at 485.

For "good cause," a court may "issue an order to protect a party or person from annoyance,

embarrassment, oppression, or undue burden or expense" by preventing the disclosure of

otherwise-discoverable information. Fed. R. Civ. P. 26(c)(1). "The 'good cause' necessary to

sustain a protective order under Rule 26(c) must be shown by particular and specific facts, 'as

distinguished from stereotyped and conclusory statements.'" *Abriq v. Metro. Gov't of Nashville &

Davidson Cnty.*, No. 3:17–0690, 2018 WL 1907445, at *1 (M.D. Tenn. Apr. 23, 2018) (quoting

*Knight Cap. Partners Corp. v. Henkel AG & Co., KGaA*, 290 F. Supp. 3d 681, 685 (E.D. Mich.

2017)).

The Sixth Circuit has elaborated on the scope of discovery and standard for limiting it in

another lethal-injection case arising out of Ohio:

> Parties may seek discovery of any relevant, non-privileged information. Fed. R. Civ. P. 26(b)(1). But district courts have discretion to limit the scope of discovery when the information sought is overbroad or unduly burdensome. Fed. R. Civ. P. 26(b)(2); *see also Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 906 (6th Cir. 1991) ("Th[e] desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant."). The district court may limit the scope of discovery "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C)(iii). "Although a plaintiff should not be denied access to information necessary to establish her claim, neither may a plaintiff be permitted to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive." *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (internal quotation marks omitted & citations omitted).
>
> To sustain a protective order under Rule 26(c), the moving party must show "good cause" for protection from one (or more) harms identified in Rule 26(c)(1)(A) "with

3

a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Serrano* [*v. Cintas Corp.*], 699 F.3d [884,] 901 [(6th Cir. 2012)] (citations omitted). The enumerated harms available to support a protective order are "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Good cause exists if "specific prejudice or harm will result" from the absence of a protective order. *Father M. v. Various Tort Claimants (In re Roman Catholic Archbishop)*, 661 F.3d 417, 424 (9th Cir. 2011). A court must balance the "right to discovery with the need to prevent 'fishing expeditions.'" *Serrano*, 699 F.3d at 902 (citations omitted).

*In re Ohio Execution Protocol Litig.* (*Fears v. Kasich*), 845 F.3d 231, 236–37 (6th Cir. 2016).

## II.     PLAINTIFF'S REQUESTS

Plaintiff seeks an order compelling Defendants to respond to Interrogatories 1–6 and 8–10 and the Requests for Production propounded in connection with them. (Doc. No. 93.)   The interrogatories in question include:

1.     Describe in full and complete detail every communication from and after January 1, 2017, between [REDACTED], Debbie Inglis, any defendant in this action and/or any agent or employee of the Department or the State and [REDACTED] Pharmacy. A full and complete description includes, but is not limited to: (a) the date on which such communication occurred; (b) the names of all persons present during such communications; (c) the name, address and telephone number of the person authorized to receive service of process on behalf of each person present; and, (d) a full and complete description of the substance of such communications.

2.     Describe in full and complete detail each and every transaction from and after January 1, 2017, between the State and/or the Department and [REDACTED] Pharmacy. Such description includes, but is not limited to: (a) the dates of such transaction; (b) the names of all persons executing any and all legal documents related to the creation, maintenance, or renewal of any such transaction; all payments provided pursuant to any such transaction and the dates on which such payments were provided; and, (c) all services and/or tangible objects provided pursuant to such transaction and the dates on which they were provided.

3.     Describe in full and complete detail every communication from and after January 1, 2017 between [REDACTED], Debbie Inglis, and/or any agent or employee of the Department and/or the State and any manufacturer, distributor, broker, pharmacy (and/or any other source of pentobarbital, sodium thiopental, midazolam, pancuronium bromide, vecuronium bromide, potassium chloride, digoxin, morphine sulfate, propranolol, secobarbital, and/or any other chemical being sought for the purpose of carrying out executions by means of lethal injection). A full and complete description includes, but is not limited to: (a) the

4

date on which such communication occurred; (b) the identity of all persons present during such communications; (c) the name, address and telephone number of the person authorized to receive service of process on behalf of each person present; (d) the chemicals discussed during such communications; and, (e) a full and complete description of the substance of such communications.

4.      Describe in full and complete detail each and every contract existing at any time from and after January 1, 2017, between the State and/or the Department and any manufacturer, distributor, or manufacturer, distributor, broker, pharmacy (and/or any other source of pentobarbital, sodium thiopental, midazolam, pancuronium bromide, vecuronium bromide, potassium chloride, digoxin, morphine sulfate, propranolol, secobarbital, and/or any other chemical being sought for the purpose of carrying out executions by means of lethal injection). Such description includes, but is not limited to: (a) the effective dates of each contract; (b) the names of all persons executing any and all such contracts; all payments provided pursuant to such contracts and the dates on which they were provided; and, (c) all services and/or tangible objects provided pursuant to such contracts and the dates on which they were provided.

5.      Describe in full and complete detail every communication related to the procurement of chemicals for the purpose of carrying out sentences of death from and after January 1, 2017, between [REDACTED], Debbie Inglis, any defendant in this action and/or any agent or employee of the Department and any employee, agent or assign of the department of correction of any other state, United States territory, or the government of the United States and/or any entity charged with carrying out a sentence of death within such jurisdictions. A full and complete description includes, but is not limited to: (a) the date on which such communication occurred; (b) the names of all persons present during such communications; (c) the name, address and telephone number of the person authorized to receive service of process on behalf of each person present; and, (d) a full and complete description of the substance of such communications.

(Doc. No. 91-1 at 1–4.)  Plaintiff now says that the information he seeks in response to those interrogatories is limited to "information (including their identities) regarding persons and entities having knowledge of actual and/or potential sources of execution drugs and/or who/which are themselves actual and potential sources of execution drugs (hereinafter, 'drug sources')." (Doc. No. 94 at 11.)

Plaintiff also propounded the following interrogatory:

6.      Describe in full and complete detail all firearm training received by any employee, agent, agent [sic] or assign of the Department. A full and complete description includes: (a) the date(s) (or, if specific date is unknown, the approximate date(s)) of such training; (b) the place of such training; (c) the

5

substance of such training; and, (d) all certificates, awards and/ or other forms of recognition received.

(Doc. No. 91-1 at 5.)  Plaintiff says the information sought in this interrogatory "is limited to the identity of those persons available to the State of Tennessee to carry out firearms-based executions and their specific skills, training, and experience." (Doc. No. 94 at 12.)  But he goes on to say that he agrees to Defendants' identifying such individuals by "unique but anonymous identifier[s]" rather than proper names. (*Id.* at 13.)

The next two interrogatories in question are:

8.      Describe in full and complete detail all training received by each person identified, designated and/or described on pages 12 through 29 and 35 through 38[1] of Tennessee's Lethal Injection Execution Manual, Execution Procedures for Lethal Injection, Revised July 5, 2018, (Lethal Injection Procedures) in each of the following areas:

a. the compounding of chemicals intended for use in executions;

b. the transportation and/or storage of chemicals intended for use in executions;

c. those activities described on pages 35 through 38 of Tennessee's Lethal Injection Execution Manual, Execution Procedures for Lethal Injection, Revised July 5, 2018, (Lethal Injection Procedures);

d. the insertion of an intravenous catheter into the median cubital vein for the purpose of the bolus injection of 320 ml of liquid into the vein;

e. the injection of 320 ml of liquid into an intravenous catheter inserted into the median cubital vein;

f. the maintenance of an intravenous catheter inserted into the median cubital vein for the purpose of the bolus injection of 320 ml of liquid into the vein; and

---

[1] The referenced pages of the protocol discuss the roles of prison personnel involved in executions, including the warden, associate warden, recorder, death watch supervisor, chaplain, security systems technicians, physician, IV team, facility maintenance supervisor, extraction team, escort officers, commissioner, assistant commissioner, communication director, investigation and compliance director, and victim services director, and describe the procedures for "Procurement, Storage, Accountability, and Transfer" of lethal injection chemicals. (Doc. No. 51-4 at 12–29, 35–38.)

6

g. those activities described on pages 39 through 45[2] of Tennessee's Lethal Injection Execution Manual, Execution Procedures for Lethal Injection, Revised July 5, 2018, (Lethal Injection Procedures).

A full and complete description includes, but is not limited to: (a) the date on which such training occurred; (b) the names of all persons present during such training; (c) the name, address and telephone number of the person authorized to receive service of process on behalf of each person present; and, (d) a full and complete description of the substance of such training. [And]

9.      Describe in full and complete detail each time any person identified, designated and/or described on pages 12 through 29 and 35 through 38 of Tennessee's Lethal Injection Execution Manual, Execution Procedures for Lethal Injection, Revised July 5, 2018, (Lethal Injection Procedures) has engaged in each of the following acts:

a. the compounding of chemicals intended for use in executions;

b. the transportation and/or storage of chemicals intended for use in executions;

c. those activities described on pages 35 through 38 of Tennessee's Lethal Injection Execution Manual, Execution Procedures for Lethal Injection, Revised July 5, 2018, (Lethal Injection Procedures);

d. the insertion of an intravenous catheter into the median cubital vein for the purpose of the bolus injection of 320 ml of liquid into the vein;

e. the injection of 320 ml of liquid into an intravenous catheter inserted into the median cubital vein;

f. the maintenance of an intravenous catheter inserted into the median cubital vein for the purpose of the bolus injection of 320 ml of liquid into the vein; and

g. those activities described on pages 39 through 45 of Tennessee's Lethal Injection Execution Manual, Execution Procedures for Lethal Injection, Revised July 5, 2018, (Lethal Injection Procedures).

A full and complete description includes, but is not limited to: (a) the date on which such acts occurred; (b) the names of all persons present during such acts; (c) the name, address and telephone number of the person authorized to receive service of process on behalf of each person present; and, (d) a full and complete description of such acts.

(Doc. No. 91-1 at 6–7.)  Plaintiff maintains the information sought in these interrogatories is

---

[2]      These pages of the protocol cover "Lethal Injection Chemical Set-Up and Preparation," "IV Line Setup," "Insertion of a Catheter and Connection of IV Lines," and "Chemical Administration and IV Monitoring." (Doc. No. 51-4 at 39–45.)

7

"limited to information regarding the specific skills, training, and experience of the persons who will, or may, directly participate in the preparation and/or administration of drugs (hereinafter, 'execution team members') as required of them by Tennessee's July 5th protocol." (Doc. No. 94 at 12.) As he did with Interrogatory 6, however, Plaintiff further agrees that Defendants may identify these individuals by pseudonyms rather than proper names. (*Id.* at 13.)

And finally, Plaintiff seeks to compel a response to Interrogatory 10, which asked Defendants to:

> 10. Describe in full and complete detail the purchase, compounding, transportation and storage of each shipment of Active Pharmaceutical Ingredient (API) and/or chemicals obtained by the State of Tennessee after January 8, 2018 for the purpose of carrying out Tennessee's Lethal Injection Execution Manual, Execution Procedures for Lethal Injection, Revised July 5, 2018, (Lethal Injection Procedures). A full and complete description includes, but is not limited to: (a) the dates between which such purchase, compounding, transportation and/or storage occurred; (b) the names of all persons present during such purchase, compounding, transportation and storage; (c) the name, address and telephone number of the person (see definition XXX) authorized to receive service of process on behalf of each person present; (d) the expiration and/or beyond use dates of such (API) and/or chemicals; and, (e) a full and complete description of such purchase, compounding, transportation and/or storage, including, but not limited to:
>
> > a. as to purchases: (i) the amount, and nature, of any consideration exchanged; and (ii) the names and numbers of all accounts from which such consideration was paid and into which such consideration was received;
> >
> > b. as to compounding: (i) the name, street address, country of origin, telephone numbers and email address of every source of (API) used to compound any such chemicals; (ii) the name, street address, telephone numbers and email address of all buildings in which such compounding took place; (iii) the name, street address, telephone numbers and email address of all persons present at any point during the period of time when such compounding took place;
> >
> > c. as to transportation: (i) the name, street address, telephone numbers and email address of any commercial carriers utilized for the purpose of transportation of each shipment of chemicals and/or API obtained by the State of Tennessee after January 8, 2018 for the purpose of carrying out Tennessee's Lethal Injection Execution Manual, Execution Procedures for Lethal Injection, Revised July 5,

8

2018, (Lethal Injection Procedures); (ii) the name, street address, telephone numbers and email address of any person and/or entity (other than a commercial carrier) participating in the shipment of chemicals and/or API obtained by the State of Tennessee after January 8, 2018 for the purpose of carrying out Tennessee's Lethal Injection Execution Manual, Execution Procedures for Lethal Injection, Revised July 5, 2018, (Lethal Injection Procedures); (iii) if a noncommercial mode of transportation was used, a description of the vehicle utilized by any person and/or entity (other than a commercial carrier) for the purpose of transporting each shipment of chemicals and/or API obtained by the State of Tennessee after January 8, 2018 for the purpose of carrying out Tennessee's Lethal Injection Execution Manual, Execution Procedures for Lethal Injection, Revised July 5, 2018, (Lethal Injection Procedures); and (iv) all containers in which such API and/or chemicals were placed during transportation;

d. as to storage: (i) the name, street address, telephone numbers and email address of the location where such API and/or chemicals were stored; (ii) the manufacturer (and/ or brand name) and serial number of any refrigerator, or other container, in which such API and/or chemicals were stored; (iii) the time and date on which such API and/or chemicals were placed in, or removed from, any such containers.

(Doc. No. 91-1 at 8–9.) Plaintiff says the information sought in this interrogatory "is limited to information related to the compounding and/or transportation of execution drugs actually used during prior Tennessee executions." (Doc. No. 94 at 12.)

In addition to the limitations to his interrogatories discussed above, Plaintiff says that he has proposed two protective orders in an effort to accommodate Defendants' concerns. (*Id.* at 12–13.) First, he proposed a protective order generally requiring counsel to maintain the confidentiality of the identity of any person or entity revealed during discovery. (*Id.*) Second, he proposed a protective order requiring Defendants to use pseudonyms to refer to all individuals identified in response to Interrogatories 6 and 8–10 as people expected to be part of the execution team and providing that such individuals would be deposed from behind a screen maintaining the confidentiality of their identities. (*Id.*) Plaintiff states that he "remains willing to abide by those

limitations he offered during negotiations" and that his motion to compel seeks only that limited information under the conditions proposed. (*Id.* at 14.)

## III.    DEFENDANTS' MOTION

Defendants assert that "Plaintiff should be prohibited from discovering the identities or information leading to the identification of persons or entities involved in carrying out executions in Tennessee because this information is irrelevant to the specific issues in this case." (Doc. No. 91 at 7.)  Specifically, they argue that identities of and information about people with knowledge of potential execution drug sources are irrelevant because Defendants "cannot locate a source for pentobarbital." (*Id.*)  They also assert that

> Because Commissioner Parker is being sued in his official capacity, he can, without revealing identities, share information regarding whether TDOC has ever searched for sources for the chemicals in Plaintiff's oral cocktail alternative.  Thus, Plaintiff does not need to know the identities of TDOC's source for midazolam and individuals with knowledge of current and potential sources.

(*Id.* at 8.)  Defendants argue that identities and information that could lead to identities of individuals involved in transporting, preparing, and administering execution drugs, as sought in Interrogatories 8–10, are irrelevant to Plaintiff's claim, regardless of whether it is deemed to be a facial or as-applied challenge to the protocol. (*Id.* at 8–11.)

Defendants further argue that preventing discovery of the identities or identifying information about individuals and entities involved in executions is necessary to protect those subjects from "unique risks of harm." (Doc. No. 91 at 11.)  In support of that argument, Defendants rely on evidence from other cases about a veiled threat of violence against a compounding pharmacy in Oklahoma and a "firestorm" of "hate mail and messages" against execution participants whose identities have been revealed. (*Id.* at 11–12.)  They also cite "threatening emails and correspondence" received by their current chemical source "from anti-death penalty

10

advocates." (*Id.* at 12–13.) And they cite examples of efforts by investigators from Tennessee's Post-Conviction Defender's Office to interview prison staff by phone and in person at their homes about death row inmates. They characterize these efforts as "harassment" and report that the staff members were "upset" and "disturbed" by these intrusions. (*Id.* at 12–13.) Finally, they observe that "the harm that exposure causes execution participants" has been recognized by legislatures in Tennessee and other states that have formalized the public policy of preserving those participants' anonymity in statutes making their identities confidential. (*Id.* at 13–14.)

Defendants also argue that they will suffer the undue burden of losing their ability to perform executions if the identities of the execution participants are revealed. Specifically, they assert that the pharmacy that currently provides the drugs used for Tennessee executions has stated that it will stop providing those drugs if its identity is revealed. (Doc. No. 91 at 8, 15.) In a declaration submitted in support of Defendants' motion, the president of the unknown pharmacy states under penalty of perjury that s/he considers anonymity to be "[a] primary contingent need" in its dealings with TDOC. (Doc. No. 91-4 at 1.) The affiant testifies that s/he "reasonably fears" harassment by anti-death penalty advocates and "resulting [] physical and financial harm to Pharmacy Z, its owner(s), and its employees" if its identity is revealed, and that its "fears are based [in part] on threatening emails and correspondence that it has received from anti-death penalty advocates." (*Id.* at 2.) Accordingly, the pharmacy president says that "if Pharmacy Z's identity as the source for TDOC were to become known, then Pharmacy Z would not continue to supply lethal injection chemicals to TDOC." (*Id.*) Defendants cite several instances in case law where execution drug suppliers have stopped supplying drugs to state corrections departments when their identities were disclosed or threatened with disclosure. (Doc. No. 91 at 16.) They further argue that revealing the identities of individuals involved in executions "would likely have the same detrimental effect"

11

of stopping those individuals' participation. (*Id.* at 17.)

## IV.    ANALYSIS

### A.    Interrogatories 1–5

Plaintiff acknowledges that these interrogatories seek the identities of TDOC's actual source of lethal injection chemicals, any potential sources known to TDOC, and the people and entities who have knowledge of TDOC's actual and/or potential sources. (Doc. No. 94 at 11.)  With regard to TDOC's current primary sources, Plaintiff says that his counsel already knows their identities and wants Defendants to acknowledge their identities "so further discovery may be had of information personally known to them." (Doc. No. 97 at 4.)  He also "seeks the identities of all drug suppliers contacted . . . and the details of communications . . . for the purpose of locating sources of execution drugs." (*Id.*)  Plaintiff asserts that a TDOC representative tasked with a search for execution drugs in 2016–17 contacted 100 potential sources, 80 of which were willing to supply execution drugs. (*Id.* at 6–9.)  But of those 80, 70 did not have any supply of pentobarbital to deliver, and 10 did not have a sufficient supply. (*Id.* at 8.)  Plaintiff argues that the discovery sought in these interrogatories is relevant to whether there is a readily available alternative method of execution, which he must prove in order to prevail on his Eighth Amendment challenge to Tennessee's current method. (Doc. No. 94 at 15–17.)

Defendants respond that the information sought in Interrogatories 1–5 is irrelevant for several reasons. (Doc. No. 99 at 7–8.)  They say they have already informed Plaintiff that they do not have a source for pentobarbital and can provide information about whether they have searched for the chemicals required for Plaintiff's other proposed alternatives without revealing the identities of anyone involved in the search. (*Id.* at 7.)  With regard to their current source of chemicals, they argue that its identity is not relevant to Plaintiff's facial challenge as a matter of

12

law, that it would be rendered irrelevant if revealed because the supplier would stop providing the chemicals, and that it is simply irrelevant because "whether the Defendants procure midazolam from Walgreens or CVS neither changes the role midazolam has in the Protocol, nor makes it any more or less likely that either of those locations has pentobarbital or the oral cocktail drugs" required by Plaintiff's proposed alternatives. (*Id.* at 8.)

There is no doubt that Plaintiff bears the burden of demonstrating the existence of "an alternative [method of execution] that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *In re Ohio Execution Protocol Litig.* (*Campbell v. Kasich*), 881 F.3d 447, 449 (6th Cir. 2018) (quoting *Glossip*, 135 S. Ct. at 2737). But that does not require Plaintiff to establish that Defendants have independently researched his proposed alternative. Rather, Plaintiff's desire to discover details about Defendants' research is largely a matter of convenience. Specifically, Plaintiff has argued that he "is not required to slog through the same time-consuming" search for execution drugs "when the information he seeks sits readily available at Defendants' fingertips." (Doc. No. 86 at 17.)

Plaintiff's convenience, however, must be weighed against the hardships risked by the Defendants and the individuals and entities at issue if their identities are revealed. The risk of harm or harassment to execution drug suppliers and resulting difficulties in the state's efforts to procure such drugs has been found to be good cause to support a protective order that prohibits even attorneys from discovering the identities of those suppliers. *In re Ohio Execution Protocol Litig.* (*Fears v. Kasich*), 845 F.3d 231, 234 (6th Cir. 2016). The sworn declaration of the president of the pharmacy that currently supplies TDOC with execution drugs establishes that there is a reasonable basis for fear that the pharmacy and its employees would face increased threats and harassment if its identity were revealed (Doc. No. 91-4.) It also establishes that TDOC risks losing

13

the pharmacy as a source if its identity is revealed. (*Id.*) Plaintiff argues that the latter statement is "materially false" because the pharmacy has continued to supply drugs to TDOC more than two years after its address was revealed in response to a public records request. (Doc. No. 97 at 26–27.) But the news article Plaintiff cites did not identify the pharmacy or publish its address. (*See* Doc. No. 97 at 26 (citing https://www.tennessean.com/story/news/crime/2018/01/19/tennessee-warneduse-controversial-drug-combination-lethal-injections/1046487001/ (last visited July 13, 2020).) Moreover, Defendants assert—and Plaintiff acknowledges—that Defendants have never confirmed the suspected identity of the pharmacy. (Doc. No. 94 at 13 n.2; Doc. No. 99 at 8 n.2.) The pharmacy's supplying TDOC with execution drugs under these circumstances does not disprove its president's indication that it will halt its supply if its identity is revealed. And given the "exhaustive" search required to find this source (*see* Doc. No. 86 at 16–17), its loss would jeopardize TDOC's ability to carry out executions. Accordingly, the likely harms to the pharmacy, its employees, and the TDOC's ability to carry out its lawful functions amount to good cause to shield from discovery the identity of the pharmacy and any information likely to result in its identification.

Revealing the identities of potential sources previously contacted by TDOC would presumably not result in the loss of its current supplier. But Defendants argue it would cause an "increased risk such entities will refuse to take TDOC's future calls." (Doc. No. 100 at 3.) Moreover, they point out that "Plaintiff's counsel and experts are as equally capable" of researching potential sources the same way TDOC's representative(s) did—by "cold calling U.S. based Active Pharmaceutical Ingredient (API) supply companies." (*Id.* at 4.) Plaintiff argues that those companies are less likely to provide information to him than to TDOC; but if potential drug sources are unwilling to reveal to Plaintiff whether they have the ability and inclination to provide

execution drugs to TDOC, that simply underscores the concern that those entities will not agree to supply such drugs in the future if they are identified now. Further, it is undisputed that TDOC's communications with all the potential sources it contacted did not lead to any willing source with a sufficient supply of pentobarbital for use in executions, and Plaintiff has not offered any reason to believe that TDOC elicited information from those sources about any of its other proposed alternatives. Accordingly, the potential negative impact to TDOC from revealing its potential sources outweighs Plaintiff's interest in taking a short-cut to information about his own proposed alternative methods of execution.

Because Plaintiff will not be permitted to discover the identities of TDOC's current or potential sources, he has no need to discover the identity of the TDOC representative(s) who have knowledge of those sources.

For these reasons, Plaintiff's motion to compel further responses to Interrogatories 1–5 will be denied, and Defendants' motion for a protective order will be granted.

**B.      Interrogatory 6**

Plaintiff argues that the information sought in this interrogatory is also relevant proof of the ready availability of some of his proposed alternative methods of execution. (Doc. No. 94 at 15–17.) Specifically, he argues that he "cannot demonstrate the availability of his firearms-based alternative methods of execution unless he can show that . . . the personnel required to operate those firearms in the manner those alternatives require [are available]." (Doc. No. 94 at 16.)

Defendants maintain that they have sufficiently responded to this request by producing the TDOC's policies and procedures for weapons training, a copy of a PowerPoint presentation that is part of the training program, a list of 3,400 weapons-qualified TDOC employees, documents describing the weapons training, and qualification cards that identify weapons training instructors

and specify the weapons on which they are qualified to train. (Doc. No. 99 at 9, 13.) They argue that the additional details requested, including the dates of training for more than three thousand employees, are irrelevant to the issue of whether there are TDOC employees available to carry out executions with firearms. (*Id.* at 9.) Defendants say that what they have already provided "should be sufficient information for Plaintiff to develop his alternatives," (*id.* at 13), and the Court agrees. Requiring Defendants to gather and produce details about the specific dates, times, etc. of thousands of employees' firearms training would be unduly burdensome and is unnecessary to support Plaintiff's assertion that firearms-trained employees are available.

Plaintiff now says that in light of Defendants' objection, he "limits the scope of Interrogatory 6 to the firearms training and related information of only those persons who are, or are reasonably expected to be, involved in carrying out Plaintiff's execution" and that he does not actually seek the identities of those participants. (Doc. No. 103 at 2 and n.3.) But that information is irrelevant to this litigation. As things stand, TDOC expects to execute Plaintiff according to its primary method, which is lethal injection. There is no need for anyone on a lethal-injection execution team to be qualified in the use of firearms. Nor is there any need for Plaintiff to demonstrate that those specific people are qualified to perform a firearms-based execution or any other proposed alternative in order to establish that the alternative is "feasible" and "readily implemented."

Plaintiff's motion to compel further response to this interrogatory will, therefore, be denied.

## C. Interrogatories 8–9

These interrogatories seek details about past executions and execution trainings, including the names of everyone present. Plaintiff has agreed, however, that Defendants may withhold the

names of those individuals and identify them by unique numerical pseudonyms in its disclosures.[3] (Doc. No. 94 at 13.) He argues that this information is relevant to his allegation "that the execution team members['] lack of adequate skill, training and experience, both alone and in light of the lack of guidance provided by Tennessee July 5th protocol, creates a substantial risk of constitutionally-intolerable pain." (*Id.* at 17.)

Defendants argue that information about the people involved in carrying out executions is irrelevant as a matter of law to Plaintiff's facial challenge to the execution protocol. (Doc. No. 99 at 10.) Nevertheless, they say they have adequately responded to these requests by producing more than 600 pages of materials including execution training checklists, redacted course rosters for lethal injection trainings, and the execution logs for two recent lethal injection executions. (*Id.*) They maintain that additional information about past execution teams is irrelevant because the composition of the execution team at the time of Plaintiff's execution may be different. (*Id.*)

The use of pseudonyms to protect the identities of individuals who participate in executions has precedent in litigation in this circuit about methods of execution. *See Cooey v. Strickland*, No. 2:04-cv-1145 (S.D. Ohio Oct. 8, 2008) (granting protective order providing that "Defendants are not required to identify to Biros or counsel for Biros the names of any persons currently or previously on the execution team" and requiring the parties to refer to team members by "generic identifiers"). But Defendants argue that the use of pseudonyms is insufficient to protect execution team members from harassment, because other details "could be cross referenced with other information and, ultimately, lead to the identification of these persons." (Doc. No. 99 at 14.) Specifically, Defendants assert that

---

[3]     In light of that concession, it is unnecessary for the Court to weigh Defendants' evidence of alleged harassment of prison employees.

> Plaintiff's counsel could learn how long these individuals have been employed by TDOC; their rank; where in the prison they work and on what shift; the duration of their time on the execution team; their role on the execution team; how many executions they have participated in; how many trainings they have participated in; when these trainings occurred; and many other factors. Then, through a Public Records Act request or simply keep observation during executions, Plaintiff's counsel would be able to deduce who these people are.

(*Id.* at 13–14.) Most of those especially identifying details—length of employment, rank, prison assignment and shift—are not requested in these interrogatories. But Defendants are apparently concerned about information Plaintiff "will seek during depositions." (Doc. No. 99 at 13.)

Plaintiff alleges that TDOC's execution team is not properly trained and has failed in the past to follow the lethal-injection execution protocol as written. (Doc. No. 51 at 115, 125.) Those facts, if proven, might not definitively establish that Plaintiff's planned execution poses a substantial risk of unconstitutional pain, but the Court cannot find that they are irrelevant to that issue. Taking Plaintiff's allegations as true, Defendants cannot avoid revealing a lack of training or failure to follow protocol simply by saying they do not know who will be on Plaintiff's execution team or that it is categorically impossible to allow discovery about team members and their training and practices without revealing their identities. If they could, no plaintiff could ever substantiate claims that improperly trained execution teams were carrying out executions in an improper or dangerous manner.

This Court has previously taken precautions to preserve the anonymity of individuals involved in the execution process, whereby such individuals "testified anonymously behind a screen at the hearing and [were not] identified by name in [the Court's] opinion." *Harbison v. Little*, 511 F. Supp. 2d 872, 887 (M.D. Tenn. 2007) (Trauger, J.), *vacated and remanded on other grounds*, 571 F.3d 531 (6th Cir. 2009). Aside from Defendants' concern that identifying

18

information could be sought during depositions, the parties have offered no argument that convinces the Court that similar precautions would be ineffective or unworkable in this case.

Accordingly, Plaintiff's motion to compel responses to these interrogatories—as narrowed by his voluntary concessions—will be granted. Specifically, Defendants must identify by pseudonym those individuals "who will, or may, directly participate in the preparation and/or administration of drugs" during Plaintiff's execution and must provide the requested details regarding their "specific skills, training, and experience." (Doc. No. 94 at 12.) Although the composition of Plaintiff's actual execution team may be uncertain, Federal Rule of Civil Procedure 26(e)(1)(A) anticipates and adequately provides for any changes in responsive information.

On the other hand, Defendants' motion for protective order with respect to these interrogatories will also be granted to the extent that Plaintiff is prohibited from seeking information through depositions or any other form of discovery that is calculated or otherwise likely to lead to the identification of these pseudonymously identified individuals.

### D.    Interrogatory 10

This interrogatory requests details about the purchase, compounding, transportation, and storage of execution drugs. To the extent this request seeks the identity of TDOC's source of execution drugs or information that would identify the source (such as its address or account numbers), the Court's ruling above with regard to Interrogatories 1–5 applies, and a protective order will prohibit discovery of such information. To the extent it seeks the identity of any individual involved in the process of acquiring, transporting, or storing execution drugs, it is subject to the Court's requirement of pseudonyms as explained with regard to Interrogatories 8–9. Defendants argue that the rest of the information sought is irrelevant.

Plaintiff alleges that TDOC's lethal-injection protocol does not adequately provide for the

proper storage and monitoring of frozen compounded drugs such as midazolam, that Defendants have deviated from the protocol's requirements including inventorying drugs and discarding expired drugs, and that they fail to maintain any records ensuring proper transportation and storage of the drugs. (Doc. No. 51 at 125–26.) He alleges that improper transportation and storage of lethal-injection chemicals increases the risk of an unconstitutionally painful execution. (*Id.* at 128.)

Defendants respond that information about compounding and transportation of lethal injection chemicals during the time period requested is irrelevant, because it is unknown whether those chemicals will be used in Plaintiff's execution. (Doc. No. 99 at 10–11.) They also argue that such details are irrelevant as a matter of law to Plaintiff's facial challenge to the lethal injection protocol. (*Id.* at 9–10.)

Even assuming, as Defendants assert, that the drugs TDOC has already purchased and stored might not be used in Plaintiff's execution, Defendants' practices regarding transportation and storage of execution chemicals are relevant to Plaintiff's Eighth Amendment claims. Moreover, Plaintiff has no other way to develop the facts about those practices than through discovery from Defendants.

Accordingly, Plaintiff's motion to compel response to this Interrogatory, as limited by his voluntary concession (*see* Doc. No. 94 at 12), will be granted. Again, however, Defendants will be granted a protective order against the discovery of the identities or identifying information about the individuals and entities involved with supplying, delivering, maintaining, or administering the chemicals in question.

E.    **Plaintiff's Revealing Suspected Sources and Participants**

In addition to seeking protection from discovery, Defendants' motion for protective order asks the Court to prohibit Plaintiff from

20

disclosing, publishing, or otherwise revealing the identities or information leading to the identification of persons or entities he believes have been or may be involved in the process of executing a death sentence in Tennessee, including persons and entities he believes are involved in obtaining and providing the chemicals, equipment, supplies, and other items used in carrying out a sentence of death in Tennessee.

(Doc. No. 90 at 1.)  This request will be denied for several reasons.

First, Defendants' motion was filed under the authority of Rule 26, which pertains exclusively to discovery and does not provide for what would effectively be a gag order.  "Rule 26, . . . which is entitled 'General Provisions Governing Discovery,' is not a blanket authorization for the court to prohibit disclosure of information whenever it deems it advisable to do so, but is rather a grant of power to impose conditions on *discovery* in order to prevent injury, harassment, or abuse of the court's processes." *Bridge C.A.T. Scan Assocs. v. Technicare Corp.*, 710 F.2d 940, 944–45 (2d Cir. 1983).

Second, as Plaintiffs correctly point out, the First Amendment generally prevents the Court from prohibiting dissemination of information "if that information has been gathered independently of judicial processes." *Id.* at 946; *Kriss v. Bayrock Grp., LLC*, No. 10CIV3959LGSFM, 2016 WL 406375, at *2 (S.D.N.Y. Feb. 1, 2016) ("Rule 26(c) empowers the court to prohibit the disclosure of documents or information, but only if they were obtained during discovery.").  There is a "heavy presumption" that prior restraints on speech are unconstitutional. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).  Such prior restraint is only permissible where the speech in question "poses 'a grave threat to a critical government interest or to a constitutional right.'" *Cnty. Sec. Agency v. Ohio Dep't of Com.*, 296 F.3d 477, 485 (6th Cir. 2002) (quoting *Procter & Gamble*, 78 F.3d 219, 225, 227 (6th Cir. 1996)) (reversing and dissolving injunction against disclosure of information from registration records of security guards working at the site of ongoing labor dispute).  "Since the founding of this country, the First Amendment

has been understood to prohibit prior restraints on speech, except in narrow circumstances presenting a clear and present danger." *Bialik v. Huber*, No. 1:12-CV-567, 2013 WL 1499051, at *1 (W.D. Mich. Mar. 18, 2013), report and recommendation adopted, No. 1:12-CV-567, 2013 WL 1499041 (W.D. Mich. Apr. 10, 2013)  (citing *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 179–82 (1968)).  Defendants have not acknowledged the First Amendment implications of their request or made any effort to demonstrate that the restraint sought is warranted under First Amendment law.  Accordingly, this request will be denied without prejudice to Defendants' ability to re-file it if they can demonstrate the type of grave and imminent harm required to prevail.

## V.    CONCLUSION

For the reasons explained above, Plaintiff's motion to compel and Defendants' motion for protective order will both be granted in part and denied in part.  An appropriate Order shall enter.


_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE