Exhibit 3

**In The Matter Of:**

*TERRY LYNN KING vs*
*TONY PARKER, et al.*

---

*VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF DRUG PROCURER*

*July 19, 2021*

---

*Gibson Court Reporting*
*606 West Main Street*
*Suite 350*
*Knoxville, TN 37902*



Min-U-Script®

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF DRUG PROCURER

July 19, 2021

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TERRY LYNN KING, | ) |
| | ) |
| Plaintiff, | ) CAPITAL CASE |
| | ) |
| vs. | ) CASE NO. |
| | ) 3:18-CV-01234 |
| TONY PARKER, et al., | ) |
| | ) VOLUME 1 |
| Defendants. | ) |

APPEARANCES:

FOR THE PLAINTIFF:

ALEX KURSMAN, ESQ.
HAYDEN NELSON-MAJOR, ESQ.
LYNNE LEONARD, ESQ.
ANA BALDRIDGE, ESQ.
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545W
Philadelphia, Pennsylvania 19106

MICHAEL A. COTTONE, ESQ.
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201

Case 3:18-cv-01234 Document 184-3 Filed 03/17/22 Page 3 of 327 PageID #: 6063

1  APPEARANCES:  (Continued)

2              FOR THE DEFENDANTS:

3              ROBERT W. MITCHELL, ESQ.
               SCOTT C. SUTHERLAND, ESQ.
4              MALLORY K. SCHILLER, ESQ.
               MIRANDA H. JONES, ESQ.
5              CODY N. BRANDON, ESQ.
               DEAN S. ATYIA, ESQ.
6              Tennessee Attorney General's Office
               P.O. Box 20207
7              Nashville, Tennessee  37202

8

   ALSO PRESENT: David Jenkins, Videographer
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | STIPULATIONS |
| 2 | Volume 1 of the videotaped videoconference |
| 3 | deposition of DRUG PROCURER, called as a witness at the |
| 4 | instance of the Plaintiff, taken pursuant to all rules |
| 5 | applicable to the Federal Rules of Civil Procedure by |
| 6 | notice on the 19th day of July, 2021, at 9:47 a.m. |
| 7 | Eastern Time, before Rhonda S. Sansom, RPR, CRR, CRC, |
| 8 | Licensed Court Reporter, pursuant to stipulation of |
| 9 | counsel. |
| 10 | It being agreed that Rhonda S. Sansom, RPR, |
| 11 | CRR, CRC, Licensed Court Reporter, may report the |
| 12 | deposition in machine shorthand, afterwards reducing |
| 13 | the same to typewriting. |
| 14 | All objections except as to the form of the |
| 15 | questions are reserved to on or before the hearing. |
| 16 | It being further agreed that all formalities |
| 17 | as to notice, caption, certificate, transmission, et |
| 18 | cetera, including the reading of the completed |
| 19 | deposition by the witness and the signature of the |
| 20 | witness, are expressly waived. |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 5 of 327 PageID #: 6065

1          I N D E X

2       E X A M I N A T I O N S

3

4   DRUG PROCURER                                    PAGE

5   Examination by Mr. Kursman                          9

6

7              E X H I B I T S

8

9   NO.              DESCRIPTION                     PAGE

10    1   Lethal Injection Execution Manual,
          Execution Procedures for Lethal
11        Injection                                     60

12    2   Midazolam storage and preparation
          instructions
13        Bates Ds' First Resp. to RPF
          001271-1273                                  110
14

15    3   10/27/17 Email, Subject, RE:
          Additional Info
          Bates Def. Int. Discl. 001936 to 1937       117
16

17    4   Potassium Chloride preparation
          instructions
          Bates Ds' First Resp. to RFP 001274 to
18        1275                                         132

19    5   8/13/2020 Log re Schedule of midazolam
          and potassium chloride injections with
20        lot number and discard after date           137

21    6   9/7/17 Email, Subject: Updtae (sic)
          Bates Def. Int. Discl. 001975               159
22

23    7   9/7/17 Email, re Updtae (sic)
          Bates Def. Int. Discl. 001973 to 1974       163

24    8   9/7/17 Email re Updtae (sic)
          Bates Def. Int. Discl. 001971 to 1972       173
25

| 1 | 9 | 9/21/17 Email re Fwd: Status Update | |
|---|---|---|---|
| 2 | | Bates Ds' First Resp. to RSP 000143 to 144 | 177 |
| 3 | 10 | 4/6/17 Email, Subject:  Re: EXTERNAL-Inquiry | |
| 4 | | Bates Def. Int. Discl. 001979 | 193 |
| 5 | 11 | 4/6/17 Email, Subject:  Re: Inquiry | |
| 6 | | Bates Def. Int. Discl. 001980 | 194 |
| 7 | 12 | 4/6/17 Email, Subject:  Inquiry Bates Def. Int. Discl. 001981 | 195 |
| 8 | 13 | 7/20/17 Email, Subject:  RE: Update | |
| 9 | | Bates Def. Int. Discl. 001977 | 200 |
| 10 | 14 | 7/24/17 Handwritten Notes of Drug Procurer re Meeting at Field Office | |
| 11 | | Bates Ds' First Resp. to RFP 000163 to 164 | 206 |
| 12 | 15 | 4/4/17 Email, Subject: RE: Your inquiry | |
| 13 | | Bates Ds' First Resp. to RFP 000140 to 141 | 212 |
| 14 | 16 | PowerPoint Presentation, TN Department of Correction, August 31, 2017 | |
| 15 | | Bates Def. Int. Discl. 002143 to 2159 | 214 |
| 16 | 17 | 10/30/19 Email, Subject:  API | |
| 17 | | Bates Ds' First Resp. to RFP 000007 | 237 |
| 18 | 18 | 6/20/18 Email, Subject:  Productivity Inquiry | |
| 19 | | Bates Def. Int. Discl. 001911 | 238 |
| 20 | 19 | 5/3/19 Slip Opinion "Whether the Food and Drug Administration Has Jurisdiction over articles Intended for | |
| 21 | | Use in Lawful Executions" | 239 |
| 22 | 20 | (No Exhibit Marked) | N/A |
| 23 | 21 | 11/26/19 Email, Subject: Lab Results | |
| 24 | | Bates Ds' First Resp. to RFP 000004 | 243 |
| 25 | 22 | 8/9/19 Email, Subject:  Results Bates Ds' First Resp. to RFP 000013 | 244 |

23 8/8/19 Email, Subject: Suitability
   Test
   Bates Ds' First Resp. to RFP 000014         245

24 8/8/19 Email, Subject: KCl protocol
   Bates Ds' First Resp. to RFP 000016         247

25 7/31/19 Email, Subject: Report
   Bates Ds' First Resp. to RFP000018
                                               251

26 7/24/19 Email, Subject: Report
   Bates Ds' First Resp. to RFP 000019         252

27 7/2/19 Email, Subject: kcl protocol
   Bates Ds' First Resp. to RFP 000021 to
   22                                          254

28 5/9/19 Email, Subject: report
   Bates Ds' First Resp. to RFP 000035         255

29 4/29/19 Email, Subject: Potency report
   Bates Ds' First Resp. to RFP 000036         257

30 8/6/18 Email, Subject: USP 71
   Bates Ds' First Resp. to RFP 000051         258

31 7/12/18 Email, Subject: Testing report
   Bates Ds' First Resp. to RFP 000058         259

32 11/14/17 Email, Subject: Info
   Bates Ds' First Resp. to RFP 000082         261

33 7/17/18 Email, Subject: sample Rx
   Bates Ds' First Resp. to RFP 000055         263

34 12/15/17 Email, Subject: RE: info
   Bates Ds' First Resp. to RFP 000104         264

35 6/26/19 Email, Subject: Proposed
   Alternative
   Bates Ds' First Resp. to RFP 000024         266

36 12/20/19 Invoice to TNDOC
   Bates Mays' Supp. Int. and Prod.
   Responses 00075                             270

37 10/26/17 Invoice to TNDOC
   Bates Def. Int. Discl. 00229                272

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 8 of 327 PageID #: 6068

1    38   8/16/18 Invoice to TNDOC
          Bates Def. Int. Discl. 00235                277
2
     39   12/28/17 Invoice to TNDOC
3         Bates Def. Int. Discl. 00233                281

4    40   10/31/18 Invoice to TNDOC
          Bates Def. Int. Discl. 000236               283
5
     41   9/7/18 Handwritten Inventory Notes
6         Bates Def. Int. Discl. 000448               285

7    42   12/30/17 Handwritten Inventory Notes
          Bates Def. Int. Discl. 000834 to 840        290
8
     43   2/11/20 Handwritten Notes re Received
9         Medications
          Bates Mays' Supp. Int. And Prod.
10        Responses 00226                             292

11   44   5/16/19 Chemical Preparation Time Sheet
          Bates Dft. Int. Discl. 000831               302
12
     45   8/13/20 Email, Subject:  requested info     310
13
     46   12/4/17 Pharmacy Services Agreement
14        Bates Def. Int. Discl. 000251 to 255        312

15   47   10/18/17 Email, Subject: Re: Question
          Bates Def. Int. Discl. 001944 to 1946       313
16
     48   Photograph of Storage Refrigerator and
17        Freezer
          Bates Ds' First Resp. to RFP 001292         104
18

19

20

21

22

23

24

25

```
 1                    THE VIDEOGRAPHER:   We're on record at
 2         9:47 a.m. Central Time on July 19th, 2021.
 3                    This is the deposition of Witness Doe
 4         taken in the matter of Terry Lynn King versus Tony
 5         Parker, et al., Case No. 3:18-CV-01234, filed in
 6         the U.S. District Court, Middle District of
 7         Tennessee, Nashville Division.
 8                    Counsel will state their names and
 9         affiliation for the record and the court reporter
10         will swear in the witness.
11                    MR. KURSMAN:   Good morning.   My name is
12         Alex Kursman from the Federal Public Defender in
13         Philadelphia.
14                    MR. COTTONE:   My name is Michael Cottone,
15         from Bass, Berry & Sims in Nashville, Tennessee,
16         for the plaintiff.
17                    MR. KURSMAN:   And also present for
18         plaintiffs in the room with me are Lynne Leonard,
19         Hayden Nelson-Major, and Ana Baldridge, all from
20         the Federal Defender in Philadelphia.
21                    MR. MITCHELL:   Good morning.   My name is
22         Rob Mitchell.   I represent the defendants,
23         Commissioner Tony Parker and Warden Tony Mays.
24         And I also represent the Drug Procurer.
25                    With me in my office is cocounsel Scott
```

```
 1           Sutherland.  And also listening in are cocounsel
 2           Dean Atyia, Cody Brandon, Mallory Schiller, and
 3           Miranda Jones.
 4                        DRUG PROCURER,
 5   having been first duly sworn, testified as follows:
 6                        EXAMINATION
 7   BY MR. KURSMAN:
 8           Q.      Okay.  Good morning.  As I said before,
 9   my name is Alex Kursman, and I'm an attorney at the
10   Federal Community Defender Office in Philadelphia.  And
11   I'm acting on behalf of Terry King in King versus
12   Parker, pending in the Middle District of Tennessee.
13                 Thank you.  Thank you for taking the time
14   to answer questions in this matter today.
15                 Do you understand that you are here today
16   to answer questions related to the King case?
17           A.      Yes.
18           Q.      And what is your understanding of what
19   the case is about?
20                 MR. KURSMAN:  I'm sorry.  Drug Procurer,
21           I think you're going to have to keep your hand on
22           the mouse, because everyone is getting feedback
23           when you're not speaking.  So I think you're going
24           to have to mute-unmute every time you answer.
25   BY MR. KURSMAN:
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 11 of 327 PageID #: 6071

```
 1          Q.        So let -- so let me ask that question
 2     again.  So what is your understanding of what this case
 3     is about?
 4          A.        Regarding the State of Tennessee's lethal
 5     injection protocol.
 6          Q.        And do you know what the specific
 7     challenge in this case is?
 8          A.        That the protocol is unconstitutional.
 9          Q.        And do you understand the elements that
10     plaintiffs must prove to meet their burden to prove the
11     case?
12          A.        A little.
13          Q.        I'm sorry, could you repeat that answer?
14          A.        A little bit, yes.
15          Q.        A little bit?  Could you describe that
16     understanding?
17          A.        As I understand it, it has to be proven
18     that the protocol violates the Constitution in that it
19     is unconstitutional on its face and by the way it's
20     carried out.  That's my general understanding.
21          Q.        And do you understand the specific
22     elements that Mr. King would have to prove to make out
23     a constitutional violation?
24          A.        Sorry.  That -- well, one, that it's
25     unconstitutional; but two, that there's another readily
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 12 of 327 PageID #: 6072

1    available alternative proposed by him.

2         Q.    And what is your understanding of what a

3    readily available alternative is?

4              MR. MITCHELL:  Objection, form.  You can

5         answer.

6              THE WITNESS:  I'm sorry, I couldn't hear.

7    BY MR. KURSMAN:

8         Q.    What is your understanding of what the

9    readily available alternative is?

10             MR. MITCHELL:  Same objection.

11             THE WITNESS:  It would be an alternative,

12        a readily available alternative, that can be

13        obtained by TDOC to employ for execution.

14   BY MR. KURSMAN:

15        Q.    Okay.  Now, as you know, we are taking

16   this deposition on an anonymous basis.  What that means

17   is that I will not ask you any questions that are

18   intended to disclose your identity.

19             To be clear, though, my understanding is

20   that you are the individual responsible for procuring

21   lethal injection drugs for use in connection with

22   Tennessee's execution protocol.  Is that right?

23        A.    Yes.

24        Q.    Okay.  Did you decide yourself that you

25   did not want to be identified for this deposition?

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 13 of 327 PageID #: 6073

```
 1                    MR. MITCHELL:  Objection, relates to
 2        attorney-client communication.
 3   BY MR. KURSMAN:
 4        Q.     Did -- did somebody tell you not -- not
 5   to identify yourself?
 6                    MR. MITCHELL:  And Alex, I'm going to
 7        object again and instruct the witness not to
 8        answer pursuant to the Court's protective order,
 9        DE107 and DE108.
10   BY MR. KURSMAN:
11        Q.     Okay.  So let's -- let's cover some --
12   some ground rules before we get started.  Have you ever
13   had your deposition taken before?
14        A.     Yes.
15        Q.     How many times?
16        A.     Once.
17        Q.     And what was that case about?
18        A.     It was a lawsuit regarding conditions at
19   the Charles L. Turner Correctional Facility.
20        Q.     And when was that?
21                    MR. MITCHELL:  Objection.  This -- this
22        can get into, you know, information that would
23        lead to the identification of the individual.  So
24        I'm going to again instruct the deponent not to
25        answer this question, pursuant to the Court's
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 14 of 327 PageID #: 6074

```
1       protective order.
2               MR. KURSMAN:   Just so I'm clear on the
3       record, I'm not attempting to ask any questions
4       that would identify the Drug Procurer.  These are
5       just very standard questions in a deposition.  I
6       just want to know if the Drug Procurer has ever
7       taken a deposition before and what type of case
8       that deposition was taken.
9               MR. MITCHELL:  And -- and the question's
10      been answered, and I think the answer was that it
11      was a civil case.
12              But obviously some of these questions,
13      you know, we can't get into specifics because that
14      could be information calculated or likely to lead
15      to the Drug Procurer's identity, which again is
16      subject to the Court's protective order, DE107 and
17      108.
18              MR. KURSMAN:   Sure.
19 BY MR. KURSMAN:
20      Q.      And Drug Procurer, do you understand
21 you're under oath?
22      A.      Yes.
23      Q.      And do you understand that means you need
24 to tell the truth, to the best of your ability?
25      A.      Yes.
```

```
1          Q.      Is -- is there any reason you cannot
2    testify truthfully or accurately today?
3          A.      No.
4          Q.      Are you feeling ill today?
5          A.      No.
6          Q.      Have you taken any medications today?
7          A.      No.
8          Q.      Have you consumed any alcohol in the last
9    24 hours?
10         A.      No.
11         Q.      Have you consumed any drugs in the last
12   24 hours?
13         A.      No.
14         Q.      And are you represented by counsel today?
15         A.      Yes.
16         Q.      And who is that?
17         A.      Rob Mitchell.
18         Q.      And can you describe for the record where
19   you are right now?
20                 MR. MITCHELL:  I think, if I can just say
21         on the record, I mean, the Drug Procurer is in the
22         Attorney General's Office in Nashville, Tennessee,
23         on premises, in an office by him or herself.  No
24         one is in there.
25                 If the Drug Procurer, if you can ratify
```

```
 1          whether that's correct, that would be helpful.
 2               THE WITNESS:   That is correct.
 3  BY MR. KURSMAN:
 4      Q.      And even though this deposition is taken
 5  over Zoom, the court reporter is making a record based
 6  on what you say.  So of course your face is blanked out
 7  now, but you will need to respond to questions
 8  verbally.  Do you understand that?
 9      A.      Yes.
10      Q.      And in order for the court reporter to
11  accurately record your testimony, please wait for me to
12  finish my question before you give an answer.  Okay?
13      A.      Understood.
14      Q.      And I will do the same for you.  I will
15  wait for you to finish your answers before I ask a
16  follow-up question.  Okay?
17      A.      Okay.
18      Q.      And if you don't understand a question,
19  just let me know and I will clarify -- I will do my
20  best to clarify that question.  Okay?
21      A.      Okay.
22      Q.      And if you -- if you need to take a break
23  at any time, just let me know and we can take a break.
24      A.      Okay.
25      Q.      But if there's a question pending, we'll
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 17 of 327 PageID #: 6077

1 | ask that you answer the question before going off the
2 | record. Do you understand that?
3 |      A.    Understood.
4 |      Q.    And from time to time your lawyer may
5 | object to my questions, but you'll still need to answer
6 | my questions unless the objection is based on a
7 | privilege assertion. Do you understand that?
8 |      A.    Yes.
9 |      Q.    Okay. And is there anybody in the room
10 | with you today?
11 |      A.    No.
12 |      Q.    Okay. And do you understand that you
13 | cannot consult with your attorneys before you answer
14 | any of my questions?
15 |      A.    Yes.
16 |      Q.    And before we begin, do you have any
17 | questions for me?
18 |      A.    No.
19 |      Q.    Okay. What did you do to prepare for
20 | this deposition?
21 |      A.    Consulted with my attorney and reviewed
22 | some discovery documents.
23 |      Q.    Okay. Who -- who did you consult with,
24 | without telling me the contents of those discussions?
25 |      A.    Rob Mitchell.

| | | |
|---|---|---|
| 1 | Q. | And how many times did you and Rob -- you |
| 2 | and Mr. Mitchell meet? | |
| 3 | A. | Once. |
| 4 | Q. | And when was that? |
| 5 | A. | Last Friday. |
| 6 | Q. | And how long was that meeting? |
| 7 | A. | Approximately two and-a-half hours. |
| 8 | Q. | Was anyone else present at that meeting? |
| 9 | A. | Yes. |
| 10 | Q. | Who? |
| 11 | A. | Scott Sutherland. |
| 12 | Q. | And did you take notes during that |
| 13 | meeting? | |
| 14 | A. | No. |
| 15 | Q. | Okay.  And in that -- in that meeting |
| 16 | with Mr. Mitchell and Mr. Sutherland, did you review | |
| 17 | any documents? | |
| 18 | A. | Yes. |
| 19 | Q. | What documents did you review? |
| 20 | A. | The lethal injection protocol, some |
| 21 | invoices, and emails. | |
| 22 | Q. | How many documents would you say you |
| 23 | reviewed? | |
| 24 | A. | Altogether, in preparation for this, a |
| 25 | couple hundred pages. | |

1    Q.    Now, you said "in preparation for this."
2  Did you review documents aside from preparation for
3  this specific deposition?
4    A.    No.
5    Q.    And did any of those documents that you
6  reviewed refresh your recollection of any specific
7  issues?
8    A.    Possibly.
9    Q.    And do you recall what they refreshed
10  your recollection about?
11    A.    With regard to dates of certain
12  occurrences.
13    Q.    And could you describe what -- what those
14  dates were, if you remember right now?
15    A.    I don't remember the specific dates, just
16  that they were contained in the documents I reviewed.
17    Q.    And do you -- were there any dates you
18  couldn't remember or events you couldn't remember until
19  you reviewed a specific document?
20    A.    I wasn't able to remember specific dates
21  that items were received without reviewing those
22  documents.
23    Q.    Okay. And so -- so tell me if my
24  understanding is wrong. So -- so once you reviewed
25  those documents, you remembered receiving emails on

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 20 of 327 PageID #: 6080

```
 1  certain dates?  Is that what you're saying?
 2       A.       It refreshed my recollection of the dates
 3  emails were received.  Also dates that items were
 4  received and stored at Riverbend, those sorts of
 5  things.
 6       Q.       Okay.  Did -- did you also review a
 7  PowerPoint presentation?
 8       A.       Yes.
 9       Q.       Okay.  And did that refresh your rec- --
10  your recollection on anything?
11       A.       Yes.
12       Q.       And can you describe how that refreshed
13  your recollection?
14            MR. MITCHELL:  Objection to form.  You
15       can answer.
16            THE WITNESS:  It refreshed my
17       recollection as to the contents of that
18       PowerPoint, what the PowerPoint itself described.
19  BY MR. KURSMAN:
20       Q.       And did -- did you create that
21  PowerPoint?
22       A.       Yes.
23       Q.       And did you present that PowerPoint?
24       A.       Yes.
25       Q.       Okay.  Did you review any materials on
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 21 of 327 PageID #: 6081

```
 1   your own to prepare for this deposition?
 2        A.     Yes, the same documents I referenced, the
 3   discovery documents.
 4        Q.     Can you describe how -- how you reviewed
 5   them on your own?
 6        A.     I printed them off and read through them.
 7        Q.     And where did you do that?
 8        A.     I'm sorry, could you repeat?
 9        Q.     Yeah, I'm sorry.  Where did you do that?
10        A.     In my office and at home.
11        Q.     Okay.  And how many hours would you say
12   you spent reviewing those materials?
13        A.     Approximately three to four.
14        Q.     Okay.  And did you review any other
15   materials than -- than the ones you just discussed
16   reviewing with Mr. Mitchell and Mr. Sutherland?
17        A.     No.
18        Q.     And did you discuss this deposition with
19   anybody else?
20        A.     No.
21        Q.     Did you discuss it -- I don't want to get
22   into any identifying information, but did you discuss
23   it with a spouse or a friend before coming in today?
24        A.     Only that I had one.  Nothing of
25   material.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 22 of 327 PageID #: 6082

1       Q.      And when was that?

2       A.      Over the weekend.

3       Q.      Okay.  And what was said in that

4  conversation?

5       A.      Just that I had a deposition Monday.

6       Q.      And why did you discuss that with this

7  person?

8       A.      To let my spouse know that I would not be

9  reachable.

10      Q.      And did they at all help you prepare for

11  this deposition?

12      A.      No.

13      Q.      Did they give you any words of

14  encouragement?

15      A.      No.

16      Q.      Okay.  Did anyone consult with you to

17  prepare for another deposition in this case?

18      A.      No.

19      Q.      And what I mean by -- what I mean by that

20  is did a person like the warden or the director contact

21  you to help them prepare for any future depositions?

22      A.      No.

23      Q.      And did you review transcripts of any

24  other depositions before testifying today?

25      A.      No.

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 23 of 327 PageID #: 6083

```
 1          Q.      Did you review any of the papers that
 2   have been filed in court in this case?
 3          A.      Responses to interrogatories.
 4          Q.      Did you -- did you review the Amended
 5   Complaint?
 6          A.      No.
 7          Q.      Can you tell me why you reviewed the
 8   responses to the interrogatories?
 9          A.      Some of the information pertained to
10   lethal injection chemicals.
11          Q.      And why exactly did you think that would
12   be relevant to your deposition today?
13          A.      Because the information was regarding the
14   procurement of the lethal injection chemicals.
15          Q.      And did -- did -- in the responses to
16   those interrogatories that you reviewed, were you the
17   one who came up with the answers to those responses?
18              MR. MITCHELL:  I'm going to object and
19          instruct the witness not to answer on the basis of
20          attorney-client privilege.
21              MR. KURSMAN:  Well, Mr. Mitchell, all --
22          all I'm asking here is whether he -- he or she is
23          the person who came up with the answers on the
24          interrogatories.  I'm not asking for any -- any
25          communication between he or she and you or any
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 24 of 327 PageID #: 6084

1       matters discussed.

2               MR. MITCHELL:   The answers are the

3       answers of the two defendants in this case,

4       Commissioner Parker and Warden Mays, who I

5       represent.   And who Commissioner Parker and Warden

6       Mays talked to and how they came up with their

7       answers is covered by attorney-client privilege.

8               MR. KURSMAN:   Just -- just to be clear

9       for the record, are you asserting that your client

10      has an attorney-client privilege based on who that

11      client talks to, although that person is not their

12      attorney?

13              MR. MITCHELL:   The formulation of the

14      interrogatories by the two named defendants I'm

15      saying is an attorney-client privilege, and we're

16      not waiving it and not permitting the Drug

17      Procurer to testify about what the Drug Procurer

18      may or may not know about the formulation of those

19      responses.

20              MR. KURSMAN:   Well, let me -- let me see

21      if I can rephrase this a bit.

22      BY MR. KURSMAN:

23          Q.      The -- the interrogatories were -- were

24      questions posed to defendants in this case.   Did the

25      defendants -- not the attorneys -- did the defendants

```
 1   consult with you before answering those questions?
 2              MR. MITCHELL:  Are you asking me or the
 3        Drug Procurer?
 4              MR. KURSMAN:  No, I'm asking the Drug
 5        Procurer there.
 6              MR. MITCHELL:  Again, same basis; to
 7        preserve the attorney-client privilege, I'm going
 8        to instruct the Drug Procurer not to answer.
 9              MR. KURSMAN:  I'm -- right now, just for
10        the record, I'm asking the Drug Procurer whether
11        he or she spoke with the defendants in this case.
12        I'm -- this has nothing to do with any meetings
13        with -- with attorneys in this case.
14              Unless the Drug Procurer represents the
15        warden or the other defendants in this case and
16        they -- they let us know that, these
17        certainly wouldn't be -- these certainly wouldn't
18        be protected by any attorney-client privilege
19        right now.  And the Drug Procurer, of course, is a
20        fact witness right now.
21              MR. MITCHELL:  And I'm still going to
22        maintain the objection -- or repeat the objection,
23        attorney-client privilege, and instruct the Drug
24        Procurer not to answer.
25              MR. KURSMAN:  And Mr. Mitchell, can --
```

```
1            you went off the screen for a bit.  Can I ask
2            where -- where you were going?
3                    MR. MITCHELL:  I was talking with General
4            Sutherland.
5                    MR. KURSMAN:  Okay.
6     BY MR. KURSMAN:
7            Q.      Drug Procurer, did you do anything else
8     to prepare for your deposition?
9            A.      No.
10           Q.      How much time in total do you estimate
11    you spent preparing for this deposition?
12           A.      Approximately six hours.
13           Q.      Six hours?  Okay.
14                   Now, let's talk a bit about -- about your
15    background without getting into your identity at all.
16    What is your highest legal of education?
17           A.      Postgraduate.
18           Q.      Okay.  And what is that in?
19                   MR. MITCHELL:  And I'm going to object,
20           again pursuant to protective orders DE107 and 108,
21           and instruct the witness not to answer.
22                   MR. KURSMAN:  Well, just for -- for the
23           record, I'm not really concerned about where the
24           Drug Procurer went to school.  All I'd like to
25           know is what their -- their -- their background is
```

```
1              in; what expertise they have to be the Drug
2              Procurer, if any.
3                       MR. MITCHELL:  And I'm going to -- I'm
4              going to repeat the objection; because depending
5              on what the answer is to that, that could really,
6              you know, narrow down the scope of individuals --
7              I mean, if it was in art history or something like
8              that.
9                       So I'm going to instruct -- you know, the
10             witness has said "postgraduate"; but I'm going to
11             instruct the Drug Procurer not to answer, again
12             pursuant to the Court's protective order.
13                      MR. KURSMAN:  Well, Rob, I'm going to
14             keep asking these questions, so feel free to keep
15             objecting.
16     BY MR. KURSMAN:
17             Q.       What type of training did you get as
18     your -- as part of that postgraduate degree?
19                      MR. MITCHELL:  And again, I'm going to
20             object pursuant to the protective order and
21             instruct the witness not to answer.
22     BY MR. KURSMAN:
23             Q.       And what type of information did you
24     learn as part of that postgraduate degree?
25                      MR. MITCHELL:  I'm going to object to
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 28 of 327   PageID #: 6088

```
1            both the form and also pursuant to the protective
2            order again.  Instruct the witness not to answer.
3     BY MR. KURSMAN:
4            Q.      So if you have a postgraduate degree, I
5     assume you also have a high school and college degree.
6     Right?
7            A.      Yes.
8            Q.      Did you get any specialized training at
9     your high school?
10           A.      No.
11           Q.      Did you got any specialized training at
12    your college?
13           A.      Can you be specific as to what you mean
14    by "specialized training?"
15           Q.      Sure.  What did you major in?
16                   MR. MITCHELL:  And I'm going to object
17            again pursuant to the protective order and
18            instruct the witness not to answer.
19    BY MR. KURSMAN:
20           Q.      Have you completed any coursework beyond
21    your postgraduate degree?
22           A.      No.
23                   MR. MITCHELL:  Same objection.
24                   MR. KURSMAN:  If they completed any
25            coursework beyond their postgraduate degree?  I'm
```

```
 1          not asking what it's in, I'm just asking if they
 2          completed any coursework.
 3                  MR. MITCHELL:   You may answer.
 4                  THE WITNESS:   No.
 5     BY MR. KURSMAN:
 6          Q.      Do you hold any certifications or
 7     certificates in any field?
 8          A.      No.
 9          Q.      Have you ever had any license of yours
10     suspended?
11                  MR. MITCHELL:   Objection.   I'll instruct
12          the witness not to answer.
13     BY MR. KURSMAN:
14          Q.      Do you have any military training?
15                  MR. MITCHELL:   Objection.   I'm going to
16          instruct the witness not to answer.
17     BY MR. KURSMAN:
18          Q.      Do you -- do you have any medical
19     training?
20                  MR. MITCHELL:   Objection.   I'm going to
21          instruct the witness not to answer.
22     BY MR. KURSMAN:
23          Q.      Do you participate in volunteer programs?
24          A.      No.
25          Q.      Do you have any legal training?
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 30 of 327 PageID #: 6090

```
1                    MR. MITCHELL:  Objection.  I'm going to
2            instruct the witness not to answer.
3     BY MR. KURSMAN:
4            Q.     And do -- do you have any pharmaceutical
5     training?
6                    MR. MITCHELL:  Same objection.  Don't
7            answer.
8     BY MR. KURSMAN:
9            Q.     Now, are you currently employed?
10           A.     Yes.
11           Q.     Where?
12                   MR. MITCHELL:  Objection.  Don't answer.
13    BY MR. KURSMAN:
14           Q.     How -- how long have you had your current
15    job at wherever you're employed?
16                   MR. MITCHELL:  Same objection.  Don't
17           answer, pursuant to the Court's protective order.
18                   MR. KURSMAN:  So, Mr. Mitchell, I don't
19           know where the Drug Procurer works.  All I'm
20           asking is how long they've held their -- their
21           most recent job.
22                   MR. MITCHELL:  And again, one by one,
23           those questions can chip away at discovery.
24           Pursuant to the Court's protective order,
25           information calculated or likely to lead to
```

```
 1              identifying information of individuals involved in
 2              carrying out executions in Tennessee is protected.
 3              Again, DE107, and I'm reading from the protective
 4              order.  So I'm going to instruct the witness not
 5              to answer.
 6      BY MR. KURSMAN:
 7              Q.      Okay.  How long have you been the Drug
 8      Procurer for Tennessee?
 9                      MR. MITCHELL:  Objection.  Don't answer,
10              pursuant to the protective order.
11                      So actually, I'll withdraw that
12              objection.
13                      THE WITNESS:  Can you repeat the
14              question, please?
15      BY MR. KURSMAN:
16              Q.      Sure.  How long have you been the Drug
17      Procurer for the State of Tennessee?
18              A.      Since 2016.
19              Q.      And before you became the Drug Procurer,
20      did you speak with the person who was the Drug Procurer
21      before you?
22              A.      No.
23              Q.      Did you review any of the Drug Procurer's
24      notes, the Drug Procurer who was there before 2- --
25      before you took over in 2016?
```

```
1           A.      No.
2           Q.      Did you ask anyone for all of the -- the
3    contact information that the prior Drug Procurer had as
4    it related to obtaining lethal injection chemicals?
5           A.      No.
6           Q.      Did you receive the prior Drug Procurer's
7    Rolodex or any notebook with phone numbers of -- of
8    pharmacies or places to obtain the lethal injection
9    chemicals?
10          A.      No.
11          Q.      So when -- when you took over as -- as
12   the Drug Procurer in 2016, how exactly did -- did you
13   start attempting to obtain lethal injection chemicals?
14                  MR. MITCHELL:  Objection, form.  You can
15          answer.
16                  THE WITNESS:  I started with Google and
17          learning -- or trying to find out where there were
18          compounding pharmacies and also where there may be
19          supplies of certain chemicals, mainly
20          pentobarbital.
21   BY MR. KURSMAN:
22          Q.      And what -- what did you do on Google?
23          A.      Searched for compounding pharmacies.
24          Q.      And why -- why at that time were you
25   looking for pentobarbital?
```

```
 1          A.        That was the drug for our lethal
 2   injection at the time.
 3          Q.        Did you contact any of the states at that
 4   time that were using pentobarbital to perform
 5   executions?
 6          A.        Yes.
 7          Q.        Which states were that?
 8                    MR. MITCHELL:  Objection.  Don't answer,
 9          pursuant to the protective order.
10                    MR. KURSMAN:  And, Mr. Mitchell, could --
11          could you state on the record how -- how that
12          would violate the protective order, whether the
13          Drug Procurer contacted states who were using
14          pentobarbital?
15                    MR. MITCHELL:  Sure.  Pursuant to the
16          Court's protective order, DE107, Page ID 5,117,
17          quote:
18                    Defendants will be granted a protective
19                    order against the discovery of the
20                    identities or identifying information about
21                    the individuals and entities involved with
22                    supplying, delivering, maintaining, or
23                    administrating the chemicals in question.
24   BY MR. KURSMAN:
25          Q.        Well, I already know the answer to this,
```

```
 1    of course.  But did any states provide you with
 2    pentobarbital?
 3            A.    No.
 4                  MR. KURSMAN:  Okay.  So if none of the
 5          states provided you with pentobarbital, I don't
 6          see how -- how that would violate the protective
 7          order, which states the Drug Procurer contacted.
 8                  MR. MITCHELL:  I'm still, I mean, DE --
 9          the quote I just read, as well as the previous
10          page:
11                      "To the extent it seeks the identity of any
12                      individual involved in the process of
13                      acquiring, transporting, or storing
14                      execution drugs, subject to the Court's
15                      requirement of pseudonyms as explained with
16                      regard to Interrogatories 8 or 9."
17                  So we're talking about the
18          transportation, acquisition, supplying of drugs.
19          And so proper nouns, who the Drug Procurer
20          contacted, are all protected.
21                  MR. KURSMAN:  None of the states were
22          involved in any of the above-mentioned things that
23          you just noted were listed in the protective
24          order.
25                  MR. MITCHELL:  They were involved with
```

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 35 of 327 PageID #: 6095

```
 1            the process of trying to acquire the drugs.
 2                  MR. KURSMAN:  Okay.
 3    BY MR. KURSMAN:
 4        Q.     Does -- does anybody report to you in
 5    your role as the Drug Procurer?
 6        A.     No.
 7        Q.     Do you report to anybody in your role as
 8    the Drug Procurer?
 9                  MR. MITCHELL:  And -- well, you may
10          answer in your role as Drug Procurer.
11                  THE WITNESS:  Yes.
12    BY MR. KURSMAN:
13        Q.     And who are those people, without --
14    without identifying them, unless they are the
15    defendants in this case?
16                  MR. MITCHELL:  And at this point I'm
17          going to instruct the witness not to answer,
18          pursuant to the protective order.
19    BY MR. KURSMAN:
20        Q.     Okay.  Do you report to the warden?
21        A.     No.
22        Q.     Do you report to the commissioner?
23        A.     Yes.
24        Q.     Do you report to the governor?
25                  MR. MITCHELL:  Objection.  Do not answer,
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 36 of 327 PageID #: 6096

```
 1          pursuant to the protective order.
 2   BY MR. KURSMAN:
 3          Q.     And how did -- how did you get the
 4   position of the Drug Procurer?
 5                 MR. MITCHELL:  Again, I'm going to object
 6          pursuant to the protective order and instruct the
 7          witness not to answer that question.
 8                 MR. KURSMAN:  Well, okay, let me see if I
 9          can -- let me see if I can ask it a bit
10          differently.  I don't see how that would violate
11          the protective order at all.
12   BY MR. KURSMAN:
13          Q.     Did you seek out the position of Drug
14   Procurer?
15                 MR. MITCHELL:  Same objection.  Don't
16          answer.
17   BY MR. KURSMAN:
18          Q.     Did -- did you apply for the position as
19   Drug Procurer?
20                 MR. MITCHELL:  Same objection.  Don't
21          answer.
22                 MR. KURSMAN:  Mr. Mitchell, every --
23          every objection you're making now seems to have
24          almost -- well, I don't even want to say "almost,"
25          but nothing to do whatsoever with anything you
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 37 of 327 PageID #: 6097

1    just read in DE107, so it almost seems as you're

2    objecting to every question.

3           The last question I asked was "Did you

4    apply for the position of the Drug Procurer?"  I'm

5    not sure how at all that would identify the

6    identity of the Drug Procurer.

7           MR. MITCHELL:  I think it's calculated or

8    is likely to lead to discoverable information.

9    Again, this -- this background, this context about

10   the Drug Procurer and how the Drug Procurer got

11   the job is all right around the protective order.

12   I mean, if you want to ask the Drug Procurer

13   certain steps the Drug Procurer took to try to

14   procure drugs, that's a different line of inquiry.

15          But right now this background information

16   is all nibbling around the heart of the Court's

17   protective order, if not striking at the heart of

18   it.

19          MR. KURSMAN:  Sure, but part -- part and

20   parcel of how the Drug Procurer attempted to get

21   drugs has to do with the Drug Procurer's

22   background.

23          If -- if the State of -- if the State of

24   Tennessee hired a pharmacist to do it or a doctor

25   to do it, it would be a bit different than if they

```
 1              hired, you know, a librarian or -- or somebody
 2              who, you know, just graduated high school.
 3                   So this is all I'm asking you.  It has
 4              nothing to do with getting the Drug Procurer's
 5              identity.  I just am trying to find out how the
 6              Drug Procurer came into the role that they came
 7              into.
 8                   MR. MITCHELL:  And I'm going to repeat my
 9              objection and instruct the Drug Procurer you are
10              not to answer whether the Drug Procurer applied
11              for the role.
12    BY MR. KURSMAN:
13         Q.   Do -- do you get paid to be the Drug
14    Procurer?
15                   MR. MITCHELL:  Objection.  Do not answer.
16    BY MR. KURSMAN:
17         Q.   What -- what motivated you to become the
18    Drug Procurer?
19                   MR. MITCHELL:  Objection.  Do not answer,
20              pursuant to the Court's protective order.
21    BY MR. KURSMAN:
22         Q.   Did -- do you receive any -- any training
23    to be the Drug Procurer?
24         A.   No.
25         Q.   When -- when you got the job as the Drug
```

1 Procurer in 2016, did anybody give you instructions on
2 how to procure the drugs?
3      A.    No.
4      Q.    Did you have any prior experience
5 procuring drugs?
6      A.    No.
7      Q.    Were you familiar at that time with the
8 drug pentobarbital?
9      A.    Only by name.
10     Q.    Were you familiar with the drug
11 midazolam?
12     A.    Only by name.
13     Q.    Were you familiar with the drug
14 vecuronium bromide?
15     A.    No.
16     Q.    Were you familiar with the drug potassium
17 chloride?
18     A.    Only by name.
19     Q.    Were -- were you aware of the difference
20 between a compounded drug and a manufactured drug?
21     A.    No.
22     Q.    Are you aware of that difference today?
23     A.    Yes.
24     Q.    Can you describe that difference for me?
25     A.    By its name, commercially manufactured

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 40 of 327 PageID #: 6100

```
1    drugs are just that; commercially manufactured and
2    available from wholesalers and companies.
3                Compounded preparations are using active
4    pharmaceutical ingredients to compound a substance that
5    is either similar strength or a higher potency.
6        Q.      And you mentioned the term "active
7    pharmaceutical ingredient."  Can -- can you describe
8    for me what that is?
9                MR. MITCHELL:  I'm going to object that
10           that calls for an expert opinion.  You can answer.
11               You can answer.
12               THE WITNESS:  Yes.  A -- my description
13           is it's a building block to the completed
14           preparation.  So it's the main component or
15           ingredient, and then it's compounded to become a
16           solution or a pill or injectable.
17   BY MR. KURSMAN:
18       Q.      And can you tell me what forms of active
19   pharmaceutical -- what forms do active pharmaceutical
20   ingredients come in?
21               MR. MITCHELL:  Same objection, expert
22           opinion.  You can answer.
23               THE WITNESS:  The ones I'm aware of and
24           I've dealt with in this role are in powder form.
25   BY MR. KURSMAN:
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 41 of 327 PageID #: 6101

```
 1          Q.      And have you ever handled an active
 2   pharmaceutical ingredient?
 3          A.      No.
 4          Q.      Have you ever stored an active
 5   pharmaceutical ingredient?
 6          A.      No.
 7          Q.      Have you ever seen an active
 8   pharmaceutical ingredient?
 9          A.      No.
10          Q.      Have you seen any of the products once
11   they are compounded?
12          A.      Yes.
13          Q.      Have you been involved in prior
14   executions?
15                  MR. MITCHELL:  Objection.  Do not answer.
16   BY MR. KURSMAN:
17          Q.      Are you -- are you involved --
18                  MR. MITCHELL:  Pursuant to the protective
19          order.
20   BY MR. KURSMAN:
21          Q.      Are you involved in this execution
22   protocol in any other capacity, aside from the Drug
23   Procurer?
24                  MR. MITCHELL:  Objection.  Do not answer,
25          pursuant to the protective order.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 42 of 327 PageID #: 6102

```
 1   BY MR. KURSMAN:
 2        Q.      Is there anyone else in Tennessee who is
 3   responsible -- without identifying their name, is there
 4   anyone else in Tennessee who is responsible for
 5   procuring lethal injection drugs for use in executions?
 6        A.      No.
 7        Q.      Is there a certain time at which you will
 8   no longer be responsible for procuring lethal injection
 9   drugs?
10             MR. MITCHELL:  Objection.  Do not answer,
11        pursuant to the protective order.
12   BY MR. KURSMAN:
13        Q.      Are -- are you responsible for procuring
14   the equipment used in an execution?
15             MR. MITCHELL:  Objection, form.
16             THE WITNESS:  Can you be more specific,
17        what you mean by "equipment?"
18   BY MR. KURSMAN:
19        Q.      Sure.  Are you responsible for obtaining
20   the syringes?
21        A.      No.
22        Q.      Are you responsible for obtaining gloves?
23        A.      No.
24        Q.      Are you responsible for obtaining the --
25   the -- the water that is used to mix the lethal
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 43 of 327 PageID #: 6103

1  injection chemicals?

2      A.      Yes.

3      Q.      And what other equipment are you

4  responsible for obtaining?

5      A.      The lethal injection chemicals, the

6  bacteriostatic water, and the saline.

7      Q.      And was there ever a point during your

8  time as the Drug Procurer that you obtained drugs

9  but -- but not the static water?

10     A.      We would obtain bacteriostatic water, and

11 it wouldn't be every time because we would order enough

12 to cover several executions.  So it would be an order

13 that would cover a span of time, so it wasn't ordered

14 every single time.

15     Q.      And how did you store the bacteriostatic

16 water?

17     A.      Stored it in a secure cabinet at room

18 temperature.

19     Q.      And has the static water been secured the

20 same way since 2016, when you took over as the Drug

21 Procurer?

22     A.      Since we've gotten it, since I've ordered

23 it and it's been received in my role, yes, it's been

24 stored the same way.

25     Q.      And what about for midazolam?  Has -- has

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 44 of 327 PageID #: 6104

```
1    that been stored the same way since 2016?
2              MR. MITCHELL:  Objection, form.  You can
3         answer.
4              THE WITNESS:  No.
5    BY MR. KURSMAN:
6         Q.     And can you describe the difference
7    between how it was stored once, compared to how it is
8    stored now?
9              MR. MITCHELL:  Same objection.  You can
10        answer.
11             THE WITNESS:  At first, midazolam that
12        was received was commercially manufactured.  That
13        midazolam was stored at room temperature in a
14        secured cabinet.
15             Compounded preparations of midazolam that
16        have been received are stored in the freezer.
17   BY MR. KURSMAN:
18        Q.     And when was the first time that you
19   received compounded midazolam?
20        A.     It would have been, without referring to
21   anything, late July-early August of 2018.
22        Q.     And was the vecuronium bromide stored the
23   same way since 2016?
24        A.     Yes.
25        Q.     Is the vecuronium bromide that you have
```

```
 1   now, is that compounded or manufactured?
 2       A.      That is commercially manufactured.
 3       Q.      Okay.  And the potassium chloride that --
 4   that you currently procure, is that compounded or
 5   manufactured?
 6       A.      It is compounded.
 7       Q.      Okay.  And the potassium chloride, has
 8   that been stored the same way since 2016?
 9       A.      No.  Similar to midazolam, the first
10   amounts we received were commercially manufactured.
11   Those were stored at room temperature in a secure
12   cabinet.
13             Now, with compounded preparations, once
14   received they are stored in the freezer.
15       Q.      And are you responsible for putting those
16   lethal injection chemicals in the freezer?
17       A.      Yes.
18       Q.      And are you responsible for moving them
19   to -- well, I apologize.  Strike that.
20             What -- what happens?  Can you describe the
21   process of what happens within 72 hours of an execution,
22   where those lethal injection drugs go from the freezer?
23             MR. MITCHELL:  Objection, form.  You can
24        answer.
25             THE WITNESS:  I'm not involved in the
```

```
 1              movement of the lethal injection chemicals at that
 2              point.  My understanding is they are moved from
 3              the freezer to the refrigerator to thaw prior to
 4              being used in the execution.
 5    BY MR. KURSMAN:
 6         Q.      And after -- after you put the lethal
 7    injection chemicals in the freezer or at room
 8    temperature, do you have any more involvement with the
 9    lethal injection chemicals at all?
10         A.      I'm involved in inventory.
11         Q.      Do you create the inventory logs?
12         A.      It's a logbook maintained in the secure
13    cabinet that I will enter information into.
14         Q.      Does anybody else enter information into
15    that log?
16         A.      Yes, the warden.
17         Q.      And how do you know who is responsible
18    for entering what information?
19         A.      The warden is present when the lethal
20    injection chemicals are received and placed into the
21    freezer and is present when they are logged into the
22    logbook.
23         Q.      And does the warden ever write anything
24    in the logbook?
25         A.      Yes.
```

```
1        Q.      And what does the warden write in the
2   logbook?
3        A.      He will write the name of the chemical
4   received, the lot number, the expiration date, and will
5   record the temperature of the freezer.
6        Q.      And what -- what do you write in the
7   logbook?
8        A.      Sometimes I'll write the same
9   information.  It just depends.  Sometimes I'll actually
10  log it in there.
11       Q.      How do you decide, between you and the
12  warden, who is going to write that information you just
13  described?
14               MR. MITCHELL:  Objection, form.  You can
15          answer.
16               THE WITNESS:  There's no real discussion
17          about it.  It's just whoever happens to have the
18          book and a pen in their hand.
19  BY MR. KURSMAN:
20       Q.      And does anybody double-check that
21  information?
22       A.      Yes.  Whichever one of us is not the one
23  writing it double-checks the information before it's
24  signed off on.
25       Q.      And are -- are you responsible for
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 48 of 327 PageID #: 6108

```
 1    discarding the lethal injection drugs if they expire?
 2         A.      Yes, I'm present when we do that.
 3         Q.      And who else is present when you do that?
 4         A.      The warden.
 5         Q.      And can you describe how you dispose of
 6    those chemicals?
 7         A.      The expired chemicals are removed from
 8    where they're stored, whether it be the freezer,
 9    refrigerator, or locked cabinet.  Any identifying
10    labels or numbers, et cetera, are removed from the
11    boxes and the vials and are put into a medical waste
12    bag.  And that medical waste bag is then included with
13    the facility's medical waste.
14         Q.      And do you put that in the logbook, as
15    well?
16         A.      We indicate when -- yes, when they are
17    removed.
18         Q.      And I -- I think we -- you talked about
19    this at the beginning.  But are you aware of the
20    current -- Tennessee's lethal injection execution
21    manual?
22         A.      And just to be clear, if I may, you are
23    meaning the protocol; is that correct?
24         Q.      I did.
25         A.      Yes.
```

```
 1          Q.     And if I refer to what I'm calling a
 2    manual and what you're calling a protocol; if I refer
 3    to it as a protocol, will you know what I'm talking
 4    about?
 5          A.     Yes.
 6          Q.     Okay.  And can you describe for me how
 7    you're aware of the protocol?
 8          A.     I've reviewed it.
 9          Q.     And when was the first time that you
10    reviewed the protocol?
11          A.     I reviewed the protocol back in 2016,
12    when it was the current protocol.  And I reviewed the
13    current protocol when it was created in 2018.
14          Q.     And have you reviewed it since 2018?
15          A.     Yes.
16          Q.     When was that?
17          A.     Several times, and I don't know
18    specifically when or an exact number of how often.
19          Q.     And can you explain to me why you
20    reviewed it several times since 2018?
21          A.     It was in the subject of court action
22    since then and just periodic review.
23          Q.     And why were you reviewing it if it was
24    the subject of court action?
25                 MR. MITCHELL:  Objection.  I'll instruct
```

```
 1           the witness not to answer, pursuant to DE107.
 2    BY MR. KURSMAN:
 3           Q.      Why were you reviewing it for periodic
 4    review?
 5           A.      Just to make sure I had a current
 6    knowledge of it and make sure things, at least for my
 7    role, were being done accordingly.
 8           Q.      Did the protocol change from 2018 until
 9    now?
10           A.      No.
11           Q.      And is -- is your role mentioned in the
12    protocol?
13           A.      With regard to the procurement and
14    storage of the lethal injection chemicals.
15           Q.      And is it your understanding that the
16    protocol is mandatory in nature?
17                   MR. MITCHELL:  I'm going to object to the
18           form.  You can answer.
19                   THE WITNESS:  If I'm understanding your
20           question correctly, it's that the protocol
21           requirements, are they mandatory and binding upon
22           TDOC and how they operate?
23    BY MR. KURSMAN:
24           Q.      Yes.
25           A.      Yes.
```

```
1          Q.      And are they binding on you, as well?
2                  MR. MITCHELL:  Same objection.
3                  THE WITNESS:  Yes.
4     BY MR. KURSMAN:
5          Q.      All right.  Can you deviate from the
6     protocol?
7          A.      Sorry, I had you on mute.  No.
8          Q.      Have you ever deviated from the protocol?
9          A.      No.
10         Q.      And what would happen if you did deviate
11    from the protocol?
12         A.      Deviating from the protocol could affect
13    the integrity of the execution process.
14         Q.      And can you describe why it would affect
15    the integrity of the execution process?
16                 MR. MITCHELL:  Objection, form.  You can
17         answer.
18                 THE WITNESS:  Well, that would depend on
19         what the deviation is.  So that is a good example.
20         It all depends on what the specific deviation
21         would be.
22    BY MR. KURSMAN:
23         Q.      Well, let's say you deviated by not
24    discarding expired drugs.  Could you describe how that
25    would affect the execution protocol?
```

```
1              MR. MITCHELL:  Objection, form.  You can
2        answer.
3              THE WITNESS:  The drug protocol requires
4        us to discard the drug, and that would mean that
5        you wouldn't want to risk mixing or using an
6        expired drug in place of a nonexpired drug in an
7        execution.
8   BY MR. KURSMAN:
9        Q.     And can you explain for me the risk
10  behind using an expired drug?
11             MR. MITCHELL:  Objection, form, and also
12        that it calls for an expert opinion.  You can --
13        you can answer, though, Drug Procurer.
14             THE WITNESS:  If a drug is expired or
15        past the expiration date, then it calls into
16        question the efficacy of that drug and whether it
17        will perform as it is supposed to.
18  BY MR. KURSMAN:
19        Q.     And are you aware of what happens --
20  strike that.  Strike that.
21             Were -- were you involved in the creation
22  of the execution protocol?
23             MR. MITCHELL:  Objection.  Pursuant to
24        the protective order -- protective order, do not
25        answer.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 53 of 327 PageID #: 6113

```
 1   BY MR. KURSMAN:
 2        Q.      Do you know if any professionals were
 3   consulted during the creation of the execution
 4   protocol?
 5                MR. MITCHELL:  I'm going to object.  I'm
 6        going to object to the form, but you can answer.
 7                THE WITNESS:  Yes.
 8   BY MR. KURSMAN:
 9        Q.      Okay.  And without disclosing any names,
10   what type of professionals were they?
11        A.      Medical.
12        Q.      Were lawyers consulted, do you know?
13        A.      I'm sorry, I didn't hear that.
14        Q.      Lawyers?  Were lawyers consulted?
15        A.      Yes.
16        Q.      Were -- were pharmacologists consulted?
17        A.      Yes.
18        Q.      Were pharmacists consulted?
19        A.      Yes.
20        Q.      Okay.  So let's take this step by step.
21                Why -- you said "medical."  Does that mean
22   doctors?
23        A.      Yes.
24        Q.      Why were doctors consulted?
25                MR. MITCHELL:  And I'm going to object,
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 54 of 327 PageID #: 6114

```
1              lack of personal knowledge.  But you can answer,
2              if you know.
3                      THE WITNESS:  I was not involved in those
4              consultations.
5    BY MR. KURSMAN:
6              Q.      Why were lawyers consulted?
7                      MR. MITCHELL:  Same objection.  You can
8              still answer.
9                      THE WITNESS:  They were consulted in the
10             drafting of the protocol.
11   BY MR. KURSMAN:
12             Q.      Right.  But my question is:  Why?
13                     MR. MITCHELL:  Same objection.  You can
14             answer.
15                     THE WITNESS:  To ensure that the protocol
16             is sound legally.
17   BY MR. KURSMAN:
18             Q.      And why were pharmacists consulted?
19                     MR. MITCHELL:  Same objection.  You can
20             answer.
21                     THE WITNESS:  Because we were dealing
22             with the procurement of lethal injection
23             chemicals, so they were consulted to procure
24             drugs.
25   BY MR. KURSMAN:
```

```
 1          Q.      And what about pharmacologists?  Why were
 2    they consulted?
 3               MR. MITCHELL:   Same objection.
 4               THE WITNESS:   With regard to compounding.
 5    BY MR. KURSMAN:
 6          Q.      And how do you know that all these people
 7    were consulted?
 8               MR. MITCHELL:   Objection.  Pursuant to
 9          the protective order, do not answer.
10    BY MR. KURSMAN:
11          Q.      Do you know what -- what research was
12    relied on for the execution protocol?
13               MR. MITCHELL:   Same objection.  Pursuant
14          to the protective order, do not answer.
15    BY MR. KURSMAN:
16          Q.      Were -- were medical texts reviewed?
17               MR. MITCHELL:   Same objection.  Do not
18          answer, pursuant to the protective order.
19    BY MR. KURSMAN:
20          Q.      Did -- do you know if other states'
21    protocols were reviewed?
22               MR. MITCHELL:   Same objection.  Pursuant
23          to the protective order, do not answer.
24    BY MR. KURSMAN:
25          Q.      Are -- are you aware of any past botched
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 56 of 327 PageID #: 6116

```
 1   executions using midazolam?
 2              MR. MITCHELL:  Objection to form.
 3              THE WITNESS:  I believe it was in
 4         Oklahoma.
 5   BY MR. KURSMAN:
 6         Q.    And can you describe what happened?
 7              MR. MITCHELL:  Same objection.  You can
 8         answer.
 9              THE WITNESS:  I don't know the specific
10         details of what the issue was with that particular
11         execution.
12   BY MR. KURSMAN:
13         Q.    How did you learn of that Oklahoma
14   execution that -- that you just discussed?
15         A.    It's been a while.  If I remember
16   correctly, I read about it online.
17         Q.    Was that while looking for pharmacies on
18   Google?
19         A.    Yes.
20         Q.    Okay.  And when you read about that
21   execution in Oklahoma, did you tell anybody in TDOC
22   about that?
23         A.    They already knew, but yes.
24         Q.    Okay.  Did that make you question whether
25   you should be attempt -- attempting to obtain the same
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 57 of 327 PageID #: 6117

```
 1   three-drug midazolam protocol?
 2        A.      Because I didn't know the specifics of
 3   what occurred in the execution, it didn't necessarily
 4   make me question it.
 5        Q.      Okay.  So you didn't -- did you read
 6   about the specifics of what occurred in that execution?
 7        A.      I have not.
 8        Q.      You weren't interested in what happened
 9   during that execution?
10               MR. MITCHELL:  Objection, form.  You can
11          answer.
12               THE WITNESS:  Sorry.  Repeat that.
13   BY MR. KURSMAN:
14        Q.      I asked:  Were you not interested in what
15   occurred in that execution?
16               MR. MITCHELL:  Same objection.  You can
17          answer.
18               THE WITNESS:  I was interested.
19   BY MR. KURSMAN:
20        Q.      But you didn't have the facts about what
21   occurred during that execution?
22               MR. MITCHELL:  Same objection.
23               THE WITNESS:  I'm sorry, I couldn't hear
24          the last part of that question.
25   BY MR. KURSMAN:
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 58 of 327 PageID #: 6118

```
1         Q.      I'm sorry, my question is just although
2    you were interested in that execution, you didn't then
3    read about the facts of what occurred during that
4    execution?
5         A.      Not in detail, no.  Just the general
6    story, that it did not go according to plan or
7    according to what was expected.
8         Q.      Did you ensure that the drugs you were
9    acquiring weren't the same drugs that were used during
10   that Oklahoma execution?
11              MR. MITCHELL:  Objection, form.  You can
12        answer.
13              THE WITNESS:  I -- I don't know who or
14        what the source was for Oklahoma.
15   BY MR. KURSMAN:
16        Q.      Did -- did you ask the pharmacy that is
17   providing TDOC with the drugs whether they are also the
18   pharmacy that provides Texas with the drugs?
19        A.      I did ask.
20        Q.      I'm sorry, you said you did ask?
21        A.      Yes, sir.
22        Q.      Okay.  And what was their response?
23              MR. MITCHELL:  Objection.  Do not answer,
24        pursuant to the Court's protective order.
25   BY MR. KURSMAN:
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 59 of 327 PageID #: 6119

```
1          Q.      Do -- do you think that -- that you
2     should have been consulted on the creation of this
3     protocol?
4               MR. MITCHELL:  Objection, form.  You can
5          answer.
6               THE WITNESS:  I did, yes, contribute in
7          terms of in the section dealing with procurement
8          and storage of the lethal injection chemicals.
9     BY MR. KURSMAN:
10         Q.      And can you describe how you contributed
11    to that section?
12              MR. MITCHELL:  Objection.  Do not answer,
13         pursuant to the protective order.
14              MR. KURSMAN:  Mr. Mitchell, I think we've
15         been going about an hour or so.  Could we -- could
16         we take a 10-minute break or so?
17              MR. MITCHELL:  Sure thing.  Do you want
18         to be back at 11:05 Central/12:05 Eastern?
19              MR. KURSMAN:  Yeah, that is perfect.  So
20         if we could go off the record.
21              THE VIDEOGRAPHER:  We're going off the
22         record at 11:54 a.m.
23              (Recess at 11:54 to 12:06 p.m.)
24              THE VIDEOGRAPHER:  We are back on the
25         record at 12:07 p.m.
```

```
 1   BY MR. KURSMAN:
 2        Q.     Drug Procurer, we just went on a
 3   10-minute break.  During that break, did you speak with
 4   your counsel?
 5        A.     No.
 6        Q.     Okay.  Did -- did you have time to think
 7   about any of the answers that you gave me during that
 8   first part of the deposition?
 9        A.     I really just went to the bathroom.  I
10   really didn't have time to think of anything else.
11        Q.     Did any of those answers change?
12        A.     No.
13             MR. KURSMAN:  Okay.  And before I begin,
14        I just want to put on the record, Mr. Mitchell,
15        that -- that I think a lot of your objections so
16        far have been outside the scope of the protective
17        order.  So I just want to put on the record that
18        at some point, if this continues, we may either
19        call the Judge or reserve our right to file a
20        motion after the deposition is over.
21             MR. MITCHELL:  Okay.
22   BY MR. KURSMAN:
23        Q.     Now, Drug Procurer, do you have the
24   exhibits in front of you?
25             I'm sorry.  Do you have the exhibits in
```

```
1   front of you?
2        A.      Yes.
3        Q.      Okay.  Did you review these exhibits
4   before today?
5        A.      No.
6                (Exhibit No. 1 marked.)
7   BY MR. KURSMAN:
8        Q.      Okay.  Could you turn to Exhibit 1?
9        A.      Stand by.
10       Q.      Sure.
11               (Pause.)
12               THE WITNESS:  Okay.  I have the exhibit.
13  BY MR. KURSMAN:
14       Q.      Have you seen this before today?
15       A.      Yes, I did.
16       Q.      And is this your understanding of what
17  the protocol is in Tennessee?
18       A.      Yes.
19       Q.      When was the last time you saw this
20  document?
21       A.      During prep over the weekend.
22       Q.      So are you familiar with the protocol's
23  contents?
24       A.      I don't have it memorized, but I am
25  familiar.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 62 of 327 PageID #: 6122

```
1          Q.        Have you read the entire thing?

2          A.        Yes.

3          Q.        When was the last time you read the

4   protocol in its entirety?

5          A.        Over the weekend.

6          Q.        And what do you understand the purpose of

7   the protocol to be?

8                    MR. MITCHELL:  Objection, form.  You can

9          answer.

10                   THE WITNESS:  It is to be exactly what it

11         is:  The protocol for how an execution, a lethal

12         injection execution, should -- protocol should be

13         followed.

14  BY MR. KURSMAN:

15         Q.        And I think we discussed this before, but

16  is it your understanding that the State of Tennessee is

17  required to follow this protocol?

18         A.        Yes.  As the current protocol in place,

19  we are required to follow it.

20         Q.        And do you have any understanding of who

21  authorized the State to conduct executions under this

22  protocol?

23         A.        The commissioner is the one who signs it.

24  I'm honestly not sure if the governor approves it as

25  well or not.
```

```
 1          Q.      Are you aware whether the State is
 2    allowed to conduct executions by any other method than
 3    what's in this protocol?
 4          A.      Electrocution.
 5          Q.      And is there a protocol for
 6    electrocution?
 7          A.      Yes.
 8          Q.      Do you know why there's not other methods
 9    of execution?
10          A.      Sorry.   Electrocution is specifically
11    mentioned in statute and other methods are not.
12          Q.      Okay.   Could you turn to Page 8 of the
13    protocol.
14          A.      Stand by.
15                  (Pause.)
16                  THE WITNESS:   Okay.
17    BY MR. KURSMAN:
18          Q.      Okay.   Five lines up from the bottom, it
19    says "Inventory Ledger."
20          A.      Sorry, I'm going between screens so it
21    takes me a second.   Yes, I see it.
22          Q.      And it says:   "Permanent record of lethal
23    injection chemicals maintained in a keyed control area
24    of the armory area of Building 7 at RMSI."
25          A.      Yes, that's what it says.
```

```
1          Q.      What does "RMSI" stand for?
2          A.      Riverbend Maximum Security Institution.
3          Q.      And are you familiar with the inventory
4     ledger?
5          A.      Yes.
6          Q.      And are you the one who records notes in
7     the inventory ledger?
8          A.      I, along with the warden.
9          Q.      Is -- is this just a running ledger?
10         A.      It's in -- it's in book form, yeah.  It's
11    a logbook.
12         Q.      What type of book?
13         A.      A logbook.
14         Q.      What is a lock book?
15         A.      Log ---L-O-G -- book.
16         Q.      Logbook?  Is it like in a composition
17    notebook?
18         A.      It's a permanently bound book.
19         Q.      And when is the last time you recorded an
20    entry in that book?
21         A.      I believe August of 2020.
22         Q.      And when was the last time the warden
23    recorded an entry in that book?
24                 MR. MITCHELL:  Objection, form.  You can
25         answer.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 65 of 327 PageID #: 6125

```
 1                    THE WITNESS:  Well, I can only speak to
 2           the time that he was there with me, and it was the
 3           same day.
 4      BY MR. KURSMAN:
 5           Q.       And why haven't you recorded an entry
 6      since August of 2020?
 7           A.       We have not received any other inventory.
 8           Q.       Are all of the drugs in inventory now
 9      expired?
10           A.       No.
11                    MR. KURSMAN:  I ask that this ledger be
12           produced to plaintiff's counsel.
13                    MR. MITCHELL:  We'll confer and get back
14           with you on about that offline.
15      BY MR. KURSMAN:
16           Q.       Are you aware that the protocol requires
17      a January and July inventory?
18           A.       Yes.  It requires a semiannual or
19      biannual inventory, and I think in parentheses it says
20      January and July.
21           Q.       But you haven't made any entry to that
22      protocol in 11 months; is that correct?
23           A.       Correct.
24           Q.       Why didn't you do the biannual inventory,
25      as required by the protocol?
```

1        A.      It was not done in January, part of the

2  reason being is COVID restrictions and limited travel

3  and access to the prison facilities.  Part of that

4  reason why the January one was not done.  And the July

5  one is set to be done.

6        Q.      When is July 1 set to be done?

7        A.      Sorry, I keep muting and unmuting.

8              Next week.

9        Q.      And why didn't you perform that inventory

10  once the COVID restrictions were raised?

11        A.      I don't have an answer to that.  Just

12  didn't.

13        Q.      Okay.  And can -- do you have any

14  midazolam in inventory that is unexpired?

15        A.      No.

16        Q.      Do you have any potassium chloride in

17  inventory that is unexpired?

18        A.      No.

19        Q.      So the only drug that you have in

20  inventory is the vecuronium bromide; is that right?

21        A.      The only unexpired drug in the inventory

22  at Riverbend is vecuronium bromide.

23        Q.      And the other drugs in inventory, they

24  are all expired; is that right?

25        A.      The ones at Riverbend, yes.

1          Q.      And are they all going to be discarded at
2    your July inventory?
3          A.      Yes.
4          Q.      Okay.  And -- you said a few times "at
5    Riverbend."  Where else are the lethal injection
6    chemicals stored?
7          A.      At the source.
8          Q.      And when you say "the source," do you
9    mean the pharmacy?
10         A.      Yes.
11         Q.      And are these lethal injection chemicals
12   compounded already?
13         A.      No.
14         Q.      So at the -- at the pharmacy, what you're
15   saying -- just so I understand -- is that they have an
16   active pharmaceutical ingredient.  Is that right?
17         A.      Yes.
18         Q.      And they have not compounded that active
19   pharmaceutical ingredient?
20         A.      No.  There's no executions set as of
21   right now; so, no, it's in API form.
22         Q.      Okay.  And is there an expiration date on
23   the active pharmaceutical ingredients?
24         A.      Yes.
25         Q.      And is there a log for the active

```
 1  pharmaceutical ingredients, as well?
 2              MR. MITCHELL:  Sorry, Alex.  Can you
 3       restate the question?  I just didn't hear.
 4              MR. KURSMAN:  Yes.  If at any time you
 5       don't hear me, please let me know.
 6  BY MR. KURSMAN:
 7       Q.      Is there a log for the active
 8  pharmaceutical ingredients at the pharmacy?
 9       A.      I would assume that they have an
10  inventory log, yes.
11       Q.      And does the pharmacy order the active
12  pharmaceutical ingredient before you obtain a
13  physician's order for the drug?
14       A.      I'm sorry, you broke up there for a
15  second.  Can you repeat?
16       Q.      Sure.  Does the pharmacy obtain an active
17  pharmaceutical ingredient before you obtain the
18  physician's order for the drug?
19              MR. MITCHELL:  Drug Procurer, did you
20       hear the question?
21              THE WITNESS:  Everybody froze, so I
22       didn't hear the question.
23              MR. KURSMAN:  I apologize.  Can you hear
24       me now?
25              THE WITNESS:  Yes.
```

```
 1   BY MR. KURSMAN:
 2        Q.      Does the pharmacy obtain the active
 3   pharmaceutical ingredient --
 4        A.      Yes.
 5        Q.      -- before the physician's order for the
 6   drug?
 7        A.      Yes, they obtain it pursuant to the
 8   order.
 9        Q.      Pursuant to what order?
10                Drug Procurer, did you hear the question?
11        A.      I'm sorry, I hit -- I hit unmute and it
12   mutes itself.
13                I thought I heard the question was "Does
14   the pharmacy compound it pursuant to an order?" and the
15   answer was "Yes."  Was that the question?
16        Q.      But my question was:  Does the pharmacy
17   obtain the active pharmaceutical ingredient before you
18   obtain the physician's order for a certain inmate?
19        A.      Yes, they obtain API prior to a
20   physician's order to compound.
21        Q.      And can you explain for me how that
22   works?
23                MR. MITCHELL:  Objection, form.  You can
24        answer.
25                THE WITNESS:  My understanding is is that
```

```
1              they order it from a supplier and receive it at
2              their facility.
3    BY MR. KURSMAN:
4         Q.      And how do they know how much to order?
5         A.      They know how much to compound per
6    execution, so they order enough to cover several
7    executions.
8         Q.      And how many is "several?"
9                 MR. MITCHELL:  Objection, form.  You can
10        answer.
11                THE WITNESS:  It just depends.  It's
12        four, five, six.
13   BY MR. KURSMAN:
14        Q.      Do -- do you pay them for the API or do
15   you only pay them once you receive the compounded
16   chemicals?
17                MR. MITCHELL:  Objection, form.
18                THE WITNESS:  We pay for the API.
19   BY MR. KURSMAN:
20        Q.      So you -- just so I'm clear.  So you
21   order the API before you receive the physician's order?
22        A.      The pharmacy orders it and receives it,
23   yes.
24        Q.      And you pay for that API before you
25   receive the physician's order?
```

1          A.       Yes.   And then we pay for it to be

2    compounded, as well.

3          Q.       Okay.   Now, can you turn to Page 32 of

4    the protocol.

5          A.       Stand by.

6          Q.       Sure.

7                   (Pause.)

8                   THE WITNESS:   Okay.   Page 32.

9    BY MR. KURSMAN:

10         Q.       Do you see at the top it defines

11   "execution team?"

12         A.       Yes.

13         Q.       Do you consider yourself a member of the

14   execution team?

15         A.       Not in the sense I did not actively

16   participate in the execution itself.

17         Q.       Okay.   Can you -- can you turn to Page 34

18   of the protocol.   It's titled "Chemicals Used in Lethal

19   Injection."

20         A.       I'm there.

21         Q.       Okay.   Do you see it says:

22                  "Chemicals used in lethal injection will

23                  either be FDA-approved commercially

24                  manufactured drugs; or, shall be compounded

25                  preparations prepared in compliance with

```
 1                    pharmaceutical standards consistent with
 2                    the United States Pharmacopoeia guidelines
 3                    and accreditation Departments, and in
 4                    accordance with applicable licensing
 5                    regulations."
 6                    Do you see that?
 7          A.        Yes.
 8          Q.        What does that mean to you?
 9                    MR. MITCHELL:  Objection, form.  You can
10          answer.
11                    THE WITNESS:  So the -- the drugs will be
12          one of two things.  Either they will be
13          obtained -- or they will be FDA-approved
14          commercially manufactured drugs sent over to be
15          compounded.  And specifically, the drugs
16          compounded have to meet the guidelines set by the
17          USP accreditation departments and consistent with
18          licensing.
19  BY MR. KURSMAN:
20          Q.        Are you familiar with the USP guidelines?
21          A.        Very, very limited.
22          Q.        Have you read the USP guidelines?
23          A.        Only parts.
24          Q.        Do -- are you the one who is tasked with
25  ensuring that the compounded preparations are prepared
```

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 73 of 327  PageID #: 6133

```
 1   in compliance with pharmaceutical standards consistent
 2   with the USP guidelines?
 3                  MR. MITCHELL:  Objection, form.
 4                  THE WITNESS:  I don't have direct
 5          oversight as to the USP.  The pharmacy itself, as
 6          part of its license, is -- has to follow their
 7          licensing.  And if they were licensed, then they
 8          would be following the USP.
 9   BY MR. KURSMAN:
10          Q.     Do you know what their license is?
11          A.     I'm sorry, you broke up there.
12          Q.     Do you know what their license is?
13          A.     They're licensed for sterile compounding.
14          Q.     And do you know what type of license they
15   have?
16          A.     Like a sterile compounding license.
17          Q.     But you don't know the specific type of
18   license that they have?
19          A.     Not beyond -- not beyond they have a
20   license to sterile compound the chemicals that are --
21   the level of chemicals that are used for an execution.
22          Q.     Did they ever send you that license?
23          A.     Yes.
24          Q.     And when was the last time they sent you
25   that license?
```

```
1          A.      I believe it was two years ago.
2          Q.      Have you asked for an updated copy of
3    that license?
4          A.      No.
5                  MR. KURSMAN:   And we -- we will be
6          requesting that license as part of discovery, as
7          well.
8                  MR. MITCHELL:   Understood.   We'll confer
9          about that.
10                 MR. KURSMAN:   Okay.
11   BY MR. KURSMAN:
12         Q.      And do you see where it says that the
13   pharmacy will compound preparations, and then at the
14   bottom it says "in accordance with applicable licensing
15   regulations?"
16         A.      Yes.
17         Q.      What does that mean to you?
18         A.      The licensing regulations applicable to
19   the -- at the state level.
20         Q.      And who is in charge of ensuring that
21   that is all done in accordance with applicable
22   licensing regulations?
23                 MR. MITCHELL:   Objection, form.   You can
24         answer.
25                 THE WITNESS:   The applicable state Board
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 75 of 327 PageID #: 6135

```
 1              of Pharmacy would have oversight on that.
 2     BY MR. KURSMAN:
 3         Q.       But it's nobody at TDOC; is that what
 4     you're saying?
 5                  MR. MITCHELL:   Same objection.
 6                  THE WITNESS:  No.
 7     BY MR. KURSMAN:
 8         Q.       Now, at the -- at the -- earlier in this
 9     deposition, you said you were partly responsible for
10     writing the storage -- storage and procurement
11     instructions.  Is this part of that storage and
12     procurement instructions that you were responsible for?
13                  And what I'm specifically talking about is
14     Page 34.
15         A.       Stand by.  I'll turn to it.
16         Q.       That's the page that we're on right now.
17                  (Pause.)
18                  THE WITNESS:  Sorry, I made a mess.  Yes.
19     BY MR. KURSMAN:
20         Q.       Okay.  So you wrote Page 34?
21         A.       I -- it was information that was provided
22     to me from the source that I then had contributed to
23     writing this page.
24         Q.       And did you also write pages 35, 36, 37,
25     and 38?
```

```
 1        A.        Not all of it.  The portions that are
 2   similar or contributed, once again, information from
 3   the source with regard to compounds, meeting those
 4   regulations, and how they are to be stored in a locked
 5   cabinet or in the fridge, pursuant to guidelines.
 6        Q.        And what about pages 39, 40, 41, 42, and
 7   43?
 8        A.        The portions that deal with the LIC
 9   preparation was information from the source and put
10   into this protocol.
11                  The information related to IV setup and
12   insertion of the IV, I did not have any input on.
13        Q.        So the pharmacy -- just so I understand,
14   the pharmacy gave you information that was then put
15   into the protocol; is -- is that right?
16        A.        Yes.
17        Q.        Okay.  Is there a communications record
18   of that?
19        A.        It would either be in an email or via
20   phone.
21        Q.        So if we turn to Page 35, are you saying
22   that some of what is in Page 35 you received from the
23   pharmacy over the phone?
24        A.        Sorry, I'll turn the page.  Yes.
25        Q.        So they told you over the phone, which
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 77 of 327 PageID #: 6137

```
 1   you then put into the protocol?
 2          A.      It was either by phone and/or email.  I
 3   don't specifically remember.
 4                  MR. KURSMAN:  Okay.  I will -- again, I
 5          will request all of those emails, to the extent
 6          they haven't been provided.
 7   BY MR. KURSMAN:
 8          Q.      Did -- did you then send the protocol to
 9   the pharmacy?
10          A.      I believe I sent not the full protocol.
11   I believe I sent these pages to make sure the wording
12   was correct.
13          Q.      And was it correct?
14          A.      Yes.
15          Q.      Did the -- did the pharmacy make any
16   edit?
17          A.      Not that I remember.
18          Q.      Okay.  And the pharmacy that provides you
19   the compounded chemicals, are they the same pharmacy
20   that provides you the vecuronium bromide?
21          A.      Yes.
22          Q.      Okay.  Now, what does TDOC do to ensure
23   that the vecuronium bromide is FDA approved?
24                  MR. MITCHELL:  Objection, form.  You can
25          answer.
```

```
 1                    THE WITNESS:   The source obtains it from
 2          their supplier.   And as I understand it, they only
 3          use FDA-approved suppliers.
 4    BY MR. KURSMAN:
 5          Q.     Okay.  And -- and how is that your
 6    understanding?
 7          A.     That's what they told me.
 8          Q.     Okay.  And are you the person who is in
 9    charge -- in charge of ensuring that the chemicals are
10    FDA approved?
11                    MR. MITCHELL:   Objection, form.   You can
12          answer.
13                    THE WITNESS:   Well, in a manner.   They --
14          by operation of their business, they are required
15          to use FDA-approved materials.   So, you know, I
16          trust them to do their job.   I don't call the FDA
17          once the LIC is received.
18    BY MR. KURSMAN:
19          Q.     And do you talk to any of your
20    supervisors to ensure that the chemicals are FDA
21    approved?
22          A.     No.
23          Q.     Okay.  Are you aware whether compounded
24    drugs have to be FDA approved?
25          A.     I don't know.
```

```
 1          Q.       What -- what is done to ensure that
 2   compounded chemicals are prepared in compliance with
 3   USP guidelines?
 4               MR. MITCHELL:  Objection, form.  You can
 5          answer.
 6               THE WITNESS:  The pharmacy has a
 7          compounding methodology or protocol that initially
 8          is created I believe from the drug company, the
 9          company that has the API.  They follow that
10          protocol in compounding.  They then send it to a
11          third party to have it tested for efficacy.
12   BY MR. KURSMAN:
13          Q.       And who chooses that third party?  Is it
14   TDOC or is it the pharmacy?
15          A.       The pharmacy.
16          Q.       Do they -- do they test it for sterility,
17   as well?
18          A.       Yes.
19          Q.       Is there anything else that they test it
20   for?
21          A.       Potency and endotoxins.
22          Q.       Do -- do they test it for a beyond use
23   date?
24          A.       Yeah.  So the testing is done and they
25   tell you, based on the compound, what the beyond the
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 80 of 327 PageID #: 6140

```
 1  date of use is, yes.
 2        Q.    Now, what is done to ensure that the
 3  compounded materials are prepared in compliance with
 4  standards from accreditation departments?
 5               MR. MITCHELL:  Same -- or objection,
 6        form.  You can answer.
 7               THE WITNESS:  The pharmacy really would
 8        be the one to answer that question.  They -- they
 9        follow their guidelines, and I'm assuming that
10        they -- that the Board of Pharmacy checks that.
11  BY MR. KURSMAN:
12        Q.    Do you know what the term "accreditation
13  departments" means, as used in this paragraph on Page
14  34?
15        A.    I don't know what specific accreditation
16  departments apply to pharmacies.
17        Q.    Okay.  But you are the one who wrote Page
18  34 in the lethal injection protocol, correct?
19        A.    It was from information given to me by
20  the pharmacy.
21        Q.    Okay.  So is it the pharmacy who wrote
22  Page 34 in the lethal injection protocol?
23        A.    It's the -- it's the wording provided by
24  the pharmacy that was then put into the page.
25        Q.    Okay.  I just want to -- I just want to
```

```
 1   sort of understand what happened.
 2               So the pharmacy calls you or emails you and
 3   gives you these instructions; is that right?  Am I right
 4   so far?
 5        A.    Yes.
 6        Q.    And then those were -- are put into the
 7   lethal injection protocol?
 8        A.    Yes.
 9        Q.    But you don't know what those words mean?
10        A.    I couldn't hear the end of your question.
11        Q.    I'm sorry.  But you don't know what some
12   of those words mean, right?
13        A.    Well, I don't know what the specific name
14   of an accreditation department is.
15        Q.    Oh, so let me ask you this:  What -- what
16   is your understanding of what an accreditation
17   department is?
18        A.    My understanding is it would be something
19   similar to like what Corrections has, which is the
20   American Correctional Association.  It's an entity that
21   -- that reviews -- well, let's just say a pharmacy.  So
22   it would be an entity that would come and review or
23   audit the pharmacy and then decide if they are
24   accredited under the standards of that society.
25        Q.    Okay.  Did you -- did you Google the term
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 82 of 327 PageID #: 6142

1   "accreditation" -- "accreditation department" to find
2   out what that term meant?
3        A.      No.
4        Q.      Did you ask the pharmacy what that term
5   meant?
6        A.      No, I did not ask them what the specific
7   name of the accreditation entity was.
8        Q.      Okay.  And how do you know that the
9   compounded preparations are prepared in compliance with
10  standards from accreditation departments?
11       A.      By the fact that they are licensed, they
12  prepare preparations, and we have seen the results of
13  the testing for the sterility, potency, and the
14  endotoxins.
15       Q.      And -- and what is done to ensure that
16  the compounded chemicals are prepared in compliance
17  with applicable licensing regulations?
18              MR. MITCHELL:  Objection, form.  I'll let
19         you answer.
20              THE WITNESS:  That would be the final
21         compounding.  That would be a question for the
22         pharmacist to answer.
23  BY MR. KURSMAN:
24       Q.      Are you aware what the applicable
25  licensing regulations are?

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 83 of 327 PageID #: 6143

```
1          A.      No.
2          Q.      Do you know what the term "applicable
3    licensing regulations" means in this paragraph on Page
4    34?
5          A.      As stated previously, it would reference
6    state licensing guidelines.
7          Q.      Do you -- do you think it also references
8    federal licensing guidelines?
9                  MR. MITCHELL:  Objection, form.  You can
10        answer.
11                 THE WITNESS:  Yes.
12   BY MR. KURSMAN:
13         Q.      Okay.  Can you turn to the next page of
14   the protocol, Page 35?  Just let me know.
15         A.      I'm there.
16         Q.      Do you see where it says "Procurement" at
17   the top?
18         A.      Sorry, you broke up.  Where?
19         Q.      I apologize.  Do you see where it says
20   "Procurement" at the top?
21         A.      Yes.
22         Q.      All right.  Did -- did you write this
23   section of the protocol, as well, Page 35?
24         A.      Yes.
25         Q.      And was that based also on what the
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 84 of 327   PageID #: 6144

1  pharmacy told you?

2       A.      Yes.

3       Q.      Did -- did the pharmacy tell you to

4  contact a physician to obtain a physician's order for

5  the lethal injection chemicals?

6       A.      Yes.   In our discussions they informed me

7  that, for a compounding, they would need a physician's

8  order.

9       Q.      And are you the person tasked with

10  contacting a physician to obtain an order for the

11  lethal injection chemicals?

12       A.      Yes.

13       Q.      And is that physician the same physician

14  in the execution protocol?

15       A.      Sorry.   No.

16       Q.      Okay.   And then you see it says:   "The

17  commissioner or his designee shall" -- "shall submit

18  the physician's order to a licensed pharmacy or

19  pharmacist to be filled."

20               Do you see that?

21       A.      Yes.

22       Q.      What's -- what's the difference between a

23  licensed pharmacy, as compared to a pharmacist?

24       A.      A licensed pharmacy would be the -- the

25  business, the pharmacy where the pharmacist works.

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 85 of 327 PageID #: 6145

```
1          Q.      Okay.  And are you the designee?

2          A.      Yes.

3          Q.      And is this how -- how it's been done?

4          A.      Yes.

5          Q.      Do -- do you always use the same

6   physician to obtain the order?

7          A.      Yes.

8          Q.      Is this physician known by the public?

9          A.      No.

10         Q.      Do you always use the same pharmacy?

11         A.      Yes.

12         Q.      Have you used a different pharmacy since

13  2016?

14         A.      No.

15         Q.      Is -- do you -- do you know if this is

16  the same pharmacy that Tennessee used to obtain

17  pentobarbital from?

18         A.      I don't know.

19         Q.      And have you ordered bulk orders before

20  execution dates were set?

21         A.      I'm sorry, what kind of orders?

22         Q.      Bulk, B-U-L-K.

23         A.      We've ordered API in larger quantities.

24  I don't know how many grams constitutes bulk.  Over 100

25  grams of API each.
```

```
 1          Q.       And why would you order so much API?
 2          A.       Once again, it's to have it for
 3   executions so that we have plenty to do an execution as
 4   they are set and don't have to order per execution.
 5          Q.       Is there -- is there anything in the
 6   execution protocol that discusses ordering the API?
 7          A.       Not that I remember.
 8          Q.       And what do you do with the drugs if
 9   they're ordered and then not used in the executions?
10          A.       Any drug that's not used is at the
11   pharmacy.  And if it's not used or expires, they would
12   dispose of it.
13          Q.       I'm sorry, my question was a bit
14   confusing.  What do you do with the drugs if -- if you
15   order a compounded or manufactured drug for a specific
16   execution and then that execution ends up not going
17   forward?  What do you do with those drugs?
18          A.       They're disposed of.
19          Q.       Okay.  And do you see -- if you -- if you
20   stay in this "Procurement" paragraph on Page 35, do you
21   see the last sentence in this paragraph, it's four
22   lines up.  It says:
23                    "Compounded preparations shall be
24                    transferred, stored, and maintained in
25                    accordance with the directions of the
```

```
 1                    pharmacy with which the Department has a
 2                    pharmacy service agreement, which shall be
 3                    in compliance with pharmaceutical standards
 4                    and consistent with United States
 5                    Pharmacopoeia guidelines."
 6         A.    Yes.
 7         Q.    What do those standards and guidelines
 8    require in terms of how the compounded lethal injection
 9    chemicals are transferred, stored, and maintained?
10              MR. MITCHELL:  Objection, calls
11         for expert opinion and also personal knowledge.
12         You can answer.
13              THE WITNESS:  Specific standards are with
14         regard to how it's transported and
15         temperature-wise how it is maintained at certain
16         temperatures so that it remains -- so it maintains
17         its efficacy.
18    BY MR. KURSMAN:
19         Q.    And are you the person who is responsible
20    for carrying out that, that portion of the protocol?
21         A.    The pharmacy ships the LIC to us, and I
22    receive it and store it at Riverbend.
23         Q.    So are you the person who is responsible
24    for ensuring that it's stored and maintained in
25    accordance with the directions of the pharmacy with
```

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 88 of 327  PageID #: 6148

1  which the Department has a Pharmacy Services Agreement
2  and which shall be in accordance with pharmaceutical
3  standards and consistent with USP?

4      A.      Yes, I'm responsible upon receipt in
5  ensuring that it is being taken and stored at Riverbend
6  according to the standards.

7      Q.      Okay.  And what do you do to ensure that
8  the lethal injection chemicals are stored in compliance
9  with the pharmaceutical standards and consistent with
10 USP guidelines?

11     A.      When it is received, it's taken to the
12 armory at Riverbend.  It's -- the container is then
13 opened, and in the process of opening it I ensure that
14 it hasn't been -- no seal has been broken or been
15 tampered with.

16          The compounded preparations are stored on
17 dry ice in the container.  Upon taking them out of the
18 container and moving them into the freezer, I ensure that
19 the temperature of the freezer will maintain the
20 preparations in a frozen state.

21          And I ensure that when I remove them from
22 the container that they are, in fact, frozen.  And I
23 place them into the freezer.  The temperature is logged
24 and the inventory is logged in the logbook.  And the
25 freezer is closed and locked at that time.

1        Q.      Is -- is there a temperature gauge on the

2  transportation device where the dry ice is contained?

3        A.      There is no temperature gauge on the

4  container that the drugs come in.

5        Q.      So you're unaware how cold the drugs are

6  stored in that container?  You're unaware of what that

7  temperature is; is that right?

8        A.      Given the fact that it's on dry ice, I

9  would assume at subzero temperatures.

10       Q.      But you don't know how -- how cold it is?

11       A.      Sorry, you broke up there at the end.

12       Q.      I'm sorry.  But do you know how cold it

13  is?

14       A.      I do not have a temperature gauge on

15  that, no.

16       Q.      Okay.  And then you said you ensure that

17  chemicals are still frozen.  How do you do that?

18       A.      When the vials are removed from the

19  container that they're shipped in, I'm able to -- I'm

20  able to tell by holding them that they are frozen.

21       Q.      How are you able to tell?

22       A.      Because the liquid in the vial is frozen

23  and it does not move.

24       Q.      Do you have any training on how to tell

25  if a lethal injection chemical is frozen?

1    A.    Other than common sense of holding a vial
2  that has a frozen liquid in it, no.
3    Q.    Okay.  And where are the compounded drugs
4  transferred to?
5    A.    To the armory at Riverbend Maximum
6  Security Institution.
7    Q.    And where do you put the compounded drugs
8  once they get to the armory?
9    A.    They are stored in the freezer.
10   Q.    And what -- what temperature is that
11 freezer?
12   A.    It's fluctuates between 1 and 4 degrees,
13 usually.
14   Q.    And is that Celsius or Fahrenheit?
15   A.    Fahrenheit.
16   Q.    And you said you "usually."  Are there
17 times where it fluctuates even more than the 4 degrees?
18   A.    Without looking specifically at the -- at
19 the logs, I -- I don't know.  It may.
20   Q.    And is there a -- is there a monitor on
21 the freezer?
22   A.    There is a thermometer kept inside the
23 freezer.
24   Q.    Okay.  And is -- how is it ensured that
25 the freezer's electricity stays on?

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 91 of 327 PageID #: 6151

```
 1        A.       There is -- should that room or the
 2   building use power -- lose power, there is a backup
 3   generator.
 4        Q.       And how long are the lethal injection
 5   compounds stored in the freezer?
 6        A.       We usually receive them approximately a
 7   week or two weeks before an execution date.  So they're
 8   stored in the freezer until, per protocol, it's time to
 9   take them out of the freezer and put them into the
10   refrigerator.
11        Q.       And after they are stored in the freezer,
12   do you test them again for potency, sterility, and
13   endotoxins?
14             MR. KURSMAN:  I believe you're on mute if
15        you're trying to answer.
16             THE WITNESS:  I'm sorry.  I froze again,
17        so I didn't hear the last question.
18   BY MR. KURSMAN:
19        Q.       Okay.  After you store them in the
20   freezer, are they tested for potency, sterility, and
21   endotoxins again?
22        A.       Once we've received them and put them in
23   the freezer, no.
24        Q.       Okay.  And when you talk about a freezer,
25   is -- is it an actual freezer?
```

```
 1        A.       Yes, like a -- it's -- it has a
 2   refrigerator section and a freezer section.
 3        Q.       So is it -- is it a mini-fridge?
 4        A.       Yes.
 5        Q.       Okay.  And so is the freezer contained
 6   within the mini-fridge?
 7        A.       No, it's like a -- it's like a
 8   miniaturized -- like a real big refrigerator.  It has a
 9   separate door for the fridge, a separate door and
10   compartment for the freezer.
11        Q.       Okay.  And I'm sorry, I missed your --
12   your last answer.  Were they tested for potency,
13   sterility, and endotoxins after they're stored in the
14   freezer?
15        A.       No, they are not tested a second time
16   after they're stored in the freezer.
17        Q.       Okay.  Now, if we go back to Page 35, you
18   see it says "Storage of LIC" on Exhibit 1?
19        A.       I'm there.
20        Q.       Okay.  Did you write this portion, as
21   well?
22        A.       Some of this portion was also in place
23   for the previous pentobarbital protocol, so I didn't
24   write all of it.
25        Q.       Okay.  So how do you decide which
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 93 of 327 PageID #: 6153

```
 1   portions of the previous pentobarbital protocol to keep
 2   and which portions to delete?
 3                 (Pause.)
 4                 THE WITNESS:  Sorry, I'm looking at it
 5         now so I can answer your question.
 6                 MR. KURSMAN:  That's all right.  Take
 7         your time.
 8                 (Pause.)
 9                 THE WITNESS:  Without having the
10         injection protocol in front of me, I think this is
11         the same language.
12   BY MR. KURSMAN:
13         Q.    Okay.  Do you see under "Storage of LIC"
14   at No. 1, the last sentence says:  "The LIC is placed
15   in an unmovable heavy gauge steel container with
16   security grade locks?"
17         A.    Yes.
18         Q.    Is the fridge a steel container?
19         A.    The fridge is not a -- is not itself a
20   steel container.  The fridge has a steel bar that locks
21   its doors into place, and that is secured with a lock.
22         Q.    So is there -- is there also an unmovable
23   heavy gauge steel container?
24         A.    Yes.
25         Q.    And is that different than the fridge?
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 94 of 327 PageID #: 6154

```
 1        A.      Yes.

 2        Q.      And can you describe that?

 3        A.      Yes.  It is a -- exactly what it sounds

 4   like.  It's a steel wall-mounted box that is secured

 5   with locks.

 6        Q.      Okay.  And when you receive the LIC --

 7   the midazolam and the potassium chloride -- are they

 8   compounded at this point?

 9        A.      Yes.

10        Q.      Okay.  And are they then put into the

11   steel-gauge container?

12        A.      No, they are put into the freezer.

13        Q.      Okay.  Why are they -- why do you not

14   follow the protocol at this step of the execution?

15               MR. MITCHELL:  Objection, form.  You can

16       answer.

17               THE WITNESS:  I'm sorry, what was that?

18   BY MR. KURSMAN:

19        Q.      Why do you not follow the protocol at

20   this stage of the execution?

21               MR. MITCHELL:  Objection, form.  You can

22       answer.

23               THE WITNESS:  The steel box is -- does

24       not have the capability to keep the LIC which is

25       compounded at above freezing temperatures, so it
```

```
 1          is placed into the freezer.
 2    BY MR. KURSMAN:
 3          Q.      So who decided at this point that you
 4    could deviate from the mandatory protocol?
 5                  MR. MITCHELL:  Objection, form.  You can
 6          answer.
 7                  THE WITNESS:  I did not make that
 8          decision and I was not present when that decision
 9          was made.
10    BY MR. KURSMAN:
11          Q.      Okay.  Who told you to put the drugs in
12    the freezer rather than the heavy gauge steel
13    container?
14          A.      Well, the -- the instruction of how it
15    had to be stored was provided by the pharmacy, that it
16    had to be stored frozen.  So it was -- it was -- there
17    was a need to add a freezer in that armory room, and
18    the box came out of the freezer.
19          Q.      So who decides when there's a need that
20    you should no longer follow the protocol?
21          A.      That would be a decision made by the
22    commissioner, in consultation with general counsel.
23          Q.      And can you explain to me how that
24    decision was made in this instance?
25                  MR. MITCHELL:  Objection, on a couple
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 96 of 327 PageID #: 6156

```
 1              bases.  Lack of personal knowledge.  And also, you
 2         know, that could get into attorney-client.
 3                   So I'm going to instruct the witness not
 4         to answer, based on the privilege.
 5    BY MR. KURSMAN:
 6         Q.      When -- let me see if I can ask this.
 7                 When -- when -- when you first received
 8    the -- the lethal injection chemicals from the
 9    pharmacist, did you speak with any lawyers about how to
10    store those chemicals?
11         A.      Sorry, I didn't move my mouse.  Yes.
12         Q.      And did you -- did you ask those lawyers
13    whether you should follow the protocol?
14                 MR. MITCHELL:  And I'm -- I'm going
15         to instruct -- I'm going to instruct him not to
16         answer again.  Attorney-client privilege.
17    BY MR. KURSMAN:
18         Q.      Can you tell me how many lawyers you
19    talked to about where to store the lethal injection
20    chemicals?
21         A.      I don't remember a specific number but
22    one.
23         Q.      Do you remember when this conversation
24    occurred?
25         A.      Sorry, you broke up there.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 97 of 327 PageID #: 6157

```
1          Q.        Do you remember when this conversation
2     occurred?
3          A.        2018, in the summer.
4          Q.        And at that point, did you realize that
5     the pharmacy instructions conflicted with the protocol?
6                    MR. MITCHELL:  Object to the form.  You
7          can answer.
8                    THE WITNESS:  Yes, I knew that the steel
9          gauge box could not maintain a freezing
10         temperature.
11    BY MR. KURSMAN:
12         Q.        Right, but my question is a bit different
13    than that.  My question is:  Did you know that the
14    pharmacy instructions conflicted with the protocol?
15                   MR. MITCHELL:  Same objection.  You can
16         answer.
17    BY MR. KURSMAN:
18         Q.        Drug Procurer, you're muted.  I don't
19    know if you heard that.
20         A.        Okay.  Can you hear me now?
21         Q.        Yes.
22         A.        All right.  Sorry about that.
23                   All right.  Yes, I was aware it
24    conflicted with the portion pertaining to storage in
25    the steel container but not conflicting with storage in
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 98 of 327   PageID #: 6158

1  accordance with USP guidelines.

2       Q.      And who told you not to follow the

3  protocol?

4              MR. MITCHELL:  Objection to form and --

5         at least that form.  You can maybe ask other

6         questions to illuminate that; but at this point,

7         I'm going to object subject to the protective

8         order.

9  BY MR. KURSMAN:

10      Q.      For the record, I just want to -- I'm

11 inquiring as to who has the authority right now to

12 override the protocol.  I don't want to know any

13 conversations you have with your attorneys regarding

14 any legal advice.

15             My only question is:  What individuals

16 said or gave you the authority to override the

17 protocol?

18             MR. MITCHELL:  And -- and maybe -- maybe

19        what I would suggest instead is probing whether he

20        spoke with general counsel's office or general

21        counsel, or something like that, or whether the

22        Drug Procurer spoke with the commissioner.

23             And maybe you can ask those yes-nos and

24        go that way, instead of just asking.

25             MR. KURSMAN:  Sure.  Let's try that.

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 99 of 327 PageID #: 6159

1      Let's try that.

2   BY MR. KURSMAN:

3      Q.    Did you -- did you speak with -- with the

4   commissioner when you realized there was a conflict

5   with the protocol and the pharmacy?

6      A.    It was discussed with the commissioner

7   and general counsel.

8      Q.    Okay.  And did the commissioner tell you

9   to not follow the protocol?

10      A.    I don't remember if those words were

11   used.  But when it was discussed, I was told that it

12   needed to be stored in a freezer.

13      Q.    Did general counsel tell you not to

14   follow the protocol?

15      A.    Once again, those words -- I don't

16   remember those words being used.  It was that based on

17   the requirements given to us by the pharmacist that we

18   had to put it in the freezer.

19      Q.    Was there any discussion about amending

20   the protocol?

21      A.    I don't know if there was.

22      Q.    Now, if you go to No. 3 on that same page

23   under "Storage of LIC," do you see it says:  "The LIC

24   on hand is monitored for expiration dates?"

25      A.    Yes.

1    Q.    Who -- who monitors the chemicals for

2    expiration dates?

3    A.    They are kept in inventory with the log,

4    so we obviously record an expiration date in the log.

5    And then during inventory, they would -- you know, any

6    that are expired would be disposed of.

7    Q.    So when you say it's recorded in the log,

8    does that mean you and the commissioner monitor the

9    lethal injection chemicals for the expiration dates?

10   A.    No, the commissioner is not there when

11   they're logged in.  It's the warden who is present.

12   Q.    Right.  I meant the warden.

13          How do you monitor for expiration dates?

14   A.    When we do inventory or when we receive

15   -- receive chemicals and those are logged away, we

16   check that and look at the expiration dates.

17   Q.    Are -- are the dates printed on the

18   lethal injection chemicals?

19   A.    Yes.

20   Q.    On the actual vial?

21   A.    Yes.

22   Q.    And do you pull those vials out of the

23   freezer every time you record something in the lab?

24   A.    No.

25   Q.    So how do you check the lethal injection

1  chemicals, other than by annual recordings?

2      A.     So we -- once again, when it's originally

3  logged in the expiration date is referenced on the

4  logbook.

5            There is also a log that indicates a seal

6  that is put on the lock.  So if -- when we check the

7  locks, or log the chemicals in, if the seal has been

8  broken and there is nothing that would indicate any

9  tampering, and so the date would remain the same since

10  it was reported from the log into the logbook.

11      Q.     So the log with the seal that you just

12  described, is that a separate log?

13      A.     Yes.

14            MR. KURSMAN:  We would request that log,

15        as well, in discovery.

16            MR. MITCHELL:  We'll confer offline.

17  BY MR. KURSMAN:

18      Q.     How do you know whether the seal is

19  broken if you don't take the lethal injection chemicals

20  out of the freezer?

21            You're -- you're muted, if you're trying

22  to answer.

23      A.     So the seal has a number, and if that

24  same-numbered seal is still intact on the lock then

25  that's how we know it hasn't been broken.

 1      Q.      Maybe I'm missing something.  I'm a bit
 2  confused by this.  The seal has a number; when you say
 3  "the seal," are you talking about the actual vial is
 4  sealed?
 5      A.      No, I'm sorry.  This is a seal that is
 6  put on the lock of the container.  So the container is
 7  locked, and the seal is then put around the lock to
 8  ensure that the cabinet or the freezer is not opened.
 9      Q.      Okay.  Okay.  So you put -- just so I'm
10  clear, you put the lethal injection chemicals into the
11  freezer, and then you seal the freezer shut and you
12  don't open it?
13      A.      Correct.
14      Q.      Okay.  What happens, though, if you have
15  more than one execution in a -- in a few weeks' span?
16              MR. MITCHELL:  Object to form.  You can
17          answer.
18              THE WITNESS:  I'm -- I'm not really sure
19          what you're asking.  Are you asking if there's
20          more than one, I guess, set of chemicals for more
21          than one execution at one time?  Is that what
22          you're -- what you're asking?
23  BY MR. KURSMAN:
24      Q.      Yes, that's what I'm asking.
25      A.      Okay.  The -- the LICs are specific to

1  the inmate, so they are identified with the inmate's
2  name on it. So we are able to -- to identify it that
3  way, which vials belong to which execution.
4      Q.      And do you know if TDOC would execute
5  anyone using expired lethal injection chemicals?
6              MR. MITCHELL: Objection, form. You can
7      answer.
8              THE WITNESS: They do not.
9  BY MR. KURSMAN:
10     Q.      And how do you know that?
11     A.      Because the commissioner has said so,
12 that we're not going to use expired drugs.
13     Q.      And then do you see in -- in No. 3, it
14 says: "As the LIC reaches its expiration date, it
15 shall be disposed of by hazardous waste pickup?"
16     A.      Yes.
17     Q.      What does that mean?
18     A.      That's what I described earlier, where
19 the labels are removed, any identifying information is
20 removed. It's placed into a medical waste bag and it's
21 thrown away in the medical waste hazardous waste can.
22     Q.      And can we jump back to the expired drugs
23 for a second? Why would you department ensure that it
24 doesn't attempt -- attempt to execute anyone with
25 expired drugs?

```
1                    MR. MITCHELL:  Objection.  You can
2          answer.
3                    THE WITNESS:  You broke up.  How do we
4          ensure that you don't?
5                    MR. KURSMAN:  No, why -- how do you
6          ensure that you don't.
7                    THE WITNESS:  Why we make sure?  Okay.
8                    MR. MITCHELL:  Objection, form.  You can
9          answer.
10                   THE WITNESS:  Because expired drugs --
11         you know, I'm not an expert, but if they're
12         expired it calls into question their -- their
13         efficacy, potency, all sorts of things.
14                   And we would not execute anybody with a
15         chemical that had been -- that has expired.
16    BY MR. KURSMAN:
17         Q.     Now, let's turn to Page 36.  Do you see
18    at the top, it says "Accountability of LIC?"
19         A.     Yes.
20         Q.     And if you go down to No. 4, the second
21    full sentence, you see it says:
22                   "Prior to the LIC being placed in storage,
23                   the expiration date and lot number or other
24                   identifying marking is recorded to ensure
25                   that the LIC is properly disposed of at the
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 105 of 327 PageID #: 6165

```
 1                    time of expiration."
 2        A.      Yes.
 3        Q.      And are you the one who records this
 4   information?
 5        A.      Both myself and the warden.
 6        Q.      Okay.  And did -- does this information
 7   have to be accurate?
 8        A.      I'm sorry, did you say does this have to
 9   be accurate?
10        Q.      Yes.
11        A.      Yes.
12                MR. KURSMAN:  Okay.  Now, what I'm going
13        to do real quickly is share my screen with you.
14        And I'm going to mark this -- this wasn't an
15        exhibit in your file.
16                So I'm going to mark this actually out of
17        order, if that's okay, Rhonda, at Exhibit 48.
18                (Exhibit No. 48 marked.)
19                MR. KURSMAN:  Could you pull up the
20        picture of the -- now it works.
21   BY MR. KURSMAN:
22        Q.      What I see here, is this the -- is this
23   the freezer that I'm looking at?
24        A.      Sorry.  Yes.
25        Q.      And is this the freezer right next to it?
```

1      A.      I didn't hear the end of your question.

2      Q.      I apologize.  So this -- this -- this

3 thing on the right of what's titled at the bottom "Ds'

4 First Resp. to RFP 001289," is that the

5 freezer/refrigerator we just talked about?

6      A.      Yes, on top of that filing cabinet.

7      Q.      Okay.  This looks like it only has one

8 door.

9      A.      Well, you can't see it clearly on the

10 picture because of the grain, but there are two doors

11 you're seeing.  That's why in the center there you see

12 that black bar going up.  That's the purpose of that

13 black bar, is to secure that top door.

14      Q.      Okay.  And where is the seal on this

15 freezer?

16      A.      Where is the freezer door?

17      Q.      No, the seal.

18      A.      You can't, once again, because of the

19 grain.  So the -- the lock, so the horizontal bar, you

20 can kind of see the lock.  So it's -- it's wrapped

21 through the opening with that lock.

22      Q.      Okay.  So there's a seal on both the

23 refrigerator and freezer?

24      A.      There's one seal for that lock, because

25 that lock locks both the refrigerator and the freezer.

1      Q.     Okay.  And did you say earlier that the

2  freezer has a thermometer inside of it?

3      A.     Yes.

4           MR. KURSMAN:  Okay.  So we can -- we can

5     pull this down.

6  BY MR. KURSMAN:

7      Q.     Now, let's go to -- back to Page 36 of

8  Exhibit 1, which is the protocol.

9      A.     Okay.

10     Q.     And do you see where it says "Transfer of

11  Location?"

12     A.     Yes.

13     Q.     And do you see next to No. 2, it says:

14           "If the LIC is not used and compromised in

15           any way, the LIC is returned to the armory,

16           reentered on the perpetual inventory

17           ledger, and secured in the refrigerator.

18           The LIC is used only for the execution of

19           the inmate for whom it was ordered."

20           Do you see that?

21     A.     Yes.

22     Q.     Is this your understanding of what

23  happens if the LIC is transferred but not used?

24     A.     Sorry.  Yes.

25     Q.     And what does the term "not used" mean?

1       A.     Not used in an execution.

2       Q.     Okay.  What if it's drawn into syringes

3  but not administered?

4             MR. MITCHELL:  Objection, form.  You can

5      answer.

6             THE WITNESS:  If it's drawn into the

7      syringes, the syringes are then disposed of.  This

8      is referring to instances where it's still in the

9      vial, hadn't been taken out of the vial.

10  BY MR. KURSMAN:

11      Q.     And is it transferred to the execution

12  chamber at room temperature?

13      A.     It's transferred at -- what was the last?

14      Q.     At room temperature?

15      A.     Yes.  Once it gets moved to the execution

16  chamber, that is room temperature.

17      Q.     And if it's not used, then you place it

18  back into the fridge; is that right?

19      A.     If it's not taken out of the vial, it's

20  brought back and put back in the fridge to be disposed

21  of.

22      Q.     Oh, but it's -- once it's in the fridge

23  for the second time, can it be used again?

24      A.     No.

25      Q.     So what -- what is the purpose of putting

1    the LIC in the fridge after it's not used for an

2    execution?

3         A.     It's simply placed back there for it to

4    then be disposed of via medical waste.

5         Q.     And why are -- why does the protocol call

6    for drugs that will never be used to be stored in the

7    fridge but direct chemicals that will be used to be

8    stored in the heavy gauge steel container?

9              MR. MITCHELL:  Objection, form.  You can

10        answer.

11             THE WITNESS:  I'm a little confused by

12        your question.  Could you restate that?

13   BY MR. KURSMAN:

14        Q.     Sure.  The protocol calls for LIC that

15   has been transferred but not used to be stored back

16   into the refrigerator, and you testified that those

17   drugs will then be exposed of.

18             But the L- -- the protocol also directs

19   that when the LIC is received by TDOC it's to be stored

20   in the heavy gauge steel container.

21             My question is:  Why does the protocol call

22   for drugs that are supposed to be used in executions to

23   be stored in a heavy gauge steel container but drugs that

24   are not going to be used in executions be stored in the

25   refrigerator?

```
1          A.      I can't explain that discrepancy.
2          Q.      Okay.  You wrote this section of the
3    protocol, as well.  Right?
4          A.      I honestly don't remember if I wrote this
5    portion or not.
6          Q.      Well, who else would have wrote it, if it
7    wasn't you?
8                  MR. MITCHELL:  And I'm going to object,
9          pursuant to the protective order, because that
10         could lead to identifying individuals involved.
11   BY MR. KURSMAN:
12         Q.      Well, how do you decide which sections of
13   this portion of the protocol you would write and which
14   sections that you wouldn't write?
15                 MR. MITCHELL:  And I'm going to object to
16         the form.
17   BY MR. KURSMAN:
18         Q.      But you can still answer.
19         A.      So the -- yes, I just -- I just don't
20   remember.  If there was a portion that I contributed to
21   or wrote, it would have been -- and I don't know that I
22   did, but it would have been with regard to the
23   refrigerator.
24                 The rest of it, I think, would still be
25   consistent with prior protocol -- protocol.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 111 of 327 PageID #: 6171

```
 1          Q.      Okay.  So that section, your belief is
 2    that section just wasn't changed?
 3          A.      As far as I know; but, you know, I don't
 4    know.
 5                  (Exhibit No. 2 marked.)
 6    BY MR. KURSMAN:
 7          Q.      Okay.  Now, if -- if you could turn to
 8    Exhibit 2.
 9          A.      Stand by.
10                  (Pause.)
11                  THE WITNESS:  Okay.
12    BY MR. KURSMAN:
13          Q.      Okay.  Do you -- do you have it in front
14    of you, Exhibit 2?
15          A.      Yes.
16          Q.      And do you see at the top it says
17    "Midazolam storage and preparation instructions?"
18                  THE WITNESS:  Yes.
19    BY MR. KURSMAN:
20          Q.      Are you familiar with this document?
21          A.      Yes.
22          Q.      And is this the storage and preparation
23    instructions for midazolam?
24          A.      Yes.
25          Q.      And was -- was this provided by the
```

1  pharmacist?

2      A.      Yes.

3      Q.      And do you recall when it was provided by

4  the pharmacist?

5      A.      I don't specifically remember.

6      Q.      If I told you that it was provided in

7  October of 2017, would that seem reasonable to you?

8      A.      Sure.

9      Q.      Okay.  Is this the same pharmacist that

10  still provides the drugs?

11      A.      Yes.

12      Q.      So did -- did you have these instructions

13  before writing the protocol?

14      A.      Yes.

15      Q.      Okay.  And are the drugs that the

16  Department has the same drugs that were provided in

17  2017?

18      A.      The drugs at the time were commercially

19  manufactured -- at that time.

20      Q.      So these instructions that I'm looking

21  at, are these instructions for commercially

22  manufactured drugs or for compounded drugs?

23      A.      These are instructions for compounded.

24  And maybe I misunderstood your question; that at the

25  time -- 2017 -- the drugs that were obtained at that

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 113 of 327 PageID #: 6173

1  time were commercially manufactured.

2      Q.    Could -- could you explain to me why, in

3  October of 2017, you would have gotten pharmacy

4  instructions for how to store compounded drugs if you

5  were using commercially available drugs at that time?

6      A.    Well, it was while we had commercially

7  manufactured drugs at the time, we also understood that

8  we may and probably would be using compounded drugs

9  that we weren't able to get commercially manufactured.

10  And so we wanted to have the instructions on hand for

11  those.

12      Q.    And why would you believe you would no

13  longer be able to obtain manufactured midazolam?

14      A.    Either the supply had run out, or the

15  pharmacist simply wouldn't be able to get it, or -- I

16  can't remember the reasons.

17      Q.    And was there any talk about going to a

18  different pharmacist?

19      A.    No.

20      Q.    Have you -- have you reached out to any

21  other pharmacists since 2017?

22      A.    Yes.

23      Q.    How many?

24      A.    I don't specifically remember how many.

25      Q.    Could you approximate how many?

```
1          A.      I would say maybe somewhere around like
2   five to ten, maybe.
3          Q.      And when was that?
4          A.      Um, it would have been in the -- once
5   again, I'm approximating.  But maybe winter of '17,
6   early '18.
7          Q.      And was that the last time you reached
8   out to any pharmacists, aside from the pharmacist who
9   wrote these preparation instructions?
10         A.      I think so.  I'm not -- I don't think I
11  directly reached out to any other ones, other than
12  them.
13         Q.      Okay.  And when did the Department last
14  procure the lethal injection chemicals from this
15  pharmacy?
16         A.      Now, when you say that, like the last
17  time we ordered a compounded preparation?  Is that what
18  you're asking?
19         Q.      Yes.
20         A.      Okay.  Off the top of my head, I believe
21  it was February of 2020.
22         Q.      And why did you order a compounded
23  preparation in February of 2020?
24         A.      I mean, I think that was the last
25  execution that was set, and so we had ordered the
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 115 of 327 PageID #: 6175

1  compounded preparation.

2        Q.    And did that execution go forward?

3        A.    I'm sorry, what was that?

4        Q.    Did that execution go forward?

5        A.    No.

6        Q.    Okay.  What did you do with those lethal

7  injection chemicals that you ordered for that

8  execution?

9        A.    They are still in the

10  freezer-slash-fridge.

11        Q.    Are they in the freezer or are they in

12  the fridge?

13        A.    I don't remember.

14        Q.    Okay.  And what about for the

15  manufactured chemicals that you have for that

16  execution?  Is -- is that -- does the Department still

17  have that chemical, as well?

18        A.    The vecuronium, yes.

19        Q.    Okay.  Do you know if any of those drugs

20  are currently expired?

21        A.    Some of the vecuronium is.

22        Q.    Okay.  And what about the midazolam?

23        A.    Yes.  And since midazolam is inmate

24  specific, it can only be -- it could have only been

25  used in the execution that it was ordered for.

1        Q.      And what about the potassium chloride?

2        A.      Same as the midazolam.

3        Q.      Okay.  So is what you're telling me the

4   vecuronium bromide is not inmate specific?

5        A.      No.

6        Q.      So you can use the vecuronium bromide

7   that you currently have on any inmate; is that right?

8        A.      For an execution, yes.

9        Q.      Right, sure.

10              The midazolam that is expired but either

11   in the fridge or the freezer, why hasn't that been

12   discarded yet?

13       A.      It hasn't been discarded because it was

14   partially about timing with the medical waste disposal

15   on the August date.  The medical waste disposal wasn't

16   done on that date.  And also COVID restrictions kept us

17   from being at the facility to do the things.  It will

18   be disposed of at the next inventory, which is next

19   week.

20       Q.      And is that also true for the potassium

21   chloride?

22       A.      I'm sorry, could you repeat?

23       Q.      Is that also true for the potassium

24   chloride?

25       A.      Yes.

1      Q.     Okay.  And when did you receive the

2 midazolam and the potassium chloride for that February

3 execution?

4      A.     It would have been approximately -- and

5 without looking at specific documents -- approximately

6 two weeks or a week or two prior to the execution date.

7      Q.     Okay.  So either January or February of

8 2020?

9      A.     Yes.

10     Q.     When were the COVID restrictions lifted

11 for TDOC?

12           MR. MITCHELL:  Objection to the form.

13      You can answer.

14           THE WITNESS:  Some are still in place.

15      We're still instructed to be, I guess, more

16      careful about the different facilities.  But for

17      the most part, the restrictions were lifted in

18      March of this year.

19 BY MR. KURSMAN:

20     Q.     And how often does medical waste come to

21 pick up disposed waste, disposed medical waste?

22     A.     Did you say how or how often?

23     Q.     How often?

24     A.     That, I don't know.

25     Q.     Okay.  Do you know when these drugs would

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 118 of 327 PageID #: 6178

1  have expired?

2      A.     Specifically, are you referring to the

3  midazolam and the potassium chloride?

4      Q.     Yes.

5      A.     Approximately they would have expired in

6  late February.  That's just an approximation, without

7  looking at it.

8      Q.     Okay.  So they would have expired almost

9  17 months ago; is that right?

10     A.     Yes.

11     Q.     But they are still not -- they are still

12  in your refrigerator or freezer?

13     A.     Yes.

14     Q.     Okay.  Did you help to write these

15  pharmacy instructions?

16     A.     No, it was written by the pharmacist.

17             (Exhibit No. 3 marked.)

18             MR. KURSMAN:  Can we -- can you pull

19     up -- can you look at Exhibit 3?

20             THE WITNESS:  Stand by.

21             (Pause.)

22             THE WITNESS:  All right.

23  BY MR. KURSMAN:

24     Q.     And this is email between you and your

25  source?

1     A.    Yes.

2     Q.    Okay.  Now, is this the same pharmacist

3 that provided you with the pharmacy instructions?

4     A.    Yes.

5     Q.    Okay.  And you see that your source says

6 "All drugs required to be stored in a secure location

7 at room temperature between 15 and 30 degrees Celsius?"

8     A.    Yes.

9     Q.    What did the source mean by that?

10     MR. MITCHELL:  Objection, form.  You can

11    answer.

12     THE WITNESS:  I'm sorry, you broke up

13    there at the end.

14 BY MR. KURSMAN:

15     Q.    I'm sorry.  What did the source mean by

16 that?

17     MR. MITCHELL:  And objection, form.  You

18    can answer.

19     THE WITNESS:  They were referring to

20    commercially manufactured preparations.

21 BY MR. KURSMAN:

22     Q.    Okay.  And do you see they also ask for

23 "a copy of the current DEA and pharmacy/state license

24 for the facility where we will be shipping the

25 medication to."

1      Do you see that?

2      A.    Yes.

3      Q.    Do you know why a DEA number would be

4   needed?

5      A.    Sorry, you broke up there.

6      Q.    Do you know why a DEA number would be

7   needed?

8      A.    My under- -- my understanding is that a

9   DE- -- a DEA number to show what types of chemicals you

10   can receive at a location.  So they needed it for the

11   drugs.

12      Q.    Did you provide a DEA number?

13      A.    Yes.

14      Q.    And did you provide the pharmacy license?

15      A.    Yes.

16      Q.    And did you do that via email?

17      A.    Yes.

18            MR. KURSMAN:  Okay.  We will be

19       requesting that in discovery, as well.

20   BY MR. KURSMAN:

21      Q.    Now, can we -- can we go back to Exhibit

22   2?  Just let me know when you get there.

23      A.    Okay.

24      Q.    Do you see at the top:  "USP Chapter 797

25   sets the following BUDs on high-risk compounded

```
 1    preparations."  And then it says:
 2                    "1, 24 hours at room temperature; 2, three
 3                    days at cold temperature" -- in
 4                    parentheses, "refrigerated"; and "3, 45
 5                    days frozen.  Once thawed at room
 6                    temperature, the preparation must be used
 7                    within 24 hours and cannot be refrozen to
 8                    extend that time.  If thawed in
 9                    refrigerator, the preparation must be used
10                    within three days."
11                    Do you see that?
12        A.          Yes.
13        Q.          What does that mean to you?
14        A.          Exactly what it says for compounded
15   preparations.  That's how it's stored at these
16   temperatures.  And depending on what temperature it's
17   at is how good it's -- how long it's good for.
18        Q.          And how do you know what temperature to
19   keep it at when it is refrigerated?
20        A.          There's not a specific temperature
21   listed.
22        Q.          So what temperature?
23        A.          On the logs, I know they log the
24   refrigerated temperature pertaining to the
25   refrigerator.
```

1        Q.      But my question is:  What temperature do

2  you try to use when you put the injection chemicals

3  into the refrigerator?

4        A.      I believe it's 40 degrees -- 40-something

5  degrees.

6        Q.      Do you look for that temperature in your

7  refrigerator when you put the lethal injection

8  chemicals in that refrigerator?

9        A.      There's a thermometer in the

10  refrigerator, yes.

11        Q.      But do you look to make sure that -- that

12  the degrees that you want the refrigerator to be at is

13  actually achieved by the refrigerator when you put the

14  lethal injection chemicals in the refrigerator?

15        A.      Yes, and it's logged.

16        Q.      And then it also says:  "3, 45 days

17  frozen."  At what temperature do you believe it needs

18  to be kept at to be frozen?

19        A.      Lower than 32 degrees.

20        Q.      Now, aside from USP Chapter 77, did you

21  review any other USP chapters?

22        A.      Not that I remember.

23        Q.      Okay.  Did you -- did you review USP

24  Chapter 77?

25        A.      Yes.  Chapter 797?

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 123 of 327 PageID #: 6183

1      Q.      Yeah, I apologize.

2      A.      Yes, I did review that with regard to the

3   frozen, 45 days, 24 hours.

4      Q.      Okay.  Now, did you look anywhere in USP

5   to determine what -- what temperature they require for

6   a LIC to be considered frozen?

7      A.      If it was in 797, I -- I did look at it,

8   but I don't remember off the top of my head.

9      Q.      Okay.  And the same question for the

10  refrigerator.  Did you --

11     A.      Same answer.

12     Q.      Okay.  And then do you see under "Items

13  you will need," it says "gloves, alcohol swabs, bags of

14  saline, and syringes."  Do you see that?

15     A.      Yes.

16     Q.      Who procures these items for TDOC?

17     A.      Riverbend.

18     Q.      So you don't receive these items from the

19  pharmacist?

20     A.      No.

21     Q.      Now, do you see where it says

22  "Preparation" in the instructions?

23     A.      Yes.

24     Q.      Do you see No. 1, it says:  "Remove 4

25  vials of midazolam from the freezer and place in

1  refrigerator 24 hours prior to use as to allow to
2  thaw?"
3          A.      Yes.
4          Q.      What does that mean?
5          A.      It means that the vials of midazolam are
6  removed from the freezer and put into the refrigerator
7  24 hours before the execution.
8          Q.      Is this consistent with the protocol?
9          A.      This is what I pulled up.  I don't
10 remember the protocol specifically speaking to this.
11         Q.      But do you recall that the protocol
12 instructs that the lethal injection chemicals are
13 required to be placed in a heavy gauge steel container?
14         A.      Yes.
15         Q.      So wouldn't that be inconsistent with the
16 pharmacist's instructions?
17         A.      Well, it seems inconsistent in the fact
18 that it's not referencing the steel cage.  It is
19 consistent with following the instructions of the
20 pharmacist and the pharmacopoeia guidelines.
21         Q.      Right.  But my question to you is:
22 Aren't the pharmacy preparation instructions
23 inconsistent with the protocol?
24                 MR. MITCHELL:  Objection, form.  You can
25     answer.

```
 1              THE WITNESS:  I would say no, because
 2         their instructions are by their standards and by
 3         pharmacopoeia standards.  So how we store it is
 4         consistent with their instructions and those
 5         standards.  It's not consistent because it's not
 6         steel gauge.
 7    BY MR. KURSMAN:
 8         Q.      Right.  So let me try to -- maybe my
 9    question is confusing.  My question is:  Are the
10    preparation instructions inconsistent with the
11    protocol?
12              MR. MITCHELL:  And again, form objection.
13         You can answer.
14              THE WITNESS:  I don't believe so.
15    BY MR. KURSMAN:
16         Q.      So you believe that instructions that
17    instruct you to place the preparations in the freezer
18    is consistent with the protocol that says "Place the
19    preparations in a steel gauge container?"
20         A.      I'll repeat my answer.  It's not
21    consistent with being in a steel container.  It is
22    consistent with the State saying they will follow their
23    instructions and the standards.
24         Q.      Let's -- let's go back to Exhibit 1.  And
25    when you get there, turn to Page 37.
```

```
 1                    (Pause.)
 2              THE WITNESS:  I'm there.
 3   BY MR. KURSMAN:
 4         Q.     And do you see where it says "Storage of
 5   LIC?"
 6         A.     Yes.
 7         Q.     Okay.  Show me where it says in -- in
 8   that section, "Storage of LIC," where it says you will
 9   follow the pharmacy's instructions.
10         A.     Stand by.  I lost it for a second.  Let
11   me reopen.
12                    (Pause.)
13              THE WITNESS:  Okay.  Sorry.  It does not
14         say it there.  That's the section that deals with
15         commercially manufactured.
16              It does say it on the page dealing with
17         compounded preparations.
18   BY MR. KURSMAN:
19         Q.     Okay.  So I -- I understand your point.
20   So what you're -- what you are saying is the -- the
21   protocol itself is internally inconsistent?
22              MR. MITCHELL:  Objection, form.  You can
23         answer.
24              THE WITNESS:  Yes.  So once again, I'll
25         repeat my answer.  There is a discrepancy between
```

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 127 of 327 PageID #: 6187

```
 1          stating "contained in a steel container"; but at
 2          the same page it says "stored at the directions of
 3          the pharmacy," meaning fridge and freezer.
 4     BY MR. KURSMAN:
 5          Q.      And when there is something that's
 6     internally inconsistent in the protocol, who decides
 7     which direction to follow?
 8          A.      As previously stated, that would be a
 9     decision made by the commissioner, in consultation with
10     general counsel.
11          Q.      Okay.  Now, let's -- let's go back to the
12     exhibit we were just on.  I believe that was Exhibit 2.
13               MR. MITCHELL:  And, Alex, just real
14          quick, are you planning on taking a lunch break at
15          any point or were you just going to work straight
16          through?
17               MR. KURSMAN:  Whatever you all prefer.  I
18          assume you'll be hungry at some point, so I'm
19          happy to take one.
20               MR. MITCHELL:  At some point now, or when
21          we're switching exhibits, or if you wanted to wait
22          like 20 minutes or so.
23               MR. KURSMAN:  So I don't actually have
24          that many questions left on -- well, I don't have
25          that many questions left on Exhibit 2, so how
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 128 of 327 PageID #: 6188

```
 1          about if we go until I'm done on Exhibit 2?
 2                MR. MITCHELL:  Sounds good.
 3                MR. KURSMAN:   Thanks.
 4    BY MR. KURSMAN:
 5        Q.    All right.  Are you back at Exhibit 2?
 6        A.    Yes.
 7        Q.    Okay.  Do you see next in No. 3, it says:
 8    "On the day of use, retrieve the necessary vials of
 9    midazolam from the refrigerator and remove the blue
10    seal from the top of each vial of midazolam?"
11        A.    Yes.
12        Q.    Who is removing the blue seal?
13        A.    Members of the execution team.
14        Q.    Are you involved at this point?
15        A.    No.
16        Q.    Is -- how does the Department ensure that
17    the lethal injection chemicals are sterile at the time
18    of use?
19                MR. MITCHELL:  Objection to form and
20          personal knowledge.
21                THE WITNESS:  When we have received the
22          results from the third-party testing.  Also, the
23          members of the execution team follow the
24          instructions of the pharmacy in preparation of the
25          syringes.
```

1    BY MR. KURSMAN:

2        Q.    So the -- when do the sterility tests

3    occur from the pharmacy?

4        A.    When the LIC is compounded.

5        Q.    And how long after the LIC is compounded

6    does TDOC obtain it?

7        A.    Generally, about two weeks.

8        Q.    And once it's obtained by TDOC, is that

9    when the 45-day clock begins?

10       A.    The 45-day clock begins when it's

11   compounded and frozen.

12       Q.    Okay.  Is -- does the sterility test

13   happen while the LIC is frozen or before it's frozen?

14       A.    And this is more of a question for the

15   pharmacist, but my understanding is that the LIC is

16   compounded.  A portion of that compound is sent for

17   testing.  And then the remainder, which is in vials, is

18   frozen at that time.

19            MR. KURSMAN:  Okay.  I think maybe we can

20       break now for lunch.  Maybe we can come back in a

21       half hour or so?  Is that fine?

22            MR. MITCHELL:  Okay.  Should we say

23       1:30/2:30?

24            MR. KURSMAN:  That sounds fine.  Thank

25       you.

```
 1              MR. MITCHELL:  Okay.
 2              THE VIDEOGRAPHER:  We're going off the
 3        record at 1:52 p.m.
 4              (Recess at 1:52 p.m. to 2:31 p.m.)
 5              THE VIDEOGRAPHER:  We're back on the
 6        record at 2:31 p.m.
 7    BY MR. KURSMAN:
 8         Q.    So Drug Procurer, we just went on break.
 9    During the break, did you discuss anything with your
10    attorneys?
11         A.    No.
12         Q.    And are you still in a room by yourself?
13         A.    I'm sorry, I can't hear you.
14         Q.    I apologize.  Are you still in a room by
15    yourself?
16         A.    Yes, I am.
17              MR. KURSMAN:  Okay.  And before I get
18        into questions, I just want to make a request to
19        Mr. Mitchell on the record, which is there have
20        been several speaking objections during this
21        deposition.  If you could just try to refrain from
22        doing that and object to form, I'd greatly
23        appreciate that.
24              MR. MITCHELL:  Okay.  Sure thing.
25              MR. KURSMAN:  Thanks.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 131 of 327 PageID #: 6191

1    BY MR. KURSMAN:

2         Q.     Could we go back to Exhibit 48, which is

3    an exhibit that you don't have, Drug Procurer, but that

4    we put up on the screen.  And I'll have

5    Ms. Nelson-Major share that again.

6               Do you see Exhibit 48?

7         A.     Yes.

8         Q.     Okay.  And do you see the refrigerator

9    and freezer in the picture?

10        A.     Yes.

11        Q.     Okay.  So my understanding is there's

12   supposed to be a seal on the lock; is that right?

13        A.     Yes.

14        Q.     Why is there no seal on this lock?

15        A.     Well, it's really hard to see, honestly.

16   I can't tell, one way or the other, if there's a seal

17   on there.

18        Q.     Let's zoom a bit.  Can you see now?

19        A.     Yes, it appears that there is a seal on

20   there when you look.  So you see the lock there in

21   somewhat of a lighter color?

22        Q.     Right.

23        A.     So right above it, it looks -- it almost

24   looks like kind of a string almost coming off of it,

25   going toward the right and up a little bit.  That is --

1  that's the plastic seal.

2          MR. KURSMAN:  Okay.  And

3      Ms. Nelson-Major, if you could go up a little bit

4      and scroll up a little to the freezer.

5  BY MR. KURSMAN:

6      Q.     When I go back a little, there's a

7  thermometer in the freezer?

8      A.     Correct.

9      Q.     So while the freezer and refrigerator are

10 sealed, is there any way for you or anyone from TDOC to

11 determine what the temperature in the freezer is?

12     A.     Not with it closed, no.

13     Q.     Okay.  So you can only determine the

14 temperature once you open the freezer?

15     A.     Correct.

16     Q.     Okay.  So if the freezer fluctuates in

17 temperature, you would have no idea unless the freezer

18 was open, correct?

19     A.     Correct.

20     Q.     Okay.  Is there a reason that -- that you

21 didn't purchase a freezer with an external temperature?

22     A.     I don't know.  I wasn't involved in

23 purchasing the freezer.

24     Q.     Oh, you weren't?  Do you know who was,

25 without -- without giving me any identifying

```
1    information?
2         A.      I do not.
3         Q.      Okay.  Were there any instructions for
4    which freezer or refrigerator to buy?
5         A.      I don't know.  I wasn't involved in it.
6         Q.      I apologize.  That's a -- that's a bad
7    question.
8                 Did -- did the pharmacist give you any
9    instructions on which freezer or refrigerator to buy?
10        A.      No.
11                (Exhibit No. 4 marked.)
12   BY MR. KURSMAN:
13        Q.      Okay.  Could we go to Exhibit 4, which
14   you have in your set of exhibits.
15                And just --
16        A.      I've got it.
17        Q.      Okay.  And this at the top, do you see it
18   says "Potassium Chloride preparation instructions?"
19        A.      Yes.
20        Q.      And was this also provided by the
21   pharmacist?
22        A.      Yes.
23        Q.      Okay.  And the -- in No. 1, it says:
24   "Remove 2 vials of potassium chloride from the freezer
25   and place in refrigerator 24 hours prior to use as to
```

1  allow it to thaw."

2       A.      Yes.

3       Q.      And like my questions before, did you see

4  -- do you see how this is inconsistent with the storage

5  of the lethal injection chemicals in the protocol?

6              MR. MITCHELL:  Objection, form.  You can

7        answer.

8              THE WITNESS:  Well, it's the same answer

9        as before in speaking about midazolam.  It's

10       inconsistent with regard the sealed container,

11       consistent with following the instructions of the

12       pharmacy.

13  BY MR. KURSMAN:

14       Q.      And who determined, as it relates to

15  potassium chloride, whether to follow the instructions

16  from the pharmacy or what the protocol directed as to

17  storing the lethal injection chemicals in the -- in the

18  sealed container?

19       A.      As stated before, that would have been

20  the decision of the commissioner, in consultation with

21  general counsel.

22       Q.      Okay.  And how do they determine when to

23  deviate from the protocol?

24              MR. MITCHELL:  Objection, form.  And

25        also -- and again, I'm not trying to -- per your

```
 1          comment, also lack of personal knowledge, which I
 2          don't believe is a form objection.
 3                    THE WITNESS:  And I cannot tell you what
 4          their thinking was.
 5                    MR. KURSMAN:  Mr. Mitchell, I think any
 6          objection that isn't a privilege objection or
 7          objection based on -- based on the secrecy
 8          statute, or the secrecy -- the --
 9                    MR. MITCHELL:  Protective order?
10                    MR. KURSMAN:  Exactly, the protective
11          order, would be an objection to form.
12                    MR. MITCHELL:  Okay.  Because I thought,
13          for instance, like personal knowledge, expert
14          opinion, lack of foundation are not formal
15          objections.  Do we want to encompass those within
16          the form objections for purposes of this
17          deposition?
18                    MR. KURSMAN:  Yes.
19                    MR. MITCHELL:  Okay.  Will do.
20  BY MR. KURSMAN:
21          Q.        Could we go to No. -- No. 14 on Exhibit
22  4?  Do you see it says:
23                    "Inspect the syringe now filled with
24                    potassium chloride, inspect to ensure you
25                    see no particles or discoloring (should be
```

```
 1                    clear liquid" -- "liquid without debris?)"
 2                    Do you see that?
 3         A.    Yes.
 4         Q.    Who is responsible for doing that
 5    inspection?
 6         A.    A member of the execution team.
 7         Q.    So that's not you?
 8         A.    Correct.
 9         Q.    Okay.  Do you know what happens if
10    particles or discoloring are present?
11         A.    Then it would not be able to be used.
12         Q.    Okay.  And do members of the execution
13    team have expertise to be able to inspect this syringe?
14              MR. MITCHELL:  Objection.
15              THE WITNESS:  They have these
16         instructions and were instructed on how to inspect
17         it.  That's, as far as I know, the extent of their
18         training.
19    BY MR. KURSMAN:
20         Q.    Do you know why the instructions don't
21    say what to do if there is discoloration?
22         A.    No.
23         Q.    Do you know why the instructions don't
24    say what to do if there are particles?
25         A.    No.
```

1      Q.     So how would the execution team know what

2 to do if there were discoloration or particles in the

3 syringe?

4            MR. MITCHELL:  Objection, form.

5            THE WITNESS:  As I understand it, they

6      were told that if there are particles in it, or

7      discoloration, it can't be used.

8 BY MR. KURSMAN:

9      Q.     Okay.  And who would have told them that,

10 without revealing any identities?

11     A.     The pharmacist.

12     Q.     So let -- let me understand this right.

13 You speak directly to the pharmacist, right?

14     A.     Yes.

15     Q.     Do members of the execution team also

16 speak directly to the pharmacist?

17     A.     Generally, no; but on this occasion or

18 these instructions, they did.

19     Q.     And does the -- does the pharmacist

20 attend any execution trainings?

21     A.     No.

22     Q.     Okay.  Were the conversations between

23 members of the execution team and the pharmacy, what --

24 were they through email?

25     A.     No.

1      Q.      Were they through the phone?

2      A.      Yes.

3      Q.      Were you in that conversation?

4      A.      No.

5      Q.      Who provided the pharmacist's number to

6  the execution team?

7      A.      I did.

8      Q.      Okay.  And why did you do that?

9      A.      For the purposes of them speaking to the

10 pharmacist about these instructions.

11     Q.      And do you know why the pharmacist didn't

12 give more detailed instructions after speaking to the

13 execution team?

14             MR. MITCHELL:  Objection, form.

15             THE WITNESS:  No.

16             (Exhibit No. 5 marked.)

17 BY MR. KURSMAN:

18     Q.      And are there any instructions that the

19 pharmacist told them orally that are not contained in

20 the instructions in either Exhibit 4 or Exhibit 5?

21             MR. MITCHELL:  Same objection.

22             THE WITNESS:  I was not part of the

23         conversation.  The part that I know was what we

24         just discussed; that if there was discoloration or

25         particles, then the substance can't be used.

1  BY MR. KURSMAN:

2      Q.      And which members of the execution team

3  had this conversation with the pharmacy, without

4  disclosing any identities?

5      A.      The executioner.

6      Q.      Okay.  Could you pull up Exhibit 6 now.

7  And let me know when you're there.

8      A.      I'm there.

9      Q.      Okay.  Do you see this is a -- what looks

10  like a type of log dated August 13, 2020?

11          MR. MITCHELL:  I'm sorry, which number?

12      Did you say Exhibit 6?

13          MR. KURSMAN:  I apologize.  Exhibit 5.

14          THE WITNESS:  Okay.

15  BY MR. KURSMAN:

16      Q.      Do you see this is dated August 13 of

17  2020?

18      A.      Yes.

19      Q.      Do you know what this was?

20      A.      I'm sorry, could you repeat?

21      Q.      Yeah, I'm sorry.  Do you know what this

22  log is?

23          And you're muted, if you're talking.

24      A.      It's a log of the midazolam compounds.

25      Q.      Okay.  And who made this log?

1          A.      The pharmacist.

2          Q.      The pharmacist?  And this is after the

3   injection, the chemicals are compounded; is that right?

4          A.      I'm sorry, they're compounded when?

5          Q.      This -- this log is made after the

6   chemicals are compounded, right?

7          A.      Yes, it was made after.

8          Q.      Okay.  And is this the entirety of the

9   lethal injection compounds that you received?

10         A.      Yes.

11         Q.      Okay.  Now, let's go to -- well, let me

12  ask you this:  Are there any other logs that look like

13  this?

14         A.      Not that I'm aware of.

15         Q.      Okay.  Now, do you see on April 24th,

16  2019, 55 milliliters of midazolam was made?

17         A.      Yes.

18         Q.      And do you see that it says it expires

19  May 1st, 2019?

20         A.      Yes.

21         Q.      And then do you see that the next item on

22  this page was 7/15/2019?  Do you see that?

23         A.      Yes.

24         Q.      And it says discard after 7/22?

25         A.      Yes.

```
 1          Q.      So there was no nonexpired midazolam
 2   between May 1st, 2019, and July 16th, 2019.  Right?
 3                  MR. MITCHELL:  Objection, form.
 4                  THE WITNESS:  Let me make sure.  Okay.
 5        The question is:  Did we have any midazolam that
 6        was not expired between -- according to this log,
 7        between May 1st and July 15th?  Is that your
 8        question?
 9   BY MR. KURSMAN:
10          Q.      That's my question.
11          A.      Based on this log, that would be correct.
12          Q.      Okay.  Were there any other logs that
13   were made by the pharmacy?
14          A.      Not that I'm aware of.
15          Q.      Okay.  Were there any other logs made by
16   the pharmacist that TDOC has?
17                  MR. MITCHELL:  Objection, form.
18                  THE WITNESS:  Not that I'm aware of.
19   BY MR. KURSMAN:
20          Q.      Okay.  Are you aware that Donnie Johnson
21   was executed by the State of Tennessee on May 16th,
22   2019?
23          A.      I'm sorry, you broke up.
24          Q.      Are you aware that Donnie Johnson was
25   executed by the State of Tennessee on May 16th, 2019?
```

```
 1        A.      I don't have the date in front of me; but
 2   if that's the date you have, fine.
 3        Q.      Do you know what midazolam was used to
 4   execute Donnie Johnson on May 16th, 2019?
 5        A.      The midazolam reference that was made on
 6   4/24/2019.
 7        Q.      Okay.  Do you know why the -- the
 8   pharmacist would have indicated to discard that
 9   midazolam after May 1, 2019?
10             MR. MITCHELL:  Objection, form.
11             THE WITNESS:  I do not, considering that
12        is before the 45-day BUD date.
13             MR. KURSMAN:  Okay.  Can we go back to
14        Exhibit 1, which would be the protocol.
15   BY MR. KURSMAN:
16        Q.      And before we get there, let me ask you
17   this:  When you receive logs from the pharmacist, do
18   you follow the BUD date or do you follow the
19   pharmacist's discard after date?
20        A.      I'm sorry, I didn't have my mouse clicked
21   over.  I follow the USP BUD date.
22        Q.      Even if the pharmacist says otherwise
23   about the drugs that that pharmacist compounded?
24             You're on mute, if you're answering.
25        A.      I'm sorry, you broke up.
```

1     Q.     I said even when the pharmacist says

2  otherwise about the pharmacist's own drugs that he or

3  she compounded?

4     A.     Well, on this log, which doesn't expire

5  until August of 2020. But whenever it was received,

6  the pharmacist would confirm that it was a 45-day date.

7  So I don't -- and I'm not the pharmacist. I can't tell

8  you why that date's on that log.

9     Q.     Okay. Let's -- let's look at Exhibit 1.

10  Let's go back to Exhibit 1, which would be the

11  protocol, and Page 36.

12     A.     Okay.

13     Q.     Are you there?

14     A.     Yes.

15     Q.     Do you see where it says "Accountability

16  of OIC?"

17     A.     Yes.

18     Q.     Do you see No. 4?

19     A.     Yes.

20     Q.     The log that is being talked about in No.

21  4, that's not the -- that's not the log we just

22  discussed in Exhibit 5, right?

23     A.     Right.

24     Q.     Okay. Now, let's go to -- let's go to

25  Page 37 on the protocol, which would just be the next

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 144 of 327 PageID #: 6204

```
 1   page.
 2        A.      Okay.
 3        Q.      And do you see the heading "Procurement?"
 4        A.      Yes.
 5        Q.      Do you see it says:
 6                "The commissioner or his designee ensures
 7                there are enough lethal injection chemicals
 8                kept in the inventory at RMSI to carry out
 9                three executions."
10                Do you see that?
11        A.      Yes.
12        Q.      And this -- this section is for
13   commercially manufactured drugs, correct?
14        A.      Yes.
15        Q.      Why does the protocol instruct that there
16   are enough manufactured lethal injection chemicals to
17   carry out three executions?
18                MR. MITCHELL:  Objection, form.  You can
19        answer.
20                THE WITNESS:  So that there is a ready
21        supply on hand to be able to carry out more than
22        one execution at a time; for instance, if they
23        were having executions that were scheduled closer
24        together.
25   BY MR. KURSMAN:
```

1    Q.    But if -- if we turn to Page 35 of

2    Exhibit 1, you see this is for compounded preparations?

3    A.    Yes.

4    Q.    Why is it silent as to how many drugs

5    should be on hand?

6         MR. MITCHELL:  Form objection.

7         THE WITNESS:  The preparations can only

8    be made for the specific inmate, so we wouldn't be

9    able to -- especially with the way they have been

10   scheduled, we wouldn't be able to have more than

11   one execution's worth of compounded drugs on hand

12   at a time.

13   BY MR. KURSMAN:

14   Q.    Can you explain to me why compounded

15   drugs can only be ordered for the specific inmate but

16   manufactured drugs can be ordered in bulk?

17        MR. MITCHELL:  Form objection.

18        THE WITNESS:  That's the stated

19   regulations as was explained to me by the doctor

20   and the pharmacist, so it's more so a question for

21   them than me.

22   BY MR. KURSMAN:

23   Q.    And the answer, though -- are you there?

24        And how -- how does TDOC know which drugs

25   are ordered for which inmate?

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 146 of 327 PageID #: 6206

1    A.    Could you rephrase your question?  I'm a
2    little confused about what you're asking.
3    Q.    How does TDOC know which drugs are
4    ordered for which inmate?
5    A.    The -- of course, we're aware of our
6    supply of, for instance, vecuronium bromide.  So if I
7    know that, for each execution we would need to order
8    midazolam and potassium chloride.
9    Q.    Right, that's kind of confusing.  So what
10   I mean is, let's say you order midazolam for one inmate
11   and then, a week later, midazolam for another inmate.
12   How do you know which midazolam is supposed to be for
13   which inmate?
14   A.    As explained earlier, when we get those
15   vials they are identified by the inmate's name.  So
16   we're able to keep them segregated by the inmate's
17   name.
18   Q.    Oh.  So do you place a sticker on the
19   vial with the inmate's name or it already has their
20   name on the vial?  Is that what you're saying?
21   A.    It comes with it.
22   Q.    Okay.  Could we turn to Page 37 of
23   Exhibit 1.
24   A.    Okay.
25   Q.    Do you see where it says when the

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 147 of 327 PageID #: 6207

1    chemicals are picked up from DSNF or RMSI warehouse, in
2    quotations, a member of the execution team checks the
3    supply of the chemicals, the concentrate, and
4    expiration dates.
5                  It's the second-to-last line after
6    "Procurement," in that first section.  Let me know when
7    you see it.
8         A.       Yes, I see it.
9         Q.       Do you know if that member -- first, are
10   you that person?
11        A.       Yes.  If it's a commercially manufactured
12   that's ordered, I -- I receive it and take it to where
13   it goes.
14        Q.       And are you the person that checks the
15   supply of the chemicals, the concentration, and the
16   expiration date?
17        A.       Yes.  The warden and I both do.
18        Q.       Okay.  Now, the protocol, though, does
19   not define you as a member of the execution team.
20   Right?
21        A.       The title of Drug Procurer is not
22   included in the definition.
23        Q.       Okay.  But even though you're not a
24   member of the execution team according to the protocol,
25   you're the person who does this for commercially

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 148 of 327 PageID #: 6208

1  manufactured drugs?

2       A.      Yes.

3       Q.      Okay.  So in this case, it would be for

4  vecuronium bromide?

5       A.      Yes.

6       Q.      Okay.  Do you do it also for potassium

7  chloride and midazolam?

8       A.      Yes.

9       Q.      And how do you check the concentration?

10      A.      On the commercially manufactured it's on

11 the label of the box and the vials, what the

12 concentration is.

13              On the compounded LICs, the concentration

14 is also on the vial.

15      Q.      And why does the protocol require the

16 concentration to be checked?

17              MR. MITCHELL:  Objection, form.

18              THE WITNESS:  The protocol requires --

19      requires a certain concentration of LIC to be

20      used, and so it's to confirm that the

21      concentration that's ordered and received matches

22      what was on the labels.

23 BY MR. KURSMAN:

24      Q.      And you think this is an important part

25 of the protocol?

1          A.      Yes.

2          Q.      Okay.  And what does it help ensure?

3          A.      That we're using the right concentration

4     of manufactured chemicals, as is required by the

5     protocol.

6          Q.      Okay.  So can we go back to Page 35 of

7     Exhibit 1.  Now, this is for compounded preparations.

8     Are you there?

9          A.      Yes.

10         Q.      You see the section regarding compounded

11    preparations?  The protocol does not require the

12    concentrations of these chemicals to be checked.

13         A.      Give me one minute.  I'll read it.

14         Q.      Take your time.

15                 (Pause.)

16                 MR. KURSMAN:  You're on mute, so whenever

17         you're ready you'll have to unmute.

18                 THE WITNESS:  Okay.  It's not as clear

19         language, but under "Accountability" in No. 4 it

20         does reference documentation and expiration date,

21         lot number, and other identifying marking is

22         recorded.

23    BY MR. KURSMAN:

24         Q.      Okay.  How would the -- how would the

25    concentration fall into lot number for identifying

1  marking?

2       A.      Because it's written on the label on the

3  vial.

4       Q.      Aren't all the concentrations of

5  midazolam that you receive the same?

6       A.      Yes.

7       Q.      Okay.  So how -- so the concentration is

8  not the expiration date, right?

9       A.      Correct.

10      Q.      And it's not the lot number, right?

11      A.      Correct.

12      Q.      And it's not the marking, right?

13      A.      It would be identifying the potency of

14 the chemical -- the concentration, I mean.

15      Q.      Okay.  And are you the person who does

16 this, as well?

17      A.      Myself and the warden, yes.

18      Q.      And do you or the warden have any medical

19 or pharmacological training?

20              MR. MITCHELL:  Objection, as far as the

21         Drug Procurer is concerned, pursuant to the

22         protective order.  But if the Drug Procurer knows

23         with respect to the warden, he can answer that

24         portion of the question.

25              THE WITNESS:  I have no knowledge of the

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 151 of 327 PageID #: 6211

1        warden's training.

2  BY MR. KURSMAN:

3      Q.    Okay.  Let's stay on Exhibit 1 and go to

4  Page 38.  And do you see where it says after "Transfer

5  of Location," No. 2:

6             "In the event the LICs are not used and not

7             compromised in any way, the LICs are

8             returned to the armory, reentered on the

9             perpetual inventory log, and secured in the

10           appropriate container."

11      A.    Yes.

12      Q.    And this is for commercially manufactured

13  drugs, right?

14      A.    Yes.

15      Q.    Why would the protocol instruct that the

16  commercially manufactured drugs be restored in a

17  container?

18           MR. MITCHELL:  Objection, form.

19           THE WITNESS:  If it had not been

20     compromised or seals broken and it's still able to

21     be used at another date and time, as long as it's

22     within its expiration date.

23  BY MR. KURSMAN:

24      Q.    And is that with the compounded drugs in

25  the event that they are taken to the execution chamber?

```
 1                    MR. MITCHELL:  Same objection.
 2                    THE WITNESS:  Yes.
 3    BY MR. KURSMAN:
 4         Q.      And why aren't the execution -- the
 5    compounded drugs just put in the armory with the
 6    manufactured drugs --
 7                    MR. MITCHELL:  Same objection.
 8    BY MR. KURSMAN:
 9         Q.      -- once they're returned?
10         A.      I'm not -- I'm not sure that I understand
11    your question.  They -- they are taken back to the
12    armory.  Are you asking why they aren't put in the
13    steel cage?
14         Q.      Yes, exactly.  Thank you.
15         A.      I can't tell you why we made that
16    decision to put them in the fridge.
17         Q.      Now, are -- we can -- you can put down
18    Exhibit 1.
19                    Can -- can you describe for me your --
20    your process for obtaining midazolam?
21                    MR. MITCHELL:  Objection, form.
22                    THE WITNESS:  So let me be clear so I
23          know what I'm describing for you.  Do you want me
24          to just kind of take you through the process of
25          ordering it, et cetera?
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 153 of 327 PageID #: 6213

1  BY MR. KURSMAN:

2      Q.      Well, if you could, take me through the

3  process of first finding out how to get it and where to

4  get it.

5              MR. MITCHELL:  Same form objection.

6              THE WITNESS:  The -- the pharmacist is

7         the one who -- as far as the API goes, is the one

8         who finds and orders it.  So they would be the

9         ones that have specific knowledge as to that.

10  BY MR. KURSMAN:

11     Q.      And is that the same for the potassium

12  chloride, as well?

13     A.      Yes.

14     Q.      Have -- have you ever attempted to obtain

15  the API for midazolam?

16     A.      No.

17     Q.      Have you ever attempted to obtain the API

18  for potassium chloride?

19     A.      No.

20     Q.      Have you ever attempted to obtain the API

21  for pentobarbital?

22     A.      Yes.

23     Q.      When was the last time you did that?

24     A.      Approximately -- I don't know an exact

25  date.  It would have been late -- probably late 2018,

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 154 of 327 PageID #: 6214

1  but I can't remember specifically.

2      Q.      And have you ever attempted to obtain the

3  API for secobarbital?

4      A.      Sorry, you broke up on that one.

5      Q.      Have you ever attempted to obtain the API

6  for secobarbital?

7      A.      No.

8      Q.      Did you ever attempt to obtain the API

9  for sodium thiopental?

10     A.      No.

11     Q.      Did you ever attempt to obtain morphine?

12     A.      No.

13     Q.      And did you ever attempt to obtain

14  etomidate?

15     A.      No.

16     Q.      Okay.  When -- when was the last time

17  that you personally attempted to obtain any drugs?

18     A.      It would have been that same time in

19  2018.  I don't remember a specific date.

20     Q.      And has the pharmacist who obtains and

21  orders the API for midazolam and potassium chloride,

22  have they attempted to obtain the API for any other

23  drugs?

24     A.      Yes, pentobarbital.

25     Q.      Do you know when the last time they

```
 1   attempted to obtain an API for pentobarbital?

 2        A.      Approximately three weeks ago.

 3        Q.      And do you know what they did to attempt

 4   to obtain the API for pentobarbital?

 5        A.      They attempted to order pentobarbital.

 6        Q.      Do you know from whom?

 7                MR. MITCHELL:  And I'm going to object,

 8        pursuant to the protective order, and instruct the

 9        Drug Procurer again not to answer.  Sorry.

10   BY MR. KURSMAN:

11        Q.      Did you ask them to attempt to obtain

12   pentobarbital three weeks ago?

13        A.      I didn't ask them three weeks ago.  They

14   have been trying to find it.

15        Q.      When was the last time you asked them to

16   attempt to obtain the API for pentobarbital?

17        A.      I don't remember the last time I told

18   them to do it.

19        Q.      Why is this person still attempting to

20   obtain the API for pentobarbital?

21        A.      Because I asked them to continue to try

22   to find it.

23        Q.      Tennessee's current lethal injection

24   protocol does not include pentobarbital, correct?

25        A.      Correct.
```

 1        Q.       So why do they continue to attempt to
 2    obtain the API for pentobarbital?
 3        A.       It was an instruction given, to continue
 4    to try to obtain it.
 5        Q.       And why?  Why did you give that
 6    instruction?
 7        A.       Because that instruction was given to me.
 8        Q.       And who gave you that instruction?
 9        A.       The commissioner, in consultation with
10    general counsel.
11        Q.       Okay.  And does the commissioner, is
12    it -- does the commissioner want to use pentobarbital
13    instead of the three-drug midazolam protocol?
14             MR. MITCHELL:  Objection, speculation.
15        Objection, form.  And also possibly
16        attorney-client.  I'm going to instruct the Drug
17        Procurer not to answer that.
18             MR. KURSMAN:  I'm not asking about any
19        conversations between the Drug Procurer and an
20        attorney.
21    BY MR. KURSMAN:
22        Q.       I'm just asking whether, to your
23    knowledge, whether the commissioner would rather use
24    pentobarbital in an execution over the three-drug
25    midazolam protocol.

```
 1                    MR. MITCHELL:  And same objection.  I'm
 2          going to instruct the Drug Procurer not to answer
 3          that.
 4   BY MR. KURSMAN:
 5          Q.      And you don't -- don't know who the
 6   pharmacist tried to get the API pentobarbital from
 7   three weeks ago?
 8                    MR. MITCHELL:  Objection, both form and
 9          foundation.  I had instructed the pharmacist not
10          to answer, pursuant to the protective order.
11                    MR. KURSMAN:  Oh, I apologize.  I saw it.
12   BY MR. KURSMAN:
13          Q.      Do you know how many entities the
14   pharmacist contacted?
15          A.      No.
16          Q.      Do you know if the pharmacist attempted
17   to obtain any other drugs, aside from pentobarbital?
18          A.      Not that I'm aware of.
19          Q.      Do you know if the pharmacist attempt --
20   attempted to obtain any drugs from sources outside the
21   United States?
22          A.      Not that I'm aware of.
23          Q.      Okay.  Have -- have you had discussions
24   with the pharmacist about the -- the legal landscape of
25   obtaining pentobarbital?
```

1      A.     Yes.

2      Q.     And what were those discussions?

3      A.     With regard to A, trying to find it in

4  the United States; and then the possibility of

5  importing.

6      Q.     And what did you discuss when you

7  discussed the possibility of importing the API

8  pentobarbital?

9      A.     It was more asking, to their knowledge,

10  what the requirements would be and the processes to do

11  that.

12      Q.     And what -- what did the pharmacist say?

13      A.     That -- I'm summarizing, but they would

14  have to apply to the DEA for a license to import a

15  controlled substance.

16      Q.     And did you ask them if that was even if

17  the drugs were used for executions?

18      A.     I'm sorry, I don't really understand your

19  question.

20      Q.     Yeah, I apologize.  It was a poorly

21  worded question.

22           So the pharmacist told you that they'd have

23  to apply for an exception from the DEA to import

24  pentobarbital.  My question is:  Do you know if the

25  pharmacist told the DEA that these are for executions?

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 159 of 327 PageID #: 6219

1     A.     I have no knowledge of what they would

2  have told the DEA.

3     Q.     Okay.  And do you know the last time that

4  the pharmacist looked for the API pentobarbital from a

5  source outside the United States?

6     A.     I don't know that.

7     Q.     Do you know if the pharmacist has sources

8  of pentobarbital outside the United States?

9     A.     I don't know.

10     Q.     Let's go to -- and have you had more

11  recent conversations with the pharmacist that -- that

12  the recent conversations that you've had with the

13  pharmacist about their search for pentobarbital, were

14  those by email?

15     A.     No.

16     Q.     What -- what mode of communication were

17  they by?

18     A.     Telephone.

19     Q.     Is there a reason that you're having all

20  these conversations with the pharmacist over the phone,

21  rather than by email?

22     A.     Because it's easier to talk on the

23  telephone.

24     Q.     Did anybody instruct you to have as

25  little communication as possible via email?

```
1        A.      No.
2                (Exhibit No. 6 marked.)
3    BY MR. KURSMAN:
4        Q.      Let's go to Exhibit 6.  Let me know when
5    you're there.
6                (Pause.)
7                THE WITNESS:  Okay.
8    BY MR. KURSMAN:
9        Q.      And do you see it says it's an email from
10   September 7th of 2017?  Do you see that?
11       A.      Yes.
12       Q.      Did you write this email?
13       A.      Yes.
14       Q.      And did this email go to the pharmacist?
15       A.      I'm sorry, I can't hear your question.
16       Q.      I apologize.  Was the recipient of this
17   email the pharmacist?
18       A.      Yes.
19       Q.      Okay.  And it says:  "The word from the
20   powers that be is that they first try to find midazolam
21   and then go from there if there are none out there to
22   get."  Do you see that?
23       A.      Yes.
24       Q.      Okay.  Who are "the powers that be?"
25               MR. MITCHELL:  Objection.  I'm going to
```

1       instruct the witness not to answer that, pursuant

2       to the protective order.

3   BY MR. KURSMAN:

4       Q.      Okay.  Well, is it -- is it the

5   commissioner?

6               MR. MITCHELL:  If I may, how about asking

7       who it includes and doing it that way?  I think

8       that might be a way around that objection, whether

9       you include the commissioner.

10              MR. KURSMAN:  Okay.

11  BY MR. KURSMAN:

12      Q.      Does -- does the powers that be -- does

13  the powers that be include the commissioner?

14      A.      Yes.

15      Q.      Does it include general counsel's office?

16      A.      Yes.

17      Q.      Does it include the warden?

18      A.      Not that I'm aware of.

19      Q.      Does it include the governor?

20      A.      I don't know.

21      Q.      Okay.  And did the conversation you had

22  with the powers that be, was that conversation via

23  email?

24      A.      No.

25      Q.      Well, how was that conversation -- how

1    did that conversation happen?

2         A.    If I remember correctly, in person.

3         Q.    And was that with all -- all of the

4    people I just mentioned present?

5         A.    No.

6         Q.    Okay.  Who wasn't present at that meeting

7    out of the people I just mentioned?

8         A.    The warden and the governor.

9         Q.    And why did they want to first try to

10   find midazolam?

11             MR. MITCHELL:  Objection, form.  And the

12        deliberative process involves attorney-client

13        privilege, so I'm going to instruct the Drug

14        Procurer not to answer.

15   BY MR. KURSMAN:

16        Q.    Did you agree with their assessment?

17        A.    Yes.

18        Q.    Did you -- did you suggest that they

19   first try midazolam before looking for pentobarbital?

20        A.    I'm sorry, before looking for what?

21        Q.    Pentobarbital.

22        A.    We looked for pentobarbital first.  When

23   we couldn't find that is when the decision was made to

24   go with midazolam.

25        Q.    Right.  At that time -- at that time,

1   around when this email was created, did you tell the
2   powers that be "I think it's time to start looking for
3   midazolam?"
4       A.      No.
5       Q.      Okay.  So how exactly did that process
6   happen?
7               MR. MITCHELL:  I'm going to object again,
8           attorney-client deliberative process, and instruct
9           the witness not to answer.
10  BY MR. KURSMAN:
11      Q.      Were -- were you instructed at that point
12  to stop looking for pentobarbital if -- if you could
13  find midazolam?
14      A.      No.
15      Q.      So what does it mean, "the word from
16  powers that be is that they first want to try to find
17  midazolam and then go from there?"
18      A.      We couldn't find pentobarbital; and so
19  the decision was made, in looking at another method, to
20  go with midazolam.
21      Q.      But at this point, was the -- the
22  protocol was a pentobarbital protocol; is that right?
23      A.      Yes.
24      Q.      Okay.  And subsequently, after this
25  email, it was changed to a three-drug midazolam

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 164 of 327 PageID #: 6224

1  protocol.  Right?

2      A.      Yes.

3      Q.      Okay.  So can you explain to me why the

4  pharmacist is still looking for the API pentobarbital?

5      A.      I would say it was at the direction of

6  the commissioner that we continued to look for

7  pentobarbital being used as a one-drug protocol.  He

8  wanted us to continue to look for it, and if we were

9  able to find it I would think that that would be what

10 was used.

11     Q.      So if you were able to find

12 pentobarbital, you would -- you would write a new

13 protocol so that pentobarbital was the preferred method

14 of execution?  Is that what you're saying?

15             MR. MITCHELL:  Objection, form.

16             THE WITNESS:  I'm sorry, you broke up

17     there about halfway through the question.

18             MR. KURSMAN:  Well, I'll strike the

19     question.

20             (Exhibit No. 7 marked.)

21 BY MR. KURSMAN:

22     Q.      Let's go to Exhibit 7.  Just let -- let

23 me know when you get there.

24             THE WITNESS:  Can you hear me?  Everybody

25     is frozen.

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 165 of 327 PageID #: 6225

```
 1                    MR. KURSMAN:  I can hear you.  Do you
 2         want to take a break to unfreeze your computer?
 3                    THE WITNESS:  Can you hear me?  Everybody
 4         is frozen.
 5                    MR. KURSMAN:  Let's go off.
 6         Mr. Mitchell, is that okay, so we try to help the
 7         Drug Procurer to update their computer?
 8                    MR. MITCHELL:  I only heard a portion of
 9         what you said.  What was that?
10                    MR. KURSMAN:  That the Drug Procurer
11         keeps saying that everyone is frozen, so maybe we
12         should go off so you can see what's going on in
13         there.
14                    MR. MITCHELL:  Okay, yeah.
15                    THE WITNESS:  You're all back now.
16                    MR. KURSMAN:  Can you hear me then?
17                    THE WITNESS:  Yes.
18                    MR. KURSMAN:  Then I guess we can
19         continue.
20    BY MR. KURSMAN:
21         Q.    Can you pull up Exhibit 7.  And let --
22    let me know when you got there.
23         A.    I'm there.
24         Q.    Okay.  And do you see this?  It's the
25    very bottom of Page 1973.  It says "Thursday, September
```

```
 1   7, 2017, at noon?"  Do you see that?
 2        A.      Yes.
 3        Q.      And did you write this email?  You're
 4   muting.
 5        A.      Sorry.  I was just looking down to see if
 6   I recognize if I wrote it.  Yes.
 7        Q.      Okay.  And is this email to the warden?
 8        A.      Yes.
 9        Q.      And what are the disclaimer requirements?
10        A.      It is a prior -- prior to being able to
11   receive the pento, the pharmacist would have to sign a
12   disclaimer stating that they would not sell or send the
13   pento to a correctional organization.
14        Q.      Okay.  So at this point you were informed
15   that midazolam was readily available; is that right?
16        A.      Yes.
17        Q.      Okay.  And then if we go to 102, which is
18   on the first page of Exhibit 7, do you see they say
19   "They do not.  It's from our primary vendor?"
20        A.      I'm sorry, which page of Exhibit 7 do you
21   want me to look at?
22        Q.      Oh, the first page.  It's -- it's Bates
23   Def. Int. Discl. 1973.  Do you see it's the second
24   email on the first page?
25        A.      Yes.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 167 of 327 PageID #: 6227

1      Q.      Do you see it says, "They do not.  It's
2    from our primary vendor?"
3      A.      Yes.
4      Q.      Did you end up getting midazolam from the
5    pharmacy's primary vendor?
6      A.      I don't know.  They didn't tell me
7    specifically who it came from, they just obtained it.
8      Q.      Okay.  And at this point, was it
9    compounded or manufactured?
10     A.      Manufactured.
11     Q.      Okay.  Now, if you go up to the first
12   email, which is at 12:08 p.m.
13     A.      Yes.
14     Q.      You see it says information will be
15   passed along to the higher ups.  Do you see that?
16     A.      Yes.
17     Q.      Are the higher ups the same people as the
18   powers that be that you referenced in the prior
19   agreement?
20     A.      Yes.
21     Q.      Okay.  Now, let's go to the second page
22   of Exhibit 7 again.  And would you go to the second
23   email, which is at 12:58 p.m.  Do you see that?
24     A.      Yes.
25     Q.      All right.  And do you see it says -- is

```
 1    this from the pharmacist?
 2         A.      This is from the pharmacy, yes.
 3         Q.      Okay.  And it's in response to the emails
 4    that we just discussed, right?
 5                 (Pause.)
 6    BY MR. KURSMAN:
 7         Q.      This is in response to the emails we just
 8    discussed, right?
 9         A.      Yeah.  I'm sorry, I thought I answered
10    "Yes."
11         Q.      Oh, I apologize.  Do you see where it
12    says:
13                 "That stuff is readily available with
14                 potassium chloride.  I reviewed several
15                 protocols from states that currently use
16                 that method.  Most have a 3-drug protocol
17                 including a paralytic and potassium
18                 chloride.  Here is my concern with
19                 midazolam.  Being a benzodiazepine, it does
20                 not elicit strong analgesic effects.
21                 Subjects may be able to feel pain from the
22                 second and third drugs, potassium chloride
23                 especially.  It may not be a huge concern
24                 but can open the door to some scrutiny on
25                 your end."
```

1    Do you see that?

2    A.    Yes.

3    Q.    And this was written by the pharmacist?

4    A.    Not by the pharmacist.

5    Q.    Who was it written by?

6    A.    The owner of the pharmacy.

7    Q.    And when -- when you said earlier that

8    the pharmacist is attempting to obtain the API, did you

9    mean the owner of the pharmacy or the pharmacist?

10   A.    No, the pharmacist is the one currently

11   searching for the API pentobarbital.

12   Q.    Okay.  So these emails that we just

13   discussed, is this between -- are these emails between

14   you and the pharmacist or between you and the owner of

15   the pharmacy?

16   A.    These are between myself and the owner of

17   the pharmacy.

18   Q.    Okay.  Now, when -- when the owner of the

19   pharmacy says "that stuff" at the beginning of this,

20   this email, is he referring to midazolam?

21   A.    I can't remember.  I think so.  I haven't

22   seen that email before, but I believe it refers to

23   midazolam.

24   Q.    Now, did you ask him which protocols he

25   reviewed?  When he said he reviewed protocols from

1  several states currently using midazolam, did you ask

2  him which states he reviewed?

3      A.      According to this email I believe I did,

4  and he opines specifically Ohio.

5      Q.      And are you aware of the botches that

6  occurred with the three-drug protocol that have

7  occurred in Ohio?

8              MR. MITCHELL:  Object to the form.

9              THE WITNESS:  No.

10 BY MR. KURSMAN:

11     Q.      Okay.  Do you know what a paralytic agent

12 is?

13     A.      It would be a drug that renders a

14 person -- that paralyzes him, seizes his muscles.

15     Q.      Do you know why the State of Tennessee is

16 using a paralytic agent in their execution protocol?

17     A.      I don't know that.  I'm not a doctor, so

18 I don't know what the medical -- medical reason is.

19 But it is part of the three-drug protocol that has been

20 constitutionally upheld, so that's what we use.

21     Q.      And how are you aware that it's been

22 constitutionally upheld?

23     A.      I was informed of that.

24     Q.      Okay.  And do you see where the owner of

25 the pharmacy says, "It may not be a huge concern but

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 171 of 327 PageID #: 6231

```
 1   can open the door to some scrutiny on your end?"
 2        A.      Yes.
 3        Q.      Is the pharmacist talking about legal
 4   scrutiny?
 5        A.      I don't know.
 6        Q.      Did you ask the pharmacist what they
 7   meant by "scrutiny on your end?"
 8        A.      No.
 9        Q.      Did you share this email with anybody?
10        A.      Yes.
11        Q.      Who?
12                MR. MITCHELL:  And I'm going to object
13           pursuant to the protective order.  Again, if you
14           rework your question he can answer that, but go
15           ahead.
16   BY MR. KURSMAN:
17        Q.      Did you share this email with the members
18   of the execution team?
19        A.      No.
20        Q.      Did you share this email with the
21   commission -- commissioner?
22        A.      Yes.
23        Q.      Did you share this email with general
24   counsel?
25        A.      Yes.
```

1       Q.      And did you share this email with the
2   governor?
3       A.      I did not.
4       Q.      Okay.  And what was the response when you
5   shared this email with those people?
6       A.      They took it and reviewed it.  I don't
7   know what if any conversations they may have had.  I
8   wasn't a party to those.  But then I was then told to
9   proceed to try and find the midazolam.
10      Q.      You were told to proceed trying to find
11  the midazolam?  Is that what you said?
12      A.      Yes.
13      Q.      Okay.  Are -- are you receiving text
14  messages during this deposition?
15      A.      No.
16      Q.      Okay.  And then the email goes on to say:
17  "Consider the use of an alternative like ketamine or
18  use in conjunction with an opioid."
19              Do you see that?
20      A.      Yes.
21      Q.      Did you share that with the people I just
22  mentioned?
23      A.      Yes.
24      Q.      And what was their response?
25      A.      Ultimately, their response was that we

1   would continue and move forward with the midazolam

2   option.

3        Q.     Okay.  Did you ever attempt to obtain

4   ketamine?

5        A.     No.

6        Q.     Did you ever attempt to obtain an

7   alternative like ketamine?

8        A.     No.

9        Q.     And did you ever attempt to obtain an

10  opioid?

11        A.     No.

12        Q.     Now, at the beginning of this deposition

13  you said that -- that doctors, pharmacologists, and

14  lawyers were consulted in creating this protocol.

15            Was this email presented to any doctors?

16        A.     I don't know if it was.  I don't know if

17  the commissioner or general counsel did or not.

18        Q.     Was it shared with any pharmacologists?

19        A.     Same answer.

20        Q.     Okay.  And was it shared with any

21  lawyers?

22        A.     The Attorney General's Office.

23        Q.     Why did you not attempt to obtain

24  ketamine?

25        A.     The decision was made to go forward with

 1    obtaining midazolam.
 2         Q.      And why did you not attempt to obtain an
 3    opioid?
 4         A.      Same answer.
 5                 Same answer.
 6                 (Exhibit No. 8 marked.)
 7    BY MR. KURSMAN:
 8         Q.      Okay.  Now, if we go to Exhibit 8.  Let
 9    me know when you get there.
10         A.      Okay.
11         Q.      And do you see this is another email from
12    you?
13         A.      Yes.
14         Q.      Is this between you and the pharmacy
15    owner?
16         A.      One second.  Let me look through it.
17                 (Pause.)
18                 THE WITNESS:  Yes, it is.
19    BY MR. KURSMAN:
20         Q.      Okay.  And if you look at the second page
21    of this exhibit.
22         A.      Yes.
23         Q.      "The good thing about the multi-drug
24    protocol is that it uses product that is commercially"
25    -- "commercially produced in high quantities that we

```
 1   can get overnight.  The life cycle is around two
 2   years."
 3        A.      Yes, I see that.
 4        Q.      Is that an email from the pharmacy owner
 5   to you?
 6        A.      I'm sorry, could you repeat?
 7        Q.      Yeah.  Is this an email from the pharmacy
 8   owner to you?
 9        A.      Yes.
10        Q.      Okay.  So were you getting commercially
11   manufactured midazolam at first?
12        A.      Yes.
13        Q.      Okay.  And -- and when did you switch
14   from commercially manufactured to compounded?
15        A.      Approximately after May of 2018, I think.
16        Q.      Okay.  Can you go back to the first page
17   in Exhibit 8.  And do you see the email, the very first
18   email at 1:39 p.m. on September 7, 2017?
19        A.      Yes.
20        Q.      And it says:  "Etomidate, limited supply.
21   Ketamine, ample supply.  Sodium thiopental is no longer
22   available."
23        A.      Yes.
24        Q.      And is this from the pharmacy owner to
25   you?
```

```
 1        A.    Yes.
 2        Q.    And do you know what etomidate is?
 3        A.    Sorry, can you repeat?
 4        Q.    Yes.  Do you know what etomidate is?
 5        A.    No, not off the top of my head.
 6        Q.    Do you know what ketamine is?
 7        A.    I think it's a sedative, but I'm not
 8   sure.
 9        Q.    Okay.  Is the pharmacy owner telling you
10   that he has a limited supply of etomidate and that he
11   or she has ample supply of ketamine?
12        A.    No, that's not what he or she can supply;
13   it's what's available, I guess, from vendors.
14        Q.    And are they able to get etomidate or
15   ketamine?
16        A.    I would assume so, but they wouldn't try.
17        Q.    Did -- did you bring this information to
18   the powers that be, or the higher ups, at TDOC?
19        A.    Yes.
20        Q.    And -- and how did they respond?
21        A.    They took the information, considered it.
22   I'm not aware of what conversations they may have had
23   outside of my presence.  And then as a result, I was
24   told to move forward with midazolam.
25        Q.    And did -- did you agree with that
```

1    assessment?

2         A.    Yes.

3         Q.    Why?

4         A.    The decision was made to move forward

5    with a protocol that had been upheld to be

6    constitutional.  And it was a protocol that had been

7    found to be constitutional; so that was the decision to

8    make, to use what had already been determined to be

9    constitutional.

10        Q.    Do you have any email correspondence with

11   other pharmacies?

12        A.    Um, I believe there were some emails when

13   I was trying to find a compounding pharmacy and/or

14   source of pentobarbital.

15        Q.    And when would that have been?

16        A.    I don't have specific dates in front of

17   me.  So it would have been in the '17-'18 timeframe.

18        Q.    And how many pharmacies would you --

19   would you say you had that email correspondence with?

20        A.    Oh, I -- I don't know, off the top of my

21   head.

22             MR. KURSMAN:  Okay.  Mr. Mitchell, we're

23        going to request those emails in discovery, as

24        well.

25             MR. MITCHELL:  Understood.

```
 1   BY MR. KURSMAN:
 2        Q.     Okay.  Now, could we turn to Exhibit 10.
 3        A.     So to be clear, are you skipping over 9?
 4               MR. KURSMAN:  I apologize.  Exhibit 9,
 5        please.
 6               (Exhibit No. 9 marked.)
 7   BY MR. KURSMAN:
 8        Q.     And you see, this is -- if we go to the
 9   very bottom of the page, you see it's an email sent
10   Thursday, September 21st, at 8:44 a.m., 2017.  Do you
11   see?
12        A.     Yes.  Sorry, I have to move my mouse
13   over.
14        Q.     And then you see it says:  "So the word
15   from the powers that be is that we want to move forward
16   with ordering the items for a 3 drug protocol,
17   including midazolam, vecuronium, and potassium
18   chloride."
19               Did -- did you write this email?
20        A.     Parts of it, the parts of the email that
21   contain essentially a response.
22        Q.     So could you explain what you mean?
23        A.     Sure.  So, for instance, I -- I wrote
24   that first part, "So the word from the powers that be."
25   And "The protocol calls for the following."  I wrote
```

1    the -- the "5-gram dose of midazolam."

2                    The reply starts with "5 grams seems like

3    a lot, and it's 10 times the amount used by the other

4    states."

5                    So the rest of that sentence, the rest of

6    that memo, is my response to the pharmacy owner.

7                    Same thing with Nos. 2 and 3.  The same

8    sentences are responses from the pharmacy owner.

9        Q.    And why is -- and the response, is that

10   from the pharmacist or the pharmacy owner?

11       A.    The pharmacy owner.

12       Q.    And how did they write in this written

13   response in an email that you sent to the pharmacy

14   owner?

15       A.    It was in email form; so, I mean, I guess

16   he -- he typed it in, his reply.  He typed it in under

17   those numbers and sent it back to me.

18       Q.    Okay.  So -- so now I think I understand.

19   So this is actually an email from the pharmacy owner to

20   you; is that right?

21       A.    Yes.

22       Q.    Okay.  And you sent the initial and then

23   responded?

24       A.    That's what it says, yes.

25       Q.    Do you know why your initial email was

1    not produced in discovery?

2          A.      I don't know.

3                  MR. KURSMAN:  Okay.  I will request your

4          initial email in discovery, as well.

5    BY MR. KURSMAN:

6          Q.      Do -- do you know why the pharmacy owner

7    is reviewing protocols of other states?

8          A.      I would assume so he would understand

9    what the pharmacy could do.

10         Q.      And then under No. 2, he is talking about

11   -- or he or she is talking vecuronium.  And it says:

12   "It would need to be reconstituted and you would need

13   10 vials."

14                 Do you see that?

15         A.      Yes.

16         Q.      Why does the vecuronium need to be

17   reconstituted?

18                 MR. MITCHELL:  Objection, form.

19                 THE WITNESS:  It's in powder form, so it

20         has to be mixed with bacteriostatic water to get

21         it into an injectable form.

22   BY MR. KURSMAN:

23         Q.      And who does that reconstitution?

24         A.      Members of the execution team.

25         Q.      And do you have pharmacy instructions on

1  how to reconstitute the vecuronium bromide?

2        A.      No, they were instructed in the same

3  conversation with the pharmacist via phone.

4        Q.      And do you know what those instructions

5  were?

6        A.      I wasn't part of that phone call.  But

7  the general instructions as explained to me was to take

8  the bacteriostatic water and take 10 milligrams of

9  bacteriostatic water and inject it into the vial with

10 the vecuronium and gently shake it until it's clear.

11       Q.      And is there a protocol that the

12 execution team members must follow when reconstituting

13 the vecuronium bromide?

14       A.      They follow the instructions that were

15 given to them by the pharmacist.

16       Q.      And what happens if they deviate from

17 those instructions?

18              MR. MITCHELL:  Objection, form.

19              THE WITNESS:  If for some reason in the

20       process of reconstituting it would result in an

21       unclear liquid, they would not use it.

22 BY MR. KURSMAN:

23       Q.      Do you know which members of the

24 execution team reconstitute the vecuronium bromide?

25       A.      The executioner.

1    Q.    And does the executioner have any

2 specialized medical experience?

3         MR. MITCHELL:  Objection, pursuant to the

4    protective order.  Don't answer that, Drug

5    Procurer.

6 BY MR. KURSMAN:

7    Q.    Now, let's go down -- stay on Exhibit 9

8 to the -- to the fourth paragraph.  It says:  "We would

9 like to order enough of the above for 20 inmates."

10        Do you see that?

11   A.    Yes.

12   Q.    So you were ordering 5,000 midazolam, 100

13 milligrams of vecuronium, and 100 milliliters of a 2

14 milliequivalent per milliliter concentration dose of

15 potassium chloride for 20 inmates.  Is that right?

16   A.    No, that's not what we ordered.  Based on

17 his -- the explanations of the pharmacy owner in 1, 2,

18 3, they weren't as originally described, 5 grams.  5

19 grams is too much.

20        So what we ended up ordering and using is

21 a 500-milligram protocol for midazolam.  It's 120

22 milliliters to make the concentration for potassium

23 chloride.  And it's 100 milligrams, 100 ml's, of

24 vecuronium.

25   Q.    So just so I'm clear, so you changed the

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 183 of 327 PageID #: 6243

```
 1    protocol based on the responses of the pharmacy owner?
 2                MR. MITCHELL:  Objection.
 3                THE WITNESS:  Based on the -- the fact
 4         that it was consistent in the other protocols
 5         referenced.
 6    BY MR. KURSMAN:
 7         Q.      Okay.  Is the pharmacy owner a
 8    pharmacist?
 9         A.      Not that I'm aware of.
10         Q.      Is the pharmacy owner a medical doctor?
11                MR. MITCHELL:  Object, based on the
12         protective order.  Please don't answer, Drug
13         Procurer.
14    BY MR. KURSMAN:
15         Q.      Does -- does the pharmacy owner have any
16    specialized expertise in either the medical or legal
17    field?
18                MR. MITCHELL:  Object.  Same objection,
19         pursuant to the protective order.  Please don't
20         answer.
21    BY MR. KURSMAN:
22         Q.      Okay.  So let's go back to Paragraph 4.
23    Again, you ordered enough of the pharmacy owner's
24    suggested protocol for 20 inmates; is that right?
25         A.      We did not get that much.
```

```
1          Q.      And how much did you get?
2          A.      I'm trying to remember.  I think we got
3    enough to do five or six.
4          Q.      Okay.  Why, at -- at that point were you
5    not using a physician's order?
6          A.      Well, commercially manufactured, you do
7    not have to have a physician's order.
8          Q.      And do you know why for a commercially
9    manufactured drug you don't need a physician's order?
10         A.      That was just what was explained to me by
11   the pharmacy and doctors.
12         Q.      Okay.  After the pharmacy owner replied
13   with these responses in 1, 2, and 3 on Page 2 of
14   Exhibit 9, did you take those responses to the higher
15   ups at TDOC?
16         A.      As I remember, yes.
17         Q.      And what did they do with those
18   responses?
19         A.      Reviewing those and, as I say in looking
20   at the other protocols, said the protocols had been
21   upheld constitutionally.  They looked at it and
22   approved the doses and concentrations.
23         Q.      And at what point did you get back to the
24   pharmacy owner and tell them you were not going with
25   their suggested protocol?
```

1    A.        I don't remember specifically how long
2  after this it was that I got back to the pharmacy
3  owner.
4    Q.        And is it at this point that they decided
5  to move forward with the three-drug protocol?  And
6  they -- "they" being the higher ups at TDOC?
7    A.        Well, the decision to pursue the three
8  drugs had already been made.  At this point, we're --
9  we're I guess finalizing the amounts and the substances
10 that would be used in the protocol.
11   Q.        Do you know why the powers that be
12 continued to go ahead with midazolam, even though the
13 pharmacist explained that it had no analgesic effects?
14   A.        I was not part of this conversation.
15   Q.        Do you see why the Department decided to
16 go ahead with midazolam, even though the pharmacist
17 advised that inmates could feel the effects from the
18 second and third drugs?
19             MR. MITCHELL:  Objection, form.
20             THE WITNESS:  Once again, I wasn't part
21      of that conversation.  But to clarify that
22      statement, it wasn't the pharmacist that said it.
23      It was the pharmacy owner.
24 BY MR. KURSMAN:
25   Q.        Right.  I know that.  I apologize for

1  that.

2          Do -- do you know why the pharmacy owner

3  was concerned that you might experience some hiccups on

4  your end if -- if the inmate could experience the second

5  and third drugs?

6          MR. MITCHELL:  Objection, form.

7          THE WITNESS:  Nothing more than what he

8      wrote in there.

9  BY MR. KURSMAN:

10     Q.     Okay.  And based on these emails, is it

11  your opinion that the pharmacy owner was trying to make

12  this as smooth of a process for you and for TDOC?

13         MR. MITCHELL:  Objection, form.

14         THE WITNESS:  I don't know -- I don't

15      know if I understand what you mean.  Smooth, in

16      the sense of obtaining whatever drugs we decided

17      to get?

18  BY MR. KURSMAN:

19     Q.     No, I apologize.  I mean smooth, as in so

20  there will be as little scrutiny as possible on your

21  end.

22     A.     I would say he -- the pharmacy owner was

23  interested in us having a -- a successful protocol, for

24  lack of a better term, or a better protocol.

25     Q.     Why?

```
 1                    MR. MITCHELL:  Objection.
 2                    THE WITNESS:  I don't know.  I don't know
 3        why he was thinking what he was thinking.
 4    BY MR. KURSMAN:
 5        Q.      All right.  Because in Exhibit 7, he --
 6    he -- he or she says to you:  "It may not be a huge
 7    concern, but that can open the door to some scrutiny on
 8    your end."
 9                    Do you remember discussing that with me
10    just a minute ago?
11        A.      Yes.
12        Q.      Okay.  Did you ask him why he would be at
13    all concerned with scrutiny on your end?
14        A.      No.  No, I didn't specifically ask him.
15        Q.      Is it in his best interests that there is
16    no scrutiny on your end?
17                    MR. MITCHELL:  Objection, form.
18                    THE WITNESS:  Once again, I don't know
19        what the pharmacy owner was thinking.
20    BY MR. KURSMAN:
21        Q.      Okay.  Now let's go back to where we
22    were, which is Exhibit 9.
23        A.      Okay.
24        Q.      You see below, where it says "The
25    protocol calls for the following dosages" on the second
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 188 of 327   PageID #: 6248

1  page of Exhibit 9.  It says:  "For each inmate, we have
2  to have backup dosages of those, so each inmate will
3  require us to have double the above dosages on hand."
4      A.    Yes.
5      Q.    Is that for the lethal injection
6  chemicals?
7      A.    Yes.
8      Q.    And do -- and do you do that now?
9      A.    Yes.
10     Q.    Okay.  Why are backup dosages necessary?
11           MR. MITCHELL:  Objection, form.
12           THE WITNESS:  So if -- for instance, if
13       a -- if the drug was put into a syringe and then
14       at the last minute there was a stay or a reprieve,
15       and then there was another date set or whatever,
16       then we would have enough to be able to proceed
17       accordingly.
18  BY MR. KURSMAN:
19     Q.    Now, let's say the midazolam was
20  injected, the first dose, and the prisoner looked to be
21  still awake.  Would you then inject the second dose
22  into a prisoner?
23           MR. MITCHELL:  Objection.
24           THE WITNESS:  The protocol calls for
25       syringes and the drug to be injected.  Then there

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 189 of 327 PageID #: 6249

1          is a waiting period.  Then there's a consciousness

2          check.

3                  If the inmate is conscious at that time,

4          the execution moves to the second set of drugs.

5          The manner -- I don't remember which one is

6          second.

7     BY MR. KURSMAN:

8          Q.      Okay.  And if the inmate appears to be

9     unconscious and the first set of vecuronium bromide is

10    administered and the inmate doesn't appear to be

11    paralyzed, would the execution team then administer the

12    second dose of potassium chloride?

13                 MR. MITCHELL:  Objection, form.

14    BY MR. KURSMAN:

15         Q.      I apologize, I meant to say vecuronium.

16                 MR. MITCHELL:  Same objection.

17                 THE WITNESS:  So -- your question.  So

18         the vecuronium bromide is administered by syringes

19         in a saline flush.  And at that point, after the

20         saline flush, the potassium chloride is

21         administered after the second flush.

22    BY MR. KURSMAN:

23         Q.      Right, but my question is a bit

24    different.  My question is:  If both of those, which

25    would be one dose; if both of those are administered

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 190 of 327 PageID #: 6250

1  and the inmate looks to be not paralyzed from the
2  paralytic, would the execution team then use the backup
3  dosage of the vecuronium bromide?
4          MR. MITCHELL:  Same objection.
5          THE WITNESS:  Yes, if they're directed.
6      If the warden sees that, then he would direct them
7      to go to the backup set.
8  BY MR. KURSMAN:
9      Q.      Okay.  And if the prisoner is given the
10 first dose of potassium chloride, as called for by the
11 protocol, and after they receive that dose they -- at
12 some point their heart doesn't stop, would the
13 execution team then administer the backup dose of
14 potassium chloride?
15         MR. MITCHELL:  Same objection.
16         THE WITNESS:  That would be if -- if --
17     yes, if there was a concern that the first set of
18     drugs are not reaching the inmate, are not in the
19     line, then they couldn't access it.
20         MR. KURSMAN:  Could we take a 10-minute
21     break?
22         MR. MITCHELL:  Sure.
23         THE VIDEOGRAPHER:  We are going off
24     record at 3:56 p.m.
25         (Recess from 3:56 p.m. to 4:11 p.m.)

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 191 of 327 PageID #: 6251

1    THE VIDEOGRAPHER:  We are back on the
2    record at 4:11 p.m.
3  BY MR. KURSMAN:
4    Q.    Drug Procurer, we just came off of a
5  break.  During the break, did you discuss anything with
6  your attorneys?
7    A.    No.
8    Q.    Okay.  And are you still in a room by
9  yourself?
10   A.    Yes.
11   Q.    Okay.  Let's -- let's switch gears now
12  and talk a bit about pentobarbital.  Were you involved
13  in obtaining pentobarbital when the State of Tennessee
14  obtained pentobarbital?
15   A.    No.
16   Q.    And are you currently involved in
17  attempting to obtain pentobarbital?
18   A.    I am not.  I'm searching for it at the
19  pharmacy, yes.
20   Q.    Okay.  And when was the last time that
21  you had a conversation with the pharmacist about
22  attempting to obtain pentobarbital?
23   A.    As previously stated, approximately three
24  weeks ago.
25   Q.    And was this a conversation with the

1  pharmacist or the pharmacy owner?

2      A.      Pharmacist.

3      Q.      And what did the pharmacist tell you

4  during that conversation?

5      A.      That the pentobarbital is not able to be

6  obtained.

7      Q.      Did you ask the pharmacist what they

8  tried to do to obtain -- or what they did to obtain,

9  try to obtain, the pentobarbital?

10     A.      Yes.  They attempted to order it from a

11 supplier; and the supplier, before it would be shipped,

12 would have required them to sign a disclaimer that it

13 would not be shipped or sold to a corrections

14 organization.

15     Q.      Do you know if this was an API or a

16 manufactured pentobarbital?

17     A.      I think it was manufactured.  I'm not

18 100-percent sure.

19     Q.      And do you know when they attempted to

20 obtain pentobarbital before three weeks ago?

21     A.      As it was explained to me, they

22 periodically look for it from providers or suppliers to

23 see if it's available in either manufactured or API

24 form.  And if they find it, they attempt to order it.

25 They have not been able to order it thus far, but I

1   don't know.  I don't have a breakdown of specific dates

2   or how many times they attempted.

3        Q.       Every time they attempt to obtain

4   pentobarbital, do they let you know?

5                MR. MITCHELL:  Objection, form.

6                THE WITNESS:  Yes and no.  You know, in a

7        conversation it's always asked by me, "Have you

8        been able to find it?" and I'm told "No."

9   BY MR. KURSMAN:

10       Q.       And do you ask them in those

11  conversations what they have done to attempt to find

12  it?

13       A.       Yes.  And it's as I described; they look

14  at vendors and suppliers to see if they can obtain it,

15  either commercially manufactured or API.

16       Q.       Okay.  And do you know how many vendors

17  or suppliers they have contacted to attempt to obtain

18  pentobarbital?

19       A.       At this time, I don't.

20       Q.       Okay.  And has TDOC tried on their own to

21  attempt to obtain pentobarbital?

22       A.       Yes.

23       Q.       Okay.  When?  When was the last time TDOC

24  did that?

25       A.       As -- as previously stated, 2000 -- 2018.

```
 1   Maybe 2017 and '18.
 2        Q.      And is this pharmacy and pharmacist that
 3   provides you with the lethal injection drugs now, is
 4   this the same pharmacy and pharmacist that said they
 5   would compound pentobarbital for you?
 6        A.      If they could obtain it, yes.
 7                (Exhibit No. 10 marked.)
 8   BY MR. KURSMAN:
 9        Q.      Okay.  Could I take you to Exhibit 10?
10        A.      Stand by.
11                (Pause.)
12                THE WITNESS:  I have it.
13   BY MR. KURSMAN:
14        Q.      And do you see it's an email on April 6,
15   2017.  It says:  "Sir, I'm inquiring as to whether your
16   organization has inventory of pentobarbital.  I
17   appreciate any help you can give."
18                Do you see that email?
19        A.      Yes.
20        Q.      Is that an email from you?
21        A.      Yes.
22        Q.      And who was it to?
23                MR. MITCHELL:  Object.  Object on the
24        basis of -- on the basis of the protective order,
25        DE107 and 108, identifying people involved in
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 195 of 327   PageID #: 6255

1       acquiring and supplying drugs.

2   BY MR. KURSMAN:

3       Q.      Was it -- was it to the pharmacist or

4   pharmacy owner that we're discussing?

5       A.      No.

6       Q.      It was to a different -- was it to a

7   pharmacist?

8       A.      It was to a -- it was to a pharmacy, I

9   believe.

10              (Exhibit No. 11 marked.)

11  BY MR. KURSMAN:

12      Q.      Okay.  Now, could you go to Exhibit 11.

13      A.      Stand by.

14              (Pause.)

15              THE WITNESS:  Okay.

16  BY MR. KURSMAN:

17      Q.      Do you see the second line down, it says:

18  "Word I am getting from the pharmacist is that we would

19  need 'USP' grade and" -- and then there's a redacted --

20  "asking if the pentobarbital comes in crystalline form

21  for bulk orders to be used to compound?"

22              Do you see that?

23      A.      Yes.

24      Q.      Does -- did you write this email?

25      A.      Yes.

1    Q.    Okay.  Was this for the pharmacist or

2    pharmacy owner that we were discussing previously?

3    A.    No.

4    Q.    When you say "Word I'm getting from

5    pharmacists," is that pharmacist a pharmacist that we

6    were discussing previously?

7    A.    Yes.

8    Q.    And that's the pharmacist that currently

9    provides you with the three drugs for your current

10   execution protocol?

11   A.    Yes.

12   Q.    Okay.  Did that pharmacist tell you why

13   you would need USP grade?

14   A.    He just told me that that would be the

15   grade that's required to do compounding.

16   Q.    Did that -- did that pharmacist tell you

17   why it needs to come in crystalline form?

18   A.    No.

19         (Exhibit No. 12 marked.)

20   BY MR. KURSMAN:

21   Q.    Let's go to Exhibit 12.

22   A.    Stand by.

23         (Pause.)

24         THE WITNESS:  Okay.

25   BY MR. KURSMAN:

```
 1        Q.      Do you see at the top, it says:  "Hi.  As
 2   discussed over the phone, please see below for the API
 3   numbers and descriptions.  Also copied to this email is
 4   our" -- and it's redacted -- "to assist you with your
 5   questions."  And it lists the pentobarbital.
 6             Do you see that?
 7        A.      I see it.
 8        Q.      Okay.  And who is this email from?
 9             MR. MITCHELL:  Objection, on the basis of
10        the protective order.  Don't answer that, Drug
11        Procurer.
12   BY MR. KURSMAN:
13        Q.      Is it -- is it from the -- a pharmacist
14   that we talked about earlier, the pharmacist that
15   provides the drugs, or a different pharmacist?
16        A.      No.
17        Q.      So a pharmacist did not write this email?
18             MR. MITCHELL:  Object to the form.
19             THE WITNESS:  Sorry, the question broke
20        up on the end.
21   BY MR. KURSMAN:
22        Q.      Did a pharmacist write this?
23        A.      I don't know if the person who authored
24   this is a pharmacist or not.
25        Q.      And then do -- do you see the email below
```

1  it, where it says, "I am looking to purchase
2  Pentobarbital CAS # 76-74-4. We would need at least
3  100 grams to start with?"
4      A.    Yes.
5      Q.    Why -- did you write this email?
6      A.    Yes.
7      Q.    Why are you asking for at least 100
8  grams?
9      A.    That would, by rough calculation, be
10  enough to do 10 executions under our pentobarbital
11  protocol.
12      Q.    And why would you need enough to carry
13  out 10 executions?
14      A.    Because we wanted to make sure that we
15  had an ample supply of pentobarbital to use for ongoing
16  protocol.
17      Q.    And how much did -- did the person who
18  responded say they had available of pentobarbital?
19      A.    It's not in this email chain, I don't
20  think.  Stand by.
21          (Pause.)
22          THE WITNESS:  But if I remember
23      correctly, they -- they didn't actually respond to
24      the specific amount of how much they had.  They
25      did respond that it was in very, very small

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 199 of 327 PageID #: 6259

1      amounts.

2   BY MR. KURSMAN:

3      Q.      Do -- do you know how much that amount

4   was?

5      A.      I believe it's in another email.  It was

6   in nanograms and not milligrams.

7          MR. KURSMAN:  To the extent there is an

8       email that mentioned nanograms, we would request

9       that in discovery, as well.

10  BY MR. KURSMAN:

11     Q.      At the top, in says:  "Hi, As discussed

12  over the phone."  Did you have a phone conversation

13  with this person?

14     A.      Yes.

15     Q.      And what was discussed with them?

16     A.      Whether they had a supply of

17  pentobarbital.

18     Q.      And who was on the phone with you?

19     A.      It was --

20          MR. MITCHELL:  I'm sorry, was the

21      question "Who was on the phone with you?"

22          MR. KURSMAN:  Yes.

23          MR. MITCHELL:  I'm going to object,

24      pursuant to DE107 of the protective order, and

25      instruct the witness not to answer.

```
 1   BY MR. KURSMAN:
 2        Q.     Were other members of the execution team
 3   on the phone with you?
 4        A.     No.
 5        Q.     Was the commissioner on the phone with
 6   you?
 7        A.     No.
 8        Q.     Was the warden on the phone with you?
 9        A.     No.
10        Q.     Were other members of this entity that
11   you were discussing pentobarbital on the phone, as
12   well?
13        A.     Not that I know of.
14        Q.     Were other members of TDOC on the phone
15   with this entity?
16        A.     No.
17        Q.     Was the pharmacist who currently supplies
18   you with execution drugs on the phone with this entity?
19        A.     No.
20        Q.     Was the pharmacy owner who currently
21   supplies TDOC execution drugs on the phone with this
22   entity?
23        A.     No.
24        Q.     Okay.  Now, what did you discuss on the
25   phone call?
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 201 of 327 PageID #: 6261

1      A.      Whether or not they had a supply of

2  pentobarbital.

3      Q.      And what did they tell you?

4      A.      Well, in the phone call, the individual

5  said they would have to discuss it internally and

6  respond.  And then they responded via email.

7           (Exhibit No. 13 marked.)

8  BY MR. KURSMAN:

9      Q.      Okay.  Let's go to Exhibit 13.

10     A.      Stand by.

11          (Pause.)

12         THE WITNESS:  Okay.

13  BY MR. KURSMAN:

14     Q.      Do you see the email at the top that says

15  "Hello," blank.  Is "blank" you?

16     A.      Sorry.  Yes.

17     Q.      Okay.  And it says:  "Sorry for the

18  dormancy.  We've been busy expanding."

19         Is this the pharmacy owner that's writing

20  this email?

21     A.      Yes.

22     Q.      Okay.  He says:  "I have some news on the

23  pento.  It's not good.  I had the DEA invite me over to

24  discuss it.  I can call you tomorrow to fill you in on

25  the details tomorrow.  Are you available?"

1          Do you see that?

2     A.     Yes.

3     Q.     Did you have a phone discussion with the

4 pharmacy owner to discuss the meeting with the DEA?

5     A.     Yes.

6     Q.     Was the warden on the call?

7     A.     No.

8     Q.     Was the commissioner on the call?

9     A.     No.

10     Q.     Were any of the other execution team

11 members on the call?

12     A.     No.

13     Q.     Was anyone on the call from the pharmacy

14 owner -- from the pharmacy owner's entity?

15     A.     Not that I'm aware of.

16     Q.     Okay.  What did the pharmacy owner tell

17 you about their meeting with the DEA?

18     A.     He informed me that he met with several

19 DEA agents in regard to the possibility of obtaining a

20 license to import pentobarbital and was told that it

21 would not be granted.

22     Q.     Did they say why it would not be?

23          MR. MITCHELL:  Alex, real quick before

24     your next question, if we can just time out for

25     like 90 seconds.  An administrative assistant

```
 1            needs to go into the room where the Drug Procurer
 2            is.  So just if everybody could stay on for 90
 3            seconds.  We are sending an admin in.
 4                    MR. KURSMAN:  Okay.  Sure.
 5                    So can we go off the record for these 90
 6            seconds.
 7                    THE VIDEOGRAPHER:  We're off the record
 8            at 4:25 p.m.
 9                    (Pause.)
10                    THE VIDEOGRAPHER:  We're back on the
11            record at 4:26 p.m.
12   BY MR. KURSMAN:
13       Q.      Before we went off the record, we were
14   talking about the meeting between the pharmacy owner
15   and the DEA.  Who from the DEA met with the pharmacy
16   owner?
17                    MR. MITCHELL:  And I'm going to object
18            again, pursuant to the protective order.  Instruct
19            the witness not to answer.
20                    MR. KURSMAN:  Can you describe for me
21            what would be violated in disclosing who from the
22            Drug Enforcement Administration met with the
23            pharmacy owner to let the pharmacy owner know that
24            they could not import pentobarbital?
25                    MR. MITCHELL:  We're talking about the
```

1    supply and procurement of pentobarbital, which is
2    one of the lethal injection drugs.  And the
3    protective order specifically cloaks the
4    identifying information or cloaks the individuals
5    who are involved in procuring those drugs.
6              We don't know who these DEA people were
7    yet.  We haven't delved into that.  We also don't
8    know what their role was.  And so if they were
9    involved in that, we're going to object to
10   identifying them.
11   BY MR. KURSMAN:
12        Q.     Okay.  Was the DEA involving in procuring
13   lethal injection chemicals for the State of Tennessee?
14             MR. MITCHELL:  There's no proof to the
15        effect right now.  What I'm --
16             MR. KURSMAN:  I'm sorry, I'm asking the
17        Drug Procurer that.
18   BY MR. KURSMAN:
19        Q.     You're on mute.
20        A.     I'm sorry.  No.
21        Q.     Okay.  So who from the DEA was at this
22   meeting with the pharmacy owner?
23        A.     All I know is DEA agents.  I don't know
24   any identifiers.
25        Q.     Do -- do you know how many?

1     A.    No.

2     Q.    Okay.  Do you know what was said?

3     A.    What I described; that they would not be

4 granting an application of the pharmacy to import

5 pentobarbital.

6     Q.    Do you know why?

7     A.    From what I was told, it was because that

8 the DEA indicated that there was supply in the United

9 States.

10    Q.    Have you ever had any conversations with

11 the DEA directly?

12    A.    No.

13    Q.    Has anybody from TDOC, without

14 identifying any of the entities, had any conversations

15 with the DEA about importing pentobarbital?

16    A.    I don't know.

17    Q.    What's that?  I apologize, I didn't hear

18 you.

19    A.    I don't know.

20    Q.    Okay.  Do you know if the pharmacy owner

21 had any conversations with the DEA after the

22 conversation with the DEA in July of 2017?

23    A.    Not that I'm aware of.

24    Q.    Do you know if the pharmacy owner

25 attempted to obtain or import pentobarbital after he or

1   she had these conversations with the DEA?

2       A.    Not that I'm aware of.

3       Q.    Did you specifically ask the pharmacy

4   owner whether they attempted to import pentobarbital

5   after these conversations with the DEA?

6       A.    There was one communication, and I cannot

7   remember the date. And it referenced a company that

8   might have pentobarbital, and I think it may have been

9   overseas.

10       That info was sent to the pharmacy owner,

11   who -- who said I believe something along the lines of,

12   "Hey, it would have to be imported, and you would into

13   the same problems as the DEA said to me to get a

14   license."

15       Q.    Okay. And were those communications

16   forwarded to you?

17       A.    The one I just referenced was in an

18   email.

19       Q.    An email? Was -- was that email

20   forwarded to -- to you?

21       A.    Yes, the email, the communication was an

22   email from me to the pharmacy owner and the pharmacy

23   owner back to me.

24       MR. KURSMAN: Okay. I would request that

25       the email be provided, to the extent that we don't

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 207 of 327 PageID #: 6267

1       have that.

2              (Exhibit No. 14 marked.)

3  BY MR. KURSMAN:

4       Q.     So can I take you to Exhibit 14.

5       A.     Stand by.

6       Q.     Let me know when you get there.

7              MR. MITCHELL:  Alex, there's an iPhone

8     connecting, and that is Scott Sutherland's iPhone.

9              MR. KURSMAN:  Okay.

10             MR. MITCHELL:  If you see a participant

11    being added.

12  BY MR. KURSMAN:

13      Q.     Are you there?

14      A.     Yes.

15      Q.     And you see these are handwritten notes?

16      A.     Yes.

17      Q.     Are these your notes?

18      A.     Yes.

19      Q.     Okay.  And did -- did you take these

20  notes?  Do you see below the second full line, it says

21  "7/24/17?"

22      A.     Yes.

23      Q.     Is that when you took these notes?

24      A.     I'm sorry, what did you say?

25      Q.     Is that when you took these notes?

1     A.    Yes.

2     Q.    Okay.  And do you see it says, "Entire"

3 -- blank -- "meeting at field office."  It says, "No

4 shortage in U.S., so would not approve import license"

5 -- or "import LS."  Do you see that?

6     A.    Yes, I see it.

7     Q.    And are those your notes relating to the

8 phone call with the pharmacy owner?

9     A.    Yes.

10     Q.    And in the first -- the first section of

11 these notes, you have these statutes.  What -- what are

12 they referring to?

13         MR. MITCHELL:  Objection, form.

14         THE WITNESS:  Those reference the

15     requirements for importing of a controlled

16     substance.

17 BY MR. KURSMAN:

18     Q.    And what does "4 to 6 weeks" mean?

19         MR. MITCHELL:  Same objection.

20         THE WITNESS:  You trailed off at the end.

21     Could you repeat?

22 BY MR. KURSMAN:

23     Q.    Oh, I'm sorry.  What does "4 to 6 weeks"

24 mean?

25     A.    Without seeing an index, it's been a long

1    time.  I think it's a reference to ordering.  I'm just
2    looking at this.  I don't remember exactly what that
3    means.
4         Q.       Okay.  And then can you see the second
5    section in your notes?  What is -- what is the statute
6    cited in the second section referring to, 21 USC
7    321(p)?
8              MR. MITCHELL:  Form objection.
9              THE WITNESS:  That relates -- to the best
10        of my recollection, that also still relates to
11        importation and dealing with whether it's a new
12        drug, defined as a new drug under that statute.
13   BY MR. KURSMAN:
14        Q.       And then you see in your notes, it says
15   "FDA Regs"; and there's an arrow, and it says "Disallow
16   importation of new drugs without prior approved
17   application.  Contents of app are onerous."
18        A.       I see it.
19        Q.       What -- what FDA requirements are you
20   referring to?
21        A.       I think that relates back to that same
22   statute or another one.  Obviously, I didn't write a
23   reference to it; so I don't remember this one, what
24   exactly it's referencing.
25        Q.       Okay.  And what does "contents of app are

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 210 of 327 PageID #: 6270

1   onerous" mean?

2       A.      It referred to the process to get

3   approval for when something is designated as a new

4   drug, I believe, and the -- all the things that had to

5   go into that application or request.

6       Q.      And just -- just so we're clear, because

7   I don't think I said this before.  But these notes are

8   about pentobarbital, right?

9       A.      Yes.

10      Q.      Okay.  Let's -- let's go to the next page

11  of this exhibit.  Do you see at the top it says:

12  "Plenty in Europe and available according," and then

13  redacted, "has it.  No lawyers."

14              Do you see that?

15      A.      Yes.

16      Q.      Okay.  Why did you -- why did you say "No

17  lawyers?"

18      A.      Really, honestly, I can't -- I think that

19  might still be in reference to the meeting with the

20  DEA, that there were no lawyers present.  I'm not

21  100-percent sure, just looking at this note.

22      Q.      Okay.  And "redacted" -- "has it."  Is

23  that somebody that the pharmacy owner knows, that

24  redacted name?

25      A.      Just looking at this, it would be an

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 211 of 327 PageID #: 6271

1   entity.

2        Q.        An entity?  Did the pharmacy owner

3   contact that entity?

4                  MR. MITCHELL:  Object to the form.

5                  THE WITNESS:  I do not remember.

6   BY MR. KURSMAN:

7        Q.        Okay.  Well, how would you know that this

8   redacted entity has pentobarbital?

9        A.        Well, I wrote it because it was what was

10  told to me.

11       Q.        Right, but that's what I'm asking about.

12  Did the pharmacy owner tell you that?

13       A.        Yes.

14       Q.        Okay.  And did the pharmacy owner tell

15  you "plenty in Europe and available?"

16       A.        Yes.  Give me one second.

17                 So, yeah, these are a continuation of

18  notes, what was being told to me about the DEA meeting.

19  And the reference that references "No lawyers at

20  meeting," "Plenty in Europe," is a statement that the

21  pharmacy owner made.

22       Q.        Okay.  Did you attempt to call anyone in

23  Europe directly?

24       A.        You broke up again.  All I heard was

25  "Europe."

```
 1          Q.       I'm sorry.  Did you attempt to obtain the
 2    -- the pentobarbital in Europe directly?
 3          A.       No.
 4          Q.       Okay.  Do you know if the pharmacy owner
 5    attempted to obtain the pentobarbital in Europe ever
 6    directly with the DEA?
 7          A.       Not that I'm aware of.
 8          Q.       Okay.  And in the last section, do you
 9    see it says:  "VA uses midazolam, sodium thiopental,
10    etomidate?"
11          A.       Yes.
12          Q.       And it says:  "In the spring of '17 I was
13    spending approximately 60 to 70 percent of each day on
14    the search."  What does that mean?
15          A.       It was me taking notes.  As requested,
16    the commissioner wanted to know how much time was being
17    spent on the search.
18          Q.       But is that you spending 60 to 70 percent
19    each day on a search, or is that the pharmacy owner
20    spending that much time on the search?
21          A.       That was information requested of me.
22          Q.       Of you?  And during that time, did you
23    attempt to obtain pentobarbital from a source outside
24    the United States?
25          A.       No.
```

1      Q.     Okay.  And then is says "Sedatives," with

2  two question marks.  What does that mean?

3      A.     It's probably a note with a question of

4  what other sedatives may be available.  I don't -- I

5  don't know.

6      .  Q.     Okay.  And at that time -- I know we

7  already discussed this, but do you recall whether the

8  compounding pharmacy told you that they were able to

9  compound pentobarbital's active pharmaceutical

10  ingredient?

11      A.     They did tell me that they could compound

12  pentobarbital.

13      Q.     And today, they're still willing to

14  compound pentobarbital's active pharmaceutical

15  ingredient, correct?

16      A.     Yes.

17      Q.     Okay.  And as of 8/31/17, Tennessee's

18  lethal injection protocol was still the one-drug

19  pentobarbital protocol, right?

20      A.     I'm sorry, what date did you say?

21      Q.     8/31/17.

22      A.     Yes.  In 2017, yes.

23             (Exhibit No. 15 marked.)

24      Q.     Okay.  Let's go to Exhibit 15.

25      A.     Stand by.

```
1                    (Pause.)

2                    THE WITNESS:   Okay.

3     BY MR. KURSMAN:

4          Q.      And do you see that the second email is

5     dated April 4th, 2017?

6          A.      Yes.

7          Q.      And is this an email that you wrote?

8          A.      Sorry, which April 4th email are you

9     talking about?

10    BY MR. KURSMAN:

11         Q.      Sorry, at 9:41 a.m.

12         A.      I'm sorry, what time?

13         Q.      9:41.

14         A.      Yes.

15         Q.      And here, you're telling another entity

16    that "We have a compounding pharmacy able to compound

17    the solution, they just need the pentobarbital?"

18         A.      Yes.

19         Q.      And that compounding pharmacy, is that

20    the same compounding pharmacy that you're working with

21    today?

22         A.      Yes.

23         Q.      I'm sorry, what was that?

24         A.      Yes.

25                 (Exhibit No. 16 marked.)
```

```
 1   BY MR. KURSMAN:
 2        Q.    Okay.  Now let's go to Exhibit 16, if you
 3   can pull that up.  Take your time.
 4        A.    Got it.
 5        Q.    Do you see this is a PowerPoint?
 6        A.    Yes, it's a PowerPoint.
 7        Q.    Are you familiar with it?
 8        A.    Yes.
 9        Q.    Did you create it?
10        A.    Yes.
11        Q.    Who -- who did you create it for?
12              MR. MITCHELL:  Objection.  I'm going to
13         object, based on the protective order.  I'm going
14         to instruct the witness not to answer.
15   BY MR. KURSMAN:
16        Q.    Did -- did you create it for the
17   commissioner?
18        A.    In part, yes.
19        Q.    Did you create it for the warden?
20        A.    No.
21        Q.    Did you create it for general counsel?
22        A.    In part, yes.
23        Q.    Did you create it for the governor?
24              MR. MITCHELL:  Objection.  Pursuant to
25         the protective order, I'm going to instruct the
```

```
 1              witness not to answer.
 2    BY MR. KURSMAN:
 3         Q.      Did you present this to the commissioner?
 4         A.      Sorry.   Yes.
 5         Q.      And did you present this to the general
 6    counsel?
 7         A.      Yes.
 8         Q.      And did you present this to the governor?
 9                 MR. MITCHELL:  And again, objection.
10         Pursuant to the protective order, I'm going to
11         instruct the witness not to answer.
12    BY MR. KURSMAN:
13         Q.      But why did you create this PowerPoint?
14         A.      I'm sorry, I can't hear you.
15         Q.      I'm sorry.   Why did you create this
16    PowerPoint?
17         A.      The purpose was to demonstrate efforts at
18    finding a source for pentobarbital and explaining that
19    we had not been able to find a source for
20    pentobarbital.
21         Q.      So when you presented this PowerPoint,
22    was it your purpose to push for the State of Tennessee
23    to begin using the three-drug midazolam protocol?
24                 MR. MITCHELL:  Object to the form.
25                 THE WITNESS:  No.
```

1   BY MR. KURSMAN:

2       Q.     Have -- has Tennessee's execution

3   protocol changed since you prepared this PowerPoint?

4       A.     Yes.

5       Q.     How quickly after you presented this

6   PowerPoint did you begin looking for midazolam rather

7   than pentobarbital?

8       A.     I believe it was -- this was August.  I

9   believe it was the next month.

10      Q.     And who told you to start looking for

11   midazolam instead of pentobarbital?

12      A.     The commissioner.

13      Q.     And was it in direct response to this

14   PowerPoint?

15             MR. MITCHELL:  Object to the form.

16             THE WITNESS:  Yes.

17   BY MR. KURSMAN:

18      Q.     And at the -- at the time of the

19   protocol, at the time of that -- I apologize.

20             At the time of that PowerPoint, the

21   protocol was a one-drug pentobarbital protocol, right?

22      A.     Yes.

23      Q.     Let's -- let's look at Page 8 of Exhibit

24   16.  Let me know.

25      A.     Okay.

1     Q.     Do you see it says "Reached out to" --

2  and then a name is redacted -- "as it was understood

3  that they had a source for Pentobarbital" -- redacted

4  -- "was unwilling to either share the identity of their

5  source, or provide our contact information to their

6  source."

7         Do you see that?

8     A.     Yes.

9     Q.     Does the redacted portion here refer to a

10  state?

11     A.     Yes.

12     Q.     How many states did you reach out to,

13  without disclosing which states they were?

14     A.     I reached out to one.

15     Q.     Do you see it says -- the next sentence

16  says:  Redacted -- Redacted "was also willing to offer

17  any guidance as to how" -- redacted -- "was able to

18  find its current source?"

19         MR. MITCHELL:  I'm sorry, Alex, if I

20     could just interpose.  I think it was "unwilling,"

21     not "willing."

22         MR. KURSMAN:  Oh, I apologize.  Thank

23     you.

24         THE WITNESS:  Yes, I see that.

25  BY MR. KURSMAN:

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 219 of 327 PageID #: 6279

```
1        Q.      Did you reach out -- without identifying
2   which states, did you reach out to any other states to
3   see if they'd be willing to offer any guidance as to
4   how they were able to find their current pentobarbital
5   sources?
6        A.      I did not.
7        Q.      Okay.  So it was just one state?
8        A.      Yes.
9                MR. MITCHELL:  Objection.
10  BY MR. KURSMAN:
11       Q.      Why didn't you reach out to any other
12  states?
13               MR. MITCHELL:  Same objection.
14               THE WITNESS:  Sorry.  After this
15          particular communication, I then informed the
16          commissioner of the results of that communication
17          and stated that I was skeptical as to whether,
18          given the nature of difficulty of finding a source
19          that any state would necessarily be cooperative.
20          And even if they were, it's still a matter of
21          finding a source.
22               So at that point, I made a decision to go
23          directly to the source of the state and directly
24          contact companies.
25  BY MR. KURSMAN:
```

```
1          Q.      Now, without disclosing any
2    communications or -- any communications with these
3    states, I'm just asking you questions whether you're
4    aware of certain things right now.
5                  So are you aware that the State of Texas
6    uses pentobarbital in their execution protocol?
7          A.      As far as I know, yes.
8          Q.      Are you aware that Missouri uses
9    pentobarbital in their execution protocol?
10         A.      Actually, I wasn't aware they had found
11   any.  But okay.
12         Q.      Okay.  Are you -- what other states do
13   you know that use pentobarbital in their execution
14   protocols?
15         A.      I know Georgia did.
16         Q.      Are you aware of any other states that
17   use pentobarbital in their execution protocols?
18         A.      No, I'm not currently aware of what the
19   other ones are.
20         Q.      Okay.  Were -- were you aware that the
21   federal government used pentobarbital in its most
22   recent execution protocol?
23         A.      Yes, I was aware of that.
24         Q.      Okay.  Since you reached out to this
25   state -- and don't disclose which state that was.
```

1    Since that time, have you reached out to any other
2    states about their attempts to obtain pentobarbital?
3         A.    I have not.
4         Q.    Okay.  Now, at the top of this
5    PowerPoint, do you see it says "Search for Source"
6    in -- it looks like it's been redacted?
7         A.    This is really a bracket, what I'm
8    looking at, so I can't see.
9         Q.    It may just be how your PowerPoint looks.
10   It's okay, you can -- is that top portion of the
11   PowerPoint, do you see that top line going through the
12   entire PowerPoint?
13        A.    Yes.
14        Q.    Okay.  Is that how the PowerPoint looks,
15   or is that a redaction?
16        A.    So on the exhibit that I'm looking at,
17   the entire top of the page is black.  All the -- all
18   the pages are.
19        Q.    Okay.  If -- if there was a redaction, do
20   you know why that would be redacted?
21        A.    If it's -- if it's redacted, I can't see
22   the name or identity or source or potential source that
23   it indicates that someone else consulted out.  But I
24   can't tell.  Everything's black on this one.
25             MR. KURSMAN:  Mr. Mitchell, to the extent

```
 1          it's redacted, but we would just request an
 2          unredacted copy of these top portions of it.
 3                  MR. MITCHELL:  If it's helpful, for the
 4          record I think it's just dark navy.  I think I can
 5          dig up a color copy somewhere for you.
 6                  MR. KURSMAN:  I think that's true.  It
 7          just looks like the redactions below in a noncolor
 8          copy.
 9   BY MR. KURSMAN:
10          Q.      Can you turn to Page 9 of Exhibit 16?
11          A.      Okay.
12          Q.      Do you see it says:  "A compounding
13   pharmacy agreed to both compound the LIC and aid in
14   search for a source?"
15          A.      Yes.
16          Q.      And this is the compounding pharmacy that
17   you're still working with today, right?
18          A.      Yes.
19          Q.      And then you -- you also say that you
20   cold called U.S.-based API supply companies.  Right?
21          A.      Yes.
22          Q.      What was the result of those calls?
23          A.      Well, either they did not have a supply
24   of the type of pentobarbital that we would need or they
25   would not -- are not willing to work with a Department
```

1  of Corrections.

2          Q.      And I think I asked you this before, but

3  did you contact any non-U.S. API supply companies?

4          A.      No.

5          Q.      And when was the last time you made any

6  attempt to contact an API supply company?

7          A.      I'd say before 2019.

8          Q.      Now, let's -- let's go to Page 10.  And

9  let me know when you got there.

10         A.      Okay.

11         Q.      You see it says:  "Collectively, contact

12 was made with close to 100 potential sources?"

13         A.      Yes.

14         Q.      And all of these, are they all in the

15 United States?

16         A.      I'm sorry, I couldn't hear that.

17         Q.      Are all these sources based in the United

18 States?

19         A.      Yes.

20                 MR. MITCHELL:  Object to form.

21 BY MR. KURSMAN:

22         Q.      And collectively, was anybody else making

23 contact with these sources aside from you?

24         A.      The pharmacy.

25         Q.      How many sources did you attempt to

1    contact?

2          A.      Off the top of my head, approximately

3    probably 70.

4          Q.      And how many pharmacy contacts?

5          A.      So it's a -- it's all-conclusive.  So

6    it's -- it's, you know, supply companies; but also

7    contacting pharmacies themselves to see if they

8    themselves have a supply in stock.  So it was a

9    combination of the two types of entities that were

10   called.

11         Q.      So I'm not -- I guess I'm a bit confused.

12   So did you contact all 100 of these entities, or did

13   you contact 70 and the pharmacy contacted 30?

14         A.      Once again, these are approximations.

15   But when I'm saying that, I'm approximating that I

16   contacted 70 and that the pharmacy contacted the

17   remainder.  Now, that's not a specific number, that's

18   an approximation.

19         Q.      No, I understand.

20                 And you -- in the -- in the PowerPoint,

21   if you look at the third bullet, it says:

22                 "Company did not have sufficient quantities

23                 of the needed form of pentobarbital and no

24                 source to obtain sufficient quantities,

25                 approximately 10 percent."

```
 1              Do you see that?
 2        A.    Yes.
 3        Q.    Does -- does that mean you needed to
 4   purchase pentobarbital if they had it in at least a
 5   threshold quantity?
 6        A.    If I -- as I recall, the conversation
 7   never got to the point of "If you had it, would you
 8   actually sell it to us?"  It came to that "We don't
 9   have it, we can't get it."
10        Q.    Okay.  You have -- the first bullet point
11   says "Company did not have an inventory of
12   pentobarbital."  Right?  Do you see that?
13        A.    Yes.
14        Q.    So that seems to suggest that that would
15   fall into your category of "We don't have it, we can't
16   get it."  Right?
17        A.    Not necessarily, because some of the
18   companies, like you brought up in the email, they had a
19   form of pentobarbital and they had a very, very small
20   amount.  Those would be the ones that can't get
21   sufficient quantities.  The vast majority, they did not
22   have it.
23        Q.    Right.  But what I'm asking about is the
24   10 percent that had some but not sufficient quantities.
25   Were you -- were you willing to work with these
```

 1  companies that couldn't meet your threshold demand?

 2      A.      I couldn't hear the rest of that

 3  question.  It broke up.  Am I doing what with these

 4  companies?

 5      Q.      Sorry.  It was worded poorly.

 6              Did -- when you called these companies, the

 7  10 percent who said "We have some pentobarbital, but we

 8  don't have what you're asking for," did you -- did you

 9  then say, "Okay, we can't work with you?"

10      A.      No.  It's that "We can't" -- "this small

11  amount, we can't get the quantity you need in order to

12  meet your order."

13              I mean, I didn't say to them, "Well, I'm

14  done with you."  That was just the end of the

15  conversation.

16      Q.      So your order was for 10 executions,

17  right?  That was what you were looking for?

18      A.      Best-case scenario, yes.

19      Q.      Okay.  What if a pharmacy said to you,

20  "We have enough for five executions?"

21              MR. MITCHELL:  Object to the form.

22              THE WITNESS:  In that hypothetical, I

23          would have -- I would have consulted with general

24          counsel and the commissioner, and I would expect

25          we would have ordered.

```
1   BY MR. KURSMAN:
2        Q.     Okay.  Did any of these pharmacies
3   respond, "We have some, we just don't have the amount
4   that you're asking for?"
5               MR. MITCHELL:  Object to the form.
6               THE WITNESS:  Yes, one specifically --
7          and there's an email -- commented that they had
8          like nanograms; such a small, small quantity.  And
9          they couldn't meet -- meet the requirements enough
10         to order.
11  BY MR. KURSMAN:
12       Q.     Okay.  But in this -- in this PowerPoint,
13  you say 10 percent didn't have sufficient quantities.
14  And 10 percent of approximately 100 would be about 10.
15              So how about those other nine pharmacies?
16              MR. MITCHELL:  Object to the form.
17              THE WITNESS:  I was just referencing one
18         that emailed me.  Others on the phone call said
19         that they didn't have it.
20              And I'd also like to reiterate that these
21         are all approximations.
22  BY MR. KURSMAN:
23       Q.     Right.  I understand.  I understand.  And
24  I'm not trying to tie you down to certain numbers, I'm
25  just trying to understand the process.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 228 of 327 PageID #: 6288

1    So if they said "We have some, we just
2    don't have what you're asking for," then the
3    conversation was over; is that right?
4        A.    Yes.  And it was never a "We don't have
5    enough to do 100, but we can do three or four or five."
6    It was "We don't have anywhere near enough to do,"
7    because it was of nanograms or the wrong kind.  It was
8    a small amount, and it would be for research purposes.
9        Q.    What about with the other pharmacies, or
10   whatever these entities were, from you to say, "Well,
11   if you don't have our amount, how much do you have?"
12   Did you ask that to all 10 percent of the pharmacies
13   that you contacted?
14            MR. MITCHELL:  Object to the form.
15            THE WITNESS:  I -- I don't remember.
16   BY MR. KURSMAN:
17       Q.    Okay.  Let's go to Page 11.  And do you
18   see here on Page 11, you say:  "The search was
19   broadened into the possibility of importing the
20   chemical from overseas?"
21       A.    Yes.
22       Q.    Did anybody at the Tennessee Department
23   of Corrections have a problem with importing
24   pentobarbital from overseas?
25            MR. MITCHELL:  Object to the form.

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 229 of 327 PageID #: 6289

```
1                    THE WITNESS:  Did anyone at TDOC have,
2         did you say, a problem or --
3    BY MR. KURSMAN:
4         Q.      Yes.
5         A.      With the idea of importing it from
6    overseas?
7         Q.      Yes.
8         A.      No.  They didn't have a problem with the
9    idea, as long as it was done with the proper licenses.
10        Q.      Okay.  How many -- how many suppliers
11   overseas were contacted?  Did you know?
12        A.      I didn't contact any.
13        Q.      And why is this last bullet point
14   redacted?
15                MR. MITCHELL:  And I'm going to object
16        and instruct the witness not to answer that.  That
17        may be more properly a question for counsel
18        offline.
19                MR. KURSMAN:  Okay.
20   BY MR. KURSMAN:
21        Q.      Did you redact the document "Drug
22   Procurement?"
23                MR. MITCHELL:  Again, I'm -- I'm going to
24        object and instruct the witness not to answer.
25        Again, a conversation for us to have offline.
```

1  BY MR. KURSMAN:

2      Q.      Let's go to -- could you turn to Page 12.

3  Do you see the first, where it says:  "The agents

4  informed" -- redacted -- "that" -- redacted --

5  "because, according to them, there is a supply" --

6  "available in the United States?"

7      A.      Yes, I see that.

8      Q.      After this PowerPoint presentation, has

9  anyone attempted to get pentobarbital from overseas in

10  TDOC?

11      A.      Not that I'm aware of.

12      Q.      And has the pharma- -- the -- the owner

13  of the pharmacy attempted to obtain pentobarbital from

14  overseas?

15      A.      Not that I'm aware of.

16      Q.      Okay.  And has the pharmacist attempted

17  to obtain pentobarbital from overseas since then?

18      A.      Not that I'm aware of.

19      Q.      Okay.  And do you see that the next

20  bullet point says:

21              "When told that the companies who do have a

22              supply would not sell their supply for use

23              in lethal injection, the" -- blank --

24              "agents explained that it didn't matter and

25              that it was an issue to take up with the

1              companies themselves."

2              Do you see that?

3    A.      Yes.

4    Q.      And was that a matter between the DEA and

5  the -- the pharmacy owner?

6    A.      Yes.

7    Q.      Okay.  Let's go to Page 13.  Do you see

8  that the second paragraph says:

9              Blank -- "is now researching FDA

10             regulations as a result of this case to

11             determine what if any process can be

12             undertaken to obtain FDA approval for the

13             importation of pentobarbital."

14   A.      Yes, I see that.

15   Q.      So at this point, was the Tennessee

16  Department of Correction still wanting to obtain

17  pentobarbital from overseas if -- if it complied with

18  the FDA regulations?

19   A.      Yes.

20   Q.      Okay.  And is that still true today?

21             MR. MITCHELL:  Object to the form.

22             THE WITNESS:  Yes.

23  BY MR. KURSMAN:

24   Q.      Okay.  What were the results of this

25  research?

1          MR. MITCHELL:  Object to the form.

2          THE WITNESS:  That the -- um, the FDA

3      would not approve the importing of pentobarbital.

4  BY MR. KURSMAN:

5      Q.    And then do you see in that same

6  paragraph, you say:  "The approval process appears to

7  be very cumbersome?"

8      A.    Yes.

9      Q.    What -- what was cumbersome about the

10 approval process at that time?

11         MR. MITCHELL:  Object to the form.

12         THE WITNESS:  It regarded -- it

13     references those notes we went over earlier on

14     some of those regs of what is required in the

15     application and approval process to be obtained in

16     order to support importing a drug such as

17     pentobarbital for the uses that we would be using

18     it for.

19 BY MR. KURSMAN:

20     Q.    And could you describe what kind of

21 exceptions could be claimed?

22         MR. MITCHELL:  Again, objection to form.

23         THE WITNESS:  I don't remember, off the

24     top of my head, at this point.

25 BY MR. KURSMAN:

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 233 of 327 PageID #: 6293

1          Q.      Did you seek an exception?

2          A.      I did not.  I don't know if the pharmacy

3    did.

4          Q.      And do you remember the last time that

5    anyone at TDOC looked into this issue?

6                  MR. MITCHELL:  Object to the form.

7                  THE WITNESS:  It would have been -- I

8          can't remember a specific date.  It would have

9          been when there was a -- I believe an agent that

10         came in -- I can't remember from where -- that

11         talked about the FDA and its ability to regulate

12         importation of those drugs, I think.  I don't

13         remember the date.

14   BY MR. KURSMAN:

15         Q.      And -- and that TDOC looked -- looked

16   into that opinion at the time?

17                 MR. MITCHELL:  Same objection.

18                 THE WITNESS:  That opinion was reviewed,

19         yes.

20   BY MR. KURSMAN:

21         Q.      Okay.  Now, let's go -- let's go to Page

22   16.  Did -- before we get there, did you review that

23   opinion?

24         A.      Yes, sir; I did.  But it's been a while,

25   so I don't remember it specifically.

1      Q.      Okay.  Did the owner of the pharmacy have

2    that opinion?

3      A.      I don't know.

4      Q.      Did anybody from TDOC talk to the owner

5    of the pharmacy about that opinion?

6      A.      I don't remember.

7      Q.      Are you the only person in communication

8    about procuring drugs with the owner of the pharmacy

9    from TDOC?

10     A.      Yes.

11     Q.      Okay.  So if you didn't talk to the

12   pharmacy about that opinion, then nobody from TDOC

13   would have talked to the pharmacy owner about that

14   opinion.  Right?

15     A.      Correct.  But I didn't say I didn't, I

16   just said I don't remember.

17     Q.      Right, right; no, I understand.

18             Could we -- could we turn to Page 16?

19     A.      I'm there.

20     Q.      Okay.  So do you see in the second

21   paragraph, you say:

22             "There are circumstances where the federal

23             government could step in and orchestrate

24             the supply of chemicals in situations where

25             supply is so low and the cost for the

```
1                   chemical is so high as to make it virtually
2                   unavailable where there is a significant
3                   need."
4                   Do you see that?
5          A.       Yes.
6          Q.       What are you talking about in that
7    paragraph?
8                   MR. MITCHELL:  Object to form.
9    BY MR. KURSMAN:
10         Q.       You're on mute, if you're answering.
11         A.       Sorry about that.
12                  I can't remember the specific reg that
13   talks about it, but the federal government has the
14   ability to I guess insert themselves into a situation.
15                  And I can't remember if it references that
16   they can then permit importation or they can dictate that
17   drugs be made available or are given or sold to entities
18   that weren't allowed to have them before.  I can't
19   remember specifically, off the top of my head.
20         Q.       And did you ask the federal government to
21   do that in this case?
22         A.       You broke up there.  Sorry.
23         Q.       I'm sorry.  Did you ask the federal
24   government to do that in this case?
25         A.       I did not.
```

1          Q.       Okay.  Let's go to the next page, which
2     is Page 17.
3                   Do you see there's a big question mark?
4          A.       Yes.
5          Q.       Is that for people to ask questions who
6     just viewed your presentation?
7          A.       Yes.
8          Q.       Did anybody ask questions?
9          A.       Not that I remember, but that doesn't
10    mean they didn't.
11         Q.       Did anybody make any statements?
12         A.       Not that I remember.
13         Q.       And we could go back to one of the
14    earlier exhibits, but I believe it's only a week after
15    this presentation that you start searching for
16    midazolam.  Is that your understanding, as well?
17         A.       It was in September, I think.
18         Q.       Right.  If you turn back -- if you turn
19    back to 6.
20         A.       Stand by.
21                  (Pause.)
22                  THE WITNESS:  Okay.
23    BY MR. KURSMAN:
24         Q.       Do you see this email is from September
25    7th, 2017?

1        A.      Sorry, you broke up.  Could you repeat,
2   please?
3        Q.      Do you see this email is from September
4   7th, 2017?
5        A.      Yes.
6        Q.      And that's a week after the PowerPoint
7   presentation, right?
8        A.      Yes.
9        Q.      And now you're asking for midazolam; is
10  that right?
11       A.      Yes.
12       Q.      Okay.  Did the powers that be tell you to
13  look for the drugs on the day of your presentation?
14       A.      I don't remember if it was that same day
15  or not.
16       Q.      And did you have any conversations with
17  the powers that be about what drugs to look for after
18  September 7th, 2017 -- after -- yeah, after September
19  7th, 2017?
20       A.      Okay.  So, yeah, so here we're looking
21  for midazolam.  And there were the other -- the emails
22  we discussed, which I may have conferred with the
23  powers that be regarding emails from the pharmacy owner
24  about other possible attempts to accommodate.  But even
25  with that information, I was directed to look for

```
 1  midazolam.
 2      Q.      But did the powers that be still want you
 3  to look for pentobarbital?
 4      A.      Yes.
 5              (Exhibit No. 17 marked.)
 6  BY MR. KURSMAN:
 7      Q.      Let's go to Exhibit 17 now.
 8      A.      Did you say 17?
 9      Q.      Yeah, 17.
10      A.      Stand by.
11              (Pause.)
12              THE WITNESS:  Okay.
13  BY MR. KURSMAN:
14      Q.      Do you see this is email from October 30,
15  2019?
16      A.      Yes.
17      Q.      And do you see in here, it's -- first of
18  all, who is this email from?  Who wrote this email?
19              MR. MITCHELL:  I'm going to object to
20      that on the basis of the Court's protective order.
21              MR. KURSMAN:  Oh, I apologize.  Let me
22      clarify the information.
23  BY MR. KURSMAN:
24      Q.      Was it the owner of the pharmacy?
25      A.      Yes.
```

```
 1        Q.      Okay.  And he says -- he or she says:
 2                "It's possible we could order it, but
 3                getting it imported would be the issue.
 4                It's a Schedule II drug, and the DEA has
 5                already advised us that they do not allow
 6                the importation of drugs that they consider
 7                readily available in the U.S.  There may be
 8                a loop hole in there given the product is
 9                not readily available."
10                Is the pharmacy owner talking about
11   pentobarbital?
12        A.      Yes.
13        Q.      And did he send this email to you?
14        A.      Yes.
15        Q.      And why -- why are you still looking for
16   pentobarbital at this time?
17        A.      As I stated before, it was directed by
18   the commissioner that I do so.
19                (Exhibit No. 18 marked.)
20   BY MR. KURSMAN:
21        Q.      Okay.  Let's go to Exhibit 18.
22        A.      Okay.
23        Q.      And is this an email on Wednesday, June
24   20th, of 2018, at 10:11 a.m.?  Do you see this?
25        A.      Yes.
```

```
 1          Q.      Is this -- did you write this email?
 2          A.      Yes.
 3          Q.      Okay.  And it says:  "We are still
 4    searching for USP-grade pentobarbital."
 5                  Do you see that?
 6          A.      Yes.
 7          Q.      You write this email to the pharmacy
 8    owner?
 9          A.      No.
10          Q.      Did you write this email to the
11    pharmacist?
12          A.      I'm sorry, to who?
13          Q.      To the pharmacist?
14          A.      No.
15          Q.      Did you get a response from this email?
16          A.      No.
17          Q.      The person never responded, whoever you
18    wrote this email to?
19          A.      No.
20                  (Exhibit No. 19 marked.)
21    BY MR. KURSMAN:
22          Q.      Okay.  Now, let's go to Exhibit 19.
23          A.      Okay.
24          Q.      And you can see this exhibit is titled
25    "Whether the Food and Drug Administration has
```

1  Jurisdiction over Articles Intended for Use in Lawful

2  Executions?"

3        A.    Yes.

4        Q.    Do you see it's dated May 3rd, 2019?

5        A.    Yes.

6        Q.    And it says "Memorandum Opinion for the

7  Attorney General?"

8        A.    Yes.

9        Q.    Have you seen this memo before?

10       A.    I believe this was what I was referencing

11 as an Attorney General opinion that I sent to the FDA

12 earlier.

13       Q.    Have you ever read this memo?

14       A.    Yes, I believe I have.

15       Q.    Did you discuss this with anyone at TDOC?

16       A.    With general counsel.

17       Q.    Okay.  Are you aware that this memo

18 instructs the FDA to not exercise jurisdiction over the

19 importation of lethal injection drugs?

20           MR. MITCHELL:  Objection.

21           THE WITNESS:  Generally speaking, yes,

22     that's what I remember this opinion said.

23 BY MR. KURSMAN:

24       Q.    And why did you not discuss this memo

25 with the pharmacy owner?

```
 1              MR. MITCHELL:  Object to the form.
 2              THE WITNESS:  I didn't say I didn't.  I
 3         said I don't remember.
 4    BY MR. KURSMAN:
 5         Q.    Why would the pharmacy owner have not
 6    attempted to obtain pentobarbital from a source outside
 7    of the United States after this memorandum was issued?
 8              MR. MITCHELL:  Same objection.
 9              THE WITNESS:  Well, because this
10         memorandum doesn't actually change the law.  And
11         my understanding from general counsel is there's
12         still a D.C. Circuit case that is controlling that
13         this memorandum does not change.  It would still
14         not allow us to do that.
15    BY MR. KURSMAN:
16         Q.    Are you aware that since the issuance of
17    this memo other states have succeeded in obtaining
18    pentobarbital?
19              MR. MITCHELL:  Object to the form.
20              THE WITNESS:  If they are the states you
21         referenced earlier, I wasn't specifically aware.
22    BY MR. KURSMAN:
23         Q.    Are you aware that the DEA has not
24    intervened in any importation of execution drugs after
25    the issuance of this memorandum?
```

```
 1              MR. MITCHELL:  Same objection.
 2              THE WITNESS:  I don't have that
 3       knowledge.
 4   BY MR. KURSMAN:
 5       Q.      Did you or anyone at TDOC contact the
 6   United States Department of Justice, Office of Legal
 7   Counsel, to get a better understanding of this
 8   memorandum?
 9       A.      I did not.  I can't speak for whether
10   general counsel did or not.
11       Q.      And if you talked to the pharmacy owner
12   about this memorandum, would have that been through
13   email?
14              MR. MITCHELL:  Object to the form.
15              THE WITNESS:  More than likely a phone
16       call.
17   BY MR. KURSMAN:
18       Q.      And did you send this memorandum to the
19   pharmacy owner?
20       A.      I don't remember if I did or not.
21       Q.      Did you contact the DEA about this
22   memorandum?
23       A.      No.
24       Q.      Did you contact the FDA about this
25   memorandum?
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 244 of 327 PageID #: 6304

1       A.     No.

2       Q.     Are you aware whether anyone at TDOC

3 contacted the DEA about this memorandum?

4       A.     I'm not aware whether they did or not.

5       Q.     Are you aware if anyone from TDOC

6 contacted the FDA about this memorandum?

7       A.     I'm not aware whether they did or not.

8           MR. KURSMAN:  I think now is probably a

9     good time for a 10-minute break.

10         THE VIDEOGRAPHER:  We're off the record

11    at 5:20 p.m.

12         (Recess at 5:20 p.m. to 5:30 p.m.)

13         THE VIDEOGRAPHER:  We are back on the

14    record at 5:30 p.m.

15 BY MR. KURSMAN:

16       Q.     Okay.  So we just got off a break.

17 During the break, did you talk to your attorneys at

18 all?

19       A.     No.

20          (Exhibit No. 21 marked.)

21 BY MR. KURSMAN:

22       Q.     Okay.  Let's go to Exhibit 21.

23       A.     Oh, and I'll tell you I'm still in the

24 room by myself.

25       Q.     Okay.  I appreciate that.

```
 1        A.    Did you say 21?
 2        Q.    Yeah, let's skip 20 and go to 21.
 3              And do you see it's an email dated
 4   November 26th, 2019?
 5        A.    Yes.
 6        Q.    And it says "See attached."
 7        A.    Yes.
 8        Q.    Is this an email from the pharmacy to
 9   you?
10        A.    Yes.
11        Q.    And did it come with an attachment?
12        A.    Yes.
13              MR. KURSMAN:  Okay.  We will request the
14        attachment in discovery.
15   BY MR. KURSMAN:
16        Q.    And was the attachment lab results?
17        A.    Yes.
18              (Exhibit No. 22 marked.)
19   BY MR. KURSMAN:
20        Q.    Let's go to Exhibit 22.
21        A.    Okay.
22        Q.    And you see this email is from August
23   9th, 2019?
24        A.    Yes.
25        Q.    It says:  "Attached is our in house
```

1  sterility report."

2      A.      Yes.

3      Q.      Is this from the pharmacy, as well?

4      A.      Yes.

5      Q.      Can you explain to me why the pharmacy is

6  conducting an in-house sterility report?

7              MR. MITCHELL:  Object to the form.

8              THE WITNESS:  They do that.  My

9      understanding is they do that anyway with their

10     compounds.  They also test their own sterility.

11 BY MR. KURSMAN:

12     Q.      Did the third party also test sterility

13 for their drugs?

14     A.      Yes.

15     Q.      Okay.  Was there a report attached to

16 this email?

17     A.      Yes.

18             MR. KURSMAN:  Okay.  We will request this

19     report in discovery, as well.

20             (Exhibit No. 23 marked.)

21 BY MR. KURSMAN:

22     Q.      Let's turn to Exhibit 23.  Let me know

23 when you're there.

24     A.      Got it.

25     Q.      Do you see this is an email dated August

```
 1   8th, 2019?
 2        A.      Yes.
 3        Q.      Is this an email from the pharmaceutical
 4   company?
 5        A.      Yes.
 6        Q.      And it says:  "Here is the
 7   suitability/methodology test for the KCl that was
 8   falling out of solution."  Do you see that?
 9        A.      Yes.
10        Q.      And "KCl" is potassium chloride, right?
11        A.      Yes.
12        Q.      Where was the potassium chloride falling
13   out of solution?
14               MR. MITCHELL:  Object to the form.
15               THE WITNESS:  It was while at the third
16        party for testing, it was falling out of solution.
17   BY MR. KURSMAN:
18        Q.      And when was that?
19        A.      Could you hear me?
20        Q.      No, I could not hear you.
21        A.      Sorry.  I don't remember a specific date,
22   but it would have been around I think the time of this
23   email.
24        Q.      Okay.  And was that potassium chloride
25   used in an execution?
```

```
 1        A.      No.
 2                MR. MITCHELL:  Object to form.
 3   BY MR. KURSMAN:
 4        Q.      Why would you not use that potassium
 5   chloride in an execution?
 6                MR. MITCHELL:  Same objection.
 7                THE WITNESS:  Because it was falling out
 8         of solution, then it was -- we wouldn't be able to
 9         use it in an execution.
10   BY MR. KURSMAN:
11        Q.      And was a test or results of a test
12   attached to this email?
13        A.      Yes.
14                MR. KURSMAN:  Okay.  We will request
15         those results, as well, in discovery.
16                (Exhibit No. 24 marked.)
17   BY MR. KURSMAN:
18        Q.      Could you turn to Exhibit 24.
19        A.      Okay.
20        Q.      This is an email dated August 8th, 2019.
21   Do you see that?
22        A.      Yes.
23        Q.      And it's at the bottom -- I'm sorry, 7:55
24   a.m.  Do you see that?  It says "kcl protocol."  Do you
25   see it?  You're muting.
```

1      A.      Sorry.  Yeah.  I didn't move my mouse

2   over.

3      Q.      Okay.  It says:  "I made edits to the

4   instructions could you have pharmacist review and

5   confirm these are good."

6      A.      Yes, I see that.

7      Q.      Is this an email that you wrote?

8      A.      Yes.

9      Q.      Okay.  What -- what edits did you make to

10   what instructions?

11      A.      It was to the calcium chloride

12   preparation protocol.  They were medical edits, as far

13   as I remember.

14      Q.      And why did you have:  "Also I want to

15   confirm that 24 hours in the fridge will be enough time

16   for it to fully thaw given the size of the vials?"

17      A.      Yes, I see that.

18      Q.      Why did you ask that?

19      A.      Since the vials were 60 ml's, they're

20   larger than the vials that had the midazolam.  So I

21   confirmed that as they were larger, 10 milligrams, that

22   24 hours in the refrigerator would be enough time to

23   thaw it.

24      Q.      And the -- the edits you made to the

25   instructions, were they attached to this email?

```
 1        A.      Yes.
 2                MR. KURSMAN:   Okay.   We would request
 3        those edits in discovery, as well.
 4   BY MR. KURSMAN:
 5        Q.      Were -- were those edits made at all
 6   because the potassium chloride was falling out of
 7   solution?
 8        A.      If I remember correctly the sequence of
 9   events, it was because it was falling out of solution
10   they had to change the potency at which it was
11   compounded.
12                So our edits were in discussions with
13   them, because it had a different potency, just to make
14   sure that the protocols for preparation of it during an
15   execution were correct -- if I remember correctly.
16        Q.      And did those protocols change at all?
17        A.      Yes.
18                MR. KURSMAN:   Okay.   We would request
19        those, the changes in the protocols, as well.
20   BY MR. KURSMAN:
21        Q.      Do you know why the potassium chloride
22   began to fall out of solution in August of 2019?
23        A.      I don't know the specifics of that.   That
24   would be a pharmacist question.
25        Q.      Did the potassium chloride ever fall out
```

```
 1   of solution at TDOC?
 2                  MR. MITCHELL:  Object to the form.
 3                  THE WITNESS:  No.
 4   BY MR. KURSMAN:
 5        Q.    Does TDOC ever edit pharmacy instructions
 6   related to any drugs not used in lethal injections?
 7                  MR. MITCHELL:  Objection.
 8                  THE WITNESS:  Can you rephrase or repeat
 9        your question once again?
10   BY MR. KURSMAN:
11        Q.    Sure.  So here, you as an agent of TDOC
12   edited instructions for the -- the potassium chloride
13   protocol.  My question is:  Does the Department ever
14   edit pharmacy instructions related to any drugs not
15   used in lethal injections?
16                  MR. MITCHELL:  Form objection.
17                  THE WITNESS:  I don't know.
18   BY MR. KURSMAN:
19        Q.    Okay.  What expertise do you have to edit
20   instructions in a potassium chloride protocol?
21                  MR. MITCHELL:  And I'm going to object
22        and instruct the witness not to answer per our
23        conversations this morning about protective order.
24                  MR. KURSMAN:  Okay.  I will just continue
25        to request those edits.  And if a redline was sent
```

```
 1          with this email I would request that, as well.
 2                  MR. MITCHELL:  Okay.
 3                  (Exhibit No. 25 marked.)
 4    BY MR. KURSMAN:
 5          Q.      Can we go to Exhibit 25.
 6          A.      Stand by.
 7                  (Pause.)
 8                  THE WITNESS:  Okay.
 9    BY MR. KURSMAN:
10          Q.      Do you see this is an email from July
11    31st, 2019?
12          A.      Yes.
13          Q.      And it says:  "Attached is the complete
14    report for Midazolam.  KCl shows as still pending."
15                  Do you see that?
16          A.      Yes.
17          Q.      Okay.  Was there a report attached for
18    the midazolam?
19          A.      Yes.
20                  MR. KURSMAN:  Okay.  We would request
21          that report in discovery.
22    BY MR. KURSMAN:
23          Q.      "The KCl shows as still pending."  Do you
24    at some point get that report, as well?
25          A.      Yes.
```

```
 1                    MR. KURSMAN:  Okay.  I will request that
 2        report in discovery, as well.
 3   BY MR. KURSMAN:
 4        Q.        Let -- let me ask you this:  Do you know,
 5   without identifying any information, who the third
 6   party is that tests the lethal injection drugs?
 7        A.        I know who it is.
 8        Q.        You do?  And do you know whether they
 9   have a relationship with the pharmacy company?
10        A.        Are you asking do I know if they had a
11   relationship?
12        Q.        Yes.
13        A.        I mean, a business one, I assume.
14        Q.        With the pharmacy company?
15        A.        Right, a business relationship.
16        Q.        And do you know whether the third-party
17   company knows that the drugs they're testing are going
18   to be used in lethal injections?
19        A.        I don't know that they know that.
20                  (Exhibit No. 26 marked.)
21   BY MR. KURSMAN:
22        Q.        Okay.  Let's go to Exhibit 26.
23        A.        Stand by.
24                  (Pause.)
25                  THE WITNESS:  Okay.
```

```
 1   BY MR. KURSMAN:
 2        Q.    You see this is from July 24th, 2019?
 3        A.    Yes.
 4        Q.    And is this also from the pharmacy
 5   company?
 6        A.    No.
 7        Q.    The owner of the pharmacy company?   I
 8   apologize.
 9        A.    Yes.
10        Q.    And it says:  "Attached are the potency
11   reports for Midazolam and KCl.  Another week before the
12   sterility comes back."
13              Do you see that?
14        A.    Yes.
15        Q.    Were potency reports attached for
16   midazolam and KCl?
17        A.    Yes.
18              MR. KURSMAN:  Okay.  And we will request
19        both of those reports in discovery.
20   BY MR. KURSMAN:
21        Q.    Did you also receive the sterility
22   reports?
23        A.    Yes.
24              MR. KURSMAN:  Okay.  We will request the
25        sterility reports for the midazolam and the KCl.
```

```
1                    (Exhibit No. 27 marked.)
2    BY MR. KURSMAN:
3         Q.      Can we go to Exhibit 27.  And do you see
4    -- let me know when you're there.
5         A.      I'm there.
6         Q.      Okay.  Do you see at the bottom it says:
7    "July 2, 2019," it says "Forward:  KCl protocol?"
8         A.      Yes.
9         Q.      It says:  "Can you review the attached
10   and let me know if this works?"
11        A.      Sorry, can you repeat?
12        Q.      Do you see it says:  "Can you review the
13   attached and let me know if this works?"
14        A.      Yes.
15        Q.      Did you write this email?
16        A.      Yes.
17        Q.      Was this also to the pharmacy?
18        A.      Was it to the pharmacy owner?
19        Q.      Yes.
20        A.      Yes.
21             MR. KURSMAN:  Okay.  We would request the
22        attachment as referenced in Exhibit 27 as
23        discovery.
24   BY MR. KURSMAN:
25        Q.      And while we're here, do you have or does
```

1    TDOC have instructions for vecuronium bromide?

2         A.    No.

3         Q.    Okay.  And why aren't there instructions

4    for vecuronium bromide?

5              MR. MITCHELL:  Objection.

6              THE WITNESS:  We don't have any written

7         instructions.  We just rely on the verbal

8         instructions that were given by the pharmacist to

9         the executioner.

10   BY MR. KURSMAN:

11        Q.    Okay.  And why did TDOC decide that they

12   didn't need written instructions?

13             MR. MITCHELL:  Same objection.

14             THE WITNESS:  The verbal instructions

15        were sufficient.

16             (Exhibit No. 28 marked.)

17   BY MR. KURSMAN:

18        Q.    Okay.  Let's go to Exhibit 28.

19             And before we get there, are the

20   instructions from the pharmacist mandatory?

21             MR. MITCHELL:  Objection.

22             THE WITNESS:  So when we're talking about

23        the instructions for the preparation of the -- of

24        the -- not drugs; the preparation of the syringes

25        is what you're referring to, yes?

```
 1   BY MR. KURSMAN:
 2         Q.     Yes.
 3         A.     Yes, we have to follow those instructions
 4   when preparing.
 5         Q.     And do -- does the execution team have to
 6   follow the pharmacist's instructions for the storing of
 7   the lethal injection chemicals?
 8               MR. MITCHELL:  Same objection.
 9               THE WITNESS:  Yes.
10   BY MR. KURSMAN:
11         Q.     Let's go to Exhibit 28.  Let me know when
12   you're there.
13         A.     I'm there.
14         Q.     Okay.  This is an email dated May 9,
15   2019?
16         A.     Yes.
17         Q.     And it says "Lab report for Midazolam?"
18         A.     Yes.
19         Q.     Okay.  Who wrote this email?
20               MR. MITCHELL:  Can you rephrase that,
21         pursuant to the protective order?
22               MR. KURSMAN:  I apologize.
23   BY MR. KURSMAN:
24         Q.     Did the pharmacy company owner write this
25   email?
```

1     A.     Yes.

2     Q.     Okay.  And who performed the lab report?

3  Was it the pharmacy company?

4     A.     No, the lab report comes from the

5  third-party tester.

6     Q.     And was there a report with this email?

7     A.     Yes.

8          MR. KURSMAN:  Okay.  We would request

9      this lab report as part of discovery, as well.

10          (Exhibit No. 29 marked.)

11  BY MR. KURSMAN:

12     Q.     Let's go to Exhibit 29.  Let me know when

13  you're there.

14     A.     I'm there.

15     Q.     Okay.  And do you see this is dated April

16  29th, 2019?

17     A.     Yes.

18     Q.     And is this also an email from the

19  pharmacy?

20     A.     From the pharmacy owner, yes.

21     Q.     And was there a potency report attached

22  to this email?

23     A.     Yes.

24          MR. KURSMAN:  Okay.  We will request that

25      in discovery.

1  BY MR. KURSMAN:

2     Q.      It also says "The sterility is still

3  pending." Do you see that?

4     A.      Yes.

5     Q.      Okay. Did you ever receive a sterility

6  report for the midazolam?

7     A.      Yes.

8             MR. KURSMAN: Okay. We'll request that,

9     as well.

10            (Exhibit No. 30 marked.)

11 BY MR. KURSMAN:

12    Q.      Let's turn to Exhibit 30. And do you see

13 this is from August 6th, 2018?

14    A.      Yes.

15    Q.      And do you see it says "Lab results for

16 sterility testing?"

17    A.      Yes.

18    Q.      Was this also from the pharmacy?

19    A.      From the pharmacy owner, yes.

20    Q.      And was this sterility test done by the

21 third party?

22    A.      Yes.

23    Q.      And there were results attached to this

24 email?

25    A.      Yes.

```
1              MR. KURSMAN:   Okay.   We will request --
2         request this as part of discovery, as well.
3                   (Exhibit No. 31 marked.)
4    BY MR. KURSMAN:
5         Q.      Now, let's go to July 12th -- I'm sorry,
6    to Exhibit 31.
7         A.      Okay.
8         Q.      And do you see it says "Attached is the
9    report from" -- blank -- "on our compounds?"
10        A.      Yes.
11        Q.      Is this also from the pharmacy owner?
12        A.      Yes.
13        Q.      Is this attached on -- or a report on
14   drugs that were compounded?
15        A.      I believe these are testing of the
16   methodology for the compounding, I think.  But there
17   are reports attached.
18        Q.      When you say "the methodology for the
19   compounding," are they actually of the compounded drug?
20        A.      I'm sorry, you broke up there at the end.
21        Q.      So it says "Attached is a report from" --
22   blank -- "on our compounds."  Is the third party
23   testing compounded drugs here?
24              MR. MITCHELL:   Object to the form.
25              THE WITNESS:   Yes.
```

1  BY MR. KURSMAN:

2      Q.      Okay.  Do you know which drugs these

3  tests were in reference to in terms of which inmate?

4      A.      Sorry.  This would have been -- like I

5  said, I don't think this was on a specific compound for

6  an inmate.  I think this was their testing of their

7  methodology for making the compound.  So it was a test

8  to make sure their methodology was sound.

9      Q.      Okay.  So can you -- can you explain that

10  to me a bit?  Is -- is what you're saying that the

11  pharmacy would compound midazolam to be used in no

12  executions but just to be tested?  Is that what you're

13  saying?

14      A.      They would -- they would compound.  So as

15  I described earlier in the deposition, they have a

16  methodology that's usually from the manufacturer of the

17  API.  They follow that methodology in making the

18  compound.

19              They then send this compound to the

20  third-party testing to make sure that it is -- that it

21  is going to pass potency and sterility and endotoxins.

22  And it's done to make sure on the front end that

23  they're compounding correctly.

24      Q.      So after they do this test compound, do

25  they also send to the third party the drugs that are

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 262 of 327 PageID #: 6322

```
 1    actually compounded to be used in executions?
 2               MR. MITCHELL:  Object to the form.
 3               THE WITNESS:  So -- yes.  So every time
 4         they -- that they compound an LIC for an
 5         execution, it's sent to that third-party testing
 6         lab.
 7    BY MR. KURSMAN:
 8         Q.    So why would they send a pre-execution
 9    compounded drug to the -- to the third party?
10               MR. MITCHELL:  Same objection.
11               THE WITNESS:  This was the first time
12         that they compounded it for us.  If you look at
13         the date, this is before the Irick execution.
14         This was done to make sure the methodology was
15         sound.
16               Once that was determined, now they send
17         the compounds that are made for each inmate and
18         execution and test it.  This was done to make sure
19         the method -- methodology was sound.
20               MR. KURSMAN:  Okay.  Well, I will -- I
21         will request this report on compounds in
22         discovery, as well.
23               And thanks for that explanation.
24               (Exhibit No. 32 marked.)
25    BY MR. KURSMAN:
```

```
 1          Q.      Could we turn to Exhibit 32?  And let me
 2   know when you get there.
 3          A.      I'm there.
 4          Q.      Okay.  Do you see this is an email dated
 5   November 14, 2017?
 6          A.      At 9:59 a.m., right?
 7          Q.      Right.
 8          A.      Yes.
 9          Q.      And do you see it says "Has the exam been
10   set up?"
11          A.      Yes.
12          Q.      Did you write this email?
13          A.      Yes.
14          Q.      What does "Has the exam been set up?"
15   mean?
16          A.      Well, honestly, to tell you what that
17   means could identify who I'm talking about.
18          Q.      Okay.  Well --
19          A.      Is there another way you want to phrase
20   it?
21          Q.      Yes.  Has the -- what does it mean, "Has
22   the exam been set up?"
23                  MR. MITCHELL:  I'm going to lodge an
24          objection pursuant to the protective order and
25          instruct the witness not to answer.
```

 1   BY MR. KURSMAN:

 2        Q.     Okay.   Is -- is there a way you can

 3   explain it to me without violating the protective

 4   order?

 5        A.     No.

 6               MR. MITCHELL:   If you want to table this

 7        until the end and then permit me to talk with the

 8        Drug Procurer and take some sort of measure like

 9        that, I'm happy to propose something like that.

10               MR. KURSMAN:   Yeah, let's do that.   I

11        think that's reasonable.

12               (Exhibit No. 33 marked.)

13   BY MR. KURSMAN:

14        Q.     Okay.   Let's move on to Exhibit 34 -- or

15   33, I'm sorry.

16        A.     Stand by.

17        Q.     And let me know when you're there.

18        A.     I'm there.

19        Q.     You see it says:   "Attached is a sample

20   prescription for ordering a compounded preparation?"

21        A.     Yes.

22        Q.     Who wrote this email?   Did the -- I'm

23   sorry, let me ask this.   Did the pharmacy owner write

24   this note?

25        A.     Yes.

```
 1          Q.      Why?

 2                  MR. MITCHELL:  Object to the form.

 3                  THE WITNESS:  As a sample of what they

 4          accept for an order, a compounded preparation.

 5   BY MR. KURSMAN:

 6          Q.      And did the pharmacy owner attach a

 7   sample prescription?

 8          A.      Yes.

 9                  MR. KURSMAN:  Okay.  We will request that

10          prescription in discovery.

11   BY MR. KURSMAN:

12          Q.      Is -- is there a reason why the pharmacy

13   owner was so enthusiastic about providing TDOC with

14   execution drugs?

15                  MR. MITCHELL:  Object to the form.

16                  THE WITNESS:  I have no way of knowing

17          his mental state or whether he's enthusiastic or

18          not.

19   BY MR. KURSMAN:

20          Q.      Well, did you -- did you ever talk to him

21   about that?

22          A.      No.

23                  (Exhibit No. 34 marked.)

24   BY MR. KURSMAN:

25          Q.      Okay.  Let's -- let's go to Exhibit 34.
```

```
 1                    Let me know when you're there.
 2          A.      Okay.
 3          Q.      Do you see the second email is December
 4  15th, 2017, at 2:11?
 5          A.      Okay.  The top one is at 2:12.  Let me
 6  scroll down.
 7          Q.      Sure.
 8          A.      Oh, yeah, 2:11.  Okay.
 9          Q.      Did you write this email?
10          A.      Yes.
11          Q.      Was it to the pharmacy owner?
12          A.      Yes.
13          Q.      What Tennessee Supreme Court case were
14  you talking about with the pharmacy owner?
15          A.      If I remember correctly, I'm referencing
16  West Lee Schofield.
17          Q.      I'm sorry?
18          A.      West -- W-E-S-T -- Lee Schofield.  And I
19  cannot remember how to spell his name.
20          Q.      Okay.  That's okay.  And why were you
21  discussing a Tennessee Supreme Court case with the
22  pharmacy owner?
23          A.      The statutes in that case are with regard
24  to the confidentiality protections under Tennessee law.
25          Q.      And when was the last time you discussed
```

```
 1   legal matters with the pharmacy owner?
 2               MR. MITCHELL:  Object to the form.
 3               THE WITNESS:  Um, I don't really recall
 4        discussing legal matters with the pharmacy owner.
 5   BY MR. KURSMAN:
 6        Q.     Okay.  Well, in 2017, you say:  "On the
 7   phone I said subsection (g) of 10-7-504 it is actually
 8   subsection (h)."
 9               That would be a discussion over legal
10   matters you had with the pharmacy owner, right?
11        A.     By that definition, I -- he wanted to
12   know -- the pharmacy owner wanted to know what
13   protections there were for confidentiality and identity
14   of those involved in lethal -- or in executions, and so
15   I sent this information to the pharmacy owner.
16               Other than this, I don't recall any
17   specific instances of having legal conversations with
18   the pharmacy owner.
19        Q.     Okay.  This is the only one you've ever
20   had; is that right?
21        A.     From my recollection, yes.
22               (Exhibit No. 35 marked.)
23   BY MR. KURSMAN:
24        Q.     Okay.  Let's go to Exhibit 35.  And let
25   me know when you're there.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 268 of 327 PageID #: 6328

```
 1          A.      Okay.
 2          Q.      Okay.  And you see this is an email of
 3    June 26th, 2019?
 4          A.      Yes.
 5          Q.      And it says "Proposed Alternative," as
 6    the subject?
 7          A.      Yes.
 8          Q.      Did you write this email?
 9          A.      Yes.
10          Q.      Okay.  And then it has "Midazolam,
11    Digoxin, Morphine Sulfate, and Propanolol."
12          A.      Yes.
13          Q.      Were you writing this email to the
14    pharmacy owner?
15          A.      Yes.
16          Q.      Why?
17                  MR. MITCHELL:  Object to the form.
18                  THE WITNESS:  It was in relation to a --
19          I want to say it was proposing a list of things as
20          alternatives to the current protocol.
21    BY MR. KURSMAN:
22          Q.      And what were you asking the pharmacy
23    owner to do with this information?
24          A.      To look into availability, but also to
25    look at the drugs themselves and see what the pharmacy
```

1  owner could find out about.

2       Q.     Did the pharmacy owner look into the

3  availability of these drugs?

4            MR. MITCHELL:  Objection.

5            THE WITNESS:  Yes, I believe so.

6  BY MR. KURSMAN:

7       Q.  ·  So the pharmacy owner looked into the

8  availability of digoxin?

9            MR. MITCHELL:  Objection.  Same

10       objection.

11            THE WITNESS:  I believe so.

12  BY MR. KURSMAN:

13       Q.     And you believe that the pharmacy owner

14  looked into the availability of morphine sulfate?

15       A.     Yes.

16       Q.     And you believe that the pharmacy owner

17  looked into the availability of propanolol?

18       A.     Yes.

19       Q.     Okay.  And were they told that these

20  drugs were available?

21            MR. MITCHELL:  Objection.

22            THE WITNESS:  Off the top of my head, I

23       can't remember which of these would -- are readily

24       available.

25  BY MR. KURSMAN:

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 270 of 327   PageID #: 6330

1      Q.      Did you say are readily or are not
2  readily?
3      A.      I can't remember which of these are or
4  are not readily available, or were at the time of this
5  email.
6      Q.      Okay.  Do you have any records showing
7  which of these drugs are readily available?
8              MR. MITCHELL:  Object to form.
9              THE WITNESS:  I don't.  I don't know, for
10        sure.  I -- I may.  There may not be any now.  I
11        don't know.
12             MR. KURSMAN:  Okay.  And I would request
13        that in discovery.
14  BY MR. KURSMAN:
15     Q.      Do you have any records showing that
16  these drugs that I just discussed are not readily
17  available?
18     A.      Same answer.
19             MR. KURSMAN:  Okay.  I would request that
20        in discovery.
21  BY MR. KURSMAN:
22     Q.      And what is your definition of "readily
23  available?"
24             MR. MITCHELL:  Object to form.
25             THE WITNESS:  Available for purchase and

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 271 of 327 PageID #: 6331

```
 1          allowed to be used or sold to the Department of
 2          Correction and in quantities to do more than -- to
 3          have a ready supply to do more than one execution.
 4   BY MR. KURSMAN:
 5          Q.     So would two executions be enough?
 6                 MR. MITCHELL:  Same objection.
 7                 THE WITNESS:  That -- I would have to
 8          consult with general counsel and the commissioner
 9          on that.
10   BY MR. KURSMAN:
11          Q.     Are you aware that an oral administration
12   of secobarbital could be used as an alternative method
13   of execution?
14                 MR. MITCHELL:  Same objection.
15                 THE WITNESS:  I'm not aware of that.
16   BY MR. KURSMAN:
17          Q.     Did you ever attempt to obtain
18   secobarbital?
19          A.     No.
20          Q.     Did the pharmacy to your knowledge ever
21   obtain secobarbital?
22          A.     Not that I recall.
23                 (Exhibit No. 36 marked.)
24   BY MR. KURSMAN:
25          Q.     Let's go to Exhibit 36.  And let me know
```

```
 1    when you get there.
 2         A.      Okay.
 3         Q.      Are you there?
 4         A.      Yes.
 5         Q.      And you see this is an invoice with an
 6    invoice date of 12/20/19?
 7         A.      Yes.
 8         Q.      And is this an invoice from the pharmacy?
 9         A.      Yes.
10         Q.      And do you see that there is an order of
11    60 -- a quantity of 60 Midazolam Bulk API in grams?
12         A.      Yes.
13         Q.      And does this indicate a purchase of 60
14    grams of midazolam?
15         A.      No, it's -- my understanding is it's 60
16    units, for lack of a better term.  I don't know how
17    many grams are in each unit.
18         Q.      And what does it create?
19         A.      Could you repeat?
20         Q.      What's that?  I'm sorry, I missed that.
21         A.      Could you repeat?
22         Q.      Yes.  What does it create?
23                 MR. MITCHELL:  Object to the form.
24                 THE WITNESS:  I'm sorry, you keep
25         breaking up.  It was "something create."
```

```
 1  BY MR. KURSMAN:
 2       Q.       Yes.   What does 60 units create?
 3               MR. MITCHELL:  Same objection.
 4               THE WITNESS:  60 units is -- like I said
 5       earlier, I haven't seen API.  My understanding is
 6       that there's a number of grams in each unit.  I
 7       don't know how many grams are in each unit.
 8  BY MR. KURSMAN:
 9       Q.       So let me get this straight.   The
10  Department is paying $40,000 for 60 units of API, but
11  you don't know how many grams are in each unit?
12               MR. MITCHELL:  Same objection.
13               THE WITNESS:  Not at this time, I don't.
14  BY MR. KURSMAN:
15       Q.       Okay.  Do you know how many executions 60
16  units could be used for?
17               MR. MITCHELL:  Same objection.
18               THE WITNESS:  At this -- right now, I
19       don't remember.
20               (Exhibit No. 37 marked.)
21  BY MR. KURSMAN:
22       Q.       Okay.  Let's go to Exhibit 37, and let me
23  know when you get there.
24       A.       Okay.
25       Q.       Okay.  Do you see this invoice from
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 274 of 327 PageID #: 6334

```
 1   October 26th, 2017?
 2        A.     Yes.
 3        Q.     And is this also from the pharmacy?
 4        A.     Yes.
 5        Q.     And it says "A quantity of 50 potassium
 6   chloride at 2 milliequivalents per milliliter at 20
 7   milliliters."  Do you see that?
 8        A.     Yes.
 9        Q.     So are you aware of how much potassium
10   chloride that is?
11        A.     In that instance, I think it refers to 50
12   vials.
13        Q.     Okay.  So if you took 50 vials of 2
14   milliequivalent per milliliter, 20 milliliters, that
15   would be 40 milliequivalents per vial.  Right?
16               MR. MITCHELL:  Object to form.
17               THE WITNESS:  Sorry, you have to go slow
18        with me on that.
19   BY MR. KURSMAN:
20        Q.     Okay.  I'm sorry.
21               So you have these vials that are 2 milli-
22   -- 2 milliequivalent per milliliters at 20 milliliters.
23   Do you see that in the description?
24        A.     Yes.
25        Q.     Okay.  So that would be a vial that
```

1  contained 40 milliequivalents of potassium chloride,

2  correct?

3       A.     It has 20 milliliters of potassium 2 mEq

4  concentration of potassium chloride.

5       Q.     Okay.  So my question is:  That would be

6  40 milliequivalents of potassium chloride per vial --

7  per vial, right?

8               MR. MITCHELL:  Object to the form.

9               THE WITNESS:  No, it's 20 milliliters.

10  BY MR. KURSMAN:

11       Q.     Okay.  Let's -- let me -- let me try this

12  again.  So there's in this vial, every milliliter,

13  there's 2 milliequivalents of potassium chloride,

14  right?

15       A.     Correct.

16       Q.     And there's 20 milliliters in this vial,

17  right?

18       A.     Correct.

19       Q.     So there would be 40 milliequivalents of

20  potassium chloride in each vial, right?

21       A.     I'm not understanding the math.  So it

22  doesn't -- 20 times 2 doesn't change the potency or the

23  mEq.  It's 2 mEq, 20 milliliters of that concentration.

24       Q.     So your understanding is that you have --

25  each vial is 2 milliequivalents in the 20-milliliter

```
 1   vial?
 2               MR. MITCHELL:  Again, I'm going to object
 3        to form.
 4               THE WITNESS:   The concentration of 2
 5        mEq's per milliliter, and there are 20 milliliters
 6        of it.
 7   BY MR. KURSMAN:
 8        Q.     Right.  So my question is:  Because it's
 9   a 20-milliliter vial, doesn't that mean each vial has
10   40 milliequivalents of potassium chloride?
11               MR. MITCHELL:  Same objection.
12               THE WITNESS:  No.
13   BY MR. KURSMAN:
14        Q.     What does it mean?
15        A.     As I've already stated, it means the
16   entire solution has a concentration of 2 mEq's per ml.
17        Q.     And how much is the entire solution?
18        A.     There are 20 milliliters in each vial.
19        Q.     Okay.  So if the vial has 20 milliliters
20   at a solution of 20 milliequivalents per milliliter,
21   what is your understanding of how many milliequivalents
22   of potassium chloride are in each vial?
23               MR. MITCHELL:  Object to the form.
24               THE WITNESS:  As I stated, 2 mEq's per ml
25        is the concentration of the entire vial.
```

1  BY MR. KURSMAN:

2       Q.      Right.  I understand that.  What I'm

3  not -- I'm not asking per the ml.  I'm asking what's

4  your understanding of how many milliequivalents are

5  there of potassium chloride in each vial.

6                  MR. MITCHELL:  And, Alex, I'm going to

7            lodge the same objection.  This has been asked and

8            answered.  I'm going to let the Drug Procurer

9            answer it, but it may be better for another

10           deposition.

11                 THE WITNESS:  There's 20 ml's in a 2 mEq

12           concentration, so there are 20 ml's of that

13           concentration.

14  BY MR. KURSMAN:

15      Q.      Right.  So what does that equal?  How

16  many milliequivalents of potassium chloride are there

17  per vial?

18      A.      As I've already stated probably eight

19  times, there's 20 milliliters -- 20 milliliters of 2

20  mEq concentration.  20 milliliters of 2 mEq

21  concentration.

22      Q.      Right.  So I'm asking -- because this is

23  an important thing of the protocol for the execution

24  team to know.  So what I'm asking is:  How many

25  milliequivalents of potassium chloride do you believe

1 are in each vial?

2     MR. MITCHELL: Alex, this has been asked

3   and answered several times, and I just don't think

4   you like the answer.

5 BY MR. KURSMAN:

6   Q.  But you -- but you can answer the

7 question.

8   A.  There are in a 20-milliliter vial, the

9 entire solution, the entire 20 milliliters is a

10 concentration of 2 mEq. So multiple vials are drawn up

11 to meet the 120-milliliter requirement for the

12 execution.

13   Q.  And how many of them are drawn up?

14   A.  Doing the math, it'd be -- to meet 20

15 milliliters would be 10 vials.

16   Q.  10 vials? Okay.

17     (Exhibit No. 38 marked.)

18 BY MR. KURSMAN:

19   Q.  Let's go to Exhibit 38. Let me know when

20 you get there.

21   A.  Okay.

22   Q.  Okay. And you see that's an invoice

23 dated August 16, 2018?

24   A.  Yes.

25   Q.  Okay. And it's an invoice from the

1  pharmacy company?

2       A.    Yes.

3       Q.    And do you see it says:  "24 doses of

4  midazolam at 50 milligrams per milliliter at 5

5  milliliters compounded for injection?"

6       A.    Yes.

7       Q.    Okay.  Do you know how many milligrams of

8  midazolam are in each vial?

9       A.    Sorry, each vial?  Each vial is 5

10 milliliters.

11      Q.    Okay.  But how many milligrams of

12 midazolam are in each vial?

13      A.    The potency is 50 milligrams per ml.

14      Q.    Right.  In each -- in each vial, how many

15 milligrams of midazolam in each vial?

16            MR. MITCHELL:  Object to the form.

17            THE WITNESS:  We're going with this math

18      again, so let's see if I can talk my way through

19      it to answer the question.

20            Okay.  So you're asking it's 5

21      milliliters, there's 50 grams per milliliter.  So

22      that is -- the potency of the entire 5 milliliters

23      then has to be diluted when pulled into the

24      syringe.

25 BY MR. KURSMAN:

1      Q.      So how many vials would be used in each
2   execution?
3              MR. MITCHELL:  And again, objection to
4       form.
5              THE WITNESS:  It's -- sorry, I'm doing
6       math in my head.
7              It's four.
8   BY MR. KURSMAN:
9      Q.      Did you say four?
10     A.      Yeah.
11     Q.      Okay.  So for each execution, of the
12  potassium chloride are you ordering 10 vials or 20
13  vials?
14     A.      For an execution, it's a total of 8
15  vials.
16     Q.      8 vials?  Is that right?
17     A.      8 vials per execution.
18     Q.      Okay.  And if we go back to Exhibit 37
19  that we just talked about a second ago.
20     A.      Stand by.
21     Q.      Sure.
22             (Pause.)
23             THE WITNESS:  What did you say it was?
24  BY MR. KURSMAN:
25     Q.      Pardon?

Case 3:18-cv-01234  Document 184-3  Filed 03/17/22  Page 281 of 327 PageID #: 6341

1        A.        Exhibit?

2        Q.        37.

3                  (Pause.)

4                  THE WITNESS:   Okay.

5   BY MR. KURSMAN:

6        Q.        Okay.  So for each execution, am I right

7   that you're ordering 20 vials of potassium chloride for

8   each execution?

9        A.        Of the commercially manufactured, it

10  would be 20.

11       Q.        20?  Okay.

12                 So for each execution, you ordered 20 vials

13  of potassium chloride and 8 vials of midazolam; is that

14  right.

15       A.        If it's commercially manufactured, we

16  would need 20 vials of potassium chloride.  And

17  midazolam, a commercial manufacturer, I think it was --

18  I think it was the same number, but I can't remember

19  off the top of my head.  The numbers of vials are

20  different when it's compounded.

21       Q.        Okay.  And how different are they?

22                 MR. MITCHELL:   Object to form.

23                 THE WITNESS:   The compounded vials have a

24           higher potency, so we don't need as many.  So we

25           have to order 8 vials of midazolam and we order --

```
 1            to include that, we order the same quantity of
 2            potassium chloride.
 3    BY MR. KURSMAN:
 4        Q.      So for compounded you order 8 vials of
 5    midazolam, you said?
 6        A.      Yes.
 7        Q.      And 20 -- still 20 of potassium chloride?
 8        A.      No, 8.
 9        Q.      8 of both?
10        A.      Yes.
11                (Exhibit No. 39 marked.)
12        Q.      Okay.  Now, let's go to Exhibit 40, I
13    believe.
14                You know what?  I apologize.  Let's go to
15    Exhibit 39.
16                And let me know when you're there.
17        A.      I'm there.
18        Q.      Okay.  And this is an invoice from
19    December 28th, 2017?
20        A.      Yes.
21        Q.      And this is from the pharmacy company?
22        A.      Yes.
23        Q.      And do you see here you have two charges
24    for sterile water for injection?
25        A.      Yes.
```

```
 1        Q.       Why in 37 and 38 were there no charges
 2   for sterile water injection?
 3               MR. MITCHELL:  Object to the form.
 4               THE WITNESS:  Could you repeat?
 5   BY MR. KURSMAN:
 6        Q.       Sure.  So in Exhibit 39, there are
 7   charges for sterile water for injection, but in
 8   Exhibits 38 and 37 there are no charges for sterile
 9   water for injection.  Why is that?
10               MR. MITCHELL:  Same objection.
11               THE WITNESS:  We didn't need any more
12          sterile water.
13   BY MR. KURSMAN:
14        Q.       Did you have sterile water on hand?
15        A.       Are you asking do we currently have it on
16   hand?
17        Q.       No, at the time of these invoices.
18        A.       Right.  We -- we received it from them,
19   and then we didn't need -- when the next invoice rolled
20   around, we still had -- still had sterile water
21   supplies.
22        Q.       Does sterile water for injection have a
23   beyond use date?
24               MR. MITCHELL:  Objection to the form.
25               THE WITNESS:  It does have.  It does have
```

```
 1         an expiration date on the package.
 2   BY MR. KURSMAN:
 3         Q.      Okay.  And do you put that on the vials,
 4   as well?
 5         A.      Yes.
 6                 (Exhibit No. 40 marked.)
 7   BY MR. KURSMAN:
 8         Q.      Let's go to Exhibit 40.  And you see this
 9   is October 31st, 2019.
10         A.      Okay.
11         Q.      Do you see that?
12         A.      Yes.
13         Q.      And here you ordered a quantity of 24
14   midazolam, 50 milligrams per milliliter, at 5
15   milliliters for a compounded injection.
16                 Do you see that?
17         A.      Yes.
18         Q.      And this is for compounding?
19         A.      Yes.
20         Q.      Okay.  So this is a compounded drug that
21   you're ordering here?
22         A.      Yes.
23         Q.      Okay.  How many executions is this for?
24         A.      This is -- this would be for one
25   execution.
```

1   Q.  Okay. A quantity of 24 is for one

2 execution?

3   A.  Not all 24 are used for the execution.

4 Only 8 are used and sent to us for the execution.

5   Q.  Okay. And are all 8 used in the

6 execution?

7      MR. MITCHELL: Object to the form.

8      THE WITNESS: No.

9 BY MR. KURSMAN:

10   Q.  What's that?

11   A.  No.

12   Q.  How many of the 8 are used in the

13 execution, if all goes well?

14      MR. MITCHELL: Same objection.

15      THE WITNESS: 4.

16 BY MR. KURSMAN:

17   Q.  4? Okay.

18      Now -- and is this the first time that you

19 purchased compounded midazolam?

20   A.  Sorry. No.

21   Q.  Okay. When was the first time you

22 purchased compounded midazolam?

23   A.  Before the Irick execution.

24   Q.  Okay. And is -- it looks like compounded

25 midazolam is a bit cheaper than manufactured midazolam;

```
 1   is that right?
 2         A.      I'd have to go back and compare them.
 3         Q.      Okay.  Well, if you go back to Exhibit
 4   40, just let me know if my math is correct.
 5                 Or Exhibit 39, I apologize.
 6                 (Pause.)
 7                 THE WITNESS:  All right.  I'm just going
 8         to go off here and try to do this right.
 9                 So going back to Exhibit 39, which was
10         commercially manufactured.  It was 8 boxes of
11         midazolam.  Each box had 10 vials, 750 a box, at
12         $6,000.
13                 So let's see, let me go back to the other
14         one.
15                 No, I would say that compounding is more
16         expensive.
17                 (Exhibit No. 41 marked.)
18   BY MR. KURSMAN:
19         Q.      Okay.  I guess I was confused.  Let's go
20   to Exhibit 41.
21         A.      Okay.
22         Q.      And you see at the top it says
23   September 7, 2018?
24         A.      Yes.
25         Q.      Are these -- is this your handwriting?
```

```
 1        A.    No.
 2        Q.    Okay.  Is this the lot that we were
 3  discussing?
 4        A.    Yes.
 5        Q.    Okay.  Is this the handwriting?
 6        A.    Yes.
 7        Q.    Okay.  Do you see, if you go to midazolam
 8  at the very bottom, two up from the top, do you see it
 9  says "4 vials?"
10        A.    Midazolam.  Oh, okay.  I'm sorry.  I'm on
11  the page, yes.
12        Q.    You see it says "Expired 7/26/2018?"  Do
13  you see that?
14        A.    Yes, I see it.
15        Q.    And do you also see it says "40 days"
16  right above it?
17        A.    Yes.
18        Q.    Okay.  Why do you have midazolam expired
19  on 7/26/2018?
20              MR. MITCHELL:  Object to the form.
21              THE WITNESS:  It was -- it's written in
22        here.  It was written because it was on the label.
23  BY MR. KURSMAN:
24        Q.    So it was -- at the time of September 7,
25  2018, was this midazolam still in the possession of
```

1  TDOC?

2      A.      Sorry, you broke up there.  Could you

3  please repeat?

4      Q.      Yeah, sure.  At the time of September

5  7th, 2018, the date of this log, was the midazolam, the

6  4 vials purchased on 7/26/2018, was that in TDOC's

7  possession?

8      A.      Based on this, based on this page, the

9  page indicates that it was in inventory at the -- at

10 Riverbend.

11     Q.      Why wasn't it removed if it was expired?

12             MR. MITCHELL:  Same objection.

13             THE WITNESS:  I don't know.

14 BY MR. KURSMAN:

15     Q.      Okay.  And what does "40 days" mean?

16     A.      That would probably -- that's a reference

17 to the USP BUD.

18     Q.      The USP what?

19     A.      BUD.

20     Q.      And what do you mean by that?

21     A.      It would seem to be a reference to -- at

22 the time this was in here to say that by the USP BUD

23 you actually have 40 days to go.

24     Q.      On September 7th, 2018?

25             MR. MITCHELL:  Object to the form.

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 289 of 327 PageID #: 6349

1  BY MR. KURSMAN:

2      Q.      I'm just -- I'm trying to understand the

3  log.  So the way you read the log on September 7, 2018,

4  there's a notation made "midazolam, 4 vials in 2018, 40

5  days."  It's your understanding that "40 days" means

6  that midazolam is good for another 40 days?

7      A.      I'm just saying that's a possibility.  I

8  don't know what it means.

9      Q.      Okay.  Now, if you go up one, two, three

10 four lines, do you see there's another entry for

11 midazolam?  Do you see that?

12     A.      Yes.

13     Q.      And it says "280 vials?"

14     A.      Yes.

15     Q.      And then it says "Expires 6/1 of 2018?"

16     A.      Yes.

17     Q.      Do you know why you still have got

18 midazolam on your hands on September 7th of 2018?

19     A.      No.

20     Q.      Do you know why you have 280 vials of

21 midazolam?

22     A.      Because it was what we ordered from the

23 pharmacy.

24     Q.      And were those orders in conjunction with

25 a physician's order?

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 290 of 327 PageID #: 6350

```
 1        A.       They were in -- they were not in a
 2   specific order for a specific execution, because they
 3   were commercially manufactured.
 4        Q.       And if you go up to potassium chloride,
 5   you see it says "88 vials?"
 6        A.       Yes.
 7        Q.       And it says 50 vials expire June 1st,
 8   2018.  Do you see that?
 9        A.       Yes.
10        Q.       Why did you still have those in TDOC's
11   possession after they expired?
12        A.       I don't know.
13        Q.       Okay.  And isn't keeping these vials in
14   TDOC's possession contrary to the protocol?
15             MR. MITCHELL:  Object to the form.
16             THE WITNESS:  Sorry.  Having -- yes, the
17        protocol does call for them to be discarded
18        after -- once they expire.
19   BY MR. KURSMAN:
20        Q.       And do you know why they weren't
21   discarded?
22        A.       No.
23        Q.       And who decides whether it will be
24   discarded?  Is that the warden or is that you?
25        A.       I'm sorry, you broke up at the end.
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 291 of 327 PageID #: 6351

```
1          Q.      Sorry.  Who decides when the drugs will
2    be discarded?  Is that the warden or is that you?
3          A.      It's -- it's a combination of both.
4          Q.      Now, let's go to -- back to potassium
5    chloride where it says "88 vials."  And it says 38
6    vials expires July of 2019.  Do you see that?
7          A.      Yes.
8          Q.      Is that compounded or manufactured
9    potassium chloride?
10         A.      Manufactured.
11         Q.      Are all these drugs that we're looking at
12   right here manufactured?
13         A.      Sorry, one second.  Let me look through
14   it.
15         Q.      Sure.
16                 (Pause.)
17                 THE WITNESS:  I believe so, yes.
18                 (Exhibit No. 42 marked.)
19   BY MR. KURSMAN:
20         Q.      Okay.  Let's go to Exhibit 42 now.
21                 MR. MITCHELL:  Can we go off record real
22         quick?
23                 MR. KURSMAN:  Sure.
24                 THE VIDEOGRAPHER:  We're going off the
25         record at 6:30 p.m.
```

```
 1                    (Discussion off the record.)

 2                    (Recess at 6:30 p.m. to 6:34 p.m.)

 3                    THE VIDEOGRAPHER:  We're back on record

 4        at 6:34 p.m.

 5    BY MR. KURSMAN:

 6        Q.      We just took a brief break.  Did you

 7    consult with your attorneys during the break?

 8        A.      No, I did not.  And I'm still in the room

 9    by myself.

10        Q.      Okay.  Can we go to Exhibit 42 now?  Let

11    me know when you get there.

12        A.      Okay.

13        Q.      And do you see that this is a log dated

14    December 30th, 2018?

15        A.      Yes.

16        Q.      Is this your handwriting?

17        A.      No.

18        Q.      Is it the warden's?

19        A.      Yes.

20        Q.      Okay.  Now, is all of the drugs that are

21    in this lab, are these all compounded drugs or are they

22    manufactured drugs?

23        A.      One second.  Let me look through it.

24                    MR. MITCHELL:  I'm going to object.

25                    (Pause.)
```

```
 1                    THE WITNESS:  Sorry.  Just to clarify,
 2         which page?  Are you just asking about the first
 3         page?
 4    BY MR. KURSMAN:
 5         Q.      Yes, let's start with the first page.
 6         A.      All right.  So on the first page, these
 7    are all commercially manufactured.
 8         Q.      Okay.  And what about the second page?
 9         A.      One second.  I'm reviewing it.
10                 (Pause.)
11                 THE WITNESS:  The midazolam at the top of
12         the page is -- at the top of the page is
13         compounded.
14    BY MR. KURSMAN:
15         Q.      And why doesn't it -- oh, it does.  Okay.
16                 (Exhibit No. 43 marked.)
17    BY MR. KURSMAN:
18         Q.      Let's look at Exhibit 43.
19         A.      Okay.
20         Q.      Do you see it says February 11th, 2020?
21         A.      Correct.
22         Q.      And are all the drugs here compounded
23    drugs?
24         A.      So the drugs referenced under the
25    February 11, 2020, date are compounded drugs.  The
```

1  drugs referenced under August 4, 2020, are

2  manufactured.

3      Q.     Okay.  Now can you see in the -- in the

4  first section there it says:  "Potassium Chloride, 15

5  solution"; the second one has potassium chloride.

6          And then it says:  "Freezer temp,

7  negative 5, two refrigerator, 47 degrees?"

8      A.     Yes, I see that.

9      Q.     What's that?

10     A.     Yes, I see that.

11     Q.     Okay.  Who determined that refrigerator

12 to be at 47 degrees?

13     A.     The -- when it was moved out of the

14 freezer to the refrigerator, they read the thermometer

15 in the refrigerator.

16     Q.     And the thermometer in the refrigerator

17 read 47 degrees?

18     A.     The thermometer in the refrigerator read

19 47 degrees.

20     Q.     Are you aware that USP 659 sets the

21 temperature for which compounded drugs should be stored

22 in the refrigerator?

23          MR. MITCHELL:  Object to the form.

24          THE WITNESS:  I'm sorry, did you say the

25     actual temperature, or did you ask if I'm aware

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 295 of 327 PageID #: 6355

1           that they set a temperature?

2    BY MR. KURSMAN:

3           Q.      Are you aware of a temperature?

4           A.      I'm not aware.

5           Q.      And are you aware that the temperature

6    that is set in USP 659 is between 36 degrees and 46

7    degrees?

8                   MR. MITCHELL:  Same objection.

9                   THE WITNESS:  I'm not aware of that.

10   BY MR. KURSMAN:

11          Q.      And when it says "freezer temp," is that

12   negative 5 degrees or is that 5 degrees?

13          A.      I didn't write this, but to me it would

14   appear that that's a dash, not a negative.

15          Q.      And how about above, where it says

16   "Potassium Chloride, freezer temp, 7?"  Is that a

17   negative 7 degrees or a 7 degrees?

18                  MR. MITCHELL:  Same objection.

19                  THE WITNESS:  That appears to be a dash,

20        as well.

21   BY MR. KURSMAN:

22          Q.      Okay.  Did you and the warden discuss the

23   actual freezer temp of the potassium chloride as a

24   negative 5 or a negative 7 or a 5 and 7?

25          A.      Actually, I can speak to the 7-degree one

1  because that is my handwriting.  So that is a dash,

2  it's not a negative.

3        Q.      Okay.  And then do you see the potassium

4  chloride at -- at the bottom, it says "Expires

5  2/23/2020."  Do you see that?

6        A.      Yes.

7        Q.      Okay.  And this is written on February

8  11th?

9                Is that right?

10       A.      That's right.  Yes, expiration,

11  2/23/2020.

12       Q.      Okay.  And it stays in the refrigerator

13  at 47 degrees, right?

14       A.      Not on that date.

15       Q.      Okay.  On what date was it moved to the

16  refrigerator at 47 degrees?

17       A.      I didn't move it.  It was done by a

18  member of the execution team prior to the February

19  execution.

20       Q.      Okay.  And do you know what date it was

21  moved to the refrigerator?

22       A.      I don't remember the specific date of

23  that execution, off the top of my head, so it would

24  have been the day before the day of the execution.

25       Q.      Okay.  Do you think they should have put

1   the date that the potassium chloride was moved from the
2   freezer to the refrigerator?
3                   MR. MITCHELL:  Object to the form.
4                   THE WITNESS:  That would help clarify,
5         yes.
6   BY MR. KURSMAN:
7         Q.        Okay.  And if the execution was called
8   off but the potassium chloride was still in the
9   refrigerator, per the execution protocol could it still
10  be used?
11                  Drug Procurer, you're muted.
12        A.        Sorry.  If it's -- if it's, to use your
13  term, called off, if it's reset to a date beyond the
14  new date or the compound being sent to the
15  refrigerator, then it would not be used.
16        Q.        So here we have the date it was moved to
17  the refrigerator.  So if an execution was stayed, let's
18  say for two days, could it still be used?
19                  MR. MITCHELL:  Object to the form.
20                  THE WITNESS:  If it's two days, so it
21        does not go down to BUD three days, technically,
22        yes, it could be used.  That would be a scenario.
23        That's why we order a backup set.  We would just
24        use the backup set.
25  BY MR. KURSMAN:

1     Q.     But -- but you, as the Drug Procurer

2  who's responsible for the storage of the lethal

3  injection chemicals, don't actually know what day the

4  potassium chloride was moved to the refrigerator,

5  right?

6     A.     As I stated, it was the day before the

7  execution.  I just don't remember the date, off the top

8  of my head.

9     Q.     Well, how do you know that, if it wasn't

10  in the log?

11     A.     Because I know when the members of the

12  execution team went to do it.

13     Q.     And let me ask you this about the

14  refrigerator temperature.  Did you talk to the

15  pharmacist or the pharmacy owner about what temperature

16  you should keep the refrigerator at?

17     A.     I don't remember if I did or not.  I

18  don't recall a specific conversation today.

19     Q.     And did you talk to the pharmacy or

20  pharmacy owner about what temperature you should keep

21  the freezer at?

22     A.     We did talk about that, and it was -- I

23  was told to keep it a little freezing, I recall, in the

24  edit.

25     Q.     And while the drugs are in either the

1  refrigerator or the freezer, you cannot tell what the
2  temperature is unless you open the refrigerator or the
3  freezer, correct?
4      A.      That's correct.
5      Q.      Okay.  And the refrigerator and freezer
6  are sealed until they're either moved from the freezer
7  to the refrigerator, they're moved from the
8  refrigerator to the execution chamber, or during your
9  periodic reviews.  Right?
10     A.      That's correct.
11     Q.      So at all other times, no one in TDOC can
12 determine the temperature of the refrigerator or the
13 freezer, right?
14             MR. MITCHELL:  Object to the form.
15             THE WITNESS:  The warden would be able to
16         go in at any time, unlock it, and check the
17         temperature of the freezer.  Outside the warden,
18         no.
19 BY MR. KURSMAN:
20     Q.      But for him to do that, he would have to
21 break the seal.  Right?
22     A.      That's correct.
23     Q.      And if he broke the seal, that would be
24 recorded in your logs.  Right?
25     A.      That's correct.

1      Q.      Okay.  And do you see that the 2/11/2020

2   ledger indicates that the midazolam is in 10-milliliter

3   vials?

4                  MR. MITCHELL:  Object to the form.

5                  THE WITNESS:  Yes.

6   BY MR. KURSMAN:

7      Q.      Okay.  Now, if you go back to Exhibit 2.

8   Let me know when you get there.

9      A.      I'm sorry, did you say "2?"

10     Q.      Yes, Exhibit 2.

11     A.      Stand by.

12              (Pause.)

13                  THE WITNESS:  Okay.

14   BY MR. KURSMAN:

15     Q.      Do you see under there you will need, 1,

16   4, 5 milliliters midazolam, 50-milligrams per

17   milliliter vials?

18     A.      Yes.

19     Q.      So why aren't you following the storage

20   and preparation instructions for the storage of the

21   midazolam on February 11th of 2020?

22                  MR. MITCHELL:  Object to the form.

23                  THE WITNESS:  It would -- without looking

24       at it, it would appear that the indication of 10

25       milliliters in the log was not accurate.  It

```
 1          should have been 5 milliliters.  But once again,
 2          without looking at it, I can't confirm it.
 3   BY MR. KURSMAN:
 4          Q.      When you say "without looking at it,"
 5   what are you talking about looking at?
 6          A.      The vials.
 7          Q.      Okay.  And this is your handwriting right
 8   here under "February?"
 9          A.      Which exhibit is that?  I have to pull it
10   back up.
11          Q.      Exhibit 43.
12          A.      Stand by.
13                  (Pause.)
14                  THE WITNESS:  Yes.
15   BY MR. KURSMAN:
16          Q.      So do you think someone made a mistake
17   and it should have said 5-milliliter vials?
18          A.      Yes.
19          Q.      Did the warden double -- does the warden
20   double-check when you make entries into the journal,
21   into the log?
22          A.      Yes, usually.
23          Q.      And the warden didn't double-check in
24   this instance?
25          A.      I don't specifically remember if he did
```

1    or he didn't.

2          Q.       Okay.   And who is tasked with adjusting

3    the preparation to ensure that the proper concentration

4    in the vials are achieved?

5          A.       Who would -- I want to make sure I'm

6    understanding you correct -- I'm sorry, the question.

7                   You're asking who would -- if the

8    concentration was different, who would instruct on how

9    to prepare it?

10         Q.       Yes.

11         A.       The pharmacist.

12         Q.       Okay.   And then who prepares the syringes

13   once an execution date is set on the date of the

14   execution?

15         A.       Members of the execution team prepare the

16   syringes.

17         Q.       Okay.   And who are the members, without

18   identifying them, by their roles?

19         A.       The executioner prepares the syringes.

20         Q.       And do you, as the Drug Procurer, take

21   steps to ensure that the drugs are acquired in the

22   concentration and volume contemplated by the

23   pharmacist's instructions?

24         A.       Yes.

25         Q.       Okay.   And how do you do that?

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 303 of 327 PageID #: 6363

```
 1          A.       We order them in the concentration
 2  suggested by the pharmacist.  They compound it to that
 3  specification.  Then it is sent to us.  And then during
 4  inventory usually we indicate the correct concentration
 5  of the vials when we log it in.
 6                   (Exhibit No. 44 marked.)
 7  BY MR. KURSMAN:
 8          Q.       Let me take you to Exhibit 44.  Let me
 9  know when you get there.
10          A.       I'm there.
11          Q.       Okay.  And do you see the "Chemical
12  Preparation Time Sheet?"
13          A.       Yes.
14          Q.       And the date is 5/16/19?
15          A.       Yes.
16          Q.       And do you see the potassium chloride was
17  prepared at 7:29?
18          A.       Yes.
19          Q.       Do you see the vecuronium bromide was
20  prepared at 7:24?
21          A.       Yes.
22          Q.       And do you see that the midazolam was
23  prepared at 9:20?
24          A.       Yes.
25          Q.       Do you know why the midazolam is prepared
```

1   two hours before the other two drugs?

2       A.     No, I don't, because I'm not involved in

3   the preparation of this.

4       Q.     And who on the execution team, without

5   identifying any names, prepares the midazolam?

6       A.     The executioner. The -- I don't know

7   what acronym, without identifying the individual for

8   the second person to witness.

9       Q.     Do you know how the drugs are mixed on

10   the day of execution?

11       A.     I'm sorry, did you say do I know how they

12   are mixed?

13       Q.     Yes.

14       A.     Okay. The midazolam is pulled from the

15   vial into the syringe; then, per the directions, saline

16   is pulled into the syringe to dilute it to the right

17   concentration.

18           The vecuronium bromide, as described

19   earlier, the bacteriostatic water is injected into each

20   of the vials used and lightly shaken until it dissolves

21   completely and is clear.

22           Then the liquid injection is pulled into

23   the syringe and potassium chloride is pulled directly

24   from the vials at the quantity directed in the

25   directions.

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 305 of 327 PageID #: 6365

```
 1        Q.      And what do the drugs look like when you
 2   receive them?
 3        A.      I'm sorry, could you repeat?
 4        Q.      Sure.  What do the drugs look like when
 5   you receive them?
 6        A.      They are in brownish-colored vials,
 7   light-colored vials, small.  The 5-milliliter ones are
 8   small.  The potassium chloride vials are bigger.  And
 9   they have a label on it.
10        Q.      And how are they transported from the
11   pharmacy to TDOC?
12        A.      They are shipped, stored in dry ice and
13   shipped.
14        Q.      And is there a temperature gauge in those
15   shipments?
16        A.      As stated earlier, no, there's not a
17   temperature gauge in them.
18        Q.      Okay.  So you don't know how cold
19   those -- those drugs are during shipment?
20        A.      I do not know the specific temperature,
21   no.
22        Q.      Is there a reason for a temperature gauge
23   while they're being shipped?
24                MR. MITCHELL:  Objection, form.
25                THE WITNESS:  I don't know.  That would
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 306 of 327 PageID #: 6366

```
 1            be a question for the pharmacists.  They're the
 2            ones that are tasked with shipping it in
 3            accordance with guidelines.
 4    BY MR. KURSMAN:
 5            Q.      And how long does it take to ship from
 6    the pharmacy to the prison?
 7                    MR. MITCHELL:  I'm going to object on the
 8            basis of the protective order.  That's a question,
 9            the answer of which could be identifying
10            information that could lead or be calculated to
11            lead to the location or identity of the pharmacy
12            or pharmacist.
13                    So don't answer, Drug Procurer.
14    BY MR. KURSMAN:
15            Q.      Let me see if I could -- does it take
16    over 24 hours?
17                    MR. MITCHELL:  Same objection.  Don't
18            answer.
19    BY MR. KURSMAN:
20            Q.      What is the protocol for determining
21    whether or not any of the lethal injection chemicals
22    have fallen out of solution?
23                    MR. MITCHELL:  Object to the form.
24                    THE WITNESS:  Sorry.  When they're --
25            when they're pulled into the syringes, they're
```

1          checked to make sure they're clear and they don't

2          have any particulates or bodies.

3     BY MR. KURSMAN:

4          Q.     And when you get the drugs from the

5     pharmacy, is it done via overnight shipping?

6                MR. MITCHELL:  Again, I'm going to object

7          to that specific question and direct the Drug

8          Procurer not to answer -- again, pursuant to the

9          protective order.

10    BY MR. KURSMAN:

11         Q.     Are the compounded drugs tested for

12    stability?

13         A.     Did you say sterility?

14         Q.     Yes, sterility.

15         A.     Yes.

16         Q.     Okay.  Is the pH level tested for each of

17    the drugs?

18                MR. MITCHELL:  Objection.

19                THE WITNESS:  I'm sorry, I didn't

20         understand you.  You broke up.

21    BY MR. KURSMAN:

22         Q.     I'm sorry.  Is the pH level tested for

23    each of the drugs?

24                MR. MITCHELL:  Same objection.

25                THE WITNESS:  That is I believe part of

1          the testing, as well.  It was part of the testing
2          when -- as discussed earlier, when they did the
3          feasibility of the methodology testing.
4    BY MR. KURSMAN:
5          Q.     But do you know what it is for the
6    individual execution?
7          A.     I think so, but that's a question for the
8    pharmacist.
9          Q.     What sort of due diligence do you conduct
10   on the pharmacist?
11                MR. MITCHELL:  Object to the form.
12                THE WITNESS:  I don't understand what you
13         mean by "due diligence."
14   BY MR. KURSMAN:
15         Q.     Did you check to see if the pharmacy had
16   a current license?
17         A.     They provided me with a license.  I
18   haven't checked.  Since they provided me that license I
19   haven't check it, no.
20         Q.     Did you ever check to see if that license
21   was valid?
22         A.     I haven't checked recently.
23         Q.     Have you ever checked to see if that
24   license was valid?
25         A.     I checked when they provided it to me.

```
 1          Q.      Okay.  Have you ever checked to see if

 2     the pharmacy was the subject of any lawsuits?

 3          A.      No.

 4          Q.      Okay.  Did you ever check to see if the

 5     pharmacy was the subject of any criminal actions?

 6          A.      No.

 7          Q.      Did you ever check to see if the pharmacy

 8     was ever sanctioned for any violations?

 9          A.      I did.  I did see information related to

10     that at one time.

11          Q.      That they were sanctioned for violations?

12              MR. MITCHELL:  And I'm -- I'm going to

13          object to this and instruct the witness not to

14          answer this with respect to the protective order.

15              MR. KURSMAN:  You're -- so, Mr. Mitchell,

16          you're objecting to the Drug Procurer's answer

17          that they found out the pharmacy committed at

18          least one violation?

19              MR. MITCHELL:  I don't think that was the

20          answer.  The answer was that the drug -- I think

21          the answer was that the pharmacy -- that the Drug

22          Procurer checked to see if the pharmacy had been

23          sanctioned.

24              The answer was yes, the Drug Procurer had

25          checked.  And then I objected to anything further.
```

```
 1              MR. KURSMAN:   Court reporter, could you
 2         read back the question and answer.
 3              (Record read.)
 4   BY MR. KURSMAN:
 5         Q.    When you saw information related to that
 6   at one time, did you follow up with the pharmacy?
 7         A.    Yes.
 8         Q.    And what did the pharmacy tell you?
 9              MR. MITCHELL:  Objection.  Again,
10         pursuant to the protective order, I'm going to
11         instruct the witness not to answer.
12   BY MR. KURSMAN:
13         Q.    How did you and the pharmacy resolve
14   whatever you found?
15              MR. MITCHELL:  Again, that could also
16         lead to information identifying the pharmacy.  I'm
17         going to again instruct the Drug Procurer not to
18         answer.
19   BY MR. KURSMAN:
20         Q.    Did you do any research after finding
21   whatever you found related to the pharmacy?
22         A.    No.
23         Q.    Why not?
24         A.    Because the information did not indicate
25   an issue with the pharmacy owner or the pharmacist.
```

```
1              MR. KURSMAN:  We'll request that,
2        whatever information you found, in discovery as
3        well.
4              (Exhibit No. 45 marked.)
5  BY MR. KURSMAN:
6        Q.    If you could turn to Exhibit 45.
7        A.    Okay.
8        Q.    And do you see this is an email dated
9  August 13th, 2020?
10       A.    Yes.
11       Q.    Did you write this email?
12       A.    One second.  Let me read it.
13       Q.    Sure.
14             (Pause.)
15             THE WITNESS:  No.
16  BY MR. KURSMAN:
17       Q.    Did the pharmacy owner write it?
18       A.    No.
19       Q.    Did the pharmacist write it?
20       A.    Yes.
21       Q.    Okay.  Was -- was this email written to
22  you?
23       A.    Was the email what?  I'm sorry.
24       Q.    Was the email written to you?
25       A.    Yes.
```

1    Q.     Okay.  Why was the pharmacist looking up
2  information related to sterile compounding?
3            MR. MITCHELL:  Object to form.
4            THE WITNESS:  It was -- it was
5        information obtained at the request of counsel.
6  BY MR. KURSMAN:
7    Q.     Okay.  And why did the pharmacist look up
8  that information at this point?
9            MR. MITCHELL:  Same objection.
10           THE WITNESS:  Because it was information
11       they requested related to a lawsuit.
12  BY MR. KURSMAN:
13   Q.     Was it related to this lawsuit?
14   A.     I honestly don't remember if this related
15  to this one or another one.
16   Q.     And did counsel contact the pharmacist to
17  get -- to get requirements for sterile compounding?
18           MR. MITCHELL:  I'm sorry, could you
19       repeat the question?  Drug Procurer, could you
20       mute real quick?  Thank you.
21  BY MR. KURSMAN:
22   Q.     Sure.  Did counsel ask the pharmacist to
23  look up the training requirements for sterile
24  compounding?
25   A.     There was a question regarding what

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 313 of 327 PageID #: 6373

1   training is received for sterile compounding, both in

2   background and ongoing.

3        Q.    And why was that question posed to the

4   pharmacist on August 13th, 2020?

5        A.    I don't remember exactly, because it was

6   directly related to responding to interrogatories.

7        Q.    And -- and did the pharmacist have the

8   training requirements required for sterile compounding

9   at that time?

10        MR. MITCHELL:  Object to the form.

11        THE WITNESS:  Per indication, yes.

12  BY MR. KURSMAN:

13        Q.    And when the pharmacist here talks about

14   drugs expiring, are they talking about the API?

15        MR. MITCHELL:  Same objection.

16        THE WITNESS:  Yes.

17        (Exhibit No. 46 marked.)

18  BY MR. KURSMAN:

19        Q.    Okay.  Let's go to Exhibit 46.

20        A.    Okay.

21        Q.    Is this the Pharmacy Services Agreement

22  you have with the current pharmacy from which you

23  procure compounding drugs?

24        A.    Yes, sir.

25        Q.    What's that?  I'm sorry.

1    A.    Yes.

2    Q.    Okay.  And you're not working with any

3  other pharmacies, correct?

4    A.    Correct.

5    Q.    Okay.  Let's go to -- and this is dated,

6  just let me see.  This is dated 12/4/17.  Do you see

7  that on Page 5?

8    A.    Let me scroll down to it.  Yes.

9         (Exhibit No. 47 marked.)

10  BY MR. KURSMAN:

11    Q.    Okay.  Let's go to Exhibit 47.

12    A.    Okay.

13    Q.    Do you see this email chain on October

14  18th, 2017?

15    A.    Yes.

16    Q.    Is this between you and the pharmacy that

17  we've been discussing?

18    A.    It's between myself and the pharmacy

19  owner.

20    Q.    Okay.  And were you ordering drugs from

21  that pharmacy?

22    A.    Yes.

23    Q.    Why were there orders before the Pharmacy

24  Services Agreement?

25    A.    Because they agreed to obtain the

1  chemicals for us prior to the agreement.

2      Q.      So why at some point did you sign a

3  Pharmacy Services Agreement with the pharmacy?

4      A.      Sorry, I was on mute.

5              The Pharmacy Services Agreement was a part

6  of or an attachment to the protocol previously that we

7  wanted to have permanently attached to this protocol.

8      Q.      Okay.  Let me -- let me ask you this.

9  Are you aware that some states perform executions by

10  firing squad?

11      A.      I'm not sure that any currently do as the

12  primary method.  It may be a backup method.

13      Q.      Have you ever attempted to obtain any --

14  any instruments that could be used for execution in a

15  firing squad?

16              MR. MITCHELL:  Object to the form.

17              THE WITNESS:  No.

18  BY MR. KURSMAN:

19      Q.      Do you think you could obtain such

20  instruments if a firing squad was the method of

21  execution?

22              MR. MITCHELL:  Same objection.

23              THE WITNESS:  Yes.

24  BY MR. KURSMAN:

25      Q.      Okay.  And do you carry a firearm?

```
 1          A.      Sorry, could you repeat?
 2          Q.      Do you carry a firearm?
 3          A.      No.
 4          Q.      Do you have any firearms training?
 5                  MR. MITCHELL:  Objection, pursuant to the
 6          protective order.  Don't answer.
 7   BY MR. KURSMAN:
 8          Q.      Do you know of anyone at TDOC that is
 9   qualified to use a firearm?
10          A.      Yes.
11          Q.      And does TDOC provide firearms training?
12          A.      You trailed off, but I think are you
13   asking does TDOC provide firearms training?
14          Q.      Yes.
15          A.      Yes.
16          Q.      And does TDOC have a firearms shooting
17   range?
18          A.      Yes.
19          Q.      And does TDOC own firearms?
20                  MR. MITCHELL:  Object to the form.
21                  THE WITNESS:  Yes.
22   BY MR. KURSMAN:
23          Q.      And does TDOC own ammunition?
24          A.      Yes.
25          Q.      And do you know if TDOC has facilities
```

1   where a firing squad execution could take place?

2               MR. MITCHELL:  Object to the form.

3               THE WITNESS:  I'm not sure where that

4         would take place.  So to answer your question, at

5         this time I don't know.

6   BY MR. KURSMAN:

7         Q.     Okay.  Do you know whether TDOC could

8   execute someone by firing squad if it was the protocol?

9               MR. MITCHELL:  Object to the form.

10              THE WITNESS:  Yes.  If it was the

11        protocol, yes, TDOC could do it.

12  BY MR. KURSMAN:

13        Q.     Okay.  And do you think TDOC could

14  execute by a single bullet to the back of the head if

15  that was the protocol?

16              MR. MITCHELL:  Same objection.

17              THE WITNESS:  Logistically speaking, yes.

18        Identifying someone to do it could be problematic.

19  BY MR. KURSMAN:

20        Q.     Okay.  And have you attempted to identify

21  somebody to do that?

22              MR. MITCHELL:  Objection.

23              THE WITNESS:  No.

24  BY MR. KURSMAN:

25        Q.     Have you ever asked the pharmacy that

```
1    you've been communicating with whether they could
2    provide you with a wedge-shaped cushion for an
3    execution?
4          A.      No, I haven't.
5          Q.      Are you aware that using a wedge-shaped
6    cushion could reduce the risk of pain during an
7    execution?
8                  MR. MITCHELL:  Object to the form.
9                  THE WITNESS:  I'm not aware of that.
10   BY MR. KURSMAN:
11         Q.      Do you think you could obtain a
12   wedge-shaped cushion?
13                 MR. MITCHELL:  Object to the form.
14                 THE WITNESS:  If needed, yes.
15   BY MR. KURSMAN:
16         Q.      Do you think you could obtain equipment
17   to administer drugs orally?
18                 MR. MITCHELL:  Object to the form.
19                 THE WITNESS:  I'm not sure what equipment
20        you're referring to.  Could you be more specific?
21   BY MR. KURSMAN:
22         Q.      Just any -- any equipment that would be
23   required to administer drugs orally, if needed.
24                 MR. MITCHELL:  Same objection.
25                 THE WITNESS:  Do you mean like a cup for
```

```
 1          a liquid?   Sure.   Beyond that, I don't really know
 2          what equipment you're referring to.
 3   BY MR. KURSMAN:
 4          Q.      And have you ever attempted to obtain
 5   drugs for an execution by an oral dose of a
 6   barbiturate?
 7                  MR. MITCHELL:  Same objection.
 8                  THE WITNESS:  No.
 9   BY MR. KURSMAN:
10          Q.      Okay.  And were you present for the
11   execution of Billy Ray Irick?
12          A.      No, I wasn't present in the room for the
13   execution.
14          Q.      Did you talk to anybody about that
15   execution after it occurred?
16          A.      Yes.
17          Q.      Who did you talk to, without disclosing
18   the identity of the people involved?
19          A.      I spoke to the warden and commissioner.
20          Q.      And what did the warden and commissioner
21   say to you about the execution of Billy Ray Irick?
22                  MR. MITCHELL:  Object to the hearsay.
23                  THE WITNESS:  I can't remember specific
24          things said.  Mainly that it went smoothly, with
25          no issues.
```

```
 1  BY MR. KURSMAN:
 2       Q.     Do you know how long the execution of
 3  Billy Ray Irick took?
 4       A.     No, I don't, not off the top of my head.
 5       Q.     Okay.  Do you know if a second dose of
 6  midazolam was prepared for the execution of Billy Ray
 7  Irick?
 8       A.     By "a second dose," are you referring to
 9  the preparation of two sets of needles or are you
10  referring to the backup set?
11       Q.     The backup set.
12       A.     It was not prepared.
13       Q.     Do you know why it wasn't?
14       A.     As I remember, it's because we -- we used
15  the first set.
16       Q.     Isn't that a deviation from the protocol?
17              MR. MITCHELL:  Object to the form.
18              THE WITNESS:  No.  The protocol requires
19         preparing two sets of syringes, and that's what
20         they did.
21  BY MR. KURSMAN:
22       Q.     And were you involved with the practice
23  sessions for the execution of Billy Ray Irick?
24       A.     I'm sorry, what kind of discussion?
25       Q.     I'm sorry.  Were you involved in any of
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 321 of 327 PageID #: 6381

1  the practice sessions for the execution of Billy Ray

2  Irick?

3         A.      I attended some of the practice sessions.

4         Q.      And why would you attend a practice

5  session?

6         A.      Just to --

7                 MR. MITCHELL:  Object to the form and

8         instruct the Drug Procurer not to answer pursuant

9         to the protective order.

10                MR. KURSMAN:  For the record,

11        Mr. Mitchell, I obviously don't know who the Drug

12        Procurer is.  So if the Drug Procurer is part of

13        the execution team that would in no way expose

14        that person's identity, because all I know of the

15        Drug Procurer is that he or she is a Drug

16        Procurer.

17                MR. MITCHELL:  The fact that the Drug

18        Procurer attended can come in.  Why the Drug

19        Procurer attended cannot.

20                MR. KURSMAN:  Okay.  And why are you

21        objecting to that?  I'm just curious.

22                MR. MITCHELL:  Because I presume the

23        protective order could lead to the identification

24        of the Drug Procurer.

25  BY MR. KURSMAN:

```
 1          Q.      Okay.  How many practice sessions did you
 2    attend?
 3          A.      I don't know exactly.
 4          Q.      Did you observe what the injection rate
 5    was during the practice sessions?
 6          A.      No.
 7                  MR. KURSMAN:  Okay.  Could we take a
 8          two-minute break?
 9                  THE VIDEOGRAPHER:  We're off the record
10          at 7:14 p.m.
11                  (Recess at 7:14 p.m. to 7:16 p.m.)
12                  THE VIDEOGRAPHER:  We are on the record
13          at 7:16 p.m.
14                  MR. KURSMAN:  Okay.  And I am going to
15          ask at this point to keep the deposition open to
16          resolve any of these outstanding objections for
17          privilege or deliberative process, based on the
18          statute.
19                  There was one thing, Mr. Mitchell, that
20          you said we'd come back to, and that was Exhibit
21          33.
22                  MR. MITCHELL:  Yes.  If you'll permit me
23          to speak with -- stipulate that I can speak with
24          the Drug Procurer and that anything we discuss,
25          you know, remains privileged.  But try to find a
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 323 of 327 PageID #: 6383

```
 1        way to describe, I think that's the one about how
 2        the exam was set up.  See if we can confer with
 3        the Drug Procurer and see if we can -- there's a
 4        way to provide you that description.
 5                MR. KURSMAN:  And it was actually Exhibit
 6        32.
 7                MR. MITCHELL:  32.  Okay.
 8                MR. KURSMAN:  Okay.  Thanks.  So could we
 9        go off the record for a few minutes.
10                THE VIDEOGRAPHER:  We are off the record
11        at 7:17 p.m.
12                (Recess at 7:17 p.m. to 7:25 p.m.)
13                THE VIDEOGRAPHER:  We are on the record
14        at 7:25 p.m.
15                MR. MITCHELL:  Alex, pursuant to the
16        stipulation I conferred with the Drug Procurer.
17        And there's no way to provide or clarify what that
18        language means in Exhibit 32 without leading to
19        some identifying information of the pharmacy.
20                And so we're going to stand by our
21        objection on that.
22                MR. KURSMAN:  Okay.  So what we will do
23        at this point is just keep the deposition open.
24                Go ahead, Mr. Mitchell.
25                MR. MITCHELL:  We can do that if you are
```

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 324 of 327 PageID #: 6384

```
 1        doing it to challenge some of the objections we
 2        made, provided you likewise stipulate that we can
 3        communicate with the deponent about -- about, you
 4        know, matters related to the State, this case,
 5        production of some of the attachments, you know,
 6        and other matters with this.
 7                  I mean, as long as you're doing it to
 8        challenge, that's okay, but otherwise --
 9                  MR. KURSMAN:  We're doing it to
10        challenge.
11                  MR. MITCHELL:  Okay.
12                  MR. KURSMAN:  That is all we're doing it
13        for at this point.
14                  MR. MITCHELL:  You're okay with us
15        communicating with your client, then, about the
16        case?
17                  MR. KURSMAN:  Well, I think you can, yes.
18        Yes, that's fair.
19                  MR. MITCHELL:  You agree to that?  Okay.
20        Then we have no problem with you leaving -- no
21        objection to leaving the deposition open.
22                  MR. KURSMAN:  Okay.  I think we can go
23        off the record.
24                  THE VIDEOGRAPHER:  We're off the record
25        at 7:26 p.m.
```

1            (Proceedings adjourned sine die at

2     7:26 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T E

2

3    STATE OF TENNESSEE

4    COUNTY OF KNOX

5            I, Rhonda S. Sansom, RPR, CRR, CRC, LCR #685,

6    licensed court reporter in and for the State of

7    Tennessee, do hereby certify that Volume 1 of the above

8    videotaped videoconference deposition of DRUG PROCURER

9    was reported by me and that the foregoing 324 pages of

10   the transcript is a true and accurate record to the

11   best of my knowledge, skills, and ability.

12            I further certify that I am not related

13   to nor an employee of counsel or any of the parties to

14   the action, nor am I in any way financially interested

15   in the outcome of this action.

16            I further certify that I am duly licensed

17   by the Tennessee Board of Court Reporting as a Licensed

18   Court Reporter as evidenced by the LCR number and

19   expiration date following my name below.

20

21            *Rhonda S. Sansom*

22   _____

     Rhonda S. Sansom, RPR, CRR, CRC
23   RhondaSansom@gibsonreporters.     Tennessee LCR# 0685
                          2021.07.27 13:31:24    Expiration Date:   6/30/22
24   Signer:
     CN=RhondaSansom@gibsonreporters.com

25

Case 3:18-cv-01234   Document 184-3   Filed 03/17/22   Page 327 of 327 PageID #: 6387