# EXHIBIT

# 4

# KING

## vs.

## PARKER, et al.

---

## 30(b)(6)

## TONY PARKER

## September 29, 2021

---



Jeannie Chaffin, LCR

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE MIDDLE DISTRICT OF TENNESSEE
2  _____

3  TERRY LYNN KING,

4              Plaintiff,

5
   vs.                              Case No. 3:18-CV-01234
6

7  TONY PARKER, et al.,

8              Defendants.
   _____
9

10

11

12

13
                          30(b)(6) Video Deposition of:
14
                          TONY PARKER
15
                          Taken on behalf of the Plaintiff
16                        September 29, 2021

17                        Commencing at 9:02 a.m.

18

19

20

21
   _____
22
                   Elite-Brentwood Reporting Services
23                  www.elitereportingservices.com
              Jeannie Chaffin, LCR, Associate Reporter
24                     Post Office Box 292382
                     Nashville, Tennessee 37229
25                        (615)595-0073
```

A P P E A R A N C E S

For the Plaintiff:

        MR. ALEX KURSMAN
        MS. LYNNE LEONARD
        Attorneys at Law
        Federal Community Defender Office
        Capital Habeas Unit
        601 Walnut Street
        Suite 545 West, Curtis Building
        Philadelphia, PA  19106
        (215)928-0520
        alex_kursman@fd.org
        lynne_leonard@fd.org

        MR. DAVID R. ESQUIVEL
        MS. SARAH B. MILLER
        Attorneys at Law
        Bass, Berry & Sims, PLC
        150 Third Avenue South
        Suite 2800
        Nashville, TN  37201
        (615)742-6200
        desquivel@bassberry.com
        smiller@bassberry.com

Case 3:18-cv-01234-Brandon Report Filed 06/17/22 Page 4 of 373 PageID #: 6392
Elite Reporting Services (615)595-0073
www.EliteReportingServices.com

```
 1   For the Defendants:

 2               MR. ROBERT MITCHELL
               MR. SCOTT SUTHERLAND
 3               Assistant Attorneys General
               Law Enforcement and Special
 4               Prosecutions Division
               Post Office Box 20207
 5               Nashville, TN  37202
               (615)532-6023
 6               robert.mitchell@ag.tn.gov
               scott.sutherland@ag.tn.gov
 7

 8

 9


10   Also Present:

11               MR. RAMON RYAN
               MS. AUGUSTA SMITH, Videographer
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Elite-Brentwood Reporting Services (615)595-0073
www.EliteReportingServices.com

                          I N D E X

                                                        Page

Examination
By Mr. Kursman                                          8



                    E X H I B I T S

                                                        Page

(None marked.)

1                    S T I P U L A T I O N S

2

3        The 30(b)(6) video deposition of TONY PARKER was taken by

4    counsel for the Plaintiff, at the offices of Bass, Berry & Sims,

5    PLC, 150 Third Avenue South, Suite 2800, Nashville, Tennessee, on

6    September 29, 2021, for all purposes under the Federal Rules of

7    Civil Procedure.

8        All formalities as to caption, notice, statement of

9    appearance, et cetera, are waived.  All objections, except as to

10   the form of the questions, are reserved to the hearing, and that

11   said deposition may be read and used in evidence in said cause of

12   action in any trial thereon or any proceeding herein.

13       It is agreed that JEANNIE CHAFFIN, LCR, Notary Public and

14   Court Reporter for the State of Tennessee, may swear the witness,

15   and that the reading and signing of the completed deposition by

16   the witness was not discussed.

17

18

19

20

21

22

23

24

25

1              *   *   *

2

3         THE VIDEOGRAPHER:  We are now on the

4    record.  Today is Wednesday, the 29th of

5    September 2021, and the time indicated on the

6    video screen is 9:02 a.m.  This is the video

7    deposition of the Tennessee Department of

8    Corrections 30(b)(6) witness, Tony Parker, in

9    the matter of Terry Lynn King versus

10   Tony Parker, et al., case number 3:18-CV-01234

11   filed in the United States District Court for

12   the Middle District of Tennessee.

13         This deposition is being held today

14   at the office of Bass, Berry & Sims at

15   150 Third Avenue South in Nashville, Tennessee.

16   My name is Augusta Smith, the videographer.

17   And the court reporter is Jeannie Chaffin, both

18   in association with Elite-Brentwood Reporting

19   Services.

20         Will counsel please introduce

21   yourselves and state whom you represent.

22         MR. KURSMAN:  Good morning.  My name

23   is Alex Kursman, and I represent the Plaintiff,

24   Terry King.

25         MR. MITCHELL:  Good morning.  My name

1  is Rob Mitchell.  I represent the Defendants,

2  Tony Parker and Tony Mayes, as well as the

3  nonparty, Tennessee Department of Correction.

4          THE VIDEOGRAPHER:  Will the court

5  reporter please swear in the witness.

6          (The Witness was sworn.)

7          MR. MITCHELL:  Alex, do we want to do

8  that preliminary?

9          MR. KURSMAN:  Yeah.  So before we

10  begin I just want to put on the record that

11  Mr. Mitchell and I have agreed that all

12  objections will be subsumed in an objection to

13  the form.  So Mr. Mitchell will just object to

14  the form when appropriate, when he feels it

15  appropriate.

16          MR. MITCHELL:  Other than relevance

17  objections, right?  Those will be reserved for

18  after?

19          MR. KURSMAN:  Sure.

20          I also want to put on the record that

21  we've been entering exhibits in prior

22  depositions.  We are just going to be using

23  those same exhibits in numerical order.

24  ///

25  ///

```
 1                    *   *   *

 2                 TONY PARKER,

 3  was called as a witness and having first been

 4  duly sworn, testified as follows:

 5

 6                 EXAMINATION

 7  QUESTIONS BY MR. KURSMAN:

 8  Q.    Good morning, Commissioner Parker.

 9  A.    Good morning.

10  Q.    Like I said, my name is Alex Kursman, and

11  I represent Terry King, who is the Plaintiff in

12  the case.  It's the case King v. Parker,

13  pending in the Middle District of Tennessee.

14         Do you understand that you're here

15  today to answer questions related to the King

16  case?

17  A.    I do.

18  Q.    And what is your understanding of what

19  that case is about?

20  A.    It's about a challenge of our lethal

21  injection protocol.

22  Q.    And have you ever taken a deposition

23  before?

24  A.    I have.

25  Q.    How many times?
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  A.    Several.  I don't know the exact number.

2  But I would say more than 15.

3  Q.    And what were those 15 cases about, if

4  you can recall?

5  A.    Primarily -- some were employee issues.

6  Some -- I've also given depositions related to

7  the execution protocols in Tennessee.  I've

8  given depositions for different things as it

9  relates to corrections.

10  Q.    And when was the last time that you gave

11  a deposition as it related to the execution

12  protocol in Tennessee?

13  A.    I would say two or three years ago.

14  Q.    And have you ever served as a 30(b)(6)

15  witness before?

16  A.    Not to my knowledge, no.

17  Q.    Okay.  Your attorney may have already

18  gone over a lot of these rules, but I just want

19  to make sure that we are on the same page.

20        Do you understand that you are under

21  oath?

22  A.    I do.

23  Q.    And you understand that means you need to

24  tell the truth to the best of your ability?

25  A.    I do.

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    Q.    And is there any reason you can't testify
2    truthfully today?
3    A.    No.
4    Q.    Is there any reason you can't testify
5    accurately today?
6    A.    No.
7    Q.    Are you taking any medication right now?
8    A.    No.
9    Q.    Are you represented by counsel?
10   A.    I am.
11   Q.    And who is that?
12   A.    The two gentlemen here to my right.  I
13   would ask them to introduce themselves.
14          MR. MITCHELL:  Mr. Mitchell and
15   Mr. Sutherland.
16   BY MR. KURSMAN:
17   Q.    And as I'm sure you're aware, the court
18   reporter is making a record based on what you
19   say.  So you will need to respond to questions
20   verbally rather than nodding your head.
21   A.    I understand that.
22   Q.    And in order for the court reporter to
23   accurately record your testimony, please wait
24   for me to finish my question before you give an
25   answer.

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  A.     Okay.

2  Q.     And I will do the same for you.

3              And if you don't understand a

4  question, just let me know and I will clarify

5  it.  And if you answer a question, I will

6  assume that you understood my question, okay?

7  A.     Okay.

8  Q.     And if you need to take a break at any

9  time, just let me know.

10  A.     Okay.

11  Q.     However, if there's a question pending,

12  I'll ask that you answer that question before

13  we take a break, okay?

14  A.     Okay.

15  Q.     And your lawyer may object to my

16  questions from time to time, but you will still

17  need to answer my question unless the question

18  is based on a privilege assertion or based on a

19  statute.  Do you understand that?

20  A.     I do.

21  Q.     Okay.  And do you have any questions for

22  me?

23  A.     I have none.

24  Q.     Okay.  Now, do you see that you have an

25  exhibit package in front of you?

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  A.     Yes.

2  Q.     Could you turn to Exhibit 69?  And just

3  let me know when you get there.

4  A.     Okay.

5  Q.     And if you go to the third page -- it

6  says page 1 on that exhibit -- it says Schedule

7  A, areas of examination.  Do you see that?

8  A.     Yes.

9  Q.     Do you understand that you are here today

10 to testify on behalf of the Tennessee

11 Department of Correction with respect to each

12 of these topics in Exhibit 69?

13 A.     I do.

14 Q.     Can you tell me what you did to prepare

15 today for your deposition?

16 A.     I've met with my attorneys in this case.

17 I also would rely on my experience as

18 commissioner and the knowledge that I have

19 related to my position as commissioner of

20 Tennessee Department of Corrections to be

21 prepared to testify on these topics.

22 Q.     Who did you meet with?

23 A.     I met with these two gentlemen.

24 Q.     And for how long?

25 A.     Several hours.

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    Q.    How many hours would you say?

2    A.    Probably seven or eight.

3    Q.    And how many meetings did you have?

4    A.    I had two.  Two over two days.  Two

5    sessions over two days.

6    Q.    Okay.  And when were those sessions?

7    A.    The last two days.  So that would have

8    been Monday and Tuesday.

9    Q.    And when you say you spent seven or eight

10   hours, is that a total amount of time you

11   spent?

12   A.    I would be -- I would say we probably

13   spent between five to seven hours the first day

14   on and off with breaks.  And then maybe three

15   to four hours the second day.

16   Q.    Okay.  So it was actually eight to eleven

17   hours total?

18   A.    Approximately.

19   Q.    Okay.  And did you review any documents?

20   A.    I reviewed several documents.

21   Q.    Which documents were they?

22   A.    I reviewed the execution protocol.  I

23   reviewed documents related to storage of

24   chemicals.  Several documents.  I can't recall

25   every document that I've reviewed.

Case 3:18-cv-01234-Brenneman Report Filed 04/17/22 Page 15 of 373 PageID #: 6402
Elite Brenneman Report Services (615) 373-0073
www.EliteReportingServices.com

1  Q.    Okay.  So the two meetings that were
2  yesterday and the day before?
3  A.    That's correct.  And we have -- we have
4  met before.  But I don't remember the exact
5  dates, nor do I remember the time spent in
6  those -- in those meetings.
7  Q.    Sure.  I'm only asking for the -- your
8  preparation for this deposition today.
9  A.    I see.
10  Q.    And you said that you have reviewed
11  several documents.  You so far named the
12  execution protocol and the storage of
13  chemicals.  What other documents did you
14  review?
15  A.    Let me think.  Logs related to
16  accountability of chemicals.  Documents related
17  to the preparation of the drugs.
18        Again, I don't remember every
19  document that I reviewed.  It would be very
20  difficult for me to recall every document that
21  I've reviewed.
22  Q.    Well, how many documents would you
23  estimate that you reviewed?
24  A.    Could have been 15 maybe.  But again, I'm
25  estimating.  I don't remember the exact number.

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1   Q.    Okay.  Did you meet with anyone other

2   than your attorneys to prepare for this

3   deposition?

4   A.    No.  My attorneys have been the people

5   that I've met with.

6   Q.    Okay.  So to prepare for this deposition,

7   for instance, you didn't meet with the warden,

8   let's say?

9   A.    No.

10  Q.    And you didn't meet with anyone else who

11  serves on the execution team at the TDOC?

12  A.    No.

13  Q.    Okay.  And did you meet with anyone else

14  in -- who has a leadership role at TDOC to

15  prepare for this deposition?

16  A.    To --

17  Q.    To prepare for this deposition.  I

18  apologize.

19  A.    No.

20  Q.    Okay.

21  A.    Other -- let me -- let me clarify that.

22  I'm sorry.

23  Q.    Sure.

24  A.    Debbie Inglis, who is a chief legal

25  counsel for the Department.  Debbie was in the

1  meeting that I had with my attorneys, since

2  she's the chief legal counsel for the

3  Department.  So she would be one that would

4  have been also included.

5  Q.    Oh, so Ms. Inglis was in those two

6  meetings the past two days?

7  A.    Correct.

8  Q.    Okay.  And what was her role in those

9  meetings?

10 A.    Her role was to observe and to basically

11 clarify any issues that I may have had or the

12 attorneys may have had.

13 Q.    Okay.  And does she have a title in TDOC?

14 When I say TDOC, I'm talking about the

15 Tennessee Department of Correction.  Does she

16 have a title in TDOC, aside from general

17 counsel?

18 A.    She's the deputy commissioner, chief

19 legal counsel for the Department.

20 Q.    Okay.  And are those two separate

21 positions?

22 A.    Actually not.  She plays a role both as

23 chief legal counsel but also the supervision as

24 a deputy commissioner.

25 Q.    And when she was in those two meetings,

1  was she serving as a deputy commissioner or as

2  chief legal counsel?

3  A.    She was as chief legal counsel.

4  Q.    Did you review the transcripts of any

5  other depositions taken in this case to prepare

6  for this deposition?

7  A.    I reviewed some of my own prior

8  depositions related to a case.  The prior

9  deposition I give related to the protocol a few

10 years ago.  There were discussions during my

11 prep related to some depositions, but I don't

12 -- I don't recall who they were.

13 Q.    Okay.  Why did you review your prior

14 deposition testimony?

15 A.    I felt it was relevant.

16 Q.    Why?

17 A.    Because it's regarding lethal injection

18 protocol and primarily, as I understand, the

19 same question that we're here today for.  Or

20 that this case is built on.

21 Q.    Did reviewing your prior testimony

22 refresh your recollection of any specific

23 issues?

24 A.    In some cases it may have.

25 Q.    Which cases would those be?

1    A.    It could help me refresh my memory

2    related to conversations that I -- or knowledge

3    that I had related to -- prior communications

4    related to selection of our drugs.  The process

5    of establishing the protocol.

6    Q.    And what did -- what did you recall after

7    reviewing those depositions?

8    A.    Well, it would be unfair to say that I

9    recalled an entire subject related to the

10   protocol and how it was established.  There

11   could be elements of how the protocol was

12   established that I recalled.  Such as the

13   people that I relied on and communicated with

14   in my decisionmaking of establishing the

15   protocol and the types of drugs we use.  Things

16   like that.

17   Q.    And can you tell me any specifics about

18   the things you remembered when reading your

19   deposition?

20   A.    I can't -- I can't -- I don't recall

21   those specifics of it, no.

22   Q.    Do you know why you were selected to

23   represent TDOC as its representative?

24   A.    Because I am the commissioner.  And I

25   represent the State in this case.

Case 3:18-cv-01234-Brenda Report Filed 09/17/22 Page 20 of 373 PageID #: 6407
Elite Brenda Document Report Filed 09/17/22 Page (615) 373 PageID #: 6407
www.EliteReportingServices.com

1   Q.    Okay.  And when you received Schedule A,

2   which is in Exhibit 69, did you go through

3   all -- all 29 topics with your counsel?

4   A.    I have.

5   Q.    Okay.  And are you aware that you are

6   required to prepare to discuss the knowledge of

7   TDOC as an entity on all of these topics?

8   A.    I am.

9   Q.    And aside from what we -- what we just

10  discussed, in terms of what you reviewed and

11  who you met with, did you do any additional

12  preparation for any of the specific Topics 1

13  through 29?

14  A.    Well, again, other than relying on my

15  knowledge and history with these topics that

16  are listed, as well as recalling my prior

17  depositions, which is related to these topics,

18  no.

19  Q.    Well, let's go to, like, Topic 2 for a

20  second.  Do you see it says, the manner in

21  which TDOC prepares or/and performs executions

22  under the execution protocol.  Do you see that?

23  Number 2.

24  A.    I do.

25  Q.    Did you think that it was not relevant to

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  speak with members of the execution team to

2  prepare for Topic 2?

3          MR. MITCHELL:  Object to the form.

4          You can answer.

5          THE WITNESS:  Not necessarily.  I

6  have knowledge of the protocol.  I have

7  knowledge of what the Department of Corrections

8  has done to prepare to perform executions under

9  the execution protocol.

10 BY MR. KURSMAN:

11 Q.    Okay.  And let's go to -- let's go to

12 Topic 3.  The creation, drafting, and

13 development of execution protocol.  Do you see

14 that?

15 A.    I do.

16 Q.    Okay.  Do you feel that it wasn't

17 necessary to speak with whatever members

18 created, drafted, and developed the execution

19 protocol to prepare for this deposition?

20          MR. MITCHELL:  Same objection.

21          THE WITNESS:  Again, my knowledge and

22 my involvement in this, along with the

23 individuals who drafted this protocol, I felt

24 like I had sufficient knowledge to testify.

25 ///

1  BY MR. KURSMAN:

2  Q.     Okay.  And let's go to Topic 4.  The

3  decision or the determination to conduct or

4  perform executions utilizing the three-drug

5  protocol.  Is it -- do you have that same

6  answer, that you feel that you have the

7  knowledge to discuss this as well for TDOC

8  without talking to other individuals?

9          MR. MITCHELL:  Same objection.

10          THE WITNESS:  Yes.

11 BY MR. KURSMAN:

12 Q.     And what about Topic 5?  Any steps taken

13 or considered to ensure that prisoners do not

14 experience pain, suffering, anxiety, or

15 distress during an execution.  Do you see that?

16 A.     I do see it.

17 Q.     Okay.  Tell me what you did to prepare

18 for Topic 5.

19          MR. MITCHELL:  Same objection.

20          THE WITNESS:  Again, we reviewed our

21 protocol.  I understand the steps that we take

22 to ensure that prisoners do not experience

23 pain, suffering, anxiety, and distress during

24 the execution pursuant to the execution

25 protocol.

Case 3:18-cv-01234-BTC Document Report Filed 04/17/22 eServices (315) 575-9333 #: 6411
Elite Reporting Services
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    And how about 6?  Any steps taken or

3  considered to monitor or determine whether a

4  prisoner experiences pain.  What did you do to

5  prepare for that topic?

6           MR. MITCHELL:  Same objection.

7           THE WITNESS:  Again, I'm aware of the

8  knowledge that I have of the steps that are

9  built into our protocol that addresses Number

10  6.  And my knowledge of that is what I'm

11  relying on.

12  BY MR. KURSMAN:

13  Q.    So you're relying on your individual

14  knowledge; is that what you're saying?

15  A.    I'm relying on my individual knowledge

16  and my knowledge of the specifics of the

17  protocol.  And the rationale of why those steps

18  were placed in our protocol.

19  Q.    So aside from reviewing the protocol, why

20  didn't you think it was necessary to talk to

21  the TDOC employees who take these steps to

22  monitor or determine whether a prisoner

23  experiences pain?

24           MR. MITCHELL:  Objection.  Form.

25           THE WITNESS:  Would you repeat your

Elite Document Reporting Service (615) 595-0073
www.EliteReportingServices.com

1  question?  I'm sorry.

2  BY MR. KURSMAN:

3  Q.    Sure.  I apologize.

4        Why did you think it was not

5  necessary to talk to TDOC employees to

6  determine the steps taken or considered to

7  monitor or determine whether a prisoner

8  experiences pain?

9        MR. MITCHELL:  Same objection.

10       THE WITNESS:  The same steps that are

11 -- been in place for prior executions are still

12 in place.  My knowledge and my -- my

13 conversations with people, such as the warden,

14 that have taken place in the past, who does the

15 consciousness check.  It's still the same.

16 Nothing's changed there.  And I have knowledge

17 of that.

18       And my experience as commissioner in

19 relation to my communication with the warden in

20 prior cases.  And in -- as well as in

21 executions has not changed.  That has not

22 changed.  So I felt there was no need to go

23 back and talk to the warden again about those

24 steps or anyone else.

25 ///

1  BY MR. KURSMAN:

2  Q.    Okay.  And let's go to Topic 7.  It says

3  any steps taken or considered to ensure that

4  drugs used in connection with the execution

5  protocol are properly injected into a prisoner.

6  What did you do to prepare for that topic?

7          MR. MITCHELL:  Same objection.

8          THE WITNESS:  Again, reviewed --

9  reviewed my notes.  Reviewed information from

10  the pharmacist related to the drugs.  And my

11  knowledge of the protocol as it relates to

12  Number 7.

13  BY MR. KURSMAN:

14  Q.    So when you say you reviewed your notes,

15  which notes are you talking about?

16  A.    I'm sorry.  I said my notes.  I'm talking

17  -- I'm talking about primarily the protocol.

18  Q.    Okay.  And you said you also reviewed

19  notes from the pharmacist?

20  A.    Yeah.  My -- I'm sorry.  Were you

21  finished?

22  Q.    No, no.  Yeah, go ahead.

23  A.    When I said notes, I'm talking about

24  specifically the sheets that they sent related

25  to instructions for the preparation of the

Case 3:18-cv-01234-BR Document Report Filed 03/17/22 Page 26 of 373 Page ID #: 6423
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  drugs.

2  Q.    Oh, you're talking about the sheets that

3  the pharmacist sent to the -- to TDOC related

4  to the preparation of the drugs?

5  A.    Correct.

6  Q.    Okay.  Did the -- did the pharmacist also

7  instruct how to properly inject the drugs into

8  the condemned inmate?

9  A.    The instructions primarily were for how

10  you prepare the -- the items needed for the

11  preparation of the drugs in the -- in the

12  executioner's room, as well as how the drugs

13  are drawn up, mixed with the saline solution

14  for preparation to be pushed into the

15  condemned.

16  Q.    Right.

17        So how would that help with Topic 7,

18  which is any steps taken or considered to

19  ensure that the drugs used in connection with

20  the protocol are properly injected into the

21  prisoner?

22  A.    Well, again, there's steps taken to

23  ensure that we have people who are trained

24  to -- EMTs who start the IVs.  And the

25  individuals who have been trained to connect

Case 3:18-cv-01234-Brienc Document Report Filed 03/17/22 Page 27 of 373 PageID #: 6414
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1   the lines, set up the IV lines, ensure the

2   proper preparation of the drug, the mixing of

3   the drugs in some cases, and how that drug is

4   administered through the IV lines into the

5   offender.  That's --

6   Q.    Sure.  But my question, going over Topic

7   7, just so I'm clear:  You just reviewed the

8   protocol and the instructions from the

9   pharmacist; am I right?

10          MR. MITCHELL:  Object to the form.

11          THE WITNESS:  Let me make sure I

12  understand your question.

13          Again, to ensure -- ensure that drugs

14  used in connection with the execution protocol

15  are properly injected into the prisoner.

16  Again, EMT -- trained EMTs, part the execution

17  team who --

18  BY MR. KURSMAN:

19  Q.    Yeah.

20  A.    Maybe I misunderstood the question.

21  Q.    Yeah, I'm sorry.  I'm just asking what

22  materials you reviewed to prepare for this

23  topic.  I'm not asking how they do it.  All I'm

24  asking is what materials you reviewed to

25  prepare for Topic 7.

1  A.    Again, the instructions from the

2  pharmacist, as well as the protocol itself.

3  Q.    Okay.  And let's go to Topic 8.  Do you

4  see Topic 8?

5  A.    Yes.

6  Q.    What did you review to prepare for Topic

7  8?

8  A.    Again, my experience as commissioner, as

9  well as the protocol itself.

10  Q.    Do you -- do you know what a paradoxical

11  reaction is?

12  A.    I do.

13  Q.    Okay.  And can you describe what a

14  paradoxical reaction is?

15  A.    Paradoxical reaction is a -- would be --

16  may I give you an example?  Would that be

17  appropriate?

18  Q.    Sure.

19  A.    So let's say, for instance, the use of a

20  drug that is designed and -- for its intended

21  purpose to sedate you and make you unconscious,

22  that it would have the adverse effect and make

23  you hyperactive and more alert.  That would be

24  an example of a paradoxical effect.

25  Q.    So for Topic 8 was there anything that

1  you reviewed, aside from the protocol itself

2  and the pharmacy instructions, to prepare for

3  Topic 8?

4  A.     No.  Other than my personal knowledge of

5  what that subject is talking about.

6  Q.     Okay.  And how about Topic 9, anything

7  other than the protocol and the pharmacy

8  instructions?

9  A.     Other than my experience in witnessing

10  executions and the fact that -- the things that

11  I previously mentioned, no.

12  Q.     Okay.  And what about Topic 10?

13  A.     Again, I relied on my knowledge and my

14  conversations that I had with individuals upon

15  establishing the three-drug protocol that we're

16  currently talking about with use of midazolam,

17  as well as my experience in witnessing the

18  actual executions in the state of Tennessee

19  with the use of midazolam.  That's what I'm

20  relying on.

21  Q.     And when you're saying your conversation

22  with individuals, you're talking about your

23  conversations with individuals at some point

24  prior to time, not to -- not in preparation for

25  this deposition today, right?

ELITE Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  A.    That would be correct.

2  Q.    Okay.  And how about 11?  Did -- for

3  that, is it only -- to prepare for Topic 11,

4  did you only review the protocol and the

5  pharmacy instructions as well?

6  A.    That's correct, as well as my knowledge

7  of that subject matter.

8  Q.    Okay.  And is that the same for Topic 12

9  as well?

10  A.    Correct.

11  Q.    Okay.  Did you review anything other than

12  the protocol and the pharmacy instructions for

13  Topic 13?

14  A.    And that's correct.  But I want to make

15  sure I'm clear.  The -- and as I've stated,

16  I've reviewed a lot of stuff.  The documents

17  that I -- when we say just the pharmacy

18  instructions and the protocol, there could be

19  other documents, too.  But sitting here now, I

20  can't recall every document that I've reviewed.

21  Q.    Okay.  You said there may have been 15

22  documents and that the only ones you can recall

23  right now are two, even though you reviewed

24  them yesterday and the day before?

25  A.    That's -- again, I reviewed several

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1   documents.  But it's hard for me to recall

2   every specific one I -- that I've looked at.

3   Q.    Okay.  Do -- but you didn't talk -- did

4   you talk to any other individuals for any of

5   these topics, aside from your two attorneys who

6   are in the room today?

7   A.    The two attorneys in the room.  As -- I

8   had -- I talked to the executioner.

9   Q.    Oh, you did talk to the executioner --

10  A.    I did.

11  Q.    -- after -- after receiving this, in

12  preparation for?

13  A.    Yes, I did.  That's correct.

14  Q.    And when did you talk to the executioner?

15  A.    I talked to the executioner yesterday.

16  Q.    Okay.  How long did you talk to the

17  executioner for?

18  A.    Probably -- maybe 15 minutes.

19  Q.    Why did you talk to the executioner?

20  A.    There was a discussion related to the

21  preparation of the drugs itself, how they were

22  drawn up.

23  Q.    And what did you and the executioner

24  discuss specifically?

25  A.    Just the general concepts of, again,

Case 3:18-cv-01234-BJD-PDB Document Report File 08/17/22 e Page 32 of 373 PageID #: 6410
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  going over the summary of how the midazolam,

2  vecuronium, and potassium chloride are drawn

3  up.  And the two different sets of chemicals.

4  Q.    And what did you ask the executioner?

5  A.    I clarified related to some issues -- I

6  say issues.  Some questions I had to confirm

7  the aseptic technique, as well as the use of

8  saline.  What order -- how the midazolam was

9  mixed, the timing of the midazolam, things like

10  that.

11  Q.    And what did the executioner tell you in

12  response to those questions?

13        MR. MITCHELL:  Object to the form.

14        You can answer.

15        THE WITNESS:  Yeah.  He went over and

16  confirmed some of the information related to

17  the aseptic technique process.  How saline was

18  used to mix the midazolam, the number of

19  syringes, the process that the executioner used

20  to push the drug.  Talking about, you know,

21  times that -- you know, how each individual is

22  different.  And things that -- things that he

23  confirmed that I thought that I already knew.

24  And as well as with the midazolam -- when it's

25  mixed, how it's mixed.  Vecuronium and the

Case 3:18-cv-01234-BJD-PDB Document 184 Filed 09/17/22 Page 33 of 373 PageID #: 6420
ELITE Brenda Report Reporting Services (315) 575-0093
www.EliteReportingServices.com

1  potassium chloride.

2  BY MR. KURSMAN:

3  Q.    Okay.  Can you describe for me what the

4  executioner told you was his process for

5  pushing the drugs?

6            MR. MITCHELL:  Form objection.

7            You can answer.

8            THE WITNESS:  Yeah.  So the

9  executioner followed the protocol.  The -- I

10  mean, do you want me to go through the whole

11  process of the warden --

12  BY MR. KURSMAN:

13  Q.    No.  What I'm asking is about your

14  conversation with the executioner yesterday.

15  And what I'm asking is what you said you asked

16  him.  You wanted to clarify how he pushed the

17  drugs.

18  A.    Okay.

19  Q.    So what my question is, what was his

20  response yesterday?  How does he push the

21  drugs?  What was his response?

22  A.    So he basically advised that he follows

23  the protocol as written.  And he also follows

24  the steps, as far as the order of the drugs.

25  He talked about the difference in individuals.

1    The flow of the drug.  How it could be, you
2    know, different for different individuals.  He
3    talked about the observation of, you know,
4    ensuring he had the right order of the drugs.
5    There were several things.
6    Q.    Right.
7           But my question is just, what is his
8    -- what did he say his technique was for
9    pushing the drugs?  Because you said you asked
10   him what his technique was for actually pushing
11   the drugs.  And I just want to know what his
12   response was to that.
13   A.    I think his response was a slow, steady
14   push of the drugs without resistance.
15   Q.    Okay.  And did you ask him any follow-ups
16   as to how he would know that was correct?
17   A.    No, I did not.
18   Q.    Okay.  And did -- and did you talk to
19   anyone else aside from the executioner?
20   A.    Not that I recall.
21   Q.    Okay.  And how about for Topic 14?  Did
22   you do anything else, other than what you've
23   described already as to prepare for Topic 14?
24   A.    No.
25   Q.    Okay.  And what about Topic 15?

1   A.     No.  Other than what I've described.

2   Q.     Okay.  And did you do anything, other

3   than what you've described, to prepare for

4   Topic 16?

5   A.     No.

6   Q.     Did you -- so for Topic 16 did you -- did

7   you speak with the warden to prepare for Topic

8   16?

9   A.     No.  Other than, again, prior

10  discussions -- I've had prior discussions with

11  a lot of people.  But in specific preparation

12  for this, no.

13  Q.     Okay.  And that's all I'm asking --

14  A.     Okay.  I understand.

15  Q.     -- is in specific preparation for this.

16          And how about Topic 17?  Anything

17  other than what you have previously described?

18  A.     Again, other than what I've previously

19  described, as well as my communication with the

20  attorneys, with the Attorney General's office.

21  Q.     And what do you mean by other than your

22  communication with the Attorney General's

23  office?

24  A.     I mean, just that.  The meetings that

25  I've had over the last two days, as well as

Case 3:18-cv-01234-Brickmont Reporting Services Page 36 of 373 PageID #: 6424
www.EliteReportingServices.com

1  reviewing protocol and documents that I've

2  reviewed.

3  Q.    Okay.  And when you had these meetings

4  with the Attorney General's office, did you

5  discuss any nonlegal matters?  And what I mean

6  by that is, decisions to come up with the

7  three-drug protocol, were they involved in

8  those decisions?

9           MR. MITCHELL:  I'm going to object

10  and instruct the witness not to answer the

11  question.

12           MR. KURSMAN:  Can -- Mr. Mitchell,

13  can you describe why?  I'm only asking what his

14  preparation was for some of these topics.  And

15  if the Attorney General's office acted as

16  non-attorneys on some of these to come up with

17  the protocol rather than providing with legal

18  advice, that would be certainly an appropriate

19  question.

20           MR. MITCHELL:  So I think it's fair

21  to ask him if when developing the protocol, he

22  consulted with the Attorney General's office.

23  But I think -- let's chop it up a little bit,

24  and that might be easier to proceed --

25           MR. KURSMAN:  Well --

1    MR. MITCHELL:  -- if that's what
2  you're asking about.
3    MR. KURSMAN:  I'm not.
4  BY MR. KURSMAN:
5  Q.    But what I'm asking is, in your meetings
6  with the Attorney General's office yesterday,
7  did they give -- remind you of how -- of how --
8  or did they give you background information on
9  how to prepare for any of these topics?
10 A.    No.  I had -- it's information that I had
11 and relied on myself.
12 Q.    So, for instance, did they remind you how
13 midazolam -- how Tennessee decided to use
14 midazolam?
15 A.    No.  That's -- that's -- the information
16 that was discussed was my recollection of that
17 and how that decision was made.
18 Q.    Okay.  And did you discuss with them how
19 Tennessee decided to use midazolam?
20 A.    That was a topic of discussion in
21 relation to my involvement in that process,
22 when the decision was made in Tennessee to move
23 to a three-drug protocol.
24 Q.    But aside from your involvement, your
25 personal involvement, what I'm asking about is

Case 3:18-cv-01234-Document Report Filed 04/17/22 e Page 38 of 373 Page ID #: 6426
Elite Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1   TDOC's decision to do so.  You said Ms. Inglis
 2   was in the room as well.  Did you and her have
 3   discussions during this meeting on why you
 4   decided to switch to a three-drug protocol?
 5           MR. MITCHELL:  I'm going to object to
 6   the form.
 7           But I think you can answer.
 8           THE WITNESS:  And I'm having a little
 9   difficult time understanding what your specific
10   question is.
11           Debbie Inglis was in the room when
12   these discussions took place.  I discussed the
13   process that I went through, along with -- in
14   making the decision for the protocol that's
15   currently in place that uses the three-drug
16   protocol.
17   BY MR. KURSMAN:
18   Q.   Right.  But -- I'm sorry.  My question
19   might be a little confusing.
20           MR. MITCHELL:  Can we go off the
21   record real quick?
22           MR. KURSMAN:  Sure.
23           THE VIDEOGRAPHER:  One moment,
24   please.  Going off the record at 9:40 a.m.
25           (Off-the-record discussions.)
```

Case 3:18-cv-01234-Brown Document Report Filed 03/17/22 Page 39 of 373 PageID #: 6426
Elite Court Reporting Services (901) 573-0075
www.EliteReportingServices.com

1          THE VIDEOGRAPHER:  Back on the record

2     at 9:42 a.m.

3     BY MR. KURSMAN:

4     Q.    Before we went off the record, I was

5     asking about how you prepared for this

6     deposition.  And I think I was asking it a bit

7     unartful.

8               What I want to know is, aside from

9     knowing what you personally did to choose

10    midazolam in the three-drug protocol, who else

11    did you talk to to figure out why TDOC, as an

12    entity, chose midazolam as the three-drug

13    protocol?

14    A.    In preparation for this deposition?

15    Q.    In preparation for this deposition.

16    A.    Again, I talked to -- well, the meeting

17    that I had with the attorneys, with

18    Debbie Inglis in the room, as well as my

19    knowledge of why that decision was made years

20    ago and my involvement in that.  That's what I

21    relied on to be prepared to testify in relation

22    to the topics you just mentioned.

23    Q.    Okay.  And did you have any conversations

24    with Ms. Inglis in the meetings the last two

25    days about why you switched from the one drug

Case 3:18-cv-01234-Document Reporter Filed 03/17/22 Page 40 of 373 PageID #: 6428
Elite Court Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  to the three-drug protocol?

2  A.    I mean, there was discussion about the

3  movement from the one drug to the three drug,

4  but I had personal knowledge of that.  And I

5  would not have had a reason to ask

6  Debbie Inglis why I made the decision to go

7  from the one drug to the three drug, because I

8  knew.  I mean, I already know that.

9  Q.    Well, while you were at these two

10 meetings the last two days, did Ms. Inglis or

11 anybody else remind you of why you moved from

12 the one drug to the three-drug protocol?

13 A.    It could have -- she could have discussed

14 the issue of pentobarbital not being available.

15 That could have come out in discussion.  But it

16 was something that I already knew, obviously.

17        So again, there could have been a

18 discussion, or she could have said that.  But

19 certainly it's not anything I would have relied

20 on to prepare to testify on this.

21 Q.    How about the decision that midazolam --

22 TDOC's decision that midazolam could be used

23 safely in an execution, did you discuss that

24 yesterday?

25 A.    Not that I recall.

1   Q.     Did you discuss that on Monday?

2   A.     Not that I recall.

3   Q.     Okay.  So aside from reviewing the

4   protocol and the pharmacy instructions and some

5   other documents that you can't recall right

6   now, was there anything else you did to prepare

7   for today to talk about TDOC's decision that

8   midazolam could be safely used in an execution?

9   A.     Other than relying on my knowledge and

10  conversations that I had had in the past that

11  are, in my opinion, still relevant today

12  related to the use of midazolam and the

13  three-drug protocol, no.

14  Q.     Okay.  And would that be the same for

15  Topic 18?

16  A.     That's correct.  Including my -- again,

17  the -- my experience and my knowledge of the

18  pharmacy services agreement that we currently

19  have in place for the pharmacy to provide the

20  drugs.

21  Q.     Okay.  So is that another document you

22  reviewed, the pharmacy services agreement?

23  A.     Yeah.

24         When I say protocol, I consider that

25  as part of the protocol that I look -- as far

Case 3:18-cv-01234-Brien Document Report Filed 09/17/22 Page 42 of 373 PageID #: 6420
Elite Reporting Services (415) 373-0073
www.EliteReportingServices.com

1  as attachments that's in the protocol.

2  Q.    Okay.  And for Topic 18, for instance, do

3  you think you're the person at TDOC with the

4  most information on this topic?

5          MR. MITCHELL:  Object to the form.

6          THE WITNESS:  No, I wouldn't say

7  that.  Probably the drug procurer has more

8  contact with the pharmacy than I do.

9  BY MR. KURSMAN:

10 Q.    Okay.  So why did you decide not to talk

11 to the drug procurer about Topic 18, to talk

12 about Topic 18?

13 A.    Well, I've had many conversations with

14 the drug procurer relating to this topic but

15 not necessarily in preparation for this

16 conversation today.  And I don't -- and that

17 information -- the drugs are still the same.

18 They still use the same pharmacist; the same

19 protocol is still in place.  So I saw no reason

20 to do that.

21 Q.    Okay.  And what about Topic 19, did you

22 -- did you review anything else, other than

23 what you've previously told us, to prepare for

24 Topic 19?

25 A.    No.

1   Q.    Okay.  And do you think that you are the

2   person at TDOC with the most information on

3   this topic, Topic 19?

4   A.    Well, the warden would definitely be the

5   individual who would -- they are the ones who

6   select this, as well as the execution team at

7   the facility.  But again, I'm very familiar

8   with that process.  And it's also -- that

9   process is included in the execution protocol

10  for the selection of team members and how

11  that's laid out.

12  Q.    So why did you decide not to talk to the

13  warden to prepare to talk about Topic 19?

14            MR. MITCHELL:  Object to the form.

15            THE WITNESS:  Well, again, I felt

16  like that I had an understanding of how the

17  team members were selected and how that process

18  worked.

19  BY MR. KURSMAN:

20  Q.    And for Topics 20 to 29, did you review

21  anything else to prepare for those topics,

22  aside from what we've discussed?

23            MR. MITCHELL:  Object to the form.

24            You can answer.

25            THE WITNESS:  Other than the -- in

ELITE Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    the alternative methods that are included here,

2    me discussing with the Attorney General's

3    office the issues that I have with these

4    alternative methods, as well as clarifying that

5    the -- none of these methods are approved by

6    the General Assembly as a form of execution for

7    Tennessee prisoners, as well as these methods

8    in most cases are not currently being used

9    in -- as well as some discussions with other

10   people that would have -- well, strike that.

11          People that are responsible in other

12   states for executions that these methods have

13   not been used.  That would be all that I've

14   done to prepare for this.

15   BY MR. KURSMAN:

16   Q.    So let me unpack that a little.

17          So are you saying that you had

18   discussions with people in other states in

19   preparation for this deposition?

20   A.    I'm saying I had discussions related to

21   say, for instance, a cocktail, oral cocktail,

22   and is that a method that's used in other

23   states.  Do you know -- you know, is anyone

24   using that for lethal injection or for

25   execution purposes.  Things like that.

 1  Q.    Who did you have discussions with?

 2  A.    I had discussions with --

 3           MR. MITCHELL:  And I'm going to

 4  interpose an objection based on DE-107, the

 5  protective order.

 6           If you can describe it without giving

 7  names, let's maybe start there --

 8           THE WITNESS:  Yeah, I can describe

 9  it --

10           MR. MITCHELL:  -- without kind of

11  identifying individuals.

12           THE WITNESS:  Other directors and

13  commissioners of corrections.

14  BY MR. KURSMAN:

15  Q.    In which states?

16           MR. MITCHELL:  And I'm going to,

17  again, object pursuant to protective order and

18  instruct the Commissioner not to answer that

19  question.

20           MR. KURSMAN:  I'm only asking what he

21  did to prepare for this deposition.  I'm not

22  asking what was used to prepare for the

23  execution protocol itself.  There's nothing

24  that's protected by that in DE-107.

25  ///

Case 3:18-cv-01234-Brenner Report Filed 04/17/22 Page 46 of 373 PageID #: 6484
ELITE Document Reporting Services (405) 595-7000
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    My only questions are who you talked to

3  to prepare for this execution -- for this

4  deposition.  So did you talk to the director of

5  prisons in Texas or somewhere else?  That would

6  certainly be an appropriate answer to tell me.

7  And I'm not asking in preparation --

8  A.    Okay.

9  Q.    -- I'm asking in preparation for this

10 deposition.  Not who you talked to to come up

11 with Tennessee's protocol.  Just in preparation

12 for this deposition.

13 A.    So if I -- if I say the state, you're

14 going to know the person, individual

15 specifically, that I discussed this with.  You

16 understand that?

17 Q.    Sure.  And that's actually what I'm

18 asking for.

19         MR. MITCHELL:  And so I'm going to

20 object and instruct him not to say what state.

21 If we can maybe -- some of this may be resolved

22 if we can -- if we can impose, kind of like,

23 timing.  You can ask the timing, when these

24 discussions happened.

25         MR. KURSMAN:  Right.  Sure.

1  BY MR. KURSMAN:

2  Q.    So I'm only asking in preparation for

3  this deposition today, who you spoke with in

4  preparation for this, so.

5  A.    Okay.  So let me -- you know -- all

6  right.  So specifically in preparation for --

7  yeah.  My discussions with other directors in

8  other states relating to the execution

9  protocols that they use or that I use centers

10  around the methods that they use, the drugs

11  they use; those that use electrocution, those

12  that do not.  Those that have alternative

13  methods other than what are common, which is

14  the three-drug protocol or the -- in most

15  cases.  Or the death by electrocution.

16        Those -- I guess those discussions

17  happened not necessarily in preparation for

18  this testimony.  So I'm aware --

19  Q.    One of the things you testified to that

20  was -- you said, I spoke with somebody at the

21  different department of corrections about an

22  oral cocktail to prepare for today.  So --

23  A.    Well, I would need to clarify that.  I

24  don't know that I necessarily spoke to them in

25  preparation for this particular deposition.

Case 3:18-cv-01234-Brown   Document Report Filed 09/17/22   Page 48 of 373   PageID #: 6485
Elite Reporting Services   (815) 575-9023
www.EliteReportingServices.com

1  The discussions of oral cocktails, the
2  discussions of other alternatives to executions
3  come up.  They come up in conferences that I
4  have with other corrections directors.  But to
5  say that I purposely sought out a director
6  regarding oral cocktail or a bullet to the back
7  of the head would be inaccurate.
8  Q.    Okay.  So let me ask a few questions.
9          After receiving this Schedule A,
10 areas of examination, did you speak with any
11 directors in other prisons?
12 A.    I could have.
13 Q.    Okay.
14 A.    And the reason -- the reason I say that
15 is, we had a conference here in Nashville in
16 August, second week in August.  And we -- I
17 spoke to a lot of directors.  The issue of --
18 the issue of executions were part of some of
19 those discussions.
20 Q.    Did you speak with any of these
21 directors, though, to prepare for your
22 testimony today?
23 A.    Again, no.  I would not say that I spoke
24 to them specifically to prepare for my
25 testimony.

Case 3:18-cv-01234-Brief Document Report Filed 03/17/22 e Page (49) 573 Page ID #: 6486
Elite Reporting Services
www.EliteReportingServices.com

1    Q.    Okay.  Let's go to Topics 26, 27, 28, and

2    29.  Do you see that?  They are all -- and also

3    25.  Do you see they are all related to getting

4    different lethal injection chemicals?

5              MR. MITCHELL:  Object to the form.

6              You can answer.

7    BY MR. KURSMAN:

8    Q.    And my question -- my question is for

9    Topics 25, 26, 27, 28, and 29.  Do you think

10   you're the person at TDOC with the most

11   information on these topics?

12             MR. MITCHELL:  Object to the form.

13             You can answer.

14             THE WITNESS:  No, I do not.

15   BY MR. KURSMAN:

16   Q.    Okay.  And who do you think the person is

17   at TDOC that has the most information on these

18   topics?

19             MR. MITCHELL:  Same objection.

20             You can answer.

21             THE WITNESS:  It would be the drug

22   procurer.

23   BY MR. KURSMAN:

24   Q.    Is there a reason you didn't speak with

25   the drug procurer to prepare for Topics 25

Case 3:18-cv-01234-Document Report - Filed 03/17/22 - Page 50 of 373 PageID #: 6487
Elite Reporting Services, LLC * (615) 595-0073
www.EliteReportingServices.com

1  through 29?

2  A.    No.

3  Q.    Okay.  And if you go back on this same --

4  same notice, if we go back to Topics 11, 12 --

5  11 and 12, do you think you're the person at

6  TDOC with the most information on those topics?

7          MR. MITCHELL:  Object to the form.

8          You can answer.

9          THE WITNESS:  Repeat the question.

10  Do I think -- I'm sorry.

11  BY MR. KURSMAN:

12  Q.    You're the individual at TDOC with the

13  most information on those topics --

14          MR. MITCHELL:  Same objection.

15  BY MR. KURSMAN:

16  Q.    -- Topics 11 and 12?

17          MR. MITCHELL:  Same objection.

18          THE WITNESS:  I would not say I'm the

19  person with the most direct knowledge, no.

20  BY MR. KURSMAN:

21  Q.    Okay.  And who would that person be?

22  A.    That would be the drug procurer, as well

23  as the executioner.

24  Q.    And why didn't you talk to the drug

25  procurer to prepare for Topics 11 and 12?

1          MR. MITCHELL:  Same objection.

2          THE WITNESS:  Again, I would rely on

3    the protocol, as well as the information that I

4    have available to me as commissioner.

5    BY MR. KURSMAN:

6    Q.    Okay.  If we go back to Topics 5, 6, and

7    7, do you think you're the person at TDOC with

8    the most information on these topics?

9          MR. MITCHELL:  Object to the form.

10          THE WITNESS:  I don't know that I

11   would have the most information or the -- I

12   guess depends on how you -- you know, what your

13   definition of qualified is.  But obviously I --

14   if we talk about steps taken to ensure patients

15   do not experience pain, suffering, anxiety,

16   distress, there's a lot of things bundled up in

17   that -- in that Number 5 that could be broken

18   down to individual acts or responsibilities as

19   it relates to the protocol that other

20   individuals do personally that I do not.

21          I'm familiar with the process, but I

22   don't know that I'm the most -- person with the

23   most experience for that topic.

24   BY MR. KURSMAN:

25   Q.    Who do you think would be the most

Elite Court Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  experienced?

2  A.    Depends --

3        MR. MITCHELL:  Object to the form and

4  also pursuant to the protective order.

5        If you can answer without giving

6  away, like, a name...

7        THE WITNESS:  It would depend on the

8  specific area.  Can you give me an example?

9  BY MR. KURSMAN:

10 Q.    Sure.  Any -- so for Topic 5 we have any

11 steps taken to ensure that a prisoner does not

12 experience pain during an execution.  Do you

13 think that you are the person at TDOC with the

14 most information on this topic?

15 A.    I think I'm the person who is responsible

16 for the protocol that's currently in place

17 that -- that uses the drugs that we use, as far

18 as, you know, if we talk about the

19 consciousness check and who's responsible for

20 that.  Obviously the warden does that directly.

21 I would not have the same information that the

22 warden would have or the experience that the

23 warden would have.  But --

24 Q.    And is there a reason you didn't speak

25 with the warden to prepare for your testimony

Case 3:18-cv-01234  Document 161-4  Filed 03/17/22  Page 53 of 373 PageID #: 6440
Elite Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1  today?

2  A.    Well, it would be the same answer as

3  before, is that the process hasn't changed.

4  I've had prior discussions with the warden but

5  not necessarily in preparation for this -- for

6  this deposition.  But those discussions

7  centered around the topics that ensure that the

8  inmate does not experience pain and checking

9  for consciousness, things like that.

10 Q.    And how about -- and I will be done with

11 this in a second.  How about Topic 14, why TDOC

12 made the determination to use a paralytic as a

13 second drug in a three-drug protocol, do you

14 think anyone at TDOC would know more

15 information than you on that topic?

16 A.    As to why we selected that protocol, I'm

17 not sure that they would.

18 Q.    Okay.  Let's move on to exhibit -- you

19 know, let's not move on to exhibit -- let's

20 move on to Exhibit 1.  Do you see -- do you see

21 Exhibit 1?

22 A.    Yes.

23 Q.    And this is titled Lethal Injection

24 Execution Manual, Execution Procedures for

25 Lethal Injection?

Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    A.    Yes.

2    Q.    This is what we've been referring to as

3    the protocol, right?

4    A.    That's correct.

5    Q.    Are the instructions in the protocol

6    mandatory?

7              MR. MITCHELL:  Object to the form.

8              You can answer.

9              THE WITNESS:  The instructions in the

10   protocol are just as they've written -- as is

11   written here.  It's a guide for the warden to

12   utilize in the -- in carrying out lethal

13   injection in the state of Tennessee.

14   BY MR. KURSMAN:

15   Q.    When you say it's a guide, my question

16   is, do they have to follow the instructions in

17   this protocol?

18   A.    Yes.  They're required and expected to

19   follow the protocol, yes.

20   Q.    So can any member of the execution team

21   deviate from the protocol?

22              MR. MITCHELL:  Object to the form.

23              You can answer.

24              THE WITNESS:  Well, I don't know

25   that -- let me think about that.  You know, I

Case 3:18-cv-01234-Document Report Filed 09/17/22 Page 55 of 373 PageID #: 6442
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  don't know that I would call it deviate.  The
2  spirit of the protocol is written to ensure
3  that individuals sentenced to death that are
4  executed by lethal injection, that process is
5  carried out using this manual as a guideline to
6  do that in the most humane, constitutionally
7  protected way possible.
8           And I'll try to answer your question
9  by giving you an example.  If the protocol
10 talks about a -- you know, a 7 o'clock start
11 time or this -- mentions different times that
12 different events will take place, there could
13 be an unforeseen event that occurs that delays
14 that time.  And if that time is delayed,
15 obviously -- let's say the process of -- you
16 know, beginning -- a process at 7 o'clock
17 started at 7:05 because of a -- of an issue at
18 -- with the strap-down team.  Obviously --
19 BY MR. KURSMAN:
20 Q.    Who decides -- who decides whether the
21 execution team can deviate?
22           MR. MITCHELL:  Object to the form.
23           THE WITNESS:  Well, let me finish my
24 answer, if you don't mind.
25           So that would require the -- a

1    deviation -- as you say a deviation.  I would

2    say an adjustment.  A necessary adjustment that

3    would be -- have to be made by the warden.  He

4    wouldn't stop the process at that time and call

5    me.  It would continue on because of an

6    unforeseen event.

7            So that's an example of how it could

8    be different than what is written here.

9    BY MR. KURSMAN:

10   Q.    Sure.

11           But who decides whether the execution

12   team can deviate from what's written in the

13   protocol?

14           MR. MITCHELL:  Object to the form.

15           THE WITNESS:  Again, adjustments take

16   place during the process.  The warden is in

17   charge with -- of that -- of the process in the

18   -- in the chamber.  The warden -- and if he has

19   to make adjustments, can make particular

20   adjustments.

21           But I want to be clear that those

22   adjustments -- he does not have the authority

23   to make the adjustment, as he knows, to avoid

24   the consciousness check.  Or to -- you know, if

25   he sees a sign of the inmate being conscious,

1  to continue on with the process.

2  BY MR. KURSMAN:

3  Q.   So how does he know which instructions he

4  can deviate from and which instructions he has

5  to follow?

6        MR. MITCHELL:  Object to the form.

7        THE WITNESS:  Again, he follows the

8  execution protocol.  Tony Mayes is a -- almost

9  a 38-year professional in corrections.  He's a

10  leader.  He's -- has extensive knowledge in

11  corrections and -- as well as in the execution

12  protocols for lethal injection, as well as

13  electrocution.  He's carried out multiple

14  executions.  And his experience and his

15  knowledge of the intent of the protocol and

16  those things that are appropriate for an

17  adjustment and those things that are not, he

18  has knowledge of that.

19        And he also has direct contact with

20  the commissioner onsite during this process.

21  Should he have an issue that he's not aware of,

22  he could reach out to me at any time.

23  BY MR. KURSMAN:

24  Q.   Is it TDOC's position that only the

25  warden can deviate from the protocol, or can

Case 3:18-cv-01234 Document Report Filed 09/17/22 Page 58 of 373 PageID #: 6445
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  other members of the execution team also

2  deviate from the protocol as they see fit?

3          MR. MITCHELL:  Object to the form.

4          THE WITNESS:  Again, you use the word

5  deviate.  I use the word to make adjustments.

6  There may be adjustments that could be

7  required -- let me say minor adjustments.  And

8  by minor adjustments, I could give you an

9  example that might not go word for word with

10 what the protocol says.  But they do not

11 violate the spirit of the protocol, of what the

12 protocol is intended to accomplish.

13 BY MR. KURSMAN:

14 Q.    Okay.  You said you could give me an

15 example?

16 A.    Okay.  So, for example, of -- again, the

17 adjustment in time of where the protocol says

18 X, Y, and Z starts at 7 o'clock or 5 o'clock.

19 Or you may have a delay.  Somebody may be

20 delayed.  Or you may have an issue with a

21 particular --

22 Q.    What about an adjustment of preparing the

23 drugs, would that be an appropriate deviation

24 that members of the execution team could

25 decide?

1          MR. MITCHELL:  Object --

2          THE WITNESS:  Give me an example.

3          MR. MITCHELL:  I'm sorry.

4          THE WITNESS:  Give me an example.

5    BY MR. KURSMAN:

6    Q.    Sure.  Let's say the execution team

7    decides they only need to prepare one set of

8    drugs, even though the protocol requires two.

9    Would that be an appropriate deviation?

10          MR. MITCHELL:  Objection to the form.

11          You can answer.

12          THE WITNESS:  The preparation for the

13   drugs, that would be -- we prepare two sets of

14   drugs.  So an adjustment of -- like that I

15   would have to look at the details or know the

16   details of something like that.  Again, delay

17   -- a delay of preparing the second set might be

18   appropriate for certain reasons.

19   BY MR. KURSMAN:

20   Q.    But my question is a little more direct,

21   which is just if members of the execution team

22   decided they only wanted to prepare one set of

23   drugs rather than two, is it TDOC's position

24   that that would be an appropriate deviation or

25   adjustment?

Elite Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  A.    No.

2          MR. MITCHELL:  Form objection.

3          You can answer.

4          THE WITNESS:  The protocol calls for

5  preparation of two sets of drugs.  So we --

6  BY MR. KURSMAN:

7  Q.    If a member of the execution team wants

8  to deviate or adjust from the protocol, what do

9  they have to do?  Is there a chain of command

10  they have to go up?

11         MR. MITCHELL:  Form objection.

12         You can answer.

13         THE WITNESS:  Again, for minor

14  adjustments that need to be made, the warden is

15  certainly carrying out that process within the

16  chamber.  Again, for the -- a member of the

17  execution team to say that we do not -- I'm

18  just not -- we're not going to prepare a second

19  set of drugs, a backup set, would not be

20  appropriate.

21  BY MR. KURSMAN:

22  Q.    Okay.  Is TDOC aware of whether -- aside

23  from timing that you just mentioned, aware of

24  whether members of the execution team have

25  deviated in the past from the execution

1  protocol?

2         MR. MITCHELL:  Objection to the form.

3  And also, Alex, what topic of examination is

4  that related to?

5         MR. KURSMAN:  I believe it's -- that

6  would be 2, the manner in which they perform

7  executions under the execution protocol.

8         MR. MITCHELL:  I'm going to object

9  and say that's outside the scope.

10         But you can answer.

11         THE WITNESS:  Would you repeat the

12  question, please?

13  BY MR. KURSMAN:

14  Q.    Sure.

15         Is TDOC aware of any times -- aside

16  from the timing that you just mentioned, aware

17  of any times that members of the execution team

18  have deviated from the protocol?

19         MR. MITCHELL:  Same objection.

20         You can answer.

21         THE WITNESS:  When you say other than

22  timing, TDOC is not aware of any deviation, as

23  you say, or adjustments from the protocol that

24  violate the spirit or the intent of the

25  protocol.

Elite Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1    BY MR. KURSMAN:

2    Q.    And when you say violate the spirit or

3    intent of the protocol, what do you mean by

4    that?

5    A.    I mean the process as laid out.  The

6    major components of the -- of the execution

7    protocol that speak to the -- the chemicals

8    used, the process of -- of --

9    Q.    So is it --

10   A.    The amount --

11   Q.    Is it TDOC's position that members of the

12   execution team can deviate or adjust from the

13   protocol, so long as it does not violate the,

14   quote/unquote, spirit or intent of the

15   protocol?

16          MR. MITCHELL:  And I'm going to,

17   again, say form objection, also outside the

18   scope.

19          You can answer.

20          THE WITNESS:  No, it's not.  Again,

21   there are things that happen during an

22   execution that could require an adjustment,

23   that could require a delay in some cases.  But

24   those adjustments, again, are not what I would

25   consider a major adjustment that would violate

1  the spirit or the intent of the protocols.

2  BY MR. KURSMAN:

3  Q.    And what would you consider a major

4  adjustment?

5  A.    Skipping the consciousness check.  Or

6  ignoring a sign of consciousness during the

7  consciousness check.  Or using potassium

8  chloride before you use vecuronium.  Or

9  things -- again, that's just some examples.

10  Q.    Would storing the drugs differently than

11  what's required by the protocol be a major

12  deviation from the protocol?

13            MR. MITCHELL:  Object to the form.

14  And also outside the scope.

15            You can answer.

16            THE WITNESS:  The storage of drugs

17  should be as directed by the pharmacist and the

18  pharmacy service agreement with the pharmacist

19  and the instructions that we receive from the

20  pharmacist.  They should be stored as directed.

21  Yes, that is an important aspect.

22  BY MR. KURSMAN:

23  Q.    Even if the protocol says otherwise?

24            MR. MITCHELL:  Same objections.

25            THE WITNESS:  We should store the

Elite Brentwood Reporting Services (615) 373-0073
www.EliteReportingServices.com

1  drugs as required by the pharmacist and per the
2  instructions of the pharmacist.
3  BY MR. KURSMAN:
4  Q.    So if the protocol says store the drugs
5  using this method and the pharmacist says store
6  the drugs using a different method, it's TDOC's
7  position that members of the execution team
8  should always follow what the pharmacist says?
9  A.    Can you show me in the protocol where you
10 are referring to?
11 Q.    Yeah, I will do that later.  But this is
12 just a general question right now.
13         MR. MITCHELL:  Both form and scope --
14 form and scope objections.
15         You can answer.
16         THE WITNESS:  Again, we should store
17 the drugs as directed from the pharmacist, in
18 that we have a contract with with the pharmacy
19 service agreement for the drugs that we receive
20 from that pharmacist.
21 BY MR. KURSMAN:
22 Q.    If that is TDOC's position, why isn't
23 that written in the protocol?
24 A.    I don't know.  Maybe it should be.  I
25 don't know.

Case 3:18-cv-01234-BJ Document Report Filed 09/17/22 Page 65 of 373 PageID #: 6452
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
 1              MR. KURSMAN:  Could we take a
 2   ten-minute break?
 3              MR. MITCHELL:  Sure.
 4              THE VIDEOGRAPHER:  One moment,
 5   please.  Going off the record at 10:19 a.m.
 6              (Short break.)
 7              THE VIDEOGRAPHER:  Back on the record
 8   at 10:32 a.m.
 9   BY MR. KURSMAN:
10   Q.    We just went on break.  While we were on
11   break, did you have any discussions with your
12   attorneys?
13   A.    I did not.
14   Q.    Now, before we were -- we left for break,
15   we were discussing deviations or adjustments
16   from the protocol.  And I believe one of -- one
17   of the things you testified to was that if the
18   protocol says X and the pharmacy owner says Y,
19   the execution team is to follow the pharmacy
20   owner; is that right?  Or the pharmacist, I
21   apologize.
22   A.    In relation to the chemicals and the
23   storage and the -- that is -- we would follow
24   the directions of the pharmacist that provided
25   the chemicals.
```

1  Q.     Why -- why would you follow the

2  directions of the pharmacist?

3  A.     Well, we -- they are the individuals that

4  are responsible and qualified to provide the

5  chemicals, as well as that's who we have a

6  pharmacy service agreement with.  They are

7  required to meet the regulations of the

8  compounding of chemicals or the supply of

9  manufactured chemicals.  And that is who --

10  that is the entity that we would rely on to

11  provide the information of how those chemicals

12  should be properly stored.

13  Q.     Okay.  And you said multiple -- I think

14  you used the term multiple individuals.  Is

15  there more than one pharmacist, or is there one

16  pharmacist that TDOC --

17  A.     Well, the pharmacy that we have the

18  services agreement with to provide the

19  chemicals.

20  Q.     Is it just one pharmacist that you know,

21  or is it more than one pharmacist?

22  A.     As far as I know -- there may be more

23  than one pharmacist working there.  But in --

24  there's one pharmacy that we have an agreement

25  with.

Case 3:18-cv-01234 Brenda Jones Report Filed 04/17/22 Page 67 of 373 PageID #: 6454
Elite Court Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  Q.    And is it TDOC's belief that the

2  pharmacist has specialized expertise?

3  A.    Yes.

4  Q.    Okay.  And does the pharmacist have

5  expertise that TDOC does not have?

6  A.    Yes.

7  Q.    Okay.  And is that expertise in relation

8  to the drugs?

9  A.    It is.

10 Q.    Okay.  Have there been times where the

11 pharmacist or pharmacy entity that you're

12 dealing with has suggested that you do

13 something that TDOC has not undertaken?

14         MR. MITCHELL:  And what topic of

15 examination is that related to?

16         MR. KURSMAN:  That would be 3, again.

17         MR. MITCHELL:  I'm going to object to

18 the form; say outside the scope.

19         And you can answer, Commissioner.

20         THE WITNESS:  Not that I'm aware of.

21 BY MR. KURSMAN:

22 Q.    Okay.  Let's go back to Exhibit 1.

23 A.    Let me clarify something, too.  In

24 previous questions that were asked about the

25 drug procurer, I want to make sure that I'm

Case 3:18-cv-01234-Brecnument Report-Filed 03/17/22 ePage 68 of 373 PageID #: 6455
Elite Brecnument Reporting Service (615) 575-9073
www.EliteReportingServices.com

1    clear on this.  The drug procurer serves other

2    purposes in the Department, too.  As far as my

3    conversations with the drug procurer, I've had

4    a conversation with the drug procurer related

5    to the subject matter of another topic.  But I

6    did ask the question related -- of the drug

7    procurer related to current chemicals on hand

8    that were not expired.  I want to be clear

9    about that.  I had that conversation this

10   morning.  But it wasn't -- I don't know that I

11   would say it was in specific preparation for a

12   particular topic item; although, it could be.

13            But just for clarification, I did

14   talk to the drug procurer this morning.  The

15   initial discussion was around a topic related

16   to contracts that has nothing to do with this

17   process.  But that question, I did ask that

18   question.  So I want to make sure I'm clear

19   about that.

20   Q.    Okay.  So just so I'm clear, this morning

21   you had a conversation with the drug procurer,

22   just asking the drug procurer, do we have any

23   expired drugs on hand?

24   A.    Yeah.  That was the topic of the

25   question, yes.

ELITE-Brentwood Reporting Services (615) 373-0073
www.EliteReportingServices.com

1  Q.    Okay.  And what did the drug procurer say

2  back?

3  A.    Just said that the only drugs that we had

4  on hand that were not expired was the

5  vecuronium.

6  Q.    And you said the drug procurer has dual

7  roles within the Department.  What other roles

8  does the drug procurer have?

9         MR. MITCHELL:  I'm going to object to

10  that and instruct the Commissioner not to

11  answer based on the protective order, the 107.

12  BY MR. KURSMAN:

13  Q.    Okay.  Does the drug procurer have any

14  other roles in the execution procedure?

15  A.    No, other than -- other than the -- the

16  role of the drug procurer.  No.

17  Q.    Okay.  Let's go back to Exhibit 1.

18  A.    Okay.

19  Q.    And that would be the execution protocol

20  that we were just talking about.

21  A.    Yes.

22  Q.    Can you tell me each person that was

23  involved in the creation of the execution

24  protocol?

25         MR. MITCHELL:  And there I'm going to

Case 3:18-cv-01234-BJD-Document Report-Filed 09/17/22 ePage (705) 373-0405D #: 6457
Elite Brenda Rodriguez Court Reporter (705) 373-0405
www.EliteReportingServices.com

1  object just based on the protective order and

2  say that there's certain people -- and I think

3  you know this.  If you can do it without

4  identifying names and maybe say role or role

5  within the protocol or something like that.

6          THE WITNESS:  So, yes, myself, as

7  commissioner.  Debbie Inglis, chief legal

8  counsel.  So I just said her name.

9          The commissioner -- assistant

10 commissioners in the Department related to

11 prison operations.  The drug procurer.  Myself,

12 in conjunction with the Attorney General's

13 office.  Primarily that was -- that's it.

14 BY MR. KURSMAN:

15 Q.    And what was each person's role that you

16 just described in creating the protocol?

17          So we can go through it one by one.

18          What was your role in creating the

19 execution protocol?

20 A.    My role was basically to review the

21 protocol and to approve a protocol that was

22 written.  Submit it as the official protocol

23 for the Department.

24 Q.    And what was Ms. Inglis's role?

25 A.    Again, to serve as chief legal counsel,

Case 3:18-cv-01234-Brenda Reporting Services (615) 373-9049 Document Report Filed 03/17/22 Page 71 of 373 PageID #: 6452
Elite Brenda Reporting Services (615) 373-9049
www.EliteReportingServices.com

1  as well as to provide input and advice related

2  to the protocol.

3  Q.    What was the drug procurer's role?

4  A.    Again, the drug procurer's role would be

5  to speak in -- on behalf of the ability of the

6  drugs -- the drugs that were available.  Any

7  information that they would have from the

8  pharmacist in relation to the drugs, the type

9  of drugs, the amount of drugs, the quantity of

10  the drug -- of the strength of the drug, things

11  like that.

12  Q.    When you say the amount, quantity, and

13  strength, are you saying that the drug procurer

14  came up with the amount, quantity, and strength

15  of the drug protocol?

16  A.    No, I'm not.  I'm -- his communication

17  with the pharmacist in developing and providing

18  information related to the protocol.

19  Q.    Okay.  Just -- I just want to be clear

20  about this.  So it was the pharmacist who came

21  up with the strength and the amount of the

22  drugs of the protocol?

23  A.    I don't know that it was totally the

24  pharmacist.  I think the pharmacist had input

25  on it.

Elite Brentwood Reporting Services (615) 373-9000
www.EliteReportingServices.com

1    Q.    Uh-huh.

2    A.    We also considered other protocols that

3    were used, as well as -- again, as I

4    understand, information provided by the

5    pharmacist.

6    Q.    You relied on information by the

7    pharmacist?  That's what you said?

8    A.    We relied -- I'm sorry?

9    Q.    Just so I understand what you're saying,

10   you said you relied on information provided by

11   the pharmacist?

12   A.    We relied on information provided by the

13   pharmacist.  We relied on information provided

14   by other people that I spoke to, who relied on

15   what other states were doing.  We relied on

16   several things.

17   Q.    Okay.  Who are those other people that

18   you spoke to?

19        MR. MITCHELL:  And pursuant to the

20   protective order, if you can answer without

21   identifying names.

22        THE WITNESS:  Sure.  So other

23   directors, other medical professionals, people

24   who were members of the team.  I'm trying not

25   to -- make sure I'm careful here.  That's

Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1  primarily it.

2  BY MR. KURSMAN:

3  Q.    When you say medical professionals, what

4  type of medical professionals do you mean?

5  A.    MDs, doctors, other people who would have

6  direct knowledge of protocols that were used in

7  other states.

8  Q.    So when you consulted with doctors, were

9  they involved in the drafting of this protocol?

10 A.    Not directly, no.

11 Q.    Now, when you say not directly, what do

12 you mean by that?

13 A.    Well, other than the conversations that I

14 had with them, the -- they did not sit down at

15 the table and help draft, directly, this

16 protocol, if that answers your question.

17 Q.    Did you -- did you talk to any

18 anesthesiologists?

19 A.    I did not.

20 Q.    How about any pharmacologists?

21 A.    I did not.

22 Q.    Okay.  What -- did the MD that you spoke

23 with have any specialty?

24 A.    He was a general surgeon.  He had

25 knowledge and experience in the use of

Case 3:18-cv-01234-BLW Document 184 Filed 09/17/22 Page 74 of 373 Page ID #: 6462
Elite Document Reporting Services (415) 373-9967
www.EliteReportingServices.com

1  midazolam.  Someone who I considered credible

2  and unbiased.

3  Q.     And is this the same physician that

4  participates in the executions?

5  A.     There was -- let me be clear.  There are

6  multi -- there were multiple MDs that I spoke

7  to, okay?  It's not just one.  One of which

8  that I did talk to and consult with is a -- is

9  a participant in the process, yes.

10  Q.     Okay.  And is that the MD that pronounces

11  death?

12  A.     Yes.

13  Q.     Okay.  And the MDs that you spoke to,

14  what did you speak to them about in relation to

15  the protocol?

16  A.     Primarily the conversation was around the

17  drug midazolam.

18  Q.     All right.

19  A.     And the -- and the -- their thoughts and

20  opinion on midazolam.  And their use and

21  observations of the effects of midazolam under

22  normal medical use in their practice, as well

23  as considering the current dosage that we use

24  and their opinion of how that would affect an

25  individual.

1    Q.    Had any of the MDs that TDOC spoke to,

2    had any of them ever used 500 milligrams of

3    midazolam on a patient?

4              MR. MITCHELL:  Object to the form and

5    also the scope of the notice.

6              You may answer.

7              THE WITNESS:  Not that I'm aware of.

8    BY MR. KURSMAN:

9    Q.    Do you know what the highest amount of

10   midazolam that any of the MDs had ever used on

11   a patient?

12             MR. MITCHELL:  Same objections.

13             THE WITNESS:  I do not, no.

14   BY MR. KURSMAN:

15   Q.    Okay.  And who actually wrote the

16   protocol?

17             MR. MITCHELL:  Object pursuant to the

18   protective order.

19             You can answer, if you know.

20             THE WITNESS:  The protocol was

21   written by the people that I mentioned prior,

22   the people who -- the chief legal counsel, as

23   well as other people who had input that I

24   mentioned before in drafting the protocol.

25   ///

Case 3:18-cv-01234-Brian Document Report Filed 04/17/22 Page 76 of 373 PageID #: 6464
Elite Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    Okay.  Did different people write

3  different sections of the protocol?

4  A.    They may have.

5  Q.    Does TDOC not know whether different

6  people wrote different sections of the

7  protocol?

8  A.    TDOC would not know specifically, not

9  without asking them -- those particular people

10 who may have written one paragraph or the

11 other.  TDOC reviewed the entire protocol and

12 approved the protocol as written in its final

13 form.

14 Q.    And what?  I apologize.

15 A.    I'm sorry?

16 Q.    And what did you say?  I apologize.

17 A.    In its final form.

18 Q.    In its final form?

19 A.    Yeah, as we have it today.

20 Q.    So if we go to the section of the

21 protocol that discusses the actual three-drug

22 execution procedure, who wrote that --

23 A.    What page are you referring to?

24 Q.    So that would be Exhibit 1, page 34.

25 A.    And your question?  I'm sorry.  Your

1  question?

2  Q.     Oh, I apologize.

3         Who wrote that section?

4  A.     That section was written by the team.

5  I'm not certain who exactly typed that section

6  out.  It was -- it was written based on

7  information that we had from the people that I

8  mentioned before.

9  Q.     And that would be --

10 A.     To include -- to include the pharmacist,

11 as well as members of the team that I had

12 mentioned previously.

13 Q.     So would that be the drug procurer who

14 came up with this protocol, this --

15 A.     The drug procurer would have had a part

16 in this.  Again, in consultation with the

17 pharmacist, as well as -- also the other

18 members of the team would have had a -- would

19 have played into this also.

20 Q.     Which other members of the team?

21 A.     Again, the chief legal counsel, the

22 Attorney General's office.  Primarily, though,

23 the drug procurer and the pharmacist.

24 Information that the drug procurer would have

25 received from the pharmacist.

1  Q.    And did members of the team rely on maybe

2  the expertise of the drug procurer and the

3  pharmacist to come up with this three-drug

4  protocol?

5  A.    I think the -- it played a part in that.

6  But also I will tell you that the use of

7  midazolam, vecuronium, and potassium was also

8  relied upon by myself in my conversations with

9  other directors that use the protocol, the

10 three-drug protocol.

11 Q.    And how about -- how did you come up with

12 these exact numbers for each drug?  Was that on

13 the advice of the pharmacist, or was that

14 something else?

15 A.    I think it primarily -- as I recall on

16 the advice of -- in discussions with a

17 pharmacist, as well as other states' use of

18 these drugs and the amounts.

19 Q.    What other states did you consider when

20 coming up with this protocol?

21 A.    Virginia, Arkansas.  I talked to several

22 states.

23 Q.    What were the other states?

24        MR. MITCHELL:  I'm going to object

25 pursuant to the protective order and instruct

Case 3:18-cv-01234-Brennom Reporting Services Filed 04/17/22e Page 79 of 373 PageID #: 6466
ELITE Document Reporter (815) 375-0970
www.EliteReportingServices.com

1  the witness not the answer what -- what states

2  there were personnel in that he spoke with.

3  BY MR. KURSMAN:

4  Q.    I just -- I'm just asking what other

5  protocols that you reviewed to come up with

6  this three-drug protocol or what other state

7  that you relied on.

8  A.    Again, the states that I mentioned, as

9  well as the conversations that I had with other

10 directors.  Alabama -- again, when I say this

11 -- I mean, you know who the directors are in

12 those states.  So it's -- but again, Alabama,

13 Arkansas, Virginia, primarily.

14 Q.    Did you rely on any medical texts?

15 A.    Medical -- I'm sorry?

16 Q.    Medical books.  TDOC -- did TDOC read

17 any --

18 A.    No, I did not.

19 Q.    How about any medical articles?

20 A.    No, I did not.

21 Q.    Did you at TDOC look at past executions

22 gone wrong?

23 A.    TDOC was aware of some executions that

24 was described in the media as botched

25 executions.  And there was conversations that I

Elite Brentwood Reporting Service (615) 595-0073
www.EliteReportingServices.com

```
 1  had with other directors related to that and
 2  their thoughts on why those things happened
 3  and was it directly related to the drug or a
 4  mistake in the process.  Or a -- for instance,
 5  a bad vein or things that could have caused
 6  that, other than the drug itself.
 7            But -- I'm aware of that.  But again,
 8  I had discussions with several people related
 9  to that.
10  Q.    And when you discussed those prior --
11  what the media called botches, what did TDOC
12  conclude, whether it was as a result of the
13  drugs or mistakes?
14  A.    Well, TDOC's conclusion was after
15  speaking with everyone, after considering the
16  information that we had, the best information
17  we had at the time was that the midazolam in
18  the dosage that we have listed here would be
19  sufficient to carry out an execution that was
20  humane and constitutionally -- met the
21  constitutional protections that an individual
22  deserves.
23  Q.    Right.
24            But my question is, when you were
25  looking at the prior botches and you said you
```

1  discussed among TDOC whether that had to do

2  with the drugs themselves or mistakes made,

3  what did TDOC conclude?  Did they -- did TDOC

4  conclude it was the drugs, or did TDOC conclude

5  it was mistakes made by individuals?

6  A.    Well -- and again, the discussion that I

7  had with -- in conversations with other

8  directors was primarily that it was possible

9  that there was a flaw in the procedure.  Not so

10  much the result of -- or the lack thereof but

11  result of the drug taking -- doing what it

12  should do on an individual, as far as making

13  them unconscious.

14          That was my interpretation and my --

15  my takeaway from those discussions.  Not

16  necessarily a discussion I had with TDOC, but

17  the discussion I had with other people who I

18  trusted and relied upon as accurate.  And

19  again, providing me relevant information at the

20  time.

21  Q.    So what did TDOC do -- or did TDOC do

22  anything to ensure that those mistakes wouldn't

23  happen in Tennessee's execution protocol?

24  A.    Well, there are procedures laid out in

25  the protocol that certainly speaks to that.

1  Safeguards.  The use of trained EMTs to start

2  the IVs.  Having observations of the injection

3  sites to ensure that there's no indications

4  from a physical or a visual standpoint that the

5  chemicals and the saline is being pushed into

6  the tissue versus a vein.  Having multiple

7  views and multiple people viewing those sites.

8  Ensuring that there's a consciousness check.

9  There are several things.

10 Q.    Would TDOC rather have EMTs pushing the

11 drugs than the executioner?

12         MR. MITCHELL:  Object to the form.

13 And also outside the scope of the notice.

14         You can answer.

15         THE WITNESS:  TDOC is satisfied that

16 the current process is sufficient to do the --

17 follow the execution protocol.  So I would --

18 the answer would be no.

19 BY MR. KURSMAN:

20 Q.    Okay.  Would TDOC rather have a medical

21 professional or a pharmacist mix the drugs than

22 the executioner?

23         MR. MITCHELL:  Same objection.

24         You may answer.

25         THE WITNESS:  Again, TDOC is

Case 3:18-cv-01234-Breconument Report Filed 09/17/22 ePage 83 of 373 PageID #: 6471
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    satisfied with the current process.  And we

2    would say no.

3    BY MR. KURSMAN:

4    Q.    Did you consider any other execution

5    protocols when coming up with this current

6    protocol?

7    A.    The protocol --

8            MR. MITCHELL:  Object to the form.

9            But you can answer.

10           THE WITNESS:  The protocol, it's --

11   the July 5, 2018, protocol was developed -- I

12   think it's fair to say that in developing this

13   protocol for lethal injection, we had to rely

14   on the chemicals that were available to us that

15   we could receive.  Obviously, it's known that

16   we could not in any form or amount acquire

17   pentobarbital.  We could not procure it.  We

18   could not find the ingredients for it.

19           And so this protocol was developed

20   based on the information we had from the people

21   that I mentioned before, as well as my

22   discussions with other people in other states

23   who are using the three-drug protocol like

24   this, and the availability of the drugs at that

25   time.

ELITE Brentwood Reporting Services (615) 373-0073
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    And did -- aside from a one-drug

3  pentobarbital drug protocol and this current

4  three-drug protocol that TDOC has in place, did

5  TDOC consider any other protocols?

6           MR. MITCHELL:  Same objection.

7           You can answer.

8           THE WITNESS:  Yeah.  Again, the

9  decision to go with this protocol with the

10  midazolam, vecuronium, and potassium chloride

11  was based on, again, our thoughts that it was

12  sufficient and that these were the drugs

13  available.  So I would say that, no, we did not

14  seriously consider any other alternatives

15  because the means to carry out those other

16  alternatives were not available.  And the fact

17  that we feel like this protocol is -- again, is

18  the best protocol that we have available and

19  are able to execute.

20  BY MR. KURSMAN:

21  Q.    If TDOC -- strike that.

22           Would TDOC rather use a one-drug

23  pentobarbital protocol than the current

24  three-drug protocol?

25           MR. MITCHELL:  Object to the form and

Elite Court Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  scope of the notice.

2          You can answer.

3          THE WITNESS:  If TDOC had access to

4  pentobarbital, it's very possible that we would

5  seriously consider that as another option.  So,

6  yes, it's possible.

7  BY MR. KURSMAN:

8  Q.    Yes, it's possible; or, yes, TDOC would

9  rather use pentobarbital as its execution

10 protocol?

11         MR. MITCHELL:  Same objections.

12         THE WITNESS:  Well, again, I think

13 Tennessee would rather -- if we had access and

14 could acquire pentobarbital, yes, we would.

15 It's a one-drug protocol versus a three.  But

16 again, it's not a viable option because we

17 don't have access to it.  We can't get access

18 to it.

19 BY MR. KURSMAN:

20 Q.    And can you tell me why the protocol was

21 changed from the one-drug pentobarbital

22 protocol to this current three-drug protocol?

23 A.    Again --

24         MR. MITCHELL:  I'm going to object to

25 the scope of the notice.

Case 3:18-cv-01234 Document Report Filed 03/17/22 Page 86 of 373 PageID #: 6474
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
1            You can answer.

2            THE WITNESS:  Because we could not

3  get access to pentobarbital in the state of

4  Tennessee.

5  BY MR. KURSMAN:

6  Q.    And when TDOC says it could not get

7  access to pentobarbital, what is that based on?

8  A.    It's based on our attempts as a

9  Department to gain access to pentobarbital both

10 from the drug procurer, as well as from myself

11 in communications with other corrections

12 directors, who at the time were currently using

13 pentobarbital, and my attempts to find a source

14 for pentobarbital.

15 Q.    And when was the last time that you

16 personally attempted to find a source for

17 pentobarbital?

18 A.    I don't remember.  I don't remember

19 the -- and I'll clarify that a little bit.  You

20 know, the conversations -- a common

21 conversation with directors and -- that have

22 execution protocols related to lethal injection

23 is pentobarbital.  Even at a -- Correctional

24 Leaders Association, the association that most

25 correction directors belong to, they are aware
```

1  of the need or the desire for some states to

2  acquire pentobarbital.  So that is a common --

3  that is a common thing that is there.

4          I don't know.  It's -- I don't recall

5  the last conversation personally I had with a

6  director related to pentobarbital or the need

7  for -- or our desire for pentobarbital.  I know

8  that it's a -- pretty much a standing request

9  between myself and the drug procurer that we

10  should -- you know, if we find a source for

11  pentobarbital, to certainly -- we would -- we

12  would want to know that.

13  BY MR. KURSMAN:

14  Q.    So the -- just so I'm clear.  The

15  instructions from TDOC to the drug procurer

16  are, keep looking for pentobarbital, keep

17  trying to get pentobarbital?

18  A.    That's correct.

19  Q.    All right.  Okay.  Let's go to page 6 of

20  Exhibit 1.  Do you see that the very last

21  sentence is -- says it will be reviewed

22  annually or needed by a designated panel?

23  A.    Yes.

24  Q.    When was the last time that the protocol

25  was reviewed?

Case 3:18-cv-01234-Brienomed Report Filed 03/17/22 Page 88 of 373 PageID #: 6476
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  A.    I think the protocol, I would say for the

2  last several years, has been under continuous

3  review, as far as the review of our lethal

4  injection protocol.  It's reviewed -- been

5  multiple reviews.

6  Q.    When was -- when was the last time it was

7  reviewed?

8  A.    Oh --

9  Q.    Let me -- I apologize.  I didn't mean to

10 interrupt.  Let me just back up.

11        So what does it mean to be reviewed?

12 A.    That it be read by -- and reviewed by the

13 leadership team.  When I say leadership team,

14 the assistant commissioner of prisons, the

15 chief legal counsel, the people in the

16 Department.  The drug procurer, myself, on at

17 least the annual basis.

18        But to try to clarify that, I think

19 with the -- the amount of executions we've had

20 and the activity around lethal injection, this

21 manual has been reviewed on multiple occasions,

22 ongoing.

23 Q.    Have you made any changes to the protocol

24 since July 5th, 2018?

25 A.    No.

ELITE Document Reporting Services, Inc. (615) 595-0073
www.EliteReportingServices.com

1    Q.    And do you recall when the last time the

2    protocol was reviewed?

3    A.    Again --

4              MR. MITCHELL:  Object to the form.

5              You can answer.

6              THE WITNESS:  Yeah.  Again, I think

7    that the protocol is reviewed on an ongoing

8    basis.  As far as a -- as far as a

9    particular -- everybody sitting around a table,

10   what's identified here as a panel review, no, I

11   do not.

12   BY MR. KURSMAN:

13   Q.    Have you ever been involved in a panel

14   review of this execution protocol?

15   A.    Other -- no.  Again, not as a -- sitting

16   around a table, I reviewed the protocol several

17   times, as well as other -- the other members

18   that I've mentioned has reviewed the protocol.

19   Q.    Does TDOC know whether a designated panel

20   has been reviewing this annually?

21   A.    Other than the people I mentioned, the

22   assistant commissioner of prisons, the chief

23   legal counsel, myself, the drug procurer, no.

24   There's not -- there's not been an identified

25   list of individuals with a particular date that

Case 3:18-cv-01234-Brodcument Reporter Filed 09/17/22eservices.com373 PageID #: 6478
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  we sat down and all around a table and went

2  over this as a group, no.

3  Q.    At these reviews have you ever discussed

4  finding alternative methods of execution?

5  A.    Again, other than what's been mentioned

6  related to our change from pentobarbital to the

7  three-drug protocol, no, I haven't.

8  Q.    Okay.  And just -- I think you testified

9  to this before.  But who at TDOC procures

10 midazolam, vecuronium bromide, and potassium

11 chloride?

12        MR. MITCHELL:  I'm going to object to

13 the form and pursuant to the protective order.

14        But you can answer.

15        THE WITNESS:  We -- again, the person

16 who's been identified as the drug procurer is

17 responsible for communications with the

18 pharmacist that we have under the pharmacy

19 service agreement, as well as any other -- so

20 -- I'm sorry.  Did that answer --

21 BY MR. KURSMAN:

22 Q.    No, go ahead.  I apologize.  I didn't

23 mean -- I thought you were done.

24 A.    The drug procurer, who is at the

25 Department.

Case 3:18-cv-01234 Document Report Filed 04/17/22 Page 91 of 373 PageID #: 6478
ELITE Brentwood Reporting Service (615) 595-0073
www.EliteReportingServices.com

1  Q.    And could you describe the drug

2  procurer's process for obtaining midazolam?

3  A.    Their direct communication with the

4  pharmacist who has the drug and provides the

5  drug to the Department for the purpose of

6  lethal injection in the Department as part of

7  the execution protocol.  Again, most of that

8  communication, of course, is by phone.  But

9  that's the process.

10 Q.    And can you describe the drug procurer's

11 process for obtaining vecuronium bromide?

12 A.    Again, their communication and the

13 authority of their job to contact on the

14 Department's behalf the pharmacist who procures

15 the drug, vecuronium bromide, from the

16 pharmacist.

17 Q.    And is that the same process for

18 obtaining potassium chloride?

19 A.    It is.

20 Q.    So just so I'm clear, the process for

21 obtaining all three of these drugs is that the

22 drug procurer contacts the pharmacist, who

23 provide -- who then provides the drugs to TDOC?

24 A.    That's correct.

25 Q.    Okay.  Is that the same process for

Case 3:18-cv-01234-Brienwood Report Filed 09/17/22 e Page 92 of 373 Page ID #: 6470
www.EliteReportingServices.com

1   attempts to obtain pentobarbital?

2   A.    It is.  The drug procurer is responsible

3   for that.  And also the drug procurer is --

4   again, has been tasked with, you know, any --

5   all attempts to find pentobarbital.  If there

6   were a source that the drug procurer may be

7   aware of, a potential source, certainly they

8   would be able to reach out to that particular

9   -- potential source and inquire as to whether

10  or not a source of pentobarbital would be

11  available to the Department and would they be

12  willing to sell or to provide the pentobarbital

13  to the Department of Corrections for the

14  purpose of lethal injection.

15  Q.    Does TDOC believe that the pharmacist who

16  is providing you with the three drugs for the

17  lethal injection protocol is making the same

18  efforts to find pentobarbital as they have made

19  to find the other three drugs?

20          MR. MITCHELL:  Object to the form.

21          You can answer.

22          THE WITNESS:  I think TDOC is under

23  the impression that under the current protocol

24  that they are responsible -- or that -- that

25  our request is to provide midazolam,

Case 3:18-cv-01234-Brian Document Report Filed 09/17/22 Page 93 of 373 PageID #: 6480
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    vecuronium, and potassium chloride.  If the

2    pentobarbital is available, I think certainly

3    the drug procurer is aware that we would be

4    interested in having a conversation and

5    certainly seeing if it was possible to acquire

6    that drug.

7            So, yes, it's TDOC's belief that

8    there's an ongoing search.  And that's

9    knowledge of the -- of the pharmacist.

10   BY MR. KURSMAN:

11   Q.    Right.

12           Does TDOC think that the pharmacist

13   is doing as a robust of search for

14   pentobarbital as it is for midazolam?  Does my

15   question make sense?

16           MR. MITCHELL:  Object to the form.

17           But you can answer.

18           THE WITNESS:  It would be hard for

19   me -- or for the Tennessee Department of

20   Corrections to say whether or not -- or what

21   the pharmacist may or may not be doing, as far

22   as what they believe or what -- certainly TDOC

23   -- again, it would be our desire for the

24   pharmacist, if pentobarbital was to be

25   available, to certainly make us aware of that

1  as an option.

2  BY MR. KURSMAN:

3  Q.    What -- does TDOC want the pharmacist to

4  do as exhaustive as a search for pentobarbital

5  as it has done for midazolam?

6        MR. MITCHELL:  I'm going to object to

7  the form and the scope of the notice.

8        You can answer.

9        THE WITNESS:  So again, TDOC is --

10  the three-drug protocol that we currently use,

11  our priority is to make sure that we have

12  access to these three drugs.  If pentobarbital

13  is available, it's something that we would want

14  to know.

15        As far as -- as far as the amount of

16  effort that goes into providing one drug versus

17  the other, I think TDOC's position would be

18  that currently we want to focus on the drugs

19  that we're currently using in this approved

20  protocol.  But again, if pentobarbital is

21  available, we would want to know that.

22  BY MR. KURSMAN:

23  Q.    So -- but my question is a little

24  different, which is, let's say the

25  pharmacist -- the drug procurer asks the

Case 3:18-cv-01234-Breonna Regina Report Filed 09/17/22 Page 95 of 373 PageID #: 6482
Elite Reporting Services
www.EliteReportingServices.com

1  pharmacist to get midazolam.  And the

2  pharmacist says, okay, I've contacted five

3  places, and it turns out I can get midazolam

4  from the fifth place.  And the drug procurer

5  then says, I'll also look for pentobarbital --

6  A.     Also look for what?

7  Q.     Pentobarbital.

8  A.     Okay.

9  Q.     And the pharmacist says, okay, I looked

10 -- I looked at one place and they don't have

11 any pento.  That means I can't get it.

12        Would it be TDOC's position that

13 that's sufficient -- a sufficient search?  Or

14 does TDOC want the pharmacist to look -- doing

15 at least as robust -- as a robust search for

16 midazolam -- for pentobarbital as it's done for

17 midazolam?

18        MR. MITCHELL:  And I'm going to,

19 again, object to the form and scope of the

20 notice.

21        You may answer.

22        THE WITNESS:  Again, TDOC would want

23 the pharmacist to continue to look for

24 pentobarbital on an ongoing basis.

25 ///

1    BY MR. KURSMAN:

2    Q.    Okay.

3    A.    And I apologize.  Can we take a

4    five-minute break?

5    Q.    Sure.  Absolutely.

6    A.    Too much coffee and getting a little

7    older.  I need...

8            THE VIDEOGRAPHER:  One moment,

9    please.  Going off the record at 11:16 a.m.

10           (Short break.)

11           THE VIDEOGRAPHER:  Back on the record

12   at 11:25 a.m.

13   BY MR. KURSMAN:

14   Q.    Commissioner Parker, let's go to Exhibit

15   6.  Let me know when you're there.

16   A.    I'm here.

17   Q.    Okay.  Do you see this e-mail,

18   September 7, 2017?

19   A.    I do.

20   Q.    Can you see it says, so the word from the

21   powers that be is that they first want to find

22   midazolam and then go from there, if there are

23   none out there to get.

24   A.    I see that, yes.

25   Q.    Okay.  Have you seen this e-mail before

Case 3:18-cv-01234-B Document 161-4 Filed 03/17/22 Page 97 of 373 PageID #: 6484
Elite Reporting Services
www.EliteReportingServices.com

1  today?

2  A.     I have.

3  Q.     Okay.  Do you know who wrote this e-mail?

4  A.     I do not particularly, no.

5  Q.     Okay.  Was it somebody from TDOC?

6  A.     I'm -- I believe so, yes.

7  Q.     Okay.  Did you -- when preparing for this

8  deposition, did you try to find out who wrote

9  this e-mail?

10  A.     I did not necessarily try to find -- my

11  best recollection is that this would have

12  probably come from the drug procurer, but I'm

13  not 100 percent sure.

14  Q.     Do you know who the powers that be are

15  that they are referring to in this e-mail?

16  A.     I'm assuming they are referring to the

17  Commissioner of Corrections --

18  Q.     Okay.

19  A.     -- myself.

20  Q.     Okay.  And do you know why they first

21  wanted to try to find midazolam on September 7,

22  2017?

23  A.     I think this was an attempt to find

24  midazolam for a three-drug protocol, once it

25  was obvious that pentobarbital was not

ELITE Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  available.

2  Q.    Did TDOC instruct the drug procurer at

3  this time to stop looking for pentobarbital?

4  A.    No.

5  Q.    Okay.  Did TDOC instruct the drug

6  procurer to continue looking for pentobarbital?

7  A.    Yes.

8  Q.    Do you know why the drug procurer didn't

9  also ask the pharmacist to look for

10 pentobarbital in this e-mail?

11 A.    I do not.  Other -- I would say that

12 although pentobarbital is not mentioned here,

13 it's my understanding and TDOC's understanding

14 that the search for pentobarbital was ongoing

15 and consistent.

16 Q.    Okay.  Let's go to Exhibit 7.  And do you

17 see on the next page -- page 2 of Exhibit 7 --

18 there's an e-mail that says, sent Thursday,

19 September 7 at 12:58 p.m.  Do you see that one?

20 Second page.

21 A.    I'm sorry.  Let me get there.

22 Q.    Sure.

23 A.    You said September 7th at --

24 Q.    12:58.

25 A.    12:58 p.m.

Case 3:18-cv-01234-Brianna Document Reporting Filed 03/17/22 Page 99 of 373 PageID #: 6486
ELITE Brianna Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

1              Yes, I'm there.

2    Q.    And do you see this is a responsive

3    e-mail to the e-mail that we just discussed?

4    A.    Okay.

5    Q.    Do you see it says, that stuff is readily

6    available along with potassium chloride.  I

7    reviewed protocols from states that currently

8    use that method.  Most have a three-drug

9    protocol including a paralytic and potassium

10   chloride.

11   A.    I see that, yes.

12   Q.    Do you know who this is from?

13   A.    It's my belief that it's from the

14   individual at the pharmacy that the drug

15   procurer was communicating with at that time.

16   Q.    Do you know what stuff they are talking

17   about when they say that stuff is readily

18   available?

19   A.    I could only assume that it's midazolam.

20   But I -- again, I don't recall having any

21   personal conversations with the drug procurer

22   related to that.

23   Q.    Do you -- do you know what protocols that

24   the pharmacist reviewed?

25            MR. MITCHELL:  Object to the form.

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 100 of 373 PageID #: 6487
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1          You can answer.

2          THE WITNESS:  I do not specifically

3  know, no.

4  BY MR. KURSMAN:

5  Q.    Okay.  And do you see that the pharmacist

6  also recommended a paralytic?  What is a

7  paralytic?

8          MR. MITCHELL:  Same objection.

9          You can answer.

10         THE WITNESS:  Paralytic is -- an

11  example would be vecuronium that paralyzes the

12  subject.

13  BY MR. KURSMAN:

14  Q.    Do you know why -- does TDOC know why

15  other states use a paralytic?

16  A.    Other than it being part of their

17  execution protocol that is used to paralyze the

18  individual and stop the breathing of an

19  individual.

20  Q.    So is the paralytic -- is it TDOC's

21  belief that a paralytic is used to end the

22  prisoner's life?

23  A.    It is TDOC's belief that the paralytic is

24  used in conjunction with the other drugs to end

25  the individual's life.  It hastens death, which

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 101 of 373 PageID #: 6498
ELITE Reporting Services  *  (615) 595-0073
www.EliteReportingServices.com

1    is the -- the object of the -- or the goal of

2    the -- of the execution protocol.

3    Q.    Did TDOC ever discuss using only a

4    two-drug protocol and taking out the paralytic?

5    A.    No.  Our discussions were around the

6    three-drug protocol.

7    Q.    And why did TDOC decide to use the

8    paralytic in the execution protocol?

9    A.    The -- TDOC decided to use the three-drug

10   protocol with the paralytic based on

11   conversations that the commissioner had with

12   other states that were using the three-drug

13   protocol.  That, as well as it was an

14   established method that, again, other states

15   were using.  And that the Department had

16   confidence in relation to being able to provide

17   a process that was humane -- the most humane

18   and ensured the constitutional protections of

19   the inmate, based on the availability of the

20   sources we had.

21   Q.    Does TDOC believe that a two-drug

22   protocol consisting of midazolam and potassium

23   chloride, does TDOC believe that that would end

24   the prisoner's life?

25             MR. MITCHELL:  I'm going to object to

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 102 of 373 PageID #: 6409
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    the form and the scope of the notice.

2            You may answer.

3            THE WITNESS:  TDOC believes that,

4    yes, it would.  But we would also state that we

5    believe the three-drug protocol that we're

6    currently using is the most appropriate method,

7    as I've stated before.

8    BY MR. KURSMAN:

9    Q.    Okay.  Can you explain why?

10   A.    Again, the -- we believe that the

11   midazolam is adequate to render the person

12   unconscious.  We believe that the paralytic,

13   again, aids in the death process, as far as

14   stopping the breathing of the individual.  And

15   used in conjunction with the potassium chloride

16   that basically stops the heart, that it

17   achieves the goal of lethal injection.

18   Q.    So is the purpose of the paralytic in

19   the -- in the lethal injection protocol to stop

20   the breathing of the individual?

21   A.    I think the purpose of the paralytic,

22   again -- and I'm speaking about -- first of

23   all, I'm not a scientist.  I'm not a medical

24   professional.  But from the Department's point

25   of view, the paralytic is used in conjunction

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 103 of 373 PageID #: 6490
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  with the other three drugs.  And by the nature

2  of the drug itself and its purpose, is to

3  paralyze the individual and to stop the

4  breathing of the individual.

5  Q.    What does TDOC believe the purpose of

6  paralyzing the individual would be?

7  A.    Again, stopping the inmate's ability to

8  breathe, the -- which in conjunction with the

9  other three drugs, hastens the death process.

10  And again, ultimately ensuring the death of the

11  individual that's been sentenced to death by

12  the Court.

13  Q.    Let's go back to the same exhibit, the

14  one...

15        MR. MITCHELL:  I'm sorry.  Can you

16  say that again?

17        MR. KURSMAN:  Yeah, I apologize.

18  BY MR. KURSMAN:

19  Q.    On Exhibit 7, the same e-mail that we

20  were just talking about at 12:58.  And in the

21  middle of the paragraph, do you see it says --

22  the third line down -- it says, here's my

23  concern with midazolam.  Being a

24  benzodiazepine, it does not elicit strong

25  analgesic effects.  The subjects may be able to

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 104 of 373 PageID #: 6491
Elite Reporting Services
www.EliteReportingServices.com

1    feel pain from the administration of the second
2    and third drugs, potassium chloride especially.
3            Do you see that?
4    A.    I do see that.
5    Q.    Have you seen this e-mail before today?
6    A.    I have seen this e-mail before.
7    Q.    What did TDOC do with this e-mail?
8            MR. MITCHELL:  Object to the form.
9            You can answer.
10           THE WITNESS:  Let me make sure I
11   understand you.  Are you -- are you asking what
12   consideration TDOC gave this e-mail?
13   BY MR. KURSMAN:
14   Q.    Yes.
15   A.    Okay.
16   Q.    Thanks.
17   A.    We considered the information as written
18   and as stated.  That's what we did with it.
19   Q.    Yeah.  How did you consider the
20   information?
21   A.    We consider this, obviously, the opinion
22   of the person who wrote the e-mail, who is --
23   who I'm assuming is a person that is associated
24   with the pharmacy that we purchase the drugs
25   from.

```
 1              Does that answer your question?
 2  Q.     No.
 3              My question is, how did you consider
 4  that statement in this e-mail?
 5  A.     I considered it -- as the commissioner
 6  and as TDOC, we considered it at its face
 7  value --
 8  Q.     Do you --
 9  A.     -- of that person's opinion of
10  midazolam --
11  Q.     Do you --
12  A.     -- the use of midazolam.
13  Q.     I apologize.
14              Did you discuss it with anyone else
15  at TDOC?
16  A.     We could have discussed it -- I could
17  have discussed it as commissioner with the drug
18  procurer.  I don't remember the exact
19  conversations.  I know I considered this
20  information along with -- as I've testified
21  before, along with the information from other
22  sources that I considered reliable and that had
23  personal knowledge of midazolam's use in a
24  three-drug protocol for the purpose of the
25  execution.  It was -- it was considered along
```

Elite Reporting Services
www.EliteReportingServices.com

1  with the other information that I had.

2  Q.    Well, did -- did anyone at TDOC ever take

3  this e-mail to any experts?  Meaning did you

4  take this e-mail to any doctors to get their

5  opinion?

6  A.    Not this particular e-mail itself.  The

7  concept of midazolam -- the question of

8  midazolam being sufficient to render someone

9  unconscious and unable to feel pain, that was a

10  consideration that I discussed with the people

11  that I mentioned previously, as -- and their

12  observations and opinions related to that

13  particular opinion that's stated here.

14  Q.    Did any individuals at TDOC have a

15  follow-up conversation with this person who

16  wrote this e-mail to understand what they meant

17  that being a -- being a benzodiazepine does not

18  elicit strong analgesic effects and the

19  subjects may be able to feel pain from the

20  second and third drugs?

21  A.    I'm not aware of that.

22        MR. MITCHELL:  Object to the form and

23  the scope of the notice.

24        You may answer.  Sorry.

25  ///

1  BY MR. KURSMAN:

2  Q.    Was there any discussion about searching

3  for an additional drug that might elicit strong

4  analgesic effects?

5  A.    I give no instructions for that.  Again,

6  based on -- in considering what was said here,

7  as well as the other individuals that I spoke

8  to, the decision was made to use midazolam.

9  Q.    Does TDOC know what the term analgesic

10 effects means?

11 A.    Yes.

12 Q.    Okay.  And what does it mean?

13 A.    It is related to the effects on an

14 individual not to feel pain.

15 Q.    And was -- and is TDOC aware that

16 midazolam does not elicit strong analgesic

17 effects?

18 A.    TDOC is aware that there is mixed

19 professional opinions on that.  I think if you

20 talk to expert witnesses on the use of

21 midazolam, you'll have people -- some who say

22 that it does, and some who say that it does

23 not.  So we're aware of both of those opinions.

24 Q.    And after receiving this e-mail -- I

25 think you've already said you did not show it

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 108 of 373 PageID #: 6495
ELITE Court Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    to a doctor.  Did you show it to a
2    pharmacologist?
3    A.    No.
4         MR. MITCHELL:  And I'm going to
5    object to the scope of the notice.  But the
6    answer stands.
7    BY MR. KURSMAN:
8    Q.    And after receiving this e-mail, was
9    there any discussion at TDOC about searching
10   for any additional drugs?
11   A.    Other than pentobarbital, no.
12   Q.    And then do you see the e-mail continues,
13   it says, consider the use of an alternative
14   like ketamine or use in conjunction with an
15   opioid.
16         Do you see that?
17   A.    I do see that.
18   Q.    Did you do that?
19         MR. MITCHELL:  I'm going to object to
20   the scope of the notice, as well as object to
21   the form.
22         You can answer.
23         THE WITNESS:  As far as considering
24   the use of an alternative like ketamine or the
25   use in conjunction with an opioid, no.  The

Elite Reporting Services
www.EliteReportingServices.com

1 decision was made to use the three-drug
2 protocol that was currently being used and that
3 TDOC considered reliable in carrying out the
4 lethal injection process.
5 BY MR. KURSMAN:
6 Q.    Okay.  So just so I'm clear, TDOC did not
7 attempt to obtain ketamine, right?
8 A.    Not that I -- not to my knowledge.
9        MR. MITCHELL:  Same objections.
10 BY MR. KURSMAN:
11 Q.    TDOC did not attempt to obtain other
12 drugs, aside from the three drugs in the
13 protocol and pentobarbital?
14        MR. MITCHELL:  Same objections.
15        THE WITNESS:  That's correct.
16 BY MR. KURSMAN:
17 Q.    Okay.  Why didn't TDOC attempt to obtain
18 any other drugs, aside from those four drugs we
19 just discussed?
20        MR. MITCHELL:  Same objections.  Form
21 and scope of the notice.
22        You can answer.
23        THE WITNESS:  Again, TDOC was
24 confident that the three-drug protocol, as
25 listed here in our current protocol, was

Elite Reporting Services
www.EliteReportingServices.com

1  sufficient based on the drugs that were

2  relied -- that we could attain and that were

3  currently being used in the execution process

4  in other states, as well as the conversations

5  that the commissioner had with other directors

6  who were using this protocol successfully.

7  BY MR. KURSMAN:

8  Q.     Is TDOC aware that the pharmacist who

9  supplies TDOC with execution drugs believes

10 that midazolam will not render the prisoners

11 insensate to the second and third drugs?

12            MR. MITCHELL:  I'm going to object to

13 the form, scope of the notice.

14            You may answer.

15            THE WITNESS:  I'm sorry.  Repeat

16 that.  I'm sorry.

17 BY MR. KURSMAN:

18 Q.     Sure.

19            Is TDOC aware that the pharmacist who

20 supplies TDOC with the drugs believes that

21 midazolam will not render the prisoners

22 insensate to the second and third drugs?

23            MR. MITCHELL:  Same objections.

24            You may answer.

25            THE WITNESS:  I'm not -- the

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 1615 of 373 PageID #: 6498
Elite Reporting Services
www.EliteReportingServices.com

1   Department's not.

2   BY MR. KURSMAN:

3   Q.    And what would the Department do if they

4   found out about that opinion from the

5   pharmacist?

6           MR. MITCHELL:  Object to the form and

7   the scope of the notice.

8           You can answer.

9           THE WITNESS:  I think -- again, the

10  Department of Corrections is confident that the

11  three-drug protocol we use is the best

12  protocol, based on the availability of the

13  drugs that we have access to, as well as our

14  use of this three-drug protocol on two

15  occasions that, frankly, has built our

16  confidence in the three-drug protocol that we

17  currently use.

18  BY MR. KURSMAN:

19  Q.    If we go back to Exhibit 7, that sentence

20  we were just talking about, being a

21  benzodiazapine, it does not elicit strong

22  analgesic effects.  Why did TDOC decide to

23  reject this opinion?

24  A.    I'm sorry, sir?  I didn't understand your

25  question.

Case 3:18-cv-01234-BElite Reporting Services 03/17/22  Page 112 of 373  PageID #: 6499
Elite Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1  Q.    Sure.

2          So the pharmacist e-mails TDOC, a

3  member of TDOC, and says, look, I have concerns

4  midazolam -- that under this protocol the

5  prisoners could feel the effects of the second

6  and third drugs.  Why did TDOC reject this

7  opinion?

8  A.    I don't know that we rejected the

9  opinion.  I think we -- I think TDOC took this

10  into consideration, along with the other

11  information that we had at the time, and made a

12  decision based on not just one e-mail but the

13  total scope of the information that TDOC had to

14  make a decision on a three-drug protocol.

15  Q.    So does TDOC believe that this opinion

16  could be correct?

17  A.    I think --

18          MR. MITCHELL:  I'm going to object to

19  the scope of the notice and also the form.

20          You can answer.

21          THE WITNESS:  I think TDOC would

22  acknowledge that there are those people who

23  have the sincere opinion that midazolam does

24  not render someone insensate, as well as people

25  and professional opinions who believe that it

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 163 of 373 PageID #: 6500
Elite Reporting Services
www.EliteReportingServices.com

1    does.  And we acknowledge that, I think.

2            But we also acknowledge that it's

3    relevant, what we have personally seen using

4    this three-drug protocol, as well as the

5    conversations of other directors that currently

6    use this three-drug protocol successfully with

7    no issues, as well as TDOC's history with this

8    three-drug protocol, that it is, again, the

9    best protocol that we have available at this

10   time.

11   BY MR. KURSMAN:

12   Q.    When you say use successfully, what do

13   you mean by that?

14   A.    To carry out lethal injection on an

15   individual that has been sentenced to death in

16   the state of Tennessee.  To render the person

17   dead.

18   Q.    Okay.  So TDOC's opinion of a successful

19   execution is a rendering a person dead?

20           MR. MITCHELL:  I'm going to object to

21   the form and scope of the notice.

22           You may answer.

23           THE WITNESS:  Well, I've said this

24   before.  TDOC is -- is -- our opinion is to

25   ensure that we do the best we can to carry out

1  the orders of the Court, which is death, in the

2  most humane and constitutionally protected

3  method that we have available to us.  That's

4  our -- that's our goal, and that's our

5  priority.

6  BY MR. KURSMAN:

7  Q.   And can you describe to me how the use of

8  a -- the second drug in this execution

9  protocol, in TDOC's opinion, would make the

10  execution more humane than just using midazolam

11  and potassium chloride?

12       MR. MITCHELL:  And same objections.

13  Form and scope of the notice.

14       You may answer.

15       THE WITNESS:  I think the second

16  drug, the vecuronium, again, it's a paralytic

17  that -- I've said this before.  It hastens the

18  death process.  It stops the breathing.  It

19  paralyzes the individual.  And that is -- that

20  is why it's important in this protocol.

21  BY MR. KURSMAN:

22  Q.   Is TDOC aware that the paralytic also

23  disallows the prisoner to move at all, even if

24  the prisoner can feel pain?

25       MR. MITCHELL:  Again, I object to the

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    form and the scope of the notice.

2              You can answer.

3              THE WITNESS:  TDOC is aware that it

4    paralyzes the individual, yes.

5    BY MR. KURSMAN:

6    Q.    But is TDOC aware that that means that

7    the individual will not be able to signal that

8    he or she feels pain from the second or third

9    drugs because they will be paralyzed?

10             MR. MITCHELL:  Same objections.

11             THE WITNESS:  TDOC is aware that an

12   individual who is paralyzed obviously couldn't

13   raise his hand or do anything like that or --

14   yes.  So, yes, we're aware of that.

15   BY MR. KURSMAN:

16   Q.    Okay.  Let's go to Exhibit 8.  And do you

17   see this as another e-mail on the same date,

18   September 7th, 2017?  And it's at 1:39?

19   A.    Yes.

20   Q.    And do you see it says, etomidate,

21   limited supply; ketamine, ample supply, at the

22   very top.

23   A.    Yes, I do see that.

24   Q.    This is an e-mail from the pharmacy to

25   TDOC as well, right?

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 116 of 373 PageID #: 6503
Elite Reporting Services
www.EliteReportingServices.com

1  A.    I understand that to be the case, yes.

2  Q.    Why is the pharmacy e-mailing TDOC about

3  its supply of etomidate and ketamine?

4          MR. MITCHELL:  Object to the form and

5  scope of the notice.

6          You can answer.

7          THE WITNESS:  I have no knowledge of

8  that.  I wouldn't be able to answer that.

9  BY MR. KURSMAN:

10 Q.    Did you ask anyone at TDOC in preparation

11 for this deposition why the pharmacy would have

12 e-mailed about their supply of etomidate and

13 ketamine?

14         MR. MITCHELL:  Same objections.

15         You can answer.

16         THE WITNESS:  I did not.

17 BY MR. KURSMAN:

18 Q.    Have you ever seen this e-mail before

19 today?

20 A.    Not that I recall.

21 Q.    Had you known --

22 A.    I --

23 Q.    I apologize.

24 A.    I want to be clear.  Again, this is --

25 goes back several years.  And I've slept since

Case 3:18-cv-01234 Document 184 Filed 03/17/22 Page 117 of 373 PageID #: 6504
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  then, so it's possible I could have in the

2  past.  But I don't -- sitting here today, I

3  don't recall personally seeing that.

4  Q.    Sure.

5        Had TDOC known that the pharmacy

6  could have supplied it with etomidate, would

7  have TDOC purchased etomidate from the

8  pharmacy?

9        MR. MITCHELL:  Objection to the form

10  and the scope of the notice.

11        You can answer.

12        THE WITNESS:  TDOC was moving forward

13  with a three-drug protocol with midazolam,

14  vecuronium, and potassium chloride.  And TDOC

15  was satisfied that, again, that was the best

16  option that we had for a three-drug protocol.

17        I don't know what context this may

18  have been sent to the individual it was sent

19  to.  It could have been a question that they

20  could have been providing this just as FYI.  I

21  don't know.

22        But to try to answer your question

23  again, the Department of Corrections was moving

24  forward with the three-drug protocol of

25  midazolam, vecuronium, and potassium chloride.

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    And is that the same answer for why TDOC

3  did not attempt to get ketamine as well?

4  A.    Yes.

5         MR. MITCHELL:  Same objections.

6  BY MR. KURSMAN:

7  Q.    Okay.  Let me ask you this.  The

8  pharmacist says, consider getting an analgesic.

9         If TDOC's position is to have the

10  most humane execution, why not just get an

11  analgesic and give that to the prisoner as

12  well?

13         MR. MITCHELL:  Objection to the form

14  and the scope of the notice.

15         You can answer.

16         THE WITNESS:  So again, it's our

17  belief that the current system that's being

18  used is the most appropriate and most humane

19  method that we can provide, based on what's

20  being used in other states with the three-drug

21  protocol, as well as our being available to

22  obtain the drugs necessary from a supplier for

23  executions in the Department of Corrections.

24  BY MR. KURSMAN:

25  Q.    Right.

Elite Reporting Services
www.EliteReportingServices.com

     1          But previously you testified that
     2  it's TDOC's position that there are some
     3  experts that believe the administration of the
     4  first drug will make the prisoners insensate to
     5  the second or third drugs or at least
     6  unconscious before receiving -- before
     7  receiving the second or third drugs.  And then
     8  there's some experts who believe that the
     9  prisoners will feel the second and third drugs
    10  after they get the midazolam.
    11          Why not -- because there's this --
    12  TDOC has received this conflicting information,
    13  why not attempt to get an analgesic, so that
    14  whether you are on either side, you can say,
    15  hey, we satisfied your concerns?
    16          MR. MITCHELL:  And again, object to
    17  the form and scope of the notice.
    18          You can answer.
    19          THE WITNESS:  Other than to say that
    20  the decisions that were made to go with the
    21  three-drug protocol from the Department's
    22  standpoint, that the information that the
    23  Department relied upon, as well as our
    24  observations of the current three-drug
    25  protocol, were satisfied that the inmate is

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 120 of 373 PageID #: 6507
Elite Reporting Services  *  (205) 595-0003
www.EliteReportingServices.com

1  unconscious and insensate to pain and that we

2  are providing the most appropriate method,

3  based on the availability of the drugs that we

4  can find.

5  BY MR. KURSMAN:

6  Q.    And when you say your observations, can

7  you describe your observations?

8  A.    I mean, our observations of the two

9  lethal injection processes that we used this

10  three-drug protocol in, so.

11  Q.    Right.

12        And what I mean is, what did TDOC

13  witness to make them more confident that this

14  three-drug execution protocol is humane?

15        MR. MITCHELL:  Objection to the form.

16  Scope of the notice.

17        You can answer.

18        THE WITNESS:  The executions of Irick

19  and Johnson and the observations of the inmate

20  after the midazolam was onboard, the

21  consciousness check that was conducted by the

22  warden, and the inmate's response to the

23  three-drug protocol.

24  BY MR. KURSMAN:

25  Q.    Does TDOC believe the inmate would have

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 121 of 373 PageID #: 6508
EliteReportingServices.com
www.EliteReportingServices.com

1  been in a better position to respond had it

2  only been a two-drug protocol rather than a

3  three-drug protocol?

4          MR. MITCHELL:  Same objections.

5          You can answer.

6          THE WITNESS:  TDOC acknowledges that

7  the paralytic could affect the inmate's ability

8  to respond once the vecuronium is onboard, but

9  obviously we're satisfied that the midazolam --

10  the 500 milligram of midazolam onboard the

11  individual rendered them unconscious and

12  insensate to pain.

13  BY MR. KURSMAN:

14  Q.    Does TDOC have any e-mail correspondence

15  with any other pharmacies aside from the

16  pharmacy who is supplying you with lethal

17  injection chemicals?

18  A.    Not that we're aware of.

19          MR. MITCHELL:  Yeah.  Object on the

20  form and scope of the notice.

21  BY MR. KURSMAN:

22  Q.    And why wouldn't you have correspondence

23  with the other pharmacies?

24          MR. MITCHELL:  Same objections.

25          THE WITNESS:  I don't know.

Elite Reporting Services
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    Is that TDOC doesn't know?

3          (Reporter clarification.)

4          MR. MITCHELL:  Same objections.

5          THE WITNESS:  Yeah, I would not know.

6  BY MR. KURSMAN:

7  Q.    Well, are you looking -- is TDOC looking

8  for pentobarbital through any other pharmacies,

9  aside from the pharmacist that supplies you

10  with midazolam?

11  A.    TDOC has instructed the drug procurer to,

12  again, have a -- there's a continuous effort to

13  look for pentobarbital.  That could be through

14  the current provider, as well as other

15  providers or potential providers.

16  Q.    Let's go to Exhibit 9.  Go to the second

17  page in Exhibit 9.  Do you see it says, so the

18  word from the powers that be is that we want to

19  move forward with ordering the items for a

20  three-drug protocol, including midazolam?

21  A.    I see that.

22  Q.    Yeah.

23          And do you see this is an e-mail from

24  September 21st, 2017?

25  A.    I do, yes.

Case 3:18-cv-01234-B Document 184  Filed 05/47/22  Page 123 of 373  PageID #: 6510
Elite Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1  Q.    So this is after the e-mail from the
2  pharmacist regarding midazolam's analgesic
3  effects, right, that was on September 7, 2017?
4  A.    That's correct.
5  Q.    Why -- well, after -- between these two
6  e-mails, did anyone at TDOC have discussions
7  about attempting to look for different drugs
8  based on that September 7th e-mail?
9         MR. MITCHELL:  Object to the form and
10  also the scope of the notice.
11         THE WITNESS:  TDOC -- it's fair to
12  say that TDOC considered the information, as
13  I've said earlier, in the original e-mail
14  that -- the September 7th e-mail -- sorry.  Let
15  me verify.  Yeah, the September 7th e-mail and
16  made the decision to move forward with
17  midazolam.
18         I'm sorry.  I don't remember your
19  exact question but...
20  BY MR. KURSMAN:
21  Q.    I think that answers it.
22  A.    Yeah.
23  Q.    Do you see that in the -- in the second
24  paragraph, where it says, for each inmate we
25  would have to have a backup dosage of those?

Case 3:18-cv-01234-Bocument 184 Filed 03/47/22 Page 124 of 373 PageID #: 6521
Elite Reporting Services
www.EliteReportingServices.com

1  A.     I see that, yes.

2  Q.     Is that for all three drugs in the

3  protocol?

4  A.     So I'm assuming there that's the second

5  dose of -- the blue set.  The backup set.

6  Q.     And why are backup doses necessary?

7  A.     The backup doses are necessary, for

8  instance, if you have -- during the process if

9  you have to switch from the left arm to the

10  right arm because of a blown vein.  Or there's

11  any issue with the first round of drugs, you --

12  the protocol instructs the executioner and the

13  warden to switch to the second set of drugs.

14         MR. KURSMAN:  Could we take a break

15  here?

16         MR. MITCHELL:  Sure.

17         THE VIDEOGRAPHER:  One moment,

18  please.  Going off record at 12:01 p.m.

19         (Short break.)

20         THE VIDEOGRAPHER:  Back on the record

21  at 12:44 p.m.

22  BY MR. KURSMAN:

23  Q.     While we were on break, is there anything

24  that you thought of that you would like to

25  change your answer to earlier?

Elite Reporting Services - (855) 573-0093
www.EliteReportingServices.com

```
1   A.      No.

2   Q.      Okay.  Let's go to -- do you have the

3   exhibits in front of you?

4   A.      I do.

5   Q.      Okay.  Great.

6           Let's go to Exhibit 10.  Do you see

7   this says, I'm inquiring as to whether your

8   organization has an inventory of pentobarbital?

9   A.      Yes.

10  Q.      Okay.  Do you know if this was written by

11  an employee of TDOC?

12  A.      I do not personally know.  No, I don't.

13  I don't know.

14  Q.      Okay.  Let's go to Exhibit 11.  Do you

15  see the second e-mail down is at 10:37 a.m. on

16  April 6, 2017?

17  A.      Yes.

18  Q.      It says, word I'm getting from the

19  pharmacist is that we would need USP grade.

20  And asking if the pentobarbital comes in

21  crystalline form for bulk orders to be used to

22  compound.

23  A.      I see that, yes.

24  Q.      Do you know who wrote this e-mail?

25  A.      I do not.
```

Elite Reporting Services
(865) 573-0073
www.EliteReportingServices.com

1  Q.    Do you know why you would need USP grade
2  pentobarbital?
3  A.    I do not.
4  Q.    Is TDOC only looking for USP grade
5  pentobarbital?
6  A.    TDOC is looking for pentobarbital in any
7  form, commercially manufactured or compounded.
8  Q.    And let's turn to Exhibit 12.  And do you
9  see that the second e-mail says, I am looking
10 to purchase pentobarbital.  We would need at
11 least 100 grams to start with.
12 A.    I see that.
13 Q.    Do you know if this e-mail is from an
14 employee from TDOC?
15 A.    I do not know.  I would assume that it
16 is, but I do not know for sure.
17 Q.    Okay.  Has TDOC instructed its drug
18 procurer to look for pentobarbital -- to only
19 look for at least a hundred grams?
20 A.    TDOC has instructed the pharmacist and
21 the drug procurer to look for any amount of
22 pentobarbital --
23 Q.    Okay.  So you --
24 A.    -- sufficient to carry out an execution.
25 Q.    I apologize for interrupting.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 127 of 373 PageID #: 6314
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1          Do you know why the drug procurer

2    would then say we would need at least 100 grams

3    to start with?

4    A.    I do not.

5    Q.    100 grams would be enough for 20

6    executions, right?

7    A.    I believe that's correct.

8    Q.    Okay.  So if a pharmacy could provide you

9    with 25 grams, would TDOC accept those 25 grams

10   of pentobarbital?

11          MR. MITCHELL:  Object to the form and

12   scope of the notice.

13          You can answer.

14          THE WITNESS:  TDOC would accept any

15   amount that would be adequate to carry out an

16   execution in any form, whether it be

17   manufactured or compound.

18   BY MR. KURSMAN:

19   Q.    Okay.  Let's go to --

20   A.    And --

21   Q.    Go ahead.  I'm sorry.

22   A.    No, you -- I'm sorry.  Go ahead.

23   Q.    Let's go to Exhibit 13.  Do you see this

24   from July 20th, 2017?

25   A.    Yes.

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 128 of 373 PageID #: 6315
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  Q.    And it says, I have some news on the

2  pento.  It's not good.  I had the DEA invite me

3  over to discuss it.  I can call you tomorrow to

4  fill you in on the details.

5          Do you see that?

6  A.    I do.

7  Q.    Do you know who this e-mail is from?

8  A.    Not personally, no, I do not.

9  Q.    Do you know who it was to?

10 A.    I do not.  I'm assuming it was to the

11 drug procurer, but I'm not --

12 Q.    Have you seen this e-mail before today?

13 A.    Not that I recall.

14 Q.    Do you know if anyone from TDOC had a

15 phone conversation to discuss the meeting with

16 the DEA?

17          MR. MITCHELL:  Object to the form and

18 scope of the notice.

19          You can answer.

20          THE WITNESS:  TDOC does not -- I --

21 we do not recall any recollection of that.  Not

22 to say that it could not have happened -- the

23 drug procurer particularly -- but we have no

24 knowledge of that.

25 ///

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    What is TDOC's understanding of the DEA's

3  involvement today on a state's ability to

4  import pentobarbital?

5          MR. MITCHELL:  Same objections.

6          You may answer.

7          THE WITNESS:  TDOC's understanding is

8  that the DEA has strictly regulated and

9  prohibited that in other states, where other

10  states have attempted to get pentobarbital from

11  other countries sent in and -- because of a

12  regulation that there is a supply of

13  pentobarbital in the United States.  So,

14  therefore, they -- it would not be required to

15  be brought in from another country.

16          Of course, the argument is there

17  that, supply may be here, but it's not a supply

18  that would be available to corrections when

19  they request it.

20  BY MR. KURSMAN:

21  Q.    Did anybody talk to the DEA about that,

22  what you just said from TDOC about they can't

23  get the supply in the United States?

24          MR. MITCHELL:  Same objections.

25          You can answer.

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 130 of 373 PageID #: 6537
Elite Reporting Services  *  (615) 595-0073
www.EliteReportingServices.com

1          THE WITNESS:  It's the -- it's our

2    understanding that this was a -- the fact that

3    the DEA was involved and prohibited the drug

4    from coming outside the country into the

5    country for the use of executions, that was

6    a -- something that was known in several states

7    by commissioners, as well as I'm assuming the

8    pharmacist and the drug procurer for the state

9    of Tennessee.

10   BY MR. KURSMAN:

11   Q.    Has anyone from TDOC reached out to the

12   DEA since 2017 to see if their stance has

13   changed?

14   A.    Not to my knowledge.

15          MR. MITCHELL:  And again, the form

16   objections and beyond the scope of the notice.

17          THE WITNESS:  Not to my knowledge.

18   BY MR. KURSMAN:

19   Q.    And when you say not to your knowledge,

20   do you mean not to TDOC's knowledge?

21   A.    Not to TDOC's knowledge.

22   Q.    Okay.  Let's go to Exhibit 14.  Do you

23   see these are handwritten notes?

24   A.    Yes.

25   Q.    Okay.  Have you seen these notes before?

```
1    A.     No.
2    Q.     So you don't know who wrote these notes?
3    A.     No.
4    Q.     Can we go to the second page of this
5    exhibit.  Do you see it says, plenty in Europe
6    and available according.  And then it says --
7    redacted -- has it.  No lawyers.
8           Do you see that?
9    A.     I do see that.
10   Q.     Do you know what that means?
11   A.     No, I do not.
12   Q.     Okay.  Were -- was TDOC aware that it
13   could obtain pentobarbital in Europe?
14          MR. MITCHELL:  Object to the form.
15          THE WITNESS:  No.
16   BY MR. KURSMAN:
17   Q.     Okay.  Has TDOC attempted to get
18   pentobarbital in Europe?
19   A.     Again, TDOC has attempted -- or the
20   request for pentobarbital was not specific to
21   any one location, state, or country.  It was a
22   search for pentobarbital, regardless.
23          As far as TDOC reaching out directly
24   to Europe, I have no knowledge of that or --
25   whatsoever.
```

1  Q.    Well, who did TDOC contact to get
2  pentobarbital, aside from the current pharmacy
3  that you're working with now?
4  A.    Again, the drug procurer would have
5  reached out to the current pharmacy that we're
6  working with and other individuals also --
7  other pharmacies, I'm assuming, also.  So it
8  wasn't limited to just one service.
9  Q.    Do you know who was -- any pharmacies in
10 Europe?
11 A.    Not that I'm aware of.
12 Q.    Okay.  And at this time do you know
13 whether you had a compounding pharmacy that was
14 able to compound pentobarbital -- pentobarbital
15 as an active pharmaceutical ingredient?
16 A.    It's my understanding at one time we did,
17 yes.
18 Q.    And do you know if the current pharmacy
19 that provides you with the lethal injection
20 chemicals would compound pentobarbital's active
21 pharmaceutical ingredient?
22 A.    I'm not one hundred percent sure.  But
23 since it's the same pharmacy we used before,
24 I'm assuming they are still capable of
25 compounding pentobarbital.

Case 3:18-cv-01234 Document 184 Filed 03/47/22 Page 133 of 373 PageID #: 6520
Elite Court Reporting Service (615) 595-0073
www.EliteReportingServices.com

1   Q.    Let's go to Exhibit 16.  And you see this

2   is a PowerPoint?

3   A.    Yes.

4   Q.    Have you seen this PowerPoint before?

5   A.    I have.

6   Q.    Do you know who created it?

7   A.    The Department of Corrections created

8   this PowerPoint.

9   Q.    Do you know who at the Department of

10   Corrections created the PowerPoint?

11   A.    The PowerPoint was created specifically

12   by the administration of the Department.  So it

13   would be people who work for me as a

14   commissioner, as well as input from general

15   counsel and others.

16   Q.    And who would that be, without disclosing

17   any identities?

18   A.    General counsel, drug procurer,

19   commissioner's office, possibly the Attorney

20   General's office, and anyone else who would

21   have had direct knowledge of the subject

22   matter, which primarily the people that I've

23   mentioned.

24   Q.    And do you know who that was presented

25   to?

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 134 of 373 PageID #: 6521
Elite Reporting Services
www.EliteReportingServices.com

1    A.    It was presented to the -- the Governor's

2    office, the administration at the time.

3    Q.    And would you in your individual capacity

4    be part of that office?

5            MR. MITCHELL:  I'm going to -- I'm

6    going to object to the form and the scope of

7    the notice.

8            You can answer.

9            You said Governor's office?

10           MR. KURSMAN:  Yeah.

11           MR. MITCHELL:  Individual capacity?

12           MR. KURSMAN:  With the -- with the

13   commissioner being one of the participants that

14   this was presented to, is the question.

15           MR. MITCHELL:  Okay.

16           THE WITNESS:  Yes.

17   BY MR. KURSMAN:

18   Q.    Okay.  And who else, without revealing

19   any identities, was in attendance when this was

20   presented?

21   A.    To the best of my recollection, the chief

22   legal counsel, members from the Attorney

23   General's office, the Governor's office, the

24   legal counsel for the Governor at the time.

25   Q.    Do you know why this PowerPoint was

Case 3:18-cv-01124-B Document 184 Filed 03/17/22 Page 135 of 373 PageID #: 6722
Elite Reporting Services (855) 573-0123
www.EliteReportingServices.com

1  created?

2  A.    It was created to inform the Governor

3  when the current process of the death penalty

4  process in Tennessee -- kind of where we were

5  at in the process of looking forward to

6  potential upcoming executions.

7  Q.    Did the Governor ask for this to be

8  created?

9         MR. MITCHELL:  I'm going to object to

10  the form and scope of the notice.

11         THE WITNESS:  I don't recall that the

12  Governor specifically asked for this to be

13  created.  The Department did this to make sure

14  that we were staying in communication with the

15  Governor's office and they were aware of where

16  we were at within the Department.

17  BY MR. KURSMAN:

18  Q.    Okay.  And where were you at, at that

19  time that this was created?

20  A.    So -- well, it's -- a lot of it's

21  included in this PowerPoint, as to where we

22  were at.  There was discussion about the number

23  of inmates on death row.  Obviously where they

24  were located.  We covered the law on

25  alternative means to execution.  What

Elite Reporting Services · (865) 573-0023
www.EliteReportingServices.com

1  Tennessee's protocol was with the

2  pentobarbital.

3          I mean, there's a lot of information

4  in here.  Do you have a specific --

5  Q.    Yeah, and I apologize for that.

6          At this point before the protocol --

7  or before the PowerPoint was presented, was

8  TDOC at that point thinking that they wanted to

9  change to the three-drug protocol?

10 A.    TDOC was concerned that pentobarbital was

11 not going to be available and that we couldn't

12 find pentobarbital.

13 Q.    So did --

14 A.    And that there was a -- there was a --

15 there was a -- that was our understanding.  And

16 wanted to make sure that the administration

17 knew that and -- as well as our process of

18 looking for alternatives to the current

19 protocol if the pentobarbital was not

20 available.

21 Q.    And was TDOC considering any alternatives

22 aside from the current three-drug protocol?

23 A.    Initially.  When we realized that

24 pentobarbital was not available, we were not

25 able to get it.  We were facing the possibility

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 137 of 373 PageID #: 6524
Elite Reporting Services · (615) 595-0073
www.EliteReportingServices.com

1    of upcoming executions, of course.  We began

2    the process, as I've described earlier today,

3    of how we developed the three-drug protocol.

4    That is the same process as -- to answer the

5    question that you just asked me.

6    Q.    Right.  I'm sorry.  Maybe my question is

7    a little unclear.

8            That process of coming up with that

9    three-drug protocol, did that process begin

10   before August 31st, 2017, the date of this

11   PowerPoint?

12   A.    I think it was -- I think the -- the

13   Department of Corrections realized that we were

14   approaching a time period where an alternative

15   to the one-drug protocol was going to be

16   necessary.  Because after exhaustive attempts

17   we could not find the pentobarbital.  It was --

18   it was our realization that we were not going

19   to be able to find it.  Although we continued

20   to look for it, that we had to establish

21   another alternative.  And it would have been

22   close to this time that we realized.

23            But the effort certainly started

24   after this and continued on until we

25   established the three-drug protocol.

Case 3:18-cv-01234-B   Document 184   Filed 03/17/22   Page 138 of 373   PageID #: 6525
Elite Reporting Services   (615) 595-0073
www.EliteReportingServices.com

1    Q.    So after this was presented to the

2    Governor and the Governor's office, was it the

3    Governor's office that instructed TDOC, okay,

4    look for midazolam?

5              MR. MITCHELL:  I'm going to object to

6    the form and the scope of the notice.  And also

7    based on the deliberative process privilege and

8    instruct the witness not to answer.  And, I

9    guess, executive privilege.

10   BY MR. KURSMAN:

11   Q.    Let's go to page 8.  I'm sorry, page 7 of

12   the -- sorry, page 8.  I apologize.

13             Do you see it says, reached out to

14   blank because it was understood they had a

15   source for pentobarbital?

16   A.    I see that.

17   Q.    Do you see that on page 8?

18             Is blank a state?

19   A.    Yes.

20   Q.    Okay.  How many states did the Department

21   of Corrections reach out to who had a source of

22   pentobarbital?

23             MR. MITCHELL:  I'm going to object to

24   the form.

25             But you can answer.

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 139 of 373 PageID #: 6576
Elite Reporting Services
www.EliteReportingServices.com

 1          THE WITNESS:  We reached out to two

 2     states, as well as -- as well as the

 3     association that represents all state

 4     corrections in America to attempt to find

 5     someone who had a current source for

 6     pentobarbital, who was willing to provide

 7     contact information that we might reach out to

 8     a pharmacist that -- to inquire as to whether

 9     or not they would provide that to Tennessee.

10     BY MR. KURSMAN:

11     Q.    Why were these states unwilling to share

12     this information?

13          MR. MITCHELL:  I'm going to object to

14     the form and the scope of the notice.

15          You can answer.

16          THE WITNESS:  It's the State's

17     understanding that some of the pharmacies were

18     very hesitant to expand providing pentobarbital

19     to other states for different reasons.  And the

20     state departments of corrections in those

21     states did not want to take a chance of losing

22     their source and putting them in the same

23     situation as -- at the current time that

24     Tennessee was in, with not being able to find

25     pentobarbital.

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    Why did Tennessee stop at two states?

3  A.    I don't know that Tennessee stopped at

4  two.  I said two.  I can recall two specific

5  states right now.  Again, the request was

6  there, both from the drug procurer and the

7  commissioner's communication with other

8  corrections commissioners, as well as the

9  association that represents us to make every

10  attempt to find pentobarbital at any location.

11  Q.    And what was your conversation with this

12  association that represents all departments of

13  corrections?

14  A.    My conversation was that, can you assist

15  in any way of finding a source of pentobarbital

16  for the use of lethal injection in the state of

17  Tennessee, either from another correction or

18  from another contact that might know a pharmacy

19  that would provide it and be willing to provide

20  it.

21  Q.    And what was the response that you

22  received?

23  A.    The response was, is that they would do

24  everything in their power to assist.  They

25  would contact me if they had a source or a

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 141 of 373 PageID #: 6528
ELITE Document Reporting Services.com
www.EliteReportingServices.com

1    potential source or a number or a contact that
2    we could reach out to.  And there was multiple
3    communications between myself and the
4    association's director to follow up on that.
5    Q.    What did you discuss during these
6    multiple conversations?
7    A.    Again, is there a source.  Have you found
8    a source.  Has another director, you know, come
9    forth willing to help -- help us.  Even -- even
10   to the point that as a director -- let's use
11   for example -- let's just say Kentucky.  If
12   Kentucky had a source and they did not want to
13   come forth and say this is Kentucky providing
14   this information, they could go to the
15   executive director, provide that -- you know,
16   here's a number of a pharmacy that might be
17   willing to provide it.  And Tennessee can reach
18   out to them, and I don't know that Kentucky
19   provided it.
20   Q.    And did you ever get any of those
21   numbers?
22   A.    No, I did not.
23   Q.    Okay.  Does TDOC know which states
24   currently have a supply of pentobarbital?
25   A.    TDOC would assume that Georgia has a

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 142 of 373 PageID #: 6529
Elite Reporting Services
www.EliteReportingServices.com

1    supply and Texas has a supply.  But again,

2    that's an assumption.

3    Q.    What about is TDOC aware of whether

4    Missouri has a supply of pentobarbital?

5    A.    Not specifically, no.

6    Q.    Is TDOC aware of whether South Dakota

7    currently has a supply of pentobarbital?

8    A.    Not specifically, no.

9    Q.    And how about the federal government?

10   A.    TDOC is aware that the federal government

11   had a supply of pentobarbital and may still

12   have a supply of pentobarbital.  But the

13   federal government is also unwilling to provide

14   any information or source to provide

15   pentobarbital to Tennessee.

16   Q.    Why do you think all these other

17   states -- Texas, Missouri, South Dakota,

18   Georgia, and the federal government -- can

19   obtain pentobarbital but Tennessee can't obtain

20   pentobarbital?

21          MR. MITCHELL:  Objection to the form

22   and beyond the scope of the notice.

23          You can answer.

24          THE WITNESS:  It could be for

25   different reasons, I guess.  I -- it could be

Elite Reporting Services
www.EliteReportingServices.com

1  because of individual agreements that

2  someone -- that a state may have had long-term

3  agreements working with a pharmacy that

4  provides that pento.

5          And, you know, I don't know.  If I

6  knew that, I would try to do anything I could

7  to alleviate those issues.  But I don't know

8  the specifics to answer that question.

9  BY MR. KURSMAN:

10 Q.     Okay.  Has TDOC reached out to any state

11 since the PowerPoint presentation, since August

12 31st, 2017?

13 A.     Yes.

14 Q.     When was the last time that TDOC had

15 reached out to a state in search of

16 pentobarbital?

17 A.     Those conversations have happened through

18 the commissioner, again, as recently as August

19 of this year, as well as in an ongoing effort

20 to try to find pentobarbital.

21 Q.     And what were you told in August of this

22 year?

23 A.     Basically the same that I've been told

24 all along.  That it's not available.  That you

25 can't find a source for it.  Either in the --

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 144 of 373 PageID #: 6731
Elite Reporting Services
www.EliteReportingServices.com

1   or that no one had a viable source for it in

2   Tennessee, for either the compounded form of

3   pentobarbital or commercially manufactured

4   pentobarbital.

5   Q.    Let's go to page 9 of the PowerPoint.  Do

6   you see it says, compounding -- in the third

7   bullet, the compounding pharmacy agreed to both

8   compound the LIC and aid in the search for a

9   source?

10  A.    Several pharmacies declined to be

11  involved in any way?  Is that the one you're --

12  Q.    Yes.

13  A.    Yes.

14  Q.    Is that the same compounding pharmacy

15  that you're working with now?

16  A.    It's my understanding, yes.

17  Q.    Okay.  How -- how are they aiding in the

18  search for a source of pentobarbital?

19  A.    They are working with the drug procurer

20  for the state to attempt to find pentobarbital.

21  Q.    Does TDOC know exactly what the pharmacy

22  is doing to attempt to obtain pentobarbital?

23  A.    Other than the request being made for an

24  ongoing search of pentobarbital and their --

25  their attempts to find pentobarbital.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 145 of 373 PageID #: 6532
Elite-Brentwood Reporting Service (615) 595-0073
www.EliteReportingServices.com

1    Q.     Does TDOC know what the pharmacy has been

2    doing in an attempt to obtain midazolam?

3    A.     Again, it's the State's understanding

4    that the pharmacy would be working to ensure

5    that a source was maintained to provide

6    midazolam to the state of Tennessee for

7    executions.

8    Q.     Does TDOC know whether those two

9    searches, the search for midazolam and the

10   search for pentobarbital, does TDOC know

11   whether those two searches are different?

12            MR. MITCHELL:  I'm going to object to

13   the form.

14            THE WITNESS:  TDOC would assume they

15   are different and -- could be different because

16   we're talking about different drugs.  But

17   again -- and also the availability of the one

18   drug as compared to the other.  The history of

19   the availability of midazolam versus

20   pentobarbital, as well as the request for

21   pentobarbital from states as compared to

22   midazolam, all those would be differences.

23            We also understand that, you know,

24   the pharmacy would -- we would assume that the

25   pharmacy would reach out to different sources

Elizabeth Benton, Licensed Court Reporter (615) 595-0073
www.EliteReportingServices.com

1  for the ingredients for a particular drug.

2          So in those ways it would be

3  different.

4  BY MR. KURSMAN:

5  Q.    So does TDOC want the search for

6  pentobarbital to be as exhaustive as the search

7  for midazolam?

8          MR. MITCHELL:  Object to the form.

9  And also beyond the scope of the notice.

10          You can answer.

11          THE WITNESS:  TDOC wants the search

12  for midazolam and pentobarbital.  But again, in

13  our current protocol is use of midazolam.  Our

14  priority is -- if there is a priority, I think

15  the priority would be both.  But the current

16  protocol calls for midazolam.  So we certainly

17  want to be sure that we maintain a supply of

18  midazolam.

19  BY MR. KURSMAN:

20  Q.    So just so I'm clear, you would want the

21  search for pentobarbital to be as exhaustive as

22  the search for midazolam?

23          MR. MITCHELL:  Same objections.

24          THE WITNESS:  Yeah.  Our request is

25  for both and to find a source for both.

Case 3:18-cv-01234 Document 184 Filed 03/17/22 Page 147 of 373 PageID #: 6334
Elite Reporting Services
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    And would you want the pharmacist

3  searching for the API of pentobarbital?

4  A.    Yes.

5         MR. MITCHELL:  Same objections.

6  BY MR. KURSMAN:

7  Q.    Okay.  And does TDOC believe that the

8  pharmacist is currently searching for the API

9  of pentobarbital?

10 A.    Yes.

11 Q.    Okay.  Do you know how the compounding

12 pharmacy searches for potassium chloride?

13 A.    The specifics, no.  Other than -- the

14 assumption would be made by the Department that

15 they would -- for potassium chloride, this

16 pharmacy would be looking for manufactured

17 supply or the ingredients for a compounding

18 solution of potassium chloride.

19 Q.    And is that also true for vecuronium

20 bromide?

21 A.    Again, if there was not a manufactured

22 supply of vecuronium, then the -- the search

23 for the ingredients to compound vecuronium

24 would be reasonably assumed.

25 Q.    Okay.  Let's go to page 10.

Case 3:18-cv-01234-BCommentd 184-prFiledg0547/2ceBage 1485 l373 PageD #: 6565
Elite Reporting Services
www.EliteReportingServices.com

```
 1  A.     10, you said?  I'm sorry.

 2  Q.     10, yes.

 3  A.     Okay.

 4  Q.     Do you say -- do you see it says,

 5  collectively, contact was made with close to

 6  100 potential sources?

 7  A.     I see that.

 8  Q.     Have sources been contacted since this

 9  protocol -- since this PowerPoint?  I

10  apologize.

11  A.     Yes.

12  Q.     Other sources aside from the current

13  compounding pharmacy that you're working with?

14  A.     I would make the assumption that it's --

15  that's the case.  But again, the drug procurer

16  for the Department would be working directly

17  with the current pharmacy, as well as any other

18  source that we could find in search of the

19  pentobarbital.

20  Q.     Did TDOC attempt to contact any sources

21  outside of the United States?

22  A.     I do not know.

23  Q.     Okay.  Now, let's go to the second bullet

24  point.  Do you see it says, company did not

25  have sufficient quantities of the needed form
```

Elite Reporting Services
www.EliteReportingServices.com

1   of pentobarbital.

2           Do you see that?

3   A.    I see that, yes.

4   Q.    What does sufficient quantities mean to

5   TDOC?

6   A.    Sufficient quantities to provide

7   pentobarbital to the Department to carry out an

8   execution.

9   Q.    Right.  But my question, though, is, what

10  is that number?  Before we saw in an e-mail

11  that they asked for 100 grams of pentobarbital.

12  Is that the sufficient quantity that this

13  bullet point is talking about?

14          MR. MITCHELL:  I'm going to object

15  that this is beyond the scope of the notice.

16          But you can answer.

17          THE WITNESS:  No.  It's my

18  understanding -- State's understanding that the

19  quantity was not sufficient to carry out a

20  single execution using pentobarbital.

21  BY MR. KURSMAN:

22  Q.    Okay.  So it's TDOC's understanding that

23  at the time this PowerPoint was made, TDOC

24  could not obtain even 500 milligrams of -- 5

25  grams of pentobarbital?

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 150 of 373 PageID #: 6937
Elite Reporting Services • (615) 595-0073
www.EliteReportingServices.com

1  A.    So, yeah, the Department -- it's our

2  understanding that we could not acquire

3  pentobarbital in a sufficient amount to carry

4  out an execution using pentobarbital as

5  described in our protocol.

6  Q.    Okay.  Let's go to page 11.  Do you see

7  that first paragraph?  It says, the search was

8  brought into a possibility of importing the

9  chemicals from overseas?

10  A.    Yes.

11  Q.    What did TDOC do to attempt to obtain

12  pentobarbital from overseas?

13         MR. MITCHELL:  I'm going to object to

14  the form.

15         THE WITNESS:  I think this may have

16  been in reference to what the Department of

17  Corrections found in their search for

18  pentobarbital; that it was common that the

19  search for the pentobarbital has been expanded

20  to broaden into the possibility of importing

21  chemicals from overseas.  It probably was in

22  reference to another state that attempted this

23  process.

24  BY MR. KURSMAN:

25  Q.    So -- just so I'm clear.  So TDOC did not

Case 3:18-cv-01234 Document 184 Filed 03/47/22 Page 151 of 373 PageID #: 6538
EliteReportingServices.com
www.EliteReportingServices.com

1  attempt to obtain pentobarbital from overseas;

2  is that right?

3  A.    Not that I -- not that I know.  Not that

4  I'm aware of, no.

5  Q.    Okay.

6  A.    I think TDOC, again, using the

7  information that we had, the contacts that we

8  had, the resources that we had, and the

9  information related to obtaining pentobarbital,

10  it was obvious that sourcing pentobarbital from

11  out of the country, that there was a

12  significant obstacle there that prevented that

13  from the federal government.

14  Q.    Since this PowerPoint was created, has

15  TDOC attempted to obtain pentobarbital from

16  overseas?

17  A.    Not that I'm aware of.  It's possible

18  that it -- the pharmacy could have investigated

19  that opportunity.  But I don't have personal

20  knowledge of that, so.  But again, the request

21  from the drug procurer to the pharmacy is that

22  we continue to look for pentobarbital in any

23  form.

24  Q.    Okay.  But the drug procurer or any

25  employee of TDOC, none of them attempted to

Elite Reporting Services
www.EliteReportingServices.com

1  obtain pentobarbital from overseas directly?

2  A.    Not that I'm aware of.

3  Q.    Okay.  Let's go to page 13.  Do you see

4  the second paragraph?  It says -- redacted --

5  is now researching FDA regulations.  As a

6  result, this case determined what, if any,

7  process can be undertaken to obtain FDA

8  approval for the implementation of

9  pentobarbital.  Thus far the approval process

10 appears to be very cumbersome, unless an

11 exception can be claimed to lessen the burden.

12        Do you see that?

13 A.    I do.

14 Q.    What were the results of that research?

15 A.    To the best of my knowledge that -- the

16 research was that the regulations that

17 prohibited the importation of pentobarbital for

18 the use of lethal injections were not removed

19 and that there was no relief found there in any

20 way or any form.

21 Q.    And when did you have a conversation with

22 the person that was doing this research?  What

23 year would that have been?

24 A.    It --

25        MR. MITCHELL:  I'm going to object to

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 153 of 373 PageID #: 6540
Elite Reporting Services
www.EliteReportingServices.com

```
 1   the form.
 2           You can answer.
 3           THE WITNESS:  Okay.  It would have
 4   been during the time before this PowerPoint was
 5   developed.  I don't remember the exact date.
 6   BY MR. KURSMAN:
 7   Q.    Do you remember who was involved in the
 8   conversation, without identifying any --
 9   A.    The drug procurer.  The drug procurer,
10   myself, the state that was involved in this
11   process, and possibly the pharmacist.
12   Q.    What do you mean by the state that was
13   involved in this process?
14           MR. MITCHELL:  I'm going to object
15   pursuant to the protective order, if that is --
16   if it's asking for the actual state.
17           MR. KURSMAN:  No, I'm not asking for
18   the actual state.  I apologize if it seemed
19   like I was asking for the state.
20           THE WITNESS:  So officials --
21   officials who -- who work for the state where
22   this incident occurred, where drugs were
23   imported -- pentobarbital and drugs were
24   attempted to be imported that the federal
25   government confiscated.
```

Case 3:18-cv-01234-BJD-MCR   Document 184   Filed 03/47/22   Page 154 of 373   PageID #: 6541
Elite Reporting Services
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    And what were you told at that meeting?

3  A.    Basically that the FD -- that the federal

4  government confiscated the drugs because of a

5  law that said if -- you could not import drugs

6  if there was a supply of drugs within the

7  country.  They would not allow it.

8  Q.    Does TDOC know what was cumbersome, as

9  used here, about the approval process?

10 A.    Oh, I think that was just a reference to

11 the regulations and the lack of response in

12 many cases that the federal government supplied

13 to states.

14 Q.    Did TDOC attempt to obtain an exception?

15 A.    I think TDO -- I'm not sure.  I would

16 have to -- I would have to follow up on that.

17 I'm not sure to answer that.

18 Q.    When was the --

19 A.    I know --

20 Q.    Go ahead.

21 A.    I know that we -- again, we explored the

22 options.  Had conversations with the state that

23 was involved here.  And it is possible that the

24 drug procurer may have had conversations with

25 federal authorities in regard to that.  But

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 155 of 373 PageID #: 6542
Elite Reporting Services
www.EliteReportingServices.com

1  again, I would want to verify that.

2  Q.    Do you know when the last time those

3  conversations would have taken place, if they

4  did take place?

5  A.    I do not.

6  Q.    Would it -- would it have been after this

7  PowerPoint or before?

8  A.    It would have been before and possibly

9  afterwards also.

10  Q.    Okay.  How much after?  And would it have

11  been in the last three years?

12  A.    I think -- I think very possibly.  If

13  there was a change in this subject matter,

14  regulation, and an indication that the federal

15  authorities were willing to back off of their

16  restrictive stats, that it's very possible that

17  that would have happened recently.

18  Q.    Would TDOC have instructed the drug

19  procurer or someone at TDOC to contact the

20  federal government if a change was made?

21  A.    Well, TDOC's instructions to the drug

22  procurer has always been to continue the effort

23  to find pentobarbital in any form, in any

24  fashion.  And if that would include this, yes,

25  it would.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 156 of 373 PageID #: 6543
Elite Benchmark Reporting Services
www.EliteReportingServices.com

1   Q.    And if the drug procurer didn't contact
2   the federal government or attempt to claim an
3   exception, would it be TDOC's position that the
4   drug procurer wasn't appropriately doing their
5   job?
6           MR. MITCHELL:  Object to the form and
7   beyond the scope of the notice.
8           You can answer.
9           THE WITNESS:  No, it would not.
10  BY MR. KURSMAN:
11  Q.    Why?
12  A.    Well, because the drug procurer is making
13  the attempts, as requested, to find
14  pentobarbital.  That includes many avenues.
15  And without speaking to drug procurer, I don't
16  know exactly if he did or if he did not make
17  this attempt.
18  Q.    Let's go to page 16 -- I mean, I
19  apologize.  To -- yeah, page 16 of the
20  protocol.  I mean, of the PowerPoint.
21          Do you see at the beginning it says,
22  a few years ago approximately 13 states reached
23  out to the Department of Justice seeking aid
24  for a source of LIC chemicals?
25  A.    I do.

Case 3:18-cv-01234 Document 184 Filed 03/47/22 Page 157 of 373 PageID #: 6544
Elite Court Reporting Services
www.EliteReportingServices.com

1  Q.    Was TDOC one of those 13 states?

2  A.    I'm not sure.

3  Q.    Okay.  And I think we went over this a

4  minute ago, but did TDOC at any point reach out

5  to the Department of Justice?

6  A.    Again, it's possible.  But I'm not sure

7  that they did.

8  Q.    And what -- in the second paragraph in

9  this page, can you describe for me what that

10  means?

11          MR. MITCHELL:  I'm sorry, what's the

12  question?  Just -- is it, the question, what

13  the second paragraph on page 16 means?

14          MR. KURSMAN:  Yep.

15          MR. MITCHELL:  Okay.  I'm going to

16  object that that's beyond the scope of the

17  notice.

18          But you can answer.

19          And I'm going to object to the form.

20          THE WITNESS:  I would be speculating,

21  but it's my assumption here that we were

22  referencing a -- the federal government's

23  authority to, again, step in and assist in the

24  supply of drugs.  Just as it says, where the

25  supply is low and the cost for the chemical is

Elizabeth Derwood, Reporting Service (615) 595-0073
www.EliteReportingServices.com

1  so high to make it virtually unavailable.

2  BY MR. KURSMAN:

3  Q.    Did anyone from TDOC ask the federal

4  government to do this?

5  A.    Not that I'm aware of.

6  Q.    So can we go to the next page, page 17?

7  A.    Yeah.

8  Q.    And there's a big question mark that

9  likes look it's asking the people watching the

10  PowerPoint to ask questions?

11  A.    Yes.

12  Q.    Did anyone ask questions or make

13  statements after the PowerPoint?

14  A.    There could have been questions made,

15  minor questions.  I don't recall specifically

16  the questions -- the specific questions.  But

17  it is possible, yes.

18  Q.    But you don't recall who asked questions?

19  A.    I do not.

20  Q.    Okay.  So after this PowerPoint was made

21  and presented, how long after did TDOC begin to

22  look for midazolam?

23  A.    I would say within a few weeks the

24  process began.

25  Q.    And did you look for midazolam before

Elite Reporting Services
www.EliteReportingServices.com

1  this PowerPoint was made?

2  A.    Again, I think that we were under -- we

3  were very aware that pentobarbital was not

4  going to be available, and we continued to be

5  unable to find a source of pentobarbital.  And

6  the inquiries and the consideration of using

7  another alternative method was upon us.

8          So to say that we did not consider or

9  begin the process before might not be totally

10 accurate.  But the concerted effort to find the

11 midazolam and all began shortly after this or

12 about the same time.

13 Q.    Was the pharmacy owner's e-mail that

14 expressed concerns about midazolam, was that

15 presented to the same individuals who were

16 present for this PowerPoint?

17 A.    Not that I recall.  I don't -- I don't

18 think so, no.

19 Q.    Okay.

20 A.    There -- there could have been -- let me

21 give you an example.  If there were

22 representatives of the Attorney General's

23 office at the meeting, they could have -- that

24 would have had knowledge of this -- of the --

25 of the pharmacy's concerns, there could have

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 160 of 373 PageID #: 6547
Elite Reporting Services
www.EliteReportingServices.com

1  been knowledge that way.  But not the Governor

2  or others.

3  Q.    And does -- is it TDOC's position that

4  the pharmacist is wrong?

5          MR. MITCHELL:  Object to the form.

6          THE WITNESS:  TDO's position is that

7  midazolam is sufficiently serving its purpose

8  in the three-drug protocol, as we currently use

9  in Tennessee to render the inmate unconscious

10  in the process of lethal injection.

11  BY MR. KURSMAN:

12  Q.    But does TDOC believe that the pharmacist

13  is incorrect when the pharmacist says the

14  inmate may experience the pain of the second

15  and third drugs?

16          MR. MITCHELL:  Again, object to the

17  form.

18          THE WITNESS:  TDOC believes that the

19  use of midazolam makes the inmate unconscious.

20  And -- and that the two -- that midazolam is

21  appropriate for the purpose, as we use it in

22  our protocol.

23          I -- there's different opinions.  We

24  realize there's some people who says that

25  midazolam does not make people insensate and

Case 3:18-cv-01234-B Document 184-1 Filed 03/17/22 Page 161 of 373 PageID #: 6548
Elite Reporting Services
www.EliteReportingServices.com

1    unconscious.  And there's people that says that

2    inmates will not feel pain by the use of

3    midazolam in the quantities that we give.

4            So it's our position that we feel

5    like that it's adequate and serves the purpose,

6    as it's prescribed in our protocol.

7    BY MR. KURSMAN:

8    Q.    How did TDOC decide which group's

9    opinions to go with?

10   A.    TDOC used the information that we had

11   available, again, through the review of what

12   was being used in other states, what was

13   readily available to us, as well as the team as

14   I described before who worked on the protocol

15   and their communications with individuals, as

16   well as the direct communications that the

17   commissioner had with other states who use

18   midazolam in their protocols.

19   Q.    Did TDOC consult with any pharmacist who

20   advised that based on this protocol, the

21   prisoner would not experience pain from the

22   second or third drugs?

23   A.    I'm not aware of a pharmacist, no.

24   Q.    How about a pharmacologist?

25   A.    Not that I'm aware of.

Elite Reporting Services
www.EliteReportingServices.com

1  Q.    Okay.  Let's go to Exhibit 18.  And do

2  you see this is from June 20th, 2018?

3  A.    Yes.

4  Q.    Do you see it's -- TDOC is searching for

5  USP-grade pentobarbital.  We need at least 10

6  grams.  Do you see that?

7  A.    I do.

8  Q.    Why are they asking for 10 grams?

9  A.    It's my understanding they would be

10 looking at the number of inmates who were --

11 could have been potentially coming up for

12 execution dates and trying to find

13 pentobarbital to carry out those executions for

14 the State.

15 Q.    But why ask for a threshold amount at 10

16 grams rather than 5 grams?

17 A.    Well, again, they would want -- the

18 assumption would be that they would be asking,

19 is there a supply -- should they have that many

20 people at one time get an execution date and be

21 available to provide pentobarbital to carry out

22 those executions.

23        But don't -- it's very -- I want to

24 be clear that our search was for any amount of

25 pentobarbital.  And I realize it says at least

1    10 grams.  But I -- there again, we're looking

2    at one piece of a conversation here.  And we

3    don't know the -- or I don't know the other

4    conversations that took place before or

5    afterwards.

6    Q.    Right.  But we can actually see the other

7    conversations.  And the other conversations

8    say, in the previous e-mails I mentioned,

9    needing 100 grams.

10          So there's now been two requests.

11   One for 100 grams of pentobarbital and one for

12   10 grams of pentobarbital.  Does TDOC know why

13   its employee was requesting more pentobarbital

14   than needed for one execution?

15   A.    Again, I think they were looking for a

16   supply that was sufficient to provide the

17   chemicals for a group of inmates who may have

18   been -- may have a date set at one particular

19   time.  And I think it's also relevant that we

20   didn't know how far those dates would be, at

21   what point they would be, would we have

22   multiple executions on one day.

23          So there's a lot of things that were

24   probably -- that were going on here.  But

25   again, the -- my answer would be that they were

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 164 of 373 PageID #: 6521
Elite Reporting Services
www.EliteReportingServices.com

1  considering the number of people who were up

2  for execution or potentially could be up for

3  the -- with a date of execution, and they were

4  making an attempt to find the quantity

5  necessary to carry out those executions.

6  Q.    But if this pharmacy responded no, all

7  TDOC would know is that they either didn't have

8  100 grams initially or 10 grams now, correct?

9  A.    If you only --

10        MR. MITCHELL:  Object to the form.

11        THE WITNESS:  If you only considered

12  what's written here, without considering phone

13  call conversations or other conversations

14  between these individuals that I may not have

15  knowledge of.

16  BY MR. KURSMAN:

17  Q.    And are you aware of the phone calls that

18  may have went on?

19  A.    I'm aware of our instructions, as a

20  state, to -- through the drug procurer and the

21  pharmacist that we would -- we were -- we were

22  searching for any amount of pentobarbital.

23  Q.    And that's also in the API form as well?

24  A.    In both forms.  Any form.

25  Q.    Okay.  Let's go to Exhibit 19.  And do

Elite Reporting Services
www.EliteReportingServices.com

1  you see this is a -- it says at the top, slip

2  opinion, whether the Food and Drug

3  Administration has jurisdiction over articles

4  intended for use in lawful executions?

5  A.    Yes.

6  Q.    Do you see it's dated May 3rd, 2019?

7  A.    Yes.

8  Q.    And do you see it says, memorandum

9  opinion for the Attorney General?

10  A.    Yes.

11  Q.    And do you understand that's the Attorney

12  General of the United States?

13  A.    Yes.

14  Q.    Have you ever seen this memorandum

15  before?

16  A.    I have not.

17  Q.    Okay.  Do you know if TDOC is aware of

18  this memorandum?

19  A.    I am not aware.

20  Q.    Is TDOC aware that this memorandum

21  instructs the FDA to not exercise jurisdiction

22  over the importation of lethal injection drugs?

23        MR. MITCHELL:  Object to the form and

24  the scope of the notice.

25        You can answer.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 166 of 373 PageID #: 6553
Elite Reporting Services
www.EliteReportingServices.com

```
 1              THE WITNESS:  I am not.
 2  BY MR. KURSMAN:
 3  Q.    When you say you are not, do you mean
 4  TDOC is not aware?
 5  A.    That's correct.
 6              MR. MITCHELL:  Same objections.
 7              THE WITNESS:  Oh, well, yeah, as
 8  commissioner I am not aware.  It's possible
 9  that the chief legal counselor may be aware,
10  but I'm not aware.
11  BY MR. KURSMAN:
12  Q.    But as a representative for TDOC in this
13  deposition or --
14  A.    I would say we may be aware --
15              MR. MITCHELL:  Alex, what topic is
16  this?  What topic of examination does this
17  pertain to?
18              MR. KURSMAN:  Okay.  So 27, 28, 29.
19  22.
20  BY MR. KURSMAN:
21  Q.    After this --
22              MR. MITCHELL:  Was 22 -- wasn't 22
23  stricken per our phone call?  Because that's
24  electrocution.
25              MR. KURSMAN:  Oh, I apologize.
```

Case 3:18-cv-01234 Document 184 Filed 03/17/22 Page 167 of 373 PageID #: 6554
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
 1              MR. MITCHELL:  Okay.
 2  BY MR. KURSMAN:
 3  Q.    Has anyone ever discussed this memo at
 4  TDOC with you personally?
 5              MR. MITCHELL:  And again, I'll object
 6  that this is beyond the scope of the notice.
 7              But you can answer.
 8              THE WITNESS:  Not that I recall.
 9  BY MR. KURSMAN:
10  Q.    And are you aware personally that this
11  memo instructs the FDA to not exercise
12  jurisdiction over the importation of lethal
13  injection drugs?
14  A.    No.
15  Q.    Okay.  Do you know if anyone at TDOC
16  discussed this memo with its source that had a
17  visit from the DEA?
18              MR. MITCHELL:  Object to the form.
19              THE WITNESS:  I am not aware.
20  BY MR. KURSMAN:
21  Q.    Do you know if anyone at TDOC attempted
22  to obtain pentobarbital from overseas after
23  this May 3rd, 2019, memo came out?
24  A.    I am not aware.  I'm not sure.
25  Q.    Did you discuss with your source
```

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 168 of 373 PageID #: 6555
Elite Reporting Services
www.EliteReportingServices.com

1   importing pentobarbital from overseas after

2   this memo was published?

3   A.     Not that I'm aware of.

4   Q.     And did you discuss this memorandum with

5   the United States Department of Justice?

6   A.     Not that I'm aware of.

7   Q.     Okay.  Let's go to Exhibit 20.  Do you

8   see this is an e-mail, December 4th, 2017?

9   A.     I do.

10  Q.     And it says vecuronium is the only one

11  that requires reconstitution?

12  A.     I see that, yes.

13  Q.     What does reconstitution mean?

14  A.     Reconstitution is the mixing of a drug

15  that's in powder form with the bacteriostatic

16  water that -- basically the vecuronium bromide

17  in this case.

18  Q.     And who at TDOC reconstitutes the

19  vecuronium bromide?

20  A.     The executioner.

21  Q.     How is the executioner qualified to

22  reconstitute vecuronium bromide?

23          MR. MITCHELL:  Object to the form.

24          You can answer.

25          THE WITNESS:  Per the instructions of

Case 3:18-cv-01234-Document-184-Filed-05/47/22-cePage 169 of 373-PageID #: 6556
Elite Reporting Services
www.EliteReportingServices.com

1  the pharmacist that provides the vecuronium

2  bromide.

3  BY MR. KURSMAN:

4  Q.    And does TDOC have instructions for

5  reconstituting the vecuronium bromide?

6  A.    Yes.  That -- those instructions were

7  provided to the executioner by -- by the

8  pharmacist.

9         MR. KURSMAN:  Okay.  And we would

10  request a copy of those instructions.

11  BY MR. KURSMAN:

12  Q.    Is TDOC aware that reconstitution

13  requires scientific skill?

14  A.    TDOC is aware that reconstitution

15  requires a process that has been approved

16  through the appropriate individuals and means

17  and regulations of pharmaceutical standards and

18  protocols.

19  Q.    But is TDOC aware that reconstitution

20  requires scientific skill of the individual

21  doing the reconstitution?

22         MR. MITCHELL:  Object to the form.

23         THE WITNESS:  No.

24  BY MR. KURSMAN:

25  Q.    Is TDOC aware that reconstitution

Case 3:18-cv-01234-Document 184 Filed 05/17/22 Page 170 of 373 PageID #: 6557
Elite Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1  requires technical skill --

2          MR. MITCHELL:  Same objection.

3  BY MR. KURSMAN:

4  Q.     -- of the individual doing the

5  reconstitution?

6  A.     I would say, yes.

7  Q.     Now, let's look at Exhibit 24.

8  A.     20 -- what?  I'm sorry.

9  Q.     24.  I apologize.

10         Do you see this says, subject -- if

11 you go down to the bottom, August 8, 2019, at

12 7:55 a.m.  It says, subject KCL protocol?

13 A.     Yes.

14 Q.     And it says, I made edits to the

15 instructions.  Could you have pharmacist review

16 it and confirm these are good?

17         Do you see that?

18 A.     Yes.

19 Q.     Did an employee -- is this -- is this

20 e-mail from an employee at TDOC?

21 A.     I would assume that it is --

22 Q.     Okay.

23 A.     -- based on what's written there.

24 Q.     What experience or expertise does this

25 employee at TDOC have to make edits to

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 171 of 373 PageID #: 6558
Elite Reporting Services  *  (615) 595-0073
www.EliteReportingServices.com

1  pharmacological instructions?

2          MR. MITCHELL:  Object to the form.

3          THE WITNESS:  This person would have

4  been making edits with instruction from the

5  pharmacist regarding this process.  Them

6  personally, I know of no qualifications, other

7  than their role in this process and their

8  direct communication with the pharmacist at the

9  time.

10 BY MR. KURSMAN:

11 Q.   So why would an employee of TDOC be

12 making edits to the instructions that the

13 pharmacist provided?

14         MR. MITCHELL:  Same objection.

15         THE WITNESS:  Again, without --

16 without knowing the particular edits that we're

17 talking about, it would be hard to say.  Again,

18 I would read this as a conversation related to

19 the process of removing the compounded chemical

20 from a frozen state and placing it in the

21 refrigerator for 24 hours to thaw and verifying

22 that it was written in a process that would

23 be -- would meet the requirements of the drug,

24 as per the pharmacist who they were

25 communicating with.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 172 of 373 PageID #: 6759
Elite Document Reporting Service (615) 595-0073
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    Do you know who -- which individual from

3  TDOC wrote this e-mail?

4  A.    I would assume this is the drug procurer.

5  Q.    Okay.  And was it in consultation with

6  anyone else at TDOC?

7  A.    Not that I'm aware of.

8  Q.    Okay.  Let's go to Exhibit 35.  That

9  would be the first exhibit in the next binder.

10  A.    Okay.

11  Q.    Okay.  Do you see at the top it says

12  proposed alternative?

13  A.    I'm sorry.  You said 35?

14  Q.    Yeah, Exhibit 35.  Do you see at the

15  top --

16  A.    Proposed alternative.  Yes, I'm sorry.

17  I'm sorry.

18  Q.    And it says, midazolam, digoxin, morphine

19  sulfate, and propranolol?

20  A.    Yes, I see that.

21  Q.    Okay.  Was TDOC aware at this time that

22  an individual was offering a proposed

23  alternative to the three-drug method?

24  A.    I would assume based on what I'm seeing

25  here that that's a possibility that someone was

Case 3:18-cv-01234-B   Document 184   Filed 05/47/22   Page 173 of 373   PageID #: 6760
Elite Reporting Services   *   (615) 595-0073
www.EliteReportingServices.com

1  offering a second method or an alternative.

2  Q.    Have you seen this e-mail before?

3  A.    I have not.

4  Q.    Okay.  Did TDOC look for the proposed

5  alternatives listed?

6  A.    Not that I'm aware of.

7  Q.    Why not?

8  A.    For reasons that I've already stated,

9  that we were -- we were satisfied that the

10 three-drug program that we were using --

11 midazolam, vecuronium, and potassium chloride

12 -- was the best protocol that we could find.

13 Q.    Do you have any reason to believe that

14 you couldn't obtain digoxin for use in

15 executions?

16 A.    I have no reason to believe that we

17 couldn't, no.

18 Q.    Do you have any reason to believe that

19 you couldn't obtain morphine sulfate for use in

20 executions?

21 A.    Again, same answer.  Possibly we could

22 have, yes.

23 Q.    Do you have any reason you couldn't

24 obtain propranolol for use in executions?

25 A.    Again, making the assumption that what's

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 174 of 373 PageID #: 6761
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  here possibly could have been available, I have
2  no reason to say that.  I believe that we would
3  not have been able to obtain it.
4  Q.    You believe -- I apologize.  So you're
5  saying you have no reason to believe that you
6  couldn't obtain pentobarbital -- propranolol
7  for use in execution?
8  A.    Again, I --
9          MR. MITCHELL:  Can you -- I'm sorry.
10 I'm not even following what you're asking.  Can
11 you just rephrase the question?
12         MR. KURSMAN:  Sure.
13         MR. MITCHELL:  Thank you.
14 BY MR. KURSMAN:
15 Q.    Do you have -- do you have any reason to
16 believe that you couldn't obtain propranolol
17 for use in executions?
18         MR. MITCHELL:  Object to the form.
19 Beyond the scope of the notice.
20         You can answer.
21         THE WITNESS:  The drugs that we could
22 obtain, from my knowledge and the State's
23 knowledge, were midazolam, vecuronium, and
24 potassium chloride.  I have no reason to
25 believe that these other drugs would have been

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 175 of 373 PageID #: 6762
Elite Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1   readily available for us to use.

2           But again, I don't know the

3   conversation particularly here that took place.

4   BY MR. KURSMAN:

5   Q.   But do you have any reason to believe

6   that you wouldn't be able to obtain them?

7           MR. MITCHELL:  Same objections.

8           THE WITNESS:  Other than based on the

9   -- based on the fact that the issues we were

10  having with obtaining pentobarbital, the issues

11  that other states were having in some cases in

12  obtaining midazolam and vecuronium, it was a

13  reasonable assumption that these other drugs,

14  although mentioned, may have been impossible to

15  obtain.  I know of no effort that we made to

16  obtain those particular drugs.

17  BY MR. KURSMAN:

18  Q.   Do you have -- do you have any reason to

19  believe you couldn't obtain diazepam for use in

20  executions?

21          MR. MITCHELL:  Object to the form and

22  the scope of the notice.

23          You can answer.

24          THE WITNESS:  It would -- again, I

25  would say the same answer again.  Obtaining the

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 176 of 373 PageID #: 6763
Elite Reporting Services • (765) 373-0093
www.EliteReportingServices.com

1    drug to use in a -- in lethal injection we

2    found was very difficult.  And we were able to

3    find the midazolam and vecuronium and potassium

4    chloride.  I would have no anticipation of

5    being able to readily find any of these other

6    drugs.

7    BY MR. KURSMAN:

8    Q.    You testified earlier that TDOC only

9    looked for four drugs total, right?

10   Pentobarbital and three drugs in the lethal

11   injection protocol, correct?

12   A.    Correct.

13   Q.    And now I'm asking you if you had any

14   reason to believe you couldn't obtain these

15   other drugs, these drugs that you have

16   testified earlier that you had never looked

17   for, correct?

18           MR. MITCHELL:  Object to the form.

19           Sorry.

20   BY MR. KURSMAN:

21   Q.    Are you testifying now that you do have

22   reason to believe you couldn't obtain these

23   other drugs that I'm asking you about, even

24   though you didn't search for them?

25           MR. MITCHELL:  Object to the form.

Case 3:18-cv-01234 Document 184 Filed 03/17/22 Page 177 of 373 PageID #: 6764
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    And beyond the scope of the notice.

2              THE WITNESS:  Again, I would -- I

3    would just say that it would seem reasonable to

4    me that it would be -- would probably have been

5    difficult to obtain.  But again, since we

6    didn't particularly look for these drugs, it

7    would be just speculation on my part.

8    BY MR. KURSMAN:

9    Q.    Did you have any reason to believe you

10   couldn't obtain amitriptyline for use in

11   executions?

12             MR. MITCHELL:  Same objections.

13             THE WITNESS:  Same answer.

14   BY MR. KURSMAN:

15   Q.    Do you have any reason to believe you

16   couldn't obtain phenobarbital in these

17   executions?

18             MR. MITCHELL:  Same objection.

19             THE WITNESS:  Again, same answer.

20   BY MR. KURSMAN:

21   Q.    Do you have any reason to believe you

22   couldn't obtain secobarbital for use in

23   executions?

24             MR. MITCHELL:  Object to the form.

25             THE WITNESS:  Yeah.  Again, my

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 178 of 373 PageID #: 6765
Elite Reporting Services * (785) 593-0093
www.EliteReportingServices.com

1   thoughts would be that, again, finding

2   midazolam, vecuronium, and potassium chloride,

3   considering the problems that other states were

4   having in obtaining chemicals to be used in

5   lethal injections protocols in other states, it

6   was difficult for -- to find a supply for these

7   drugs to be used in the correctional setting.

8   So my reasonable assumption would be any of

9   these drugs could have been very difficult to

10  find.

11  BY MR. KURSMAN:

12  Q.    But you've never attempted to obtain any

13  of these drugs, right?

14  A.    Correct.  Not to my knowledge.

15  Q.    And when you initially contacted the

16  current pharmacist about whether they could

17  supply you with midazolam, am I right that that

18  same day they said yes?

19  A.    Yes.

20  Q.    And you're describing that as difficult

21  to obtain, midazolam?

22  A.    I am.

23  Q.    Okay.

24        MR. MITCHELL:  Can we go off record

25  real quick?

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 179 of 373 PageID #: 6566
Elite Reporting Services  •  (615) 595-0073
www.EliteReportingServices.com

```
 1              MR. KURSMAN:  Sure.
 2              THE VIDEOGRAPHER:  One moment,
 3  please.  Going off the record at 1:56 p.m.
 4              (Short break.)
 5              THE VIDEOGRAPHER:  Back on the record
 6  at 2:08 p.m.
 7  BY MR. KURSMAN:
 8  Q.    Commissioner Parker, before we went to
 9  break we were discussing secobarbital.  Is TDOC
10  aware that an oral administration of
11  secobarbital could be used as an alternative
12  method of execution?
13              MR. MITCHELL:  Going to object to the
14  form.
15              You can answer.
16              THE WITNESS:  No.
17  BY MR. KURSMAN:
18  Q.    In preparation for your testimony today,
19  did you review the complaint in this case?
20  A.    I did.
21  Q.    Did you review the proffered alternatives
22  in this case?
23  A.    I did.
24  Q.    Are you aware that some states perform
25  executions by firing squad?
```

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 180 of 373 PageID #: 4767
Elite Reporting Services
www.EliteReportingServices.com

1   A.      I am.

2   Q.      Okay.  And are you aware one of those

3   states would be Utah?

4   A.      Correct.

5   Q.      Do you know if TDOC employees are

6   required to complete firearms training as a

7   requirement to be an employee of TDOC?

8   A.      Yes.

9   Q.      Do you know of anyone at TDOC that's

10  qualified to use a firearm?

11  A.      Yes.

12  Q.      Does TDOC provide firearms training?

13  A.      Yes, we do.

14  Q.      Does TDOC have access to a firearms range

15  or a shooting range?

16  A.      Yes, we do.

17  Q.      And does TDOC own firearms?

18  A.      We do.

19  Q.      And can you readily acquire firearms?

20  A.      Yes.  We can acquire the firearms, yes.

21  Q.      And does TDOC own ammunition?

22  A.      We do.

23  Q.      Can you readily acquire ammunition?

24  A.      Yes.

25  Q.      Does TDOC have facilities where a firing

Elite Reporting Services
www.EliteReportingServices.com

1  squad execution could take place?

2         MR. MITCHELL:  Object to the form.

3         You can answer.

4         THE WITNESS:  Not that I'm aware of.

5  BY MR. KURSMAN:

6  Q.    Is TDOC aware of how Utah performs its

7  executions by firing squad?

8  A.    Not the specifics, no.

9  Q.    Has TDOC ever looked into Utah's

10 execution by firing squad protocol?

11 A.    No.

12 Q.    Okay.  Do you believe -- well, could TDOC

13 execute someone by firing squad?

14         MR. MITCHELL:  Object to the form.

15         THE WITNESS:  TDOC would not be able

16 to execute someone by method of firing squad.

17 First of all, TDOC is not familiar with the

18 process.  There's -- I'm not sure -- TDOC would

19 not be sure of the physical plant requirements

20 for such an event, as well as the fact that

21 Tennessee State Legislature does not recognize

22 firing squad as a legal means of execution in

23 this state.  And the fact that there are many

24 considerations that would have to be reviewed,

25 would have to -- processes considered related

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  to the use of a firing squad in the state.

2  BY MR. KURSMAN:

3  Q.    Could TDOC start by reviewing Utah's

4  execution protocol?

5  A.    I think Tennessee could -- I mean, it's

6  possible we could review their protocol,

7  obviously.  But again, I would go back to the

8  methods of approved execution in the state of

9  Tennessee, which are lethal injection and for

10  those inmates convicted prior to January 1 of

11  '99, electrocution.

12          But again, using a method such as a

13  firing squad, I mean, the Department would --

14  as we sit here today, I would have -- I don't

15  know where I would start in regard to -- other

16  than reviewing some other state's protocol to

17  try to determine what would be necessary.  A

18  lot of considerations.  Ricochet, how you

19  prevent ricochet.  How do you ensure

20  confidentiality.  How do you protect the

21  environment that you're using.  Issues of

22  securing the offender, the weapon, the type of

23  weapon, the type of ammunition.  I mean,

24  there's a lot of things that would have to go

25  -- be considered there.

Elite Reporting Services
www.EliteReportingServices.com

1  Q.    But you could start by looking at Utah's
2  protocol?
3  A.    Again, reviewing another state's protocol
4  would be possible, yes.
5  Q.    And after you reviewed Utah's protocol --
6  which you said TDOC has not done, right?
7  A.    Correct.
8  Q.    Okay.  So you -- so TDOC has not looked
9  into whether they could perform an execution by
10 firing squad?
11        MR. MITCHELL:  Object to the form.
12        THE WITNESS:  TDOC has considered
13 that based on the complaint, the fact -- and
14 just the initial -- the initial conclusion is,
15 again, first of all, the state legislature does
16 not recognize a legal means of execution in
17 Tennessee by the use of a firing squad.  But
18 then also the other elements that go into
19 developing a protocol have not been addressed.
20 BY MR. KURSMAN:
21 Q.    Sure.  Sure.  I understand that.  But
22 when you created this current protocol, you
23 said you started by looking at other protocols
24 of different states?
25 A.    Correct.

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 184 of 373 PageID #: 4571
Elite Reporting Services
www.EliteReportingServices.com

1  Q.    Couldn't you do the same for a firing

2  squad protocol?

3  A.    You could do the same, as far as looking

4  at their -- looking at the protocol for another

5  state, obviously.  But the difference would be

6  that in Tennessee, Tennessee recognizes lethal

7  injection as a legal means of execution.

8  Currently that's not the case in Tennessee for

9  a firing squad.

10  Q.    Yeah.  I'm only asking whether it's

11  physically possible for Tennessee adopt

12  execution by firing squad, not whether it's

13  possible.

14  A.    I understand.  And then the -- is it

15  physically possible?  Again, the State of

16  Tennessee -- there's a lot of elements in the

17  process that would have to be explored, again,

18  that the State is currently not aware of, such

19  as physical plant requirements, how you control

20  for confidentiality, how you control for safety

21  and security of the facility or wherever this

22  process took place.  Several elements that we

23  would not have knowledge of at this point.

24  Q.    Are you aware that Utah is controlling

25  for all these things and all of your concerns

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 185 of 373 PageID #: 6572
Elite Reporting Services
www.EliteReportingServices.com

1    in their executions by firing squad?

2            MR. MITCHELL:  Object to the form.

3            THE WITNESS:  It would be an

4    assumption that I would make that they are.

5    But again, without having personal knowledge of

6    that, it would just only be an assumption.

7    BY MR. KURSMAN:

8    Q.    Okay.  Could TDOC execute someone by a

9    single bullet to the back of the head?

10           MR. MITCHELL:  Object to the form.

11           THE WITNESS:  I would have, again,

12   some of the same concerns:  where that process

13   took place; how it would take place; what type

14   of weapon would be used; how you control for

15   ricochet; how you can -- you know, how you

16   prepare the staff to carry out such an event;

17   how many staff would be required; what kind of

18   environment, physical plant, you would need to

19   carry out that process.

20           Tennessee is not in a position to

21   carry out execution with a single bullet to the

22   back of the head.  And then I would also

23   clarify that these -- in this method that the

24   State Legislature does not approve that here in

25   Tennessee.

Case 3:18-cv-01234-B Document 184-1 Filed 03/17/22 Page 186 of 373 PageID #: 6573
Elite Reporting Services
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    And have you looked to any protocols to

3  see how execution by a single bullet to the

4  back of the head operates?

5  A.    I'm not aware of any protocols for a

6  single bullet to the back of the head operates.

7  But to answer your question, no.

8  Q.    Okay.  So just so I'm clear, TDOC has

9  never looked into how to carry out an execution

10  by firing squad; is that right?

11  A.    That's correct.

12  Q.    Okay.  And TDOC has never looked into how

13  to carry out an execution by a single bullet to

14  the back of the head?

15  A.    That's correct.

16  Q.    Has TDOC looked at a euthanasia oral

17  cocktail to serve as its protocol for

18  executions?

19  A.    We have not.

20  Q.    Do you believe that TDOC could administer

21  a lethal oral cocktail?

22        MR. MITCHELL:  Object to the form.

23        THE WITNESS:  No.  Because again,

24  there's too many -- there would be too many

25  unanswered questions at this point.  Processes

Case 3:18-cv-01234 Document 184 Filed 03/17/22 Page 187 of 373 PageID #: 6574
ELITE Courtroom Reporting Service - (615) 595-0073
www.EliteReportingServices.com

1  that would have to be established, if possible,

2  to carry out such an event.  Obviously, I mean,

3  there's many questions I would have as

4  commissioner and the State would have as the

5  Department of Corrections as to how that would

6  be accomplished.

7  BY MR. KURSMAN:

8  Q.    So just so I understand your answer, TDOC

9  believes that it could not -- it could not

10  administer a lethal oral cocktail for use in

11  executions?

12  A.    We can't without knowing the answers to

13  the questions that the Department would have as

14  to how that would be carried out in a safe,

15  humane manner, as well as the -- the

16  environment that that would take place in, the

17  controls of the inmate, the particulars of that

18  type of event.  No, we would not be able to.

19  Q.    Okay.  So I'm hearing two different

20  answers.  I'm just trying to understand which

21  one's right.  Is it your testimony that TDOC

22  doesn't know whether you could administer an

23  execution by lethal oral cocktail; or that, no,

24  it couldn't do it?

25  A.    TDOC's answer would be, no, we couldn't

1  do it.  Because we don't know the specifics of

2  how this is carried out, nor do we even know

3  where you would begin with a process such as

4  that.

5  Q.    Okay.  And what if you did have those

6  specifics --

7              MR. MITCHELL:  Objection.

8  BY MR. KURSMAN:

9  Q.    -- then do you believe you could carry

10  out an execution by oral cocktail?

11             MR. MITCHELL:  Object to the form.

12             THE WITNESS:  That would be very --

13  to answer that would be very -- using

14  speculation to the highest degree.  Again,

15  depending on the answers to some of these --

16  some of these concerns and questions, it would

17  be hard to say.

18  BY MR. KURSMAN:

19  Q.    Let's say a protocol essentially said you

20  can give an inmate a cup of fruit juice filled

21  with lethal injection chemicals, would TDOC be

22  able to give an inmate a cup of fruit juice?

23             MR. MITCHELL:  Form objection.

24             THE WITNESS:  TDO -- I -- you know,

25  TDOC -- let's assume TDOC could give an inmate

1    a fruit juice.  Whether or not the inmate drunk

2    the fruit juice would be another issue.  How

3    you would control the inmate, how you would

4    protect the staff from him throwing the fruit

5    juice that had lethal chemicals in it on

6    someone.  There's a lot of questions there that

7    would have to be addressed and concerns that

8    would have to be addressed.

9          So when I say that we could not, we

10   would not unless we were confident that all

11   those issues were addressed and it was a safe

12   process.

13   BY MR. KURSMAN:

14   Q.   Has TDOC -- is TDOC able to force an

15   inmate to take medication?

16          MR. MITCHELL:  Object to the form.

17          THE WITNESS:  TDOC is available --

18   does have means available to force-medicate

19   individuals, yes, through -- through drugs that

20   are injected in most cases into an individual.

21   BY MR. KURSMAN:

22   Q.   So if the TDOC has the ability to

23   force -- forcefully medicate individuals, why

24   does it believe it could not forcefully give

25   individuals an oral cocktail?

Case 3:18-cv-01234 Document 184 Filed 03/17/22 Page 190 of 373 PageID #: 4577
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1          MR. MITCHELL:  Same objection.

2          THE WITNESS:  Again, without knowing

3    the specifics of how that would be

4    accomplished, it would be hard to say.  I'm

5    just -- I'm -- I want to make sure I'm clear.

6    Again, our concern is not just that the inmate

7    receives the cocktail by drinking it, it's how

8    we do that.  How that process is carried out.

9    What prevents the inmate from using it as a

10   weapon on someone.  Is it -- and we're not

11   talking about a process where the drug is

12   injected into an individual.  We're talking

13   about somebody that drinks the cocktail.  So

14   it's different.

15          But again, it's hard for -- it's hard

16   for the State to say that we would definitely

17   be able to do that without knowing the details.

18   BY MR. KURSMAN:

19   Q.    Right.

20          And I want to make sure you're clear,

21   too.  That's why I'm trying to figure out if

22   you're saying TDOC couldn't do this or TDOC is

23   just unaware whether they couldn't do it

24   because they don't know the details of how to

25   do it?

Case 3:18-cv-01234 Document 184 Filed 05/47/22 Page 161 of 373 PageID #: 6578
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    A.    My -- the State's answer would be that we

2    could not at this point.  Because again, we

3    know not enough about the process or even where

4    to begin with establishing a clear and concise

5    protocol that is safe, that controls for all

6    the things that we've talked about.

7    Q.    Sure.

8          So you could not tomorrow.  But could

9    you if you educated yourself on the process?

10         MR. MITCHELL:  Object to the form.

11         THE WITNESS:  Again, until we

12   understand the process -- educating ourself on

13   the process is one thing.  But what we find in

14   determining what it would require to do, that

15   is still unknown.  And without knowing that,

16   it's hard to say that we definitely could.

17   BY MR. KURSMAN:

18   Q.    Okay.  I understand.

19         Has TDOC considered removing the

20   paralytic in its current three-drug protocol?

21   A.    No, we haven't.

22   Q.    Why not?

23   A.    As I stated earlier, that the State's

24   position is that we believe the three-drug

25   protocol is effective, it's efficient in its

Elite-Reporting Services  •  (615) 595-0073
www.EliteReportingServices.com

1   intended use, and that we have no reason to
2   modify the protocol.
3   Q.    Has anyone that you've spoken to tell
4   you that this -- told you that the second drug
5   is necessary in the three-drug protocol to
6   effectuate death?
7   A.    No.
8   Q.    Is TDOC aware that removing the paralytic
9   may help with the consciousness check?
10          MR. MITCHELL:  Object to the form.
11          THE WITNESS:  No.
12  BY MR. KURSMAN:
13  Q.    Is TDOC aware that removing the paralytic
14  may help the prisoner show signs of distress if
15  he can still feel pain from the third drug?
16          MR. MITCHELL:  Same objection.
17          THE WITNESS:  Would you repeat the
18  question, please?  I'm sorry.
19  BY MR. KURSMAN:
20  Q.    Sure.
21  A.    I'm sorry.
22  Q.    Sure.
23          Is TDOC aware that removing the
24  paralytic would help to allow the prisoner to
25  show signs of distress if he can feel the third

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  drug?

2          MR. MITCHELL:  Form objection.

3          THE WITNESS:  TDOC understands that

4  the second drug is the paralytic.  And that

5  once that drug is onboard and active, that the

6  inmate -- it paralyzes the inmate.  We think

7  it's very relevant that the consciousness check

8  is done prior to the paralytic being onboard.

9  And that the determination is made at that

10  point that the inmate is unconscious before the

11  paralytic is put onboard.

12          So again, we feel like that the

13  vecuronium is an important part of the

14  three-drug protocol that we use.

15  BY MR. KURSMAN:

16  Q.    Is TDOC concerned that the paralytic may

17  make an inmate regain consciousness, but they

18  won't be able to show signs of distress because

19  they will be paralyzed at that point?

20          MR. MITCHELL:  Object to the form and

21  scope of the notice.

22          THE WITNESS:  TDOC, again, is

23  confident that the vecuronium in conjunction

24  with the midazolam and the potassium chloride

25  hastens death in this case, in which the object

Elite Reporting Services • (615) 595-0073
www.EliteReportingServices.com

1  of this protocol is to put the inmate to death.

2  And that it hastens death; and therefore, is

3  necessary for the three-drug protocol.

4  BY MR. KURSMAN:

5  Q.    But my question is a bit different.  My

6  question is, is TDOC concerned that the second

7  drug in the protocol, the vecuronium bromide,

8  may cause the inmate to regain consciousness as

9  defined in the protocol, but the inmate will

10 not be able to show signs of distress because

11 they are paralyzed?

12         MR. MITCHELL:  Form objection.  Scope

13 of the notice objection.

14         You can answer.

15         THE WITNESS:  TDOC, again, is

16 confident that the three-drug protocol that we

17 use renders the inmate unconscious at the

18 beginning with the first drug, the midazolam.

19 And that the vecuronium only aids in the

20 process of putting the inmate to death by

21 paralyzing the inmate, stopping his breathing,

22 which, again, hastens death.  It ensures death

23 at a faster rate.  And with the potassium

24 chloride as the third drug that stops the

25 heart.

Case 3:18-cv-01234 B Document 184 - Filed 03/17/22 Page 195 of 373 Page ID #: 6582
Elite Reporting Services
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    How much faster does TDOC believe that

3  the second drug will cause death as compared to

4  just a two-drug protocol?

5  A.    I don't know that TDOC has a particular

6  timeline.  We do know that as a -- again, as a

7  paralytic, by stopping the breathing of an

8  individual within a few minutes, that obviously

9  if you're not breathing, drawing breath, you're

10  -- it hastens death.  And helps achieve the

11  goal of putting someone to death.

12  Q.    So why does TDOC use the third drug then?

13  A.    To stop the heart.

14  Q.    Okay.  So the second drug is, per your

15  testimony, to stop breathing?

16  A.    Correct.

17  Q.    And the third drug is to stop the heart?

18  A.    Correct.

19  Q.    Both of those drugs individually, per

20  your testimony, could kill the inmate, right?

21  A.    They could.

22         And it's important to point out that,

23  you know, it's very possible that the inmate

24  expires before the potassium chloride goes

25  onboard.  It's possible that the inmate expires

Elite Reporting Services
www.EliteReportingServices.com

1  before the vecuronium in some cases goes
2  onboard.  I mean, that's possible.
3  Q.    So you -- TDOC believes that the inmate
4  could die from just injection of the first
5  drug?
6  A.    I think it's -- I think TDOC would say
7  that there's -- it's always possible.  But
8  certainly the midazolam at the high dosage that
9  we provide, as well as bringing the vecuronium
10  onboard in some cases, that we believe that
11  it's possible the inmate has expired before the
12  potassium chloride is administered.
13  Q.    Has any doctor or expert that you've
14  consulted with told you that they believe that
15  midazolam alone would cause the death of an
16  inmate?
17  A.    No.
18  Q.    Okay.  So why does TDOC believe that's
19  possible?
20  A.    Well, I just think that with the high
21  dosage that we provide, as well as the -- with
22  the second drug -- let me be clear.  With the
23  second drug that stops the breathing, based on
24  observations that the Department of Corrections
25  has had with our executions, that that is very

Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

1  possible that the inmate is expired before the
2  third drug goes onboard.
3  Q.    But what about before the second drug?
4  A.    You know, that's a fair -- a fair
5  question.  I don't know so much about the first
6  drug, but certainly by the time the second drug
7  takes full effect.
8  Q.    Has any expert that you've relied on told
9  you that the three-drug protocol would work
10 faster than a two-drug -- midazolam, potassium
11 chloride -- protocol?
12 A.    No.
13 Q.    Okay.  So why does TDOC believe that a
14 three-drug protocol would work faster than the
15 two-drug protocol?
16         MR. MITCHELL:  Object to the form.
17         You can answer.
18         THE WITNESS:  I don't have a reason
19 to believe one would work faster than the
20 other.  I'm just saying I believe that the
21 three-drug protocol that we currently use is
22 sufficient to putting an inmate to death.
23 BY MR. KURSMAN:
24 Q.    So maybe I'm confused.  Because I thought
25 what you said was that the reason for the

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 198 of 373 PageID #: 6565
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  second drug was that it hastens death?

2  A.    It does.

3  Q.    Are you saying that's compared to a

4  two-drug -- midazolam, potassium chloride --

5  protocol?

6  A.    No.  Not comparing one to the other.  I'm

7  not saying that.  I'm just saying that the

8  three-drug protocol that we currently use has,

9  in the State's opinion, performed flawlessly.

10  And that it has performed its function in the

11  lethal injection process.

12  Q.    So my question to you, though, is why not

13  just take out the second drug and inject with

14  the midazolam and then the potassium chloride?

15  A.    Well, again, because the process that

16  we're using currently has been effective, and

17  it's used in other states.  We -- we have

18  confidence in this protocol, and we see no need

19  to make that change.

20  Q.    Would you have confidence in the two-drug

21  protocol being midazolam and potassium

22  chloride?

23         MR. MITCHELL:  Object to the form and

24  beyond the scope of the notice.

25         You can answer.

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 199 of 373 PageID #: 6596
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1          THE WITNESS:  And again, the State

2     would argue that our three-drug protocol is

3     sufficient.  It has worked flawlessly, in our

4     opinion.  It works -- it has worked in other

5     states.  It's used in other states.  And that

6     we would not change from the three-drug to a

7     two-drug protocol.

8     BY MR. KURSMAN:

9     Q.    Right.  But would you have confidence in

10    a two-drug protocol, a two-drug protocol being

11    midazolam and potassium chloride?

12         MR. MITCHELL:  Same objections.

13         THE WITNESS:  Again, I can't say that

14    we would because we haven't used it.  We've

15    used the drug -- the protocol that we currently

16    have on place -- in place and that it has

17    performed without exception.

18    BY MR. KURSMAN:

19    Q.    Does TDOC believe that the third drug in

20    the protocol will cause an inmate's death?

21         MR. MITCHELL:  Object to the form.

22         You can answer.

23         THE WITNESS:  TDOC believes that the

24    third drug would stop the heart.  Obviously,

25    after stopping the heart you would -- the

Case 3:18-cv-01234 B Document 184 Filed 05/17/22 Page 200 of 373 PageID #: 6587
Elite Reporting Services
www.EliteReportingServices.com

1  individual would expire in -- after that.

2  BY MR. KURSMAN:

3  Q.    And does TDOC believe that the first drug

4  in that protocol, midazolam, would cause an

5  inmate to be unconscious as defined in the

6  protocol?

7  A.    Yes.

8  Q.    Okay.  So if you have a drug that is

9  causing an inmate to be unconscious as defined

10 in the protocol and then a drug that will stop

11 the inmate's heart and kill them, why would

12 TDOC not be confident that a two-drug protocol

13 of midazolam and potassium chloride would be

14 sufficient to execute an inmate?

15         MR. MITCHELL:  Form, scope of notice

16 objection.

17         You can answer.

18         THE WITNESS:  I don't know that we

19 wouldn't be confident that it would --

20 sufficient for execution purposes.  Again,

21 we're very confident in the current method that

22 we use, the three-drug protocol, that has

23 worked and is used in other states that

24 performs adequately.

25         So, you know, again, to say that

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 201 of 373 PageID #: 6598
Elite Reporting Services
www.EliteReportingServices.com

1  we're not confident that it might render

2  someone dead, I'd be -- not be appropriate to

3  say that probably.  But we are fully confident

4  in our current protocol.

5  BY MR. KURSMAN:

6  Q.    Right.  And I've heard that numerous

7  times.  But my questions are different.  Mine

8  are about the two-drug protocol, whether you'd

9  be confident in that protocol.  I've heard that

10 you're confident in the three-drug protocol.  I

11 want to know if TDOC would be confident in the

12 two-drug protocol, being midazolam followed by

13 potassium chloride?

14 A.    Again --

15         MR. MITCHELL:  Object to the form.

16 Beyond the scope of the notice.

17         THE WITNESS:  Again -- yeah.  TDOC --

18 it's hard to say that we would be 100 percent

19 confident in that protocol.  We haven't used

20 it.

21 BY MR. KURSMAN:

22 Q.    Why?

23 A.    We've used the three-drug protocol.

24 Q.    Why wouldn't you be 100 percent confident

25 in that protocol?

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 202 of 373 PageID #: 6909
ELITE Business Courtroom Reporting Services
www.EliteReportingServices.com

1   A.     Because --

2              MR. MITCHELL:  Same objection.

3              THE WITNESS:  Because again, we have

4   not used the protocol.  We have not used the

5   protocol.  We've used the protocol, the

6   three-drug protocol, that has been used in

7   other states, that we are confident in and that

8   we have used without issues.

9   BY MR. KURSMAN:

10  Q.     Were you 100 percent confident in your

11  three-drug protocol before you used it in

12  execution -- for executions in Tennessee?

13             MR. MITCHELL:  Same objections.

14             THE WITNESS:  I was as confident as

15  we could be based on the availability of the

16  drugs that we could find, as well as the

17  three-drug protocol being used in other states.

18  And by -- in other states with people that I

19  had communications with that I trusted as

20  reliable sources.

21  BY MR. KURSMAN:

22  Q.     And is TDOC less confident in a two-drug

23  protocol than the current three-drug protocol?

24             MR. MITCHELL:  Same objections.

25             THE WITNESS:  Yes.

Elite Reporting Services
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    Why?

3  A.    Because we haven't used it.  And because

4  the fact that we're confident that the current

5  method that we're using is adequate to carry

6  out executions in Tennessee.

7  Q.    Okay.  But we just discussed a second ago

8  that midazolam, in TDOC's opinion, would cause

9  the inmate to be unconscious, right?

10  A.    Right.

11  Q.    And potassium chloride, in TDOC's

12  opinion, causes the inmate's heart to stop,

13  right?

14  A.    Correct.

15  Q.    So based on those two opinions by TDOC,

16  why would TDOC be any less confident that a

17  two-drug protocol could effectuate death, as

18  compared to the three-drug protocol with the

19  paralytic?

20        MR. MITCHELL:  Again, I'm going to

21  object to the form.  I'm also going to object

22  it goes beyond the scope of the notice.

23        THE WITNESS:  Okay.  So it's the same

24  answer that I've already given.  We haven't

25  used it.  We're familiar with the protocol

Elite Reporting Services
www.EliteReportingServices.com

1  we're using that we adopted that has worked

2  without exception in Tennessee, and it has been

3  used in other states.

4  BY MR. KURSMAN:

5  Q.    Would TDOC use the two-drug protocol if

6  they could not obtain vecuronium bromide?

7          MR. MITCHELL:  Same objections.

8          THE WITNESS:  That would be something

9  we would have to consider at the time and

10 evaluate.  Again, with the drugs that are

11 available now, we feel like the three-drug

12 protocol is appropriate, and that would be our

13 choice.

14 BY MR. KURSMAN:

15 Q.    But if vecuronium bromide was not

16 available, would TDOC feel comfortable

17 proceeding with a two-drug protocol?

18         MR. MITCHELL:  Form objection.  Scope

19 of the notice objection.

20         THE WITNESS:  If we could not obtain

21 the drugs that were currently approved in our

22 protocol, by state law we would -- I would

23 certify to the Governor that I couldn't receive

24 those drugs, and we would rely on the

25 alternative method of execution.

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    Being the two-drug protocol?  Is that

3  what you're saying?

4  A.    Well, we would have to -- we would have

5  to explore that.  We would have to look for --

6  make a decision at that time regarding the

7  protocol, much like we did with pentobarbital.

8        But, you know, I would be speculating

9  as to what would happen.  Or there would be

10 conversation, of course, with the State, with

11 the administration, with the Attorney General's

12 office in looking at our protocol to see what

13 kind of adjustments would have to be made.

14 Q.    Well, if TDOC only had midazolam and

15 potassium chloride, why would it not go forward

16 with executions with only those two drugs?

17       MR. MITCHELL:  Form objection.  Scope

18 and notice objection.

19       THE WITNESS:  I don't know that we

20 would not.  I'm just saying that if we could

21 not get vecuronium, obviously, we would have to

22 re-evaluate the protocol as we did when we

23 could not obtain pentobarbital.

24 BY MR. KURSMAN:

25 Q.    Does TDOC understand that taking

1  vecuronium bromide out of the current protocol

2  adds an additional safeguard to this protocol,

3  being that the inmate can respond if he feels

4  the pain of the third drug?

5          MR. MITCHELL:  Same objections.

6          THE WITNESS:  TDOC understands that

7  the purpose of vecuronium -- the results of

8  vecuronium and how it relates to the protocol,

9  whether or not it's a safeguard or not, I --

10  would probably be debatable.

11  BY MR. KURSMAN:

12  Q.    Did you ask any experts what the

13  preferred method would be, whether it would be

14  the three-drug protocol or the two-drug

15  protocol that we've been discussing?

16  A.    Experts being?

17  Q.    Doctors.

18  A.    No.

19  Q.    Pharmacists?

20  A.    Again, there was -- the State consulted

21  with different people in developing our

22  protocol.  Some of those people were

23  pharmacists and -- but in regard to specific

24  questions of whether or not vecuronium is

25  included or not, I'm not familiar with that.

Case 3:18-cv-01234 Document 184 Filed 03/17/22 Page 207 of 373 PageID #: 6994
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  Q.    Well, why didn't you ask any of those

2  people whether a two-drug protocol would be

3  more appropriate than a three-drug protocol?

4  A.    Well, again, we considered the drugs that

5  were available, the drugs -- the protocols that

6  were being used in other states successfully,

7  and the determination was made to go with the

8  three-drug protocol.

9  Q.    Right.  But we have the drugs available,

10 both for the three drugs.  Of course, you have

11 them.  And we also have them available for the

12 two drugs because they are in the three drugs.

13 We're just taking out the paralytic.

14        So the question is, why didn't you

15 ask these experts that you were relying on

16 whether it would be more appropriate or more

17 humane to execute just using these two drugs

18 rather than these three drugs?

19        MR. MITCHELL:  Object to the form.

20        THE WITNESS:  Again, I don't know

21 that that was not discussed.  What I do know is

22 that the decision was made to use the

23 three-drug protocol that we currently have in

24 place using vecuronium.

25 ///

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 208 of 373 PageID #: 6995
Elite B Document Reporting Service
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    Can you go to page 10 of Exhibit 1?

3          MR. SUTHERLAND:  Page what?  I'm

4  sorry.

5          MR. KURSMAN:  Exhibit 1.  I'm sorry.

6  BY MR. KURSMAN:

7  Q.    And do you see this is --

8  A.    I'm sorry.  I'm on Exhibit 10.

9  Q.    I'm sorry.  Page 10 of Exhibit 1.  It

10  will be a diagram of the --

11  A.    I see.

12          Okay.

13  Q.    Do you see the diagram?

14  A.    I do.

15  Q.    Can you explain to me who from the

16  execution team is where during an execution?

17          MR. MITCHELL:  Object to the form.

18          You can answer.

19          THE WITNESS:  So you have -- the

20  condemned is usually in Cell 1 in the

21  deathwatch area.  Do you see that?

22  BY MR. KURSMAN:

23  Q.    Uh-huh.

24  A.    Now, are you talking about during the

25  execution itself or during deathwatch?

1  Q.    I apologize.

2  A.    I just want to make sure I --

3  Q.    During the execution itself.

4  A.    During the execution itself, sure.

5        So, yes, during the lethal injection

6  process, the executioner, members of the IV

7  team are in the lethal injection executioner's

8  room.  The inmate is located on the gurney in

9  front of the executioner's room.

10       The warden and the assistant

11  commissioner -- I mean, the assistant warden of

12  security is in the execution chamber.  The

13  official witnesses are located in the official

14  witness holding room, observation room.  The

15  victim's family is located in the victim's

16  family observation room.

17       The EMTs and member of the IV team is

18  both located in the -- outside the

19  executioner's room, as well as in the

20  executioner's room in the execution chamber

21  during the process of applying the IVs.

22       Am I answering your question?

23  Q.    You are.

24  A.    Okay.

25  Q.    So let's go to once the IVs are inserted.

Elite Reporting Services
www.EliteReportingServices.com

1  The -- you said the EMTs are also in the lethal

2  injection executioner's room; is that right?

3  A.    No.

4  Q.    Okay.

5  A.    I'm sorry.  The EMTs are located -- they

6  go back into the area outside the lethal

7  injection executioner's room.

8  Q.    Okay.  So at this point the EMTs can't

9  see anything, right, in the execution chamber?

10 A.    The EMTs are in that area there outside

11 the executioner's room.  No.

12 Q.    Okay.  How many IV team members are in

13 the executioner's room?

14 A.    Normally two to three.

15 Q.    When you say normally two to three, is it

16 not the same for every execution?

17 A.    It -- possibly not.

18 Q.    Okay.  Why wouldn't it be the same?

19 A.    You may have -- so in -- in other words,

20 you have an IV team member that is outside the

21 room for whatever reason.  You may have a --

22 you usually have two primary IV team members

23 inside the executioner's room.  One to observe

24 the IV in each arm with the camera, another IV

25 team member to assist with and monitor the

Elite Reporting Services
www.EliteReportingServices.com

1  drawing of the chemicals into the syringes and

2  that process.

3  Q.    So just so I'm clear, there's --

4  you're -- there's the executioner and then two

5  or three additional IV team members in the

6  executioner's room?  Is that what you're

7  saying?

8  A.    Yes.

9  Q.    Okay.  So there's the executioner, who is

10  pushing the drugs and mixing the drugs, right?

11  A.    Yes.

12  Q.    There's the IV team member, who's known

13  as the recorder, who's assisting the

14  executioner?

15  A.    Correct.

16  Q.    Okay.  And then there's the IV team

17  member who's observing the lines?

18  A.    The process, yes.

19  Q.    And then you said there's an additional

20  IV team member?

21  A.    Correct.

22  Q.    What is that additional IV team member

23  doing?

24  A.    That person also assists with -- comes

25  out and helps in the preparation of the IV

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 212 of 373 PageID #: 6399
ELITE B Document Reporting Services 212 of 373 PageID #: 6399
www.EliteReportingServices.com

1  lines being connected to the inmate, as well

2  as -- I don't want to say assist with the IVs

3  being connected to the inmate.  That's the

4  EMT's job.  But they assist with the taping of

5  the hands and things like that to assist the

6  EMT.

7  Q.    Do any of the IV team members have

8  medical experience?

9  A.    Not other than -- other than the EMTs?

10  Q.    Other than the EMTs.

11  A.    Yes.  The -- no, they are -- other than

12  the training that they've received related to

13  their function in this role.

14  Q.    Okay.  And who trains the IV team members

15  relating to their functions in this role,

16  without disclosing the identity of that person?

17  A.    The medical professionals that are

18  trained to provide training in IV preparation

19  and using IVs and the insertion of IVs and

20  using chemicals with IVs.

21  Q.    And do those medical professionals train

22  every IV team member?

23  A.    Those -- every IV team member has been

24  trained in that area of expertise.

25  Q.    By who?

Elite Reporting Services
www.EliteReportingServices.com

1  A.     By the people who the Department provided

2  to provide that training.

3  Q.     Are those people medical professionals?

4  A.     Those people are medical professionals,

5  yes.

6  Q.     Okay.  Just so I'm clear, so medical

7  professionals train the executioner; is that

8  right?

9  A.     Yes.

10  Q.     Medical professionals train the observer?

11  A.     Yes.

12  Q.     Medical professionals train the recorder?

13  A.     The second person in the IV room who is

14  recording the preparation of the chemicals and

15  watching, yes.

16  Q.     And medical professionals train the last

17  IV team member, who is sometimes in the

18  executioner's room and sometimes is not?

19  A.     Yes.

20  Q.     Okay.  Who is in the execution chamber

21  with the inmate while the drugs are being

22  pushed?

23  A.     The warden and the assistant warden of

24  security.

25  Q.     Does the warden leave the room at any

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 214 of 373 PageID #: 6601
ELITE Court Reporting Services.com
www.EliteReportingServices.com

1  point, the execution chamber?

2  A.    Not during the -- not during the process,

3  no.

4  Q.    Okay.  And who determines whether the

5  inmate is unconscious?

6  A.    The warden makes that determination.

7  Q.    Does anyone confirm that the prisoner is

8  unconscious, aside from the warden?

9  A.    The warden makes that determination.

10 He's the one that performs the consciousness

11 check.  Obviously the executioner and people in

12 the executioner's room can observe the inmate,

13 but the warden is the one who performs the

14 consciousness check and gives the order to

15 proceed or not proceed with the execution.

16 Q.    What happens if the inmate is declared

17 unconscious and then appears to move again?

18         MR. MITCHELL:  Object to the form.

19         THE WITNESS:  The warden would move

20 to the alternative, where the inmate

21 appeared -- or the inmate presented signs of

22 being conscious and would go to the second set

23 of chemicals.

24 BY MR. KURSMAN:

25 Q.    Okay.  What if the inmate is declared

Case 3:18-cv-01234-B   Document 184   Filed 05/17/22   Page 215 of 373   PageID #: 6602
Elite Reporting Services
www.EliteReportingServices.com

1   unconscious, the executioner starts

2   administering the second drug, and the inmate

3   moves, what's supposed to happen then?

4           MR. MITCHELL:  Form objection.

5           THE WITNESS:  Again, the warden would

6   have the process moved to the second set of

7   chemicals.

8   BY MR. KURSMAN:

9   Q.    And by the second set, do you mean the

10  midazolam again?

11  A.    Right.  And starting over with the

12  midazolam.

13  Q.    Okay.  So just so I'm clear.  So if the

14  prisoner gets 500 milligrams of midazolam and

15  then receives vecuronium bromide and moves, the

16  warden then instructs the executioner to give

17  more midazolam?

18          MR. MITCHELL:  Form objection.

19          THE WITNESS:  If the -- if the inmate

20  is given midazolam and there's a consciousness

21  check and then the inmate were to give an

22  indication after the consciousness check that

23  they're -- that he'd become conscious, then

24  they would move to the second set of --

25  ///

Elite Reporting Services<br>www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    Right.  I get that.  But my question

3  is -- so it's a bit confusing, so I

4  apologize -- is what if the warden does the

5  consciousness check, there's no movement, and

6  the warden declares the inmate unconscious, and

7  then the second drug begins to be administered

8  and the inmate moves, what does the warden do

9  then?

10          MR. MITCHELL:  Form objection.

11          THE WITNESS:  Okay.  I'm not trying

12  to be facetious.  I just want to make sure I

13  understand.

14          The movement of the inmate --

15  obviously if you give him or her the midazolam,

16  the consciousness check is done.  The inmate --

17  declares the inmate unconscious, but the inmate

18  is breathing.  There's movement in -- with

19  breathing.  I mean, you're talking about other

20  movement.  You're talking about the inmate

21  moving in some --

22  BY MR. KURSMAN:

23  Q.    (Nods head affirmatively.)

24  A.    Again, you would defer to the second set

25  of chemicals and begin the process.

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 217 of 373 PageID #: 6664
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1   Q.    So the -- just so I'm clear.  So the

2   warden would instruct the executioner to go

3   back to the second set of midazolam?

4   A.    Yes.

5   Q.    Okay.  Do you know who was in the

6   executioner's room during the Irick execution?

7   A.    The executioner and members of the IV

8   team.

9   Q.    Yeah.  Which members of the IV team --

10          MR. MITCHELL:  Object pursuant to the

11  protective order.

12  BY MR. KURSMAN:

13  Q.    -- without identifying the IV team?

14  A.    Yes, I do.

15  Q.    Could you say which members the IV team?

16          MR. MITCHELL:  Object pursuant to the

17  protective order.  I'm not sure how that can be

18  done necessarily.

19          MR. KURSMAN:  So -- right.  So I --

20  the observer, the recorder, and the third

21  person who's inside or outside.

22          MR. MITCHELL:  Sorry.  My bad.  My

23  bad.

24          THE WITNESS:  Yes.  So the observer,

25  the recorder, and it's my understanding the

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 218 of 373 PageID #: 6605
ELITE Court Reporting Services
www.EliteReportingServices.com

1  third member -- that there was a third member

2  there.

3  BY MR. KURSMAN:

4  Q.    Okay.  And how about during the Johnson

5  execution?

6  A.    It's my understanding that there was the

7  observer and the recorder.

8  Q.    Why was the third member in the execution

9  room during the Irick execution but not during

10 the Johnson execution?

11 A.    It's -- if I'm correct, if my

12 recollection is -- if my memory serves me

13 right, that part -- it's possible that that

14 person on the second execution no longer worked

15 for the Department.

16 Q.    Why didn't TDOC decide to replace that

17 person before the Johnson execution?

18 A.    No particular reason, other than the fact

19 that he wasn't replaced.  That the -- the

20 duties and responsibilities that are required

21 there were sufficient with the people that were

22 there that day.  It would be much like the same

23 scenario if one of the individuals became ill

24 or were not able to attend that night, that we

25 would ensure that we had the sufficient number

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 269 of 373 PageID #: 6606
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  of team members to carry out the execution.

2  Q.    And who at TDOC made that call, decided

3  not to replace that third IV team member?

4  A.    That would -- that would be a decision

5  made by the warden and the -- and the

6  Department.

7  Q.    The warden and the Department?

8  A.    The warden and the Department.  Because

9  obviously if you had another person there that

10 you wanted to replace, you would have to ensure

11 that the training and all had taken place and

12 the person was available to do that -- perform

13 those duties.  We would not just take

14 someone -- pick someone and put them in that

15 -- in that space to perform those duties.

16 Q.    Who selects members of the execution

17 team?

18 A.    The members of the execution team are --

19 many of them -- some of them are selected based

20 on their position in the Department.  Obviously

21 the warden, associate warden of security.

22 Particular members of the facility level are

23 selected, again, by the warden with input,

24 probably from the assistant commissioner of

25 prisons.

Case 3:18-cv-01234-B Document 184 Reporting Filed 05/17/22 eBage 220 of 373 PageID #: 6607
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1 Q.     And do you know how he selects those

2 members for the execution?

3 A.     I do.

4 Q.     Okay.  Can you describe that?

5 A.     Those -- those requirements and

6 specifications, if you call it that, are listed

7 in the protocol.  And based on the individual's

8 integrity, their ability to maintain

9 confidentiality, their professional conduct,

10 their demeanor, their years of service, things

11 like that.

12 Q.     Okay.  Before we go any further, how many

13 total members -- current members of the IV team

14 are there right now?

15 A.     Excluding the EMTs, currently three.

16 Q.     And does that include the executioner?

17 A.     No.

18 Q.     So the executioner plus three IV team

19 members?

20 A.     (Nods head affirmatively.)

21 Q.     Okay.  And does anyone on the execution

22 team have medical experience?

23 A.     Other than -- no.  Not professional

24 medical experience to the fact that they're a

25 trained medical professional, other than if you

Elite Reporting Services
www.EliteReportingServices.com

1   consider the physician.  But again, the

2   physician's not listed as in that group.

3           So, no, the IV team members, the

4   executioner, they are not medical

5   professionals, no.

6   Q.    Why is TDOC -- why did TDOC decide to use

7   people who don't have medical experience to

8   serve as the IV team members in an execution?

9   A.    In some cases medical professionals are

10  resistant to that process because of the oath

11  that they take as medical professionals.

12  Again, finding people who are able to carry out

13  the duties and the responsibilities that are

14  appropriately trained by medical professionals

15  to carry out those responsibilities is the

16  method we use.

17  Q.    Did TDOC ask an EMT if they would be

18  willing to serve as the executioner?

19  A.    No.

20  Q.    Why?

21  A.    The executioner that we have in place has

22  been in place for several years and has

23  performed the executions in the state.  And we

24  would see no need to do that.

25  Q.    Right.

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 222 of 373 PageID #: 6609

1          So the executioner has performed

2     executions with pentobarbital, right?

3     A.     Correct.

4     Q.     And the executioner performs --

5     A.     Oh, that -- I'm not sure about the

6     pentobarbital.

7     Q.     Okay.  But the executioner performs

8     executions with electrocution, right?

9     A.     Yes.

10    Q.     Okay.  Why did TDOC think it was

11    appropriate to use the same executioner who

12    performs the electrocution executions to also

13    perform executions using the three-drug

14    protocol?

15          MR. MITCHELL:  Object to the form.

16          THE WITNESS:  The executioner has

17    used lethal injection drugs before in

18    executions.  And he's a -- they have also

19    used -- he's been -- that person has been the

20    executioner in executions using the electric

21    chair.  That person has performed in that

22    role/responsibility with a high level of

23    integrity and service to the State.  Conduct

24    has been exceptional and very reliable and very

25    dependable.  We would have no reason to change

Elite Reporting Services
www.EliteReportingServices.com

1  executioners.

2  BY MR. KURSMAN:

3  Q.    Did you -- did you ask any medical

4  professional whether it was appropriate to use

5  a nonmedical professional to push drugs into an

6  inmate?

7  A.    I did not.

8  Q.    Did anyone at TDOC?

9  A.    Not that I'm aware of.

10  Q.    Did you ask the physician who's part of

11  the execution team whether he would serve -- he

12  or she would serve as the executioner?

13          MR. MITCHELL:  Object to the form.

14          THE WITNESS:  I did not.

15  BY MR. KURSMAN:

16  Q.    Okay.  Does TDOC believe that a physician

17  would be more equipped to serve as the

18  executioner than the person who currently

19  serves as the executioner?

20          MR. MITCHELL:  Object to the form and

21  the scope of the notice.

22          THE WITNESS:  I do not.  We do not.

23  BY MR. KURSMAN:

24  Q.    You believe -- TDOC believes that the

25  executioner that it currently uses is more --

Elite Reporting Services
www.EliteReportingServices.com

```
 1   is as qualified as a physician to push drugs
 2   into an inmate?
 3              MR. MITCHELL:  Same objections.
 4              THE WITNESS:  I would not say that,
 5   more qualified.  Obviously a medical doctor
 6   would have qualifications that a nonmedical
 7   professional would not have.  But again, for
 8   the reasons that I've already stated, the
 9   executioner that is currently used has
10   performed those roles adequately and in a
11   professional manner.  And we would not change
12   that protocol and go to -- or ask a doctor to
13   do that process.
14   BY MR. KURSMAN:
15   Q.    And why wouldn't TDOC ask a doctor to
16   perform the role of the executioner?
17              MR. MITCHELL:  Form objection.
18   Beyond the scope of the notice objection.
19              THE WITNESS:  There again -- again,
20   the process of executing an inmate, I don't
21   know that you -- I -- that process currently is
22   being carried out by an individual who works
23   for the Department of Corrections; that serves
24   in that role -- has served in that role for
25   many years and performed that role without
```

Case 3:18-cv-01234-B Document 184 Filed 05/47/22 Page 225 of 373 PageID #: 6632
Elite Reporting Services
www.EliteReportingServices.com

1  issue, is reliable, is considered very

2  dedicated to the Department in service of the

3  State of Tennessee.  He has no -- first of all,

4  he has no oath of a medical professional.  Most

5  doctors -- all doctors do.

6          And that -- the role of executioner,

7  he is being -- that role is being performed

8  by -- without flaw by this individual.  We

9  would have no reason to change or ask a doctor

10  or a nurse or an EMT or anyone else to do that

11  role.

12  BY MR. KURSMAN:

13  Q.    How does TDOC know that that role is

14  performed without flaw?

15          MR. MITCHELL:  Object to the form.

16          THE WITNESS:  By observation and

17  the -- the results of the execution process and

18  the individual's role as executioner, the

19  observation of that.  And knowing the -- his

20  duties and how he carried out those duties.

21  BY MR. KURSMAN:

22  Q.    Well, who oversees the execution to

23  ensure that he's carrying out those duties

24  correctly?

25  A.    The warden is responsible for that.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 226 of 373 PageID #: 6843
Elite Reporting Services
www.EliteReportingServices.com

1  Q.    Who watches the executioner as he pushes

2  the drugs into the inmate?

3  A.    Well, the people that's in the room see

4  the executioner -- or with the executioner.

5  The warden does not physically see the person

6  as he's pushing the drugs.  But obviously, the

7  warden is aware of the situation at hand and

8  sees the individual that the drugs are being

9  pushed into, observes the process, and is aware

10  of the protocol being followed.

11  Q.    And does the warden have any medical

12  training?

13  A.    No.

14  Q.    And do the IV team members who are

15  overseeing the executioner, do they have any

16  medical training?

17  A.    They have the training that's been

18  provided related to use of IVs and the IV lines

19  and all.

20  Q.    And it's TDOC's position that the IV team

21  members are trained by qualified medical

22  professionals?

23  A.    Yes.

24  Q.    Okay.  What is TDOC's position on the

25  executioner's qualifications to reconstitute

1  the drugs?

2  A.    It's our position that he has received

3  adequate training and is -- has and is

4  performing those duties as directed.

5  Q.    Who's trained the executioner to

6  reconstitute the drugs?

7  A.    The pharmacist that we have a contract

8  with has provided the instructions to the

9  executioner, and the executioner has used those

10  instructions in the reconstituting of the

11  drugs.

12  Q.    Does TDOC believe that the executioner

13  has written instructions for midazolam?

14  A.    Yes.

15  Q.    Does TDOC believe the executioner has

16  written instructions for vecuronium bromide?

17  A.    Yes.

18  Q.    Does TDOC believe the executioner has

19  written instructions for potassium chloride?

20  A.    Yes.

21  Q.    Okay.  Does TDOC believe that the other

22  IV team members have seen all three of those

23  written instructions?

24  A.    I don't know that every member of the IV

25  team has received those -- or has seen those

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 228 of 373 PageID #: 6615
Elite Reporting Services
www.EliteReportingServices.com

1  instructions.  But the executioner is the

2  individual who mixes the drug and reconstitutes

3  the vecuronium.

4  Q.    How about the IV team member who is

5  supposed to oversee the execution, has that

6  person seen the written instructions for the

7  vecuronium bromide?

8  A.    Yes.

9        MR. MITCHELL:  Object to the form.

10  BY MR. KURSMAN:

11  Q.    What is TDOC's position on whether the

12  executioner is qualified to administer an IV

13  push?

14  A.    Our position is that he is qualified and

15  capable to perform an IV push.

16  Q.    And what qualifies the executioner to do

17  that?

18  A.    His training, as well as his experience.

19  Q.    And who is training the executioner,

20  without identifying any names to perform an IV

21  push?

22  A.    Medical professionals.

23  Q.    And how does the executioner train -- how

24  does an executioner know the appropriate, like,

25  push rate?

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 229 of 373 PageID #: 6676
Elite Court Reporting & Service
www.EliteReportingServices.com

1          MR. MITCHELL:  Object to the form.

2          THE WITNESS:  Define IV push rate.

3  BY MR. KURSMAN:

4  Q.    The rate at which the executioner is

5  supposed to push the drugs.

6          MR. MITCHELL:  Same objection.

7          THE WITNESS:  The rate that he pushes

8  the drug is in a slow, steady push.  I think he

9  will tell you that that rate could vary

10 depending on the individual.  The executioner

11 was trained to recognize push rates that are

12 not -- are push -- IV push that is not normal,

13 that meets resistance, to recognize that.  He

14 also is trained to recognize a slower natural

15 push rate versus a higher natural push rate,

16 depending on the individual, the size of the

17 vein, the makeup of the individual, as opposed

18 to an IV that may be not inserted correctly in

19 the vein and into the tissue, as well as to

20 recognize the signs -- the physical signs on

21 the individual.

22 BY MR. KURSMAN:

23 Q.    And who has trained the executioner to

24 recognize those signs?

25 A.    A medical professional.

Elite Reporting Services
www.EliteReportingServices.com

1  Q.     And what expertise does that medical
2  professional have?
3  A.     They have training in IV and -- both IV
4  insertion and the use of IVs.
5  Q.     Why didn't TDOC ask that person to serve
6  as the executioner?
7  A.     For the same reasons already stated.  We
8  have an executioner that has performed
9  flawlessly, that does the job that's required
10 to do.  And we see no reason to change that.
11 Q.     Let's go to page --
12         MR. MITCHELL:  Oh, can we go off
13 record?
14         MR. KURSMAN:  Sure.
15         Can we go off the record for a
16 minute?
17         THE VIDEOGRAPHER:  One moment,
18 please.  Going off the record at 3:13 p.m.
19         (Short break.)
20         THE VIDEOGRAPHER:  Back on the record
21 at 3:22 p.m.
22 BY MR. KURSMAN:
23 Q.     Before we went on break, we were talking
24 about the IV team members.  Are the IV team
25 members trained to assess the inmate's

Elite Reporting Services
www.EliteReportingServices.com

1   consciousness?

2            MR. MITCHELL:  Objection to the form.

3            THE WITNESS:  The IV team members are

4   not -- are not responsible for the

5   consciousness check; although, they are aware

6   of the consciousness check.  And one of those

7   IV team members documents within the -- within

8   the executioner's room the responses of the --

9   any responses of the consciousness check.

10  BY MR. KURSMAN:

11  Q.    Are they trained to assess for

12  consciousness?

13  A.    No.  The warden is the one responsible to

14  assess consciousness.

15  Q.    Let's turn to page 19 of Exhibit 1.  Do

16  you see at the top it says physician?

17  A.    I do.

18  Q.    And Number 5 says to pronounce death.  Do

19  you see that?

20  A.    I do.

21  Q.    Did TDOC ask the physician if they would

22  be willing to be the person who does the

23  consciousness check?

24  A.    No.

25  Q.    Why?

1   A.    Because the warden was the one selected

2   for that process.

3   Q.    Does TDOC believe that the physician is

4   more qualified than the warden to perform a

5   consciousness check?

6            MR. MITCHELL:  Object to the form and

7   the scope of the notice.

8            THE WITNESS:  The warden -- TDOC

9   would acknowledge certainly that a physician

10  has -- would have more specific training

11  relating to consciousness than the warden.  But

12  we chose the warden as the individual who would

13  conduct the consciousness check.

14  BY MR. KURSMAN:

15  Q.    If TDOC believes that the physician has

16  more expertise as it relates to a consciousness

17  check, why did TDOC choose the warden over the

18  decision to perform the consciousness check?

19           MR. MITCHELL:  Same pair of

20  objections.

21           THE WITNESS:  We feel the warden is

22  adequate to make the determination if the

23  inmate is conscious.  To determine if the

24  inmate is unconscious, there's also a question

25  of -- and during that process of

Case 3:18-cv-01234-B Document 184 Filed 05/47/22 Page 233 of 373 Page ID #: 6620
Elite Reporting Services
www.EliteReportingServices.com

1  confidentiality and protecting the physician's
2  identity to that consciousness check is
3  conducted.  People are there, obviously.  The
4  curtains are open and the physician is in the
5  back.  To do that you would have to bring the
6  physician out in that -- in that area.
7  BY MR. KURSMAN:
8  Q.    Did you consult with any experts about
9  who should perform the consciousness check?
10 A.    We consulted with a physician who worked
11 with the warden in training the warden how to
12 perform a consciousness check.
13 Q.    And was it the physician's opinion that
14 the warden should be doing the consciousness
15 check over a physician?
16       MR. MITCHELL:  Object to the form and
17 the scope of the notice.
18       THE WITNESS:  No.  It was the
19 Department's decision to use the warden to do
20 the consciousness check.
21 BY MR. KURSMAN:
22 Q.    And why did the Department make that
23 decision?
24 A.    Again, the Department felt like the
25 warden could make that decision based on the

Elite Reporting Services
www.EliteReportingServices.com

1  training that he would receive from a

2  physician.  And considering the need to protect

3  the identity of the physician that was involved

4  in the process.

5  Q.    Is that physician an anesthesiologist?

6  A.    No.

7  Q.    Does that physician regularly do

8  consciousness checks?

9  A.    Possibly.  But I don't know that they do

10  a consciousness check every day, obviously.  I

11  think the physician that provided the training

12  is certainly qualified to determine whether

13  somebody is conscious or not.

14  Q.    Did TDOC look into the background of that

15  physician that's providing the training to the

16  warden?

17  A.    TDOC would be familiar -- let me ask for

18  a clarification when you say background.

19  Q.    Sure.  I apologize.

20        Did TDOC ask that physician how many

21  consciousness checks that physician performed

22  during his or her career?

23  A.    Not to my --

24        MR. MITCHELL:  I'm going to object.

25  That's beyond the scope of the notice.

Case 3:18-cv-01234-Document-184-Filed-03/17/22-Page 235 of 373 PageID #: 6622
Elite Reporting Services
www.EliteReportingServices.com

1          THE WITNESS:  Not to my knowledge.

2   BY MR. KURSMAN:

3   Q.    Okay.  Did the physician tell TDOC that

4   the warden was qualified to perform a

5   consciousness check?

6          MR. MITCHELL:  Same objection, as

7   well as a form objection.

8          THE WITNESS:  The physician was

9   confident that the warden was appropriately

10  trained to determine if the inmate was

11  unconscious or not.

12  BY MR. KURSMAN:

13  Q.    Did TDOC ask an anesthesiologist whether

14  it was appropriate to use the warden to

15  determine the consciousness check?

16  A.    We did not.

17  Q.    Why not?

18  A.    We felt that the training and the

19  instructions from the physician to the warden

20  to determine -- to prepare the warden to make a

21  decision based on his observations and the

22  elements of the consciousness check, that it

23  was sufficient to determine if the inmate was

24  conscious or not.

25  Q.    Okay.  Is TDOC aware that machines are

Elite Reporting Services
www.EliteReportingServices.com

1  used to determine consciousness or determine

2  levels of anesthetic death in hospital

3  settings?

4          MR. MITCHELL:  Object to the form and

5  the scope of the notice.

6          THE WITNESS:  We are.

7  BY MR. KURSMAN:

8  Q.   Is there a reason that a machine isn't

9  being used to determine the, quote/unquote,

10 consciousness of an inmate during the lethal

11 injection procedure?

12 A.   No particular reason, other than it's not

13 part of our protocol.  And we feel that the

14 warden can make the appropriate assessment

15 based on the consciousness check that's

16 currently in our protocol.

17 Q.   Well, you say it's not part of your

18 protocol, but TDOC wrote the protocol.  So the

19 question is, why did TDOC write the protocol

20 without requiring that a machine be in the

21 execution chamber to determine the inmate's

22 consciousness?

23 A.   Because we felt like the warden was

24 appropriately -- was qualified to make the

25 determination if someone was conscious or not

Elite Reporting Services - (615) 595-0073
www.EliteReportingServices.com

1    based on the training he received.

2    Q.    Let's go back to page 19.  If you see

3    Number 2.  It says, as an ultimate and last

4    option, the physician may perform a venous

5    cutdown procedure should the IV team be unable

6    to find a vein adequate to insert the catheter.

7    A.    I'm sorry.  You said page -- okay.  The

8    page we're currently on.

9    Q.    Yeah, I apologize.

10   A.    That's no problem.  I'm just tired.

11         All right.  Number 2?

12   Q.    Yes.

13   A.    Yes, I see that.

14   Q.    What does a venous cutdown procedure

15   mean?

16   A.    It is a medical procedure where the

17   physician accesses an alternative point for the

18   IV -- insertion of IV fluids into the

19   individual by accessing a vein, is my

20   understanding, in the neck of the individual.

21   Q.    And what does the ultimate and last

22   option mean?

23   A.    If -- if there cannot be a vein

24   established by the IV team or by the EMTs, the

25   physician has the opportunity to come out and

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 238 of 373 PageID #: 6625
Elite Reporting Services
www.EliteReportingServices.com

```
 1   make an attempt also to find an accessible

 2   vein.  And if that fails, the cutdown procedure

 3   is a option that's available kind of as a last

 4   resort to the physician.

 5   Q.    And who decides to call in a physician?

 6   A.    After the attempts are made by the EMTs

 7   and they cannot -- they are unsuccessful at

 8   providing a vein, they would notify the warden.

 9   The warden would notify -- bring in the EMT --

10   the physician.

11   Q.    And then you see Number 3.  It says to

12   examine the body for vital signs five minutes

13   after the LIC has been injected?

14   A.    Correct.

15   Q.    Are the blinds open at this time?

16   A.    No.

17   Q.    The blinds are closed at this point?

18   A.    Yes.

19   Q.    Why wait five minutes?

20   A.    You wait five minutes after the last drug

21   and saline -- or after the saline is pushed in

22   the last set of drugs, you wait five minutes to

23   give adequate time to -- for the person to

24   expire.

25   Q.    And then after the inmate is declared
```

Elite Reporting Services
www.EliteReportingServices.com

1  dead, are the blinds opened again?

2  A.    No.

3  Q.    So after the lethal injection chemicals

4  are injected, the blinds are shut, the inmate

5  is declared dead.  All that happens with the

6  blinds closed.  And the witnesses don't

7  actually see the inmate being declared dead; is

8  that right?

9  A.    That's correct.

10  Q.    Is there any reason that after the

11  injection of midazolam, the blinds couldn't be

12  briefly closed so the physician could enter the

13  room to perform a consciousness check?

14        MR. MITCHELL:  Object to the form and

15  also beyond the scope of the notice.

16        THE WITNESS:  I think it may be

17  possible.  It would require a modification of

18  the -- of the protocol.  Again, the warden

19  is -- or the warden performed -- under the

20  current protocol, the warden performs the

21  consciousness check.  To bring a physician out,

22  it would require that the blinds were closed to

23  bring the physician out to do that inspection,

24  make the determination, and then re-enter and

25  reopen the blinds.

Elite Reporting Services
www.EliteReportingServices.com

1          It's -- is it possible?  Yes, it's

2    possible.

3    BY MR. KURSMAN:

4    Q.    Right.  That doesn't seem that

5    complicated to me.  Do you think that's a

6    complicated procedure?

7          MR. MITCHELL:  Same objections to

8    form and scope of the notice.

9          THE WITNESS:  I don't know that I

10   would classify it as complicated.  It's -- it

11   would be a change -- significant change in the

12   procedure and the training regimen, as well as

13   the physician's role in this process to

14   determine, again, if he's -- if that individual

15   would be willing to do that, participate in

16   that.

17   BY MR. KURSMAN:

18   Q.    So let me just understand what those are.

19          There's two blinds in the execution

20   room.  And they are just blinds that you pull

21   down, right?

22   A.    Correct.

23   Q.    So all it would require is somebody to

24   walk over and pull those two blinds down; is

25   that right?

Elite Reporting Services
www.EliteReportingServices.com

1  A.    Yeah.  It would require those blinds

2  being pulled.  It would require -- there would

3  have to be a determination made, is -- if the

4  sound was removed, the mics were cut, there

5  would have to be a determination made is if

6  the -- if the physician was willing to

7  participate in that part of the process.  And

8  then those steps would have to be retraced as

9  the physician exits the room, mics return to

10 active status, and blinds raised.  And how we

11 would proceed at that point, assuming the

12 inmate was unconscious.

13 Q.    Sure.

14       Okay.  But TDOC has not asked the

15 physician to perform a consciousness check?

16 A.    No.

17 Q.    Okay.  Let's go to page 20 of Exhibit 1.

18       And before we get there, the

19 associate warden is in the room -- in the

20 execution chamber with the warden, correct?

21 A.    That's correct.

22 Q.    So there's two people that could just

23 pull the blinds down, the two blinds down and

24 then put them up, right?

25 A.    Correct.

Case 3:18-cv-01234 B Document 184 Filed 03/47/22 Page 242 of 373 PageID #: 6629
Elite Reporting Services
www.EliteReportingServices.com

1  Q.    Okay.  Let's go to page 20.  And this is
2  at the top, IV team.  Do you see that?
3  A.    Yes.
4  Q.    And then it says to establish properly
5  functioning IV lines for administration of
6  lethal injection chemicals?
7  A.    Correct.
8  Q.    How does TDOC ensure that the IV team has
9  done this?
10  A.    TDOC ensures that the -- let me -- let me
11  look at something here.
12  Q.    Sure.
13  A.    (Reviews documents.)
14        TDOC relies on the IV team members
15  and their training that they receive from
16  medical professionals to carry out this
17  function, as well as some of the steps listed
18  here as the monitoring of the equipment,
19  ensuring that the protocol is followed,
20  ensuring that adequate monitoring of the
21  equipment to ensure that you have adequate
22  flow, things like that, of the IV lines.
23  Q.    So let's -- so let's go to 4, for
24  instance.  It says to make sure vascular access
25  is properly established.

Elite Reporting Services
www.EliteReportingServices.com

1    A.    Yes.

2    Q.    How does TDOC ensure this is done?

3    A.    Again, by the process of the catheter

4    being inserted.  Ensuring that there is a --

5    the flash in the -- within the catheter -- or

6    within the needle above the hub.  Ensuring that

7    the IV line is appropriately attached.  The

8    executioner in the room ensuring that they have

9    a good flow of saline from the saline and

10   through the lines into the arm of the

11   individual.  Those type of processes.

12   Q.    Okay.  How does the executioner know what

13   a good flow would look like?

14   A.    He's been trained on the -- again, when

15   you access -- forgive me.  I'm just a little

16   tired.  I'm trying to keep my focus here.

17   Q.    Sure.

18   A.    Ensuring that when the IV line is

19   connected, that there is a -- and that the --

20   the bulb -- the injection point for the saline

21   is properly attached and that you have a steady

22   drip.  There's no slow process of the flow of

23   the saline into the individual.  Also making

24   sure that the catheter clears itself of the --

25   of the flash -- the blood flash.  It clears

Elite Reporting Services
www.EliteReportingServices.com

1  within the hub of the needle in the injection
2  port.  And those type of things.
3  Q.    So at this point in the procedure,
4  though, there's no medical professionals that
5  are performing these duties, right?
6  A.    There's -- no, not as I've described.
7  It's the executioner.  It's the -- it's the
8  members of the IV team who are witnessing and
9  watching the process, as well as the -- the
10 EMTs who are located within the execution
11 chamber that are -- that have just, you know,
12 inserted the -- the IVs.
13 Q.    And do all of these members of the IV
14 team, including the executioner, they are
15 corrections guards, right?  They are
16 correctional officers, right?
17         MR. MITCHELL:  I'm going to object
18 based on the protective order.  But there may
19 be a way to work around that.
20         But I'm going to instruct the witness
21 not to answer that specific question.
22 BY MR. KURSMAN:
23 Q.    Sure.
24         They are all employees of TDOC?
25 A.    Would you -- I'm sorry.  Would you re-ask

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 245 of 373 PageID #: 6632
Elite Reporting Services
www.EliteReportingServices.com

1  the question?

2  Q.    We've already established that in other

3  depositions.

4         I'm just asking, are all of the IV

5  team members and executioner are corrections

6  officers?

7         MR. MITCHELL:  And I'm going to

8  object based on that question and instruct the

9  witness not to answer.

10 BY MR. KURSMAN:

11 Q.    Okay.  But they are all employees of

12 TDOC, right?

13 A.    They all -- they are employees of the

14 Department with the exception of the -- and I'm

15 excluding the EMTs, who are obviously not a

16 part of our Department.

17 Q.    Sure.

18        And does TDOC consider the

19 executioner a member of the IV team?

20 A.    No.  The executioner is a role of itself.

21 Q.    Is there a reason why there's no

22 description of the executioner in the protocol?

23 The protocol contains, between pages 13 and 29,

24 descriptions of all the roles and members of

25 the execution team.  Is there a reason that the

Elite Reporting Services
www.EliteReportingServices.com

1   protocol does not contain a description of the

2   executioner's role?

3   A.    No particular reason that I'm aware of.

4   Q.    Let's go to page 32 of Exhibit 1.  And do

5   you see this says training execution team

6   member?

7   A.    Yes.

8   Q.    And then under training, we have Number

9   1.  All execution team members must read the

10  lethal injection execution manual when they

11  become members of the execution team?

12  A.    Correct.

13  Q.    Does this include the executioner as

14  well?

15  A.    Yes.

16  Q.    How does TDOC ensure that each of its

17  members read the execution manual?

18  A.    The facility -- the warden would ensure

19  that that is part of the process once they

20  become team members.

21  Q.    Do team members receive any other

22  training materials aside from the protocol

23  itself?

24  A.    Other than the information regarding

25  their specific role.  For example, the

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 247 of 373 PageID #: 6634
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  executioner who would rely on information

2  related from the pharmacist.  But this is the

3  primary document for execution team members to

4  review.

5  Q.    And how about aside from the information

6  from the pharmacist, is there any other

7  instructions that the execution members rely

8  on?

9  A.    This is the primary document.

10 Q.    Right.

11       So it's -- my question is, aside from

12 the protocol and the instructions from the

13 pharmacist, is there any other instructions

14 that the execution team members rely on?

15 A.    For the process of carrying out an

16 execution?

17 Q.    That's right.

18 A.    This is it.

19 Q.    Okay.

20 A.    Yeah.

21 Q.    Okay.  And then you see it says the

22 warden or designee holds a class during which

23 the manual is reviewed?

24 A.    Yes.

25 Q.    Is there a discussion of issues that

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 248 of 373 PageID #: 6635
Elite Reporting Services
www.EliteReportingServices.com

1 arise during rehearsals for executions during

2 this class?

3 A.    There could be.  I think that the

4 discussion is not as open.  It's a discussion

5 that -- where people would obviously be allowed

6 to ask questions if they had questions.  So

7 it's possibly there could be discussion.

8 Q.    Is there any tests done at this class to

9 ensure that the execution team members

10 understand the protocol?

11 A.    Not that I'm aware of.

12 Q.    And if the protocol isn't mandatory, if

13 the execution team members are allowed to

14 deviate from the protocol like you said, what's

15 the point of them reading the entire protocol?

16         MR. MITCHELL:  Object to the form.

17         THE WITNESS:  The protocol is in

18 place to be followed.  The protocol -- the

19 commissioner -- I never said that the protocol

20 could be deviated from.  There's adjustments

21 that have to be made.  I want to be careful

22 that I clarify that.

23         The spirit and the intent of this

24 protocol is to be followed.  And the training

25 that's required is to make sure that members of

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 249 of 373 PageID #: 6636
Elite Reporting Services
www.EliteReportingServices.com

1  the execution team have good knowledge of this
2  protocol and follow the instructions of the
3  protocol.
4  Q.    Let's say the protocol says -- and I'm
5  not saying it does say this.
6  A.    Sure.
7  Q.    But let's say the protocol says IV Team
8  Member 2 needs to carry the execution drugs
9  from the armory to the execution chamber.  And
10  the IV team members decide between themselves,
11  no, it's going be IV Team Member 4 instead.
12  Would that be a deviation, in your mind or
13  according to TDOC?  Would that be allowed?
14          MR. MITCHELL:  Alex, which topic of
15  examination is this pertaining to?
16          MR. KURSMAN:  This would be -- this
17  would be 3, how TDOC carries out its execution
18  protocol, if that's 3.  I believe that's 2.
19          MR. MITCHELL:  Objection to the form
20  and beyond the scope of the notice.
21          THE WITNESS:  So in that example that
22  you give, the intent is to get the execution --
23  the drug from Point A to Point B.  If IV Team
24  Member 1 was identified in the protocol to do
25  that and on the way to work that evening IV

Elite Reporting Services · www.EliteReportingServices.com · (615) 595-0073

1    Team Member 1 had an accident and wasn't there,

2    IV Team Member 2 could carry out that

3    responsibility.

4            Because again, the spirit of the --

5    of the -- of the protocol and the intent of the

6    protocol is to get the drug from Point A to

7    Point B and that was carried out.

8            That would be an example of a

9    modification.  A necessary modification that

10    might not go word for word with the protocol,

11    but the end goal was achieved.

12    BY MR. KURSMAN:

13    Q.    Would they have to run that decision up a

14    chain of command, or would they be able to

15    decide that for themselves?

16            MR. MITCHELL:  Same pair of

17    objections.

18            THE WITNESS:  Again, that would be

19    something that the warden would be aware of at

20    that point.

21    BY MR. KURSMAN:

22    Q.    So when you say the warden would be aware

23    of it, is the warden the person who makes the

24    ultimate decision as whether -- as to whether

25    deviations or adjustments can be made from the

Elite Reporting Services
www.EliteReportingServices.com

1    protocol?

2              MR. MITCHELL:  Form objection.

3              THE WITNESS:  Again, it depends on

4    the nature of the adjustment that's being made

5    or the -- or the situation at hand.  If it's

6    something that the warden has knowledge of --

7    obviously the warden's going to have knowledge

8    of that -- it would be okay with that, I'm

9    assuming.

10             But the warden is ultimately

11   responsible for the -- the protocol being

12   carried out in the facility, in the chamber, as

13   well as those minor deviations that may take

14   place.  Like the example I gave before where

15   you had a strap-down team member that had

16   trouble getting a strap secured on the

17   individual and it caused a lapse in the time

18   that's listed on the protocol versus what's

19   actually happening.  And there's a five minute

20   delay.  The warden is not going to call the

21   commissioner and ask for permission to proceed

22   because the times are different.

23   BY MR. KURSMAN:

24   Q.    So I'm just trying to figure out, does

25   the buck stop with the warden?  Or does it go

Elite Reporting Services
www.EliteReportingServices.com

1  higher than that when a deviation or an

2  adjustment is made to the protocol?

3          MR. MITCHELL:  Form objection.

4          THE WITNESS:  Again, depending on the

5  nature of the adjustment or why the adjustment

6  is being made.  For an -- examples I'm giving

7  you minor are adjustments.  The commissioner of

8  the Department is ultimately responsible for

9  the protocol and the execution or the carrying

10  out of the execution process for the Department

11  of Corrections.

12  BY MR. KURSMAN:

13  Q.   What about for storing drugs?  Let's say

14  the protocol says you need to store drugs in

15  this place, and instead the drug procurer

16  stores drugs somewhere else.  Would you

17  consider that an adjustment or a deviation?

18          MR. MITCHELL:  Form objection.

19          THE WITNESS:  I would consider --

20  well, again, the drug should be stored as

21  prescribed by the -- per the instructions of

22  the pharmacy.  That's --

23  BY MR. KURSMAN:

24  Q.   Do you believe that to be the case even

25  if it conflicts with the protocol?

1  A.    Yes.  I believe that the drugs that we

2  procure should be stored in accordance with

3  the -- with the instructions from the pharmacy

4  where we purchased the drugs.

5  Q.    So if the TDOC says one thing and the

6  pharmacy instructions say another, it's TDOC's

7  position that its execution teams should follow

8  the pharmacy instructions?

9  A.    Give me an example of what you're talking

10  about.

11  Q.    Sure.  Let's say the execution protocol

12  says drugs must be stored in a container.  And

13  the pharmacy owner's instructions say drugs

14  must be stored in a freezer.  How does --

15  first, what should the -- what should the

16  execution team do?  Which of those two

17  provisions should they follow?

18         MR. MITCHELL:  Form objection.

19         THE WITNESS:  They should follow the

20  instructions of the pharmacy where the drugs

21  were purchased.

22  BY MR. KURSMAN:

23  Q.    And how do they know which to choose when

24  they have instructions from the protocol that

25  conflict with instructions from the pharmacy?

Elite Reporting Services
www.EliteReportingServices.com

1          MR. MITCHELL:  Form objection.  Yeah.

2          THE WITNESS:  They know to follow the

3   protocol -- the instructions from the

4   pharmacist where the drugs are kept.

5   BY MR. KURSMAN:

6   Q.    Yeah.  My question is, how would they

7   know to do that?

8          MR. MITCHELL:  Same objection.

9          THE WITNESS:  Because that's the

10  instruction that they received from the

11  pharmacy in the storing of that particular

12  drug.

13  BY MR. KURSMAN:

14  Q.    Sure.

15         So they have instructions from the

16  pharmacy owner, but then they also have

17  instructions from TDOC.  And is it your

18  testimony that TDOC believes that its

19  executioners -- members of its execution team

20  should follow instructions from the pharmacy

21  owner over their own instructions?

22  A.    My testimony is that the members of the

23  execution team who handle the drugs and receive

24  the drugs and store the drugs should follow the

25  instructions of the pharmacy who provided the

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 255 of 373 PageID #: 6542
Elite Reporting Services
www.EliteReportingServices.com

1   drugs to the Department.  If it's a -- if it's

2   a compounded LIC that requires freezing, it

3   should be stored in a freezer as described by

4   the pharmacy.  If it's a commercially

5   manufactured drug that requires to be stored at

6   room temperature, it should be stored at room

7   temperature in a locked container.

8   Q.     How would the drug procurer know to

9   follow the pharmacy instructions rather than

10  the instructions for TDOC's execution protocol?

11  Did they ask --

12  A.     Ask?

13  Q.     -- you as commissioner?

14  A.     No.

15  Q.     Did they ask the warden?

16  A.     No.

17  Q.     Okay.  So they made that determination on

18  their own?

19  A.     No.  The State would ensure that the

20  drugs that we received from the pharmacy, that

21  could change again from -- when I say change

22  from a commercially manufactured drug to a

23  compounded drug, storing requirements could

24  change depending on the way it's compounded,

25  whatever.  We want to make sure -- the State

Case 3:18-cv-01234-B Document 184 Filed 05/17/22  Page 256 of 373  PageID #: 6543
Elite-Brentwood Reporting Service
www.EliteReportingServices.com

1  wants to make sure that that drug is stored as
2  prescribed by the pharmacist that we -- that we
3  receive the compounding drugs from.
4  Q.    No, I understand that.
5       My question is, if the protocol
6  doesn't say that -- I understand what your
7  testimony is.  But if the protocol doesn't say
8  that, if the protocol doesn't say just follow
9  the pharmacy instructions but instead says this
10  is how you are to store drugs, how does the
11  drug procurer know not to follow what the
12  protocol is telling that person to do?
13       MR. MITCHELL:  Object to the form.
14       THE WITNESS:  Again, the people who
15  handle those drugs would follow the orders of
16  the -- or the instructions of the pharmacy
17  where we purchase the drugs from.
18  BY MR. KURSMAN:
19  Q.    Right.  That's not my question as to
20  which they would follow.  My question is, how
21  do they know?  How do they know which one they
22  should follow?  Without speaking with you as
23  the commissioner, without speaking to the
24  warden, which you testified they didn't do, how
25  would the drug procurer know to follow the

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 257 of 373 PageID #: 6564
Elite Reporting Services
www.EliteReportingServices.com

1  pharmacy instructions over what TDOC tells

2  them?

3  A.    They would know because to -- they would

4  know the requirements of the pharmacy because

5  they have direct contact with the pharmacy.

6  They know what the instructions are for the

7  storage of those chemicals.  And it's provided

8  to them.  Those instructions are provided to

9  them by the drug procurer who --

10  Q.    So it's your testimony that the drug

11  procurer has the ability to not follow the

12  protocol in certain circumstances?

13          MR. MITCHELL:  Object to the form.

14          THE WITNESS:  Again, the drug

15  procurer is -- has the authority and

16  responsibility to follow the instructions of

17  the pharmacist and the pharmacy where we --

18  where we obtain these chemicals from.  That is

19  my testimony.

20  BY MR. KURSMAN:

21  Q.    Right.  But my question is different,

22  which is, does the drug procurer have the

23  ability, have the discretion to not follow

24  instructions in the protocol --

25          MR. MITCHELL:  Object to the form.

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 258 of 373 PageID #: 6545
Elite Reporting Services
www.EliteReportingServices.com

1   BY MR. KURSMAN:

2   Q.    -- without speaking with you as the

3   commissioner or the warden?

4   A.    The drug -- I'll say this again.  The

5   drug procurer understands that our

6   responsibility is -- as the State is to follow

7   the instructions of the pharmacy where the

8   drugs are purchased.

9   Q.    How does the drug procurer understand

10  that if they haven't spoken with you as

11  commissioner or the warden about that?

12          MR. MITCHELL:  Object to the form.

13          THE WITNESS:  I think the drug

14  procurer understands the nature of the -- what

15  we're doing here.  And the fact that these

16  chemicals are -- he's -- that person's had a

17  lot of communication with the pharmacy.

18  There's been in-depth discussions about how

19  those drugs are shipped, handled, what the

20  expectations are, as far as the storage when we

21  receive them, when they are taken out of the

22  freezer, how long.  All of those things.

23  That's --

24  BY MR. KURSMAN:

25  Q.    That --

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 259 of 373 PageID #: 6546
Elite Reporting Services
www.EliteReportingServices.com

1  A.    I think it's reasonably -- it's a

2  reasonable expectation there that they

3  understand those instructions.

4  Q.    The drug procurer and every member of the

5  execution team has this document.  It's 104

6  pages.  And it was written by their bosses.

7  You said it was written by the higher-ups at

8  TDOC.  And what you're telling me now is that

9  members of this execution team who aren't

10 higher-ups at TDOC can deviate from the

11 protocol when they see necessary; is that

12 right?

13         MR. MITCHELL:  Object to the form.

14         THE WITNESS:  No, it's not right.

15 BY MR. KURSMAN:

16 Q.    Okay.  Let's go to page 35 of the

17 protocol.  Do you see at the top it says

18 compounded preparations?

19 A.    I do.

20 Q.    Okay.  And now let's go to paragraph 1.

21 A.    Okay.

22 Q.    Okay.  Do you see storage of LIC?

23 A.    I do.

24 Q.    And LIC is lethal injection chemicals?

25 A.    That's correct.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 260 of 373 PageID #: 6547
Elite Reporting Services
www.EliteReportingServices.com

1    Q.    Okay.  And do you see the last sentence

2    says, the LIC is placed in an unmovable,

3    heavy-gauge steel container with security grade

4    locks.  Do you see that?

5    A.    I do.

6    Q.    And do you see at the top that's for

7    compounded preparations?

8    A.    I see that, yes.

9    Q.    Does the drug procurer store compounded

10   preparations in unmovable, heavy-gauge steel

11   container with security gridlocks?

12   A.    No.  The chemicals are stored -- the

13   compounded chemicals are stored in a

14   refrigerated container, per the instructions of

15   the pharmacist.

16   Q.    And who made the decision to store those

17   chemicals in a refrigerator instead of a

18   heavy-gauge steel container?

19   A.    That was the instructions of the

20   pharmacist.

21   Q.    Who at TDOC, though, made the decision to

22   follow the instructions of the pharmacist?

23   A.    The State did.  The Department.

24   Q.    Who at the Department?

25   A.    The Department of Corrections.  Myself,

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 261 of 373 PageID #: 6548
Elite Reporting Services
www.EliteReportingServices.com

1    as well as -- I'm the commissioner, as well

2    as -- that's the instructions of the State.

3    Q.    You just told me a minute ago -- you

4    testified that the drug procurer never spoke

5    with you or the warden about where to store the

6    drugs.  But now you're testifying that you're

7    the person who made the decision to store the

8    drugs in the refrigerator?

9         MR. MITCHELL:  I --

10        THE WITNESS:  What I'm -- what I am

11   attempting to tell you is that the position of

12   the State, the Department of Corrections -- the

13   Tennessee Department of Corrections, has been

14   to follow the instructions of the pharmacy in

15   the storage of the drugs.

16   BY MR. KURSMAN:

17   Q.    Right.  But you told me that the drug

18   procurer never asked you if the pharmacy

19   instructions conflict with the protocol of what

20   to follow.  Am I right?

21   A.    We never had a discussion that said, hey,

22   this protocol says one thing, the pharmacy says

23   something else.  The discussion has always

24   been, we follow the instructions of the

25   pharmacy where the drugs are purchased in

Elite Reporting Services certified Court Reporters
www.EliteReportingServices.com

1  relation to how they are stored, in what
2  environment they are stored.
3  　　　　MR. MITCHELL:  Alex, I think the
4  confusion is the sentence above Paragraph 1.
5  BY MR. KURSMAN:
6  Q.　　But why -- why wouldn't you amend the
7  protocol to say that?
8  　　　　MR. MITCHELL:  Object to the form.
9  　　　　THE WITNESS:  That's a good question.
10  I'm not saying that the protocol might be
11  better if we put that sentence in there.  But
12  again, the instructions are -- and the drug
13  procurer understands this, as well as the
14  warden of the facility understands that those
15  drugs are to be stored as instructed by the
16  pharmacy.
17  BY MR. KURSMAN:
18  Q.　　Now, let's go back to page 32, training
19  of execution team members.  How do you practice
20  for determining an inmate's consciousness?
21  A.　　The warden performs that responsibility
22  to check for an inmate's consciousness.
23  Q.　　Right.  How does the warden practice to
24  assess an inmate's consciousness?
25  A.　　So he uses -- after the midazolam is

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 263 of 373 PageID #: 6650
Elite Reporting Services
www.EliteReportingServices.com

1   administered, there's a two-minute waiting

2   period.  The warden brushes the back of the --

3   the eyelids of the offender.  He calls loudly

4   the offender's name.  He puts his hand on his

5   shoulder and shakes -- I've even seen that.

6   Shaking the inmate and obviously doing a check

7   or a pinch of the trapezius muscle and -- to

8   determine if there's any reaction to that -- to

9   those stimuli.  That's how the consciousness

10  check is performed.

11  Q.    Right.  I understand how he does it.  But

12  my question is, how does he practice for it?

13  How is there -- do you have any practices where

14  a person -- if Person A is conscious and Person

15  B is not conscious, so he knows whether he's

16  accurately determining whether a person is

17  conscious or not?

18  A.    Not in training.  To my knowledge, we've

19  never had an individual who is in a training

20  session that was unconscious and somebody who

21  was conscious to do the training on those two

22  individuals, no.

23  Q.    Okay.  So aside from the trainings that

24  the entire execution team does, is there

25  additional training when checking for an

Elite Reporting Services · www.EliteReportingServices.com

1    inmate's consciousness?

2    A.    Other than what the warden received from

3    the physician, not that I'm aware of.

4    Q.    And can you describe what exactly the

5    warden received from the physician?

6    A.    Basically a summary of that process of --

7    that I just described and the visual indicators

8    that would -- the warden would use to determine

9    if somebody showed signs of consciousness.

10   Q.    And what are those visual indicators?

11   A.    Obviously any type of physical movement,

12   response to the stimuli, whether that be

13   calling the name of the inmate, opening his

14   eyes, turning their head, or a visual of the --

15   of the person laying there in response to the

16   stimulus.

17   Q.    So is it TDOC's position that an inmate

18   opened their eyes, that would mean they were

19   conscious after a consciousness check?

20   A.    Yes.  That would be a sign obviously that

21   the inmate could be conscious, yes.

22   Q.    What if they moved their legs?

23            MR. MITCHELL:  Object to the form.

24            THE WITNESS:  Possibly, yes.

25   ///

Elite Reporting Services
www.EliteReportingServices.com

1    BY MR. KURSMAN:

2    Q.    What if they moved their fingers?

3          MR. MITCHELL:  Same objection.

4          THE WITNESS:  Could be.  Again, it

5    depends on the amount of movement and the type

6    of movement.

7    BY MR. KURSMAN:

8    Q.    Why isn't it detailed in the protocol

9    that the warden should receive special training

10   on consciousness checks?

11   A.    Specifically in relation to the things I

12   just said?  Or is your question more -- I

13   don't -- I don't guess I understand your

14   question.

15   Q.    I apologize.

16          In the protocol it does not say that

17   the warden will receive additional training for

18   the consciousness checks.  Why doesn't it say

19   that in the protocol?

20   A.    It just -- it just does not.  The -- we,

21   as the State, realize the warden is responsible

22   for those duties as determined in the protocol.

23   And we realize that we -- the State is

24   responsible for ensuring that the warden has

25   been trained to perform that procedure and

Elite Reporting Services
www.EliteReportingServices.com

1    recognize signs of consciousness.  We did not

2    put that in the protocol.

3    Q.    Do you think you should have put it in

4    the protocol?

5    A.    No, not particularly.

6    Q.    Let's go to page 66.  Just let me know

7    when you get there.

8             MR. MITCHELL:  66?

9             MR. KURSMAN:  66, yeah.

10   BY MR. KURSMAN:

11   Q.    Do you see under 7 it says, at this time

12   the warden shall assess the consciousness of

13   the condemned inmate?

14   A.    Yes.

15   Q.    What does the term consciousness mean as

16   used in the protocol?

17   A.    The consciousness of the inmate -- of the

18   inmate's response to the stimulus of the

19   consciousness check.  Obvious signs of

20   consciousness.

21   Q.    Is there a difference to TDOC between

22   being asleep and being unconscious?

23            MR. MITCHELL:  Object to the form and

24   scope of the notice.

25            You can answer.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 267 of 373 PageID #: 6654
Elite Court Reporting Service (615) 595-0073
www.EliteReportingServices.com

```
 1            THE WITNESS:  Yes.  The difference in
 2   being asleep versus being unconscious would be
 3   -- obviously if someone is asleep and you call
 4   their name loudly and shake them or brush their
 5   eyelashes or do the -- the check of the
 6   trapezius muscle, there would be -- if the
 7   person was just asleep, they would respond to
 8   that.  They would wake up or show some obvious
 9   sign that they were aware of what was being
10   done.  Responding to the stimulant.  Someone
11   who was unconscious would not respond to that.
12   BY MR. KURSMAN:
13   Q.    Is there a difference between being
14   unresponsive and insensate?
15            MR. MITCHELL:  Objection.  Scope of
16   the notice.
17            THE WITNESS:  We believe that the
18   person being unresponsive after the onboarding
19   of the midazolam and not responding to a
20   consciousness check is indication that they are
21   unconscious and insensate to the pain.
22   BY MR. KURSMAN:
23   Q.    How does TDOC believe it can make the
24   determination that someone is unresponsive
25   versus insensate?
```

1    A.    Again -- well, first of all, the

2    Department of Corrections is not a medical

3    professional; although, there are medical

4    opinions that we feel like support that.  And

5    the -- obviously the inmate is not responding

6    to the stimulus of the consciousness check,

7    that would be our position on that.

8    Q.    Would be your position that they are

9    unresponsive?

10   A.    Unconscious.

11   Q.    Would it be your position that not

12   responding to the consciousness check would

13   mean they are insensate?

14   A.    Yes.

15   Q.    Would it mean that they are insensate to

16   the second drug as well?

17        MR. MITCHELL:  Object to the form and

18   the scope of the notice.

19        THE WITNESS:  Yes.

20   BY MR. KURSMAN:

21   Q.    And would it mean that they are insensate

22   to the third drug as well?

23        MR. MITCHELL:  Same objections.

24        THE WITNESS:  Yes.

25   ///

Elite Reporting Services
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    And what does TDOC believe a person who

3  is unconscious, what do they believe that

4  person would look like?

5          MR. MITCHELL:  Object -- yeah, object

6  to the form and also scope of the notice.

7          THE WITNESS:  I'm sorry.  Would look

8  like?  Can you help clarify that a little bit?

9  BY MR. KURSMAN:

10  Q.    Sure.

11          What -- the term unconscious is used

12  repeatedly in the protocol.  What does TDOC

13  believe that an unconscious person physically

14  looks like if they are unconscious?

15          MR. MITCHELL:  Same objection.

16          THE WITNESS:  Someone who is -- in

17  this particular situation, someone who is

18  obviously unresponsive to stimulus, to their --

19  their eyes are closed, they are asleep -- they

20  appear to be asleep.  They do not respond to

21  their names being called.  They do not respond

22  to painful stimulus that's applied by the

23  warden during the consciousness check.  Do not

24  respond to movement or the shaking them or

25  calling their name.  Provide no response to

```
 1   that.
 2   BY MR. KURSMAN:
 3   Q.    Is TDOC aware of medical standards
 4   related to checking for consciousness?
 5             MR. MITCHELL:  Object to the scope of
 6   the notice.
 7             THE WITNESS:  No.  Not particularly,
 8   no.
 9   BY MR. KURSMAN:
10   Q.    Does TDOC understand that there are
11   different levels of sedation?
12             MR. MITCHELL:  Same objection.
13             THE WITNESS:  Not particularly, no.
14   BY MR. KURSMAN:
15   Q.    Just -- what is the level of anesthetic
16   depth that an inmate must be under to be
17   declared unconscious?
18             MR. MITCHELL:  Form and scope of the
19   notice.
20             THE WITNESS:  I'm not sure.
21   BY MR. KURSMAN:
22   Q.    Is it mild sedation?
23             MR. MITCHELL:  Same objections.
24             THE WITNESS:  I'm not sure.
25   ///
```

Case 3:18-cv-01234-Document 184 Filed 03/47/22 Page 271 of 373 PageID #: 6658
Elite Reporting Services
www.EliteReportingServices.com

1    BY MR. KURSMAN:

2    Q.    Is it local sedation?

3    A.    Again --

4            MR. MITCHELL:  Same objections.

5            THE WITNESS:  -- I'm not sure.  Our

6    determination is based on the consciousness

7    check that we do after the midazolam is

8    onboard.

9    BY MR. KURSMAN:

10   Q.    Is TDOC aware that an individual could be

11   under mild sedation and not respond to the

12   consciousness check as outlined in this

13   protocol?

14           MR. MITCHELL:  Same two objections.

15           THE WITNESS:  Again, TDOC is of the

16   opinion with the amount of midazolam that's

17   used in our protocol, that an individual would

18   be unconscious and insensate to pain after the

19   midazolam is applied.

20   BY MR. KURSMAN:

21   Q.    Right.  But my question is only, is TDOC

22   aware that a person under mild sedation -- and

23   I'm not talking about this protocol -- that a

24   person under mild sedation could be

25   unresponsive after the consciousness check

Elite Reporting Services
www.EliteReportingServices.com

1  performed as described in this protocol?

2          MR. MITCHELL:  Same pair of

3  objections.

4          THE WITNESS:  Not that I'm aware of.

5  BY MR. KURSMAN:

6  Q.    Okay.  Has TDOC ever consulted with an

7  anesthesiologist about this?

8  A.    No.

9  Q.    Does TDOC believe that an individual can

10 be declared unconscious under this protocol but

11 remain sensate to the second and third drugs?

12         MR. MITCHELL:  Form objection.  Scope

13 of notice objection.

14         THE WITNESS:  TDOC is of the opinion

15 that our protocol, as I've stated, once

16 applied, the midazolam at the -- at the amount

17 that is in our protocol renders a person

18 unconscious and insensate to pain.

19 BY MR. KURSMAN:

20 Q.    But TDOC did not consult with an

21 anesthesiologist, correct?

22 A.    No.

23 Q.    TDOC did not consult with a

24 pharmacologist?

25         MR. MITCHELL:  Same objections.

Elite Reporting Services
www.EliteReportingServices.com

1          THE WITNESS:  No.  Other than,

2     again -- not that I'm aware of.

3     BY MR. KURSMAN:

4     Q.    How does TDOC know that a prisoner who is

5     unresponsive is under a level of sedation more

6     than just mild sedation?

7          MR. MITCHELL:  Form and scope of

8     notice objections.

9          THE WITNESS:  TDOC would -- based our

10    opinion on the fact that, again, considering

11    the executions that we've carried out, as well

12    as the other states that use the protocol that

13    we currently have, as well as the opinions of

14    some medical experts that would agree with us

15    that the amount of drug that we use with

16    midazolam would render somebody unconscious and

17    insensate to pain, that it's adequate for what

18    we use.

19    BY MR. KURSMAN:

20    Q.    I'm just -- I'm just trying to figure out

21    how TDOC would know whether the inmate is going

22    under a mild sedation.  Because I believe what

23    you testified to before was if the inmate is

24    unresponsive to the consciousness check, it

25    would then be declared unconscious.

Case 3:18-cv-01234 Document 184 Filed 03/47/22 Page 274 of 373 PageID #: 6761
Elite Court Reporting Service (615) 595-0073
www.EliteReportingServices.com

1         So my question is, just how does
2  TDOC -- how is TDOC able to differentiate
3  between an inmate just being under a mild
4  sedation versus an inmate being under a deeper
5  level of sedation?
6         MR. MITCHELL:  I'm going to object to
7  the form and scope of the notice.
8         THE WITNESS:  It -- again, as you
9  know, we have no -- we have no -- that
10 determination is made by a consciousness check
11 with visual observations of the offender -- of
12 the individual that's receiving the drugs and
13 their response to any stimuli that we apply
14 during the consciousness check.
15 BY MR. KURSMAN:
16 Q.   So are you saying that TDOC doesn't
17 actually know whether that individual is only
18 under mild sedation?
19        MR. MITCHELL:  Same objections.
20        THE WITNESS:  TDOC believes that the
21 person is, again, unconscious and insensate to
22 pain, based on the amount of drug that we
23 apply, as well as the information -- the best
24 information we have at hand.
25 ///

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 275 of 373 PageID #: 6762
Elite Reporting Services
www.EliteReportingServices.com

1   BY MR. KURSMAN:

2   Q.    Sure.  I'm only trying to figure out the

3   level of sedation that TDOC believes that the

4   inmate is under or how they can determine that

5   level of sedation.

6            MR. MITCHELL:  What topic of

7   examination is this related to?

8            MR. KURSMAN:  Certainly Topic 2, the

9   manner in which they perform the protocol.  And

10  Topics 5 and 6.

11  BY MR. KURSMAN:

12  Q.    So back to the consciousness check.

13  After the prisoner is declared unconscious

14  using the consciousness check that's described

15  in the protocol --

16  A.    Yes.

17  Q.    -- am I right that there's no way that

18  TDOC knows what level of anesthetic depth the

19  prisoner is under at that point?

20            MR. MITCHELL:  Object to the form and

21  the scope of the notice.

22            THE WITNESS:  Other than what I've

23  described, no.

24  BY MR. KURSMAN:

25  Q.    Okay.  Is coughing a sign of

Elite Reporting Services
www.EliteReportingServices.com

1   consciousness?

2   A.    I'm sorry?

3   Q.    Coughing.

4        MR. MITCHELL:  Same objections.

5        THE WITNESS:  Again, coughing is an

6   -- could be an involuntary response that would

7   not necessarily mean that somebody is

8   conscious.

9   BY MR. KURSMAN:

10   Q.    And we already discussed why TDOC didn't

11   have a doctor perform the consciousness check.

12   Why doesn't TDOC have EMTs perform the

13   consciousness check?

14   A.    Other than that was the responsibility

15   assigned to the warden, there's no reason.

16   That's -- we -- the Department of Corrections

17   made the decision that the warden would be the

18   one to do the consciousness check and to

19   determine if the inmate was conscious.

20   Q.    Has the warden ever been tested on

21   whether he can adequately determine what level

22   of anesthetic depth an inmate is under?

23   A.    Not that I'm aware of.

24        MR. MITCHELL:  Object to the form and

25   scope and notice.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 277 of 373 PageID #: 6764
Elite Reporting Services
www.EliteReportingServices.com

1       Actually not scope of the notice.  I
2  withdraw that one.
3  BY MR. KURSMAN:
4  Q.    Is anyone else under the protocol -- can
5  anyone else in the protocol perform the
6  consciousness check?
7  A.    No.  The warden performs the
8  consciousness check.
9       MR. KURSMAN:  Could we take a break
10 at this point?
11      THE VIDEOGRAPHER:  One moment,
12 please.  Going off the record at 4:22 p.m.
13      (Short break.)
14      THE VIDEOGRAPHER:  Back on the record
15 at 4:36 p.m.
16 BY MR. KURSMAN:
17 Q.    Can we go back to Exhibit 1, page 19,
18 where it says physician?
19 A.    Did you say page 19?
20 Q.    Page 19, yeah.
21      And do you see on duties, Number 2,
22 it says in an ultimate and last option, a
23 physician may perform a venous cutdown
24 procedure?
25 A.    I do.

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 278 of 373 PageID #: 6765
Elite Court Reporting Services
www.EliteReportingServices.com

1  Q.    Has the physician agreed to do that
2  should it be necessary?
3  A.    He has.
4  Q.    And do you at all discuss the physician's
5  Hippocratic Oath as it relates to Paragraph 2?
6  A.    I'm sorry.  I didn't understand the last
7  part of the question.
8  Q.    Oh, yeah.  I apologize.
9         Did TDOC and the physician discuss
10 the physician's Hippocratic Oath as it relates
11 to Paragraph 2?
12        MR. MITCHELL:  Object to the form and
13 the scope of the notice.
14        THE WITNESS:  Not so much the
15 Hippocratic Oath, other than his willingness to
16 perform that procedure.
17 BY MR. KURSMAN:
18 Q.    Is there a reason that TDOC asked him if
19 he was willing to perform this procedure but
20 not whether he was willing to perform the
21 consciousness check?
22 A.    No, there is no reason.
23 Q.    Okay.  Let's go to page 66.  Do you see
24 this is 7:10 p.m.?  This is the instructions
25 for the actual day of the execution?

Elite Reporting Services
www.EliteReportingServices.com

1   A.    Yes.

2   Q.    And if you go to Paragraph 7 in the

3   middle, it says, the condemned inmate's

4   unresponsiveness will demonstrate that the

5   inmate is unconscious.

6         Do you see that?

7   A.    I do see that.

8   Q.    I know we talked about this a bit, but is

9   TDOC aware that if someone is unresponsive that

10  does not mean that they are necessarily

11  insensate to pain also?

12        MR. MITCHELL:  Object to the form.

13        THE WITNESS:  We understand that

14  there is that opinion, yes.

15  BY MR. KURSMAN:

16  Q.    Is there -- is TDOC aware of a different

17  opinion that if an individual is unresponsive,

18  that means that they are insensate to pain?

19        MR. MITCHELL:  Same objection.

20        THE WITNESS:  TDOC is aware that

21  someone could be under certain circumstances

22  unresponsive and insensate to pain.  But I

23  would clarify that to say that in our protocol,

24  with the amount of drug that we use for the

25  first drug, that it's our belief that the

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    inmate is both insensate and unconscious to

2    pain.

3    BY MR. KURSMAN:

4    Q.    I believe you said TDOC is aware that

5    person could be unresponsive and insensate to

6    pain.  Did you mean to say you are aware that a

7    person could be unresponsive but also sensate

8    to pain?

9              MR. MITCHELL:  Form objection.

10             THE WITNESS:  What I said was, is

11   that we're aware -- we are -- we understand

12   that there is opinions that say that an inmate

13   can be unconscious and sensate to pain.

14             Was that your question?

15   BY MR. KURSMAN:

16   Q.    Oh, no.  I'm sorry.  My question is not

17   in the context of an inmate or an execution

18   protocol.  My question is simply, is TDOC aware

19   that individuals can be unresponsive but still

20   remain sensate to pain?

21             MR. MITCHELL:  I'm going to object

22   that's outside the scope of the notice.  And

23   also object to the form.

24             THE WITNESS:  TDOC is aware that

25   someone could be unconscious and sensate to

Elite Reporting Services
www.EliteReportingServices.com

1  pain.

2  BY MR. KURSMAN:

3  Q.    Okay.  Who wrote the language in

4  Paragraph 7?

5  A.    I'm not 100 percent sure who the

6  individual was that wrote that language.  It is

7  the language of the Department for this

8  protocol.  I don't know the particular

9  individual who wrote it.

10  Q.    Do you know if an anesthesiologist was

11  consulted with regards to Paragraph 7?

12  A.    No, I do not.

13  Q.    Okay.  Do you know if a medical doctor

14  was consulted with regards to Paragraph 7?

15  A.    I think a medical doctor was part of

16  the -- determining the consciousness check and

17  what that would look like, as well as the

18  information in Paragraph 7.

19  Q.    Do you know if a pharmacologist was

20  consulted with regards to Paragraph 7?

21  A.    I do not.

22  Q.    Does TDOC understand that depending on

23  the level of sedation of a person, the more

24  extreme stimuli you usurp on that person, the

25  more likely it is that they will then respond?

Elite Reporting Services
www.EliteReportingServices.com

1          MR. MITCHELL:  Object to the form and

2     scope of the notice.

3          THE WITNESS:  TDOC understands that

4     that's a possibility.  Again -- but I clarify

5     that to also consider that our -- our stance

6     and our protocol is based on the amount of

7     midazolam that we use to render someone

8     unconscious and insensate to pain.

9     BY MR. KURSMAN:

10    Q.    Right.

11         So is TDOC aware that if a person is

12    under mild sedation and a tap on the shoulder

13    or their eyes are rubbed or they are squeezed

14    in their trapezius muscles, that they will not

15    respond?  Is TDOC aware of that?

16         MR. MITCHELL:  Same two objections.

17         THE WITNESS:  No.

18    BY MR. KURSMAN:

19    Q.    Is TDOC aware that if someone is under

20    mild sedation and they are punched in the face,

21    they will likely respond?

22         MR. MITCHELL:  Same two objections.

23         THE WITNESS:  No.

24    BY MR. KURSMAN:

25    Q.    Okay.  Does TDOC believe that -- strike

Elite Reporting Services
www.EliteReportingServices.com

1  that.

2          The last line of Paragraph 7 says, if

3  the condemned inmate is responsive, the warden

4  shall direct the executioner to switch to the

5  secondary IV line.

6          Do you see that?

7  A.    I do.

8  Q.    Why does the executioner switch to the

9  second IV line?

10  A.    To carry out the execution using the

11  secondary set of drugs.

12  Q.    Does TDOC believe that if the inmate is

13  responsive after receiving 500 milligrams of

14  midazolam, an additional 500 milligrams of

15  midazolam will then make them unresponsive?

16  A.    Yes.

17  Q.    Has TDOC consulted with any medical

18  professionals regarding that?

19  A.    Not that I'm aware of.

20  Q.    And what if the inmate is responsive

21  after the second IV line is administered?

22  A.    Then the warden would contact the

23  commissioner.

24  Q.    And what would happen then?

25  A.    I would delay the execution, stop the

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 284 of 373 PageID #: 6671
Elite Reporting Services
www.EliteReportingServices.com

1  execution at that point.

2  Q.    And who normally directs the execution to

3  stop, if an execution is to stop?  Would that

4  be the warden, the commissioner, somebody else?

5  A.    The warden would contact the

6  commissioner.  The commissioner, obviously,

7  would make the decision at that point to stop

8  the execution.  And I would notify individuals

9  within State government.

10  Q.    And then let's go to page 69.  And do you

11  see it says contingency issues?

12  A.    Yes.

13  Q.    Are these the only contingency issues

14  that TDOC has prepared to address in an

15  execution?

16  A.    These are the only contingency issues

17  that's listed in the protocol.  Other

18  contingencies, I guess, it's possible could

19  come up that would require a decision being

20  made.

21        I don't know that you could list

22  every contingency.  But these are the

23  contingencies that the Department thinks

24  would -- could be likely to occur.

25  Q.    Does the execution team receive any

Elite Reporting Services
www.EliteReportingServices.com

```
 1  training on any other contingency issues?
 2  A.    No, not --
 3            MR. MITCHELL:  Object to the form.
 4            THE WITNESS:  Not that I'm aware of
 5  specifically, no.
 6  BY MR. KURSMAN:
 7  Q.    And what happens if a different
 8  contingency arises?
 9            MR. MITCHELL:  Same objection.
10            THE WITNESS:  Depends on the
11  contingency.  The -- either the warden or
12  myself would provide the instructions based on
13  whatever the situation.  It's hard to say
14  without knowing the contingency.
15  BY MR. KURSMAN:
16  Q.    Let's go to page 32 of the protocol.  Do
17  you see it says training of the execution team
18  member?
19  A.    Yes, I see that.
20  Q.    Okay.  And it references an annual class.
21  What is the annual review class?
22  A.    It's a review with the warden or designee
23  at the facility that he holds with the
24  execution manual of where they review the
25  manual with the team members.
```

Elite Reporting Services
www.EliteReportingServices.com

1    Q.    When was the most recent class?

2    A.    I'm not sure.

3    Q.    Does -- TDOC doesn't know what the most

4    recent class was?

5    A.    I do not.

6    Q.    Did you ask the warden when he held his

7    most recent class, to prepare for this

8    deposition?

9    A.    I did not.

10   Q.    Do you know who teaches the class?

11   A.    It would either be the warden or the

12   designee.  Would probably be the Assistant

13   Warden of Security Stuart.

14   Q.    Is attendance required for this class?

15   A.    Yes.  The members of the team would be

16   required to attend this class or attend an

17   alternative review if they were not available

18   to be there.

19   Q.    And what would the alternate review be?

20   A.    That would be determined by the warden.

21   Q.    Has that happened ever?

22   A.    I'm not sure.

23   Q.    Okay.  And when you say members of the

24   team, is that every member of the execution

25   team is required to attend these classes?

1    A.    Yes.

2    Q.    And is there any assessment to ensure

3    that the protocol is clearly understood by all

4    participants?

5    A.    Other than the opportunity for

6    individuals to ask questions to clarify any

7    questions they might have.  To -- there is no

8    test or pass or fail, if that's your question.

9    Q.    That's my question.

10          And is there a doctor present at

11   these trainings?

12   A.    No.

13   Q.    Is the physician that's part of the

14   execution team, is that physician present at

15   these trainings?

16          MR. MITCHELL:  Object to the form.

17          THE WITNESS:  No.

18   BY MR. KURSMAN:

19   Q.    So how -- who confirms that the

20   executioner is performing the correct push rate

21   if there's no physician present at these

22   trainings?

23          MR. MITCHELL:  Object to the form.

24          THE WITNESS:  Again, the State relies

25   on the executioner's prior training and

Elite Reporting Services
www.EliteReportingServices.com

1  experience in pushing the chemical.

2  BY MR. KURSMAN:

3  Q.    And who confirms that the warden is

4  conducting an appropriate consciousness check

5  if there's no physician at these trainings?

6  A.    Again, the State relies on the training

7  provided to the warden for that.

8  Q.    Let's go to Exhibit 67.

9  A.    You said 67?

10  Q.    Yeah, 67.

11        And do you -- do you see this as a

12  chemical preparation timesheet?

13  A.    I do.

14  Q.    Okay.  And this is July of 2018?

15  A.    That's correct.

16  Q.    Does TDOC know why executioner has

17  delayed the midazolam syringe preparation

18  trainings?

19  A.    Yes.  The delay in the preparation for

20  midazolam would be -- could be possibly the

21  start of a -- the execution protocol.  Possibly

22  trying to plan for a contingency of a possible

23  stay of execution, temporary stay of execution,

24  or a decision being made regarding an appeal.

25        Because the midazolam, again, is --

Case 3:18-cv-01234 Document 184 Filed 03/47/22 Page 289 of 373 PageID #: 6676
Elite Reporting Services
www.EliteReportingServices.com

1  once it's mixed, you have one hour to utilize

2  that chemical.  So you certainly do not want to

3  prepare the chemical, and then have a situation

4  where an execution could be delayed more than

5  one hour, which would violate the -- the

6  instructions of the pharmacist in relation to

7  the use of the drug.

8  Q.    And this one hour that you talk about,

9  that comes from the pharmacist's instructions;

10  is that what you're saying?

11  A.    Yes.

12  Q.    So in the executions themselves, that --

13  is that why you're delaying the midazolam

14  syringe preparations?

15          MR. MITCHELL:  Object to the form.

16          THE WITNESS:  Yes.

17  BY MR. KURSMAN:

18  Q.    And do you -- do you believe that TDOC

19  takes the training seriously?

20  A.    Yes.

21  Q.    Okay.  Let's go to Exhibit 68.  Do you

22  see the first page?  It says, the inmate name

23  Wild Bill.

24  A.    I do.

25  Q.    Does TDOC believe that that indicates the

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 290 of 373 PageID #: 6677
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  execution team is taking the training

2  seriously?

3  A.    I think the use of a name at the top --

4  just like on page 82 where it says condemned

5  and -- or say, for instance, using Xs in place

6  of the inmate's number does not in and of

7  itself indicate that individuals are not taking

8  the training seriously.

9  Q.    Okay.  So on the next page where it says

10  inmate name Con Demned --

11  A.    Yes.

12  Q.    -- you think that indicates that the

13  execution team is taking the training

14  seriously?

15  A.    Again, I -- it's my belief that although

16  it's probably not the best use -- and it's my

17  understanding that the warden has corrected

18  that.  But again, an individual that makes a

19  decision to put that name on the paper does

20  not -- is not an indication, in the State's

21  opinion, that the people participating in the

22  training is not taking the training seriously.

23  Q.    And what about the next page where it

24  says Annie Oakley, is that the same answer for

25  the next page?

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 291 of 373 PageID #: 6678
Elite Reporting Services
www.EliteReportingServices.com

```
 1   A.    It is the same answer, yes.
 2   Q.    And the same answer for the next page
 3   that says Doc Holliday?
 4   A.    Yes.
 5   Q.    And the same answer for the next page, it
 6   says Tom Thumb?
 7   A.    Yes.
 8   Q.    And the same answer for the next page, it
 9   says John Henry?
10   A.    Yes.
11   Q.    Is it the same answer for the next page
12   that says Billy the Kid?
13   A.    Yes, it is.
14   Q.    And when the execution team trains, has
15   that been referred to by the execution team
16   members as band practice?
17   A.    It has.
18   Q.    And do you think it's appropriate for the
19   execution team to be referring to training as
20   band practice?
21   A.    I think the choice of that name had no
22   negative connotations or meaning or intent from
23   anyone within TDOC.  I think that was a -- that
24   was a choice of a name to -- obviously an
25   attempt to help protect the identity of some of
```

Case 3:18-cv-01234 Document 184 Filed 03/17/22 Page 292 of 373 PageID #: 6679
Elite Reporting Services
www.EliteReportingServices.com

1  the people that were on the team, as well as

2  protect the times and the activity that was

3  going on at the facility at that particular

4  time.

5            Again, it's the State's opinion that

6  that use of the word band practice had no

7  reflection of anyone's lack of respect or

8  understanding of the seriousness of the nature

9  of the training process for lethal injection

10 protocol or the execution -- or the

11 electrocution protocol.

12 Q.    How would calling the training band

13 practice protect the individual's identities?

14 A.    Again, using a term that's not -- band

15 practice versus a practice session for

16 electrocution or a practice session for lethal

17 injection would tend not to draw the same

18 amount of attention, you know, as using the

19 term band practice.

20 Q.    Does TDOC have a band?

21 A.    TDOC does not.  But there's some

22 institutions that have bands.

23 Q.    So if a TDOC employee was to tell another

24 TDOC employee they were going to band practice,

25 don't you think that would draw some questions

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 293 of 373 PageID #: 6690
Elite Court Reporting Services
www.EliteReportingServices.com

1  if they didn't have a band?

2  A.    It -- it could --

3           MR. MITCHELL:  Object to the form.

4           THE WITNESS:  It could.  It could.

5  But it would be an expectation that a team

6  member would not go and advertise that they

7  were going to band practice, nor an execution

8  practice or a protocol practice.

9  BY MR. KURSMAN:

10 Q.    So if they are not advertising that they

11 are going to band practice, could you describe

12 for me again how that would protect the

13 identity of the individuals who are

14 participating in this execution?

15 A.    Again, it's an attempt to not publicize

16 and make commonly known the times and the

17 activities or the times that these trainings

18 were going on, to try to protect the identity

19 of these people.

20 Q.    Were any of the execution team members

21 disciplined for using the term band practice?

22 A.    I'm not for sure.

23 Q.    Were any of the execution team members

24 disciplined for using the names we just

25 discussed as the inmates involved in the

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 294 of 373 PageID #: 6621
ELITE B Deuteron Reporting Service 615 373-0021
www.EliteReportingServices.com

1  executions?

2  A.    I'm not -- I'm not for sure.

3  Q.    Let's go to page 34 on Exhibit 1.

4         MR. MITCHELL:  3-4?  I'm sorry.

5         MR. KURSMAN:  34.

6         MR. MITCHELL:  Okay, yeah.

7  BY MR. KURSMAN:

8  Q.    And do you see that?  It says the

9  chemicals used in lethal injection.

10  A.    I do.

11  Q.    Okay.  And it has the three drugs and how

12  much of each drug should be administered.  Do

13  you see that?

14  A.    I do.

15  Q.    Who came up with the three-drug protocol?

16  A.    The State of Tennessee in consultation

17  with the pharmacist, as well as consultation

18  with other states that use the three-drug

19  protocol.

20  Q.    And does TDOC trust the pharmacist?

21  A.    We do.

22  Q.    Does TDOC think the pharmacist is

23  qualified to opine on the three drugs to be

24  used in the lethal injection protocol?

25  A.    We do.

Case 3:18-cv-01234-B Document 184 Filed 03/47/22 Page 295 of 373 PageID #: 6682
Elite Reporting Services
www.EliteReportingServices.com

1  Q.     What type of drug is midazolam?

2  A.     It's a -- midazolam is a benzodiazepine.

3  Q.     And what is the level of anesthetic depth

4  that TDOC believes that midazolam can achieve?

5           MR. MITCHELL:  Object to the form and

6  also the scope of the notice.

7           THE WITNESS:  Clarify your -- I'm

8  sorry.  Clarify --

9  BY MR. KURSMAN:

10  Q.     Sure.

11  A.     -- your question for a layperson.

12  Q.     Sure.  I apologize.

13  A.     I don't understand.

14  Q.     Does TDOC believe that midazolam can --

15  can achieve more than mild sedation?

16           MR. MITCHELL:  Same objection.

17           THE WITNESS:  TDOC believes that the

18  500 milligram of midazolam, as described here

19  in the protocol, renders a person unconscious

20  and insensate to pain.

21  BY MR. KURSMAN:

22  Q.     So the reason I ask is because in the

23  medical field, the term unconscious normally

24  isn't used.  It's levels of sedation.  So I'm

25  just trying to figure out what level of

Elite Reporting Services * www.EliteReportingServices.com

1  sedation TDOC believes that midazolam can

2  achieve.

3          So is it local anesthesia?  Is it

4  mild sedation?  Is it deep sedation?  Is it

5  something else?

6          MR. MITCHELL:  Same objections.

7          THE WITNESS:  I don't -- I don't know

8  that I can speak to that in regard to the level

9  of sedation, other than to say that the State

10 believes that, again, as I've said, using

11 midazolam, as we have prescribed here in the

12 protocol, renders a person unconscious and

13 insensate to pain.

14 BY MR. KURSMAN:

15 Q.    Does TDOC believe that midazolam is

16 typically used as an anesthetic in medical

17 procedures?

18          MR. MITCHELL:  Same objections.

19          THE WITNESS:  Not particularly, no.

20 BY MR. KURSMAN:

21 Q.    Does -- is TDOC aware as to whether

22 midazolam is FDA approved as the sole drug to

23 produce and maintain anesthesia?

24          MR. MITCHELL:  Same objection.

25          THE WITNESS:  No.

Elite Reporting Services  *  (615) 595-0073
www.EliteReportingServices.com

```
 1   BY MR. KURSMAN:

 2   Q.    Does TDOC believe that midazolam can be

 3   used as a sole drug to produce and maintain

 4   general anesthesia during painful surgical

 5   procedures?

 6              MR. MITCHELL:  Same objections.

 7              THE WITNESS:  No.

 8   BY MR. KURSMAN:

 9   Q.    Is TDOC aware that midazolam has a

10   ceiling effect?

11              (Reporter clarification.)

12              MR. MITCHELL:  Same objections.

13              THE WITNESS:  Describe ceiling

14   effect.

15   BY MR. KURSMAN:

16   Q.    Sure.

17              So -- well, let me ask you this

18   first.

19              Does TDOC know what a ceiling effect

20   means?

21   A.    So I'm assuming you're saying that

22   there's a level of unconsciousness that

23   regardless of the amount of drug you give, you

24   achieve no more -- a higher level of

25   unconsciousness.
```

Elite Reporting Services
www.EliteReportingServices.com

1    Q.    That's right.

2    A.    Yeah.

3    Q.    So essentially is TDOC aware that once

4    you give an individual a certain level of

5    midazolam, no matter how much more you give, it

6    will have no more effect on that individual?

7          MR. MITCHELL:  Form objection and

8    scope of the notice objection.

9          THE WITNESS:  TDOC, I think, is aware

10   that there's, again, different medical opinions

11   on that topic, as well as the amount of drug as

12   in relation to the level of consciousness.  We

13   believe that, again, the drugs that we have and

14   the amount of midazolam renders a person

15   unconscious and insensate to pain.

16   BY MR. KURSMAN:

17   Q.    Has TDOC talked to any expert who has

18   opined that midazolam does not have a ceiling

19   effect?

20          MR. MITCHELL:  Object to the form.

21          THE WITNESS:  We could have.  I'm not

22   aware of the particulars.  There could be --

23   again, our attorneys and the witnesses that we

24   have that are medical experts could possibly

25   testify to that.  But I'm not personally aware

1  of that.

2  BY MR. KURSMAN:

3  Q.    And if every expert testifies that at

4  some point midazolam does have a ceiling

5  effect, what would TDOC's reason be for giving

6  an additional 500 milligrams of midazolam --

7          MR. MITCHELL:  Form.

8  BY MR. KURSMAN:

9  Q.    -- if the inmate is insensate -- is

10 responsive after the first 500 milligrams are

11 administered?

12         MR. MITCHELL:  Form and scope of the

13 notice objections.

14         THE WITNESS:  I hate to ask you to do

15 it, but please repeat that.  You lost me.

16 BY MR. KURSMAN:

17 Q.    That was a long question.  I apologize.

18         So if all experts agree that

19 midazolam has a ceiling effect at some point,

20 why would TDOC's protocol call for an

21 additional 500 milligrams of midazolam, if the

22 first 500 milligrams do not render the prisoner

23 unresponsive or unconsciousness, as described

24 in the protocol?

25         MR. MITCHELL:  Form and scope of the

1   notice objections.

2           THE WITNESS:  So we use 500 milligram

3   total.  So we believe that -- the State

4   believes that that 500 milligrams efficiently

5   makes someone unconscious and insensate to

6   pain.

7           The State -- I'm not prepared to

8   testify as to what that ceiling effect is;

9   although, we feel like that our current

10  protocol with the amounts listed has shown that

11  an inmate -- it makes an inmate unconscious and

12  insensate to pain.

13  BY MR. KURSMAN:

14  Q.    My question is only if the State's

15  experts say midazolam has a ceiling effect but

16  it's some higher point than what Plaintiff's

17  experts say the ceiling rate is, will TDOC

18  consider taking out that second set of

19  midazolam?

20          MR. MITCHELL:  Same pair of

21  objections.

22          THE WITNESS:  Again, I'm not sure I

23  understand your question.  And -- we feel like

24  that the current protocol with the 500

25  milligrams total is sufficient and at --

1  performing its job in the protocol for lethal

2  injection.  And there would be no reason we

3  would remove that or change that.

4  BY MR. KURSMAN:

5  Q.    Is TDOC aware that midazolam is highly

6  acidic?

7            MR. MITCHELL:  Same -- just the

8  notice objection.

9            THE WITNESS:  I'm not personally

10  aware of that.  I don't know that we are.

11  BY MR. KURSMAN:

12  Q.    And what type of drug is vecuronium

13  bromide?

14  A.    It's a paralytic.

15  Q.    And I know we discussed this before.  But

16  does TDOC believe that the inmate's

17  consciousness could be better assessed if it

18  was only using the first and third drugs in the

19  execution protocol?

20            MR. MITCHELL:  Object to the form and

21  the scope of the notice.

22            THE WITNESS:  Repeat the question,

23  please.

24  BY MR. KURSMAN:

25  Q.    Sure.

Elite Reporting Services • www.EliteReportingServices.com

1          So you testified prior that the

2    reason that vecuronium bromide was being used

3    was because it helps to effectuate the inmate's

4    death.  My question to you is only, if you took

5    out that second drug, vecuronium bromide, and

6    just performed execution by a two-drug

7    protocol, is it TDOC's opinion that that

8    two-drug protocol without a paralytic, TDOC

9    team members would be able to better determine

10   whether the inmate was conscious during the

11   entire execution?

12          MR. MITCHELL:  Objection to the form

13   and beyond the scope of the notice.

14          THE WITNESS:  It's TDOC's belief that

15   as the consciousness check is conducted after

16   the midazolam is onboard, that taking out the

17   paralytic would not help in the process of

18   determining consciousness.

19   BY MR. KURSMAN:

20   Q.   Can you describe how the warden would

21   assess the inmate's consciousness, as defined

22   in the protocol, after an inmate was injected

23   with vecuronium bromide?

24   A.    The consciousness --

25          MR. MITCHELL:  Object to the form.

Elite Reporting Services
www.EliteReportingServices.com

1          THE WITNESS:  The consciousness check
2    is performed before the vecuronium bromide is
3    put onboard.  After the vecuronium is put
4    onboard, obviously the warden would continue to
5    monitor the inmate, his actions and his
6    response to the drugs.
7    BY MR. KURSMAN:
8    Q.    Right.
9          But my question is, how would the
10   warden be able to do that if the inmate was
11   paralyzed?
12         MR. MITCHELL:  Object to the form and
13   beyond the scope of the notice.
14         THE WITNESS:  Right.  I don't know
15   that he would.  Again, unless -- if the
16   vecuronium served its purpose in paralyzing the
17   inmate, it's obvious that the inmate could not
18   respond or move.  I would agree with that.
19   BY MR. KURSMAN:
20   Q.    So doesn't the vecuronium bromide
21   interfere with the warden's ability to
22   determine the inmate's consciousness during the
23   entirety of the execution proceedings?
24         MR. MITCHELL:  Objection, form and
25   beyond the scope of the notice.

Elite Document Reporting Services.com
www.EliteReportingServices.com

 1          THE WITNESS:  It could -- it could be

 2    determined, I guess, that it could affect the

 3    determination of consciousness during the

 4    entire process.  But it's -- to me it's

 5    important that the consciousness check is

 6    conducted before the vecuronium is put onboard.

 7    And it's also important that the process of

 8    lethal injection, the end goal is to terminate

 9    the inmate's life.  And the vecuronium, again,

10    assists in that process by stopping the

11    breathing and paralyzing the inmate.

12    BY MR. KURSMAN:

13    Q.    Isn't the warden supposed to monitor the

14    consciousness of the inmate throughout the

15    entirety of the execution procedure?

16    A.    Well, the consciousness check is

17    conducted at the beginning -- or at the end of

18    the midazolam.  But the monitor -- the warden

19    monitors the inmate and visualize -- with the

20    visual of the inmate through the entire

21    process.

22    Q.    Would TDOC agree that there's no way to

23    monitor the inmate's consciousness once the

24    inmate is paralyzed with the second drug?

25          MR. MITCHELL:  Object to the form and

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    beyond the scope of the notice.

2         THE WITNESS:  I think that's a

3    reasonable -- a reasonable observation and --

4    to make since the vecuronium is a paralytic.

5    BY MR. KURSMAN:

6    Q.    Is TDOC willing to execute inmates

7    without using the vecuronium bromide?

8         MR. MITCHELL:  Object to the form and

9    beyond -- object to the form.

10         THE WITNESS:  TDOC is -- is, again,

11   satisfied and confident that the current

12   protocol is serving the purpose.  And has been

13   used flawlessly in two prior executions in

14   Tennessee, as well as in other states.

15   BY MR. KURSMAN:

16   Q.    Right.

17         But would TDOC be willing to execute

18   inmates without using vecuronium bromide?

19         MR. MITCHELL:  Object to the form.

20         THE WITNESS:  No.  We have a -- we

21   have a current protocol that's in place that is

22   being used, that is -- has been used without

23   issue.  And it would be our position that our

24   current protocol is sufficient to carry out the

25   execution process.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 306 of 373 PageID #: 6093
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    But why not -- why wouldn't TDOC rather

3  use a protocol with drugs you already have that

4  would effectuate death, that would give the

5  warden a better ability to monitor the inmate's

6  consciousness?

7            MR. MITCHELL:  Object to the form.

8            THE WITNESS:  Other than reasons I've

9  already stated, again, the ultimate goal is the

10  death of the inmate utilizing the protocol that

11  we have in place.  The vecuronium aids in that

12  process, and we would not change that process.

13  BY MR. KURSMAN:

14  Q.    Right.

15            We discussed earlier, though, that

16  you had no expert opinions that adding the

17  vecuronium would make death any quicker and --

18  if it's just a two-drug protocol, midazolam and

19  potassium chloride.  And you also testified

20  that the vecuronium bromide makes it harder for

21  the warden to monitor the consciousness of the

22  inmate during the actual execution.

23            So my question is, why won't TDOC

24  just move to a two-drug protocol, midazolam and

25  potassium chloride, so that the inmate will

1  be -- his life will be terminated as quickly

2  and the warden will be better able to assess

3  consciousness throughout the entirety of the

4  execution procedure?

5          MR. MITCHELL:  Object to the form.

6          THE WITNESS:  Yeah.  Again, the State

7  is of the opinion that the current protocol is

8  working as designed, and there would be no

9  reason that we would want to change our

10 protocol.

11 BY MR. KURSMAN:

12 Q.    What type of drug is potassium chloride?

13 A.    I'm not aware of the particular type of

14 drug.  It's -- I understand its function as it

15 relates to the protocol.  But I can't tell you

16 the particular class or the type of drug.

17 Q.    Can you tell me what its function is?

18 A.    Its function is to basically stop the

19 heart of an individual in that dose.

20 Q.    Do you know what will happen if the

21 prisoner is administered the second and third

22 drugs and is not insensate to pain?

23          MR. MITCHELL:  Object to the form.

24          THE WITNESS:  The individual would

25 experience pain from the drugs.

Elite Reporting Services • (615) 595-0073
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    Do you know what type of pain?

3         MR. MITCHELL:  Same objection.

4         THE WITNESS:  Serious pain.

5  BY MR. KURSMAN:

6  Q.    Have you consulted with any professionals

7  about that?

8  A.    No.  Not particularly, no.

9  Q.    And we go back to page 34, to the

10 chemicals used in lethal injection.

11 A.    Yes.

12 Q.    How was the amount of each dose

13 determined?  What I mean by that is, we have

14 500 milligrams of midazolam, 100 milligrams of

15 vecuronium bromide, and 240 milliequivalents of

16 potassium chloride.  Who determined the dose

17 for each drug?

18 A.    Again, that was the State's decision in

19 consultation with the pharmacist, as well as

20 considering other protocols that were used with

21 these three drugs.

22 Q.    And what was discussed with the

23 pharmacist when deciding on these three drugs?

24 A.    The type of drug, the amount appropriate

25 to carry out a lethal injection, and those

Elite Reporting Services
www.EliteReportingServices.com

1  same -- again, with the pharmacist, those same

2  things were looked at as we considered other

3  protocols that used these chemicals in the

4  protocol.

5  Q.    And when you say other protocols, do you

6  mean other amounts of the drug?

7  A.    Other amounts and other -- yeah.  Of the

8  drug itself, yes.

9  Q.    So how do you come up with 500 milligrams

10 of midazolam?

11 A.    Again, considering what other states

12 used, as well as the consultation with the

13 pharmacist.

14 Q.    What if the pharmacist said that 500

15 milligrams of midazolam would not render a

16 prisoner insensate to the second and third

17 drugs, would TDOC still use this protocol?

18          MR. MITCHELL:  Object to the form.

19          THE WITNESS:  We -- again, we would

20 consider all the information related to that

21 topic from the individuals that would testify

22 as professionals -- medical professionals who

23 had a different opinion, as well as those who

24 would say that it would not make someone

25 insensate to pain.

Case 3:18-cv-01234 Document 184 Filed 03/47/22 Page 310 of 373 PageID #: 6097
Elite Reporting Services
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    But what if the pharmacist who helped to

3  write this protocol, what if the pharmacist

4  said, you know, I don't believe midazolam will

5  render the prisoner insensate to the second and

6  third drugs, would that cause TDOC to

7  reevaluate its protocol?

8          MR. MITCHELL:  Same objection.

9          THE WITNESS:  I think Tennessee would

10  -- like we have done in many cases -- not in

11  many cases, but in the past there's been

12  different opinions.  We would look at all the

13  opinions and make a decision based on that, as

14  we've done in this case, in determining 500

15  milligrams.

16          We know that other states use it.

17  It's been effective.  And we also know that

18  Tennessee has used this protocol in the past,

19  and its been effective in its -- in its use.

20  BY MR. KURSMAN:

21  Q.    Are any of the drugs diluted before they

22  are administered?

23  A.    They are mixed with the saline solution,

24  but that's -- that is per the instruction of

25  the pharmacist.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 311 of 373 PageID #: 6698
Elizabeth Drennon, Reporting Services
www.EliteReportingServices.com

1    Q.    Okay.  Is that each drug is mixed with a

2    saline solution?  Is that TDOC's understanding?

3    A.    Well, the midazolam -- the drug itself is

4    not diluted.  It's mixed with the -- with the

5    saline for -- in the -- in the syringes.  As

6    you know, the vecuronium bromide is

7    reconstituted with the bacteriostatic water.

8            But that -- is that what you're

9    asking?

10   Q.    That's what I'm asking.

11   A.    Yes.  Yes.

12   Q.    And when the drugs are being diluted, how

13   is the proper PH level assessed?

14           MR. MITCHELL:  Object to the form.

15           THE WITNESS:  I don't know that the

16   proper PH is tested at the time, other than per

17   the instruction of the pharmacist that we use

18   to draw these drugs up.

19   BY MR. KURSMAN:

20   Q.    So no one at TDOC is assessing the proper

21   PH level once these drugs are diluted?

22   A.    No.

23   Q.    Okay.  Let's go to -- let's stay on 34.

24   And then it says chemicals were -- that last

25   full paragraph.  Chemicals will either be FDA

Elite Reporting Services
www.EliteReportingServices.com

1   approved.  Commercially manufactured drugs

2   shall be compounded.  Preparations prepared in

3   line with pharmaceutical standards.

4           Do you see that?

5   A.    Yes.

6   Q.    What is the difference between a

7   compounded and manufactured drug?

8   A.    Compounded drugs are drugs that are

9   compounded in a sterile environment in a

10  sterile pharmacy using ingredients to compound

11  the particular drug.  Commercially manufactured

12  drugs are drugs that are manufactured under FDA

13  approval and process that are sold as a

14  commercially manufactured drug.  Many cases

15  they have different storage requirements and

16  different -- different -- either use-by dates

17  or expiration dates.

18  Q.    Is TDOC aware of risks associated with

19  compounded drugs?

20  A.    Yes.  We realize -- and when you say

21  risks, I'm assuming you're talking about the

22  precautions that have to be taking place to

23  ensure that the sterility and all of those

24  issues are maintained of the -- of the

25  compounded drug.

1  Q.     I am.

2  A.     That is correct.

3  Q.     Yes.

4  A.     We are.

5  Q.     Does TDOC ever use expired drugs?

6  A.     No.

7  Q.     Would TDOC ever use expired drugs?

8  A.     No.

9  Q.     What is done to ensure that compounded

10 chemicals are prepared in compliance with the

11 USP guidelines?

12 A.     We ensure that we have a contract with a

13 -- an appropriate pharmacy that is qualified

14 and have the appropriate -- follow the

15 appropriate pharmaceutical standards and

16 licensures to compound drugs for use.

17 That's -- we have a contract that ensures that.

18 Q.     And what is done to ensure that

19 compounded chemicals are prepared in compliance

20 with applicable licenses and regulations?

21 A.     Again, we depend on the pharmacists or

22 the pharmacy that is under contract and the

23 requirements of that particular pharmacy to

24 have the licensures and the -- to meet the

25 requirements to provide those chemicals.

Case 3:18-cv-01234 Document 184 Filed 03/47/22 Page 315 of 373 PageID #: 6701
Elite Reporting Services
www.EliteReportingServices.com

1  Q.    How are the drugs transported to TDOC?

2  A.    They are transported -- what drugs in

3  particular are you speaking of?

4  Q.    Let's start with the compounded drugs.

5  A.    They are transported per the direction of

6  the pharmacist, which in most cases is

7  transported usually in a container packed with

8  dry ice that is delivered to the facility,

9  where those chemicals are transferred to the

10  appropriate area, as defined and as required by

11  the pharmacist, with the instructions that we

12  talked about earlier.

13  Q.    And how does TDOC ensure that the drugs

14  are sterile at the time of use?

15  A.    By following the instructions provided by

16  the pharmacist to ensure that the drugs are

17  maintained and stored in the appropriate

18  fashion:  frozen, removed 24 hours prior to

19  use, allowed -- thawed, and utilized at room

20  temperature.

21  Q.    Is TDOC aware that the pharmacy from whom

22  it receives the drugs has been disciplined by a

23  State board?

24        MR. MITCHELL:  Object to the form.

25  And object beyond the scope of the notice.

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 315 of 373 PageID #: 6702
Elite Reporting Services
www.EliteReportingServices.com

```
 1              THE WITNESS:  TDOC is unaware of any
 2   disciplinary action that would determine or
 3   render them unsatisfactory to perform the
 4   duties that we have under contract with them.
 5   BY MR. KURSMAN:
 6   Q.    Has TDOC ever refused a manufacturer's
 7   request to return midazolam?
 8              MR. MITCHELL:  Object to the form and
 9   the scope of the notice.
10              THE WITNESS:  Yes.
11   BY MR. KURSMAN:
12   Q.    Okay.  And when was that?
13   A.    I don't remember the exact -- it was a
14   few years ago.
15   Q.    And why did the manufacturer request TDOC
16   to return midazolam?
17              MR. MITCHELL:  Same objections.
18              THE WITNESS:  Because the drug was
19   going to be used in a correctional setting to
20   take someone's life.
21              MR. MITCHELL:  Can we go off record
22   real quick?
23              MR. KURSMAN:  Sure.
24              MR. MITCHELL:  If that's the end of
25   that line of questioning.  And maybe it's not.
```

```
1              THE VIDEOGRAPHER:  One moment,
2   please.  Going off the record at 5:26 p.m.
3              (Short break.)
4              THE VIDEOGRAPHER:  Back on the record
5   at 5:34 p.m.
6   BY MR. KURSMAN:
7   Q.    Could we go back to Exhibit 1 on page 13?
8   A.    Page 13, you said?
9   Q.    Page 13.
10             Do you see at the top it says,
11  primary role of the warden is to ensure that
12  the procedures prescribed by law and as
13  outlined in this manual are performed?
14  A.    I do.
15  Q.    What does prescribed by law mean to TDOC?
16  A.    The process of carrying out the execution
17  of a condemned inmate.
18  Q.    What law is this paragraph talking about?
19             MR. MITCHELL:  Object to the form.
20             THE WITNESS:  I'm not personally -- I
21  don't have personal knowledge of the particular
22  law, as a number or not.  But it's the law of
23  inmates that have been adjudicated and
24  determined to be sentenced to death in the
25  carrying out of judicial executions in the
```

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 317 of 373 PageID #: 6704
Elite Reporting Services
www.EliteReportingServices.com

1  state of Tennessee as prescribed by TCA code.

2  BY MR. KURSMAN:

3  Q.    So when it says prescribed by law, is it

4  not also talking about the United States

5  Constitution?  Or is it?

6         MR. MITCHELL:  Same form objection.

7         THE WITNESS:  As a nonlawyer in the

8  room, yes, it would -- the United States

9  Constitution would apply and cover what we do.

10  Yes.

11  BY MR. KURSMAN:

12  Q.    And who wrote this language, this

13  paragraph right here?

14  A.    That language has been in the protocol

15  for some time.  And I'm not -- I'm not sure who

16  exactly wrote that language.

17  Q.    Okay.  Has TDOC ever removed anyone from

18  the execution team?

19  A.    Removed in regard to?

20  Q.    Taken an individual off the execution

21  team who was on the execution team.

22         MR. MITCHELL:  I'm going to object to

23  the form.

24         THE WITNESS:  Yeah, that would be a

25  question for the warden.  I -- I think so.  But

Elite Reporting Services
www.EliteReportingServices.com

```
 1   I don't have personal knowledge of a particular
 2   individual that was removed.  But I believe
 3   that that is accurate.
 4   BY MR. KURSMAN:
 5   Q.    And it's your testimony that the person
 6   who would have better knowledge would be the
 7   warden?
 8   A.    Yes.
 9          MR. MITCHELL:  Alex, what topic of
10   examination would that pertain to?
11          MR. KURSMAN:  Sure.
12          2.
13          MR. MITCHELL:  I'm going to object
14   based on the scope of the notice.
15          MR. KURSMAN:  19.
16          MR. MITCHELL:  Same objection.
17          MR. KURSMAN:  20.
18   BY MR. KURSMAN:
19   Q.    Could we go to Exhibit 50?
20   A.    Did you say Exhibit 50?
21   Q.    50.  5-0.
22   A.    I'm sorry.
23   Q.    Have you seen this document before?
24   A.    I'm sorry.  It's taking me a minute to
25   get there.
```

Case 3:18-cv-01554-EMC Document 184 Filed 05/17/22 Page 319 of 373 PageID #: 6706
Elite Reporting Services
www.EliteReportingServices.com

1  Q.    Sure.

2  A.    Yes.

3  Q.    Okay.  And are you the one who filled out

4  this document?

5  A.    Yes.

6  Q.    Okay.  So let's go to IV Team Member 5.

7  Do you see that at the bottom?

8  A.    Yes.

9  Q.    Why did IV Team Member 5 only participate

10 in one training session?

11 A.    Let me -- let me refresh my memory here

12 and look at this.

13            (Reviews documents.)

14            I don't remember the specifics of IV

15 Team Member 5, as to why he did not -- or she

16 did not participate in that -- in those

17 sessions.

18 Q.    No.  My question is, why did they only

19 participate in one training session?

20 A.    I do not know.

21 Q.    And what about IV Team Member 6, why did

22 they only participate in one training session?

23 A.    Again, I do not know.  I would have to

24 speculate if I gave you an answer to that.

25 Q.    Do you know whether IV Team Member 5 or

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 320 of 373 PageID #: 6707
Elite Reporting Services  •  (205) 573-7018
www.EliteReportingServices.com

1 IV Team Member 6 participated in

2 Donnie Johnson's execution?

3 A.   I do not.

4 Q.   Do you know whether IV Team Member 5 or

5 IV Team Member 6 participated in

6 Billy Ray Irick's execution?

7 A.   I do not.

8 Q.   Are the people who are identified as IV

9 Team Member 1 and IV Team Member 2 and IV Team

10 Member 3, are they still part of the execution

11 team?

12         MR. MITCHELL:  Object to the form.

13         You may answer.

14         THE WITNESS:  I would need to review

15 the documents to see who IV Team Member 1 and

16 IV Team Member 3 is personally to answer that

17 question.

18 BY MR. KURSMAN:

19 Q.   So do you know right now, as spokesperson

20 for TDOC, which -- who out of -- out of these

21 IV team members are the current IV team members

22 in the execution team?

23 A.   No, not without -- not without making the

24 identification of who IV Team Member 1 or 3 or

25 4 was referring to.  No.

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 321 of 373 PageID #: 6708
Elite Reporting Services, 615-595-0073
www.EliteReportingServices.com

1  Q.    Could we take a look at Exhibit 2?

2  A.    I have it.

3  Q.    Do you see that it says midazolam storage

4  and preparation instructions?

5  A.    Yes.

6  Q.    And it includes instructions for storage

7  and preparation of midazolam?

8  A.    Correct.

9  Q.    Okay.  Now, let's go to Exhibit 4.  And

10 do you see that potassium chloride preparation

11 instructions?

12 A.    Yes.

13 Q.    Does TDOC also have vecuronium bromide

14 preparation instructions?

15 A.    Currently the vecuronium bromide that we

16 have is, as I understand it, commercially

17 manufactured and stored at room temperature.

18 Q.    Do you -- does TDOC have written storage

19 instructions for the vecuronium bromide?

20 A.    I believe we do, yes.

21 Q.    Does TDOC have written instructions for

22 how to prepare the vecuronium bromide?

23 A.    We do.

24 Q.    And is that how the executioner knows how

25 to reconstitute the vecuronium bromide?

Elite Reporting Services
www.EliteReportingServices.com

1   A.     It is.

2   Q.     And were both Exhibit 2 and Exhibit 4

3   provided by the pharmacist?

4   A.     Yes.

5   Q.     Do you know what the color is of the

6   content of the prepared syringes?

7   A.     The color?

8   Q.     Of the prepared syringes.  Are they

9   clear, or are they something else?

10          MR. MITCHELL:  Object to the form.

11          THE WITNESS:  No, I do not know.

12  BY MR. KURSMAN:

13  Q.     Does --

14          MR. MITCHELL:  Are you asking about

15  the potassium chloride?

16          MR. KURSMAN:  No, just the syringes

17  themselves.

18  BY MR. KURSMAN:

19  Q.     Does TDOC know what falling out of

20  solution means?

21  A.     I do not, no.

22  Q.     Do you know who checks on the execution

23  team to determine the lethal injection

24  chemicals are falling out of solution?

25  A.     No, I do not.

Case 3:18-cv-01234 Document 184 Filed 03/47/22 Page 323 of 373 PageID #: 6710
ELITE Courtroom Reporting & Video Services (615) 595-0073
www.EliteReportingServices.com

1  Q.     Let's go to page 39 of Exhibit 1.

2         (Reporter clarification.)

3  BY MR. KURSMAN:

4  Q.     And do you see in Paragraph 2, it says if

5  the LICs are drawn in syringes by one member of

6  the execution team, another member of the

7  execution team observes and verifies that the

8  procedure is carried out correctly?

9  A.     Yes.

10 Q.     Who draws the LICs in the syringes?

11 A.     The executioner.

12 Q.     How is it determined that the executioner

13 do that?

14 A.     Well, the executioner is the one

15 responsible for that.  I mean, that's the --

16 he's the one that has received the training for

17 that particular event, and he is the individual

18 who draws the chemical.

19 Q.     And then do you see it says another

20 member of the execution team observes and

21 verifies that the procedure has been carried

22 out correctly?

23 A.     Yes.

24 Q.     What does it mean for the procedure to be

25 carried out correctly?

1  A.     That the LICs are drawn accordingly to --

2  according to the directions as provided by the

3  pharmacist, placed in the correct order in the

4  trays, and identified in the right sequence.

5  Q.     How does the execution team member, who

6  is not the executioner, verify that the

7  procedure has been carried out correctly?

8  A.     That person knows the protocol and knows

9  the process for drawing these chemicals and

10 monitors that to ensure compliance with the

11 instructions that have been provided by the

12 pharmacist.

13 Q.     When you say that person knows the

14 protocols, do you mean that person knows the

15 instructions as provided by the pharmacist?

16 A.     Yes.

17 Q.     Does that person know the instructions

18 for midazolam as provided by the pharmacist?

19 A.     Yes.

20 Q.     Does that person know the instructions

21 for vecuronium bromide as provided by the

22 pharmacist?

23 A.     Yes.

24 Q.     Does that person know the instructions

25 for potassium chloride as provided by the

Case 3:18-cv-01234-B Document 184 Reporting Service Page 325 of 373 PageID #: 6212
Elite Reporting Services
www.EliteReportingServices.com

1  pharmacist?

2  A.    Yes.

3  Q.    And is there a point where those

4  instructions are reviewed at all?  Meaning does

5  the executioner and this additional IV team

6  member review those instructions at any point?

7  A.    Those instructions are part of their

8  preparation, and they are familiar with those

9  instructions, yes.

10  Q.    And who decides which member of the IV

11  team will verify that the executioner's

12  performing his job correctly?

13  A.    That is -- that is a responsibility of

14  the IV team members that are in the room with

15  them.  Those individuals -- I know who they

16  are.  They are -- they carried out that

17  responsibility for the two executions in

18  question that we talked about.

19  Q.    And how do they have the knowledge to

20  verify that the executioner is doing -- doing

21  this correct?

22  A.    You know, they -- the knowledge that they

23  have, as provided per the instructions of the

24  pharmacist, as well as the instructions that

25  are in the protocol and verify that the

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 326 of 373 PageID #: 6743
ELITE BiCoastal Reporting Service (865) 593-0003
www.EliteReportingServices.com

1   executioner is following those protocols as
2   defined in the instructions from the
3   pharmacist, as well as the instructions that
4   are in the protocol.
5   Q.    Do any members of the IV team member have
6   the -- the IV team members have experience
7   reconstituting drugs?
8   A.    No.  Other than their role in observing
9   the executioner in the -- in their -- in the
10  executioner's reconstituting the drug during
11  this process.
12  Q.    So how would they be able to verify?
13  A.    Verify what?
14  Q.    Verify that the -- that the executioner
15  is doing it correctly?
16  A.    Again, they know the instructions and
17  their -- their purpose -- their responsibility
18  is to ensure, again, that the instructions are
19  followed.  To verify that, to observe it, both
20  the instructions of the pharmacist, as well as
21  the instructions that are found in the
22  protocol.
23  Q.    Do the instructions require the IV team
24  to fill all nine red syringes first, before
25  they fill the blue syringes?

Case 3:18-cv-01234-Document 184-1 Filed 03/17/22 Page 327 of 373 PageID #: 6754
Elite Court Reporting Services.com
www.EliteReportingServices.com

```
1              MR. MITCHELL:  I'm just not following
2    you.  What instructions are we talking about?
3              MR. KURSMAN:  The instructions both
4    from the pharmacist and from the protocol.
5    BY MR. KURSMAN:
6    Q.    I'm just trying to figure out how it's
7    done in the executioner's room.
8    A.    Yeah.  So the executioner --
9              MR. MITCHELL:  I'm going to object to
10   the form.
11             But you can keep going.
12             THE WITNESS:  I don't know that
13   the -- the instructions from the pharmacist
14   would not dictate which set of drugs that
15   are -- which set of chemicals, either the red
16   set or the blue set, are prepared first or
17   second.  The protocol says that the -- there
18   will be two sets prepared.
19             Personally, I don't remember if
20   there's a particular order.  I think the
21   executioner has a -- has a pattern that he
22   follows in every case that's the same.  And --
23   but I don't recall from memory exactly how --
24   what set is first or what set is second.
25   ///
```

Elite Reporting Services
www.EliteReportingServices.com

1  BY MR. KURSMAN:

2  Q.    You don't know which set was first and

3  which set was second, you're saying?

4  A.    No, I don't.

5  Q.    Okay.  Was the second set of syringes

6  prepared for Mr. Irick's execution?

7  A.    I'm not sure that it was.

8  Q.    Do you know -- does TDOC know whether or

9  not the second set of syringes was prepared in

10  Mr. Irick's execution?

11  A.    I'm not sure.  I would have to confirm

12  with the executioner.

13  Q.    Does TDOC not take an inventory of the

14  drugs that are used and not used after an

15  execution occurs?

16  A.    We do.

17         MR. MITCHELL:  Object to the form.

18  BY MR. KURSMAN:

19  Q.    And you -- there have only recently been

20  two executions using this lethal injection

21  protocol, right?

22  A.    That's correct.

23  Q.    And TDOC does not know whether the backup

24  set was prepared in one of those two

25  executions?

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 329 of 373 PageID #: 6276
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1  A.   For me to answer the question, I would
2  have to check the inventory.  Because if it was
3  not, the inventory would reflect that, of
4  course, in the record.
5  Q.   And if it was not, would you consider
6  that a deviation from the protocol?
7          MR. MITCHELL:  Object to the form.
8          THE WITNESS:  Again, if it was not,
9  that would be an adjustment that was made to
10 the protocol.  But for the -- what particular
11 reason, I would not -- I don't have knowledge
12 of at this point.
13 BY MR. KURSMAN:
14 Q.   And who would be able to decide to make
15 that deviation?
16          MR. MITCHELL:  Object to the form.
17          THE WITNESS:  It would be the
18 executioner, based on whatever circumstances
19 were -- involved that decision being made.
20 Again, I don't have the knowledge to answer
21 that question.
22 BY MR. KURSMAN:
23 Q.   And does TDOC believe that the
24 executioner has the discretion to deviate and
25 prepare only one set of syringes?

Case 3:18-cv-01234-BJD Document 184-1 Filed 05/17/22 Page 330 of 373 PageID #: 6737
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
 1              MR. MITCHELL:  Form.

 2              THE WITNESS:  TDOC's position would

 3    be that the -- the protocol should be followed

 4    where there were two sets of syringes prepared,

 5    unless there was a -- some issue that prevented

 6    the second set from being prepared.

 7    BY MR. KURSMAN:

 8    Q.    Okay.  And who gets to determine whether

 9    or not to deviate from the protocol and only

10    prepare one set or follow that protocol and

11    prepare both sets?

12              MR. MITCHELL:  Form objection.

13              THE WITNESS:  Again, we would --

14    there would have to be an examination of the

15    circumstances that preempted that decision for

16    me to answer that question.

17    BY MR. KURSMAN:

18    Q.    Did TDOC do an examination of the

19    circumstances after Mr. Irick's execution?

20              MR. MITCHELL:  Same objection.

21              THE WITNESS:  No, not that I'm aware

22    of.

23    BY MR. KURSMAN:

24    Q.    Did TDOC do an examination of the

25    circumstances after Mr. Johnson's execution?
```

Elite Brentwood Reporting Service
www.EliteReportingServices.com

1    MR. MITCHELL:  Same objection.

2    THE WITNESS:  By examination, could

3    you clarify that?

4    BY MR. KURSMAN:

5    Q.    Sure.

6    Does TDOC evaluate the performance of

7    all the individuals involved in an execution

8    after an execution goes forward?

9    A.    We observe and we evaluate the entire

10   process from a visual standpoint and an

11   observation standpoint.

12   Q.    And would one of the things that TDOC

13   does after an execution is to ensure that the

14   execution team members follow the protocol?

15   A.    Yes.

16   Q.    Okay.  And if an execution team member

17   deviated from the protocol, would TDOC do

18   anything about that?

19   MR. MITCHELL:  Object to the form.

20   THE WITNESS:  Other than, again, we

21   would -- we should evaluate the circumstances

22   to determine why the adjustment was made.

23   BY MR. KURSMAN:

24   Q.    And if a backup set was not prepared in

25   Mr. Irick's execution, would TDOC consider that

Elite Reporting Services
www.EliteReportingServices.com

1  a substantial deviation from the execution

2  protocol?

3          MR. MITCHELL:  Form.

4          THE WITNESS:  It would be a -- it

5  would be a -- an adjustment that -- again, that

6  the State would look at to determine -- to make

7  that determination we would have to, again,

8  consider the circumstances and why the

9  deviation or the adjustment was made.

10 BY MR. KURSMAN:

11 Q.   But as of now TDOC is unaware whether

12 that deviation was made?

13 A.   As I sit here today, to my knowledge, I

14 would have to review the records to

15 appropriately answer that because I don't have

16 the information in front of me to answer your

17 question.

18          MR. KURSMAN:  Okay.  Could we take a

19 two-minute break now?  And then I'll be done

20 and wrap it up.

21          MR. MITCHELL:  Sure.

22          MR. KURSMAN:  Okay.

23          THE VIDEOGRAPHER:  Going off the

24 record at 5:57 p.m.

25          (Short break.)

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 333 of 373 PageID #: 6720
Elite Reporting Services
www.EliteReportingServices.com

```
 1            THE VIDEOGRAPHER:  Back on the record
 2   at 6:03 p.m.
 3   BY MR. KURSMAN:
 4   Q.    Just a few more questions.
 5            Is TDOC aware of what size IV line
 6   tubing is used in the executions?
 7   A.    No.
 8   Q.    Okay.  Did you take any notes during the
 9   deposition today?
10   A.    No.
11   Q.    Did you have any documents in the room
12   with you, other than the exhibits we discussed?
13   A.    No.
14   Q.    And did you bring with you the documents
15   that you reviewed in preparation for the
16   deposition today?
17   A.    I did not bring them with me, no.
18   Q.    And did you take any notes during your
19   preparation for the deposition today?
20   A.    No.
21            MR. KURSMAN:  Okay.  We would
22   just request all the documents that
23   Commissioner Parker reviewed in preparation for
24   the deposition.  And we'd also request the size
25   of the IV tubing used in the execution
```

Case 3:18-cv-01234 Document 184 Filed 05/17/22 Page 334 of 373 PageID #: 6721
Elite Reporting Services
www.EliteReportingServices.com

1    procedures.

2            MR. MITCHELL:  That request is still

3    under considering per yesterday.  And all the

4    documents he reviewed have already been

5    provided.

6            MR. KURSMAN:  Okay.  And we'd also

7    request the vecuronium bromide instructions, to

8    the extent they exist.

9            MR. MITCHELL:  Understood.

10           MR. KURSMAN:  And we can go off the

11   record.  We're done.

12           THE VIDEOGRAPHER:  All right.  If

13   there are no more questions, this concludes the

14   deposition.  The time is 6:05 p.m.

15           THE REPORTER:  Do you want to order

16   this transcript?

17           MR. KURSMAN:  Yes, please.

18           THE REPORTER:  Okay.  Would you like

19   a copy?

20           MR. MITCHELL:  Yes.

21            FURTHER DEPONENT SAITH NOT

22           (Proceedings concluded at 6:05 p.m.)

23

24

25

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 335 of 373 PageID #: 6722
Elite Reporting Services  (855) 595-0003
www.EliteReportingServices.com

```
 1                C E R T I F I C A T E

 2

 3   STATE OF TENNESSEE

 4   COUNTY OF SUMNER

 5            I, JEANNIE CHAFFIN, Licensed Court

 6   Reporter, with offices in Portland, Tennessee, hereby

 7   certify that I reported the foregoing 30(b)(6) video

 8   deposition of TONY PARKER by machine shorthand to the

 9   best of my skills and abilities, and thereafter the

10   same was reduced to typewritten form by me.

11            I further certify that I am not related

12   to any of the parties named herein, nor their

13   counsel, and have no interest, financial or

14   otherwise, in the outcome of the proceedings.

15        I further certify that in order for this
     document to be considered a true and correct copy, it
16   must bear my original signature and that any
     unauthorized reproduction in whole or in part and/or
17   transfer of this document is not authorized, will not
     be considered authentic, and will be in violation of
18   Tennessee Code Annotated 39-14-104, Theft of
     Services.

19

20

21

22   JEANNIE CHAFFIN, LCR
     Elite Reporting Services
23   Associate Court Reporter and
     Notary Public State of Tennessee
24
     My Notary Commission Expires:  6/7/2025
25   LCR #169 - Expires:  6/30/2022
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

**1**

**1** 12:6 19:12 52:20, 21 66:22 68:17 75:24 86:20 181:10 207:2,5,9, 20 230:15 240:17 245:4,9 248:24 249:1 258:20 261:4 276:17 293:3 315:7 319:9,15,24 322:1

**10** 28:12 124:6 146:25 147:1,2 161:5,8,15 162:1, 12 163:8 207:2,8, 9

**100** 96:13 125:11 126:2,5 147:6 148:11 162:9,11 163:8 200:18,24 201:10 280:5 307:14

**104** 258:5

**107** 68:11

**10:19** 64:5

**10:32** 64:8

**10:37** 124:15

**11** 29:2,3 49:4,5, 16,25 124:14 149:6

**11:16** 95:9

**11:25** 95:12

**12** 29:8 49:4,5,16, 25 125:8

**12:01** 123:18

**12:44** 123:21

**12:58** 97:19,24,25 102:20

**13** 29:13 126:23 151:3 155:22 156:1 244:23 315:7,8,9

**14** 33:21,23 52:11 129:22

**15** 9:2,3 14:24

29:21 30:18 33:25

**150** 6:15

**16** 34:4,6,8 132:1 155:18,19 156:13

**17** 34:16 157:6

**18** 40:15 41:2,11, 12 161:1

**19** 41:21,24 42:3, 13 163:25 230:15 236:2 276:17,19, 20 317:15

**1:39** 114:18

**1:56** 178:3

**2**

**2** 19:19,23 20:2 60:6 97:17 236:3, 11 248:8,18 249:2 274:8 276:21 277:5,11 317:12 319:9 320:1 321:2 322:4

**20** 42:20 126:5 167:7 169:8 240:17 241:1 317:17

**2017** 95:18 96:22 114:18 121:24 122:3 124:16 126:24 129:12 136:10 142:12 167:8

**2018** 82:11 87:24 161:2 287:14

**2019** 164:6 166:23 169:11

**2021** 6:5

**20th** 126:24 161:2

**21st** 121:24

**22** 165:19,22

**24** 169:7,9 170:21 313:18

**240** 307:15

**25** 48:3,9,25 126:9

**26** 48:1,9

**27** 48:1,9 165:18

**28** 48:1,9 165:18

**29** 19:3,13 42:20 48:2,9 49:1 165:18 244:23

**29th** 6:4

**2:08** 178:6

**3**

**3** 20:12 66:16 237:11 248:17,18 319:10,16,24

**3-4** 293:4

**30(b)(6)** 6:8 9:14

**31st** 136:10 142:12

**32** 245:4 261:18 284:16

**34** 75:24 293:3,5 307:9 310:23

**35** 171:8,13,14 258:16

**38-year** 56:9

**39** 322:1

**3:13** 229:18

**3:18-CV-01234** 6:10

**3:22** 229:21

**3rd** 164:6 166:23

**4**

**4** 21:2 241:23 248:11 319:25 320:9 321:2

**4:22** 276:12

**4:36** 276:15

**4th** 167:8

**5**

**5** 21:12,18 50:6,17

51:10 57:18 82:11 148:24 161:16 230:18 274:10 318:6,9,15,25 319:4

**5-0** 317:21

**50** 317:19,20,21

**500** 74:2 120:10 148:24 214:14 282:13,14 294:18 298:6,10,21,22 299:2,4,24 307:14 308:9,14 309:14

**5:26** 315:2

**5:34** 315:5

**5:57** 331:24

**5th** 87:24

**6**

**6** 22:2,10 50:6 86:19 95:15 124:16 274:10 318:21 319:1,5

**66** 265:6,8,9 277:23

**67** 287:8,9,10

**68** 288:21

**69** 12:2,12 19:2 283:10

**6:03** 332:2

**6:05** 333:14,22

**7**

**7** 24:2,12 25:17 26:7,25 50:7 54:10,16 57:18 95:18 96:21 97:16,17,19 102:19 110:19 122:3 137:11 265:11 278:2 280:4,11,14,18,20 282:2

**7:05** 54:17

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 337 of 373 PageID #5714
E0124 Bernwood Reporting Service 361-573-7073
www.EliteReportingServices.com

**7:10** 277:24

**7:55** 169:12

**7th** 97:23 114:18 122:8,14,15

--------

**8**

**8** 27:3,4,7,25 28:3 114:16 137:11,12, 17 169:11

**82** 289:4

--------

**9**

**9** 28:6 121:16,17 143:5

**99** 181:11

**9:02** 6:6

**9:40** 37:24

**9:42** 38:2

--------

**A**

**a.m.** 6:6 37:24 38:2 64:5,8 95:9, 12 124:15 169:12

**ability** 9:24 70:5 102:7 120:7 128:3 188:22 219:8 256:11,23 302:21 305:5

**Absolutely** 95:5

**accept** 126:9,14

**access** 84:3,13, 17 85:3,7,9 93:12 110:13 179:14 241:24 242:15

**accesses** 236:17

**accessible** 237:1

**accessing** 236:19

**accident** 249:1

**accomplish** 57:12

**accomplished**

186:6 189:4

**accordance** 252:2

**accountability** 14:16

**accurate** 80:18 158:10 317:3

**accurately** 10:5, 23 262:16

**achieve** 194:10 294:4,15 295:2 296:24

**achieved** 249:11

**achieves** 101:17

**acidic** 300:6

**acknowledge** 111:22 112:1,2 231:9

**acknowledges** 120:6

**acquire** 82:16 84:14 86:2 92:5 149:2 179:19,20, 23

**acted** 35:15

**action** 314:2

**actions** 302:5

**active** 131:15,20 192:5 240:10

**activities** 292:17

**activity** 87:20 291:2

**acts** 50:18

**actual** 28:18 75:21 152:16,18 277:25 305:22

**adding** 305:16

**additional** 19:11 106:3 107:10 205:2 210:5,19,22 262:25 264:17 282:14 298:6,21 324:5

**address** 283:14

**addressed** 182:19 188:7,8,11

**addresses** 22:9

**adds** 205:2

**adequate** 101:11 126:15 160:5 202:5 226:3 231:22 236:6 237:23 241:20,21 272:17

**adequately** 199:24 223:10 275:21

**adjudicated** 315:23

**adjust** 59:8 61:12

**adjustment** 55:2, 23 56:17 57:17,22 58:14,25 61:22,25 62:4 250:4 251:2, 5,17 328:9 330:22 331:5,9

**adjustments** 55:15,19,20,22 57:5,6,7,8 59:14 60:23 61:24 64:15 204:13 247:20 249:25 251:7

**administer** 185:20 186:10,22 227:12

**administered** 26:4 195:12 215:7 262:1 282:21 293:12 298:11 306:21 309:22

**administering** 214:2

**administration** 103:1 118:3 132:12 133:2 135:16 164:3 178:10 204:11 241:5

**adopt** 183:11

**adopted** 203:1

**adverse** 27:22

**advertise** 292:6

**advertising** 292:10

**advice** 35:18 70:1 77:13,16

**advised** 32:22 160:20

**affect** 73:24 120:7 303:2

**affirmatively** 215:23 219:20

**agree** 272:14 298:18 302:18 303:22

**agreed** 7:11 143:7 277:1

**agreement** 40:18, 22 62:18 63:19 65:6,18,24 89:19

**agreements** 142:1,3

**ahead** 24:22 89:22 126:21,22 153:20

**aid** 143:8 155:23

**aiding** 143:17

**aids** 101:13 193:19 305:11

**Alabama** 78:10, 12

**alert** 27:23

**Alex** 6:23 7:7 8:10 60:3 165:15 248:14 261:3 317:9

**alleviate** 142:7

**allowed** 247:5,13 248:13 313:19

**alternate** 285:19

**alternative** 43:1,4 46:12 89:4 107:13,24 134:25 136:14,21 158:7 171:12,16,23 172:1 178:11 203:25 213:20

Elite Reporting Services
www.EliteReportingServices.com

236:17 285:17

**alternatives** 47:2 83:14,16 135:18, 21 172:5 178:21

**amend** 261:6

**America** 138:4

**amitriptyline** 176:10

**ammunition** 179:21,23 181:23

**amount** 13:10 61:10 70:9,12,14, 21 74:9 82:16 87:19 93:15 125:21 126:15 149:3 161:15,24 163:22 264:5 270:16 271:16 272:15 273:22 278:24 281:6 291:18 296:23 297:11,14 307:12, 24

**amounts** 77:18 299:10 308:6,7

**ample** 114:21

**analgesic** 102:25 105:18 106:4,9,16 110:22 117:8,11 118:13 122:2

**anesthesia** 295:3,23 296:4

**anesthesiologist** 233:5 234:13 271:7,21 280:10

**anesthesiologists** 72:18

**anesthetic** 235:2 269:15 274:18 275:22 294:3 295:16

**Annie** 289:24

**annual** 87:17 284:20,21

**annually** 86:22 88:20

**answering**

208:22

**answers** 72:16 122:21 186:12,20 187:15

**anticipation** 175:4

**anxiety** 21:14,23 50:15

**anyone's** 291:7

**API** 146:3,8 163:23

**apologize** 15:18 23:3 64:21 75:14, 16 76:2 87:9 89:22 95:3 102:17 104:13 115:23 125:25 135:5 137:12 147:10 152:18 155:19 165:25 169:9 173:4 208:1 215:4 233:19 236:9 264:15 277:8 294:12 298:17

**appeal** 287:24

**appeared** 213:21

**appears** 151:10 213:17

**applicable** 312:20

**applied** 268:22 270:19 271:16

**apply** 273:13,23 316:9

**applying** 208:21

**approaching** 136:14

**appropriately** 155:4 220:14 234:9 235:24 242:7 331:15

**approval** 151:8,9 153:9 311:13

**approve** 69:21 184:24

**approved** 43:5 75:12 93:19

168:15 181:8 203:21 295:22 311:1

**approximately** 13:18 155:22

**April** 124:16

**area** 51:8 207:21 209:6,10 211:24 232:6 313:10

**areas** 12:7 47:10

**argue** 198:2

**argument** 128:16

**arise** 247:1

**arises** 284:8

**Arkansas** 77:21 78:13

**arm** 123:9,10 209:24 242:10

**armory** 248:9

**articles** 78:19 164:3

**aseptic** 31:7,17

**asks** 93:25

**asleep** 265:22 266:2,3,7 268:19, 20

**aspect** 62:21

**Assembly** 43:6

**assertion** 11:18

**assess** 229:25 230:11,14 261:24 265:12 301:21 306:2

**assessed** 300:17 310:13

**assessing** 310:20

**assessment** 235:14 286:2

**assigned** 275:15

**assist** 139:14,24 156:23 209:25 211:2,4,5

**assistant** 69:9 87:14 88:22 208:10,11 212:23 218:24 285:12

**assisting** 210:13

**assists** 210:24 303:10

**associate** 218:21 240:19

**association** 6:18 85:24 138:3 139:9,12

**association's** 140:4

**assume** 11:6 98:19 125:15 140:25 144:14,24 169:21 171:4,24 187:25

**assumed** 146:24

**assuming** 96:16 103:23 123:4 127:10 129:7 131:7,24 240:11 250:9 296:21 311:21

**assumption** 141:2 146:14 147:14 156:21 161:18 172:25 174:13 177:8 184:4,6

**attached** 242:7, 21

**attachments** 41:1

**attain** 109:2

**attempt** 96:23 108:7,11,17 117:3 118:13 138:4 139:10 143:20,22 144:2 147:20 149:11 150:1 153:14 155:2,17 163:4 237:1 290:25 292:15

**attempted** 85:16 128:10 130:17,19 149:22 150:15,25

www.EliteReportingServices.com

152:24 166:21 177:12

**attempting** 122:7 260:11

**attempts** 85:8,13 91:1,5 136:16 143:25 155:13 237:6

**attend** 217:24 285:16,25

**attendance** 133:19 285:14

**attention** 291:18

**attorney** 9:17 34:20,22 35:4,15, 22 36:6 43:2 69:12 76:22 132:19 133:22 158:22 164:9,11 204:11

**attorneys** 12:16 15:2,4 16:1,12 30:5,7 34:20 38:17 64:12 297:23

**August** 47:16 136:10 142:11,18, 21 169:11

**Augusta** 6:16

**authorities** 153:19 154:15

**authority** 55:22 90:13 156:23 256:15

**availability** 82:24 100:19 110:12 119:3 144:17,19 201:15

**Avenue** 6:15

**avenues** 155:14

**avoid** 55:23

**aware** 10:17 19:5 22:7 46:18 56:21 59:22,23 60:15, 16,22 66:20 74:7 78:23 79:7 85:25 91:7 92:3,25 105:21 106:15,18,

23 109:8,19 113:22 114:3,6, 11,14 120:18 130:12 131:11 134:15 141:3,6,10 150:4,17 151:2 157:5 158:3 160:23,25 163:17, 19 164:17,19,20 165:4,8,9,10,14 166:10,19,24 167:3,6 168:12, 14,19,25 171:7,21 172:6 178:10,24 179:2 180:4,6 183:18,24 185:5 191:8,13,23 222:9 225:7,9 230:5 234:25 245:3 247:11 249:19,22 263:3 266:9 269:3 270:10,22 271:4 272:2 275:23 278:9,16,20 279:4,6,11,18,24 281:11,15,19 282:19 284:4 295:21 296:9 297:3,9,22,25 300:5,10 306:13 311:18 313:21 329:21 332:5

---

**B**

---

**back** 23:23 38:1 47:6 49:3,4 50:6 64:7 66:22 68:2, 17 87:10 95:11 102:13 110:19 115:25 123:20 154:15 178:5 181:7 184:9,22 185:4,6,14 209:6 216:3 229:20 232:5 236:2 261:18 262:2 274:12 276:14,17 307:9 315:4,7 332:1

**background** 36:8 233:14,18

**backup** 59:19 122:25 123:5,6,7 327:23 330:24

**bacteriostatic** 167:15 310:7

**bad** 79:5 216:22, 23

**band** 290:16,20 291:6,12,14,19, 20,24 292:1,7,11, 21

**bands** 291:22

**based** 10:18 11:18 44:4 68:11 69:1 76:6 82:20 83:11 85:7,8 100:10,19 106:6 109:1 110:12 111:12 117:19 119:3 122:8 137:7 160:20 169:23 171:24 174:8,9 182:13 195:23 201:15 202:15 218:19 219:7 232:25 234:21 235:15 236:1 243:18 244:8 270:6 272:9 273:22 281:6 284:12 309:13 317:14 328:18

**basically** 16:10 32:22 69:20 101:16 142:23 153:3 167:16 263:6 306:18

**basis** 87:17 88:8 94:24

**Bass** 6:14

**began** 136:1 157:24 158:11

**begin** 7:10 136:9 157:21 158:9 187:3 190:4 215:25

**beginning** 54:16 155:21 193:18 303:17

**begins** 215:7

**behalf** 12:10 70:5 90:14

**bacteriostatic** 167:15 310:7

**belief** 66:1 92:7 98:13 99:21,23 117:17 278:25 289:15 301:14

**believes** 101:3 109:9,20 159:18 186:9 195:3 198:23 222:24 231:15 253:18 273:20 274:3 294:4,17 295:1,10 299:4

**belong** 85:25

**benzodiazapine** 110:21

**benzodiazepine** 102:24 105:17 294:2

**Berry** 6:14

**big** 157:8

**Bill** 288:23

**Billy** 290:12 319:6

**binder** 171:9

**bit** 35:23 38:6 85:19 193:5 215:3 268:8 278:8

**blank** 137:14,18

**blinds** 237:15,17 238:1,4,6,11,22, 25 239:19,20,24 240:1,10,23

**blood** 242:25

**blown** 123:10

**blue** 123:5 325:25 326:16

**board** 313:23

**body** 237:12

**books** 78:16

**bosses** 258:6

**botched** 78:24

**botches** 79:11,25

**bottom** 169:11 318:7

**break** 11:8,13

Case 3:18-cv-01234-B Document 184 Filed 03/17/21 Page 340 of 373 PageID #: 8727
E0124 B Document Reporting 03/17/21 Page 340 of 373 PageID # 8727
www.EliteReportingServices.com

64:2,6,10,11,14
95:4,10 123:14,
19,23 178:4,9
229:19,23 276:9,
13 315:3 331:19,
25

**breaks** 13:14

**breath** 194:9

**breathe** 102:8

**breathing** 99:18
101:14,20 102:4
113:18 193:21
194:7,9,15 195:23
215:18,19 303:11

**briefly** 238:12

**bring** 232:5 237:9
238:21,23 332:14,
17

**bringing** 195:9

**broaden** 149:20

**broken** 50:17

**bromide** 89:10
90:11,15 146:20
167:16,19,22
168:2,5 193:7
203:6,15 205:1
214:15 226:16
227:7 300:13
301:2,5,23 302:2,
20 304:7,18
305:20 307:15
310:6 320:13,15,
19,22,25 323:21
333:7

**brought** 128:15
149:8

**brush** 266:4

**brushes** 262:2

**buck** 250:25

**built** 17:20 22:9
110:15

**bulb** 242:20

**bulk** 124:21

**bullet** 47:6 143:7
147:23 148:13
184:9,21 185:3,6,
13

**bundled** 50:16

**burden** 151:11

---

**C**

**call** 54:1 55:4
127:3 163:13
165:23 218:2
219:6 237:5
250:20 266:3
298:20

**called** 8:3 79:11
268:21

**calling** 263:13
268:25 291:12

**calls** 59:4 145:16
163:17 262:3

**camera** 209:24

**capable** 131:24
227:15

**capacity** 133:3,11

**career** 233:22

**careful** 71:25
247:21

**carried** 54:5
56:13 186:14
187:2 189:8
223:22 224:20
249:7 250:12
272:11 322:8,21,
25 323:7 324:16

**carries** 248:17

**carry** 79:19 83:15
112:14,25 125:24
126:15 148:7,19
149:3 161:13,21
163:5 184:16,19,
21 185:9,13 186:2
187:9 202:5 218:1
220:12,15 241:16
248:8 249:2
282:10 304:24
307:25

**carrying** 53:12
59:15 108:3
224:23 246:15
251:9 315:16,25

**case** 6:10 8:12,16,

19 12:16 17:5,8,
20 18:25 115:1
147:15 151:6
167:17 178:19,22
183:8 192:25
251:24 309:14
326:22

**cases** 9:3 17:24,
25 23:20 26:3
43:8 46:15 61:23
153:12 174:11
188:20 195:1,10
220:9 309:10,11
311:14 313:6

**catheter** 236:6
242:3,5,24

**caused** 79:5
250:17

**causing** 199:9

**ceiling** 296:10,13,
19 297:18 298:4,
19 299:8,15,17

**Cell** 207:20

**centered** 52:7

**centers** 46:9

**certify** 203:23

**Chaffin** 6:17

**chain** 59:9 249:14

**chair** 221:21

**challenge** 8:20

**chamber** 55:18
59:16 208:12,20
209:9 212:20
213:1 235:21
240:20 243:11
248:9 250:12

**chance** 138:21

**change** 89:6
123:25 135:9
154:13,20 197:19
198:6 221:25
223:11 224:9
229:10 239:11
254:21,24 300:3
305:12 306:9

**changed** 23:16,
21,22 52:3 84:21

129:13

**charge** 55:17

**check** 23:15
51:19 55:24 62:5,
7 81:8 119:21
191:9 192:7
213:11,14 214:21,
22 215:5,16
230:5,6,9,23
231:5,13,17,18
232:2,9,12,15,20
233:10 234:5,15,
22 235:15 238:13,
21 240:15 261:22
262:6,10 263:19
265:19 266:5,20
267:6,12 268:23
270:7,12,25
272:24 273:10,14
274:12,14 275:11,
13,18 276:6,8
277:21 280:16
287:4 301:15
302:1 303:5,16
328:2

**checking** 52:8
262:25 269:4

**checks** 233:8,21
264:10,18 321:22

**chemical** 156:25
170:19 287:1,12
288:2,3 322:18

**chemicals** 13:24
14:13,16 31:3
48:4 61:7 64:22,
25 65:5,8,9,11,19
67:7 81:5 82:14
120:17 131:20
149:9,21 155:24
162:17 177:4
187:21 188:5
210:1 211:20
212:14 213:23
214:7 215:25
238:3 241:6
256:7,18 257:16
258:24 259:12,13,
17 293:9 307:10
308:3 310:24,25
312:10,19,25
313:9 321:24
323:9 326:15

Case 3:18-cv-01124-B Document 184 Filed 03/17/20 Page 341 of 373 PageID #:1678
E0124 B Document 184 Report Filed 03/17/20 Page 341 of 373 PageID #:1678
www.EliteReportingServices.com

**chief** 15:24 16:2, 18,23 17:2,3 69:7, 25 74:22 76:21 87:15 88:22 133:21 165:9

**chloride** 31:2 32:1 62:8 83:10 89:11 90:18 92:1 98:6,10 100:23 101:15 103:2 113:11 116:14,25 146:12,15,18 172:11 173:24 175:4 177:2 192:24 193:24 194:24 195:12 196:11 197:4,14, 22 198:11 199:13 200:13 202:11 204:15 226:19 305:19,25 306:12 307:16 320:10 321:15 323:25

**choice** 203:13 290:21,24

**choose** 38:9 231:17 252:23

**chop** 35:23

**chose** 38:12 231:12

**circumstances** 256:12 278:21 328:18 329:15,19, 25 330:21 331:8

**claim** 155:2

**claimed** 151:11

**clarification** 67:13 121:3 233:18 296:11 322:2

**clarified** 31:5

**clarify** 11:4 15:21 16:11 32:16 46:23 66:23 85:19 87:18 184:23 247:22 268:8 278:23 281:4 286:6 294:7,8 330:3

**clarifying** 43:4

**class** 246:22 247:2,8 284:20,21 285:1,4,7,10,14, 16 306:16

**classes** 285:25

**classify** 239:10

**clear** 26:7 29:15 55:21 67:1,8,18, 20 70:19 73:5 86:14 90:20 108:6 115:24 145:20 149:25 161:24 185:8 189:5,20 190:4 195:22 210:3 212:6 214:13 216:1 321:9

**clears** 242:24,25

**close** 136:22 147:5

**closed** 237:17 238:6,12,22 268:19

**cocktail** 43:21 46:22 47:6 185:17,21 186:10, 23 187:10 188:25 189:7,13

**cocktails** 47:1

**code** 316:1

**coffee** 95:6

**collectively** 147:5

**color** 321:5,7

**comfortable** 203:16

**command** 59:9 249:14

**commercially** 125:7 143:3 254:4,22 311:1, 11,14 320:16

**commissioner** 8:8 12:18,19 16:18,24 17:1 18:24 23:18 27:8 44:18 50:4 56:20 66:19 68:10 69:7,

9 87:14 88:22 95:14 96:17 100:11 104:5,17 109:5 132:14 133:13 142:18 160:17 165:8 178:8 186:4 208:11 218:24 247:19 250:21 251:7 254:13 255:23 257:3,11 260:1 282:23 283:4,6 332:23

**commissioner's** 132:19 139:7

**commissioners** 44:13 69:10 129:7 139:8

**common** 46:13 85:20 86:2,3 149:18

**commonly** 292:16

**communicated** 18:13

**communicating** 98:15 170:25

**communication** 23:19 34:19,22 70:16 90:3,8,12 134:14 139:7 170:8 257:17

**communications** 18:3 85:11 89:17 140:3 160:15,16 201:19

**company** 147:24

**compared** 144:18,21 194:3 197:3 202:18

**comparing** 197:6

**complaint** 178:19 182:13

**complete** 179:6

**compliance** 312:10,19 323:10

**complicated** 239:5,6,10

**components** 61:6

**compound** 124:22 126:17 131:14,20 143:8 146:23 311:10 312:16

**compounded** 125:7 143:2 170:19 254:2,23, 24 258:18 259:7, 9,13 311:2,7,8,9, 19,25 312:9,19 313:4

**compounding** 65:8 131:13,25 143:6,7,14 146:11,17 147:13 255:3

**Con** 289:10

**concept** 105:7

**concepts** 30:25

**concern** 102:23 189:6

**concerned** 135:10 192:16 193:6

**concerns** 111:3 118:15 158:14,25 183:25 184:12 187:16 188:7

**concerted** 158:10

**concise** 190:4

**conclude** 79:12 80:3,4

**concluded** 333:22

**concludes** 333:13

**conclusion** 79:14 182:14

**condemned** 25:8,15 207:20 265:13 278:3 282:3 289:4 315:17

**conduct** 21:3

Case 3:18-cv-01124-B Document 18 Reported Filed 03/47/22 certee 342 of 593 PageD 6729
E0124-B Document 18 Reported Filed 03/17/22 certee 342 of 593 PageD 6729
www.EliteReportingServices.com

219:9 221:23
231:13

**conducted**
119:21 232:3
301:15 303:6,17

**conducting**
287:4

**conference**
47:15

**conferences**
47:3

**confidence**
100:16 110:16
197:18,20 198:9

**confident** 108:24
110:10 119:13
188:10 192:23
193:16 199:12,19,
21 200:1,3,9,10,
11,19,24 201:7,
10,14,22 202:4,16
234:9 304:11

**confidentiality**
181:20 183:20
219:9 232:1

**confirm** 31:6
169:16 213:7
327:11

**confirmed** 31:16,
23

**confirms** 286:19
287:3

**confiscated**
152:25 153:4

**conflict** 252:25
260:19

**conflicting**
118:12

**conflicts** 251:25

**confused** 196:24

**confusing** 37:19
215:3

**confusion** 261:4

**conjunction**
69:12 99:24
101:15,25 102:8
107:14,25 192:23

**connect** 25:25

**connected** 211:1,
3 242:19

**connection** 24:4
25:19 26:14

**connotations**
290:22

**conscious** 55:25
213:22 214:23
231:23 233:13
234:24 235:25
262:14,15,17,21
263:19,21 275:8,
19 301:10

**consciousness**
23:15 51:19 52:9
55:24 62:5,6,7
81:8 119:21 191:9
192:7,17 193:8
213:10,14 214:20,
22 215:5,16
230:1,5,6,9,12,14,
23 231:5,11,13,
16,18 232:2,9,12,
14,20 233:8,10,21
234:5,15,22
235:1,10,15,22
238:13,21 240:15
261:20,22,24
262:9 263:1,9,19
264:10,18 265:1,
12,15,17,19,20
266:20 267:6,12
268:23 269:4
270:6,12,25
272:24 273:10,14
274:12,14 275:1,
11,13,18 276:6,8
277:21 280:16
287:4 297:12
300:17 301:15,18,
21,24 302:1,22
303:3,5,14,16,23
305:6,21 306:3

**consideration**
103:12 105:10
111:10 158:6

**considerations**
180:24 181:18

**considered**
21:13 22:3 23:6
24:3 25:18 71:2

73:1 103:17
104:5,6,19,22,25
108:3 122:12
163:11 180:25
181:25 182:12
190:19 206:4
224:1 308:2

**consistent** 97:15

**consisting**
100:22

**Constitution**
316:5,9

**constitutional**
79:21 100:18

**constitutionally**
54:6 79:20 113:2

**consult** 73:8
160:19 232:8
271:20,23

**consultation**
76:16 171:5
293:16,17 307:19
308:12

**consulted** 35:22
72:8 195:14
205:20 232:10
271:6 280:11,14,
20 282:17 307:6

**contact** 41:8
56:19 90:13 131:1
138:7 139:18,25
140:1 147:5,20
154:19 155:1
256:5 282:22
283:5

**contacted** 94:2
147:8 177:15

**contacts** 90:22
150:7

**container** 252:12
254:7 259:3,11,
14,18 313:7

**content** 321:6

**context** 116:17
279:17

**contingencies**
283:18,23

**contingency**
283:11,13,16,22
284:1,8,11,14
287:22

**continue** 55:5
56:1 94:23 97:6
150:22 154:22
302:4

**continued**
136:19,24 158:4

**continues** 107:12

**continuous** 87:2
121:12

**contract** 63:18
226:7 312:12,17,
22 314:4

**contracts** 67:16

**control** 183:19,20
184:14 188:3

**controlling**
183:24

**controls** 186:17
190:5

**conversation**
28:21 32:14 41:16
67:4,9,21 73:16
85:21 86:5 92:4
105:15 127:15
139:11,14 151:21
152:8 162:2
170:18 174:3
204:10

**conversations**
18:2 23:13 28:14,
23 38:23 40:10
41:13 67:3 72:13
77:8 78:9,25 80:7
85:20 98:21
100:11 104:19
109:4 112:5 140:6
142:17 153:22,24
154:3 162:4,7
163:13

**convicted** 181:10

**copy** 168:10
333:19

**correct** 14:3 16:7
25:5 29:1,6,10,14
30:13 33:16 40:16

Case 3:18-cv-01224-B Document 184 Filed 03/17/20 Page 343 of 373 PageID #: 6730
E0124B Deposition Reporting of Sarah Goode Jul 325-1 0 QBC
www.EliteReportingServices.com

53:4 86:18 90:24
108:15 111:16
122:4 126:7 163:8
165:5 175:11,12,
17 177:14 179:4
182:7,25 185:11,
15 194:16,18
202:14 210:15,21
217:11 221:3
237:14 238:9
239:22 240:20,21,
25 241:7 245:12
258:25 271:21
286:20 287:15
312:2 320:8 323:3
324:21 327:22

**corrected** 289:17

**correction** 7:3
12:11 16:15 85:25
139:17

**correctional**
85:23 177:7
243:16 314:19

**corrections** 6:8
9:9 12:20 20:7
44:13 46:21 47:4
56:9,11 85:11
91:13 92:20 96:17
110:10 116:23
117:23 128:18
132:7,10 136:13
137:21 138:4,20
139:8,13 149:17
186:5 195:24
223:23 243:15
244:5 251:11
259:25 260:12,13
267:2 275:16

**correctly** 224:24
228:18 322:8,22,
25 323:7 324:12
325:15

**correspondence**
120:14,22

**cost** 156:25

**coughing** 274:25
275:3,5

**counsel** 6:20 10:9
15:25 16:2,17,19,
23 17:2,3 19:3
69:8,25 74:22
76:21 87:15 88:23

132:15,18 133:22,
24

**counselor** 165:9

**countries** 128:11

**country** 128:15
129:4,5 130:21
150:11 153:7

**court** 6:11,17 7:4
10:17,22 102:12
113:1

**cover** 316:9

**covered** 134:24

**created** 20:18
132:6,7,10,11
134:1,2,8,13,19
150:14 182:22

**creating** 69:16,18

**creation** 20:12
68:23

**credible** 73:1

**crystalline**
124:21

**cumbersome**
151:10 153:8

**cup** 187:20,22

**current** 67:7
73:23 81:16 82:1,
5 83:3,23 84:22
91:23 108:25
117:17 118:24
121:14 131:2,5,18
134:3 135:18,22
138:5,23 145:13,
15 147:12,17
177:16 182:22
190:20 199:21
200:4 201:23
202:4 205:1
219:13 238:20
299:9,24 304:11,
21,24 306:7
319:21

**curtains** 232:4

**cut** 240:4

**cutdown** 236:5,
14 237:2 276:23

---

**D**

**Dakota** 141:6,17

**date** 88:25 114:17
136:10 152:5
161:20 162:18
163:3

**dated** 164:6

**dates** 14:5 161:12
162:20 311:16,17

**day** 13:13,15 14:2
29:24 162:22
177:18 217:22
233:10 277:25

**days** 13:4,5,7 16:6
34:25 38:25 39:10

**DE-107** 44:4,24

**DEA** 127:2,16
128:8,21 129:3,12
166:17

**DEA's** 128:2

**dead** 112:17,19
200:2 238:1,5,7

**dealing** 66:12

**death** 46:15 54:3
73:11 99:25
101:13 102:9,10,
11 112:15 113:1,
18 134:3,23 191:6
192:25 193:1,2,
20,22 194:3,10,11
195:15 196:22
197:1 198:20
202:17 230:18
235:2 301:4
305:4,10,17
315:24

**deathwatch**
207:21,25

**debatable** 205:10

**Debbie** 15:24,25
37:11 38:18 39:6
69:7

**December** 167:8

**decide** 41:10
42:12 57:25 100:7
110:22 160:8

217:16 220:6
248:10 249:15
328:14

**decided** 36:13,19
37:4 58:22 100:9
218:2

**decides** 54:20
55:11 58:7 237:5
324:10

**deciding** 307:23

**decision** 21:3
36:17,22 37:1,14
38:19 39:6,21,22
40:7 83:9 106:8
108:1 111:12,14
122:16 204:6
206:22 218:4
231:18 232:19,23,
25 234:21 249:13,
24 259:16,21
260:7 275:17
283:7,19 287:24
289:19 307:18
309:13 328:19
329:15

**decisionmaking**
18:14

**decisions** 35:6,8
118:20

**declared** 213:16,
25 237:25 238:5,7
269:17 271:10
272:25 274:13

**declares** 215:6,17

**declined** 143:10

**dedicated** 224:2

**deep** 295:4

**deeper** 273:4

**Defendants** 7:1

**defer** 215:24

**Define** 228:2

**defined** 193:9
199:5,9 301:21
313:10 325:2

**definition** 50:13

**degree** 187:14

Case 3:18-cv-01234-B Document 184 Filed 05/17/21 Page 344 of 373 PageID 4731
E0124 B Court Reporting Service Page 344 of 373 Page #e731
www.EliteReportingServices.com

**delay** 57:19 58:16, 17 61:23 250:20 282:25 287:19

**delayed** 54:14 57:20 287:17 288:4

**delaying** 288:13

**delays** 54:13

**deliberative** 137:7

**delivered** 313:8

**demeanor** 219:10

**Demned** 289:10

**demonstrate** 278:4

**department** 6:7 7:3 12:11,20 15:25 16:3,15,19 20:7 46:21 67:2 68:7 69:10,23 85:9 87:16 89:25 90:5,6 91:11,13 92:19 100:15 110:3,10 116:23 117:23 118:23 132:7,9,12 134:13,16 136:13 137:20 146:14 147:16 148:7 149:1,16 155:23 156:5 167:5 181:13 186:5,13 195:24 212:1 217:15 218:6,7,8, 20 223:23 224:2 232:22,24 244:14, 16 251:8,10 254:1 259:23,24,25 260:12,13 267:2 275:16 280:7 283:23

**Department's** 90:14 101:24 110:1 118:21 232:19

**departments** 138:20 139:12

**depend** 51:7 312:21

**dependable** 221:25

**depending** 187:15 228:10,16 251:4 254:24 280:22

**depends** 50:12 51:2 250:3 264:5 284:10

**DEPONENT** 333:21

**deposition** 6:7,13 8:22 9:11 12:15 14:8 15:3,6,15,17 17:6,9,14 18:19 20:19 28:25 38:6, 14,15 43:19 44:21 45:4,10,12 46:3, 25 52:6 96:8 115:11 165:13 285:8 332:9,16, 19,24 333:14

**depositions** 7:22 9:6,8 17:5,8,11 18:7 19:17 244:3

**depth** 269:16 274:18 275:22 294:3

**deputy** 16:18,24 17:1

**describe** 27:13 32:3 35:13 44:6,8 90:1,10 113:7 119:7 156:9 219:4 263:4 292:11 296:13 301:20

**describing** 177:20

**description** 244:22 245:1

**descriptions** 244:24

**deserves** 79:22

**designated** 86:22 88:19

**designed** 27:20 306:8

**designee** 246:22

**deviated** 59:25 60:18 247:20 330:17

**deviation** 55:1 57:23 58:9,24 60:22 62:12 248:12 251:1,17 328:6,15 331:1,9, 12

**deviations** 64:15 249:25 250:13

**diagram** 207:10, 13

**diazepam** 174:19

**dictate** 326:14

**die** 195:4

**difference** 32:25 183:5 265:21 266:1,13 311:6

**differences** 144:22

**differentiate** 273:2

**differently** 62:10

**difficult** 14:20 37:9 175:2 176:5 177:6,9,20

**digoxin** 171:18 172:14

**diluted** 309:21 310:4,12,21

**direct** 49:19 56:19 58:20 72:6 90:3 132:21 160:16 170:8 256:5 282:4

**directed** 62:17,20 63:17 226:4

**direction** 313:5

**directions** 64:24 65:2 323:2

**directly** 51:20 72:10,11,15 79:3 130:23 147:16 151:1

**director** 45:4 47:5 86:6 140:4,8,10,

**284:22 285:12**

**desire** 86:1,7 92:23

**detailed** 264:8

**details** 58:15,16 127:4 189:17,24

**determination** 21:3 52:12 192:9 206:7 213:6,9 231:22 235:25 238:24 240:3,5 254:17 266:24 270:6 273:10 303:3 331:7

**determine** 22:3, 22 23:6,7 181:17 231:23 233:12 234:10,15,20,23 235:1,9,21 239:14 262:8 263:8 274:4 275:19,21 301:9 302:22 314:2 321:23 329:8 330:22 331:6

**determined** 151:6 264:22 285:20 303:2 307:13,16 315:24 322:12

**determines** 213:4

**determining** 190:14 261:20 262:16 280:16 301:18 309:14

**developed** 20:18 82:11,19 136:3 152:5

**developing** 35:21 70:17 82:12 182:19 205:21

**development** 20:13

**deviate** 53:21 54:1,21 55:12 56:4,25 57:2,5 59:8 61:12 247:14 258:10 328:24 329:9

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 345 of 373 PageID# 6732
E01234B Deemed Reporting Excellence 345 of 373 PageID# 6732
www.EliteReportingServices.com

15

**directors** 44:12
46:7 47:4,11,17,
21 71:23 77:9
78:10,11 79:1
80:8 85:12,21,25
109:5 112:5

**directs** 283:2

**disallows** 113:23

**disciplinary**
314:2

**disciplined**
292:21,24 313:22

**disclosing**
132:16 211:16

**discretion** 256:23
328:24

**discuss** 19:6 21:7
30:24 35:5 36:18
39:23 40:1 100:3
104:14 127:3,15
140:5 166:25
167:4 277:4,9

**discussed** 19:10
36:16 37:12 39:13
42:22 45:15 79:10
80:1 89:3 98:3
104:16,17 105:10
108:19 166:3,16
202:7 206:21
275:10 292:25
300:15 305:15
307:22 332:12

**discusses** 75:21

**discussing** 43:2
64:15 178:9
205:15

**discussion** 30:20
36:20 39:2,15,18
67:15 80:6,16,17
106:2 107:9
134:22 246:25
247:4,7 260:21,23

**discussions**
17:10 34:10 37:3,
12,25 43:9,18,20
44:1,2 45:24 46:7,
16 47:1,2,19 52:4,
6 64:11 77:16
79:8 80:15 82:22

100:5 122:6
257:18

**distress** 21:15,23
50:16 191:14,25
192:18 193:10

**District** 6:11,12
8:13

**Doc** 290:3

**doctor** 107:1
195:13 223:5,12,
15 224:9 275:11
280:13,15 286:10

**doctors** 72:5,8
105:4 205:17
224:5

**document** 13:25
14:19,20 29:20
40:21 246:3,9
258:5 317:23
318:4

**documents**
13:19,20,21,23,24
14:11,13,16,22
29:16,19,22 30:1
35:1 40:5 230:7
241:13 318:13
319:15 332:11,14,
22 333:4

**Donnie** 319:2

**dosage** 73:23
79:18 122:25
195:8,21

**dose** 123:5
306:19 307:12,16

**doses** 123:6,7

**draft** 72:15

**drafted** 20:18,23

**drafting** 20:12
72:9 74:24

**draw** 291:17,25
310:18

**drawing** 194:9
210:1 323:9

**drawn** 25:13
30:22 31:2 322:5
323:1

**draws** 322:10,18

**drinking** 189:7

**drinks** 189:13

**drip** 242:22

**drug** 26:2,3 27:20
31:20 33:1 38:25
39:3,7,12 41:7,11,
14 48:21,25
49:22,24 52:13
66:25 67:1,3,4,6,
14,21,22 68:1,6,8,
13,16 69:11 70:3,
4,10,13,15 73:17
76:13,15,23,24
77:2,12 79:3,6
80:11 83:3 85:10
86:9,15 87:16
88:23 89:16,24
90:1,4,5,10,15,22
91:2,3,6 92:3,6
93:16,25 94:4
96:12 97:2,5,8
98:14,21 102:2
104:17 106:3
113:8,16 118:4
121:11 125:17,21
126:1 127:11,23
129:3,8 131:4
132:18 139:6
143:19 144:18
145:1 147:15
150:21,24 152:9
153:24 154:18,21
155:1,4,12,15
163:20 164:2
167:14 170:23
171:4 175:1
189:11 191:4,15
192:1,4,5 193:7,
18,24 194:3,12,
14,17 195:5,22,23
196:2,3,6 197:1,
13 198:15,19,24
199:3,8,10 205:4
214:2 215:7 227:2
228:8 237:20
248:23 249:6
251:15,20 253:12
254:5,8,22,23
255:1,11,25
256:9,10,14,22
257:4,5,9,13
258:4 259:9
260:4,17 261:12

267:16,22 272:15
273:22 278:24,25
288:7 293:12
294:1 295:22
296:3,23 297:11
300:12 301:5
303:24 306:12,14,
16 307:17,24
308:6,8 310:1,3
311:7,11,14,25
314:18 325:10

**drugs** 14:17 18:4,
15 24:4,10 25:1,4,
7,11,12,19 26:3,
13 30:21 32:5,17,
21,24 33:4,9,11,
14 40:20 41:17
46:10 51:17 57:23
58:8,13,14,23
59:5,19 62:10,16
63:1,4,6,17,19
66:8 67:23 68:3
70:6,8,9,22 77:18
79:13 80:2,4
81:11,21 82:24
83:12 90:21,23
91:16,19 93:12,18
99:24 102:1,9
103:2,24 105:20
107:10 108:12,18
109:1,9,11,20,22
110:13 111:6
114:9 117:22
118:5,7,9 119:3
122:7 123:2,11,13
144:16 152:22,23
153:4,5,6 156:24
159:15 160:22
164:22 166:13
173:21,25 174:13,
16 175:6,9,10,15,
23 176:6 177:7,9,
13 188:19 194:19
201:16 203:10,21,
24 204:16 206:4,
5,9,10,12,17,18
210:10 212:21
221:17 222:5
223:1 225:2,6,8
226:1,6,11 228:5
237:22 248:8
251:13,14,16
252:1,4,12,13,20
253:4,23,24
254:1,20 255:3,
10,15,17 257:8,19

Case 3:18-cv-01124-B Document 184 Filed 05/17/21 Page 346 of 373 PageID 6773
Elite Court Reporting Services, Inc. 248-358-0008
www.EliteReportingServices.com

260:6,8,15,25
261:15 271:11
273:12 282:11
293:11,23 297:13
300:18 302:6
305:3 306:22,25
307:21,23 308:17
309:6,21 310:12,
18,21 311:1,8,12,
19 312:5,7,16
313:1,2,4,13,16,
22 325:7 326:14
327:14

**drunk** 188:1

**dry** 313:8

**dual** 68:6

**duly** 8:4

**duties** 217:20
218:13,15 220:13
224:20,23 226:4
243:5 264:22
276:21 314:4

---

**E**

**e-mail** 95:17,25
96:3,9,15 97:10,
18 98:3 102:19
103:5,6,7,12,22
104:4 105:3,4,6,
16 106:24 107:8,
12 111:12 114:17,
24 115:18 120:14
121:23 122:1,8,
13,14,15 124:15,
24 125:9,13
127:7,12 148:10
158:13 167:8
169:20 171:3
172:2

**e-mailed** 115:12

**e-mailing** 115:2

**e-mails** 111:2
122:6 162:8

**earlier** 122:13
123:25 136:2
175:8,16 190:23
305:15 313:12

**easier** 35:24

**edits** 169:14,25
170:4,12,16

**educated** 190:9

**educating** 190:12

**effect** 27:22,24
196:7 296:10,14,
19 297:6,19
298:5,19 299:8,15

**effective** 190:25
197:16 309:17,19

**effects** 73:21
102:25 105:18
106:4,10,13,17
110:22 111:5
122:3

**effectuate** 191:6
202:17 301:3
305:4

**efficient** 190:25

**efficiently** 299:4

**effort** 93:16
121:12 136:23
142:19 154:22
158:10 174:15

**efforts** 91:18

**electric** 221:20

**electrocution**
46:11,15 56:13
165:24 181:11
221:8,12 291:11,
16

**elements** 18:11
182:18 183:16,22
234:22

**eleven** 13:16

**elicit** 102:24
105:18 106:3,16
110:21

**Elite-brentwood**
6:18

**employee** 9:5
124:11 125:14
150:25 162:13
169:19,20,25
170:11 179:7
291:23,24

**employees** 22:21
23:5 179:5 243:24
244:11,13

**EMT** 26:16 211:6
220:17 224:10
237:9

**EMT's** 211:4

**EMTS** 25:24 26:16
81:1,10 208:17
209:1,5,8,10
211:9,10 219:15
236:24 237:6
243:10 244:15
275:12

**end** 99:21,24
100:23 249:11
303:8,17 314:24

**ensure** 21:13,22
24:3 25:19,23
26:1,13 50:14
51:11 52:7 54:2
80:22 81:3 112:25
144:4 181:19
217:25 218:10
224:23 241:8,21
242:2 245:16,18
247:9 254:19
286:2 311:23
312:9,12,18
313:13,16 315:11
323:10 325:18
330:13

**ensured** 100:18

**ensures** 193:22
241:10 312:17

**ensuring** 33:4
81:8 102:10
241:19,20 242:4,
6,8,18 264:24

**enter** 238:12

**entering** 7:21

**entire** 18:9 75:11
247:15 262:24
301:11 303:4,20
330:9

**entirety** 302:23
303:15 306:3

**entity** 19:7 38:12
65:10 66:11

**environment**
181:21 184:18
186:16 261:2
311:9

**equipment**
241:18,21

**equipped** 222:17

**essentially**
187:19 297:3

**establish** 136:20
241:4

**established**
18:10,12 100:14
136:25 186:1
236:24 241:25
244:2

**establishing**
18:5,14 28:15
190:4

**estimate** 14:23

**estimating** 14:25

**et al** 6:10

**etomidate** 114:20
115:3,12 116:6,7

**Europe** 130:5,13,
18,24 131:10

**euthanasia**
185:16

**evaluate** 203:10
330:6,9,21

**evening** 248:25

**event** 54:13 55:6
180:20 184:16
186:2,18 322:17

**events** 54:12

**exact** 9:1 14:4,25
77:12 104:18
122:19 152:5
314:13

**examination** 8:6
12:7 47:10 60:3
66:15 165:16
248:15 274:7
317:10 329:14,18,
24 330:2

**examine** 237:12

Case 3:18-cv-01234-B Document 18 Reporting Filed 05/47/22 cender 641 of 373 PageID #: 6734
E01234 B Document 18 Reporting Filed 05/47/22 cender 641 of 373 PageID #: 6734
www.EliteReportingServices.com

**examples** 62:9
251:6

**exception** 151:11
153:14 155:3
198:17 203:2
244:14

**exceptional**
221:24

**excluding** 219:15
244:15

**execute** 83:19
180:13,16 184:8
199:14 206:17
304:6,17

**executed** 54:4

**executing** 223:20

**execution** 9:7,11
13:22 14:12 15:11
19:22 20:1,9,13,
18 21:15,24 24:4
26:14,16 39:23
40:8 42:6,9 43:6,
25 44:23 45:3
46:8 51:12 52:24
53:20 54:21 55:11
56:8,11 57:1,24
58:6,21 59:7,17,
24,25 60:7,17
61:6,12,22 63:7
64:19 68:14,19,23
69:19 75:22 79:19
80:23 81:17 82:4
84:9 85:22 88:14
89:4 90:7 99:17
100:2,8 104:25
109:3,9 112:19
113:8,10 117:10
119:14 125:24
126:16 134:25
148:8,20 149:4
161:12,20 162:14
163:2,3 173:7
178:12 180:1,10,
22 181:4,8 182:9,
16 183:7,12
184:21 185:3,9,13
186:23 187:10
199:20 201:12
203:25 207:16,25
208:3,4,12,20
209:9,16 212:20
213:1,15 216:6
217:5,8,9,10,14,

17 218:1,16,18
219:2,21 220:8
222:11 224:17,22
227:5 235:21
239:19 240:20
243:10 244:25
245:5,9,10,11,17
246:3,7,14,16
247:9,13 248:1,8,
9,17,22 251:9,10
252:7,11,16
253:19,23 254:10
258:5,9 261:19
262:24 277:25
279:17 282:10,25
283:1,2,3,8,15,25
284:17,24 285:24
286:14 287:21,23
288:4 289:1,13
290:14,15,19
291:10 292:7,14,
20,23 300:19
301:6,11 302:23
303:15 304:25
305:22 306:4
315:16 316:18,20,
21 319:2,6,10,22
321:22 322:6,7,20
323:5 327:6,10,15
329:19,25 330:7,
8,13,14,16,25
331:1 332:25

**executioner**
30:8,9,14,15,17,
19,23 31:4,11,19
32:4,9,14 33:19
49:23 81:11,22
123:12 167:20,21
168:7 208:6
210:4,9,14 212:7
213:11 214:1,16
216:2,7 219:16,18
220:4,18,21
221:1,4,7,11,16,
20 222:12,18,19,
25 223:9,16
224:6,18 225:1,4,
15 226:5,9,12,15,
18 227:1,12,16,
19,23,24 228:4,
10,23 229:6,8
242:8,12 243:7,14
244:5,19,20,22
245:13 246:1
282:4,8 286:20
287:16 320:24

322:11,12,14
323:6 324:5,20
325:1,9,14 326:8,
21 327:12 328:18,
24

**executioner's**
25:12 208:7,9,19,
20 209:2,7,11,13,
23 210:6 212:18
213:12 216:6
225:25 230:8
245:2 286:25
324:11 325:10
326:7

**executioners**
222:1 253:19

**executions** 19:21
20:8 21:4 23:11,
21 28:10,18 43:12
47:2,18 56:14
60:7 73:4 78:21,
23,25 87:19
117:23 119:18
126:6 129:5 134:6
136:1 144:7
161:13,22 162:22
163:5 164:4
172:15,20,24
173:17 174:20
176:11,17,23
178:25 180:7
184:1 185:18
186:11 195:25
201:12 202:6
204:16 220:23
221:2,8,12,13,18,
20 247:1 272:11
288:12 293:1
304:13 315:25
324:17 327:20,25
332:6

**executive** 137:9
140:15

**exercise** 164:21
166:11

**exhaustive** 93:4
136:16 145:6,21

**exhibit** 11:25
12:2,6,12 19:2
52:18,19,20,21
66:22 68:17 75:24
86:20 95:14
97:16,17 102:13,

19 110:19 114:16
121:16,17 124:6,
14 125:8 126:23
129:22 130:5
132:1 161:1
163:25 167:7
169:7 171:8,9,14
207:2,5,8,9
230:15 240:17
245:4 276:17
287:8 288:21
293:3 315:7
317:19,20 320:1,9
321:2 322:1

**exhibits** 7:21,23
124:3 332:12

**exist** 333:8

**exits** 240:9

**expand** 138:18

**expanded** 149:19

**expectation**
258:2 292:5

**expectations**
257:20

**expected** 53:18

**experience** 12:17
21:14,22 23:18
27:8 28:9,17
40:17 50:15,23
51:12,22 52:8
56:14 72:25
159:14 160:21
169:24 211:8
219:22,24 220:7
227:18 287:1
306:25 325:6

**experienced**
51:1

**experiences**
22:4,23 23:8

**expert** 106:20
195:13 196:8
297:17 298:3
305:16

**expertise** 66:2,5,
7 77:2 169:24
211:24 229:1
231:16

**experts** 105:3

www.EliteReportingServices.com

118:3,8 205:12,16
206:15 232:8
272:14 297:24
298:18 299:15,17

**expiration** 311:17

**expire** 199:1
237:24

**expired** 67:8,23
68:4 195:11 196:1
312:5,7

**expires** 194:24,25

**explain** 101:9
207:15

**explore** 204:5

**explored** 153:21
183:17

**expressed**
158:14

**extensive** 56:10

**extent** 333:8

**extreme** 280:24

**eyelashes** 266:5

**eyelids** 262:3

**eyes** 263:14,18
268:19 281:13

—————

**F**

**face** 104:6 281:20

**facetious** 215:12

**facilities** 179:25

**facility** 42:7
183:21 218:22
245:18 250:12
261:14 284:23
291:3 313:8

**facing** 135:25

**fact** 28:10 83:16
129:2 174:9
180:20,23 182:13
202:4 217:18
219:24 257:15
272:10

**fail** 286:8

**fails** 237:2

**fair** 35:20 82:12
122:11 196:4

**falling** 321:19,24

**familiar** 42:7
50:21 180:17
202:25 205:25
233:17 324:8

**family** 208:15,16

**fashion** 154:24
313:18

**faster** 193:23
194:2 196:10,14,
19

**FD** 153:3

**FDA** 151:5,7
164:21 166:11
295:22 310:25
311:12

**federal** 141:9,10,
13,18 150:13
152:24 153:3,12,
25 154:14,20
155:2 156:22
157:3

**feel** 20:16 21:6
83:17 103:1
105:9,19 106:14
111:5 113:24
118:9 160:2,4
191:15,25 192:12
203:11,16 231:21
235:13 267:4
299:9,23

**feels** 7:14 114:8
205:3

**felt** 17:15 20:23
23:22 42:15
232:24 234:18
235:23

**field** 294:23

**figure** 38:11
189:21 250:24
272:20 274:2
294:25 326:6

**filed** 6:11

**fill** 127:4 325:24,
25

**filled** 187:20
318:3

**final** 75:12,17,18

**find** 82:18 85:13,
16 86:10 91:5,18,
19 95:21 96:8,10,
21,23 119:4
135:12 136:17,19
138:4,24 139:10
142:20,25 143:20,
25 145:25 147:18
154:23 155:13
158:5,10 161:12
163:4 172:12
175:3,5 177:6,10
190:13 201:16
236:6 237:1

**finding** 89:4
139:15 177:1
220:12

**fingers** 264:2

**finish** 10:24 54:23

**finished** 24:21

**firearm** 179:10

**firearms** 179:6,
12,14,17,19,20

**firing** 178:25
179:25 180:7,10,
13,16,22 181:1,13
182:10,17 183:1,
9,12 184:1 185:10

**fit** 57:2

**five-minute** 95:4

**flash** 242:5,25

**flaw** 80:9 224:8,14

**flawlessly** 197:9
198:3 229:9
304:13

**flow** 33:1 241:22
242:9,13,22

**fluids** 236:18

**focus** 93:18
242:16

**follow** 53:16,19
56:5 63:8 64:19,
23 65:1 81:17
140:4 153:16

**filled** 187:20

**248:2 252:7,17,19
253:2,20,24 254:9
255:8,11,15,20,
22,25 256:11,16,
23 257:6 259:22
260:14,20,24
312:14 329:10
330:14

**follow-up** 105:15

**follow-ups** 33:15

**Food** 164:2

**force** 188:14,23

**force-medicate**
188:18

**forcefully** 188:23,
24

**forgive** 242:15

**form** 7:13,14 20:3
22:24 26:10 31:13
32:6 37:6 41:5
42:14,23 43:6
48:5,12 49:7 50:9
51:3 53:7,22
54:22 55:14 56:6
57:3 58:10 59:2,
11 60:2 61:17
62:13 63:13,14
66:18 74:4 75:13,
17,18 81:12 82:8,
16 83:25 88:4
89:13 91:20 92:16
93:7 94:19 98:25
101:1 103:8
105:22 107:21
108:20 109:13
110:6 111:19
112:21 113:13
114:1 115:4 116:9
117:13 118:17
119:15 120:20
122:9 124:21
125:7 126:11,16
127:17 129:15
130:14 133:6
134:10 137:6,24
138:14 141:21
143:2 144:13
145:8 147:25
149:14 150:23
151:20 152:1
154:23 155:6
156:19 159:5,17

Case 3:18-cv-01124-B Document 184 Filed 05/17/21 Page 349 of 373 PageID #: 6736
E0124 B Document 184 Filed 03/17/21 Page 649 Electronically Filed Doc #
**www.EliteReportingServices.com**

163:10,23,24
164:23 166:18
167:15,23 168:22
170:2 173:18
174:21 175:18,25
176:24 178:14
180:2,14 182:11
184:2,10 185:22
187:11,23 188:16
190:10 191:10
192:2,20 193:12
196:16 197:23
198:21 199:15
200:15 202:21
203:18 204:17
206:19 207:17
213:18 214:4,18
215:10 221:15
222:13,20 223:17
224:15 227:9
228:1 230:2 231:6
232:16 234:7
235:4 238:14
239:8 247:16
248:19 250:2
251:3,18 252:18
253:1 255:13
256:13,25 257:12
258:13 261:8
263:23 265:23
267:17 268:6
269:18 271:12
272:7 273:7
274:20 275:24
277:12 278:12
279:9,23 281:1
284:3 286:16,23
288:15 292:3
294:5 297:7,20
298:7,12,25
300:20 301:12,25
302:12,24 303:25
304:8,9,19 305:7
306:5,23 308:18
310:14 313:24
314:8 315:19
316:6,23 319:12
321:10 326:10
327:17 328:7,16
329:1,12 330:19
331:3

**forms** 163:24

**forward** 116:12,
24 121:19 122:16
134:5 204:15

330:8

**found** 110:4 140:7
149:17 151:19
175:2 325:21

**frankly** 110:15

**freezer** 252:14
254:3 257:22

**freezing** 254:2

**front** 11:25 124:3
208:9 331:16

**frozen** 170:20
313:18

**fruit** 187:20,22
188:1,2,4

**full** 196:7 310:25

**fully** 200:3

**function** 197:10
211:13 241:17
306:14,17,18

**functioning**
241:5

**functions** 211:15

**FYI** 116:20

**G**

**gain** 85:9

**gave** 9:10 103:12
250:14 318:24

**general** 16:16
30:25 43:6 63:12
72:24 132:14,18
164:9,12 296:4

**General's** 34:20,
22 35:4,15,22
36:6 43:2 69:12
76:22 132:20
133:23 158:22
204:11

**gentlemen** 10:12
12:23

**Georgia** 140:25
141:18

**give** 10:24 17:9
27:16 36:7,8 51:8
57:8,14 58:2,4

106:5 117:11
158:21 160:3
187:20,22,25
188:24 214:16,21
215:15 237:23
248:22 252:9
296:23 297:4,5
305:4

**giving** 44:6 51:5
54:9 251:6 298:5

**goal** 100:1 101:17
113:4 194:11
249:11 303:8
305:9

**good** 6:22,25 8:8,
9 127:2 169:16
242:9,13 248:1
261:9

**government**
141:9,10,13,18
150:13 152:25
153:4,12 154:20
155:2 157:4 283:9

**government's**
156:22

**Governor** 133:24
134:2,7,12 137:2
159:1 203:23

**Governor's**
133:1,9,23 134:15
137:2,3

**grade** 124:19
125:1,4 259:3

**grams** 125:11,19
126:2,5,9 148:11,
25 161:6,8,16
162:1,9,11,12
163:8

**Great** 124:5

**gridlocks** 259:11

**group** 89:2
162:17 220:2

**group's** 160:8

**guards** 243:15

**guess** 46:16
50:12 137:9
141:25 264:13
283:18 303:2

**guide** 53:11,15

**guideline** 54:5

**guidelines**
312:11

**gurney** 208:8

**H**

**hand** 67:7,23 68:4
114:13 225:7
250:5 262:4
273:24

**handle** 253:23
255:15

**handled** 257:19

**hands** 211:5

**handwritten**
129:23

**happen** 61:21
80:23 204:9 214:3
282:24 306:20

**happened** 45:24
46:17 79:2 127:22
142:17 154:17
285:21

**happening**
250:19

**hard** 30:1 92:18
170:17 187:17
189:4,15 190:16
200:18 284:13

**harder** 305:20

**hastens** 99:25
102:9 113:17
192:25 193:2,22
194:10 197:1

**hate** 298:14

**head** 10:20 47:7
184:9,22 185:4,6,
14 215:23 219:20
263:14

**heard** 200:6,9

**hearing** 186:19

**heart** 101:16
193:25 194:13,17
198:24,25 199:11

Case 3:18-cv-01234-B Document 184 Filed 03/17/22 Page 350 of 373 PageID #6737
EliteReportingServices.com
www.EliteReportingServices.com

202:12 306:19

**heavy-gauge**
259:3,10,18

**held** 6:13 285:6

**helped** 309:2

**helps** 194:10
210:25 301:3

**Henry** 290:9

**hesitant** 138:18

**hey** 118:15 260:21

**high** 157:1 195:8,
20 221:22

**higher** 228:15
251:1 296:24
299:16

**higher-ups**
258:7,10

**highest** 74:9
187:14

**highly** 300:5

**Hippocratic**
277:5,10,15

**history** 19:15
112:7 144:18

**holding** 208:14

**holds** 246:22
284:23

**Holliday** 290:3

**hospital** 235:2

**hour** 288:1,5,8

**hours** 12:25 13:1,
10,13,15,17
170:21 313:18

**hub** 242:6 243:1

**humane** 54:6
79:20 100:17
113:2,10 117:10,
18 119:14 186:15
206:17

**hundred** 125:19
131:22

**hyperactive**
27:23

**I**

**ice** 313:8

**identification**
319:24

**identified** 88:10,
24 89:16 248:24
319:8 323:4

**identifying** 44:11
69:4 71:21 152:8
216:13 227:20

**identities** 132:17
133:19 291:13

**identity** 211:16
232:2 233:3
290:25 292:13,18

**ignoring** 62:6

**ill** 217:23

**implementation**
151:8

**import** 128:4
153:5

**important** 62:21
113:20 192:13
194:22 303:5,7

**importation**
151:17 164:22
166:12

**imported** 152:23,
24

**importing** 149:8,
20 167:1

**impose** 45:22

**impossible**
174:14

**impression**
91:23

**in-depth** 257:18

**inaccurate** 47:7

**incident** 152:22

**include** 76:10
154:24 219:16
245:13

**included** 16:4

42:9 43:1 134:21
205:25

**includes** 155:14
320:6

**including** 40:16
98:9 121:20
243:14

**incorrect** 159:13

**indication** 154:14
214:22 266:20
289:20

**indications** 81:3

**indicators** 263:7,
10

**individual** 22:13,
15 31:21 42:5
45:14 49:12 50:18
73:25 79:21 80:12
98:14 99:18,19
101:14,20 102:3,
4,6,11 106:14
112:15 113:19
114:4,7,12 116:18
120:11 133:3,11
142:1 168:20
169:4 171:2,22
188:20 189:12
194:8 199:1
223:22 224:8
225:8 227:2
228:10,16,17,21
231:12 236:19,20
239:14 242:11,23
250:17 262:19
270:10,17 271:9
273:12,17 278:17
280:6,9 289:18
297:4,6 306:19,24
316:20 317:2
322:17

**individual's**
99:25 219:7
224:18 291:13

**individually**
194:19

**individuals** 20:23
21:8 25:25 28:14,
22,23 30:4 32:25
33:2 44:11 50:20
54:3 65:3,14 80:5
88:25 105:14

106:7 131:6
158:15 160:15
163:14 168:16
188:19,23,25
217:23 262:22
279:19 283:8
286:6 289:7
292:13 308:21
324:15 330:7

**inform** 134:2

**information** 24:9
31:16 36:8,10,15
41:4,17 42:2
48:11,17 49:6,13
50:3,8,11 51:14,
21 52:15 65:11
70:7,18 71:4,6,10,
12,13 76:7,24
79:16 80:19 82:20
103:17,20 104:20,
21 105:1 111:11,
13 118:12,22
122:12 135:3
138:7,12 140:14
141:14 150:7,9
160:10 245:24
246:1,5 273:23,24
280:18 308:20
331:16

**Inglis** 15:24 16:5
37:1,11 38:18,24
39:6,10 69:7

**Inglis's** 69:24

**ingredient**
131:15,21

**ingredients**
82:18 145:1
146:17,23 311:10

**initial** 67:15
182:14

**initially** 135:23
163:8 177:15

**inject** 25:7 197:13

**injected** 24:5
25:20 26:15
188:20 189:12
237:13 238:4
301:22

**injection** 8:21
17:17 43:24 48:4
52:23,25 53:13

Elite Reporting Services
www.EliteReportingServices.com

54:4 56:12 81:2
82:13 85:22 87:4,
20 90:6 91:14,17
101:17,19 108:4
112:14 119:9
120:17 131:19
139:16 159:10
164:22 166:13
175:1,11 181:9
183:7 187:21
195:4 197:11
208:5,7 209:2,7
221:17 235:11
238:3,11 241:6
242:20 243:1
245:10 258:24
291:9,17 293:9,24
300:2 303:8
307:10,25 321:23
327:20

**injections** 151:18
177:5

**inmate** 25:8 52:8
55:25 100:19
118:25 119:19,25
122:24 159:9,14,
19 186:17 187:20,
22,25 188:1,3,15
189:6,9 192:6,10,
17 193:1,8,9,17,
20,21 194:20,23,
25 195:3,11,16
196:1,22 199:5,9,
14 202:9 205:3
208:8 211:1,3
212:21 213:5,12,
16,20,21,25
214:2,19,21
215:6,8,14,16,17,
20 222:6 223:2,20
225:2 231:23,24
234:10,23 235:10
237:25 238:4,7
240:12 262:6
263:13,17,21
265:13,17 267:5
269:16 272:21,23
273:3,4 274:4
275:19,22 278:5
279:1,12,17
282:3,12,20
288:22 289:10
298:9 299:11
301:10,22 302:5,
10,17 303:11,14,

19,20,24 305:10,
22,25 315:17

**inmate's** 102:7
119:22 120:7
198:20 199:11
202:12 229:25
235:21 261:20,22,
24 263:1 265:18
278:3 289:6
300:16 301:3,21
302:22 303:9,23
305:5

**inmates** 134:23
160:2 161:10
162:17 181:10
292:25 304:6,18
315:23

**input** 70:1,24
74:23 132:14
218:23

**inquire** 91:9
138:8

**inquiries** 158:6

**inquiring** 124:7

**insensate**
109:11,22 111:24
118:4 119:1
120:12 159:25
266:14,21,25
267:13,15,21
270:18 271:18
272:17 273:21
278:11,18,22
279:1,5 281:8
294:20 295:13
297:15 298:9
299:5,12 306:22
308:16,25 309:5

**insert** 236:6

**inserted** 208:25
228:18 242:4
243:12

**insertion** 211:19
229:4 236:18

**inside** 209:23
216:21

**inspection**
238:23

**instance** 15:7
27:19 36:12 41:2

43:21 79:4 123:8
241:24 289:5

**institutions**
291:22

**instruct** 25:7
35:10 44:18 45:20
68:10 77:25 97:2,
5 137:8 216:2
243:20 244:8

**instructed**
121:11 125:17,20
137:3 154:18
261:15

**instruction** 170:4
253:10 309:24
310:17

**instructions**
24:25 25:9 26:8
27:1 28:2,8 29:5,
12,18 40:4 53:5,9,
16 56:3,4 62:19
63:2 86:15 106:5
154:21 163:19
167:25 168:4,6,10
169:15 170:1,12
226:8,10,13,16,
19,23 227:1,6
234:19 246:7,12,
13 248:2 251:21
252:3,6,8,13,20,
24,25 253:3,15,
17,20,21,25
254:9,10 255:9,16
256:1,6,8,16,24
257:7 258:3
259:14,19,22
260:2,14,19,24
261:12 277:24
284:12 288:6,9
313:11,15 320:4,
6,11,14,19,21
323:11,15,17,20,
24 324:4,6,7,9,23,
24 325:2,3,16,18,
20,21,23 326:2,3,
13 333:7

**instructs** 123:12
164:21 166:11
214:16

**integrity** 219:8
221:23

**intended** 27:20

57:12 164:4 191:1

**intent** 56:15 60:24
61:3,14 62:1
247:23 248:22
249:5 290:22

**interested** 92:4

**interfere** 302:21

**interpose** 44:4

**interpretation**
80:14

**interrupt** 87:10

**interrupting**
125:25

**introduce** 6:20
10:13

**inventory** 124:8
327:13 328:2,3

**investigated**
150:18

**invite** 127:2

**involuntary**
275:6

**involved** 35:7
68:23 72:9 88:13
129:3 143:11
152:7,10,13
153:23 233:3
292:25 328:19
330:7

**involvement**
20:22 36:21,24,25
38:20 128:3

**lrick** 119:18 216:6
217:9

**lrick's** 319:6
327:6,10 329:19
330:25

**issue** 39:14 47:17,
18 54:17 56:21
57:20 123:11
188:2 224:1
304:23 329:5

**issues** 9:5 16:11
17:23 31:5,6 43:3
112:7 142:7
174:9,10 181:21
188:11 201:8

Case 3:18-cv-01234-B Document 184 Filed 05/17/23 Page 352 of 373 PageID #6739
E0124B Deerwood Reporting Filed 05/17/23 (832) 548-0085
www.EliteReportingServices.com

246:25 283:11,13, 16 284:1 311:24

**item** 67:12

**items** 25:10 121:19

**IV** 26:1,4 208:6,17 209:12,20,22,24 210:5,12,16,20, 22,25 211:7,14, 18,22,23 212:13, 17 216:7,9,13,15 218:3 219:13,18 220:3,8 225:14, 18,20 226:22,24 227:4,12,15,20 228:2,12,18 229:3,24 230:3,7 236:5,18,24 241:2,5,8,14,22 242:7,18 243:8,13 244:4,19 248:7, 10,11,23,25 249:2 282:5,9,21 318:6, 9,14,21,25 319:1, 4,5,8,9,15,16,21, 24 324:5,10,14 325:5,6,23 332:5, 25

**IVS** 25:24 81:2 208:21,25 211:2, 19,20 225:18 229:4 243:12

_____

**J**

**January** 181:10

**Jeannie** 6:17

**job** 90:13 155:5 211:4 229:9 300:1 324:12

**John** 290:9

**Johnson** 119:19 217:4,10,17

**Johnson's** 319:2 329:25

**judicial** 315:25

**juice** 187:20,22 188:1,2,5

**July** 82:11 87:24

126:24 287:14

**June** 161:2

**jurisdiction** 164:3,21 166:12

**Justice** 155:23 156:5 167:5

_____

**K**

**KCL** 169:12

**Kentucky** 140:11, 12,13,18

**ketamine** 107:14, 24 108:7 114:21 115:3,13 117:3

**Kid** 290:12

**kill** 194:20 199:11

**kind** 44:10 45:22 134:4 184:17 204:13 237:3

**King** 6:9,24 8:11, 12,15

**knew** 31:23 39:8, 16 135:17 142:6

**knowing** 38:9 170:16 186:12 189:2,17 190:15 224:19 284:14

**knowledge** 9:16 12:18 18:2 19:6, 15 20:6,7,21,24 21:7 22:8,10,14, 15,16 23:12,16 24:11 28:4,13 29:6 38:19 39:4 40:9,17 49:19 56:10,15,18 72:6, 25 92:9 104:23 108:8 115:7 127:24 129:14,17, 19,20,21 130:24 132:21 150:20 151:15 158:24 159:1 163:15 173:22,23 177:14 183:23 184:5 234:1 248:1 250:6,7 262:18 315:21 317:1,6

324:19,22 328:11, 20 331:13

**Kursman** 6:22,23 7:9,19 8:7,10 10:16 20:10 21:1, 11 22:1,12 23:2 24:1,13 26:18 32:2,12 35:12,25 36:3,4 37:17,22 38:3 41:9 42:19 43:15 44:14,20 45:1,25 46:1 48:7, 15,23 49:11,15,20 50:5,24 51:9 53:14 54:19 55:9 56:2,23 57:13 58:5,19 59:6,21 60:5,13 61:1 62:2, 22 63:3,21 64:1,9 66:16,21 68:12 69:14 72:2 74:8, 14 75:1 78:3 81:19 82:3 83:1, 20 84:7,19 85:5 86:13 88:12 89:21 92:10 93:2,22 95:1,13 99:4,13 101:8 102:17,18 103:13 106:1 107:7 108:5,10,16 109:7,17 110:2,18 112:11 113:6,21 114:5,15 115:9,17 117:1,6,24 119:5, 24 120:13,21 121:1,6 122:20 123:14,22 126:18 128:1,20 129:10, 18 130:16 133:10, 12,17 134:17 137:10 138:10 139:1 142:9 145:4,19 146:1,6 148:21 149:24 152:6,17 153:1 155:10 156:14 157:2 159:11 160:7 163:16 165:2,11,18,20,25 166:2,9,20 168:3, 9,11,24 169:3 170:10 171:1 173:12,14 174:4, 17 175:7,20 176:8,14,20 177:11 178:1,7,17

180:5 181:2 182:20 184:7 185:1 186:7 187:8,18 188:13, 21 189:18 190:17 191:12,19 192:15 193:4 194:1 196:23 198:8,18 199:2 200:5,21 201:9,21 202:1 203:4,14 204:1,24 205:11 207:1,5,6, 22 213:24 214:8 215:1,22 216:12, 19 217:3 222:2, 15,23 223:14 224:12,21 227:10 228:3,22 229:14, 22 230:10 231:14 232:7,21 234:2,12 235:7 239:3,17 243:22 244:10 248:16 249:12,21 250:23 251:12,23 252:22 253:5,13 255:18 256:20 257:1,24 258:15 260:16 261:5,17 264:1,7 265:9,10 266:12,22 267:20 268:1,9 269:2,9, 14,21 270:1,9,20 271:5,19 272:3,19 273:15 274:1,8, 11,24 275:9 276:3,9,16 277:17 278:15 279:3,15 280:2 281:9,18,24 284:6,15 286:18 287:2 288:17 292:9 293:5,7 294:9,21 295:14, 20 296:1,8,15 297:16 298:2,8,16 299:13 300:4,11, 24 301:19 302:7, 19 303:12 304:5, 15 305:1,13 306:11 307:1,5 309:1,20 310:19 314:5,11,23 315:6 316:2,11 317:4, 11,15,17,18 319:18 321:12,16, 18 322:3 326:3,5 327:1,18 328:13,

ELITE-Brenda Dewitt-Williams and Associates
www.EliteReportingServices.com

22 329:7,17,23 330:4,23 331:10, 18,22 332:3,21 333:6,10,17

**L**

**lack** 80:10 153:11 291:7

**laid** 42:11 61:5 80:24

**language** 280:3, 6,7 316:12,14,16

**lapse** 250:17

**law** 134:24 153:5 203:22 315:12,15, 18,22 316:3

**lawful** 164:4

**lawyer** 11:15

**lawyers** 130:7

**laying** 263:15

**layperson** 294:11

**leader** 56:10

**Leaders** 85:24

**leadership** 15:14 87:13

**leave** 212:25

**left** 64:14 123:9

**legal** 15:24 16:2, 19,23 17:2,3 35:17 69:7,25 74:22 76:21 87:15 88:23 133:22,24 165:9 180:22 182:16 183:7

**legislature** 180:21 182:15 184:24

**legs** 263:22

**lessen** 151:11

**lethal** 8:20 17:17 43:24 48:4 52:23, 25 53:12 54:4 56:12 82:13 85:22 87:3,20 90:6 91:14,17 101:17,

19 108:4 112:14 119:9 120:16 131:19 139:16 151:18 159:10 164:22 166:12 175:1,10 177:5 181:9 183:6 185:21 186:10,23 187:21 188:5 197:11 208:5,7 209:1,6 221:17 235:10 238:3 241:6 245:10 258:24 291:9,16 293:9,24 300:1 303:8 307:10,25 321:23 327:20

**level** 218:22 221:22 269:15 272:5 273:5 274:3,5,18 275:21 280:23 294:3,25 295:8 296:22,24 297:4,12 310:13, 21

**levels** 235:2 269:11 294:24

**LIC** 143:8 155:24 237:13 254:2 258:22,24 259:2

**licenses** 312:20

**licensures** 312:16,24

**LICS** 322:5,10 323:1

**life** 99:22,25 100:24 303:9 306:1 314:20

**likes** 157:9

**limited** 114:21 131:8

**lines** 26:1,4 210:17 211:1 225:18 241:5,22 242:10

**list** 88:25 283:21

**listed** 19:16 79:18 108:25 172:5 219:6 220:2 241:17 250:18

283:17 299:10

**local** 270:2 295:3

**located** 134:24 208:8,13,15,18 209:5 243:10

**location** 130:21 139:10

**locked** 254:7

**locks** 259:4

**Logs** 14:15

**long** 12:24 30:16 61:13 157:21 257:22 298:17

**long-term** 142:2

**longer** 217:14

**looked** 30:2 94:9, 10 175:9,16 180:9 182:8 185:2,9,12, 16 308:2

**losing** 138:21

**lost** 298:15

**lot** 9:18 29:16 34:11 47:17 50:16 134:20 135:3 162:23 181:18,24 183:16 188:6 257:17

**loudly** 262:3 266:4

**low** 156:25

**Lynn** 6:9

**M**

**machine** 235:8,20

**machines** 234:25

**made** 36:17,22 38:19 39:6 52:12 55:3 59:14 80:2,5 87:23 91:18 106:8 108:1 111:11 118:20 122:16 143:23 146:14 147:5 148:23 154:20 157:14,20 158:1 169:14

174:15 192:9 204:13 206:7,22 218:2,5 237:6 240:3,5 247:21 249:25 250:4 251:2,6 254:17 259:16,21 260:7 273:10 275:17 283:20 287:24 328:9,19 330:22 331:9,12

**maintain** 145:17 219:8 295:23 296:3

**maintained** 144:5 311:24 313:17

**major** 61:6,25 62:3,11

**make** 9:19 26:11 27:21,22 29:14 55:19,23 57:5 66:25 67:18 71:25 92:15,25 93:11 103:10 111:14 113:9 118:4 119:13 134:13 135:16 139:9 147:14 155:16 157:1,12 159:25 169:25 184:4 189:5,20 192:17 197:19 204:6 208:2 215:12 231:22 232:22,25 234:20 235:14,24 237:1 238:24 241:24 247:25 254:25 255:1 266:23 282:15 283:7 292:16 304:4 305:17 308:24 309:13 328:14 331:6

**makes** 159:19 213:6,9 249:23 289:18 299:5,11 305:20

**makeup** 228:17

**making** 10:18 37:14 80:12 91:17 155:12 163:4 170:4,12 172:25 242:23 319:23

mandatory 53:6 247:12

manner 19:20 60:6 186:15 223:11 274:9

manual 52:24 54:5 87:21 245:10,17 246:23 284:24,25 315:13

manufactured 65:9 125:7 126:17 143:3 146:16,21 254:5,22 311:1,7, 11,12,14 320:17

manufacturer 314:15

manufacturer's 314:15

mark 157:8

materials 26:22, 24 245:22

matter 6:9 29:7 67:5 132:22 154:13 297:5

matters 35:5

Mayes 7:2 56:8

MD 72:22 73:10

MDS 72:5 73:6,13 74:1,10

meaning 105:3 290:22 324:4

means 9:23 83:15 94:11 106:10 114:6 130:10 134:25 156:10,13 168:16 180:22 182:16 183:7 188:18 278:18 296:20 321:20

meant 105:16

media 78:24 79:11

medical 71:23 72:3,4 73:22 78:14,15,16,19 81:20 101:23 211:8,17,21

212:3,4,6,10,12, 16 219:22,24,25 220:4,7,9,11,14 222:3 223:5 224:4 225:11,16,21 227:22 228:25 229:1 236:16 241:16 243:4 267:2,3 269:3 272:14 280:13,15 282:17 294:23 295:16 297:10,24 308:22

medicate 188:23

medication 10:7 188:15

meet 12:22 15:1, 7,10,13 65:7 170:23 312:24

meeting 16:1 37:3 38:16 127:15 153:2 158:23

meetings 13:3 14:1,6 16:6,9,25 34:24 35:3 36:5 38:24 39:10

meets 228:13

member 53:20 59:7,16 111:3 208:17 209:20,25 210:12,17,20,22 211:22,23 212:17 217:1,8 218:3 226:24 227:4 244:19 245:6 248:8,11,24 249:1,2 250:15 258:4 284:18 285:24 292:6 318:6,9,15,21,25 319:1,4,5,9,10,15, 16,24 322:5,6,20 323:5 324:6,10 325:5 330:16

members 20:1,17 42:10,17 57:1,24 58:21 59:24 60:17 61:11 63:7 71:24 76:11,18,20 77:1 88:17 133:22 208:6 209:12,22 210:5 211:7,14

216:7,9,15 218:1, 16,18,22 219:2, 13,19 220:3,8 225:14,21 226:22 229:24,25 230:3,7 241:14 243:8,13 244:5,24 245:9, 11,17,20,21 246:3,7,14 247:9, 13,25 248:10 253:19,22 258:9 261:19 284:25 285:15,23 290:16 292:20,23 301:9 319:21 324:14 325:5,6 330:14

memo 166:3,11, 16,23 167:2

memorandum 164:8,14,18,20 167:4

memory 18:1 217:12 318:11 326:23

mentioned 28:11 38:22 59:23 60:16 74:21,24 76:8,12 78:8 82:21 88:18, 21 89:5 97:12 105:11 132:23 162:8 174:14

mentions 54:11

met 12:16,23 14:4 15:5 19:11 79:20

method 43:22 63:5,6 98:8 100:14 101:6 113:3 117:19 119:2 158:7 171:23 172:1 178:12 180:16 181:12 184:23 199:21 202:5 203:25 205:13 220:16

methods 43:1,4, 5,7,12 46:10,13 89:4 181:8

mics 240:4,9

midazolam 28:16,19 31:1,8,9,

18,24 36:13,14,19 38:10,12 39:21,22 40:8,12 73:1,17, 20,21 74:3,10 77:7 79:17 83:10 89:10 90:2 91:25 92:14 93:5 94:1,3, 16,17 95:22 96:21,24 98:19 100:22 101:11 102:23 104:10,12 105:7,8 106:8,16, 21 109:10,21 111:4,23 113:10 116:13,25 118:10 119:20 120:9,10 121:10,20 122:17 137:4 144:2,6,9, 19,22 145:7,12, 13,16,18,22 157:22,25 158:11, 14 159:7,19,20,25 160:3,18 171:18 172:11 173:23 174:12 175:3 177:2,17,21 192:24 193:18 195:8,15 196:10 197:4,14,21 198:11 199:4,13 200:12 202:8 204:14 214:10,12, 14,17,20 215:15 216:3 226:13 238:11 261:25 266:19 270:7,16, 19 271:16 272:16 281:7 282:14,15 287:17,20,25 288:13 294:1,2,4, 14,18 295:1,11, 15,22 296:2,9 297:5,14,18 298:4,6,19,21 299:15,19 300:5 301:16 303:18 305:18,24 307:14 308:10,15 309:4 310:3 314:7,16 320:3,7 323:18

midazolam's 104:23 122:2

middle 6:12 8:13 102:21 278:3

EliteReporting.com
www.EliteReportingServices.com

**mild** 269:22 270:11,22,24 272:6,22 273:3,18 281:12,20 294:15 295:4

**milliequivalents** 307:15

**milligram** 120:10 294:18 299:2

**milligrams** 74:2 148:24 214:14 282:13,14 298:6, 10,21,22 299:4,25 307:14 308:9,15 309:15

**mind** 54:24 248:12

**Mine** 200:7

**minor** 57:7,8 59:13 157:15 250:13 251:7

**minute** 156:4 229:16 250:19 260:3 317:24

**minutes** 30:18 194:8 237:12,19, 20,22

**Missouri** 141:4, 17

**mistake** 79:4

**mistakes** 79:13 80:2,5,22

**misunderstood** 26:20

**Mitchell** 6:25 7:1, 7,11,13,16 10:14 20:3,20 21:9,19 22:6,24 23:9 24:7 26:10 31:13 32:6 35:9,12,20 36:1 37:5,20 41:5 42:14,23 44:3,10, 16 45:19 48:5,12, 19 49:7,14,17 50:1,9 51:3 53:7, 22 54:22 55:14 56:6 57:3 58:1,3, 10 59:2,11 60:2,8, 19 61:16 62:13,24 63:13 64:3 66:14,

17 68:9,25 71:19 74:4,12,17 77:24 81:12,23 82:8 83:6,25 84:11,24 88:4 89:12 91:20 92:16 93:6 94:18 98:25 99:8 100:25 102:15 103:8 105:22 107:4,19 108:9,14,20 109:12,23 110:6 111:18 112:20 113:12,25 114:10 115:4,14 116:9 117:5,13 118:16 119:15 120:4,19, 24 121:4 122:9 123:16 126:11 127:17 128:5,24 129:15 130:14 133:5,11,15 134:9 137:5,23 138:13 141:21 144:12 145:8,23 146:5 148:14 149:13 151:25 152:14 155:6 156:11,15 159:5,16 163:10 164:23 165:6,15, 22 166:1,5,18 167:23 168:22 169:2 170:2,14 173:9,13,18 174:7,21 175:18, 25 176:12,18,24 177:24 178:13 180:2,14 182:11 184:2,10 185:22 187:7,11,23 188:16 189:1 190:10 191:10,16 192:2,20 193:12 196:16 197:23 198:12,21 199:15 200:15 201:2,13, 24 202:20 203:7, 18 204:17 205:5 206:19 207:17 213:18 214:4,18 215:10 216:10,16, 22 221:15 222:13, 20 223:3,17 224:15 227:9 228:1,6 229:12 230:2 231:6,19 232:16 233:24

234:6 235:4 238:14 239:7 243:17 244:7 247:16 248:14,19 249:16 250:2 251:3,18 252:18 253:1,8 255:13 256:13,25 257:12 258:13 260:9 261:3,8 263:23 264:3 265:8,23 266:15 267:17,23 268:5,15 269:5, 12,18,23 270:4,14 271:2,12,25 272:7 273:6,19 274:6,20 275:4,24 277:12 278:12,19 279:9, 21 281:1,16,22 284:3,9 286:16,23 288:15 292:3 293:4,6 294:5,16 295:6,18,24 296:6,12 297:7,20 298:7,12,25 299:20 300:7,20 301:12,25 302:12, 24 303:25 304:8, 19 305:7 306:5,23 307:3 308:18 309:8 310:14 313:24 314:8,17, 21,24 315:19 316:6,22 317:9, 13,16 319:12 321:10,14 326:1,9 327:17 328:7,16 329:1,12,20 330:1,19 331:3,21 333:2,9,20

**mix** 31:18 81:21

**mixed** 25:13 31:9, 25 106:18 288:1 309:23 310:1,4

**mixes** 227:2

**mixing** 26:2 167:14 210:10

**modification** 238:17 249:9

**modify** 191:2

**moment** 37:23 64:4 95:8 123:17 178:2 229:17

276:11 315:1

**Monday** 13:8 40:1

**monitor** 22:3,22 23:7 209:25 302:5 303:13,18,23 305:5,21

**monitoring** 241:18,20

**monitors** 303:19 323:10

**morning** 6:22,25 8:8,9 67:10,14,20

**morphine** 171:18 172:19

**move** 36:22 52:18,19,20 113:23 121:19 122:16 213:17,19 214:24 302:18 305:24

**moved** 39:11 214:6 263:22 264:2

**movement** 39:3 215:5,14,18,20 263:11 264:5,6 268:24

**moves** 214:3,15 215:8

**moving** 116:12,23 215:21

**multi** 73:6

**multiple** 56:13 65:13,14 73:6 81:6,7 87:5,21 140:2,6 162:22

**muscle** 262:7 266:6

**muscles** 281:14

_____

**N**

**named** 14:11

**names** 44:7 69:4 71:21 227:20 268:21 292:24

EliteReportingServices.com
www.EliteReportingServices.com

**Nashville** 6:15
47:15

**natural** 228:14,15

**nature** 102:1
250:4 251:5
257:14 291:8

**necessarily** 20:5
41:15 46:17,24
52:5 80:16 96:10
216:18 275:7
278:10

**neck** 236:20

**needed** 25:10
86:22 147:25
162:14

**needing** 162:9

**needle** 242:6
243:1

**negative** 290:22

**news** 127:1

**night** 217:24

**nodding** 10:20

**nods** 215:23
219:20

**non-attorneys**
35:16

**nonlawyer** 316:7

**nonlegal** 35:5

**nonmedical**
222:5 223:6

**nonparty** 7:3

**normal** 73:22
228:12

**notes** 24:9,14,15,
16,19,23 129:23,
25 130:2 332:8,18

**Nothing's** 23:16

**notice** 49:4 74:5
81:13 84:1,25
93:7 94:20 101:1
105:23 107:5,20
108:21 109:13
110:7 111:19
112:21 113:13
114:1 115:5

116:10 117:14
118:17 119:16
120:20 122:10
126:12 127:18
129:16 133:7
134:10 137:6
138:14 141:22
145:9 148:15
155:7 156:17
164:24 166:6
173:19 174:22
176:1 192:21
193:13 197:24
199:15 200:16
202:22 203:19
204:18 222:21
223:18 231:7
232:17 233:25
235:5 238:15
239:8 248:20
265:24 266:16
267:18 268:6
269:6,19 271:13
272:8 273:7
274:21 275:25
276:1 277:13
279:22 281:2
294:6 297:8
298:13 299:1
300:8,21 301:13
302:13,25 304:1
313:25 314:9
317:14

**notify** 237:8,9
283:8

**number** 6:10 9:1
14:25 19:23 22:9
24:12 31:18 50:17
134:22 140:1,16
148:10 161:10
163:1 217:25
230:18 236:3,11
237:11 245:8
276:21 289:6
315:22

**numbers** 77:12
140:21

**numerical** 7:23

**numerous** 200:6

**nurse** 224:10

**O**

**Oakley** 289:24

**oath** 9:21 220:10
224:4 277:5,10,15

**object** 7:13 11:15
20:3 26:10 31:13
35:9 37:5 41:5
42:14,23 44:17
45:20 48:5,12
49:7 50:9 51:3
53:7,22 54:22
55:14 56:6 57:3
58:1 60:8 62:13
66:17 68:9 69:1
74:4,17 77:24
81:12 82:8 83:25
84:24 88:4 89:12
91:20 92:16 93:6
94:19 98:25
100:1,25 103:8
105:22 107:5,19,
20 109:12 110:6
111:18 112:20
113:25 115:4
118:16 120:19
122:9 126:11
127:17 130:14
133:6 134:9
137:5,23 138:13
144:12 145:8
148:14 149:13
151:25 152:14
155:6 156:16,19
159:5,16 163:10
164:23 166:5,18
167:23 168:22
170:2 173:18
174:21 175:18,25
176:24 178:13
180:2,14 182:11
184:2,10 185:22
187:11 188:16
190:10 191:10
192:20,25 196:16
197:23 198:21
200:15 202:21
206:19 207:17
213:18 216:10,16
221:15 222:13,20
224:15 227:9
228:1 231:6
232:16 233:24
235:4 238:14

243:17 244:8
247:16 255:13
256:13,25 257:12
258:13 261:8
263:23 265:23
267:17 268:5
269:5 273:6
274:20 275:24
277:12 278:12
279:21,23 281:1
284:3 286:16,23
288:15 292:3
294:5 297:20
300:20 301:25
302:12 303:25
304:8,9,19 305:7
306:5,23 308:18
310:14 313:24,25
314:8 315:19
316:22 317:13
319:12 321:10
326:9 327:17
328:7,16 330:19

**objection** 7:12
20:20 21:9,19
22:6,24 23:9 24:7
32:6 44:4 48:19
49:14,17 50:1
58:10 59:2,11
60:2,19 61:17
81:23 83:6 99:8
116:9 117:13
119:15 141:21
169:2 170:14
176:18 187:7,23
189:1 191:16
192:2 193:12,13
199:16 201:2
203:18,19 204:17,
18 214:4,18
215:10 223:17,18
228:6 230:2
234:6,7 248:19
250:2 251:3,18
252:18 253:1,8
264:3 266:15
268:15 269:12
271:12,13 278:19
279:9 284:9
294:16 295:24
297:7,8 300:8
301:12 302:24
307:3 309:8 316:6
317:16 329:12,20
330:1

Case 3:18-cv-01234-B Document 184 Filed 05/27/22 Page 357 of 373 PageID 6244
EliteBar Depo and Reporting Services — Elite Services Division
www.EliteReportingServices.com

**objections** 7:12, 17 62:24 63:14 74:12 84:11 108:9,14,20 109:23 113:12 114:10 115:14 117:5 120:4,24 121:4 128:5,24 129:16 145:23 146:5 165:6 174:7 176:12 198:12 201:13,24 203:7 205:5 223:3 231:20 239:7 249:17 267:23 269:23 270:4,14 271:3,25 272:8 273:19 275:4 281:16,22 295:6, 18 296:6,12 298:13 299:1,21 314:17

**observation** 33:3 208:14,16 224:16, 19 304:3 330:11

**observations** 73:21 81:2 105:12 118:24 119:6,7,8, 19 195:24 234:21 273:11

**observe** 16:10 209:23 213:12 325:19 330:9

**observer** 212:10 216:20,24 217:7

**observes** 225:9 322:7,20

**observing** 210:17 325:8

**obstacle** 150:12

**obtain** 91:1 108:7, 11,17 117:22 130:13 141:19 143:22 144:2 148:24 149:11 150:1,15 151:1,7 153:14 166:22 172:14,19,24 173:3,6,16,22 174:6,15,16,19 175:14,22 176:5, 10,16,22 177:12,

21 203:6,20 204:23 256:18

**obtaining** 90:2, 11,18,21 150:9 174:10,12,25 177:4

**obvious** 96:25 150:10 265:19 266:8 302:17

**occasions** 87:21 110:15

**occur** 283:24

**occurred** 152:22

**occurs** 54:13 327:15

**off-the-record** 37:25

**offender** 26:5 181:22 262:3 273:11

**offender's** 262:4

**offering** 171:22 172:1

**office** 6:14 34:20, 23 35:4,15,22 36:6 43:3 69:13 76:22 132:19,20 133:2,4,9,23 134:15 137:2,3 158:23 204:12

**officers** 243:16 244:6

**official** 69:22 208:13

**officials** 152:20, 21

**older** 95:7

**onboard** 119:20 120:8,10 192:5,8, 11 194:25 195:2, 10 196:2 270:8 301:16 302:3,4 303:6

**onboarding** 266:18

**one's** 186:21

**one-drug** 83:2,22 84:15,21 136:15

**ongoing** 87:22 88:7 92:8 94:24 97:14 142:19 143:24

**onsite** 56:20

**open** 232:4 237:15 247:4

**opened** 238:1 263:18

**opening** 263:13

**operates** 185:4,6

**operations** 69:11

**opine** 293:23

**opined** 297:18

**opinion** 40:11 73:20,24 103:21 104:9 105:5,13 110:4,23 111:7,9, 15,23 112:18,24 113:9 164:2,9 197:9 198:4 202:8,12 232:13 270:16 271:14 272:10 278:14,17 289:21 291:5 301:7 306:7 308:23

**opinions** 105:12 106:19,23 111:25 159:23 160:9 202:15 267:4 272:13 279:12 297:10 305:16 309:12,13

**opioid** 107:15,25

**opportunity** 150:19 236:25 286:5

**opposed** 228:17

**option** 84:5,16 93:1 116:16 236:4,22 237:3 276:22

**options** 153:22

**or/and** 19:21

**oral** 43:21 46:22 47:1,6 178:10 185:16,21 186:10, 23 187:10 188:25

**order** 7:23 10:22 31:8 32:24 33:4 44:5,17 51:4 68:11 69:1 71:20 74:18 77:25 89:13 152:15 213:14 216:11,17 243:18 323:3 326:20 333:15

**ordering** 121:19

**orders** 113:1 124:21 255:15

**organization** 124:8

**original** 122:13

**ourself** 190:12

**outlined** 270:12 315:13

**overseas** 149:9, 12,21 150:1,16 151:1 166:22 167:1

**oversee** 227:5

**overseeing** 225:15

**oversees** 224:22

**owner** 64:18,20 253:16,21

**owner's** 158:13 252:13

**P**

**p.m.** 97:19,25 123:18,21 178:3,6 229:18,21 276:12, 15 277:24 315:2,5 331:24 332:2 333:14,22

**package** 11:25

**packed** 313:7

**pages** 244:23 258:6

Case 3:18-cv-01234-B Document 184 Filed 03/17/20 Page 358 of 373 PageID #6745
ELITE Deposition Reporting Filed 03/17/20 Page 358 of 373 PageID #6745
www.EliteReportingServices.com

**pain** 21:14,23
22:4,23 23:8
50:15 51:12 52:8
103:1 105:9,19
106:14 113:24
114:8 119:1
120:12 159:14
160:2,21 191:15
205:4 266:21
270:18 271:18
272:17 273:22
278:11,18,22
279:2,6,8,13,20
280:1 281:8
294:20 295:13
297:15 299:6,12
306:22,25 307:2,4
308:25

**painful** 268:22
296:4

**pair** 231:19
249:16 271:2
299:20

**panel** 86:22
88:10,13,19

**paper** 289:19

**paradoxical**
27:10,14,15,24

**paragraph** 75:10
102:21 122:24
149:7 151:4
156:8,13 258:20
261:4 277:5,11
278:2 280:4,11,
14,18,20 282:2
310:25 315:18
316:13 322:4

**paralytic** 52:12
98:9 99:6,7,10,15,
20,21,23 100:4,8,
10 101:12,18,21,
25 113:16,22
120:7 190:20
191:8,13,24
192:4,8,11,16
194:7 202:19
206:13 300:14
301:8,17 304:4

**paralyze** 99:17
102:3

**paralyzed** 114:9,
12 192:19 193:11

302:11 303:24

**paralyzes** 99:11
113:19 114:4
192:6

**paralyzing** 102:6
193:21 302:16
303:11

**Parker** 6:8,10 7:2
8:2,8,12 95:14
178:8 332:23

**part** 26:16 40:25
47:18 76:15 77:5
90:6 99:16 133:4
176:7 192:13
217:13 222:10
235:13,17 240:7
244:16 245:19
277:7 280:15
286:13 319:10
324:7

**participant** 73:9

**participants**
133:13 286:4

**participate**
239:15 240:7
318:9,16,19,22

**participated**
319:1,5

**participates** 73:4

**participating**
289:21 292:14

**particulars**
186:17 297:22

**pass** 286:8

**past** 16:6 23:14
40:10 59:25 78:21
116:2 309:11,18

**patient** 74:3,11

**patients** 50:14

**pattern** 326:21

**penalty** 134:3

**pending** 8:13
11:11

**pento** 94:11 127:2
142:4

**pentobarbital**
39:14 82:17 83:3,
23 84:4,9,14,21
85:3,7,9,13,14,17,
23 86:2,6,7,11,16,
17 89:6 91:1,5,10,
12,18 92:2,14,24
93:4,12,20 94:5,7,
16,24 96:25 97:3,
6,10,12,14 107:11
108:13 121:8,13
124:8,20 125:2,5,
6,10,18,22 126:10
128:4,10,13
130:13,18,20,22
131:2,14,25
135:2,10,12,19,24
136:17 137:15,22
138:6,18,25
139:10,15 140:24
141:4,7,11,12,15,
19,20 142:16,20
143:3,4,18,20,22,
24,25 144:10,20,
21 145:6,12,21
146:3,9 147:19
148:1,7,11,20,25
149:3,4,12,18,19
150:1,9,10,15,22
151:1,9,17 152:23
154:23 155:14
158:3,5 161:5,13,
21,25 162:11,12,
13 163:22 166:22
167:1 173:6
174:10 175:10
204:7,23 221:2,6

**pentobarbital's**
131:20

**people** 15:4 18:13
23:13 25:23 34:11
43:10,11,18 69:2
71:14,17,23 72:5
74:21,22,23 75:2,
6,9 76:7 79:8
80:17 81:7 82:20,
22 87:15 88:21
105:10 106:21
111:22,24 132:13,
22 157:9 159:24,
25 160:1 161:20
163:1 201:18
205:21,22 206:2
212:1,3,4 213:11
217:21 220:7,12

225:3 232:3
240:22 247:5
255:14 289:21
291:1 292:19
319:8

**percent** 96:13
131:22 200:18,24
201:10 280:5

**perform** 20:8 21:4
60:6 178:24 182:9
218:12,15 221:13
223:16 227:15,20
231:4,18 232:9,12
234:4 236:4
238:13 240:15
264:25 274:9
275:11,12 276:5,
23 277:16,19,20
314:3

**performance**
330:6

**performed** 197:9,
10 198:17 220:23
221:1,21 223:10,
25 224:7,14 229:8
233:21 238:19
262:10 271:1
301:6 302:2
315:13

**performing** 226:4
243:5 286:20
300:1 324:12

**performs** 19:21
180:6 199:24
213:10,13 221:4,
7,12 238:20
261:21 276:7

**period** 136:14
262:2

**permission**
250:21

**person** 41:3 42:2
45:14 48:10,16
49:5,19,21 50:7,
22 51:13,15 68:22
89:15 101:11
103:22,23 105:15
112:16,19 151:22
170:3 210:24
211:16 212:13
216:21 217:14,17
218:9,12 221:19,

Case 3:18-cv-01124-B Document 184 Filed 05/17/22 Page 456 of 575 PageID 9746
E-Lite Reporting Services, Inc.
www.EliteReportingServices.com

21 222:18 225:5
227:6 229:5
230:22 237:23
249:23 255:12
260:7 262:14,16
263:15 266:7,18
268:2,4,13
270:22,24 271:17
273:21 279:5,7
280:23,24 281:11
294:19 295:12
297:14 317:5
323:8,13,14,17,
20,24

**person's** 69:15
104:9 257:16

**personal** 28:4
36:25 39:4 98:21
104:23 150:19
184:5 315:21
317:1

**personally** 38:9
50:20 85:16 86:5
112:3 116:3
124:12 127:8
166:4,10 170:6
297:25 300:9
315:20 319:16
326:19

**personnel** 78:2

**pertain** 165:17
317:10

**pertaining**
248:15

**PH** 310:13,16,21

**pharmaceutical**
131:15,21 168:17
311:3 312:15

**pharmacies**
120:15,23 121:8
131:7,9 138:17
143:10

**pharmacist**
24:10,19 25:3,6
26:9 27:2 41:18
62:17,18,20 63:1,
2,5,8,17,20 64:20,
24 65:2,15,16,20,
21,23 66:2,4,11
70:8,17,20,24
71:5,7,11,13

76:10,17,23,25
77:3,13,17 81:21
89:18 90:4,14,16,
22 91:15 92:9,12,
21,24 93:3,25
94:1,2,9,14,23
97:9 98:24 99:5
109:8,19 110:5
111:2 117:8 121:9
122:2 124:19
125:20 129:8
138:8 146:2,8
152:11 159:4,12,
13 160:19,23
163:21 168:1,8
169:15 170:5,8,
13,24 177:16
226:7 246:2,6,13
253:4 255:2
256:17 259:15,20,
22 288:6 293:17,
20,22 307:19,23
308:1,13,14
309:2,3,25 310:17
313:6,11,16 321:3
323:3,12,15,18,22
324:1,24 325:3,20
326:4,13

**pharmacist's**
288:9

**pharmacists**
205:19,23 312:21

**pharmacological**
170:1

**pharmacologist**
107:2 160:24
271:24 280:19

**pharmacologists**
72:20

**pharmacy** 28:2,7
29:5,12,17 40:4,
18,19,22 41:8
62:18 63:18
64:18,19 65:6,17,
24 66:11 89:18
98:14 103:24
114:24 115:2,11
116:5,8 120:16
126:8 131:2,5,13,
18,23 139:18
140:16 142:3
143:7,14,21
144:1,4,24,25

146:12,16 147:13,
17 150:18,21
158:13 163:6
251:22 252:3,6,8,
13,20,25 253:11,
16,20,25 254:4,9,
20 255:9,16
256:1,4,5,17
257:7,17 260:14,
18,22,25 261:16
311:10 312:13,22,
23 313:21

**pharmacy's**
158:25

**phenobarbital**
176:16

**phone** 90:8
127:15 163:12,17
165:23

**physical** 81:4
180:19 183:19
184:18 228:20
263:11

**physically**
183:11,15 225:5
268:13

**physician** 73:3
220:1 222:10,16
223:1 230:16,21
231:3,9,15 232:4,
6,10,15 233:2,3,5,
7,11,15,20,21
234:3,8,19 236:4,
17,25 237:4,5,10
238:12,21,23
240:6,9,15 263:3,
5 276:18,23
277:1,9 286:13,
14,21 287:5

**physician's**
220:2 232:1,13
239:13 277:4,10

**pick** 218:14

**piece** 162:2

**pinch** 262:7

**place** 23:11,12,14
37:12,15 40:19
41:19 51:16 54:12
55:16 83:4 94:4,
10 154:3,4 162:4
174:3 180:1

183:22 184:13
186:16 198:16
206:24 218:11
220:21,22 247:18
250:14 251:15
289:5 304:21
305:11 311:22

**places** 94:3

**placing** 170:20

**Plaintiff** 6:23 8:11

**Plaintiff's** 299:16

**plan** 287:22

**plant** 180:19
183:19 184:18

**played** 76:19 77:5

**plays** 16:22

**plenty** 130:5

**point** 28:23
101:24 135:6,8
140:10 147:24
148:13 156:4
162:21 183:23
185:25 190:2
192:10,19 194:22
209:8 213:1
236:17 237:17
240:11 242:20
243:3 247:15
248:23 249:6,7,20
274:19 276:10
283:1,7 298:4,19
299:16 324:3,6
328:12

**port** 243:2

**position** 12:19
56:24 58:23 61:11
63:7,22 93:17
94:12 117:9 118:2
120:1 155:3
159:3,6 160:4
184:20 190:24
218:20 225:20,24
226:2 227:11,14
252:7 260:11
263:17 267:7,8,11
304:23 329:2

**positions** 16:21

**possibility**
135:25 149:8,20

Case 3:18-cv-01124-B Document 184 Filed 05/17/22 Page 360 of 373 PageID #: 6747
**EliteLitigationReportingServices.com**
**www.EliteReportingServices.com**

171:25 281:4

**possibly** 132:19
152:11 154:8,12
172:21 173:1
209:17 233:9
247:7 263:24
287:20,21 297:24

**potassium** 31:2
32:1 62:7 77:7
83:10 89:10 90:18
92:1 98:6,9
100:22 101:15
103:2 113:11
116:14,25 146:12,
15,18 172:11
173:24 175:3
177:2 192:24
193:23 194:24
195:12 196:10
197:4,14,21
198:11 199:13
200:13 202:11
204:15 226:19
305:19,25 306:12
307:16 320:10
321:15 323:25

**potential** 91:7,9
121:15 134:6
140:1 147:6

**potentially**
161:11 163:2

**powder** 167:15

**power** 139:24

**Powerpoint**
132:2,4,8,10,11
133:25 134:21
135:7 136:11
142:11 143:5
147:9 148:23
150:14 152:4
154:7 155:20
157:10,13,20
158:1,16

**powers** 95:21
96:14 121:18

**practice** 73:22
261:19,23 262:12
290:16,20 291:6,
13,15,16,19,24
292:7,8,11,21

**practices** 262:13

**precautions**
311:22

**preempted**
329:15

**preferred** 205:13

**preliminary** 7:8

**prep** 17:11

**preparation** 14:8,
17 19:12 24:25
25:4,11,14 26:2
28:24 30:12,21
34:11,15 35:14
38:14,15 41:15
43:19 45:7,9,11
46:2,4,6,17,25
52:5 58:12 59:5
67:11 115:10
178:18 210:25
211:18 212:14
287:12,17,19
320:4,7,10,14
324:8 332:15,19,
23

**preparations**
258:18 259:7,10
288:14 311:2

**prepare** 12:14
15:2,6,15,17 17:5
19:6 20:2,8,19
21:17 22:5 24:6
25:10 26:22,25
27:6 28:2 29:3
33:23 34:3,7 36:9
39:20 40:6 41:23
42:13,21 43:14
44:21,22 45:3
46:22 47:21,24
48:25 49:25 51:25
58:7,13,22 59:18
184:16 234:20
285:7 288:3
320:22 328:25
329:10,11

**prepared** 12:21
38:5,21 283:14
299:7 311:2
312:10,19 321:6,8
326:16,18 327:6,
9,24 329:4,6
330:24

**prepares** 19:21

**preparing** 57:22
58:17 96:7

**prescribed** 160:6
251:21 255:2
295:11 315:12,15
316:1,3

**present** 158:16
286:10,14,21

**presentation**
142:11

**presented** 132:24
133:1,14,20 135:7
137:1 157:21
158:15 213:21

**pretty** 86:8

**prevent** 181:19

**prevented** 150:12
329:5

**prevents** 189:9

**previous** 66:24
162:8

**previously** 28:11
34:17,18 41:23
76:12 105:11
118:1

**primarily** 9:5
17:18 24:17 25:9
69:13 72:1 73:16
76:22 77:15 78:13
80:8 132:22

**primary** 209:22
246:3,9 315:11

**prior** 7:21 17:7,8,
13,21 18:3 19:16
23:11,20 28:24
34:9,10 52:4
74:21 79:10,25
181:10 192:8
286:25 301:1
304:13 313:18

**priority** 93:11
113:5 145:14,15

**prison** 69:11

**prisoner** 22:4,22
23:7 24:5 25:21
26:15 51:11
113:23,24 117:11
160:21 191:14,24

213:7 214:14
272:4 274:13,19
298:22 306:21
308:16 309:5

**prisoner's** 99:22
100:24

**prisoners** 21:13,
22 43:7 109:10,21
111:5 118:4,9

**prisons** 45:5
47:11 87:14 88:22
218:25

**privilege** 11:18
137:7,9

**problem** 236:10

**problems** 177:3

**procedure** 68:14
75:22 80:9 235:11
236:5,14,16 237:2
239:6,12 243:3
264:25 276:24
277:16,19 303:15
306:4 322:8,21,24
323:7

**procedures**
52:24 80:24
295:17 296:5
315:12 333:1

**proceed** 35:24
213:15 240:11
250:21

**proceeding**
203:17

**proceedings**
302:23 333:22

**process** 18:4
31:17,19 32:4,11
36:21 37:13 42:8,
9,17 50:21 52:3
54:4,15,16 55:4,
16,17 56:1,20
59:15 61:5,8
67:17 73:9 79:4
81:16 82:1 90:2,9,
11,17,20,25
100:17 101:13
102:9 108:4 109:3
113:18 123:8
134:3,4,5 135:17
136:2,4,8,9 137:7

Case 3:18-cv-01234-B Document 184 Filed 05/17/20 Page 361 of 373 PageID #: 6748
E01234 B Document 184 Filed 05/17/20 Page 361 of 373 PageID #: 6748
www.EliteReportingServices.com

149:23 151:7,9
152:11,13 153:9
157:24 158:9
159:10 168:15
170:5,7,19,22
180:18 183:17,22
184:12,19 187:3
188:12 189:8,11
190:3,9,12,13
193:20 197:11,15
208:6,21 210:2,18
213:2 214:6
215:25 220:10
223:13,20,21
224:17 225:9
231:2,25 233:4
239:13 240:7
242:3,22 243:9
245:19 246:15
251:10 263:6
291:9 301:17
303:4,7,10,21
304:25 305:12
311:13 315:16
323:9 325:11
330:10

**processes** 119:9
180:25 185:25
242:11

**procure** 82:17
252:2

**procurer** 41:7,11,
14 48:22,25
49:22,25 66:25
67:1,3,4,7,14,21,
22 68:1,6,8,13,16
69:11 70:13
76:13,15,23,24
77:2 85:10 86:9,
15 87:16 88:23
89:16,24 90:22
91:2,3,6 92:3
93:25 94:4 96:12
97:2,6,8 98:15,21
104:18 121:11
125:18,21 126:1
127:11,23 129:8
131:4 132:18
139:6 143:19
147:15 150:21,24
152:9 153:24
154:19,22 155:1,
4,12,15 163:20
171:4 251:15
254:8 255:11,25

256:9,11,15,22
257:5,9,14 258:4
259:9 260:4,18
261:13

**procurer's** 70:3,4
90:2,10

**procures** 89:9
90:14

**produce** 295:23
296:3

**professional**
56:9 81:21 101:24
106:19 111:25
219:9,23,25
222:4,5 223:7,11
224:4 228:25
229:2 267:3

**professionals**
71:23 72:3,4
211:17,21 212:3,
4,7,10,12,16
220:5,9,11,14
225:22 227:22
241:16 243:4
282:18 307:6
308:22

**proffered** 178:21

**program** 172:10

**prohibited** 128:9
129:3 151:17

**pronounce**
230:18

**pronounces**
73:10

**proper** 26:2
310:13,16,20

**properly** 24:5
25:7,20 26:15
65:12 241:4,25
242:21

**proposed** 171:12,
16,22 172:4

**propranolol**
171:19 172:12
173:6,16

**protect** 181:20
188:4 233:2
290:25 291:2,13

292:12,18

**protected** 44:24
54:7 113:2

**protecting** 232:1

**protections**
79:21 100:18

**protective** 44:5,
17 51:4 68:11
69:1 71:20 74:18
77:25 89:13
152:15 216:11,17
243:18

**protocol** 8:21
9:12 13:22 14:12
17:9,18 18:5,10,
11,15 19:22 20:6,
9,13,19,23 21:5,
21,25 22:9,17,18,
19 24:5,11,17
25:20 26:8,14
27:2,9 28:1,7,15
29:4,12,18 32:9,
23 35:1,7,17,21
36:23 37:4,14,16
38:10,13 39:1,12
40:4,13,24,25
41:1,19 42:9
44:23 45:11 46:14
50:3,19 51:16
52:13,16 53:3,5,
10,17,19,21 54:2,
9 55:13 56:8,15,
25 57:2,10,11,12,
17 58:8 59:4,8
60:1,7,18,23,25
61:3,7,13,15
62:11,12,23 63:4,
9,23 64:16,18
68:19,24 69:5,16,
19,21,22 70:2,15,
18,22 72:9,16
73:15 74:16,20,24
75:3,7,11,12,21
76:14 77:4,9,10,
20 78:6 80:23,25
81:17 82:6,7,10,
11,13,19,23 83:3,
4,9,17,18,23,24
84:10,15,20,22
86:24 87:1,4,23
88:2,7,14,16,18
89:7 90:7 91:17,
23 93:10,20 96:24
98:9 99:17 100:2,

4,6,8,10,13,22
101:5,19 104:24
108:2,13,24,25
109:6 110:11,12,
14,16 111:4,14
112:4,6,8,9 113:9,
20 116:13,16,24
117:21 118:21,25
119:10,14,23
120:2,3 121:20
123:3,12 135:1,6,
9,19,22 136:3,9,
15,25 145:13,16
147:9 149:5
155:20 159:8,22
160:6,14,20
169:12 172:12
175:11 180:10
181:4,6,16 182:2,
3,5,19,22 183:2,4
185:17 187:19
190:5,20,25
191:2,5 192:14
193:1,3,7,9,16
194:4 196:9,11,
14,15,21 197:5,8,
18,21 198:2,7,10,
15,20 199:4,6,10,
12,22 200:4,8,9,
10,12,19,23,25
201:4,5,6,11,17,
23 202:17,18,25
203:5,12,17,22
204:2,7,12,22
205:1,2,8,14,15,
22 206:2,3,8,23
219:7 221:14
223:12 225:10
235:13,16,18,19
238:18,20 241:19
244:22,23 245:1,
22 246:12 247:10,
12,14,15,17,18,
19,24 248:2,3,4,7,
18,24 249:5,6,10
250:1,11,18
251:2,9,14,25
252:11,24 253:3
254:10 255:5,7,8,
12 256:12,24
258:11,17 260:19,
22 261:7,10
264:8,16,19,22
265:2,4,16 268:12
270:13,17,23
271:1,10,15,17

Case 3:18-cv-01124-B Document 184 Filed 03/07/22 Page 362 of 373 PageID #16749
E-Litigation Reporting Services, Inc.
www.EliteReportingServices.com

272:12 274:9,15
276:4,5 278:23
279:18 280:8
281:6 283:17
284:16 286:3
287:21 291:10,11
292:8 293:15,19,
24 294:19 295:12
298:20,24 299:10,
24 300:1,19
301:7,8,22
304:12,21,24
305:3,10,18,24
306:7,10,15
308:4,17 309:3,7,
18 316:14 323:8
324:25 325:4,22
326:4,17 327:21
328:6,10 329:3,9,
10 330:14,17
331:2

**protocols** 9:7
46:9 56:12 62:1
71:2 72:6 78:5
82:5 83:5 85:22
98:7,23 160:18
168:18 177:5
182:23 185:2,5
206:5 307:20
308:3,5 323:14
325:1

**provide** 40:19
65:4,11,18 70:1
90:23 91:12,25
100:16 117:19
126:8 138:6,9
139:19 140:15,17
141:13,14 144:5
148:6 161:21
162:16 179:12
195:9,21 211:18
212:2 268:25
284:12 312:25

**provided** 64:24
71:4,10,12,13
140:19 168:7
170:13 212:1
225:18 226:8
233:11 253:25
256:7,8 287:7
313:15 321:3
323:2,11,15,18,
21,25 324:23
333:5

**provider** 121:14

**providers** 121:15

**providing** 35:17
70:17 80:19 91:16
93:16 116:20
119:2 138:18
140:13 233:15
237:8

**provisions**
252:17

**publicize** 292:15

**published** 167:2

**pull** 239:20,24
240:23

**pulled** 240:2

**punched** 281:20

**purchase** 103:24
125:10 255:17

**purchased** 116:7
252:4,21 257:8
260:25

**purpose** 27:21
90:5 91:14
101:18,21 102:2,5
104:24 159:7,21
160:5 205:7
302:16 304:12
325:17

**purposely** 47:5

**purposes** 43:25
67:2 199:20

**pursuant** 21:24
44:17 51:4 71:19
74:17 77:25 89:13
152:15 216:10,16

**push** 31:20 32:20
33:14 222:5 223:1
227:13,15,21,25
228:2,5,8,11,12,
15 286:20

**pushed** 25:14
32:16 81:5 212:22
225:9 237:21

**pushes** 225:1
228:7

**pushing** 32:5
33:9,10 81:10

210:10 225:6
287:1

**put** 7:10,20 192:11
193:1 218:14
240:24 261:11
265:2,3 289:19
302:3 303:6

**puts** 262:4

**putting** 138:22
193:20 194:11
196:22

---

### Q

**qualifications**
170:6 223:6
225:25

**qualified** 50:13
65:4 167:21
179:10 223:1,5
225:21 227:12,14
231:4 233:12
234:4 235:24
293:23 312:13

**qualifies** 227:16

**quantities** 147:25
148:4,6 160:3

**quantity** 70:9,12,
14 148:12,19
163:4

**question** 10:24
11:4,5,6,11,12,17
17:19 23:1 26:6,
12,20 32:19 33:7
35:11,19 37:10,18
44:19 48:8 49:9
53:15 54:8 58:20
60:12 63:12 67:6,
17,18,25 72:16
75:25 76:1 79:24
92:15 93:23
104:1,3 105:7
110:25 116:19,22
122:19 133:14
136:5,6 142:8
148:9 156:12
157:8 173:11
185:7 191:18
193:5,6 196:5
197:12 206:14
208:22 215:2

231:24 235:19
243:21 244:1,8
246:11 253:6
255:5,19,20
256:21 261:9
262:12 264:12,14
270:21 273:1
277:7 279:14,16,
18 286:8,9 294:11
298:17 299:14,23
300:22 301:4
302:9 305:23
316:25 318:18
319:17 324:18
328:1,21 329:16
331:17

**questioning**
314:25

**questions** 8:7,15
10:19 11:16,21
31:6,12 45:2 47:8
66:24 157:10,12,
14,15,16,18
185:25 186:3,13
187:16 188:6
200:7 205:24
247:6 286:6,7
291:25 332:4
333:13

**quick** 37:21
177:25 314:22

**quicker** 305:17

**quickly** 306:1

**quote/unquote**
61:14 235:9

---

### R

**raise** 114:13

**raised** 240:10

**range** 179:14,15

**rate** 193:23
227:25 228:2,4,7,
9,15 286:20
299:17

**rates** 228:11

**rationale** 22:17

**Ray** 319:6

E1124-B Document Reporting Services, Inc.
www.EliteReportingServices.com

**re-ask** 243:25

**re-enter** 238:24

**re-evaluate** 204:22

**reach** 56:22 91:8 137:21 138:7 140:2,17 144:25 156:4

**reached** 129:11 131:5 137:13 138:1 142:10,15 155:22

**reaching** 130:23

**reaction** 27:11, 14,15 262:8

**read** 78:16 87:12 170:18 245:9,17

**readily** 98:5,17 160:13 174:1 175:5 179:19,23

**reading** 18:18 247:15

**real** 37:21 177:25 314:22

**realization** 136:18

**realize** 159:24 161:25 264:21,23 311:20

**realized** 135:23 136:13,22

**reason** 10:1,4 39:5 41:19 47:14 48:24 51:24 172:13,16,18,23 173:2,5,15,24 174:5,18 175:14, 22 176:9,15,21 191:1 196:18,25 209:21 217:18 221:25 224:9 229:10 235:8,12 238:10 244:21,25 245:3 275:15 277:18,22 294:22 298:5 300:2 301:2 306:9 328:11

**reasonable**

174:13 176:3 177:8 258:2 304:3

**reasons** 58:18 138:19 141:25 172:8 223:8 229:7 305:8

**recall** 9:4 13:24 14:20 17:12 18:6, 20 29:20,22 30:1 33:20 39:25 40:2, 5 77:15 86:4 88:1 98:20 115:20 116:3 127:13,21 134:11 139:4 157:15,18 158:17 166:8 326:23

**recalled** 18:9,12

**recalling** 19:16

**receive** 62:19 63:19 82:15 203:23 233:1 241:15 245:21 253:23 255:3 257:21 264:9,17 283:25

**received** 19:1 76:25 118:12 139:22 211:12 226:2,25 236:1 253:10 254:20 263:2,5 322:16

**receives** 189:7 214:15 313:22

**receiving** 30:11 47:9 106:24 107:8 118:6,7 273:12 282:13

**recent** 285:1,4,7

**recently** 142:18 154:17 327:19

**recognize** 180:21 182:16 228:11,13, 14,20,24 265:1

**recognizes** 183:6

**recollection** 17:22 36:16 96:11 127:21 133:21 217:12

**recommended**

99:6

**reconstitute** 167:22 225:25 226:6 320:25

**reconstituted** 310:7

**reconstitutes** 167:18 227:2

**reconstituting** 168:5 226:10 325:7,10

**reconstitution** 167:11,13,14 168:12,14,19,21, 25 169:5

**record** 6:4 7:10, 20 10:18,23 37:21,24 38:1,4 64:5,7 95:9,11 123:18,20 177:24 178:3,5 229:13, 15,18,20 276:12, 14 314:21 315:2,4 328:4 331:24 332:1 333:11

**recorder** 210:13 212:12 216:20,25 217:7

**recording** 212:14

**records** 331:14

**red** 325:24 326:15

**redacted** 130:7 151:4

**reevaluate** 309:7

**reference** 149:16, 22 153:10

**references** 284:20

**referencing** 156:22

**referred** 290:15

**referring** 53:2 63:10 75:23 96:15,16 290:19 319:25

**reflect** 328:3

**reflection** 291:7

**refresh** 17:22 18:1 318:11

**refrigerated** 259:14

**refrigerator** 170:21 259:17 260:8

**refused** 314:6

**regain** 192:17 193:8

**regard** 153:25 181:15 205:23 295:8 316:19

**regimen** 239:12

**regularly** 233:7

**regulated** 128:8

**regulation** 128:12 154:14

**regulations** 65:7 151:5,16 153:11 168:17 312:20

**rehearsals** 247:1

**reject** 110:23 111:6

**rejected** 111:8

**related** 8:15 9:6, 11 12:19 13:23 14:15,16 17:8,9, 11 18:2,3,4,9 19:17 24:10,24 25:3 30:20 31:5, 16 40:12 43:20 48:3 60:4 66:15 67:4,6,7,15 69:10 70:1,18 79:1,3,8 85:22 86:6 89:6 98:22 105:12 106:13 150:9 170:18 180:25 211:12 225:18 246:2 269:4 274:7 308:20

**relates** 9:9 24:11 50:19 205:8 231:16 277:5,10 306:15

relating 41:14
46:8 211:15
231:11

relation 23:19
36:21 38:21 64:22
66:7 70:8 73:14
100:16 261:1
264:11 288:6
297:12

relevance 7:16

relevant 17:15
19:25 40:11 80:19
112:3 162:19
192:7

reliable 104:22
108:3 201:20
221:24 224:1

relied 18:13 28:13
36:11 38:21 39:19
71:6,8,10,12,13,
14,15 77:8 78:7
80:18 109:2
118:23 196:8

relief 151:19

relies 241:14
286:24 287:6

rely 12:17 50:2
65:10 77:1 78:14
82:13 203:24
246:1,7,14

relying 19:14
22:11,13,15 28:20
40:9 206:15

remain 271:11
279:20

remember 14:4,
5,18,25 85:18
104:18 122:18
152:5,7 314:13
318:14 326:19

remembered
18:18

remind 36:7,12
39:11

remove 300:3

removed 151:18
240:4 313:18
316:17,19 317:2

removing 170:19
190:19 191:8,13,
23

render 101:11
105:8 109:10,21
111:24 112:16
159:9 200:1
272:16 281:7
298:22 308:15
309:5 314:3

rendered 120:11

rendering 112:19

renders 193:17
271:17 294:19
295:12 297:14

reopen 238:25

repeat 22:25 49:9
60:11 109:15
191:17 298:15
300:22

repeatedly
268:12

rephrase 173:11

replace 217:16
218:3,10

replaced 217:19

reporter 6:17 7:5
10:18,22 121:3
296:11 322:2
333:15,18

Reporting 6:18

represent 6:21,23
7:1 8:11 18:23,25

representative
18:23 165:12

representatives
158:22

represented 10:9

represents 138:3
139:9,12

request 86:8
91:25 128:19
130:20 139:5
143:23 144:20
145:24 150:20
168:10 314:7,15
332:22,24 333:2,7

requested 155:13

requesting
162:13

requests 162:10

require 54:25
61:22,23 190:14
238:17,22 239:23
240:1,2 283:19
325:23

required 19:6
53:18 57:7 62:11
63:1 65:7 128:14
179:6 184:17
217:20 229:9
247:25 285:14,16,
25 313:10

requirement
179:7

requirements
170:23 180:19
183:19 219:5
254:23 256:4
311:15 312:23,25

requires 58:8
167:11 168:13,15,
20 169:1 254:2,5

requiring 235:20

research 151:14,
16,22

researching
151:5

reserved 7:17

resistance 33:14
228:13

resistant 220:10

resolved 45:21

resort 237:4

resources 150:8

respect 12:11
291:7

respond 10:19
120:1,8 205:3
266:7,11 268:20,
21,24 270:11
280:25 281:15,21
302:18

responded 163:6

responding
266:10,19 267:5,
12

response 31:12
32:20,21 33:12,13
119:22 139:21,23
153:11 263:12,15
265:18 268:25
273:13 275:6
302:6

responses 230:8,
9

responsibilities
50:18 217:20
220:13,15

responsibility
249:3 256:16
257:6 261:21
275:14 324:13,17
325:17

responsible
43:11 51:15,19
65:4 89:17 91:2,
24 224:25 230:4,
13 250:11 251:8
264:21,24 322:15

responsive 98:2
282:3,13,20
298:10

restrictive 154:16

result 79:12
80:10,11 151:6

results 151:14
205:7 224:17

retraced 240:8

return 240:9
314:7,16

revealing 133:18

review 13:19
14:14 17:4,13
27:6 29:4,11
41:22 42:20 69:20
87:3 88:10,14
160:11 169:15
178:19,21 181:6
246:4 284:21,22,
24 285:17,19
319:14 324:6

Case 3:18-cv-01124-B Document 184 Filed 05/17/21 Page 365 of 373 PageID #9752
E0124B Document 184-1 Filed 05/17/21 Page 365 of 373 PageID #9752
www.EliteReportingServices.com

331:14

**reviewed** 13:20, 22,23,25 14:10, 19,21,23 17:7 19:10 21:20 24:8, 9,14,18 26:7,22, 24 28:1 29:16,20, 23,25 35:2 40:22 75:11 78:5 86:21, 25 87:4,7,11,12, 21 88:2,7,16,18 98:7,24 180:24 182:5 246:23 324:4 332:15,23 333:4

**reviewing** 17:21 18:7 22:19 35:1 40:3 88:20 181:3, 16 182:3

**reviews** 87:5 89:3 241:13 318:13

**ricochet** 181:18, 19 184:15

**risks** 311:18,21

**Rob** 7:1

**robust** 92:13 94:15

**role** 15:14 16:8, 10,22 68:16 69:4, 15,18,20,24 70:3, 4 170:7 211:13,15 223:16,24,25 224:6,7,11,13,18 239:13 244:20 245:2,25 315:11 325:8

**role/ responsibility** 221:22

**roles** 68:7,14 223:10 244:24

**room** 25:12 30:6,7 37:2,11 38:18 208:8,9,14,16,19, 20 209:2,7,11,13, 21,23 210:6 212:13,18,25 213:12 216:6 217:9 225:3 230:8 238:13 239:20

240:9,19 242:8 254:6 313:19 316:8 320:17 324:14 326:7 332:11

**round** 123:11

**row** 134:23

**rubbed** 281:13

**rules** 9:18

**run** 249:13

---

**S**

**safe** 186:14 188:11 190:5

**safeguard** 205:2, 9

**Safeguards** 81:1

**safely** 39:23 40:8

**safety** 183:20

**SAITH** 333:21

**saline** 25:13 31:8, 17 81:5 237:21 242:9,20,23 309:23 310:2,5

**sat** 89:1

**satisfied** 81:15 82:1 116:15 118:15,25 120:9 172:9 304:11

**scenario** 217:23

**Schedule** 12:6 19:1 47:9

**scientific** 168:13, 20

**scientist** 101:23

**scope** 60:9 61:18 62:14 63:13,14 66:18 74:5 81:13 84:1,25 93:7 94:19 101:1 105:23 107:5,20 108:21 109:13 110:7 111:13,19 112:21 113:13 114:1 115:5

116:10 117:14 118:17 119:16 120:20 122:10 126:12 127:18 129:16 133:6 134:10 137:6 138:14 141:22 145:9 148:15 155:7 156:16 164:24 166:6 173:19 174:22 176:1 192:21 193:12 197:24 199:15 200:16 202:22 203:18 204:17 222:21 223:18 231:7 232:17 233:25 235:5 238:15 239:8 248:20 265:24 266:15 267:18 268:6 269:5,18 271:12 272:7 273:7 274:21 275:25 276:1 277:13 279:22 281:2 294:6 297:8 298:12,25 300:21 301:13 302:13,25 304:1 313:25 314:9 317:14

**screen** 6:6

**search** 92:8,13 93:4 94:13,15 97:14 130:22 142:15 143:8,18, 24 144:9,10 145:5,6,11,21,22 146:22 147:18 149:7,17,19 161:24 175:24

**searches** 144:9, 11 146:12

**searching** 106:2 107:9 146:3,8 161:4 163:22

**secobarbital** 176:22 178:9,11

**secondary** 282:5, 11

**section** 75:20 76:3,4,5

**sections** 75:3,6

**secured** 250:16

**securing** 181:22

**security** 183:21 208:12 212:24 218:21 259:3,11 285:13

**sedate** 27:21

**sedation** 269:11, 22 270:2,11,22,24 272:5,6,22 273:4, 5,18 274:3,5 280:23 281:12,20 294:15,24 295:1, 4,9

**seeking** 155:23

**sees** 55:25 225:8

**select** 42:6

**selected** 18:22 42:17 52:16 218:19,23 231:1

**selection** 18:4 42:10

**selects** 218:16 219:1

**sell** 91:12

**sensate** 271:11 279:7,13,20,25

**sense** 92:15

**sentence** 86:21 110:19 259:1 261:4,11

**sentenced** 54:3 102:11 112:15 315:24

**separate** 16:20

**September** 6:5 95:18 96:21 97:19,23 114:18 121:24 122:3,8, 14,15

**sequence** 323:4

**seriousness** 291:8

**serve** 69:25

185:17 220:8,18
222:11,12,17
229:5

**served** 9:14
223:24 302:16

**serves** 15:11 67:1
160:5 217:12
222:19 223:23

**service** 62:18
63:19 65:6 89:19
131:8 219:10
221:23 224:2

**services** 6:19
40:18,22 65:18

**serving** 17:1
159:7 304:12

**session** 262:20
291:15,16 318:10,
19,22

**sessions** 13:5,6
318:17

**set** 26:1 58:7,17,
22 59:19 123:5,13
162:18 213:22
214:6,9,24 215:24
216:3 237:22
282:11 299:18
326:14,15,16,24
327:2,3,5,9,24
328:25 329:6,10
330:24

**sets** 31:3 58:13
59:5 326:18
329:4,11

**setting** 177:7
314:19

**settings** 235:3

**shake** 266:4

**shakes** 262:5

**shaking** 262:6
268:24

**share** 138:11

**sheets** 24:24 25:2

**shipped** 257:19

**shooting** 179:15

**short** 64:6 95:10

123:19 178:4
229:19 276:13
315:3 331:25

**shortly** 158:11

**shoulder** 262:5
281:12

**show** 63:9 106:25
107:1 191:14,25
192:18 193:10
266:8

**showed** 263:9

**shown** 299:10

**shut** 238:4

**side** 118:14

**sign** 55:25 62:6
263:20 266:9
274:25

**signal** 114:7

**significant**
150:12 239:11

**signs** 191:14,25
192:18 193:10
213:21 228:20,24
237:12 263:9
265:1,19

**simply** 279:18

**Sims** 6:14

**sincere** 111:23

**single** 148:20
184:9,21 185:3,6,
13

**sir** 110:24

**sit** 72:14 181:14
331:13

**sites** 81:3,7

**sitting** 29:19 88:9,
15 116:2

**situation** 138:23
225:7 250:5
268:17 284:13
288:3

**size** 228:16 332:5,
24

**skill** 168:13,20
169:1

**Skipping** 62:5

**slept** 115:25

**slip** 164:1

**slow** 33:13 228:8
242:22

**slower** 228:14

**Smith** 6:16

**sold** 311:13

**sole** 295:22 296:3

**solution** 25:13
146:18 309:23
310:2 321:20,24

**someone's**
314:20

**sought** 47:5

**sound** 240:4

**source** 85:13,16
86:10 91:6,7,9,10
137:15,21 138:5,
22 139:15,25
140:1,7,8,12
141:14 142:25
143:1,9,18 144:5
145:25 147:18
155:24 158:5
166:16,25

**sources** 100:20
104:22 144:25
147:6,8,12,20
201:20

**sourcing** 150:10

**South** 6:15 141:6,
17

**space** 218:15

**speak** 20:1,17
34:7 47:10,20
48:24 51:24 61:7
70:5 73:14 295:8

**speaking** 79:15
101:22 155:15
255:22,23 257:2
313:3

**speaks** 80:25

**special** 264:9

**specialized** 66:2

**specialty** 72:23

**specific** 17:22
19:12 30:2 34:11,
15 37:9 51:8
67:11 130:20
135:4 139:4
157:16 205:23
231:10 243:21
245:25

**specifically**
24:24 30:24 45:15
46:6 47:24 75:8
99:2 132:11
134:12 141:5,8
157:15 264:11
284:5

**specifications**
219:6

**specifics** 18:17,
21 22:16 142:8
146:13 180:8
187:1,6 189:3
318:14

**speculate** 318:24

**speculating**
156:20 204:8

**speculation**
176:7 187:14

**spent** 13:9,11,13
14:5

**spirit** 54:2 57:11
60:24 61:2,14
62:1 247:23 249:4

**spoke** 46:3,20,24
47:17,23 71:14,18
72:22 73:6,13
74:1 78:2 106:7
260:4

**spoken** 191:3
257:10

**spokesperson**
319:19

**squad** 178:25
180:1,7,10,13,16,
22 181:1,13
182:10,17 183:2,
9,12 184:1 185:10

**squeezed** 281:13

Case 3:18-cv-01234-B Document 184 Filed 05/17/21 Page 367 of 373 PageID #: 6754
E0124 B Document 184 Filed 05/17/21 Page 367 of 373 PageID #: 6754
www.EliteReportingServices.com

**staff** 184:16,17
188:4

**stance** 129:12
281:5

**standards** 168:17
269:3 311:3
312:15

**standing** 86:8

**standpoint** 81:4
118:22 330:10,11

**stands** 107:6

**start** 25:24 44:7
54:10 81:1 125:11
126:3 181:3,15
182:1 287:21
313:4

**started** 54:17
136:23 182:23

**starting** 214:11

**starts** 57:18 214:1

**state** 6:21 18:25
28:18 45:13,20
53:13 78:6 85:3
101:4 112:16
129:8 130:21
137:18 138:3,20
139:16 142:2,10,
15 143:20 144:6
149:22 152:10,12,
16,18,19,21
153:22 161:14
163:20 170:20
180:21,23 181:1,8
182:15 183:5,15,
18 184:24 186:4
189:16 198:1
203:22 204:10
205:20 220:23
221:23 224:3
254:19,25 257:6
259:23 260:2,12
264:21,23 283:9
286:24 287:6
293:16 295:9
299:3,7 306:6
313:23 316:1
331:6

**state's** 128:3
138:16 144:3
148:18 173:22
181:16 182:3

190:1,23 197:9
289:20 291:5
299:14 307:18

**stated** 29:15
101:7 103:18
105:13 172:8
190:23 223:8
229:7 271:15
305:9

**statement** 104:4

**statements**
157:13

**states** 6:11 43:12,
18,23 44:15 46:8
71:15 72:7 77:19,
22,23 78:1,8,12
82:22 86:1 98:7
99:15 100:12,14
109:4 117:20
128:9,10,13,23
129:6 137:20
138:2,11,19,21
139:2,5 140:23
141:17 144:21
147:21 153:13
155:22 156:1
160:12,17 164:12
167:5 174:11
177:3,5 178:24
179:3 182:24
197:17 198:5
199:23 201:7,17,
18 203:3 206:6
272:12 293:18
304:14 308:11
309:16 316:4,8

**states'** 77:17

**stats** 154:16

**status** 240:10

**statute** 11:19

**stay** 287:23
310:23

**staying** 134:14

**steady** 33:13
228:8 242:21

**steel** 259:3,10,18

**step** 156:23

**steps** 21:12,21
22:2,8,17,21 23:6,

10,24 24:3 25:18,
22 32:24 50:14
51:11 240:8
241:17

**sterile** 311:9,10
313:14

**sterility** 311:23

**stimulant** 266:10

**stimuli** 262:9
263:12 273:13
280:24

**stimulus** 263:16
265:18 267:6
268:18,22

**stop** 55:4 97:3
99:18 101:19
102:3 139:2
194:13,15,17
198:24 199:10
202:12 250:25
282:25 283:3,7
306:18

**stopped** 139:3

**stopping** 101:14
102:7 193:21
194:7 198:25
303:10

**stops** 101:16
113:18 193:24
195:23

**storage** 13:23
14:12 62:16 64:23
256:7 257:20
258:22 260:15
311:15 320:3,6,18

**store** 62:25 63:4,
5,16 251:14
253:24 255:10
259:9,16 260:5,7

**stored** 62:20
65:12 251:20
252:2,12,14
254:3,5,6 255:1
259:12,13 261:1,
2,15 313:17
320:17

**stores** 251:16

**storing** 62:10
251:13 253:11

254:23

**strap** 250:16

**strap-down**
54:18 250:15

**strength** 70:10,
13,14,21

**stricken** 165:23

**strictly** 128:8

**strike** 43:10 83:21
281:25

**strong** 102:24
105:18 106:3,16
110:21

**Stuart** 285:13

**stuff** 29:16 98:5,
16,17

**subject** 18:9 28:5
29:7 67:5 99:12
132:21 154:13
169:10,12

**subjects** 102:25
105:19

**Submit** 69:22

**substantial** 331:1

**subsumed** 7:12

**successful**
112:18

**successfully**
109:6 112:6,12
206:6

**suffering** 21:14,
23 50:15

**sufficient** 20:24
79:19 81:16 83:12
94:13 105:8 109:1
125:24 147:25
148:4,6,12,19
149:3 162:16
196:22 198:3
199:14,20 217:21,
25 234:23 299:25
304:24

**sufficiently** 159:7

**suggested** 66:12

**sulfate** 171:19

Case 3:18-cv-01124-B Document 184 Filed 03/17/22 Page 368 of 373 PageID #755
EO1234B Deposition Report Filed 03/17/22 Page 368 of 373 PageID #755
www.EliteReportingServices.com

172:19

**summary** 31:1
263:6

**supervision**
16:23

**supplied** 116:6
153:12

**supplier** 117:22

**supplies** 109:9,20
121:9

**supply** 65:8
114:21 115:3,12
128:12,17,23
140:24 141:1,4,7,
11,12 145:17
146:17,22 153:6
156:24,25 161:19
162:16 177:6,17

**supplying** 120:16

**support** 267:4

**supposed** 214:3
227:5 228:5
303:13

**surgeon** 72:24

**surgical** 296:4

**Sutherland** 10:15
207:3

**swear** 7:5

**switch** 37:4
123:9,13 282:4,8

**switched** 38:25

**sworn** 7:6 8:4

**syringe** 287:17
288:14

**syringes** 31:19
210:1 310:5
321:6,8,16 322:5,
10 325:24,25
327:5,9 328:25
329:4

**system** 117:17

---

**T**

---

**table** 72:15 88:9,
16 89:1

**takeaway** 80:15

**takes** 196:7
288:19

**taking** 10:7 80:11
100:4 204:25
206:13 289:1,7,
13,22 299:18
301:16 311:22
317:24

**talk** 22:20 23:5,23
30:3,4,9,14,16,19
33:18 38:11 40:7
41:10,11 42:12,13
45:4 49:24 50:14
51:18 67:14 72:17
73:8 106:20
128:21 288:8

**talked** 30:8,15
32:25 33:3 38:16
45:2,10 77:21
190:6 278:8
297:17 313:12
324:18

**talking** 16:14 21:8
24:15,16,17,23
25:2 28:5,16,22
31:20 68:20 98:16
102:20 110:20
144:16 148:13
170:17 189:11,12
207:24 215:19,20
229:23 252:9
270:23 311:21
315:18 316:4
326:2

**talks** 54:10

**tap** 281:12

**taping** 211:4

**tasked** 91:4

**TCA** 316:1

**TDO** 153:15
187:24

**TDO's** 159:6

**TDOC** 15:11,14
16:13,14,16 18:23
19:7,21 21:7
22:21 23:5 25:3
38:11 41:3 42:2
48:10,17 49:6,12
50:7 51:13 52:11,

14 59:22 60:15,22
65:16 66:5,13
74:1 75:5,8,11
78:16,21,23 79:11
80:1,3,4,16,21
81:10,15,20,25
83:4,5,21,22 84:3,
8 85:6 86:15
88:19 89:9 90:23
91:15,22 92:12,22
93:3,9 94:14,22
96:5 97:2,5 99:14
100:3,7,9,21,23
101:3 102:5
103:7,12 104:6,15
105:2,14 106:9,
15,18 107:9
108:3,6,11,17,23
109:8,9,19,20
110:22 111:2,3,6,
9,13,15,21 112:24
113:22 114:3,6,
11,25 115:2,10
116:5,7,12,14
117:2 118:12
119:12,25 120:6,
14 121:2,7,11
122:6,11,12
124:11 125:4,6,
14,17,20 126:9,14
127:14,20 128:22
129:11 130:12,17,
19,23 131:1
135:8,10,21 137:3
140:23,25 141:3,
6,10 142:10,14
143:21 144:1,8,
10,14 145:5,11
146:7 147:20
148:5,23 149:11,
25 150:6,15,25
153:8,14 154:18,
19 156:1,4 157:3,
21 159:12,18
160:8,10,19 161:4
162:12 163:7
164:17,20 165:4,
12 166:4,15,21
167:18 168:4,12,
14,19,25 169:20,
25 170:11 171:3,
6,21 172:4 177:8
178:9 179:5,7,9,
12,14,17,21,25
180:6,9,12,15,17,
18 181:3 182:6,8,

12 184:8 185:8,
12,16,20 186:8,21
187:21,25 188:14,
17,22 189:22
190:19 191:8,13,
23 192:3,16,22
193:6,15 194:2,5,
12 195:3,6,18
196:13 198:19,23
199:3,12 200:11,
17 201:22 202:15,
16 203:5,16
204:14,25 205:6
217:16 218:2
220:6,17 221:10
222:8,16,24
223:15 224:13
226:12,15,18,21
229:5 230:21
231:3,8,15,17
233:14,17,20
234:3,13,25
235:18,19 240:14
241:8,10,14 242:2
243:24 244:12,18
245:16 248:13,17
252:5 253:17,18
256:1 258:8,10
259:21 265:21
266:23 268:2,12
269:3,10 270:10,
15,21 271:6,9,14,
20,23 272:4,9,21
273:2,16,20
274:3,18 275:10,
12 277:9,18
278:9,16,20
279:4,18,24
280:22 281:3,11,
15,19,25 282:12,
17 283:14 285:3
287:16 288:18,25
290:23 291:20,21,
23,24 293:20,22
294:4,14,17
295:1,15,21
296:2,9,19 297:3,
9,17 299:17
300:5,16 301:8
303:22 304:6,10,
17 305:2,23
308:17 309:6
310:20 311:18
312:5,7 313:1,13,
21 314:1,6,15
315:15 316:17

FOLSOM Court Reporting & Litigation Services, LLC
www.EliteReportingServices.com

319:20 320:13,18,
21 321:19 327:8,
13,23 328:23
329:18,24 330:6,
12,17,25 331:11
332:5

**TDOC's** 37:1
39:22 40:7 56:24
58:23 61:11 63:6,
22 66:1 79:14
92:7 93:17 94:12
97:13 99:20,23
112:7,18 113:9
117:9 118:2
128:2,7 129:20,21
148:22 154:21
155:3 159:3
186:25 202:8,11
225:20,24 227:11
252:6 254:10
263:17 298:5,20
301:7,14 310:2
329:2

**teaches** 285:10

**team** 15:11 20:1
26:17 42:6,10,17
53:20 54:18,21
55:12 57:1,24
58:6,21 59:7,17,
24 60:17 61:12
63:7 64:19 71:24
76:4,11,18,20
77:1 87:13 160:13
207:16 208:7,17
209:12,20,22,25
210:5,12,16,20,22
211:7,14,22,23
212:17 216:8,9,
13,15 218:1,3,17,
18 219:13,18,22
220:3,8 222:11
225:14,20 226:22,
25 227:4 229:24
230:3,7 236:5,24
241:2,8,14 243:8,
14 244:5,19,25
245:5,9,11,20,21
246:3,14 247:9,13
248:1,7,10,11,23
249:1,2 250:15
252:16 253:19,23
258:5,9 261:19
262:24 283:25
284:17,25 285:15,
24,25 286:14

**teams** 252:7

**technical** 169:1

**technique** 31:7,
17 33:8,10

**telling** 255:12
258:8

**tells** 256:1

**temperature**
254:6,7 313:20
320:17

**temporary**
287:23

**ten-minute** 64:2

**tend** 291:17

**Tennessee** 6:7,
12,15 7:3 8:13
9:7,12 12:10,20
16:15 28:18
36:13,19,22 43:7
53:13 84:13 85:4
92:19 112:16
129:9 134:4
138:9,24 139:2,3,
17 140:17 141:15,
19 143:2 144:6
159:9 180:21
181:5,9 182:17
183:6,8,11,16
184:20,25 201:12
202:6 203:2 224:3
260:13 293:16
304:14 309:9,18
316:1

**Tennessee's**
45:11 80:23 135:1

**term** 65:14 106:9
265:15 268:11
291:14,19 292:21
294:23

**terminate** 303:8

**terminated** 306:1

**terms** 19:10

**Terry** 6:9,24 8:11

**test** 286:8

**tested** 275:20
310:16

**testified** 8:4
46:19 64:17 89:8
104:20 118:1
175:8,16 255:24
260:4 272:23
301:1 305:19

**testifies** 298:3

**testify** 10:1,4
12:10,21 20:24
38:21 39:20
297:25 299:8
308:21

**testifying** 175:21
260:6

**testimony** 10:23
17:14,21 46:18
47:22,25 51:25
178:18 186:21
194:15,20 253:18,
22 255:7 256:10,
19 317:5

**tests** 247:8

**Texas** 45:5 141:1,
17

**texts** 78:14

**thaw** 170:21

**thawed** 313:19

**thereof** 80:10

**thing** 86:3 190:13
252:5 260:22

**things** 9:8 18:15,
18 28:10 31:9,22
33:5 43:25 46:19
50:16 52:9 56:16,
17 61:21 62:9
64:17 70:10 71:16
79:2,5 81:9
162:23 181:24
183:25 190:6
211:5 219:10

**terminate** 303:8

**terminated** 306:1

241:22 243:2
257:22 264:11
308:2 330:12

**thinking** 135:8

**thinks** 283:23

**thought** 31:23
89:23 123:24
196:24

**thoughts** 73:19
79:2 83:11 177:1

**three-drug** 21:4
28:15 35:7 36:23
37:4,15 38:10,12
39:1,12 40:13
46:14 52:13 75:21
77:3,10 78:6
82:23 83:4,24
84:22 89:7 93:10
96:24 98:8 100:6,
9,12 101:5 104:24
108:1,24 110:11,
14,16 111:14
112:4,6,8 116:13,
16,24 117:20
118:21,24 119:10,
14,23 120:3
121:20 135:9,22
136:3,9,25 159:8
171:23 172:10
190:20,24 191:5
192:14 193:3,16
196:9,14,21 197:8
198:2,6 199:22
200:10,23 201:6,
11,17,23 202:18
203:11 205:14
206:3,8,23 221:13
293:15,18

**threshold** 161:15

**throwing** 188:4

**Thumb** 290:6

**Thursday** 97:18

**time** 6:5 9:10 11:9,
16 13:10 14:5
28:24 37:9 54:11,
14 55:4 56:22
57:17 79:17 80:20
82:25 85:12,15
86:24 87:6 88:1
97:3 98:15 111:11
112:10 131:12,16

EliteReportingServices.com
www.EliteReportingServices.com

133:2,24 134:19
136:14,22 138:23
142:14 148:23
152:4 154:2
158:12 161:20
162:19 170:9
171:21 196:6
203:9 204:6
237:15,23 250:17
265:11 291:4
310:16 313:14
316:15 333:14

**timeline** 194:6

**times** 8:25 31:21
54:11 60:15,17
66:10 88:17 200:7
250:22 291:2
292:16,17

**timesheet** 287:12

**timing** 31:9 45:23
59:23 60:16,22

**tired** 236:10
242:16

**tissue** 81:6
228:19

**title** 16:13,16

**titled** 52:23

**today** 6:4,13 8:15
10:2,5 12:9,15
14:8 17:19 28:25
30:6 40:7,11
41:16 46:3,22
47:22 52:1 75:19
96:1 103:5 115:19
116:2 127:12
128:3 136:2
178:18 181:14
331:13 332:9,16,
19

**told** 32:4 41:23
142:21,23 153:2
191:4 195:14
196:8 260:3,17

**Tom** 290:6

**tomorrow** 127:3
190:8

**Tony** 6:8,10 7:2
8:2 56:8

**top** 114:22 164:1

171:11,15 230:16
241:2 258:17
259:6 289:3
315:10

**topic** 19:19 20:2,
12 21:2,12,18
22:5 24:2,6 25:17
26:6,23,25 27:3,4,
6,25 28:3,6,12
29:3,8,13 33:21,
23,25 34:4,6,7,16
36:20 40:15 41:2,
4,11,12,14,21,24
42:3,13 50:23
51:10,14 52:11,15
60:3 66:14 67:5,
12,15,24 165:15,
16 248:14 274:6,8
297:11 308:21
317:9

**topics** 12:12,21
19:3,7,12,15,17
30:5 35:14 36:9
38:22 42:20,21
48:1,9,11,18,25
49:4,6,13,16,25
50:6,8 52:7
274:10

**total** 13:10,17
111:13 175:9
219:13 299:3,25

**totally** 70:23
158:9

**train** 211:21
212:7,10,12,16
227:23

**trained** 25:23,25
26:16 81:1
211:18,24 219:25
220:14 225:21
226:5 228:11,14,
23 229:25 230:11
234:10 242:14
264:25

**training** 179:6,12
211:12,18 212:2
218:11 225:12,16,
17 226:3 227:18,
19 229:3 231:10
232:11 233:1,11,
15 234:18 236:1
239:12 241:15
245:5,8,22 247:24

261:18 262:18,19,
21,25 264:9,17
284:1,17 286:25
287:6 288:19
289:1,8,13,22
290:19 291:9,12
318:10,19,22
322:16

**trainings** 262:23
286:11,15,22
287:5,18 292:17

**trains** 211:14
290:14

**transcript** 333:16

**transcripts** 17:4

**transferred** 313:9

**transported**
313:1,2,5,7

**trapezius** 262:7
266:6 281:14

**trays** 323:4

**trouble** 250:16

**true** 146:19

**trust** 293:20

**trusted** 80:18
201:19

**truth** 9:24

**truthfully** 10:2

**tubing** 332:6,25

**Tuesday** 13:8

**turn** 12:2 125:8
230:15

**turning** 263:14

**turns** 94:3

**two-drug** 100:4,
21 120:2 194:4
196:10,15 197:4,
20 198:7,10
199:12 200:8,12
201:22 202:17
203:5,17 204:2
205:14 206:2
301:6,8 305:18,24

**two-minute**
262:1 331:19

**type** 70:8 72:4
181:22,23 184:13
186:18 242:11
243:2 263:11
264:5 294:1
300:12 306:12,13,
16 307:2,24

**typed** 76:5

**types** 18:15

**typically** 295:16

---

**U**

**Uh-huh** 71:1
207:23

**ultimate** 236:3,21
249:24 276:22
305:9

**ultimately** 102:10
250:10 251:8

**unable** 105:9
158:5 236:5

**unanswered**
185:25

**unartful** 38:7

**unavailable**
157:1

**unaware** 189:23
314:1 331:11

**unbiased** 73:2

**unclear** 136:7

**unconscious**
27:21 80:13
101:12 105:9
118:6 119:1
120:11 159:9,19
160:1 192:10
193:17 199:5,9
202:9 213:5,8,17
214:1 215:6,17
231:24 234:11
240:12 262:20
265:22 266:2,11,
21 267:10 268:3,
11,13,14 269:17
270:18 271:10,18
272:16,25 273:21
274:13 278:5
279:1,13,25 281:8

Elite Reporting Services
www.EliteReportingServices.com

294:19,23 295:12 297:15 299:5,11

**unconsciousness** 296:22,25 298:23

**understand** 8:14 9:20,23 10:21 11:3,19 12:9 17:18 21:21 26:12 34:14 45:16 71:4,9 103:11 105:16 110:24 115:1 144:23 164:11 182:21 183:14 186:8,20 190:12,18 204:25 215:13 239:18 247:10 255:4,6 257:9 258:3 262:11 264:13 269:10 277:6 278:13 279:11 280:22 294:13 299:23 306:14 320:16

**understanding** 8:18 37:9 42:16 97:13 128:2,7 129:2 131:16 135:15 138:17 143:16 144:3 148:18,22 149:2 161:9 216:25 217:6 236:20 289:17 291:8 310:2

**understands** 192:3 205:6 257:5,14 261:13,14 281:3

**understood** 11:6 137:14 286:3 333:9

**undertaken** 66:13 151:7

**unfair** 18:8

**unforeseen** 54:13 55:6

**United** 6:11 128:13,23 147:21 164:12 167:5 316:4,8

**unknown** 190:15

**unmovable** 259:2,10

**unpack** 43:16

**unresponsive** 266:14,18,24 267:9 268:18 270:25 272:5,24 278:9,17,22 279:5,7,19 282:15 298:23

**unresponsiveness** 278:4

**unsatisfactory** 314:3

**unsuccessful** 237:7

**unwilling** 138:11 141:13

**upcoming** 134:6 136:1

**use-by** 311:16

**USP** 124:19 125:1,4 312:11

**USP-GRADE** 161:5

**usurp** 280:24

**Utah** 179:3 180:6 183:24

**Utah's** 180:9 181:3 182:1,5

**utilize** 53:12 288:1

**utilized** 313:19

**utilizing** 21:4 305:10

---

**V**

**vary** 228:9

**vascular** 241:24

**vecuronium** 31:2,25 62:8 68:5 77:7 83:10 89:10 90:11,15 92:1 99:11 113:16 116:14,25 120:8

146:19,22,23 167:10,16,19,22 168:1,5 172:11 173:23 174:12 175:3 177:2 192:13,23 193:7,19 195:1,9 203:6,15 204:21 205:1,7,8,24 206:24 214:15 226:16 227:3,7 300:12 301:2,5,23 302:2,3,16,20 303:6,9 304:4,7,18 305:11,17,20 307:15 310:6 320:13,15,19,22,25 323:21 333:7

**vein** 79:5 81:6 123:10 228:17,19 236:6,19,23 237:2,8

**venous** 236:4,14 276:23

**verbally** 10:20

**verifies** 322:7,21

**verify** 122:15 154:1 323:6 324:11,20,25 325:12,13,14,19

**verifying** 170:21

**versus** 6:9 81:6 84:15 93:16 144:19 228:15 250:18 266:2,25 273:4 291:15

**viable** 84:16 143:1

**victim's** 208:15

**video** 6:6

**view** 101:25

**viewing** 81:7

**views** 81:7

**violate** 57:11 60:24 61:2,13,25 288:5

**Virginia** 77:21 78:13

**virtually** 157:1

**visit** 166:17

**visual** 81:4 263:7,10,14 273:11 303:20 330:10

**visualize** 303:19

**vital** 237:12

---

**W**

**wait** 10:23 237:19,20,22

**waiting** 262:1

**wake** 266:8

**walk** 239:24

**wanted** 32:16 58:22 96:21 135:8,16 218:10

**warden** 15:7 23:13,19,23 32:11 34:7 42:4,13 51:20,22,23,25 52:4 53:11 55:3,16,18 56:25 59:14 119:22 123:13 208:10,11 212:23,25 213:6,8,9,13,19 214:5,16 215:4,6,8 216:2 218:5,7,8,21,23 224:25 225:5,7,11 230:13 231:1,4,8,11,12,17,21 232:11,14,19,25 233:16 234:4,9,14,19,20 235:14,23 237:8,9 238:18,19,20 240:19,20 245:18 246:22 249:19,22,23 250:6,10,20,25 254:15 255:24 257:3,11 260:5 261:14,21,23 262:2 263:2,5,8 264:9,17,21,24 265:12 268:23 275:15,17,20 276:7 282:3,22 283:4,5 284:11,22 285:6,11,13,20

Case 3:18-cv-01234-B Document 184 Filed 10/04/22 Page 372 of 373 PageID 6759
EliteReportingServices.com
www.EliteReportingServices.com

287:3,7 289:17
301:20 302:4,10
303:13,18 305:5,
21 306:2 315:11
316:25 317:7

**warden's** 250:7
302:21

**watches** 225:1

**watching** 157:9
212:15 243:9

**water** 167:16
310:7

**ways** 145:2

**weapon** 181:22,
23 184:14 189:10

**Wednesday** 6:4

**week** 47:16

**weeks** 157:23

**whatsoever**
130:25

**Wild** 288:23

**willingness**
277:15

**withdraw** 276:2

**witnesses** 106:20
208:13 238:6
297:23

**witnessing** 28:9,
17 243:8

**word** 57:4,5,9
95:20 121:18
124:18 249:10
291:6

**words** 209:19

**work** 132:13
152:21 196:9,14,
19 243:19 248:25

**worked** 42:18
160:14 198:3,4
199:23 203:1
217:14 232:10

**working** 65:23
131:3,6 142:3
143:15,19 144:4
147:13,16 306:8

**works** 198:4
223:22

**wrap** 331:20

**write** 75:2 235:19
309:3

**written** 32:23
53:10,11 54:2
55:8,12 63:23
69:22 74:21
75:10,12 76:4,6
103:17 124:10
163:12 169:23
170:22 226:13,16,
19,23 227:6
258:6,7 320:18,21

**wrong** 78:22
159:4

**wrote** 74:15 75:6,
22 76:3 96:3,8
103:22 105:16
124:24 130:2
171:3 235:18
280:3,6,9 316:12,
16

---

**X**

---

**Xs** 289:5

---

**Y**

---

**year** 142:19,22
151:23

**years** 9:13 17:10
38:19 87:2 115:25
154:11 155:22
219:10 220:22
223:25 314:14

**yesterday** 14:2
29:24 30:15
32:14,20 36:6
39:24 333:3