# EXHIBIT
8

# KING

## vs.

## PARKER, et al.

---

# JAMES WILLIAMS, M.D., M.SC.

## January 04, 2022

---



Chattanooga (423)266-2332   Jackson (731)425-1222
Knoxville (865)329-9919   Nashville (615)595-0073   Memphis (901)522-4477
www.elitereportingservices.com

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                        AT NASHVILLE
   _____
 3
   TERRY LYNN KING,
 4
             PLAINTIFF,
 5                                    CAPITAL CASE
   VS.                                CASE NO. 3:18-cv-01234
 6                                    JUDGE CAMPBELL
   TONY PARKER, et al.,
 7
             DEFENDANTS.
 8 _____

 9

10

11

12

13              Videoconference Deposition of:

14              JAMES S. WILLIAMS, M.D., M.Sc.

15              Taken on behalf of the Defendants
                January 4, 2022
16
                Commencing at 10:04 a.m.
17

18

19

20

21

22 _____

23           Elite-Brentwood Reporting Services
                www.elitereportingservices.com
24           MELINDA CANTRELL, CCR, LCR, RPR
                  Chattanooga, Tennessee
25                   (423)266-2332
</pre>

Case 3:18-cv-01234 Document 104-2 Filed 03/17/22 Page 3 of 163 PageID #: 6896
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1                 A P P E A R A N C E S

 2      For the Plaintiff:

 3              MS. LYNNE LEONARD
                MR. ALEX KURSMAN
 4              MS. ANATASSIA BALDRIDGE
                Attorneys at Law
 5              Federal Community Defender Office - PAED
                601 Walnut Street
 6              Suite 545 West
                Philadelphia, PA  19106
 7              (215) 928-0520
                lynne.leonard@fd.org
 8              alex_kursman@fd.org
                ana_baldridge@fd.org
 9
                MR. DAVID ESQUIVEL
10              MR. JEREMY GUNN
                Attorneys at Law
11              Bass, Berry & Sims
                150 Third Avenue South
12              Suite 2800
                Nashville, TN  37201
13              (615) 742-6200
                desquivel@bassberry.com
14              jeremy.gunn@bassberry.com

15
        For the Defendant:
16
                MR. KEVIN MITCHELL
17              MR. SCOTT SUTHERLAND
                MR. CODY BRANDON
18              Attorneys at Law
                Office of the Attorney General
19              State of Tennessee
                P.O. Box 20207
20              Nashville, TN 37202-0207
                (615) 741-3491
21              kevin.mitchell@ag.tn.gov
                scott.sutherland@ag.tn.gov
22              cody.brandon@ag.tn.gov

23
        Also present:
24
                MR. JULES WELSH
25
```

Case 3:18-cv-01234 Elite Reporting Services Document Report (615) Filed 595-0073 05/17/22 www.EliteReportingServices.com Page 4 of 163 PageID #: 6897

```
                        I   N   D   E   X
```

```
                                                      Page

Examination
By Mr. Mitchell                                       5




                   E   X   H   I   B   I   T   S

                                                      Page

Exhibit No. 1                                         7
     Notice of Deposition with Subpoena

Exhibit No. 2                                         43
     Curriculum Vitae and Report of Dr. Williams

Exhibit No. 3                                         100
     Dr. Fackler "Gunshot Review"

Exhibit No. 4                                         101
     Utah's Protocol for Execution by Firing Squad

Exhibit No. 5                                         101
     U.S. Army's Protocol for Execution by Firing
     Squad

Exhibit No. 6                                         109
     Dr. Young's "Diagnosis of Brain Death"

Exhibit No. 7                                         123
     ATLS Tenth Edition "Advanced Trauma Life
     Support" Student Manual

Exhibit No. 8                                         128
     U.S. Army Correction System Procedures for
     Military Executions

Exhibit No. 9                                         132
     E-mail Forum
```

Case 3:18-cv-01234 Document 102-8 Filed 03/17/22 Page 5 of 163 PageID #: 6898
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1

2                    S T I P U L A T I O N S

3

4                The deposition of JAMES WILLIAMS, M.D., M.Sc.,

5      was taken by counsel for the Defendants, by agreement, via

6      videoconference, on January 4, 2022, for all purposes

7      under the Tennessee Rules of Civil Procedure.

8                All formalities as to caption, notice, statement

9      of appearance, et cetera, are waived.  All objections,

10     except as to the form of the question, are reserved to the

11     hearing, and that said deposition may be read and used in

12     evidence in said cause of action in any trial thereon or

13     any proceeding herein.

14                 It is agreed that MELINDA CANTRELL, RPR,

15     Licensed Court Reporter for the State of Tennessee, may

16     swear the witness, and that the reading and signing of the

17     completed deposition was not discussed.

18

19

20

21

22

23

24

25

Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

```
 1                        *   *   *
 2              MR. MITCHELL:  Good morning, Dr. Williams.
 3    My name is Rob Mitchell and I'm with the Tennessee
 4    Attorney General's Office.
 5              THE WITNESS:  Nice to meet you.
 6              MR. MITCHELL:  Is there any preliminaries,
 7    Lynne, on your end, or Dr. Williams or Ms. Court Reporter?
 8              THE COURT REPORTER:  I would like everybody
 9    to introduce themselves for the record, once we get
10    started.
11              MR. MITCHELL:  Okay.  Yeah.
12              THE COURT REPORTER:  Yeah.
13              MR. MITCHELL:  If there's nothing on
14    your-all's end, I think we can go ahead and swear the
15    witness.
16                        *   *   *
17              MR. MITCHELL:  Good morning, Dr. Williams.  I
18    know we introduced ourselves, but I'm Rob Mitchell on
19    behalf of the defendant in this case.  With me today, also
20    appearing by Zoom, are several of my co-counsel:  Scott
21    Sutherland, Cody Brandon, and Dean Atyia.
22              THE WITNESS:  Good morning.
23              MS. LEONARD:  Good morning.  My name is Lynne
24    Leonard.  I represent the plaintiff, Terry King, in this
25    case.  And along with me on the Zoom call are several of
```

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1    my colleagues as well.  From the Federal Community

 2    Defender Office in Philadelphia is Alex Kursman, Ana

 3    Baldrige, and one of our interns, our fellow, is observing

 4    us, Jules Welsh.  And then we have some of my colleagues

 5    from the law firm Bass, Berry & Sims in Nashville,

 6    Tennessee, and that would be David Esquivel and Jeremy

 7    Gunn.

 8                        *    *    *

 9                   JAMES WILLIAMS, M.D., M.Sc.,

10    was called as a witness, and after having been duly sworn,

11    testified as follows:

12                        EXAMINATION

13    QUESTIONS BY MR. MITCHELL:

14    Q.      Where are you located right now, Dr. Williams?

15    A.      I live -- I'm in my home in Clyde, Texas.

16    Q.      Okay.  And what is that address?

17    A.      My address is 5260 County Road 120, Clyde, Texas.

18    C-L-Y-D-E.

19    Q.      And is anyone in the room with you, Dr. Williams?

20    A.      No.  I'm by myself today.

21    Q.      Okay.  And have you given a deposition before?

22    A.      Yes, sir, I have.

23    Q.      Okay.  How many times?

24    A.      Probably in the nature of 15 to 20 depositions

25    over my career.
```

```
1    Q.      Okay.  And what is that in front of you that's not
2    your breakfast?
3    A.      What's in front of me that's not my breakfast?  My
4    computer.
5    Q.      Okay.  Anything else?
6    A.      And orange juice.  I have a notepad and I have my
7    cell phone, which is not on.
8    Q.      Okay.  And do you have your expert report or any
9    other documents in front of you?
10   A.      My expert report I have on my computer in front of
11   me.  That's it.  I don't have any printed documents.
12   Q.      Okay.  And do you have anything else on your
13   computer in front of you that is open?
14   A.      No, just the Zoom meeting.
15   Q.      And a couple of ground rules I would like to go
16   over before we begin, Dr. Williams.  I know you've taken a
17   deposition before.  Please ask me to repeat if you didn't
18   hear what I've said, especially since we're over Zoom.
19   Please ask me to clarify --
20   A.      Certainly, I will.
21   Q.      I'm sorry, what was that?
22   A.      I said, certainly, I will.
23   Q.      Thank you.
24           All right.  Please ask me to clarify if I say
25   something and you don't understand what I ask.  And you
```

Case 3:18-cv-01234-B Document Report Filed 05/17/22 Page 615 of 163 PageID #: 6902
Elite Reporting Services • (615) 595-0073
www.EliteReportingServices.com

```
 1    probably know this; breaks are fine.  You just can't take

 2    a break between me asking a question and you answering.

 3    Can we agree to that?

 4    A.      We can.

 5    Q.      Okay.  Thank you.

 6            I'd like to show you -- just one second.

 7            MR. MITCHELL:  Is the screen share function

 8    available?  Oh, there it is.  Okay.  I'm sorry.

 9    BY MR. MITCHELL:

10    Q.      I'd like to show you, Dr. Williams, Exhibit 1.

11            (WHEREUPON, a document was marked as Exhibit

12    Number 1.)

13    BY MR. MITCHELL:

14    Q.      Do you recognize this document?

15    A.      I'm not seeing a screen share here.

16    Q.      Okay.  Do you see this now?

17    A.      Yes, I do.

18    Q.      Okay.  And have you seen this document before?

19    A.      Yes, I have.

20    Q.      Okay.  And is this a Notice of Subpoena for your

21    deposition today?

22    A.      I believe it is, yes.

23    Q.      And also to produce documents?

24    A.      Yes, sir.

25    Q.      Okay.  And did you produce documents to your
```

Case 3:18-cv-01234-B Document Report Filed 09/17/22 Page 10 of 163 PageID #: 6903
ELITE Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    attorney?

2    A.      I produced documents to my attorney in conjunction

3    with their advice, yeah.

4    Q.      Okay.  And what documents did you produce to your

5    attorney?

6    A.      I don't have the list in front of me.  Along with

7    my deposition, I provided the list of my sources that I

8    used in preparing the -- the report.  They have copies of

9    my Curriculum Vitae, my bona fides, and so forth.

10   Q.      Okay.  Did you also produce the documents that are

11   listed in this Attachment A to the subpoena?

12   A.      Some of them I did not.

13   Q.      Okay.  Did you produce your entire file in this

14   litigation?

15   A.      Well, yes, I guess I did.  I don't have the paper

16   file.  I have documents on my computer that are at

17   different locations, e-mails and so forth.  I suppose you

18   could say that constitutes a file, but that's it.

19   Q.      Did you produce those e-mails to your attorney?

20   A.      Since they're between myself and my attorney, they

21   have them, yes.

22   Q.      Okay.  And did you produce all documents and

23   communications regarding this litigation to your attorney?

24   A.      Since all the communications are with my attorney,

25   yes.

Case 3:18-cv-01234-B   Document Report Filed 09/17/22   Page 11 of 163   PageID #: 6904
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
1    Q.      So you have no communications regarding this case
2    that aren't with your attorney?
3    A.      Correct.
4    Q.      Okay.  Did you complete -- or did you provide your
5    attorneys with time and billing records?
6    A.      I have not done so yet, no.
7    Q.      Okay.  And did you provide your attorneys with all
8    documents and communications that you cited or relied on
9    in drafting your expert report?
10   A.      Yes, I did.
11   Q.      Including any documents that you did not rely
12   upon?
13   A.      Documents I did not rely upon?  Well, that would,
14   you know, be the entire Alexandria Library, so I did not
15   give them that, no.
16   Q.      Are there any documents you reviewed in
17   preparation for your expert report but ultimately chose
18   not to rely upon, when submitting your expert report?
19   A.      There would be a -- the short answer is yes.
20   Q.      Okay.  What are those documents?
21   A.      My library.  I have read hundreds of books and
22   papers on issues of the death penalty and then the medical
23   issues related thereto.  Essentially, it's a topic that
24   I've been studying, to some degree, at least ten to
25   15 years, so there's a tremendous amount of material, most
```

1   of which is not actually in my possession; library --

2   library searches, Medline searches, online searches of

3   documents relating to the medical -- medical aspects

4   of -- of inflicting death through various means, and these

5   are -- these are -- it's an enormous compendium of sources

6   that I've read.

7   Q.      Are there documents in your possession that have

8   influenced your testimony today that you did not provide

9   to your attorneys in this litigation?

10  A.      Not that I'm aware of.

11  Q.      And have you provided to your attorneys all

12  documents and communications showing that you are

13  sufficiently qualified to testify an expert -- as an

14  expert in this case?

15  A.      I believe they have received all those documents,

16  yes.

17  Q.      Did you rely on any documents or communications

18  prepared by other experts that influenced your testimony

19  today?

20  A.      Not in the -- not in the preparation of my

21  document.  But since that document was written, I have

22  been in communication with a -- I attended the trial of a

23  -- a gentleman on trial -- sorry, on death row in Nevada.

24  So I did have access to information at that trial that I

25  haven't had prior to this, and so that -- that does,

Case 3:18-cv-01234-BRM Document Report Filed 09/17/22 Page 13 of 163 PageID #: 6906
FICUS-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    necessarily, play into my -- my testimony today, uh-huh.

2    Q.      And what is the name of that man in Nevada?

3    A.      It's not Mr. Floyd, is it?  I'm sorry, I don't

4    tend to keep these names foremost my mind.

5    Q.      And are you looking at anything, Dr. Williams?

6    A.      I'm looking at my screen to try and minimize this

7    so I can bring up the file from Nevada.

8    Q.      And I'm going to -- I'm going to request that you

9    don't look at anything other than what I show you during

10   the course of this deposition.

11   A.      Okay.  Fair enough.

12   Q.      Do you remember --

13   A.      I don't recall the -- I don't recall the

14   plaintiff's name, no.

15   Q.      What was it in that Nevada litigation that

16   subsequently came to your attention that will affect your

17   testimony today?

18   A.      Well, it may affect my testimony.  I had

19   discussions with two of my colleagues, Dr. Zivot and the

20   other gentleman, I -- his name escapes me as well.  And I

21   must be -- I must be clear here, Mr. Mitchell, I have

22   developed a lifelong habit of not remembering names.  As

23   an ER physician, I try to remember the details of the

24   patient.

25           The joke that I make is that if you don't have a

1    name tag or toe tag, I don't know who you are.  This is,

2    in part, a habit in perfecting patient confidentiality.

3    But I've always been rather absent-minded when it comes to

4    names, so I don't recall names real well.

5         Nonetheless, Dr. Zivot gave testimony at the trial

6    in Nevada, which I'm sure you've read about the -- some of

7    the problems related to execution by lethal injection.  He

8    brought up some points that I had not considered before

9    just by having quite a lot of reading on the topic of

10   execution by lethal injection.

11        And he also brought up some facts, not just

12   arguments, but facts that I was not aware of -- in terms

13   of the history of lethal injection that I was not aware

14   of.  Those, necessarily, colored my view of executions and

15   the practicality and efficacy of them.  But they don't --

16   they don't color my testimony on the -- on the facts that

17   I'm being asked to be an expert on, which is death by

18   gunshot wound and firing squad.

19   Q.    What sort of expert is Dr. Zivot?

20   A.    Dr. Zivot is an intensive care specialist.  I

21   believe his -- his board certification is anesthesiology.

22   Q.    After Dr. Zivot testified in Nevada, how did your

23   opinion regarding executions change?

24   A.    My general opinion did not change at all.  My

25   concern as to the reliability of execution by lethal

Case 3:18-cv-01234 Document 102-1 Report Filed 09/17/22 e Page (615) 595-0073 PageID #: 6908
FLOTT & Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
1    injection was raised somewhat.  But I've already been

2    fairly skeptical in some aspects of the efficacy and

3    efficiency of death by lethal injection already, so I

4    wouldn't say it substantially changed my views.

5    Q.      Did Dr. Zivot's testimony change your views

6    regarding execution by firing squad?

7    A.      Not at all.

8    Q.      And what sort of expert was the other Nevada

9    expert who affected your testimony today?

10   A.      The name that comes to my mind is Dr. Freeman, but

11   I think I've got that wrong.  I think I'm confusing him

12   with another fellow from a different situation.  He was

13   also an anesthesiologist, and he was testifying, again, on

14   the issues of -- specifically to the pharmacology and

15   pharmacokinetics of the drugs -- some of the particular

16   drugs being proposed for death by lethal injection in

17   Nevada.

18   Q.      Dr. Williams, are you under the influence of

19   anything today, including any medications, that could

20   hinder your ability to testify truthfully?

21   A.      I am not.

22   Q.      Do you have any medical condition that could

23   affect your testimony today?

24   A.      I do not.

25   Q.      Did you speak to anyone to prepare for your
```

1    testimony today?

2    A.      I spoke with the attorneys for the case, for

3    Mr. King.

4    Q.      Which attorneys were those?

5    A.      I spoke with Alex Kursman, Lynne Leonard, I

6    believe it was Mr. Esquivel.  There were three people on

7    the call last night.

8    Q.      Okay.

9    A.      And I've had extensive --

10   Q.      And --

11   A.      -- communication with Alex Kursman and Lynne

12   Leonard over the past couple of weeks.

13   Q.      Were those other communications that were not the

14   call last night phone, e-mails, Teams?  What medium was

15   used?

16   A.      Cell phone calls, primarily, and -- I should say

17   e-mails, primarily, with some telephone calls to clarify

18   certain points.

19   Q.      And were those all after you submitted your expert

20   report in this case?

21   A.      Well, in terms of preparation for deposition, yes.

22   Q.      How many times did you speak on the telephone with

23   Mr. Kursman?

24   A.      Yesterday, I spoke with him twice.  Prior to that,

25   I think I've spoken to him once this year.  And before

1    that, it was four to six months since I spoke with him.

2    Q.    This year being 2022?

3    A.    In 2022, yeah.

4    Q.    And how many times -- was Ms. Leonard on all of

5    those calls?

6    A.    No.  No.  There have been a couple of calls with

7    just Mr. Kursman and myself and a couple of calls with

8    Ms. Leonard and myself.

9    Q.    How many calls have you had, since submitting your

10   report, with just Ms. Leonard?

11   A.    Two or three, maybe.  Actually, it may not be even

12   that many.  It might've been just one or two.

13   Q.    Other than your attorneys, did you speak with

14   anyone to prepare for your testimony today?

15   A.    I did not.

16   Q.    Did your attorneys read anything to you in

17   preparation for your testimony today?

18   A.    No, I don't recall them reading anything to me.

19   Q.    Did you review any documents to prepare for your

20   testimony today?

21   A.    Yes.  I reviewed my reports.  I reviewed your

22   subpoena.  I reviewed -- with respect to this case?  I

23   reviewed -- yes, I reviewed some materials in -- in

24   preparation for this case.  I reviewed Dr. Lee's expert

25   report, which you submitted, and I reviewed some of the

1    documents that he had cited, as well as some other

2    supporting documents that colored my response to that.

3    Q.       What supporting documents were those?

4    A.       Primarily, his would be -- well, it was Vincent --

5    Dr. Vincent Di Maio's book, "Gunshot Wounds," which I'm

6    sure you're familiar with.  And in addition to that, a

7    couple of references that Dr. Di Maio makes, which are

8    academic papers, which I have looked up online.

9    Q.       Academic papers that Dr. Di Maio referenced, but

10   did not author?

11   A.       Correct.

12   Q.       What are those academic papers?

13   A.       Well, I could get the file out and seek through

14   it, but there are -- I couldn't name them off the top of

15   my head.  But I did -- I have -- in specific, I looked at

16   a couple of papers written by Dr. Fack -- Dr. Martin

17   Fackler, late -- the late Dr. Fackler, who's arguably the

18   dean of wound ballistics and the foremost expert in

19   gunshot wound ballistics and gunshot wounding who's ever

20   lived.

21           So I've reviewed a number of Dr. Fackler's papers,

22   including the review paper, which I provided to my

23   attorneys, which is -- which is a very good starting

24   point.  Dr. Di Maio did rely on that in preparing his

25   book, and it does have some bearing on his -- on Dr. Lee's

```
 1   comment.
 2   Q.      What other papers of Dr. Fackler did you review in
 3   anticipation of your testimony today?
 4   A.      I couldn't name them for you.  I've got almost
 5   every paper that Dr. Fackler ever wrote in my files.
 6   Unfortunately, I don't have most of those files with me.
 7   We recently moved house and most of my files and books are
 8   in a storage unit.  But I've read several hundred papers
 9   by Dr. Fackler.
10   Q.      How many papers by Dr. Fackler have you read
11   Di Maio's the last eight weeks?
12   A.      Three or four.  And I didn't read them
13   cover -- you know, beginning to end.  I just read the
14   relevant portions that I wanted to refresh my memory on.
15   Q.      In anticipation of your testimony today?
16   A.      In anticipation of testimony here, as well as in
17   preparation of another report for a different case.  And
18   for review for my testimony in Nevada in November, I
19   reread a couple of Dr. Fackler's points as well.
20   Q.      And what report were you preparing for a different
21   case?
22   A.      I've been preparing a report for the Pizzuto case
23   in Idaho.  In Mr. Floyd's case, I've reviewed my report
24   for the Floyd case again, and that's -- going over my
25   testimony in my head, so I wanted to review some of the
```

FICUS Brenda Report Reporter, (615) 595-0073
www.EliteReportingServices.com

```
 1    points I made to be sure that I had my facts correct, so
 2    that would primarily be it.
 3    Q.      Besides documents by Dr. Fackler and Dr. Di Maio,
 4    what other documents did you review in anticipation of
 5    your testimony today?
 6    A.      You have them in the list of references that I
 7    gave you.  I looked at Lieutenant Colonel Grossman's
 8    books, "On Killing," "On Combat," on some issues.  I did
 9    also look at -- what else did I look at?  Did I look at --
10    I looked at a couple of anatomic texts, anatomy text books
11    that I got for refreshers, in my mind, of some details of
12    anatomy that probably -- that would be about the sum total
13    of sources that I looked at.
14    Q.      Any other sources you reviewed in anticipation of
15    your testimony today that we have not discussed?
16    A.      None that I can think of, sir.
17    Q.      What were those anatomy textbooks that you
18    reviewed?
19    A.      One of them is -- the one that I relied mainly on
20    is "Grant's Atlas of Anatomy," which is a common --
21    commonly reviewed source, and I can't recall the name of
22    the other one.  It's a photographic anatomy atlas out of
23    the University of Cambridge.  I've got a pocket copy of it
24    that's very helpful.
25    Q.      Besides that, did you review anything else in
```

1    anticipation of your testimony today?

2    A.       Nothing that I can recall.

3    Q.       Dr. Williams, where did you attend high school?

4    A.       I attended high school at William Aberhart High

5    School in Calvary, Alberta, Canada.

6    Q.       And after high school, did you go to college?

7    A.       I went to the university at the University of

8    Calvary.  I obtained a bachelor's degree in zoology.

9    Q.       Okay.  And what year was that?

10   A.       I received my bachelor's degree in 1976.

11   Q.       And after you received your bachelor's, did you

12   pursue your education further?

13   A.       I pursued another year of university education at

14   the same institution to obtain a teaching credential so

15   that I could teach school.

16   Q.       And did you pursue your education after that?

17   A.       Yes, sir.  I taught school for eight years, and

18   then I returned to the university to enter -- I took a

19   one-year course of studies to get some grades behind me

20   because I had been an indifferent student in my bachelor's

21   program, decided to apply myself, get some good grades so

22   I could get into graduate school.  Did one year of that,

23   obtained a very high GPA, did some tough courses.

24           And then I proceeded to enter a graduate program

25   in endocrinology and biochemistry, which I started in 1989

Case 3:18-cv-01234-B Document 123 Filed 09/17/22 Page 22 of 163 PageID #: 6915
Elite Brentwood Reporting Services (215) 595-0073
www.EliteReportingServices.com

```
 1    -- sorry, 1985 -- wait, no, '86, January of '86.  I

 2    entered that program and graduated in September of 1988

 3    with a master's degree in biochemistry and endocrinology.

 4    I also entered, simultaneously -- as I was preparing to

 5    defend my thesis, I was accepted into and began studies at

 6    the University of Calvary.  All my degrees are from the

 7    University of Calvary.

 8           But before I finished my master's defense, I

 9    entered medical school at the University of Calvary

10    Cumming School of Medicine and graduated from that

11    university three years later with a medical degree.

12    Q.    When you taught school for eight years, what did

13    you teach?

14    A.    Mostly kids.  But I specialized in chemistry and

15    biology.  I did teach some physics and I taught some

16    mathematics.

17    Q.    And what year did you get your MD?

18    A.    1991.

19    Q.    And that was from the University of Calvary?

20    A.    Yes, sir.

21    Q.    Where did you complete your residency?

22    A.    At the University of Alberta.

23    Q.    And did you have any particular emphasis of study

24    when you pursued your MD?

25    A.    I was very interested in endocrinology and
```

Case 3:18-cv-01234-B Document 112 Reported Filed 09/17/22 Page 23 of 163 PageID #: 6916
F10123-B Document Reporting Services (315) 595-0070
www.EliteReportingServices.com

1    anesthesiology.  I actually wanted to be an
2    anesthesiologist, but I had -- unfortunately, I didn't
3    have the finances to be able to afford that.  I had three
4    small children, so I took the shortest residency that I
5    could take, which was family medicine.
6    Q.      And what do you do professionally, Dr. Williams?
7    A.      My primary occupation is as an emergency
8    physician.
9    Q.      Okay.  And how long have you practiced emergency
10   medicine?
11   A.      I've been -- I was practicing emergency medicine,
12   part-time, from 1993, when I began in private practice,
13   until 2003, at which time I became a full-time emergency
14   physician.  In the precedent years, I practiced clinical
15   family medicine with a -- basically, what we call -- used
16   to call, in those days, general practice, which meant I
17   did everything.  I did obstetrics, I did surgery, I did
18   pediatrics, geriatrics, and admitted to hospital, did
19   hospitalist work, and I also covered the emergency room,
20   you know, pretty much it.
21   Q.      As an emergency physician, what are your
22   responsibilities?
23   A.      Well, when -- as the emergency services physician
24   at any hospital has the responsibility of making the
25   initial assessment examination and diagnosis of emergent

Case 3:18-cv-01234-B   Document Report Filed 09/17/22   Page 24 of 163   PageID #: 6917
EliteReportingServices.com   (615) 595-0073
www.EliteReportingServices.com

```
 1    conditions that present to the emergency department,

 2    making appropriate tests and treatment as required, and

 3    then the settling on a disposition, whether discharge back

 4    into the community or admission to the hospital or

 5    transfer to another facility.  So it's -- it's a complex

 6    job.

 7    Q.      Are those your responsibilities?

 8    A.      Yes, sir.

 9    Q.      Do you perform trauma-related surgery?

10    A.      I do not do surgery in a sense that most people

11    think of it as surgery.  I perform emergency procedures on

12    some trauma patients, which could be considered

13    quasi-surgical, such as placement of chest tubes,

14    which -- excuse me -- thoracostomies, which are procedures

15    for either draining blood out of the chest or air out of

16    the chest.  I do quasi -- I do surg -- sorry -- venous and

17    arterial cutdowns on occasion, but my services are

18    primarily what would be called procedural as opposed to

19    surgical.

20    Q.      So you do not perform what people traditionally

21    think of a surgery?

22    A.      I do not.

23    Q.      Where do you practice emergency medicine?

24    A.      My primary place of practice, right now, is at

25    Citizens Hospital in Victoria, Texas.  I have a couple of
```

ELITE Brenda Peña, Services (361) 575-8073
www.EliteReportingServices.com

1    other hospitals that I do some part-time practice at;

2    Pecos, which is Reeves County Hospital in Reeves County in

3    West Texas, Saint Francis Hospital in Grand Island,

4    Nebraska, and I also have privileges in a couple of

5    hospitals in Wisconsin, but I don't practice there at this

6    point.

7    Q.      Are you an independent contractor at all of these

8    hospitals?

9    A.      I am.

10   Q.      You said that being an emergency services

11   physician is your primary job; is that correct?

12   A.      That's correct.

13   Q.      What other occupations do you have?

14   A.      I have a clinic at -- two clinics, actually, one

15   in Kingsville, Texas, and one in Abilene, Texas, which is

16   very close to me here, where I do --

17   Q.      What are the names of those clinics?

18   A.      The name of my clinic is a PLLC called Anahata

19   Wellness Center, and I specialize there in treatments for

20   hormone replacement for men and women, as well as some

21   minor cosmetic procedures, such as injections, fillers,

22   and neurotoxins for cosmetic purposes.

23   Q.      And do you have any other occupations other than

24   those that we discussed?

25   A.      I do conduct firearms training under the -- my

```
1    other company.  My LLC is called Tactical Anatomy Systems,

2    LLC.  I conduct training for civilian, but primarily law

3    enforcement personnel, in the use of deadly force.

4    Q.      Do you own Tactical Anatomy Systems?

5    A.      I do.

6    Q.      Are there any other employees of Tactical Anatomy

7    Systems?

8    A.      There are not.

9    Q.      Have there ever been any other employees?

10   A.      No.

11   Q.      How long have you operated Tactical Anatomy

12   Systems?

13   A.      I believe I incorporated Tactical Anatomy in '05

14   or '06.  I'd have to look at the articles of

15   incorporation.  I was teaching that same material for

16   about three years prior to incorporation.

17   Q.      Does Tactical Anatomy have a website?

18   A.      Yes.

19   Q.      And is Tactical Anatomy incorporated in Texas?

20   A.      It's incorporated in Wisconsin.

21   Q.      Now, have you ever served as a SWAT team

22   physician?

23   A.      I have.

24   Q.      For how long?  How many years?

25   A.      It was about -- I was on the -- on the SWAT team
```

Case 3:18-cv-01234-B Document Report Filed 08/17/22 Page 27 of 163 PageID #: 6924
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
1    for about two years.

2    Q.      And were you on the SWAT team as a physician?

3    A.      Yes.

4    Q.      What were your duties as a SWAT team physician?

5    A.      Primarily to provide consultation and instruction

6    to the team members and to the administration of the

7    sheriff's department, formulate medical care policies for

8    the SWAT environment, to train the SWAT team members on

9    principles of tactical combat casualty care, T3C, and to

10   attend SWAT operations when it was feasible to do so, and

11   attend as a fully functioning member of the SWAT team to

12   provide oversight of care of any casualties that may occur

13   at the SWAT operation.

14   Q.      As a SWAT team physician, did you treat gunshot

15   wounds?

16   A.      I fortunately never had to treat a gunshot wound

17   as -- as the team physician.  I did treat some gunshot

18   wounds that came from that same department, but I was not

19   on those operations, and I treated them in the emergency

20   department where I was on duty at the time.

21   Q.      Did you perform surgery related to those gunshot

22   wounds?

23   A.      No.  I do not perform surgery, as I previously

24   testified.

25   Q.      Do you have any other current medical employment?
```

Case 3:18-cv-01234-B Document Report Filed 09/17/22 Page 28 of 163 PageID #: 6921
FIClE4Breotument Reporting Services (815) 595 PageID #: 6921
www.EliteReportingServices.com

```
 1    A.       I do not.

 2    Q.       Are you board certified, Dr. Williams?

 3    A.       I am board certified.

 4    Q.       By whom are you board certified?

 5    A.       I am certified by the American Board of Family

 6    Medicine.

 7    Q.       And how long have you been board certified by the

 8    American Board of Family Medicine?

 9    A.       Since 2008.

10    Q.       And are you board certified by any other

11    associations?

12    A.       Yeah.  I maintain -- it's not called board

13    certification, but it's the equivalent in Canada.  I'm

14    certified by the College of Family Physicians of Canada.

15    Q.       And how long have you been certified by the

16    College of Family Physicians of Canada?

17    A.       Since 2003.  Sorry, 19 -- 19 -- 1993.  I

18    apologize, getting my decades mixed up.

19    Q.       Do you belong to any professional associations,

20    Dr. Williams?

21    A.       I belong to the Texas -- Texas Medical

22    Association, TMA.  Am I still on -- I think I'm still a

23    member of the American College of Sports Medicine, but

24    I -- I'm really not very active with that, so I can't

25    recall.  I think my dues --
```

FIQ284Brentwood Reporting Services (915) 595-0075
www.EliteReportingServices.com

```
 1    Q.      Do you --

 2    A.      -- may have lapsed.

 3    Q.      Do you have an active membership in any other

 4    professional associations?

 5    A.      No, I do not.

 6    Q.      Do you consider yourself an expert in firearms,

 7    Dr. Williams?

 8    A.      Yes, I do, in some firearms.

 9    Q.      And what -- which firearms?

10    A.      Primarily pistol, handguns.

11    Q.      Do you consider yourself an expert in rifles?

12    A.      I consider myself less expert, but I am certified

13    as such, yes.

14    Q.      By whom are you certified?

15    A.      National Rifle Association.

16    Q.      And --

17    A.      I --

18    Q.      Do you --

19    A.      I also have expert -- I also have held expert

20    qualification in rifle by the Department of Justice in the

21    State of Wisconsin and by the sheriff's department in

22    that -- that I served at.  So I have expertise there, yes,

23    in rifle.

24    Q.      And on what basis do you consider yourself an

25    expert in riflery?
```

FOLLES-Brennan Court Reporting Services (305) 555-0123
www.EliteReportingServices.com

1     A.      On the basis of having been a lifelong rifle
2     shooter, of being a life -- not a lifelong competitor, but
3     I've been an active competitor in rifle competition and
4     tend to place quite highly.  I have been qualified as a
5     sharpshooter under NRA guideline for qualification.  I
6     qualified as expert with my sheriff's department in
7     Wisconsin.  So those things would say that I'm an expert.
8     Q.      Are there any other bases that lead you to
9     consider yourself an expert in riflery?
10    A.      Not any that you could point a finger at and say
11    this is my certificate in it.  But, no, having the amount
12    of experience I have in the use of rifles, in competitive
13    marksmanship, and in hunting, as well as in tactical
14    training, these things would all speak to my expertise.
15    Q.      Do you teach tactical training with the use of a
16    rifle?
17    A.      I do.
18    Q.      And what does that training consist of?
19    A.      It -- it varies.  Most of my training is classroom
20    training within the -- the Tactical Anatomy curriculum.
21    But we do some training with police car beams; rifles in
22    shot placement, under time and space to rest to -- the
23    objective being to get the officers that I'm training to
24    be able to place their shots more precisely for definitive
25    incapacitation of their adversary, in the shortest

Case 3:18-cv-01234-Brendan Report Filed 09/17/22 e Page 31 of 163 Page ID #: 6924
ELITE Brendan Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    possible time.

2    Q.    Is the focus of this rifle training how to aim a

3    rifle?

4    A.    I would say that's intrinsic in the training, but

5    I don't teach people how to form a safe picture.  When

6    people come to me for my training, they are already --

7    they must already be operating at a fairly high level of

8    proficiency with their firearms.  In other words, they

9    must be able to pass their department's qualification

10   course of fire with pistol, rifle, and shotgun adequately

11   -- and be expert enough with their own weaponry that they

12   know how to aim themselves, without me having to teach

13   them such a basis skill.  I simply refine their ability to

14   aim their rifle in such a way that it can produce a better

15   outcome in an officer-involved shooting.

16   Q.    Is it fair to say you teach them where to aim

17   their rifle?

18   A.    That would be fair.

19   Q.    On what basis do you consider yourself an expert

20   in handguns?

21   A.    I have considerably more competition experience in

22   handguns and considerably more training and -- and

23   qualifications as a handgun instructor.  I'm certified as

24   a pistol instructor by the National Rifle Association.

25   I'm also certified by SADAA (phonetic) group as a

Case 3:18-cv-01234-BLW Document Report Filed 09/17/22e Page 32 of 163 PageID #: 6925
FIGGS - Direct Examination (315) 595-9073
www.EliteReportingServices.com

```
 1    fourth-level instructor.

 2           I have -- what else have I got?  Wisconsin Pistol

 3    Association did at one time qualify me as an instructor.

 4    I was the area coordinator for the in -- International

 5    Defensive Pistol Association for the State of Wisconsin

 6    for ten years, organizing pistol matches.  And I was also

 7    a safety officer instructor for the International

 8    Defensive Pistol Association, in which I instructed the

 9    instructors, telling them how to teach people safe

10    operation of their firearms in a competition environment.

11    Q.     Is this in --

12    A.     I'm also certified as a firearms instructor by the

13    Wisconsin Department of Justice in pistol.

14    Q.     Is there any other basis that we have not

15    discussed upon which you consider yourself an expert in

16    firearms?

17    A.     No, I think we've pretty much covered it.

18    Q.     Do you have any other experience that you relied

19    on, in writing your report in this litigation?

20    A.     Well, pretty much it all comes down to my firearms

21    expertise and my medical expertise, which is a -- an

22    amalgam of two lifelong bodies of study.

23    Q.     Have you ever --

24    A.     So that's about it.

25    Q.     Have you ever shot a human being, Dr. Williams?
```

Case 3:18-cv-01234-Brown Document Report Filed 09/17/22 Page 33 of 163 Page ID #: 6926
FILLIE4 Document Report Filed 09/17/22 Page (315) 595-Page ID #: 6920
www.EliteReportingServices.com

```
 1    A.      I have been fortunate not to do so.

 2    Q.      Have you ever been present when someone other than

 3    yourself received a gunshot wound?

 4    A.      Yes.

 5    Q.      How many times?

 6    A.      Once.

 7    Q.      Under what circumstances?

 8    A.      It was in a hospital emergency room where the

 9    individual was shot by a police officer as he was

10    attempting to carry out an act of deadly force on the

11    officer.

12    Q.      Where was the individual shot?

13    A.      In the leg.

14    Q.      Did you treat the individual?

15    A.      I did.

16    Q.      And what year was this?

17    A.      Somewhere between 2000 and 2003.  I couldn't tell

18    you the exact year.

19    Q.      Have you ever been present when someone was shot

20    in the chest?

21    A.      Other than myself, no.

22    Q.      Have you ever been present when someone was shot

23    in the head?

24    A.      No.

25    Q.      How many people have you treated were shot in the
```

Case 3:18-cv-01234-B Document Report Filed 09/17/22 Page 34 of 163 PageID #: 6921
ELITE Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    head?

2    A.      Hard to say.  Over 100, less than 200, somewhere

3    in there.  I would say 150.

4    Q.      How many of those individuals do you estimate died

5    from that wound to the head?

6    A.      I couldn't say with any precision.  It would be

7    probably more than 80 percent.

8    Q.      What does your treatment of those individuals

9    generally consist of?

10   A.      Of a head gunshot wound?

11   Q.      Yes.

12   A.      Well, my initial assessment is going to evaluate

13   whether the individual is -- is conscious and breathing,

14   maintaining his own airway.  That's my first assessment.

15   I follow the standard ABCs of trauma:  If his airway's

16   intact, that's good.  If he's breathing, that's also good.

17   Does he appear to have circulatory stability?  Are his

18   hemodynamics stable?  Then I have to reassess whether he

19   has some significant disability such that he's not able to

20   control his airway.  And then, if necessary, secure the

21   airway by an intratracheal intubation.  These are the

22   emergent things that need to be gone.

23           Then the next -- the next step -- other

24   than -- after that would be to do a complete survey of the

25   individual, head-to-toe, to see if there's other wounds,

Case 3:18-cv-01234-B   Document 123   Filed 03/17/22   Page 35 of 163   PageID #: 692
FLOYD - DIRECT REPORTER'S (615) 595-0073
www.EliteReportingServices.com

```
 1    other issues I need to be concerned about.  And then as

 2    soon as it's practicable and expedient, I get that

 3    individual to the CT scanner so we can find out what the

 4    heck is going on inside his head, find out where the

 5    bullets have gone, where the wounds are, what the damage

 6    is, and then proceed from there to -- to disposition.  Of

 7    course, we obtain lab work as well.

 8          But, generally speaking, most of the hospitals

 9    I've worked at, in my career, don't have neurosurgical

10    capabilities, so that means the patient has to be

11    transferred to a hospital that does have neurosurgical

12    capability, unless the individual is already deceased, in

13    which case transfer is not necessary.  But most of the --

14    Q.    Do you --

15    A.    Most of the time they're transferred to a

16    neurosurgeon.

17    Q.    And you do not perform neurosurgery, do you?

18    A.    I do not.

19    Q.    Have you ever performed neurosurgery?

20    A.    I've been present when neurosurgical

21    procedures -- been there as an observer and an assistant a

22    handful of times.  Neurosurgery is not something I've

23    looked into in great depth.

24    Q.    But you have not performed neurosurgery yourself?

25    A.    Sure have not.
```

Case 3:18-cv-01234-B   Document Report Filed 09/17/22   Page 36 of 163   PageID #: 6929
EliteReporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1    Q.       Have you ever had anyone come into your emergency

 2    room who had received four bullets to the head and was

 3    still able to return fire, after receiving these wounds?

 4    A.       Yeah.  Yes.

 5    Q.       When was that?

 6    A.       That was sometime between 2003 and 2007, somewhere

 7    in there.  We had a fellow was drunk in our county and he

 8    decided to -- I don't know what he decided -- but, anyway,

 9    he elected, in the circumstances of a domestic dispute, to

10    pull a gun and fire upon the two officers, sheriff's

11    department -- I think it was sheriff -- yeah, they were

12    sheriff's officers, who were there to -- to intervene in

13    the domestic situation.

14           The individual was fired upon by the officers and

15    he was hit four times in the head, none of which were

16    severe wounds.  He was -- they were all peripheral wounds

17    that affected the skin.  One bullet tunneled under the

18    scalp, both the earlobes were hit -- actually, no, the

19    fourth bullet didn't hit his head, it hit his neck.

20    Again, was a superficial wound.

21           All four wounds were superficial and the

22    individual survived by treating in the emergency room with

23    basic -- basic care, and then he was transferred to jail.

24    Q.       And was the individual able to return fire on the

25    officers, after receiving these four gunshot wounds to the
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    head?

2    A.      I don't know whether he did or did not.  But he

3    was certainly capable of doing it, yes.  He was conscious.

4    He was alert.  He was able to -- his judgment was intact.

5    He was able to speak and answer questions.  He had full

6    use of all of his facilities, although he was intoxicated.

7    Q.      Do you agree that there is a huge potential for a

8    variant in outcomes, when someone is shot in the head?

9    A.      Of course.

10   Q.      Is one of those reasons for the potential for

11   variance because the brain stem is very small?

12   A.      That would be fairly low on my list of primary,

13   but yeah, that's certainly true.

14   Q.      Are you reviewing anything in front of you,

15   Dr. Williams?

16   A.      No, I'm just doodling.

17   Q.      Can the brain stem be difficult to hit because it

18   is small?

19   A.      Any small target's hard to hit, sir.

20   Q.      Including the brain stem?

21   A.      Of course.

22   Q.      Can the brain stem be difficult to hit because of

23   the density of the bones in the skull?

24   A.      Well, no.  Hitting the brain stem with a bullet is

25   a matter of firearms accuracy, and it's not really -- no,

Case 3:18-cv-01234-B   Document Report Filed 04/17/22   Page 38 of 163   PageID #: 6935
FICUS Brenon   Reporter   (915) 555-1775
www.EliteReportingServices.com

1    no.  The bones -- the density of the bones and skull are
2    less of a concern than where you're actually aiming your
3    bullet.
4          Even a .22-caliber bullet, a .22 rimfire, has
5    enough energy to penetrate from any angle, provided the
6    angle is -- is aimed precisely.  It requires a
7    perpendicular or nearly perpendicular of the bullet on the
8    portion of the skull that your bullet has to pass through.
9    If it's a tangent past a certain amount, 30 degrees, 45
10   degrees -- I couldn't tell you the precise angle -- once
11   the angle of incidence is tangential enough, it will not
12   penetrate the bone, but it will glance off and on to the
13   scalp.
14   Q.     So is it your testimony, Dr. Williams, that the
15   density of the bones do not make it more difficult to hit
16   the brain stem with a bullet?
17   A.     In sum and in short, yes, that's true.
18   Q.     Does the curvature of the skull's surface make it
19   difficult to hit the brain stem?
20   A.     It can be.  It can be.  If -- well, no, actually,
21   it doesn't make it difficult to hit the brain stem at all
22   because if you're aiming at the brain stem from any angle,
23   you're not going to have to deal with -- with curvature of
24   the skull because you'll be aiming at, virtually, a
25   perpendicular angle; any presentation, 360, 360.  XY is

Case 3:18-cv-01234-B Document Report Filed 09/17/22 Page 39 of 163 PageID #: 6932
ELITE Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    the axis.

2    Q.      Is it well documented in trauma literature that

3    pistol bullets striking the human head at certain angles

4    will glance off the bone of the skull and exit without

5    penetrating the skull?

6    A.      Yes.

7    Q.      What trauma literature is that?

8    A.      The medical trauma literature.  I mean, you can

9    read the articles to that nature in Journal of Trauma,

10   Annals of Emergency Medicine, you name it.  I'm sure you

11   could find it in virtually all of the skull-related

12   journals.  Medical journals, trauma journals, you'll find

13   reports on this type.  It's just --

14   Q.      Do you --

15   A.      Okay.

16   Q.      Do you know the names of any of those reports?

17   A.      No, I don't have them at the top of my head.

18   Q.      Do you know the names of any of those authors?

19   A.      Many of them I will know if I looked at them, but

20   no, I couldn't tell you one off the top of my head.

21   Q.      Do you agree that with a random gunshot to the

22   head, the chances of hitting the brain stem are 6 to

23   7 percent?

24           MS. LEONARD:  Object to the form.

25           You can answer, Dr. Williams.

Case 3:18-cv-01234-BJD-JRK   Document 1234   Filed 09/17/22   Page 40 of 163 PageID #: 6933
Elite Reporting Services   *   (405) 595-9905
www.EliteReportingServices.com

1      THE WITNESS:  Oh, okay.

2      I couldn't tell you whether it's 6 to

3 7 percent, 15 percent, 30 percent.  I've never seen that

4 particular statistic, so I don't have an opinion on it.

5 BY MR. MITCHELL:

6 Q.      So, in your opinion, it could be as much as

7 30 percent that a random shot to the head could hit the

8 brain stem?

9      MS. LEONARD:  Object to the form.

10     THE WITNESS:  I'm sorry.  I didn't answer you

11 correctly, Mr. Mitchell.  My comment was I have no idea

12 what the percentage might be.

13 BY MR. MITCHELL:

14 Q.      How many people have you treated, Dr. Williams,

15 who were shot in the chest?

16 A.      Several hundred.

17 Q.      A thousand?

18 A.      I don't think that many, but it might be getting

19 close to it.

20 Q.      How many of those individuals died of that gunshot

21 wound to the chest?

22 A.      Again, I don't know because I don't see most

23 people after they've been through my emergency department.

24 But my understanding is with -- and depending on the

25 sources you use for the -- some of the most reliable data

Case 3:18-cv-01234-BRM-DEA Document 18-4 Filed 09/17/22 Page 41 of 163 PageID #: 6934
FLORIDA Reporting & Video Services (415) 595-0073
www.EliteReportingServices.com

1     that I think I've seen came out of Miami.  Wasn't medical.

2          Miami Metro Dade did a study of lethality of

3     gunshot wounds, and their estimate was that only about 6

4     percent of gunshot wounds sustained in the field --

5     handgun, gunshot wounds -- resulted in death.  So those

6     are gunshot wounds anywhere.

7          The people that I see who've been shot in the

8     chest in the emergency room tend to be people who are

9     pretty -- pretty badly injured.  There are people who

10    don't even come to the hospital after a gunshot wound, a

11    very small minority of course.  But all of these things

12    make it difficult to estimate the lethality of a gunshot

13    wound to the chest.

14         Outside of the central corridor of the chest,

15    running the -- the middle portion and anterior portion to

16    your presentation, there's a lot of -- a lot of air.

17    There's a lot of non -- nonlethal structures that can be

18    interdicted by a bullet, and they will produce relatively

19    minor injury only and are very survivable.

20         So if I did a search on that, I could probably

21    give you an estimate, but I'd say probably the number

22    of people who die from their gunshot wounds, from their

23    chest, is probably a minority of the cases and, maybe, as

24    small as 30 to 40 percent, but I -- that's just a guess.

25    Q.     How many rifle wounds to the chest have you

```
 1   treated?

 2   A.      Quite a few less.  Probably -- probably fewer than

 3   200, maybe fewer than 100.  I couldn't -- I don't keep

 4   records on these things, so this is just a general

 5   impression of my -- over the course of my career.

 6   Q.      Have you ever seen anyone die by lethal injection?

 7   A.      I have not.

 8   Q.      Have you ever served as an expert for any state

 9   department of corrections?

10   A.      I've never testified as an expert for the

11   department of corrections, no.

12   Q.      Do you have any blogs, Dr. Williams?

13   A.      Yes, I have a blog that I write, intermittently,

14   on my website.

15   Q.      What blog is that?

16   A.      The tactical -- it's the Tactical Anatomy Systems

17   website and it's just called blog.

18   Q.      Do you have any other blogs?

19   A.      No.

20   Q.      What topics do you write about on that blog?

21   A.      Typically, I write about issues of firearms,

22   ammunition, gunshot wounding, police -- issues of police,

23   law enforcement officers, and military imports; issues of

24   the day that affect law enforcement, which, as you may

25   gather, I'm quite a strong poignant of that -- that lobby.
```

Case 3:18-cv-01234-Brenda Document Reporting Services Filed 09/17/22 e Page (415) 595-9090 ID #: 6936

FIOLE34Brenda Document Reporting Services Filed 09/17/22 e Page (415) 595-9090 Page ID #: 6936
www.EliteReportingServices.com

1    Q.      Have you had any other blogs in the past,

2    Dr. Williams?

3    A.      No, I haven't really been a blogger.

4    Q.      Are you on any social media?

5    A.      Yeah.  Yeah, I have a Facebook account, a personal

6    one, as well as a Facebook account for my -- for Tactical

7    Anatomy, and another one for Anahata Wellness systems.

8    Q.      Do you have any other social media accounts?

9    A.      No.

10   Q.      Have you had any other social media accounts in

11   the past?

12   A.      I guess if you call -- social media accounts?  If

13   you call being on an Internet message board, yes, I have.

14   Is that -- is that what you're driving at?

15   Q.      Sure.  What is that Internet message board?

16   A.      Well, there's a bunch of them.  I'm a member of a

17   number of past and present firearms in law enforcement

18   message boards:  24hourcampfire.com would be one, another

19   one would be 10-8, that's 10-8forums.com.  There's a law

20   enforcement one called primaryandsecondary.com, ar15.com.

21   I'm a member on all of these, but I rarely contribute.

22           What's the other one that was -- Dr. Gary Roberts

23   and I were both very active in Primary and Secondary for a

24   while on the issue of gunshot wounding and ballistics.

25   And there's a couple of other wound ballistic pages that I

Case 3:18-cv-01234-B   Document Report   Filed 09/17/22   Page 44 of 163   PageID #: 6947
FIORES Breanna Reporting Services (415) 595-9095
www.EliteReportingServices.com

```
 1    was a member of, for a period of time, but I -- I rarely

 2    go -- excuse me -- I rarely have time to write on or even

 3    read any of those anymore.

 4    Q.      Do you have a username on 24-Hour Campfire?

 5    A.      Yeah, it's Doc Rocket.

 6    Q.      And do you have a username on 10-8 Forums or 10-8?

 7    A.      I believe it's just my name.  James S. Williams,

 8    but it might be JSWMD.  I can't recall.

 9    Q.      Do you have a username on Primary and Secondary?

10    A.      Yeah, but I -- again, I haven't been there for a

11    while.  I think it's JSWMD, or it may be James Williams,

12    MD.  I can't recall.

13    Q.      Do you have a username on ar15.com?

14    A.      I haven't been there -- I must have, but I haven't

15    been there in so long that I can't recall.  I think

16    it's -- if I have a membership, it's James W, MD or it may

17    be Doc Rocket.  I can't recall.

18    Q.      When was the last time you accessed any of these

19    forums?

20    A.      Well, I was doing some COVID education on 24-Hour

21    Campfire back in the summer, July, August.  I usually keep

22    up with some of the hunting news that the guys have --

23    some of the guys I know there.  I might -- I did check in

24    on one of the hunting forums in late December briefly, but

25    that would be it.
```

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1    Q.      Did you prepare an expert report in this case,
 2    Dr. Williams?
 3    A.      I did.
 4    Q.      I'm going to share my screen.
 5            Do you recognize this document, Dr. Williams?
 6    A.      I do.
 7    Q.      Is this your expert report in this litigation?
 8    A.      Yes.
 9    Q.      And it's dated November 10, 2021?
10    A.      Yes, sir.
11    Q.      Okay.
12            MR. MITCHELL:  I'll have this marked as
13    Exhibit 2, please.
14            (WHEREUPON, a document was marked as Exhibit
15    Number 2.
16    BY MR. MITCHELL:
17    Q.      And is this your signature on page 14,
18    Dr. Williams?
19    A.      It is.
20    Q.      Dr. Williams, what questions were you engaged to
21    answer?
22    A.      I was asked to report on the efficiency, efficacy
23    of a firing squad as a means of execution.
24    Q.      Okay.  Do you see right here, on page 4, where it
25    says you're engaged to address two questions?
```

```
 1    A.      Uh-huh.

 2    Q.      Are those the two questions you were engaged to

 3    address?

 4    A.      Those are the specific questions, yes.

 5    Q.      Is the first question:  Would execution by firing

 6    squad cause death in a quick and painless manner?

 7    A.      Yes, that would be what I would call efficacy.

 8    Q.      Is the second question:  Is execution by firing

 9    squad feasible in Tennessee?

10    A.      Yeah.  And that's what I would call efficiency,

11    yes.

12    Q.      Were you engaged by plaintiff's counsel to answer

13    any other questions?

14    A.      This is what I was engaged to answer, and these

15    are the questions I've answered.

16    Q.      Were you engaged to address any other methods of

17    execution?

18    A.      I was not.

19    Q.      Did plaintiff's counsel engage you to craft a

20    protocol for execution by firing squad?

21    A.      They did not.

22    Q.      Have you ever crafted a protocol for execution by

23    firing squad?

24    A.      Absolutely not.

25    Q.      Did you attach your CV to this expert report?
```

```
 1    A.      It was submitted, yes.

 2    Q.      Is your CV up to date in this case?

 3    A.      It should be.  I reviewed it just before

 4    submission, so it would have been up to date at that time.

 5    Q.      As of November 10th, was this list of expert

 6    reports and testimony up to date?

 7    A.      Yes.

 8    Q.      Did you ever testify as an expert in 2021?

 9    A.      In '21?  Yes.  I testified as an expert in

10    deposition in the Glossip case, and I testified in Las

11    Vegas, Nevada, in the -- the other case that I referred

12    to, Floyd, the Floyd case.

13    Q.      And what month did you testify in the Floyd case?

14    A.      I testified around November 18th of 2020.

15    Q.      Do you know if it was on November 18th -- of 2020

16    or 2021?

17    A.      Oh, yeah, '21.  Sorry, 2021.  My bad.  If I look

18    at my calendar, I could tell you exactly what date.

19    Q.      Please do that.

20    A.      Okay.  And I testified on the morning of 18

21    November.

22    Q.      Okay.  And when did you testify in the Glossip

23    case?

24    A.      I don't have that date in front of me.  Last year,

25    July -- June, July, something like that.  Might have been
```

Case 3:18-cv-01234 Document 123 Filed 03/17/22 Page 48 of 163 PageID #: 6941
FJC124-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1   April or --

2   Q.      In 2021 -- I'm sorry, what was that last part?

3   A.      I -- no, I'm -- I was just saying I couldn't

4   remember the month.  Go ahead.

5   Q.      In 2021, did you testify as an expert in firing

6   squad in any other litigation?

7   A.      I did not testify under any litigation last year

8   other than those two -- those two circumstances.

9   Q.      Did you testify as an expert as to firing squad in

10  2020?

11  A.      Twenty-twenty?  I don't believe we had anything in

12  2020, no.

13  Q.      Now, this is a list of your lectures and

14  conferences that you've presented at?

15  A.      Uh-huh.

16  Q.      Have you left any lectures and conferences out?

17  A.      Uh-huh.

18  Q.      Which ones?

19  A.      Yes, I have.  Many.  These -- I just highlighted

20  the ones that I was an -- I was advertised as a speaker

21  at.

22  Q.      So --

23  A.      This -- there's been many other conferences.  For

24  instance, I've attended the IALEFI conference that you'll

25  see in the first instance, IALEFI.  I've attended almost

Case 3:18-cv-01234-BJD-JBT   Document 76-1   Filed 09/17/22   Page 49 of 163 PageID #: 6942
FIND-A-Document Reporting Services (850) 575-9075
www.EliteReportingServices.com

1    every IALEFI conference since 2009.  I missed a couple.

2    ILEETA, which you can see down there in the fourth, I've

3    attended the ILEETA conference almost every year since

4    2007.  That's an annual meeting.  So I attend, but don't

5    necessarily present.  But I'm often asked to participate

6    in discussions.

7            And I served on the panel of experts at ILEETA

8    many years that I've been there.  And there's a -- a panel

9    discussion on the -- one of the afternoons that I lead

10   where the firearms experts panel, answer questions from

11   the -- the general membership attending, and we have a

12   discussion -- a roundtable discussion about issues of the

13   day affecting firearms and gunshot wounds and so forth.

14   Q.      Were you a presenter at any conferences in 2021?

15   A.      No.

16   Q.      Were you a presenter at any conferences in 2020?

17   A.      Yeah.  Yeah.  I presented at IALEFI in 2020.

18   Which I think is on there; is it not?  Oh, no, it wasn't

19   2020, it was 2018.  Time flies.  No, 2018 was the last

20   time I presented at a major law enforcement conference.

21   Q.      After that June 2018 law enforcement conference,

22   have you presented at any other conferences in the

23   intervening three and a half years?

24   A.      I have not.

25   Q.      Do you have any certifications related to firing

Case 3:18-cv-01234-B Document Report Filed 09/17/22 Page 50 of 163 PageID #: 6943
Elite Reporting Services
www.EliteReportingServices.com

```
 1   squad?

 2   A.      Only that I have been accepted as an expert in

 3   firing squad by the State of Arkansas, by the judge of the

 4   State of Arkansas trial, and again here in Nevada.  Those

 5   are the only two things that would give me any bona fides,

 6   I guess.

 7   Q.      Nothing from any sort of professional association?

 8   A.      Yeah, no, I don't know that there is any

 9   professional firing squad organization, so.

10   Q.      Have you undergone any training relating to firing

11   squads?

12   A.      I'm not aware that anyone has ever had any such

13   training available anywhere in the world.

14   Q.      So --

15   A.      So no.

16   Q.      -- is the answer no?

17   A.      So the answer is no.

18   Q.      Have you ever spoken to a participant of a firing

19   squad execution?

20   A.      No, I haven't spoken with him.  I was present when

21   he was -- when he testified in Arkansas.

22   Q.      Who was that individual?

23   A.      It was -- I believe he was the assistant warden.

24   I can't recall his name.  So he was one of the

25   administrators involved in the last -- I might be mistaken
```

Case 3:18-cv-01234-Brenward Reporting Services (615) 595-0073 Page 51 of 163 PageID #: 6944
FIZZ-34 Document Report Filed 09/17/22 Page (51 of 163)
www.EliteReportingServices.com

```
 1   here.  Hang -- let me -- hang on a second.

 2          I recently saw the deposition of the -- the warden

 3   at the Utah prison, and I might be confusing him with the

 4   other fellow.  Let's just say I have -- I think -- I can't

 5   say with certainty that I have -- that there -- that there

 6   was testimony at Arkansas by that individual.  I may be

 7   mistaken.  I may be confounding two different testimonies.

 8   Q.      In any event, you haven't spoken personally with

 9   these individuals?

10   A.      No, sir, I have not.

11   Q.      Now, do you see here, on page 2 of your report,

12   where you state that you've conducted about ten, quote,

13   firearms training in the past five years?

14   A.      Yeah, I see it.

15   Q.      Towards the bottom?

16   A.      Yes.

17   Q.      When was the last firearms training you conducted?

18   A.      I last instructed at a firearms class in October

19   of 2021.  I was an assistant instructor at a class offered

20   by a colleague.  And I last conducted a Tactical Anatomy

21   -- full Tactical Anatomy course in the state of Nevada in

22   2019.

23   Q.      In 2019, 2020, or 2021, did you conduct any other

24   firearms training?

25              MS. LEONARD:  Object to the form.
```

```
 1              THE WITNESS:  I did not -- I did not conduct

 2    any firearms trainings as a -- as the provider of the

 3    training.  I may have provided some ad hoc assistance at

 4    one or two classes that I attended.  But, no, I have not

 5    actually been the on-the-spot trainer for any of them.  So

 6    that's -- that's the sum right there that we talked about.

 7    BY MR. MITCHELL:

 8    Q.      So you assisted a colleague in October of 2021 in

 9    conducting a firearms training; is that correct?

10    A.      Yeah, that's correct.

11    Q.      And in 2019, that was the last Tactical Anatomy

12    Systems firearms training you conducted?

13    A.      Yes, sir.

14    Q.      And did you only conduct the one Tactical Anatomy

15    Systems training in the last three years?

16              MS. LEONARD:  Object to the form.

17              THE WITNESS:  The -- the Nevada class --

18              MR. MITCHELL:  Just a second, Doctor.

19    Dr. Williams, let me interrupt you.  I'm -- I'm sorry.

20              Lynne --

21              THE WITNESS:  Okay.

22              MR. MITCHELL: -- what's the basis for your

23    objection?  Can you explain?

24              MS. LEONARD:  Yeah, it's an unclear question.

25    Could you just rephrase that to make that a little -- a
```

```
 1    little clearer what you're asking?

 2              MR. MITCHELL:  Sure.

 3    BY MR. MITCHELL:

 4    Q.      Dr. Williams, I apologize.  In 2019, did you only

 5    perform one Tactical Anatomy Systems training?

 6    A.      Actually, no.  We already covered the other one.

 7    I conducted the training in Nevada for the Department of

 8    Wildlife, which was, I think, in March.  And then I

 9    conducted the training at Houston, which we've already

10    covered, at the IALEFI conference.  So there were actually

11    two classes that year, but that was the sum total for

12    2019.

13    Q.      How many trainings did you conduct in 2018?

14    A.      I would have to review that, but somewhere in the

15    neighborhood -- three or less.  I don't do a lot of

16    teaching of this stuff anymore.

17    Q.      Were those all through Tactical Anatomy Systems?

18    A.      Yeah.  That's the only -- the only place that I

19    offer training, yeah, is through Tactical Anatomy.

20    Q.      Do you keep records of these trainings?

21    A.      Yes, I do.

22    Q.      How far back do you keep these records?

23    A.      Back to 2006, I would imagine.

24    Q.      And do you have any academic publications in the

25    past ten years?
```

ELITE-Brentwood Report Services (615) 595-0073
www.EliteReportingServices.com

1    A.      No.

2    Q.      Have you ever published a medical literature?

3    A.      Yes.

4    Q.      How many times?

5    A.      Five to ten times.  And this was all back when I

6    was still associated with the research organization at

7    Calvary, so my last publication would have been 1990,

8    1991, something like that.

9    Q.      Is this before you received your MD degree?

10   A.      Yes, I haven't published anything since I got my

11   MD.

12   Q.      Have you published anything related to trauma?

13   A.      Medical trauma, no.

14   Q.      Are you a ballistics expert, Dr. Williams?

15   A.      I am not a ballistics expert, but I have a high

16   degree of familiarity in the field, and I know a lot of

17   ballistics experts, yes.

18   Q.      I'm sorry.  Say that last portion.  I just didn't

19   catch it.

20   A.      I know a lot of ballistics ex -- people that I

21   would consider ballistics experts that I refer to

22   expertise.  Most laymen would consider me ballistics

23   expert, but I -- I tend to defer to my colleagues that are

24   more advanced in the field than I am.

25   Q.      What is the name of a layman who would consider

Case 3:18-cv-01234-B   Document 123   Filed 09/17/22   Page 55 of 163   PageID #: 6942
ELITE Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    you a ballistics expert?

2    A.      Rob Mitchell.  Anybody who doesn't study

3    ballistics would have to consider my knowledge to be

4    expert above their own.

5    Q.      So is it your testimony I would consider you a

6    ballistics expert?

7    A.      I'm being facetious, Mr. Mitchell, of course.  But

8    anyone who has not studied ballistics to any great extent

9    would consider my knowledge expert.  So, for example, when

10   I went -- I attended a revolver symposium in -- at a gun

11   site in Arizona in late November.  Even though I was not

12   there as an expert, I was deferred to as an expert by many

13   of the instructors present because of the fact that I have

14   known expertise in the firearms community in this area.

15           So I don't mean to dissimulate.  Truly, I don't.

16   But I've never considered myself to be a ballistics

17   expert.  I'm more of an expert in the terminal effects of

18   ballistic projectiles, and the distinction is very real.

19   Q.      So you don't consider yourself a ballistics

20   expert?

21   A.      That would be correct.

22   Q.      Have you ever published in ballistics literature?

23   A.      I have not.

24   Q.      I'm sorry, what was that?

25   A.      I have not.

Elite Reporting Services
www.EliteReportingServices.com

```
 1    Q.      Now, returning to your expert report, on page 14,
 2    did you conclude that firing squad is a feasible means of
 3    execution in Tennessee?
 4    A.      I did.
 5    Q.      What does it mean for a firing squad to be
 6    feasible?
 7    A.      Well, my -- my definition of feasibility would be
 8    that it would be feasible to take a condemned person to a
 9    place of execution, by personnel of the State of Tennessee
10    Department of Corrections, to affix that person in such a
11    manner that he could not avoid the projectiles, to
12    assemble a group of riflemen, employed by or engaged by
13    State of Tennessee Department of Corrections, and that
14    they should be able to shoot him to death with those
15    rifles in an expedient manner that would result in a quick
16    and relatively painless death.
17    Q.      And that's what it means for an execution by
18    firing squad to be feasible in Tennessee?
19    A.      That's what I would say feasibility entails.
20    Q.      And is this still your conclusion today that
21    execution by firing squad is a feasible means of execution
22    in Tennessee?
23    A.      Yes.
24    Q.      Has your conclusion changed in any way from
25    November 10, 2021?
```

```
 1    A.      It has not.

 2    Q.      Did you also conclude that firing squad execution

 3    will result in a quick and painless death?

 4    A.      Yes.

 5    Q.      What does it mean to have a painless death?

 6    A.      Well, it's highly subjective, sir.  Pain is a

 7    highly subjective function.  But in the -- in the grand

 8    scheme of things, a death that involves absolutely no

 9    sensation, no neural sensations of a noxious nature.

10    There are -- such a thing is extremely rare.  It is

11    achievable, but it's extremely rare.

12    Q.      Painless death is extremely rare?

13    A.      If we're talking about neurological definition of

14    zero pain, yeah, it's extremely rare.  Death is -- death

15    is almost always -- and when I say almost always, I mean

16    in the -- the quantities of deaths that may be truly

17    painless, are infinitesimal, a drop in an ocean.  Pain is

18    always involved in death.

19            So when I speak of painless, I'm speaking in terms

20    of the overall spectrum of pain that a person goes through

21    in the process of passing from life to death.  Death by

22    gunshot wound, by firing squad, is as about as painless as

23    it gets, short of a gunshot wound directly to the brain

24    stem, which is the only thing I can say -- I can think of

25    that will actually result in an instantaneous death with
```

Case 3:18-cv-01234-Brocument Report-Filed 09/17/22e Page 58 of 163 PageID #: 6951
FLORA BREWER, Official Court Reporter (615) 595-0073
www.EliteReportingServices.com

1    no more neurological impulses conveying pain to the brain.

2    That's the only exception.

3    Q.    Could the same gunshot in two different

4    individuals create different experiences of pain for each

5    of those individuals?

6    A.    It could do.  I mean, there's -- there's -- it's

7    hard to compare apples to apples because human -- just

8    variations in human anatomy are so wonderful and varied

9    that what appears to be exactly the same sort of gunshot

10   wound in one person may actually result in a very

11   different, subjective impression in another person.

12        Blood vessels don't follow an anatomically

13   prescribed pattern.  Neither do nerves.  So it's very

14   possible that a wound that would be relatively painless in

15   one man might be considerably more painful in another.

16   But in the main -- if we look at an average, if you will,

17   of similar injuries, whether it's gunshot wounds, crush

18   injuries, electrical injuries, what have you, they'll all

19   produce a -- they will all tend to exhibit central

20   tendencies in the Gaussian format, just like anything

21   else.

22   Q.    As an emergency department physician, have you

23   ever seen a painful death?

24   A.    Many times.

25   Q.    How many times?

```
 1    A.       Many times.

 2    Q.       Under what circumstances?

 3    A.       Death by heart failure, death by myocardial

 4    infarction, people who've died from traumatic injuries in

 5    motor vehicle collisions, deaths from infectious disease

 6    resulting in cardio respiratory failure.  The list goes

 7    on.

 8    Q.       What are some other examples in that list?

 9    A.       Death by drug toxicity, death by edged weapons,

10    death by blunt instruments, beating to death, death by

11    gunshot wound, of course, death by electrical injury,

12    death by burns.

13    Q.       And those are all examples of painful death you've

14    seen as an emergency department physician?

15    A.       Yes.

16    Q.       You mentioned death by gunshot wounds.  How many

17    painful deaths by gunshot wounds have you seen?

18    A.       Not too many.  Not too many.

19    Q.       Out of the hundreds and hundreds of gunshot wounds

20    you've treated?

21    A.       As I said -- as I told you, most of the people

22    that I see who have gunshot wounds don't die in the

23    emergency room.  They may die in the operating room, they

24    may die in the hospital later, or they may be dead by the

25    time I see them.  So the number -- number of actual deaths
```

ELITE Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    that I see, as they happen, is relatively small; a few

2    dozen.

3    Q.      Dr. Williams, what does it mean to have a quick

4    death?

5    A.      It's very subjective, isn't it?  You talk to the

6    man who's taken six months to die from very painful bone

7    metastasis from his prostate cancer and ask him what a

8    quick death is.  He'll tell you something very differently

9    than the man who dies from 24 hours of slowly suffocating

10   in his pulmonary fluids that are accumulating because of

11   congestive heart failure.

12           The man who's dying from metastasis will consider

13   that a slow death by suffocation, over 24 hours, to be a

14   quick and preferable way to die.  It's -- it's a

15   meaningless question, sir.  The quickness is entirely

16   subjective.

17   Q.      So when you concluded that firing squad will

18   result in a quick death, that was entirely a subjective

19   use of quick?

20   A.      It's a subjective term that I think most people

21   can identify with.  Since you and I have not had to face

22   death personally, we can only draw our -- our frame of

23   reference from what we've read and heard.  So we look at

24   what people have gone through, in the course of their

25   dying, as it's reported to us or as we observe ourselves,

Case 3:18-cv-01234-B   Document 123   Filed 09/17/22   Page 61 of 163 PageID #: 6954
ELITE REPORTING SERVICES   (615) 595-0073
www.EliteReportingServices.com

```
1    and then we have to make conclusions as to what we think
2    would be quick or by comparison.
3           Now, from myself, looking at -- having seen people
4    die by inches over months or even years, I would consider
5    a death that takes five or six or ten seconds from a
6    gunshot wound -- or a series of gunshot wounds to the
7    chest to be very quick indeed, but that's my subjective
8    opinion.  You know, the concept is not one that has ever
9    been quantified in any literature.
10   Q.      Do you consider a quick death to be a death that
11   occurs in under 30 minutes?
12   A.      Compared to dying by inches from bone metastasis,
13   yeah.  I mean, this is -- it's all relative, sir.  You
14   can't --
15   Q.      Have you ever -- have you ever personally
16   witnessed someone die by a quick death?
17   A.      I've seen people die very quickly, yes.
18   Q.      How many times?
19   A.      Dozens.
20   Q.      Under what circumstances?
21   A.      By cardio -- the list I gave you earlier:
22   Myocardia infarction -- well, not the whole list -- motor
23   vehicle collisions and injuries sustained from those.
24   Those -- basically, traumatic deaths can be very quick
25   indeed.  Most medical deaths take a bit longer.  The sole
```

Case 3:18-cv-01234-B   Document Report Filed 09/17/22   Page 62 of 163   PageID #: 6955
ELITE Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1    exception to that, that I can think of, would be -- that's
 2    actually not the sole exception.  The two major exceptions
 3    would be myocardia infarction with association cardiac
 4    arrhythmias, and the other one would be, of course,
 5    massive stroke, which would be very quick.
 6    Q.      Have you ever been present on the scene of a motor
 7    vehicle accident when someone died?
 8    A.      Yes.
 9    Q.      How many times?
10    A.      Half a dozen.  No, not that many.  Twice.  Twice
11    that I've actually seen the person die.
12    Q.      And were you present when that motor vehicle --
13    when those two motor vehicle accidents happened?
14    A.      Unfortunately, yes.
15    Q.      Were you present in your capacity as a physician?
16    A.      I was there as a bystander in both cases, but I
17    did render medical aid in one case.
18            Sorry.  Dogs.
19    Q.      Is it still your conclusion today that execution
20    by firing squad will result in a quick and painless death?
21    A.      That is my contention, yes.
22    Q.      Has your conclusion changed in any way from
23    November 10, 2021?
24    A.      It has not.
25    Q.      What is your basis for concluding that execution
```

Case 3:18-cv-01234-Brenwood Reporting Services (615) 595-0073
PLICE4 Document Report Filed 09/17/22 Page 63 of 163 PageID #: 6956
www.EliteReportingServices.com

1    by firing squad is a feasible means of execution in

2    Tennessee?

3    A.      By the means that I described to you earlier.

4    It's not difficult to take a condemned person to a place

5    where he can be shot to death.  It's not difficult for the

6    department of corrections to assemble the rifles,

7    ammunition, and riflemen necessary to commit an execution.

8           The complexities, the mechanics, the -- the steps

9    that need to be taken for that sort of execution are no

10   more onerous than those required for execution by lethal

11   injection.  And in some cases, it may be considerably less

12   fuss and bother.  It's certainly less than the fuss and

13   bother involved with death by electrocution.

14   Q.      Have you ever attended a death by electrocution?

15   A.      I've seen death after electrocution, yes.  I have

16   not attended an execution by electrocution.

17   Q.      What do you mean by you've seen death after

18   electrocution?

19   A.      I've attended -- I've attended to individuals

20   who've been electrocuted in -- in an accidental situation

21   where they have been brought to me shortly thereafter.  In

22   each case, they were already dead.  They had already died.

23   They died at the scene.

24   Q.      So you have not seen a lethal injection execution

25   occur?

```
 1    A.       I have never seen an execution, of any kind, in
 2    person.
 3    Q.       Have you ever witnessed an execution of any kind
 4    be rehearsed?
 5    A.       No.
 6    Q.       What type of firearm would the defendants need in
 7    this case to execute someone by firing squad?
 8    A.       Rifles.  Center-fired rifles, major caliber.  What
 9    we would -- is commonly referred to as a high-powered
10    rifle; a hunting rifle, a deer rifle, a police rifle.
11    Something with a caliber -- well, a caliber is -- is just
12    a measure of the diameter of the bullet or the diameter of
13    the bore of the barrel.
14           Really, what we're talking about is a -- is a
15    firearm capable of firing a projectile with sufficient
16    energy to kill a large mammal, so a deer-hunting rifle is
17    what most people would identify.
18    Q.       Are any of the examples you mentioned preferable
19    to any of the others?
20    A.       Not really.  Not really.  Any -- any hunting rifle
21    that is in common use -- I should say hunting ammunition
22    that is in common use -- any rifle ammunition that is in
23    common use for law enforcement purposes should be
24    sufficient for this task.
25    Q.       When an execution by firing squad occurs, should
```

1    the condemned be fixed in a stationary position so the

2    condemned does not become a moving target for the

3    riflemen?

4    A.      Absolutely.

5    Q.      Should a target be placed on the condemned?

6    A.      I think that would be expedient, yes.

7    Q.      Where should the target be placed?

8    A.      It should be placed over the upper portions of the

9    cardiovascular bundle.  So I would -- I would estimate --

10   I mean, something -- a paper or cloth target or a

11   piece -- whatever -- a flat piece of something that's

12   about 3 to 4 inches in diameter and placed over the lower

13   part of the sternum, overlapping the left sternum border,

14   and that would be an anterior posterior presentation.  The

15   final would be upper part of the ventricles, the atria,

16   and the other roots, the pulmonary trunk roots and so

17   forth.

18   Q.      Should the target be placed on the head?

19   A.      If you're just -- if your protocol requires that

20   the person be shot in the head, then put it on the head.

21   That's up to the state doing the executing, sir.  It's not

22   up to me.

23   Q.      Is one purpose for placing the target on the chest

24   to avoid disfiguring the face out of sympathy and dignity?

25   A.      I believe that is the case.  I've seen it.  I've

Case 3:18-cv-01234-Brian Document Report Filed 09/17/22 Page 66 of 163 Page ID #: 6959
FIG1284 Document Report Filed 09/17/22 Page (65) 575 Page ID #: 6959
www.EliteReportingServices.com

1    read it mentioned in several sources, yes.

2    Q.      And is another purpose for placing the target on

3    the chest to enable postmortem identification?

4    A.      I've read that as well, yes.

5    Q.      Do you agree with what you've read?

6    A.      It makes some sense.  I have no opinion one way or

7    the other.

8    Q.      You use the term "cardiovascular bundle."  Is that

9    a medical term?

10   A.      Yes.

11   Q.      What is the cardiovascular bundle?

12   A.      It is the collection of the heart and the great

13   vessels in the mediastinum of the chest.  They

14   are -- these structures are all closely together.  They

15   comprise the -- in vertical presentation.  The

16   cardiovascular bundle is roughly from the bottom of the

17   sternum up to about two-thirds of the way up the sternum.

18   And about -- you know, the -- on the left extreme would be

19   the apex of the heart; the right extreme would be the

20   right atrial border; vertically, the top of the aortic

21   arch; and in the inferior margin would be roughly the apex

22   of the heart as well.

23   Q.      Are there any other structures in the

24   cardiovascular bundle?

25   A.      Within the cardiovascular bundle, there are the

Case 3:18-cv-01234-B   Document Report Filed 03/17/22   Page 67 of 163   PageID #: 6964
ELITE Broadwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    heart, which comprises the two atria and two ventricles.

2    There'd also be the aortic root, the pulmonary trunk, the

3    two pulmonary arteries.  You also have the return

4    vascular, which would comprise the -- the venous sinus,

5    the superior vena cava -- or the inferior vena cava, and

6    the pulmonary veins returning from the -- the lungs.  So

7    these -- these are the primary components of the

8    cardiovascular bundle.

9    Q.      Do you agree that if someone is shot in 80 percent

10   of the chest, that it will not produce anything close to

11   cardiovascular incapacitation?

12   A.      Yes, that's quite true.

13   Q.      Is cardiovascular incapacitation desirable for

14   firing squad execution?

15   A.      That is the primary mechanism by which mortality

16   is achieved, yes.

17   Q.      What is cardiovascular incapacitation?

18   A.      The mechanism of death, of dying, is to cause the

19   brain to cease to function.  The central nervous system,

20   the brain, is where the life force appears to be

21   concentrated, and once the brain ceases to function,

22   that's considered brain death, and that is the currently

23   accepted, final definition of death in the medical

24   literature and consensus among physicians is brain death.

25           Brain death can be achieved by destruction of the

Case 3:18-cv-01234-BJD-PDB  Document Report Filed 05/17/22  Page 68 of 163  PageID #: 6965
Florida Brannen Court Reporting Services (850) 585-9973
www.EliteReportingServices.com

1    brain itself, but it's more commonly achieved or

2    accomplished or results if some -- often -- usually, it's

3    not intentional, but it's -- it -- it's the culmination of

4    the lack of circulation of blood to the brain with the

5    delivery of oxygen to the brain.

6            Oxygen is absolutely necessary for the brain to

7    function, and the brain tissues, the neurons in the brain,

8    require a constant supply of oxygen to stay alive.  Brain

9    cells cease to function after they have lost sufficient

10   oxygen to keep their energy cycles working, and this takes

11   only a matter of a few seconds, once circulation has

12   ceased to the brain.

13           So if you stop circulation at the cardiovascular

14   bundle, you stop delivery of oxygen to the brain, and the

15   brain's reserves of oxygen that it can maintain function

16   with is typically exhausted within six, seven, maybe ten

17   seconds.  In an individual who has hyperventilated prior

18   to the moment of death, that brain reserve may be a little

19   longer.  May go up to 15, 16, 20 seconds by some

20   estimates, but it certainly doesn't last longer than that.

21           So when we use the cardiovascular gunshot wound as

22   our means of execution, what we're really doing is

23   stopping the brain oxygen delivery system, and

24   that's -- that's how you accomplish inflicting mortality

25   upon the individual.

Case 3:18-cv-01234-Brick Document Report Filed 09/17/22 e Page 69 of 163 PageID #: 6962
ELITE Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1              Can we pause now, sir?  I could use a break.

 2    Q.       Absolutely.  Should we say 13 minutes, 10:45

 3    central?

 4    A.       That's fine.  I don't need that long.  But if that

 5    works for everybody else, I'm fine with it.

 6    Q.       Just to round it up to something easy.

 7    A.       Sure, let's do that.

 8    Q.       Thank you.

 9    A.       Thank you, sir.

10              (WHEREUPON, a recess was taken at 10:33 a.m. and

11    the deposition resumed at 10:45 a.m.)

12    BY MR. MITCHELL:

13    Q.       Dr. Williams, during our break, did you look at

14    anything?

15    A.       Just checked some e-mails, that's all.  Not

16    relevant to this case.

17    Q.       Okay.

18    A.       Nothing relevant.

19    Q.       Related to the firing squad?

20    A.       No, just business stuff.

21    Q.       Related to any other case?

22    A.       No, sir.

23    Q.       Did you speak with anyone during our break?

24    A.       I did not.  I spoke to my wife.  She was on her

25    way out the door.
```

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1    Q.      About this deposition?

 2    A.      No, uh-huh.  No.

 3    Q.      Is it your position that it's feasible for the

 4    defendants in this case to execute by firing squad?

 5    A.      I'm sorry.  Can you repeat the question.

 6    Q.      Sure.

 7            Is your position that it is feasible for the

 8    defendants in this case to execute an inmate by firing

 9    squad?

10    A.      Oh, okay.  I'm sorry.  I'm mixing up plaintiffs

11    and defendants in my head.  Yes, sir, I believe that's

12    true.

13    Q.      It is feasible for the defendants to execute an

14    inmate by firing squad?

15    A.      I have no familiarity with the Department of

16    Corrections, so I really don't know where they would do

17    it.  It's up to them.

18    Q.      Is there a risk that a bullet could ricochet

19    during a firing squad execution?

20    A.      If they excercise the level of care and intention

21    as done by other jurisdictions, that risk is virtually

22    nil, but there is a slight possibility.

23    Q.      What is the level of care and intention exercised

24    by other jurisdictions?

25    A.      Well, just to use the Utah firing squad death
```

FIORE Breedlove Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  chamber, for example, they provide for a very good level

2  of protection for witnesses and the execution squad itself

3  by placing the other individuals behind bullet resistant,

4  ballistically impervious materials.  So they have

5  ballistically resistant windows for the witness viewing

6  chambers, which are embedded in ballistically resistant

7  walls.  I'm not exactly sure what the construction is, but

8  even a direct -- a directive fired caliber from one of the

9  execution rifles couldn't penetrate them at a 90-degree

10  angle of incidence.  That's what I'm told.

11      Likewise, the execution squad is behind a

12  ballistically impervious barricade, which has various

13  small firing slits located in them, so there's a remote

14  possibility that a ricochet could come back through one of

15  those slots and injure one of the execution squad members,

16  but, again, the likelihood of that is extremely small.

17      So that's the nature of the execution chamber, as

18  I understand it.  And this is from testimony that I've had

19  deposition at trial and that I have reviewed in other

20  cases.  I have not actually seen the execution chamber.

21      Now, the other -- I think the more important means

22  of preventing collateral damage, unintended injuries from

23  ricochet, is that the -- the subject, the condemned

24  person, is strapped into a chair, which is affixed to a

25  firm platform, and the backstop for the chair consists of

| | |
|---|---|
| 1 | heavy lumbar, behind which is some absorbant material that |
| 2 | slows the bullet down. And then behind that is a heavy, |
| 3 | ballistically impervious blanket, for lack of a better |
| 4 | term, which bullets are unlikely to penetrate or bounce |
| 5 | off of. |
| 6 | And then should any of these bullets pass through |
| 7 | the body of the condemned through the plywood -- or not |
| 8 | plywood -- but the lumbar or through the ballistically |
| 9 | absorptive materials behind that, it essentially sandbags |
| 10 | it. Then the -- the Kevlar blanket will absorb the |
| 11 | remaining injury of those -- energy of those bullets and |
| 12 | they will not pass any further. |
| 13 | Since there's no hard surfaces of sufficient |
| 14 | hardness that a bullet would bounce used in the |
| 15 | manufacturer of the chair, even if a bullet was to go |
| 16 | astray by a substantial margin, which is extremely |
| 17 | unlikely given the training that they use for the |
| 18 | execution team -- I'm not saying impossible, but extremely |
| 19 | unlikely -- the -- the possibility of a ricochet is |
| 20 | virtually nil. You never say 100 percent certainty, but |
| 21 | very, very low probability that anything would ever bounce |
| 22 | off. |
| 23 | Q. Is everything that you just testified to in the |
| 24 | Utah protocol? |
| 25 | A. Yes, sir. |

Case 3:18-cv-01234-B Document Report Filed 09/17/22 Page 73 of 163 PageID #: 6956
EliteReportingServices.com (615) 595-0073
www.EliteReportingServices.com

1   Q.      And those are all measures Utah takes to prevent a

2   ricochet from occurring, correct?

3   A.      That's my understanding, yes.

4   Q.      What is the chair that the condemned is affixed to

5   in Utah made of?

6   A.      Lumbar, wood.

7   Q.      Now, what other measures does Utah take to address

8   the possibility of a bullet ricochetting?

9   A.      Pretty much it.  I don't think -- I can't think of

10  anything else.  I may have omitted something

11  unintentionally, but I think that covers it all.

12  Q.      Are there any other measures you can think of that

13  would address the possibility of a bullet ricochetting

14  during an execution by firing squad?

15  A.      I can't think of anything over and above the

16  measures I've given you that has any -- there's any need

17  for, or any feasibility of constructing.

18  Q.      What sort of experience -- I'm sorry, what was

19  that last part?

20  A.      You know, if I thought about it, I might be able

21  to come up with a couple other ideas.  Maybe you could

22  extend the Kevlar blanket to the sides of the -- of

23  the -- of the chair on the platform so that you'd have

24  more of a -- three sides surround the individual, you

25  know, and over the top of it.  I suppose that would work

Case 3:18-cv-01234-BRM Document Report Filed 09/17/22 Page 74 of 163 PageID #: 6961
FLORA BRENNEMAN - Certified Court Reporter (415) 595-9093
www.EliteReportingServices.com

1    or could work.  But then that would block the view of the
2    condemned person from the witnesses, so that really
3    wouldn't be feasible, unless you put the witnesses
4    behind -- on the same side as the execution team, and then
5    that would involve building a second level.
6           I don't know.  I mean, there's -- there's things
7    that could be done.  But the steps that have been taken by
8    Utah Department of Corrections seem to have been well
9    thought out, very thorough, and there certainly has never
10   been a reported incident of ricochet in Utah, in any of
11   the executions that they've undertaken by firing squad
12   since the mid-1800s, so.  And I am frankly not aware of
13   any reports of anyone injured by a ricochet during a
14   firing squad -- a firing squad execution ever.  So I don't
15   know that anything beyond what Utah has done is -- is
16   necessary.
17   Q.     How many executions by firing squad has Utah
18   conducted since the mid-1800s?
19   A.     I don't have that number at my fingertips.  It's
20   about 40, I believe.  No, that's too many.
21   Q.     What sort --
22   A.     Yeah.  Oh, I just looked at this last month -- or
23   in November.  In the mid-20s, I think, 25 or so.
24   Q.     What sort of experience is necessary to execute
25   someone by firing squad?

```
 1    A.      You mean aside from administrative experience.

 2    Q.      Well, firearms proficiency?

 3    A.      Oh, certainly, yeah.  In terms of the

 4    executioners, the riflemen, yeah, they would need to be

 5    experienced.  They need to be able to exhibit --

 6    certainly, they would need to meet the minimum standard

 7    for law enforcement training in their state.  Rifle

 8    qualification courses of firearms are very well

 9    established in every state.  Of course, there are firearm

10    or marksmanship requirements that must be met.  These vary

11    from state to state.

12            It's been awhile since I've looked at Tennessee's

13    requirements, but the peace officers in Tennessee must

14    qualify -- if they're authorized to use a rifle, they must

15    qualify with it on a regular basis; I believe twice

16    annually.  They must be able to hit at a specific target

17    in a specific range, which is, you know, within a

18    reasonable degree of certainty and acceptable standard for

19    police firearms proficiency.  And, in fact, the standard

20    that they must meet in -- in the rifle qualification is a

21    higher standard than would be required to hit a 3-inch

22    circle or 4-inch circle, on the chest of a condemned

23    person, at a distance of 21 feet.

24            So the proficiency of any certified rifle --

25    certified peace officer who is certified to use a rifle on
```

ELITE-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    duty, any of those individuals would have the requisite

2    marksmanship capabilities to serve on a firing squad.

3    Q.      Do you agree that any firing squad shooter should

4    be trained in marksmanship?

5    A.      Yes.

6    Q.      Do you agree that any firing squad shooter should

7    be certified in marksmanship?

8    A.      Yes.

9    Q.      How long does it take to be trained in

10   marksmanship?

11   A.      It depends on the state's requirements.  Most

12   states have a requirement -- a minimum requirement for

13   marksmanship training with firearms that they have in

14   their prescribed academy curriculum.

15   Q.      Do you know whether Tennessee has a requirement?

16   A.      I haven't looked at the training requirement

17   recently, but yes, I believe they do have it.  I do know

18   that the agencies in Tennessee that I have trained with

19   have rigorous standards, and I believe those are -- I know

20   those follow the guidelines from Tennessee POST

21   requirements.  But I think in Nashville -- Nashville Metro

22   actually goes over and above those.  So those are agencies

23   that meet and exceed the State requirements within the

24   state of Tennessee.

25   Q.      What agencies have you trained with in the state

Case 3:18-cv-01234-Brieout-next Report Filed 09/17/22e Page (615) 595-0073D #: 6974
ELITE Breoutnext Reporrting Services (615) 595-0073
www.EliteReportingServices.com

```
 1    of Tennessee?

 2    A.      I've conducted training at Metro Nashville PD on

 3    three occasions, I believe, in the past.  And those

 4    trainings have been attended by multiple agencies, not

 5    just Metro Nashville PD, but Tennessee State Patrol have

 6    attended, members of that organization, and a number of

 7    the local police force and -- and sheriff's department

 8    personnel in that part of Tennessee.

 9    Q.      When was the most recent training in Tennessee you

10    conducted?

11    A.      I'd have to look at my records.  I believe it was

12    2008.  Might have been 2009.

13    Q.      Is there a difference between shooting a human and

14    shooting a target?

15    A.      In terms of the mechanics, no.  In terms of the

16    subjective experience, there's an enormous difference.

17    Q.      What is that difference in terms of the

18    psychology?

19    A.      The difference is enormous.  Lieutenant --

20    Lieutenant Colonel Dave Grossman wrote a book, "On

21    Killing," which I have supplied the publication

22    information on.  If you haven't read it, I highly

23    recommend it.  It's -- Lieutenant Colonel Grossman is a --

24    is an expert on the psychology of killing, possibly the

25    leading world expert on it.
```

FLO12-4B Document Report Filed 05/17/22 Page (815) 595 PageID #: 6971
www.EliteReportingServices.com

```
 1          He comments on his -- in the introduction to his

 2   book, that the act of homicide is universal human phobia.

 3   We are instinctly -- as human beings, instinctively have a

 4   psychological barrier.  It's hardwired into us at some

 5   level, and we have a barricade that makes killing another

 6   human being a frightening, if not a phobic, stimulus in

 7   such that it must be conditioned out of the individual by

 8   training in order to act in a manner that one can actually

 9   inflict death upon another human being.

10          History's full of the examples of people who have

11   successfully trained in this endeavor.  And it doesn't

12   matter whether it's on the criminal side or on the side of

13   law and order, individuals must be trained to inflict harm

14   on another person.

15   Q.      How long --

16   A.      That --

17   Q.      -- does it take to train -- how long does it take

18   to train to inflict harm on another person?

19   A.      It varies.  It varies with the person.  And since

20   I don't conduct that training, I couldn't give you a

21   specific time frame.  David Grossman suggests that it can

22   be done in as little as less than six months by taking a

23   raw recruit into the United States military and turning

24   that individual into an effective killer of human beings.

25   Q.      Do you agree that the vast majority of people find
```

Case 3:18-cv-01234-B   Document Report   Filed 09/17/22   Page (915) 535-0643   PageID #: 6972
FI01234Breed net ReportFiled 09/17/22 es Page 79 of 163 Page
www.EliteReportingServices.com

```
 1    it psychologically much more difficult to shoot a person

 2    than a target?

 3    A.      Absolutely, I agree.

 4    Q.      Have you spoken with anyone at the Tennessee

 5    Department of Corrections about executions by firing

 6    squad?

 7    A.      I have not.

 8    Q.      Do you know, personally, any individuals from

 9    Tennessee who are willing to carry out execution by firing

10    squad?

11    A.      I haven't asked them specifically, but I know a

12    number of people who I think might be willing to do so.

13    Q.      But you don't know because you haven't asked them

14    if they're willing?

15    A.      I haven't specifically asked them.

16    Q.      So is the answer no, you do not know any

17    individuals in Tennessee who are willing to carry out an

18    execution by firing squad?

19    A.      True, that's my answer.

20    Q.      About how many sworn officers are there in the

21    state of Tennessee?

22    A.      When I looked at that a few weeks ago, I believe

23    it was about 15,000.

24    Q.      And what is the basis for that statistic?

25    A.      I looked it up on the State of Tennessee website.
```

Case 3:18-cv-01234 Document 123-4 Filed 09/17/22 Page 80 of 163 PageID #: 6972
FIRAS Brandon Reporter Services (615) 595-0073
www.EliteReportingServices.com

```
 1    Q.      Where on the State of Tennessee website did you
 2    look that up?
 3    A.      Couldn't tell you.  I just did a search on the
 4    Tennessee website.  Yeah, I couldn't tell you exactly
 5    where it is.
 6    Q.      What State of Tennessee website was that?
 7    A.      Tennessee.gov.
 8    Q.      Has it been your experience that all law
 9    enforcement personnel are expertly familiar with the use
10    of a rifle?
11    A.      No.
12    Q.      Do you agree that a death by firing squad is not
13    guaranteed to be free from human error?
14    A.      Do I guarantee -- can you put that without the
15    double negatives.
16    Q.      Do you agree that a death by firing squad could
17    have human error?
18    A.      Yes, I agree.
19    Q.      Now, in your expert report, you cited both Utah's
20    current protocol for execution by firing squad and older
21    firing squad protocol of the U.S. Army in support of your
22    conclusion that execution by firing squad is a feasible
23    means of execution; is that right?
24    A.      No, the current U.S. military method is -- is
25    feasible, their old protocol is feasible, and the current
```

1   Utah protocol are feasible.  They're all feasible.  I

2   alluded to both a former and a current U.S. military

3   protocol, I believe.  In fact, in any case, if I didn't

4   refer to it in that way, I'm sorry.  But I have testified

5   as to all three of those protocols.  I may be confusing my

6   -- my case here.

7   Q.      So here, on page 4 of your report, under Materials

8   Considered, you considered, first, Utah's Protocol for

9   Execution by Firing Squad, correct?

10  A.      Correct.

11  Q.      And it says that that was attached to this report?

12  A.      I believe it was, yes.

13  Q.      And if we scroll down, do we see that attachment

14  anywhere before your CV?

15  A.      I don't see it there, no.

16  Q.      Do we see it after your CV?

17  A.      I guess not, no.

18  Q.      And two, do you also consider the U.S. Army's

19  protocol for executions by firing squad attached to this

20  report as Appendix C?

21  A.      Yes, I did consider the U.S. Army's protocol.

22  Q.      And did we see that anywhere attached to this

23  report before or after your CV?

24  A.      I don't see it here, no, sir.

25  Q.      And is your position that there are two U.S. Army

1    protocols that you considered in preparing this report?

2    A.       Yes, there are.

3    Q.       And what are the dates of those U.S. Army --

4    A.       The former protocol -- the former protocol was, I

5    believe -- and I'd have to look at the stuff again -- it

6    was about 1947 and '48, and it was active until 1957 or

7    '58.  The current protocol was developed and published in

8    1957 or '58.  Now, that's the best of my recollection.  I

9    might be a little bit arrear.

10   Q.       So do you see on page 11 you wrote:  To prepare

11   for this report, I reviewed Utah's current protocol for

12   execution by firing squad and an older firing squad

13   protocol of the U.S. Army?

14   A.       Yes.

15   Q.       And you only mentioned one U.S. Army protocol; is

16   that correct?

17   A.       Yes.

18   Q.       But it's your testimony that you considered two

19   U.S. Army protocols?

20   A.       Yes.  I use the term an "older" to refer to the

21   fact that it preceded the Utah protocol.  And I was

22   referring to -- it doesn't state this clearly enough.

23   That's an error in my grammar.  I was -- I reviewed and

24   considered both of these as currently active protocols, so

25   the Utah protocol and the older, current firing squad

FIDES Breedlove Report - Services (615) 595-0073
www.EliteReportingServices.com

```
 1   protocol of the U.S. Army are the two that are my primary
 2   sources here.  I did review the earlier U.S. Army protocol
 3   as background or context material for the current U.S.
 4   Army protocol.
 5   Q.      Did you provide that earlier, previous U.S. Army
 6   protocol to your attorneys to supply as materials
 7   considered in this report?
 8   A.      I don't recall if I did or if I didn't.
 9   Q.      And here, you see at the bottom of page 11, where
10   it says:  The Army's procedure differs in some minor, but
11   practical points?
12   A.      Yes.
13   Q.      Are all of these points of procedure from the
14   1950s protocol?
15   A.      Yes, sir.
16   Q.      What in your report relied on the 1940s Army
17   protocol?
18   A.      We'd be going back to the first case, maybe the
19   second case that I had testified on, or provided a report
20   on, which would have been the -- the case in -- the
21   Ledford case in Georgia in 2017 and the Danny Bible case
22   in Texas in 2017.  For those reports, I only had the
23   earlier U.S. military protocol.  I didn't have the current
24   one.  I'm not sure exactly how that came about, but
25   we -- I prepared those reports, at that time, relying on
```

www.EliteReportingServices.com

1     the earlier U.S. Army protocol.

2     Q.     And is execution by firing squad still an

3     authorized means of execution by the U.S. Army?

4     A.     Yes.

5     Q.     How do you know that?

6     A.     I asked a fellow who works for the -- had worked

7     for the Judge Advocate General some years ago.

8     Q.     Did you ask him some years ago or he worked --

9     A.     Yeah, I asked him -- I asked him back in 2017.

10    Actually, yeah, he had been, and he said as far as he was

11    aware, it was still an active means of execution at that

12    time.

13    Q.     And did you know if it's still an active means of

14    execution on January 4, 2022?

15    A.     I know within a reasonable degree of certainty.  I

16    certainly haven't come across anything that says they've

17    stopped using it, so let's put it that way.

18    Q.     And what was the name of this gentleman you spoke

19    with in 2017?

20    A.     His name would be John Holschen, I believe.  It

21    might have been John Holschen.  It may have been Gary

22    Roberts.  I don't recall which one exactly.  They both

23    have expert knowledge.

24    Q.     Did you speak with them in person or through some

25    sort of media?

```
1    A.      On the telephone.

2    Q.      And what was Mr. Roberts' role with the U.S.

3    Government?

4    A.      Dr. Roberts, not Mr. Roberts -- Dr. Roberts

5    is -- or was at the time in the United States Navy

6    Reserve, held a commission in that organization, and he

7    had -- Dr. Roberts is probably the most -- foremost world

8    expert in ballistics -- firearms ballistics in the world,

9    studied under Dr. Fackler, and he has testified before

10   Congress, before inquiries at the Pentagon, and to the

11   Judge Advocate General by his communication to me.  So

12   that would be his role.  He has been in an advisory

13   capacity to the -- to the military and to the government

14   in general.

15   Q.      And what was the other gentlemen you mentioned?

16   Was it Holsbine?

17   A.      Holschen.  John Holschen, H-O-L-S-C-H-E-N, I

18   believe is the spelling.  I know Mr. Holschen from the

19   ballistics -- Internet wound ballistic community and from

20   personal communication.  He currently conducts training,

21   part-time training.  Actually, he does have a training

22   coming.  That might be his primary means of earning an

23   income now in -- as a trauma medic.  And he served in the

24   United States Armed Forces as a field medic in Afghanistan

25   and Iraq for a number of years.
```

Case 3:18-cv-01234-B Document Report Filed 09/17/22 Page 86 of 163 PageID #: 6979
FlorisBrenneman Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    Q.    Is the U.S. Army's protocol for execution by

2    firing squad more practical than Utah's protocol?

3    A.    I don't think either one is more or less practical

4    than the other.  The Utah protocol is a bit more specific

5    in some points, less specific in others.  The differences

6    in practicality are not in the protocols themselves but in

7    the way the protocol's interpreted and acted upon.  The

8    administrative processes that they've developed in Utah

9    for firing squad executions are over and above the

10   verbatim reading of their protocol, but I think they've

11   done a good job with it.

12         I do not know when the United States military last

13   executed someone by firing squad with any real certainty.

14   And so I -- and I have been unable to speak with anyone or

15   see testimony or written documents that suggest what their

16   interpretations of their protocol is, so.

17   Q.    Do you know -- do you know whether the U.S.

18   military executed someone by firing squad in the last

19   50 years?

20   A.    I don't know.  I don't know of any executions done

21   by the United States military after 1947.

22   Q.    And going back to the two individuals we discussed

23   a second ago, do you have any other basis, other than your

24   conversations with those individuals, for concluding that

25   execution by firing squad is still an active, authorized

Case 3:18-cv-01234-Brien Document Report Filed 09/17/22 Page 67 of 163 PageID #: 6980
ELITE Brien Court Reporter Filed 09/17/22 Page (615) 595-0073
www.EliteReportingServices.com

1   means of execution by the U.S. military?

2   A.       No, I think I -- I think I've done some -- I know

3   I've done some literature searches on the Internet to see

4   if I could find any information to suggest that this is no

5   longer on the books and I wasn't able to find anything

6   suggesting that the protocol has ever been withdrawn or

7   that it is not being used.

8          So I have found no evidence that they've withdrawn

9   the protocol, which suggests to me that they likely still

10  have it on their -- in their files and on their books.

11  But that's just a conclusion I've drawn.  That's not a

12  statement of fact.  That's just my opinion of it.

13  Q.       How many riflemen does Utah's protocol require?

14  A.       It requires four, with an alternate.

15  Q.       Are there any backups?

16  A.       Backup riflemen?  That's the alternate.

17  Q.       Yeah.  And how many riflemen does the U.S. Army's

18  protocol require?

19  A.       Eight.

20  Q.       Which number is more appropriate?

21  A.       I don't think there's any material difference.

22  Q.       You don't think four is any -- is materially

23  difference than eight, double?

24  A.       I do not.

25  Q.       Why not?

Case 3:18-cv-01234-BJD-JRK  Document 164-1  Filed 09/17/22  Page 88 of 163 PageID #: 6985
FLORIDA Branch Report - 9-17-22 - (850) 595-0073
www.EliteReportingServices.com

1    A.      Because ballistic energy imported by a single

2    rifle bullet is more sufficient to cause death by this

3    mechanism.  When you take -- when you triple or quadruple

4    that amount, it's just a matter of literal overkill.

5    Extend that to eight riflemen and it's even more so.

6    The -- the ballistic energy of those projectiles and the

7    destructive capacity of them is more than sufficient to

8    kill.

9    Q.      Do you know, in the Army's protocol, how far is

10   the firing squad from the condemned?

11   A.      I believe it's 35 feet, but I'd have to re -- I'd

12   have to look at that again and review.

13   Q.      And how far is the squad from the condemned in

14   Utah's protocol?

15   A.      Twenty-one feet.

16   Q.      Which of these two distances is preferable?

17   A.      For the -- in terms of the marksmanship

18   capabilities of the individuals involved, the difference

19   between 21 feet and 35 feet is negligible.

20   Q.      So neither one -- neither distance is preferable

21   when conducting an execution by firing squad?

22   A.      In my opinion, no.  It might be different in the

23   opinion of the people running those firing squads, but

24   the -- the degree of accuracy that can be obtained at

25   either of those distances is well within the limits that

Case 3:18-cv-01234-Brimento Report Filed 09/17/22 e Page 89 of 163 PageID #: 6982
FROM Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    we need to stay within for successfully killing the

2    condemned person.

3    Q.      Dr. Williams, what is your basis for concluding

4    that execution by firing squad in Tennessee will result in

5    a quick and painless death?

6    A.      As I've already testified, rifles will produce

7    enough of a ballistic injury to the cardiovascular bundle

8    that the individual will -- the individual so executed

9    will cease to have any functional cardiovascular function

10   within milliseconds of the impact of the bullets, and

11   brain death will follow within a matter of seconds.

12   Q.      Does this opinion rely on any assumptions?

13   A.      I don't know what you would define as an

14   assumption, sir.  I mean, does that rely on my

15   understanding of medical physiology?  If you meant

16   physiology, yes.  I mean, these -- these are facts, not

17   assumptions.

18   Q.      Well, does your opinion that execution by firing

19   squad in Tennessee will result in quick and painless death

20   rely on riflemen hitting the target, for instance?

21   A.      So you're saying hitting the target is an

22   assumption.

23   Q.      Isn't it an assumption?  Can riflemen miss?

24   A.      They can miss.  I don't know that I'd define it as

25   an assumption.

Case 3:18-cv-01234-Brian root Report Filed 09/17/22 Page 90 of 163 PageID #: 6982
FIClteBrieotumet Reporting Services 06177296e75fagE0151595 PageQ07D #: 6982
www.EliteReportingServices.com

```
 1    Q.      Could there be a faulty round of ammunition?

 2    A.      Extremely unlikely.

 3    Q.      Possible?

 4    A.      Within the realm of possibility, yes.

 5    Q.      Is your opinion that the only painless method of

 6    death is a direct gunshot wound to the brain stem of the

 7    brain?

 8    A.      Well, it doesn't necessarily have to be a gunshot

 9    wound.  It could be a piece of rebar falling off a

10    building and getting -- but it -- basically, a traumatic

11    injury to the brain stem, causing complete cessation of

12    function of the brain stem, is necessary.  And if you're

13    dealing with something that's traveling as fast as a

14    bullet, it will get there before the nerve transmission

15    from the skin can get to the brain.  So, yeah, that would

16    be the only -- the only way that you can instantaneously

17    incapacitate somebody.

18    Q.      So would you agree that the only method of

19    execution that would be completely painless is a direct

20    gunshot wound to the brain stem of the brain?

21    A.      That is my assertion, yes.

22    Q.      Do you agree that the response by humans being

23    shot in the chest with a rifle can be highly variable?

24    A.      No, I would not say it's highly variable.  The

25    response is going to be pretty similar with -- from one
```

Case 3:18-cv-01234-BrenDocument Report Filed 08/17/22ervPage 91 of 163 PageID #: 6984
ELITE REPORTING SERVICES (615) 595-0073
www.EliteReportingServices.com

1    person to the next.  Three rifle -- three rifle wounds,
2    high-power rifle wounds, to the cardiovascular bundle are
3    going to produce exactly the same effect within a very
4    small variability.
5    Q.      Dr. Williams, is this your expert report?
6    A.      Yes.
7    Q.      Do you see this sentence in the middle of the page
8    where you state that you have interviewed personnel, who
9    have served as field medics in the U.S. Armed Forces, with
10   respect to the effects of a gunshot wound to the
11   cardiovascular bundle?
12   A.      Yes.
13   Q.      In the following sentence where it says that those
14   individuals have informed you that the response to being
15   shot with a rifle in the chest will be highly variable?
16   A.      Yes.
17   Q.      Do you agree with what those individuals have told
18   you?
19   A.      I do.
20   Q.      And is that consistent with your professional
21   experience?
22   A.      Yes, it is.
23   Q.      How, in the response to being shot with a rifle in
24   the chest be highly variable?
25   A.      Well, if you look at those two sentences, you'll

1     see in the first one, I refer to being shot in the chest,

2     and, second one, I refer to being shot in the

3     cardiovascular bundle.  These are two different

4     structures, so we're not comparing apples to apples.

5     Those are completely different statements.

6          A rifle shot to the chest can be highly variable

7     because if you don't shoot the person in the

8     cardiovascular bundle, response can be highly variable.

9     If it just creases the skin, that could be called a chest

10    wound.  A bullet that penetrates the periphery of the

11    chest, breaks a rib, and passes through the other side

12    without reaching into the thoracic cavity, that's a

13    different thing as well.

14          Something that hits you in the high chest, such as

15    my own personal gunshot wound, without intervening --

16    without penetrating into the thoracic cavity, would be an

17    example of that.  Yet again, that could be a gunshot

18    wound.  And, probably, the most common type of thoracic

19    gunshot wound that I deal with is one that penetrates into

20    the thoracic cavity on one side or the other, affecting

21    part of the lung on one side or the other.  And then there

22    is a potential of a gunshot wound above the card -- the

23    cardiovascular bundle in the central chest areas and the

24    injuries that can occur there.

25          And, of course, there's the chest wounds to the

Case 3:18-cv-01234-B   Document Report   Filed 09/17/22   Page 93 of 163   PageID #: 6936
ELITE-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    cardiovascular bundle.  Notwithstanding, you have to

2    consider the possibility of wounds that pass through the

3    chest on a different angle that do not impact the

4    cardiovascular bundle, but do impact the thoracic spine,

5    which has a completely different set of symptoms, so --

6    and presentation.

7          So there are multiple types of chest wounds that

8    are included in that, and that's why it says highly

9    variable and that's why I agree it is highly variable.

10   The chest is a huge structure, a huge area of the body.

11   It's not a very unique system.  It's a large, anatomic

12   quadrant where the cardiovascular bundle, which I refer to

13   in this second segment -- section, second sentence in that

14   paragraph, is a precisely defined, anatomic region of the

15   body.

16         And the effects of that sort of gunshot wound are

17   quite highly predictable, which is exactly what the

18   medic -- the people that I've spoken to, in the third

19   sentence of that paragraph, is exactly what they said.

20   People struck in the cardiovascular bundle have a highly

21   predictable response; they stop all purposeful movement

22   almost immediately and they cease any signs of life or

23   response in less than ten seconds.

24   Q.      Dr. Williams, do you agree that a gunshot can be

25   extremely painful?

```
 1    A.      The possibility exists that gunshot wounds can be
 2   very painful.  Again, you have to put it into context:  If
 3   you have a choice between a gunshot and a sword wound,
 4   even a knife wound -- knife wounds, edge weapon wounds
 5   tend to be much painful, in general, than gunshot wounds.
 6   Burns tend to be more painful than gunshot wounds.
 7   Traumatic fractures tend to be more painful than gunshot
 8   wounds.  There's all kinds of degrees of pain.
 9          But in terms of gunshot wounds, can they be
10   painful?  Yeah, they can be.  They can be.  Most of the
11   ones that I see are not particularly painful compared to
12   many other forms of trauma, as I've described.
13    Q.      But you agree that they can be extremely painful?
14    A.      Yes, sir, they can.
15    Q.      Has anyone ever told you that a gunshot wound to
16   the chest feels like being hit in the chest with a
17   baseball bat?
18    A.      Yep.
19    Q.      How many people have told you that?
20    A.      Dozens.
21    Q.      Had all these people been shot in the chest?
22    A.      Yeah.  I'm talking about people who have been shot
23   in the chest and are still conscious and talking to me.
24    Q.      And dozens of them said it was equivalent to being
25   hit in the chest with a baseball bat?
```

Case 3:18-cv-01234-B Document Reporter Filed 09/17/22 Page 95 of 163 PageID #: 6983
FLOYD-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1    A.      They might not have used the term "baseball bat"
 2    directly, but being hit in the chest with a blunt object,
 3    being punched in the chest, being hit by a rock in the
 4    chest, like being tackled at a football game, those
 5    are -- those are the kind of similes that people have put
 6    to me.
 7    Q.      How many individuals, who were shot in the chest,
 8    have told you that it felt like being hit in the chest
 9    with a baseball bat?
10    A.      Specifically a baseball bat?  I don't know.  Maybe
11    half a dozen, maybe less, maybe a little more, something
12    along those lines.
13    Q.      Does being hit in the chest with a baseball bat
14    result in pain to the person who was hit?
15    A.      You have to take into account the progression of
16    the injury and how people perceive pain initially.
17    Typically, the typical layman doesn't look at the way an
18    injury progresses over time, and so they tend to -- they
19    tend to oversimplify.  So the fact that being struck with
20    a bat in the chest might be painful five seconds after the
21    injury doesn't -- doesn't negate the fact that most people
22    -- if you actually have them break down the time frame,
23    the sensation of a blow is more of a stunning effect as
24    opposed to a painful effect.
25            The sensation of receiving a blow is not
```

FIONA Brennon Reporting Services (615) 595-0073
www.EliteReportingServices.com

1    immediately painful many times.  The stunning effect is

         2    much more commonly described.  Now, that's perhaps outside

         3    the realm of many -- experience of many people in the

         4    academic or the white collar world.  But those people who

         5    have engaged in martial arts or collision sports may be

         6    more familiar with the -- the differentiation between the

         7    act of -- the immediate impression of receiving a blow

         8    versus the painful aftereffects that occur several seconds

         9    later.

        10    Q.      Dr. Williams, do you agree that being hit in the

        11    chest with a baseball bat can be extremely painful?

        12    A.      I suppose it can be, uh-huh.

        13    Q.      Is it painful if a gunshot wound hits a bone?

        14    A.      Can be.

        15    Q.      Can it be extremely painful?

        16    A.      Hitting the bone isn't the painful part.  It's the

        17    fracture that is the painful part, the result in fracture.

        18    Fractures of the long bones typically are very painful,

        19    not so much in the -- in the -- again, in the immediate

        20    postinjury period, the first few seconds afterwards.  Most

        21    people don't report pain at that time, but they start to

        22    report pain several seconds to several minutes after, as

        23    the fracture moves.  So, you know, they -- the experience

        24    of pain is, again, very subjective.

        25    Q.      But you agree that when a gunshot wound hits a

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
1    bone, it can be extremely painful?

2    A.      It can be.

3    Q.      How many times have you personally received a

4    gunshot wound, Dr. Williams?

5    A.      One time.

6    Q.      Was it painful when you were shot?

7    A.      No.

8    Q.      Not at any point thereafter?

9    A.      I began to experience pain about three hours

10   later.

11   Q.      And were you treated for that pain?

12   A.      I was.

13   Q.      How so?

14   A.      I was given a shot of Demerol.

15   Q.      Did you have any other treatment for that pain?

16   A.      No, same shot.

17   Q.      Were you shot in the shoulder?

18   A.      Yeah.

19   Q.      And in the shoulder is not where an inmate under

20   Utah's protocol would have the target placed, is it?

21   A.      Absolutely not.

22   Q.      Nor is the shoulder where an inmate under the U.S.

23   Army's protocol would have the target placed, is it?

24   A.      No.

25   Q.      Did you drink alcohol the day you were shot?
```

ELITE Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1    A.      I did not.

 2    Q.      Was it shocking when you were shot?

 3    A.      I was stunned, yes.

 4    Q.      Did you feel any adrenaline?

 5    A.      It's hard to say.  I'm sure that there was a

 6    response, but I -- I don't recall having a sense of a

 7    panic or -- I guess I must have had something of that

 8    nature.  It was a long time ago, yes.

 9    Q.      How old were you when you were shot?

10    A.      I was 18.

11    Q.      How many bullets were you shot by or with?

12    A.      One bullet.

13    Q.      What type of gun fired the bullet?

14    A.      A pistol.

15    Q.      Do you know what type of pistol?

16    A.      It was a Browning automatic pistol.

17    Q.      What caliber bullet were you shot with?

18    A.      It was a Winchester magnum rimfire.

19    Q.      And did you drive yourself to the hospital?

20    A.      I did.

21    Q.      Besides the narcotics medication you received, did

22    you receive any other medical treatment?

23    A.      I was kept overnight in the hospital for

24    observation.  The next morning, my family doctor came in

25    and examined me and said, I think we should take the
```

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

1  bullet out.  And so he took me to the operating suite and

2  removed the bullet, then I was discharged home that

3  afternoon.

4  Q.      Do you agree that during an execution by firing

5  squad, a bullet could hit a bone?

6  A.      Almost certainly it will.

7  Q.      Which bone?

8  A.      Most likely -- well, the -- the sternum is the

9  obvious first place the bullets will hit.  Because you're

10  dealing with high-powered rifles, these bullets will also

11  impact the thoracic spine.  It's unlikely that a rib would

12  actually be hit, but I suppose if there's a bullet that

13  erred by a few inches that a rib might be hit as well.

14  Q.      Do bones have nerve endings?

15  A.      Bones do have -- have -- do have nerves, yeah.

16  Q.      And do these nerves include pain receptors?

17  A.      They do.

18  Q.      Does the ribcage protect the heart?

19  A.      The bony cartilaginous structure of the chest --

20  of the ribcage does protect the heart to some degree, yes.

21  Q.      How many ribs are in a typical ribcage?

22  A.      You've got 12 ribs on each side.

23  Q.      So is that 24?

24  A.      Yes.

25  Q.      Can a bullet to one of these 24 ribs be very

Case 3:18-cv-01234-B Document 184-8 Filed 03/17/22 Page 100 of 163 PageID #: 6993
FDL124 B Deposition of Dr. Joseph Antognini  (605) 595-0073
www.EliteReportingServices.com

```
1    painful?

2    A.      It could be.

3    Q.      Does the sternum protect the heart?

4    A.      It lies in front of the heart, yes.

5    Q.      And what is a typical sternum's width?

6    A.      Typical sternum is about 5 to 7 centimeters in

7    width in a male, and it's about 6 to 8 millimeters in

8    depth.

9    Q.      And what is a typical sternum's length?

10   A.      Well, about 30 centimeters in vertical

11   presentation.

12   Q.      And do you agree that it can be very painful to

13   have a bullet hit a sternum?

14   A.      It can be.  Sternal fractures can -- can be quite

15   painful.

16   Q.      Do you agree that a gunshot wound to the spine can

17   be painful?

18   A.      My understanding is that it tends not to be, but I

19   -- the injury to the spine itself doesn't seem to be as

20   painful in patients that I have dealt with.  They don't

21   have as much pain in that region as they do in the

22   anterior chest.

23   Q.      Is the anterior chest from the ribcage and

24   sternum?

25   A.      Yes, sir.
```

Case 3:18-cv-01234-B Document 184-8 Filed 05/17/22 Page 101 of 163 PageID #: 6934
EliteReportingServices.com
www.EliteReportingServices.com

```
 1     Q.      Do gunshot wounds to the chest often produce
 2     spinal injuries?
 3     A.      Yes.
 4     Q.      Do you agree that all gunshot wounds are
 5     contaminated with bacteria that was brought by the bullet?
 6     A.      Well, that's a common misconception.  There may be
 7     some bacteria on the bullet itself from being handled that
 8     will be carried with it.  The bullet is certainly not
 9     sterilized by the gunshot, the active firing of the
10     bullet.  And then as the bullet passes through the skin,
11     it will break the skin, and that opens the wound channel
12     to bacteria that colonize the skin.  Of course, if there's
13     clothing in between, the -- there may be bacteria and
14     other fungi and viral particles on that clothing that
15     would contaminate the wound as well.  So, yeah, those
16     would all be -- those would all be in operation here.
17     Q.      So I guess I'm not sure I understand your answer.
18     Do you agree that all gunshot wounds are contaminated with
19     bacteria brought by the bullet?
20     A.      Theoretically, they are.  We don't see a lot of
21     infections in gunshot wounds because the -- for a lot of
22     reasons.  But there are bacteria that are brought in, no
23     question.
24     Q.      Do you see this document in front of you,
25     Dr. Williams?
```

```
 1   A.      I see it.
 2   Q.      Is this the gunshot wounds article by Dr. Fackler
 3   that you provided to your counsel?
 4   A.      It looks like it.
 5   Q.      And do you see here, this sentence:  All gunshot
 6   wounds are contaminated with bacteria?
 7   A.      Yes.
 8   Q.      Do you agree with Dr. Fackler?
 9   A.      Yes, and I think it's consistent with what I told
10   you in my previous testimony.  Yes, there's -- there is a
11   degree of contamination with all gunshot wounds.
12   Q.      And that's on page 201.
13           MR. MITCHELL:  And we'll have that marked as,
14   I think, Exhibit 3.
15           THE COURT REPORTER:  That's correct.
16           MR. MITCHELL:  Because I don't -- I don't
17   think we marked the Utah or Army's protocol.
18           THE COURT REPORTER:  You did not.
19           MR. MITCHELL:  While we're at it, let's just
20   go ahead and do that real quick.
21           (WHEREUPON, documents were marked as Exhibit
22   Number 3.)
23   BY MR. MITCHELL:
24   Q.      Dr. Williams, you recognize this document?
25   A.      Scroll down a little further.
```

```
 1    Q.      Tell me when to stop.

 2    A.      Yeah, this is the Utah protocol.

 3    Q.      That you relied on in writing your report?

 4    A.      Yes, sir.

 5    Q.      Okay.  Dated June 10, 2010?

 6    A.      Yes.

 7              MR. MITCHELL:  We can make that Exhibit 4,

 8    please.

 9              (WHEREUPON, a document was marked as Exhibit

10    Number 4.)

11    BY MR. MITCHELL:

12    Q.      And, Dr. Williams, is this the U.S. Army protocol

13    dated April 7, 1959, that you relied on in drafting your

14    expert report in this litigation?

15    A.      Yes, this is it.

16    Q.      And this is the more recent of the two U.S. Army's

17    protocols that you relied on in drafting your report in

18    this litigation, correct?

19    A.      Yes, it is.  Yes, it is.  I misstated the date

20    when I said 1958.  It's a 1959 document.

21              MR. MITCHELL:  If we could mark this as

22    Exhibit 5, please.

23              (WHEREUPON, a document was marked as Exhibit

24    Number 5.)

25    BY MR. MITCHELL:
```

Case 3:18-cv-01124-B Document 184 Filed 05/47/22 Page 104 of 193 PageID #: 6097
FL1234-B Deutwood Reporter Service 141.595-0003
www.EliteReportingServices.com

```
 1    Q.      Dr. Williams, have you ever treated an individual
 2   who was shot in the heart by a gun?
 3    A.      Yes.
 4    Q.      How many times have you treated someone who was
 5   shot in the heart by a gunshot bullet?
 6    A.      I don't know the exact number, 15 or 20 times
 7   perhaps, perhaps less.
 8    Q.      Were those people -- were any of those people in
 9   pain who had been shot in the heart?
10    A.      I don't recall anybody expressing pain.  They were
11   too sick to express pain.
12    Q.      Did they express any discomfort?
13    A.      They were people who were fighting for their
14   lives.  They were not really conscious to the degree that
15   you and I would consider capable of responding in a
16   meaningful fashion.
17    Q.      Did those people seem discomforted in any degree?
18    A.      These are people who are in very great distress
19   from a medical perspective.  Discomfort is -- is -- I
20   don't know if you would describe discomfort as being
21   extraneous to the decision -- or to the -- to the
22   expression.  These are people with compromised
23   hemodynamics.  Their level of consciousness would have
24   been impaired to some degree by the injuries they had
25   sustained.  But were they -- were they experiencing
```

Case 3:18-cv-01234-B Document 184-8 Filed 05/17/22 Page 105 of 163 PageID #: 6998
FD1234B Document 184-8 Filed 05/17/22 Page 105 of 163 PageID #: 6998
www.EliteReportingServices.com

1    discomfort?  I couldn't tell you.

2    Q.     Were all of these people on pain medications by

3    the time you saw them?

4    A.     No.  Very few of them, if any, were.  When people

5    have sustained injuries of this type, your primary

6    consideration is maintaining hemodynamic integrity.  Pain

7    medication, narcotic pain medications, are going to

8    compromise that, so we tend not to treat that with pain

9    medication.

10   Q.     Have you ever treated a gunshot wound to the

11   sternum?

12   A.     That would be with the gunshot wounds to the heart

13   that I've dealt with, yes.

14   Q.     But not a separate gunshot wound to the sternum?

15   A.     I don't recall ever seeing anybody with a sternal

16   gunshot wound that wasn't either already dead or actively

17   dying from the gunshot wound to the heart.  I don't recall

18   one.

19   Q.     Have you ever treated someone who was shot in the

20   ribcage?

21   A.     Yes, several times.

22   Q.     How many times?

23   A.     Twenty-five, 30 times, more than that.  No,

24   probably more than that.  Maybe 80 or 100 times.

25   Q.     How many people of those people survived?

Case 3:18-cv-01234-B Document 184-8 Filed 03/47/22 Page 106 of 163 PageID #: 6999
EliteReportingServices.com
www.EliteReportingServices.com

1    A.      People shot in the ribs, most of them survived.

2    If it was -- let's put it this way:  If the gunshot wound

3    was to the lateral chest wall involving ribs or otherwise,

4    most of those people would survive.

5    Q.      Going back to the cardiovascular bundle, does the

6    cardiovascular bundle include the arteries?

7    A.      Yes, sir.

8    Q.      Which arteries?

9    A.      The aortic root, the aortic arch, the arteries

10   branching off the aortic roots, the coronary arteries, the

11   common carotid, the innominate, those arteries.

12   Q.      Are there any arteries not included in the

13   cardiovascular bundle?

14   A.      Well, there's a lot of arteries in the body that

15   aren't part of the cardiovascular bundle, yes.

16   Q.      Can you name a couple of examples?

17   A.      The descending aorta, femoral arteries, subclavian

18   arteries, brachial arteries.  Lots.

19   Q.      And are veins also included in the cardiovascular

20   bundle?

21   A.      Yeah, I referred to those earlier.  The pulmonary

22   veins from the left and right side, the pulmonary trunk,

23   inferior vena cava, superior vena cava, the sinus --

24   venous sinus, those would all be venous structures.

25   Q.      And are there any veins that aren't included in

Case 3:18-cv-01234-B Document 184-8 Filed 03/47/22 Page 107 of 163 PageID #: 7040
ELITE REPORTING SERVICES * (615) 595-0073
www.EliteReportingServices.com

1    the cardiovascular bundle?

    2    A.      Lots and lots.  For every artery in the body,

    3    there's a corresponding vein.

    4    Q.      Can you give us a couple of examples of veins that

    5    aren't included in the cardiovascular bundle?

    6    A.      Just take those veins I already gave you, cross

    7    out artery and put veins.  So subclavian, femoral, iliac,

    8    and so forth.

    9    Q.      What about capillaries, are those part of the

   10    cardiovascular bundle?

   11    A.      There are capillaries therein, within it, but

   12    they're -- those are minor structures, not anything that

   13    you would consider as relevant to a gunshot wound.

   14    Q.      Now, how does blood travel to the brain?

   15    A.      It travels out of the left ventricle into the

   16    ascending aorta, and then it's sent to the branches

   17    leading superiorly off the aortic arch with the innominate

   18    vein and the common carotid.  Those are the ventricle and

   19    go forward, go up through the neck and into the -- into

   20    the head and supply the brain.

   21    Q.      Did you say the common carotid artery?

   22    A.      Yeah, I'm sorry.  I'm drawing a blank.  The

   23    carotid -- I'm sorry.  I'm drawing a blank.  There's

   24    three -- there's three arterial trunks that came out off

   25    the aortic arch that go up to the brain.  For lack --

EliteReportingServices.com
www.EliteReportingServices.com

1    Q.      Are those all arteries?

2    A.      Yeah, those are -- those are the three arterial

3    branches off the aortic arch that proceed superiorly and

4    provide all the blood to the brain and the upper

5    extremities.

6    Q.      And if one of those arterial branches ceases to

7    carry blood to the brain, can the other two continue to

8    carry blood to the brain?

9    A.      They can.

10   Q.      Now, if blood supply to the brain ceases, how long

11   does it take for loss of consciousness to ensue?

12   A.      With all loss -- with loss of all circulation to

13   the brain, it's widely considered to be 6 to 10 seconds

14   before conscious function ceases.

15   Q.      Can it be longer?

16   A.      It can be.

17   Q.      How much longer?

18   A.      If the individual -- if the individual

19   hyperventilates for a period of time prior to the

20   execution, that would be longer.  There's not a lot of

21   literature to support this.  The only -- the only -- and

22   it's a rather interesting case.  There was a physician in

23   France, during the Reign of Terror, who was executed by

24   guillotine, and he and his colleagues had a conference

25   prior to the execution, and he -- they were -- they were

Case 3:18-cv-01234-B   Document 184   Filed 05/17/22   Page 109 of 163   PageID #: 1002
EliteReportingServices.com
www.EliteReportingServices.com

1    all genuinely interested how long the brain was conscious

2    after the severing of the head.  And so he advised his

3    colleagues that he -- since he would be unable to speak,

4    he would communicate to them by blinking his eyes and

5    looking at them.

6         When the executioner raised his head out of the

7    basket to display it to the crowd, this individual, when

8    his head had been severed, was able to continue blinking

9    and looking at his friends for, I believe, it was 16

10   seconds after the -- after his head had been severed.  So

11   that's the longest we have any record of -- an antidotal

12   record of someone being conscious and alert after there

13   was no further circulation to the brain.

14   Q.    Could it be several minutes?

15   A.    No.

16   Q.    Does brain death necessarily follow loss of

17   consciousness?

18   A.    No.  Lots of people lose consciousness and don't

19   die.  But in this circumstance, brain death would

20   certainly follow, yes.

21   Q.    What is brain death?

22   A.    I would have to look at my definition on that

23   again, but -- because I haven't memorized it.  But,

24   essentially, that would be the loss of organized neural

25   activity such that there's impulses being sent from the

Case 3:18-cv-01234-B   Document 184-8   Filed 03/17/22   Page 110 of 163   PageID #: 7003
ELITE REPORTING SERVICES * (615) 595-0073
www.EliteReportingServices.com

1    brain to the rest of the body, giving the body commands

2    and knowing how to keep functioning.  That is usually --

3    it can be measured, to some degree, by -- excuse me -- by

4    electroencephalogram, looking at brain wave activity.

5          When there's no further brain wave activity,

6    that's considered to be a sign of brain death.  But the

7    actual moment of brain death has never really been

8    defined, to my knowledge, in medical literature.

9    Q.    Is pulmonary edema a frequent consequence of brain

10   death?

11   A.    Pulmonary edema.

12   Q.    Yes.

13   A.    No.  No.

14   Q.    Is one of the articles you supplied your counsel

15   with Dr. Young's Diagnosis of Brain Death?

16   A.    Yeah, I believe so.

17   Q.    Is this that document?

18   A.    It could be.  Yeah, if it's from Uptodate, yeah.

19   Q.    Is this document you supplied your counsel?

20   A.    I believe it is.  It looks familiar.

21   Q.    By Dr. Young?

22   A.    Yes, sir.

23   Q.    Do you see there at the very bottom of page 14 of

24   this article where it says:  Pulmonary edema and diabetes

25   insipidus are frequent early consequences of brain death

1    and may also precipitate cardiopulmonary failure?

2    A.      Yeah, this is referring to deaths in the -- the

3    ICUs or a critical care situation where a person has

4    experienced brain death, but still has active cardiac

5    function.

6    Q.      Do you agree that pulmonary edema can be a

7    consequence of brain death?

8    A.      In that setting, yes.

9    Q.      In any other settings?

10   A.      No.  I mean, pulmonary edema is something that

11   develops over hours to days.  It's not something that

12   happens rapidly as a consequence of shutdown of brain

13   function.  If you -- you're looking at a person who's been

14   shot in the cardiovascular bundle, whose heart ceases to

15   function, and the person dies, on autopsy, you're not

16   going to find pulmonary edema because it takes a long time

17   to develop.

18               MR. MITCHELL:  And if we can have that

19   article by Dr. Young marked as -- I believe we're on

20   Exhibit 6.

21               THE COURT REPORTER:  We are.

22               (WHEREUPON, a document was marked as Exhibit

23   Number 6.)

24   BY MR. MITCHELL:

25   Q.      Now, Dr. Williams, in the copy of Utah's Firing

```
 1   Squad Execution Protocol that you relied on in drafting
 2   your report, does that protocol take in account the fact
 3   that 10 minutes after the first volley of bullets, signs
 4   of life may still be present?

 5              MS. LEONARD:  Object to the form.

 6              THE WITNESS:  I'd have to review the -- no,
 7   the Utah article -- Utah protocol has fail-safes built
 8   into it such that there would not be signs of life that
 9   late.  They've got a fail-safe in there saying up to 10
10   minutes, I believe.  But the -- the protocol is very clear
11   that if the individual shows signs of life within -- I
12   believe it's two minutes, the leader of the execution
13   squad is authorized to fire a second volley, which to my
14   knowledge has never happened with any Utah execution after
15   a second volley being fired -- sorry, a second volley has
16   been fired a couple of times.

17              But I've never -- I've no knowledge of Utah
18   ever refiring more than a second volley.  And in, at
19   least, one of those cases, that second volley was fired
20   very rapidly, like within one minute.

21   BY MR. MITCHELL:

22   Q.      How many cases are you aware of where Utah fired a
23   second volley?

24   A.      Sorry, can you say that again.

25   Q.      How many executions in Utah do you know of that
```

ELITE BROADCAST reporting services
www.EliteReportingServices.com

```
 1    required or -- or let's not use required.  Excuse me.  Let
 2    me -- let me rephrase.
 3         How many executions in Utah had a second volley
 4    fired?
 5    A.    Two, to my knowledge.
 6    Q.    Dr. Williams, is this your expert report in this
 7    case?
 8    A.    It is.
 9    Q.    And do you see here where you're summarizing
10    Utah's protocol?
11    A.    Yes.
12    Q.    You stated that signs of life will be checked for
13    by the attending physician for a maximum of 10 minutes?
14    A.    Right.
15    Q.    And that if signs of life are still present, then
16    a second volley shall be fired?
17    A.    Uh-huh.
18    Q.    And so do you agree that ten minutes after the
19    first volley, signs of life may still be present and a
20    second volley fired?
21    A.    You know, there's a theoretical possibility that
22    if you're checking every one minute, you're still seeing
23    signs of life, you're firing a volley subsequent to that
24    each time, which is what the protocol asks for.  This
25    would suggest that at 10 minutes this individual would've
```

ELITE REPORTING SERVICES
www.EliteReportingServices.com

1    received 30 rifle wounds to the chest, at least 30 rifle

2    wounds to the cardiovascular bundle.  So the probability

3    that there would be any life signs 10 minutes into this

4    process is fantastically improbable.

5    Q.      So is it your understand of Utah's protocol that

6    every minute, after the first three minutes, that signs of

7    life are present as determined by the attending physician,

8    another volley is fired up to 10 minutes?

9    A.      If that -- I mean, you see the section.  If, after

10   that first volley, the condemned shows obvious signs of

11   life, consciousness, a second volley shall be immediately

12   fired.  So, in other words, if the individual is still

13   moving immediately after the first volley, the execution

14   leader -- execution squad leader can authorize a second

15   volley fired immediately.

16           They load their rifles with two rounds.  The only

17   times that those two rounds have been required have been

18   in two executions, that I know of.  In both cases, two

19   volleys were sufficient to end the individual's life.  The

20   possibility that a third volley would be required is

21   fantastically improbable.

22   Q.      But is it possible that a sign of life may be

23   present after 10 minutes and then a second volley is

24   fired?

25   A.      Within the realms of any kind of scientific

Case 3:18-cv-01234-BBC Document 184-8 Filed 03/17/22 Page 115 of 163 Page ID #: 7008
EliteReportingServices.com
www.EliteReportingServices.com

1    possibility, no.

2    Q.      Do you know when the U.S. military last conducted

3    an execution by firing squad?

4    A.      The last execution that I'm aware of was 1947.

5    There may have been one in early 1948 as well, but I can't

6    confirm it.

7    Q.      In preparing your expert report, did you review

8    Tennessee's lethal injection protocol?

9    A.      No, I did not.

10   Q.      Have you subsequently reviewed Tennessee's

11   execution protocol?

12   A.      I have not.

13   Q.      Do you know which drugs Tennessee protocol calls

14   for?

15   A.      I do not.

16   Q.      Did you review any depositions from this case?

17   A.      Depositions from this case?  No, I did not.

18   Q.      So you cannot informatively opine on the risk of

19   operator error in Tennessee lethal injection protocol, can

20   you?

21   A.      Specifically, no, I cannot.

22   Q.      And did plaintiff's counsel engage you to opine on

23   the risk of operator error in Tennessee's lethal injection

24   protocol?

25   A.      They did not.

Case 3:18-cv-01234 Document 184-8 Filed 03/47/22 Page 116 of 163 PageID #: 7009
EliteReportingServices.com
www.EliteReportingServices.com

```
 1    Q.      Is it your view that a botched execution is one
 2    that ends up taking an hour or two?
 3    A.      I don't have a view on that.  A botched execution,
 4    it can be defined in a lot of different ways by a lot of
 5    different people.  I don't really -- I don't really have
 6    an opinion, in general.  Certainly, if something that
 7    keeps somebody alive for an hour, yeah, that would be -- I
 8    think that would hit -- hit the standard of botched.
 9    Q.      Do you agree that when performed appropriately,
10    lethal injection provides us with, arguably, the quickest
11    and most humane method of deliberately ending life?
12    A.      I believe it could be the most humane, if -- if
13    performed correctly.  Given that assumption, I think it's
14    probably the most humane.
15                MR. MITCHELL:  Counsel, can we take a break?
16    It's almost lunchtime.
17                MS. LEONARD:  That's fine with me.  How long
18    do you want to go for?
19                MR. MITCHELL:  Thirty minutes, say 12:30
20    Central?
21                MS. LEONARD:  Sure, that's fine.
22                MR. MITCHELL:  Does that work with you,
23    Dr. Williams?
24                THE WITNESS:  Fine.
25                MR. MITCHELL:  Thank you.
```

```
 1                    THE WITNESS:  Thank you.

 2                    (WHEREUPON, a lunch break was taken at 11:50

 3      a.m. The deposition resumed at 12:23 p.m.)

 4                    MR. MITCHELL:  Lynne, are you prepared to

 5      proceed?

 6                    We are back on the record.

 7      BY MR. MITCHELL:

 8      Q.      Dr. Williams, we just took a break for about

 9      30 minutes.  During that break, did you speak with anyone?

10      A.      Yes.  I spoke with plaintiff's attorney, Lynne

11      Leonard.  She pointed out to me I might have made an error

12      in my earlier testimony regarding depositions that I

13      reviewed in preparation for this case.

14              I did review a deposition from Utah Department of

15      Corrections in preparation for the case, but I did it at

16      the same time as my preparation for the Nevada case, which

17      was actually the week of the trial, so I mixed it up.  But

18      that is also in my preparation for the case.  I wanted to

19      clarify that.

20      Q.      Do you know whose deposition or what deposition

21      that was that you reviewed?

22      A.      I believe that was the warden who was testifying

23      as to the physical attributes of the Utah death chamber.

24      Q.      Was that deposition taken specifically in this

25      litigation?
```

Case 3:18-cv-01234-B Document 184-8 Filed 03/17/22 Page 163 of 193 PageID #: 7051
EliteReportingServices.com    (855) 585-0093
www.EliteReportingServices.com

```
 1    A.      I don't know if it was this litigation or it was a
 2    different -- a different case.  I'm involved in four
 3    different cases right now, Mr. Mitchell.  Sometimes they
 4    bleed into each other.
 5    Q.      Well, give me just a second.
 6            And here on your expert report, do you see where,
 7    Number 4, it says you have reviewed the deposition of
 8    Steven Turley in this case?
 9    A.      Yes.
10    Q.      Is that what we are speaking about?
11    A.      I think it is, yes.
12    Q.      Okay.  Did Ms. Kur -- or, excuse me -- Ms. Leonard
13    remind you of any other materials you reviewed?
14    A.      No.  That was the sole content of our
15    conversation.
16    Q.      Did you speak to anyone else during our break?
17    A.      No.
18    Q.      Did you review any materials during our break?
19    A.      No.
20    Q.      Dr. Williams, have you ever improperly placed a
21    central IV line?
22    A.      Do you mean like an IV line, a central line that
23    -- improper is kind of a vague term.  What are you
24    specifically looking for, Mr. Mitchell.
25    Q.      Well, have you ever placed a central IV line that
```

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 119 of 163 PageID #: 7012
ELITE Courtroom and Litigation Services (615) 595-0073
www.EliteReportingServices.com

1   you had to rearrange or replace?

2   A.      I've placed a lot of central lines in 30 years,

3   Mr. Mitchell.  I'm sure I've had a few that have required

4   -- yeah, I can think of an example in the last year or so.

5   I placed a subclavian line -- that was the triple lumen

6   catheter -- that I advanced was faulty or it -- it became

7   bent during insertion and I was not able to place it in

8   the same location.  I had to go to the other side and use

9   the other -- the contralateral subclavian vein for access.

10          That is a pretty rare occurrence, but it's

11  happened to me, maybe, two or three times over the course

12  of my career.  That would be about it.  The central lines

13  are pretty critical; you either make them work or the

14  patient is in real trouble.  So that would be about the

15  worst I've had to deal with.

16  Q.      Is it your testimony that you only improperly

17  placed a central IV line two or three times over the

18  course of your career?

19  A.      To the best of my recollection, yeah.

20  Q.      Dr. Williams, have you served as an expert witness

21  in the Glossip versus Chandler case in Oklahoma?

22  A.      Yes, I have been engaged on that case.

23  Q.      And do Ms. Kolodinsky and Mr. Kursman also

24  represent you in that case?

25  A.      I believe so, yes.

Case 3:18-cv-01234-B Document 1848 Filed 05/17/22 Page 120 of 163 PageID #: 7073
EliteReportingServices.com
www.EliteReportingServices.com

```
 1    Q.      And did you give testimony or a deposition in that
 2    case about a year ago, January 25th, 2021?
 3    A.      I don't recall it being that late, but I'll take
 4    your word for it.  Yes, it was last year.
 5    Q.      Do you see this document?
 6    A.      I see it.
 7    Q.      Do you recall this deposition being taken in the
 8    Glossip case on January 25th?
 9    A.      I do.
10    Q.      Can you read to me what the question was at
11    line 23, in your deposition.
12    A.      (Witness reading.)  How many times have you
13    improperly placed a central IV line in a patient.
14    Q.      And what was your answer?
15    A.      Well, I don't recall specifically what I said.
16    I've had an opportunity to think about it since then,
17    which is why I told you, two or three times, that I don't
18    recall specifically what I said at that time.  We can read
19    what I said.
20    Q.      Yeah.  What did you say?  What does line 25 say
21    you said?
22    A.      (Witness reading.)  I didn't improperly place a
23    central line.
24    Q.      And you said:  In what percent of your central
25    lines did you improperly place a central line?
```

ELITE REPORTING SERVICES * (615) 595-0073
www.EliteReportingServices.com

1    A.      Yeah.  I said:  I've done thousands of central

2    lines, I don't know.  Twenty, 30, 40, 50, I don't know.

3    Certainly less than a hundred.

4           I've had opportunity to review that, to the best

5    of my ability, since that time and I realized that my

6    rates of failure in central lines is well below the

7    margin, looking at cases.  Unlike gunshot wounds, which

8    are tracked on a regular basis in procedure logs, central

9    lines aren't.

10          I've been able to review my procedure logs and I

11   haven't had a failed central line, improperly placed, that

12   I put as far as back as I have been able to research.

13   I've had two or three where I've had problems with the

14   equipment that required me to go to another location.

15   These are the ones that I just spoke to you about at this

16   time.

17          MR. MITCHELL:  I'm going to object to the

18   answer as nonresponsive.

19   BY MR. WILLIAMS:

20   Q.     Dr. Williams, in what percent of your central

21   lines was the line improperly placed?  In your testimony

22   on January 25th, 2021, what did you testify was the

23   percent of your central lines that were improperly placed?

24   A.      I guess that perhaps 2 percent of my central lines

25   have been improperly placed, because I was unprepared for

1   the question and did not have the facts in my head.  I

2   have since looked at those and the numbers are

3   significantly less than 2 percent.

4   Q.      And how were you able to look at those?

5   A.      I was able to access my procedure logs at two

6   different hospitals where I have done procedures in the

7   emergency department.  And for the period of time that we

8   are looking back on, back to 2016, none were improperly

9   placed.  And as I looked further back, in my memory, I

10  couldn't think of another one.

11          So improperly placed central line, Mr. Mitchell,

12  would be one that did not cannulate the vein that was, for

13  lack of a better word, the target of the procedure.  And I

14  can only recall a single time, back when I was a resident,

15  where I had a central line procedure be improperly placed

16  where I went through the subclavian line and cost me my

17  thorax.  And yet, during the same procedure, I corrected

18  the problem and then placed it correctly.

19          So my recollection and statement, as a guess of 2

20  percent last time, was erroneous.  And I have been able to

21  ascertain, to my satisfaction, that my successful

22  percentage in central line placement is very close to

23  100 percent over the course of my career.

24          I'm considered to be very good at placing central

25  lines.  And, in fact, I am usually, almost, almost always,

Case 3:18-cv-01234-B   Document 184-8   Filed 03/47/22   Page 123 of 163   PageID #: 7016
EliteReportingServices.com
www.EliteReportingServices.com

1    when I'm working with another physician in my emergency
2    department, the nursing staff requests that I do the
3    central line because my success rate is so high.
4                MR. MITCHELL:  I'm going to object to that
5    answer as nonresponsive.
6    BY MR. MITCHELL:
7    Q.      How many hospitals were you able to review your
8    records for placement of central lines?
9    A.      I was able to review procedure logs for two
10   hospitals.
11   Q.      And how many hospitals have you placed central
12   lines in, during the course of your career?
13   A.      Fourteen.
14   Q.      So there are 12 hospitals you were unable to
15   review procedure logs?
16   A.      That's correct.
17   Q.      How many times have you improperly place a
18   peripheral line in a patient, Dr. Williams?
19   A.      Peripheral lines, I would say 2 to 3 percent.
20   Q.      How many peripheral lines have you placed in
21   patients?
22   A.      Thousands.
23   Q.      And do you see on page 123 of you January 25th,
24   2021, testimony where you said that it was 10 to
25   15 percent of peripheral IV access attempts are

Case 3:18-cv-01234-B Document 148 Filed 03/17/22 Page 124 of 163 PageID #: 1217
EliteReportingServices.com
www.EliteReportingServices.com

```
1   unsuccessful?

2   A.      I would say in terms of the overall average,

3   that's correct.

4   Q.      So you're well above -- or below, in a good way,

5   average; is that your testimony?

6   A.      My expertise in cannulating veins are considered

7   extremely expert.

8   Q.      Yeah.  So you still improperly placed a peripheral

9   line hundreds of times; is that correct?

10  A.      Looking back, 10 to 15 percent, that would

11  certainly be the case.  I'm well below that.  I would say

12  maybe a hundred times.

13  Q.      Do you see on page 121 --

14  A.      That's a guess, Mr. Mitchell.  These are not

15  things that are -- that are -- that I could possibly

16  measure.

17  Q.      Did you guess in your testimony on January 25th,

18  2021, that it was hundreds of times you did improperly

19  place a peripheral line in a patient?

20  A.      Uh-huh.  Yeah, I was guessing.  I've had to -- I

21  was not prepared for the question at that time,

22  Mr. Mitchell, and, as a consequence, I had to -- I should

23  not have said that.  I should have said I don't know and

24  left it at that.  But I have had opportunity to review my

25  recollection, to the best of my ability, since then, and
```

ELITE Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
 1    I'm -- and what records I can ascertain, it's certainly
 2    been much better than the average and certainly the guess
 3    I gave you last time.  It was an overestimate of failure.
 4    Q.     Now, Dr. Williams, switching back to page 10 of
 5    your expert report, do you see the sentence that says:
 6    Current firearms injury data show that Americans
 7    intentionally or accidently shot by rifles die in about
 8    80 percent of cases?
 9    A.     Yes.
10    Q.     What is the basis for that statement?
11    A.     As I recall, the footnote cites the "American
12    College of Surgeons Advanced Trauma Life Support" textbook
13    for students.
14    Q.     Is that Footnote 10?
15    A.     Yes.
16    Q.     Okay.  And that is Footnote 10, isn't it?
17    A.     Yes.
18                MR. MITCHELL:  If we could have this marked
19    as Exhibit 7, I believe we are on; is that correct?
20                THE COURT REPORTER:  That's correct.
21                (WHEREUPON, a document was marked as Exhibit
22    Number 7.)
23    BY MR. MITCHELL:
24    Q.     Dr. Williams, is this the "Advanced Trauma Life
25    Support" manual you referenced a moment ago.
```

Case 3:18-cv-01234-B Document 184-8 Filed 05/17/22 Page 126 of 163 PageID #: 7019
FD1234-B Deposition of Dr. Williams (165) 595-0023
www.EliteReportingServices.com

```
 1    A.       It is an ATLS manual.  I'm don't know if it's the
 2    one I specifically referenced.
 3    Q.       Well, do you know if this is the one you provided
 4    to your attorneys?
 5    A.       I don't know.  I have taken the death trauma life
 6    support multiple times and each time they issued me a new
 7    manual.  It could be.  I don't know.  I don't keep track
 8    of them.
 9    Q.       You see where it says the copyright is 2018?
10    A.       Yes.
11    Q.       And, in fact, in Footnote 10, you cited the 2016
12    edition of the "Advanced Trauma Life Support" manual?"
13    A.       That's what I see written here, yes.
14    Q.       So you did not cite it to the basis of that
15    statement on page 10 of your report, did you?
16    A.       I cited to -- yeah, the citation may be erroneous,
17    that's correct.
18    Q.       Other than Utah's protocol for firing squad and
19    the Army's protocol for firing squad, is there any other
20    protocol for firing squad that you -- is there any other?
21              THE COURT REPORTER:  Can you repeat your
22    question?
23              MR. MITCHELL:  Yeah.
24    BY MR. MITCHELL:
25    Q.       Dr. Williams, other than Utah's protocol for
```

Case 3:18-cv-01234-B Document 184-8 Filed 05/17/22 Page 127 of 163 PageID #: 1020
EliteReportingServices.com  Excerpt (615) 595-0073
www.EliteReportingServices.com

1    firing squad and U.S. Army's protocol for firing squad,

2    did you review any other protocol for firing squad in

3    anticipation of your expert report in this case?

4    A.      I have not read or been made aware of any other

5    protocol for firing squad, no.

6    Q.      Can wind affect a firing squad shooter's ability

7    to hit a target?

8    A.      To a very small degree, yes.

9    Q.      And can rain affect a firing squad shooter's

10   ability to hit a target?

11   A.      The effect of rainfall on bullets is theoretical

12   and, as far as I know, it's never been measured.  But you

13   are correct.  You are correct with that.

14   Q.      Can it affect the shooter's ability to aim?

15   A.      Oh, yes.

16   Q.      How so?

17   A.      Rainfall can reduce -- heavy rainfall can reduce

18   visibility even in a relatively short distance.  We've all

19   been in severe rainstorms where that might happen.

20   Similarly, the accumulation of water on the siting systems

21   of the rifle might affect the ability of the operator to

22   obtain a proper site picture.

23   Q.      Is it possible for a rifle's site to be bumped and

24   knocked out of alignment?

25   A.      It is.

Case 3:18-cv-01234-B Document 184-8 Filed 03/17/22 Page 128 of 163 PageID #: 7021
E0124B Deposition Reported & Transcribed (615) 595-0073
www.EliteReportingServices.com

```
 1    Q.      Is it possible that shooters can be supplied with
 2    a faulty round of ammunition for a firing squad execution?
 3    A.      It is possible.
 4    Q.      Dr. Williams, turning back to your report in this
 5    case, did you insert a graphic from a Chicago Daily
 6    Tribunal article from 1938?
 7    A.      I did.
 8    Q.      Did you provide this article to your attorneys in
 9    this case?
10    A.      I provided the copy that you see here, yes.
11    Q.      Do you possess the complete article?
12    A.      I do not.
13    Q.      Have you ever?
14    A.      I have never had the whole article.
15    Q.      How did you receive this excerpt?
16    A.      To the best of my recollection, this excerpt was
17    obtained in the course of the death penalty case in which
18    I was retained as an expert in the State of Ohio in 2018,
19    I believe, might have been 2019.  This case never went to
20    deposition and -- was it Ohio?  I don't recall which case
21    it was, but it came from the federal defenders office in
22    Ohio.
23    Q.      Did the Court in that case in Ohio preclude you
24    from testifying?
25    A.      I don't recall.
```

```
 1    Q.      Did you plan to testify in that case?

 2    A.      I do not recall ever being asked to sit for a

 3    deposition or to testify at trial.  No, I don't recall at

 4    all what stopped that case.  It's kind of outside my

 5    wheelhouse.

 6    Q.      Dr. Williams, do you see this document?

 7    A.      I do.

 8    Q.      Do you see where it's titled, "U.S. Army

 9    Corrections System:  Procedures for Military Executions?"

10    A.      I do.

11    Q.      Do you see at the bottom where it comes from the

12    Department of Army's Headquarters in Washington, DC?

13    A.      I see.

14    Q.      Do you see where the date is January 17th, 2006?

15    A.      I do.

16    Q.      And do you see at the top of this, page 5, where

17    it states that military executions will be by lethal

18    injection?

19    A.      I do.

20    Q.      And these military procedures are from 2006?

21    A.      It would appear to be so.

22    Q.      And the U.S. Military procedures you rely on are

23    from 1959 and earlier, correct?

24    A.      That's correct.

25                  MR. WILLIAMS:  If I can have that marked as
```

ELITE REPORTING SERVICES (805) 595-0003
www.EliteReportingServices.com

```
 1    Exhibit 8.

 2                    (WHEREUPON, a document was marked as Exhibit

 3    Number 8.)

 4    BY MR. MITCHELL:

 5    Q.      Dr. Williams, you have treated, in your -- in the

 6    course of your time as an emergency department physician,

 7    hundreds of gunshot wounds; is that correct?

 8    A.      Yes.

 9    Q.      Were those gunshot wounds received by both men and

10    women?

11    A.      Yes.  Mostly men, though.

12    Q.      But women as well?

13    A.      Some.

14    Q.      What is the oldest person you have ever treated

15    who received a gunshot wound?

16    A.      Quite honest, I couldn't tell you.  Some people

17    have been, you know, fairly advanced, people in their

18    seventies, perhaps, but I'm not sure.

19    Q.      What is the youngest person you treated who

20    received a gunshot wound?

21    A.      I have seen gunshot wounds in individuals into

22    their teens.  I don't think I've ever seen anyone under

23    the age of 14, 15, 16, but I might be wrong.  I might be

24    mistaken.  I may have seen a pediatric wound.

25    Q.      Dr. Williams, I'm going show you Exhibit 9.  Do
```

1   you see here a post by Doc Rocket?

2   A.      Yeah, it looks like mine.

3   Q.      And did you write this?

4   A.      It appears I did.

5   Q.      Is the date here July 22nd, 2015?

6   A.      Yep.

7   Q.      And are you talking here about a surfeit of

8   empty-headed young females who sought medical attention?

9   A.      Apparently so.

10  Q.      Did you treat any of these young men -- young

11  females for medical attention?

12  A.      It appears so.

13  Q.      Do you see here at the top of page 2 where you

14  stated:  I have long held the opinion that if idiot young

15  females were removed from the population, America would be

16  a much healthier place?

17  A.      Looks like I said that.

18  Q.      Is that your opinion as a medical doctor?

19  A.      That was my opinion as an upset individual at the

20  time.

21  Q.      Upset about something that happened in your

22  professional capacity as a medical doctor?

23  A.      Upset in my position as a citizen, looking at the

24  cost of things like that.

25  Q.      About a situation you encountered professionally;

Case 3:18-cv-01234-B   Document 148   Filed 05/17/22   Page 132 of 163   PageID #: 1025
EliteReportingServices.com
(615) 595-0073
www.EliteReportingServices.com

```
 1   is that correct?

 2   A.      Yes.

 3   Q.      Can you read for me the paragraph beginning

 4   "consider this?"

 5   A.      (Witness reading.)  Consider this:  The number one

 6   ER complaint in America is abdominal pain.  Guess which

 7   sex accounts for 75 percent of abdominal pain in ER's is.

 8   Yep, females, most under 35.  Guess what the most common

 9   cause in abdominal pain in ER's is.  Constipation.  Our

10   health care system is spending billions of dollars

11   annually to address the fact that most women have lousy

12   dietary and bowel habits, and don't have a clue about how

13   to deal with their own feces.

14   Q.      Is it still your opinion, as a medical doctor,

15   that most women have lousy dietary and bowel habits?

16   A.      Most Americans have lousy dietary and bowel

17   habits, women included.

18   Q.      And did you also write this post at the bottom of

19   page 4, top of page 5?

20   A.      Sorry -- I think so. Can you pop it up so I can

21   see the -- yeah, that's my post.

22   Q.      Okay.  What do you say in this post on July 22nd,

23   2015?

24   A.      It says -- I wrote (witness reading):  Don't get

25   me started on an intoxicated, naked, and combative female.
```

Case 3:18-cv-01234-B   Document 148-8   Filed 05/17/22   Page 133 of 163   PageID #: 1026
ED1234 B Document 148-8 Filed 05/17/22 Page 133 of 163 PageID #: 1026
www.EliteReportingServices.com

1   My solution to same is Haldol.  Early and often.

2   Q.      Do you still recommend using Haldol early and

3   often?

4   A.      Haldol, but lately we've gone to Geodon.  It's

5   more effective more quickly, and it does tend to abort the

6   combative behavior in a more rapid fashion.

7   Q.      What is Haldol traditionally used to treat?

8   A.      Haldol is a phenothiazine and psychotic

9   medication.  It's used to treat psychosis.

10  Q.      And you use it to treat intoxicated, naked, and

11  combative females?

12  A.      When people are intoxicated and behaving in a

13  manner that approach psychosis -- this is alcoholic

14  induced psychosis -- the appropriate treatment is

15  antipsychotic medication.

16  Q.      And so you do use Haldol to treat intoxicated,

17  naked, and combative females?

18  A.      As well as intoxicated, naked, and combative

19  males.

20  Q.      But you only mention females in this post; is that

21  right?

22  A.      I believe that was the topic in this case, yeah.

23  That was the parameter of discussion.

24          MR. MITCHELL:  If I didn't say it already,

25  we'll have this marked as Exhibit 9.

```
 1              (WHEREUPON, a document was marked as Exhibit

 2     Number 9.)

 3              MR. MITCHELL:  Dr. Williams, I have no

 4     further questions for you, but because we haven't received

 5     all the materials responsive to the subpoena we issued, we

 6     are going to leave your deposition open.  Thank you for

 7     your time.

 8              THE WITNESS:  Thank you, Mr. Mitchell.

 9              MR. MITCHELL:  Lynne, that is all I have,

10     unless you have anything else?

11              MS. LEONARD:  Nothing from me.

12              THE COURT REPORTER:  Can I have orders on the

13     record please, copies?  I'm sorry, can I have copies on

14     the record, please, orders for the deposition.

15              Mr. Mitchell?

16              MR. MITCHELL:  We would like a PDF copy,

17     please.

18              THE COURT REPORTER:  Okay.  Anyone else?

19              MS. LEONARD:  We will also take one on the

20     plaintiff's side, please.

21              THE COURT REPORTER:  Okay.  Thank you.

22               FURTHER THE DEPONENT SAITH NOT.

23              (Proceedings ended at 12:47 p.m.)

24

25
```

Case 3:18-cv-01234-B Document 148-8 Filed 05/47/22 Page 135 of 163 PageID #: 1028
**(855) 595-3032**
**www.EliteReportingServices.com**

```
 1                 C E R T I F I C A T E

 2    STATE OF TENNESSEE:

 3    COUNTY OF HAMILTON:

 4

 5              I, MELINDA CANTRELL, Court Reporter, with

 6    offices in Chattanooga, Tennessee, hereby certify that I

 7    reported the foregoing deposition of JAMES S. WILLIAMS,

 8    M.C., M.Sc., by machine shorthand to the best of my skills

 9    and abilities, and thereafter the same was reduced to

10    typewritten form by me.

11              I further certify that in order for this
      document to be considered a true and correct copy, it must
12    bear my original signature, and that any unauthorized
      reproduction in whole or in part and/or transfer of this
13    document is not authorized, will not be considered
      authentic, and will be in violation of Tennessee Code
14    Annotated 39-14-149 Services.

15

16

17    _____
      Melinda Cantrell, CCR, LCR, RPR
18    Elite-Brentwood Reporting Services
      LCR #872.  Expiration:  June 30, 2022
19

20

21

22

23

24

25
```

Case 3:18-cv-01234-B Document 1848 Filed 03/47/22 Page 136 of 163 PageID #: 7029
ELITE-BRENTWOOD Reporting Services (865) 595-0003
www.EliteReportingServices.com

**Exhibits**

**Ex. 01 Dr. James Williams** 2:8 7:10,11,12

**Ex. 02 Dr. James Williams** 2:10 43:13,14,15

**Ex. 03 Dr. James Williams** 2:11 100:14,21,22

**Ex. 04 Dr. James Williams** 2:13 101:7,9,10

**Ex. 05 Dr. James Williams** 2:14 101:22,23,24

**Ex. 06 Dr. James Williams** 2:16 109:20,22,23

**Ex. 07 Dr. James Williams** 2:18 123:19,21,22

**Ex. 08 Dr. James Williams** 2:20 128:1,2,3

**Ex. 09 Dr. James Williams** 2:22 128:25 131:25 132:1,2

**0**

**05** 24:13

**06** 24:14

**1**

**1** 7:10,12

**10** 43:9 54:25 60:23 101:5 106:13 110:3,9 111:13,25 112:3, 8,23 121:24 122:10 123:4,14, 16 124:11,15

**10-8** 41:19 42:6

**10-8forums.com** 41:19

**100** 32:2 40:3 70:20 103:24 120:23

**10:33** 67:10

**10:45** 67:2,11

**10th** 45:5

**11** 80:10 81:9

**11:50** 115:2

**12** 97:22 121:14

**120** 5:17

**121** 122:13

**123** 121:23

**12:23** 115:3

**12:30** 114:19

**12:47** 132:23

**13** 67:2

**14** 43:17 54:1 108:23 128:23

**15** 5:24 9:25 38:3 66:19 102:6 121:25 122:10 128:23

**15,000** 77:23

**150** 32:3

**16** 66:19 107:9 128:23

**17th** 127:14

**18** 45:20 96:10

**18th** 45:14,15

**19** 26:17

**1938** 126:6

**1940s** 81:16

**1947** 80:6 84:21 113:4

**1948** 113:5

**1950s** 81:14

**1957** 80:6,8

**1958** 101:20

**1959** 101:13,20 127:23

**1976** 19:10

**1985** 20:1

**1988** 20:2

**1989** 19:25

**1990** 52:7

**1991** 20:18 52:8

**1993** 21:12 26:17

**2**

**2** 43:13,15 49:11 119:24 120:3,19 121:19 129:13

**20** 5:24 66:19 102:6

**200** 32:2 40:3

**2000** 31:17

**2003** 21:13 26:17 31:17 34:6

**2006** 51:23 127:14,20

**2007** 34:6 47:4

**2008** 26:9 75:12

**2009** 47:1 75:12

**201** 100:12

**2010** 101:5

**2015** 129:5 130:23

**2016** 120:8 124:11

**2017** 81:21,22 82:9,19

**2018** 47:19,21 51:13 124:9 126:18

**2019** 49:22,23 50:11 51:4,12 126:19

**2020** 45:14,15 46:10,12 47:16, 17,19 49:23

**2021** 43:9 45:8,16, 17 46:2,5 47:14

**49**:19,23 50:8 54:25 60:23 118:2 119:22 121:24 122:18

**2022** 15:2,3 82:14

**21** 45:9,17 73:23 86:19

**22** 36:4

**22-caliber** 36:4

**22nd** 129:5 130:22

**23** 118:11

**24** 58:9,13 97:23, 25

**24-hour** 42:4,20

**24hourcampfire. com** 41:18

**25** 72:23 118:20

**25th** 118:2,8 119:22 121:23 122:17

**3**

**3** 63:12 100:14,22 121:19

**3-inch** 73:21

**30** 36:9 38:3,7 39:24 59:11 98:10 103:23 112:1 115:9 117:2 119:2

**35** 86:11,19 130:8

**360** 36:25

**4**

**4** 43:24 63:12 79:7 82:14 101:7,10 116:7 130:19

**4-inch** 73:22

**40** 39:24 72:20 119:2

**45** 36:9

**48** 80:6

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 137 of 163 PageID #7030
EliteReportingServices.com
www.EliteReportingServices.com

**5**

**5** 98:6 101:22,24
127:16 130:19

**50** 84:19 119:2

**5260** 5:17

**58** 80:7,8

**6**

**6** 37:22 38:2 39:3
98:7 106:13
109:20,23

**7**

**7** 37:23 38:3 98:6
101:13 123:19,22

**75** 130:7

**8**

**8** 98:7 128:1,3

**80** 32:7 65:9
103:24 123:8

**86** 20:1

**9**

**9** 128:25 131:25
132:2

**90-degree** 69:9

**A**

**a.m.** 67:10,11
115:3

**ABCS** 32:15

**abdominal** 130:6,
7,9

**Aberhart** 19:4

**Abilene** 23:15

**ability** 13:20
29:13 119:5
122:25 125:6,10,

14,21

**abort** 131:5

**absent-minded**
12:3

**absolutely** 44:24
55:8 63:4 66:6
67:2 77:3 95:21

**absorb** 70:10

**absorbant** 70:1

**absorptive** 70:9

**academic** 16:8,9,
12 51:24 94:4

**academy** 74:14

**acceptable** 73:18

**accepted** 20:5
48:2 65:23

**access** 10:24
117:9 120:5
121:25

**accessed** 42:18

**accident** 60:7

**accidental** 61:20

**accidently** 123:7

**accidents** 60:13

**accomplish**
66:24

**accomplished**
66:2

**account** 41:5,6
93:15 110:2

**accounts** 41:8,
10,12 130:7

**accumulating**
58:10

**accumulation**
125:20

**accuracy** 35:25
86:24

**achievable** 55:11

**achieved** 65:16,
25 66:1

**act** 31:10 76:2,8
94:7

**acted** 84:7

**active** 26:24 27:3
28:3 41:23 80:6,
24 82:11,13 84:25
99:9 109:4

**actively** 103:16

**activity** 107:25
108:4,5

**actual** 57:25
108:7

**ad** 50:3

**addition** 16:6

**address** 5:16,17
43:25 44:3,16
71:7,13 130:11

**adequately** 29:10

**administration**
25:6

**administrative**
73:1 84:8

**administrators**
48:25

**admission** 22:4

**admitted** 21:18

**adrenaline** 96:4

**advanced** 52:24
117:6 123:12,24
124:12 128:17

**adversary** 28:25

**advertised** 46:20

**advice** 8:3

**advised** 107:2

**advisory** 83:12

**Advocate** 82:7
83:11

**affect** 11:16,18
13:23 40:24
125:6,9,14,21

**affected** 13:9
34:17

**affecting** 47:13
90:20

**affix** 54:10

**affixed** 69:24 71:4

**afford** 21:3

**Afghanistan**
83:24

**aftereffects** 94:8

**afternoon** 97:3

**afternoons** 47:9

**age** 128:23

**agencies** 74:18,
22,25 75:4

**agree** 7:3 35:7
37:21 64:5 65:9
74:3,6 76:25 77:3
78:12,16,18
88:18,22 89:17
91:9,24 92:13
94:10,25 97:4
98:12,16 99:4,18
100:8 109:6
111:18 114:9

**ahead** 4:14 46:4
100:20

**aid** 60:17

**aim** 29:2,12,14,16
125:14

**aimed** 36:6

**aiming** 36:2,22,24

**air** 22:15 39:16

**airway** 32:14,20,
21

**airway's** 32:15

**Alberta** 19:5
20:22

**alcohol** 95:25

**alcoholic** 131:13

**alert** 35:4 107:12

**Alex** 5:2 14:5,11

**Alexandria** 9:14

**alignment** 125:24

**alive** 66:8 114:7

**alluded** 79:2

**alternate** 85:14,
16

amalgam 30:22

America 129:15
130:6

American 26:5,8,
23 123:11

Americans 123:6
130:16

ammunition
40:22 61:7 62:21,
22 88:1 126:2

amount 9:25
28:11 36:9 86:4

Ana 5:2

Anahata 23:18
41:7

anatomic 18:10
91:11,14

anatomically
56:12

anatomy 18:10,
12,17,20,22 24:1,
4,6,11,13,17,19
28:20 40:16 41:7
49:20,21 50:11,14
51:5,17,19 56:8

anesthesiologist
13:13 21:2

anesthesiology
12:21 21:1

angle 36:5,6,10,
11,22,25 69:10
91:3

angles 37:3

Annals 37:10

annual 47:4

annually 73:16
130:11

answering 7:2

anterior 39:15
63:14 98:22,23

anticipation
17:3,15,16 18:4,
14 19:1 125:3

antidotal 107:11

antipsychotic
131:15

anymore 42:3
51:16

aorta 104:17
105:16

aortic 64:20 65:2
104:9,10 105:17,
25 106:3

apex 64:19,21

apologize 26:18
51:4

Apparently 129:9

appearing 4:20

appears 56:9
65:20 129:4,12

Appendix 79:20

apples 56:7 90:4

apply 19:21

approach 131:13

appropriately
114:9

April 46:1 101:13

ar15.com 42:13

ar15.com. 41:20

arch 64:21 104:9
105:17,25 106:3

area 30:4 53:14
91:10

areas 90:23

arguably 16:17
114:10

arguments 12:12

Arizona 53:11

Arkansas 48:3,4,
21 49:6

Armed 83:24 89:9

Army 78:21 79:25
80:3,13,15,19
81:1,2,4,5,16
82:1,3 101:12
127:8

Army's 79:18,21
81:10 84:1 85:17
86:9 95:23 100:17
101:16 124:19
125:1 127:12

arrear 80:9

arrhythmias 60:4

arterial 22:17
105:24 106:2,6

arteries 65:3
104:6,8,9,10,11,
12,14,17,18 106:1

artery 105:2,7,21

article 100:2
108:24 109:19
110:7 126:6,8,11,
14

articles 24:14
37:9 108:14

arts 94:5

ascending
105:16

ascertain 120:21
123:1

asks 111:24

aspects 10:3 13:2

assemble 54:12
61:6

assertion 88:21

assessment
21:25 32:12,14

assistance 50:3

assistant 33:21
48:23 49:19

assisted 50:8

association
26:22 27:15 29:24
30:3,5,8 48:7 60:3

associations
26:11,19 27:4

assumption
87:14,22,23,25
114:13

assumptions
87:12,17

astray 70:16

atlas 18:20,22

ATLS 124:1

atria 63:15 65:1

atrial 64:20

attach 44:25

attached 79:11,
19,22

attachment 8:11
79:13

attempting 31:10

attempts 121:25

attend 19:3 25:10,
11 47:4

attended 10:22
19:4 46:24,25
47:3 50:4 53:10
61:14,16,19 75:4,
6

attending 47:11
111:13 112:7

attention 11:16
129:8,11

attorney 4:4 8:1,
2,5,19,20,23,24
9:2 115:10

attorneys 9:5,7
10:9,11 14:2,4
15:13,16 16:23
81:6 124:4 126:8

attributes 115:23

Atyia 4:21

August 42:21

author 16:10

authorize 112:14

authorized 73:14
82:3 84:25 110:13

authors 37:18

automatic 96:16

autopsy 109:15

average 56:16
122:2,5 123:2

avoid 54:11 63:24

aware 10:10 12:12,13 48:12 72:12 82:11 110:22 113:4 125:4

awhile 73:12

axis 37:1

---

**B**

---

bachelor's 19:8, 10,11,20

back 22:3 42:21 51:22,23 52:5 69:14 81:18 82:9 84:22 104:5 115:6 119:12 120:8,9,14 122:10 123:4 126:4

background 81:3

backstop 69:25

Backup 85:16

backups 85:15

bacteria 99:5,7, 12,13,19,22 100:6

bad 45:17

badly 39:9

Baldrige 5:3

ballistic 41:25 53:18 83:19 86:1, 6 87:7

ballistically 69:4, 5,6,12 70:3,8

ballistics 16:18, 19 41:24 52:14, 15,17,20,21,22 53:1,3,6,8,16,19, 22 83:8,19

barrel 62:13

barricade 69:12 76:5

barrier 76:4

baseball 92:17,25 93:1,9,10,13 94:11

bases 28:8

basic 34:23

basically 21:15 59:24 88:10

basis 27:24 28:1 29:13,19 30:14 50:22 60:25 73:15 77:24 84:23 87:3 119:8 123:10 124:14

basket 107:7

Bass 5:5

bat 92:17,25 93:1, 9,10,13,20 94:11

beams 28:21

bearing 16:25

beating 57:10

began 20:5 21:12 95:9

begin 6:16

beginning 17:13 130:3

behalf 4:19

behaving 131:12

behavior 131:6

beings 76:3,24

belong 26:19,21

bent 117:7

Berry 5:5

Bible 81:21

billing 9:5

billions 130:10

biochemistry 19:25 20:3

biology 20:15

bit 59:25 80:9 84:4

blank 105:22,23

blanket 70:3,10 71:22

bleed 116:4

blinking 107:4,8

block 72:1

blog 40:13,15,17, 20

blogger 41:3

blogs 40:12,18 41:1

blood 22:15 56:12 66:4 105:14 106:4,7,8,10

blow 93:23,25 94:7

blunt 57:10 93:2

board 12:21 26:2, 3,4,5,7,8,10,12 41:13,15

boards 41:18

bodies 30:22

body 70:7 91:10, 15 104:14 105:2 108:1

bona 8:9 48:5

bone 36:12 37:4 58:6 59:12 94:13, 16 95:1 97:5,7

bones 35:23 36:1, 15 94:18 97:14,15

bony 97:19

book 16:5,25 75:20 76:2

books 9:21 17:7 18:8,10 85:5,10

border 63:13 64:20

bore 62:13

botched 114:1,3, 8

bother 61:12,13

bottom 49:15 64:16 81:9 108:23 127:11 130:18

bounce 70:4,14, 21

bowel 130:12,15, 16

brachial 104:18

brain 35:11,17,20, 22,24 36:16,19, 21,22 37:22 38:8 55:23 56:1 65:19, 20,21,22,24,25 66:1,4,5,6,7,8,12, 14,18,23 87:11 88:6,7,11,12,15, 20 105:14,20,25 106:4,7,8,10,13 107:1,13,16,19,21 108:1,4,5,6,7,9, 15,25 109:4,7,12

brain's 66:15

branches 105:16 106:3,6

branching 104:10

Brandon 4:21

break 7:2 67:1,13, 23 93:22 99:11 114:15 115:2,8,9 116:16,18

breakfast 6:2,3

breaks 7:1 90:11

breathing 32:13, 16

briefly 42:24

bring 11:7

brought 12:8,11 61:21 99:5,19,22

Browning 96:16

building 72:5 88:10

built 110:7

bullet 34:17,19 35:24 36:3,4,7,8, 16 39:18 62:12 68:18 69:3 70:2, 14,15 71:8,13 86:2 88:14 90:10 96:12,13,17 97:1, 2,5,12,25 98:13 99:5,7,8,10,19 102:5

bullets 33:5 34:2

37:3 70:4,6,11 87:10 96:11 97:9, 10 110:3 125:11

**bumped** 125:23

**bunch** 41:16

**bundle** 63:9 64:8, 11,16,24,25 65:8 66:14 87:7 89:2, 11 90:3,8,23 91:1, 4,12,20 104:5,6, 13,15,20 105:1,5, 10 109:14 112:2

**burns** 57:12 92:6

**business** 67:20

**bystander** 60:16

---

**C**

**C-L-Y-D-E** 5:18

**calendar** 45:18

**caliber** 62:8,11 69:8 96:17

**call** 4:25 14:7,14 21:15,16 41:12,13 44:7,10

**called** 5:10 22:18 23:18 24:1 26:12 40:17 41:20 90:9

**calls** 14:16,17 15:5,6,7,9 113:13

**Calvary** 19:5,8 20:6,7,9,19 52:7

**Cambridge** 18:23

**Campfire** 42:4,21

**Canada** 19:5 26:13,14,16

**cancer** 58:7

**cannulate** 120:12

**cannulating** 122:6

**capabilities** 33:10 74:2 86:18

**capability** 33:12

**capable** 35:3 62:15 102:15

**capacity** 60:15 83:13 86:7 129:22

**capillaries** 105:9, 11

**car** 28:21

**card** 90:22

**cardiac** 60:3 109:4

**cardio** 57:6 59:21

**cardiopulmonary** 109:1

**cardiovascular** 63:9 64:8,11,16, 24,25 65:8,11,13, 17 66:13,21 87:7, 9 89:2,11 90:3,8, 23 91:1,4,12,20 104:5,6,13,15,19 105:1,5,10 109:14 112:2

**care** 12:20 25:7,9, 12 34:23 68:20,23 109:3 130:10

**career** 5:25 33:9 40:5 117:12,18 120:23 121:12

**carotid** 104:11 105:18,21,23

**carried** 99:8

**carry** 31:10 77:9, 17 106:7,8

**cartilaginous** 97:19

**case** 4:19,25 9:1 10:14 14:2,20 15:22,24 17:17, 21,22,23,24 33:13 43:1 45:2,10,11, 12,13,23 60:17 61:22 62:7 63:25 67:16,21 68:4,8 79:3,6 81:18,19, 20,21 106:22 111:7 113:16,17 115:13,15,16,18 116:2,8 117:21, 22,24 118:2,8 122:11 125:3 126:5,9,17,19,20,

23 127:1,4 131:22

**cases** 39:23 60:16 61:11 69:20 110:19,22 112:18 116:3 119:7 123:8

**casualties** 25:12

**casualty** 25:9

**catch** 52:19

**catheter** 117:6

**causing** 88:11

**cava** 65:5 104:23

**cavity** 90:12,16, 20

**cease** 65:19 66:9 87:9 91:22

**ceased** 66:12

**ceases** 65:21 106:6,10,14 109:14

**cell** 6:7 14:16

**cells** 66:9

**Center** 23:19

**Center-fired** 62:8

**centimeters** 98:6,10

**central** 39:14 56:19 65:19 67:3 90:23 114:20 116:21,22,25 117:2,12,17 118:13,23,24,25 119:1,6,8,11,20, 23,24 120:11,15, 22,24 121:3,8,11

**certainty** 49:5 70:20 73:18 82:15 84:13

**certificate** 28:11

**certification** 12:21 26:13

**certifications** 47:25

**certified** 26:2,3,4, 5,7,10,14,15 27:12,14 29:23,25

30:12 73:24,25 74:7

**cessation** 88:11

**chair** 69:24,25 70:15 71:4,23

**chamber** 69:1,17, 20 115:23

**chambers** 69:6

**chances** 37:22

**Chandler** 117:21

**change** 12:23,24 13:5

**changed** 13:4 54:24 60:22

**channel** 99:11

**check** 42:23

**checked** 67:15 111:12

**checking** 111:22

**chemistry** 20:14

**chest** 22:13,15,16 31:20 38:15,21 39:8,13,14,23,25 59:7 63:23 64:3, 13 65:10 73:22 88:23 89:15,24 90:1,6,9,11,14,23, 25 91:3,7,10 92:16,21,23,25 93:2,3,4,7,8,13,20 94:11 97:19 98:22,23 99:1 104:3 112:1

**Chicago** 126:5

**children** 21:4

**choice** 92:3

**chose** 9:17

**circle** 73:22

**circulation** 66:4, 11,13 106:12 107:13

**circulatory** 32:17

**circumstance** 107:19

www.EliteReportingServices.com

circumstances 31:7 34:9 46:8 57:2 59:20

citation 124:16

cite 124:14

cited 9:8 16:1 78:19 124:11,16

cites 123:11

citizen 129:23

Citizens 22:25

civilian 24:2

clarify 6:19,24 14:17 115:19

class 49:18,19 50:17

classes 50:4 51:11

classroom 28:19

clear 11:21 110:10

clearer 51:1

clinic 23:14,18

clinical 21:14

clinics 23:14,17

close 23:16 38:19 65:10 120:22

closely 64:14

cloth 63:10

clothing 99:13,14

clue 130:12

Clyde 5:15,17

co-counsel 4:20

Cody 4:21

collar 94:4

collateral 69:22

colleague 49:20 50:8

colleagues 5:1,4 11:19 52:23 106:24 107:3

collection 64:12

college 19:6 26:14,16,23 123:12

collision 94:5

collisions 57:5 59:23

Colonel 18:7 75:20,23

colonize 99:12

color 12:16

colored 12:14 16:2

combat 18:8 25:9

combative 130:25 131:6,11, 17,18

commands 108:1

comment 17:1 38:11

comments 76:1

commission 83:6

commit 61:7

common 18:20 62:21,22,23 90:18 99:6 104:11 105:18,21 130:8

commonly 18:21 62:9 66:1 94:2

communicate 107:4

communication 10:22 14:11 83:11,20

communications 8:23,24 9:1,8 10:12,17 14:13

community 5:1 22:4 53:14 83:19

company 24:1

compare 56:7

compared 59:12 92:11

comparing 90:4

comparison 59:2

compendium 10:5

competition 28:3 29:21 30:10

competitive 28:12

competitor 28:2, 3

complaint 130:6

complete 9:4 20:21 32:24 88:11 126:11

completely 88:19 90:5 91:5

complex 22:5

complexities 61:8

components 65:7

comprise 64:15 65:4

comprises 65:1

compromise 103:8

compromised 102:22

computer 6:4,10, 13 8:16

concentrated 65:21

concept 59:8

concern 12:25 36:2

concerned 33:1

conclude 54:2 55:2

concluded 58:17

concluding 60:25 84:24 87:3

conclusion 54:20,24 60:19,22 78:22 85:11

conclusions 59:1

condemned 54:8 61:4 63:1,2,5 69:23 70:7 71:4 72:2 73:22 86:10, 13 87:2 112:10

condition 13:22

conditioned 76:7

conditions 22:1

conduct 23:25 24:2 49:23 50:1, 14 51:13 76:20

conducted 49:12, 17,20 50:12 51:7, 9 72:18 75:2,10 113:2

conducting 50:9 86:21

conducts 83:20

conference 46:24 47:1,3,20, 21 51:10 106:24

conferences 46:14,16,23 47:14,16,22

confidentiality 12:2

confirm 113:6

confounding 49:7

confusing 13:11 49:3 79:5

congestive 58:11

Congress 83:10

conjunction 8:2

conscious 32:13 35:3 92:23 102:14 106:14 107:1,12

consciousness 102:23 106:11 107:17,18 112:11

consensus 65:24

consequence 108:9 109:7,12

EliteReportingServices.com

122:22

**consequences**
108:25

**considerably**
29:21,22 56:15
61:11

**consideration**
103:6

**considered** 12:8
22:12 53:16 65:22
79:8 80:1,18,24
81:7 106:13 108:6
120:24 122:6

**consist** 28:18
32:9

**consistent** 89:20
100:9

**consists** 69:25

**constant** 66:8

**Constipation**
130:9

**constitutes** 8:18

**constructing**
71:17

**construction**
69:7

**consultation**
25:5

**contaminate**
99:15

**contaminated**
99:5,18 100:6

**contamination**
100:11

**content** 116:14

**contention** 60:21

**context** 81:3 92:2

**continue** 106:7
107:8

**contractor** 23:7

**contralateral**
117:9

**contribute** 41:21

**control** 32:20

**conversation**
116:15

**conversations**
84:24

**conveying** 56:1

**coordinator** 30:4

**copies** 8:8 132:13

**copy** 18:23
109:25 126:10
132:16

**copyright** 124:9

**coronary** 104:10

**correct** 9:3 16:11
18:1 23:11,12
50:9,10 53:21
71:2 79:9,10
80:16 100:15
101:18 121:16
122:3,9 123:19,20
124:17 125:13
127:23,24 128:7
130:1

**corrected** 120:17

**corrections** 40:9,
11 54:10,13 61:6
68:16 72:8 77:5
115:15 127:9

**correctly** 38:11
114:13 120:18

**corridor** 39:14

**cosmetic** 23:21,
22

**cost** 120:16
129:24

**counsel** 44:12,19
100:3 108:14,19
113:22 114:15

**county** 5:17 23:2
34:7

**couple** 6:15 14:12
15:6,7 16:7,16
17:19 18:10 22:25
23:4 41:25 47:1
71:21 104:16
105:4 110:16

**courses** 19:23
73:8

**Court** 4:7,8,12
100:15,18 109:21
123:20 124:21
126:23 132:12,18,
21

**cover** 17:13

**covered** 21:19
30:17 51:6,10

**covers** 71:11

**COVID** 42:20

**craft** 44:19

**crafted** 44:22

**creases** 90:9

**create** 56:4

**credential** 19:14

**criminal** 76:12

**critical** 109:3
117:13

**cross** 105:6

**crowd** 107:7

**crush** 56:17

**CT** 33:3

**culmination** 66:3

**Cumming** 20:10

**current** 25:25
78:20,24,25 79:2
80:7,11,25 81:3,
23 123:6

**curriculum** 8:9
28:20 74:14

**curvature** 36:18,
23

**cutdowns** 22:17

**CV** 44:25 45:2
79:14,16,23

**cycles** 66:10

———————

**D**

———————

**Dade** 39:2

**Daily** 126:5

**damage** 33:5
69:22

**Danny** 81:21

**data** 38:25 123:6

**date** 45:2,4,6,18,
24 101:19 127:14
129:5

**dated** 43:9 101:5,
13

**dates** 80:3

**Dave** 75:20

**David** 5:6 76:21

**day** 40:24 47:13
95:25

**days** 21:16 109:11

**DC** 127:12

**dead** 57:24 61:22
103:16

**deadly** 24:3 31:10

**deal** 36:23 90:19
117:15 130:13

**dealing** 88:13
97:10

**dealt** 98:20
103:13

**dean** 4:21 16:18

**death** 9:22 10:4,
23 12:17 13:3,16
39:5 44:6 54:14,
16 55:3,5,8,12,14,
18,21,25 56:23
57:3,9,10,11,12,
13,16 58:4,8,13,
18,22 59:5,10,16
60:20 61:5,13,14,
15,17 65:18,22,
23,24,25 66:18
68:25 76:9 78:12,
16 86:2 87:5,11,
19 88:6 107:16,
19,21 108:6,7,10,
15,25 109:4,7
115:23 124:5
126:17

**deaths** 55:16

57:5,17,25 59:24, 25 109:2

**decades** 26:18

**deceased** 33:12

**December** 42:24

**decided** 19:21 34:8

**decision** 102:21

**deer** 62:10

**deer-hunting** 62:16

**defend** 20:5

**defendant** 4:19

**defendants** 62:6 68:4,8,11,13

**Defender** 5:2

**defenders** 126:21

**defense** 20:8

**Defensive** 30:5,8

**defer** 52:23

**deferred** 53:12

**define** 87:13,24

**defined** 91:14 108:8 114:4

**definition** 54:7 55:13 65:23 107:22

**definitive** 28:24

**degree** 9:24 19:8, 10 20:3,11 52:9, 16 73:18 82:15 86:24 97:20 100:11 102:14,17, 24 108:3 125:8

**degrees** 20:6 36:9,10 92:8

**deliberately** 114:11

**delivery** 66:5,14, 23

**Demerol** 95:14

**density** 35:23 36:1,15

**department** 22:1 25:7,18,20 27:20, 21 28:6 30:13 34:11 38:23 40:9, 11 51:7 54:10,13 56:22 57:14 61:6 68:15 72:8 75:7 77:5 115:14 120:7 121:2 127:12 128:6

**department's** 29:9

**depending** 38:24

**depends** 74:11

**DEPONENT** 132:22

**deposition** 5:21 6:17 7:21 8:7 11:10 14:21 45:10 49:2 67:11 68:1 69:19 115:3,14, 20,24 116:7 118:1,7,11 126:20 127:3 132:6,14

**depositions** 5:24 113:16,17 115:12

**depth** 33:23 98:8

**descending** 104:17

**describe** 102:20

**desirable** 65:13

**destruction** 65:25

**destructive** 86:7

**details** 11:23 18:11

**determined** 112:7

**develop** 109:17

**developed** 11:22 80:7 84:8

**develops** 109:11

**Di** 16:5,7,9,24 17:11 18:3

**diabetes** 108:24

**diagnosis** 21:25 108:15

**diameter** 62:12 63:12

**die** 39:22 40:6 57:22,23,24 58:6, 14 59:4,16,17 60:11 107:19 123:7

**died** 32:4 38:20 57:4 60:7 61:22, 23

**dies** 58:9 109:15

**dietary** 130:12,15, 16

**difference** 75:13, 16,17,19 85:21,23 86:18

**differences** 84:5

**differentiation** 94:6

**differently** 58:8

**differs** 81:10

**difficult** 35:17,22 36:15,19,21 39:12 61:4,5 77:1

**dignity** 63:24

**direct** 69:8 88:6, 19

**directive** 69:8

**directly** 55:23 93:2

**disability** 32:19

**discharge** 22:3

**discharged** 97:2

**discomfort** 102:12,19,20 103:1

**discomforted** 102:17

**discussed** 18:15 23:24 30:15 84:22

**discussion** 47:9, 12 131:23

**discussions** 11:19 47:6

**disease** 57:5

**disfiguring** 63:24

**display** 107:7

**disposition** 22:3 33:6

**dispute** 34:9

**dissimulate** 53:15

**distance** 73:23 86:20 125:18

**distances** 86:16, 25

**distinction** 53:18

**distress** 102:18

**Doc** 42:5,17 129:1

**doctor** 50:18 96:24 129:18,22 130:14

**document** 7:11, 14,18 10:21 43:5, 14 99:24 100:24 101:9,20,23 108:17,19 109:22 118:5 123:21 127:6 128:2 132:1

**documented** 37:2

**documents** 6:9, 11 7:23,25 8:2,4, 10,16,22 9:8,11, 13,16,20 10:3,7, 12,15,17 15:19 16:1,2,3 18:3,4 84:15 100:21

**Dogs** 60:18

**dollars** 130:10

**domestic** 34:9,13

**doodling** 35:16

**door** 67:25

**double** 78:15 85:23

**dozen** 58:2 60:10 93:11

**www.EliteReportingServices.com**

**dozens** 59:19 92:20,24

**drafting** 9:9 101:13,17 110:1

**draining** 22:15

**draw** 58:22

**drawing** 105:22, 23

**drawn** 85:11

**drink** 95:25

**drive** 96:19

**driving** 41:14

**drop** 55:17

**drug** 57:9

**drugs** 13:15,16 113:13

**drunk** 34:7

**dues** 26:25

**duly** 5:10

**duties** 25:4

**duty** 25:20 74:1

**dying** 58:12,25 59:12 65:18 103:17

---

**E**

**e-mails** 8:17,19 14:14,17 67:15

**earlier** 59:21 61:3 81:2,5,23 82:1 104:21 115:12 127:23

**earlobes** 34:18

**early** 108:25 113:5 131:1,2

**earning** 83:22

**easy** 67:6

**edema** 108:9,11, 24 109:6,10,16

**edge** 92:4

**edged** 57:9

**edition** 124:12

**education** 19:12, 13,16 42:20

**effect** 89:3 93:23, 24 94:1 125:11

**effective** 76:24 131:5

**effects** 53:17 89:10 91:16

**efficacy** 12:15 13:2 43:22 44:7

**efficiency** 13:3 43:22 44:10

**elected** 34:9

**electrical** 56:18 57:11

**electrocuted** 61:20

**electrocution** 61:13,14,15,16,18

**electroencephal ogram** 108:4

**embedded** 69:6

**emergency** 21:7, 9,11,13,19,21,23 22:1,11,23 23:10 25:19 31:8 34:1, 22 37:10 38:23 39:8 56:22 57:14, 23 120:7 121:1 128:6

**emergent** 21:25 32:22

**emphasis** 20:23

**employed** 54:12

**employees** 24:6, 9

**employment** 25:25

**empty-headed** 129:8

**enable** 64:3

**encountered** 129:25

**end** 4:7,14 17:13 112:19

**endeavor** 76:11

**ended** 132:23

**ending** 114:11

**endings** 97:14

**endocrinology** 19:25 20:3,25

**ends** 114:2

**energy** 36:5 62:16 66:10 70:11 86:1, 6

**enforcement** 24:3 40:23,24 41:17,20 47:20,21 62:23 73:7 78:9

**engage** 44:19 113:22

**engaged** 43:20, 25 44:2,12,14,16 54:12 94:5 117:22

**enormous** 10:5 75:16,19

**ensue** 106:11

**entails** 54:19

**enter** 19:18,24

**entered** 20:2,4,9

**entire** 8:13 9:14

**environment** 25:8 30:10

**equipment** 119:14

**equivalent** 26:13 92:24

**ER** 11:23 130:6

**ER's** 130:7,9

**erred** 97:13

**erroneous** 120:20 124:16

**error** 78:13,17 80:23 113:19,23 115:11

**escapes** 11:20

**Esquivel** 5:6 14:6

**essentially** 9:23 70:9 107:24

**established** 73:9

**estimate** 32:4 39:3,12,21 63:9

**estimates** 66:20

**evaluate** 32:12

**event** 49:8

**evidence** 85:8

**exact** 31:18 102:6

**examination** 5:12 21:25

**examined** 96:25

**examples** 57:8,13 62:18 76:10 104:16 105:4

**exceed** 74:23

**exception** 56:2 60:1,2

**exceptions** 60:2

**excercise** 68:20

**excerpt** 126:15,16

**excuse** 22:14 42:2 108:3 111:1 116:12

**execute** 62:7 68:4,8,13 72:24

**executed** 84:13, 18 87:8 106:23

**executing** 63:21

**execution** 12:7, 10,25 13:6 43:23 44:5,8,17,20,22 48:19 54:3,9,17, 21 55:2 60:19,25 61:1,7,9,10,16,24 62:1,3,25 65:14 66:22 68:19 69:2, 9,11,15,17,20 70:18 71:14 72:4, 14 77:9,18 78:20, 22,23 79:9 80:12 82:2,3,11,14 84:1, 25 85:1 86:21

**www.EliteReportingServices.com**

87:4,18 88:19
97:4 106:20,25
110:1,12,14
112:13,14 113:3,
4,11 114:1,3
126:2

**executioner**
107:6

**executioners**
73:4

**executions**
12:14,23 72:11,17
77:5 79:19 84:9,
20 110:25 111:3
112:18 127:9,17

**exercised** 68:23

**exhausted** 66:16

**exhibit** 7:10,11
43:13,14 56:19
73:5 100:14,21
101:7,9,22,23
109:20,22 123:19,
21 128:1,2,25
131:25 132:1

**exists** 92:1

**exit** 37:4

**expedient** 33:2
54:15 63:6

**experience** 28:12
29:21 30:18 71:18
72:24 73:1 75:16
78:8 89:21 94:3,
23 95:9

**experienced**
73:5 109:4

**experiences** 56:4

**experiencing**
102:25

**expert** 6:8,10 9:9,
17,18 10:13,14
12:17,19 13:8,9
14:19 15:24 16:18
27:6,11,12,19,25
28:6,7,9 29:11,19
30:15 40:8,10
43:1,7 44:25 45:5,
8,9 46:5,9 48:2
52:14,15,23 53:1,
4,6,9,12,17,20

54:1 75:24,25
78:19 82:23 83:8
89:5 101:14 111:6
113:7 116:6
117:20 122:7
123:5 125:3
126:18

**expertise** 27:22
28:14 30:21 52:22
53:14 122:6

**expertly** 78:9

**experts** 10:18
47:7,10 52:17,21

**explain** 50:23

**express** 102:11,
12

**expressing**
102:10

**expression**
102:22

**extend** 71:22 86:5

**extensive** 14:9

**extent** 53:8

**extraneous**
102:21

**extreme** 64:18,19

**extremely** 55:10,
11,12,14 69:16
70:16,18 88:2
91:25 92:13
94:11,15 95:1
122:7

**extremities** 106:5

**eyes** 107:4

---

**F**

**face** 58:21 63:24

**Facebook** 41:5,6

**facetious** 53:7

**facilities** 35:6

**facility** 22:5

**Fack** 16:16

**Fackler** 16:17
17:2,5,9,10 18:3

83:9 100:2,8

**Fackler's** 16:21
17:19

**fact** 53:13 73:19
79:3 80:21 85:12
93:19,21 110:2
120:25 124:11
130:11

**facts** 12:11,12,16
18:1 87:16 120:1

**fail-safe** 110:9

**fail-safes** 110:7

**failed** 119:11

**failure** 57:3,6
58:11 109:1 119:6
123:3

**fair** 11:11 29:16,18

**fairly** 13:2 29:7
35:12 128:17

**falling** 88:9

**familiar** 16:6 78:9
94:6 108:20

**familiarity** 52:16
68:15

**family** 21:5,15
26:5,8,14,16
96:24

**fantastically**
112:4,21

**fashion** 102:16
131:6

**fast** 88:13

**faulty** 88:1 117:6
126:2

**feasibility** 54:7,
19 71:17

**feasible** 25:10
44:9 54:2,6,8,18,
21 61:1 68:3,7,13
72:3 78:22,25
79:1

**feces** 130:13

**federal** 5:1 126:21

**feel** 96:4

**feels** 92:16

**feet** 73:23 86:11,
15,19

**fellow** 5:3 13:12
34:7 49:4 82:6

**felt** 93:8

**female** 130:25

**females** 129:8,11,
15 130:8 131:11,
17,20

**femoral** 104:17
105:7

**fewer** 40:2,3

**fides** 8:9 48:5

**field** 39:4 52:16,24
83:24 89:9

**fighting** 102:13

**file** 8:13,16,18
11:7 16:13

**files** 17:5,6,7
85:10

**fillers** 23:21

**final** 63:15 65:23

**finances** 21:3

**find** 33:3,4 37:11,
12 76:25 85:4,5
109:16

**fine** 7:1 67:4,5
114:17,21,24

**finger** 28:10

**fingertips** 72:19

**finished** 20:8

**fire** 29:10 34:3,10,
24 110:13

**firearm** 62:6,15
73:9

**firearms** 23:25
27:6,8,9 29:8
30:10,12,16,20
35:25 40:21 41:17
47:10,13 49:13,
17,18,24 50:2,9,
12 53:14 73:2,8,
19 74:13 83:8

123:6

**fired** 34:14 69:8
96:13 110:15,16,
19,22 111:4,16,20
112:8,12,15,24

**firing** 12:18 13:6
43:23 44:5,8,20,
23 46:5,9 47:25
48:3,9,10,18 54:2,
5,18,21 55:2,22
58:17 60:20 61:1
62:7,15,25 65:14
67:19 68:4,8,14,
19,25 69:13 71:14
72:11,14,17,25
74:2,3,6 77:5,9,18
78:12,16,20,21,22
79:9,19 80:12,25
82:2 84:2,9,13,18,
25 86:10,21,23
87:4,18 97:4 99:9
109:25 111:23
113:3 124:18,19,
20 125:1,2,5,6,9
126:2

**firm** 5:5 69:25

**fixed** 63:1

**flat** 63:11

**flies** 47:19

**Floyd** 11:3 17:24
45:12,13

**Floyd's** 17:23

**fluids** 58:10

**focus** 29:2

**follow** 32:15
56:12 74:20 87:11
107:16,20

**football** 93:4

**footnote** 123:11,
14,16 124:11

**force** 24:3 31:10
65:20 75:7

**Forces** 83:24 89:9

**foremost** 11:4
16:18 83:7

**form** 29:5 37:24
38:9 49:25 50:16

**format** 56:20

**forms** 92:12

**formulate** 25:7

**fortunate** 31:1

**fortunately** 25:16

**forums** 42:6,19,
24

**forward** 105:19

**found** 85:8

**Fourteen** 121:13

**fourth** 34:19 47:2

**fourth-level** 30:1

**fracture** 94:17,23

**fractures** 92:7
94:18 98:14

**frame** 58:22 76:21
93:22

**France** 106:23

**Francis** 23:3

**frankly** 72:12

**free** 78:13

**Freeman** 13:10

**frequent** 108:9,25

**friends** 107:9

**frightening** 76:6

**front** 6:1,3,9,10,13
8:6 35:14 45:24
98:4 99:24

**full** 35:5 49:21
76:10

**full-time** 21:13

**fully** 25:11

**function** 7:7 55:7
65:19,21 66:7,9,
15 87:9 88:12
106:14 109:5,13,
15

**functional** 87:9

**functioning**
25:11 108:2

**fungi** 99:14

**fuss** 61:12

---

**G**

**game** 93:4

**Gary** 41:22 82:21

**gather** 40:25

**Gaussian** 56:20

**gave** 12:5 18:7
59:21 105:6 123:3

**general** 12:24
21:16 40:4 47:11
82:7 83:11,14
92:5 114:6

**General's** 4:4

**generally** 32:9
33:8

**gentleman** 10:23
11:20 82:18

**gentlemen** 83:15

**genuinely** 107:1

**Geodon** 131:4

**Georgia** 81:21

**geriatrics** 21:18

**give** 9:15 39:21
48:5 76:20 105:4
116:5 118:1

**giving** 108:1

**glance** 36:12 37:4

**Glossip** 45:10,22
117:21 118:8

**good** 4:2,17,22,23
16:23 19:21 32:16
69:1 84:11 120:24
122:4

**government**
83:3,13

**GPA** 19:23

**grades** 19:19,21

**graduate** 19:22,
24

**graduated** 20:2,

10

**grammar** 80:23

**grand** 23:3 55:7

**Grant's** 18:20

**graphic** 126:5

**great** 33:23 53:8
64:12 102:18

**Grossman** 75:20,
23 76:21

**Grossman's** 18:7

**ground** 6:15

**group** 29:25
54:12

**guarantee** 78:14

**guaranteed**
78:13

**guess** 8:15 39:24
41:12 48:6 79:17
96:7 99:17 119:24
120:19 122:14,17
123:2 130:6,8

**guessing** 122:20

**guideline** 28:5

**guidelines** 74:20

**guillotine** 106:24

**gun** 34:10 53:10
96:13 102:2

**Gunn** 5:7

**gunshot** 12:18
16:5,19 25:14,16,
17,21 31:3 32:10
34:25 37:21 38:20
39:3,4,5,6,10,12,
22 40:22 41:24
47:13 55:22,23
56:3,9,17 57:11,
16,17,19,22 59:6
66:21 88:6,8,20
89:10 90:15,17,
19,22 91:16,24
92:1,3,5,6,7,9,15
94:13,25 95:4
98:16 99:1,4,9,18,
21 100:2,5,11
102:5 103:10,12,
14,16,17 104:2

105:13 119:7
128:7,9,15,20,21

**guys** 42:22,23

---

**H**

**H-O-L-S-C-H-E-N**
83:17

**habit** 11:22 12:2

**habits** 130:12,15,
17

**Haldol** 131:1,2,4,
7,8,16

**half** 47:23 60:10
93:11

**handful** 33:22

**handgun** 29:23
39:5

**handguns** 27:10
29:20,22

**handled** 99:7

**hang** 49:1

**happen** 58:1
125:19

**happened** 60:13
110:14 117:11
129:21

**hard** 32:2 35:19
56:7 70:13 96:5

**hardness** 70:14

**hardwired** 76:4

**harm** 76:13,18

**He'll** 58:8

**head** 16:15 17:25
31:23 32:1,5,10
33:4 34:2,15,19
35:1,8 37:3,17,20,
22 38:7 63:18,20
68:11 105:20
107:2,6,8,10
120:1

**head-to-toe**
32:25

**Headquarters**
127:12

**health** 130:10

**healthier** 129:16

**hear** 6:18

**heard** 58:23

**heart** 57:3 58:11
64:12,19,22 65:1
97:18,20 98:3,4
102:2,5,9 103:12,
17 109:14

**heavy** 70:1,2
125:17

**heck** 33:4

**held** 27:19 83:6
129:14

**helpful** 18:24

**hemodynamic**
103:6

**hemodynamics**
32:18 102:23

**high** 19:3,4,6,23
29:7 52:15 90:14
121:3

**high-power** 89:2

**high-powered**
62:9 97:10

**higher** 73:21

**highlighted**
46:19

**highly** 28:4 55:6,7
75:22 88:23,24
89:15,24 90:6,8
91:8,9,17,20

**hinder** 13:20

**history** 12:13

**History's** 76:10

**hit** 34:15,18,19
35:17,19,22
36:15,19,21 38:7
73:16,21 92:16,25
93:2,3,8,13,14
94:10 97:5,9,12,
13 98:13 114:8
125:7,10

**hits** 90:14 94:13,
25

**hitting** 35:24
37:22 87:20,21
94:16

**hoc** 50:3

**Holsbine** 83:16

**Holschen** 82:20,
21 83:17,18

**home** 5:15 97:2

**homicide** 76:2

**honest** 128:16

**hormone** 23:20

**hospital** 21:18,24
22:4,25 23:2,3
31:8 33:11 39:10
57:24 96:19,23

**hospitalist** 21:19

**hospitals** 23:1,5,
8 33:8 120:6
121:7,10,11,14

**hour** 114:2,7

**hours** 58:9,13
95:9 109:11

**house** 17:7

**Houston** 51:9

**huge** 35:7 91:10

**human** 30:25 37:3
56:7,8 75:13 76:2,
3,6,9,24 78:13,17

**humane** 114:11,
12,14

**humans** 88:22

**hundred** 17:8
38:16 119:3
122:12

**hundreds** 9:21
57:19 122:9,18
128:7

**hunting** 28:13
42:22,24 62:10,
20,21

**hyperventilated**
66:17

**hyperventilates**
106:19

---

**I**

**IALEFI** 46:24,25
47:1,17 51:10

**ICUS** 109:3

**Idaho** 17:23

**idea** 38:11

**ideas** 71:21

**identification**
64:3

**identify** 58:21
62:17

**idiot** 129:14

**ILEETA** 47:2,3,7

**iliac** 105:7

**imagine** 51:23

**immediately**
91:22 94:1
112:11,13,15

**impact** 87:10
91:3,4 97:11

**impaired** 102:24

**impervious** 69:4,
12 70:3

**important** 69:21

**imported** 86:1

**imports** 40:23

**impossible** 70:18

**impression** 40:5
56:11 94:7

**improbable**
112:4,21

**improper** 116:23

**improperly**
116:20 117:16
118:13,22,25
119:11,21,23,25
120:8,11,15
121:17 122:8,18

**impulses** 56:1
107:25

**incapacitate**
88:17

**www.EliteReportingServices.com**

incapacitation 28:25 65:11,13,17

inches 59:4,12 63:12 97:13

incidence 36:11 69:10

incident 72:10

include 97:16 104:6

included 91:8 104:12,19,25 105:5 130:17

including 9:11 13:19 16:22 35:20

income 83:23

incorporated 24:13,19,20

incorporation 24:15,16

independent 23:7

indifferent 19:20

individual 31:9, 12,14 32:13,25 33:3,12 34:14,22, 24 48:22 49:6 66:17,25 71:24 76:7,24 87:8 102:1 106:18 107:7 110:11 111:25 112:12 129:19

individual's 112:19

individuals 32:4, 8 38:20 49:9 56:4, 5 61:19 69:3 74:1 76:13 77:8,17 84:22,24 86:18 89:14,17 93:7 128:21

induced 131:14

infarction 57:4 59:22 60:3

infections 99:21

infectious 57:5

inferior 64:21 65:5 104:23

infinitesimal 55:17

inflict 76:9,13,18

inflicting 10:4 66:24

influence 13:18

influenced 10:8, 18

information 10:24 75:22 85:4

informatively 113:18

informed 89:14

initial 21:25 32:12

initially 93:16

injection 12:7,10, 13 13:1,3,16 40:6 61:11,24 113:8, 19,23 114:10 127:18

injections 23:21

injure 69:15

injured 39:9 72:13

injuries 56:17,18 57:4 59:23 69:22 90:24 99:2 102:24 103:5

injury 39:19 57:11 70:11 87:7 88:11 93:16,18,21 98:19 123:6

inmate 68:8,14 95:19,22

innominate 104:11 105:17

inquiries 83:10

insert 126:5

insertion 117:7

inside 33:4

insipidus 108:25

instance 46:24,25 87:20

instantaneous 55:25

instantaneously 88:16

instinctively 76:3

instinctly 76:3

institution 19:14

instructed 30:8 49:18

instruction 25:5

instructor 29:23, 24 30:1,3,7,12 49:19

instructors 30:9 53:13

instruments 57:10

intact 32:16 35:4

integrity 103:6

intensive 12:20

intention 68:20, 23

intentional 66:3

intentionally 123:7

interdicted 39:18

interested 20:25 107:1

interesting 106:22

intermittently 40:13

International 30:4,7

Internet 41:13,15 83:19 85:3

interns 5:3

interpretations 84:16

interpreted 84:7

interrupt 50:19

intervene 34:12

intervening 47:23 90:15

interviewed 89:8

intoxicated 35:6 130:25 131:10,12, 16,18

intratracheal 32:21

intrinsic 29:4

introduce 4:9

introduced 4:18

introduction 76:1

intubation 32:21

involve 72:5

involved 48:25 55:18 61:13 86:18 116:2

involves 55:8

involving 104:3

Iraq 83:25

Island 23:3

issue 41:24

issued 124:6 132:5

issues 9:22,23 13:14 18:8 33:1 40:21,22,23 47:12

IV 116:21,22,25 117:17 118:13 121:25

J

jail 34:23

James 5:9 42:7, 11,16

January 20:1 82:14 118:2,8 119:22 121:23 122:17 127:14

Jeremy 5:6

job 22:6 23:11 84:11

John 82:20,21 83:17

joke 11:25

Journal 37:9

journals 37:12

JSWMD 42:8,11

judge 48:3 82:7 83:11

judgment 35:4

juice 6:6

Jules 5:4

July 42:21 45:25 129:5 130:22

June 45:25 47:21 101:5

jurisdictions 68:21,24

Justice 27:20 30:13

**K**

Kevlar 70:10 71:22

kids 20:14

kill 62:16 86:8

killer 76:24

killing 18:8 75:21, 24 76:5 87:1

kind 62:1,3 93:5 112:25 116:23 127:4

kinds 92:8

King 4:24 14:3

Kingsville 23:15

knife 92:4

knocked 125:24

knowing 108:2

knowledge 53:3, 9 82:23 108:8 110:14,17 111:5

Kolodinsky 117:23

Kur 116:12

Kursman 5:2 14:5,11,23 15:7 117:23

**L**

lab 33:7

lack 66:4 70:3 105:25 120:13

lapsed 27:2

large 62:16 91:11

Las 45:10

late 16:17 42:24 53:11 110:9 118:3

lateral 104:3

law 5:5 24:2 40:23,24 41:17,19 47:20,21 62:23 73:7 76:13 78:8

layman 52:25 93:17

laymen 52:22

lead 28:8 47:9

leader 110:12 112:14

leading 75:25 105:17

leave 132:6

lectures 46:13,16

Ledford 81:21

Lee's 15:24 16:25

left 46:16 63:13 64:18 104:22 105:15 122:24

leg 31:13

length 98:9

Leonard 4:23,24 14:5,12 15:4,8,10

37:24 38:9 49:25 50:16,24 110:5 114:17,21 115:11 116:12 132:11,19

lethal 12:7,10,13, 25 13:3,16 40:6 61:10,24 113:8, 19,23 114:10 127:17

lethality 39:2,12

level 29:7 68:20, 23 69:1 72:5 76:5 102:23

library 9:14,21 10:1,2

lies 98:4

Lieutenant 18:7 75:19,20,23

life 28:2 55:21 65:20 91:22 110:4,8,11 111:12,15,19,23 112:3,7,11,19,22 114:11 123:12,24 124:5,12

lifelong 11:22 28:1,2 30:22

likelihood 69:16

Likewise 69:11

limits 86:25

lines 93:12 117:2, 12 118:25 119:2, 6,9,21,23,24 120:25 121:8,12, 19,20

list 8:6,7 18:6 35:12 45:5 46:13 57:6,8 59:21,22

listed 8:11

literal 86:4

literature 37:2,7,8 52:2 53:22 59:9 65:24 85:3 106:21 108:8

litigation 8:14,23 10:9 11:15 30:19 43:7 46:6,7

101:14,18 115:25 116:1

live 5:15

lived 16:20

lives 102:14

LLC 24:1,2

load 112:16

lobby 40:25

local 75:7

located 5:14 69:13

location 117:8 119:14

locations 8:17

logs 119:8,10 120:5 121:9,15

long 21:9 24:11, 24 26:7,15 42:15 67:4 74:9 76:15, 17 94:18 96:8 106:10 107:1 109:16 114:17 129:14

longer 59:25 66:19,20 85:5 106:15,17,20

longest 107:11

looked 16:8,15 18:7,10,13 33:23 37:19 72:22 73:12 74:16 77:22,25 120:2,9

lose 107:18

loss 106:11,12 107:16,24

lost 66:9

lot 12:9 39:16,17 51:15 52:16,20 99:20,21 104:14 106:20 114:4 117:2

lots 104:18 105:2 107:18

lousy 130:11,15, 16

Case 3:18-cv-01234-B Document 184 Filed 05/17/22 Page 150 of 163 PageID #:7043

low 35:12 70:21

lower 63:12

lumbar 70:1,8
71:6

lumen 117:5

lunch 115:2

lunchtime 114:16

lung 90:21

lungs 65:6

Lynne 4:7,23
14:5,11 50:20
115:4,10 132:9

**M**

M.D. 5:9

M.sc. 5:9

made 18:1 71:5
115:11 125:4

magnum 96:18

main 56:16

maintain 26:12
66:15

maintaining
32:14 103:6

Maio 16:7,9,24
18:3

Maio's 16:5 17:11

major 47:20 60:2
62:8

majority 76:25

make 11:25 36:15,
18,21 39:12 50:25
59:1 101:7 117:13

makes 16:7 64:6
76:5

making 21:24
22:2

male 98:7

males 131:19

mammal 62:16

man 11:2 56:15

58:6,9,12

manner 44:6
54:11,15 76:8
131:13

manual 123:25
124:1,7,12

manufacturer
70:15

March 51:8

margin 64:21
70:16 119:7

mark 101:21

marked 7:11
43:12,14 100:13,
17,21 101:9,23
109:19,22 123:18,
21 127:25 128:2
131:25 132:1

marksmanship
28:13 73:10 74:2,
4,7,10,13 86:17

martial 94:5

Martin 16:16

massive 60:5

master's 20:3,8

matches 30:6

material 9:25
24:15 70:1 81:3
85:21

materially 85:22

materials 15:23
69:4 70:9 79:7
81:6 116:13,18
132:5

mathematics
20:16

matter 35:25
66:11 76:12 86:4
87:11

maximum 111:13

MD 20:17,24
42:12,16 52:9,11

meaningful
102:16

meaningless
58:15

means 10:4 33:10
43:23 54:2,17,21
61:1,3 66:22
69:21 78:23 82:3,
11,13 83:22 85:1

meant 21:16
87:15

measure 62:12
122:16

measured 108:3
125:12

measures 71:1,7,
12,16

mechanics 61:8
75:15

mechanism
65:15,18 86:3

media 41:4,8,10,
12 82:25

mediastinum
64:13

medic 83:23,24
91:18

medical 9:22 10:3
13:22 20:9,11
25:7,25 26:21
30:21 37:8,12
39:1 52:2,13
59:25 60:17 64:9
65:23 87:15 96:22
102:19 108:8
129:8,11,18,22
130:14

medication 96:21
103:7,9 131:9,15

medications
13:19 103:2,7

medicine 20:10
21:5,10,11,15
22:23 26:6,8,23
37:10

medics 89:9

medium 14:14

Medline 10:2

meet 4:5 73:6,20
74:23

meeting 6:14
47:4

member 25:11
26:23 41:16,21
42:1

members 25:6,8
69:15 75:6

membership
27:3 42:16 47:11

memorized
107:23

memory 17:14
120:9

men 23:20 128:9,
11 129:10

mention 131:20

mentioned 57:16
62:18 64:1 80:15
83:15

message 41:13,
15,18

met 73:10

metastasis 58:7,
12 59:12

method 78:24
88:5,18 114:11

methods 44:16

Metro 39:2 74:21
75:2,5

Miami 39:1,2

mid-1800s 72:12,
18

mid-20s 72:23

middle 39:15 89:7

might've 15:12

military 40:23
76:23 78:24 79:2
81:23 83:13
84:12,18,21 85:1
113:2 127:9,17,
20,22

millimeters 98:7

Case 3:18-cv-01234-BJD-PDB Document 148-8 Filed 05/17/21 Page 151 of 163 PageID #: 1044
www.EliteReportingServices.com

milliseconds 87:10

mind 11:4 13:10 18:11

mine 129:2

minimize 11:6

minimum 73:6 74:12

minor 23:21 39:19 81:10 105:12

minority 39:11,23

minute 110:20 111:22 112:6

minutes 59:11 67:2 94:22 107:14 110:3,10,12 111:13,18,25 112:3,6,8,23 114:19 115:9

misconception 99:6

missed 47:1

misstated 101:19

mistaken 48:25 49:7 128:24

Mitchell 4:2,3,6, 11,13,17,18 5:13 7:7,9,13 11:21 38:5,11,13 43:12, 16 50:7,18,22 51:2,3 53:2,7 67:12 100:13,16, 19,23 101:7,11, 21,25 109:18,24 110:21 114:15,19, 22,25 115:4,7 116:3,24 117:3 119:17 120:11 121:4,6 122:14,22 123:18,23 124:23, 24 128:4 131:24 132:3,8,9,15,16

mixed 26:18 115:17

mixing 68:10

moment 66:18 108:7 123:25

month 45:13 46:4 72:22

months 15:1 58:6 59:4 76:22

morning 4:2,17, 22,23 45:20 96:24

mortality 65:15 66:24

motor 57:5 59:22 60:6,12,13

moved 17:7

movement 91:21

moves 94:23

moving 63:2 112:13

multiple 75:4 91:7 124:6

myocardia 59:22 60:3

myocardial 57:3

---

**N**

naked 130:25 131:10,17,18

names 11:4,22 12:4 23:17 37:16, 18

narcotic 103:7

narcotics 96:21

Nashville 5:5 74:21 75:2,5

National 27:15 29:24

nature 5:24 37:9 55:9 69:17 96:8

Navy 83:5

Nebraska 23:4

necessarily 11:1 12:14 47:5 88:8 107:16

neck 34:19 105:19

negate 93:21

negatives 78:15

negligible 86:19

neighborhood 51:15

nerve 88:14 97:14

nerves 56:13 97:15,16

nervous 65:19

neural 55:9 107:24

neurological 55:13 56:1

neurons 66:7

neurosurgeon 33:16

neurosurgery 33:17,19,22,24

neurosurgical 33:9,11,20

neurotoxins 23:22

Nevada 10:23 11:2,7,15 12:6,22 13:8,17 17:18 45:11 48:4 49:21 50:17 51:7 115:16

news 42:22

Nice 4:5

night 14:7,14

nil 68:22 70:20

Nonetheless 12:5

nonlethal 39:17

nonresponsive 119:18 121:5

notepad 6:6

Notice 7:20

Notwithstanding 91:1

November 17:18 43:9 45:5,14,15, 21 53:11 54:25 60:23 72:23

noxious 55:9

NRA 28:5

number 7:12 16:21 39:21 41:17 43:15 57:25 72:19 75:6 77:12 83:25 85:20 100:22 101:10,24 102:6 109:23 116:7 123:22 128:3 130:5 132:2

numbers 120:2

nursing 121:2

---

**O**

object 37:24 38:9 49:25 50:16 93:2 110:5 119:17 121:4

objection 50:23

objective 28:23

observation 96:24

observe 58:25

observer 33:21

observing 5:3

obstetrics 21:17

obtain 19:14 33:7 125:22

obtained 19:8,23 86:24 126:17

obvious 97:9 112:10

occasion 22:17

occasions 75:3

occupation 21:7

occupations 23:13,23

occur 25:12 61:25 90:24 94:8

occurrence 117:10

occurring 71:2

Case 3:18-cv-01234 Document 184 Filed 03/01/21 Page 152 of 163 PageID #7045

occurs 59:11 62:25

ocean 55:17

October 49:18 50:8

offer 51:19

offered 49:19

office 4:4 5:2 126:21

officer 30:7 31:9, 11 73:25

officer-involved 29:15

officers 28:23 34:10,12,14,25 40:23 73:13 77:20

Ohio 126:18,20, 22,23

Oklahoma 117:21

older 78:20 80:12, 20,25

oldest 128:14

omitted 71:10

on-the-spot 50:5

one-year 19:19

onerous 61:10

online 10:2 16:8

open 6:13 132:6

opens 99:11

operated 24:11

operating 29:7 57:23 97:1

operation 25:13 30:10 99:16

operations 25:10,19

operator 113:19, 23 125:21

opine 113:18,22

opinion 12:23,24 38:4,6 59:8 64:6 85:12 86:22,23

87:12,18 88:5 114:6 129:14,18, 19 130:14

opportunity 118:16 119:4 122:24

opposed 22:18 93:24

orange 6:6

order 76:8,13

orders 132:12,14

organization 48:9 52:6 75:6 83:6

organized 107:24

organizing 30:6

outcome 29:15

outcomes 35:8

overestimate 123:3

overkill 86:4

overlapping 63:13

overnight 96:23

oversight 25:12

oversimplify 93:19

oxygen 66:5,6,8, 10,14,15,23

---

**P**

p.m. 115:3 132:23

pages 41:25

pain 55:6,14,17,20 56:1,4 92:8 93:14, 16 94:21,22,24 95:9,11,15 97:16 98:21 102:9,10,11 103:2,6,7,8 130:6, 7,9

painful 56:15,23 57:13,17 58:6 91:25 92:2,5,6,7, 10,11,13 93:20,24

94:1,8,11,13,15, 16,17,18 95:1,6 98:1,12,15,17,20

painless 44:6 54:16 55:3,5,12, 17,19,22 56:14 60:20 87:5,19 88:5,19

panel 47:7,8,10

panic 96:7

paper 8:15 16:22 17:5 63:10

papers 9:22 16:8, 9,12,16,21 17:2,8, 10

paragraph 91:14, 19 130:3

parameter 131:23

part 12:2 46:2 63:13,15 71:19 75:8 90:21 94:16, 17 104:15 105:9

part-time 21:12 23:1 83:21

participant 48:18

participate 47:5

particles 99:14

pass 29:9 36:8 70:6,12 91:2

passes 90:11 99:10

passing 55:21

past 14:12 36:9 41:1,11,17 49:13 51:25 75:3

patient 11:24 12:2 33:10 117:14 118:13 121:18 122:19

patients 22:12 98:20 121:21

Patrol 75:5

pattern 56:13

pause 67:1

PD 75:2,5

PDF 132:16

peace 73:13,25

Pecos 23:2

pediatric 128:24

pediatrics 21:18

penalty 9:22 126:17

penetrate 36:5,12 69:9 70:4

penetrates 90:10, 19

penetrating 37:5 90:16

Pentagon 83:10

people 14:6 22:10,20 29:5,6 30:9 31:25 38:14, 23 39:7,8,9,22 52:20 57:4,21 58:20,24 59:3,17 62:17 76:10,25 77:12 86:23 91:18,20 92:19, 21,22 93:5,16,21 94:3,4,21 102:8, 13,17,18,22 103:2,4,25 104:1, 4 107:18 114:5 128:16,17 131:12

perceive 93:16

percent 32:7 37:23 38:3,7 39:4, 24 65:9 70:20 118:24 119:20,23, 24 120:3,20,23 121:19,25 122:10 123:8 130:7

percentage 38:12 120:22

perfecting 12:2

perform 22:9,11, 20 25:21,23 33:17 51:5

performed 33:19, 24 114:9,13

www.EliteReportingServices.com

period 42:1 94:20 106:19 120:7

peripheral 34:16 121:18,19,20,25 122:8,19

periphery 90:10

perpendicular 36:7,25

person 54:8,10 55:20 56:10,11 60:11 61:4 62:2 63:20 69:24 72:2 73:23 76:14,18,19 77:1 82:24 87:2 89:1 90:7 93:14 109:3,13,15 128:14,19

personal 41:5 83:20 90:15

personally 49:8 58:22 59:15 77:8 95:3

personnel 24:3 54:9 75:8 78:9 89:8

perspective 102:19

pharmacokinetics 13:15

pharmacology 13:14

phenothiazine 131:8

Philadelphia 5:2

phobia 76:2

phobic 76:6

phone 6:7 14:14, 16

phonetic 29:25

photographic 18:22

physical 115:23

physician 11:23 21:8,14,21,23 23:11 24:22 25:2, 4,14,17 56:22

57:14 60:15 106:22 111:13 112:7 121:1 128:6

physicians 26:14,16 65:24

physics 20:15

physiology 87:15,16

picture 29:5 125:22

piece 63:11 88:9

pistol 27:10 29:10,24 30:2,5,6, 8,13 37:3 96:14, 15,16

Pizzuto 17:22

place 22:24 28:4, 24 51:18 54:9 61:4 97:9 117:7 118:22,25 121:17 122:19 129:16

placement 22:13 28:22 120:22 121:8

placing 63:23 64:2 69:3 120:24

plaintiff 4:24

plaintiff's 11:14 44:12,19 113:22 115:10 132:20

plaintiffs 68:10

plan 127:1

platform 69:25 71:23

play 11:1

PLLC 23:18

plywood 70:7,8

pocket 18:23

poignant 40:25

point 16:24 23:6 28:10 95:8

pointed 115:11

points 12:8 14:18 17:19 18:1 81:11,

13 84:5

police 28:21 31:9 40:22 62:10 73:19 75:7

policies 25:7

pop 130:20

population 129:15

portion 36:8 39:15 52:18

portions 17:14 63:8

position 63:1 68:3,7 79:25 129:23

possess 126:11

possession 10:1, 7

possibility 68:22 69:14 70:19 71:8, 13 88:4 91:2 92:1 111:21 112:20 113:1

possibly 75:24 122:15

post 74:20 129:1 130:18,21,22 131:20

posterior 63:14

postinjury 94:20

postmortem 64:3

potential 35:7,10 90:22

practicable 33:2

practical 81:11 84:2,3

practicality 12:15 84:6

practice 21:12,16 22:23,24 23:1,5

practiced 21:9,14

practicing 21:11

preceded 80:21

precedent 21:14

precipitate 109:1

precise 36:10

precisely 28:24 36:6 91:14

precision 32:6

preclude 126:23

predictable 91:17,21

preferable 58:14 62:18 86:16,20

preliminaries 4:6

preparation 9:17 10:20 14:21 15:17,24 17:17 115:13,15,16,18

prepare 13:25 15:14,19 43:1 80:10

prepared 10:18 81:25 115:4 122:21

preparing 8:8 16:24 17:20,22 20:4 80:1 113:7

prescribed 56:13 74:14

present 22:1 31:2,19,22 33:20 41:17 47:5 48:20 53:13 60:6,12,15 110:4 111:15,19 112:7,23

presentation 36:25 39:16 63:14 64:15 91:6 98:11

presented 46:14 47:17,20,22

presenter 47:14, 16

pretty 21:20 30:17,20 39:9 71:9 88:25 117:10,13

prevent 71:1

www.EliteReportingServices.com

preventing 69:22

previous 81:5
100:10

previously 25:23

primarily 14:16,
17 16:4 18:2
22:18 24:2 25:5
27:10

primary 21:7
22:24 23:11 35:12
41:23 42:9 65:7,
15 81:1 83:22
103:5

primaryandseco
ndary.com 41:20

principles 25:9

printed 6:11

prior 10:25 14:24
24:16 66:17
106:19,25

prison 49:3

private 21:12

privileges 23:4

probability 70:21
112:2

problem 120:18

problems 12:7
119:13

procedural 22:18

procedure 81:10,
13 119:8,10
120:5,13,15,17
121:9,15

procedures
22:11,14 23:21
33:21 120:6
127:9,20,22

proceed 33:6
106:3 115:5

proceeded 19:24

proceedings
132:23

process 55:21
112:4

processes 84:8

produce 7:23,25
8:4,10,13,19,22
29:14 39:18 56:19
65:10 87:6 89:3
99:1

produced 8:2

professional
26:19 27:4 48:7,9
89:20 129:22

professionally
21:6 129:25

proficiency 29:8
73:2,19,24

program 19:21,24
20:2

progresses
93:18

progression
93:15

projectile 62:15

projectiles 53:18
54:11 86:6

proper 125:22

proposed 13:16

prostate 58:7

protect 97:18,20
98:3

protection 69:2

protocol 44:20,22
63:19 70:24
78:20,21,25 79:1,
3,8,19,21 80:4,7,
11,13,15,21,25
81:1,2,4,6,14,17,
23 82:1 84:1,2,4,
10,16 85:6,9,13,
18 86:9,14 95:20,
23 100:17 101:2,
12 110:1,2,7,10
111:10,24 112:5
113:8,11,13,19,24
124:18,19,20,25
125:1,2,5

protocol's 84:7

protocols 79:5
80:1,19,24 84:6

101:17

provide 9:4,7
10:8 25:5,12 69:1
81:5 106:4 126:8

provided 8:7
10:11 16:22 36:5
50:3 81:19 100:3
124:3 126:10

provider 50:2

psychological
76:4

psychologically
77:1

psychology
75:18,24

psychosis 131:9,
13,14

psychotic 131:8

publication 52:7
75:21

publications
51:24

published 52:2,
10,12 53:22 80:7

pull 34:10

pulmonary 58:10
63:16 65:2,3,6
104:21,22 108:9,
11,24 109:6,10,16

punched 93:3

purpose 63:23
64:2

purposeful 91:21

purposes 23:22
62:23

pursue 19:12,16

pursued 19:13
20:24

put 63:20 72:3
78:14 82:17 92:2
93:5 104:2 105:7
119:12

quadrant 91:12

quadruple 86:3

qualification
27:20 28:5 29:9
73:8,20

qualifications
29:23

qualified 10:13
28:4,6

qualify 30:3
73:14,15

quantified 59:9

quantities 55:16

quasi 22:16

quasi-surgical
22:13

question 7:2
44:5,8 50:24
58:15 68:5 99:23
118:10 120:1
122:21 124:22

questions 5:13
35:5 43:20,25
44:2,4,13,15
47:10 132:4

quick 44:6 54:15
55:3 58:3,8,14,18,
19 59:2,7,10,16,
24 60:5,20 87:5,
19 100:20

quickest 114:10

quickly 59:17
131:5

quickness 58:15

quote 49:12

rain 125:9

rainfall 125:11,17

rainstorms
125:19

raised 13:1 107:6

random 37:21 38:7

range 73:17

rapid 131:6

rapidly 109:12 110:20

rare 55:10,11,12, 14 117:10

rarely 41:21 42:1, 2

rate 121:3

rates 119:6

raw 76:23

reaching 90:12

read 9:21 10:6 12:6 15:16 17:8, 10,12,13 37:9 42:3 58:23 64:1,4, 5 75:22 118:10,18 125:4 130:3

reading 12:9 15:18 84:10 118:12,22 130:5, 24

real 12:4 53:18 84:13 100:20 117:14

realized 119:5

realm 88:4 94:3

realms 112:25

rearrange 117:1

reasonable 73:18 82:15

reasons 35:10 99:22

reassess 32:18

rebar 88:9

recall 11:13 12:4 15:18 18:21 19:2 26:25 42:8,12,15, 17 48:24 81:8 82:22 96:6 102:10 103:15,17 118:3, 7,15,18 120:14

123:11 126:20,25 127:2,3

receive 96:22 126:15

received 10:15 19:10,11 31:3 34:2 52:9 95:3 96:21 112:1 128:9,15,20 132:4

receiving 34:3,25 93:25 94:7

recent 75:9 101:16

recently 17:7 49:2 74:17

receptors 97:16

recess 67:10

recognize 7:14 43:5 100:24

recollection 80:8 117:19 120:19 122:25 126:16

recommend 75:23 131:2

record 4:9 107:11,12 115:6 132:13,14

records 9:5 40:4 51:20,22 75:11 121:8 123:1

recruit 76:23

reduce 125:17

Reeves 23:2

refer 52:21 79:4 80:20 90:1,2 91:12

reference 58:23

referenced 16:9 123:25 124:2

references 16:7 18:6

referred 45:11 62:9 104:21

referring 80:22 109:2

refine 29:13

refiring 110:18

refresh 17:14

refreshers 18:11

region 91:14 98:21

regular 73:15 119:8

rehearsed 62:4

Reign 106:23

related 9:23 12:7 25:21 47:25 52:12 67:19,21

relating 10:3 48:10

relative 59:13

relevant 17:14 67:16,18 105:13

reliability 12:25

reliable 38:25

relied 9:8 18:19 30:18 81:16 101:3,13,17 110:1

rely 9:11,13,18 10:17 16:24 87:12,14,20 127:22

relying 81:25

remaining 70:11

remember 11:12, 23 46:4

remembering 11:22

remind 116:13

remote 69:13

removed 97:2 129:15

render 60:17

repeat 6:17 68:5 124:21

rephrase 50:25 111:2

replace 117:1

replacement 23:20

report 6:8,10 8:8 9:9,17,18 14:20 15:10,25 17:17, 20,22,23 30:19 43:1,7,22 44:25 49:11 54:1 78:19 79:7,11,20,23 80:1,11 81:7,16, 19 89:5 94:21,22 101:3,14,17 110:2 111:6 113:7 116:6 123:5 124:15 125:3 126:4

reported 58:25 72:10

Reporter 4:7,8,12 100:15,18 109:21 123:20 124:21 132:12,18,21

reports 15:21 37:13,16 45:6 72:13 81:22,25

represent 4:24 117:24

request 11:8

requests 121:2

require 66:8 85:13,18

required 22:2 61:10 73:21 111:1 112:17,20 117:3 119:14

requirement 74:12,15,16

requirements 73:10,13 74:11, 21,23

requires 36:6 63:19 85:14

requisite 74:1

reread 17:19

research 52:6 119:12

reserve 66:18

83:6

**reserves** 66:15

**residency** 20:21
21:4

**resident** 120:14

**resistant** 69:3,5,6

**respect** 15:22
89:10

**respiratory** 57:6

**responding**
102:15

**response** 16:2
88:22,25 89:14,23
90:8 91:21,23
96:6

**responsibilities**
21:22 22:7

**responsibility**
21:24

**responsive** 132:5

**rest** 28:22 108:1

**result** 54:15 55:3,
25 56:10 58:18
60:20 87:4,19
93:14 94:17

**resulted** 39:5

**resulting** 57:6

**results** 66:2

**resumed** 67:11
115:3

**retained** 126:18

**return** 34:3,24
65:3

**returned** 19:18

**returning** 54:1
65:6

**review** 15:19
16:22 17:2,18,25
18:4,25 51:14
81:2 86:12 110:6
113:7,16 115:14
116:18 119:4,10
121:7,9,15 122:24
125:2

**reviewed** 9:16
15:21,22,23,24,25
16:21 17:23
18:14,18,21 45:3
69:19 80:11,23
113:10 115:13,21
116:7,13

**reviewing** 35:14

**revolver** 53:10

**rib** 90:11 97:11,13

**ribcage** 97:18,20,
21 98:23 103:20

**ribs** 97:21,22,25
104:1,3

**ricochet** 68:18
69:14,23 70:19
71:2 72:10,13

**ricochetting**
71:8,13

**rifle** 27:15,20,23
28:1,3,16 29:2,3,
10,14,17,24 39:25
62:10,16,20,22
73:7,14,20,24,25
78:10 86:2 88:23
89:1,2,15,23 90:6
112:1 125:21

**rifle's** 125:23

**riflemen** 54:12
61:7 63:3 73:4
85:13,16,17 86:5
87:20,23

**riflery** 27:25 28:9

**rifles** 27:11 28:12,
21 54:15 61:6
62:8 69:9 87:6
97:10 112:16
123:7

**rigorous** 74:19

**rimfire** 36:4 96:18

**risk** 68:18,21
113:18,23

**Road** 5:17

**Rob** 4:3,18 53:2

**Roberts** 41:22
82:22 83:4,7

**Roberts'** 83:2

**rock** 93:3

**Rocket** 42:5,17
129:1

**role** 83:2,12

**room** 5:19 21:19
31:8 34:2,22 39:8
57:23

**root** 65:2 104:9

**roots** 63:16
104:10

**roughly** 64:16,21

**round** 67:6 88:1
126:2

**rounds** 112:16,17

**roundtable** 47:12

**row** 10:23

**rules** 6:15

**running** 39:15
86:23

---

**S**

**SADAA** 29:25

**safe** 29:5 30:9

**safety** 30:7

**Saint** 23:3

**SAITH** 132:22

**sandbags** 70:9

**satisfaction**
120:21

**scalp** 34:18 36:13

**scanner** 33:3

**scene** 60:6 61:23

**scheme** 55:8

**school** 19:3,4,5,6,
15,17,22 20:9,10,
12

**scientific** 112:25

**Scott** 4:20

**screen** 7:7,15

11:6 43:4

**scroll** 79:13
100:25

**search** 39:20 78:3

**searches** 10:2
85:3

**Secondary** 41:23
42:9

**seconds** 59:5
66:11,17,19 87:11
91:23 93:20 94:8,
20,22 106:13
107:10

**section** 91:13
112:9

**secure** 32:20

**seek** 16:13

**segment** 91:13

**sensation** 55:9
93:23,25

**sensations** 55:9

**sense** 22:10 64:6
96:6

**sentence** 89:7,13
91:13,19 100:5
123:5

**sentences** 89:25

**separate** 103:14

**September** 20:2

**series** 59:6

**serve** 74:2

**served** 24:21
27:22 40:8 47:7
83:23 89:9 117:20

**services** 21:23
22:17 23:10

**set** 91:5

**setting** 109:8

**settings** 109:9

**settling** 22:3

**seventies** 128:18

**severe** 34:16
125:19

severed 107:8,10

severing 107:2

sex 130:7

share 7:7,15 43:4

sharpshooter 28:5

sheriff 34:11

sheriff's 25:7 27:21 28:6 34:10, 12 75:7

shocking 96:2

shoot 54:14 77:1 90:7

shooter 28:2 74:3,6

shooter's 125:6, 9,14

shooters 126:1

shooting 29:15 75:13,14

short 9:19 36:17 55:23 125:18

shortest 21:4 28:25

shortly 61:21

shot 28:22 30:25 31:9,12,19,22,25 35:8 38:7,15 39:7 61:5 63:20 65:9 88:23 89:15,23 90:1,2,6 92:21,22 93:7 95:6,14,16, 17,25 96:2,9,11, 17 102:2,5,9 103:19 104:1 109:14 123:7

shotgun 29:10

shots 28:24

shoulder 95:17, 19,22

show 7:6,10 11:9 123:6 128:25

showing 10:12

shows 110:11 112:10

shutdown 109:12

sick 102:11

side 72:4 76:12 90:11,20,21 97:22 104:22 117:8 132:20

sides 71:22,24

sign 108:6 112:22

signature 43:17

significant 32:19

significantly 120:3

signs 91:22 110:3,8,11 111:12,15,19,23 112:3,6,10

similar 56:17 88:25

Similarly 125:20

similes 93:5

simply 29:13

Sims 5:5

simultaneously 20:4

single 86:1 120:14

sinus 65:4 104:23,24

sir 5:22 7:24 18:16 19:17 20:20 22:8 35:19 43:10 49:10 50:13 55:6 58:15 59:13 63:21 67:1, 9,22 68:11 70:25 79:24 81:15 87:14 92:14 98:25 101:4 104:7 108:22

sit 127:2

site 53:11 125:22, 23

siting 125:20

situation 13:12 34:13 61:20 109:3 129:25

skeptical 13:2

skill 29:13

skin 34:17 88:15 90:9 99:10,11,12

skull 35:23 36:1,8, 24 37:4,5

skull's 36:18

skull-related 37:11

slight 68:22

slits 69:13

slots 69:15

slow 58:13

slowly 58:9

slows 70:2

small 21:4 35:11, 18,19 39:11,24 58:1 69:13,16 89:4 125:8

social 41:4,8,10, 12

sole 59:25 60:2 116:14

solution 131:1

sort 12:19 13:8 48:7 56:9 61:9 71:18 72:21,24 82:25 91:16

sought 129:8

source 18:21

sources 8:7 10:5 18:13,14 38:25 64:1 81:2

space 28:22

speak 13:25 14:22 15:13 28:14 35:5 55:19 67:23 82:24 84:14 107:3 115:9 116:16

speaker 46:20

speaking 33:8 55:19 116:10

specialist 12:20

specialize 23:19

specialized 20:14

specific 16:15 44:4 73:16,17 76:21 84:4,5

specifically 13:14 77:11,15 93:10 113:21 115:24 116:24 118:15,18 124:2

spectrum 55:20

spelling 83:18

spending 130:10

spinal 99:2

spine 91:4 97:11 98:16,19

spoke 14:2,5,24 15:1 67:24 82:18 115:10 119:15

spoken 14:25 48:18,20 49:8 77:4 91:18

sports 26:23 94:5

squad 12:18 13:6 43:23 44:6,9,20, 23 46:6,9 48:1,3, 9,19 54:2,5,18,21 55:2,22 58:17 60:20 61:1 62:7, 25 65:14 67:19 68:4,9,14,19,25 69:2,11,15 71:14 72:11,14,17,25 74:2,3,6 77:6,10, 18 78:12,16,20, 21,22 79:9,19 80:12,25 82:2 84:2,9,13,18,25 86:10,13,21 87:4, 19 97:5 110:1,13 112:14 113:3 124:18,19,20 125:1,2,5,6,9 126:2

squads 48:11 86:23

stability 32:17

stable 32:18

staff 121:2

standard 32:15 73:6,18,19,21 114:8

standards 74:19

start 94:21

started 4:10 19:25 130:25

starting 16:23

state 27:21 30:5 40:8 48:3,4 49:12, 21 54:9,13 63:21 73:7,9,11 74:23, 24,25 75:5 77:21, 25 78:1,6 80:22 89:8 126:18

state's 74:11

stated 111:12 129:14

statement 85:12 120:19 123:10 124:15

statements 90:5

states 74:12 76:23 83:5,24 84:12,21 127:17

stationary 63:1

statistic 38:4 77:24

stay 66:8 87:1

stem 35:11,17,20, 22,24 36:16,19, 21,22 37:22 38:8 55:24 88:6,11,12, 20

step 32:23

steps 61:8 72:7

sterilized 99:9

sternal 98:14 103:15

sternum 63:13 64:17 97:8 98:3,6, 13,24 103:11,14

sternum's 98:5,9

Steven 116:8

stimulus 76:6

stop 66:13,14 91:21 101:1

stopped 82:17 127:4

stopping 66:23

storage 17:8

strapped 69:24

striking 37:3

stroke 60:5

strong 40:25

struck 91:20 93:19

structure 91:10 97:19

structures 39:17 64:14,23 90:4 104:24 105:12

student 19:20

students 123:13

studied 53:8 83:9

studies 19:19 20:5

study 20:23 30:22 39:2 53:2

studying 9:24

stuff 51:16 67:20 80:5

stunned 96:3

stunning 93:23 94:1

subclavian 104:17 105:7 117:5,9 120:16

subject 69:23

subjective 55:6,7 56:11 58:5,16,18, 20 59:7 75:16 94:24

submission 45:4

submitted 14:19 15:25 45:1

submitting 9:18 15:9

subpoena 7:20 8:11 15:22 132:5

subsequent 111:23

subsequently 11:16 113:10

substantial 70:16

substantially 13:4

success 121:3

successful 120:21

successfully 76:11 87:1

sufficient 62:15, 24 66:9 70:13 86:2,7 112:19

sufficiently 10:13

suffocating 58:9

suffocation 58:13

suggest 84:15 85:4 111:25

suggesting 85:6

suggests 76:21 85:9

suite 97:1

sum 18:12 36:17 50:6 51:11

summarizing 111:9

summer 42:21

superficial 34:20, 21

superior 65:5 104:23

superiorly 105:17 106:3

supplied 75:21 108:14,19 126:1

supply 66:8 81:6 105:20 106:10

support 78:21 106:21 123:12,25 124:6,12

supporting 16:2, 3

suppose 8:17 71:25 94:12 97:12

surface 36:18

surfaces 70:13

surfeit 129:7

surg 22:16

Surgeons 123:12

surgery 21:17 22:9,10,11,21 25:21,23

surgical 22:19

surround 71:24

survey 32:24

survivable 39:19

survive 104:4

survived 34:22 103:25 104:1

sustained 39:4 59:23 102:25 103:5

Sutherland 4:21

SWAT 24:21,25 25:2,4,8,10,11,13, 14

swear 4:14

switching 123:4

sword 92:3

sworn 5:10 77:20

sympathy 63:24

symposium 53:10

symptoms 91:5

system 65:19 66:23 91:11 127:9 130:10

**systems** 24:1,4,7, 12 40:16 41:7 50:12,15 51:5,17 125:20

**T**

**T3c** 25:9

**tackled** 93:4

**tactical** 24:1,4,6, 11,13,17,19 25:9 28:13,15,20 40:16 41:6 49:20,21 50:11,14 51:5,17, 19

**tag** 12:1

**takes** 59:5 66:10 71:1 109:16

**taking** 76:22 114:2

**talk** 58:5

**talked** 50:6

**talking** 55:13 62:14 92:22,23 129:7

**tangent** 36:9

**tangential** 36:11

**target** 63:2,5,7,10, 18,23 64:2 73:16 75:14 77:2 87:20, 21 95:20,23 120:13 125:7,10

**target's** 35:19

**task** 62:24

**taught** 19:17 20:12,15

**teach** 19:15 20:13,15 28:15 29:5,12,16 30:9

**teaching** 19:14 24:15 51:16

**team** 24:21,25 25:2,4,6,8,11,14, 17 70:18 72:4

**Teams** 14:14

**teens** 128:22

**telephone** 14:17, 22 83:1

**telling** 30:9

**ten** 9:24 30:6 49:12 51:25 52:5 59:5 66:16 91:23 111:18

**tend** 11:4 28:4 39:8 52:23 56:19 92:5,6,7 93:18,19 103:8 131:5

**tendencies** 56:20

**Tennessee** 4:3 5:6 44:9 54:3,9, 13,18,22 61:2 73:13 74:15,18, 20,24 75:1,5,8,9 77:4,9,17,21,25 78:1,4,6 87:4,19 113:13,19

**Tennessee's** 73:12 113:8,10,23

**Tennessee.gov.** 78:7

**term** 58:20 64:8,9 70:4 80:20 93:1 116:23

**terminal** 53:17

**terms** 12:12 14:21 55:19 73:3 75:15, 17 86:17 92:9 122:2

**Terror** 106:23

**Terry** 4:24

**testified** 5:11 12:22 25:24 40:10 45:9,10,14,20 48:21 70:23 79:4 81:19 83:9 87:6

**testify** 10:13 13:20 45:8,13,22 46:5,7,9 119:22 127:1,3

**testifying** 13:13 115:22 126:24

**testimonies** 49:7

**testimony** 10:8, 18 11:1,17,18 12:5,16 13:5,9,23 14:1 15:14,17,20 17:3,15,16,18,25 18:5,15 19:1 36:14 45:6 49:6 53:5 69:18 80:18 84:15 100:10 115:12 117:16 118:1 119:21 121:24 122:5,17

**tests** 22:2

**Texas** 5:15,17 22:25 23:3,15 24:19 26:21 81:22

**text** 18:10

**textbook** 123:12

**textbooks** 18:17

**texts** 18:10

**theoretical** 111:21 125:11

**Theoretically** 99:20

**There'd** 65:2

**thereto** 9:23

**thesis** 20:5

**thing** 55:10,24 90:13

**things** 28:7,14 32:22 39:11 40:4 48:5 55:8 72:6 122:15 129:24

**Thirty** 114:19

**thoracic** 90:12, 16,18,20 91:4 97:11

**thoracostomies** 22:14

**thorax** 120:17

**thought** 71:20 72:9

**thousand** 38:17

**thousands** 119:1 121:22

**time** 9:5 21:13 25:20 28:22 29:1 30:3 33:15 42:1,2, 18 45:4 47:19,20 57:25 76:21 81:25 82:12 83:5 93:18, 22 94:21 95:5 96:8 103:3 106:19 109:16 111:24 115:16 118:18 119:5,16 120:7, 14,20 122:21 123:3 124:6 128:6 129:20 132:7

**times** 5:23 14:22 15:4 31:5 33:22 34:15 52:4,5 56:24,25 57:1 59:18 60:9 94:1 95:3 102:4,6 103:21,22,23,24 110:16 112:17 117:11,17 118:12, 17 121:17 122:9, 12,18 124:6

**tissues** 66:7

**titled** 127:8

**TMA** 26:22

**today** 4:19 5:20 7:21 10:8,19 11:1, 17 13:9,19,23 14:1 15:14,17,20 17:3,15 18:5,15 19:1 54:20 60:19

**toe** 12:1

**told** 57:21 69:10 89:17 92:15,19 93:8 100:9 118:17

**top** 16:14 37:17,20 64:20 71:25 127:16 129:13 130:19

**topic** 9:23 12:9 131:22

**topics** 40:20

**total** 18:12 51:11

**tough** 19:23

**toxicity** 57:9

**track** 124:7

**tracked** 119:8

**traditionally** 22:20 131:7

**train** 25:8 76:17, 18

**trained** 74:4,9,18, 25 76:11,13

**trainer** 50:5

**training** 23:25 24:2 28:14,15,18, 19,20,21,23 29:2, 4,6,22 48:10,13 49:13,17,24 50:3, 9,12,15 51:5,7,9, 19 70:17 73:7 74:13,16 75:2,9 76:8,20 83:20,21

**trainings** 50:2 51:13,20 75:4

**transfer** 22:5 33:13

**transferred** 33:11,15 34:23

**transmission** 88:14

**trauma** 22:12 32:15 37:2,7,8,9, 12 52:12,13 83:23 92:12 123:12,24 124:5,12

**trauma-related** 22:9

**traumatic** 57:4 59:24 88:10 92:7

**travel** 105:14

**traveling** 88:13

**travels** 105:15

**treat** 25:14,16,17 31:14 103:8 129:10 131:7,9, 10,16

**treated** 25:19 31:25 38:14 40:1 57:20 95:11 102:1,4 103:10,19 128:5,14,19

**treating** 34:22

**treatment** 22:2 32:8 95:15 96:22 131:14

**treatments** 23:19

**tremendous** 9:25

**trial** 10:22,23,24 12:5 48:4 69:19 115:17 127:3

**Tribunal** 126:6

**triple** 86:3 117:5

**trouble** 117:14

**true** 35:13 36:17 65:12 68:12 77:19

**trunk** 63:16 65:2 104:22

**trunks** 105:24

**truthfully** 13:20

**tubes** 22:13

**tunneled** 34:17

**Turley** 116:8

**turning** 76:23 126:4

**Twenty** 119:2

**Twenty-five** 103:23

**Twenty-one** 86:15

**Twenty-twenty** 46:11

**two-thirds** 64:17

**type** 37:13 62:6 90:18 96:13,15 103:5

**types** 91:7

**typical** 93:17 97:21 98:5,6,9

**typically** 40:21 66:16 93:17 94:18

---

**U**

**U.S.** 78:21,24

79:2,18,21,25 80:3,13,15,19 81:1,2,3,5,23 82:1,3 83:2 84:1, 17 85:1,17 89:9 95:22 101:12,16 113:2 125:1 127:8,22

**uh-huh** 11:1 44:1 46:15,17 68:2 94:12 111:17 122:20

**ultimately** 9:17

**unable** 84:14 107:3 121:14

**unclear** 50:24

**undergone** 48:10

**understand** 6:25 69:18 99:17 112:5

**understanding** 38:24 71:3 87:15 98:18

**undertaken** 72:11

**unintended** 69:22

**unintentionally** 71:11

**unique** 91:11

**unit** 17:8

**United** 76:23 83:5,24 84:12,21

**universal** 76:2

**university** 18:23 19:7,13,18 20:6,7, 9,11,19,22

**Unlike** 119:7

**unprepared** 119:25

**unsuccessful** 122:1

**upper** 63:8,15 106:4

**upset** 129:19,21, 23

**Uptodate** 108:18

**username** 42:4,6, 9,13

**Utah** 49:3 68:25 70:24 71:1,5,7 72:8,10,15,17 79:1 80:21,25 84:4,8 100:17 101:2 110:7,14, 17,22,25 111:3 115:14,23

**Utah's** 78:19 79:8 80:11 84:2 85:13 86:14 95:20 109:25 111:10 112:5 124:18,25

---

**V**

**vague** 116:23

**variability** 89:4

**variable** 88:23,24 89:15,24 90:6,8 91:9

**variance** 35:11

**variant** 35:8

**variations** 56:8

**varied** 56:8

**varies** 28:19 76:19

**vary** 73:10

**vascular** 65:4

**vast** 76:25

**Vegas** 45:11

**vehicle** 57:5 59:23 60:7,12,13

**vein** 105:3,18 117:9 120:12

**veins** 65:6 104:19, 22,25 105:4,6,7 122:6

**vena** 65:5 104:23

**venous** 22:16 65:4 104:24

**ventricle** 105:15,

18

**ventricles** 63:15
65:1

**verbatim** 84:10

**versus** 94:8
117:21

**vertical** 64:15
98:10

**vertically** 64:20

**vessels** 56:12
64:13

**Victoria** 22:25

**view** 12:14 72:1
114:1,3

**viewing** 69:5

**views** 13:4,5

**Vincent** 16:4,5

**viral** 99:14

**virtually** 36:24
37:11 68:21 70:20

**visibility** 125:18

**Vitae** 8:9

**volley** 110:3,13,
15,18,19,23
111:3,16,19,20,23
112:8,10,11,13,
15,20,23

**volleys** 112:19

---

**W**

**wait** 20:1

**wall** 104:3

**walls** 69:7

**wanted** 17:14,25
21:1 115:18

**warden** 48:23
49:2 115:22

**Washington**
127:12

**water** 125:20

**wave** 108:4,5

**ways** 114:4

**weapon** 92:4

**weaponry** 29:11

**weapons** 57:9

**website** 24:17
40:14,17 77:25
78:1,4,6

**week** 115:17

**weeks** 14:12
17:11 77:22

**Wellness** 23:19
41:7

**Welsh** 5:4

**West** 23:3

**wheelhouse**
127:5

**white** 94:4

**who've** 39:7 57:4
61:20

**widely** 106:13

**width** 98:5,7

**wife** 67:24

**Wildlife** 51:8

**William** 19:4

**Williams** 4:2,7,17
5:9,14,19 6:16
7:10 11:5 13:18
19:3 21:6 26:2,20
27:7 30:25 35:15
36:14 37:25 38:14
40:12 41:2 42:7,
11 43:2,5,18,20
50:19 51:4 52:14
58:3 67:13 87:3
89:5 91:24 94:10
95:4 99:25 100:24
101:12 102:1
109:25 111:6
114:23 115:8
116:20 117:20
119:19,20 121:18
123:4,24 124:25
126:4 127:6,25
128:5,25 132:3

**Winchester**
96:18

**wind** 125:6

**windows** 69:5

**Wisconsin** 23:5
24:20 27:21 28:7
30:2,5,13

**withdrawn** 85:6,8

**witnessed** 59:16
62:3

**witnesses** 69:2
72:2,3

**women** 23:20
128:10,12 130:11,
15,17

**wonderful** 56:8

**wood** 71:6

**word** 118:4
120:13

**words** 29:8
112:12

**work** 21:19 33:7
71:25 72:1 114:22
117:13

**worked** 33:9 82:6,
8

**working** 66:10
121:1

**works** 67:5 82:6

**world** 48:13 75:25
83:7,8 94:4

**worst** 117:15

**would've** 111:25

**wound** 12:18
16:18,19 25:16
31:3 32:5,10
34:20 38:21
39:10,13 41:25
55:22,23 56:10,14
57:11 59:6 66:21
83:19 88:6,9,20
89:10 90:10,15,
18,19,22 91:16
92:3,4,15 94:13,
25 95:4 98:16
99:11,15 103:10,
14,16,17 104:2
105:13 128:15,20,
24

**wounding** 16:19
40:22 41:24

**wounds** 16:5
25:15,18,22 32:25
33:5 34:3,16,21,
25 39:3,4,5,6,22,
25 47:13 56:17
57:16,17,19,22
59:6 89:1,2 90:25
91:2,7 92:1,4,5,6,
8,9 99:1,4,18,21
100:2,6,11 103:12
112:1,2 119:7
128:7,9,21

**write** 40:13,20,21
42:2 129:3 130:18

**writing** 30:19
101:3

**written** 10:21
16:16 84:15
124:13

**wrong** 13:11
128:23

**wrote** 17:5 75:20
80:10 130:24

---

**X**

**XY** 36:25

---

**Y**

**year** 14:25 15:2
19:9,13,22 20:17
31:16,18 45:24
46:7 47:3 51:11
117:4 118:2,4

**years** 9:25 19:17
20:11,12 21:14
24:16,24 25:1
30:6 47:8,23
49:13 50:15 51:25
59:4 82:7,8 83:25
84:19 117:2

**Yesterday** 14:24

**young** 108:21
109:19 129:8,10,
14

**Young's** 108:15

**youngest** 128:19

**your-all's** 4:14

---

**Z**

---

**Zivot** 11:19 12:5,
19,20,22

**Zivot's** 13:5

**zoology** 19:8

**Zoom** 4:20,25
6:14,18