EXHIBIT

13

3     _____

4

5               IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
                     NASHVILLE DIVISION

6

   TERRY LYNN KING,             )
7                        )
          Plaintiff,     )
8                        )
      Vs.               )   No. 3:18-cv-01234
9                        )
   TONY PARKER, et al.,      )
10                      )
          Defendants.     )
11     _____)
12   APPEARANCES:
13          FOR THE PLAINTIFF:
14          Alex Kursman
          Federal Community Defender Office for the
15           Eastern District of Pennsylvania
16          601 Walnut Street, Suite 545W
17          Philadelphia, Pennsylvania  19106
18
19
20          FOR THE DEFENDANTS:
21
22          Dean S. Atyia
23          Tennessee Attorney General's Office
24          Post Office Box 20207
25          Nashville, Tennessee  37202

www.veritext.com       Veritext Legal Solutions       800-556-8974

```
 1                     I N D E X
 2                                      PAGE NO.
 3   The witness,
 4   Joseph Antognini, M.D.
 5   EXAMINATION BY MR. KURSMAN. . . . . . . . . .      6
 6   EXAMINATION BY MR. ATYIA. . . . . . . . . .      268
 7   EXAMINATION BY MR. KURSMAN. . . . . . . . . .    280
 8
 9                   E X H I B I T S
10   Number    Page       Description
11     1        86        Expert Report of Joseph F. Antognini,
                           M.D., M.B.A.
12
       2        86        ASA chart
13
       3       147        Glass, et al., study
14
       4       165        Divoll study
15
       5       167        Inagaki study
16
       6       192        Midazolam black box warning
17
       7       194        Schultz study
18
       8       203        Vuyk study
19
       9       214        Bailey study
20
      10       218        Kuizenga study
21
      11       225        Reves study
22
      12       228        Nishikawa study
23
      13       229        Antonik study
24
      14       336        Miyake study
25
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1                    S T I P U L A T I O N

 2                    The deposition of JOSEPH ANTOGNINI,

 3       M.D., called as a witness at the instance of the

 4       Defendants, taken pursuant to all rules applicable to

 5       the Tennessee Rules of Civil Procedure by agreement on

 6       the 28th day of January, 2022, before Missy Davis,

 7       Notary Public in and for Knox County and the State of

 8       Tennessee pursuant to stipulation of counsel.

 9                              It being agreed that Missy Davis may

10       report the deposition in machine shorthand, afterwards

11       reducing the same to typewriting.

12                              All objections except as to the form

13       of the questions are reserved to on or before the

14       hearing.

15                              It being further agreed that all

16       formalities as to notice, caption, certificate,

17       transmission, et cetera.  The reading of the completed

18       deposition by the witness and the signature of the

19       witness are expressly waived.

20

21

22

23

24

25
```

www.veritext.com                    Veritext Legal Solutions                    800-556-8974

```
 1                    JOSEPH ANTOGNINI, M.D.,
 2       having first been duly sworn, was examined and deposed
 3       as follows:  The witness,
 4                         VIDEO OPERATOR:  Good morning.  We
 5                 are going on the record at 9:01 a.m. on
 6                 January 28th, 2022.  This is media unit number
 7                 1 of the video recorded deposition of
 8                 Dr. Joseph Antognini in the case of Terry Lynn
 9                 King versus Tony Parker, et al., filed in the
10                 United States District Court, Middle District
11                 of Tennessee, Nashville Division, case number
12                 3:18-cv-01234.  This deposition is being held
13                 remotely via Zoom.  Will counsel please
14                 identify themselves for the record?
15                         MR. KURSMAN:  My name is Alex Kursman
16                 and I am counsel for Terry King.  Along here
17                 with me on this Zoom is Sarah Miller, Jeremy
18                 Gunn, Ana Baldridge, Hayden Nelson-Major, David
19                 Esquivel.  Aaron Sommer is in my office with me
20                 as well.
21                         MR. ATYIA:  My name is Dean Atyia.  I
22                 am counsel for the defendants.  It looks like
23                 here with me are Scott Sutherland, Connie
24                 Blandon, Rob Mitchell, Miranda Jones, and
25                 Mallory Shuler.
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
 1                        VIDEO OPERATOR:  Okay.  If there's no
 2            one else, will the court reporter please swear
 3            in the witness.
 4                        (Thereupon, the witness was sworn.)
 5                        MR. ATYIA:  Alex, I'm sorry, I meant
 6            to mention this a moment ago.  I just wanted to
 7            get something on the record and make sure it's
 8            okay with you.  I am admitted to the Middle
 9            District, have not filed my Notice of
10            Appearance because I've spoken to the Clerk's
11            Office and they are in the process of setting
12            up my CMECF.  I'm hopeful that will be done
13            today and I can file that today, but I don't
14            know for sure.  So if you're okay with that, I
15            think we can proceed.
16                        MR. KURSMAN:  Yeah, we have no
17            objection to that if you are planning to enter
18            your appearance.
19                        MR. ATYIA:  Yes, I am.  Thank you,
20            Alex.
21                        COURT REPORTER:  Excuse me.  Can I
22            get the spelling of your last name, Dean?
23                        MR. ATYIA:  Yes, ma'am.  My last name
24            is Atyia, A-t-y-i-a.
25                        COURT REPORTER:  Thank you.
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

EXAMINATION BY MR. KURSMAN:

1

2          Q.          Good morning, Dr. Antognini.

3          A.          Good morning, sir.

4          Q.          My name is Alex Kursman and I'm an

5    attorney with the Federal Community Defender Office in

6    Philadelphia.  And I'm acting on behalf of plaintiff

7    Terry King in King vs. Parker pending in the Middle

8    District of Tennessee.  Do you understand that you're

9    here today to answer questions related to the King

10   case?

11         A.          Yes.

12         Q.          And what is your understanding of

13   what this case is about?

14         A.          My understanding is that the

15   plaintiffs, I guess the inmates, are challenging the

16   lethal injection protocol that is used by the State of

17   Tennessee and I'm here to provide expert testimony on

18   behalf of the State.

19         Q.          And have you reviewed the entire

20   Tennessee lethal injection protocol?

21         A.          I have not recently, but I have

22   reviewed it, yes.

23         Q.          And what is your position on the

24   death penalty?

25         A.          Well, that could -- I'll try to give

```
 1    you an executive summary of that.  I have some
 2    conflicting views on the death penalty for religious
 3    reasons and for reasons of, you know, I think one of
 4    the worst things that a government or a state can do is
 5    to execute an innocent person, so I have certainly
 6    concerns about the possibility that there are people
 7    that either are on death row who are innocent or people
 8    that have been executed who are innocent.  So I
 9    certainly do struggle with that.
10              On the religious perspective, there's
11    clearly a difference of opinion especially depending on
12    your religion.  I'm a Catholic and even in the Catholic
13    Church, there is a division about the death penalty.
14    And so, personally, I think that there are instances
15    where the death penalty would be appropriate and those
16    instances might differ from somebody else who has
17    different criteria.  So I think my sort of funneling
18    point of all this is that I just let the democratic
19    process work its way out and if a state decides that
20    they're going to have the death penalty, then that's
21    their choice.  And if a state decides they don't want
22    to have a death penalty, that's their choice.
23              And so I basically am not -- I have
24    some misgivings about the death penalty, I'll put it
25    that way, so I think to say that you're against the
```

```
 1      death penalty, let's say in all instances, I'm not sure
 2      that I could say I'm against the death penalty in all
 3      instances.
 4              Q.      And how many death penalty cases,
 5      lethal injection cases have you testified in?
 6              A.      I would have to refer to my report
 7      where I specify that.  I would say -- now, some of the
 8      cases, for example, as you know I did work in Ohio and
 9      testified in Ohio.  I've testified in Arkansas.  And
10      I've been to Ohio maybe three times, Arkansas twice.  I
11      don't know whether they're the same case or not, if
12      that's what you mean.  Inmates come and go on these
13      cases, so I don't know exactly how to answer that
14      question in terms of numbers, but I can --
15              Q.      It's over five, though, right?
16              A.      Oh, yeah, obviously, yes, correct.
17              Q.      And you've probably worked with over,
18      you know, seven or eight states?
19              A.      Probably.  I would have to look at my
20      report and all that, but, yeah, that might be about
21      right.
22              Q.      And I'm not holding you to these
23      answers.  And the federal government, too, you've
24      worked for them?
25              A.      That is correct.  I was an expert
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    witness on behalf of the federal government.

2          Q.       Why do you think you became the go-to

3    guy for these lethal injection cases?

4          A.       Well, that story began about -- at

5    least my perspective on it, about six years ago.  Let's

6    see, early 2016.  So, yeah, six years ago.  I was

7    contacted by -- there's a medical legal company called

8    Elite Medical and they basically find doctors who are

9    willing to do medical legal work.  And I was contacted

10   by them to provide some expert testimony on behalf of

11   a -- it was a patient that had died at a hospital here

12   in California as a result of -- primarily as the result

13   of a midazolam overdose and they asked me for -- I

14   don't know how they got my name, but they asked me to

15   provide testimony for the State.  I'm sorry, for the --

16   I was actually testifying on behalf of the hospital

17   because the State would essentially fine the hospital

18   because of this and so I was testifying on behalf of

19   the hospital.  And this was an administrative case.

20                And then within a couple of months

21   after that work, I got a call from Elite saying there's

22   a state that wants to try to find a witness for lethal

23   injection and it was Mississippi and they asked if I

24   was interested in doing that.  And I said, well, let me

25   look at it, and so I ended up doing that.  And then

```
 1      just over time, different states would contact me and
 2      ask would you be willing to provide some testimony or
 3      expert witness testimony for that state.  So that just
 4      sort of -- I think once my name got out there, I was
 5      contacted by other states.
 6              Q.      Have you ever said no to a state?
 7              A.      I have said no in the sense that I
 8      did not provide any expert -- you know, like a report
 9      or anything like that.
10              Q.      Why?
11              A.      I would not --
12                      MR. ATYIA:  All right.  I'm going to
13              voice an objection here.  I think to the extent
14              he has served as a testifying expert, he's
15              required to disclose that.  I think beyond
16              that, it's his privileged information.
17                      MR. KURSMAN:  We're in a deposition,
18              though, so he can answer this question.
19              Q.      Why?
20              A.      I'm sorry, sir, you're asking me?
21                      MR. ATYIA:  I'm sorry, Alex, hold on.
22              If it's --
23                      MR. KURSMAN:  Are you making a
24              privilege objection right now?
25                      MR. ATYIA:  Well, what I'm trying to
```

www.veritext.com                    Veritext Legal Solutions                    800-556-8974

```
 1              understand is I believe that it -- I don't
 2              believe it's our privilege.  But if he was a
 3              consulting expert or some other type of expert
 4              for a state and had communications with that
 5              state in that capacity, I don't know that
 6              that's discoverable.  So I'm going to reserve
 7              that objection and let him -- he can go ahead
 8              and keep answering, but I think we're getting
 9              on the boundaries of expert discovery here.
10         Q.        So why did you not work as an expert
11    for that state?
12         A.        It was a -- just sort of timing issue
13    in my personal and professional life that I didn't have
14    the time or the interest, I suppose, to pursue it.
15         Q.        Have you ever told a state that their
16    protocol wasn't -- you didn't think it was adequate?
17              MR. ATYIA:  I'm again going to
18              object.  I think, Alex, we have to specify if
19              it's in a report that he's provided or in his
20              capacity as a testifying expert.  His
21              consultancies I don't believe are discoverable.
22              MR. KURSMAN:  Are you making a
23              privilege objection?
24              MR. ATYIA:  It's not my privilege,
25              but I would appreciate you re-wording the
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1              question so that it adheres to the bounds of
 2              expert discovery.
 3                      MR. KURSMAN:  Court Reporter, could
 4              you read back the question?
 5                      COURT REPORTER:  Sorry, I'm working
 6              with a loaner right and I'm trying to figure
 7              out how to get back.
 8                      MR. KURSMAN:  You know what?  It's
 9              okay.
10                      COURT REPORTER:  Oh, okay.  Go ahead.
11         Q.        Has there ever been a lethal
12    injection protocol that you have been shown by a state
13    where you told the state you didn't think that protocol
14    was adequate?
15                      MR. ATYIA:  Same objection.
16         A.        I have, to my knowledge -- and I'll
17    explain my answer.  I've never told a state that it's
18    inadequate or adequate.  I don't make those kinds of
19    opinions.  States contact me and they say here's the
20    protocol.
21         Q.        Have you ever --
22         A.        I'm not done with my answer.  Here's
23    the protocol.  And I review the protocol and I say, you
24    know, these are the expected outcomes, in my opinion,
25    of what would happen if you follow this protocol.  And
```

```
 1    then I tell a state, if you decide what you want to do
 2    with that information, you can leave the protocol in
 3    place, you can change the protocol, whatever you want
 4    to do.  But I don't advise the states and tell them
 5    that, you know, this is inadequate, because -- and I --
 6    well, I'll just leave it at that.  I don't use terms
 7    like that.  I don't -- like I say, these are -- in my
 8    opinion, these are the expected outcomes and you decide
 9    what you want to do with that.
10              Q.       Has a state ever asked you, do you
11    think our protocol will cause the inmate pain?
12                   MR. ATYIA:  I've got to object again.
13              If he's had communications with states as an
14              expert, I don't -- I guess, again, it's not our
15              privilege, but I think you know, Alex, that
16              those are protected communications.  What's at
17              issue is what he's testified to as a testifying
18              expert.
19                   MR. KURSMAN:  Is this a privilege
20              objection?
21                   MR. ATYIA:  Again, I don't -- it's
22              not my privilege to assert.  I think you're
23              asking questions that are under privilege.
24              Q.       Has a state ever asked you whether a
25    protocol could cause an inmate pain?
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1              A.         I suppose in -- you know, I'm going
 2     back through my memory here about, you know, what
 3     states have asked me specifically.  And I'm sure in
 4     those kinds of questions they have asked would this
 5     protocol cause pain.  You know, I'm not sure it's
 6     exactly the way that you've worded it, but in -- I
 7     think their questions in that regard have been, you
 8     know, pretty close to the way that your question is
 9     worded.  Now, I am of the opinion that all the
10     protocols basically, you know, there's going to be
11     some amount of pain no matter what in lethal injection
12     because you have to start an IV, so, you know, the
13     lethal injection protocol is not completely painless
14     because at the very least you have to start an IV.
15              Q.         Do you think some of the protocols
16     that you've seen will cause more pain than others?
17              A.         So when you say some of the
18     protocols, are you talking about lethal injection
19     protocols or just all protocols that I've --
20              Q.         Lethal injection protocols.
21              A.         Lethal injection protocols.  And I'm
22     sorry, repeat the question about the pain.
23              Q.         Out of all of the lethal injection
24     protocols that you've seen, do you think some of those
25     lethal injection protocols will cause the inmate more
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

1    pain than others?

2         A.        The ones that I have seen, I do

3    not believe that one would cause more pain than the

4    other.  It's within the bounds of my -- of, you know,

5    obviously, trying to measure pain is somewhat

6    subjective, of course, but in my opinion that

7    the amount of pain which is, I believe, to be

8    essentially zero with these lethal injection protocols,

9    then -- to answer the question, then the amount of pain

10   would be the same for all of them, which is zero as far

11   as outside of starting the IV.

12        Q.        Okay.  So I know we've sort of gotten

13   started, but I just want to go over some ground rules

14   before we get into the meat of the deposition.  I know

15   you've taken your deposition several times before.  How

16   many times have you taken a deposition?

17        A.        I have been deposed for, you know,

18   medical malpractice, not me personally as a defendant,

19   so I'm not going to count those.  I think you mean for

20   lethal injection and so forth, but for --

21        Q.        No, no, I actually mean ever.

22        A.        Oh, okay.  I'm sorry.  Maybe five,

23   six, seven times, my guess.  I would have to go back

24   because I actually haven't done -- I have not done a

25   lot of depositions.  I've done more testimony I think

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1    than I've done depositions.
 2         Q.          And how many depositions have you
 3    done in the lethal injection context?
 4         A.          Maybe three.  This would be the third
 5    one maybe.  Yeah.  And just as a side bar, having done
 6    this now for six years, I've been surprised a little
 7    bit about why I've not been deposed.  It's usually I
 8    just go straight to the testimony in court.  So it's
 9    not been very often actually, as far as I can recall.
10         Q.          And then the three depositions for
11    lethal injection, which cases were those, if you
12    remember?
13         A.          Yeah.  Well, this one, as I said,
14    this is the -- and then there was -- I was deposed
15    in -- for the Oklahoma case.  That was about a year
16    ago.  Yeah, it might be -- this might just be the
17    second one, now I think about it.  I'm thinking back
18    about it.  Maybe, I think, Oklahoma might have been the
19    first time, now that I -- and I don't know if I did it
20    since then up to this point.
21         Q.          And was Oklahoma also a -- the same
22    three-drug protocol?
23         A.          Yes.  It's three drug.  I don't know
24    what -- I think the doses are about the same.
25    Certainly the midazolam doses are the same.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1        Q.         Did you also do a deposition in

2   Arkansas?

3        A.         I don't think so.  I thought -- I

4   think Arkansas was all basically trial testimony.  I

5   don't know that I actually was deposed.  If I was, you

6   know, I don't remember it.  But I don't think I was

7   deposed in Arkansas, but I could be wrong about that.

8        Q.         And do you remember anything

9   different about the Oklahoma protocol than about the

10  Tennessee protocol?

11       A.         I believe that there are differences

12  in -- let me see.  It seems to me that one of them, and

13  I'm sorry, I don't remember all the details, but some

14  of these protocols have very, very -- I can't say

15  brief, but some of them are much longer than others.  I

16  can't remember if Tennessee's is longer than Oklahoma's

17  or Oklahoma is longer than Tennessee's.  But there's

18  more specificity in one versus the other.  I'm sorry, I

19  don't remember which one is which.  But at its core, or

20  at their cores, they're very similar.  I think one of

21  them specifies more about possibly about consciousness

22  checks and other specific details like that, but I

23  don't -- I'm sorry, I do not remember which one is

24  which.

25       Q.         And do you think it's important to

```
1    have more specificity when there -- in the context of a
2    consciousness check?
3              A.        Not necessarily, no.  No, I don't
4    think so.
5              Q.        Do you think it's important to have a
6    medical professional perform a consciousness check?
7              A.        Well, medical professional is
8    certainly a broad term.  Lay people could be taught how
9    to do consciousness checks, so I don't know how much
10   training is, you know, required for this.  But all I
11   can say is that if lay people can be taught to do
12   consciousness checks, I think that can be applied to a
13   broad group of people.
14             Q.        So do you think it's important that a
15   medical professional would be involved in the
16   consciousness check?
17             A.        I don't think it's important, no.  I
18   don't think that it's -- would it be -- I just don't
19   think that it's critically important by any means.
20             Q.        So you think anybody can do it?
21             A.        Somebody who is properly trained.
22             Q.        And what does that mean, properly
23   trained, in your opinion?
24             A.        Well, as I said, people -- lay people
25   could be trained to do consciousness checks.  That's
```

1    part of some of the basic life support and first aid
2    training and -- now, does that mean you can just take
3    somebody off the street and give them a one-hour
4    lecture and then, you know, tell them to do a
5    consciousness check in the execution chamber?  I don't
6    think that would probably be the best thing
7    necessarily.  But I don't think you need to be a
8    medical professional.  But certainly, experience would
9    be beneficial, I will say that, having experience in
10   terms of the general area of medicine and so forth.
11   So, again, lay people can be taught to do this.  I'm
12   not saying that that's sort of the floor in terms of
13   what would be required in an execution chamber, but I
14   would just say that medical professional, again, very
15   broad term.
16           Q.          You're saying lay people who are
17   trained is not the floor?
18           A.          No.  I say that, you know, lay people
19   trained to check, do consciousness checks would
20   probably not be sufficient if they had no other
21   experience.  Again, if you would grab somebody off the
22   street and give them a one-hour course to do a
23   consciousness check and then put them in an execution
24   chamber and say do a consciousness check on this
25   individual, then I'm not sure that would be sufficient.

www.veritext.com          Veritext Legal Solutions          800-556-8974

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 20 of 418 PageID #: 7697

```
 1      Now, again, it's something that lay people can be
 2      trained to do, so, again, it depends on experience and
 3      the type of training that person has received.
 4              Q.        And what type of training do you
 5      think is necessary?
 6              A.        Well, if you go to a standard first
 7      aid course or BLS, basic life support course, they
 8      incorporate the -- usually they will incorporate some
 9      type of training to do consciousness checks, so -- I've
10      not actually developed a curriculum for that, so I
11      can't really answer beyond that.
12              Q.        So all I want to know is what type of
13      training, because you said you think training a lay
14      person would be the floor, not training them off the
15      street in one hour, but training a lay person would be
16      the floor, so I want to know what type of training you
17      think would meet that floor standard that you're
18      talking about.
19              A.        Well, again, I have looked at the
20      curriculum, I guess, of -- for some basic life support
21      and first aid courses that talk about consciousness
22      checks and so I think that would be at a bare minimum
23      what a person would need to understand to be able to do
24      a consciousness check.  I'm not really -- not able to
25      or want to go into the specific details right here on
```

www.veritext.com              Veritext Legal Solutions              800-556-8974

1    the spot because you're talking essentially about
2    specifics around a curriculum instead of, you know,
3    basically a curriculum to determine or to be able to do
4    these consciousness checks, so I just don't -- I'm not
5    sure I can provide any more details right here on the
6    spot.
7            Q.        Okay.  And you said you're -- are you
8    not able to or you don't want to?
9            A.        Well, I think both, I mean, in the
10   sense that I don't want to because I don't have those
11   details.  So, for example, if you start asking me
12   questions, well, what scale should be used in terms of
13   determining consciousness and what -- how many times
14   should a person -- you know, what length of time should
15   this be spent teaching this person, details like that,
16   I cannot provide to you because I haven't thought all
17   the way through.  I defer, again, to the American Red
18   Cross, who has developed these curricula and others as
19   far as what is being taught for basic life support.  So
20   I say that I don't want to simply because I don't want
21   to misspeak and I don't have all those facts readily
22   available.
23           Q.        Did you have those facts when you
24   were writing your report?
25           A.        Well, I certainly reviewed the

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 22 of 418 PageID #: 7699

```
1    criteria.  I'm sorry, I reviewed the -- I believe it
2    was the American Red Cross.  I cannot remember exactly
3    in my report what I referred to, but I did refer to the
4    training of lay people in some of these types of
5    courses, so --
6              Q.        And do you know whether the
7    individuals who performed the consciousness check in
8    Tennessee's lethal injection were trained in accordance
9    with whatever materials you looked at?
10             A.        I don't know only in the sense --
11   first off, I don't know.  Secondly, since my report was
12   just submitted recently whether any training has
13   occurred subsequent to that or any training occurred
14   before that, I do not know.
15             Q.        Okay.  So if in your report you said
16   that the training was sufficient, are you saying now
17   you actually don't know whether the training is
18   sufficient?
19             A.        I'm not sure, and certainly you can
20   correct me if I'm wrong, I'm not sure that I explicitly
21   stated that the training of the individual in that
22   protocol is sufficient.  I think I might have said that
23   an individual who is going to be doing the
24   consciousness check is capable of being trained.  I
25   don't know -- since I don't know the training of the
```

```
 1    specific individual, I don't think I would have said

 2    that.  I could have and that would have been my error.

 3    But I think my statement was more around saying that a

 4    person, as specified in the protocol, is capable of

 5    being trained to do a consciousness check.

 6              Q.      But just so I understand you

 7    correctly, is it your opinion that so long as a person

 8    is trained in accordance with a first aid consciousness

 9    check they would be able to determine the anesthetic

10    depth of an inmate subject to lethal injection?

11              A.      It is -- again, it's an individual

12    who is trained with and understands the types of

13    responses to look for.  That individual would be able

14    to determine whether, for example, there is a response

15    to a verbal command or to a sternal rub and so forth.

16    And that would be the same as if the person was a

17    medical professional or a lay person.  So they would be

18    able to, if properly trained and properly applied, they

19    would be able to elicit those responses just like a

20    medical professional.

21              Q.      In a hospital setting, nurses and

22    doctors who determine anesthetic depth, are they only

23    trained with a first aid definition of consciousness?

24              A.      Well --

25              MR. ATYIA:  Objection.  You're asking
```

```
  1              if he knows about what hospitals are trained to
  2              do.
  3                         MR. KURSMAN:  Yes, he's an expert.
  4              But I would appreciate it if you just objected
  5              to form.
  6                         MR. ATYIA:  Okay.  I'm sorry.
  7              Objection to form.
  8              A.         Well, as it turns out, as I look back
  9    on my own medical training and experience and so forth
 10    and education, and I think this is true in general for
 11    a lot of physicians and nurses, we may not get explicit
 12    instruction and training to determine levels of
 13    consciousness.  It's something that you might pick up
 14    on your own if you did a rotation in the surgery unit
 15    and so forth, you would pick that up.  But it's not --
 16    to my knowledge, it's not a required part of the
 17    physician training or the nurses training, again.  So
 18    it's possible for a physician or a nurse to go through
 19    their whole training and education and not really pick
 20    up any explicit instruction or material related to
 21    checking consciousness levels.
 22              Q.         When you say it's possible for nurses
 23    or doctors, are you talking about nurses who practice
 24    anesthesiology?
 25              A.         No.  I'm just talking about nurses in
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

general.

Q.    But what about nurses who practice
anesthesiology?

A.    Well, nurse anesthetists get training
that is pretty intense, not as intense, of course, as
an anesthesiologist, but certainly there is some fairly
intense and a lot of material, so I would expect that
they would get that type of training to check levels of
consciousness.  But, no, as it turns out, you know --
again, looking back at my own career and because I was
a professor of anesthesiology at U.C. Davis and I
trained a lot of residents, I'm not sure that we had
explicit sort of criteria -- not criteria, but explicit
curriculum that everybody got.  I could be wrong about
that, because I didn't teach everything to everybody.
But, you know, it's something that you pick up more on,
I suppose, your experience side than in any sort of a
classroom side.

Q.    Can you describe for me how you would
pick that up on the experience side?

A.    Well, if you would -- you take care
of patients all the time that have depressed levels of
consciousness.  And I'm not talking about here just
about anesthesiology, but just in medicine in general.
You have people -- you have patients that are going to

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 26 of 418 PageID #: 7703

```
 1    have depressed levels of consciousness and you would
 2    ask them to -- you would have to assess their level of
 3    consciousness.  So one thing that you have to
 4    understand about this and doctors in general, if you
 5    want to take -- and this is my opinion in terms of an
 6    estimate.  I'm not even sure I can give you a numerical
 7    estimate.
 8                    If you were to ask them about
 9    different sedation scales or different -- like what's
10    called the Glasgow coma scale, and ask them to be
11    specific about that, I think a vast majority of them
12    would not be able to determine or to use those scales
13    to be able to determine a level of consciousness
14    because it's just not part of their training, or
15    experience, or education.  So some people are going to
16    pick it up based on the types of patients that they
17    take care of and others won't.  So there's a lot of
18    variability, I guess, across the board in medicine and
19    nursing in terms of whether you would be able to
20    determine levels of consciousness.
21         Q.       For those people who are able to
22    determine levels of consciousness, those people who had
23    the rotations or see those patients, do they get better
24    over time?
25                    MR. ATYIA:  Objection to form.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
1          A.          Well, I guess in general they would,
2     yeah.  I mean, obviously, if -- I mean, you get better.
3     I always offer the following caveat, and it applies to
4     me just like anyone else about an experience and what
5     you do.  And I've said this before when I was teaching
6     residents, you know, someone will say, oh, well, you
7     know, I've been doing this for 20 years like this and I
8     have a lot of experience, I've been doing it for 20
9     years.  And sometimes it's like, well, you've been
10    doing it for 20 years but you've been doing it wrong
11    for 20 years.  So just because you have experience
12    doesn't mean that you're doing things the right way.
13    I'm sorry, that may be a little bit of a side bar to
14    answer your question.  But, you know, yes, you can --
15    experience does help you learn how to do things, but if
16    you're learning the wrong thing, doing it the wrong
17    way, then it's -- obviously, it's still the wrong way.
18          Q.          And in a hospital setting when you're
19    determining levels of anesthetic depth, are you only
20    going off of what the nurse anesthetist says when you
21    have machines monitoring levels of anesthetic depth as
22    well?
23          A.          So the anesthesiologist or the nurse
24    anesthetist or what's called the anesthesia assistant,
25    the person that's at the head of the table there looks
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    at a variety of different signs and criteria.  There is

        2    a -- monitors that monitor the electroencephalogram, or

        3    the EEG.  So, in general, we use all of those to

        4    monitor the depth of anesthesia.  Now, the depth of

        5    anesthesia is not necessarily the same thing as the

        6    depth of consciousness.  They primarily go hand in

        7    hand, but, no, we don't look just at the amount of

        8    unconsciousness as our sort of depth of anesthesia.  We

        9    have to look at all the other things going on in the

       10    body, especially the cardiovascular system.  So

       11    sometimes when we talk about depth of anesthesia, we're

       12    incorporating the effects on the cardiovascular system

       13    and saying, hey, you know, this level here, the blood

       14    pressure is too low so we're going to have to lighten

       15    the anesthetic.

       16            Q.        So describe for me exactly what signs

       17    you're looking for.  You said the EEG, you said the

       18    electroencephalogram.

       19            A.        The EEG is just the acronym basically

       20    for the electroencephalogram.  And there's a variety of

       21    different monitors that are commercially available.

       22    Most people are familiar with the BIS, B-I-S, monitor

       23    that some people use.  And that, of course, it's pretty

       24    explicitly just for the depth of the brain, the

       25    anesthetic depth in the brain essentially.  But it's

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    not a perfect monitor.  No monitor in medicine is

     2    perfect.  But we look at the blood pressure, the heart

     3    rate as far as understanding how deep the patient might

     4    be.  Again, we're not just focused on the depth of

     5    anesthesia relative to the brain.  We're looking at

     6    body-wide and sometimes we have to make decisions that

     7    basically we would have to lower -- we would have to

     8    decrease the anesthetic because of effects on blood

     9    pressure even though the patient might be lightly

    10    anesthetized.

    11            Q.        I'm not asking about the blood

    12    pressure.  I'm only asking about monitoring their level

    13    of anesthetic depth.  So you said you also look at

    14    signs and criteria.  What types of signs and criteria

    15    are you talking about?

    16            A.        Well, again, blood pressure, heart

    17    rate, there could be tearing, tear formation.  Not very

    18    common.  I don't see -- I have not seen that a lot in

    19    my career.  If the patient is not -- if there's not a

    20    muscle relaxant on board, we look for patient movement.

    21            Q.        What does a tear formation show?

    22            A.        Well, it's a more or less an

    23    autonomic response to certain stimulants, so you start

    24    seeing tear formation in the eyes.

    25            Q.        So would that mean -- would that

```
 1    signal to you that you would need to increase the level
 2    of anesthetic depth, is that what you mean?
 3           A.        Not necessarily by itself.  If
 4    everything else was okay and I saw tear formation, I
 5    wouldn't increase the anesthetic just because of tear
 6    formation.  You have to sort of incorporate everything.
 7           Q.        Well, what else are you looking for
 8    aside from tear formation?
 9           A.        Well, as I mentioned, heart rate
10    response, blood pressure response, the movement
11    response, so forth.  In my practice, I have taken a
12    more -- I guess a pharmacological approach to this
13    issue.  Let me explain that.  So, you know, it's funny
14    when you think about what an anesthesiologist does and
15    what we do, we do a lot of monitoring, of course.  But
16    from a patient perspective, the one thing that patients
17    say basically is I don't want to be awake, almost
18    across the board, I don't want to be awake.  And
19    wouldn't you know it that of the main effect that we
20    want to have with these anesthetics, the main thing
21    that we want to occur, we do not have a good monitor
22    for.  We have a great monitor for a lot of other
23    things, for the blood pressure, for neuromuscular
24    function, et cetera, et cetera, but, you know, it
25    just -- it's the nature of the nervous system that we
```

www.veritext.com                 Veritext Legal Solutions                 800-556-8974

1    do not have a good monitor for that.

2                    So, I'm sorry, sometimes I digress a

3    little bit.  But we do not have a good monitor for the

4    depth of anesthesia for the brain and so -- I

5    apologize, I can't remember exactly what your question

6    is about, but --

7         Q.        No, I think that's what you're

8    answering.  So just so I understand, so you're looking

9    at a lot of different things, is what you're saying,

10   right?

11        A.        Correct.

12        Q.        Okay.  And you say you don't have a

13   good monitor to determine whether the depth of

14   anesthesia that a patient is under; is that right?

15        A.        I believe -- well, maybe I

16   shouldn't -- I probably shouldn't say, you know, good.

17   I personally believe that -- now, I'm going back to

18   where I was.  I was talking about pharmacology.  Now I

19   sort of got myself back on track, and I apologize.

20                    These drugs, based on the studies

21   that have been published over the years, these drugs,

22   especially the inhaled drugs, and also intervenous

23   drugs, if you look at their effects on consciousness

24   and recall and so forth, especially, again with the

25   inhaled drugs, when you achieve a certain level of

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 32 of 418 PageID #: 7709

```
 1     anesthesia -- I mean, a concentration of a drug, not a
 2     depth of anesthesia, but an actual concentration of the
 3     drug or partial presence of the drug, I believe that
 4     there's virtually no chance that a patient is going to
 5     be awake and aware, so -- sometimes these patients may
 6     have increased blood pressure.  They may have heart
 7     rate changes or tearing, these other criteria that I've
 8     talked about.  Sometimes I will ignore those.  I'll
 9     just say, well, I know that this level of anesthesia,
10     this amount of anesthetic that is virtually certain
11     that they will not have memory and they're not aware of
12     these events.  So I don't necessarily give more
13     anesthetic just because they have had these types of
14     responses.
15              Q.        What anesthetics are you talking
16     about?
17              A.        Well, for example, it could be some
18     of the inhaled anesthetics such as sevoflurane, which
19     is spelled s-e-v-o-f-l-u-r-a-n-e, desflurane,
20     d-e-s-f-l-u-r-a-n-e, isoflurane, i-s-o-f-l-u-r-a-n-e.
21     And they're kind of ether drugs basically.  They're
22     similar to ether in that sense.  And in the -- when I
23     talk about the pharmacology, I basically say that the
24     variability among humans is very, very low in terms of
25     the action of these drugs, so that -- now, if you give
```

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 33 of 418 PageID #: 7710

```
 1    a certain amount of this drug -- of these drugs
 2    basically, all humans are going to be affected by that.
 3    So I rely or have relied more on sort of the
 4    pharmacology amount than, you know, some of these
 5    signs.  Now, I don't ignore those signs altogether.  I
 6    might give an opiate, let's say, if something is
 7    occurring, but I may not do anything.
 8              Q.        And then you said injectables, too,
 9    right?
10              A.        That's correct.
11              Q.        What injectables are you talking
12    about?
13              A.        Propofol is probably the one that we
14    are -- obviously, it's the one that's used mostly here
15    today.  In the past, it would have been maybe
16    thiopental or -- but primarily thiopental or propofol.
17    There are also opiates that we can give by infusion
18    such as fentanyl or something called remifentanil,
19    r-e-m-i.  Something called dexmedetomidine is also used
20    as an infusion.  So those IV drugs are used.  The
21    challenge around that is you can give a certain
22    infusion rate, but that doesn't tell you what the
23    actual concentration is in the patient as opposed to
24    the inhaled drugs that I talked about such as
25    isoflurane.  You can monitor those coming out of the
```

```
1    breath, so we have a very good monitor for that.  So
2    it's just easier to be able to know where you are with
3    those drugs.
4           Q.       Just so I understand.  That's
5    helpful.  You're saying with injectables, if you give a
6    certain amount to patient A and a certain amount to
7    patient B, the nanograms per milliter in their blood
8    may not be the same, is that what you're saying?
9           A.       That's correct, yeah.
10          Q.       Why is it different?
11          A.       Well, each person -- let's see.  It's
12   a pretty long pharmacological -- pharmacodynamic and
13   most pharmacokinetic explanation that I don't think you
14   would want me to go into because besides putting anyone
15   to sleep, this would certainly do it, if they haven't
16   gone to sleep.  But when you give --
17                   So I'm going to answer your question
18   first talking about the isoflurane type of drug that's
19   inhaled.  That drug is basically -- it's a gas, a vapor
20   that goes into your lungs and then into your
21   bloodstream.  I guess for lack of a better word, the
22   chemistry of how that -- sort of physics of how that
23   drug transported in the body and how it gets into the
24   brain, it's related to what's called the partial
25   pressure.  And so if I gave -- if I took an individual
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

1    and I gave a certain level of that drug into the lungs,
2    they would achieve a certain level in their
3    bloodstream.  And I took the next person and did the
4    same thing, the levels would be very, very close
5    because it's governed basically by physics, essentially
6    the movement of those molecules from the lungs into the
7    blood and into the brain.
8                     With the IV drugs, they are different
9    in the sense that the body -- there's more differences,
10   I guess, from individual to individual about how
11   that -- the individuals, how their bodies manage those
12   drugs and other issues around what's called protein
13   binding and how the drugs are distributed to various
14   organs.  There are a lot more moving parts and
15   variability and I -- I may have already confused people
16   about that.  I'm sorry, I'm trying to get as lay person
17   as I can get, but that's -- there's just a difference
18   between those types of, you know, IV drugs and the
19   inhaled drugs.
20        Q.        No, I think that was helpful.  So you
21   mentioned that these class of drugs where if a patient
22   gets enough that you just assume based on
23   pharmacological principles that they're in this level
24   of anesthetic depth, whatever that level may be.  And
25   you named inhalation drugs and then you named several

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 36 of 418 PageID #: 7713

1     classes of IV drugs.  Are there any other drugs that
2     you can think of?
3           A.          Well, any IV drug, including
4     midazolam, including propofol, the opiates, as you
5     look -- as you increase the infusion of these drugs and
6     you get into higher levels, in general, you're going to
7     see patients getting higher levels in their blood as
8     well.  And so in a sense, you are -- you could use a
9     pharmacological or pharmacokinetic approach where
10    you're saying once I get to this level here, you know,
11    99.9 percent of patients will be anesthetized at same.
12                I guess what I'm trying to get across
13    here and I'm not doing a very good job, I think, is
14    that the amount of variability essentially within a
15    patient and across patients is less with the inhaled
16    drugs as compared to the IV drugs.  But once you get
17    high enough doses of the IV drugs, it doesn't matter,
18    even though there's still going to be some variability,
19    you still have achieved such a high level that, you
20    know, everybody is going to be anesthetized or
21    everybody is going to, you know, have the end effect
22    that you want.
23          Q.          So I want to go back to this everyone
24    will be anesthetized and let's take out the inhalation
25    drugs for a second.  So, initially, you said inhalation

```
1      drugs and IV drugs and the drugs that you mentioned
2      when you're in the hospital are propofol.  I think you
3      mentioned some barbiturates and you mentioned something
4      else.  Is there any other drugs aside from those when
5      you give those drugs to a patient you can safely assume
6      that that patient is now under a level of general
7      anesthesia?
8                       MR. ATYIA:  Objection to form.  Alex,
9              sorry, we're in agreement I can just say form
10             and that encompasses everything?
11                      MR. KURSMAN:  Yes.
12                      MR. ATYIA:  Okay.
13             A.       Are there any other drugs?  You know,
14      that's sort of a broad catch there.  So all the -- to
15      my knowledge, all the IV drugs that we use in the
16      operating room, and in fact, all the -- for the most
17      part, almost all IV drugs I would imagine have that
18      type of variability and not just ones that would induce
19      general anesthesia.  They're just -- there is a
20      significant amount of variability from patient to
21      patient.
22             Q.       So maybe my question, I think -- I
23      think my question is confusing.  So I'm not asking
24      about variability.  All I'm asking about is, you said
25      there are a certain number of drugs that when given
```

```
 1    enough to a patient, you can safely assume no matter
 2    what the monitor says, you can safely assume that they
 3    are under a level of general anesthesia, and you named
 4    barbiturates, you named propofol.  I'm asking is there
 5    any other drugs where you can safely assume if you've
 6    given enough that a patient is under general
 7    anesthesia?
 8            A.      Well, obviously, I believe that's
 9    true with midazolam and with certainly some of the
10    older -- you know, older anesthetic drugs we don't use
11    anymore, including some of the older barbiturates.
12            Q.      So is that true for all
13    benzodiazepines?
14                    MR. ATYIA:  Can we just give him a
15            second.  I didn't know if he was finished.  Can
16            you just make sure to pause and let him make
17            sure he's finished?
18            A.      Yeah.  Again, I would have to go back
19    and look to see if, you know -- and I want to make sure
20    I'm making myself clear about this distinction I've
21    made between inhaled anesthetics and IV drugs and this
22    variability issue.  Again, it has to do with you look
23    at the concentration of the drug or partial pressure of
24    the drug and you compare it to what effect does that
25    have on a population of patients.  And at a certain
```

1    level, you say, okay, at this concentration of this
2    particular drug, a hundred percent of patients are
3    unconscious and have no awareness, or have no memory,
4    or whatever it is.  And that's a very narrow window.
5    That is, you go from one concentration to a slightly
6    higher one and all of a sudden, you know, you've gone
7    from maybe only ten percent of patients being
8    unconscious to a hundred percent of the patients being
9    unconscious.  See, that step increase is very small,
10   relatively small.
11                     Whereas with the IV drugs, you
12   don't -- you can't do that in small steps necessarily.
13   That is, small steps, you know, you increase the
14   percent of patients that become unconscious, but you
15   have to really get into high concentrations to get a
16   hundred percent sure that everybody would be
17   unconscious.  That's why when I say with the inhaled
18   drugs, I know that if I get high enough, at this point,
19   a hundred percent of patients would be unconscious.
20   Whereas with IV drugs, as I get in higher levels, I may
21   not feel that comfortable until I get into really high
22   levels.
23           Q.      Because you want to -- just so I'm
24   clear.  Because you want to make sure there's a certain
25   nanogram per milliliter of blood of that drug in their

1    system, is that what you're saying?

2         A.        Yeah, I guess that would be one way

3    of putting it.  I'm not saying that -- you know, we're

4    not measuring that nanogram level in a patient.

5         Q.        Sure, because you can't at that time.

6         A.        No, no.  It's not -- yeah, that's

7    correct.

8         Q.        Let me ask you this:  What is the --

9    for midazolam, what would that nanogram per milliliter

10   be?  Because you said there are points up to where a

11   hundred percent of the patients would be under

12   anesthesia.  For midazolam, what would that nanogram

13   per milliliter be?

14        A.        Well, that actually I don't know the

15   answer to the question.  I'm not sure that those types

16   of studies have been done.  But in some of the studies

17   that I cited, and specifically with the Glass study,

18   that was a study from 1997, and pulling this from my

19   memory, I believe they achieved levels of around -- the

20   highest may have been 890, 8-9-0, my recollection.

21   Might have been a little bit -- again, I'm not sure.  I

22   don't know, in other studies with midazolam if a

23   similar approach has been done where they measured the

24   actual concentration of the drug.  Now, the Glass

25   study, they did not get down to the lowest level or

1    basically it was -- the lowest level being if there was

2    no response to painful stimulus.  And other studies,

3    benzodiazepines have been shown to be able to achieve a

4    lack of response essentially to the painful stimulants.

5    But in those studies, I don't think that they actually

6    achieved -- or I don't think they actually measured the

7    concentration of the drug.

8              Q.        So you don't know what the

9    concentration of the drug would be midazolam to achieve

10   general anesthesia?

11             A.        In humans, I don't know that that --

12   I don't know that.  I don't know that that's ever been

13   actually looked at in terms of the actual concentration

14   of the drug in the blood.

15             Q.        Okay.  Do you think there's a number?

16             A.        I think there is.  I just don't know

17   if it's ever been measured.

18             Q.        So even though it has never been

19   measured, you in a hospital setting would inject

20   midazolam into a patient and assume, based on, as you

21   put it, pharmacological studies, that they were then

22   under general anesthesia?

23             A.        What I have -- first of all, your

24   question -- first off, midazolam certainly is not used

25   hardly at all for -- in the current, you know, 2022 as

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 42 of 418 PageID #: 7719

1    a drug for induction of anesthesia because we have

2    such -- much better drugs for a variety of different

3    reasons.  But there have been studies and I certainly

4    have used midazolam for induction of general

5    anesthesia.  But there have been studies that have

6    looked at the use of midazolam as an induction drug and

7    midazolam is found to be adequate for that purpose.

8            Q.        Right, but that's not what I'm

9    asking.  What I'm asking is, you said a minute ago that

10   you would assume like propofol, like barbiturates, that

11   in a hospital setting, if you gave a patient enough

12   midazolam based on its pharmacological properties that

13   they would be under general anesthesia.  I then asked

14   you, could you tell me how many nanograms per

15   milliliter it would take for an individual to be under

16   general anesthesia with midazolam and you told me I

17   don't know, I don't know if there are studies; is that

18   all correct?

19            MR. ATYIA:  Objection to form.

20            A.        That is correct.  But again, I

21   also -- I don't want you to think that I have -- I use

22   that pharmacological principle across the board for all

23   the things that I do for the -- especially for the IV

24   drugs.  So I have to rely in part on what others have

25   done.  And I've cited studies where midazolam has been

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1      used for induction of general anesthesia, so I have to

 2      rely on that as well.  I don't want you to think or

 3      anyone else to think that I am, you know, using as I

 4      described this pharmacological principles and

 5      pharmacodynamic principles as a sole guide of my use of

 6      these drugs.  As I said before, it's more true, I

 7      think, with the inhaled drugs than it is with the IV

 8      drugs.

 9            Q.        Right, but I just want to make sure I

10      understand you because you said with the inhaled drugs,

11      you actually don't -- you know, sometimes you don't

12      actually need to look at these other mechanisms or

13      these other signs because you know if you give them

14      enough.  And you also said with barbiturates that's

15      true, too, and with propofol.  And these drugs are

16      labeled total anesthetics.  And then I asked you if

17      there are any other drugs and you said, yes, midazolam

18      based on its pharmacological properties.  So now it

19      seems to me that you're saying, no, midazolam I would

20      also look at these other signs because I don't know the

21      nanograms per milliliter; is that right?  I'm just

22      trying to find out what exactly you would you do with

23      midazolam.

24            MR. ATYIA:  Objection to form.

25            A.        So I would like to answer your
```

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 44 of 418 PageID #: 7721

```
1      question to go back to what I said about in comparison
2      let's say of propofol to midazolam or barbiturates to
3      propofol to midazolam and so forth that -- in my
4      opinion, and again, I'm going to go back, I'm going to
5      repeat myself, this comparison of inhaled drugs to IV
6      drugs, in my opinion, the variability is low enough
7      with inhaled drugs that I feel that once I've achieved
8      a certain amount of -- a certain level, I feel
9      comfortable that the patient is adequately -- you know,
10     is under -- you know, is not going to be aware or
11     conscious.  I don't have that amount of comfort, I
12     guess, when I'm using an IV drug because of the
13     variability.  And so I would -- whereas I might ignore
14     some of these signs in a patient anesthetized with
15     isoflurane, for example, I might give them more weight
16     in somebody anesthetized with an IV drug.
17                        Again, when we do these things we're
18     not adjusting things solely on the basis of, you know,
19     is this patient awake or not.  We're incorporating
20     other criteria, you know, the blood pressure and so
21     forth.  So we have to come to a clinical decision
22     about, you know, what are we going to do.  And again,
23     for the IV drugs, I would focus -- I shouldn't say
24     focus, but I might give more consideration to some of
25     these other signs that are occurring.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 45 of 418 PageID #: 7722

```
1           Q.          Okay.  So for the IV drugs, you would
2     give more consideration than for the inhaled drugs,
3     right?
4           A.          Possibly, yes, that's true, yes.
5           Q.          Okay.  Now, how about, would you give
6     more consideration for propofol than you would for a
7     barbiturate or would that be the same?
8           A.          Well, I'm trying to think of the
9     context of how -- so first off, we don't use
10    barbiturates anymore.  We've used -- for induction of
11    general anesthesia.  Even when I was in training, we
12    rarely used barbiturates as an infusion.  Whereas with
13    propofol, we can use it as an infusion, so it's -- I
14    hate -- I'm not -- I don't -- I guess I don't feel that
15    comfortable trying to lump barbiturates in with
16    propofol.  I feel more comfortable, you know, just
17    talking about propofol.
18          Q.          Okay.  Let's then deal with -- let's
19    deal with how about midazolam versus propofol.  Would
20    you feel more comfortable ignoring the other signs with
21    propofol than you would with midazolam?
22          A.          So, you have -- again, propofol is a
23    drug that we can give, infuse, and we can give a
24    large amount and it will wear off.  With midazolam, I
25    mean, we could do that, but the problem is that it
```

```
 1    would take a long time to wear off.  So it's not -- I'm
 2    just saying, and I think everyone should know this, or
 3    maybe you don't, but, I mean, I've never used midazolam
 4    as an infusion basically for that purpose.  I've
 5    always -- you know, I've used midazolam as an injection
 6    for induction of general anesthesia.  I have cited the
 7    reports -- or the studies in my reports -- my report in
 8    which midazolam has been used for that purpose and the
 9    dose described there.  So I don't -- you know, I'm not
10    sure I understand.  Perhaps you could repeat that
11    question.  I don't think -- I just don't like the
12    comparison there, I suppose.
13               Q.        Let me repeat.  Let me ask a
14    different question first and then I'll repeat that
15    question.  So just so I'm clear, you've never used
16    midazolam as a solo drug to maintain general
17    anesthesia, right?
18               A.        Yeah, I have not, no.
19               Q.        Okay.  So would you be more
20    comfortable ignoring clinical signs when you give a
21    very large dose of propofol, if you gave a very large
22    dose of propofol versus if you gave a very large dose
23    of midazolam when determining a patient's depth of
24    anesthesia?
25               A.        No, I don't think I would ignore one
```

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 47 of 418 PageID #: 7724

```
 1    versus the other.  With any of the IV drugs like that,
 2    I think that you have to -- in my opinion, you would
 3    have to focus -- again, if we're thinking about, I
 4    guess, consciousness here, you would have to focus more
 5    on some of these signs than you would with the inhaled
 6    anesthetics.  And again, just because we have a lot of
 7    good data, I believe, a lot of good data with inhaled
 8    anesthetics with these various end points of
 9    consciousness that we don't really have with some of
10    the other drugs, so because of that, I feel, I guess, a
11    little less comfortable ignoring those with IV drugs
12    than I would with inhaled drugs.
13            Q.      So with all the IV drugs, the
14    clinical signs should be looked at, is what you're
15    saying; is that right?
16            A.      In a clinical setting.  Now, I guess
17    when I give you this caveat, which is that there are,
18    I'm sure, anesthesiologists that -- and I'm not talking
19    about expert witnesses on the other side, I'm just
20    talking about anesthesiologists in general who might
21    claim -- who would disagree with me, you know, even at
22    this high -- you know, at this level of isoflurane,
23    let's say, I'm not going to ignore these clinical
24    signs.  But that's just sort of a difference of
25    clinical -- of management, I think.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1          Q.          Would they disagree with you with
 2     these high levels of propofol I can ignore these
 3     clinical signs?
 4          A.          You know, I think some people that
 5     would perhaps agree with me and some that would
 6     disagree.  But, again, we're focused, when I say we,
 7     I'm talking about the anesthesiologists in general, in
 8     a patient who's anesthetized, for the most part, we are
 9     focused on -- and this is perhaps an oversimplification
10     from what we do, but we're focused on is the patient
11     unconscious and what's going on with their blood
12     pressure, and usually the breathing is not a problem
13     because we're breathing for the patient.
14                    So it's really about are they
15     unconscious and what's going on with the blood
16     pressure.  And we might treat those together or
17     separate.  It kind of depends.  So when I talk about
18     these other signs, you know, I may intervene basically
19     in terms of controlling the blood pressure in a way
20     that, you know, works against the level of
21     consciousness issue or vice versa.  It just -- it kind
22     of depends on the clinical situation.
23          Q.          Right, but I'm only talking about for
24     determining consciousness here.  Forget about the
25     other -- the other things that you all are monitoring.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    I'm only talking about consciousness here.  There are

2    other clinical signs -- there are clinical signs that

3    anesthesiologists and nurse anesthetists look for,

4    right, when they give anesthetics to determine whether

5    the patient is unconscious, as you call it, right?

6              A.        That is correct, yes.

7              Q.        Okay.  And you said with inhaled

8    drugs, sometimes you can ignore those signs because you

9    know that the patient is under a deep enough level,

10   anesthetic depth, right?

11             A.        Yes.

12             Q.        Okay.  And you also said there are

13   times if you give enough injectable drug, there are

14   times you can ignore those signs; is that right?  Or am

15   I wrong about that?

16             A.        I believe you can.  Again, it's a

17   level of confidence.  I feel more confident with the

18   inhaled drugs than I do with the IV drugs.

19             Q.        Okay.  And then I asked you about the

20   IV drugs, to name them, and you said propofol and you

21   named barbiturates, you named thiopental as well,

22   right?

23             A.        Yes.

24             Q.        And then at some point you named

25   midazolam, and I'm asking if you can be as confident

1     with midazolam as you are with propofol?

       2                    MR. ATYIA:  Objection to form.

       3           A.         I would say probably less confident

       4     with midazolam than with propofol because we have less

       5     data with midazolam.  Now, I'm a very data driven

       6     person when it comes to these decisions.  And so when

       7     we have less data, I do feel less comfortable with some

       8     of these, you know, what levels we should be achieving

       9     or how much drug we should be giving.

      10           Q.         So when giving propofol, or

      11     thiopental, or midazolam, to be more comfortable, you

      12     should be looking for the clinical signs as well,

      13     right?

      14           A.         You would obviously be looking at the

      15     signs no matter what the drug is, but you -- in my

      16     opinion, you would be more concerned about -- you would

      17     have less confidence in the level of anesthesia in

      18     somebody who has been given an IV drug such as

      19     midazolam, or propofol, or a barbiturate.  Maybe not so

      20     much the barbiturate perhaps, but, again, that's

      21     something that we don't have a lot of data on.  But

      22     from a pharmacological perspective, barbiturates are

      23     similar to propofol.  That's sort of an

      24     oversimplification, but basically they're similar in

      25     some respects.

1          Q.          Are you aware of any death penalty

        2     protocols that use inhaled drugs?

        3          A.          I am not.

        4          Q.          Okay.  And when you talk about the

        5     signs to look for, is there a sign or monitor that you

        6     think is better than others?

        7          A.          Monitor to look for what?

        8          Q.          Meaning to look for consciousness.

        9     I'm sorry, that was a poor question.  Meaning, you

       10     know, is the -- you described the BIS earlier.  Do you

       11     think the BIS is the best monitor you think -- a

       12     consciousness check is the best monitor?  In your

       13     expert opinion, what do you think that best monitor is,

       14     if there is one?

       15          A.          So I will use monitor, monitor to me

       16     in a sense, in and of itself, I think of it as a

       17     machine.  But we certainly do use the word monitor in

       18     terms of us looking at the patient.  In my opinion, the

       19     data suggests pretty strongly that the BIS is probably

       20     the best monitor for the level of consciousness or the

       21     depth of the anesthetic in the brain.

       22                      Now, some people disagree with that.

       23     It's not -- certainly not a perfect monitor.  I have

       24     used the BIS quite a bit in my career, but it's not a

       25     hundred percent, basically.  So if you're going to put

www.veritext.com            Veritext Legal Solutions            800-556-8974

1    my feet to the fire and say what's the best monitor out

2    there, it would be the BIS or something -- there are

3    other types of brain monitors that also work, but I

4    think the BIS is probably -- they're all more or less,

5    in my opinion, the data are about the same in terms of

6    their effectiveness.

7            Q.         When using the BIS or these other

8    monitors, are they monitoring the patient throughout

9    the duration of the entire surgery?

10           A.         They are.  Well, let me clarify that

11   statement.  In general, you would want to use it

12   throughout.  Now, some people will put the monitor on

13   after a patient is asleep and maybe take it off before

14   they wake up, but in general, I like to -- when I've

15   used it, I like to have it on before they go to

16   sleep and then leave it on until they're fully awake,

17   but practices vary.

18           Q.         Why?

19           A.         Well, one of the nice things about

20   the BIS monitor, again, within the context of it's not

21   perfect, but one of the nice things about the BIS

22   monitor is that you don't need a control measurement.

23   That is, if you take -- so the BIS monitor gives you a

24   number basically between zero and a hundred.  And it

25   arrives at that number through an algorithm and just

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
 1    looks at all the brainwaves and comes up with that
 2    number.  And if I were to take the BIS --
 3                    Let me set up an experiment here for
 4    you or a hypothetical kind of demonstration.  If I were
 5    to take you, Mr. Kursman, and I were to put a strip
 6    across your forehead and then gave you an anesthetic
 7    and measured the BIS, your BIS would, you know, maybe
 8    start around 95 and you go down to, let's say, 50 after
 9    I do that.
10                    If I had instead anesthetized you and
11    put the strip on after you're anesthetized, I should
12    get about 50 on the BIS.  So you don't need the control
13    data basically to be able to arrive at that number.
14    So, you know, some people say I'm going to induce the
15    patient, I know these drugs work, you know, they have
16    the intended effect, I'll just put the BIS monitor
17    after they're anesthetized just because of, you know,
18    there are a lot of things happening, it's just, you
19    know, they don't have enough time to put it on.  I like
20    to put it on because I like to see that effect, but
21    it's not necessary.  And then some people take the
22    strips off before the patient wakes up.  In the past, I
23    sort of like to leave it on because that's interesting
24    to me to see those effects, but you don't have to do
25    that.
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
 1            Q.         What about after I reach 50, because
 2     you used me as an example, what about after the patient
 3     reaches 50?  So you put the BIS monitor on, they're at
 4     90, you give them the drugs, they go down to 50.  Would
 5     it be appropriate to take the BIS monitor off then
 6     prior to surgery?
 7            A.         No.  No, I mean, I don't -- well, I
 8     don't think appropriate would be the best way.  It
 9     doesn't seem to me that you would have a strong reason
10     to remove it.  If you're going to measure the BIS,
11     you're going to be measuring it throughout the whole
12     operation.  The amount of anesthetic that you might be
13     giving is going to vary, so that's the reason why you
14     have the BIS monitor on there, is to measure the
15     electroencephalogram, so you want to measure it
16     throughout the whole course of the anesthetic and
17     surgery.  It wouldn't make much sense to me, I guess,
18     to put it on and take it off because you've achieved
19     that level because it's going to change potentially.
20     It almost certainly will change somewhat.
21            Q.         Why does it change?
22            A.         Well, there are different levels of
23     stimulation.  There are different amounts of anesthetic
24     that are being given.  There are different things that
25     are happening to the patient.  So you would want to be
```

www.veritext.com                    Veritext Legal Solutions                    800-556-8974

1    able to monitor that.

2          Q.        Just so I'm clear, so if a patient --

3    if the stimulation goes up with a stronger stimulation,

4    then the BIS will go up and then you'll have to give

5    more anesthetic, is that what it's about?

6          A.        Yeah, for the most part.  I mean, the

7    BIS number is something that we would incorporate into

8    our decision about, you know, what to do in terms of

9    the anesthetic level.  It's not the only thing that we

10   look at, but it's one thing that we would look at.

11         Q.        I know we've been going for while and

12   you've given me initial admonishments, which I'll do

13   now, and I know you've taken a lot of depositions, so

14   you don't really need this, but you understand that

15   you're under oath, right?

16         A.        Yes.

17         Q.        And you understand that means you

18   need to tell the truth?

19         A.        Yes.

20         Q.        And is there any reason you can't

21   testify truthfully or accurately today?

22         A.        There's no reason, except for there

23   have been -- if something of privileged information

24   were to come up, then I would have to -- I guess we

25   would have to work that out.  I wouldn't answer

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 56 of 418 PageID #: 7733

```
 1    untruthfully.  I may just not answer based on that,
 2    so --
 3            Q.        You're saying if your attorney
 4    objects and instructs you not to answer?
 5            A.        Well, or if I feel as though it's
 6    into an area of where there's attorney-client
 7    privilege, I guess.  I don't know.  I mean, I think --
 8    I wouldn't wait for an objection, I guess.  I might
 9    bring up that issue myself.
10            Q.        Okay.  That's fair.  Are you taking
11    any medication today?
12            A.        Am I taking any medication?
13            Q.        Today.
14            A.        Yes.  Well, I don't know what --
15                      MR. ATYIA:  Let me object here.
16              Alex, this is his health information.  I'm not
17              going to -- if you want to ask him if he's
18              taking medication that may change his
19              testimony.  Can you respect his health privacy
20              and do that?
21                      MR. KURSMAN:  I think I'm allowed to
22              ask all that, but it's okay.
23                      MR. ATYIA:  Okay.  I appreciate that.
24            Q.        Are you taking any medication that
25    would affect your ability to recall facts today?
```

```
 1              A.        I don't think so, no.  I take
 2      medication for some problems that I have with
 3      essentially migraines, but -- and some other
 4      medications for my cholesterol, so I don't think any of
 5      that is going to affect my ability to answer the
 6      questions.
 7              Q.        The medication you're taking won't
 8      affect your ability to give accurate testimony today?
 9              A.        I do not believe so, no.
10              Q.        Okay.  Does it affect your memory at
11      all?
12              A.        I do not believe so, no.  I don't
13      think so.  I mean, that's something that the --
14      obviously, maybe if several testing occurred, I don't
15      know, but I doubt it, so --
16              Q.        And are you represented by counsel
17      today?
18              A.        I don't know if the -- Mr. Atyia is
19      representing me.  I think I'm here as a consultant, so
20      I don't have a separate attorney that's representing
21      me, if I understand your question.
22              Q.        Okay.  And I think you've been doing
23      this a lot already, but just -- you understand that you
24      have to respond verbally rather than shaking your head?
25              A.        Yes.  Hopefully when I shake my head
```

```
1    I'm also talking and saying yes or no, something like
2    that.  So, yes, I'm aware of that.
3            Q.       And you understand you can't consult
4    with your -- with Mr. Atyia before you answer any of my
5    questions?
6            A.       That is correct, I understand that.
7            Q.       Okay.  What did you do to prepare for
8    this deposition?
9            A.       I reviewed the reports by Dr. Van
10   Norman and Dr. Stevens.  I reviewed their deposition
11   transcripts.  And I reviewed my own report.  I had some
12   consultations via telephone or Zoom, I guess.  It
13   wasn't Zoom, I know, it's internet consultations with
14   the attorneys from Tennessee, like Mr. Atyia and
15   Mr. Mitchell.
16           Q.       Anybody else?  I apologize.  Who
17   else?
18           A.       Mr. Sutherland was involved in that
19   as well.
20           Q.       How many times did you talk either by
21   phone or via Zoom?
22           A.       So in preparation for the deposition?
23           Q.       In preparation for the deposition.
24           A.       I would guess maybe four times, give
25   or take.  I mean, there certainly were other phone
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 59 of 418 PageID #: 7736

```
 1    calls.  I might call to say I have a question about
 2    something and all that and that would add -- you know,
 3    that might be another four or five.  But they were
 4    usually pretty brief, so I don't -- I'm guessing four.
 5    I could be off by that -- wrong about that, but it's --
 6    it's not like it was ten or 20 or anything like that.
 7    I would say it's probably around four times, you know,
 8    where we spent an hour or two.
 9            Q.        Well, how long were the meetings?
10            A.        Yeah, about an hour or two.  I think
11    the total amount of time my guess was maybe six to
12    eight hours, is my guess.
13            Q.        All in preparation for this
14    deposition?
15            A.        Yes.
16            Q.        And was anyone else present at these
17    meetings?
18            A.        I don't think so.  I think it was
19    usually Mr. Atyia, Mr. Mitchell, and Mr. Sutherland.
20    Sometimes one of them might have gone off to do
21    something and so it was only two of them.  And maybe
22    there was only one of them, you know, during these,
23    so -- but nobody else to my knowledge.
24            Q.        And did you all review any documents
25    during the meetings?
```

```
 1            A.          We reviewed the reports by Dr. Van --
 2     well, let's see.  For the actual -- for the preparation
 3     of the deposition, I think we would have -- I think we
 4     reviewed, maybe not in terms of having the actual
 5     document in front us in terms of the Zoom session, but
 6     we would have reviewed the reports by Dr. Stevens and
 7     by Dr. Van Norman.  We might have looked at the reports
 8     for Dr. Williams and Blanke, I believe, early on.  I
 9     don't think -- I'm not sure that was part of the
10     deposition preparation that we would have looked at
11     those, maybe earlier.  I don't recall with those.  And
12     then you said other documents.  There certainly were
13     probably some studies that I had cited or maybe Dr. Van
14     Norman had cited, someone else had cited that we might
15     have looked at.  But that was not a huge part of what
16     we looked at.
17            Q.          Did you look at any studies that
18     weren't cited?
19            A.          So the only study that I looked at
20     that I did not cite but we had talked about in the
21     deposition discussion that I looked at again after we
22     finished, and it's a study by -- I can give you the
23     author's first name.  I don't have it in front of me,
24     but I believe I have the correct selling of the author
25     and the citation.  The first author's last name is
```

1    Dhanani, and I'll spell it for you.  It's
2    D-h-a-n-a-n-i.  And I'm pretty sure that's the
3    spelling.
4                    That was published in the New England
5    Journal of Medicine last year.  And the nature of the
6    study and I'm -- despite the fact that I just reviewed
7    it a few days ago, I might get a little bit of the
8    facts mixed up here.  But essentially what they were
9    looking at -- these were patients that -- essentially
10   these patients were, as we colloquially say, they
11   pulled the plug.  These were terminally ill patients
12   that were going to have withdrawal of life support.
13   And they were looking at the -- you know, what happens
14   to the heartbeat basically after withdrawal of the life
15   support.
16                    And what they were primarily
17   concerned with is how long does it take for the heart
18   to slow and then stop, and then once the heart stops,
19   you know -- so let me just stop there, no pun intended.
20   But certainly, lay people may not quite understand this
21   and even physicians I think hopefully will understand
22   this issue about -- if you think about, you know, when
23   do you know for sure the heart is stopped, right?  You
24   think, well, you know, here's a beat and then there's
25   no further beats.  And you wait a minute and you say,

1    okay, well, after a minute, there's no -- there aren't

    2    any heartbeats, so, you know, the patient is dead,

    3    we're going to turn the monitor off or whatever or pull

    4    the strips off.

    5                        What if there was one more beat at a

    6    minute and one second?  You would have missed that.

    7    Okay.  So this study basically was looking at what

    8    happens to the heartbeat, and it turns out that, you

    9    know, someone could have their heart can stop and then

   10    after two or three minutes, you see another beat.  So

   11    the study had to do with when do you actually -- you

   12    feel that you can declare death if you use the

   13    heartbeat as a criteria.

   14                        And I was just talking about that

   15    study in relation to declaring death and declaring

   16    death in the execution chamber.  So I didn't cite it in

   17    my report, I just brought it up because of this issue

   18    around, you know, when -- you know, the timing of

   19    events in the execution chamber.  And so I did look at

   20    that study.  I don't know whether it was going to come

   21    up in the context of this deposition, but, you know, it

   22    wasn't part of my report, but I thought about it after

   23    I think I submitted my report and started thinking more

   24    about the issue around the declaration of death.

   25                Q.        And did you review any materials on

1    your own to prepare for the deposition?

2            A.        Well, as I said, I looked at the --

3    yesterday or maybe the day before, I looked at the

4    trial -- or the deposition transcripts of Dr. Stevens

5    and Dr. Van Norman and then their reports and my

6    report.  Those are the ones I did on my own.

7            Q.        Did anyone consult with you to

8    prepare for another deposition in this case, meaning --

9    and what I mean by that is like the warden or the

10   director, did anybody talk to you before any of their

11   depositions?

12           A.        I don't think so.  I don't -- I think

13   whatever -- the only thing I remember about another

14   deposition was the warden and it was after the

15   deposition was given and they said, you know, the

16   warden said such and such or -- well, I can't remember

17   the exact conversation, but it was, I think, after the

18   deposition.  It wasn't before.

19           Q.        I mean, did you talk to the warden

20   after the deposition?

21           A.        No, no, no, no.  This was a

22   discussion between the attorneys for the State of

23   Tennessee and me.  I didn't -- I have not talked to the

24   warden.  No, I have not talked to the warden, no, nor

25   anyone else.  I've not had any contact with anyone

1    else.

    2                        MR. ATYIA:  I'm sorry, Alex.  I'm

    3          going to object to as privileged any

    4          discussions between the State's counsel and

    5          Dr. Antognini other than discussions giving him

    6          information to rely on.  You're free to get

    7          into that, but --

    8                        MR. KURSMAN:  Sure.  And I don't want

    9          answers on that.

   10          Q.        My question was going to be, did you

   11    talk to anybody at the Tennessee Department of

   12    Corrections aside from the warden?

   13          A.        I didn't talk to the warden.

   14          Q.        I apologize.  I just meant aside --

   15    not aside from you talking to him.  Did you talk to

   16    anyone at the Tennessee Department of Corrections?

   17          A.        No.

   18          Q.        Have you ever talked to anyone at the

   19    Tennessee Department of Corrections?

   20          A.        I mean, I -- not as far as I recall,

   21    not in relation to this case, and I don't think I would

   22    have talked to them even before that.  I don't have a

   23    recollection of ever having any contact.  To my

   24    knowledge, I've never had any contact with the people

   25    from the Department of Corrections in any of my cases

```
 1    -- well, with the exception, I suppose, in some of
 2    the -- maybe in some of the cases that I have been
 3    involved with the general counsel, I guess, the term
 4    general counsel for the Department of Corrections has
 5    been present, but not in this case, as far as I can
 6    recall.
 7          Q.       And did you review any of the papers
 8    filed in the Court?  And what I mean by that is the
 9    complaint by the plaintiffs or anything else?
10          A.       I did not do that in preparation for
11    the deposition.  Early on, did I look at the complaint?
12    That's possible.  I don't think so, though.  I don't
13    recall that.
14          Q.       And did you discuss this deposition
15    with anyone aside from your counsel or aside from the
16    Tennessee Attorney General's Office?
17          A.       No.
18          Q.       Did you do anything else to prepare
19    for the deposition aside from what we've already talked
20    about?
21          A.       I'm going to try to give you a -- I'm
22    giving you a truthful answer, I just -- but it's going
23    to be full of a lot of questions.  It's almost -- it's
24    quite likely that after one of our depositions, you
25    know, training sessions -- not training sessions, but
```

```
 1    one of our deposition discussions session that we had
 2    with the Tennessee attorneys and me, I might have gone
 3    back to an article that I cited, I suppose.  I don't
 4    recall if I did what that article was, but it would
 5    have been one that I cited.  Like I said, the only one
 6    that comes off the top of my head that I looked at that
 7    I didn't cite was the one I just talked about.  I don't
 8    think that I've looked at anything else since -- you
 9    know, during that period.
10         Q.       And is eight hours a normal amount of
11    time that you usually prepare for depositions?
12         A.       I would say it's a little bit more
13    than -- well, first off, like I said, this, I believe,
14    may only be the second deposition I've given, so --
15    maybe it's the third, but -- at least in relation to
16    lethal injection material.  So my recollection is I
17    think I probably spent less time preparing in terms of
18    a -- sort of a discussion with the attorneys on the
19    prior deposition compared to this one.  It seemed a
20    little more than the other one.
21         Q.       How much money have you made so far
22    in this case, for your work on this case?
23         A.       Without reviewing my invoice
24    material, I'm going to just have to give you a guess,
25    which would be -- and of course, I haven't been
```

1    reimbursed on some of my time yet.  So probably

    2    $10,000.00 to $15,000.00 maybe.  It's a ball park

    3    figure at this point.  I'm not sure.  It might be more

    4    than that, I don't know.

    5            Q.        And have you submitted your invoices

    6    yet?

    7            A.        I believe I have.  I'm pretty sure I

    8    have submitted time for Tennessee.  Yeah, I'm pretty

    9    sure -- and I might have been paid by them, I don't

   10    know.

   11                    MR. ATYIA:  I'm going to object.

   12            This is -- that's a communication with us that

   13            has -- that's privileged.  He doesn't have to

   14            answer that.  If you want to ask him about what

   15            he gets paid and things like that, but why is

   16            his submission of invoices involved?  I mean,

   17            if you want to get in -- if there's a good

   18            reason, I'll withdraw the privilege.

   19                    MR. KURSMAN:  There is no privilege

   20            to that.  But if you're objecting to privilege,

   21            are you instructing him not to answer?

   22                    MR. ATYIA:  No.  I mean, if you want

   23            to ask him what he's submitted, go for it.

   24            Q.        So I think you answered it anyway.

   25    How about in lethal injection cases in general, how

much would you say you've made in the last five years?

A.    I'm not hesitating because I -- you know, I want to give you an answer.  And I -- you know, obviously there's a -- it's easy for me to look at the numbers because it's on my tax statements and all that kind of thing.  But it might be close to $150,000.00 over five years.  It might be a little bit more than that.  I haven't -- I'm not sure I've included the amount -- well, it's now over six years, I guess.  I haven't included the amount that I would have made recently, so it's probably in that range.

Q.    And what percentage of your annual income would that be?

A.    And I'm not going to answer that.

Q.    You're in a deposition.

A.    Well, why do I have to tell you what my annual -- I mean, you can -- by taking the $150,000.00 and then asking what percentage, you can calculate my annual income and I don't think that's -- you know, what -- maybe I can answer it this way:  If for whatever reason various states decided they didn't want me anymore and I stopped doing this work, I would not -- I would be pleased.  You know, there have been many times I've said to myself, you know, why am I doing this?  And I just -- you know, the amount of

```
 1    money that I make on this is not going to affect my
 2    standard of living, so -- anyway.  I don't -- you know,
 3    I don't know why that is important to you, I guess.  I
 4    guess I can understand it if I need this to survive,
 5    I'll just put it at that.  I've been lucky enough and
 6    blessed enough to have a very good income over the
 7    years, have been very frugal, my wife and I, so not
 8    having this income would not affect my standard of
 9    living in any bit.
10          Q.        So are you refusing to answer my
11    question?
12          A.        I guess I am, yeah.
13          Q.        So you're not going to answer the
14    question what percent --
15                    MR. ATYIA:  Objection, form.  He's
16          answered it.  He hasn't been instructed.  I
17          think he answered you.  You're free to seek
18          relief --
19          Q.        Are you going to answer my question,
20    what percentage of your annual income has come from
21    these lethal injection cases in the last five years?
22          A.        All right.  Now, if you want to be
23    that much of a stickler about it, you know, I actually
24    have calculated that over the years and it's probably
25    around -- you know, I -- all right.  It's about
```

1    ten percent.  So now you can do the math obviously.  So
2    thank you very much.  You know, people now know
3    essentially of all my sources of income and like, you
4    know, whatever.  There.  You know, people can now do
5    that calculation over the last several years.  So I
6    think that's just a very rude thing to ask for.  I
7    understand why you're doing it, but I just don't -- I
8    don't see why that is so important to you that you have
9    to pull that out of me like that.
10            Q.        So Dr. Antognini, I'm not trying to
11   be rude and I'm not doing this to be rude.  It's for
12   the same reason that I'm asking --
13                      MR. ATYIA:  Let's just ask a
14           question, Alex.
15           Q.        -- how much money you're -- being
16   made.  One of the responses you said was -- you said a
17   lot of times you ask yourself why am I even doing this?
18   Why do you ask yourself that?
19           A.        Well, this exchange is just a great
20   example, you know.  You know, there's a lot of
21   unpleasantness involved around these types of issues.
22   And you know, this -- the way that we do things in the
23   legal system is very adversarial and I just don't --
24   it's just not very pleasant, can be very unpleasant at
25   times.

www.veritext.com          Veritext Legal Solutions          800-556-8974

1          Q.        So why are you doing this?

2          A.         I explain it in the following way for

3     the most part:  I'm going to ask some rhetorical

4     questions, because I know I'm the one being deposed and

5     you are not.  But suppose I would ask you a question,

6     do you believe that it's a defendant's right to have

7     competent representation?  And you would say presumably

8     yes.  Do you believe it's a defendant's right to have

9     availability of an expert witness to testify on his or

10    her behalf?  And you would say yes.  I think that's a

11    fundamental right.  Well, in these cases, the

12    defendant, or in this case, the State of Tennessee or

13    the people of the State of Tennessee or the State of

14    Arkansas or Oklahoma, so they are entitled to

15    representation and expert witnesses.

16                    And the nature of these cases is such

17    that it's very difficult for them to get people to

18    testify, expert witnesses to testify, so I have taken

19    that on.  And sometimes I think to myself, you know,

20    why do I continue to do this?  So it's just -- it's

21    very -- it's a very unpleasant process, but I feel

22    obligated in the sense of the administration of justice

23    to do this work.  But I do it truthfully and offering

24    my opinions about, you know, what these protocols

25    involve.

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1                    So, you know, that's the main reason
 2      why I do it.  You hire expert witnesses, the State
 3      hires expert witnesses, so, you know, that's the basic
 4      reason.  I doubt that there's anybody on this call or
 5      even for the State of Tennessee that, you know, relish,
 6      thoroughly enjoy doing this type of work, but, you
 7      know, here we are.
 8              Q.       Thank you for that, but let's get --
 9      do you have your report in front of you?
10              A.       I do not.
11              Q.       Are you able to pull it up?
12              A.       I can.  It's not on this particular
13      computer here, so I would have to get my thumb drive
14      and put it in there.
15              Q.       That's okay.  We'll e-mail it to the
16      Attorney General's Office right now and they can
17      forward that to you.  You have access to e-mail, I
18      assume, because --
19              A.       Yes.
20              Q.       Okay.
21                      MR. ATYIA:  Alex, so for sharing
22              exhibits, I've told him not to look at anything
23              unless you know what he's looking at.  So if
24              you want to -- however you want to do that, if
25              you want to screen share it, whatever.  I'm
```

```
 1              going to screen share.

 2                       MR. KURSMAN:  I'm going to screen

 3              share, but we'll send you the -- your report as

 4              well.

 5                       MR. ATYIA:  Okay.  But one other

 6              thing is that for some documents he may need to

 7              look through the entirety of the document.

 8                       MR. KURSMAN:  We can go off the

 9              record if he needs to do that.

10                       MR. ATYIA:  Okay.  Thank you.

11                       MR. KURSMAN:  Sure.

12         Q.        So when you use -- did you receive

13    your report?

14         A.        Oh, right now?  I'm sorry.  Let me

15    look and see here.  Okay.  Hold on just a moment.  I

16    have not.  Has it been sent?

17         Q.        I'm not sure.  Well, you don't

18    actually have to receive it yet.  Let's --

19                       MR. ATYIA:  I just got it now, Alex.

20                       THE WITNESS:  So you sent it to me.

21         I'm sorry, I didn't realize -- okay.

22                       MR. ATYIA:  If you'll just give us

23              one second, I'll forward it to him right now.

24                       MR. KURSMAN:  Okay.

25         Q.        Well, what I can do anyway, I can
```

1    talk to you about your report and I'll screen share,
        2    so -- when you use the term unconsciousness in your
        3    report, what do you mean by that?
        4            A.        Okay.  If I may, do you want me to
        5    look at my report now or do you want me to answer the
        6    question?  What's your preference?
        7            Q.        No, my preference would be for you to
        8    answer the question.
        9            A.        Okay.  Repeat it then.
       10            Q.        Sure.  When you use the term
       11    unconsciousness in your report, what do you mean by
       12    that term?
       13            A.        So unconsciousness basically, as I
       14    use it there, means that a patient -- so
       15    unconsciousness incorporates two basic phenomena, I
       16    guess, for the lack of a better term, where a patient
       17    is not responsive to various stimuli and they have
       18    decreased or absence of awareness.  So let me further
       19    clarify that.  Unconscious in terms of a response to
       20    stimuli basically would be that you apply a variety of
       21    different stimuli, including verbal communication, a
       22    tactile stimulation, maybe a painful stimulus, and so
       23    forth, and you look to see if the patient responds or
       24    the person responds.  That's sort of the objective
       25    criteria that I would use or a person would use when

www.veritext.com            Veritext Legal Solutions            800-556-8974

1    you're looking at somebody.

2                    But the individual that you're

3    examining has a subjective component of this -- the

4    awareness part where they are -- basically have various

5    levels of awareness, and by awareness I mean that they

6    are incorporating the stimuli, the environment, and

7    they have essentially in their mind a representation of

8    what the world is like around them.  And usually the

9    subjective component, the response to stimuli, goes

10   hand in hand with the awareness part.  Not always,

11   there's certainly conditions where they're sort of

12   disconnected, but basically it's a combination of those

13   two.  Now, some people would say that, you know,

14   awareness and consciousness are completely separate

15   because, again, one is objective, one is subjective,

16   and I'm not going to perhaps argue with anyone about

17   that.  I get that understanding.  But in general, they

18   go hand in hand.  But, again, there are exceptions to

19   that.

20       Q.        So if a patient responds to name

21   calling, would that fall under your definition of

22   unconsciousness?

23       A.        If a person responded to their name,

24   I would not say that they are -- I would say that they

25   are still conscious.  They may have a depressed level

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 76 of 418 PageID #: 7753

1    of consciousness, but they would still be conscious, I

2    think.

3         Q.        What if they fail to respond to a

4    verbal command but they responded to mild prodding,

5    would they still be conscious?

6         A.        I believe that they would be, yes.

7         Q.        And what if they fail to respond to

8    mild prodding but then responded to like a trapezius

9    squeeze, would they still be conscious?

10        A.        I believe you're now getting, in my

11   opinion, you're getting into the realm of

12   unconsciousness.  Now, you have to understand, and I

13   didn't make this clear, that the -- you know, we talk

14   about unconsciousness, consciousness as an all or none

15   phenomenon, and unfortunately, I certainly fall into

16   that trap, I guess, where sometimes I use them

17   basically as -- you know, conscious or unconscious.

18   But consciousness is really a spectrum, so when you

19   have somebody who responds only to a trapezius squeeze,

20   then there are some scientists and physicians who would

21   say that they are unconscious, others would say, well,

22   they still have some level of consciousness.  So I

23   think you're getting into the threshold part where --

24        Q.        Your report when you use the term

25   unconsciousness, do you mean that the patient would

1    still respond to a trapezius squeeze?

2         A.        No, I don't.  Well, they would not

3    respond to a painful stimulus.

4         Q.        Okay.  Would that painful stimulus --

5    or not stimulus, I apologize.  Would that painful

6    stimulus include a trapezius squeeze?

7         A.        It could, yes.

8         Q.        And how noxious, because you said a

9    painful stimulus, how noxious of a stimuli would you

10   say a trapezius squeeze is?

11        A.        Well, it's -- if it's applied with,

12   you know, a strong pinch, it could be quite noxious,

13   you know.

14        Q.        Is it as noxious as surgical stimuli,

15   would you say?

16        A.        No.

17        Q.        Okay.  So it's not as noxious as

18   like, say, cutting a person, right?

19        A.        It is not.  And I base that answer on

20   the pharmacology -- or pharmacological effects of these

21   drugs, so -- because you look at how much anesthetic is

22   required to blunt or to oblate those types of

23   responses.  You need less for a trapezius squeeze, in

24   general, you need less anesthetic for a trapezius

25   squeeze than you would for a surgical incision, which

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    is less than is required for endotracheal intubation,

2    so you need more for endotracheal intubation than you

3    need for surgical stimulation, which is more than you

4    need for the trapezius squeeze.

5         Q.        And would you say a bolus dose of 240

6    milliequivalents of potassium chloride is more painful

7    of a stimuli than a trapezius squeeze?

8         A.        I do not -- I have an opinion on

9    that, which is that I believe it is -- one of the

10   things that's not really come up here very much,

11   because unfortunately -- as I said to you earlier, I'm

12   a very data driven person.  And of course, you have to

13   put all the data together.  Now, we all agree that

14   potassium chloride is painful on injection or can be

15   painful on injection.  But I don't know that we have a

16   good answer to how much -- how painful is 240

17   milliequivalents of potassium chloride because, first

18   off, there may -- you may reach a point which giving

19   more potassium chloride is not any more painful.  And

20   there are certainly studies out there looking at

21   infusions of potassium chloride which show surprisingly

22   that some of these infusions in terms of the pain are

23   similar to the pain of, let's say, the insertion of an

24   NG tube or something like that, and so -- but that's on

25   lower doses of potassium.  So I don't know that we have

1    good data to say that the infusion of potassium

2    chloride is more painful than a trapezius squeeze.  My

3    guess would be that it is more painful, but I don't

4    think it -- it may not be by a lot, I just don't know.

5         Q.        You don't have an opinion as to

6    whether a bolus dose of 240 milliequivalents of

7    potassium chloride is more painful to an awake person

8    than a trapezius squeeze?

9                   MR. ATYIA:  Objection, form.

10        A.        I think I -- at the end of my

11   discussion, I did say I think, in my opinion, it would

12   be more painful, but I can't give you a number saying

13   it's 50 percent more painful or anything like that.  I

14   believe that it is more painful.

15        Q.        Do you think it would be horribly

16   painful if given to a fully awake person?

17        A.        The pain level would be on a scale of

18   1 to 10, it would be pretty high.  I'm not sure

19   horribly is the best way of -- you know, the adjective

20   that you want to use, but, you know, it would be

21   definitely painful.

22        Q.        Would it be close to a 10?

23        A.        I don't know.  Again, if you look at

24   the studies of the injection of potassium chloride that

25   I ever reviewed and I believe were cited in my report,

1    that, you know, some patients describe it as being a 10

2    out of 10 with potassium infusion and others describe

3    it as being I think maybe 4 out of 10.  I can't

4    remember the numbers off the top of my head.

5                    So, you know, the other thing that we

6    don't talk about here so much is that the infusion of

7    the potassium chloride, while initially painful, can

8    affect the vein in a way that it will basically -- I'm

9    not sure I'm going to use the right term here, but it

10   basically stops the nerves from being able to transmit

11   signal, so it's unclear to me how -- essentially how

12   long that pain would last.  And so I guess it's not

13   just the question of how painful it is, it's also a

14   question of how long it will last.  And certainly, once

15   the heart stops and there's no blood flow to the brain

16   and then -- even in an awake person, the amount of time

17   it would be painful, you're probably talking about

18   maybe a total of 20 seconds at most is my guess, again,

19   dependent on the rate of infusion and so forth.

20          Q.        Are you describing potassium chloride

21   right now as having analgesic properties?

22          A.        No, I am not.

23          Q.        And when you say --

24          A.        I'm not sure why you would ask -- I'm

25   not sure why you think that -- if I said something that

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 81 of 418 PageID #: 7758

```
1    would even clarify -- what have I said that makes you
2    think that I described it as having analgesic
3    properties?
4          Q.         You said at some point, the potassium
5    chloride may stop the nerve signals from sending the
6    pain up to the brain.
7          A.         Yes.  If I were to take one of the
8    nerves in your hand and (inaudible) you would not be
9    able to send signals from your hand up into your brain.
10   That's not really considered to be analgesic.  That's
11   the destruction of tissue.  Potassium chloride would do
12   a similar thing where it would destroy the nerve
13   endings, at least certainly make them not functional.
14   But I wouldn't describe it as being an analgesic
15   property at all.
16         Q.         I just want to be clear right now.
17   Are you disputing at all that a bolus dose of 240
18   milliequivalents of potassium chloride would not be
19   painful to an awake person?
20         A.         No, I'm not disputing that.
21         Q.         Okay.
22         A.         I'm not -- yeah, your question was,
23   is it more painful than a trapezius squeeze, which I
24   answered.  I said, yes, I would believe it would be
25   more painful than a trapezius squeeze.  And that in
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1      some patients it could be a 10 out of 10.  And that
 2      what we don't know is what effect that would have on
 3      the nerve endings and whether those nerves would be
 4      able to transmit pain signals essentially to the brain
 5      after the initial stimulation, which as I said, would
 6      be painful.  So putting that all together, I'm not sure
 7      why you would ask -- you know, you would say am I
 8      disputing the actions of potassium chloride in terms of
 9      pain, so I hope I've summarized it enough for you to
10      understand my position.
11              Q.        You have.  Thank you.
12                        MR. KURSMAN:  I see that the
13              videographer is asking for a break.  Do you all
14              mind taking a break right now?
15                        THE WITNESS:  It's fine with me.
16                        MR. ATYIA:  Alex, whatever you want.
17                        MR. KURSMAN:  Okay.  Can we go off
18              the record?
19                        VIDEO OPERATOR:  Going off the
20              record.  The time is 10:59.
21                        (Brief recess.)
22                        VIDEO OPERATOR:  We're back on the
23              record.  The time is 11:10.
24              Q.        Do you have your report in front of
25      you now?
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 83 of 418 PageID #: 7760

```
 1              A.        I did.  Give me a moment here to
 2    bring it up.  Do I have it in front of me?  Yes.
 3              Q.        Could you go to paragraph 11?
 4              A.        Yes.
 5              Q.        I just want to know, here you have
 6    the term deep unconsciousness in the second line.
 7              A.        Yes.
 8              Q.        Is that different from the way you
 9    use unconsciousness in the rest of your report?
10              A.        I use that term to describe a level
11    of unconsciousness that I believe would render the -- a
12    subject incapable of perceiving pain, so deep enough
13    that they could not perceive pain.  That's the way I
14    use that term or that word.
15              Q.        Deep enough that they could not
16    perceive?
17              A.        Pain from noxious stimulants.
18              Q.        From any stimuli whatsoever, you're
19    saying?
20              A.        In my opinion, yes.
21              Q.        And what I'm going to do now is I'm
22    going to pull up the ASA chart.  I will send that to
23    you as well.  But let me see if I -- did that work?  Do
24    you see the --
25              A.        I do see a -- hold on.  I do see
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    that, yes.

2            Q.        Okay.  So when you say deep

3    unconsciousness, where in this ASA chart would that be?

4            A.        Could you make that a little bit

5    larger?

6            Q.        Oh, yeah.  I apologize.

7            A.        Yeah, that's fine.  There you go.

8    Now scroll down.  So I would say there would be

9    under -- well, going back to paragraph 11 as I anchor

10   on this question here, relative to my use of the word

11   deep unconsciousness, which I answer the same that deep

12   enough to not respond to -- not to perceive pain, would

13   put them under general anesthesia, basically.

14           Q.        Now, I will stop this share.  Can you

15   see me again?

16           A.        Yes.

17           Q.        And do you have your report still in

18   front of you?

19           A.        Yes.

20           Q.        The term linear as you use in your

21   report, what does the term linear mean?

22           A.        Can you show me where I use that

23   term?

24           Q.        Sure.  Before I show you, could you

25   define what you believe the term linear to mean?

```
 1              A.          Well, linear is a term obviously
 2     describing a line or a line type of relationship where
 3     the line, you know, either goes up or down.  And in
 4     science, basically, you look at the data points to see
 5     whether it -- do the data points fit a line or a
 6     different type of -- you know, maybe a curved line,
 7     such as straight line versus curved line, so -- and you
 8     also have to think about the confidence you have in
 9     terms of saying it's either a linear -- a straight line
10     or a curved line, basically.  And sometimes when you
11     have data points that are scattered, you may be able to
12     fit a curved line to those data points or you may be
13     able -- a linear line.  And from a statistical
14     standpoint, you can't differentiate the two -- you
15     don't have enough confidence that the linear line is
16     better than the -- the straight line is better than the
17     curved line.
18              Q.          Okay.  So just so I'm clear, what
19     you're saying is a linear line is -- means a straight
20     line, right?
21              A.          Yes, in that context.  When I use the
22     term linear, I'm saying that it's going to be a
23     straight line for a particular set of data points
24     within a certain range.  So as an example on -- it's
25     kind of hard to explain this without having sort of a
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

1    chalkboard in front of me, but on a certain part of

 2    a -- if you have a curved line, you look at certain

 3    data points, you can fit a straight line to that, so it

 4    depends on the -- what data points that you're looking

 5    at.

 6           Q.        Just so I understand, exponential

 7    line, that would be a curved line, right?

 8           A.        That's correct, yes.

 9           Q.        So an exponential line is the

10    opposite of a linear line?

11           A.        I wouldn't say -- opposite is not the

12    right the word.  I'm just saying they're different.

13           Q.        Okay.  Okay.

14           A.        They're different, they're not

15    opposite.

16                    MR. KURSMAN:  While we're here, I

17           just want to mark EXHIBIT 1, which was Dr.

18           Antognini's report.

19                        (Thereupon, the Expert Report of

20           Joseph F. Antognini, M.D., M.B.A., was marked

21           and filed as EXHIBIT 1.)

22                    MR. KURSMAN:  And EXHIBIT 2, which is

23           the ASA chart that I just showed Dr. Antognini.

24                        (Thereupon, the ASA chart was marked

25           and filed as EXHIBIT 2.)

```
 1            Q.         So I think you can close out of your
 2    report for a second, but we'll get back to it.  Have
 3    you ever used vecuronium bromide?
 4            A.         Many times, yes.
 5            Q.         For what purpose?
 6            A.         To basically relax muscles.  That's
 7    its main effect is to block the transmission of nerve
 8    signals essentially from the nerve to the muscle.
 9            Q.         And when was the last time you
10    administered vecuronium bromide on an individual?
11            A.         It's hard to say for sure.  It's been
12    years because they switched over to rocuronium, but
13    vecuronium I might have used within the last ten years,
14    it's possible I didn't.
15            Q.         How about rocuronium, when was the
16    last time you used rocuronium?
17            A.         That would probably be basically
18    maybe four or five years ago, is my guess.
19            Q.         Do you always administer a different
20    drug before administering vecuronium bromide?
21            A.         A different drug?  I mean, I don't in
22    general -- we wouldn't in general administer vecuronium
23    as the first drug in an awake patient, I guess, so I'm
24    not sure what you mean.
25            Q.         That is my question, if it was
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1    unclear.  In an awake patient, what would you

 2    administer before vecuronium bromide?

 3             A.          In general, you would administer a

 4    drug that is going to produce -- at least produce

 5    sedation or hopefully unconsciousness.  Now, I offer

 6    the following caveat, which is that in some emergency

 7    situations, so I'm going to -- and I've said this

 8    before in testimony, in medicine, never say never and

 9    never say always.

10                       So there have been sort of rare

11    circumstances with somebody who has required emergent

12    endotracheal intubation for airway protection

13    essentially where I have given just a muscle relaxant.

14    I don't know that it was vecuronium, but I didn't give

15    anything else, and that was because the person's blood

16    pressure and so forth was, you know, quite low and I

17    was worried about lowering their blood pressure and

18    they need to have a breathing tube and I basically have

19    said to them, sorry, but we have to do this, but I

20    can't give you any anesthesia and it's stimulating,

21    but, you know, these drugs might lower your blood

22    pressure too much.  And so I have given vecuronium by

23    itself to some patients, only a handful at the most in

24    my career.  So I have done that, now that I think about

25    it.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1              Q.        And you've done it, you said, in
 2      emergency situations?
 3              A.        That is correct, yes.
 4              Q.        In situations where you're trying to
 5      save a patient's life, I assume?
 6              A.        Yes, that's correct.
 7              Q.        And in those emergency situations,
 8      there are times where painful procedures just have to
 9      happen to save a person's life, right?
10              A.        Yes, that is correct.
11              Q.        And you said at these times, you let
12      the patient know, you know, I'm sorry, but you're going
13      to feel this noxious stimuli because this is an
14      emergency?
15              A.        Correct.  Generally speaking, that's
16      what I would say, yes.
17              Q.        And how painful is that noxious
18      stimuli?
19              A.        The endotracheal intubation
20      procedure?
21              Q.        The vecuronium bromide without an
22      anesthetic?
23              A.        Well, the -- in awake patients, let's
24      say we just took a young, healthy person and tried to
25      do the endotracheal intubation without muscle relaxant,
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1     just with nothing, I mean, you can't do it for the most

2     part.  Unless somebody is almost hypnotized, I suppose,

3     but for the most part, people would not tolerate that.

4     They would gag and they would basically -- you couldn't

5     physically do it because they would close their mouth

6     and it's so stimulating and uncomfortable to do that.

7     So it is among the most stimulating procedures that we

8     can do.  And if you look at the, you know, in terms of

9     the anesthetic requirements --

10          Q.          I don't mean to cut you off because

11     I'm just not talking about endotracheal intubation

12     here.  I'm talking about -- I was asking about the

13     vecuronium bromide or rocuronium.  How painful would

14     just receiving that be?

15          A.          Oh, I see.  I'm sorry.  I thought you

16     meant in relation to the endotracheal intubation.  So,

17     certainly, we do have fairly good data on people who

18     have been paralyzed with something like vecuronium and

19     there are various studies, you know, different

20     methodologies and, for the most part, it's very -- it's

21     uncomfortable or even horrifying, it's been described.

22                     Now, having said that, interestingly

23     enough, and I think I mentioned this in my report, is

24     that, you know, some of these studies, I think this is

25     a volunteer study.  They have volunteers say that they

1    would do it again.  I thought, okay, well -- they
2    describe it some of them as being horrifying, but yet,
3    some of them would repeat the study.  So it is not
4    something that you would want to subject a patient to
5    or anybody to if you could avoid it, if you could give
6    other drugs to try to prevent that, you know, the
7    consciousness part of it.
8            Q.       Will a bolus dose of 100 milligrams
9    of vecuronium bromide be different -- well, have a
10   different effect than a clinical dose?
11           A.       It would have a faster onset than a
12   clinical dose, but the end effect basically would be
13   the same, you would just get there more quickly.  And
14   of course, if you kept the patient alive or the person
15   alive, it would last longer as well.
16           Q.       The vecuronium bromide would last
17   longer, you say?
18           A.       100 milligrams compared to, you know,
19   10 milligrams.
20           Q.       The person would essentially be
21   paralyzed longer?
22           A.       Correct.
23           Q.       Let's say you gave a person 100
24   milligrams of vecuronium bromide, how long do you think
25   they would be paralyzed for?

1          A.          Oh, boy.  Again, it could be easily a
2    couple of hours, maybe even longer, I guess, assuming
3    for the moment that you're keeping the person alive.
4          Q.          Let's say you're not keeping the
5    person alive.
6          A.          Yeah, okay.
7          Q.          You're giving them 100 -- a bolus of
8    100 milligrams of vecuronium bromide, how long would
9    they be paralyzed for and then how long would it take
10   them to die?
11         A.          Well, 100 milligrams of vecuronium
12   would have -- achieve what I would describe as complete
13   paralysis probably within -- again, you know, I have to
14   look at the data, but my guess would be within 45 to 60
15   seconds.  I mean, that is a huge dose that would have a
16   fast effect because of the, you know, size of the dose,
17   so I'm guessing within a minute or -- it's my guess
18   that you would have complete paralysis.  You would
19   probably, almost certainly would have -- you know, the
20   individual would feel the effects before that, but
21   probably within a minute, is my guess.
22                     So let's now talk about, you know,
23   what happens between that point and the time of death
24   or when death occurs and the person being unable to
25   breathe will start to decrease their oxygen levels and

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 93 of 418  PageID #: 7770

```
 1        will become hypoxic, which means basically their oxygen
 2        levels are getting lower and lower, because they're not
 3        breathing.  And then that hypoxia would eventually
 4        cause them to become unconscious because we all need
 5        oxygen to be able to -- for our brains to work.
 6                           And then effects on the heart or the
 7        heart starts to slow, maybe it goes up initially
 8        because of the stress, but it goes down, eventually the
 9        heart starts to beat irregularly and beat more slowly.
10        And then the heart stops.  And let's assume for the
11        moment, notwithstanding our discussion earlier about
12        that paper I had talked about, but let's say the heart
13        stops and it -- you no longer have any further beats.
14        So we'll say that's the time of death, when you have
15        the last heartbeat.  That could take, again, from
16        individual to individual, it might take on average ten,
17        15 minutes.  But in some individuals, depending on
18        their co-morbidities and so forth, that amount of
19        hypoxia could result in an arrhythmia that basically
20        kills them much sooner than that.  So in a normal
21        individual, it might be ten or 15 minutes, but in some
22        individuals, it might be a lot less if they have
23        co-morbidities that would make them more susceptible to
24        hypoxia.
25                  Q.       So let's go through that in a normal
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 94 of 418 PageID #: 7771

```
 1    individual.  So you said that they would feel the
 2    initial effects at first and it would take somewhere
 3    like 45 to 60 seconds to get the full effect.  But what
 4    do you mean by the initial effects at first?  Let's
 5    start there.
 6              A.        Yeah.  Well, basically, you feel that
 7    you can't -- you know, you're not able to move your
 8    muscles, that you feel like you're very weak.  And so
 9    when you see what we describe as being a partial
10    paralysis from these drugs, we often use the term they
11    look like a fish out of water where you just -- and I'm
12    sorry, I know you admonished me earlier about don't use
13    any verbal types of -- I'm sorry, any visual signs on
14    this, but I'll do it visually and then maybe the court
15    reporter with my help will be able to put this into
16    words.  But basically, you know, a fish out of water.
17              So let me just stand back here where,
18    you know, you're trying to lift your hand up and, you
19    know, you can't keep your hand elevated, right?  So
20    you're trying to lift your arm up, whatever, and it
21    just falls back down onto the table.  And that's what
22    we call a fish out of water, and that's a partial
23    paralysis.  And that will start to occur probably
24    within -- with that dose, again, patient-dependent, but
25    it could occur maybe within 30 seconds or so, is my
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 95 of 418 PageID #: 7772

```
  1        guess.  I have to be honest in terms of my review of
  2        the pharmacokinetics and dynamics of these drugs, but I
  3        think with that dose, you certainly would probably see
  4        if not complete paralysis, near complete within a
  5        minute, is my guess, but it might be longer, but
  6        probably not.
  7                Q.      So at about a minute, we're at full
  8        paralysis.  Then you describe at some point that the
  9        patient will begin to suffocate; is that right?
 10                A.      I did not use the word suffocate.
 11                Q.      I apologize.  What word did you use?
 12                A.      Well, I just said that they're not
 13        able to breathe so their oxygen level is going to start
 14        to decrease.
 15                Q.      Okay.  And if they are awake, if
 16        you're just giving them the vecuronium bromide, they
 17        will have that feeling of trying to breathe, but not
 18        being able to, right?
 19                A.      If they're awake, yes, that's
 20        correct.
 21                Q.      And they would have the feeling of
 22        the air hunger, right?
 23                A.      Air hunger is one term that is used,
 24        yes.  I think that would be an appropriate way of
 25        putting it.
```

```
 1          Q.          At what point do you think that would
 2     be where they start to begin experiencing air hunger,
 3     meaning at what minute?
 4          A.          I'm sorry, I thought I saw Dean raise
 5     his hand for something.
 6          Q.          Answer my question before we get to
 7     that.
 8          A.          Okay.  Sure.  And your question was
 9     when would they start experiencing air hunger?
10          Q.          Yes.  I mean, when in your expert
11     opinion?
12          A.          Probably at that dose pretty close to
13     the dose of the -- at the time when they're fully
14     paralyzed, because the muscles in the body differ in
15     terms of their sort of sensitivity to these drugs and
16     the diaphram itself is actually a little bit more, as I
17     recall, a little bit more resistant than other muscles.
18     But that difference is going to be pretty small at this
19     dose.  So if I say that it's a minute when you're fully
20     paralyzed, maybe it's a minute and ten seconds when
21     their diaphragm is fully paralyzed.  You know, the
22     difference there, although there might be one, it's
23     very slight.  I would imagine it's going to be very
24     slight.
25                     MR. KURSMAN:  Can we go off the
```

```
 1              record?
 2                        VIDEO OPERATOR:  Off the record.  The
 3              time is 11:30.
 4                        (Lunch recess.)
 5                        VIDEO OPERATOR:  Going back on the
 6              record.  The time is 12:04.
 7              Q.        Dr. Antognini, we just went on a 30
 8      minute break.  During that break, did you talk to
 9      anybody?
10              A.        I talked to my wife.  You know, I
11      talked -- not about the deposition, but I locked her
12      out accidentally and she gave me an earful.
13              Q.        Okay.  Okay.  Hopefully she's back in
14      there.  Before we were leaving or before we took the
15      break, we were talking about vecuronium bromide and you
16      were describing the effects of vecuronium bromide upon
17      an awake person.  If that awake person received a 100
18      milligram bolus dose of vecuronium bromide and
19      eventually died like you said, what would the cause of
20      death be?
21              A.        Okay.  I will answer the question.  I
22      want to clarify an answer you -- to one of my earlier
23      questions.
24              Q.        Go ahead.
25              A.        That is the medications that I took
```

```
1      this morning.  During the break when I went into the
2      bathroom, I looked at my pills and realized, oh, I
3      didn't take my medicines today.  So during the break, I
4      did take my medications, so I want you to be aware of
5      that.  I thought I had, but I did not.
6                  Q.        Okay.
7                  A.        But I have taken them now, so --
8      okay.  So what would be the mechanism of death from the
9      vecuronium.  As I discussed, you know, the low oxygen
10     level is going to be occurring throughout the body
11     affecting the various organs, including the heart and
12     brain, and as I just summarized, I mentioned the brain
13     will become depressed essentially to the point that the
14     person would be unconscious.  The heart, however, is a
15     bit more resistant basically in general and the heart
16     would continue to beat for a while longer until
17     eventually the heart stops beating, and that would be
18     the mechanism of death, that the heart stops.
19     Obviously, you cannot declare death in those types of
20     circumstances until the heart stops.  That's the
21     usual -- one of the criteria that are used.  But you
22     know, essentially the heart has to stop beating in
23     order for you to say, okay, the person has died.
24                 Q.        And once the vecuronium bromide is
25     given to an inmate be it a 100 milligram bolus dose,
```

1    would a consciousness check be possible after they

2    received the potassium chloride?

3            A.        After the potassium chloride or after

4    the vecuronium?

5            Q.        After the vecuronium bromide.

6            A.        Yes.  After the vecuronium bromide is

7    administered, a consciousness check would not be able

8    to elicit any type of response because of the muscles

9    being paralyzed.

10           Q.        Okay.  So let's move to potassium

11   chloride, which is the third drug in the lethal

12   injection protocol.  Have you ever given potassium

13   chloride to a patient?

14           A.        Yes, I have.

15           Q.        Can you tell me why?

16           A.        Actually, two ways essentially.

17   Again, this is a bit of an oversimplification.

18   Actually, I guess, it's more than two ways.  But in

19   normal clinical practice, you would give potassium

20   chloride in essentially two different ways.  One of

21   them I could discount more or less, which is that one

22   of the IV fluids that we give to patients is what's

23   called lactated rings solution.  And that actually has

24   a small amount of potassium in it, but it's not enough

25   to cause -- you know, patients as far as I know of

```
1    never described to me that that particular solution is
2    painful.  The electrolytes that are in it are -- at
3    least the ones that might cause pain are low enough,
4    such as potassium chloride, that you wouldn't normally
5    perceive pain.  But we use that solution quite a bit,
6    so -- but, again, it's a pretty low concentration.
7                     The other circumstance in which we
8    would give potassium would be as an actual infusion of
9    the potassium chloride through the IV for conditions
10   primarily what's called hypokalemia,
11   h-y-p-o-k-a-l-e-m-i-a, hypokalemia, which just
12   basically means a low potassium concentration in the
13   blood.  And because that can have an effect on
14   primarily the heart, what we would be focused on, it
15   can have effects elsewhere, but we want to increase the
16   potassium in the blood, so we would give potassium
17   chloride for that purpose.
18        Q.        What's the maximum amount of
19   potassium chloride that you have ever given to a
20   patient?
21        A.        Probably maybe 40 milliequivalents,
22   is my guess.
23        Q.        And what dose do you think would be
24   required for an individual to die from the potassium
25   chloride?
```

```
 1            A.          It's a very good question in a sense
 2       it's a -- obviously, understanding the context of
 3       you're serious, you know, what dose would kill
 4       somebody, but just from a physiological and
 5       pharmacological perspective, it's a very interesting
 6       question to work out.  And I don't know that we know an
 7       exact answer to that.  I can go into the details of why
 8       it's kind of interesting, but, you know, we don't know
 9       for sure the exact dose, I think, that would kill
10       anybody for --
11                     So let's sort of walk through what
12       happens when you increase the potassium concentration
13       in the blood.  As you get into higher and higher levels
14       of potassium chloride in the -- or potassium in the
15       blood, you know, instead of being let's say around 4,
16       you go over the 5 and 6 and 7, you start to -- you can
17       begin to see effects on the heart rhythm and actually
18       going into what's called ventricular tachycardia or
19       even ventricular fibrillation, and both of those,
20       especially the ventricular fibrillation are lethal
21       heart rhythms.  And that amount of -- or that level of
22       potassium in the blood that would cause that is going
23       to vary from individual to individual.
24                     So let's assume for the moment that
25       it's 10 milliequivalents per liter -- or 10
```

1    milliequivalents basically a concentration in the

2    blood, and that's the level.  How much do you need to

3    give intravenously in order to achieve that level?  It

4    depends on how fast you give it and it depends on

5    the amount.  So if you gave a small dose or bolus of

6    the potassium, but you gave it rapidly and that sort of

7    bolus of the drug went through the bloodstream into the

8    heart and into the lungs and back into the heart, you

9    may momentarily achieve a concentration that is

10   sufficient to stop the heart.  If you gave that same

11   dose more slowly, you might not achieve a high enough

12   concentration to be able to stop the heart.  So there

13   are a lot of factors that are involved about what dose

14   might be fatal.  I mean -- so it's -- for obvious

15   reasons, no one has ever -- certainly, no one has ever

16   studied this in humans.

17          Q.        That makes sense.  A bolus dose,

18   though, of 240 milliequivalents, that will cause death,

19   right?

20          A.        Yes, that's my opinion.  As it turns

21   out, I do have some I would call qualitative experience

22   with this in animals.  So I did a lot of animal work

23   and I used goats as my model.  And goats, as it turns

24   out, are on average about the same size as a human more

25   or less, 50, 60, 70 kilograms.  And at the end of these

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 103 of 418 PageID #: 7780

1    experiments, I would have to -- we would basically
2    euthanize the animal, they're anesthetized, so these
3    are not awake animals, they're anesthetized.  And
4    generally speaking, what we would do as part of that
5    protocol, we would inject concentrated potassium
6    chloride.
7                    And at the time we were doing this, I
8    never really thought too much about, well, how much
9    potassium chloride am I injecting.  But subsequent to
10   my starting to do this work with these protocols, I
11   sort of thought, well, let me go back and think about,
12   you know, how much drug was I injecting, how much
13   potassium chloride was I injecting.  And I think, based
14   on my recollection and my calculations, it turned out
15   to be around 240 milliequivalents.  I mean, it wasn't
16   exactly that, but just the amount -- when you look, I
17   think, the concentration of the potassium in a
18   saturated solution of potassium chloride which is what
19   we use in the volume, I think it turned out to be that.
20   And when you inject that intravenously, the heart
21   stopped probably within five to ten seconds, it seemed
22   like.  It was very, very fast.
23             Q.       In a goat, you're saying?
24             A.       In a goat, yeah.
25             Q.       How long after an inmate receives 240

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 104 of 418 PageID #: 7781

```
1    milliequivalents of potassium chloride do you believe
2    that they will die?
3           A.        My guess, based on the -- my
4    understanding of how fast the injection would go, my
5    guess, it would probably stop the heart within 30 to 60
6    seconds, is my guess.  But I don't know.  I mean, I
7    guess -- you know, some of these hearts -- again, I'm
8    basing some of my experience on some of my animal
9    studies because I don't -- you know, for obvious
10   reasons, we don't really have that in humans.  That is
11   a very difficult question to answer because, again, it
12   depends on the rapidity or how fast it's being given
13   and so forth, so --
14          Q.        If it's given like it's given in a
15   protocol, just a fast injection, bolus dose of 240
16   milliequivalents?
17          A.        I would say probably within 30 to 60
18   seconds, is my guess.  Again, we have to be a little
19   bit -- at least I think I have to be careful about, you
20   know, when does death occur.  So this is an issue that
21   I think is -- you know, at least in my mind, is
22   something that's come up is that if you go into an
23   execution chamber, if you're looking at a protocol or
24   an execution in one state, what criteria do they use to
25   declare death compared to another state?  And you might
```

```
 1    think, oh, it should be the same.  Well, I don't know.
 2    I mean, it's -- the death is declared by the --
 3    presumably by a physician there and I don't know what
 4    criteria one physician would use in one state compared
 5    to a criteria used in another state, so maybe --
 6             Q.        I'm not trying to trick you up here
 7    at all.  If you want to define your definition of death
 8    first and then you can talk about the 30, 60 seconds
 9    what you mean by death.
10             A.        Yeah, sure.  So, again, yeah, I feel
11    like I need to elaborate a little more about it
12    because, again, it gets down to the timing of things.
13    Suppose you give the potassium chloride and the heart
14    stops.  And just basically, there's a beat and there's
15    no more beat, there's not a beat to follow.  And you
16    wait a minute and the physician comes in, examines the
17    inmate, and says, you know, the inmate is dead.  So
18    let's say that the heart -- the last heartbeat is at
19    10:15.  Let's pick a number, 10:15.  And then at 10:16,
20    there's no heartbeat, the physician comes in and
21    declares the inmate dead at 10:16.  That's the time of
22    death, 10:16.
23                      But maybe in another state a
24    physician is a little bit more conservative and says
25    I'm going to wait two minutes.  So at 10:15 we see the
```

```
 1    last heartbeat, they come in at 10:17, examine the
 2    inmate, and said, you know, now the time of death is
 3    10:17, even though in both instances the last heartbeat
 4    was at 10:15.  So that's why these timing issues about
 5    when is the time of death, I'm kind of giving you the
 6    context here about why it depends a bit on criteria.
 7              Q.        Sure.  So let's forget about when the
 8    doctor comes in and just talk about that last heartbeat
 9    that you're talking about, like not when they're
10    declared dead by the physician, but when their heart
11    stops and they are dead, right?  Let's talk about that.
12    So if an inmate received a 500 milligram bolus dose of
13    midazolam and then was followed by 240 milliequivalents
14    of potassium chloride, how long after the 240
15    milliequivalents of potassium chloride do you believe
16    the inmate would be dead?
17              A.        So there's no vecuronium being given?
18              Q.        There's no vecuronium.
19              A.        Okay.  So midazolam and then the --
20    so the inmate, I believe, would be dead in general, in
21    general --
22              Q.        Yes.
23              A.        The inmate, the last heartbeat would
24    probably be about 30 to 60 seconds after the injection
25    of the potassium chloride.  And I'm kind of hedging,
```

```
 1     waffling, hedging my bets here because I'm a little bit
 2     not sure about -- now, when we talk about these issues,
 3     we sometimes talk about, you know, the injection of
 4     this drug.  Well, are we talking about the beginning of
 5     the injection, are we talking about when it's all fully
 6     injected?
 7          Q.          Sorry, and I apologize.  Let's say
 8     Tennessee, and this will be very simple math, okay?
 9     Let's say Tennessee took one minute to inject the 500
10     milligrams of midazolam.  So you're at one minute.
11     Then the warden waited two minutes to do the
12     consciousness check.  One minute to inject the
13     potassium chloride immediately after the consciousness
14     check, so that's four minutes.  How long after that do
15     you think the inmate would be dead?
16          A.          Probably by minute five, you know, I
17     would say by minute five.  You know, it might be four
18     minutes and 30 seconds or five minutes, but somewhere
19     around minute five is -- you know, is my guess.
20          Q.          Now, let's say that that same
21     scenario where Tennessee took one minute to inject the
22     bolus dose of midazolam.  Then it injected -- then
23     there was a two minute consciousness check, again, so
24     we're at three minutes again.  And it took one minute
25     to inject the vecuronium bromide.  And after the
```

```
 1    vecuronium bromide, it took another minute to inject
 2    the potassium chloride.  What is your opinion on when
 3    the inmate would die, at what point?
 4            A.         In general, the -- I'm sorry, I sort
 5    of lost track of the minutes, but -- whether you use
 6    vecuronium in general, and I'm going to qualify my
 7    answer.  I know where you're going with this.  But in
 8    general, as I said, 30 to 60 seconds depending on the
 9    rapidity of the injection, the heart would stop, I
10    would think, after injection of the potassium chloride.
11                      Now, never say never, never say
12    always.  There are circumstances under which there can
13    be problems.  So let's take the scenario perhaps that
14    could happen and so you give somebody 500 milligrams of
15    midazolam and they start to have an obstructed airway.
16    They start to have hypoxia.  Maybe there is somebody
17    who is very obese and they can develop hypoxia very,
18    very quickly.  And maybe they have heart disease, which
19    a lot of people have heart disease.  And that level of
20    hypoxia and that level of heart disease and so forth is
21    a very tenuous situation for that individual.  And you
22    know, maybe they're just barely getting by in terms of
23    their breathing and then you give the vecuronium and
24    they stop breathing and they have a fatal arrhythmia.
25    And not only that, the hypoxia, what it does to the
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

1    heart, is that it can affect not the rhythm, but can

2    affect the function of the heart, so the function --

3    the heart is not beating nearly as strongly as it was.

4                      So at that point, you've given the

5    vecuronium.  The heart is really beating weakly and you

6    give the potassium chloride, well, there's not enough

7    heart function around it to efficiently pump that

8    potassium chloride.  That potassium chloride goes

9    through the vein into the right ventricle -- or the

10   right atrium of the heart, the right ventricle into the

11   pulmonary artery to the lungs.  It has to come down,

12   back into the heart and out the aorta to eventually get

13   into the heart muscle itself to cause the -- you know,

14   to have its effect.  So in that scenario, it would be

15   possible for someone to die from the vecuronium before

16   the potassium chloride even hits the heart.

17        Q.        I got that.  But in your scenario,

18   the potassium is being injected.  So how long after the

19   potassium is injected would that patient die, in that

20   scenario?

21        A.        I don't know I can give you a number.

22   I can just give you a situation where there would be a

23   delay in the administration -- there would be a delay

24   in the action of the potassium chloride because of the

25   failure of the -- you know, the heart is failing,

1    you're not getting enough blood flow to really --

    2         Q.        Even in that scenario, that uncommon

    3    scenario that you just mentioned, even in that scenario

    4    where the potassium bromide is injected immediately

    5    after the vecuronium bromide, how long after the

    6    potassium chloride is injected, whether the potassium

    7    chloride kills the inmate or the vecuronium bromide

    8    kills the inmate, how long after will it take them to

    9    die after the potassium chloride is injected even in

   10    that scenario?

   11         A.        Well, in that scenario, suppose that

   12    the heart is pumping so poorly that, you know, it might

   13    take two minutes, let's say, theoretically I get -- I'm

   14    just theorizing here, it might take, you know, two

   15    minutes for the potassium chloride to eventually get

   16    into the heart, the heart is pumping so slowly and so

   17    miserably.  You know, I can see a scenario where that

   18    might occur, so -- and maybe the heart stops from the

   19    vecuronium -- I mean from the hypoxia before the

   20    potassium chloride actually hits the heart.

   21         Q.        And when you say two minutes, you're

   22    talking about two minutes after the potassium chloride,

   23    right?

   24         A.        That is correct, yeah.

   25         Q.        Okay.  So I just want to go back to

1    where we were before.  So you testified that in
2    Tennessee, if they gave the 500 milligrams of midazolam
3    followed by a consciousness check followed by potassium
4    chloride, it's your opinion, just tell me if I'm right
5    here, it's your opinion that the inmate would likely
6    die, meaning their heart would stop beating, somewhere
7    between 30 and 60 seconds after they received the
8    potassium chloride, right?
9          A.        That would be my guess, yes.  Again,
10   based on my experience, my animal experience, which,
11   you know, I'm sort of extrapolating here a little bit,
12   but that would be -- that would be my guess, but --
13         Q.        And if instead Tennessee gave 500
14   milligrams of midazolam followed by a two minute
15   consciousness check followed by a bolus dose of
16   vecuronium bromide followed by potassium chloride, it's
17   your opinion that the inmate would die still 30 to 60
18   seconds after a bolus dose of potassium chloride,
19   right, in the general -- in a general case?
20         A.        Yeah, I would say that generally
21   speaking.  You know, and that's a big waffle word,
22   isn't it?  To speak generally.  So let me just clarify.
23   I know this line of questioning has to do with, you
24   know, does vecuronium hasten death.  I get that, I know
25   that's where you're getting at.  I know this is an

```
1    issue that came up.  And I absolutely concede, if you
2    want to use that, I'm sure you're just rubbing your
3    hands when someone like me says -- uses the word
4    concede.  I concede that in most cases vecuronium in
5    this situation would not hasten death.  I absolutely
6    agree with that.  In most situations, vecuronium as
7    administered in this Tennessee protocol and in other
8    protocols similar to it will not hasten death.  What I
9    am saying is that there are circumstances in which
10   potassium -- where vecuronium would hasten death.
11            Q.          Right.  I actually think you
12   described, and tell me if I'm wrong, you described a
13   circumstance where vecuronium would actually make death
14   take longer, right?  You said because the heart would
15   stop beating, the potassium chloride would be
16   administered, and then it would take two minutes after
17   the potassium chloride to effectuate death; is that
18   right?
19            A.          That is one scenario.  But the other
20   scenario I said was that the potassium chloride would
21   not get to the heart before the heart stopped because
22   of severe hypoxia.  So what if the heart stopped
23   because of the severe hypoxia before the potassium
24   chloride gets to the heart?  Well, we have -- you know,
25   the heart is stopped, the inmate is dead, you can
```

```
 1    declare death.  But the potassium chloride didn't get

 2    into the heart.  Under that circumstance, vecuronium

 3    hastened death.  The death was the primary -- one of

 4    the primary causes of the death.  Now, does that

 5    scenario happen in all executions?  No.  And it doesn't

 6    happen in most of them I imagine.  But the question

 7    really to me was, is, you know, can it hasten death?

 8    And I think that in some situations it can.

 9          Q.       You're talking about very rare

10    situations here, right?

11          A.       I would not say very rare.

12          Q.       No, I'm talking about -- here's my

13    question.

14                   MR. ATYIA:  Objection to form.

15          Sorry, objection.

16          Q.       Here's my question:  Would it be very

17    rare that potassium chloride would kill a patient

18    within 30 to 60 seconds after being administered?

19          A.       Would it be very rare for potassium

20    chloride to get -- no, it would be very common for it

21    to kill somebody within 30 to 60 seconds.

22          Q.       I apologize.  Would it be --

23                   MR. ATYIA:  Sorry.  Sorry.  I know

24          you're having a discussion, but there is a lot

25          of talking over.  Can we just take a little
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1              more time to make sure that Alex's question is
 2              finished, Dr. Antognini, and similarly that
 3              Dr. Antognini has finished --
 4                   THE WITNESS:  Yes.
 5                   MR. ATYIA:  No, no.  I appreciate it.
 6         Q.         Would it be very rare that the bolus
 7    dose of vecuronium bromide would cause death within 30
 8    to 60 seconds after being administered?
 9         A.         I do not like the use of the term
10    very rare.  I prefer to have numbers.  But I concede it
11    would be a small minority of situations, I think.  It
12    would be -- you know, would it be five percent of the
13    time?  Maybe.  I don't know an exact number.  I'm
14    providing to you a -- you know, basically a situation
15    about that.
16                   Let me, to try to help you understand
17    how some of this material informs my discussion around
18    this.  So I'm going to tell you about a clinical case
19    that we had at the U.C. Davis Medical Center.  And
20    these things happen unfortunately quite -- or more
21    commonly than you would think.  And what happens in
22    these cases is basically -- I think it informs our
23    understanding of this area.
24                   So this is a patient that was going
25    to have a kidney transplant and during the preparation,
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1      the patient is anesthetized and during the -- when
 2      they're placing a catheter into the neck vein, there
 3      are problems.  The patient had a cardiac arrest.  They
 4      did resuscitation, couldn't get his heart back starting
 5      and declared him dead.  And then sometime later -- I'm
 6      talking, again, I don't know the exact timing, but, you
 7      know, five minutes, ten minutes later, somebody comes
 8      into the operating room to, you know, do whatever they
 9      needed to do and they notice the patient either had a
10      heartbeat or was breathing, I don't remember.  Well,
11      they came back and resuscitated this guy.  The guy left
12      the hospital intact with no neurologic problems.
13                      So, you know, this thing about how
14      slowly it can take for drugs to take effect and all
15      that and at the extremes, you know, at the point of
16      death, you know, sometimes these things can take a long
17      time, sometimes they don't.  I mean, it just -- you
18      know, what happens with these drugs when you have a
19      really poorly functioning heart and cardiovascular
20      system, you know, strange things can happen.  Are these
21      things rare?  Yeah, they're rare, stuff like that I
22      just described.  But there are certainly other patients
23      that have been declared and then have been
24      resuscitated.  So, likewise, when you give these drugs,
25      they can take a long time to circulate.  That's a
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

1    scenario I'm trying to present here.

2         Q.        What do you think the point is of

3    vecuronium bromide in this protocol?

4         A.        I would defer that to the State of

5    Tennessee in this specific case.  All I can say is, you

6    know, what the effects of the drug are.  I don't know

7    what -- why they include it.  I don't know why they

8    don't include it.

9         Q.        Well, in your expert --

10        A.        All I can tell you is that, you know,

11   if you give vecuronium, this is the effect that you

12   would expect to see.

13        Q.        In your expert opinion, what is the

14   purpose of the vecuronium bromide in this protocol?

15        A.        Well, again, I think you're just

16   asking the same question in a slightly different way,

17   which is what is the purpose.  I don't know what the

18   purpose of the drug is as far as Tennessee is

19   concerned.  As I said, I know what the effect will be.

20   And you know, would vecuronium by itself kill somebody,

21   especially at this dose?  And the answer is, yes, it

22   would.

23             So maybe their intent is to -- you

24   know, the analogy that I use and I'm not sure it's the

25   best analogy, but when you have a firing squad,

```
 1      sometimes you're going to have, I guess, depending on

 2      the protocol, you might have six shooters, you might

 3      have eight.  When you ask yourself, well, why would one

 4      have six, why one have eight?  Well, it's because, you

 5      know, if you only had three, maybe three is not enough.

 6      Maybe six is better, maybe -- you know, whatever number

 7      you choose --

 8              Q.      Doctor, I mean, you and I both

 9      know --

10                      MR. ATYIA:  Hold on, Alex.

11                      THE WITNESS:  I'm not finished.

12                      MR. ATYIA:  Please respect the

13              witness in answering your question and allow

14              him to finish.  You can ask all your questions,

15              but he has to be allowed to finish.

16              A.      So if you think of the analogy of

17      these drugs being like bullets, they're just using more

18      bullets, I guess.

19              Q.      Dr. Antognini, we talked awhile ago

20      and you said the bolus dose of potassium chloride on

21      its own was sure to cause death.  So thinking back on

22      that analogy that you just gave to me, after thinking

23      about your prior testimony, do you believe that analogy

24      is a bit inappropriate?

25                      MR. ATYIA:  Objection to form.
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

```
 1            A.         I'm not sure -- you sort of broke up
 2    there.  Could you repeat that again?  I think I lost
 3    part of it.
 4            Q.         Sure.  So you testified earlier under
 5    oath that the bolus dose of potassium chloride as used
 6    in this protocol was sure to cause death, right?  You
 7    were sure that that bolus dose of potassium chloride
 8    would cause death; am I right?
 9            A.         That is correct, in the vast majority
10    of circumstances, yes.
11            Q.         Is there any circumstance as used in
12    this protocol where a bolus dose of 240
13    milliequivalents of potassium chloride would not cause
14    death, in your expert opinion?
15            A.         Well, as I described to you just a
16    moment ago, there's a scenario where the inmate might
17    die before the potassium chloride has its effect, so --
18            Q.         If they don't die before the
19    potassium chloride has its effect, the potassium
20    chloride will kill them, right?
21            A.         That is correct.  I think it would be
22    highly -- it would.  So even in the scenario where I
23    talked about where there's very slow circulation, if
24    the heart is very, very -- you know, it stops, the
25    potassium chloride has gone into the vein, and then,
```

1     you know, you wait a minute, the heart doesn't -- you

2     know, at a minute, the heart starts beating again,

3     well, then it's going to beat and then that potassium

4     chloride is going to get into the heart.  So, you know,

5     at some point if the heart continues to beat, it's --

6     the potassium chloride is going to kill the inmate.

7                Q.          If you were advising a state on how

8     to -- how to -- how to make a protocol, and a state

9     said to you, we want -- we have two options and we want

10    death to occur as quickly as possible.  The one option

11    is midazolam followed by potassium chloride.  The other

12    option is midazolam followed by vecuronium bromide

13    followed by potassium chloride.  Which option would you

14    tell them to select?

15                     MR. ATYIA:  Object to form.

16                A.          I do not advise states in that

17    regard.  I do not help states develop protocols.

18                Q.          Yeah, this is a hypothetical

19    question.

20                A.          Well, even hypothetically, I'm not

21    going to provide advice to that.  I would just say if

22    you had a protocol where you gave midazolam and then

23    potassium chloride and you had another protocol where

24    you gave midazolam followed by vecuronium followed by

25    potassium chloride, in general, as I -- we use that

```
 1    term, you're going to have a faster death with the
 2    midazolam and potassium chloride protocol because
 3    you've basically removed a step.  So, by definition,
 4    you're going to have a faster death with that protocol.
 5             Q.        Okay.  Let's switch gears a bit and
 6    talk about midazolam.  When was the last time you used
 7    midazolam?
 8             A.        It's probably three years, four years
 9    is my guess.
10             Q.        Have you ever used it as a solo drug,
11    meaning without other drugs?
12             A.        I probably -- I probably have.
13    Earlier in my career, I might have for some procedures
14    like cardioversion, something like that, I might have
15    given it as a solo drug, so --
16             Q.        If you gave it as a solo drug, what
17    level of anesthetic depth were you trying to achieve?
18             A.        As a solo drug, I was achieving
19    basically deep sedation.  I wasn't trying for general
20    anesthesia.  There are other instances where I gave it
21    for induction, but I think in those cases I also used
22    an opiate for induction.  I'm not sure I ever used it
23    by itself.
24             Q.        So I just want to make sure I
25    understand your testimony.  You're saying that you gave
```

1    midazolam as a solo drug in clinical practice for deep
2    sedation, not minimal sedation, not moderate sedation,
3    but deep sedation?
4              A.        I think so.  I mean, again, I think
5    of the scenario of a cardioversion when -- so just to
6    make sure that people understand what that is.  That's
7    when you have to shock the heart basically to get
8    somebody to come out of a particular rhythm.  It's very
9    painful if done awake and it's one of those
10   scenarios -- or one of those clinical situations where
11   you give the drug, but you want the person to wake up
12   quickly.  And given the different types of drugs that
13   we had at the time, it's possible that I would have
14   given midazolam.  I cannot recall as I sit here today
15   that, oh, yeah, I remember I did it on this particular
16   patient, but I can imagine myself doing that back when
17   midazolam first came out.
18             Q.        If you did do it, would it have been
19   an emergency situation?
20             A.        No.  No, sometimes these
21   cardioversions are elective and sometimes they come --
22   patients come in and they have elective cardioversions
23   so it's not an emergency.
24             Q.        And do you think that was the last
25   time you used it as a solo drug?

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 122 of 418 PageID #: 7799

```
 1            A.         That would be it.  I don't think I
 2    would have used it -- there might have been some
 3    scenarios where I did, but I don't think so.
 4            Q.         And have you ever used it as a solo
 5    drug for a surgical procedure?
 6            A.         I have not used it as a solo drug for
 7    a procedure that involved a skin incision, I don't
 8    think.  I don't think that -- again, the only time I've
 9    ever used it as a solo drug is basically in the
10    scenario that I think I've used it for cardioversions,
11    but I've never used it for a procedure by itself
12    because that's not really what midazolam is generally
13    used for.
14            Q.         And you -- as you were speaking, you
15    received a text message.  Was that a personal message?
16            A.         I don't know.  It's from my Terminix
17    person that's saying, you know, thank you for being a
18    customer for Terminix, one of the pest control people,
19    so --
20            Q.         And what drugs do you use with
21    midazolam in surgeries?
22            A.         So are you talking about -- okay,
23    so --
24            Q.         I think you said, just so I can be a
25    little more clear, I think you said I've never used
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 123 of 418 PageID #: 7800

```
 1    midazolam as a solo drug when making a skin incision.
 2    So what drugs were used -- well, first, did you ever
 3    use midazolam with any other drugs when making a skin
 4    incision?
 5            A.        So, yes.  So midazolam -- sometimes
 6    what we would do is I would give midazolam up front
 7    with the induction.  And then if it was a very short
 8    procedure, the skin incision might have occurred right
 9    after the -- near the induction period or right
10    afterwards, so it would have been part of the mix
11    essentially, so -- and that would have been given --
12    the midazolam would have been given with an opiate like
13    fentanyl and possibly and then maybe something like
14    propofol or thiopental back in the early days.  So it
15    would have been in conjunction with other drugs.
16            Q.        And why in a surgical procedure would
17    you use those other drugs with midazolam?
18            A.        Because the kinetics of midazolam are
19    such that you wouldn't -- at those low, relatively low
20    doses, and higher doses, I should say, higher doses --
21    that's my Terminix thing again because I didn't answer
22    a few minutes ago.  But anyway, in order to achieve
23    sort of the same levels of deep sedation, or
24    unconsciousness, or whatever your goal is, you would
25    have to give a lot of midazolam.  And so in medicine,
```

1    we often give polypharmacy where we give a little bit
2    of this and a little bit of that and you continue to
3    reduce the side effects from the drugs, so we just do
4    that in general.
5            Q.      What is the highest dose of midazolam
6    that you've ever given?
7            A.      I would say maybe between 20 and
8    30 milligrams, is my guess.
9            Q.      And at 20 to 30 milligrams, what
10   level of sedation are you trying to achieve on that
11   patient?
12           A.      General anesthesia basically.  You
13   know, I would say it was during -- for an induction of
14   general anesthesia.
15           Q.      So it's for induction of general
16   anesthesia?
17           A.      Correct.
18           Q.      Was it for maintenance of general
19   anesthesia?
20           A.      No, the drug will -- that dose of
21   drug will last a little bit.  Basically it will last
22   for ten minutes, 15 minutes, or something, you know,
23   depending on the dose and all that.  So if it was a
24   very short procedure, you could rely on midazolam quite
25   a bit, but in general, you wouldn't give it as an

1    infusion for general anesthesia.

2         Q.        Even in a very short procedure where

3    you made a surgical incision?

4         A.        Well, in a very short procedure,

5    excuse me, like if it was an abscess that needed to be

6    incised, it would be possible to give midazolam and

7    nothing else, and I think be able to incise the

8    abscess, but --

9         Q.        But say it was heart surgery, if you

10   could complete heart surgery in 20 to 30 minutes?

11        A.        You could not complete heart surgery

12   in 20 to 30 minutes.  But I would not do it for a

13   procedure that, you know, basically -- midazolam is

14   such that in order to really get to the effect that you

15   want, you need to give a pretty large dose.  So the

16   induction dose, as I mentioned, is .2 to .3, even

17   higher, milligrams per kilogram.  And if you try to

18   keep giving more and more, you're just going to have

19   that drug sticking around a long time and that's not

20   beneficial for the patient.

21        Q.        And what do you mean by sticking

22   around a long time?

23        A.        Well, that just means that it's not

24   being cleared out of the blood.  I mean, it is being

25   cleared out of the blood, but it's just -- it's just,

www.veritext.com        Veritext Legal Solutions        800-556-8974

```
 1    you know, common sense, if you give more of a drug, for

 2    most drugs, the longer it's going to -- the drug is

 3    going to last because you've achieved much higher

 4    levels.

 5            Q.      And how about a deeper level of

 6    sedation, is it your belief that midazolam will do that

 7    as well?

 8            A.      It will give -- that it will last

 9    longer to achieve deeper levels of sedation?

10            Q.      Yes.

11            A.      Yeah, if you have -- so if you give

12    midazolam at a sufficient dose to induce general

13    anesthesia, you know, the drug concentration goes up

14    and then it starts to come down.  And if you think

15    about, you know, what's the minimum level of the drug

16    that you need to have around, if you have a higher peak

17    and it starts to come down, it's just going to -- it's

18    going to take longer to get to that minimum level and

19    so --

20            Q.      I'm just -- so you said at .2, .3

21    milligrams per kilogram, it gets you to a level of

22    anesthetic depth, right?

23            A.      It induces general anesthesia at that

24    point, yes.

25            Q.      Okay.  And then you said if you give
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 127 of 418 PageID #: 7804

1     more, it lengthens that period whatever anesthetic

2     depth you are under, right?

3            A.        That is correct.  That's my opinion.

4            Q.        Okay.  Is it your opinion that it

5     also increases the level of anesthetic depth or only

6     that it lengthens the time that you are under that

7     level of anesthetic depth?

8            A.        Again, we're sort of talking about a

9     dose response effect here, so I -- if you give more of

10    the midazolam, you would achieve a deeper level of

11    anesthesia or sedation.  I realize that it doesn't

12    cause the amount of brain suppression or brain

13    depression, or whatever term you want to use, similar

14    to -- or like compared to other drugs that we use, such

15    as a barbiturate.  So I do not disagree with the idea

16    that you can achieve deeper levels of anesthesia with

17    phenobarbital, for example, or with isoflurane.  You

18    absolutely will achieve deeper levels of anesthesia or

19    brain suppression with those drugs as compared to

20    midazolam.

21                     Now, the caveat there, of course, is

22    that that has not been studied at these super maximal

23    doses in humans, first off.  But I believe that the

24    other data -- or just that you do reach a point at

25    which giving more of the midazolam will have maybe a

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 128 of 418 PageID #: 7805

| 1 | minimal effect on the depth of anesthesia but it |
| 2 | certainly lasts longer.  Now, having said that, I do |
| 3 | believe that the depth that you do achieve is |
| 4 | sufficient to do surgical or noxious procedures. |
| 5 | Q. Go back to surgical procedures. |
| 6 | Let's say you gave a patient 500 milligrams of |
| 7 | midazolam because you said that would last a long time. |
| 8 | Do you believe that would be sufficient to perform |
| 9 | heart surgery? |
| 10 | A. All right.  So I will answer your |
| 11 | question, but I want to do the -- give you some context |
| 12 | there.  You know, would it be sufficient to do heart |
| 13 | surgery?  Quite possibly.  But it would be what I would |
| 14 | say a woefully inadequate approach to doing anesthesia. |
| 15 | For some reason, and maybe I'm at fault here along with |
| 16 | other experts in this long saga of the battle of the |
| 17 | experts related to lethal injection, but there's a |
| 18 | comparison -- you know, you can't do surgery with this, |
| 19 | right?  A heart surgery and so on and so forth, you |
| 20 | know, these surgeries that we're talking about, heart |
| 21 | surgery, brain, whatever it is, you know, these take a |
| 22 | long time to do, hours.  And of course, you can't give |
| 23 | a drug like midazolam for hours, because the patient -- |
| 24 | it would take a long time to wake them.  We have much |
| 25 | better drugs to do that. |

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 129 of 418 PageID #: 7806

```
 1            Q.         But let's --

 2            A.         I'm not done.

 3            Q.         Go ahead.  Go ahead.

 4            A.         Thank you very much.  But also

 5      the amount of -- the time that an inmate might be

 6      theoretically subjected to a noxious stimulus is much,

 7      much shorter than that.  I mean, we have to all, I

 8      hope, maybe not, concede that the time frame is much,

 9      much shorter.  So to do this comparison to heart

10      surgery, because now you want people to think, oh, my

11      God, you know, you can't do heart surgery with this.

12      Well, we're not doing heart surgery.  You know, they're

13      not doing heart surgery in the execution chamber, so I

14      think it's a bit fluff kind of question to make that

15      kind of comparison.

16            Q.         Let me ask you my question because

17      I'm not making a comparison here, you are.  So let me

18      ask you my question again.  It's a very straightforward

19      question.  It's not a comparison at all.  It's a

20      straightforward question, and all it needs is a yes or

21      no answer.  Would you feel comfortable using

22      500 milligrams of midazolam on a patient to perform

23      heart surgery?

24            A.         No.  But if I may clarify my answer,

25      not because I wouldn't achieve the level that would be
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
 1      sufficient, it's because there -- we have better drugs
 2      than that.
 3             Q.      And would you feel comfortable using
 4      500 milligrams of midazolam on a patient as the solo
 5      drug for brain surgery?
 6             A.      Let me go back to your earlier
 7      question and -- because you asked would I feel
 8      comfortable with heart surgery.  I would not feel -- I
 9      would feel very uncomfortable using 500 milligrams of
10      midazolam by itself for heart surgery, for brain
11      surgery, for a long orthopedic case, whatever the case,
12      whatever it may be.  Given, you know, where we are in
13      2022, or even in 1990, if I said, oh, I'm going to use
14      500 milligrams of midazolam for the sole anesthetic for
15      this long procedure, I would lose my license.  All
16      right.  Not because the drug wouldn't have its intended
17      effect.  Because I have much better choices.
18                     Now, in a prior deposition about a
19      year ago, similar line of questioning, and my answer I
20      think sort of gets to this point, if I was on a
21      deserted island with -- you know, with you, or anyone,
22      or my family member and they needed surgery and that's
23      all I had, by God, I would use it.
24             Q.      What if all you had was a bottle of
25      alcohol, would you use that?
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

1           A.         Alcohol, as it turns out, is a

2 general anesthetic, so, yes.

3           Q.         Okay.

4           A.         So yes, because -- you know, but the

5 problem, of course, is that with alcohol, it's going to

6 last a long time, similar to midazolam, it's going to

7 last a long time.

8           Q.         You brought up a prior deposition

9 from a year ago and you seem to have a memory of it.

10 Did you review that deposition in anticipation for this

11 deposition today?

12           A.         No.  But it's one of the questions

13 that sort of stuck out in my mind because it was a

14 similar line of questioning.

15           Q.         Okay.

16           A.         So I guess I know I'm not allowed to

17 ask questions, but if you were my -- on that desert

18 island and I said to you, you know, you need this

19 surgery and this is all -- either it's bite the bullet

20 or you can have midazolam, what choice would you make?

21 I know that's rhetorical, but anyway.

22           Q.         Do you know of a drug called

23 atropine?

24           A.         Yes.

25           Q.         What does atropine do?

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 132 of 418 PageID #: 7809

```
 1            A.            So atropine has several effects
 2    and -- primarily on the heart.  It has other
 3    effects.  It can dry the mouth out and so forth.  But
 4    essentially, it has effects that it would basically
 5    increase the heart rate.
 6            Q.            Do you know --
 7            A.            As a primary effect.
 8            Q.            Do you know if it passes through the
 9    blood brain barrier?
10            A.            It has some passage into the blood
11    brain barrier, yes.  There is -- and we talk about
12    historically what's called mad hatter and all that
13    where you get these effects in the brain from it, so,
14    yes, it can pass into the brain.
15            Q.            When you're saying mad hatter and
16    you're moving your hand by your brain, do you mean to
17    say that it scatters perception?
18            A.            It can have that effect, yes.
19            Q.            And do you know whether atropine used
20    to be used in heart surgery?
21            A.            Atropine has been used as -- in heart
22    surgery.  I mean, we use it for other surgeries where
23    there are problems with the heart rate.  Sometimes it's
24    been used as a premedicant in the past.  So it's not
25    just heart surgery, but it's other surgeries as well.
```

```
 1            Q.       What about -- I'm going to have a
 2   hard time pronouncing this so you're welcome to correct
 3   me, succinylcholine.  And I spell it for you.  It's --
 4            A.       Succinylcholine?
 5            Q.       Exactly.
 6            A.       Succinylcholine, yes.  You might want
 7   to spell that for the court reporter.
 8            Q.       So it's -- and Dr. Antognini, tell me
 9   if I'm spelling it right.  It's
10   s-u-c-c-i-n-y-l-o-c-h-o-l-i-n-e.
11            A.       I think you had one too many O's in
12   it.  It should be n-y-l, succinyl then choline.  I
13   don't think there's an O in there.
14            Q.       Okay.
15            A.       Yeah.
16            Q.       And is that a paralytic?
17            A.       Yes.  It's different sort of action,
18   but, yes, it paralyzes the muscle.
19            Q.       And if you administer that to a
20   patient at a normal dose, will they be paralyzed?
21            A.       Yes.
22            Q.       Will they be able to talk?
23            A.       No.
24            Q.       And what about -- I'm going to botch
25   this as well, glycopyrrolate?
```

www.veritext.com              Veritext Legal Solutions              800-556-8974

```
 1              A.         Yes, that's the way you pronounce it.

 2              Q.         And what type of drug is that?

 3              A.         That's a drug that's, for all intents

 4     and purposes, similar to atropine in terms of its

 5     effect on the heart and other -- so, for example, when

 6     we give atropine, also with drying out the mouth,

 7     glycopyrrolate can have that same effect.

 8     Glycopyrrolate, however, doesn't go into the brain

 9     nearly as much as something like atropine does.

10              Q.         What's the point of giving

11     glycopyrrolate?

12              A.         Basically sometimes people have used

13     it for I think pre-medication.  Back in the old days,

14     we used to want to have a dry mouth.  I don't think

15     people use that any -- at all anymore.  It's very, very

16     unusual.  It's primarily given -- when you give a

17     muscle relaxant like vecuronium or rocuronium and you

18     want to reverse the effects of that, it was common --

19     we commonly give a reversal drug, something like what's

20     called neostigmine, n-e-o-s-t-i-g-m-i-n, neostigmine,

21     and then you would also give something like atropine or

22     glycopyrrolate with that, and the reason why is because

23     the neostigmine has one effect to reverse the muscle

24     relaxant, but it also has a side effect of slowing the

25     heart rate and other effects like that.  So you want to
```

www.veritext.com                 Veritext Legal Solutions                 800-556-8974

```
 1      prevent that if possible, so you would give the
 2      glycopyrrolate with the neostigmine or another drug
 3      like entroferium (phonetic) that would be -- and so
 4      it's used in that way.  I think that's probably the
 5      most common usage in anesthesiology.
 6              Q.       So I understand, glycopyrrolate, it
 7      can increase the heart rate, right?
 8              A.       Yes.
 9              Q.       And it can the MAC also?
10              A.       The minimum alveolar concentration?
11              Q.       Yes.
12              A.       Glycopyrrolate?
13              Q.       Yes.
14              A.       I am not aware of glycopyrrolate
15      having that effect.  It might.  I would imagine it's a
16      pretty small effect if it's there.  I don't remember
17      that -- you know, one of my proud achievements in my
18      area of research has been to know what affects MAC and
19      I don't recall glycopyrrolate having a big effect on
20      that.  I could be wrong.  I don't know everything.
21              Q.       Okay.  Does it have an effect on the
22      EEG?
23              A.       Glycopyrrolate?
24              Q.       Yes.
25              A.       In awake humans without any other
```

www.veritext.com              Veritext Legal Solutions              800-556-8974

1    drugs, I would probably say no, because, again, it

2    doesn't get across very easily.  So even in

3    anesthetized humans, I don't think so.  I mean, if

4    there was an effect I would have to say it would

5    probably be pretty minimal.  But, again, I'm not

6    familiar that literature and so I could be wrong about

7    that.  There may be something out there that I don't

8    know about.

9            Q.       Okay.  And when looking at an EEG

10   when you're determining a patient's depth of sedation,

11   what are you looking for?

12           A.       In normal clinical practice, quite

13   frankly, most -- the vast majority of anesthesiologists

14   I don't think know how to interpret the raw, what we

15   call the raw EEG.  If they use EEG at all, it's going

16   to be a processed EEG like the BIS monitor.  You know,

17   it's very easy to read a number between 0 and 100.  But

18   in general, with an EEG, if you're using it in

19   anesthesia is that you would be looking at -- so when

20   we are awake, our EEG's have a -- what's called a fast

21   frequency low amplitude pattern, so basically it's a

22   squiggly line that goes very fast basically up and

23   down.  But the up and down, how far up and down it goes

24   is pretty -- is low, it's a low amplitude.  And then

25   when you into sedation and deep sedation and

www.veritext.com          Veritext Legal Solutions          800-556-8974

1     anesthesia, general anesthesia, that EEG wave becomes

2     higher in amplitude and slower.  The waves per second

3     basically become less, so it's a slow high amplitude

4     wave.

5          Q.        Just so I understand, because this is

6     a bit confusing.  What you're talking about is that

7     burst suppression?

8          A.        No.  You can achieve burst

9     suppression until you increase the dose, but I'm not

10    talking about burst suppression, no.

11         Q.        Okay.  So what is burst suppression

12    on an EEG?

13         A.        So burst suppression occurs when an

14    individual, and it can be due to anesthesia or drugs or

15    it can be due to brain trauma of some sort, but

16    basically you have these periods of where the EEG is

17    flat or isoelectric as we call it.  And then you have a

18    burst of electrical activity, so you would see this

19    burst of activity on the EEG.  And then you go flat

20    again.  And you can measure the amounts -- you know,

21    the time that you have a flat line basically compared

22    to the amount of time you have a burst activity and it

23    can give you a number to that and that gives you the

24    amount of burst suppression.

25         Q.        So does burst suppression indicate

1    something to you as an anesthesiologist when you're

2    looking at an EEG?

3         A.        It indicates to me that the -- in

4    general, that's too deep of a level of anesthesia.  You

5    don't want too deep.  You don't want to achieve, in the

6    average individual coming into the operating room, you

7    do not want to be at burst suppression during the

8    anesthetic.

9         Q.        What do you mean by in the average

10   individual?

11        A.        Well, there are some types of brain

12   surgeries, for example, where basically you would want

13   to achieve burst suppression for the purposes of what

14   we call brain protection.  But for somebody coming in

15   for just your average, you know, gallbladder being

16   taken out or an orthopedic procedure, you wouldn't want

17   to be at burst suppression.  You don't achieve --

18   you've already achieved general anesthesia, the patient

19   is unconscious, they're not going to have any memory.

20   If you try to go to burst suppression, you're just

21   giving too much anesthetic and potentially going to

22   lower the blood pressure more and it's just -- that's

23   not something that you would want to do.

24                  MR. KURSMAN:  I think now is a good

25            time for a break.  Can we go off the record?

```
 1                    VIDEO OPERATOR:  Going off the
 2          record.  The time is the 1:06.
 3                         (Brief recess.)
 4                    VIDEO OPERATOR:  Back on the record.
 5          The time is 1:23.
 6          Q.        We just got back from a break.
 7   During the break, Dr. Antognini, did you talk with
 8   anyone?
 9          A.        I talked to my wife and her friend
10   who came for their -- to go out, but not about the
11   deposition.  It was just about dog things mostly.
12          Q.        And I notice you were talking to
13   Mr. Atyia as well.  Was that only about dog things as
14   well?
15          A.        Yes, I showed him my -- he asked what
16   kind of dog it is and I showed him.  And I showed him
17   the skin disorder that she has.
18          Q.        Sorry to hear that.  Do you have your
19   report in front of you?
20          A.        I will bring it up.  Yes, I have it
21   in front of me now.
22          Q.        Can you go to paragraph 8 of your
23   report?
24          A.        Yes.
25          Q.        Okay.  And do you see where you say
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1    the exact relationship between midazolam concentrations

 2    that produce unconsciousness and immobility is unknown?

 3            A.      Yes.

 4            Q.           Is it your opinion that midazolam can

 5    produce immobility?

 6            A.           I believe, based on the -- immobility

 7    to response to a noxious stimulus, I believe that it

 8    can.  So has it been studied at the doses, for example,

 9    contemplated in the protocol?  I would say no.  So I do

10    agree that the -- that's why it's unknown, because of

11    the -- our lack of understanding or lack of data about

12    what dose or what concentration of midazolam in the

13    blood would be sufficient to produce immobility.

14            Q.           And in this article, you cite Glass.

15    Do you see Glass, et al.?

16            A.      Yes.

17                 MR. KURSMAN:  And Mr. Atyia, what

18            we're going to do is send you that Glass

19            article right now as well.  But I assume you

20            have it because this is one of the articles you

21            cited.

22                 MR. ATYIA:  Alex, if you want, I know

23            that Dr. Antognini has all of his report

24            documents, so if you want to not send those and

25            just tell him to pull it up, either that or you
```

```
 1            have a copy that you particularly want him to
 2            see, you can do that.
 3                     MR. KURSMAN:  Oh, sure.  We're just
 4            using the copies that you sent us, so if you
 5            want to pull it up, that would be great.
 6                     MR. ATYIA:  Dr. Antognini, go ahead
 7            and just pull Glass up.  And then if you need
 8            to look at something else, make sure you tell
 9            Mr. Kursman what you pulled up and what you're
10            looking at.
11                     THE WITNESS:  Of course.
12                     MR. ATYIA:  And if you don't have it,
13            ask us.  I'm sure Mr. Kursman will help us.
14                     THE WITNESS:  I have it on my thumb
15            drive, which is on a different computer.
16                     MR. ATYIA:  We'll e-mail it to you.
17                     MR. KURSMAN:  I'll share my screen.
18                     THE WITNESS:  Would it be -- it would
19            just take me 30 seconds to get the thumb drive
20            and if you're going to pull up other articles,
21            that way we can save time in terms of the
22            getting the other articles.
23                     MR. KURSMAN:  Okay.  Let's go off the
24            record then.
25                     VIDEO OPERATOR:  Going off the
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 142 of 418 PageID #: 7819

```
 1              record.  The time is 1:26.
 2                     (Brief recess.)
 3                     VIDEO OPERATOR:  Back on the record.
 4          The time is 1:27.
 5          A.          Okay.  So let me pull up the --
 6          Q.          Well, before you get there, let me
 7    ask you this:  In paragraph E, it says, in the middle
 8    of the paragraph, Glass, et al., determined that the
 9    midazolam plasma concentration to produce
10    unconsciousness in 50 percent of individuals was 270
11    nanograms per milliliter, right?
12          A.          Yes, that's what I wrote.
13          Q.          Okay.  What level of sedation are you
14    talking about when you use the term unconsciousness?
15          A.          I would defer to the Glass people
16    because they used the term unconsciousness, and I
17    believe it was to achieves on the sedation scale
18    maybe -- a scale of 0 to 5, I believe it might have
19    been 1 or 2, but they didn't -- but I'm not sure.
20          Q.          Would that include not responding to
21    mild stimulus?
22          A.          I really would refer to the paper to
23    make sure I'm using -- they use the term or the word
24    unconsciousness and I'm using it here in the way that
25    they did.
```

```
 1              Q.         The way that you use it here, though,
 2       respond to a mild stimulus, would you be conscious or
 3       unconscious?
 4              A.         Probably a mild stimulus would be
 5       still conscious, in my opinion.
 6              Q.         And 50 percent of the individuals
 7       with a plasma concentration of 270 nanograms per
 8       milliliter were at least conscious, according to their
 9       study, too, right?
10              A.         Correct.  That's absolutely, yeah,
11       that's the way that we would define that.
12              Q.         Now, are you aware that in the Glass
13       study the authors use the term consciousness only to
14       refer to whether the subject responded to a verbal
15       command?
16              A.         I probably was aware at the time when
17       I read it.  I don't remember what the -- you know, at
18       what point they said that, you know, when they -- when
19       the investigators considered the subjects to be
20       unconscious, so I would have to look at the paper.
21              Q.         And that's different than your
22       definition of consciousness, right?
23              A.         That is correct, yes.
24              Q.         Let's go to the paper.  Do you have
25       the paper?
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 144 of 418 PageID #: 7821

```
 1            A.        Yes.  Let's see here.  I have it up.
 2    Actually I didn't have it up yet, so let me go to it.
 3            Q.        I can share my screen as well.
 4            A.        I have it here.  Okay.  It's coming
 5    up.  It's coming up.  And yes, I have it in front of
 6    me.
 7            Q.        And can you see my screen as well?
 8            A.        Yes, I can.
 9            Q.        Okay.  So let's go to Table 1 on page
10    3.
11            A.        Yes.
12            Q.        Do you see if you don't respond to a
13    noxious stimuli, your score is a 0?
14            A.        Correct.
15            Q.        And if you do respond to noxious
16    stimulus but don't respond to mild prodding, then your
17    score would be 1, right?
18            A.        Correct.
19            Q.        And if you respond only after mild
20    prodding or shaking, your score would be 2, right?
21            A.        Yes, correct.
22            Q.        Now, if we go down to page 840, and
23    let me know when you get there.
24            A.        Yes, I see it.
25            Q.        Do you see this table that has
```

```
 1      midazolam concentration mg per ml?

 2              A.         Yes.

 3              Q.         And do you see the sedation scores on

 4      the side?

 5              A.         Yes.

 6              Q.         You see no one in the study had a

 7      sedation score of 0, right?

 8              A.         That is correct.

 9              Q.         And that means every participant in

10      this study who received midazolam responded to a

11      noxious stimuli?

12              A.         That is correct.

13              Q.         Even the subject who had a blood

14      level of 800 nanograms per milliliter of midazolam?

15              A.         That is correct.  At some point I

16      want to bring some context into this, but you can

17      continue.

18              Q.         Go ahead.

19              A.         First off, the highest level that was

20      achieved here with midazolam, as you see there, is

21      about 800 nanograms per ml.  That's the one that's at

22      the far right there.  And then the rest of them, as you

23      can see, were in the levels of around 550 or less.

24      There have been other more recent studies indicating

25      that benzodiazepines, and I cite them specifically
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

1       using remimazolam, can produce sedation scores of 0.

        2       And remimazolam is going to behave like any other

        3       benzodiazepine, so the nice thing about that drug is

        4       that you can give much higher doses and not worry about

        5       how long it takes to wear off because it wears off

        6       quickly relative to midazolam.

        7                Q.       Okay.  But right now I'm only talking

        8       about the Glass scores.

        9                A.       I understand.  I just want you to --

       10                Q.       And I just want to -- we will talk

       11       about those other studies later.

       12                A.       Okay.

       13                Q.       Right now we're talking about Glass

       14       here.  And I think, you know, you just said not one

       15       subject didn't respond to the noxious stimuli.  And the

       16       noxious stimuli in this study was a trapezius squeeze,

       17       right?

       18                A.       That is correct.  I'm pretty sure

       19       that's what they used.

       20                Q.       Okay.  And if you look at the other

       21       four graphs on this page, we have isoflurane, we

       22       have -- or the other two graphs and propofol, you see

       23       these two?

       24                A.       Yes.

       25                Q.       Okay.  You see there's a lot of

```
 1     sedation scores of 0, right?

 2            A.         Yes.

 3            Q.         So subjects who received propofol and

 4     isoflurane, many of those subjects did not respond to a

 5     trapezius squeeze, right?

 6            A.         That is correct.

 7            Q.         And then if you look at figure 3 on

 8     this same page --

 9                       MR. KURSMAN:  And I'm going to mark

10            this as EXHIBIT 3.

11                       (Thereupon, the Glass, et al., study

12            was marked and filed as EXHIBIT 3.)

13            Q.         Do you see it says open circles

14     represent observations classified as conscious, do you

15     see that?

16            A.         Yes.

17            Q.         And then it says, response to verbal

18     commands.  That's what they're defining as conscious.

19            A.         Correct.

20            Q.         Okay.  So if you look at even around

21     almost 600 nanograms per milliliter, you still have at

22     least one subject responding to verbal commands, right?

23            A.         Let's see.  Yes, I see that.  That's

24     the open circle that you're talking about.

25            Q.         Right.
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 148 of 418 PageID #: 7825

```
 1              A.          Yeah.  Yes, I see that.

 2              Q.          And at 425 as well, we see another --

 3              A.          Correct.

 4              Q.          -- subject responding to verbal

 5      command.  And at 270, right, you have half of the

 6      subjects responding to verbal command and then many of

 7      the subjects responding to mild prodding or shaking,

 8      right?

 9              A.          Correct.

10              Q.          Now, if we go to table 5, which is on

11      page 843 -- let me know when you get there.

12              A.          I'm sorry, figure 5 or -- oh, sorry,

13      table 5.  Yes, I see it there.

14              Q.          And do you see it says for

15      consciousness for midazolam, do you see that?  It says

16      BIS 3.0 consciousness.

17              A.          Yes.

18              Q.          And then it says midazolam.

19              A.          Yes.

20              Q.          Then it says on average you need a

21      BIS score of 49 to 70, right, to be unconscious?

22              A.          The BIS 3.0, so you're talking about

23      the top -- yes, I see the number.  It says midazolam

24      49, and then in parentheses 37 to 62, and then 70, in

25      parentheses 65 to 75, is that what you're referring to?
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
 1              Q.       That is.

 2              A.       Okay.  I see that.

 3              Q.       And when they're talking about

 4    consciousness like we talked about before, they're only

 5    talking about whether they're responding to a verbal

 6    command, right, in this study?

 7              A.       That is -- again, I'm -- not having

 8    referred or looked at that part of that paper, I

 9    believe you're correct on that.  Again, I would have to

10    maybe clarify that and read it, but I believe that's

11    correct.

12              Q.       Okay.  So when they use the term

13    unconsciousness, aren't they actually talking about

14    responsiveness?

15              A.       They are talking about responsiveness

16    because that's what they tested, that is correct.  And

17    a lot of investigators and a lot of anesthesiologists

18    would use responsiveness as a measure of consciousness.

19              Q.       So let's go to page 841 now.

20              A.       Okay.

21              Q.       And do you see the chart with the

22    midazolam and the propofol, the probability of

23    consciousness, that chart at the bottom of figure 5?

24              A.       Yes.

25              Q.       And do you see when you get to
```

```
 1    probability of consciousness at about 50, you have a
 2    BIS score at around 65 for midazolam.  Do you see that?
 3           A.         That is probability -- I'm sorry.
 4    This is for consciousness?  Yes.  Figure 5, looking at
 5    midazolam, the X there, so at a probability of
 6    consciousness is 50 percent at a BIS of around 65 or
 7    so, that is -- that's correct.
 8           Q.         And all -- when all they're talking
 9    about is a probability of responding to a verbal
10    command when your BIS is 65, you have 50 percent
11    probability of responding to a verbal command when your
12    BIS is 65 with midazolam?
13           A.         That is correct, yes.
14           Q.         Now, let's go to page 844.
15           A.         Okay.
16           Q.         And do you see in that first full
17    paragraph it says, in a preliminary report from this
18    trial, we noted that increasing intensity of
19    stimulation applied during this clinical assessment
20    process can lead to participant arousal thereby
21    resulting in a variable clinical state despite
22    maintenance of constant drug levels.  Do you see that?
23           A.         I do.
24           Q.         What does that mean to you?
25           A.         What it means, which is a very
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 151 of 418 PageID #: 7828

1    common -- what should be commonly understood, I hope,

2    among anesthesiologists, but also the broader audience,

3    is that if you have -- if you maintain a certain level

4    of an anesthetic, that the -- stimulating that person

5    would increase their arousal.  If they are in a range

6    where what I would call light anesthesia, and we use

7    that term quite a bit, but -- you know, when you're at

8    a light level of anesthesia, you can stimulate somebody

9    and that will cause them to become aroused or to go

10   closer to basically waking up essentially.  But when

11   you have deep levels of anesthesia, that response is

12   going to be blunted, you know, stimulus is not going to

13   cause as much brain arousal basically.

14          Q.        But that's not what this says.  That

15   last clause is not what this says, right?

16          A.        No, it does not, but I just wanted to

17   give you the context there.

18          Q.        Right.  But in this paper, they had

19   scores of 0 for propofol and isoflurane, right, meaning

20   they didn't respond to noxious stimuli; am I right?

21   Subjects who received propofol and isoflurane, and we

22   talked about this before, and I can take you back to it

23   if you want, received scores of 0.  Do you recall us

24   talking about that?

25          A.        Yes, but that's -- I do.

1          Q.          Okay.  They were part of this study,
    2     right?
    3          A.          Propofol and -- yes.
    4          Q.          Okay.  And then this sentence says,
    5     we noted that increasing intensity of stimulation
    6     during this clinical assessment process can lead to
    7     participant arousal thereby resulting in a variable
    8     clinical state despite maintenance of constant drug
    9     levels, right?  And they don't -- they didn't put here
   10     we're only talking about people who received a 3, 4, or
   11     5 on the scale.  We're talking about everybody here,
   12     right?
   13          A.          I would not agree with that
   14     assumption, and I'll tell you why.  And that's simply
   15     because having written many papers in my career and
   16     reviewed many papers, if I was studying different drugs
   17     and I might have seen an effect such as described here
   18     primarily with one drug as opposed to another, I might
   19     have made a -- sort of a general statement like this.
   20     I'm not sure that you can conclude that this statement
   21     applied to all drugs studied and all the levels at
   22     which the participant started at.  Now, could it, could
   23     this apply to all of them?  Yes.  But I'm not going to
   24     say that it absolutely -- unless they were explicit in
   25     here about that.  But I think you're reading too much

www.veritext.com                Veritext Legal Solutions                800-556-8974

```
 1    or somebody is reading a little bit too much in that

 2    sentence to jump to that conclusion.

 3              Q.        Do you agree that it would apply to

 4    all the subjects who received midazolam?

 5              A.        Well, I don't know.  It just says a

 6    maintenance -- despite maintenance of constant drug

 7    levels.  They don't specify what the drug levels

 8    were -- or what the drugs were in that sentence, so I

 9    don't know.

10              Q.        Let's go back to that initial chart

11    on page -- figure 3.  Let me know when you get there.

12              A.        Which figure?

13              Q.        Figure 3.

14              A.        Okay.  Hold on, I'm almost there.

15              Q.        Page 840.  I have it up on the screen

16    as well.

17              A.        Yes, I have it here.

18              Q.        So even at 800 nanograms per

19    milliliter, every subject responded to noxious stimuli

20    who received midazolam, right?

21              A.        That is correct.

22              Q.        Let's stop looking at this here.

23    Now, what I want to do is I want to show you -- I'm

24    going to show you -- let me show you an autopsy report

25    if we can send that to Dean.  And I can share my screen
```

```
 1      as well.
 2                      MR. ATYIA:  Can I take a second to
 3            look at it once you send it?
 4                      MR. KURSMAN:  Sure.
 5            Q.        Can you see this autopsy report that
 6      I have up?
 7                      MR. ATYIA:  I'm sorry, can we hold
 8            on, Alex?  I just need to take a second to just
 9            look.  It's hard for me to see on the screen
10            and I just want to take a look.
11                      MR. KURSMAN:  Sure.  Let's go off the
12            record while Mr. Atyia is taking a look at
13            this.
14                      VIDEO OPERATOR:  Going off the
15            record.  The time is 1:46.
16                      (Brief recess.)
17                      VIDEO OPERATOR:  Back on the record.
18            The time is 1:47.
19            Q.        Okay.  So we are back on the record.
20      And I was showing you the autopsy report of Billy Ray
21      Irick.  Have you ever seen this autopsy report before,
22      Dr. Antognini?
23            A.        I have seen autopsy reports, a number
24      of them, and I'm not sure if this is one of them.  I
25      really don't remember.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1              Q.         Okay.  And do you see it says his
 2      place of death was -- where my pointer is?
 3              A.         Yes.
 4              Q.         August 9th, 2018?
 5              A.         Yes, I see that.
 6              Q.         And if you scroll down, you see it
 7      says the cause of death, lethal injection?
 8              A.         Yes.
 9              Q.         If we go down to page 2, do you see
10      it says positive findings?
11              A.         Yes.
12              Q.         And it says midazolam, do you see
13      that?
14              A.         Yes.
15              Q.         And then it says result 390 nanograms
16      per milliliter, do you see that?
17              A.         Yes.
18              Q.         Now, in the Glass study that we just
19      talked about, 390 nanograms per milliliter in those
20      subjects, that would correlate with scores of about 1,
21      2, and 3, right?
22              A.         I would have to look at the -- you
23      know, based on what I -- my recollection of that paper,
24      that would be about right.  But of course, making this
25      leap from a postmortem concentration to that is --
```

```
 1    that's a leap that I don't think is -- is fraught with
 2    error, so -- but, you know, it is what it is.  390 is
 3    what was measured.  Whether that reflected what the
 4    concentration was at the time of death or whatever is a
 5    different story.
 6            Q.        And why do you say it's fraught with
 7    error?
 8            A.        Well, I am not a forensic pathologist
 9    or a forensic toxicologist.  But I do, as a physician,
10    especially doing work in this area, know enough about
11    the drawing of tissue samples including blood
12    postmortem can be prone to error in terms of, you know,
13    you make a measurement of the drug and at that point in
14    time, it doesn't necessarily reflect what may have been
15    circulating at the time that it was -- time of death,
16    basically when the inmate was unconscious because drug
17    concentrations change, to my knowledge, postmortem, so
18    --
19            Q.        Are you aware that there are studies
20    that show midazolam drug concentrations do not change
21    postmortem?
22                      MR. ATYIA:  Objection to form.
23            A.        I am not aware of those studies.  If
24    you have them, show them to me.  I would be very
25    interested in seeing them.
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 157 of 418 PageID #: 7834

```
 1            Q.          And are you aware of any studies that
 2    say that midazolam concentration in the blood does
 3    change postmortem?
 4                       MR. ATYIA:  Objection, form.
 5            A.          I do not know if midazolam has been
 6    studied specifically postmortem, but --
 7            Q.          If we scroll down to page -- what
 8    would be page 5, you see it's a new autopsy report.
 9    And it says at the top Donnie Edward Johnson.
10            A.          Yes.
11            Q.          And do you see the date of death
12    5/16/2019?
13            A.          Correct.  Yes, I see that.
14            Q.          And then do you see it says cause of
15    death, lethal injection?
16            A.          I see that, yes.
17            Q.          And here, if you go down to page
18    10 --
19            A.          Yes.
20            Q.          -- do you see the midazolam result
21    930 nanograms per milliliter?
22            A.          Yes.
23            Q.          And this is more than anyone in the
24    Glass study, right?
25            A.          That is correct.  It was 930, yeah.
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 158 of 418 PageID #: 7835

1    I think it was around 800 was more in the Glass --

2            Q.        Even in the Glass study, we had

3    someone at -- we only had someone at 800 nanograms per

4    milliliter, right?

5            A.        That is correct.

6            Q.        But even then, they were responding,

7    at 800, they were responding to noxious stimuli, right?

8            A.        That is correct, yes.

9            Q.        And when you were talking before

10   about how injectable drugs may circulate differently in

11   different individual's bodies.  Did you believe that's

12   why this report, Donnie Johnson, could have had 930

13   nanograms per milliliter while if we go to the Billy

14   Ray Irick may have only had 390 nanograms per

15   milliliter?

16           A.        So those various factors that I

17   discussed earlier to the variability could play a role

18   in that.  But, again, I would say I would be more

19   concerned about postmortem changes.

20           Q.        Okay.  So if you gave two people the

21   same amount of midazolam, is it your opinion that they

22   would have a different amount of midazolam in their

23   blood in terms of nanograms per milliliter?

24           A.        Well, there's no question that they

25   would have a different amount because -- I mean, it

depends on what you mean by different.  You know,

simply because the -- you know, it's only by chance

that you would have the exact same amount measured in

blood because there is variability.  Even given that,

you know, there is absolutely some variability among

individuals in terms of the concentration that you

achieve.

Q.          Okay.  Now, let's look at another

study.  And if we could send this study, Divoll.  I'm

going to share again.  Have you ever seen this study

before?  And we're sending it to you now, but I believe

you've seen it before.  This is a study by Marcia

Divoll, Benzodiazepine Overdosage, Plasma

Concentrations and Critical Outcome.

A.          Yes, I am familiar with that study,

and I've seen it before.  I don't think I used it in

my -- I could have, I don't remember actually, but I

know that I have -- it's come up before, so I am aware

of the study in terms of the overdoses and all that,

yeah.

Q.          And this is a --

MR. ATYIA:  Let's hold for a second,

Alex.  I don't -- this isn't in his materials.

I need a copy.

MR. KURSMAN:  Sure.  I think we are

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 160 of 418 PageID #: 7837

```
 1              sending you a copy right now.  Do you have it?
 2                      MR. ATYIA:  Well, I'll update my
 3              e-mail.  I just want to wait one second.  I
 4              want Dr. Antognini to have the full document.
 5                      MR. KURSMAN:  Let's go off the record
 6              and wait until he gets it.
 7                      VIDEO OPERATOR:  Off the record.  The
 8              time is 1:55.
 9                      (Brief recess.)
10                      VIDEO OPERATOR:  Going back on the
11              record.  The time is 1:56.
12              Q.      Before we left, I was asking you
13      about the Divoll study, so I want to take you to -- I
14      have it up on the screen.  And under results where it's
15      highlighted, do you see where it says, in four cases,
16      diazepam alone was injected.  Although plasma
17      concentrations of diazepam and its major metabolite,
18      and I can spell this, but desmethyldiazepam were as
19      high as 4,792 and 2,266 nanograms per milligram (as
20      read) respectively, none of the four patients displayed
21      any clinically important signs of excessive sedation.
22              A.      I see that, yes.
23              Q.      And how much more potent is midazolam
24      than diazepam?
25              A.      It kind of varies when you sort of
```

```
 1    look through the literature, but it's probably --
 2    midazolam is probably two to three times more potent
 3    than diazepam, approximately.
 4           Q.        So at -- even if we use the higher
 5    end at three times as potent, that would be equivalent
 6    to around 1,600 nanograms per milligram of midazolam
 7    and 900 nanograms per milligram of midazolam, right,
 8    for these two patients?
 9           A.        Approximately, yes, that's correct.
10    Now, may I answer more fully?  I don't know where -- I
11    mean, I know where you're going with this, but I do
12    have a point that I want to make about it, but --
13           Q.        Sure.  We'll get to that in a second.
14           A.        Yeah, okay.
15           Q.        So if you go to the next page, page
16    2.
17           A.        Yes.
18           Q.        Do you see it says under discussion
19    where I've highlighted again, high plasma
20    concentrations of diazepam did not necessarily predict
21    serious CNS depression?
22           A.        I'm sorry, is that in the -- written
23    in the paper?
24           Q.        In the paper itself.  Yeah, I have it
25    highlighted on the screen.
```

```
1              A.         Where are we?

2              Q.         So it's on page 2 under discussion.

3              A.         Oh, yes, I see.  I have to apologize.

4    For some reason, when I pulled this up, I'm not seeing

5    your screen and my screen at the same time for some

6    reason.  Usually in Zoom, you know, I can see both of

7    them.  For some reason, it's not happening.  I can't --

8    something is not right about the way I can't -- all of

9    a sudden there's something wrong here and I can't see

10   your screen and my screen paper -- or that paper at the

11   same time, so -- but I am -- I know that I see the

12   highlighted portion here, which says high plasma

13   concentrations of diazepam.

14             Q.         Did not necessarily predict serious

15   CNS depression.

16             A.         Yes, I see that.

17                  MR. ATYIA:  Objection.  Is he going

18             to be allowed to explain his answers, or do you

19             just want him to -- and I don't mean to make an

20             out of form objection here.  I just mean to

21             say -- I think before we keep going, we're

22             going to lose sight of whatever he wants to say

23             in --

24                  MR. KURSMAN:  Mr. Atyia, one, the

25             first thing is with these speaking objections,
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 163 of 418 PageID #: 7840

```
 1            you're taking my time.  But the second and more
 2            important thing, you're more than able to
 3            continue this deposition when I am done and ask
 4            him follow-up questions.
 5       Q.       So back to this discussion, do you
 6  have any reason to disagree with this highlighted
 7  portion?
 8            MR. ATYIA:  Dr. Antognini, you're
 9            free to explain your answers if you feel that
10            is necessary.
11       A.       So I think I disagree with the way in
12  which this information is being used.  I don't disagree
13  with the -- you know, there just basically it's stating
14  what the data that they reported.  But I think you have
15  to be careful about extrapolating from midazolam doses
16  in the Glass study to here because we're talking
17  about -- we're not just -- the Glass study.  But just
18  what is known about midazolam, the acute
19  administration, IV administration of midazolam and
20  achieving a particular drug level is not -- you know,
21  you can't equate that to a situation where you've given
22  a different drug, in this case diazepam, that has been
23  ingested over a longer period of time basically because
24  it was taken orally, and people that may be tolerant to
25  the drug because some of these -- even though, you
```

1    know, some of these patients may have been already on

2    benzodiazepines, and therefore, tolerant.  So I think

3    it's a bit of an apples to oranges comparison.

4         Q.        You think comparing midazolam to

5    diazepam is an apples to orange comparison?

6         A.        I think comparing the ingestion of

7    diazepam in these types of patients in the Divoll study

8    and looking at their blood levels and their level of

9    consciousness and comparing that to the acute

10   administration of midazolam in naive subjects, that is

11   the apples to oranges comparison.

12        Q.        So my question, though, is different.

13   It's just a yes or no question.  Do you think comparing

14   midazolam to diazepam is an apples to orange

15   comparison?

16        A.        By them -- you know, just

17   comparing --

18                  MR. ATYIA:  Objection, form.

19        A.        You know, maybe you're trying to get

20   me in one of these gotcha moments so that you can

21   disclose it to the transcript and say, hey,

22   Dr. Antognini says that, you know, midazolam and

23   diazepam are basically the same except for a slight,

24   you know, difference in potency.  But by itself, based

25   on the characteristics of the drugs in the acute

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 165 of 418 PageID #: 7842

```
 1    administration, diazepam and benzodiazepine given
 2    intravenously, there is, as I said, a slight difference
 3    in potency or a difference in potency between the two.
 4    And benzodiazepines, for the most part, all work the
 5    same way, pretty much -- I should say they almost all
 6    work the same way.  So in that sense, it is an apples
 7    to apples comparison.  But what's the apples to orange
 8    comparison here is the way in which these drugs were
 9    given and in the patients that received them, so --
10    anyway, I don't know whether you think that's a gotcha
11    or not, but that's my answer.
12            Q.        And do you have any reason to believe
13    or do you -- strike that.  Do you know whether the
14    patients in the Divoll built up any tolerance to
15    diazepam?
16            A.        I do not know that.
17            Q.        Okay.  Now, let's go back to your
18    report.  Do you have your report still?
19            A.        Yes.
20                MR. KURSMAN:  Before we do, I'll mark
21            the Divoll exhibit as EXHIBIT 4.
22                    (Thereupon, the Divoll study was
23            marked and filed as EXHIBIT 4.)
24            Q.        Back to your report.  And we're still
25    on paragraph 8.  And do you see you cite Inagaki?
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 166 of 418 PageID #: 7843

```
 1              A.        Yes.

 2              Q.        Inagaki, et al., reported that

 3      midazolam at 539 nanograms per milliliter reduced

 4      halothane requirements for immobility by 70 percent.

 5      If midazolam reduced halothane in a strict linear

 6      manner beyond the 539 nanograms per milliliter, a

 7      midazolam concentration of about 770 nanograms per

 8      milliliter would produce immobility, right?

 9              A.        Correct.

10              Q.        Now, if it didn't, if it did not

11      reduce halothane in a strict linear manner, all of your

12      math would be incorrect, right?

13              A.        That is correct, yes.  Well, yes,

14      that is correct.  As you can see, I qualify it and say

15      it would be the -- the ratio basically would be

16      different in terms of the amount produced -- the

17      unconsciousness versus the amount that would produce

18      immobility.

19              Q.        Are you aware of any studies that say

20      midazolam reduces halothane in a strict linear manner?

21              A.        So I think I would have to look at

22      the Inagaki study --

23                        MR. ATYIA:  Objection to form on

24              that.

25              A.        Because I may be mixing that study up
```

```
1    with others.  And this, again, gets into the issue

2    around what is linear and what is maybe an exponential

3    set --

4              Q.        Why don't we look at the Inagaki

5    study, perhaps on your flash drive?

6              A.        Probably, I do.  So let's bring that

7    up here.  Yes, it's coming up now.  Yes, I have it

8    here.  One second so I can --

9              Q.        Can you see it on my screen?  If you

10   could go to page 615.

11             A.        Okay.

12             Q.        Let me know when you get there.

13             A.        615, yes, there it is.

14                       MR. KURSMAN:  I'm going to mark this

15             exhibit as EXHIBIT 5.

16                       (Thereupon, the Inagaki study was

17             marked and filed as EXHIBIT 5.)

18             Q.        Okay.  So 615, if you go to that last

19   full paragraph.

20             A.        Yes.

21             Q.        Do you see at the very end, it says,

22   the most dramatic MAC reduction of halothane was seen

23   as the midazolam concentration increased from 0 to 134

24   nanograms per milliliter.  Further increases in

25   midazolam concentration continued to reduce the MAC of
```

```
 1      halothane but to a lesser degree.  Do you see that?
 2           A.        Yes.
 3           Q.        Doesn't that mean that midazolam does
 4      not reduce halothane in a strict linear manner?
 5           A.        That is the -- an interpretation of
 6      that sentence that most people would say, but -- so
 7      just sort of to answer your question here, so on page
 8      616, where they have figure 3, if you go to figure 3 --
 9      yes, figure 3, it basically would be figure 3 and
10      figure 4.  So you see figure 3 where it starts at .8,
11      it goes from 0 and then the highest dose of around .55,
12      you now have a MAC of basically, you know, 3 it looks
13      like.  Do you see that?
14           Q.        Yeah, I do.
15           A.        Okay.  All right.  So you look at
16      that curve and you say to yourself, oh, that looks like
17      an exponential curve.
18           Q.        Uh-huh.
19           A.        All right.  But then you say to
20      yourself, well, what if I don't look -- and this is a
21      better way of just looking at this data.
22           Q.        Uh-huh.
23           A.        What if I look at the -- I ignore the
24      data point at .8 and I look at the other three.  And I
25      say to myself, well, that's the line.  Now, together it
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1     looks exponential, but the three data points to the
2     right there basically excluding the far left one, that
3     is a line.  And most importantly is that they didn't
4     study doses of .55.  So to say that it is a -- not a
5     linear relationship, yes, in total looking at that line
6     you see, it's exponential, you don't know what might be
7     happening beyond that line.
8          Q.          So when you --
9          A.          We have not studied -- I'm not done
10     yet.  We haven't studied doses beyond that.  So, you
11     know, that's why I -- from a statistical standpoint, I
12     think we have to be careful about, you know, how we
13     look at these data.  And then if we go to figure 4, you
14     see the actual data points there and you realize --
15     well, they did put a curved line in there and that was
16     a fit, but, you know, what would be the best fit if you
17     tried a linear line there?  And you know, the
18     correlation might be a little bit lower, but it still
19     wouldn't -- I'm not sure that the statistical -- there
20     would be a statistically significant difference between
21     a straight line and a curved line.
22          Q.          So when you look at these graphs, are
23     you seeing a linear line, is that what you're saying?
24          A.          I'm saying that you could fit a
25     linear and a straight line to those data, especially as

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1    I look at the middle figure or the top part of figure
 2    4.
 3              Q.        Do you see an exponential line when
 4    you look at these graphs?
 5              A.        I see an exponential line as well.  I
 6    should say a -- I'm not sure exponential is the term,
 7    because it's probably not -- you know, it's a curved
 8    line, so I guess, technically speaking, it would be
 9    considered exponential.
10              Q.        Well, why don't we look to see what
11    the authors of the study say?
12              A.        Of course.
13              Q.        Let's go to where you took me to
14    figure 3.
15              A.        Okay.
16              Q.        Do you see it says the relationship
17    showed not a linear but an exponential curve.  Do you
18    see that?
19              A.        Yes.
20              Q.        And are you saying you disagree with
21    the author's interpretation of this graph?
22              A.        I don't think I would disagree with
23    that, because I -- it does, the relationship shows from
24    all those data a nonlinear one but an exponential
25    curve.  But that doesn't mean that the data, especially
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1      if you had studied at higher doses, would continue to
 2      be exponential or follow that -- an exponential, I
 3      guess, curve.
 4              Q.        And then if we go to the other graph
 5      you showed me on figure 4.  Do you see that?
 6              A.        Yes.
 7              Q.        Do you see it says the relationship
 8      showed an exponential correlation.  Do you disagree
 9      with the authors that figure 4 shows an exponential
10      correlation?
11              A.        I do not disagree with what the
12      authors have stated there.  But, again, I say that
13      you -- you know, they didn't study larger doses and
14      that a linear -- a straight line could fit those data
15      as well.  So I'll just leave it at that.  That's
16      basically what I've said before, is that a straight
17      line is possible.  I'm just going to just say this.
18      I'm not trying to -- I guess I do sound like quibbling
19      about this and it really gets down into the
20      nitty-gritty details of statistical analysis.  But you
21      have to be very careful when you are extrapolating
22      beyond data points that you did not collect.
23              Q.        The authors collected these data
24      points, right?
25              A.        That is correct, yes.
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 172 of 418 PageID #: 7849

```
 1              Q.          And the authors are saying these data
 2      points establish an exponential curve, right?
 3              A.          That is correct.  But what they
 4      didn't say, however, is that what was the set with the
 5      linear curve and maybe the linear curve, statistically
 6      speaking, is no different from an exponential curve,
 7      the exponential curve seemed better.
 8              Q.          So it's your expert opinion that
 9      figure 4 and figure 3 in the Inagaki study support the
10      finding of a linear line?
11                  MR. ATYIA:  Objection, form.
12              A.          So let me -- I want to make sure that
13      you understand where I'm coming from.  And believe me,
14      you know, I don't think this is -- you know, you
15      obviously got some instruction from your experts about
16      this, so -- unless you've had a lot of training in
17      these statistical analyses and all that.  But I'm going
18      to focus on the top figure of figure 4, which shows the
19      individual data points.  And look how much variability
20      there is.  That is that at, for example, just at a
21      concentration of 0 midazolam, there's a lot of
22      variability of end-tidal halothane.  And then when you
23      go up to about like, I guess it's around like 150 or
24      so, the first sort of large set of data points, there's
25      a lot of variability.  So there's just a lot of
```

```
 1    variability in those data.  And when you have that much
 2    variability saying that a fit of an exponential curve
 3    is better than the fit of just a straight line, I don't
 4    know that the -- that would be true.
 5              Q.       You're aware --
 6              A.       If I may finish my answer.  From a
 7    statistical --
 8                       MR. ATYIA:  Please allow him to,
 9              Alex.  That's not a speaking objection.  That's
10              a request to you, please allow him to finish.
11              A.       So basically you would have those
12    data points and you may not achieve -- I mean,
13    basically you can't from a statistical standpoint say
14    that an exponential curve is a better fit than a linear
15    curve.  So that's why I do say that it's possible that
16    this could be a linear relationship.
17              Q.       This is a study that you cited,
18    right?
19              A.       That is correct.
20              Q.       Okay.  And the authors of this study
21    are saying this data supports an exponential curve,
22    right?
23              A.       That's correct, that's what they say.
24              Q.       And the authors of this study also
25    say not a linear curve, right?
```

```
 1              A.       That is correct.
 2              Q.       And this is a study that you cited to
 3      support your position in your report, right?
 4              A.       That is correct.
 5              Q.       Okay.  And I believe you just
 6      testified, well, they didn't -- they didn't get data
 7      points for the increased amount of midazolam, meaning
 8      they stopped at some point, so they don't know what
 9      will happen next, right?
10              A.       That is correct.
11              Q.       And this is a study that you cited,
12      so I assume you think this study is legitimate, right?
13              A.       Every study that is, you know, that
14      we cite is legitimate.  I guess that would be okay to
15      say that.  But no matter whether it's studies that I
16      cite or it's studies that your experts cite, no study
17      answers, you know, the question at hand directly and/or
18      conclusively.  And every study is going to have
19      something in it, for the most part, that basically is
20      going to perhaps be -- doesn't support your position.
21      So, you know, if we had a study or group of studies
22      that answered all these questions, we wouldn't be here.
23              Q.       I'm just asking you this:  Do you
24      trust the opinions of the authors of this study in this
25      report?
```

```
 1              A.         I trust their opinion.  I'm not sure
 2     I would use the word trust, but I would -- I do not, I
 3     do not disagree with their interpretation.  I have
 4     other interpretations that are possible, but I don't
 5     disagree with their interpretation of the data.
 6              Q.         Do you defer to their opinions in
 7     this report?
 8              A.         I wouldn't say I would defer to their
 9     opinions.  I would just -- you know, when we, as
10     physicians especially, someone like myself that's been
11     involved in a lot of research and all that, I don't
12     necessarily use the word defer.  I look at a paper and
13     I say, well, you know, I say -- and I've said this
14     about my own papers, every paper, every study has
15     limitations, and I'm just pointing out some of the
16     limitations of this particular paper.
17              Q.         Do you think this paper is accurate?
18              A.         I don't -- I have nothing -- I agree
19     that in a sense that I have nothing to say that the
20     data that they reported is inaccurate.  The
21     interpretation, however, is a slightly different
22     subject, I think.
23              Q.         Okay.  Well, let's stay on this page,
24     page 4, the first full paragraph on the left side.
25              A.         What's the page number?
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1          Q.          I apologize.  It's page 616.  And I
 2     am right here.  Do you see the little hand I'm putting
 3     over it?  Do you see it says midazolam acts at the
 4     specific receptors in the central nervous system, and
 5     the number of benzodiazepine receptors is limited.
 6     Therefore, benzodiazepine receptors will become
 7     saturated at a sufficient level of serum midazolam
 8     concentration.  The present results indicate clearly
 9     that the midazolam action to potentiate the anesthetic
10     action of halothane has a saturable nature.  Do you see
11     that?
12          A.          I do.
13          Q.          Doesn't that mean that the authors of
14     this study believe that midazolam has a ceiling effect?
15          A.          I do not know if they use that term
16     ceiling effect, but I would say that they -- you could
17     interpret that from that paragraph.  That's what they
18     are inferring.
19          Q.          And if you go to the next sentence,
20     it says, the present results indicate clearly that the
21     midazolam action to potentiate the anesthetic action of
22     halothane has a saturable nature, right?  Do you see
23     that?
24          A.          I see that, yes.
25          Q.          So are the authors saying that the

1  GABA receptors can become saturated by the midazolam?

2          A.          That is -- yes, I guess saturated is

3  a bit of a -- I'm not sure that's a pharmacologically

4  accurate way of saying it, but it's -- I agree that

5  that word would be acceptable.

6          Q.          And they're saying at some point no

7  matter how much more midazolam you give to a patient,

8  the effects won't increase because the receptors will

9  be saturated, right?

10         A.          That is -- yes, that is the

11 interpretation of that.  And we've already discussed

12 about issues around when ceiling effect occurs and all

13 that, but -- so, I can say, yes, that's -- that is

14 the -- one interpretation of that, yes.

15         Q.          And do you disagree with that?

16         A.          I don't disagree with the statement

17 that the data does show that midazolam action to

18 potentiate the anesthetic action of halothane has a

19 saturable nature.  But again, that's one interpretation

20 of their data.

21         Q.          And you're not disagreeing with that

22 interpretation, right?

23         A.          I am -- again, I'm not disagreeing

24 with it.  I'm just saying that their -- the data are

25 limited.  They didn't study higher doses, and

```
 1    therefore, you don't know what might be occurring at
 2    higher doses.
 3            Q.        Well, let's go to page 5.
 4            A.        Okay.  Is that the next page, I
 5    guess?
 6            Q.        That's the next page.  That's page
 7    617.  And do you see it says at the bottom, in
 8    conclusion, midazolam produced marked reduction of
 9    halothane MAC in humans at the serum concentration
10    lower than that required to cause sleep.  It appears
11    difficult to determine the type of interaction between
12    halothane and midazolam in the anesthetic efficacy
13    because their relationship shows an exponential fit,
14    indicating the saturated nature of midazolam action to
15    potentiate the anesthetic action of halothane.  Do you
16    see that?
17            A.        Uh-huh.  Yes.
18            Q.        So, again, here they're talking about
19    the same ceiling effect again, right?
20            A.        Yes.  They don't use that term, but
21    that's what they're implying, I think.
22            Q.        Okay.  So we can close this.  Let's
23    go back to your report on paragraph 8.  Can you give me
24    a number that you believe a midazolam concentration
25    would cause -- would produce immobility?
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1              A.          I cannot.  And I'll tell you why,

 2      because the -- I have cited studies, animal studies

 3      where -- and this is the mouse study where midazolam

 4      produced immobility.  They did not study drug

 5      concentrations in those animals, and even if they did,

 6      those are in animals.  And I've already said more than

 7      once that we don't know what happens -- we don't have

 8      data, I should say, with midazolam beyond what has been

 9      purported in some of these studies that you've pulled

10      up.  We don't know the drug concentrations at, you

11      know, these massive doses, so --

12                          I could cobble together, I suppose, I

13      haven't, I could cobble together what might be

14      an amount, but I would be -- you know, I would be

15      hesitant to do that.  I know Dr. Stevens has done a

16      similar analysis for midazolam in terms of the ceiling

17      effect and so forth and I think that analysis he has

18      abandoned, at least I think based on his testimony,

19      because it's very difficult to extrapolate from animals

20      and humans, to humans, and there are a lot of moving

21      parts.  It's just -- I wouldn't have confidence in a

22      number basically -- based on that type of analysis.

23              Q.          So if you don't have confidence in a

24      number, can you give a number of the amount of

25      midazolam it would take to produce unconsciousness as
```

1     you define it in the report?

 2              A.        Well, those data I think are a little

 3     bit more amenable to that type of analysis.  So first

 4     we can look at -- we could look at the Glass study and

 5     look at those concentrations of midazolam.  We have the

 6     remimazolam papers that I cited where immobility was

 7     produced at least immobility to, I believe it was

 8     trapezius squeeze.  So we know that with

 9     benzodiazepines, based on those studies, can produce

10     immobility to -- at least to a trapezius squeeze.  So

11     it's possible to take some of the pharmacokinetic data

12     that we have and put that together, but -- so a little

13     bit easier to do, but it still would be quite a bit of

14     extrapolation.

15              Q.        Let's go to paragraph 10.

16              A.        And that's of my --

17              Q.        Of your report.  You see you give a

18     definition of pain?

19              A.        Hold on just one moment, please.

20              Q.        Sure.

21              A.        Paragraph 10?

22              Q.        Yes.

23              A.        Yes, I see it, yes.

24              Q.        Do you agree that an inability to

25     communicate does not negate the possibility that a

```
 1    human experiences pain?

 2            A.         I'm not sure -- I agree with the

 3    statement that if you are unable to communicate doesn't

 4    necessarily mean that you are not having pain.  Even if

 5    you cannot communicate, you can still have pain.

 6            Q.         Do you think that should be in your

 7    definition as well in paragraph 10?

 8                       MR. ATYIA:  Objection, form.

 9            A.         Let's see.  So if what you could do

10    is maybe give me an explicit statement that you would

11    think I should include in that.

12            Q.         Sure.  The inability to communicate

13    does not negate the possibility that a human

14    experiences pain.

15            A.         That is -- actually, I believe that

16    might even be on the ISP web site, so I agree with that

17    statement.

18            Q.         So why didn't you include it in

19    paragraph 10?

20            A.         Because I don't think that the --

21    it's pertinent, in my opinion, it's pertinent to these

22    discussions.  Now, obviously, you do, as well as the

23    experts, because you're coming from the perspective of

24    that, you know, these individuals are awake, the

25    midazolam doesn't produce unconsciousness, and that
```

```
1     when you get the vecuronium, they're unable to
2     communicate it, and therefore, they're in pain.  And I
3     just -- I obviously disagree with that.  I think they
4     are unconscious and that they don't perceive pain
5     because of the fact that they're unconscious.  So
6     that's the reason why I don't think it's particularly
7     important to state that in my definition of pain.
8              Q.        If you know it's a relevant point of
9     this case, why did you decide to leave it out of your
10    definition if the IASP defines it as such?
11                       MR. ATYIA:  Objection, form.
12             A.        I just -- again, I don't think
13    it's -- I'm not disagreeing with the statement.  I'm
14    just saying that I don't think it applies, based on my
15    opinion of what midazolam does.  So you can say
16    anything, basically, about general anesthesia, right?
17    I mean, you can say that, you know, the person is
18    unable to communicate, and therefore, we don't know
19    whether they're having pain or not, so --
20             Q.        Or an individual who is doing a
21    consciousness check in a hospital setting, would you
22    want them to know that the inability to communicate
23    pain does not mean that the person is not feeling pain?
24             A.        Yes.  You know, in certain
25    circumstances, you know, obviously, especially if
```

```
 1        you're using a neuromuscular blocking drug, then, you
 2        know, that person is unable to communicate that.
 3               Q.        And in the lethal injection context,
 4        we're using a neuromuscular blocking drug, right?
 5               A.        That is correct, yes.
 6               Q.        So if you would want a person in a
 7        hospital setting knowing that definition, why wouldn't
 8        you want the Court to know that definition?
 9               A.        I'm not saying that the Court can't
10        know that definition.  I just did not include it in
11        that paragraph, so -- I'm not hiding that.  I didn't
12        say otherwise.  I didn't, you know, say that --
13        contrary to that statement, so --
14               Q.        Well, while we were talking before,
15        you mentioned that that was part of the IASP pain
16        definition, right?
17               A.        Well, it's not part of the pain --
18        you know, the pain definition, as I've written there, I
19        think it's based on when I was at the web site.  And
20        that statement that you've made there is a disclaimer.
21        Maybe disclaimer is not quite the right word.  But it's
22        a caution that just because somebody is not responsive
23        because of a variety of different clinical scenarios
24        doesn't mean that they're not having pain.
25               Q.        Are you aware that the footnote on
```

```
1      the bottom of your report is in a bold definition from
2      the IASP and the IASP has a revised definition of pain?
3              A.      I was not aware of that because I --
4      is this something that happened since I accessed it on
5      12/8/21?
6              Q.      That I don't know.  But you were
7      aware of the other portion that I mentioned, so I am
8      just wondering why it wasn't included in here, but we
9      can move on.  Let's go to paragraph 13 of your report.
10             A.      Okay.  I'm there.  Are you --
11             Q.      Do you see the very bottom?  It says,
12     doses above 5 milligrams must be used with extreme
13     caution because of the well-known risks of
14     unconsciousness, respiratory depression, apnea, and
15     death.  And then you have, see package insert.
16             A.      Yes, I see that.
17             Q.      When you use the term unconsciousness
18     here, what are you referring to?
19             A.      I am referring to the same way I
20     think I previously defined it as being unresponsive to
21     various stimuli and a decreased awareness of your
22     environment.  So that is the -- and I'm using that sort
23     of from -- sort of the average physician's perspective
24     of unconsciousness.
25             Q.      Are you aware that the black box does
```

```
 1    not use the term unconsciousness?

 2         A.        Well, I don't believe that the black

 3    box does, but I believe that the package insert, I

 4    would have to review it again, but I believe that the

 5    package insert certainly talks about the effects of

 6    midazolam on consciousness, so -- maybe not all the

 7    things that I've written there are part of the black

 8    box warning, but in total, the package insert does

 9    support the idea that midazolam is a very dangerous

10    drug.

11         Q.        Why don't we pull up the package

12    insert?

13         A.        Okay.  I'm pulling it up on my end.

14         Q.        Do you see it says on my -- midazolam

15    hydrochloride, Hospira, Inc.?

16         A.        If you can -- so there's some --

17    again, I apologize.  Somehow when I start to bring

18    things up, it makes the Zoom meeting window really

19    small and I can't seem to increase it.  Maybe if I

20    can -- no, that's not it.  I'm sorry, it just

21    doesn't -- I can't -- oh, wait.  I think I've figured

22    it out.  My apologies.  So I see that now.  I see your

23    screen much larger now.

24         Q.        Okay.  So do you see it says

25    midazolam has been associated with respiratory
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 186 of 418 PageID #: 7863

1    depression, arrest, especially when used for sedation

2    in non-critical care settings?

3              A.        Yes.

4              Q.        It doesn't say anything about

5    unconsciousness, does it?

6              A.        No, I'm not there, I guess.  Does it

7    say it anywhere else?  Why don't you tell us?  Is it

8    anywhere else in the package insert?

9              Q.        So now do you see -- are you aware

10   that one-third of all drugs have a black box warning?

11             A.        I have heard that amount, yes, that

12   is correct.  I mean, I shouldn't say it's correct.  I'm

13   not -- I don't have any direct knowledge, but I know

14   that it's probably a large number of drugs that have a

15   black box warning.

16             Q.        And do you know what the dose of

17   midazolam is that would cause a fatal reaction in a

18   patient?

19             A.        Well, again, even a low dose of

20   midazolam can kill a patient, so -- I've heard this

21   before.  You know, you say, you know, midazolam is a

22   safe drug, it doesn't kill people.  Then I would

23   challenge your expert witnesses, particularly Dr. Van

24   Norman, to give midazolam willy-nilly to patients who

25   walk away and, oh, just don't worry about it.  It's not

```
1    a lethal drug.  I mean, that's ridiculous.  It's
2    absolutely ridiculous to say that midazolam is not a
3    dangerous drug.  By itself, midazolam has killed
4    patients.
5            Q.       What is the mechanism of the action
6    at which it kills patients?
7            A.       By itself, it would be the production
8    of unconsciousness and whatever amount of
9    unconsciousness you want to define, but it's enough
10   that the patients have airway obstruction and they
11   basically stop breathing because of an airway
12   obstruction and they become hypoxic and they die.
13           Q.       So it's respiratory depression,
14   airway obstruction, hypoxia?
15           A.       Yes.
16           Q.       And those aren't the intended actions
17   of midazolam, right?
18           A.       They are not.  Side effects, but not
19   intended.
20           Q.       And what is the -- can a barbiturate,
21   an overdose of a barbiturate kill somebody?
22           A.       Yes.
23           Q.       And what would be the mechanism of
24   action that would kill a person in the course of -- in
25   the case of a barbiturate?
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

1          A.          Depending on the amount and the speed

2    with which it was administered, you would get an airway

3    obstruction.  You would also potentially get apnea

4    where you basically stop the respiratory drive.  With

5    midazolam, you may not stop the respiratory drive, per

6    se, but you get an obstructed airway.  Whereas with a

7    barbiturate of a high enough dose, you would not only

8    get potentially an airway obstruction, you would

9    actually stop the attempts at breathing as well.  And

10   then at even higher doses, you can get profound

11   cardiovascular depression where the heart and blood

12   pressure, you know, function goes down very low and

13   then death ensues.

14          Q.          And they would still be producing

15   lower levels of sedation to kill an individual, right?

16                 MR. ATYIA:  Objection to form.

17          A.          Lower levels of sedation?

18          Q.          Meaning a barbiturate could kill an

19   individual just by its mechanism action, by its

20   intended effect, if you give enough of it?

21          A.          Yeah, I'm not sure that I would say

22   by its intended effect.  I mean, obviously you don't

23   intend to, you know, give these drugs to produce blood

24   pressure decreases and all that.  If you use a

25   barbiturate in, in a typical way in which you would use

```
 1      a barbiturate, at least nowadays, which of course even
 2      now it's very rare, but you use a barbiturate to
 3      induce, let's say, a coma which is going to be profound
 4      brain depression, you get, unfortunately, as a side
 5      effect the effects on breathing and the blood pressure.
 6      So you have to support the breathing, but sometimes the
 7      blood pressure, even with support, the blood pressure
 8      gets very low.  So, yeah, I'm not sure that that
 9      question was worded in a way that I feel comfortable
10      answering, so --
11            Q.      Well, let me ask you this, because
12      you talked about side effects.  With midazolam,
13      midazolam can kill a patient based on its side effects,
14      right?  Is that right?
15            A.      That is correct, yes.
16            Q.      Now, a barbiturate, on the other
17      hand, could kill a person not based on its side effects
18      but based on its method of action, what it's used to
19      do, right?
20            A.      I'm having a -- you're getting me
21      there.  I understand where you're going with that.  I
22      think what I'm a little bit -- about here is that, you
23      know, midazolam kills because of the side effects,
24      basically, and you're saying that kind of -- you know,
25      a barbiturates kills because of the intended effect.
```

```
 1      And I don't think that's the right -- it's necessarily
 2      the right way to look at it.
 3                          And basically, my point is that with
 4      midazolam, you give higher and higher doses of it and
 5      you'll begin to see more of these effects.  Your
 6      therapeutic goal here is to cause brain depression with
 7      midazolam.  And I use that term broadly speaking, brain
 8      depression in a sense that you're going to produce
 9      amnesia, you're going to produce unconsciousness, and
10      so forth.  So that is the intended effect of using
11      midazolam at higher and higher doses, so, for example,
12      with the induction of general anesthesia with
13      midazolam.  And all drugs like that, midazolam,
14      whatever, phenobarbital, fentanyl, they also cause
15      airway obstruction that can also affect the breathing.
16                          So, you know, the side effects and
17      the intended effects sort of go hand in hand with these
18      drugs.  So I'm not sure that you can make that kind of
19      separation, is my point.  Except to say -- and again,
20      I'm not trying to agree -- I mean, I more or less agree
21      with what you're trying to get to, the phenobarbital in
22      terms like it's so powerful, you get to these
23      unintended or the side effects much more quickly and
24      much more easily than you would with midazolam.
25                  Q.      And is that a result of brain
```

www.veritext.com        Veritext Legal Solutions        800-556-8974

1    depression for a barbiturate?

2          A.        Barbiturates also can cause a direct

3    vasodilation, as I recall, a direct peripheral

4    vasodilation and a depression of the heart that you

5    wouldn't see really I think as much with midazolam, I

6    believe.  So it's not just the brain depression, but

7    also some of these peripheral effects as well.

8          Q.        Does midazolam have a fatal dose?

9          A.        So there are data out there on

10   various drugs about, you know, the toxic dose, the

11   lethal dose, and so forth.  Trying to figure out what

12   that dose is, is obviously a little bit difficult with

13   a drug like midazolam because you can't -- I mean, you

14   don't want to obviously study that.  You would have to

15   kill patients, so obviously you're not going to do that

16   type of study, and you have to put those together.  All

17   I can say is that there are doses in humans that have

18   died from the dose, some of them a relatively small

19   dose.

20         Q.        I'm talking about a toxic dose.  I'm

21   talking about a fatal dose.  Does midazolam have a

22   fatal dose?

23         A.        Well, let me answer that question in

24   the following way, which is that there are -- if you

25   take a patient and you give them 5 milligrams or 3

```
 1    milligrams of midazolam and nothing else and you come
 2    back and they're dead, then that was a fatal dose for
 3    that patient.  For someone else, maybe it would take
 4    20 milligrams or 30 milligrams.  You know, we don't
 5    have those types of data, so I cannot tell you with
 6    midazolam if there was a -- you know, what that fatal
 7    dose is.
 8                     MR. KURSMAN:  Let me mark the black
 9            box as EXHIBIT 6.
10                     (Thereupon, the midazolam black box
11            warning was marked and filed as EXHIBIT 6.)
12            Q.       I assume you're aware that drugs --
13                     MR. ATYIA:  Alex, we only saw it on
14            the screen.  I need to get a copy of that.
15                     MR. KURSMAN:  Okay.  Hayden, could
16            you send a copy of that, the black box?
17                     MR. ATYIA:  Can we go off the record
18            on that for one second?
19                     MR. KURSMAN:  Sure.
20                     VIDEO OPERATOR:  Going off the
21            record.  The time is 2:45.
22                     (Brief recess.)
23                     VIDEO OPERATOR:  Back on the record.
24            The time is 3:00.
25            Q.       We just went on break for about 15
```

```
 1    minutes.  During the break, did you talk to anybody,
 2    Dr. Antognini?
 3              A.        I called my vet's office because I
 4    got a message that they have contacted me about our
 5    dog, but I'm not sure who it was.  But anyway, that's
 6    the only person I've spoken to.
 7              Q.        Okay.  And did you have a chance to
 8    review the black box label that was sent?
 9              A.        Actually, I did not do that.  I'm
10    sorry, I didn't know -- I apologize.  I was told I
11    wasn't supposed to look at any material during breaks,
12    so I did not do that.
13              Q.        Okay.  Well, let's go to -- we were
14    talking a minute ago about the fatal dose of midazolam,
15    and I asked you if you knew whether there was a fatal
16    dose of midazolam.  Do you know whether there is a --
17    well, let me ask this first:  Do you know the
18    difference between a toxic dose and a fatal dose?
19              A.        A toxic dose, I mean, I get the
20    definitions correctly, but when we think about a toxic
21    dose or a toxic effect when we're looking at a
22    particular adverse outcome of some sort, that it
23    causes, let's say liver damage or something like that,
24    causes toxicity, whereas as a fatal dose actually kills
25    somebody, a lethal dose.  So usually the toxic dose
```

```
 1    would be less than the fatal dose usually.

 2          Q.        And are you aware that midazolam does

 3    not have a fatal dose?

 4          A.        You would have to show me where that

 5    comes from, because, as I say, if you give, you know,

 6    midazolam by itself, you know, it will kill -- you

 7    know, some people die, so I don't know how you can say

 8    that it does not have a fatal dose.

 9                    MR. KURSMAN:  Okay.  Let me show you

10            what I will mark as, I believe, EXHIBIT 7

11            maybe.  And this will be a study by Schultz.

12                    (Thereupon, the Schultz study was

13            marked and filed as EXHIBIT 7.)

14                    MR. KURSMAN:  I believe we sent it to

15            you, Dean.

16                    MR. ATYIA:  I'm sending it to

17            Dr. Antognini.  I'll let you know when he gets

18            it and we have time to be ready for it, I

19            guess.

20          Q.        And offer just, Dr. Antognini, look

21    at my screen and see, have you -- let me take you to

22    the top.  Have you seen this article before?  Martin

23    Schultz, Therapeutic and Toxic Blood Concentrations --

24          A.        Yes, I believe I have, yeah.  And I

25    believe Dr. Stevens has produced this before, I
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 195 of 418 PageID #: 7872

```
 1    believe, but I'm not sure.  But anyway, I think I'm
 2    pretty sure I've seen this before.
 3            Q.        Okay.  So if I take you to page 65,
 4    you see it has substance, midazolam?
 5            A.        Yes.
 6            Q.        And do you see it has a therapeutic
 7    dose?
 8            A.        That's milligrams per liter, yes.
 9            Q.        And do you see there's a toxic dose?
10            A.        Yes.
11            Q.        But do you see it does not have a
12    fatal dose?
13            A.        I see that.  Okay.  So let's talk a
14    little bit about that.  So you asked me earlier, you
15    know, is there a fatal dose?  Do we know a fatal dose?
16    And again, I think that comes from some of your expert
17    witnesses.  So imagine your grandmother is in the
18    hospital, going to have a procedure, and I say to you,
19    I'm going to give your grandmother 10 milligrams of
20    midazolam, or 20 milligrams of midazolam, or 5, or
21    whatever, I'm going to walk away and I'm not going to
22    monitor the patient.  And you're going to say, well,
23    wait a minute.  That's -- should you be -- shouldn't
24    you be monitoring?  Oh, no, I don't have to monitor.
25    There's no fatal dose.  The fatal dose has not been
```

1    determined, so don't worry about it.  I mean, that is

2    an absolutely ridiculous approach to try to claim that

3    there's no fatal dose of midazolam by showing me a

4    paper that has a blank box in it.  I mean, that's

5    getting down to -- I won't make any comments about the

6    utility of this type of paper, but I think you get my

7    point.

8           Q.        No, I don't actually.  Do you know

9    the fatal dose of midazolam?

10          A.        The fatal dose, you do not maybe -- I

11   don't know what your understanding is or anyone else's

12   understanding is about establishing a fatal dose like

13   this.  In order to know the fatal dose, you have to

14   kill people.  People have to die as a result of it.

15   And you know, we don't know what that dose is because,

16   thankfully, we haven't had enough people die from it to

17   be able to establish that with confidence.  But if

18   midazolam did not kill people by itself, we wouldn't

19   have all this black box warning and these precautions

20   in hospitals and so forth.

21          Q.        As you can see from this table, other

22   drugs have fatal doses, right?

23          A.        Yes.

24          Q.        And are you aware that other

25   anesthetics have fatal doses?

```
  1              A.       Yes.  Now, let's take a look -- I

  2    didn't realize this, but the drug fourth down,

  3    metocurine, do you see that drug there?

  4              Q.       I do.

  5              A.       Do you know what metocurine is?

  6              Q.       I do not.

  7              A.       Metocurine is a drug like vecuronium.

  8    It's a muscle relaxant.  If you give metocurine to

  9    somebody, they will become paralyzed and they will die,

 10    just like with vecuronium.  But wait a minute.  There's

 11    no -- there's a blank box in toxic and there's a blank

 12    box in comatose-fatal.  All right.  So let's go -- once

 13    you scroll down and let's see what it says about

 14    vecuronium.  Can you go down to vecuronium, please, if

 15    they have it?  Scroll up.  All right.  Let's try -- oh,

 16    there it, vecuronium.  Look, vecuronium, the block that

 17    -- that box is empty.  So using your own analysis of

 18    this paper, vecuronium, it can't cause death.

 19              Q.       That's not my analysis of the paper.

 20              A.       Wait a minute, sir.

 21              Q.       I'm asking --

 22              A.       What you're saying is that there's no

 23    established dose of -- fatal dose of midazolam because

 24    there's nothing in that box, and you can make the same

 25    assumption based on the absence of vecuronium, but we
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 198 of 418 PageID #: 7875

```
 1    all have agreed the vecuronium can kill somebody, so --
 2         Q.         What's the fatal dose for vecuronium?
 3         A.         Probably in the range of maybe --
 4    well, basically it's going to be less than the
 5    therapeutic dose probably.  I'm not sure what the --
 6    they say milligrams per liter in terms of blood
 7    concentration.  The fatal dose would probably be quite
 8    similar to that because the intended effect of a
 9    therapeutic dose of vecuronium is to produce muscle
10    relaxation and muscle relaxation, of course, is going
11    to stop the breathing, so --
12         Q.         Let's go to page 72.  And I'm going
13    to take you to page 72.  Do you see pentobarbital?
14         A.         Yes.
15         Q.         Do you see it has a fatal dose?
16         A.         Yes.
17         Q.         Why do you think pentobarbital has a
18    fatal dose but midazolam does not?
19         A.         All right.  You're obviously going
20    along a script here because you want to get to your
21    questions without realizing what I just pointed out.
22    This table and this paper obviously is going to be
23    incomplete because some of those data are not either
24    known or shouldn't be known because you don't want to
25    kill people.  So let's go back to the vecuronium
```

1    example.  There is no dose noted there, fatal dose of

2    vecuronium, but we've all agreed that it can kill

3    patients.  So how would you propose that we establish

4    the fatal dose of vecuronium?

5            Q.        I'm sorry.  I'm just asking you why

6    do you believe pentobarbital has a fatal dose but

7    midazolam does not?

8            A.        Because the sufficient data on the

9    doses of pentobarbital that caused those blood levels,

10   and therefore, has been associated or has caused death,

11   because those data have been obtained not because of

12   some, you know, study.  That would be obviously

13   unethical.  But because of patients that had been

14   overdosed on pentobarbital either many years ago when

15   pentobarbital was commonly available -- but, you know,

16   it's based on studies like that.

17           Q.        And they don't have that data for

18   midazolam, right?

19           A.        Yeah.  You are barking up this

20   tree -- I mean, I have to admire that.  You are right.

21   Let's go back to the midazolam if we could.

22           Q.        Sure.

23           A.        Okay.  In the box for midazolam, it

24   says comatose or fatal, that box is empty.  There is

25   not a dose there.  I agree with that.

```
 1              Q.         Right.  So --
 2              A.         But what's your point about all this?
 3      I've already shown you that there's no such data for
 4      vecuronium or for some of the other drugs, so --
 5      anyway, go ahead.
 6              Q.         So for vecuronium, for instance,
 7      right, a hospital wouldn't have data on patients
 8      overdosing on vecuronium, right?  That's just not
 9      something you would overdose on, right?
10              A.         Hopefully not, no.
11              Q.         Right.  But the hospital does have
12      data on people overdosing on barbiturates, right?
13              A.         There's published literature that
14      supports that level of -- blood level for a fatal dose
15      of pentobarbital, that is correct.
16              Q.         And that's how the fatal dose was
17      determined, right?
18              A.         That is -- I think.  I'm not sure how
19      they determined it in that particular -- for this
20      paper, but that would be about right, I think.  That's
21      how they would do that.
22              Q.         But there is no data relating to
23      midazolam overdoses being fatal, right?  They don't
24      have that data and that's why it's left blank?
25              A.         They do not have that data.
```

www.veritext.com                  Veritext Legal Solutions                  800-556-8974

```
 1           Q.        Okay.  Even though midazolam has been

 2      in existence for decades?

 3           A.        Even though it's been in existence

 4      for decades.

 5           Q.        And I showed you a study earlier

 6      where patients have come into the hospital with very

 7      high levels of benzodiazepines in their system, right?

 8           A.        Yes.

 9           Q.        Now, let's go back to your report.

10           A.        Okay.

11           Q.        And do you see that in -- you cite in

12      this same paragraph that we were just talking about,

13      you cite this Vuyk, et al., 2019?

14           A.        Yes.

15           Q.        Do you see that?  Okay.  Do you have

16      Vuyk in front of you?  Do you have that in your --

17           A.        Actually, I'm not sure if I have the

18      full chapter here.  If you want to bring it up --

19                     MR. ATYIA:  Alex, could you send it?

20                     MR. KURSMAN:  I'll bring it up as

21           well.

22           Q.        So this is the Vuyk article that

23      you --

24           A.        Yes.

25           Q.        So we go down to page 654 -- tell me
```

```
 1     if you can see the screen or if you want it --
 2              A.         No, that's pretty good right there.
 3              Q.         654.  And you see this is the section
 4     on benzodiazepines?
 5              A.         Yes, I see that.
 6              Q.         If I scroll down.  Do you agree that
 7     in clinical practice midazolam is often used
 8     immediately before induction of anesthesia?
 9              A.         That is it's most common use, that is
10     correct, in a clinical setting.
11              Q.         And if we go to page 656, do you see
12     it says all benzodiazepines have hypnotic, sedative,
13     anxiolytic, amnesic, anticonvulsant, and centrally
14     produced muscle relaxant properties?
15              A.         Yes.
16              Q.         Why do you think it doesn't say
17     anesthetic properties?
18              A.         I would say that's because of the
19     fact that, especially in 2020 when this book was
20     published, which was just a couple years ago, that we
21     would not use midazolam for an induction of general
22     anesthesia because we have such better drugs now.  So
23     it would be very -- you know, I certainly don't fault
24     somebody for leaving that off the list there,
25     especially since it says all benzodiazepines and we
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

```
 1      wouldn't use all benzodiazepines for the induction of
 2      anesthesia.  If we were to use one, it would be
 3      basically midazolam, if we did it.  So the absence of
 4      that doesn't mean that it doesn't -- you know, that it
 5      doesn't exist.
 6              Q.      And if we go to page 659 --
 7                      MR. KURSMAN:  And I will mark this as
 8              EXHIBIT 8, I believe.
 9                      (Thereupon, the Vuyk study was marked
10              and filed as EXHIBIT 8.)
11              Q.      Do you see it says at the very
12      bottom, benzodiazepines lack analgesic properties and
13      must be used with other anesthetic drugs to provide
14      sufficient analgesic?
15              A.      I see that, yes.
16              Q.      Do you agree with that?
17              A.      I disagree with that.  Let me say
18      this:  I disagree basically what that sentence said,
19      you know, it lacks analgesic properties.  I think
20      there's sufficient data out there to suggest that it
21      has some analgesic properties, not nearly as much as
22      opiates, for example, but some.
23              Q.      Not nearly as much as opiates but
24      some.  How much?
25              A.      Well, you cannot very easily make a
```

```
 1    comparison and say, you know, it's a tenth of the
 2    analgesic potency of fentanyl, or morphine, or
 3    something like that.  All I can tell you is that at
 4    some doses, relatively low doses, there are studies
 5    suggesting that or indicating that midazolam reduces
 6    pain levels, and so -- but I can't give you, you know,
 7    an exact number, like it's, you know, ten percent of
 8    what fentanyl would do or something like that.
 9         Q.       So just so I'm clear, this study that
10    you cited in your report, you disagree with a
11    conclusion?
12         A.       I disagree with that.  I disagree
13    with that.  I know this has been an issue.  You know,
14    there's several issues in these cases.  They're very
15    contentious and there's disagreement and I know this is
16    one of them.  But, again, the context here is that I
17    would never use midazolam as an analgesic in clinical
18    practice because we have much better drugs to use.  I
19    would never use 500 milligrams of midazolam.  I
20    wouldn't use midazolam as the only induction drug
21    because we have much better drugs to use, but that
22    doesn't mean that they don't have these -- the
23    midazolam doesn't have these other effects.
24         Q.       That article that we just looked at
25    was in Miller's?
```

```
 1              A.         That is correct.
 2              Q.         Is that the preeminent textbook for
 3     anesthesia?
 4              A.         It is probably, if I were to say the
 5     most eminent book, it would be Miller.  I have actually
 6     been an author on some chapter -- I mean some editions
 7     ago, but, yes.  It doesn't mean I agree with everything
 8     that's in there, that everything is right, but it is a
 9     preeminent.  So now you can say even Dr. Antognini says
10     the book is -- you know, it has a statement in it, so
11     you can put that in your whatever you use it for, you
12     know, your statements and so forth.
13              Q.         What should I put it in?
14              A.         Whatever, you know, your complaints
15     that you write and all that and so forth, so --
16              Q.         Okay.  Let's go to paragraph 14 in
17     your report.
18              A.         Okay.  All right.  Let's see, where
19     should you put it?  I think I just got your joke.  I'm
20     a little bit slow on the take here.  Sorry, gentlemen
21     and ladies.  Okay.  So my report.  What paragraph?
22              Q.         14.
23              A.         Yes, I see it.
24              Q.         Do you see it says, finally, the
25     package insert clearly states that midazolam is
```

```
 1       indicated for induction of general anesthesia?
 2              A.        Yes.
 3              Q.        Okay.  So let's look back at the
 4       package insert again.
 5              A.        Yes.
 6              Q.        Pull that up.  I'm going to share my
 7       screen.  So is this what you're talking about under
 8       indications and usage where it says intravenously for
 9       induction of general anesthesia?
10              A.        Yes.
11              Q.        And then it says, though, before
12       administration of other anesthetic agents?
13              A.        Yes, I see that.
14              Q.        Why didn't you include that second
15       clause in your report?
16              A.        So I probably should have.  I have in
17       the past.  And so let's talk a little bit about that
18       sentence there.  It says intravenously for induction of
19       general anesthesia before administration of other
20       anesthetic agents.  And I -- so I want to just go back
21       to something here about the package insert and then
22       we'll get back to that sentence.  I was under the
23       impression that the package inserts for a drug, whether
24       it's made by one company or another, they all have to
25       be the same, I thought.  It said maybe prior to the
```

1    administration of other anesthetic agents.  This says
 2    before.  But anyway, that's a minor point because it
 3    says before.
 4                      But let's look at that sentence or
 5    that -- it's not a full sentence there, but not so much
 6    from the scientific standpoint but just from the
 7    English language standpoint.  So as indicated,
 8    intravenously for induction of general anesthesia.  So
 9    what does induction mean?  It means to start the
10    process, to achieve the process of something, basically
11    to induce sleep, et cetera.  So the package insert says
12    induction of general anesthesia.  They're basically
13    saying you can use this to induce general anesthesia,
14    to achieve the state of general anesthesia.  And then
15    it says before administration of other anesthetic
16    agents.
17                      Now, if midazolam only produced
18    sedation and deep sedation, did not produce anesthesia,
19    it makes sense to me that the sentence would read
20    something like intravenously for the induction of
21    sedation before administration of anesthetic agents.
22    The word other in this context means that midazolam is
23    in a group of other anesthetic agents.  If it wasn't an
24    anesthetic agent, they wouldn't have used the word
25    other.  So, to me, the common interpretation of that

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 208 of 418 PageID #: 7885

```
 1    sentence is that they are including midazolam as
 2    another anesthetic agent, so --
 3            Q.        That's interesting.  So you believe
 4    that because they use the term of other anesthetic
 5    agents, they are saying to you as an anesthesiologist
 6    that midazolam is an anesthetic, is that your
 7    testimony?
 8            A.        That is an interpretation of that
 9    sentence.
10            Q.        You're an anesthesiologist.  Do you
11    know what midazolam is classified as?
12            A.        It is classified as a sedative
13    hypnotic.
14                      MR. ATYIA:  Objection to form.
15            Q.        It's not classified as an anesthetic,
16    is it?
17            A.        It is not, to my knowledge.  When I
18    look at the package insert, I do not see it as that
19    classification, but --
20            Q.        Propofol, is propofol --
21            A.        I'm not done yet.  I'm not done yet.
22            Q.        Go ahead.
23            A.        Despite that, it basically can be
24    used to induce general anesthesia and it has, you know,
25    that word other in there.  So, again, I don't -- you
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 209 of 418 PageID #: 7886

| | |
|---|---|
| 1 | know, in a clinical context, you wouldn't use midazolam |
| 2 | by itself for a prolonged procedure, and we've already |
| 3 | talked about previously, but -- and it's classification |
| 4 | is it's not classified in the same class as maybe |
| 5 | isoflurane, or propofol, or something like that.  But |
| 6 | that doesn't say anything about what the FDA believes, |
| 7 | you know, in terms of you normally would use it for, |
| 8 | and if they thought that it couldn't induce general |
| 9 | anesthesia, then they probably would not have put that |
| 10 | in there. |
| 11 | Q.        I would like to continue on this |
| 12 | because I find your reading of this interesting.  So a |
| 13 | second ago, you said to me that under indications and |
| 14 | usages, because it says before administration of other |
| 15 | anesthetic agents, that signals to you as an |
| 16 | anesthesiologist that midazolam in and of itself is an |
| 17 | anesthetic, right?  Is that what you just said? |
| 18 | MR. ATYIA:  Objection to form. |
| 19 | A.        That would be one interpretation of |
| 20 | that sentence.  And I have said in my report and I've |
| 21 | said in deposition before, I don't -- I think I've said |
| 22 | it here today and certainly in testimony, you can give |
| 23 | midazolam for the induction of general anesthesia.  You |
| 24 | follow that by a muscle relaxant and you can intubate |
| 25 | somebody, and that's a very stimulating procedure.  And |

```
1    so in that setting, it is used basically as a general
2    anesthetic to do that type of procedure.  That's my
3    opinion, that I've said that many, many times.
4             Q.       I'm just asking you about this
5    sentence.  This is all I'm asking you about, this
6    sentence without a filibuster, this sentence.  When you
7    see before administration of other anesthetics, are you
8    telling me that that signals to you as an
9    anesthesiologist that midazolam is an anesthetic?
10                  MR. ATYIA:  Objection to form.
11            A.       That sentence by itself taken out of
12   context may not signal to me as an anesthesiologist
13   that the primary effect of midazolam at these doses is
14   to be a general anesthetic, but, you know, based on the
15   data that produced this and the data that produced the
16   package insert, I should say, and the studies that were
17   done with the use of midazolam as an induction of
18   general anesthesia, then I believe that that statement
19   says -- is correct that you give it for the induction
20   for general anesthesia before the administration of
21   other anesthetic agents.  It's just that we wouldn't in
22   the clinical setting use midazolam as a, quote, sole
23   anesthetic for the, you know, reasons that we've just
24   gone over.  There's a difference between, you know,
25   what a drug could do and what a drug -- you should be
```

```
 1    using the drug for.  You know, some drugs have effects

 2    that you don't want to use it for that particular

 3    effect, but you use it for a different effect.  It

 4    doesn't negate the possibility that it has these other

 5    effects.

 6              Q.         Are you aware that there are other

 7    drugs that are labeled anesthetics, classified as

 8    anesthetics?

 9              A.         Yes.

10              Q.         And are you aware that midazolam is

11    not one those drugs?

12                   MR. ATYIA:  Objection, form.

13              A.         I don't know that -- I would have to,

14    I guess, when you say that midazolam is not classified

15    like that, I suppose you would have to produce to me

16    a -- you know, what source you're looking at.  I don't

17    know off the top of my head and I suppose if we go to

18    the FDA you could look up, you know, what anesthetic --

19    what drugs are considered to be anesthetic or

20    classified as anesthetics, I suppose, so --

21              Q.         But let me understand this right.

22    You wrote a report in this case on the use of midazolam

23    and you don't know what midazolam is classified as?

24              A.         No, I do.  I said --

25                   MR. ATYIA:  Objection to form.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1              A.          It's classified as a sedative

 2       hypnotic, I believe would probably be the best term

 3       there.  And I'm a little bit unclear about that simply

 4       because how it's classified by, say, the FDA, the exact

 5       wording I may not have right, but it would be something

 6       similar to that.  It would be an anxiolytic to stop

 7       anxiety and a sedative hypnotic.

 8              Q.          So are you unaware of whether it's

 9       classified as an anesthetic?

10                          MR. ATYIA:  Objection.

11              A.          I don't think it's classified an

12       anesthetic.

13              Q.          Okay.  Now, let's look at indications

14       and usages again, which is up on my screen.  It doesn't

15       say that midazolam is indicated for the maintenance of

16       general anesthesia, right?

17              A.          It does not, no.

18              Q.          There are other drugs, though, right,

19       other drugs that have an indication and usages and some

20       of those drugs are indicated for the maintenance of

21       general anesthesia, right?

22              A.          As a general topic, yes, general

23       statement, that is correct.  I'm not sure it says that

24       specifically in here, but that's true, yeah, there are

25       other drugs we would use for maintenance.
```

```
 1              Q.         Drugs such as halothane?

 2              A.         Halothane, yes.

 3              Q.         We can stop this.  Let's go back to

 4    your report.  Let's go to paragraph 16.  And do you see

 5    you cite Bailey, et al.?

 6              A.         Yes.

 7              Q.         And what is the point of you citing

 8    Bailey, et al., in this paragraph?

 9              A.         Well, related to our earlier

10    discussion around whether midazolam is -- can be fatal,

11    this was a study that was done.  It was a two-part kind

12    of study.  They were interested in the respiratory

13    depression component of this discussion, this issue

14    around does midazolam cause respiratory depression.

15    And I believe they studied this in volunteers.  And

16    then collated or had data from the -- well, it says

17    Department of Health and Human Services where there had

18    been deaths in the United States that were reported to

19    DHS and described circumstances where patients died as

20    a result of midazolam administration.

21              Q.         Why don't we take a look at Bailey.

22    Do you have that in your --

23              A.         I almost certainly do, so let me pull

24    that up here.  What page are you wanting to go to?

25                         MR. KURSMAN:  And we'll mark this as
```

```
 1            EXHIBIT 9.
 2                    (Thereupon, the Bailey study was
 3            marked and filed as EXHIBIT 9.)
 4            Q.        Let's go to page 830.
 5            A.        830, okay.
 6            Q.        Do you see that very final paragraph?
 7            A.        Yes.  The concluding paragraph?  Yes.
 8            Q.        You see it says, our results
 9    demonstrate that midazolam when combined with an opioid
10    is likely to place patients at high risk for hypoxemia
11    and apnea, correct?
12            A.        Yes, that's correct, that's what it
13    says.
14            Q.        This study is saying midazolam when
15    combined with an opioid can cause death, right?
16            A.        That's what the sentence says, but
17    look at the data.  Look at the data reported where they
18    said some of these patients did not receive other
19    drugs, which is what I said in my report.
20            Q.        Now, let's take this down and let me
21    ask you this:  We were talking about fatal doses
22    before.  Do you think all drugs have a fatal dose?
23            A.        I've already said never say never and
24    never say always.  But I am reminded of Paracelsus, who
25    was a, you know, famous philosopher/scientist back in
```

```
 1    the 1500's, whatever it said.  It's the dose that makes

 2    the poison.  And you know, one dose of almost anything

 3    can kill you.  So I would say, yes, there are drugs

 4    that, you know, very safe in general, but you can get a

 5    high enough dose and it can kill you.  So can all drugs

 6    kill you?  I would say probably, yes.  I mean, I

 7    guess -- I mean, off the top of my head, I'm sure there

 8    are going to be some examples of maybe I'm a little bit

 9    off by that.  But in general, if you give enough of a

10    drug, it's going to have some effect of some sort that

11    would kill a patient eventually.

12         Q.        Well, I'm talking about fatal dose,

13    because in your expertise, does the term fatal dose

14    have a recognized definition in the medical community

15    that you're aware of?

16         A.        So, in general, a fatal dose would be

17    one in which you would -- it's a dose that, you know,

18    you would say on average or at this point you start to

19    see people dying from it.  You know, you have to be

20    careful about how you define that.  I mean, I have a

21    general sense of a fatal dose.  I have more of a sense

22    of what's called lethal -- an LD50 or a lethal dose 50

23    than a fatal dose.  But I certainly have this

24    understanding of fatal dose.  It's not quite as, I

25    think, well-defined, I suppose, as a lethal dose 50.
```

www.veritext.com                 Veritext Legal Solutions                 800-556-8974

```
 1              Q.         And what is that definition that you
 2       believe it to be for a fatal dose?
 3              A.         For midazolam?
 4              Q.         No, just in general.  What does the
 5       term fatal dose mean in the medical community?
 6              A.         It means a dose of a drug that would
 7       kill a patient, basically.  But, again, it's -- you can
 8       take a drug and give it to 100 people and maybe at that
 9       dose it kills two people out of 100.  Now, is that a
10       fatal dose?  Well, it certainly was for those two
11       patients.  What's your cutoff, you know, level here?  A
12       fatal dose is sort of a qualitative term because it's
13       not quite as precise as LD50.  So if I understand --
14       now, maybe, you know, if you could elaborate about
15       where you're leading with this, but I guess -- like I
16       said, a fatal dose in the general medical community is
17       going to be one where most physicians, I suppose, would
18       recognize that at this dose, some people are going to
19       die.
20              Q.         And pentobarbital has a fatal dose,
21       right?
22              A.         The fatal dose is known.
23              Q.         Right, the fatal dose is known.  And
24       the fatal dose of thiopental is known, right?
25              A.         I would say probably yes.  You know,
```

```
 1     again, you have to -- I'm going back to the paper that
 2     you brought up.  You have to understand where those
 3     numbers come from.  It's not so easy to say that, you
 4     know, it's known for thiopental, so I would concede or
 5     I would guess that, yes, it's probably known for
 6     thiopental as well.
 7             Q.      But it's not known for midazolam?
 8             A.      It is not, to my knowledge, it is not
 9     known for midazolam.
10             Q.      Let's move to paragraph 18 in your
11     report.
12             A.      Okay.
13             Q.      And do you see it says midazolam can
14     clearly produce unconsciousness as defined by multiple
15     investigators?
16             A.      Yes.
17             Q.      And you cite Glass, which we already
18     talked about.  And then you cite Kuizenga and Reves
19     from 1978?
20             A.      Yes.
21             Q.      Do you have Kuizenga in your --
22             A.      Yes.  I'll pull it up real quick.
23             Q.      And I'll share my screen in a second.
24                     MR. KURSMAN:  Mark this as EXHIBIT
25             10.
```

```
 1                          (Thereupon, the Kuizenga study was
 2              marked and filed as EXHIBIT 10.)
 3              Q.        Do you see it up on my screen?
 4              A.        Yes.
 5              Q.        So let's go to page 355.
 6              A.        Yes, I see it here.
 7              Q.        And if you go down to the last
 8      paragraph, do you see that?
 9              A.        Yes.
10              Q.        It says, responsiveness was
11      determined by testing the response of the patient to
12      simple commands from a pre-recorded tape.  And then in
13      parentheses, raise your thumb, spread your fingers, and
14      clench your fist, given by headphones every 30 seconds.
15      The first time that the patient did not respond to a
16      verbal command was registered.  Do you see that?
17              A.        Yes.
18              Q.        At the time of loss of
19      responsiveness.  Do you see that?
20              A.        Yes.  Yes.
21              Q.        So what Kuizenga is actually studying
22      is responsiveness, not consciousness, right?
23              A.        They are studying loss of
24      responsiveness, as stated there, and they also say loss
25      of consciousness elsewhere in their paper, but they are
```

```
 1     studying there or what they recorded, I guess, and
 2     reported would be the loss of responsiveness, which
 3     they define as being the loss of consciousness.
 4            Q.        And in Kuizenga, the subjects were
 5     not stimulated, right?
 6            A.        I do not believe they were.  I do
 7     not -- I don't think so.  I'm not sure about that,
 8     because it -- let's see.  Give me a moment to see
 9     what's going on here.  All right.  I don't believe that
10     they were being stimulated.  It looks they had not
11     received -- I don't think -- you're right, I don't
12     think they were stimulated.
13            Q.        They're just listening to the
14     pre-recorded tape?
15            A.        I believe that's correct, yes.
16            Q.        Okay.  Let's go to page 358.
17            A.        Okay.
18            Q.        And do you see under discussion, do
19     you see where it says discussion?
20            A.        Yes.
21            Q.        You see it says, in this study, we
22     demonstrated biphasic EEG effects for all the induction
23     agents except midazolam.
24            A.        Yes.
25            Q.        And then if we go to 359.
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 220 of 418 PageID #: 7897

```
 1              A.         Yes.

 2              Q.         Very last paragraph beginning with we

 3       conclude.

 4              A.         Yes.

 5              Q.         It says, we conclude that thiopental,

 6       propofol, etomidate, and sevoflurane, but not midazolam

 7       induced biphasic EEG effects during the transition from

 8       consciousness to unconsciousness.  Do you see that?

 9              A.         Yes.

10              Q.         So are they saying that subjects who

11       received midazolam, the EEG doesn't give them an

12       accurate reading when the subject moves from responsive

13       to unresponsive?

14              A.         I'm sorry, could you repeat that?

15       I'm just scanning the rest of that -- part of that page

16       there.

17              Q.         Sure.

18              A.         Could you repeat that?

19              Q.         Are the authors saying that the EEG,

20       at least when used with subjects who receive midazolam

21       doesn't accurately reflect when they go from responsive

22       to unresponsive?

23              A.         I'm not sure that they say that

24       because -- so that biphasic effect, and again, I

25       probably should take some time to read this a little
```

```
 1    bit more thoroughly, but the biphasic effect is -- I
 2    believe they're defining it as being where there's, and
 3    I could be wrong, but -- let's see where there is --
 4    basically, what you do is you see this -- so going back
 5    to the discussion here, the beginning, it says,
 6    biphasic effects -- and so I'm at the beginning of the
 7    discussion at page 358 -- is an increase in alpha
 8    activity and beta activity followed by a decrease in
 9    alpha and beta activity and then simultaneously
10    increase -- simultaneous increase in delta activity.
11    So basically, when they use the term biphasic, it means
12    that you see this sort of activation occurring and then
13    this depression occurring.  So that's biphasic effect
14    is what they found with thiopental, propofol, and
15    etomidate and sevoflurane, but not midazolam.  That
16    says nothing about whether, you know, midazolam
17    produces unconsciousness or whatever.  You know --
18              Q.        Dr. Antognini, that wasn't --
19              A.        I'm not done yet.  Drugs, you know,
20    differ in terms of effect one parameter but not
21    another, so they're different EEG effects of these
22    drugs.  And so just because midazolam doesn't induce
23    the biphasic effect says nothing about what it does for
24    unconsciousness and so forth.  And so, yeah, I mean,
25    that's true what they say, I guess.  You know, I
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 222 of 418 PageID #: 7899

1    believe their interpretation, but it doesn't say

2    anything about what midazolam does for unconsciousness.

3             Q.        And I wasn't asking you about

4    unconsciousness.  All I was asking you about was its

5    effects on the EEG.

6             A.        Yeah.

7             Q.        So you're saying you agree with that

8    conclusion or have no reason to disagree with that,

9    right?

10            A.        I have no reason to disagree with

11   that based on what I've seen.

12            Q.        Okay.  And you talked about

13   consciousness.  Do you agree that the authors didn't

14   draw any conclusions as to whether midazolam can

15   maintain anesthesia?

16            A.        I do not remember.  You know, I would

17   have to look at their methods about what they did here.

18   They obviously, if you look at just the figure, it

19   looks like they used -- I'm guessing they used

20   midazolam or they gave these drugs as an infusion, but

21   I don't know for sure.

22            Q.        Well, we just talked about the fact

23   that they were measuring responsiveness and you agreed

24   that's what this study was doing, measuring

25   responsiveness to a pre-recorded tape, right?

```
 1           A.          Well, that was one way -- that was
 2     just part of the study where they were looking at
 3     the -- they had to have some measure of the transition
 4     from consciousness to unconsciousness, so that's --
 5     they used that tape and those commands to do that.
 6           Q.          And where midazolam was administered,
 7     could they draw any correlations on what the BIS score
 8     would be required to assume somebody was not
 9     responsive?
10           A.          So let's look at that data here.  So
11     in figure 3, they have -- what you see there basically
12     are, I believe, individual -- yeah, these are
13     individual patients.  I'm focusing now on figure 3 at
14     the bottom, the middle figure of that where it says
15     midazolam and you -- what you see there are the lines
16     basically representing the BIS number.  And as time
17     went on, these individuals became -- or lost
18     responsiveness, and that's what the circles signify,
19     although in the figure legend it says the moment of
20     loss of consciousness, but they determine consciousness
21     by the loss of responsiveness.  So you asked about the
22     BIS number.  I think that's the data that you're -- I
23     don't know.  There might be other BIS data here, but
24     that's the one that shows the BIS data basically
25     relative to the loss of consciousness.
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
 1              Q.        Let's go to -- let me stop this.  And
 2     let's go to Reves, the other study that you cited for
 3     your proposition that midazolam can clearly produce
 4     unconsciousness.  Do you have Reves, a 1978 article?
 5              A.        I'm pulling it up now.  Yes, I have
 6     it.
 7                        MR. ATYIA:  May I ask, Videographer,
 8              how much time or where we are on the time?
 9                        VIDEO OPERATOR:  Hold on one moment.
10                        MR. KURSMAN:  Well, while you're
11              doing that, let's go to -- I'm going to share
12              my screen and let's go to --
13                        VIDEO OPERATOR:  About five and a
14              half hours.
15              Q.        Go to table -- do you see page 1,
16     under table 1, do you see where my --
17              A.        Yes, I see it.  I have it pulled up
18     here, too.
19              Q.        Do you see it says, induction of
20     anesthesia was defined as complete loss of lid reflex
21     and failure to respond to oral commands?
22              A.        Yes.
23              Q.        So, again, this study is looking at
24     nonresponsiveness, right?
25              A.        That is correct, yes.
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
1           Q.          And there was no painful stimuli
2     applied, right?
3           A.          To my knowledge, no, not in this
4     particular study.
5           Q.          And do you recall that there was, as
6     part of this study, there was a post-visit follow-up
7     where they discussed pain?
8           A.          Yes, I -- well, I shouldn't say yes.
9     I don't doubt you and we can look at that, but I
10    don't -- I know that some of these studies had that, so
11    we can look at that.
12          Q.          Do you agree that midazolam is an
13    amnestic?
14          A.          Yes, it has that property.
15          Q.          So if the subject was to receive
16    midazolam and then have a post-visit follow-up to
17    discuss pain, would they be able to recall that pain?
18          A.          If they had an amnestic drug like
19    midazolam, it's quite possible they would not recall
20    that pain.
21          Q.          We can take this down.
22                      MR. KURSMAN:  And that will be
23              EXHIBIT 11.
24                      (Thereupon, the Reves study was
25              marked and filed as EXHIBIT 11.)
```

```
 1              Q.        And then at the end of paragraph 18,
 2      you cite Nishikawa.  Do you have Nishikawa?
 3              A.        Yeah.  Let me just make sure.  You
 4      mean Nishikawa?
 5              Q.        Nishikawa.  I apologize.
 6              A.        That's fine.  Sure.  Okay.  It's
 7      coming up.  Yes, I have it here.
 8              Q.        This is a study on mice, right?
 9              A.        Yes.
10              Q.        And it's a study about immobilizing
11      the mice?
12              A.        That is only one part of it, but --
13      you know, it's about more than that, but that's one
14      part of it.
15              Q.        Well, let's go to the conclusion of
16      this study on page 179.
17              A.        Okay.
18              Q.        Make sure I'm on the right page.  Do
19      you see, the present study provided in vivo evidence
20      that genetic and pharmacological manipulations to alter
21      ambient GABA concentrations have significant effects on
22      the hypnotic and immobilizing actions of propofol and
23      midazolam.
24              A.        Yes.
25              Q.        It does not say on the amnestic
```

Page 226

```
 1    effects of midazolam, right?  Or, I mean, anesthetic
 2    effects, I apologize.
 3           A.         Yeah.  It does not.  But it says
 4    immobilizing actions of propofol and midazolam, so
 5    that's immobility.
 6           Q.         Are you aware of studies on any other
 7    animals that show midazolam can produce complete
 8    anesthesia?
 9           A.         I do not -- I have not found any
10    other studies aside from this particular one.  I'm sure
11    if I had, I would remember, so -- I just don't know at
12    this point.  I don't recall.
13           Q.         Have you seen studies that show
14    midazolam actually cannot produce complete anesthesia
15    on rats?
16           A.         I have seen studies that have used
17    midazolam, and again, you go up to a certain dose and
18    you stop and say we didn't, you know, produce complete
19    immobility at that dose.  But again, it's a question
20    of, well, if you had gone further, what would you have
21    seen?  So there are studies out there where they look
22    at midazolam and I can't give them to you right now,
23    but I'm pretty sure I've seen them where they give
24    midazolam to look at the effects and at the highest
25    dose that they study they did not produce complete, you
```

```
 1    know, immobility based just solely on midazolam.
 2            Q.         And there are limitations to studies
 3    on mice, right?
 4            A.         Yes.  There are limitations to all
 5    studies.  I'm sorry, I keep on interrupting you, I
 6    apologize.
 7            Q.         Oh, no, that's okay.
 8                       MR. KURSMAN:  And I'm going to mark
 9            this as EXHIBIT 12.
10                       (Thereupon, the Nishikawa study was
11            marked and filed as EXHIBIT 12.)
12            Q.         So let's go back to your report and
13    let's go now to paragraph 19.  So we talked about
14    Glass.  Now let's talk about Antonik, which you cite in
15    paragraph 19.  Do you have Antonik?
16            A.         Yes.  So go ahead and tell me where
17    you want to go with that one and let me just pull it up
18    while you're doing that.
19            Q.         Take your time.
20            A.         It's coming up now.  Okay.  I have it
21    here, so --
22            Q.         Let me pull it up and I will share my
23    screen.
24            A.         Okay.
25            Q.         Do you see it on my screen?
```

```
 1              A.      Yes.

 2              Q.      Now, if we go to page -- the second

 3      page of Antonik, which would be --

 4                      MR. KURSMAN:  And this is EXHIBIT 13.

 5                      (Thereupon, the Antonik study was

 6              marked and filed as EXHIBIT 13.)

 7              Q.      Which would be page 275.  Do you see

 8      table 2?  They're using the MOAA/S scores.

 9              A.      Yes.

10              Q.      And so for a score of 2, it says,

11      responds only after mild prodding or shaking, right?

12              A.      Yes.

13              Q.      And you would get a 1 if you

14      responded after a trapezius squeeze.

15              A.      Yes.

16              Q.      So let's go to page 278.

17              A.      Okay.  Okay.

18              Q.      And do you see it says, in this

19      cohort experienced -- six of ten subjects in this

20      cohort experienced loss of consciousness, and they have

21      MOAA/S scores of less than 2.

22              A.      I'm sorry, could you show me -- oh,

23      yes, I see it here.  Yeah, I see it here.

24              Q.      Do you see it?

25              A.      Yes.
```

```
 1              Q.        Okay.  So if you respond to a painful
 2    trapezius squeeze, according to this study, you are
 3    unconscious, right?
 4              A.        Yes.
 5              Q.        And now let's go to table 4, which is
 6    right at the top.  Do you see it?
 7              A.        Table 4, I see it, yes.
 8              Q.        And do you see it says, the mean, the
 9    mean blood levels right here, nanograms per milliliter,
10    the second column over?
11              A.        Yes.  Yes.
12              Q.        And you see for midazolam, it says
13    1,554 nanograms per milliliter, do you see that?
14              A.        Yes.
15              Q.        And now if we go to figure 4, so the
16    mean amount of midazolam in the subject's blood were
17    1,554 nanograms per milliliter, right?
18              A.        Yes.
19              Q.        Now, let's go to figure 4, and that
20    will be on page 280.
21              A.        2-8?  What?
22              Q.        280.
23              A.        280, okay.  All right.
24              Q.        And do you see this midazolam?
25              A.        Yes.
```

```
 1              Q.        And do you see the chart at the
 2      bottom?
 3              A.        Yes.
 4              Q.        Okay.  So even though the mean levels
 5      of blood in the subjects of midazolam, the mean
 6      midazolam in the blood was 1,554 nanograms per
 7      milliliter, many of the subjects responded to a
 8      trapezius squeeze, right?
 9              A.        Yes.
10              Q.        And for BIS levels, I think you said
11      at the beginning you thought the BIS was the most
12      important mechanism to look at consciousness.  What do
13      you think is sufficient in terms of a BIS reading to
14      ensure that a person is unconscious who has received
15      midazolam?
16              A.        Generally, the range for
17      unconsciousness is going to be -- I know you have
18      quibbled about what unconsciousness means, but for the
19      lack of a trapezius squeeze, we're probably talking of
20      a, my guess, of a BIS number of maybe 60 to 70, I
21      suppose.  I don't know off the top of my head.
22              Q.        And what about when you use the term
23      deeply unconscious?  I'm not sure that I could --
24              A.        I used the term what?
25              Q.        Deeply unconscious.
```

```
 1            A.        Deeply unconscious.  It's probably
 2   lower than -- it's going to be a BIS of maybe 40 to 60.
 3   That's the general range that we would attempt to
 4   achieve with -- the general range we attempt to achieve
 5   for general anesthesia during a clinical case.
 6            Q.        Okay.  So let's go to page 282 now.
 7            A.        Okay.
 8            Q.        Which is --
 9            A.        Okay.
10            Q.        And do you see at the bottom the
11   midazolam BIS scores?
12            A.        Yes.
13            Q.        Do you see that no subject who
14   received midazolam had anywhere close to a BIS score of
15   60?
16            A.        So you're looking at the figure there
17   of midazolam?
18            Q.        Do you see where it says BIS scores
19   on the side?
20            A.        Yeah.  You're looking at figure 5,
21   correct?
22            Q.        Figure 5, that's right.
23            A.        Yes.  So the lower portion of figure
24   5.
25            Q.        Yes.
```

1           A.          Lower right, I should say.

2           Q.          Midazolam.

3           A.          Okay.  Well, these are data reported

4    as the medians plus or minus interquartile range of

5    n = 18 for midazolam.  So these don't represent all the

6    individuals.  So if you look at some of those bars,

7    basically, especially at the lowest point, which is

8    maybe a few minutes after the midazolam has been given,

9    the lowest bar there, the error bar, basically, is at

10   around 68, maybe 67.  That doesn't represent all

11   patients.  There's going to be some variations.  So

12   some patients -- some of these individuals probably

13   were below 60 just based on the amount of spread of

14   that error bar.

15          Q.          Okay.  And we know the mean in

16   nanograms per milliliter for these subjects was 1,554

17   nanograms per milliliter of midazolam in their blood,

18   right?

19          A.          So I'm going to -- I have to admit

20   maybe a little bit of egg on my face that that 1,554

21   number, I'm surprised it's that high, I really am,

22   based on the dose of the drug that was given.  But

23   that, you know, may be a correct number, but I'm

24   surprised it's that high.  But I don't deny the fact

25   that it says 1,554.

1      Q.      Would that be a high level of

2   midazolam to have in your blood?

3      A.      It would, yes.

4      Q.      And do you see that in this same

5   figure, figure 5, the mean of the BIS score is still

6   well above 70, even at its lowest point?

7      A.      Yes.

8      Q.      And these were subjects who received

9   no stimulation whatsoever?

10      A.      I do not believe that they did,

11   except for the --

12      Q.      Except for the tape?

13      A.      No.  Well, no, because remember these

14   are individuals that were given the sedation scale.  I

15   mean, they were subjected to the sedation scale.  So,

16   you know, at some point, they had to be -- you know, a

17   name called out, they had to be, you know, prodded or

18   shaked, some of them received a trapezius squeeze, so

19   they did receive some stimulation by virtue of the fact

20   that they had to measure the sedation score.

21      Q.      So, in your opinion, is the

22   stimulation that they received was -- was at the time

23   they were assessing the sedation score, right?

24      A.      Yeah.  As far as the BIS number is

25   concerned, my guess is that they probably recorded the

```
 1    BIS number before stimulation.  That's usually the way

 2    that these types of studies are done.  But I don't know

 3    for sure, I would have to look at the study.

 4         Q.        Well, I do, so we can go to that.  So

 5    let's go to page 275.

 6         A.        Okay.

 7         Q.        It says, during this study, sedation

 8    was measured by BIS monitoring.  The confounding

 9    effects of stimulation producing movements were

10    mitigated by recording the BIS value immediately before

11    the MOAA/S assessment, right?

12         A.        Yes, I see that.

13         Q.        Okay.  So these patients had a mean

14    of 1,554 nanograms per milliliter of midazolam in their

15    blood and still the mean was above 70 on their BIS

16    score even before any stimulation, right?

17         A.        Okay.  So let's just go back to that

18    table so I can look at that number again.

19         Q.        Sure.  I'll pull it up for you.  Here

20    it is, table 4.

21         A.        Yes, I see it here.

22         Q.        Okay.

23         A.        Okay.  All right.  So if you want to

24    repeat your question.

25         Q.        Sure.  So the mean blood level of --
```

Page 235

```
1    the mean level of midazolam was the 1,554 nanograms per
2    milliliter in these subjects and their mean BIS reading
3    with that blood level was about 74 or so, right, based
4    on the chart that we just looked at?
5              A.      Yes.
6              Q.      Okay.  And this was before any
7    stimulation whatsoever, right?
8              A.      Yes.
9              Q.      And the authors of this study looked
10   at the BIS before stimulation because they were
11   concerned that stimulation in and of itself can raise
12   the BIS, right?
13             A.      Yes.
14             Q.      Okay.  So one would expect that if
15   they were prodded or if they received a trapezius
16   squeeze, that BIS score would have went up, right?
17             A.      Yes.  All right.  So now I'm going
18   to -- now that I've had a better look around in this
19   paper and saw the 1,554, so the 1,554 number that you
20   are focused on is the C max or basically the highest
21   plasma concentration that was measured.  And they also
22   report just directly next to it the T max, which is
23   they state is the time of maximum plasma concentration.
24   So I don't know, I would have to again look at the
25   methodology about how they arrived at that number.  But
```

1    one of the things that we have to be very careful
2    about, this is a study that was done where you gave a
3    bolus of midazolam and it was .075 milligrams per
4    kilogram, that works out to be in 70 kilogram adult
5    about 5 milligrams in an adult would 7.5 milligrams and
6    they gave that as a bolus.  I don't know over what
7    period of time.

8                        But drugs such as midazolam have this
9    lag effect where you can measure a peak effect or a
10   peak drug level that doesn't necessarily correspond to
11   what you see clinically, because it takes time for that
12   drug to cross over into the brain.  So that's different
13   than what was done in, for example, the Glass study.
14   And it would be different than what you were talking
15   about with those autopsies where they were measuring
16   it.  It's a very -- you know, it's not as clean cut as
17   I think you're trying to make it here.  But all I can
18   say is that I am surprised it was 1,554.  I wish
19   they -- maybe they did.  Let me just look and see here.
20   The report would actually have the -- they are
21   remimazolam here.  I don't know that they show the
22   midazolam concentrations here at all, but that's too
23   bad.  I don't see that they show that.  But I guess my
24   point is that you have to be careful about using that
25   number 1,554 in trying to correlate it with, you know,

www.veritext.com              Veritext Legal Solutions              800-556-8974

```
 1      some of the effects that they saw and so forth.  So
 2      I'll just leave it at that.
 3              Q.         In a hospital setting where there is
 4      a BIS machine, is the BIS continually monitored during
 5      surgery?
 6              A.         It should be, yes.  Usually it would
 7      be, yes.
 8              Q.         And is the reason for that that you
 9      want to monitor the patient's level of sedation during
10      the surgery?
11              A.         Yes, or level of anesthesia or
12      sedation, yes.
13              Q.         And would it be unhelpful if you
14      stopped monitoring the patient's level of sedation
15      during surgery?
16              A.         Would it be unhelpful?  Yes, it would
17      be unhelpful.  It wouldn't be doing the patient a
18      benefit if you just stopped monitoring them.
19              Q.         And it could actually cause the
20      patient a lot of harm, right?
21              A.         That is correct, yes.
22              Q.         If you were unaware whether the
23      patient was conscious or not during surgery?
24              A.         That is correct, although, again, no
25      monitor is perfect in terms of knowing whether somebody
```

www.veritext.com                 Veritext Legal Solutions                 800-556-8974

1    is conscious or not during the anesthesia and surgery.

2            Q.        Sure.  But do you agree that the more

3    things that you can do to monitor the consciousness

4    level is helpful to reducing that pain during surgery?

5            A.        Yeah.  You know, generally speaking,

6    I think that's a true statement in a clinical realm.

7            Q.        Well, why are you qualifying it in a

8    clinical realm?

9            A.        Well, so some of the things that we

10   look for in the operating room such as increases in

11   blood pressure, increases in heart rate, salivation,

12   the tearing, and so forth that we've talked about,

13   movant responses, these are helpful in terms of us

14   determining whether somebody, you know, their level of

15   anesthesia and so forth, but it's still a possibility

16   that somebody could have consciousness if the

17   anesthetic is really low and we're seeing that.  So I

18   guess my point is that the -- you can't put that all

19   together and still have a hundred percent certainty

20   answer that, you know, somebody is conscious or not.

21           Q.        Sure.  My only question, though, is

22   it helps, each one of those helps the people who are

23   monitoring consciousness, right?  Each one of those

24   different mechanisms helps.

25           A.        If you know how to interpret the data

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1    and all that, yeah, you know, like I said, it does
 2    help, but it's certainly not a guarantee and it's not
 3    used all the time by a lot of anesthesiologists to do
 4    that.
 5            Q.      Is there ever a time in a hospital
 6    setting where a patient receives a paralytic and then
 7    there is no monitoring whatsoever by machine?
 8            A.      By?
 9            Q.      Machine, meaning EEG, BIS, et cetera.
10            A.      And you said something like
11    vecuronium given by itself?
12            Q.      No, not vecuronium given by itself.
13    After vecuronium is given in a surgical procedure,
14    would there ever be a time where a patient isn't
15    monitored by machines?
16            A.      And you mean machines like blood
17    pressure machines and nothing else?
18            Q.      That is what I mean.
19            A.      I see, okay.  In the clinical
20    setting, no, I don't think you would ever see that.
21    You would always have blood pressure, heart rate
22    monitors and so forth.  Obviously, you would have a
23    ventilator on the patient, so you would have all those
24    machines.
25            Q.      Isn't that because you would want to
```

1    know what's going on with the patient?

2          A.        Yes.  You use that information to

3    assess the patient for a variety of different outcomes,

4    bad outcomes, or just the effects of the drugs that

5    you're giving and what's occurring clinically.

6          Q.        And if you didn't monitor that

7    patient, you could dramatically increase their risk of

8    pain, right?

9          A.        No, I'm not sure I would say

10   dramatically increase.  I think that the -- I'm trying

11   to think of how you, you know, in the clinical realm, I

12   guess, we use these machines basically for a variety of

13   different reasons in somebody -- you know, somebody who

14   has received vecuronium, let's say, in the operating

15   room or in the intensive care unit, you know, we use

16   more or less the same types of machines, blood

17   pressure, heart rate, and all that.  And yes, we use

18   that information to understand -- to incorporate that

19   information in our assessment of whether the patient is

20   conscious or not.  I don't -- you know, we also use

21   that information for other reasons, but, you know,

22   relative to consciousness and so forth, yes, we would

23   use that information in basically an algorithm of

24   deciding what is the probability that somebody might be

25   conscious or not.

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1           Q.        Well, if there's no paralytic given
 2    to a patient, you can look at a patient's movements and
 3    reactions, right?
 4           A.        Yes.
 5           Q.        And that helps determine level of
 6    sedation, right?
 7           A.        Yes.
 8           Q.        But once the paralytic is given, you
 9    can no longer do that, right?
10           A.        That is correct, you cannot do that
11    anymore.
12           Q.        So if you took all the machines away
13    once the paralytic is given, you would essentially
14    being, for lack of a better term, flying blind in terms
15    of level of anesthesia, right?
16           A.        Yes, although I would say even with
17    all those machines, you wouldn't -- you would be flying
18    with only -- with one eye closed and the other one, you
19    know, just barely open, because, you know, that -- as
20    Dr. Van Norman has so -- you know, has put it, even
21    with all these machines, we still don't know whether
22    people are conscious or not sometimes, so --
23           Q.        And do you agree with that?
24           A.        Well, you know, one thing that I do
25    agree, and I don't know how my colleagues in Tennessee
```

```
 1      are going to think about this, my answer, but I'm going
 2      to put it out there because it's -- you know, I'm going
 3      to testify truthfully about -- and I'll give you --
 4      I'll set this scenario up.  I'll set it up in sort of a
 5      hypothetical scenario, which is that when we give these
 6      anesthetic drugs and they produce unconsciousness based
 7      on -- and they're not -- you know, let's not quibble
 8      about what that term means, but just they produce
 9      unconsciousness from an observer perspective that
10      there's no response to verbal stimulation, there's no
11      response to painful stimulation.  Then the -- and the
12      patient has no memory of that and, you know, you talk
13      to them afterwards and say, well, do you remember
14      anything about what happened during the operation?  And
15      they say no.  And from your clinical perspective, you
16      know, they were not responsive to stimuli.
17                      And let's assume for the moment we're
18      not talking about someone who has been given
19      vecuronium, just an anesthetic drug.  So they didn't
20      respond to surgical stimulation and they have no memory
21      of anything.  So how do you know that the person was
22      really unconscious?  You know, if they don't remember
23      it and they didn't respond, you know, how do you know?
24      That's a philosophical -- almost a philosophical
25      dilemma because you cannot test that hypothesis.  It's
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1     not a testable hypothesis because that situation
 2     prevents understanding or knowing, you know, whether
 3     somebody had awareness during that period.  We have to
 4     rely basically on our understanding of these drugs.
 5                        Now, on the flip side, you know, we
 6     may not know whether they're conscious, but we also
 7     don't -- we may not know whether they're unconscious.
 8     You cannot have it both ways.  You know, Dr. Van Norman
 9     can't say, well, you know, they could be conscious and
10     I can't say they are unconscious because -- in that
11     scenario I'm talking about, because there's no way to
12     test that hypothesis based on the way I set that up.
13     That is a dilemma.
14          Q.        Right.  And I understand that and I
15     appreciate that.  The vecuronium, that would mask signs
16     of consciousness if they were conscious enough to
17     respond?
18          A.        That is true.
19          Q.        So if the Tennessee Department of
20     Corrections asks you which way you thought would be the
21     more humane way to execute an individual with
22     vecuronium -- with midazolam followed by potassium
23     chloride or midazolam followed by vecuronium bromide
24     followed by potassium chloride, what would your answer
25     be?
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1                    MR. ATYIA:  Objection to form.
 2          A.          I would not make any comment or
 3     answer that question.  And I have asked -- I have been
 4     asked that question, not, I think, in Tennessee, but --
 5     and not in deposition, but just in discussions with
 6     other states and other people involved with this.  I
 7     don't make any opinions about whether it's humane or
 8     not.  That's -- come on, that is a judgment question
 9     that is -- I think that anybody could answer for, you
10     know, for themselves.  You know, what is a humane way?
11     You know, what is humane for me may be different than
12     for you.  So I'm not -- I don't tell or say to a state,
13     well, if you followed this protocol, it would be more
14     humane than if -- and I don't mean this Tennessee
15     protocol, but if you follow this hypothetical protocol
16     A, it's more humane than, you know, hypothetical
17     protocol B.  I don't make those types of statements.
18          Q.          And I appreciate that.  And I used a
19     poor choice of words.  What if they asked you which
20     protocol would greater ensure that the prisoner would
21     be unconscious and that we could monitor the prisoner
22     for being unconscious if we gave just midazolam and
23     then potassium chloride or midazolam, vecuronium
24     bromide, and then potassium chloride, what would you
25     tell them?
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1                    MR. ATYIA:  Object to form.
 2           A.          Which of those protocols would allow
 3      you to be better at detecting consciousness?  I think
 4      you said or is that what you said?
 5           Q.          Yes.
 6           A.          Okay.  The protocol that -- so most
 7      of these protocols, clearly then Tennessee, and I'm
 8      just going to focus on Tennessee now because that's
 9      what I'm testifying to, is the Tennessee protocol, you
10      know, they have a consciousness check there.  So they
11      do test for consciousness, most of these protocols do.
12      In fact, I think all of them do, although I haven't
13      seen all of them.  So whether you have a protocol that
14      is one that excludes vecuronium or includes vecuronium,
15      they would include a consciousness check.  So that to
16      me is what you would want to have in a protocol, not
17      whether you state that vecuronium is going to hide
18      something.
19           Q.          Well, you and I just discussed a
20      minute ago that noxious stimuli can both increase the
21      BIS and increase your level of anesthetic depth,
22      meaning it can raise it, right?  If you are sedated and
23      then you get a trapezius squeeze, for instance, you
24      might then awaken, right?
25           A.          Yes.
```

```
 1              Q.         So in Tennessee, are you aware that
 2    the consciousness check happens before any noxious
 3    stimuli?
 4              A.         Well, my understanding that the --
 5    oh.
 6              Q.         I apologize.  Are you aware that it
 7    happens before the vecuronium bromide?
 8              A.         Yes.
 9              Q.         And you're obviously aware it happens
10    before the potassium chloride?
11              A.         Yes.
12              Q.         Okay.  So do you not think it would
13    be helpful that after the consciousness check for
14    Tennessee to be able to continue to monitor the
15    inmate's consciousness by just administering potassium
16    chloride after the midazolam?
17              A.         And so let's talk about -- I will say
18    my opinion about what you would expect to see if you
19    were to have a protocol of midazolam with potassium
20    chloride as opposed to midazolam, then vecuronium, and
21    then potassium chloride.
22              Q.         That's not my question, though.  I
23    mean, my question is a pretty simple question, which is
24    not what you expect to see.  It's if Tennessee wants to
25    continue to monitor an inmate's consciousness during
```

```
 1      the entirety of the lethal injection procedure,

 2      wouldn't it be helpful to start with midazolam and then

 3      inject the potassium chloride?

 4            A.        Okay.  I was trying to answer your

 5      question.

 6                      MR. ATYIA:  Object to form.

 7            A.        I have to give you the context here,

 8      you know, and because I want -- as I said, what I would

 9      expect to see.  If you gave midazolam and then gave

10      potassium chloride, it's quite possible that you would

11      see a reflex withdrawal of that extremity because it

12      is, you know, as we've discussed, and I have said and

13      everyone agrees that potassium chloride when given

14      intravenously is a noxious stimulus, so I would expect

15      there to be a withdrawal reflex from that or a movement

16      of that arm where it's being injected, which I believe

17      would be, could be a withdrawal reflex.  And then, you

18      know, would that be sufficient to raise the level of

19      consciousness of the inmate to the point that the

20      inmate would be basically conscious and awake?  I do

21      not think so based on the totality of the studies and

22      so forth that I've pulled together.  I do not think

23      that would be likely.  But at that point, you know, the

24      potassium chloride goes in and then there's cardiac

25      arrest and then the inmate dies.  So there wouldn't be
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

```
 1      a practical way of using that information.

 2                    So let's do a -- you know, let's do

 3      sort of a thought experiment on this.  You know, let's

 4      say that a state did use a protocol with midazolam and

 5      just potassium chloride and they go through some of

 6      these executions and, you know, you see this movement

 7      of the arm that is essentially a withdrawal reflex.

 8      Now, you know, again, I'm -- I don't know exactly what

 9      would happen, but I suspect that you would see arm

10      movement because of this, again, possibly withdrawal

11      reflex.  You may not see it.  But let's assume for the

12      moment that you do.  On the one side, you could say,

13      well, that's something that happens during anesthesia.

14      Even at the ASA table that you brought up earlier says

15      that a withdrawal reflex is not considered purposeful

16      movement.  I believe that was in that table.  I mean, I

17      know it's in that table, but I don't know that we

18      actually talked about that.  But in any case, a

19      withdrawal reflex does not mean that it's purposeful

20      movement.

21                    But you know, there are a lot of

22      people that would say, oh, my goodness, you know, the

23      inmate is moving.  That doesn't indicate that the

24      inmate is awake.  By ASA's definition, a withdrawal

25      reflex is considered to be a non-purposeful movement.
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

So you would ask me -- you've asked me about wouldn't it be better in terms of monitoring their level of consciousness than -- I don't know. I suppose in that scenario that the potassium chloride was sufficiently noxious that even despite the 500 milligrams of midazolam, the inmate basically opened their eyes and screamed out, you know, would that be considered to be conscious? I suppose, yes, you could say that. The inmate came -- went from a low -- or a deeper level of anesthesia, so up to a higher level to the point of being -- having spontaneous vocalizations and so forth, so is that scenario possible? Yes, it is. I don't think that -- I think that the dose of midazolam that's given would prevent that, but we don't have those data for obvious reasons, so --

Q. If you think that the dose of midazolam would prevent that, what is your expert opinion as to the purpose of vecuronium bromide?

A. I do not know why the -- a state uses vecuronium. Again, I --

MR. ATYIA: Object to form.

A. As I've said before, you put these protocol -- you know, states provide these protocols and I can say this is -- you know, this is what I expect, so -- they haven't told me, you know, no state

```
 1      to my recollection has said, you know, why did we
 2      include vecuronium?  And obviously, it probably goes
 3      back to the first lethal injection protocol where they
 4      just said this is, you know, what we're using, so --
 5             Q.        When you give potassium chloride in
 6      the operating room when a patient is under general
 7      anesthesia, is there normally a withdrawal reflex?
 8             A.        There is not.
 9                      THE WITNESS:  May we take a one
10             minute break?
11                      MR. KURSMAN:  Sure.
12                      THE WITNESS:  My dog is licking
13             herself.
14                      MR. KURSMAN:  How about we do a ten
15             minute break.
16                      THE WITNESS:  Okay.  That's fine.
17             Thank you.
18                      VIDEO OPERATOR:  Going off the
19             record.  The time is 4:29.
20                      (Brief recess.)
21                      VIDEO OPERATOR:  Back on the record.
22             The time is 4:39.
23                      MR. ATYIA:  All right.  Thanks, Alex.
24             I'm just going to get on the record very
25             quickly.  I'm going to have some questions for
```

```
 1              Dr. Antognini and I asked the court reporter,
 2         he says you've got like about 43 minutes left.
 3         And I know that you may have -- or you may want
 4         to do -- reexamine Dr. Antognini after my
 5         questions, so I just wanted to give a heads-up.
 6                   MR. KURSMAN:  Okay.  Just so you're
 7         aware, Dean, I will get additional time over my
 8         seven hours if you ask questions.
 9                   MR. ATYIA:  Is that right?
10                   MR. KURSMAN:  That is right.
11                   MR. ATYIA:  I'm not aware of that, so
12         I don't know that I can agree to that.  I'm not
13         aware of -- I think you have seven hours.
14                   MR. KURSMAN:  Okay.  Well, if my
15         seven hours are up and you want to ask
16         questions and then not allow me to ask
17         questions after, we can take that up with the
18         Court.
19                   MR. ATYIA:  I'm not saying -- that's
20         why I'm giving you notice.  And I'm saying,
21         hey, I'm going to have questions.  But maybe we
22         can agree now of some reasonable scope because
23         he's been here for almost seven hours and I
24         appreciate your right to ask him after I ask
25         him, but what I'm asking you is, I don't think
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 253 of 418 PageID #: 7930

```
 1                  that's balance.  And I would say that seven

 2                  hours is seven hours.  But, sure, if you want

 3                  to ask him more redirect, but I don't think we

 4                  need to take up with the Court to agree on some

 5                  reasonable limitation to your redirect.

 6                       MR. KURSMAN:  Okay.  Well, why don't

 7                  I go until my seven hours and then we can

 8                  discuss.

 9                       MR. ATYIA:  Sure.

10          Q.          While we were off the record, did you

11     talk with anybody?

12          A.          Yes.  My wife came back and we talked

13     about the dog and the vet.

14          Q.          Okay.  How's the dog doing?

15          A.          You know, okay.  I mean, she's still

16     scratching and licking herself, so --

17          Q.          Okay.  Sorry about that.  So when we

18     left, as we were leaving, you said when potassium

19     chloride is given in an operating room, normally

20     there's no withdrawal reflex, right?

21          A.          Most of the time that we give

22     potassium chloride in the operating room, the patient,

23     of course, would be anesthetized and would be possibly,

24     you know, a drug like vecuronium on board, so, you

25     know, you wouldn't be able to see withdrawal reflex
```

1    even if there was an attempt to do that.

2         Q.        What if there was no vecuronium on

3    board in the operating room, is there a withdrawal

4    reflex when you've administered potassium chloride?

5         A.        No, I don't think so, not in my

6    recollection.

7         Q.        So why do you think there would be a

8    withdrawal reflex in the lethal injection context?

9         A.        Well, because any time you apply a

10   noxious stimulus to an extremity, in this case we're

11   talking about an arm, you can get a withdrawal -- I

12   shouldn't say any time.  There's a possibility that you

13   could get a withdrawal reflex, so it just -- you have

14   to recognize that possibility.

15        Q.        Right.  I understand that there is a

16   possibility, but do you think it's probable that a

17   withdrawal reflex would happen in a lethal injection

18   context after 500 milligrams of midazolam?

19        A.        I'm not sure I can, you know, assign

20   a probability to it.  I really don't know.  Again,

21   we're talking about -- obviously both, on both sides,

22   there is some speculation here as to what occurs with a

23   500 milligram dose of midazolam, so I'm not sure I

24   would assign a probability to that.  I wouldn't feel

25   comfortable, I guess.

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1              Q.          You just told me that in the
 2    operating room when vecuronium or rocuronium is not
 3    applied and a patient is under general anesthesia, when
 4    they receive potassium chloride, there is usually not a
 5    withdrawal reflex, right?
 6              A.          That's true.  But we're not giving
 7    the dose of potassium chloride that's contemplated in
 8    the protocol.
 9              Q.          And do you believe the withdrawal
10    reflex would be because of the high dose of potassium
11    chloride in the protocol?
12              A.          Yes.  Basically if you have a high
13    enough -- if you give a very low dose at a low speed,
14    it's going to be less irritating.  Give a higher dose
15    at a higher speed, then it's going to be more
16    irritating, so I think you would increase the
17    probability of a withdrawal reflex.
18              Q.          Okay.  Now, let's go to page 32 of
19    your report, page 32.  And let me know when you get
20    there.
21              A.          Page 32?
22              Q.          Yes.  Do you see it says statements 5
23    and 6, the consciousness checks outlined?
24              A.          Yes.
25              Q.          In the Tennessee protocol are
```

1    sufficient to determine unconsciousness and are
2    commonly used in a clinical setting.  All right.  When
3    you say this, are you just talking about a trapezius
4    squeeze?
5            A.        I would have to refer to the
6    protocol.  When I wrote that -- as I sit here today, I
7    don't recall what the protocol says about the
8    consciousness checks, what they are, so --
9            Q.        Well, what do you think would be a
10    sufficient consciousness check in this context?
11            A.        I think it could be a combination of
12    different things, but it would include -- should I
13    think, or usually should include a verbal stimulus of
14    some sort, a tactile stimulus, and then a painful
15    stimulus, so a sternal rub, for example, or a pinching
16    of the skin of extremities, or something of that
17    nature.  You might include a -- sort of an eyelash
18    reflex or a touching of the cornea.  Those would be the
19    ones that I would think that you would want to include.
20            Q.        Do you think the person who is
21    performing the consciousness check should be trained on
22    signs of distress?
23            A.        I'm not sure what you mean by
24    distress.  That's not something that -- I mean, I know
25    what the word means, but -- yeah, I think that the

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 257 of 418 PageID #: 7934

1    person should know what to look for in terms of some

2    type of response with these stimuli.

3              Q.          Okay.  And if during the

4    consciousness check the inmate moves their fingers,

5    would be that indicative of the inmate being conscious?

6              A.          Not necessarily.  If there was, you

7    know, spontaneous, again, occur during (inaudible) and

8    so, you know, in response to a stimulus, you might see

9    some finger movements.  You know, if it's a painful

10   stimulus, you could see -- you know, especially if it's

11   the stimulated extremity, so finger movements by

12   themselves may not indicate that the individual is

13   conscious.

14             Q.          But if you were doing the

15   consciousness check and you performed a trapezius

16   squeeze and the inmate moved their fingers, would you

17   determine at that point that they were not conscious?

18             A.          It depends on how much finger

19   movement that occurs.  If there's just a small amount,

20   and again, I can't really define it, I can sort of see

21   it, but if it's a small amount, I might not -- I might

22   conclude that there's -- you know, it's not a

23   big amount, big enough that I'm worried about the

24   person being conscious.

25             Q.          And when you say you would have to

```
 1    see it, do you think you have a greater amount of
 2    expertise than the person who's doing the consciousness
 3    check in Tennessee execution procedures?
 4                   MR. ATYIA:  Object to form.
 5         A.        Not knowing, you know, who is in
 6    there in Tennessee, although I believe, and correct me
 7    if I'm wrong, I believe the warden is the one doing
 8    this, so -- I don't know what this warden's training
 9    is.  I doubt that they are a physician or, you know, in
10    the medical field.  So I would hope that I would have a
11    better feeling for these things than he would because
12    I'm a doctor and I've been a doctor for many, many
13    years, so I hope that training and education of mine
14    has come to some use.
15         Q.        And what if the inmate, when you were
16    performing a consciousness check, what if they blinked
17    their eyes during the consciousness check, would that
18    be indicative of consciousness?
19         A.        And this would be to what type of
20    stimulus?
21         Q.        To any of the stimulus you just
22    outlined.
23         A.        I see, yes.  Let me think here for --
24    so I would say, you know, probably yes, that would
25    be -- I would be concerned about their level of
```

```
1    consciousness if they had an eyelid blinking response
2    to the stimuli that I have specified.  The eyelid
3    response is sort of similar to the finger response.  It
4    probably doesn't mean that the person is conscious,
5    especially, you know if it's -- I would expect it to be
6    more than that.  But, you know, you're setting up a
7    scenario here where, you know, maybe you're building up
8    to more and more different type of responses, and
9    again, you have to consider all the different things
10   that are occurring here and what you see to figure out,
11   okay, am I confident this person is conscious or not?
12        Q.        What about if they open their mouth?
13        A.        Well, obviously, if they open their
14   mouth to a verbal stimulus, for example, you know, you
15   call out the inmate and they open their mouth and they
16   say their name, of course, we would all agree, I hope,
17   that that person is conscious.  But if they just open
18   their mouth to some of the stimuli -- again, you're
19   talking about some responses that begin to, on a
20   spectrum, indicate that the individual is not as deeply
21   anesthetized as, you know, someone who didn't have
22   those types of responses.
23        Q.        So as we're going through these
24   different responses, you keep repeating that you would
25   be looking for other signs as well.  How would you
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1    train the warden if you were training the warden as to
 2    what to look for?
 3                      MR. ATYIA:  Objection, form.
 4            A.         I am not going to answer a question
 5    where I'm, you know, training the warden.  But I can
 6    answer questions if I was training a medical student,
 7    which is that you would look for, with a verbal
 8    stimulus, you look to see whether they respond in a
 9    sense that, you know, they open their eyes to their
10    name and they look at you.  For a tactile stimulus,
11    same thing, whether it's sort of the gentle prodding,
12    do they open their eyes and, you know, look at you and
13    maybe verbalize?  And the same thing with a noxious
14    stimulus, if they open their eyes with a noxious
15    stimulus and verbalize or maybe they just open their
16    eyes, then you start to think that they are on the
17    spectrum towards consciousness because they are
18    responding to these stimuli.  So those are the types of
19    things that I would teach a medical student, or a
20    nursing student, or whatever to look for.
21            Q.         Are these easy things to teach a
22    medical or nursing student?
23            A.         Relatively, so, yeah, I think that
24    they are.  I mean, it's pretty straightforward.  It's
25    always a question, you know, well, did they open their
```

www.veritext.com            Veritext Legal Solutions            800-556-8974

```
 1     eyes?  I thought I saw some eye movement there.
 2     Basically there might be movement that's clear to
 3     everybody.  There might be some movement that's, you
 4     know, very, very subtle.  And the subtle movement,
 5     again, related to your earlier question about the
 6     finger movement, the subtle movement may not be enough
 7     to really make me think, oh, you know, that's something
 8     that I consider to be a positive response.
 9              Q.      What about if they made sounds during
10     the consciousness check, would that indicate
11     consciousness?
12              A.      If they vocalize to, I guess, calling
13     out their name, that's different than vocal -- and when
14     I say vocal, I don't mean vocalizing, but in sense that
15     they are forming complete words and sentences.
16     Sometimes we use the term vocalization in anesthesia
17     where they just -- they let out this sort of moan or
18     they have -- their airway, you know, there's
19     basically -- you can hear sounds coming from their --
20     foaming basically is what's occurring.  Those again are
21     signs that the individual is moving from a deeper level
22     to a more lighter level of sedation, or anesthesia, or
23     whatever it is they're under.
24              Q.      And what about if they kick their
25     legs during the consciousness check?
```

```
 1              A.        That would also be, especially if
 2    it's a -- it probably would not be -- I'm not sure I
 3    could consider that to be a purposeful movement for
 4    these different stimuli, except maybe with the sternal
 5    rub, which is going to be the noxious stimulus, or a
 6    trapezius squeeze.  And I recognize that these inmates
 7    are strapped down, but you would look for -- you might
 8    see that type of movement and -- again, indicating that
 9    the person is at a lighter level than a deeper level.
10              Q.        What if the inmate said help?
11              A.        Then that person, that inmate would
12    be conscious.
13              Q.        And if they showed the signs of what
14    you refer to as moving from one level to another in
15    terms of consciousness, if they show those signs,
16    meaning if they blink their eyes or if they kick their
17    legs, what should be done then?
18              A.        What should be done in the protocol?
19              MR. ATYIA:  Objection to form.
20              Q.        What should be done to further
21    determine the inmate's consciousness?
22              A.        Well, my understanding of the
23    protocol is that -- again, I'm not going to answer a
24    question that tells the State of Tennessee --
25              Q.        I mean, let me rephrase it because
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 263 of 418 PageID #: 7940

```
1    I'm not asking in terms of should they give another
2    bolus dose of midazolam.  What I'm asking you is if a
3    consciousness check is done, let's say the eyelids, the
4    trapezius squeeze, and the inmate blinks, which you
5    said is indicative of them possibly becoming conscious,
6    is it your expert opinion that another consciousness
7    check should be done?  Should they be declared
8    conscious at that point?  What should be done if they
9    blink?
10           A.       I'm going to refer to the protocol
11   and say, you know -- I believe the protocol says if
12   they don't pass the consciousness check, they're
13   supposed to give them more midazolam.  I'm not going to
14   say, you know, what should the warden do at that point
15   aside from not -- you know, what the warden does
16   essentially is not really any of my business.  I'm not
17   going to advise a warden or I'm not going to say, here
18   state, oh, the warden -- you know, they should do this.
19   I'm not going to try to help a state develop a protocol
20   to basically, you know, to help them with that kind of
21   scenario.
22           Q.       And I'm not trying to do that.  I
23   guess I was misunderstanding your answer.  So are you
24   saying your answers to if they blink their eyes, if
25   they open their mouth, if they kick their legs, if they
```

1    made sounds, all of that would mean or should mean to
2    the warden that they are conscious?
3              A.        I would say that those types of
4    signs, especially, of course, if they had all of them
5    together, I suppose, but, you know, there are signs
6    that indicate that the probability of consciousness is
7    going to be higher and that, you know, they would have
8    to do the next step in the protocol, which I believe is
9    to give them more midazolam.
10             Q.        And what do you think would happen if
11   they received another 500 milligram dose, bolus dose of
12   midazolam?
13             A.        Well --
14             MR. ATYIA:  Objection to form.
15             A.        The drug levels will be higher.  The
16   midazolam will be higher.  And you might at that point
17   get to the point where they are no longer responsive to
18   those stimuli.  I would expect that to occur with the
19   500 milligram dose, but there may be some kinetic
20   reasons why the drug didn't have its -- that effect
21   when the consciousness check was done.
22             Q.        If there were those kinetic reasons,
23   don't you think it would be helpful to administer
24   potassium chloride as the second drug rather than
25   vecuronium bromide so that the warden could continue to

```
 1     monitor the consciousness of the inmate?

 2                     MR. ATYIA:  Objection to form.

 3          A.          Yeah, I'm -- I understand where

 4     you're going with this in terms, you know, the way they

 5     do this protocol and trying to have a protocol without

 6     vecuronium, but you cannot give -- you give midazolam

 7     and then you give the potassium chloride, you cannot,

 8     you know, give the potassium chloride and then sort of

 9     expect me to be able to figure out, well, you know, and

10     then do a consciousness check here because by the time

11     you get around to doing that, the heart is stopped and

12     the patient -- or the inmate is dead, so it's almost

13     futile I guess when do you say enough here, but --

14          Q.          Well, even if the patient, the

15     inmate, and you say futile because you believe the

16     patient will -- the inmate will die within 30 to 60

17     seconds of receiving the potassium chloride, but if the

18     inmate is aware at the time that they're receiving the

19     vecuronium bromide, isn't it also true that they will

20     then suffer from the time they receive vecuronium

21     bromide to the time they receive the potassium chloride

22     as well?

23                     MR. ATYIA:  Objection, form.

24          A.          So let's sort of analyze the

25     situation in a sort of a time fashion in addition to
```

```
 1     the actions of these drugs.  Basically, you know, let's
 2     assume for the moment that I am wrong and Dr. Van
 3     Norman and others are correct that these inmates are
 4     awake, then, yes, giving vecuronium will -- the inmates
 5     would -- and then followed by the potassium chloride,
 6     the inmates would suffer longer because you now have
 7     this vecuronium on board where they're suffocating or
 8     they're, you know, to use their terms, they're not able
 9     to breathe and then they get the potassium chloride.
10     Whereas if they just got the potassium chloride, then
11     you don't have that suffering from the vecuronium.  So,
12     you know, I've said many times if you give vecuronium
13     to an awake person, if you give potassium chloride at
14     that dose to an awake person, there's going to be
15     suffering.  So I don't -- I understand where you're
16     coming from.  You're coming from the side that these
17     people are awake and I'm saying that they're not, and
18     so if you want to assume that they're awake, then,
19     yeah, that suffering would happen.  But I don't -- I
20     dispute that assumption.
21            Q.        Let's say as the second drug in the
22     Tennessee protocol instead of vecuronium bromide they
23     were to give Drano.  Do you believe that vecuronium
24     bromide serves any better purpose in this protocol than
25     Drano?
```

```
 1                    MR. ATYIA:  Objection to form.

 2            A.        I do not know the purpose for which

 3     vecuronium is being administered in this protocol.  I

 4     don't know why they included it.  All I can tell you is

 5     that it was used -- I should say I can tell you what

 6     the effects of the drug are.  And comparing that to

 7     Drano, Drano is a caustic substance and so it's going

 8     to be similar, I guess, in a sense to the potassium

 9     chloride in the sense that it's going to cause, you

10     know, severe vein irritation.  So in that sense, the --

11     you know, the Drano situation I guess would inflict

12     more pain and suffering or more potential pain and

13     suffering than vecuronium would.

14                    MR. KURSMAN:  Could we go off the

15           record for a second?

16                    VIDEO OPERATOR:  Going off the

17           record.  The time is 5:03.

18                    (Brief off the record discussion.)

19                    VIDEO OPERATOR:  Back on the record.

20           The time is 5:05.

21                    MR. ATYIA:  Sorry, I jumped the gun a

22           couple of times now.  I understand from

23           Mr. Kursman he has let's say 31 or 32 minutes

24           left.  I'm going to ask my questions and then

25           Mr. Kursman will have whatever remaining time
```

```
 1              he has left, and then if he needs more, he may

 2              take half of whatever I use over 30 minutes.

 3              That makes sense, but does that work, Alex?

 4                      MR. KURSMAN:  And I agree to that.

 5                      MR. ATYIA:  Thank you.

 6      EXAMINATION BY MR. ATYIA:

 7              Q.      Dr. Antognini, is that okay with you

 8      if we keep you a little longer than seven hours?

 9              A.      That's fine.

10              Q.      Okay.  I'll try to be very, very

11      fast.  My first question is, you've got shown this

12      autopsy report -- I'm sorry, let me rephrase.  You got

13      shown toxicology reports of executed inmates that

14      showed blood concentration of midazolam, do you recall

15      that?

16              A.      Yes, I do, yes.

17              Q.      Okay.  Do you have any idea of how

18      long after the inmate died the blood was harvested for

19      that testing?

20              A.      I don't have a specific number for

21      those autopsies, but in general, I think they're done

22      the next day, but it can vary.  I think that can

23      be done -- it depends on when the execution occurred

24      and when the body gets to the morgue and all that, so I

25      think it's sometimes as much as 24 hours, but I --
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 269 of 418 PageID #: 7946

```
 1              Q.         I'm sorry.
 2              A.         So those ones I didn't see what the
 3      time interval was.
 4              Q.         Okay.  And do you have any idea how
 5      long after the blood was harvested that it was tested
 6      for midazolam concentration?
 7              A.         I do not, no.
 8              Q.         And do you -- I wasn't clear on this.
 9      Do you have any opinion about the effect that time
10      could have on the midazolam concentration with regard
11      to blood taken out of an executed person's body?
12              A.         In general, drugs, drug
13      concentrations postmortem can vary and change over
14      time, and I don't know how much data is out there for
15      midazolam, but most drugs do that.  So I think you
16      would have to, again, take these with a grain of salt.
17      Now, I think Mr. Kursman mentioned a study where that
18      was looked at and I don't -- I'm not familiar with that
19      study and I'm not sure, maybe he was -- you know, what
20      that study is.  In any case, it's pretty well
21      documented that drug concentrations postmortem can vary
22      and may not be reliable.  But specifically midazolam, I
23      don't know.
24              Q.         Okay.  And you got asked a lot --
25      Mr. Kursman asked you a lot -- there's been a lot of
```

1    discussion about the nanograms -- is nanograms per

2    milliliter concentration of midazolam?

3              A.        Yes.

4              Q.        Okay.  And you talked about a study

5    that mentioned 1,541 being a data point of nanograms

6    per milliliter in one of those studies?

7              A.        Yes.  That was the -- Antonik, I

8    believe, was the study on that one, yes.

9              Q.        Okay.  Do you have any idea,

10   knowledge, or estimate of what the concentration of

11   midazolam would be in an individual who receives an

12   injection of 500 milligrams of midazolam according to

13   the protocol?

14             A.        I do not have -- you can certainly

15   extrapolate from the data that we have on midazolam.

16   You know, if you give 5 milligrams of midazolam and you

17   get a certain peak level.  If you gave 500, which is

18   100 times more, you would expect the peak level to be

19   about 100 times more.  Those type of pharmacokinetic

20   extrapolations are pretty solid.  I don't want to say a

21   hundred percent, but they, for the most part, you can

22   just do that type of extrapolation.  So I'm not sure I

23   answered your question about it.

24             Q.        I think I understand that you can --

25   there may be a way to calculate.  What I know is like

```
1    do you have like a ball park figure for me?  Are you
2    able to do this calculation giving me some kind of ball
3    park figure of what you would expect the concentration
4    of midazolam in someone's blood who's been given
5    500 milligrams of midazolam according to the protocol?
6              A.         Off the top of my head, you're asking
7    if I have that off the top of my head.  The only number
8    that I have off the top of my head is the 1,554 that
9    we've been discussing, and that's after a -- that was
10   about a 5 milligram dose in a 70 kilogram adult, so I
11   could use that number and extrapolate and that would be
12   basically 100 times 1,554, which would be -- let me do
13   my math here.  It would be 155,000 approximately, is
14   what I would guess, nanograms per mill.  So 1,554 for 5
15   would be 100 times that.  That would be about 150,000
16   or so.
17                   That just seems like a very -- you
18   know, and kudos to Mr. Kursman and his expert
19   witnesses.  That's something that I didn't see there.
20   It just seems like a very high number and maybe -- you
21   know, it may be true.  But I'm certainly going to go
22   back and take a look at that and then look at other
23   studies that gave a bolus of midazolam.  I guess, that
24   number seems very, very high and I -- I'm going to look
25   at, you know, some studies like Greenblat did looking
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
1    at -- and others looking at midazolam boluses.  I just
2    don't think they achieved those high of levels, so
3    that's why that number is really surprising to me.
4            Q.       Okay.  Well, let's -- I appreciate
5    you explaining that.  I want to slow it down for a
6    second.  Let's just assume that the study Mr. Kursman,
7    the number Mr. Kursman pointed us to is correct, the
8    1,554, I think you said, right?
9            A.       Okay.
10           Q.       You're saying that based on the
11   assumption that that is a correct number, 1,554 is a
12   correct number in that study, you would expect a person
13   injected with 500 milligrams as per the protocol to
14   have a concentration of 150,000?
15           A.       Okay.  I'm sorry, I think I've -- I
16   haven't misspoken, I just haven't been thinking this
17   through about what -- on comparison here.  So, remember
18   that the -- so, again, we have to take with a grain of
19   salt these postmortem samples.  But let's assume for
20   the moment you're able to get a blood sample right
21   immediately before death.  You know, you've got an
22   inmate in there and you then, you know, go through that
23   protocol.  And let's assume for the moment that a
24   typical execution takes 12 minutes or so, or maybe 13
25   minutes or so.  So the way these drugs work, I guess,
```

```
 1        when you get this injection and you get this peak level
 2        and then it starts to fall down very rapidly.  So the
 3        14, or 13, or 12 minute point at which death occurs,
 4        that is much lower than the peak effect or the peak
 5        level, because that occurs at around one minute or so.
 6        So you can't -- you know, if you're looking at what you
 7        see postmortem, you know, what drug was actually
 8        present at the time of death is going to be lower than
 9        what you would see at the peak because of that
10        (inaudible) and all the things that caused the drug
11        levels to go down.  So when I said that a 500 dose of
12        midazolam based on the study that we were just talking
13        about would produce -- again, let me do the mental math
14        here.  It's 1,500 approximately times 100, that would
15        be 150,000.  That would be the peak level.  But
16        again -- so I know you want an answer.  I guess I'm
17        very suspicious on that number.  It just seems very,
18        very high.
19                  Q.        Okay.
20                  A.        Yeah.  Anyway.  And so I hope I've
21        answered your question.  I know I've taken some time on
22        that doing that, but --
23                  Q.        So let's say you have a peak level
24        that's going to drop off quickly, that's what you're
25        saying?
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

```
1              A.         Yes.

2              Q.         Would the effect that you've

3     expressed, which I believe is that midazolam would

4     render the person unconscious, would that effect also

5     drop off quickly?

6              A.         No, because the -- if you do a -- no.

7     The answer is no because the drug level is so high, you

8     know, even when it's falling off rapidly, it's still

9     well above the amount that produces unconsciousness or

10    produces the effects that you're looking for.  So,

11    again, a much larger dose is going to last a lot

12    longer.  You're going to be above that threshold a much

13    longer period of time.

14             Q.         Okay.  I want to switch gears for a

15    second.  There's been a lot of -- some talk about the

16    other engagements or depositions or capacities in which

17    you've served as an expert witness.  You remember that?

18             A.         Yes.

19             Q.         And you've disclosed that you're an

20    expert witness in Oklahoma litigation?

21             A.         That is correct, yes.

22             Q.         Have you ever seen an execution in

23    your capacity as an expert witness?

24             A.         Yes.

25             Q.         Why didn't you disclose that in your
```

1    report?

2          A.          Because I observed the execution

3    yesterday.

4          Q.          Can you tell us what you observed in

5    that execution?

6          A.          So I observed the execution of Donald

7    Grant in McAllister, Oklahoma, yesterday.  And I

8    don't -- I was asked to do that by -- you know, we can

9    talk about the details why.  But they needed to have

10   somebody observe that.  And that was the first and only

11   one that I've observed.  And the protocol basically

12   they follow a three-drug protocol.  They give midazolam

13   followed vecuronium followed by potassium chloride.

14                     And I was in the observation room

15   about 15 feet away.  There were a lot of people in that

16   room, about 18 of us.  But I had a very good view of

17   the inmate.  And after the warrant was read and the

18   inmate had his statement, they had to cut off the mic

19   at the two minute point because the inmate continued to

20   talk, and over the course of the next several minutes,

21   it seemed like, it's kind of hard after I -- you know,

22   over that period of time that the inmate became more --

23   appeared to become more sedate, subdued, and then

24   closed his eyes.  And then I would guess about four or

25   five minutes after, or maybe three minutes or four

1    minutes after the inmate seemed to be getting more

2    sedate and sleepy, somebody came in to do what appeared

3    to be consciousness checks where they did a sternal

4    rub.  I could hear them call out the inmate's name.

5    They were pinching the inmate's arm.

6                          Between the time that the inmate

7    became more sedate and the consciousness check, the

8    inmate's breathing was a little bit shallow and it

9    looked like he had sort what we describe as this

10   rocking boat motion where the abdomen would go up and

11   the chest and the neck muscles would sort of go down.

12   It was difficult for me to know whether that was a

13   complete airway obstruction or a partial airway

14   obstruction at that point.  But between the time of

15   when the drug went in and when the consciousness check

16   occurred, I did not see any spontaneous movement.  I

17   did not see any signs of distress, or pain, or anything

18   of that nature.  Primarily I would be looking for

19   movement; I did not see that.

20                          After the -- during the consciousness

21   check, I did not see any response to that.  The inmate

22   did not open his eyes.  I did not see his mouth move.

23   I did not see him moving any of his extremities or at

24   least that I could see.  And then after the

25   consciousness checks were done, the Department of

```
1      Corrections individual, and I don't know whether that
2      was the warden, who that was, turned the mic on to say
3      that the inmate is unconscious.  And during that period
4      of time, I could hear pretty loud snoring, the
5      patient's breathing -- or the inmate's breathing
6      pattern, which I couldn't really know whether it was
7      partial or complete airway obstruction, at least at
8      that point in time, seemed to be a partial airway
9      obstruction because it was pretty loud snoring.  And
10     then the mic went off.
11                      And then the -- presumably the other
12     drugs started to go in, the vecuronium.  I did see some
13     bubbles flowing through the IV that I didn't see
14     earlier, so I don't know which arm the IV went -- or
15     the drugs went.  I should say I don't know which
16     drug -- I'm sorry, which arm the midazolam went in,
17     because they have two IV's.  But in any case, I could
18     see some bubbles flowing through the IV's.  And then
19     soon thereafter, breathing ceased.  It looked like the
20     inmate's lips started to turn a little bit bluish.  And
21     then there was a wait period of several minutes, it
22     seemed like.  And then the person came in, which I
23     presume was a physician.  I don't know who does the
24     declaration of death and all that, but they came in,
25     they listened to the inmate's chest with a stethoscope,
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1    they felt for a pulse in the neck, presumably the
 2    carotid pulse, that's what it looked like.  And then
 3    they were looking at the pupils as well.  And then that
 4    person walked out and the -- someone came out -- came
 5    into the execution chamber and said that the time of
 6    death was, I think, 10:16, and then the curtains went
 7    down, and that was it.  And we were escorted out of the
 8    room.  So that's essentially what I saw.  You know, I
 9    haven't -- you know, that's from my recollection of
10    what I saw, so -- as I sit here today.
11         Q.        I want to talk for a second about the
12    airway obstruction.  Have you ever heard patients in a
13    clinical setting, like in the operating room who are
14    under anesthesia snore?
15         A.        Yes.  It happens fairly -- it can
16    happen pretty regularly if you're not careful about
17    maintaining their airway properly, yes.
18         Q.        So why does that happen?
19         A.        Well, the -- I shouldn't say all, but
20    most of the anesthetic drugs will cause basically a
21    relaxation of the muscles of the neck and that results
22    in an airway obstruction.  You know, it can be partial
23    where you're still able to get air in and out and that
24    causes the snoring sound because you get this sort of
25    intermittent -- and I know you can't -- I'm basically
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    what I'm doing is I'm sort of clapping my hands a
2    little bit like that, and you can see that intermittent
3    rapid opening and closing of the airway would cause the
4    snoring to occur.  And that's basically happening in
5    the back of the throat where the airway is starting to
6    close down and so you get this intermittent opening and
7    closing of the airway and that causes the snoring,
8    usually with the tongue falling back in the throat.
9           Q.      Does anything about that in a
10   clinical or in an execution setting lead you to believe
11   that it's some expression of an experience of pain?
12          A.      No, it's -- snoring can happen in
13   anesthetized individuals.  It does not indicate
14   anything related, in my opinion, related to
15   consciousness.  It's just the effect of the drug on the
16   airway.
17          Q.      Is there anything about what you saw
18   in Oklahoma that changes your opinion or otherwise that
19   you need to tell us?
20          A.      No.  Everything that I saw
21   essentially -- you know, having read some descriptions
22   and having -- you know, knowing how these drugs work,
23   when I saw that, I thought, this is what I would expect
24   to see.  This is what I would expect to happen with
25   these -- with this.  So nothing really happened that

www.veritext.com          Veritext Legal Solutions          800-556-8974

```
 1    made me -- you know, changes my opinion about, you
 2    know, the effects of these drugs.
 3                        MR. ATYIA:  Alex, I don't have
 4             anything that I can think of right now.
 5                        MR. KURSMAN:  Just so I can put on
 6             the record, we are going to object to all of
 7             that testimony.  It's outside the scope of his
 8             expert report.  I'm also going to ask at the
 9             end of this deposition to keep this deposition
10             open as this is the first time we've been
11             provided with any information that your expert,
12             Dr. Antognini, witnessed an execution.  And to
13             the extent he's basing any of his opinions,
14             including those that you just questioned on,
15             him on about that execution, we are objecting
16             to that as well.  With those objections in
17             mind, I will begin my final 40 minutes or so.
18    EXAMINATION BY MR. KURSMAN:
19             Q.        Let me ask you about that execution
20    yesterday that you just testified to.  Did you take any
21    notes from the execution?
22             A.        Yes, I did.
23             Q.        And we will request all of those
24    notes.  Did you talk to anybody about --
25                        MR. ATYIA:  Hold on.  Hold on.  You
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 281 of 418 PageID #: 7958

```
 1              don't request -- this is not the place to be --
 2                      MR. KURSMAN:  Well, I'm requesting
 3              those notes on the record.
 4                      MR. ATYIA:  Through Zoom.
 5              Q.       Do you have those notes, Dr.
 6      Antognini?
 7              A.       I have them here in my room.  I don't
 8      have them in front of me.
 9                      MR. KURSMAN:  Okay.  So we are
10              requesting them from Dr. Antognini.
11                      MR. ATYIA:  I'm going to go on
12              record, Dr. Antognini hasn't been -- we'll
13              confer about it.  We'll confer about it.
14                      MR. KURSMAN:  Are you objecting to
15              providing us with Dr. Antognini's notes about
16              an execution he witnessed yesterday and you
17              just gave us notice of that execution at the
18              six hour and 20 minute mark of this deposition
19              that is supposed to last seven hours?
20                      MR. ATYIA:  Well, Alex (inaudible),
21              we just found out about it.  I asked him about
22              it.  You're free to ask him about it.  We're
23              happy to -- I'm answering your question.  I'm
24              happy to -- we are happy to confer to give you
25              everything that you are entitled to.  I'm just
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 282 of 418 PageID #: 7959

```
 1              saying you haven't served a subpoena.  You're

 2              stating it, a formal request in a deposition

 3              and I'm just saying, you know, we'll work with

 4              you, but that's not --

 5                        MR. KURSMAN:  For the record, Mr.

 6              Atyia, when did you find out that Dr. Antognini

 7              was going to witness this execution?

 8                        MR. ATYIA:  Alex, I'm not under oath.

 9              I'm not a witness in this case.  If you want

10              to --

11                        MR. KURSMAN:  For the record, when

12              you found out that Dr. Antognini was going to

13              witness this execution.

14                        MR. ATYIA:  I'll tell you this:  I'm

15              not under oath and I would have to look back at

16              when we found out in preparing for this

17              deposition.  I can't give you an exact time.

18              Hold on.  I'm answering your question.  And I

19              would like if you would -- I'm going out of my

20              way to give you the information you just

21              requested.  I'm not trying to keep anything

22              from you.  We are happy to provide you whatever

23              you're entitled to.  I'm happy to go through

24              and tell you exactly when I found out, but it

25              was very recently.  This is not something I was
```

```
 1              aware of and have known for a long time and it
 2              just happened yesterday.
 3                      MR. KURSMAN:  Okay.  And -- go ahead.
 4              go ahead.
 5                      MR. ATYIA:  If you want to confer,
 6              we're not going to try to keep anything from
 7              you, Alex.
 8                      MR. KURSMAN:  I would like for you to
 9              say on the record when you did find out that
10              Dr. Antognini was going to attend this
11              execution.
12                      MR. ATYIA:  I don't remember.  I have
13              to look at my -- I really don't remember.  And
14              I'm not under oath and I don't have to -- I'm
15              not trying to be difficult.  Honestly, this
16              doesn't count against your time.  You're free
17              to ask, I just don't have that information
18              right now offhand and I'm -- you know, we're
19              happy to give it to you.  I'll look back
20              through things.  We can figure it out.
21                      MR. KURSMAN:  Okay.  So we are
22              requesting the notes that Dr. Antognini took
23              both during the execution and in anticipation
24              of the execution.  Those would be responsive to
25              our RFP's including 8617.
```

```
 1           Q.          Dr. Antognini, aside from the notes
 2      that you said you have in your possession at your
 3      house, did you talk to anyone about the execution?
 4           A.          So just as -- with my work with the
 5      attorneys in Oklahoma, so I did speak to the attorneys
 6      in Oklahoma immediately after the execution.  And then
 7      I spoke with Mr. Atyia after that, and that was
 8      yesterday.
 9           Q.          And what did you tell them about the
10      execution?
11           A.          Basically what I just said here about
12      the -- you know, what I saw, you know, the events that
13      I saw.  I mean, there are some details that I -- that
14      I -- and other things that I saw that are not --
15      they're not high level details, they're just other
16      things that I saw occurring.
17           Q.          And what were those?
18           A.          So I made a lot of notes about how
19      many people were in the room, where I sat relative to
20      these people.  I made notes about the individuals that
21      were in the execution chamber itself, where they stood.
22      I made a small diagram of the -- well, I shouldn't say
23      of the room, but the execution chamber and the -- has a
24      computer monitor off to the right of the viewing
25      window, so I made a note there because that viewing --
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 285 of 418 PageID #: 7962

1    that computer screen gets the feed of a camera that's
2    looking directly down on the inmate so you can see the
3    inmate's face and chest and neck and arms, maybe not
4    all of their arms, but you can see most of their arms.
5    I made a lot of notes about -- I should say I kept a
6    time, sort of a time stamp so when certain events
7    occurred, I put the timing on when they occurred,
8    because there's a clock in the chamber that allows you
9    to obviously read the time and you can write that down.
10                       As far as the execution is concerned,
11   there was one point at which the inmate -- this is
12   after the presumably the injection of midazolam.  There
13   was one point at which the inmate had a -- made sort of
14   larger breath than he had before, so it was like sort
15   of a gasp in a way.  That, I think, occurred just the
16   one time.  Let's see here.  Okay.  Then the -- what
17   else was occurring as far as the inmate is concerned?
18   So I did not observe any tears, although I did look at
19   a couple of news reports afterwards and some of the --
20   one reporter thought they saw the appearance of tears
21   and another reporter said that there were tears
22   streaming down his face.  I did not see that, and I was
23   looking at the inmate's face, so I don't know, could I
24   have missed it?  That's possible, but -- that, I did
25   not see that.

```
 1                         Okay.  What else?  That, I think I --
 2      again, that's -- I'm thinking about other things that I
 3      could have observed that -- I think at this point, I've
 4      exhausted all of my -- there was a -- at the very end,
 5      this is after the inmate -- I'm not sure that -- I'm
 6      not sure when this occurred.  I would have to refer
 7      to -- I'm not sure when it occurred relative to the
 8      declaration of death, but it was very, very close to
 9      that -- around that time, probably within even seconds
10      that there was a momentary time, and talking about just
11      a few seconds where there was some blood coming out of
12      the IV in the left arm and then it went back in.  And
13      let's see.
14                         I'm sure I might have missed a few
15      things here and there.  I mean, some of -- a lot of my
16      notes, I shouldn't say a lot, but I would write, you
17      know, the inmate's still breathing, still breathing,
18      things like that where I was sort of just writing down,
19      you know, he was still breathing or doing something
20      like that.  Okay.  Again, I think that's -- I think
21      I've gotten everything -- well, I can't recall anything
22      else.
23              Q.         You said when the execution was over,
24      you talked to the Oklahoma Attorney Generals.  What did
25      you tell them about the execution?
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 287 of 418 PageID #: 7964

```
 1              A.         Well, I believe that's privileged
 2     information.  I don't know.  You know, I know Oklahoma
 3     is not being represented here, but that seems to be
 4     attorney-client privilege there.  I mean, that was
 5     something I was talking to them about that, so --
 6              Q.         You're serving as an expert witness
 7     in that case?
 8              A.         Not in -- well, let's see.  Did I
 9     serve as an expert witness in that particular case of
10     Mr. Donald Grant?  My guess is the answer is, yes, I'm
11     pretty sure the depositions that I have given or the
12     testimony that I've given I believe included him.
13              Q.         And are you set to testify at a trial
14     in that case?
15              A.         Yes.  And I mean, I have -- I have
16     given -- there was testimony in January that I guess
17     would not be reflected in your -- my report because my
18     report was given in December.  I'm not sure, you know,
19     when it was scheduled and all that, but it came up
20     rather quickly, so I did give testimony in January for
21     Oklahoma.
22              Q.         When were you asked to view the
23     execution?
24              A.         I would say maybe two weeks ago.
25              Q.         And who asked you to view the
```

1    execution?

2              A.         The Attorney General's Office.

3              Q.         Were you paid?

4              A.         I will charge for it.  I haven't been

5    paid yet, of course, but I will, you know, charge for

6    it, yes.

7              Q.         How much will you charge for viewing

8    the execution?

9              A.         I don't know exactly.  The only

10   reason is because it's not part of the contract,

11   basically, so I think what we'll be doing is

12   essentially charging what I would normally charge for,

13   you know, going to a trial kind of thing, showing up in

14   person, whatever that is, and it might be $4,000.00.  I

15   forget exactly what the contract -- I think it's in the

16   report.

17             Q.         Is it $6,000.00, does that sound --

18             A.         I don't know.  It might be.  I don't

19   remember what my contract says about how much I would

20   be paid for, you know, showing up in person for

21   something.  But it wasn't part of the contract and I

22   said -- we decided we could work those details out

23   later, so --

24             Q.         And when did you first inform the

25   attorneys at the Tennessee Attorney General's Office

www.veritext.com              Veritext Legal Solutions              800-556-8974

```
 1      that you were going to view the execution?
 2                      MR. ATYIA:  Okay.  That's plainly
 3              privileged.  I'm happy to waive it -- if
 4              Dr. Antognini can answer it, I'm happy to
 5              selectively waive that to allay your concerns,
 6              Alex.  But if you'll recognize that's
 7              privileged and (inaudible) waiver, I'll let him
 8              answer.  I'll let him answer.  If you agree on
 9              the record that we're just selectively waiving
10              it so you can explore that nobody tried to
11              surprise you, of course he can answer it.  But
12              I need an agreement to a selective waiver of
13              privilege.
14                      MR. KURSMAN:  When you spoke is not
15              privileged, so --
16                      MR. ATYIA:  You're asking about what
17              we spoke about.
18                      MR. KURSMAN:  No, no, I'm not asking.
19              I'm asking when he told you.  You already
20              established on the record that he did tell you.
21              I'm asking when.  That's not a privileged
22              question.
23                      MR. ATYIA:  Fair enough.  I'm going
24              to object to the privilege, but Dr. Antognini,
25              you can answer.
```

```
 1            A.        I don't remember exactly.  So I'm
 2      trying to in my mind piece together the time line here
 3      and when was I asked to do this.  So now that I think
 4      about it, it might have been more than two weeks ago.
 5      So here's the reason why there's -- you know, my
 6      mind -- I'm a little bit, you know, not sure.  Because
 7      initially -- so I still -- I do clinical work.  It's
 8      not in anesthesiology, it's in wound care, and I see
 9      patients on Tuesdays and Thursdays, and this execution
10      was scheduled on a Thursday.  And when I was asked
11      about this, I said, well, you know, let me look at my
12      schedule.  I don't think that's going to work out
13      because I have -- even if, you know, I shifted things
14      up, it turned out that that -- this last Wednesday, the
15      26th, was going to be -- there was a personal thing
16      that I was going to be going to at night, and I said,
17      you know, it's just -- I would have to travel at night
18      to get there.  I just -- you know, I'm not really
19      willing to do that and I'm not sure I want to see an
20      execution anyway.  So these are my discussions with the
21      State of Oklahoma.  And then at some point -- so I
22      don't know when I mentioned this to Tennessee.
23            Q.        Was it over a week ago that you
24      mentioned it to Tennessee?
25            A.        Yeah, I would say it was over a week
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 291 of 418 PageID #: 7968

```
 1    ago.
 2              Q.        Was it over two weeks ago?
 3              A.         I'm not sure about that.  But the
 4    reason why I wasn't sure, I may not have told them, is
 5    that I wasn't sure I was going to be doing this.  And
 6    then this event that I was going to go to on Wednesday
 7    here in Los Angeles was postponed because of COVID
 8    reasons and I thought, well, now I can move my patients
 9    around and I can do this.  So at about two weeks ago,
10    I'm guessing, is when I decided I would do this.  And I
11    don't remember exactly when I mentioned it to the
12    people -- you know, to Mr. Atyia and so forth.  I just
13    don't recall.  It was after that point.  And was it
14    more than a week ago?  It might have been.  I just
15    don't know when it was exactly.
16              Q.        Okay.  But it was -- you think it was
17    over a week ago?
18              A.         I think so, yeah.  I'm not sure.  I
19    just don't know.
20              Q.        Okay.  When you got home, did you
21    talk to your wife about it?
22              A.         Not about the execution itself.  I
23    talked to her about the -- you know, travel and things
24    like that.  And you know, I have to admit my wife is
25    asking about it and I said I cannot talk to you about
```

1    it because I haven't done my affidavit yet.  I have to
2    do that and I don't want there to be any influence
3    about anything, so I did not talk to her about it,
4    about the specific events between when we -- you know,
5    the curtain goes up and when the curtain goes down.
6            Q.        So what did you talk to your wife
7    about concerning the execution?
8            A.        Well, again, it depends on what you
9    mean by the execution.  I talked -- I said to her, you
10   know, there are people in the witness room and that we
11   were all close together and some people had masks on
12   and others didn't, because obviously I was concerned
13   about COVID, and then about where I had to wait and so
14   forth, but nothing about the execution itself.
15           Q.        At what point did you read news
16   reports about the execution?
17           A.        Probably maybe an hour or so after
18   the -- well, maybe not.  I'm not sure when, but it was
19   pretty soon after I had seen the execution.
20           Q.        Why, why did you read news reports?
21           A.        Well, I was just curious to see what
22   the description was versus my experience.  Now, should
23   I have done that?  Maybe not, but I did it, so I'm
24   being truthful about that.
25           Q.        And did the experience -- have you

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 293 of 418 PageID #: 7970

```
 1     felt any trauma from that experience?
 2                     MR. ATYIA:  Go ahead.
 3             A.          Not really.  Not yet.  I mean, I know
 4     that -- you know, it's going to be -- you know, one
 5     thing I didn't mention to you, but I will now is,
 6     because I'm a religious person, I said prayers before
 7     the execution for the victims and for the people that
 8     were actually involved, you know, having to carry out
 9     the execution, and for the inmate.
10             Q.          Are you going to seek any
11     psychological or psychiatric treatment for your
12     experience viewing the execution?
13                     MR. ATYIA:  Objection.  I can't
14             instruct him not to answer.  I don't -- I think
15             that's going into his private information.
16             That's really not fair.  But I can't instruct
17             him not to answer.  Dr. Antognini, go ahead.
18             A.          I don't -- at this point, I don't --
19     you know, when you're sane, you don't think you need a
20     psychiatrist, and then when you finally do go insane,
21     you have problems, then -- at this point, I don't see
22     that happening.  Now, could it?  I suppose that's true.
23                     But I want you to know, and I'm going
24     to be very up front about this is that, you know, I
25     didn't seek out this -- you know, to see this
```

```
 1    execution.  In fact, I was pretty resistant to doing
 2    it.  But there's always been, you know, this nagging
 3    thing in my head about here I have been doing this work
 4    for six years and, you know, maybe I really should see
 5    one of these and more than one of these to say, you
 6    know, what exactly is happening here.  Am I, you know,
 7    doing the right thing here?  Am I -- is this actually
 8    my opinion basically or my expert opinion, does that
 9    comport with, you know, what is actually occurring?
10    And so I did it for that reason as well, and so --
11                    Nobody likes to see that happening.
12    We all wish we could have turned the clock back and I'm
13    sure probably the inmate as well.  But, I guess, you
14    know, one of the strongest reasons I did this was
15    because I felt, you know, if -- Antognini, if you're
16    going to start -- if you're going to continue to do
17    this type of work where you say it's okay basically
18    that this is what you expect to happen and that
19    testimony and expert opinion, you know, leads to this
20    event, maybe you should see with your own eyes, you
21    know, what exactly is happening here.  So that also was
22    a reason for me to do this.
23            Q.      So part of the reason you witnessed
24    the execution was for self-discovery, is that what
25    you're saying?
```

```
 1            A.        I wouldn't say self-discovery.  It
 2      was more about basically -- so in prior -- in prior
 3      executions that I have heard about, you know, from
 4      witness reports and so forth, you know, people talk
 5      about heaving and gasping and, you know, things like
 6      that, and I am of the belief -- again, I've only seen
 7      the one yesterday, but I am of the belief that I think,
 8      you know, reporters in general use pejorative terms for
 9      this and for what they might observe.
10                      And also because there's -- there is
11      this, I think, false understanding among lay people
12      about what happened stepping outside the execution
13      setting and into the clinical setting.  There is this
14      sort of misunderstanding about what happens in an
15      operating room in terms of things and, you know, I
16      think people expect -- a lay person expects you
17      anesthetize somebody, they lie there still, calm, you
18      know, nothing's happening, you know, they just -- and
19      the surgery continues.  Whereas in an operating room, a
20      lot of bad things happen, patients move, you know,
21      complications occur.  It's not as pretty as we would
22      like to think it is.  So when I see these reports of
23      whatever occurred in executions, in my mind's eye, I
24      think to myself, well, you know, this is probably what
25      happened, you know, this is -- you know, that's -- you
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

```
 1    know, as an example, what happened in the John Grant
 2    execution where there was, you know, vomiting.  And I
 3    thought, well, that's just regurgitation.  He had eaten
 4    a lot of food and drink.  And in the operating room, if
 5    I had a patient there on the table and they had eaten
 6    that much and drank that much fluid and then you gave
 7    them, you know, a big dose of an induction drug, or in
 8    this case, 500 milligrams of midazolam, regurgitation,
 9    if it happened, I'm not surprised by that.
10               So people thought, oh, my God, that
11    was horrific.  That was, you know, terrible what
12    happened.  Well, that's what you would expect to happen
13    in that setting.  It's an unfortunate common -- I
14    shouldn't say common, but it occurs clinically.
15    Regurgitation and vomiting can happen in the operating
16    room on a patient, so -- to circle back to your
17    question about, you know, this self-discovery kind of
18    thing, I guess, more about trying to educate myself, I
19    suppose, or see exactly what's going on as opposed to
20    self-discovery.
21          Q.     In the operating room, do you see
22    the -- what you described as rocking the boat, do you
23    see that all the time when a patient is under general
24    anesthesia?
25          A.     It's called rocking boat, not rocking
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    the boat, but a rocking boat.  You know, it's a minor

2    issue.  But I wouldn't say you see it all the time

3    because the -- hopefully you are controlling the airway

4    to the extent that you don't see that.  So it happens

5    frequently enough that we learn about it and we have to

6    observe the patient for it where we're trying to

7    maintain the airway.

8            Q.        And what do you do when you see

9    rocking boat?

10           A.        So a classic, you know, rocking boat

11   motion where the abdomen basically is going up, the

12   chest and neck muscles and so forth are going down

13   indicating a complete airway obstruction.  You have to

14   basically relieve that.  So usually that's going to

15   be -- so these are on patients that are not intubated

16   and you have to do a jaw thrust to open up the airway.

17   You might have to assist their breathing with a mask.

18   You might have to put an oral airway in there or some

19   other type of airway.

20           Q.        Is rocking the boat also known as

21   paradoxical breathing?

22           A.        I think that -- I'm not that familiar

23   with that term.  I've seen that in relation to rocking

24   boat, but, yeah, I think that's about right.

25           Q.        And in a hospital setting when you

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 298 of 418 PageID #: 7975

```
 1    see rocking boat, do the doctors in the room do
 2    something to then ameliorate that problem?
 3            A.        Yes.  I mean, as I said, we would do
 4    an air lift -- or we would do an airway -- a jaw thrust
 5    or put an airway in because the patient can die if you
 6    don't relieve that.
 7            Q.        And rocking boat, as you call it,
 8    that you said indicates airway obstruction?
 9            A.        Yes.
10            Q.        Does it indicate anything else?
11            A.        Not really.  I mean, it's airway
12    obstruction caused by or as the result of the drug that
13    was administered, usually an anesthetic drug.
14            Q.        And why would an anesthetic drug
15    cause rocking boat?
16            A.        Because the anesthetic drug collapses
17    the airway or relaxes the airway muscles so that the
18    individual cannot maintain their airway.  The tongue
19    falls back, and at that point, you now have -- if
20    you've completely occluded the airway, the patient
21    could still be trying to breathe, but they can't
22    breathe through that closed airway.
23            Q.        And if you are awake or aware while
24    rocking boat is happening, is that a painful sensation
25    for an individual?
```

```
 1              A.         That sensation -- you would not -- an
 2       awake person can clear their own airway like that.
 3       They don't -- an awake person doesn't demonstrate this
 4       rocking boat phenomenon because they are able to open
 5       up their own airway.  So if you think about it, you
 6       know, you wouldn't lie there awake with your tongue
 7       falling back on the back of your throat and not clear
 8       it yourself.  You would open up your airway yourself,
 9       so it doesn't really happen in somebody who is awake.
10       Now, of course, we're all familiar with people who
11       snore, but that occurs when they're going through the
12       stages of sleep and, you know, sleep is sort of similar
13       in that regard that you get the airway relaxation and
14       the closure of the airway.
15              Q.         If you saw heaving or gasping during
16       the execution, would that change your opinion at all?
17              A.         No.  Gasping is -- in fact, as I just
18       mentioned -- or I just mentioned, there was one -- so
19       gasp is defined basically as a sudden intake of air,
20       more or less.  It has a connotation that occurs with
21       sort of like a panic thing like you see something that
22       scares you, you go, oh, you make that sudden intake of
23       air.  And what I observed was, I think, a momentary
24       opening of the airway where the inmate was able to take
25       in a much fuller breath than he had been able to do so
```

www.veritext.com          Veritext Legal Solutions          800-556-8974

1    before.  So, now, heaving as in, you know, somebody who
2    is vomiting is -- again something that happens with the
3    administration of anesthetic drugs, amnestic drugs, and
4    so forth, so even with heaving, I -- you know, that
5    would not change my opinion unless -- you know,
6    again --
7              Q.         What if you saw tears, would that
8    change your opinion?
9              A.         No.  No, because the problem with the
10   tears is that, you know, we do, as I said -- testified
11   earlier, tears are one of the components of basically
12   -- or one of the things that we might look for.
13                        But you also have to think about
14   what's going through the inmate's mind, right, after
15   the warrant has been read and the inmate has basically
16   given their last statement.  And sometimes these
17   inmates are contrite and are, you know, sorry for what
18   they've done.  Other times they're combative, I
19   suppose.  I've only -- you know, I've only seen this
20   once, so I can only rely on the descriptions.  But, you
21   know, they're facing their moments in life and I think
22   some of them probably get tears from it, tears forming
23   as the drugs are going in.  So you can see those tears
24   coming down as the midazolam is going in.  I mean,
25   theoretically you could.  I think that's quite

```
 1      possible.  So seeing those tears forming, especially
 2      right at the period when the midazolam is going in
 3      doesn't really change my opinion.
 4                      You know, I don't think -- the only
 5      noxious -- in my opinion, the only noxious thing that
 6      occurs in these inmates is the administration of
 7      potassium chloride.  I certainly disagree and dispute
 8      the contention by the other experts that, you know,
 9      vecuronium is a -- you know, is a noxious stimulus.  In
10      an awake person, yes, but not in somebody who is
11      anesthetized and I've given, I think, my opinion on
12      that.
13             Q.      Well, just so I'm clear, so are you
14      saying potassium chloride is a noxious stimuli in a
15      person who receives 500 milligrams of midazolam?
16             A.      Yes.  But let's make sure we're using
17      the same terminology.  I differentiate noxious stimuli
18      or noxious stimulus from pain.  Unfortunately, people,
19      including doctors, you know, they conflate the two.
20      They say painful stimulus or a noxious stimulus.  A
21      noxious stimulus is one that basically -- and I think
22      I, my opinion, in my report, that it basically is
23      capable of producing tissue damage.  The experience of
24      pain is basically what the individual sort of feels and
25      the experience that they have, so you can apply a
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 302 of 418 PageID #: 7979

1    noxious stimulus to a brain dead human, but I don't

         2    think that that human, of course, has pain because

         3    they're brain dead, so --

         4           Q.        Is there anything that you could have

         5    seen yesterday during the execution that would have

         6    changed your expert opinion?

         7           A.        Is there anything I could have seen

         8    or I did see?

         9           Q.        No, that you could have seen.

        10           A.        Well, if the consciousness checks

        11    were done and the, you know, prisoner responded

        12    vigorously to that and then they proceeded, then I

        13    would say, hmm, that's not, you know, the way it's

        14    supposed to be in the protocol.  If the inmate --

        15    again, I'm thinking about theoreticals, but if the

        16    inmate, you know, didn't seem to go off to sleep and

        17    they did the consciousness check and they gave more

        18    midazolam, I would have to deal with that and say,

        19    okay, did they -- you know, are they going to do a

        20    second consciousness check and so forth.

        21                     So these protocols, they're supposed

        22    to make sure that the IV is patent and all that and we

        23    all know about some of the executions that have

        24    occurred where there have been problems with delivery

        25    of the drug.  And I've always claimed that in order for

```
 1    those protocols to work in the way that they are
 2    intended, as I understand it, that you have to have a
 3    patent, functioning, properly placed IV.
 4          Q.        Are you aware that the individual who
 5    does the consciousness check in Oklahoma is a doctor?
 6          A.        I have been told that that individual
 7    is a doctor.  I have no idea if they are not.  I don't
 8    know who the person is that goes -- that went in there
 9    yesterday, but that's what I've been told.
10          Q.        Do you think having a doctor do the
11    consciousness check instead of a prison warden is more
12    appropriate?
13          A.        I will not say whether it's more
14    appropriate --
15               MR. ATYIA:  Objection to form.
16          A.         -- but I will say that a physician
17    will have more training in doing consciousness checks
18    than a warden would.
19          Q.        Let me ask you again, have you
20    received any texts or e-mails from your counsel today?
21          A.        No.  Well, the e-mails were just the
22    ones where he forwarded those references, but no texts
23    and I haven't spoken to him.
24               MR. ATYIA:  I've e-mailed him the
25          exhibits you've given us.  If you think that
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 304 of 418 PageID #: 7981

```
 1              I'm texting with him during this deposition, I
 2              can tell you that's not.  Besides sending the
 3              e-mails that you told me to send him and that
 4              you provided, I think nothing else is being
 5              (inaudible), Alex.
 6         Q.        You testified a minute ago that it's
 7    your opinion that individuals subject to the Tennessee
 8    execution protocol would have midazolam in their blood
 9    at a level of 155,400 nanograms per milliliter.  Do you
10    remember testifying to that?
11         A.        I said -- I did that calculation and
12    that's the number I came up with because Mr. Atyia
13    asked me to do that calculation.  I do not trust that
14    1,554 number.  I need to look at that and look at what
15    other people have provided or what they have reported
16    for midazolam concentrations.  So that -- all I'm doing
17    there is -- so you take the peak level, if you get this
18    peak level at midazolam 5 milligrams and you just
19    multiply by 100, then that would be your expectation of
20    what the level would be with 500 milligrams.  But that
21    1,554, that just -- it seems very high.  And it just --
22    in fact, you should go back and talk to Dr. Stevens
23    about this because he did a similar calculation way
24    back when and I'm pretty sure he didn't get that high
25    of a level.  I could be wrong.  I just don't remember
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 305 of 418 PageID #: 7982

1    off the top of my head, but I don't think it was that

2    high.

3            Q.        Well, I'm asking you about your

4    calculation right now about inmates subject to lethal

5    injection execution.  Is that your opinion to a

6    scientific certainty?

7            A.        That that's what the level would be?

8            Q.        Yeah, 155,400.

9            A.        No, I'm not certain about that,

10   because I am uncertain about that assumption that 1,554

11   is the correct number.

12           Q.        You also said -- you also told Mr.

13   Atyia you would go back and review the Greenblat

14   studies.  Do you recall saying that?

15           A.        Yes.

16           Q.        Do you consider those studies to be

17   reliable studies?

18           A.        In general, yes.  So let's just make

19   sure, you know, we understand each other about

20   reliability and all that.  Every paper that you read, I

21   shouldn't say every paper, many papers that you read

22   there can be a mistake made in the way the data are

23   reported.  And in fact, as you know, if you look at my

24   report, I talk about what I thought was an error in one

25   of the studies that I cited.  And I think they just

1       basically made an error in terms of where the decimal

2       point went.  So those types of errors can happen, and

3       so I -- that's why I want to go back and take a look

4       and see what was the peak level, you know, in

5       Greenblat's study, let's say, or someone -- you know,

6       some study giving midazolam at about the dose as the

7       Antonik study and they got a peak level at one minute

8       of 150 instead of 1,554, it makes me think, hmm, I'm

9       not sure that they accurately reported that in the

10      Antonik study, so that's why I want to look at that.

11              Q.       That was a study that you were

12      relying on in your report, right?

13              A.       I was relying upon that.  I wasn't

14      relying upon that peak level, but I was relying upon

15      the other data that I was looking at.

16              Q.       Another study you rely on in your

17      report is Miyake, right?

18              A.       Yes.

19              Q.       And do you agree that Miyake explains

20      that midazolam has a ceiling effect?

21              A.       I do not remember if they use that

22      term.  They probably do.  They reported that the

23      midazolam going from .2 per kilogram to .3 per

24      kilogram, they did not detect a change in the effects

25      on the EEG.

```
 1              Q.        Go ahead.
 2              A.        Yeah, but that is one of the pitfalls
 3     of sort of understanding the ceiling effect, it can't
 4     go -- basically going from .2 to .3, there's only a
 5     50 percent increase in the drug dose, and to adequately
 6     sort of explore or probe where there's a ceiling
 7     effect, you need to have a much broader range of doses.
 8     So, you know, I could show this to you on a graph very
 9     easily about what I -- you know, statistically, you
10     can't really come to that conclusion, although they
11     did, and I disagree with them that they conclusively
12     show a ceiling effect, but, you know, that's --
13              Q.        You're aware that in the Miyake
14     study, the authors concluded when you raise the
15     midazolam from .2 to .3 milligrams per kilogram, so
16     that would be from 20 milligrams to 30 kilograms in a
17     100 kilogram person, that there is no change on the
18     BIS, right?
19                    MR. ATYIA:  Hold on.  Go ahead and
20              answer, but --
21              A.        That is my recollection, yes, of
22     the --
23                    MR. ATYIA:  Alex, I think we may be
24              coming near -- maybe we're past the time.
25                    MR. KURSMAN:  You're going to cut me
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 308 of 418 PageID #: 7985

| | |
|---|---|
| 1 | off right now?  You just informed me 20 minutes |
| 2 | ago that Dr. Antognini viewed an execution. |
| 3 | MR. ATYIA:  Alex, nobody -- I didn't |
| 4 | say I was going to cut you off.  What I said is |
| 5 | I think we may be coming up on -- nobody is |
| 6 | trying to take away what you want to do.  All |
| 7 | I'm saying is I think we may be coming up on |
| 8 | time. |
| 9 | MR. KURSMAN:  Yeah -- |
| 10 | MR. ATYIA:  Hold on.  It appears to |
| 11 | me, if you're basing that you want more time on |
| 12 | this Oklahoma execution, you're not asking |
| 13 | questions about that.  You're going back into |
| 14 | studies we've covered.  So what would you like |
| 15 | in terms of time?  What would satisfy you at |
| 16 | this point?  I would like to ask the court |
| 17 | reporter where we are on time.  If you want |
| 18 | more and can articulate a reason, we'll |
| 19 | consider it.  I'm just trying have a discussion |
| 20 | with you, that's all. |
| 21 | MR. KURSMAN:  At this point, I am |
| 22 | going through a study we haven't gone through |
| 23 | yet.  I had 30 minutes when you started your |
| 24 | questioning.  At the point you started your |
| 25 | questioning is when you disclosed the fact that |

```
 1              Dr. Antognini witnessed an execution yesterday.
 2              We learned on the record through Dr. Antognini
 3              that he informed you over a week ago that he
 4              was going to see the execution, and yet, none
 5              of the attorneys from the Attorney General's
 6              Office notified counsel for plaintiffs before
 7              this seven hour deposition.
 8                        MR. ATYIA:  We don't think we
 9              necessarily had a duty to call you, Alex, and
10              tell you things our expert told us that we had
11              no control over.  But I understand why you want
12              to explore it.  It seems like you're asking
13              about a study.  How much more time would you
14              like?  That's all I want to know.  And to see
15              if we can accommodate you.  How much more time
16              would you like?
17                        MR. KURSMAN:  For the purposes of
18              this deposition, I think all I need is 15 more
19              minutes.  But I am certainly going to keep the
20              deposition open.
21                        MR. ATYIA:  Okay.  Well, I understand
22              you're going to keep it open.  Can we take a
23              break, can I talk and see -- we have been as
24              accommodating as we can.  Let's take a five to
25              ten minute break.
```

```
 1                    MR. KURSMAN:  Sure.
 2                    VIDEO OPERATOR:  Going off the
 3           record.  The time is 6:06.
 4                    (Brief recess.)
 5                    VIDEO OPERATOR:  Back on the record.
 6           The time is 6:14.
 7                    MR. ATYIA:  Dr. Antognini, if you're
 8           okay with it, we want to go ahead and give them
 9           another 15 minutes that they asked for.
10                    THE WITNESS:  Yes, that's fine.
11                    MR. KURSMAN:  Actually, we conferred
12           as well and we think we actually are entitled
13           to much more than 15 minutes.
14                    MR. ATYIA:  Okay.  Well, I appreciate
15           that.  You already agreed on the record to a
16           limited scope.  We're expanding that.  I'm
17           happy to hear what more you think you're
18           entitled to, but I am going to get this on the
19           record.  I understand that you think that we
20           had some obligation to inform you of an
21           expert's other activities or what he's doing
22           with regards to his other employment.  We would
23           disagree with that.  But I looked through my
24           e-mail and I can't find in the few minutes I
25           looked a record of when we found out that he
```

| | |
|---|---|
| 1 | would be viewing this Oklahoma execution. I |
| 2 | conferred with my co-counsel and have been told |
| 3 | that it was around Monday, is our best estimate |
| 4 | of when we learned that he had confirmed that. |
| 5 | And I know before I said I learned about this |
| 6 | very recently and I think it was around Monday. |
| 7 | And there may have been mention last week that |
| 8 | it was a positive. That's about all we knew, |
| 9 | Alex. And so, you know, that's just the facts |
| 10 | that I have. To the extent that we agreed to |
| 11 | expand your time, that we've agreed to give you |
| 12 | more time, and then you say now you want more |
| 13 | time, and we said, okay, let us go back and |
| 14 | confer about the 15 minutes. And we said, |
| 15 | okay, we'll give you 15 minutes. And now |
| 16 | you're saying you want more time. What more |
| 17 | than 15 minutes? Because you're talking about |
| 18 | a study you could have asked him at any time |
| 19 | during this deposition. Are there any new |
| 20 | facts you've learned during -- you know, since |
| 21 | he wrote the report. We've been here seven |
| 22 | hours. You know, just like you think we had an |
| 23 | obligation to call you up and tell you |
| 24 | everything we know, you could have asked him |
| 25 | that in the past seven hours. So what do you |

```
1              want, like what would -- I guess, at this
2              point, what do you think is reasonable that
3              would satisfy you today?
4                        MR. KURSMAN:  When I agreed to use
5              half the time that you used, I had no idea that
6              you would get from the witness that he viewed
7              an execution yesterday.  And that was the way
8              that you had provided notice to us that the
9              witness viewed an execution yesterday.  Aside
10             from being highly inappropriate, it opens up a
11             lot of avenues for me to explore right now.
12             Had I known that Monday or Friday, when you
13             were informed that Dr. Antognini was going to
14             view the execution, my whole approach to this
15             deposition may have been entirely different.
16             Based on this late disclosure, and late is
17             putting it mildly, I would like to continue
18             with my deposition.  If at some point you want
19             to cut me off, we can then take that up with
20             the District Court.  But as of now, based on
21             this late disclosure, I am going to continue
22             with my deposition as planned.
23                        MR. ATYIA:  Okay.  Well, if we're
24             conferring, just as you asked me when did this
25             happen and you're calling that -- us
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 313 of 418 PageID #: 7990

```
 1              inappropriate, I'm not sure you cited anything
 2              that gives us an obligation to go to the
 3              lengths of your terms.  And maybe there is, I
 4              have not looked, but I don't think there is.
 5              And a request to continue after seven hours of
 6              questioning I don't think is fair.  If you want
 7              to tell us the time that you think you need, we
 8              will consider it.  We thought it was 15
 9              minutes, we're ready to agree to that.
10                   MR. KURSMAN:  How about I continue
11              with this study before we went on break, and
12              after that, I will confer with counsel, with
13              plaintiff's counsel.
14                   MR. ATYIA:  Why don't we go off the
15              record for a second and try to work this out.
16                   VIDEO OPERATOR:  Going off the
17              record.  The time is 6:19.
18                   (Brief recess.)
19                   VIDEO OPERATOR:  Back on the record.
20              The time is 6:20.
21         Q.        So when we went off the record, Dr.
22    Antognini, we were talking about the Miyake study.
23                   MR. ATYIA:  No, that's not what we're
24              doing, Alex.  You're not going to continue in
25              an unbounded deposition when we've gone past
```

```
 1            seven hours plus past the time that we
 2            stipulated with you.  So we can agree to
 3            continue to produce Dr. Antognini if you are --
 4            you've provided with no request for additional
 5            time.  You've provided us no idea of how much
 6            more time you want.  You just said you're going
 7            to continue your deposition.  If that's your
 8            position, there's nothing we have to work with
 9            and we need to confer with our folks and decide
10            what to do next.  If you have a request for
11            time that we can consider, we're happy to try
12            to accommodate that.  But it's getting late.
13            Like I'm supposed to be home right now.  It may
14            snow here.  What do you need to do in this
15            deposition to feel satisfied?
16                      MR. KURSMAN:  I apologize that it may
17            snow there and you have to be home, but
18            unfortunately, you had just told us at hour
19            6:30 of this deposition that Dr. Antognini,
20            your expert anesthesiologist, witnessed an
21            execution with the same three drugs that are
22            subject to this execution protocol.  Your
23            witness, Dr. Antognini, also told us that he
24            told you he was going to view that execution
25            over a week ago.  Neither you nor any of your
```

```
 1          co-counsel ever informed anyone on plaintiff's
 2          counsel that Dr. Antognini was going to view
 3          this execution.  Now at hour 6:30, you tell us
 4          he viewed this execution and complain that
 5          we're going over seven hours.  Take your time
 6          and confer with counsel.  We are going to
 7          continue this deposition until you tell us we
 8          have to stop.
 9                    MR. ATYIA:  Yeah, this isn't -- I'm
10          sorry if this isn't productive.  We're trying
11          to accommodate you.  If you're just going to
12          say you're going to continue until you're told
13          to stop, then I understand.  Let me confer with
14          my counsel and we'll see what we can do.
15                    MR. KURSMAN:  We can go off the
16          record.
17                    VIDEO OPERATOR:  Off the record.  The
18          time is 6:23.
19                    (Brief recess.)
20                    VIDEO OPERATOR:  Back on the record.
21          The time is 6:32.
22                    MR. ATYIA:  When we were off the
23          record, I conferred with my counsel and I asked
24          Mr. Ely and Ms. Davis if they could devote some
25          more time to this, so, Dr. Antognini, can you
```

```
 1              do another hour?
 2                        THE WITNESS:  Yes.
 3                        MR. ATYIA:  Okay.  Alex, maybe if you
 4              can try and get this done in an hour, that
 5              would be -- we would really appreciate that.
 6                        MR. KURSMAN:  I think I will actually
 7              be done way shorter than an hour.
 8                        MR. ATYIA:  We're happy to be here
 9              for another hour if you want.
10                        MR. KURSMAN:  Okay.  I will be
11              leaving the deposition open, though, as well,
12              just so --
13                        MR. ATYIA:  Yeah, we understand.
14              That's something you can do unilaterally.
15                        MR. KURSMAN:  Okay.  Now, are we back
16              on the record?
17              Q.      So we were talking about Miyake, but
18         before we get there, I want to go back to the execution
19         you witnessed yesterday.  Where did you witness the
20         execution?
21              A.      You mean where I was sitting or where
22         the city?
23              Q.      Oh, no, I apologize.  Where were you
24         seated in the --
25              A.      Okay.  The witness room that I was --
```

```
 1     I guess it's two witness rooms, but the one that I was
 2     in, which is the one that's directly adjacent to the
 3     chamber, there are two rows of ten seats.  And I was in
 4     the second row, fourth seat from the right.  And then
 5     if you look at the window, observation window if you
 6     want to call it that, there's actually two of them, two
 7     large observation windows with basically a frame in
 8     between.  And I was basically about -- my field of --
 9     or where my head would be located, you know, relative
10     to the window about one foot to the left of the
11     beginning of the window, basically.  So I had a clear
12     view of the inmate's body and head and so forth, so
13     I -- and I'm probably about 15 approximately, you know,
14     based on my guestimate, about 15 feet away from the
15     inmate, would be my guess.
16              Q.        Who else was in the viewing area with
17     you?
18              A.        So when we went in, there were
19     already probably maybe ten people, I'm guessing, in the
20     room.  And I don't know who those people were.  Just
21     sort of, you know, looking around, it seemed like some
22     of them were probably from the -- reporters.  And there
23     were some individuals in the front, I'm guessing, were
24     witnesses on behalf of the inmate.  I'm not positive
25     about that, but just based on the fact that the -- when
```

1     the inmate was making a statement and he was looking at
2     those individuals and then later on, they were -- the
3     individuals were crying, I assumed that they were
4     witnesses on behalf of the inmate.
5                     And there was a -- a couple of
6     people, of course, I -- there were a couple of people
7     in front of me.  I don't know who they were.  And then
8     the people that came in with me were -- there were
9     two -- the prosecuting attorneys for the case, the
10    original prosecuting attorneys is what they were -- who
11    they said they were.  There was a gentleman who was
12    the -- he gave his title as a -- he said he was an
13    investigator for the Oklahoma Highway Patrol.  There
14    was a woman who was the -- she said she was like a
15    secretary in the Governor's cabinet related to public
16    relations.  I don't really know exactly.  Her first
17    name was Trish.  You know, I don't what her full name
18    is, you know, if that's just a nickname, but it's
19    Trish.
20                    The people that came in with me, I
21    feel like I'm missing somebody.  I got -- I said the
22    investigator for the Highway Patrol, there were the two
23    prosecuting attorneys, there was -- oh, there was
24    somebody else, a man who, you know, he introduced
25    himself and said who he was and what he did, but I

```
 1    forget exactly what it was.  I think he was -- oh, my,

 2    let's see.  His role was -- I think, you know,

 3    something in law enforcement.  I forget exactly what it

 4    was.  He was a -- I think he said he was a former

 5    police chief, but I don't know what his role here was,

 6    I forget exactly.  The only name that I remember is

 7    Trish.

 8            Q.        Was there a -- you said you were in

 9    the second row, so was a person in front of you in the

10    first row?

11            A.        There was a person in front of me,

12    yes.  But we're elevated, the seats are elevated in the

13    second row, so they don't -- it doesn't obstruct your

14    view, at least to my recollection it's elevated.  I did

15    not have an obstructed view based on that.

16            Q.        Was anyone standing?

17            A.        There was -- in the witness room?

18            Q.        Yes.

19            A.        Off to the -- and I forgot to mention

20    this, off to the -- my far right in a small room was a

21    person from the Department of Corrections.  I don't

22    think -- when we first got ushered in, there were two

23    people from the Department of Corrections and one of

24    them gave their explicit instructions, which basically

25    said -- he said, you must be quiet.  If you say
```

```
1    anything, you'll be escorted out of the room.  You
2    can't talk to anybody in the room.
3                        So we entered the room at around
4    9:41, so it was basically about 20 minutes of just
5    sitting there quietly.  In any case, that gentleman --
6    the gentleman that gave those instructions, I don't
7    think he stayed in the room.  There was another person
8    from the -- I presume from the Department of
9    Corrections who stood off to the side and I think he's
10   the one that was making sure that if anyone talked, he
11   would, you know, remove you if you did.  If somebody
12   did something that they shouldn't have, he was the one
13   that was going to, you know, enforce the rules.  There
14   might have been the other gentleman there, but I didn't
15   want to look around too much because I was afraid I
16   might get kicked out of the room for doing something I
17   shouldn't.
18            Q.        And did you have any conversations
19   with anybody who was in that room?
20            A.        In the room?
21            Q.        Not while you were in the room.  I
22   assume you didn't have any conversations while you were
23   in the room.
24            A.        No.  No, we did not.
25            Q.        Did you have any conversations
```

1    with --

2         A.        Well, just to be absolutely clear

3    about that, when we first entered the room, the -- one

4    of the gentlemen, one of the people from the Department

5    of Corrections said to me, you sit over there.  And

6    there was a Kleenex box on the chair.  But the two

7    prosecuting attorneys were going to sit next -- it

8    looked like they were going to sit next to each other,

9    so there was a little bit of a mixup about where I was

10   supposed to sit and so we had a conversation about, you

11   know, where I'm supposed to sit, but that was basically

12   it.

13        Q.        How did that conversation go?

14        A.        Well, when this person from the

15   Department of Corrections said to me you're supposed to

16   sit over there, I think he said where that box is, I

17   forget exactly his words, but he meant to imply where

18   the Kleenex box was and that's why it was there.  But

19   during that process, the two prosecuting attorneys had

20   already -- were already going down that row and they

21   moved the box because they were going to, I guess, be

22   -- were going to sit together, but they didn't hear

23   that conversation.  They didn't know that that was

24   where I was supposed to sit, so I had to go to the

25   person from the Department of Corrections there and I

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 322 of 418 PageID #: 7999

1    said, where do you want me to sit?  You know, again, we
2    just sort of worked out that I was supposed -- I was
3    still confused, you know.  I said to him, is this the
4    chair that you want me -- that I'm supposed to be
5    sitting in?  He said yes.  So that's how that all went
6    out.
7            Q.        Were the prosecuting attorneys aware
8    that you are an expert for the State of Oklahoma in the
9    lethal injection challenge?
10           A.        Yes.  While we were waiting in
11   another part of the prison, you know, those people that
12   were going to be witnesses as far as that is concerned,
13   you know, some of these people that I just talked
14   about, we just had discussions about, you know,
15   introducing ourselves and so forth, so I told them that
16   I am an expert witness for Oklahoma and I came to
17   observe the execution.
18           Q.        And did they say, okay, then sit with
19   us?
20           A.        No.  The seat that was chosen for me
21   was one that was worked out with the attorneys from the
22   Attorney General's Office.
23           Q.        And how was that seat chosen?
24           A.        They just felt that that would be the
25   best place to view, you know, what was going on in the

chamber.

Q.        Why would the second row be a better

view than the first row?

A.        I believe it was because they -- not

to get -- I don't think it's detailed -- I guess they

do kind of go into attorney-client privilege, but I

think that there -- you know, the first row -- I am not

sure about this, and maybe you should ask them, but it

sounds like the first row is supposed to be for the

witnesses for the inmate and all the seats were going

to be occupied except for the ones that are at the very

end, which would not have given perhaps as good a view

as the one that I was sitting in.  That's my guess.

Q.        After the execution, did you have any

conversations with the prosecuting attorneys?

A.        No.  No, I did not have any

discussions.  So when we were being transported -- so

we were transported in a van, you know, from basically

the warden's office area or building to the building

where this occurred.  And then we were transported in a

van coming back.  They were talking, people were

talking, but I stayed silent.  I did not have a

conversation with them.

Q.        Did anybody ask you what your

thoughts were on the execution as an anesthesiologist?

```
1              A.         The only person that had a question
2     about what I observed, and let me give you the context
3     here.  Before the execution, the person who was the
4     investigator from the Oklahoma Department, you know,
5     Highway Patrol asked me about, you know, can you tell
6     when these drugs are going in through an IV?  And I
7     said, it kind of depends on what you can -- you know,
8     how close you are.  And I'm talking about my clinical
9     experience here.  How close you are and what's going
10    on.  You might be able to see small bubbles going in.
11    And if you're really close, you could observe, even
12    without bubbles, you could see basically fluid flowing
13    in.  It's different -- because of what we call a change
14    in the refraction basically or the way the light is
15    transmitted, you can kind of see that way.  But that's
16    more difficult to observe because, you know, I don't
17    know, looking at this when these drugs are being
18    injected.  And we had that conversation before the
19    execution.
20              And then after the execution, he just
21    asked me, well, did you see those drugs going in?  I
22    just said, I saw bubbles at one point going in, which I
23    think I testified earlier to you.  If I didn't, then,
24    you know, towards the end I saw bubbles in the IV going
25    in, and I just said that to him.  And I have no idea if
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 325 of 418 PageID #: 8002

```
 1    that means it was being injected or not, but that's
 2    just what I observed.
 3              Q.          And could you see the IV point of
 4    entry in the inmate?
 5              A.          On the left arm I could.  On the
 6    right arm I had to use the computer -- the screen, so
 7    video screen to see that because, you know, the camera
 8    is over the inmate.  I can't see the right arm
 9    directly.
10              Q.          From your position, could you see the
11    inmate's eyes?
12              A.          Yes.
13              Q.          And could you see whether they were
14    tearing?
15              A.          I did not see that.  Could I have
16    seen that?  Yes, I -- if they had a small number of
17    tears, I could have missed it.
18              Q.          Could you see the inmate's right arm?
19              A.          Only by the video stream.
20              Q.          What about the inmate's right leg?
21              A.          I would -- so the -- in the chamber
22    itself, if you think about the room being sort of a
23    rectangle and the inmate was basically to my -- you
24    know, the head was on the right side of that room as
25    I'm looking at the room, and the legs are on the left
```

```
 1        side of the room as you look at that room, there was
 2        the individual from the -- presumably from the
 3        Department of Corrections.  He's the one that read the
 4        warrant and so forth.  He was standing at the legs
 5        basically near the knee essentially of the -- where the
 6        inmate was on that table.  He obscured not all of the
 7        inmate's legs, but some of it.  I could see the feet,
 8        although the inmate was covered with a sheet.  I could
 9        see the feet -- obviously, I couldn't see the feet
10        because they were covered by the sheet and I could see
11        the protrusions basically.  So I -- that's what I saw
12        in terms of the legs.
13                Q.       And during your testimony earlier,
14        you also discussed a different execution that wasn't in
15        your expert report and that was the execution of, I
16        believe, John Grant?
17                A.       Correct.
18                Q.       And in that execution, I think you
19        testified that he repeatedly vomited during the
20        midazolam induction, right?
21                A.       I do not know that I used the term
22        repeatedly vomited.  I think I said there were reports
23        that he vomited.  But I think that regurgitation is
24        probably a better term.  I mean, I wasn't there, so I
25        can't say for sure what happened.  But he either -- you
```

```
 1    know, gastric contents came out, let's put it that way,

 2    whether that was the result of regurgitation, you know,

 3    passive regurgitation, or active vomiting, I guess is a

 4    point of contention, I suppose, but that's my

 5    understanding of what happened.

 6              Q.        And then were there also reports of

 7    heaving, do you know?

 8              A.        I don't know for sure if I recall

 9    that.  I think that was some of the -- you know, a word

10    that was used in some of the news reports.  But I don't

11    know -- again, I wasn't there, but that word was

12    probably was used, you know, possibly.  I guess I can't

13    tell you for sure.

14              Q.        Did you go into the execution

15    yesterday hoping to see anything?

16              A.        I was going there as a -- almost as a

17    scientist just to, you know, make observations and

18    write them down.  I wasn't hoping to see one thing or

19    another.  I was just trying to observe -- you know,

20    write down what I observed.

21              Q.        But somehow you did not observe

22    tears, no reporters observed tears?

23              A.        I did not see that, no.

24              Q.        And you were being paid something

25    like $7,000.00 by the Attorney General's to witness the
```

www.veritext.com                 Veritext Legal Solutions                 800-556-8974

execution?

        A.        Again, I don't know what the dollar amount will turn out to be. But based on the contract, it might be. I don't know if it's going to be $7,000.00. I don't remember exactly. Again, it wasn't part of the contract, so -- but you're not far off, I imagine, what the amount would be.

        Q.        And witnessing --

                MR. ATYIA: We didn't pay for that.

                MR. KURSMAN: Yeah. Just so the record is clear, I'm talking about the Oklahoma Attorney General's.

                MR. ATYIA: Oh, yeah, okay.

        Q.        And that is in anticipation of a -- for a trial at the end of February; is that right?

        A.        Yes. Well, I don't know what's going to happen with that information. I'm fully willing to say to my -- you know, what is blatantly obvious is that, you know, do I have a conflict of interest. You know, here I am making these recommendations and I'm also observing executions. Am I going to, you know, fudge the data, so to speak. I'm not going to fudge the data. I'm going to report it just basically the way I did it. And as I said to you very early on about -- when you asked about this, if I never heard --

```
 1    got another call from any state or anybody else about

 2    doing this work, I would be happy.

 3           Q.        Let's go back for a second.  You just

 4    said do I have a conflict of interest.  Do you have a

 5    conflict of interest?

 6           A.        Well, a conflict of interest is one

 7    of those things where basically you have to ask

 8    yourself, you know, how would this be perceived.  So in

 9    one sense, someone might perceive that, you know, my

10    participation in that way as a conflict of interest.

11    But you know, all I can tell you is that I would report

12    the data.

13           Q.        If you were authoring a paper on that

14    execution that you observed yesterday, would you have

15    to note that you had a conflict of interest?

16           A.        What you would note is that -- you

17    know, so if I did a study that was -- I got support for

18    on the basis of a -- you know, like a drug company,

19    then you would have to report that, you know, you've

20    received support for that.  It's not necessarily called

21    a -- you know, you don't have to say, hey, there's a

22    conflict of interest here.  An editor would have to

23    make a decision about whether that conflict is

24    sufficient to cause -- you know, cause the data to be

25    suspect.  And likewise here, I'm going to write out an
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 330 of 418 PageID #: 8007

1    affidavit and then the legal system, whether it's the

2    Judge or whatever, can decide what the -- you know, if

3    there's a conflict of interest or not.  That's up to

4    the Judge to decide that.

5            Q.          If you wrote a case study about the

6    single execution you observed yesterday, would you

7    think it's appropriate that a conflict of interest

8    statement was appropriate in that case study that you

9    were acting on behalf of the Oklahoma Attorney

10   General's as an expert in the lethal injection trial

11   and that you were paid approximately $7,000.00 to view

12   the execution?

13           A.          Well, I think what would be

14   appropriate is in my affidavit is to make that

15   statement, a statement such as that, was that, you

16   know, I received X number of dollars or I received

17   compensation for this.

18           Q.          I'm not asking you about your

19   affidavit.  I'm asking if you were to write a case

20   study on this report, like many of these studies that

21   we've been looking at for the last seven hours, would

22   you have to disclose that you had a conflict of

23   interest?

24           A.          I think I've answered that question.

25   I would say, yes, you have to fill out, eventually, a

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 331 of 418 PageID #: 8008

```
 1     conflict of interest form or a set of questions that
 2     are then handled by the editor to decide, you know,
 3     what kind of statement you should make in the paper.
 4     And maybe the editor says, you know what?  There's too
 5     much of a conflict here.  And I'm talking
 6     hypothetically, because, you know, I'm not going to --
 7     you're not going to write a case report on an execution
 8     and try to get it published.  So it's a little bit of
 9     a -- you know, it's not a little bit, it's a
10     hypothetical.  I mean, no one would ever do that, so --
11               Q.        Well, some of the studies that you
12     cite in your report, aren't they based on single
13     patient case studies?
14               A.        Yes, but not an execution.  I mean,
15     that's -- that is a -- it's not the type of thing that
16     you would report as a case report.  It's just -- it
17     isn't.  So I don't -- again, it's sort of a
18     hypothetical that I'm not sure would exist, but if
19     there was a journal out there that for some reason
20     would be interested in this -- in a case report and I
21     had an interest to write it up, which I don't, then,
22     yes, I would have to report that -- or should report
23     that I have been compensated for that.  But I don't see
24     that as a -- you know, compensation in things like this
25     come up all the time and the important thing is that
```

www.veritext.com                Veritext Legal Solutions                800-556-8974

1    you be honest about it and you put it up front and let

2    other people decide whether or not there's a conflict

3    or how much -- how trustworthy you are in terms of your

4    reporting of the data.

5            Q.      Would you be willing to view another

6    execution?

7            A.      Yes, I think that at this point in

8    time, I would be.  But I wouldn't want to make a -- you

9    know, a business out of it by any means.  I certainly

10   don't need the money and I don't need the -- I just

11   don't need it.  I mean, it just -- yeah, I'm not -- you

12   know, I probably would, but I'm not going to be looking

13   for it.

14           Q.      Are you planning on viewing another

15   execution?

16           A.      No, there are no -- I have not been

17   contacted by anyone and I'm not out there looking for

18   it.  And as I said earlier, when I was first contacted

19   by Oklahoma, I said, you know, I just don't think this

20   is, you know, something I want to do.  You know, the

21   schedule is too much of a problem for me and I'm not

22   sure that I really want to see an execution.  At one

23   point in my -- you know, someone asked me that

24   question, I think my answer was, I've never see an

25   execution and I hope that I never do.  But again, I

```
 1    think one of the important issues if I decide to do it
 2    is just because I wanted to be able to say to myself
 3    that if I'm going to be part of a process that ends in
 4    this, this is the end result, I probably should see
 5    exactly what -- how this works, and that was another
 6    reason why I decided to do it.
 7           Q.       Would you be willing to serve as an
 8    expert in a future lethal injection case?
 9           A.       I would be willing to do that for the
10    state or for an inmate.  If an inmate -- you know, I
11    know plaintiffs or inmates -- or attorneys for inmates
12    might not look at me as being perhaps a, you know, good
13    choice for them.  But if they thought for some reason
14    that I could help them, then I would be willing to do
15    that.  I mean, I don't have any problems with, you
16    know -- it's not like I -- you know, I don't have any
17    problems working with inmates' attorneys and testifying
18    on behalf of inmates.  If, you know, they felt my
19    testimony would be helpful to them, I would do that.
20           Q.       Okay.  Let's go back to the Miyake
21    study that we were discussing before.  We were talking
22    about when we cut off you said you were aware of how
23    the Miyake study showed that at .2 milligrams per
24    kilogram and .3 milligrams per kilogram there is no
25    change on the BIS.  Do you recall that?
```

```
 1              A.        I do, yes.
 2              Q.        So if we have a 100 kilogram person
 3      who received 20 milligrams or 30 milligrams, these
 4      authors are saying there would be no change in the BIS,
 5      right?
 6              A.        That's what the data suggested, yes.
 7      You know, that's what they reported and that was the
 8      conclusion, that there was no change between using .2
 9      to .3.
10              Q.        And that's raising the dose
11      50 percent, right?
12              A.        Yes.
13              Q.        And do you recall -- I can pull it
14      up, but do you recall that they said the maximum effect
15      of midazolam on the BIS is approximately 70?
16              A.        And this is in the Miyake study?
17              Q.        This is the Miyake study, yeah.
18              A.        We'll have to pull that study up
19      because I don't think it was -- I think it was below
20      that.  I believe that the BIS levels were in the low
21      60's.
22              Q.        Well, what if the Miyake study said
23      the maximum effect of midazolam on the BIS is
24      approximately 70, would that change your opinion today?
25              A.        No, not really.  Again, you're
```

```
 1    looking at a dose response.  The reported -- they were

 2    looking for the dose response, but using that as

 3    evidence that there's a ceiling effect, you just cannot

 4    determine a ceiling effect on the basis of doses that

 5    are close apart or close together.

 6           Q.        Miyake is an article that you cited

 7    in your report, right?  Let's pull up Miyake.  Do you

 8    have Miyake?

 9           A.        Yeah, I do.

10           Q.        I'll share my screen as well.

11           A.        Okay.  Miyake.  Miyake.  Oops,

12    something happened here.  Something happened.

13           Q.        Well, I can just show you on my

14    screen if you know the --

15           A.        I have it here.  So go ahead, I have

16    it here.

17           Q.        Okay.  So do you see where I am right

18    here?  It says, these results are consistent with those

19    reported earlier showing that BIS decreased only to 70

20    by the end of continuous infusion for ten minutes and

21    that the maximum effect of midazolam on the BIS is

22    approximately 70.  Do you see that?

23           A.        Yes.

24           Q.        Okay.  And you know that, as you said

25    before, 70, the BIS reading for general anesthesia,
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 336 of 418 PageID #: 8013

1    right?

2              A.        All right.  So let's now go to -- it

3    might be the page before that, 389.  Oh, no.  I'm

4    sorry.  I'm sorry.  No, it's right there, so -- no,

5    scroll up a little bit.  No, it's right there.  That's

6    fine.  So if you look at the figure A -- I'm sorry,

7    what figure is that?  It's figure -- yes, correct.

8                         MR. KURSMAN:  And let's mark this as

9              EXHIBIT 14.

10                        (Thereupon, the Miyake study was

11             marked and filed as EXHIBIT 14.)

12             A.        So you see, first off, the BIS -- the

13   dots are closer to 60 there.  And then if you go into

14   the actual results section, I believe, we're going to

15   see this in two different spots, but if you go into

16   results, so scroll up.  All right.  I'm not sure I'm

17   going to be able to find it, you're going to be able to

18   find it, so let me pull it up on my screen here.

19             Q.        So while you're doing that, let me

20   ask you this:  Are you saying the authors are wrong

21   when they say these results are consistent with those

22   reported earlier showing that the BIS decreased only to

23   70?

24             A.        Okay.  Hold on.

25             Q.        Did you hear my question?

1      A.        I did hear your question and you

2    asked me do I think they're wrong.  Well, what I am

3    saying is that the -- I don't think that they report

4    their data -- or I need to take a closer look at what

5    you're -- all right.  So first off, let's go to page --

6    it would be their page 392.

7           Q.        Okay.

8           A.        And this is the paragraph that's

9    beginning at the very bottom.  It says, there are

10   several limitations to our study and they're talking

11   about remifentanil and then they write, in our

12   preliminary study, the BIS was 96 and then it went down

13   to 64, 60, 64, and 64 at the five, ten, 15, and 20

14   minute intervals respectively.  So in that preliminary

15   study, they went down to the low 60's.  And then if you

16   go to -- all right.  Pardon me for a moment here.

17   Let's see if I can find it here.  If we go to -- okay.

18   So I think it's -- probably I'm going to be focused now

19   on that figure there, figure 2-A.

20          Q.        What page are you on?

21          A.        I'm on page 390, which is figure 2-A.

22   You can see that the -- and the open circles are the

23   large dose group.  You can see that the open circles

24   there on figure 2-A, the open circles at time points of

25   around maybe five minutes.  I'm not sure, you know,

```
 1      it's basically perhaps five minutes all the way to
 2      about 15 minutes are around 60 or -- are around 60,
 3      maybe in the low 60's.  And I'm talking again about the
 4      open circles, not the filled one, because -- or the
 5      .3 milligrams.  So at that point for that 15 minute
 6      period, the BIS is around, you know, 60 or the low
 7      60's.  And then when you get down to 30, 45, and 60
 8      minutes, then it starts to go up to around 70.  So
 9      maybe that's where they get their 70 from.  But, you
10      know, during the time period that is important as far
11      as our discussion is concerned, it's in the low 60's.
12              Q.        So let me ask my question again.  So
13      do you believe the authors are wrong when they say the
14      results are consistent with those reported earlier
15      showing that the BIS decreased only to 70?
16              A.        I believe -- I believe that what they
17      are -- so let's -- when they talk about that -- when
18      you have that sentence, they refer to reference 9 and
19      reference 6.  So if you go to reference 6 and reference
20      9, I think those -- that 70 number is -- they're
21      referring to those other papers, not to their own
22      study.
23              Q.        Do you see that they say these are --
24              MR. ATYIA:  Does Dr. Antognini have a
25          copy of this study or --
```

```
 1                    THE WITNESS:  I have it in front of
 2         me.
 3                    MR. ATYIA:  Okay.
 4         A.        I don't have -- I might -- I think I
 5    do have the reference studies, but I also have the
 6    Miyake study in front of me.
 7         Q.        Are you saying that the -- and then
 8    they say, and the maximum effect of midazolam on the
 9    BIS is approximately 70.  Do you see that?  I've got it
10    highlighted.
11         A.        Yes, I see it.
12         Q.        Do you disagree with the authors
13    about that statement?
14         A.        I actually would disagree with that
15    because their own data shows that it goes down to 60,
16    in the low 60's, and they report -- I showed you where
17    they reported that.  And they said approximately 70,
18    so, you know, these are Japanese authors that are
19    writing in English and there may have been something
20    lost in translation there, so -- I just -- you know, I
21    don't agree with your interpretation of that sentence.
22    And I don't -- I believe, I think that the authors
23    probably didn't mean to imply that their data show that
24    the lowest value was 70, because the data show
25    otherwise.
```

1          Q.          It actually says in the discussion,

2     the maximum effect of midazolam on the BIS is

3     approximately 70.  And this is an article that you're

4     citing in your report and now you're saying you

5     disagree with the authors; am I right?

6                     MR. ATYIA:  Objection, form.

7          A.          I disagree with that sentence and how

8     you are interpreting it.

9          Q.          It says, these findings suggest that

10    BIS does not decrease further even if its plasma

11    concentration increases the level -- levels higher than

12    that required for sedation.  Do you disagree with that

13    statement?

14         A.          I don't.  But focus on the word

15    suggest.  It doesn't prove it, it just suggests.  And

16    again, you have to look at the methodology and I've

17    already -- you know, ad nauseam gone over the

18    methodology that you can't -- you may not see much of

19    an effect, a change with just a 50 percent increase in

20    the dose.

21         Q.          So what these findings are suggesting

22    for layman's terms, like what these findings are

23    suggesting is a ceiling effect at .2 milligrams per

24    kilogram, right?

25         A.          You can use the word suggest if you

```
 1    want.  You know --
 2              Q.        They're using the word, not me.
 3              A.        Yeah.  Well, actually -- I'm sorry,
 4    you probably -- do they actually use the words ceiling
 5    effect here?
 6              Q.        No, they say -- I'm just talking
 7    about the term suggests.
 8              A.        Yeah.  Okay.  Well, sometimes when we
 9    write things in the science literature and this happens
10    elsewhere I'm sure, but we will use words like suggest
11    and so forth.  Usually that means that, you know,
12    there's a trend there.  You know, it's not reached
13    statistical significance and you can't hang your hat on
14    it.
15              Q.        But this is an article that you're
16    citing in your report.
17              A.        Yeah, I do that.  So if you want to
18    keep on talking, I just realized now it's getting
19    pretty dark and my room is -- so I'm going to turn a
20    light on real quick.  It's taking me a second here.
21    Hold on.  I don't know whether or not you want to see
22    more of me or not, but there it is.  The light is back
23    on.
24              Q.        I'm happy to go until midnight.
25              A.        Hopefully not midnight my time.
```

1          Q.          And in Miyake, there were no

2     consciousness checks, right?

3          A.          There were not, as I recall, because

4     they gave the midazolam followed by -- they gave

5     remifentanil as I discussed.  And then that, of course,

6     wears off and then they gave vecuronium.  Now, as you

7     know, my -- one of my takes from this paper is that

8     these patients were intubated, which is stimulating.

9     They were left with a tracheal in place there for up to

10    60 minutes and they, you know, didn't see much of a

11    change over that period of time.  So that's pretty

12    telling as well.  One dose of midazolam kept them at

13    that level for that long.

14         Q.          They're intubated, they're paralyzed,

15    right?

16         A.          Correct.

17         Q.          So let's go to -- so what they're

18    talking about here is, do you see it says .3 milligrams

19    per kilogram isn't that -- doesn't change -- it goes

20    from .2 milligrams per kilogram to .3 milligrams per

21    kilogram, there's no (inaudible) of the BIS, right?

22    That's what they're saying.  And they're saying that

23    the BIS remains over 70.  So, let's now go to --

24         A.          I'm not going to agree to that, you

25    know, interpretation of that sentence.  But you know,

```
 1        if you want to keep on beating this dead horse, that's
 2        fine, but I don't agree with that interpretation.
 3                        MR. ATYIA:  Alex, I know you wanted
 4                to make sure we stayed on the record rather
 5                than going off the record.  It seems like
 6                you're outside the Oklahoma execution that you
 7                felt was late disclosed or undisclosed or --
 8                and it looks we're -- you know, I'm here as
 9                long as you want to be, but is there a limit to
10                what you're planning to do?
11                        MR. KURSMAN:  There is a limit.  I am
12                outside the scope of the Oklahoma execution at
13                this point.
14                        MR. ATYIA:  Is there a reason you
15                couldn't have asked these questions during
16                the -- about this study during the seven hours?
17                        MR. KURSMAN:  Yes.  So I was planning
18                on it and then I stopped at 6:30 to give you
19                some time to ask questions on direct, and when
20                you asked those questions and disclosed that he
21                witnessed an execution yesterday, that opened
22                up a whole different line of questions for me
23                than what I was --
24                        MR. ATYIA:  Understood.  I just want
25                to understand --
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 344 of 418 PageID #: 8021

1                    MR. KURSMAN:  All I have is a few
 2          more questions.  I'll be done very shortly.
 3                    MR. ATYIA:  I don't want to rush you.
 4          Take your time.
 5          Q.        So if we go back to your report,
 6    let's go to paragraph 29 of your report.  Do you have
 7    your report or do you want me to share it?
 8          A.        No, I have it here.  So paragraph 29,
 9    all right.  Let me go to paragraph 29.  Let me just
10    catch up to you here.  Yes, I have it here.
11          Q.        Okay.  So do you -- at the very
12    bottom, you see, the answer in my opinion to a
13    reasonable medical and scientific certainty is that
14    midazolam administered to persons at .3 to .4
15    milligrams per kilogram produces unconsciousness, blunt
16    response to noxious stimuli, reduces awareness of pain
17    such that these persons don't experience any more pain
18    than persons anesthetized with other anesthetics such a
19    thiopental, propofol, and isoflurane.  Do you see that?
20          A.        Yeah.  You got a few of the words
21    off, but that's fine.  You put it pretty closely.
22          Q.        Okay.  Is it still your opinion that
23    at .3 milligrams per kilogram persons don't experience
24    any more pain than those anesthetized with anesthetics
25    such as thiopental, propofol, or isoflurane?

```
 1              A.         Yes, it is.  Again, you know, based
 2       on my -- the definition of pain that I have used and
 3       that we've gone over, basically I would say that giving
 4       someone .3 milligrams per kilogram of midazolam or
 5       giving them propofol as an induction dose, you're going
 6       to have no pain in either case.
 7              Q.         I'm not talking about as an induction
 8       dose.  I'm talking about .3 milligrams per kilogram of
 9       midazolam, is that as sufficient to ensure a person
10       doesn't experience pain as those persons anesthetized
11       with other anesthetics such as thiopental, propofol, or
12       isoflurane?  It's just a yes or no answer.
13              A.         Yeah, I would say, yes, they have
14       similar amounts of -- well, I won't say similar amounts
15       of pain because I would say they both have -- you know,
16       there's no pain.
17                    MR. KURSMAN:  Could we go off the
18             record for a few minutes?
19                    VIDEO OPERATOR:  We're off the
20             record.  The time is 7:16.
21                    (Brief recess.)
22                    VIDEO OPERATOR:  Back on the record.
23             The time is 7:24.
24                    MR. KURSMAN:  I have no further
25             questions.  I will -- I believe we entered 14
```

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 346 of 418 PageID #: 8023

```
 1              exhibits, which I will e-mail to the court
 2              reporter and to the counsel for defendants as
 3              well.
 4                       VIDEO OPERATOR:  Anything further?
 5                       MR. KURSMAN:  Not from plaintiff's
 6              counsel.
 7                       MR. ATYIA:  Alex, if you need us to
 8              work with you on something, please reach out.
 9                       MR. KURSMAN:  I appreciate that.
10                       MR. ATYIA:  We're happy to work with
11              you.
12                       MR. KURSMAN:  I appreciate that.
13              Have a good weekend everybody.
14                       MR. ATYIA:  You, too.  Thanks
15              everybody.  Thanks Dr. Antognini.
16                       VIDEO OPERATOR:  Stand by.  This
17              concludes the video deposition.  The time is
18              7:24.  Going off the record.
19                           (FURTHER THE DEPONENT SAITH NOT.)
20
21
22
23
24
25
```

```
 1                  C E R T I F I C A T E

 2        STATE OF TENNESSEE   )

 3        COUNTY OF KNOX       )

 4                       I, Missy Davis, LCR #356, Licensed

 5           Court Reporter in and for the State of Tennessee, do

 6           hereby certify that the above Transcript of Proceedings

 7           was reported by me, and that the foregoing (346) pages

 8           of the transcript are a true and accurate record to the

 9           best of my knowledge, skills, and ability.

10                       I further certify that I am not

11           related to nor employee of counsel or any of the

12           parties to the action, nor am I in any way financially

13           interested in the outcome of this case.

14                       I further certify that I am duly

15           licensed by the Tennessee Board of Court Reporting as a

16           Licensed Court Reporter as evidenced by the LCR number

17           and date following my name below.

18

19

20

21

22

23

24                       Missy Davis, LCR #356

25                       Expiration Date:  6/30/22
```

Page 347

| 0 | 10:16 105:19,21 | 19 228:13,15 | 203 2:18 |
|---|---|---|---|

**0** 136:17 142:18
144:13 145:7
146:1 147:1
151:19,23 167:23
168:11 172:21
**01234** 1:8 4:12
**075** 237:3

**1**

**1** 2:11 4:7 79:18
86:17,21 142:19
144:9,17 155:20
224:15,16 229:13
**1,500** 273:14
**1,541** 270:5
**1,554** 230:13,17
231:6 233:16,20
233:25 235:14
236:1,19,19
237:18,25 271:8
271:12,14 272:8
272:11 304:14,21
305:10 306:8
**1,600** 161:6
**10** 2:20 79:18,22
80:1,2,3 82:1,1
91:19 101:25,25
157:18 180:15,21
181:7,19 195:19
217:25 218:2
**10,000.00** 67:2
**100** 91:8,18,23
92:7,8,11 97:17
98:25 136:17
216:8,9 270:18,19
271:12,15 273:14
304:19 307:17
334:2
**10:15** 105:19,19
105:25 106:4

**10:16** 105:19,21
105:22 278:6
**10:17** 106:1,3
**10:59** 82:20
**11** 2:21 83:3 84:9
225:23,25
**11:10** 82:23
**11:30** 97:3
**12** 2:22 228:9,11
272:24 273:3
**12/8/21** 184:5
**12:04** 97:6
**13** 2:23 184:9
229:4,6 272:24
273:3
**134** 167:23
**14** 2:24 205:16,22
273:3 336:9,11
345:25
**147** 2:13
**15** 93:17,21 124:22
192:25 275:15
309:18 310:9,13
311:14,15,17
313:8 317:13,14
337:13 338:2,5
**15,000.00** 67:2
**150** 172:23 306:8
**150,000** 271:15
272:14 273:15
**150,000.00** 68:6,18
**1500's** 215:1
**155,000** 271:13
**155,400** 304:9
305:8
**16** 213:4
**165** 2:14
**167** 2:15
**179** 226:16
**18** 217:10 226:1
233:5 275:16

**19** 228:13,15
**19106** 1:17
**192** 2:16
**194** 2:17
**1978** 217:19 224:4
**1990** 130:13
**1997** 40:18
**1:06** 139:2
**1:23** 139:5
**1:26** 142:1
**1:27** 142:4
**1:46** 154:15
**1:47** 154:18
**1:55** 160:8
**1:56** 160:11

**2**

**2** 2:12 86:22,25
125:16 126:20
142:19 144:20
155:9,21 161:16
162:2 229:8,10,21
306:23 307:4,15
333:23 334:8
337:19,21,24
340:23 342:20
**2,266** 160:19
**2-8** 230:21
**20** 27:7,8,10,11
59:6 80:18 124:7
124:9 125:10,12
192:4 195:20
281:18 307:16
308:1 320:4 334:3
337:13
**2016** 9:6
**2018** 155:4
**2019** 201:13
**2020** 202:19
**20207** 1:24
**2022** 1:2 3:6 4:6
41:25 130:13

**203** 2:18
**214** 2:19
**218** 2:20
**225** 2:21
**228** 2:22
**229** 2:23
**24** 268:25
**240** 78:5,16 79:6
81:17 102:18
103:15,25 104:15
106:13,14 118:12
**268** 2:6
**26th** 290:15
**270** 142:10 143:7
148:5
**275** 229:7 235:5
**278** 229:16
**27927** 347:22
**28** 1:2
**280** 2:7 230:20,22
230:23
**282** 232:6
**28th** 3:6 4:6
**29** 344:6,8,9
**2:45** 192:21

**3**

**3** 2:13 125:16
126:20 144:10
147:7,10,12
152:10 153:11,13
155:21 168:8,8,9,9
168:10,12 170:14
172:9 191:25
223:11,13 306:23
307:4,15 333:24
334:9 338:5
342:18,20 344:14
344:23 345:4,8
**3.0** 148:16,22
**30** 94:25 97:7
104:5,17 105:8

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 349 of 418 PageID #: 8026

106:24 107:18
108:8 111:7,17
113:18,21 114:7
124:8,9 125:10,12
141:19 192:4
218:14 265:16
268:2 307:16
308:23 334:3
338:7
**31** 267:23
**32** 255:18,19,21
267:23
**336** 2:24
**346** 347:7
**355** 218:5
**356** 347:4,24
**358** 219:16 221:7
**359** 219:25
**37** 148:24
**37202** 1:25
**389** 336:3
**390** 155:15,19
156:2 158:14
337:21
**392** 337:6
**3:00** 192:24
**3:18** 1:8 4:12

**4**

**4** 2:14 80:3 101:15
152:10 165:21,23
168:10 169:13
170:2 171:5,9
172:9,18 175:24
230:5,7,15,19
235:20 344:14
**4,000.00.** 288:14
**4,792** 160:19
**40** 100:21 232:2
280:17
**425** 148:2

**43** 252:2
**45** 92:14 94:3
338:7
**49** 148:21,24
**4:29** 251:19
**4:39** 251:22

**5**

**5** 2:15 101:16
142:18 148:10,12
148:13 149:23
150:4 152:11
157:8 167:15,17
178:3 184:12
191:25 195:20
232:20,22,24
234:5 237:5
255:22 270:16
271:10,14 304:18
**5/16/2019** 157:12
**50** 53:8,12 54:1,3,4
79:13 102:25
142:10 143:6
150:1,6,10 215:22
215:25 307:5
334:11 340:19
**500** 106:12 107:9
108:14 111:2,13
128:6 129:22
130:4,9,14 204:19
250:5 254:18,23
264:11,19 270:12
270:17 271:5
272:13 273:11
296:8 301:15
304:20
**539** 166:3,6
**545w** 1:16
**55** 168:11 169:4
**550** 145:23
**5:03** 267:17

**5:05** 267:20

**6**

**6** 2:5,16 101:16
192:9,11 255:23
338:19,19
**6,000.00** 288:17
**6/30/22** 347:25
**60** 92:14 94:3
102:25 104:5,17
105:8 106:24
108:8 111:7,17
113:18,21 114:8
231:20 232:2,15
233:13 265:16
336:13 337:13
338:2,2,6,7 339:15
342:10
**60's** 334:21 337:15
338:3,7,11 339:16
**600** 147:21
**601** 1:16
**615** 167:10,13,18
**616** 168:8 176:1
**617** 178:7
**62** 148:24
**64** 337:13,13,13
**65** 148:25 150:2,6
150:10,12 195:3
**654** 201:25 202:3
**656** 202:11
**659** 203:6
**67** 233:10
**68** 233:10
**6:06** 310:3
**6:14** 310:6
**6:19** 313:17
**6:20** 313:20
**6:23** 315:18
**6:30** 314:19 315:3
343:18

**6:32** 315:21

**7**

**7** 2:17 101:16
194:10,13
**7,000.00** 327:25
330:11
**7,000.00.** 328:5
**7.5** 237:5
**70** 102:25 148:21
148:24 166:4
231:20 234:6
235:15 237:4
271:10 334:15,24
335:19,22,25
336:23 338:8,9,15
338:20 339:9,17
339:24 340:3
342:23
**72** 198:12,13
**74** 236:3
**75** 148:25
**770** 166:7
**7:16** 345:20
**7:24** 345:23
346:18

**8**

**8** 2:18 139:22
165:25 168:10,24
178:23 203:8,10
**8-9-0** 40:20
**800** 145:14,21
153:18 158:1,3,7
**830** 214:4,5
**840** 144:22 153:15
**841** 149:19
**843** 148:11
**844** 150:14
**86** 2:11,12
**8617** 283:25

**890** 40:20

**9**

**9** 2:19 214:1,3
338:18,20
**90** 54:4
**900** 161:7
**930** 157:21,25
158:12
**95** 53:8
**96** 337:12
**99.9** 36:11
**9:01** 4:5
**9:41** 320:4
**9th** 155:4

**a**

**a.m.** 4:5
**aaron** 4:19
**abandoned** 179:18
**abdomen** 276:10
297:11
**ability** 56:25 57:5
57:8 347:9
**able** 20:23,24 21:3
21:8 23:9,13,18,19
26:12,13,19,21
34:2 41:3 53:13
55:1 72:11 80:10
81:9 82:4 85:11
85:13 93:5 94:7
94:15 95:13,18
99:7 102:12 125:7
133:22 163:2
196:17 225:17
247:14 253:25
265:9 266:8 271:2
272:20 278:23
299:4,24,25
324:10 333:2
336:17,17

**abscess** 125:5,8
**absence** 74:18
197:25 203:3
**absolutely** 112:1,5
127:18 143:10
152:24 159:5
187:2 196:2 321:2
**acceptable** 177:5
**access** 72:17
**accessed** 184:4
**accidentally** 97:12
**accommodate**
309:15 314:12
315:11
**accommodating**
309:24
**accurate** 57:8
175:17 177:4
220:12 347:8
**accurately** 55:21
220:21 306:9
**achieve** 31:25 35:2
41:3,9 92:12
102:3,9,11 120:17
123:22 124:10
126:9 127:10,16
127:18 128:3
129:25 137:8
138:5,13,17 159:7
173:12 207:10,14
232:4,4
**achieved** 36:19
40:19 41:6 44:7
54:18 126:3
138:18 145:20
272:2
**achievements**
135:17
**achieves** 142:17
**achieving** 50:8
120:18 163:20

**acronym** 28:19
**acting** 6:6 330:9
**action** 32:25
109:24 133:17
176:9,10,21,21
177:17,18 178:14
178:15 187:5,24
188:19 189:18
347:12
**actions** 82:8
187:16 226:22
227:4 266:1
**activation** 221:12
**active** 327:3
**activities** 310:21
**activity** 137:18,19
137:22 221:8,8,9
221:10
**acts** 176:3
**actual** 32:2 33:23
40:24 41:13 60:2
60:4 100:8 169:14
336:14
**acute** 163:18
164:9,25
**ad** 340:17
**add** 59:2
**addition** 265:25
**additional** 252:7
314:4
**adequate** 11:16
12:14,18 42:7
**adequately** 44:9
307:5
**adheres** 12:1
**adjacent** 317:2
**adjective** 79:19
**adjusting** 44:18
**administer** 87:19
87:22 88:2,3
133:19 264:23

**administered**
87:10 99:7 112:7
112:16 113:18
114:8 188:2 223:6
254:4 267:3
298:13 344:14
**administering**
87:20 247:15
**administration**
71:22 109:23
163:19,19 164:10
165:1 206:12,19
207:1,15,21
209:14 210:7,20
213:20 300:3
301:6
**administrative**
9:19
**admire** 199:20
**admit** 233:19
291:24
**admitted** 5:8
**admonished** 94:12
**admonishments**
55:12
**adult** 237:4,5
271:10
**adversarial** 70:23
**adverse** 193:22
**advice** 119:21
**advise** 13:4 119:16
263:17
**advising** 119:7
**affect** 56:25 57:5,8
57:10 69:1,8 80:8
109:1,2 190:15
**affidavit** 292:1
330:1,14,19
**afraid** 320:15
**agent** 207:24
208:2

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 351 of 418 PageID #: 8028

**agents** 206:12,20
207:1,16,21,23
208:5 209:15
210:21 219:23
**ago** 5:6 9:5,6
16:16 42:9 61:7
87:18 117:19
118:16 123:22
130:19 131:9
193:14 199:14
202:20 205:7
209:13 246:20
287:24 290:4,23
291:1,2,9,14,17
304:6 308:2 309:3
314:25
**agree** 48:5 78:13
112:6 140:10
152:13 153:3
175:18 177:4
180:24 181:2,16
190:20,20 199:25
202:6 203:16
205:7 222:7,13
225:12 239:2
242:23,25 252:12
252:22 253:4
259:16 268:4
289:8 306:19
313:9 314:2
339:21 342:24
343:2
**agreed** 3:9,15
198:1 199:2
222:23 310:15
311:10,11 312:4
**agreement** 3:5
37:9 289:12
**agrees** 248:13
**ahead** 11:7 12:10
97:24 129:3,3

141:6 145:18
200:5 208:22
228:16 283:3,4
293:2,17 307:1,19
310:8 335:15
**aid** 19:1 20:7,21
23:8,23
**air** 95:22,23 96:2,9
278:23 298:4
299:19,23
**airway** 88:12
108:15 187:10,11
187:14 188:2,6,8
190:15 261:18
276:13,13 277:7,8
278:12,17,22
279:3,5,7,16 297:3
297:7,13,16,18,19
298:4,5,8,11,17,17
298:18,20,22
299:2,5,8,13,14,24
**al** 1:9 2:13 4:9
140:15 142:8
147:11 166:2
201:13 213:5,8
**alcohol** 130:25
131:1,5
**alex** 1:14 4:15 5:5
5:20 6:4 10:21
11:18 13:15 37:8
56:16 64:2 70:14
72:21 73:19 82:16
117:10 140:22
154:8 159:23
173:9 192:13
201:19 251:23
268:3 280:3
281:20 282:8
283:7 289:6 304:5
307:23 308:3
309:9 311:9

313:24 316:3
343:3 346:7
**alex's** 114:1
**algorithm** 52:25
241:23
**alive** 91:14,15 92:3
92:5
**allay** 289:5
**allow** 117:13
173:8,10 246:2
252:16
**allowed** 56:21
117:15 131:16
162:18
**allows** 285:8
**alpha** 221:7,9
**alter** 226:20
**altogether** 33:5
**alveolar** 135:10
**ambient** 226:21
**ameliorate** 298:2
**amenable** 180:3
**american** 21:17
22:2
**amnesia** 190:9
**amnesic** 202:13
**amnestic** 225:13
225:18 226:25
300:3
**amount** 14:11
15:7,9 28:7 32:10
33:1,4 34:6,6
36:14 37:20 44:8
44:11 45:24 54:12
59:11 66:10 68:9
68:10,25 80:16
93:18 99:24
100:18 101:21
102:5 103:16
127:12 129:5
137:22,24 158:21

158:22,25 159:3
166:16,17 174:7
179:14,24 186:11
187:8 188:1
230:16 233:13
257:19,21,23
258:1 274:9 328:3
328:7
**amounts** 54:23
137:20 345:14,14
**amplitude** 136:21
136:24 137:2,3
**ana** 4:18
**analgesic** 80:21
81:2,10,14 203:12
203:14,19,21
204:2,17
**analogy** 116:24,25
117:16,22,23
**analyses** 172:17
**analysis** 171:20
179:16,17,22
180:3 197:17,19
**analyze** 265:24
**anchor** 84:9
**anesthesia** 27:24
28:4,5,8,11 29:5
31:4,14 32:1,2,9
37:7,19 38:3,7
40:12 41:10,22
42:1,5,13,16 43:1
45:11 46:6,17,24
50:17 84:13 88:20
120:20 124:12,14
124:16,19 125:1
126:13,23 127:11
127:16,18 128:1
128:14 136:19
137:1,1,14 138:4
138:18 151:6,8,11
182:16 190:12

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 352 of 418 PageID #: 8029

202:8,22 203:2
205:3 206:1,9,19
207:8,12,13,14,18
208:24 209:9,23
210:18,20 212:16
212:21 222:15
224:20 227:8,14
232:5 238:11
239:1,15 242:15
249:13 250:10
251:7 255:3
261:16,22 278:14
296:24 335:25
**anesthesiologist**
25:6 27:23 30:14
138:1 208:5,10
209:16 210:9,12
314:20 323:25
**anesthesiologists**
47:18,20 48:7
49:3 136:13
149:17 151:2
240:3
**anesthesiology**
24:24 25:3,11,24
135:5 290:8
**anesthetic** 23:9,22
27:19,21 28:15,25
29:8,13 30:2,5
32:10,13 35:24
38:10 49:10 51:21
53:6 54:12,16,23
55:5,9 77:21,24
89:22 90:9 120:17
126:22 127:1,5,7
130:14 131:2
138:8,21 151:4
176:9,21 177:18
178:12,15 202:17
203:13 206:12,20
207:1,15,21,23,24

208:2,4,6,15
209:15,17 210:2,9
210:14,21,23
211:18,19 212:9
212:12 227:1
239:17 243:6,19
246:21 278:20
298:13,14,16
300:3
**anesthetics** 30:20
32:15,18 38:21
43:16 47:6,8 49:4
196:25 210:7
211:7,8,20 344:18
344:24 345:11
**anesthetist** 27:20
27:24
**anesthetists** 25:4
49:3
**anesthetize** 295:17
**anesthetized** 29:10
36:11,20,24 44:14
44:16 48:8 53:10
53:11,17 103:2,3
115:1 136:3
253:23 259:21
279:13 301:11
344:18,24 345:10
**angeles** 291:7
**animal** 102:22
103:2 104:8
111:10 179:2
**animals** 102:22
103:3 179:5,6,19
227:7
**annual** 68:12,17
68:19 69:20
**answer** 6:9 8:13
10:18 12:17,22
15:9 20:11 27:14
34:17 40:15 43:25

55:25 56:1,4 57:5
58:4 65:22 67:14
67:21 68:3,14,20
69:10,13,19 74:5,8
77:19 78:16 84:11
96:6 97:21,22
101:7 104:11
108:7 116:21
123:21 128:10
129:21,24 130:19
161:10 165:11
168:7 173:6
191:23 239:20
243:1 244:24
245:3,9 248:4
260:4,6 262:23
263:23 273:16
274:7 287:10
289:4,8,8,11,25
293:14,17 307:20
332:24 344:12
345:12
**answered** 67:24
69:16,17 81:24
174:22 270:23
273:21 330:24
**answering** 11:8
31:8 117:13
189:10 281:23
282:18
**answers** 8:23 64:9
162:18 163:9
174:17 263:24
**anticipation**
131:10 283:23
328:14
**anticonvulsant**
202:13
**antognini** 1:1 2:4
2:11 3:2 4:1,8 6:2
64:5 70:10 86:20

86:23 97:7 114:2
114:3 117:19
133:8 139:7
140:23 141:6
154:22 160:4
163:8 164:22
193:2 194:17,20
205:9 221:18
252:1,4 268:7
280:12 281:6,10
281:12 282:6,12
283:10,22 284:1
289:4,24 293:17
294:15 308:2
309:1,2 310:7
312:13 313:22
314:3,19,23 315:2
315:25 338:24
346:15
**antognini's** 86:18
281:15
**antonik** 2:23
228:14,15 229:3,5
270:7 306:7,10
**anxiety** 212:7
**anxiolytic** 202:13
212:6
**anybody** 18:20
58:16 63:10 64:11
72:4 91:5 97:9
101:10 193:1
245:9 253:11
280:24 320:2,19
323:24 329:1
**anymore** 38:11
45:10 68:22
134:15 242:11
**anyway** 67:24
69:2 73:25 123:22
131:21 165:10
193:5 195:1 200:5

207:2 273:20
290:20
**aorta** 109:12
**apart** 335:5
**apnea** 184:14
188:3 214:11
**apologies** 185:22
**apologize** 31:5,19
58:16 64:14 77:5
84:6 95:11 107:7
113:22 162:3
176:1 185:17
193:10 226:5
227:2 228:6 247:6
314:16 316:23
**appearance** 5:10
5:18 285:20
**appearances** 1:12
**appeared** 275:23
276:2
**appears** 178:10
308:10
**apples** 164:3,5,11
164:14 165:6,7,7
**applicable** 3:4
**applied** 18:12
23:18 77:11
150:19 152:21
225:2 255:3
**applies** 27:3
182:14
**apply** 74:20
152:23 153:3
254:9 301:25
**appreciate** 11:25
24:4 56:23 114:5
244:15 245:18
252:24 272:4
310:14 316:5
346:9,12

**approach** 30:12
36:9 40:23 128:14
196:2 312:14
**appropriate** 7:15
54:5,8 95:24
303:12,14 330:7,8
330:14
**approximately**
161:3,9 271:13
273:14 317:13
330:11 334:15,24
335:22 339:9,17
340:3
**area** 19:10 56:6
114:23 135:18
156:10 317:16
323:19
**argue** 75:16
**arkansas** 8:9,10
17:2,4,7 71:14
**arm** 94:20 248:16
249:7,9 254:11
276:5 277:14,16
286:12 325:5,6,8
325:18
**arms** 285:3,4,4
**arousal** 150:20
151:5,13 152:7
**aroused** 151:9
**arrest** 115:3 186:1
248:25
**arrhythmia** 93:19
108:24
**arrive** 53:13
**arrived** 236:25
**arrives** 52:25
**artery** 109:11
**article** 66:3,4
140:14,19 194:22
201:22 204:24
224:4 335:6 340:3

341:15
**articles** 140:20
141:20,22
**articulate** 308:18
**asa** 2:12 83:22
84:3 86:23,24
249:14
**asa's** 249:24
**aside** 30:8 37:4
64:12,14,15 65:15
65:15,19 227:10
263:15 284:1
312:9
**asked** 9:13,14,23
13:10,24 14:3,4
42:13 43:16 49:19
130:7 139:15
193:15 195:14
223:21 245:3,4,19
250:1 252:1
269:24,25 275:8
281:21 287:22,25
290:3,10 304:13
310:9 311:18,24
312:24 315:23
324:5,21 328:25
332:23 337:2
343:15,20
**asking** 10:20
13:23 21:11 23:25
29:11,12 37:23,24
38:4 42:9,9 49:25
68:18 70:12 82:13
90:12 116:16
160:12 174:23
197:21 199:5
210:4,5 222:3,4
252:25 263:1,2
271:6 289:16,18
289:19,21 291:25
305:3 308:12

309:12 330:18,19
**asks** 244:20
**asleep** 52:13
**assert** 13:22
**assess** 26:2 241:3
**assessing** 234:23
**assessment** 150:19
152:6 235:11
241:19
**assign** 254:19,24
**assist** 297:17
**assistant** 27:24
**associated** 185:25
199:10
**assume** 35:22 37:5
38:1,2,5 41:20
42:10 72:18 89:5
93:10 101:24
140:19 174:12
192:12 223:8
243:17 249:11
266:2,18 272:6,19
272:23 320:22
**assumed** 318:3
**assuming** 92:2
**assumption**
152:14 197:25
266:20 272:11
305:10
**atrium** 109:10
**atropine** 131:23
131:25 132:1,19
132:21 134:4,6,9
134:21
**attempt** 232:3,4
254:1
**attempts** 188:9
**attend** 283:10
**attorney** 1:23 6:5
56:3,6 57:20
65:16 72:16

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 354 of 418 PageID #: 8031

286:24 287:4
288:2,25 309:5
322:22 323:6
327:25 328:12
330:9
**attorneys** 58:14
63:22 66:2,18
284:5,5 288:25
309:5 318:9,10,23
321:7,19 322:7,21
323:15 333:11,17
**atyia** 1:22 2:6 4:21
4:21 5:5,19,23,24
10:12,21,25 11:17
11:24 12:15 13:12
13:21 23:25 24:6
26:25 37:8,12
38:14 42:19 43:24
50:2 56:15,23
57:18 58:4,14
59:19 64:2 67:11
67:22 69:15 70:13
72:21 73:5,10,19
73:22 79:9 82:16
113:14,23 114:5
117:10,12,25
119:15 139:13
140:17,22 141:6
141:12,16 154:2,7
154:12 156:22
157:4 159:22
160:2 162:17,24
163:8 164:18
166:23 172:11
173:8 181:8
182:11 188:16
192:13,17 194:16
201:19 208:14
209:18 210:10
211:12,25 212:10
224:7 245:1 246:1

248:6 250:21
251:23 252:9,11
252:19 253:9
258:4 260:3
262:19 264:14
265:2,23 267:1,21
268:5,6 280:3,25
281:4,11,20 282:6
282:8,14 283:5,12
284:7 289:2,16,23
291:12 293:2,13
303:15,24 304:12
305:13 307:19,23
308:3,10 309:8,21
310:7,14 312:23
313:14,23 315:9
315:22 316:3,8,13
328:9,13 338:24
339:3 340:6 343:3
343:14,24 344:3
346:7,10,14
**audience** 151:2
**august** 155:4
**author** 60:24
205:6
**author's** 60:23,25
170:21
**authoring** 329:13
**authors** 143:13
170:11 171:9,12
171:23 172:1
173:20,24 174:24
176:13,25 220:19
222:13 236:9
307:14 334:4
336:20 338:13
339:12,18,22
340:5
**autonomic** 29:23
**autopsies** 237:15
268:21

**autopsy** 153:24
154:5,20,21,23
157:8 268:12
**availability** 71:9
**available** 21:22
28:21 199:15
**avenues** 312:11
**average** 93:16
102:24 138:6,9,15
148:20 184:23
215:18
**avoid** 91:5
**awake** 30:17,18
32:5 44:19 52:16
79:7,16 80:16
81:19 87:23 88:1
89:23 95:15,19
97:17,17 103:3
121:9 135:25
136:20 181:24
248:20 249:24
266:4,13,14,17,18
298:23 299:2,3,6,9
301:10
**awaken** 246:24
**aware** 32:5,11
44:10 51:1 58:2
98:4 135:14
143:12,16 156:19
156:23 157:1
159:18 166:19
173:5 183:25
184:3,7,25 186:9
192:12 194:2
196:24 211:6,10
215:15 227:6
247:1,6,9 252:7,11
252:13 265:18
283:1 298:23
303:4 307:13
322:7 333:22

**awareness** 39:3
74:18 75:4,5,5,10
75:14 184:21
244:3 344:16
**awhile** 117:19

**b**

**b** 2:9 28:22 34:7
245:17
**back** 12:4,7 14:2
15:23 16:17 24:8
25:10 31:17,19
36:23 38:18 44:1
44:4 66:3 82:22
84:9 87:2 94:17
94:21 97:5,13
102:8 103:11
109:12 110:25
115:4,11 117:21
121:16 123:14
128:5 130:6
134:13 139:4,6
142:3 151:22
153:10 154:17,19
160:10 163:5
165:17,24 178:23
192:2,23 198:25
199:21 201:9
206:3,20,22 213:3
214:25 217:1
221:4 228:12
235:17 251:3,21
253:12 267:19
271:22 279:5,8
282:15 283:19
286:12 294:12
296:16 298:19
299:7,7 304:22,24
305:13 306:3
308:13 310:5
311:13 313:19
315:20 316:15,18

www.veritext.com          Veritext Legal Solutions          800-556-8974
Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 355 of 418 PageID #: 8032

323:21 329:3
333:20 341:22
344:5 345:22
**bad** 237:23 241:4
295:20
**bailey** 2:19 213:5
213:8,21 214:2
**balance** 253:1
**baldridge** 4:18
**ball** 67:2 271:1,2
**bar** 16:5 27:13
233:9,9,14
**barbiturate** 45:7
50:19,20 127:15
187:20,21,25
188:7,18,25 189:1
189:2,16 191:1
**barbiturates** 37:3
38:4,11 42:10
43:14 44:2 45:10
45:12,15 49:21
50:22 189:25
191:2 200:12
**bare** 20:22
**barely** 108:22
242:19
**barking** 199:19
**barrier** 132:9,11
**bars** 233:6
**base** 77:19
**based** 26:16 31:20
35:22 41:20 42:12
43:18 56:1 103:13
104:3 111:10
140:6 155:23
164:24 179:18,22
180:9 182:14
183:19 189:13,17
189:18 197:25
199:16 210:14
222:11 228:1

233:13,22 236:3
243:6 244:12
248:21 272:10
273:12 312:16,20
317:14,25 319:15
328:3 331:12
345:1
**basic** 19:1 20:7,20
21:19 72:3 74:15
**basically** 7:23 9:8
14:10 17:4 21:3
28:19 29:7 30:17
32:21,23 33:2
34:19 35:5 41:1
46:4 48:18 50:24
51:25 52:24 53:13
61:14 62:7 74:13
74:20 75:4,12
76:17 80:8,10
84:13 85:4,10
87:6,17 88:18
90:4 91:12 93:1
93:19 94:6,16
98:15 100:12
102:1 103:1
105:14 114:14,22
120:3,19 121:7
122:9 124:12,21
125:13 132:4
134:12 136:21,22
137:3,16,21
138:12 151:10,13
156:16 163:13,23
164:23 166:15
168:9,12 169:2
171:16 173:11,13
174:19 179:22
182:16 187:11
188:4 189:24
190:3 198:4 203:3
203:18 207:10,12

208:23 210:1
216:7 221:4,11
223:11,16,24
233:7,9 236:20
241:12,23 244:4
248:20 250:6
255:12 261:2,19
261:20 263:20
266:1 271:12
275:11 278:20,25
279:4 284:11
288:11 294:8,17
295:2 297:11,14
299:19 300:11,15
301:21,22,24
306:1 307:4 317:7
317:8,11 319:24
320:4 321:11
323:18 324:12,14
325:23 326:5,11
328:23 329:7
338:1 345:3
**basing** 104:8
280:13 308:11
**basis** 44:18 329:18
335:4
**bathroom** 98:2
**battle** 128:16
**beat** 61:24 62:5,10
93:9,9 98:16
105:14,15,15
119:3,5
**beating** 98:17,22
109:3,5 111:6
112:15 119:2
343:1
**beats** 61:25 93:13
**becoming** 263:5
**began** 9:4
**beginning** 107:4
220:2 221:5,6

231:11 317:11
337:9
**behalf** 6:6,18 9:1
9:10,16,18 71:10
317:24 318:4
330:9 333:18
**behave** 146:2
**belief** 126:6 295:6
295:7
**believe** 11:1,2,21
15:3,7 17:11 22:1
31:15,17 32:3
38:8 40:19 47:7
49:16 57:9,12
60:8,24 66:13
67:7 71:6,8 76:6
76:10 78:9 79:14
79:25 81:24 83:11
84:25 104:1
106:15,20 117:23
127:23 128:3,8
140:6,7 142:17,18
149:9,10 158:11
159:11 165:12
172:13 174:5
176:14 178:24
180:7 181:15
185:2,3,4 191:6
194:10,14,24,25
195:1 199:6 203:8
208:3 210:18
212:2 213:15
216:2 219:6,9,15
221:2 222:1
223:12 234:10
248:16 249:16
255:9 258:6,7
263:11 264:8
265:15 266:23
270:8 274:3
279:10 287:1,12

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 356 of 418 PageID #: 8033

323:4 326:16
334:20 336:14
338:13,16,16
339:22 345:25
**believes** 209:6
**beneficial** 19:9
125:20
**benefit** 238:18
**benzodiazepine**
146:3 159:13
165:1 176:5,6
**benzodiazepines**
38:13 41:3 145:25
164:2 165:4 180:9
201:7 202:4,12,25
203:1,12
**best** 19:6 51:11,12
51:13,20 52:1
54:8 79:19 116:25
169:16 212:2
311:3 322:25
347:9
**beta** 221:8,9
**bets** 107:1
**better** 26:23 27:2
34:21 42:2 51:6
74:16 85:16,16
117:6 128:25
130:1,17 168:21
172:7 173:3,14
202:22 204:18,21
236:18 242:14
246:3 250:2
258:11 266:24
323:2 326:24
**beyond** 10:15
20:11 166:6 169:7
169:10 171:22
179:8
**big** 111:21 135:19
257:23,23 296:7

**billy** 154:20
158:13
**binding** 35:13
**biphasic** 219:22
220:7,24 221:1,6
221:11,13,23
**bis** 28:22 51:10,11
51:19,24 52:2,4,7
52:20,21,23 53:2,7
53:7,12,16 54:3,5
54:10,14 55:4,7
136:16 148:16,21
148:22 150:2,6,10
150:12 223:7,16
223:22,23,24
231:10,11,13,20
232:2,11,14,18
234:5,24 235:1,8
235:10,15 236:2
236:10,12,16
238:4,4 240:9
246:21 307:18
333:25 334:4,15
334:20,23 335:19
335:21,25 336:12
336:22 337:12
338:6,15 339:9
340:2,10 342:21
342:23
**bit** 16:7 27:13 31:3
40:21 51:24 61:7
66:12 68:7 69:9
84:4 96:16,17
98:15 99:17 100:5
104:19 105:24
106:6 107:1
111:11 117:24
120:5 124:1,2,21
124:25 129:14
137:6 151:7 153:1
164:3 169:18

177:3 180:3,13,13
189:22 191:12
195:14 205:20
206:17 212:3
215:8 221:1
233:20 276:8
277:20 279:2
290:6 321:9 331:8
331:9 336:5
**bite** 131:19
**black** 2:16 184:25
185:2,7 186:10,15
192:8,10,16 193:8
196:19
**blandon** 4:24
**blank** 196:4
197:11,11 200:24
**blanke** 60:8
**blatantly** 328:18
**blessed** 69:6
**blind** 242:14
**blink** 262:16 263:9
263:24
**blinked** 258:16
**blinking** 259:1
**blinks** 263:4
**block** 87:7 197:16
**blocking** 183:1,4
**blood** 28:13 29:2,8
29:11,16 30:10,23
32:6 34:7 35:7
36:7 39:25 41:14
44:20 48:11,15,19
80:15 88:15,17,21
100:13,16 101:13
101:15,22 102:2
110:1 125:24,25
132:9,10 138:22
140:13 145:13
156:11 157:2
158:23 159:4

164:8 188:11,23
189:5,7,7 194:23
198:6 199:9
200:14 230:9,16
231:5,6 233:17
234:2 235:15,25
236:3 239:11
240:16,21 241:16
268:14,18 269:5
269:11 271:4
272:20 286:11
304:8
**bloodstream**
34:21 35:3 102:7
**bls** 20:7
**bluish** 277:20
**blunt** 77:22
344:15
**blunted** 151:12
**board** 26:18 29:20
30:18 42:22
253:24 254:3
266:7 347:15
**boat** 276:10
296:22,25 297:1,1
297:9,10,20,24
298:1,7,15,24
299:4
**bodies** 35:11
158:11
**body** 28:10 29:6
34:23 35:9 96:14
98:10 268:24
269:11 317:12
**bold** 184:1
**bolus** 78:5 79:6
81:17 91:8 92:7
97:18 98:25 102:5
102:7,17 104:15
106:12 107:22
111:15,18 114:6

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 357 of 418 PageID #: 8034

117:20 118:5,7,12
237:3,6 263:2
264:11 271:23
**boluses** 272:1
**book** 202:19 205:5
205:10
**botch** 133:24
**bottle** 130:24
**bottom** 149:23
178:7 184:1,11
203:12 223:14
231:2 232:10
337:9 344:12
**boundaries** 11:9
**bounds** 12:1 15:4
**box** 1:24 2:16
184:25 185:3,8
186:10,15 192:9
192:10,16 193:8
196:4,19 197:11
197:12,17,24
199:23,24 321:6
321:16,18,21
**boy** 92:1
**brain** 28:24,25
29:5 31:4 34:24
35:7 51:21 52:3
80:15 81:6,9 82:4
98:12,12 127:12
127:12,19 128:21
130:5,10 132:9,11
132:13,14,16
134:8 137:15
138:11,14 151:13
189:4 190:6,7,25
191:6 237:12
302:1,3
**brains** 93:5
**brainwaves** 53:1
**break** 82:13,14
97:8,8,15 98:1,3

138:25 139:6,7
192:25 193:1
251:10,15 309:23
309:25 313:11
**breaks** 193:11
**breath** 34:1
285:14 299:25
**breathe** 92:25
95:13,17 266:9
298:21,22
**breathing** 48:12
48:13 88:18 93:3
108:23,24 115:10
187:11 188:9
189:5,6 190:15
198:11 276:8
277:5,5,19 286:17
286:17,19 297:17
297:21
**brief** 17:15 59:4
82:21 139:3 142:2
154:16 160:9
192:22 251:20
267:18 310:4
313:18 315:19
345:21
**bring** 56:9 83:2
139:20 145:16
167:6 185:17
201:18,20
**broad** 18:8,13
19:15 37:14
**broader** 151:2
307:7
**broadly** 190:7
**broke** 118:1
**bromide** 87:3,10
87:20 88:2 89:21
90:13 91:9,16,24
92:8 95:16 97:15
97:16,18 98:24

99:5,6 107:25
108:1 110:4,5,7
111:16 114:7
116:3,14 119:12
244:23 245:24
247:7 250:18
264:25 265:19,21
266:22,24
**brought** 62:17
131:8 217:2
249:14
**bubbles** 277:13,18
324:10,12,22,24
**building** 259:7
323:19,19
**built** 165:14
**bullet** 131:19
**bullets** 117:17,18
**burst** 137:7,8,10
137:11,13,18,19
137:22,24,25
138:7,13,17,20
**business** 263:16
332:9

## c

**c** 133:10,10,10
236:20 347:1,1
**cabinet** 318:15
**calculate** 68:19
270:25
**calculated** 69:24
**calculation** 70:5
271:2 304:11,13
304:23 305:4
**calculations**
103:14
**california** 9:12
**call** 9:21 49:5 59:1
72:4 94:22 102:21
136:15 137:17
138:14 151:6

259:15 276:4
298:7 309:9
311:23 317:6
324:13 329:1
**called** 3:3 9:7
26:10 27:24 33:18
33:19 34:24 35:12
99:23 100:10
101:18 131:22
132:12 134:20
136:20 193:3
215:22 234:17
296:25 329:20
**calling** 75:21
261:12 312:25
**calls** 59:1
**calm** 295:17
**camera** 285:1
325:7
**capable** 22:24
23:4 301:23
**capacities** 274:16
**capacity** 11:5,20
274:23
**caption** 3:16
**cardiac** 115:3
248:24
**cardiovascular**
28:10,12 115:19
188:11
**cardioversion**
120:14 121:5
**cardioversions**
121:21,22 122:10
**care** 25:21 26:17
186:2 241:15
290:8
**career** 25:10 29:19
51:24 88:24
120:13 152:15

careful 104:19
163:15 169:12
171:21 215:20
237:1,24 278:16
carotid 278:2
carry 293:8
case 4:8,11 6:10
6:13 8:11 9:19
16:15 63:8 64:21
65:5 66:22,22
71:12 111:19
114:18 116:5
130:11,11 163:22
182:9 187:25
211:22 232:5
249:18 254:10
269:20 277:17
282:9 287:7,9,14
296:8 318:9 320:5
330:5,8,19 331:7
331:13,16,20
333:8 345:6
347:13
cases 8:4,5,8,13
9:3 16:11 64:25
65:2 67:25 69:21
71:11,16 112:4
114:22 120:21
160:15 204:14
catch 37:14
344:10
catheter 115:2
catholic 7:12,12
cause 13:11,25
14:5,16,25 15:3
93:4 97:19 99:25
100:3 101:22
102:18 109:13
114:7 117:21
118:6,8,13 127:12
151:9,13 155:7

157:14 178:10,25
186:17 190:6,14
191:2 197:18
213:14 214:15
238:19 267:9
278:20 279:3
298:15 329:24,24
caused 199:9,10
273:10 298:12
causes 113:4
193:23,24 278:24
279:7
caustic 267:7
caution 183:22
184:13
caveat 27:3 47:17
88:6 127:21
ceased 277:19
ceiling 176:14,16
177:12 178:19
179:16 306:20
307:3,6,12 335:3,4
340:23 341:4
center 114:19
central 176:4
centrally 202:13
certain 29:23
31:25 32:10 33:1
33:21 34:6,6 35:1
35:2 37:25 38:25
39:24 44:8,8
85:24 86:1,2
151:3 182:24
227:17 270:17
285:6 305:9
certainly 7:5,9
16:25 18:8 19:8
21:25 22:19 25:6
34:15 38:9 41:24
42:3 51:17,23
54:20 58:25 60:12

61:20 75:11 76:15
78:20 80:14 81:13
90:17 92:19 95:3
102:15 115:22
128:2 185:5
202:23 209:22
213:23 215:23
216:10 240:2
270:14 271:21
301:7 309:19
332:9
certainty 239:19
305:6 344:13
certificate 3:16
certify 347:6,10
347:14
cetera 3:17 30:24
30:24 207:11
240:9
chair 321:6 322:4
chalkboard 86:1
challenge 33:21
186:23 322:9
challenging 6:15
chamber 19:5,13
19:24 62:16,19
104:23 129:13
278:5 284:21,23
285:8 317:3 323:1
325:21
chance 32:4 159:2
193:7
change 13:3 54:19
54:20,21 56:18
156:17,20 157:3
269:13 299:16
300:5,8 301:3
306:24 307:17
324:13 333:25
334:4,8,24 340:19
342:11,19

changed 302:6
changes 32:7
158:19 279:18
280:1
chapter 201:18
205:6
characteristics
164:25
charge 288:4,5,7
288:12
charging 288:12
chart 2:12 83:22
84:3 86:23,24
149:21,23 153:10
231:1 236:4
check 18:2,6,16
19:5,19,23,24
20:24 22:7,24
23:5,9 25:8 51:12
99:1,7 107:12,14
107:23 111:3,15
182:21 246:10,15
247:2,13 256:10
256:21 257:4,15
258:3,16,17
261:10,25 263:3,7
263:12 264:21
265:10 276:7,15
276:21 302:17,20
303:5,11
checking 24:21
checks 17:22 18:9
18:12,25 19:19
20:9,22 21:4
255:23 256:8
276:3,25 302:10
303:17 342:2
chemistry 34:22
chest 276:11
277:25 285:3
297:12

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 359 of 418 PageID #: 8036

chief 319:5
chloride 78:6,14
78:17,19,21 79:2,7
79:24 80:7,20
81:5,11,18 82:8
99:2,3,11,13,20
100:4,9,17,19,25
101:14 103:6,9,13
103:18 104:1
105:13 106:14,15
106:25 107:13
108:2,10 109:6,8,8
109:16,24 110:6,7
110:9,15,20,22
111:4,8,16,18
112:15,17,20,24
113:1,17,20
117:20 118:5,7,13
118:17,19,20,25
119:4,6,11,13,23
119:25 120:2
244:23,24 245:23
245:24 247:10,16
247:20,21 248:3
248:10,13,24
249:5 250:4 251:5
253:19,22 254:4
255:4,7,11 264:24
265:7,8,17,21
266:5,9,10,13
267:9 275:13
301:7,14
choice 7:21,22
131:20 245:19
333:13
choices 130:17
cholesterol 57:4
choline 133:12
choose 117:7
chosen 322:20,23

church 7:13
circle 147:24
296:16
circles 147:13
223:18 337:22,23
337:24 338:4
circulate 115:25
158:10
circulating 156:15
circulation 118:23
circumstance
100:7 112:13
113:2 118:11
circumstances
88:11 98:20
108:12 112:9
118:10 182:25
213:19
citation 60:25
cite 60:20 62:16
66:7 140:14
145:25 165:25
174:14,16,16
201:11,13 213:5
217:17,18 226:2
228:14 331:12
cited 40:17 42:25
46:6 60:13,14,14
60:18 66:3,5
79:25 140:21
173:17 174:2,11
179:2 180:6
204:10 224:2
305:25 313:1
335:6
citing 213:7 340:4
341:16
city 316:22
civil 3:5
claim 47:21 196:2

claimed 302:25
clapping 279:1
clarify 52:10
74:19 81:1 97:22
111:22 129:24
149:10
class 35:21 209:4
classes 36:1
classic 297:10
classification
208:19 209:3
classified 147:14
208:11,12,15
209:4 211:7,14,20
211:23 212:1,4,9
212:11
classroom 25:18
clause 151:15
206:15
clean 237:16
clear 38:20 39:24
46:15 55:2 76:13
81:16 85:18
122:25 204:9
261:2 269:8 299:2
299:7 301:13
317:11 321:2
328:11
cleared 125:24,25
clearly 7:11 176:8
176:20 205:25
217:14 224:3
246:7
clench 218:14
clerk's 5:10
client 56:6 287:4
323:6
clinical 44:21
46:20 47:14,16,23
47:25 48:3,22
49:2,2 50:12

91:10,12 99:19
114:18 121:1,10
136:12 150:19,21
152:6,8 183:23
202:7,10 204:17
209:1 210:22
232:5 239:6,8
240:19 241:11
243:15 256:2
278:13 279:10
290:7 295:13
324:8
clinically 160:21
237:11 241:5
296:14
clock 285:8 294:12
close 14:8 35:4
68:6 79:22 87:1
90:5 96:12 178:22
232:14 279:6
286:8 292:11
324:8,9,11 335:5,5
closed 242:18
275:24 298:22
closely 344:21
closer 151:10
336:13 337:4
closing 279:3,7
closure 299:14
cmecf 5:12
cns 161:21 162:15
cobble 179:12,13
cohort 229:19,20
collapses 298:16
collated 213:16
colleagues 242:25
collect 171:22
collected 171:23
colloquially 61:10
column 230:10

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 360 of 418 PageID #: 8037

coma 26:10 189:3
comatose 197:12
199:24
combative 300:18
combination
75:12 256:11
combined 214:9
214:15
come 8:12 44:21
55:24 62:20 69:20
78:10 104:22
106:1 109:11
121:8,21,22
126:14,17 159:18
192:1 201:6 217:3
245:8 258:14
307:10 331:25
comes 50:6 53:1
66:6 105:16,20
106:8 115:7 194:5
195:16
comfort 44:11
comfortable 39:21
44:9 45:15,16,20
46:20 47:11 50:7
50:11 129:21
130:3,8 189:9
254:25
coming 33:25
138:6,14 144:4,5
167:7 172:13
181:23 226:7
228:20 261:19
266:16,16 286:11
300:24 307:24
308:5,7 323:21
command 23:15
76:4 143:15 148:5
148:6 149:6
150:10,11 218:16

commands 147:18
147:22 218:12
223:5 224:21
comment 245:2
comments 196:5
commercially
28:21
common 29:18
113:20 126:1
134:18 135:5
151:1 202:9
207:25 296:13,14
commonly 114:21
134:19 151:1
199:15 256:2
communicate
180:25 181:3,5,12
182:2,18,22 183:2
communication
67:12 74:21
communications
11:4 13:13,16
community 1:14
6:5 215:14 216:5
216:16
company 9:7
206:24 329:18
compare 38:24
compared 36:16
66:19 91:18
104:25 105:4
127:14,19 137:21
comparing 164:4
164:6,9,13,17
267:6
comparison 44:1,5
46:12 128:18
129:9,15,17,19
164:3,5,11,15
165:7,8 204:1
272:17

compensated
331:23
compensation
330:17 331:24
competent 71:7
complain 315:4
complaint 65:9,11
complaints 205:14
complete 92:12,18
95:4,4 125:10,11
224:20 227:7,14
227:18,25 261:15
276:13 277:7
297:13
completed 3:17
completely 14:13
75:14 298:20
complications
295:21
component 75:3,9
213:13
components
300:11
comport 294:9
computer 72:13
141:15 284:24
285:1 325:6
concede 112:1,4,4
114:10 129:8
217:4
concentrated
103:5
concentration
32:1,2 33:23
38:23 39:1,5
40:24 41:7,9,13
100:6,12 101:12
102:1,9,12 103:17
126:13 135:10
140:12 142:9
143:7 145:1

155:25 156:4
157:2 159:6 166:7
167:23,25 172:21
176:8 178:9,24
198:7 236:21,23
268:14 269:6,10
270:2,10 271:3
272:14 340:11
concentrations
39:15 140:1
156:17,20 159:14
160:17 161:20
162:13 179:5,10
180:5 194:23
226:21 237:22
269:13,21 304:16
concerned 50:16
61:17 116:19
158:19 234:25
236:11 258:25
285:10,17 292:12
322:12 338:11
concerning 292:7
concerns 7:6
289:5
conclude 152:20
220:3,5 257:22
concluded 307:14
concludes 346:17
concluding 214:7
conclusion 153:2
178:8 204:11
222:8 226:15
307:10 334:8
conclusions
222:14
conclusively
174:18 307:11
conditions 75:11
100:9

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 361 of 418 PageID #: 8038

**confer** 281:13,13
281:24 283:5
311:14 313:12
314:9 315:6,13
**conferred** 310:11
311:2 315:23
**conferring** 312:24
**confidence** 49:17
50:17 85:8,15
179:21,23 196:17
**confident** 49:17,25
50:3 259:11
**confirmed** 311:4
**conflate** 301:19
**conflict** 328:19
329:4,5,6,10,15,22
329:23 330:3,7,22
331:1,5 332:2
**conflicting** 7:2
**confounding**
235:8
**confused** 35:15
322:3
**confusing** 37:23
137:6
**conjunction**
123:15
**connie** 4:23
**connotation**
299:20
**conscious** 44:11
75:25 76:1,5,9,17
143:2,5,8 147:14
147:18 238:23
239:1,20 241:20
241:25 242:22
244:6,9,16 248:20
250:8 257:5,13,17
257:24 259:4,11
259:17 262:12
263:5,8 264:2

**consciousness**
17:21 18:2,6,9,12
18:16,25 19:5,19
19:23,24 20:9,21
20:24 21:4,13
22:7,24 23:5,8,23
24:13,21 25:9,23
26:1,3,13,20,22
28:6 31:23 47:4,9
48:21,24 49:1
51:8,12,20 75:14
76:1,14,18,22 91:7
99:1,7 107:12,13
107:23 111:3,15
143:13,22 148:15
148:16 149:4,18
149:23 150:1,4,6
164:9 182:21
185:6 218:22,25
219:3 220:8
222:13 223:4,20
223:20,25 229:20
231:12 239:3,16
239:23 241:22
244:16 246:3,10
246:11,15 247:2
247:13,15,25
248:19 250:3
255:23 256:8,10
256:21 257:4,15
258:2,16,17,18
259:1 260:17
261:10,11,25
262:15,21 263:3,6
263:12 264:6,21
265:1,10 276:3,7
276:15,20,25
279:15 302:10,17
302:20 303:5,11
303:17 342:2

**conservative**
105:24
**consider** 259:9
261:8 262:3
305:16 308:19
313:8 314:11
**consideration**
44:24 45:2,6
**considered** 81:10
143:19 170:9
211:19 249:15,25
250:7
**consistent** 335:18
336:21 338:14
**constant** 150:22
152:8 153:6
**consult** 58:3 63:7
**consultancies**
11:21
**consultant** 57:19
**consultations**
58:12,13
**consulting** 11:3
**contact** 10:1 12:19
63:25 64:23,24
**contacted** 9:7,9
10:5 193:4 332:17
332:18
**contemplated**
140:9 255:7
**contention** 301:8
327:4
**contentious**
204:15
**contents** 327:1
**context** 16:3 18:1
45:9 52:20 62:21
85:21 101:2 106:6
128:11 145:16
151:17 183:3
204:16 207:22

209:1 210:12
248:7 254:8,18
256:10 324:2
**continually** 238:4
**continue** 71:20
98:16 124:2
145:17 163:3
171:1 209:11
247:14,25 264:25
294:16 312:17,21
313:5,10,24 314:3
314:7 315:7,12
**continued** 167:25
275:19
**continues** 119:5
295:19
**continuous** 335:20
**contract** 288:10
288:15,19,21
328:4,6
**contrary** 183:13
**contrite** 300:17
**control** 52:22
53:12 122:18
309:11
**controlling** 48:19
297:3
**conversation**
63:17 321:10,13
321:23 323:23
324:18
**conversations**
320:18,22,25
323:15
**copies** 141:4
**copy** 141:1 159:24
160:1 192:14,16
338:25
**core** 17:19
**cores** 17:20

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 362 of 418 PageID #: 8039

**cornea** 256:18
**correct** 8:16,25
22:20 31:11 33:10
34:9 40:7 42:18
42:20 49:6 58:6
60:24 86:8 89:3,6
89:10,15 91:22
95:20 110:24
118:9,21 124:17
127:3 133:2
143:10,23 144:14
144:18,21 145:8
145:12,15 146:18
147:6,19 148:3,9
149:9,11,16 150:7
150:13 153:21
157:13,25 158:5,8
161:9 166:9,13,14
171:25 172:3
173:19,23 174:1,4
174:10 183:5
186:12,12 189:15
200:15 202:10
205:1 210:19
212:23 214:11,12
219:15 224:25
232:21 233:23
238:21,24 242:10
258:6 266:3 272:7
272:11,12 274:21
305:11 326:17
336:7 342:16
**corrections** 64:12
64:16,19,25 65:4
244:20 277:1
319:21,23 320:9
321:5,15,25 326:3
**correctly** 23:7
193:20
**correlate** 155:20
237:25

**correlation** 169:18
171:8,10
**correlations** 223:7
**correspond**
237:10
**counsel** 3:8 4:13
4:16,22 57:16
64:4 65:3,4,15
303:20 309:6
311:2 313:12,13
315:1,2,6,14,23
346:2,6 347:11
**count** 15:19
283:16
**county** 3:7 347:3
**couple** 9:20 92:2
202:20 267:22
285:19 318:5,6
**course** 15:6 19:22
20:7,7 25:5 28:23
30:15 54:16 66:25
78:12 91:14
127:21 128:22
131:5 141:11
155:24 170:12
187:24 189:1
198:10 253:23
259:16 264:4
275:20 288:5
289:11 299:10
302:2 318:6 342:5
**courses** 20:21 22:5
**court** 1:4 4:10 5:2
5:21,25 12:3,5,10
16:8 65:8 94:14
133:7 183:8,9
252:1,18 253:4
308:16 312:20
346:1 347:5,15,16
**covered** 308:14
326:8,10

**covid** 291:7
292:13
**criteria** 7:17 22:1
25:13,13 28:1
29:14,14 32:7
44:20 62:13 74:25
98:21 104:24
105:4,5 106:6
**critical** 159:14
186:2
**critically** 18:19
**cross** 21:18 22:2
237:12
**crying** 318:3
**curious** 292:21
**current** 41:25
**curricula** 21:18
**curriculum** 20:10
20:20 21:2,3
25:14
**curtain** 292:5,5
**curtains** 278:6
**curve** 168:16,17
170:17,25 171:3
172:2,5,5,6,7
173:2,14,15,21,25
**curved** 85:6,7,10
85:12,17 86:2,7
169:15,21 170:7
**customer** 122:18
**cut** 90:10 237:16
275:18 307:25
308:4 312:19
333:22
**cutoff** 216:11
**cutting** 77:18
**cv** 1:8 4:12

**d**

**d** 2:1 32:20 61:2
**damage** 193:23
301:23

**dangerous** 185:9
187:3
**dark** 341:19
**data** 47:7,7 50:5,5
50:7,21 51:19
52:5 53:13 78:12
78:13 79:1 85:4,5
85:11,12,23 86:3,4
90:17 92:14
127:24 140:11
163:14 168:21,24
169:1,13,14,25
170:24,25 171:14
171:22,23 172:1
172:19,24 173:1
173:12,21 174:6
175:5,20 177:17
177:20,24 179:8
180:2,11 191:9
192:5 198:23
199:8,11,17 200:3
200:7,12,22,24,25
203:20 210:15,15
213:16 214:17,17
223:10,22,23,24
233:3 239:25
250:14 269:14
270:5,15 305:22
306:15 328:22,23
329:12,24 332:4
334:6 337:4
339:15,23,24
**date** 157:11
347:17,25
**david** 4:18
**davis** 3:6,9 25:11
114:19 315:24
347:4,24
**day** 3:6 63:3
268:22

www.veritext.com Veritext Legal Solutions 800-556-8974

days  61:7 123:14
  134:13
dead  62:2 105:17
  105:21 106:10,11
  106:16,20 107:15
  112:25 115:5
  192:2 265:12
  302:1,3 343:1
deal  45:18,19
  302:18
dean  1:22 4:21
  5:22 96:4 153:25
  194:15 252:7
death  6:24 7:2,7
  7:13,15,20,22,24
  8:1,2,4 51:1 62:12
  62:15,16,24 92:23
  92:24 93:14 97:20
  98:8,18,19 102:18
  104:20,25 105:2,7
  105:9,22 106:2,5
  111:24 112:5,8,10
  112:13,17 113:1,3
  113:3,4,7 114:7
  115:16 117:21
  118:6,8,14 119:10
  120:1,4 155:2,7
  156:4,15 157:11
  157:15 184:15
  188:13 197:18
  199:10 214:15
  272:21 273:3,8
  277:24 278:6
  286:8
deaths  213:18
decades  201:2,4
december  287:18
decide  13:1,8
  182:9 314:9 330:2
  330:4 331:2 332:2
  333:1

decided  68:21
  288:22 291:10
  333:6
decides  7:19,21
deciding  241:24
decimal  306:1
decision  44:21
  55:8 329:23
decisions  29:6
  50:6
declaration  62:24
  277:24 286:8
declare  62:12
  98:19 104:25
  113:1
declared  105:2
  106:10 115:5,23
  263:7
declares  105:21
declaring  62:15,15
decrease  29:8
  92:25 95:14 221:8
  340:10
decreased  74:18
  184:21 335:19
  336:22 338:15
decreases  188:24
deep  29:3 49:9
  83:6,12,15 84:2,11
  84:11 120:19
  121:1,3 123:23
  136:25 138:4,5
  151:11 207:18
deeper  126:5,9
  127:10,16,18
  250:9 261:21
  262:9
deeply  231:23,25
  232:1 259:20
defendant  15:18
  71:12

decided's  71:6,8
defendants  1:10
  1:20 3:4 4:22
  346:2
defender  1:14 6:5
defer  21:17 116:4
  142:15 175:6,8,12
define  84:25 105:7
  143:11 180:1
  187:9 215:20
  219:3 257:20
defined  184:20
  215:25 217:14
  224:20 299:19
defines  182:10
defining  147:18
  221:2
definitely  79:21
definition  23:23
  75:21 105:7 120:3
  143:22 180:18
  181:7 182:7,10
  183:7,8,10,16,18
  184:1,2 215:14
  216:1 249:24
  345:2
definitions  193:20
degree  168:1
delay  109:23,23
delivery  302:24
delta  221:10
democratic  7:18
demonstrate
  214:9 299:3
demonstrated
  219:22
demonstration
  53:4
deny  233:24
department  64:11
  64:16,19,25 65:4

213:17 244:19
  276:25 319:21,23
  320:8 321:4,15,25
  324:4 326:3
dependent  80:19
  94:24
depending  7:11
  93:17 108:8 117:1
  124:23 188:1
depends  20:2
  48:17,22 86:4
  102:4,4 104:12
  106:6 159:1
  257:18 268:23
  292:8 324:7
deponent  346:19
deposed  4:2 15:17
  16:7,14 17:5,7
  71:4
deposition  1:1 3:2
  3:10,18 4:7,12
  10:17 15:14,15,16
  17:1 58:8,10,22,23
  59:14 60:3,10,21
  62:21 63:1,4,8,14
  63:15,18,20 65:11
  65:14,19 66:1,14
  66:19 68:15 97:11
  130:18 131:8,10
  131:11 139:11
  163:3 209:21
  245:5 280:9,9
  281:18 282:2,17
  304:1 309:7,18,20
  311:19 312:15,18
  312:22 313:25
  314:7,15,19 315:7
  316:11 346:17
depositions  15:25
  16:1,2,10 55:13
  63:11 65:24 66:11

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 364 of 418 PageID #: 8041

274:16 287:11
**depressed** 25:22
  26:1 75:25 98:13
**depression** 127:13
  161:21 162:15
  184:14 186:1
  187:13 188:11
  189:4 190:6,8
  191:1,4,6 213:13
  213:14 221:13
**depth** 23:10,22
  27:19,21 28:4,4,6
  28:8,11,24,25 29:4
  29:13 30:2 31:4
  31:13 32:2 35:24
  46:23 49:10 51:21
  120:17 126:22
  127:2,5,7 128:1,3
  136:10 246:21
**describe** 25:19
  28:16 80:1,2
  81:14 83:10 91:2
  92:12 94:9 95:8
  276:9
**described** 43:4
  46:9 51:10 81:2
  90:21 100:1
  112:12,12 115:22
  118:15 152:17
  213:19 296:22
**describing** 80:20
  85:2 97:16
**description** 2:10
  292:22
**descriptions**
  279:21 300:20
**desert** 131:17
**deserted** 130:21
**desflurane** 32:19
**desmethyldiazep...**
  160:18

**despite** 61:6
  150:21 152:8
  153:6 208:23
  250:5
**destroy** 81:12
**destruction** 81:11
**detailed** 323:5
**details** 17:13,22
  20:25 21:5,11,15
  101:7 171:20
  275:9 284:13,15
  288:22
**detect** 306:24
**detecting** 246:3
**determine** 21:3
  23:9,14,22 24:12
  26:12,13,20,22
  31:13 49:4 178:11
  223:20 242:5
  256:1 257:17
  262:21 335:4
**determined** 142:8
  196:1 200:17,19
  218:11
**determining** 21:13
  27:19 46:23 48:24
  136:10 239:14
**develop** 108:17
  119:17 263:19
**developed** 20:10
  21:18
**devote** 315:24
**dexmedetomidine**
  33:19
**dhanani** 61:1
**dhs** 213:19
**diagram** 284:22
**diaphragm** 96:21
**diaphram** 96:16
**diazepam** 160:16
  160:17,24 161:3

161:20 162:13
  163:22 164:5,7,14
  164:23 165:1,15
**die** 92:10 100:24
  104:2 108:3
  109:15,19 110:9
  111:6,17 118:17
  118:18 187:12
  194:7 196:14,16
  197:9 216:19
  265:16 298:5
**died** 9:11 97:19
  98:23 191:18
  213:19 268:18
**dies** 248:25
**differ** 7:16 96:14
  221:20
**difference** 7:11
  35:17 47:24 96:18
  96:22 164:24
  165:2,3 169:20
  193:18 210:24
**differences** 17:11
  35:9
**different** 7:17 10:1
  17:9 26:9,9 28:1
  28:21 31:9 34:10
  35:8 42:2 46:14
  54:22,23,24 74:21
  83:8 85:6 86:12
  86:14 87:19,21
  90:19 91:9,10
  99:20 116:16
  121:12 133:17
  141:15 143:21
  152:16 156:5
  158:11,22,25
  159:1 163:22
  164:12 166:16
  172:6 175:21
  183:23 211:3

221:21 237:12,14
  239:24 241:3,13
  245:11 256:12
  259:8,9,24 261:13
  262:4 312:15
  324:13 326:14
  336:15 343:22
**differentiate** 85:14
  301:17
**differently** 158:10
**difficult** 71:17
  104:11 178:11
  179:19 191:12
  276:12 283:15
  324:16
**digress** 31:2
**dilemma** 243:25
  244:13
**direct** 186:13
  191:2,3 343:19
**directly** 174:17
  236:22 285:2
  317:2 325:9
**director** 63:10
**disagree** 47:21
  48:1,6 51:22
  127:15 163:6,11
  163:12 170:20,22
  171:8,11 175:3,5
  177:15,16 182:3
  203:17,18 204:10
  204:12,12 222:8
  222:10 301:7
  307:11 310:23
  339:12,14 340:5,7
  340:12
**disagreeing**
  177:21,23 182:13
**disagreement**
  204:15

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 365 of 418 PageID #: 8042

disclaimer 183:20
183:21
disclose 10:15
164:21 274:25
330:22
disclosed 274:19
308:25 343:7,20
disclosure 312:16
312:21
disconnected
75:12
discount 99:21
discoverable 11:6
11:21
discovery 11:9
12:2 294:24 295:1
296:17,20
discuss 65:14
225:17 253:8
discussed 98:9
158:17 177:11
225:7 246:19
248:12 326:14
342:5
discussing 271:9
333:21
discussion 60:21
63:22 66:18 79:11
93:11 113:24
114:17 161:18
162:2 163:5
213:10,13 219:18
219:19 221:5,7
267:18 270:1
308:19 338:11
340:1
discussions 64:4,5
66:1 181:22 245:5
290:20 322:14
323:17

disease 108:18,19
108:20
disorder 139:17
displayed 160:20
dispute 266:20
301:7
disputing 81:17,20
82:8
distinction 38:20
distress 256:22,24
276:17
distributed 35:13
district 1:4,5,15
4:10,10 5:9 6:8
312:20
division 1:5 4:11
7:13
divoll 2:14 159:9
159:13 160:13
164:7 165:14,21
165:22
doctor 106:8
117:8 258:12,12
303:5,7,10
doctors 9:8 23:22
24:23 26:4 298:1
301:19
document 60:5
73:7 160:4
documented
269:21
documents 59:24
60:12 73:6 140:24
dog 139:11,13,16
193:5 251:12
253:13,14
doing 9:24,25
22:23 27:7,8,10,10
27:12,16 36:13
57:22 68:22,25
70:7,11,17 71:1

72:6 103:7 121:16
128:14 129:12,13
156:10 182:20
222:24 224:11
228:18 238:17
253:14 257:14
258:2,7 265:11
273:22 279:1
286:19 288:11
291:5 294:1,3,7
303:17 304:16
310:21 313:24
320:16 329:2
336:19
dollar 328:3
dollars 330:16
donald 275:6
287:10
donnie 157:9
158:12
dose 46:9,21,22,22
78:5 79:6 81:17
91:8,10,12 92:15
92:16 94:24 95:3
96:12,13,19 97:18
98:25 100:23
101:3,9 102:5,11
102:13,17 104:15
106:12 107:22
111:15,18 114:7
116:21 117:20
118:5,7,12 124:5
124:20,23 125:15
125:16 126:12
127:9 133:20
137:9 140:12
168:11 186:16,19
188:7 191:8,10,11
191:12,18,19,20
191:21,22 192:2,7
193:14,16,18,18

193:19,21,24,25
193:25 194:1,3,8
195:7,9,12,15,15
195:25,25 196:3,9
196:10,12,13,15
197:23,23 198:2,5
198:7,9,15,18
199:1,1,4,6,25
200:14,16 214:22
215:1,2,5,12,13,16
215:17,21,22,23
215:24,25 216:2,5
216:6,9,10,12,16
216:18,20,22,23
216:24 227:17,19
227:25 233:22
250:13,16 254:23
255:7,10,13,14
263:2 264:11,11
264:19 266:14
271:10 273:11
274:11 296:7
306:6 307:5
334:10 335:1,2
337:23 340:20
342:12 345:5,8
doses 16:24,25
36:17 78:25
123:20,20,20
127:23 140:8
146:4 163:15
169:4,10 171:1,13
177:25 178:2
179:11 184:12
188:10 190:4,11
191:17 196:22,25
199:9 204:4,4
210:13 214:21
307:7 335:4
dots 336:13

www.veritext.com    Veritext Legal Solutions    800-556-8974

**doubt** 57:15 72:4
225:9 258:9
**dr** 4:8 6:2 58:9,10
60:1,6,7,8,13 63:4
63:5 64:5 70:10
86:17,23 97:7
114:2,3 117:19
133:8 139:7
140:23 141:6
154:22 160:4
163:8 164:22
179:15 186:23
193:2 194:17,20
194:25 205:9
221:18 242:20
244:8 252:1,4
266:2 268:7
280:12 281:5,10
281:12,15 282:6
282:12 283:10,22
284:1 289:4,24
293:17 304:22
308:2 309:1,2
310:7 312:13
313:21 314:3,19
314:23 315:2,25
338:24 346:15
**dramatic** 167:22
**dramatically**
241:7,10
**drank** 296:6
**drano** 266:23,25
267:7,7,11
**draw** 222:14 223:7
**drawing** 156:11
**drink** 296:4
**drive** 72:13 141:15
141:19 167:5
188:4,5
**driven** 50:5 78:12

**drop** 273:24 274:5
**drug** 16:22,23
32:1,3,3 33:1
34:18,19,23 35:1
36:3 38:23,24
39:2,25 40:24
41:7,9,14 42:1,6
44:12,16 45:23
46:16 49:13 50:9
50:15,18 87:20,21
87:23 88:4 99:11
102:7 103:12
107:4 116:6,18
120:10,15,16,18
121:1,11,25 122:5
122:6,9 123:1
124:20,21 125:19
126:1,2,13,15
128:23 130:5,16
131:22 134:2,3,19
135:2 146:3
150:22 152:8,18
153:6,7 156:13,16
156:20 163:20,22
163:25 179:4,10
183:1,4 185:10
186:22 187:1,3
191:13 197:2,3,7
204:20 206:23
210:25,25 211:1
215:10 216:6,8
225:18 233:22
237:10,12 243:19
253:24 264:15,20
264:24 266:21
267:6 269:12,21
273:7,10 274:7
275:12 276:15
277:16 279:15
296:7 298:12,13
298:14,16 302:25

307:5 329:18
**drugs** 31:20,21,22
31:23,25 32:21,25
33:1,20,24 34:3
35:8,12,13,18,19
35:21,25 36:1,1,5
36:16,16,17,25
37:1,1,1,4,5,13,15
37:17,25 38:5,10
38:21 39:11,18,20
42:2,24 43:6,7,8
43:10,15,17 44:5,6
44:7,23 45:1,2
47:1,10,11,12,13
49:8,18,18,20 51:2
53:15 54:4 77:21
88:21 91:6 94:10
95:2 96:15 115:14
115:18,24 117:17
120:11 121:12
122:20 123:2,3,15
123:17 124:3
126:2 127:14,19
128:25 130:1
136:1 137:14
152:16,21 153:8
158:10 164:25
165:8 186:10,14
188:23 190:13,18
191:10 192:12
196:22 200:4
202:22 203:13
204:18,21 211:1,7
211:11,19 212:18
212:19,20,25
213:1 214:19,22
215:3,5 221:19,22
222:20 237:8
241:4 243:6 244:4
266:1 269:12,15
272:25 277:12,15

278:20 279:22
280:2 300:3,3,23
314:21 324:6,17
324:21
**dry** 132:3 134:14
**drying** 134:6
**due** 137:14,15
**duly** 4:2 347:14
**duration** 52:9
**duty** 309:9
**dying** 215:19
**dynamics** 95:2

**e**

**e** 2:1,9 32:19,19,20
32:20,20 33:19
72:15,17 100:11
133:10 134:20
141:16 142:7
160:3 303:20,21
303:24 304:3
310:24 346:1
347:1,1
**earful** 97:12
**earlier** 51:10
60:11 78:11 93:11
94:12 97:22 118:4
120:13 130:6
158:17 195:14
201:5 213:9
249:14 261:5
277:14 300:11
324:23 326:13
332:18 335:19
336:22 338:14
**early** 9:6 60:8
65:11 123:14
328:24
**easier** 34:2 180:13
**easily** 92:1 136:2
190:24 203:25
307:9

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 367 of 418 PageID #: 8044

eastern 1:15
easy 68:4 136:17
  217:3 260:21
eaten 296:3,5
editions 205:6
editor 329:22
  331:2,4
educate 296:18
education 24:10
  24:19 26:15
  258:13
edward 157:9
eeg 28:3,17,19
  135:22 136:9,15
  136:15,16,18
  137:1,12,16,19
  138:2 219:22
  220:7,11,19
  221:21 222:5
  240:9 306:25
eeg's 136:20
effect 30:19 36:21
  38:24 53:16,20
  82:2 87:7 91:10
  91:12 92:16 94:3
  100:13 109:14
  115:14 116:11,19
  118:17,19 125:14
  127:9 128:1
  130:17 132:7,18
  134:5,7,23,24
  135:15,16,19,21
  136:4 152:17
  176:14,16 177:12
  178:19 179:17
  188:20,22 189:5
  189:25 190:10
  193:21 198:8
  210:13 211:3,3
  215:10 220:24
  221:1,13,20,23

237:9,9 264:20
269:9 273:4 274:2
274:4 279:15
306:20 307:3,7,12
334:14,23 335:3,4
335:21 339:8
340:2,19,23 341:5
effectiveness 52:6
effects 28:12 29:8
  31:23 53:24 77:20
  92:20 93:6 94:2,4
  97:16 100:15
  101:17 116:6
  124:3 132:1,3,4,13
  134:18,25 177:8
  185:5 187:18
  189:5,12,13,17,23
  190:5,16,17,23
  191:7 204:23
  211:1,5 219:22
  220:7 221:6,21
  222:5 226:21
  227:1,2,24 235:9
  238:1 241:4 267:6
  274:10 280:2
  306:24
effectuate 112:17
efficacy 178:12
efficiently 109:7
egg 233:20
eight 8:18 59:12
  66:10 117:3,4
either 7:7 58:20
  85:3,9 115:9
  131:19 140:25
  198:23 199:14
  326:25 345:6
elaborate 105:11
  216:14
elective 121:21,22

electrical 137:18
electroencephal...
  28:2,18,20 54:15
electrolytes 100:2
elevated 94:19
  319:12,12,14
elicit 23:19 99:8
elite 9:8,21
else's 196:11
ely 315:24
emergency 88:6
  89:2,7,14 121:19
  121:23
emergent 88:11
eminent 205:5
employee 347:11
employment
  310:22
empty 197:17
  199:24
encompasses
  37:10
ended 9:25
endings 81:13
  82:3
endotracheal 78:1
  78:2 88:12 89:19
  89:25 90:11,16
ends 333:3
enforce 320:13
enforcement
  319:3
engagements
  274:16
england 61:4
english 207:7
  339:19
enjoy 72:6
ensues 188:13
ensure 231:14
  245:20 345:9

enter 5:17
entered 320:3
  321:3 345:25
entire 6:19 52:9
entirely 312:15
entirety 73:7
  248:1
entitled 71:14
  281:25 282:23
  310:12,18
entroferium 135:3
entry 325:4
environment 75:6
  184:22
equate 163:21
equivalent 161:5
error 23:2 156:2,7
  156:12 233:9,14
  305:24 306:1
errors 306:2
escorted 278:7
  320:1
especially 7:11
  28:10 31:22,24
  42:23 101:20
  116:21 156:10
  169:25 170:25
  175:10 182:25
  186:1 202:19,25
  233:7 257:10
  259:5 262:1 264:4
  301:1
esquivel 4:19
essentially 9:17
  15:8 21:1 28:25
  35:5 36:14 41:4
  57:3 61:8,9 70:3
  75:7 80:11 82:4
  87:8 88:13 91:20
  98:13,22 99:16,20
  123:11 132:4

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 368 of 418 PageID #: 8045

151:10 242:13
249:7 263:16
278:8 279:21
288:12 326:5
**establish** 172:2
196:17 199:3
**established** 197:23
289:20
**establishing**
196:12
**estimate** 26:6,7
270:10 311:3
**et** 1:9 2:13 3:17
4:9 30:24,24
140:15 142:8
147:11 166:2
201:13 207:11
213:5,8 240:9
**ether** 32:21,22
**etomidate** 220:6
221:15
**euthanize** 103:2
**event** 291:6
294:20
**events** 32:12 62:19
284:12 285:6
292:4
**eventually** 93:3,8
97:19 98:17
109:12 110:15
215:11 330:25
**everybody** 25:14
25:15 36:20,21
39:16 152:11
261:3 346:13,15
**evidence** 226:19
335:3
**evidenced** 347:16
**exact** 63:17 101:7
101:19 114:13
115:6 140:1 159:3

204:7 212:4
282:17
**exactly** 8:13 14:6
22:2 28:16 31:5
43:22 103:16
133:5 249:8
282:24 288:9,15
290:1 291:11,15
294:6,21 296:19
318:16 319:1,3,6
321:17 328:5
333:5
**examination** 2:5,6
2:7 6:1 268:6
280:18
**examine** 106:1
**examined** 4:2
**examines** 105:16
**examining** 75:3
**example** 8:8 21:11
23:14 32:17 44:15
54:2 70:20 85:24
127:17 134:5
138:12 140:8
172:20 190:11
199:1 203:22
237:13 256:15
259:14 296:1
**examples** 215:8
**exception** 65:1
**exceptions** 75:18
**excessive** 160:21
**exchange** 70:19
**excludes** 246:14
**excluding** 169:2
**excuse** 5:21 125:5
**execute** 7:5 244:21
**executed** 7:8
268:13 269:11
**execution** 19:5,13
19:23 62:16,19

104:23,24 129:13
258:3 268:23
272:24 274:22
275:2,5,6 278:5
279:10 280:12,15
280:19,21 281:16
281:17 282:7,13
283:11,23,24
284:3,6,10,21,23
285:10 286:23,25
287:23 288:1,8
289:1 290:9,20
291:22 292:7,9,14
292:16,19 293:7,9
293:12 294:1,24
295:12 296:2
299:16 302:5
304:8 305:5 308:2
308:12 309:1,4
311:1 312:7,9,14
314:21,22,24
315:3,4 316:18,20
322:17 323:14,25
324:3,19,20
326:14,15,18
327:14 328:1
329:14 330:6,12
331:7,14 332:6,15
332:22,25 343:6
343:12,21
**executions** 113:5
249:6 295:3,23
302:23 328:21
**executive** 7:1
**exhausted** 286:4
**exhibit** 86:17,21
86:22,25 147:10
147:12 165:21,21
165:23 167:15,15
167:17 192:9,11
194:10,13 203:8

203:10 214:1,3
217:24 218:2
225:23,25 228:9
228:11 229:4,6
336:9,11
**exhibits** 72:22
303:25 346:1
**exist** 203:5 331:18
**existence** 201:2,3
**expand** 311:11
**expanding** 310:16
**expect** 25:7 116:12
236:14 247:18,24
248:9,14 250:25
259:5 264:18
265:9 270:18
271:3 272:12
279:23,24 294:18
295:16 296:12
**expectation**
304:19
**expected** 12:24
13:8
**expects** 295:16
**experience** 19:8,9
19:21 20:2 24:9
25:17,20 26:15
27:4,8,11,15
102:21 104:8
111:10,10 279:11
292:22,25 293:1
293:12 301:23,25
324:9 344:17,23
345:10
**experienced**
229:19,20
**experiences** 181:1
181:14
**experiencing** 96:2
96:9

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 369 of 418 PageID #: 8046

**experiment** 53:3
249:3
**experiments** 103:1
**expert** 2:11 6:17
8:25 9:10 10:3,8
10:14 11:3,3,9,10
11:20 12:2 13:14
13:18 24:3 47:19
51:19 71:9,15,18
72:2,3 86:19
96:10 116:9,13
118:14 172:8
186:23 195:16
250:17 263:6
271:18 274:17,20
274:23 280:8,11
287:6,9 294:8,19
302:6 309:10
314:20 322:8,16
326:15 330:10
333:8
**expert's** 310:21
**expertise** 215:13
258:2
**experts** 128:16,17
172:15 174:16
181:23 301:8
**expiration** 347:25
**explain** 12:17
30:13 71:2 85:25
162:18 163:9
**explaining** 272:5
**explains** 306:19
**explanation** 34:13
**explicit** 24:11,20
25:13,13 152:24
181:10 319:24
**explicitly** 22:20
28:24
**explore** 289:10
307:6 309:12

312:11
**exponential** 86:6,9
167:2 168:17
169:1,6 170:3,5,6
170:9,17,24 171:2
171:2,8,9 172:2,6
172:7 173:2,14,21
178:13
**expressed** 274:3
**expression** 279:11
**expressly** 3:19
**extent** 10:13
280:13 297:4
311:10
**extrapolate**
179:19 270:15
271:11
**extrapolating**
111:11 163:15
171:21
**extrapolation**
180:14 270:22
**extrapolations**
270:20
**extreme** 184:12
**extremes** 115:15
**extremities** 256:16
276:23
**extremity** 248:11
254:10 257:11
**eye** 242:18 261:1
295:23
**eyelash** 256:17
**eyelid** 259:1,2
**eyelids** 263:3
**eyes** 29:24 250:6
258:17 260:9,12
260:14,16 261:1
262:16 263:24
275:24 276:22
294:20 325:11

**f**

**f** 2:11 32:19,20,20
86:20 347:1
**face** 233:20 285:3
285:22,23
**facing** 300:21
**fact** 37:16 61:6
182:5 202:19
222:22 233:24
234:19 246:12
294:1 299:17
304:22 305:23
308:25 317:25
**factors** 102:13
158:16
**facts** 21:21,23
56:25 61:8 311:9
311:20
**fail** 76:3,7
**failing** 109:25
**failure** 109:25
224:21
**fair** 56:10 289:23
293:16 313:6
**fairly** 25:6 90:17
278:15
**fall** 75:21 76:15
273:2
**falling** 274:8 279:8
299:7
**falls** 94:21 298:19
**false** 295:11
**familiar** 28:22
136:6 159:15
269:18 297:22
299:10
**family** 130:22
**famous** 214:25
**far** 15:10 16:9
21:19 29:3 64:20
65:5 66:21 99:25

116:18 136:23
145:22 169:2
234:24 285:10,17
319:20 322:12
328:6 338:10
**fashion** 265:25
**fast** 92:16 102:4
103:22 104:4,12
104:15 136:20,22
268:11
**faster** 91:11 120:1
120:4
**fatal** 102:14
108:24 186:17
191:8,21,22 192:2
192:6 193:14,15
193:18,24 194:1,3
194:8 195:12,15
195:15,25,25
196:3,9,10,12,13
196:22,25 197:12
197:23 198:2,7,15
198:18 199:1,4,6
199:24 200:14,16
200:23 213:10
214:21,22 215:12
215:13,16,21,23
215:24 216:2,5,10
216:12,16,20,22
216:23,24
**fault** 128:15
202:23
**fda** 209:6 211:18
212:4
**february** 328:15
**federal** 1:14 6:5
8:23 9:1
**feed** 285:1
**feel** 39:21 44:7,8
45:14,16,20 47:10
49:17 50:7 56:5

Page 22

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 370 of 418 PageID #: 8047

62:12 71:21 89:13
92:20 94:1,6,8
105:10 129:21
130:3,7,8,9 163:9
189:9 254:24
314:15 318:21
**feeling** 95:17,21
182:23 258:11
**feels** 301:24
**feet** 52:1 275:15
317:14 326:7,9,9
**felt** 278:1 293:1
294:15 322:24
333:18 343:7
**fentanyl** 33:18
123:13 190:14
204:2,8
**fibrillation** 101:19
101:20
**field** 258:10 317:8
**figure** 12:6 67:3
147:7 148:12
149:23 150:4
153:11,12,13
168:8,8,9,9,10,10
169:13 170:1,1,14
171:5,9 172:9,9,18
172:18 191:11
222:18 223:11,13
223:14,19 230:15
230:19 232:16,20
232:22,23 234:5,5
259:10 265:9
271:1,3 283:20
336:6,7,7 337:19
337:19,21,24
**figured** 185:21
**file** 5:13
**filed** 4:9 5:9 65:8
86:21,25 147:12
165:23 167:17

192:11 194:13
203:10 214:3
218:2 225:25
228:11 229:6
336:11
**filibuster** 210:6
**fill** 330:25
**filled** 338:4
**final** 214:6 280:17
**finally** 205:24
293:20
**financially** 347:12
**find** 9:8,22 43:22
209:12 282:6
283:9 310:24
336:17,18 337:17
**finding** 172:10
**findings** 155:10
340:9,21,22
**fine** 9:17 82:15
84:7 226:6 251:16
268:9 310:10
336:6 343:2
344:21
**finger** 257:9,11,18
259:3 261:6
**fingers** 218:13
257:4,16
**finish** 117:14,15
173:6,10
**finished** 38:15,17
60:22 114:2,3
117:11
**fire** 52:1
**firing** 116:25
**first** 4:2 16:19
19:1 20:6,21
22:11 23:8,23
34:18 41:23,24
45:9 46:14 60:23
60:25 66:13 78:17

87:23 94:2,4
105:8 121:17
123:2 127:23
145:19 150:16
162:25 172:24
175:24 180:3
193:17 218:15
251:3 268:11
275:10 280:10
288:24 318:16
319:10,22 321:3
323:3,7,9 332:18
336:12 337:5
**fish** 94:11,16,22
**fist** 218:14
**fit** 85:5,12 86:3
169:16,16,24
171:14 173:2,3,14
178:13
**five** 8:15 15:22
59:3 68:1,7 69:21
87:18 103:21
107:16,17,18,19
114:12 115:7
224:13 275:25
309:24 337:13,25
338:1
**flash** 167:5
**flat** 137:17,19,21
**flip** 244:5
**floor** 19:12,17
20:14,16,17
**flow** 80:15 110:1
**flowing** 277:13,18
324:12
**fluff** 129:14
**fluid** 296:6 324:12
**fluids** 99:22
**flying** 242:14,17
**foaming** 261:20

**focus** 44:23,24
47:3,4 172:18
246:8 340:14
**focused** 29:4 48:6
48:9,10 100:14
236:20 337:18
**focusing** 223:13
**folks** 314:9
**follow** 12:25
105:15 163:4
171:2 209:24
225:6,16 245:15
275:12
**followed** 106:13
111:3,3,14,15,16
119:11,12,13,24
119:24 221:8
244:22,23,24
245:13 266:5
275:13,13 342:4
**following** 27:3
71:2 88:6 191:24
347:17
**follows** 4:3
**food** 296:4
**foot** 317:10
**footnote** 183:25
**foregoing** 347:7
**forehead** 53:6
**forensic** 156:8,9
**forget** 48:24 106:7
288:15 319:1,3,6
321:17
**forgot** 319:19
**form** 3:12 24:5,7
26:25 37:8,9
42:19 43:24 50:2
69:15 79:9 113:14
117:25 119:15
156:22 157:4
162:20 164:18

www.veritext.com Veritext Legal Solutions 800-556-8974

166:23 172:11
181:8 182:11
188:16 208:14
209:18 210:10
211:12,25 245:1
246:1 248:6
250:21 258:4
260:3 262:19
264:14 265:2,23
267:1 303:15
331:1 340:6
**formal** 282:2
**formalities** 3:16
**formation** 29:17
29:21,24 30:4,6,8
**former** 319:4
**forming** 261:15
300:22 301:1
**forth** 15:20 19:10
23:15 24:9,15
30:11 31:24 44:3
44:21 74:23 80:19
88:16 93:18
104:13 108:20
128:19 132:3
179:17 190:10
191:11 196:20
205:12,15 221:24
238:1 239:12,15
240:22 241:22
248:22 250:11
291:12 292:14
295:4 297:12
300:4 302:20
317:12 322:15
326:4 341:11
**forward** 72:17
73:23
**forwarded** 303:22
**found** 42:7 221:14
227:9 281:21

282:12,16,24
310:25
**four** 58:24 59:3,4
59:7 87:18 107:14
107:17 120:8
146:21 160:15,20
275:24,25
**fourth** 197:2 317:4
**frame** 129:8 317:7
**frankly** 136:13
**fraught** 156:1,6
**free** 64:6 69:17
163:9 281:22
283:16
**frequency** 136:21
**frequently** 297:5
**friday** 312:12
**friend** 139:9
**front** 60:5,23 72:9
82:24 83:2 84:18
86:1 123:6 139:19
139:21 144:5
201:16 281:8
293:24 317:23
318:7 319:9,11
332:1 339:1,6
**frugal** 69:7
**fudge** 328:22,22
**full** 65:23 94:3
95:7 150:16 160:4
167:19 175:24
201:18 207:5
318:17
**fuller** 299:25
**fully** 52:16 79:16
96:13,19,21 107:5
161:10 328:17
**function** 30:24
109:2,2,7 188:12
**functional** 81:13

**functioning**
115:19 303:3
**fundamental**
71:11
**funneling** 7:17
**funny** 30:13
**further** 3:15 61:25
74:18 93:13
167:24 227:20
262:20 340:10
345:24 346:4,19
347:10,14
**futile** 265:13,15
**future** 333:8

## g

**g** 134:20
**gaba** 177:1 226:21
**gag** 90:4
**gallbladder**
138:15
**gas** 34:19
**gasp** 285:15
299:19
**gasping** 295:5
299:15,17
**gastric** 327:1
**gears** 120:5
274:14
**general** 19:10
24:10 25:1,24
26:4 27:1 28:3
36:6 37:6,19 38:3
38:6 41:10,22
42:4,13,16 43:1
45:11 46:6,16
47:20 48:7 52:11
52:14 65:3,4
67:25 75:17 77:24
84:13 87:22,22
88:3 98:15 106:20
106:21 108:4,6,8

111:19,19 119:25
120:19 124:4,12
124:14,15,18,25
125:1 126:12,23
131:2 136:18
137:1 138:4,18
152:19 182:16
190:12 202:21
206:1,9,19 207:8
207:12,13,14
208:24 209:8,23
210:1,14,18,20
212:16,21,22,22
215:4,9,16,21
216:4,16 232:3,4,5
251:6 255:3
268:21 269:12
295:8 296:23
305:18 335:25
**general's** 1:23
65:16 72:16 288:2
288:25 309:5
322:22 327:25
328:12 330:10
**generally** 89:15
103:4 111:20,22
122:12 231:16
239:5
**generals** 286:24
**genetic** 226:20
**gentle** 260:11
**gentleman** 318:11
320:5,6,14
**gentlemen** 205:20
321:4
**getting** 11:8 36:7
76:10,11,23 93:2
108:22 110:1
111:25 141:22
189:20 196:5
276:1 314:12

www.veritext.com    Veritext Legal Solutions    800-556-8974

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 372 of 418 PageID #: 8049

341:18
**give** 6:25 19:3,22
26:6 32:12,25
33:6,17,21 34:5,16
37:5 38:14 43:13
44:15,24 45:2,5,23
45:23 46:20 47:17
49:4,13 54:4 55:4
57:8 58:24 60:22
65:21 66:24 68:3
73:22 79:12 83:1
88:14,20 91:5
99:19,22 100:8,16
102:3,4 105:13
108:14,23 109:6
109:21,22 115:24
116:11 121:11
123:6,25 124:1,1
124:25 125:6,15
126:1,8,11,25
127:9 128:11,22
134:6,16,19,21
135:1 137:23
146:4 151:17
177:7 178:23
179:24 180:17
181:10 186:24
188:20,23 190:4
191:25 194:5
195:19 197:8
204:6 209:22
210:19 215:9
216:8 219:8
220:11 227:22,23
243:3,5 248:7
251:5 252:5
253:21 255:13,14
263:1,13 264:9
265:6,6,7,8 266:12
266:13,23 270:16
275:12 281:24

282:17,20 283:19
287:20 310:8
311:11,15 324:2
343:18
**given** 37:25 38:6
50:18 54:24 55:12
63:15 66:14 79:16
88:13,22 98:25
99:12 100:19
104:12,14,14
106:17 109:4
120:15 121:12,14
123:11,12 124:6
130:12 134:16
159:4 163:21
165:1,9 218:14
233:8,22 234:14
240:11,12,13
242:1,8,13 243:18
248:13 250:14
253:19 271:4
287:11,12,16,18
300:16 301:11
303:25 323:12
**gives** 52:23 137:23
313:2
**giving** 50:9,10
54:13 64:5 65:22
78:18 92:7 95:16
106:5 125:18
127:25 134:10
138:21 241:5
252:20 255:6
266:4 271:2 306:6
345:3,5
**glasgow** 26:10
**glass** 2:13 40:17
40:24 140:14,15
140:18 141:7
142:8,15 143:12
146:8,13 147:11

155:18 157:24
158:1,2 163:16,17
180:4 217:17
228:14 237:13
**glycopyrrolate**
133:25 134:7,8,11
134:22 135:2,6,12
135:14,19,23
**go** 8:12 9:2 11:7
12:10 15:13,23
16:8 20:6,25
24:18 28:6 34:14
36:23 38:18 39:5
44:1,4 52:15 53:8
54:4 55:4 67:23
73:8 75:18 82:17
83:3 84:7 93:25
96:25 97:24 101:7
101:16 103:11
104:4,22 110:25
128:5 129:3,3
130:6 134:8
137:19 138:20,25
139:10,22 141:6
141:23 143:24
144:2,9,22 145:18
148:10 149:19
150:14 151:9
153:10 154:11
155:9 157:17
158:13 160:5
161:15 165:17
167:10,18 168:8
169:13 170:13
171:4 172:23
176:19 178:3,23
180:15 184:9
190:17 192:17
193:13 197:12,14
198:12,25 199:21
200:5 201:9,25

202:11 203:6
205:16 206:20
208:22 211:17
213:3,4,24 214:4
218:5,7 219:16,25
220:21 224:1,2,11
224:12,15 226:15
227:17 228:12,13
228:16,17 229:2
229:16 230:5,15
230:19 232:6
235:4,5,17 249:5
253:7 255:18
267:14 271:21
272:22 273:11
276:10,11 277:12
281:11 282:23
283:3,4 291:6
293:2,17,20
299:22 302:16
304:22 305:13
306:3 307:1,4,19
310:8 311:13
313:2,14 315:15
316:18 321:13,24
323:6 327:14
329:3 333:20
335:15 336:2,13
336:15 337:5,16
337:17 338:8,19
341:24 342:17,23
344:5,6,9 345:17
**goal** 123:24 190:6
**goat** 103:23,24
**goats** 102:23,23
**god** 129:11 130:23
296:10
**goes** 34:20 55:3
75:9 85:3 93:7,8
109:8 126:13
136:22,23 168:11

| | | | |
|---|---|---|---|
| 188:12 248:24 | 174:18,20 189:3 | 320:13 321:7,8,20 | **great** 30:22 70:19 |
| 251:2 292:5,5 | 189:21 190:8,9 | 321:21,22 322:12 | 141:5 |
| 303:8 339:15 | 191:15 192:20 | 322:25 323:10 | **greater** 245:20 |
| 342:19 | 195:18,19,21,21 | 324:6,9,10,21,22 | 258:1 |
| **going** 4:5 7:20 | 195:22 198:4,10 | 324:24 327:16 | **greenblat** 271:25 |
| 10:12 11:6,17 | 198:12,19,22 | 328:4,16,21,22,23 | 305:13 |
| 14:1,10 15:19 | 206:6 215:8,10 | 329:25 331:6,7 | **greenblat's** 306:5 |
| 22:23 25:25 26:15 | 216:17,18 217:1 | 332:12 333:3 | **gritty** 171:20 |
| 27:20 28:9,14 | 219:9 221:4 | 336:14,17,17 | **ground** 15:13 |
| 31:17 32:4 33:2 | 224:11 228:8 | 337:18 341:19 | **group** 18:13 |
| 34:17 36:6,18,20 | 231:17 232:2 | 342:24 343:5 | 174:21 207:23 |
| 36:21 44:4,4,10,22 | 233:11,19 236:17 | 345:5 346:18 | 337:23 |
| 47:23 48:11,15 | 241:1 243:1,1,2 | **good** 4:4 6:2,3 | **guarantee** 240:2 |
| 51:25 53:14 54:10 | 246:8,17 251:18 | 30:21 31:1,3,13,16 | **guess** 6:15 13:14 |
| 54:11,13,19 55:11 | 251:24,25 252:21 | 34:1 36:13 47:7,7 | 15:23 20:20 26:18 |
| 56:17 57:5 61:12 | 255:14,15 259:23 | 67:17 69:6 78:16 | 27:1 30:12 34:21 |
| 62:3,20 64:3,10 | 260:4 262:5,23 | 79:1 90:17 101:1 | 35:10 36:12 40:2 |
| 65:21,22 66:24 | 263:10,13,17,17 | 138:24 202:2 | 44:12 45:14 47:4 |
| 67:11 68:14 69:1 | 263:19 264:7 | 275:16 323:12 | 47:10,16 54:17 |
| 69:13,19 71:3 | 265:4 266:14 | 333:12 346:13 | 55:24 56:7,8 |
| 73:1,2 75:16 80:9 | 267:7,9,16,24 | **goodness** 249:22 | 58:12,24 59:11,12 |
| 82:19 83:21,22 | 271:21,24 273:8 | **gotcha** 164:20 | 65:3 66:24 68:9 |
| 84:9 85:22 88:4,7 | 273:24 274:11,12 | 165:10 | 69:3,4,12 74:16 |
| 89:12 95:13 96:18 | 280:6,8 281:11 | **gotten** 15:12 | 76:16 79:3 80:12 |
| 96:23 97:5 98:10 | 282:7,12,19 283:6 | 286:21 | 80:18 87:18,23 |
| 101:18,22 105:25 | 283:10 288:13 | **governed** 35:5 | 92:2,14,17,21 95:1 |
| 108:6,7 114:18,24 | 289:1,23 290:12 | **government** 7:4 | 95:5 99:18 100:22 |
| 117:1 119:3,4,6,21 | 290:15,16,16 | 8:23 9:1 | 104:3,5,6,7,18 |
| 120:1,4 125:18 | 291:5,6 293:4,10 | **governor's** 318:15 | 107:19 111:9,12 |
| 126:2,3,17,18 | 293:15,23 294:16 | **grab** 19:21 | 117:1,18 120:9 |
| 130:13 131:5,6 | 294:16 296:19 | **grain** 269:16 | 124:8 131:16 |
| 133:1,24 136:15 | 297:11,12,14 | 272:18 | 170:8 171:3,18 |
| 138:19,21 139:1 | 299:11 300:14,23 | **grandmother** | 172:23 174:14 |
| 140:18 141:20,25 | 300:24 301:2 | 195:17,19 | 177:2 178:5 186:6 |
| 146:2 147:9 | 302:19 306:23 | **grant** 275:7 | 194:19 211:14 |
| 151:12,12 152:23 | 307:4,25 308:4,13 | 287:10 296:1 | 215:7 216:15 |
| 153:24 154:14 | 308:22 309:4,19 | 326:16 | 217:5 219:1 |
| 159:10 160:10 | 309:22 310:2,18 | **graph** 170:21 | 221:25 231:20 |
| 161:11 162:17,21 | 312:13,21 313:16 | 171:4 307:8 | 234:25 237:23 |
| 162:22 167:14 | 313:24 314:6,24 | **graphs** 146:21,22 | 239:18 241:12 |
| 171:17 172:17 | 315:2,5,6,11,12 | 169:22 170:4 | 254:25 261:12 |

www.veritext.com     Veritext Legal Solutions     800-556-8974

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 374 of 418 PageID #: 8051

263:23 265:13
267:8,11 271:14
271:23 272:25
273:16 275:24
287:10,16 294:13
296:18 312:1
317:1,15 321:21
323:5,13 327:3,12
**guessing** 59:4
92:17 222:19
291:10 317:19,23
**guestimate** 317:14
**guide** 43:5
**gun** 267:21
**gunn** 4:18
**guy** 9:3 115:11,11

**h**

**h** 2:9 61:2 100:11
133:10
**half** 148:5 224:14
268:2 312:5
**halothane** 166:4,5
166:11,20 167:22
168:1,4 172:22
176:10,22 177:18
178:9,12,15 213:1
213:2
**hand** 28:6,7 75:10
75:10,18,18 81:8,9
94:18,19 96:5
132:16 174:17
176:2 189:17
190:17,17
**handful** 88:23
**handled** 331:2
**hands** 112:3 279:1
**hang** 341:13
**happen** 12:25 89:9
108:14 113:5,6
114:20 115:20
174:9 249:9

254:17 264:10
266:19 278:16,18
279:12,24 294:18
295:20 296:12,15
299:9 306:2
312:25 328:17
**happened** 184:4
243:14 279:25
283:2 295:12,25
296:1,9,12 326:25
327:5 335:12,12
**happening** 53:18
54:25 162:7 169:7
279:4 293:22
294:6,11,21
295:18 298:24
**happens** 61:13
62:8 92:23 101:12
114:21 115:18
179:7 247:2,7,9
249:13 278:15
295:14 297:4
300:2 341:9
**happy** 281:23,24
281:24 282:22,23
283:19 289:3,4
310:17 314:11
316:8 329:2
341:24 346:10
**hard** 85:25 87:11
133:2 154:9
275:21
**harm** 238:20
**harvested** 268:18
269:5
**hasten** 111:24
112:5,8,10 113:7
**hastened** 113:3
**hat** 341:13
**hate** 45:14

**hatter** 132:12,15
**hayden** 4:18
192:15
**head** 27:25 57:24
57:25 66:6 80:4
211:17 215:7
231:21 271:6,7,8
294:3 305:1 317:9
317:12 325:24
**headphones**
218:14
**heads** 252:5
**health** 56:16,19
213:17
**healthy** 89:24
**hear** 139:18
261:19 276:4
277:4 310:17
321:22 336:25
337:1
**heard** 186:11,20
278:12 295:3
328:25
**hearing** 3:14
**heart** 29:2,16 30:9
32:6 61:17,18,23
62:9 80:15 93:6,7
93:9,10,12 98:11
98:14,15,17,18,20
98:22 100:14
101:17,21 102:8,8
102:10,12 103:20
104:5 105:13,18
106:10 108:9,18
108:19,20 109:1,2
109:3,5,7,10,12,13
109:16,25 110:12
110:16,16,18,20
111:6 112:14,21
112:21,22,24,25
113:2 115:4,19

118:24 119:1,2,4,5
121:7 125:9,10,11
128:9,12,19,20
129:9,11,12,13,23
130:8,10 132:2,5
132:20,21,23,25
134:5,25 135:7
188:11 191:4
239:11 240:21
241:17 265:11
**heartbeat** 61:14
62:8,13 93:15
105:18,20 106:1,3
106:8,23 115:10
**heartbeats** 62:2
**hearts** 104:7
**heaving** 295:5
299:15 300:1,4
327:7
**hedging** 106:25
107:1
**held** 4:12
**help** 27:15 94:15
114:16 119:17
141:13 240:2
262:10 263:19,20
333:14
**helpful** 34:5 35:20
239:4,13 247:13
248:2 264:23
333:19
**helps** 239:22,22,24
242:5
**hesitant** 179:15
**hesitating** 68:2
**hey** 28:13 164:21
252:21 329:21
**hide** 246:17
**hiding** 183:11
**high** 36:17,19
39:15,18,21 47:22

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 375 of 418 PageID #: 8052

48:2 79:18 102:11 137:3 160:19 161:19 162:12 188:7 201:7 214:10 215:5 233:21,24 234:1 255:10,12 271:20 271:24 272:2 273:18 274:7 284:15 304:21,24 305:2

**higher** 36:6,7 39:6 39:20 101:13,13 123:20,20 125:17 126:3,16 137:2 146:4 161:4 171:1 177:25 178:2 188:10 190:4,4,11 190:11 250:10 255:14,15 264:7 264:15,16 340:11

**highest** 40:20 124:5 145:19 168:11 227:24 236:20

**highlighted** 160:15 161:19,25 162:12 163:6 339:10

**highly** 118:22 312:10

**highway** 318:13 318:22 324:5

**hire** 72:2

**hires** 72:3

**historically** 132:12

**hits** 109:16 110:20

**hmm** 302:13 306:8

**hold** 10:21 73:15 83:25 117:10

153:14 154:7 159:22 180:19 224:9 280:25,25 282:18 307:19 308:10 336:24 341:21

**holding** 8:22

**home** 291:20 314:13,17

**honest** 95:1 332:1

**honestly** 283:15

**hope** 82:9 129:8 151:1 258:10,13 259:16 273:20 332:25

**hopeful** 5:12

**hopefully** 57:25 61:21 88:5 97:13 200:10 297:3 341:25

**hoping** 327:15,18

**horribly** 79:15,19

**horrific** 296:11

**horrifying** 90:21 91:2

**horse** 343:1

**hospira** 185:15

**hospital** 9:11,16 9:17,19 23:21 27:18 37:2 41:19 42:11 115:12 182:21 183:7 195:18 200:7,11 201:6 238:3 240:5 297:25

**hospitals** 24:1 196:20

**hour** 19:3,22 20:15 59:8,10 281:18 292:17 309:7 314:18

315:3 316:1,4,7,9

**hours** 59:12 66:10 92:2 128:22,23 224:14 252:8,13 252:15,23 253:2,2 253:7 268:8,25 281:19 311:22,25 313:5 314:1 315:5 330:21 343:16

**house** 284:3

**how's** 253:14

**huge** 60:15 92:15

**huh** 168:18,22 178:17

**human** 102:24 181:1,13 213:17 302:1,2

**humane** 244:21 245:7,10,11,14,16

**humans** 32:24 33:2 41:11 102:16 104:10 127:23 135:25 136:3 178:9 179:20,20 191:17

**hundred** 39:2,8,16 39:19 40:11 51:25 52:24 239:19 270:21

**hunger** 95:22,23 96:2,9

**hydrochloride** 185:15

**hypnotic** 202:12 208:13 212:2,7 226:22

**hypnotized** 90:2

**hypokalemia** 100:10,11

**hypothesis** 243:25 244:1,12

**hypothetical** 53:4 119:18 243:5 245:15,16 331:10 331:18

**hypothetically** 119:20 331:6

**hypoxemia** 214:10

**hypoxia** 93:3,19 93:24 108:16,17 108:20,25 110:19 112:22,23 187:14

**hypoxic** 93:1 187:12

**i**

**iasp** 182:10 183:15 184:2,2

**idea** 127:15 185:9 268:17 269:4 270:9 303:7 312:5 314:5 324:25

**identify** 4:14

**ignore** 32:8 33:5 44:13 46:25 47:23 48:2 49:8,14 168:23

**ignoring** 45:20 46:20 47:11

**imagine** 37:17 96:23 113:6 121:16 135:15 195:17 328:7

**immediately** 107:13 110:4 202:8 235:10 272:21 284:6

**immobility** 140:2 140:5,6,13 166:4,8 166:18 178:25 179:4 180:6,7,10 227:5,19 228:1

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 376 of 418 PageID #: 8053

**immobilizing**
226:10,22 227:4
**imply** 321:17
339:23
**implying** 178:21
**important** 17:25
18:5,14,17,19 69:3
70:8 160:21 163:2
182:7 231:12
331:25 333:1
338:10
**importantly** 169:3
**impression** 206:23
**inability** 180:24
181:12 182:22
**inaccurate** 175:20
**inadequate** 12:18
13:5 128:14
**inagaki** 2:15
165:25 166:2,22
167:4,16 172:9
**inappropriate**
117:24 312:10
313:1
**inaudible** 81:8
257:7 273:10
281:20 289:7
304:5 342:21
**incapable** 83:12
**incise** 125:7
**incised** 125:6
**incision** 77:25
122:7 123:1,4,8
125:3
**include** 77:6 116:7
116:8 142:20
181:11,18 183:10
206:14 246:15
251:2 256:12,13
256:17,19

**included** 68:8,10
184:8 267:4
287:12
**includes** 246:14
**including** 36:3,4
38:11 74:21 98:11
156:11 208:1
280:14 283:25
301:19
**income** 68:13,19
69:6,8,20 70:3
**incomplete** 198:23
**incorporate** 20:8,8
30:6 55:7 241:18
**incorporates**
74:15
**incorporating**
28:12 44:19 75:6
**incorrect** 166:12
**increase** 30:1,5
36:5 39:9,13
100:15 101:12
132:5 135:7 137:9
151:5 177:8
185:19 221:7,10
221:10 241:7,10
246:20,21 255:16
307:5 340:19
**increased** 32:6
167:23 174:7
**increases** 127:5
167:24 239:10,11
340:11
**increasing** 150:18
152:5
**indicate** 137:25
176:8,20 249:23
257:12 259:20
261:10 264:6
279:13 298:10

**indicated** 206:1
207:7 212:15,20
**indicates** 138:3
298:8
**indicating** 145:24
178:14 204:5
262:8 297:13
**indication** 212:19
**indications** 206:8
209:13 212:13
**indicative** 257:5
258:18 263:5
**individual** 19:25
22:21,23 23:1,11
23:13 34:25 35:10
35:10 42:15 75:2
87:10 92:20 93:16
93:16,21 94:1
100:24 101:23,23
108:21 137:14
138:6,10 172:19
182:20 188:15,19
223:12,13 244:21
257:12 259:20
261:21 270:11
277:1 298:18,25
301:24 303:4,6
326:2
**individual's**
158:11
**individuals** 22:7
35:11 93:17,22
142:10 143:6
159:6 181:24
223:17 233:6,12
234:14 279:13
284:20 304:7
317:23 318:2,3
**induce** 37:18
53:14 126:12
189:3 207:11,13

**208:24 209:8
221:22
induced** 220:7
**induces** 126:23
**induction** 42:1,4,6
43:1 45:10 46:6
120:21,22 123:7,9
124:13,15 125:16
190:12 202:8,21
203:1 204:20
206:1,9,18 207:8,9
207:12,20 209:23
210:17,19 219:22
224:19 296:7
326:20 345:5,7
**inferring** 176:18
**inflict** 267:11
**influence** 292:2
**inform** 288:24
310:20
**information** 10:16
13:2 55:23 56:16
64:6 163:12 241:2
241:18,19,21,23
249:1 280:11
282:20 283:17
287:2 293:15
328:17
**informed** 308:1
309:3 312:13
315:1
**informs** 114:17,22
**infuse** 45:23
**infusion** 33:17,20
33:22 36:5 45:12
45:13 46:4 79:1
80:2,6,19 100:8
125:1 222:20
335:20
**infusions** 78:21,22

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 377 of 418 PageID #: 8054

ingested 163:23
ingestion 164:6
inhalation 35:25
36:24,25
inhaled 31:22,25
32:18 33:24 34:19
35:19 36:15 38:21
39:17 43:7,10
44:5,7 45:2 47:5,7
47:12 49:7,18
51:2
initial 55:12 82:5
94:2,4 153:10
initially 36:25
80:7 93:7 290:7
inject 41:19 103:5
103:20 107:9,12
107:21,25 108:1
248:3
injectable 49:13
158:10
injectables 33:8
33:11 34:5
injected 107:6,22
109:18,19 110:4,6
110:9 160:16
248:16 272:13
324:18 325:1
injecting 103:9,12
103:13
injection 6:16,20
8:5 9:3,23 12:12
14:11,13,18,20,21
14:23,25 15:8,20
16:3,11 22:8
23:10 46:5 66:16
67:25 69:21 78:14
78:15 79:24 99:12
104:4,15 106:24
107:3,5 108:9,10
128:17 155:7

157:15 183:3
248:1 251:3 254:8
254:17 270:12
273:1 285:12
305:5 322:9
330:10 333:8
inmate 13:11,25
14:25 23:10 98:25
103:25 105:17,17
105:21 106:2,12
106:16,20,23
107:15 108:3
110:7,8 111:5,17
112:25 118:16
119:6 129:5
156:16 248:19,20
248:25 249:23,24
250:6,9 257:4,5,16
258:15 259:15
262:10,11 263:4
265:1,12,15,16,18
268:18 272:22
275:17,18,19,22
276:1,6,21 277:3
285:2,11,13,17
286:5 293:9
294:13 299:24
300:15 302:14,16
317:15,24 318:1,4
323:10 325:4,8,23
326:6,8 333:10,10
inmate's 247:15
247:25 262:21
276:4,5,8 277:5,20
277:25 285:3,23
286:17 300:14
317:12 325:11,18
325:20 326:7
inmates 6:15 8:12
262:6 266:3,4,6
268:13 300:17

301:6 305:4
333:11,11,17,18
innocent 7:5,7,8
insane 293:20
insert 184:15
185:3,5,8,12 186:8
205:25 206:4,21
207:11 208:18
210:16
insertion 78:23
inserts 206:23
instance 3:3 200:6
246:23
instances 7:14,16
8:1,3 106:3
120:20
instruct 293:14,16
instructed 69:16
instructing 67:21
instruction 24:12
24:20 172:15
instructions
319:24 320:6
instructs 56:4
intact 115:12
intake 299:19,22
intend 188:23
intended 53:16
61:19 130:16
187:16,19 188:20
188:22 189:25
190:10,17 198:8
303:2
intense 25:5,5,7
intensity 150:18
152:5
intensive 241:15
intent 116:23
intents 134:3
interaction 178:11

interest 11:14
328:19 329:4,5,6
329:10,15,22
330:3,7,23 331:1
331:21
interested 9:24
156:25 213:12
331:20 347:13
interesting 53:23
101:5,8 208:3
209:12
interestingly
90:22
intermittent
278:25 279:2,6
internet 58:13
interpret 136:14
176:17 239:25
interpretation
168:5 170:21
175:3,5,21 177:11
177:14,19,22
207:25 208:8
209:19 222:1
339:21 342:25
343:2
interpretations
175:4
interpreting 340:8
interquartile
233:4
interrupting 228:5
interval 269:3
intervals 337:14
intervene 48:18
intervenous 31:22
intravenously
102:3 103:20
165:2 206:8,18
207:8,20 248:14

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 378 of 418 PageID #: 8055

introduced 318:24
introducing
322:15
intubate 209:24
intubated 297:15
342:8,14
intubation 78:1,2
88:12 89:19,25
90:11,16
investigator
318:13,22 324:4
investigators
143:19 149:17
217:15
invoice 66:23
invoices 67:5,16
involve 71:25
involved 18:15
58:18 65:3 67:16
70:21 102:13
122:7 175:11
245:6 293:8
irick 154:21
158:14
irregularly 93:9
irritating 255:14
255:16
irritation 267:10
island 130:21
131:18
isoelectric 137:17
isoflurane 32:20
33:25 34:18 44:15
47:22 127:17
146:21 147:4
151:19,21 209:5
344:19,25 345:12
isp 181:16
issue 11:12 13:17
30:13 38:22 48:21
56:9 61:22 62:17

62:24 104:20
112:1 167:1
204:13 213:13
297:2
issues 35:12 70:21
106:4 107:2
177:12 204:14
333:1
iv 14:12,14 15:11
33:20 35:8,18
36:1,3,16,17 37:1
37:15,17 38:21
39:11,20 42:23
43:7 44:5,12,16,23
45:1 47:1,11,13
49:18,20 50:18
99:22 100:9
163:19 277:13,14
286:12 302:22
303:3 324:6,24
325:3
iv's 277:17,18

**j**

january 1:2 3:6
4:6 287:16,20
japanese 339:18
jaw 297:16 298:4
jeremy 4:17
job 36:13
john 296:1 326:16
johnson 157:9
158:12
joke 205:19
jones 4:24
joseph 1:1 2:4,11
3:2 4:1,8 86:20
journal 61:5
331:19
judge 330:2,4
judgment 245:8

jump 153:2
jumped 267:21
justice 71:22

**k**

k 100:11
keep 11:8 94:19
125:18 162:21
228:5 259:24
268:8 280:9
282:21 283:6
309:19,22 341:18
343:1
keeping 92:3,4
kept 91:14 285:5
342:12
kick 261:24
262:16 263:25
kicked 320:16
kidney 114:25
kill 101:3,9 113:17
113:21 116:20
118:20 119:6
186:20,22 187:21
187:24 188:15,18
189:13,17 191:15
194:6 196:14,18
198:1,25 199:2
215:3,5,6,11 216:7
killed 187:3
kills 93:20 110:7,8
187:6 189:23,25
193:24 216:9
kilogram 125:17
126:21 237:4,4
271:10 306:23,24
307:15,17 333:24
333:24 334:2
340:24 342:19,20
342:21 344:15,23
345:4,8

kilograms 102:25
307:16
kind 32:21 48:17
48:21 53:4 68:6
85:25 101:8 106:5
106:25 129:14,15
139:16 160:25
189:24 190:18
213:11 263:20
271:2 275:21
288:13 296:17
323:6 324:7,15
331:3
kinds 12:18 14:4
kinetic 264:19,22
kinetics 123:18
king 1:6 4:9,16 6:7
6:7,9
kleenex 321:6,18
knee 326:5
knew 193:15
311:8
know 5:14 7:3 8:8
8:11,13,18 9:14
10:8 11:5 12:8,24
13:5,15 14:1,2,5,8
14:10,12 15:4,12
15:14,17 16:19,23
17:5,6 18:9,10
19:4,18 20:12,16
21:2,14 22:6,10,11
22:14,17,25,25
25:9,16 27:6,7,14
28:13 30:13,19,24
31:16 32:9 33:4
34:2 35:18 36:10
36:20,21 37:13
38:10,15,19 39:6
39:13,18 40:3,14
40:22 41:8,11,12
41:12,16,25 42:17

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 379 of 418 PageID #: 8056

| | | | |
|---|---|---|---|
| 42:17 43:3,11,13 | 115:8,13,15,16,18 | 192:4,6 193:10,16 | 256:24 257:1,7,8,9 |
| 43:20 44:9,10,18 | 115:20 116:6,6,7 | 193:17 194:5,6,7,7 | 257:10,22 258:5,8 |
| 44:20,22 45:16 | 116:10,17,19,20 | 194:17 195:15,15 | 258:9,24 259:5,6,7 |
| 46:2,5,9 47:21,22 | 116:24 117:5,6,9 | 196:8,11,13,15,15 | 259:14,21 260:5,9 |
| 48:4,18,20 49:9 | 118:24 119:1,2,4 | 197:5 199:12,15 | 260:12,25 261:4,7 |
| 50:8 51:10 53:7 | 122:16,17 124:13 | 202:23 203:4,19 | 261:18 263:11,14 |
| 53:14,15,15,17,19 | 124:22 125:13 | 204:1,6,7,13,13,15 | 263:15,18,20 |
| 55:8,11,13 56:7,14 | 126:1,13,15 | 205:10,12,14 | 264:5,7 265:4,8,9 |
| 57:15,18 58:13 | 128:12,18,20,21 | 208:11,24 209:1,7 | 266:1,8,12 267:2,4 |
| 59:2,7,22 61:13,19 | 129:11,12 130:12 | 210:14,23,24 | 267:10,11 269:14 |
| 61:22,23,24 62:2,9 | 130:21 131:4,16 | 211:1,13,16,17,18 | 269:19,23 270:16 |
| 62:18,18,20,21 | 131:18,21,22 | 211:23 214:25 | 270:25 271:18,21 |
| 63:15 65:25 66:9 | 132:6,8,19 135:17 | 215:2,4,17,19 | 271:25 272:21,22 |
| 67:4,10 68:3,3,20 | 135:18,20 136:8 | 216:11,14,25 | 273:6,7,16,21 |
| 68:23,24,25 69:2,3 | 136:14,16 137:20 | 217:4 221:16,17 | 274:8 275:8,21 |
| 69:23,25 70:2,2,4 | 138:15 140:22 | 221:19,25 222:16 | 276:12 277:1,6,14 |
| 70:4,20,20,22 71:4 | 143:17,18 144:23 | 222:21 223:23 | 277:15,23 278:8,9 |
| 71:19,24 72:1,3,5 | 146:14 148:11 | 225:10 226:13 | 278:22,25 279:21 |
| 72:7,23 75:13 | 151:7,12 153:5,9 | 227:11,18 228:1 | 279:22 280:1,2 |
| 76:13,17 77:12,13 | 153:11 155:23 | 231:17,21 233:15 | 282:3 283:18 |
| 78:15,25 79:4,19 | 156:2,10,12 157:5 | 233:23 234:16,16 | 284:12,12 285:23 |
| 79:20,23 80:1,5 | 159:1,2,5,18 | 234:17 235:2 | 286:17,19 287:2,2 |
| 82:2,7 83:5 85:3,6 | 161:10,11 162:6 | 236:24 237:6,16 | 287:2,18 288:5,9 |
| 88:14,16,21 89:12 | 162:11 163:13,20 | 237:21,25 239:5 | 288:13,18,20 |
| 89:12 90:8,19,24 | 164:1,16,19,22,24 | 239:14,20,25 | 290:5,6,11,13,17 |
| 91:6,18 92:13,16 | 165:10,13,16 | 240:1 241:1,11,13 | 290:18,22 291:12 |
| 92:19,22 94:7,12 | 167:12 168:12 | 241:15,20,21 | 291:15,19,23,24 |
| 94:16,18,19 96:21 | 169:6,11,12,16,17 | 242:19,19,20,21 | 292:4,10 293:3,4,4 |
| 97:10 98:9,22 | 170:7 171:13 | 242:24,25 243:2,7 | 293:8,19,23,24,25 |
| 99:25,25 101:3,6,6 | 172:14,14 173:4 | 243:12,16,21,22 | 294:2,4,6,6,9,14 |
| 101:8,8,15 103:12 | 174:8,13,17,21 | 243:23,23 244:2,5 | 294:15,19,21 |
| 104:6,7,9,20,21 | 175:9,13 176:15 | 244:6,7,8,9 245:10 | 295:3,4,5,8,15,18 |
| 105:1,3,17 106:2 | 178:1 179:7,10,11 | 245:10,11,16 | 295:18,20,24,25 |
| 107:3,16,17,19 | 179:14,15 180:8 | 246:10 248:8,12 | 295:25 296:1,2,7 |
| 108:7,22 109:13 | 181:24 182:8,17 | 248:18,23 249:2,3 | 296:11,17 297:1 |
| 109:21,25 110:12 | 182:18,22,24,25 | 249:6,8,8,17,17,21 | 297:10 299:6,12 |
| 110:14,17 111:11 | 183:2,8,10,12,18 | 249:22 250:3,7,19 | 300:1,4,5,10,17,19 |
| 111:21,23,24,24 | 184:6 186:13,16 | 250:23,24,25 | 300:21 301:4,8,9 |
| 111:25 112:24 | 186:21,21 188:12 | 251:1,4 252:3,12 | 301:19 302:11,13 |
| 113:7,23 114:12 | 188:23 189:23,24 | 253:15,24,25 | 302:16,19,23 |
| 114:13,14 115:6,7 | 190:16 191:10 | 254:19,20 255:19 | 303:8 305:19,23 |

306:4,5 307:8,9,12
309:14 311:5,9,20
311:22,24 317:9
317:13,20,21
318:7,16,17,18,24
319:2,5 320:11,13
321:11,23 322:1,3
322:11,13,14,25
323:7,18 324:4,5,7
324:16,17,24
325:7,24 326:21
327:1,2,7,8,9,11
327:12,17,19
328:2,4,16,18,19
328:20,21 329:8,9
329:11,17,18,19
329:21,24 330:2
330:16 331:2,4,6,9
331:24 332:9,12
332:19,20,20,23
333:10,11,12,16
333:16,18 334:7
335:14,24 337:25
338:6,10 339:18
339:20 340:17
341:1,11,12,21
342:7,10,25,25
343:3,8 345:1,15
**knowing** 183:7
238:25 244:2
258:5 279:22
**knowledge** 12:16
24:16 37:15 59:23
64:24 156:17
186:13 208:17
217:8 225:3
270:10 347:9
**known** 163:18
184:13 198:24,24
216:22,23,24
217:4,5,7,9 283:1

297:20 312:12
**knows** 24:1
**knox** 3:7 347:3
**kudos** 271:18
**kuizenga** 2:20
217:18,21 218:1
218:21 219:4
**kursman** 1:14 2:5
2:7 4:15,15 5:16
6:1,4 10:17,23
11:22 12:3,8
13:19 24:3 37:11
53:5 56:21 64:8
67:19 73:2,8,11,24
82:12,17 86:16,22
96:25 138:24
140:17 141:3,9,13
141:17,23 147:9
154:4,11 159:25
160:5 162:24
165:20 167:14
192:8,15,19 194:9
194:14 201:20
203:7 213:25
217:24 224:10
225:22 228:8
229:4 251:11,14
252:6,10,14 253:6
267:14,23,25
268:4 269:17,25
271:18 272:6,7
280:5,18 281:2,9
281:14 282:5,11
283:3,8,21 289:14
289:18 307:25
308:9,21 309:17
310:1,11 312:4
313:10 314:16
315:15 316:6,10
316:15 328:10
336:8 343:11,17

344:1 345:17,24
346:5,9,12

**l**

**l** 3:1 32:19,20,20
100:11 133:10,10
133:12
**label** 193:8
**labeled** 43:16
211:7
**lack** 34:21 41:4
74:16 140:11,11
203:12 231:19
242:14
**lacks** 203:19
**lactated** 99:23
**ladies** 205:21
**lag** 237:9
**language** 207:7
**large** 45:24 46:21
46:21,22 125:15
172:24 186:14
317:7 337:23
**larger** 84:5 171:13
185:23 274:11
285:14
**lasts** 128:2
**late** 312:16,16,21
314:12 343:7
**law** 319:3
**lay** 18:8,11,24
19:11,16,18 20:1
20:13,15 22:4
23:17 35:16 61:20
295:11,16
**layman's** 340:22
**lcr** 347:4,16,24
**ld50** 215:22
216:13
**lead** 150:20 152:6
279:10

**leading** 216:15
**leads** 294:19
**leap** 155:25 156:1
**learn** 27:15 297:5
**learned** 309:2
311:4,5,20
**learning** 27:16
**leave** 13:2,6 52:16
53:23 171:15
182:9 238:2
**leaving** 97:14
202:24 253:18
316:11
**lecture** 19:4
**left** 115:11 160:12
169:2 175:24
200:24 252:2
253:18 267:24
268:1 286:12
317:10 325:5,25
342:9
**leg** 325:20
**legal** 9:7,9 70:23
330:1
**legend** 223:19
**legitimate** 174:12
174:14
**legs** 261:25 262:17
263:25 325:25
326:4,7,12
**length** 21:14
**lengthens** 127:1,6
**lengths** 313:3
**lesser** 168:1
**lethal** 6:16,20 8:5
9:3,22 12:11
14:11,13,18,20,21
14:23,25 15:8,20
16:3,11 22:8
23:10 66:16 67:25
69:21 99:11

Page 33

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 381 of 418 PageID #: 8058

101:20 128:17
155:7 157:15
183:3 187:1
191:11 193:25
215:22,22,25
248:1 251:3 254:8
254:17 305:4
322:9 330:10
333:8
**level** 26:2,13 28:13
29:12 30:1 31:25
32:9 35:1,2,23,24
36:10,19 37:6
38:3 39:1 40:4,25
41:1 44:8 47:22
48:20 49:9,17
50:17 51:20 54:19
55:9 75:25 76:22
79:17 83:10 95:13
98:10 101:21
102:2,3 108:19,20
120:17 124:10
126:5,15,18,21
127:5,7,10 129:25
138:4 142:13
145:14,19 151:3,8
163:20 164:8
176:7 200:14,14
216:11 234:1
235:25 236:1,3
237:10 238:9,11
238:14 239:4,14
242:5,15 246:21
248:18 250:2,9,10
258:25 261:21,22
262:9,9,14 270:17
270:18 273:1,5,15
273:23 274:7
284:15 304:9,17
304:18,20,25
305:7 306:4,7,14

340:11 342:13
**levels** 24:12,21
25:8,22 26:1,20,22
27:19,21 35:4
36:6,7 39:20,22
40:19 48:2 50:8
54:22 75:5 92:25
93:2 101:13
123:23 126:4,9
127:16,18 145:23
150:22 151:11
152:9,21 153:7,7
164:8 188:15,17
199:9 201:7 204:6
230:9 231:4,10
264:15 272:2
273:11 334:20
340:11
**license** 130:15
**licensed** 347:4,15
347:16
**licking** 251:12
253:16
**lid** 224:20
**lie** 295:17 299:6
**life** 11:13 19:1
20:7,20 21:19
61:12,14 89:5,9
300:21
**lift** 94:18,20 298:4
**light** 151:6,8
324:14 341:20,22
**lighten** 28:14
**lighter** 261:22
262:9
**lightly** 29:9
**likes** 294:11
**likewise** 115:24
329:25
**limit** 343:9,11

**limitation** 253:5
**limitations** 175:15
175:16 228:2,4
337:10
**limited** 176:5
177:25 310:16
**line** 83:6 85:2,2,3
85:5,6,7,7,9,10,12
85:13,15,16,17,19
85:20,23 86:2,3,7
86:7,9,10 111:23
130:19 131:14
136:22 137:21
168:25 169:3,5,7
169:15,17,21,21
169:23,25 170:3,5
170:8 171:14,17
172:10 173:3
290:2 343:22
**linear** 84:20,21,25
85:1,9,13,15,19,22
86:10 166:5,11,20
167:2 168:4 169:5
169:17,23,25
170:17 171:14
172:5,5,10 173:14
173:16,25
**lines** 223:15
**lips** 277:20
**list** 202:24
**listened** 277:25
**listening** 219:13
**liter** 101:25 195:8
198:6
**literature** 136:6
161:1 200:13
341:9
**litigation** 274:20
**little** 16:6 27:13
31:3 40:21 47:11
61:7 66:12,20

68:7 84:4 96:16
96:17 104:18
105:11,24 107:1
111:11 113:25
122:25 124:1,2,21
153:1 169:18
176:2 180:2,12
189:22 191:12
195:14 205:20
206:17 212:3
215:8 220:25
233:20 268:8
276:8 277:20
279:2 290:6 321:9
331:8,9 336:5
**liver** 193:23
**living** 69:2,9
**loaner** 12:6
**located** 317:9
**locked** 97:11
**long** 23:7 34:12
46:1 59:9 61:17
80:12,14 91:24
92:8,9 103:25
106:14 107:14
109:18 110:5,8
115:16,25 125:19
125:22 128:7,16
128:22,24 130:11
130:15 131:6,7
146:5 268:18
269:5 283:1
342:13 343:9
**longer** 17:15,16,17
91:15,17,21 92:2
93:13 95:5 98:16
112:14 126:2,9,18
128:2 163:23
242:9 264:17
266:6 268:8
274:12,13

Page 34

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 382 of 418 PageID #: 8059

**look** 8:19 9:25
23:13 24:8 28:7,9
29:2,13,20 31:23
36:5 38:19,22
43:12,20 49:3
51:5,7,8 55:10,10
60:17 62:19 65:11
68:4 72:22 73:7
73:15 74:5,23
77:21 79:23 85:4
86:2 90:8 92:14
94:11 103:16
141:8 143:20
146:20 147:7,20
154:3,9,10,12
155:22 159:8
161:1 166:21
167:4 168:15,20
168:23,24 169:13
169:22 170:1,4,10
172:19 175:12
180:4,4,5 190:2
193:11 194:20
197:1,16 206:3
207:4 208:18
211:18 212:13
213:21 214:17,17
222:17,18 223:10
225:9,11 227:21
227:24 231:12
233:6 235:3,18
236:18,24 237:19
239:10 242:2
257:1 260:2,7,8,10
260:12,20 262:7
271:22,22,24
282:15 283:13,19
285:18 290:11
300:12 304:14,14
305:23 306:3,10
317:5 320:15

326:1 333:12
336:6 337:4
340:16
**looked** 20:19 22:9
41:13 42:6 47:14
60:7,10,15,16,19
60:21 63:2,3 66:6
66:8 98:2 149:8
204:24 236:4,9
269:18 276:9
277:19 278:2
310:23,25 313:4
321:8
**looking** 25:10
28:17 29:5 30:7
31:8 50:12,14
51:18 61:9,13
62:7 72:23 75:1
78:20 86:4 104:23
136:9,11,19 138:2
141:10 150:4
153:22 164:8
168:21 169:5
193:21 211:16
223:2 224:23
232:16,20 259:25
271:25 272:1
273:6 274:10
276:18 278:3
285:2,23 306:15
317:21 318:1
324:17 325:25
330:21 332:12,17
335:1,2
**looks** 4:22 27:25
53:1 168:12,16
169:1 219:10
222:19 343:8
**los** 291:7
**lose** 130:15 162:22

**loss** 218:18,23,24
219:2,3 223:20,21
223:25 224:20
229:20
**lost** 108:5 118:2
223:17 339:20
**lot** 15:25 24:11
25:7,12 26:17
27:8 29:18 30:15
30:22 31:9 35:14
47:6,7 50:21
53:18 55:13 57:23
65:23 70:17,20
79:4 93:22 102:13
102:22 108:19
113:24 123:25
146:25 149:17,17
172:16,21,25,25
175:11 179:20
238:20 240:3
249:21 269:24,25
269:25 274:11,15
275:15 284:18
285:5 286:15,16
295:20 296:4
312:11
**loud** 277:4,9
**low** 28:14 32:24
44:6 88:16 98:9
100:3,6,12 123:19
123:19 136:21,24
136:24 186:19
188:12 189:8
204:4 239:17
250:9 255:13,13
334:20 337:15
338:3,6,11 339:16
**lower** 29:7 78:25
88:21 93:2,2
138:22 169:18
178:10 188:15,17

232:2,23 233:1
273:4,8
**lowering** 88:17
**lowest** 40:25 41:1
233:7,9 234:6
339:24
**lucky** 69:5
**lump** 45:15
**lunch** 97:4
**lungs** 34:20 35:1,6
102:8 109:11
**lynn** 1:6 4:8

**m**

**m** 33:19 100:11
134:20
**m.b.a.** 2:11 86:20
**m.d.** 1:1 2:4,11 3:3
4:1 86:20
**ma'am** 5:23
**mac** 135:9,18
167:22,25 168:12
178:9
**machine** 3:10
51:17 238:4 240:7
240:9
**machines** 27:21
240:15,16,17,24
241:12,16 242:12
242:17,21
**mad** 132:12,15
**mail** 72:15,17
141:16 160:3
310:24 346:1
**mailed** 303:24
**mails** 303:20,21
304:3
**main** 30:19,20
72:1 87:7
**maintain** 46:16
151:3 222:15
297:7 298:18

Page 35

**maintaining**
278:17
**maintenance**
124:18 150:22
152:8 153:6,6
212:15,20,25
**major** 4:18 160:17
**majority** 26:11
118:9 136:13
**making** 10:23
11:22 38:20 123:1
123:3 129:17
155:24 318:1
320:10 328:20
**mallory** 4:25
**malpractice** 15:18
**man** 318:24
**manage** 35:11
**management**
47:25
**manipulations**
226:20
**manner** 166:6,11
166:20 168:4
**marcia** 159:12
**mark** 86:17 147:9
165:20 167:14
192:8 194:10
203:7 213:25
217:24 228:8
281:18 336:8
**marked** 86:20,24
147:12 165:23
167:17 178:8
192:11 194:13
203:9 214:3 218:2
225:25 228:11
229:6 336:11
**martin** 194:22
**mask** 244:15
297:17

**masks** 292:11
**massive** 179:11
**material** 24:20
25:7 66:16,24
114:17 193:11
**materials** 22:9
62:25 159:23
**math** 70:1 107:8
166:12 271:13
273:13
**matter** 14:11
36:17 38:1 50:15
174:15 177:7
**max** 236:20,22
**maximal** 127:22
**maximum** 100:18
236:23 334:14,23
335:21 339:8
340:2
**mcallister** 275:7
**mean** 8:12 15:19
15:21 18:22 19:2
21:9 27:2,2,12
29:25 30:2 32:1
45:25 46:3 54:7
55:6 56:7 57:13
58:25 63:9,19
64:20 65:8 67:16
67:22 68:17 74:3
74:11 75:5 76:25
84:21,25 87:21,24
90:1,10 92:15
94:4 96:10 102:14
103:15 104:6
105:2,9 110:19
115:17 117:8
121:4 125:21,24
129:7 132:16,22
136:3 138:9
150:24 158:25
159:1 161:11

162:19,20 168:3
170:25 173:12
176:13 181:4
182:17,23 183:24
186:12 187:1
188:22 190:20
191:13 193:19
196:1,4 199:20
203:4 204:22
205:6,7 207:9
215:6,7,20 216:5
221:24 226:4
227:1 230:8,9,16
231:4,5 233:15
234:5,15 235:13
235:15,25 236:1,2
240:16,18 245:14
247:23 249:16,19
253:15 256:23,24
259:4 260:24
261:14 262:25
264:1,1 284:13
286:15 287:4,15
292:9 293:3 298:3
298:11 300:24
316:21 326:24
331:10,14 332:11
333:15 339:23
**meaning** 51:8,9
63:8 96:3 111:6
120:11 151:19
174:7 188:18
240:9 246:22
262:16
**means** 18:19 55:17
74:14 85:19 93:1
100:12 125:23
145:9 150:25
207:9,22 216:6
221:11 231:18
243:8 256:25

325:1 332:9
341:11
**meant** 5:5 64:14
90:16 321:17
**measure** 15:5
54:10,14,15
137:20 149:18
223:3 234:20
237:9
**measured** 40:23
41:6,17,19 53:7
156:3 159:3 235:8
236:21
**measurement**
52:22 156:13
**measuring** 40:4
54:11 222:23,24
237:15
**meat** 15:14
**mechanism** 98:8
98:18 187:5,23
188:19 231:12
**mechanisms** 43:12
239:24
**media** 4:6
**medians** 233:4
**medical** 9:7,8,9
15:18 18:6,7,15
19:8,14 23:17,20
24:9 114:19
215:14 216:5,16
258:10 260:6,19
260:22 344:11
**medication** 56:11
56:12,18,24 57:2,7
134:13
**medications** 57:4
97:25 98:4
**medicine** 19:10
25:24 26:18 29:1
61:5 88:8 123:25

Page 36

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 384 of 418 PageID #: 8061

| | | | |
|---|---|---|---|
| **medicines** 98:3 | 43:17,19,23 44:2,3 | 190:4,7,11,13,13 | 269:15,22 270:2 |
| **meet** 20:17 | 45:19,21,24 46:3,5 | 190:24 191:5,8,13 | 270:11,12,15,16 |
| **meeting** 185:18 | 46:8,16,23 49:25 | 191:21 192:1,6,10 | 271:4,5,23 272:1 |
| **meetings** 59:9,17 | 50:1,4,5,11,19 | 193:14,16 194:2,6 | 273:12 274:3 |
| 59:25 | 106:13,19 107:10 | 195:4,20,20 196:3 | 275:12 277:16 |
| **member** 130:22 | 107:22 108:15 | 196:9,18 197:23 | 285:12 296:8 |
| **memory** 14:2 | 111:2,14 119:11 | 198:18 199:7,18 | 300:24 301:2,15 |
| 32:11 39:3 40:19 | 119:12,22,24 | 199:21,23 200:23 | 302:18 304:8,16 |
| 57:10 131:9 | 120:2,6,7 121:1,14 | 201:1 202:7,21 | 304:18 306:6,20 |
| 138:19 243:12,20 | 121:17 122:12,21 | 203:3 204:5,17,19 | 306:23 307:15 |
| **mental** 273:13 | 123:1,3,5,6,12,17 | 204:20,23 205:25 | 326:20 334:15,23 |
| **mention** 5:6 293:5 | 123:18,25 124:5 | 207:17,22 208:1,6 | 335:21 339:8 |
| 311:7 319:19 | 124:24 125:6,13 | 208:11 209:1,16 | 340:2 342:4,12 |
| **mentioned** 30:9 | 126:6,12 127:10 | 209:23 210:9,13 | 344:14 345:4,9 |
| 35:21 37:1,3,3 | 127:20,25 128:7 | 210:17,22 211:10 | **middle** 1:5 4:10 |
| 90:23 98:12 110:3 | 128:23 129:22 | 211:14,22,23 | 5:8 6:7 142:7 |
| 125:16 183:15 | 130:4,10,14 131:6 | 212:15 213:10,14 | 170:1 223:14 |
| 184:7 269:17 | 131:20 140:1,4,12 | 213:20 214:9,14 | **midnight** 341:24 |
| 270:5 290:22,24 | 142:9 145:1,10,14 | 216:3 217:7,9,13 | 341:25 |
| 291:11 299:18,18 | 145:20 146:6 | 219:23 220:6,11 | **migraines** 57:3 |
| **message** 122:15,15 | 148:15,18,23 | 220:20 221:15,16 | **mild** 76:4,8 142:21 |
| 193:4 | 149:22 150:2,5,12 | 221:22 222:2,14 | 143:2,4 144:16,19 |
| **metabolite** 160:17 | 153:4,20 155:12 | 222:20 223:6,15 | 148:7 229:11 |
| **method** 189:18 | 156:20 157:2,5,20 | 224:3 225:12,16 | **mildly** 312:17 |
| **methodologies** | 158:21,22 160:23 | 225:19 226:23 | **mill** 271:14 |
| 90:20 | 161:2,6,7 163:15 | 227:1,4,7,14,17,22 | **miller** 4:17 205:5 |
| **methodology** | 163:18,19 164:4 | 227:24 228:1 | **miller's** 204:25 |
| 236:25 340:16,18 | 164:10,14,22 | 230:12,16,24 | **milliequivalents** |
| **methods** 222:17 | 166:3,5,7,20 | 231:5,6,15 232:11 | 78:6,17 79:6 |
| **metocurine** 197:3 | 167:23,25 168:3 | 232:14,17 233:2,5 | 81:18 100:21 |
| 197:5,7,8 | 172:21 174:7 | 233:8,17 234:2 | 101:25 102:1,18 |
| **mg** 145:1 | 176:3,7,9,14,21 | 235:14 236:1 | 103:15 104:1,16 |
| **mic** 275:18 277:2 | 177:1,7,17 178:8 | 237:3,8,22 244:22 | 106:13,15 118:13 |
| 277:10 | 178:12,14,24 | 244:23 245:22,23 | **milligram** 97:18 |
| **mice** 226:8,11 | 179:3,8,16,25 | 247:16,19,20 | 98:25 106:12 |
| 228:3 | 180:5 181:25 | 248:2,9 249:4 | 160:19 161:6,7 |
| **midazolam** 2:16 | 182:15 185:6,9,14 | 250:6,13,17 | 254:23 264:11,19 |
| 9:13 16:25 36:4 | 185:25 186:17,20 | 254:18,23 263:2 | 271:10 |
| 38:9 40:9,12,22 | 186:21,24 187:2,3 | 263:13 264:9,12 | **milligrams** 91:8 |
| 41:9,20,24 42:4,6 | 187:17 188:5 | 264:16 265:6 | 91:18,19,24 92:8 |
| 42:7,12,16,25 | 189:12,13,23 | 268:14 269:6,10 | 92:11 107:10 |

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 385 of 418 PageID #: 8062

108:14 111:2,14
124:8,9 125:17
126:21 128:6
129:22 130:4,9,14
184:12 191:25
192:1,4,4 195:8,19
195:20 198:6
204:19 237:3,5,5
250:5 254:18
270:12,16 271:5
272:13 296:8
301:15 304:18,20
307:15,16 333:23
333:24 334:3,3
338:5 340:23
342:18,20,20
344:15,23 345:4,8
**milliliter** 39:25
40:9,13 42:15
43:21 142:11
143:8 145:14
147:21 153:19
155:16,19 157:21
158:4,13,15,23
166:3,6,8 167:24
230:9,13,17 231:7
233:16,17 235:14
236:2 270:2,6
304:9
**milliter** 34:7
**mind** 75:7 82:14
104:21 131:13
280:17 290:2,6
300:14
**mind's** 295:23
**mine** 258:13
**minimal** 121:2
128:1 136:5
**minimum** 20:22
126:15,18 135:10

**minor** 207:2 297:1
**minority** 114:11
**minus** 233:4
**minute** 42:9 61:25
62:1,6 92:17,21
95:5,7 96:3,19,20
97:8 105:16 107:9
107:10,12,16,17
107:19,21,23,24
108:1 111:14
119:1,2 193:14
195:23 197:10,20
246:20 251:10,15
273:3,5 275:19
281:18 304:6
306:7 309:25
337:14 338:5
**minutes** 62:10
93:17,21 105:25
107:11,14,18,18
107:24 108:5
110:13,15,21,22
112:16 115:7,7
123:22 124:22,22
125:10,12 193:1
233:8 252:2
267:23 268:2
272:24,25 275:20
275:25,25 276:1
277:21 280:17
308:1,23 309:19
310:9,13,24
311:14,15,17
313:9 320:4
335:20 337:25
338:1,2,8 342:10
345:18
**miranda** 4:24
**miserably** 110:17
**misgivings** 7:24

**missed** 62:6
285:24 286:14
325:17
**missing** 318:21
**mississippi** 9:23
**misspeak** 21:21
**misspoken** 272:16
**missy** 3:6,9 347:4
347:24
**mistake** 305:22
**misunderstanding**
263:23 295:14
**mitchell** 4:24
58:15 59:19
**mitigated** 235:10
**mix** 123:10
**mixed** 61:8
**mixing** 166:25
**mixup** 321:9
**miyake** 2:24
306:17,19 307:13
313:22 316:17
333:20,23 334:16
334:17,22 335:6,7
335:8,11,11
336:10 339:6
342:1
**ml** 145:1,21
**moaa** 229:8,21
235:11
**moan** 261:17
**model** 102:23
**moderate** 121:2
**molecules** 35:6
**moment** 5:6 73:15
83:1 92:3 93:11
101:24 118:16
180:19 219:8
223:19 224:9
243:17 249:12
266:2 272:20,23

337:16
**momentarily**
102:9
**momentary**
286:10 299:23
**moments** 164:20
300:21
**monday** 311:3,6
312:12
**money** 66:21 69:1
70:15 332:10
**monitor** 28:2,4,22
29:1,1 30:21,22
31:1,3,13 33:25
34:1 38:2 51:5,7
51:11,12,13,15,15
51:17,20,23 52:1
52:12,20,22,23
53:16 54:3,5,14
55:1 62:3 136:16
195:22,24 238:9
238:25 239:3
241:6 245:21
247:14,25 265:1
284:24
**monitored** 238:4
240:15
**monitoring** 27:21
29:12 30:15 48:25
52:8 195:24 235:8
238:14,18 239:23
240:7 250:2
**monitors** 28:2,21
52:3,8 240:22
**months** 9:20
**morbidities** 93:18
93:23
**morgue** 268:24
**morning** 4:4 6:2,3
98:1

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 386 of 418 PageID #: 8063

morphine 204:2
motion 276:10
297:11
mouse 179:3
mouth 90:5 132:3
134:6,14 259:12
259:14,15,18
263:25 276:22
movant 239:13
move 94:7 99:10
184:9 217:10
276:22 291:8
295:20
moved 257:16
321:21
movement 29:20
30:10 35:6 248:15
249:6,10,16,20,25
257:19 261:1,2,3,4
261:6,6 262:3,8
276:16,19
movements 235:9
242:2 257:9,11
moves 220:12
257:4
moving 35:14
132:16 179:20
249:23 261:21
262:14 276:23
multiple 217:14
multiply 304:19
muscle 29:20 87:8
88:13 89:25
109:13 133:18
134:17,23 197:8
198:9,10 202:14
209:24
muscles 87:6 94:8
96:14,17 99:8
276:11 278:21
297:12 298:17

**n**

n 2:1 3:1 32:19,20
32:20 61:2,2
133:10,10,12
134:20,20 233:5
nagging 294:2
naive 164:10
name 4:15,21 5:22
5:23 6:4 9:14 10:4
49:20 60:23,25
75:20,23 234:17
259:16 260:10
261:13 276:4
318:17,17 319:6
347:17
named 35:25,25
38:3,4 49:21,21,24
nanogram 39:25
40:4,9,12
nanograms 34:7
42:14 43:21
142:11 143:7
145:14,21 147:21
153:18 155:15,19
157:21 158:3,13
158:14,23 160:19
161:6,7 166:3,6,7
167:24 230:9,13
230:17 231:6
233:16,17 235:14
236:1 270:1,1,5
271:14 304:9
narrow 39:4
nashville 1:5,25
4:11
nature 30:25 61:5
71:16 176:10,22
177:19 178:14
256:17 276:18
nauseam 340:17

near 95:4 123:9
307:24 326:5
nearly 109:3 134:9
203:21,23
necessarily 18:3
19:7 28:5 30:3
32:12 39:12
156:14 161:20
162:14 175:12
181:4 190:1
237:10 257:6
309:9 329:20
necessary 20:5
53:21 163:10
neck 115:2 276:11
278:1,21 285:3
297:12
need 19:7 20:23
30:1 43:12 52:22
53:12 55:14,18
69:4 73:6 77:23
77:24 78:2,3,4
88:18 93:4 102:2
105:11 125:15
126:16 131:18
141:7 148:20
154:8 159:24
192:14 253:4
279:19 289:12
293:19 304:14
307:7 309:18
313:7 314:9,14
332:10,10,11
337:4 346:7
needed 115:9
125:5 130:22
275:9
needs 73:9 129:20
268:1
negate 180:25
181:13 211:4

neither 314:25
nelson 4:18
neostigmine
134:20,20,23
135:2
nerve 81:5,12 82:3
87:7,8
nerves 80:10 81:8
82:3
nervous 30:25
176:4
neurologic 115:12
neuromuscular
30:23 183:1,4
never 12:17 41:18
46:3,15 64:24
88:8,8,9 100:1
103:8 108:11,11
108:11 122:11,25
204:17,19 214:23
214:23,24 328:25
332:24,25
new 61:4 157:8
311:19
news 285:19
292:15,20 327:10
ng 78:24
nice 52:19,21
146:3
nickname 318:18
night 290:16,17
nilly 186:24
nishikawa 2:22
226:2,2,4,5 228:10
nitty 171:20
non 186:2 249:25
nonlinear 170:24
nonresponsiven...
224:24
normal 66:10
93:20,25 99:19

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 387 of 418 PageID #: 8064

133:20 136:12
**normally**  100:4
209:7 251:7
253:19 288:12
**norman**  58:10
60:7,14 63:5
186:24 242:20
244:8 266:3
**notary**  3:7
**note**  284:25
329:15,16
**noted**  150:18
152:5 199:1
**notes**  280:21,24
281:3,5,15 283:22
284:1,18,20 285:5
286:16
**nothing's**  295:18
**notice**  3:16 5:9
115:9 139:12
252:20 281:17
312:8
**notified**  309:6
**notwithstanding**
93:11
**nowadays**  189:1
**noxious**  77:8,9,12
77:14,17 83:17
89:13,17 128:4
129:6 140:7
144:13,15 145:11
146:15,16 151:20
153:19 158:7
246:20 247:2
248:14 250:5
254:10 260:13,14
262:5 301:5,5,9,14
301:17,18,20,21
302:1 344:16
**number**  2:10 4:6
4:11 37:25 41:15

52:24,25 53:2,13
55:7 79:12 105:19
109:21 114:13
117:6 136:17
137:23 148:23
154:23 175:25
176:5 178:24
179:22,24,24
186:14 204:7
223:16,22 231:20
233:21,23 234:24
235:1,18 236:19
236:25 237:25
268:20 271:7,11
271:20,24 272:3,7
272:11,12 273:17
304:12,14 305:11
325:16 330:16
338:20 347:16
**numbers**  8:14
68:5 80:4 114:10
217:3
**numerical**  26:6
**nurse**  24:18 25:4
27:20,23 49:3
**nurses**  23:21
24:11,17,22,23,25
25:2
**nursing**  26:19
260:20,22

**o**

**o**  3:1 32:19,20
100:11 133:10,10
133:13 134:20
**o's**  133:11
**oath**  55:15 118:5
282:8,15 283:14
**obese**  108:17
**object**  11:18 13:12
56:15 64:3 67:11
119:15 246:1

248:6 250:21
258:4 280:6
289:24
**objected**  24:4
**objecting**  67:20
280:15 281:14
**objection**  5:17
10:13,24 11:7,23
12:15 13:20 23:25
24:7 26:25 37:8
42:19 43:24 50:2
56:8 69:15 79:9
113:14,15 117:25
156:22 157:4
162:17,20 164:18
166:23 172:11
173:9 181:8
182:11 188:16
208:14 209:18
210:10 211:12,25
212:10 245:1
260:3 262:19
264:14 265:2,23
267:1 293:13
303:15 340:6
**objections**  3:12
162:25 280:16
**objective**  74:24
75:15
**objects**  56:4
**oblate**  77:22
**obligated**  71:22
**obligation**  310:20
311:23 313:2
**obscured**  326:6
**observation**
275:14 317:5,7
**observations**
147:14 327:17
**observe**  275:10
285:18 295:9

297:6 322:17
324:11,16 327:19
327:21
**observed**  275:2,4
275:6,11 286:3
299:23 324:2
325:2 327:20,22
329:14 330:6
**observer**  243:9
**observing**  328:21
**obstruct**  319:13
**obstructed**  108:15
188:6 319:15
**obstruction**
187:10,12,14
188:3,8 190:15
276:13,14 277:7,9
278:12,22 297:13
298:8,12
**obtained**  199:11
**obvious**  102:14
104:9 250:15
328:18
**obviously**  8:16
15:5 27:2,17
33:14 38:8 50:14
57:14 68:4 70:1
85:1 98:19 101:2
172:15 181:22
182:3,25 188:22
191:12,14,15
198:19,22 199:12
222:18 240:22
247:9 251:2
254:21 259:13
285:9 292:12
326:9
**occluded**  298:20
**occupied**  323:11
**occur**  30:21 94:23
94:25 104:20

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 388 of 418 PageID #: 8065

110:18 119:10
257:7 264:18
279:4 295:21
**occurred** 22:13,13
57:14 123:8
268:23 276:16
285:7,7,15 286:6,7
295:23 302:24
323:20
**occurring** 33:7
44:25 98:10 178:1
221:12,13 241:5
259:10 261:20
284:16 285:17
294:9
**occurs** 92:24
137:13 177:12
254:22 257:19
273:3,5 296:14
299:11,20 301:6
**offer** 27:3 88:5
194:20
**offering** 71:23
**offhand** 283:18
**office** 1:14,23,24
4:19 5:11 6:5
65:16 72:16 193:3
288:2,25 309:6
322:22 323:19
**oh** 8:16 12:10
15:22 27:6 73:14
84:6 90:15 92:1
98:2 105:1 121:15
129:10 130:13
141:3 148:12
162:3 168:16
185:21 186:25
195:24 197:15
228:7 229:22
247:5 249:22
261:7 263:18

296:10 299:22
316:23 318:23
319:1 328:13
336:3
**ohio** 8:8,9,10
**okay** 5:1,8,14 12:9
12:10 15:12,22
21:7 22:15 24:6
30:4 31:12 37:12
39:1 41:15 45:1,5
45:18 46:19 49:7
49:12,19 51:4
56:10,22,23 57:10
57:22 58:7 62:1,7
72:15,20 73:5,10
73:15,21,24 74:4,9
77:4,17 81:21
82:17 84:2 85:18
86:13,13 91:1
92:6 95:15 96:8
97:13,13,21 98:6,8
98:23 99:10
106:19 107:8
110:25 120:5
122:22 126:25
127:4 131:3,15
133:14 135:21
136:9 137:11
139:25 141:23
142:5,13 144:4,9
146:7,12,20,25
147:20 149:2,12
149:20 150:15
152:1,4 153:14
154:19 155:1
158:20 159:8
161:14 165:17
167:11,18 168:15
170:15 173:20
174:5,14 175:23
178:4,22 184:10

185:13,24 192:15
193:7,13 194:9
195:3,13 199:23
201:1,10,15
205:16,18,21
206:3 212:13
214:5 217:12
219:16,17 222:12
226:6,17 228:7,20
228:24 229:17,17
230:1,23 231:4
232:6,7,9 233:3,15
235:6,13,17,22,23
236:6,14 240:19
246:6 247:12
248:4 251:16
252:6,14 253:6,14
253:15,17 255:18
257:3 259:11
268:7,10,17 269:4
269:24 270:4,9
272:4,9,15 273:19
274:14 281:9
283:3,21 285:16
286:1,20 289:2
291:16,20 294:17
302:19 309:21
310:8,14 311:13
311:15 312:23
316:3,10,15,25
322:18 328:13
333:20 335:11,17
335:24 336:24
337:7,17 339:3
341:8 344:11,22
**oklahoma** 16:15
16:18,21 17:9,17
71:14 274:20
275:7 279:18
284:5,6 286:24
287:2,21 290:21

303:5 308:12
311:1 318:13
322:8,16 324:4
328:11 330:9
332:19 343:6,12
**oklahoma's** 17:16
**old** 134:13
**older** 38:10,10,11
**once** 10:4 36:10,16
44:7 61:18 80:14
98:24 154:3 179:7
197:12 242:8,13
300:20
**ones** 15:2 37:18
63:6 100:3 256:19
269:2 303:22
323:11
**onset** 91:11
**oops** 335:11
**open** 147:13,24
242:19 259:12,13
259:15,17 260:9
260:12,14,15,25
263:25 276:22
280:10 297:16
299:4,8 309:20,22
316:11 337:22,23
337:24 338:4
**opened** 250:6
343:21
**opening** 279:3,6
299:24
**opens** 312:10
**operating** 37:16
115:8 138:6
239:10 241:14
251:6 253:19,22
254:3 255:2
278:13 295:15,19
296:4,15,21

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 389 of 418 PageID #: 8066

operation 54:12
243:14
operator 4:4 5:1
82:19,22 97:2,5
139:1,4 141:25
142:3 154:14,17
160:7,10 192:20
192:23 224:9,13
251:18,21 267:16
267:19 310:2,5
313:16,19 315:17
315:20 345:19,22
346:4,16
opiate 33:6 120:22
123:12
opiates 33:17 36:4
203:22,23
opinion 7:11 12:24
13:8 14:9 15:6
18:23 23:7 26:5
44:4,6 47:2 50:16
51:13,18 52:5
76:11 78:8 79:5
79:11 83:20 96:11
102:20 108:2
111:4,5,17 116:13
118:14 127:3,4
140:4 143:5
158:21 172:8
175:1 181:21
182:15 210:3
234:21 247:18
250:18 263:6
269:9 279:14,18
280:1 294:8,8,19
299:16 300:5,8
301:3,5,11,22
302:6 304:7 305:5
334:24 344:12,22
opinions 12:19
71:24 174:24

175:6,9 245:7
280:13
opioid 214:9,15
opposed 33:23
152:18 247:20
296:19
opposite 86:10,11
86:15
option 119:10,12
119:13
options 119:9
oral 224:21 297:18
orally 163:24
orange 164:5,14
165:7
oranges 164:3,11
order 98:23 102:3
123:22 125:14
196:13 302:25
organs 35:14
98:11
original 318:10
orthopedic 130:11
138:16
outcome 159:14
193:22 347:13
outcomes 12:24
13:8 241:3,4
outlined 255:23
258:22
outside 15:11
280:7 295:12
343:6,12
overdosage 159:13
overdose 9:13
187:21 200:9
overdosed 199:14
overdoses 159:19
200:23
overdosing 200:8
200:12

oversimplification
48:9 50:24 99:17
oxygen 92:25 93:1
93:5 95:13 98:9

**p**

p 3:1 100:11
package 184:15
185:3,5,8,11 186:8
205:25 206:4,21
206:23 207:11
208:18 210:16
page 2:2,10 144:9
144:22 146:21
147:8 148:11
149:19 150:14
153:11,15 155:9
157:7,8,17 161:15
161:15 162:2
167:10 168:7
175:23,24,25
176:1 178:3,4,6,6
195:3 198:12,13
201:25 202:11
203:6 213:24
214:4 218:5
219:16 220:15
221:7 224:15
226:16,18 229:2,3
229:7,16 230:20
232:6 235:5
255:18,19,21
336:3 337:5,6,20
337:21
pages 347:7
paid 67:9,15 288:3
288:5,20 327:24
330:11
pain 13:11,25 14:5
14:11,16,22 15:1,3
15:5,7,9 78:22,23
79:17 80:12 81:6

82:4,9 83:12,13,17
84:12 100:3,5
180:18 181:1,4,5
181:14 182:2,4,7
182:19,23,23
183:15,17,18,24
184:2 204:6 225:7
225:17,17,20
239:4 241:8
267:12,12 276:17
279:11 301:18,24
302:2 344:16,17
344:24 345:2,6,10
345:15,16
painful 41:2,4
74:22 77:3,4,5,9
78:6,14,15,16,19
79:2,3,7,12,13,14
79:16,21 80:7,13
80:17 81:19,23,25
82:6 89:8,17
90:13 100:2 121:9
225:1 230:1
243:11 256:14
257:9 298:24
301:20
painless 14:13
panic 299:21
paper 93:12
142:22 143:20,24
143:25 149:8
151:18 155:23
161:23,24 162:10
162:10 175:12,14
175:16,17 196:4,6
197:18,19 198:22
200:20 217:1
218:25 236:19
305:20,21 329:13
331:3 342:7

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 390 of 418 PageID #: 8067

papers 65:7
152:15,16 175:14
180:6 305:21
338:21
paracelsus 214:24
paradoxical
297:21
paragraph 83:3
84:9 139:22 142:7
142:8 150:17
165:25 167:19
175:24 176:17
178:23 180:15,21
181:7,19 183:11
184:9 201:12
205:16,21 213:4,8
214:6,7 217:10
218:8 220:2 226:1
228:13,15 337:8
344:6,8,9
paralysis 92:13,18
94:10,23 95:4,8
paralytic 133:16
240:6 242:1,8,13
paralyzed 90:18
91:21,25 92:9
96:14,20,21 99:9
133:20 197:9
342:14
paralyzes 133:18
parameter 221:20
pardon 337:16
parentheses
148:24,25 218:13
park 67:2 271:1,3
parker 1:9 4:9 6:7
part 19:1 24:16
26:14 37:17 42:24
48:8 55:6 60:9,15
62:22 71:3 75:4
75:10 76:23 86:1

90:2,3,20 91:7
103:4 118:3
123:10 149:8
152:1 165:4 170:1
174:19 183:15,17
185:7 213:11
220:15 223:2
225:6 226:12,14
270:21 288:10,21
294:23 322:11
328:6 333:3
partial 32:3 34:24
38:23 94:9,22
276:13 277:7,8
278:22
participant 145:9
150:20 152:7,22
participation
329:10
particular 39:2
72:12 85:23 100:1
121:8,15 163:20
175:16 193:22
200:19 211:2
225:4 227:10
287:9
particularly 141:1
182:6 186:23
parties 347:12
parts 35:14 179:21
pass 132:14
263:12
passage 132:10
passes 132:8
passive 327:3
patent 302:22
303:3
pathologist 156:8
patient 9:11 29:3,9
29:19,20 30:16
31:14 32:4 33:23

34:6,7 35:21
36:15 37:5,6,20,21
38:1,6 40:4 41:20
42:11 44:9,14,19
48:8,10,13 49:5,9
51:18 52:8,13
53:15,22 54:2,25
55:2 62:2 74:14
74:16,23 75:20
76:25 87:23 88:1
89:12 91:4,14
94:24 95:9 99:13
100:20 109:19
113:17 114:24
115:1,3,9 121:16
124:11 125:20
128:6,23 129:22
130:4 133:20
138:18 177:7
186:18,20 189:13
191:25 192:3
195:22 215:11
216:7 218:11,15
238:17,20,23
240:6,14,23 241:1
241:3,7,19 242:2
243:12 251:6
253:22 255:3
265:12,14,16
296:5,16,23 297:6
298:5,20 331:13
patient's 46:23
89:5 136:10 238:9
238:14 242:2
277:5
patients 25:22,25
26:16,23 30:16
32:5 36:7,11,15
38:25 39:2,7,8,14
39:19 40:11 61:9
61:10,11 80:1

82:1 88:23 89:23
99:22,25 115:22
121:22 160:20
161:8 164:1,7
165:9,14 186:24
187:4,6,10 191:15
199:3,13 200:7
201:6 213:19
214:10,18 216:11
223:13 233:11,12
235:13 278:12
290:9 291:8
295:20 297:15
342:8
patrol 318:13,22
324:5
pattern 136:21
277:6
pause 38:16
pay 328:9
peak 126:16 237:9
237:10 270:17,18
273:1,4,4,9,15,23
304:17,18 306:4,7
306:14
pejorative 295:8
penalty 6:24 7:2
7:13,15,20,22,24
8:1,2,4 51:1
pending 6:7
pennsylvania 1:15
1:17
pentobarbital
198:13,17 199:6,9
199:14,15 200:15
216:20
people 7:6,7 18:8
18:11,13,24,24
19:11,16,18 20:1
22:4 25:25 26:15
26:21,22 28:22,23

35:15 48:4 51:22
52:12 53:14,21
61:20 64:24 70:2
70:4 71:13,17
75:13 90:3,17
108:19 121:6
122:18 129:10
134:12,15 142:15
152:10 158:20
163:24 168:6
186:22 194:7
196:14,14,16,18
198:25 200:12
215:19 216:8,9,18
239:22 242:22
245:6 249:22
266:17 275:15
284:19,20 291:12
292:10,11 293:7
295:4,11,16
296:10 299:10
301:18 304:15
317:19,20 318:6,6
318:8,20 319:23
321:4 322:11,13
323:21 332:2
**perceive** 83:13,16
84:12 100:5 182:4
329:9
**perceived** 329:8
**perceiving** 83:12
**percent** 36:11 39:2
39:7,8,14,16,19
40:11 51:25 69:14
70:1 79:13 114:12
142:10 143:6
150:6,10 166:4
204:7 239:19
270:21 307:5
334:11 340:19

**percentage** 68:12
68:18 69:20
**perception** 132:17
**perfect** 29:1,2
51:23 52:21
238:25
**perform** 18:6
128:8 129:22
**performed** 22:7
257:15
**performing**
256:21 258:16
**period** 66:9 123:9
127:1 163:23
237:7 244:3
274:13 275:22
277:3,21 301:2
338:6,10 342:11
**periods** 137:16
**peripheral** 191:3,7
**person** 7:5 20:3,14
20:15,23 21:14,15
23:4,7,16,17 27:25
34:11 35:3,16
50:6 74:24,25
75:23 77:18 78:12
79:7,16 80:16
81:19 89:24 91:14
91:20,23 92:3,5,24
97:17,17 98:14,23
121:11 122:17
151:4 182:17,23
183:2,6 187:24
189:17 193:6
231:14 243:21
256:20 257:1,24
258:2 259:4,11,17
262:9,11 266:13
266:14 272:12
274:4 277:22
278:4 288:14,20

293:6 295:16
299:2,3 301:10,15
303:8 307:17
319:9,11,21 320:7
321:14,25 324:1,3
334:2 345:9
**person's** 88:15
89:9 269:11
**personal** 11:13
122:15 290:15
**personally** 7:14
15:18 31:17
**persons** 344:14,17
344:18,23 345:10
**perspective** 7:10
9:5 30:16 50:22
101:5 181:23
184:23 243:9,15
**pertinent** 181:21
181:21
**pest** 122:18
**pharmacodynamic**
34:12 43:5
**pharmacokinetic**
34:13 36:9 180:11
270:19
**pharmacokinetics**
95:2
**pharmacological**
30:12 34:12 35:23
36:9 41:21 42:12
42:22 43:4,18
50:22 77:20 101:5
226:20
**pharmacologically**
177:3
**pharmacology**
31:18 32:23 33:4
77:20
**phenobarbital**
127:17 190:14,21

**phenomena** 74:15
**phenomenon**
76:15 299:4
**philadelphia** 1:17
6:6
**philosopher**
214:25
**philosophical**
243:24,24
**phone** 58:21,25
**phonetic** 135:3
**physically** 90:5
**physician** 24:17
24:18 105:3,4,16
105:20,24 106:10
156:9 258:9
277:23 303:16
**physician's** 184:23
**physicians** 24:11
61:21 76:20
175:10 216:17
**physics** 34:22 35:5
**physiological**
101:4
**pick** 24:13,15,19
25:16,20 26:16
105:19
**piece** 290:2
**pills** 98:2
**pinch** 77:12
**pinching** 256:15
276:5
**pitfalls** 307:2
**place** 13:3 155:2
214:10 281:1
322:25 342:9
**placed** 303:3
**placing** 115:2
**plainly** 289:2
**plaintiff** 1:7,13 6:6

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 392 of 418 PageID #: 8069

plaintiff's 313:13 315:1 346:5
plaintiffs 6:15 65:9 309:6 333:11
planned 312:22
planning 5:17 332:14 343:10,17
plasma 142:9 143:7 159:13 160:16 161:19 162:12 236:21,23 340:10
play 158:17
pleasant 70:24
please 4:13 5:2 117:12 173:8,10 180:19 197:14 346:8
pleased 68:23
plug 61:11
plus 233:4 314:1
point 7:18 16:20 39:18 49:24 67:3 78:18 81:4 92:23 95:8 96:1 98:13 108:3 109:4 115:15 116:2 119:5 126:24 127:24 130:20 134:10 143:18 145:15 156:13 161:12 168:24 174:8 177:6 182:8 190:3,19 196:7 200:2 207:2 213:7 215:18 227:12 233:7 234:6,16 237:24 239:18 248:19,23 250:10 257:17 263:8,14 264:16,17 270:5

273:3 275:19 276:14 277:8 285:11,13 286:3 290:21 291:13 292:15 293:18,21 298:19 306:2 308:16,21,24 312:2,18 324:22 325:3 327:4 332:7 332:23 338:5 343:13
pointed 198:21 272:7
pointer 155:2
pointing 175:15
points 40:10 47:8 85:4,5,11,12,23 86:3,4 169:1,14 171:22,24 172:2 172:19,24 173:12 174:7 337:24
poison 215:2
police 319:5
polypharmacy 124:1
poor 51:9 245:19
poorly 110:12 115:19
population 38:25
portion 162:12 163:7 184:7 232:23
position 6:23 82:10 174:3,20 314:8 325:10
positive 155:10 261:8 311:8 317:24
possession 284:2
possibility 7:6 180:25 181:13

211:4 239:15 254:12,14,16
possible 24:18,22 65:12 87:14 99:1 109:15 119:10 121:13 125:6 135:1 171:17 173:15 175:4 180:11 225:19 248:10 250:12 285:24 301:1
possibly 17:21 45:4 123:13 128:13 249:10 253:23 263:5 327:12
post 1:24 225:6,16
postmortem 155:25 156:12,17 156:21 157:3,6 158:19 269:13,21 272:19 273:7
postponed 291:7
potassium 78:6,14 78:17,19,21,25 79:1,7,24 80:2,7 80:20 81:4,11,18 82:8 99:2,3,10,12 99:19,24 100:4,8,9 100:12,16,16,19 100:24 101:12,14 101:14,22 102:6 103:5,9,13,17,18 104:1 105:13 106:14,15,25 107:13 108:2,10 109:6,8,8,16,18,19 109:24 110:4,6,6,9 110:15,20,22 111:3,8,16,18 112:10,15,17,20

112:23 113:1,17 113:19 117:20 118:5,7,13,17,19 118:19,25 119:3,6 119:11,13,23,25 120:2 244:22,24 245:23,24 247:10 247:15,19,21 248:3,10,13,24 249:5 250:4 251:5 253:18,22 254:4 255:4,7,10 264:24 265:7,8,17,21 266:5,9,10,13 267:8 275:13 301:7,14
potency 164:24 165:3,3 204:2
potent 160:23 161:2,5
potential 267:12
potentially 54:19 138:21 188:3,8
potentiate 176:9 176:21 177:18 178:15
powerful 190:22
practical 249:1
practice 24:23 25:2 30:11 99:19 121:1 136:12 202:7 204:18
practices 52:17
prayers 293:6
pre 134:13 218:12 219:14 222:25
precautions 196:19
precise 216:13
predict 161:20 162:14

Page 45

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 393 of 418 PageID #: 8670

preeminent 205:2
205:9
prefer 114:10
preference 74:6,7
preliminary
150:17 337:12,14
premedicant
132:24
preparation 58:22
58:23 59:13 60:2
60:10 65:10
114:25
prepare 58:7 63:1
63:8 65:18 66:11
preparing 66:17
282:16
presence 32:3
present 59:16 65:5
116:1 176:8,20
226:19 273:8
pressure 28:14
29:2,9,12,16 30:10
30:23 32:6 34:25
38:23 44:20 48:12
48:16,19 88:16,17
88:22 138:22
188:12,24 189:5,7
189:7 239:11
240:17,21 241:17
presumably 71:7
105:3 277:11
278:1 285:12
326:2
presume 277:23
320:8
pretty 14:8 25:5
28:23 34:12 51:19
59:4 61:2 67:7,8
79:18 96:12,18
100:6 125:15
135:16 136:5,24

146:18 165:5
195:2 202:2
227:23 247:23
260:24 269:20
270:20 277:4,9
278:16 287:11
292:19 294:1
295:21 304:24
341:19 342:11
344:21
prevent 91:6
135:1 250:14,17
prevents 244:2
previously 184:20
209:3
primarily 9:12
28:6 33:16 61:16
100:10,14 132:2
134:16 152:18
276:18
primary 113:3,4
132:7 210:13
principle 42:22
principles 35:23
43:4,5
prior 54:6 66:19
117:23 130:18
131:8 206:25
295:2,2
prison 303:11
322:11
prisoner 245:20
245:21 302:11
privacy 56:19
private 293:15
privilege 10:24
11:2,23,24 13:15
13:19,22,23 56:7
67:18,19,20 287:4
289:13,24 323:6

privileged 10:16
55:23 64:3 67:13
287:1 289:3,7,15
289:21
probability
149:22 150:1,3,5,9
150:11 241:24
254:20,24 255:17
264:6
probable 254:16
probably 8:17,19
19:6,20 31:16
33:13 50:3 51:19
52:4 59:7 60:13
66:17 67:1 68:11
69:24 80:17 87:17
92:13,19,21 94:23
95:3,6 96:12
100:21 103:21
104:5,17 106:24
107:16 120:8,12
120:12 135:4
136:1,5 143:4,16
161:1,2 167:6
170:7 186:14
198:3,5,7 205:4
206:16 209:9
212:2 215:6
216:25 217:5
220:25 231:19
232:1 233:12
234:25 251:2
258:24 259:4
262:2 286:9
292:17 294:13
295:24 300:22
306:22 317:13,19
317:22 326:24
327:12 332:12
333:4 337:18
339:23 341:4

probe 307:6
problem 45:25
48:12 131:5 298:2
300:9 332:21
problems 57:2
108:13 115:3,12
132:23 293:21
302:24 333:15,17
procedure 3:5
89:20 122:5,7,11
123:8,16 124:24
125:2,4,13 130:15
138:16 195:18
209:2,25 210:2
240:13 248:1
procedures 89:8
90:7 120:13 128:4
128:5 258:3
proceed 5:15
proceeded 302:12
proceedings 347:6
process 5:11 7:19
71:21 150:20
152:6 207:10,10
321:19 333:3
processed 136:16
prodded 234:17
236:15
prodding 76:4,8
144:16,20 148:7
229:11 260:11
produce 88:4,4
140:2,5,13 142:9
146:1 166:8,17
178:25 179:25
180:9 181:25
188:23 190:8,9
198:9 207:18
211:15 217:14
224:3 227:7,14,18
227:25 243:6,8

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 394 of 418 PageID #: 8071

273:13 314:3
**produced**  166:16
  178:8 179:4 180:7
  194:25 202:14
  207:17 210:15,15
**produces**  221:17
  274:9,10 344:15
**producing**  188:14
  235:9 301:23
**production**  187:7
**productive**  315:10
**professional**  11:13
  18:6,7,15 19:8,14
  23:17,20
**professor**  25:11
**profound**  188:10
  189:3
**prolonged**  209:2
**prone**  156:12
**pronounce**  134:1
**pronouncing**
  133:2
**properly**  18:21,22
  23:18,18 278:17
  303:3
**properties**  42:12
  43:18 80:21 81:3
  202:14,17 203:12
  203:19,21
**property**  81:15
  225:14
**propofol**  33:13,16
  36:4 37:2 38:4
  42:10 43:15 44:2
  44:3 45:6,13,16,17
  45:19,21,22 46:21
  46:22 48:2 49:20
  50:1,4,10,19,23
  123:14 146:22
  147:3 149:22
  151:19,21 152:3

208:20,20 209:5
220:6 221:14
226:22 227:4
344:19,25 345:5
345:11
**propose**  199:3
**proposition**  224:3
**prosecuting**  318:9
  318:10,23 321:7
  321:19 322:7
  323:15
**protected**  13:16
**protection**  88:12
  138:14
**protein**  35:12
**protocol**  6:16,20
  11:16 12:12,13,20
  12:23,23,25 13:2,3
  13:11,25 14:5,13
  16:22 17:9,10
  22:22 23:4 99:12
  103:5 104:15,23
  112:7 116:3,14
  117:2 118:6,12
  119:8,22,23 120:2
  120:4 140:9
  245:13,15,15,17
  245:20 246:6,9,13
  246:16 247:19
  249:4 250:23
  251:3 255:8,11,25
  256:6,7 262:18,23
  263:10,11,19
  264:8 265:5,5
  266:22,24 267:3
  270:13 271:5
  272:13,23 275:11
  275:12 302:14
  304:8 314:22
**protocols**  14:10,15
  14:18,19,19,20,21

14:24,25 15:8
17:14 51:2 71:24
103:10 112:8
119:17 246:2,7,11
250:23 302:21
303:1
**protrusions**
  326:11
**proud**  135:17
**prove**  340:15
**provide**  6:17 9:10
  9:15 10:2,8 21:5
  21:16 119:21
  203:13 250:23
  282:22
**provided**  11:19
  226:19 280:11
  304:4,15 312:8
  314:4,5
**providing**  114:14
  281:15
**psychiatric**  293:11
**psychiatrist**
  293:20
**psychological**
  293:11
**public**  3:7 318:15
**published**  31:21
  61:4 200:13
  202:20 331:8
**pull**  62:3 70:9
  72:11 83:22
  140:25 141:5,7,20
  142:5 185:11
  206:6 213:23
  217:22 228:17,22
  235:19 334:13,18
  335:7 336:18
**pulled**  61:11 141:9
  162:4 179:9
  224:17 248:22

**pulling**  40:18
  185:13 224:5
**pulmonary**  109:11
**pulse**  278:1,2
**pump**  109:7
**pumping**  110:12
  110:16
**pun**  61:19
**pupils**  278:3
**purported**  179:9
**purpose**  42:7 46:4
  46:8 87:5 100:17
  116:14,17,18
  250:18 266:24
  267:2
**purposeful**  249:15
  249:19,25 262:3
**purposes**  134:4
  138:13 309:17
**pursuant**  3:4,8
**pursue**  11:14
**put**  7:24 19:23
  41:21 51:25 52:12
  53:5,11,16,19,20
  54:3,18 69:5
  72:14 78:13 84:13
  94:15 152:9
  169:15 180:12
  191:16 205:11,13
  205:19 209:9
  239:18 242:20
  243:2 250:22
  280:5 285:7
  297:18 298:5
  327:1 332:1
  344:21
**putting**  34:14 40:3
  82:6 95:25 176:2
  312:17

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 395 of 418 PageID #: 8072

| q | questioning | r | 292:15,20 300:15 |
|---|---|---|---|

**q**

**qualify** 108:6
 166:14
**qualifying** 239:7
**qualitative** 102:21
 216:12
**question** 8:14
 10:18 12:1,4 14:8
 14:22 15:9 27:14
 31:5 34:17 37:22
 37:23 40:15 41:24
 44:1 46:11,14,15
 51:9 57:21 59:1
 64:10 69:11,14,19
 70:14 71:5 74:6,8
 80:13,14 81:22
 84:10 87:25 96:6
 96:8 97:21 101:1
 101:6 104:11
 113:6,13,16 114:1
 116:16 117:13
 119:19 128:11
 129:14,16,18,19
 129:20 130:7
 158:24 164:12,13
 168:7 174:17
 189:9 191:23
 227:19 235:24
 239:21 245:3,4,8
 247:22,23,23
 248:5 260:4,25
 261:5 262:24
 268:11 270:23
 273:21 281:23
 282:18 289:22
 296:17 324:1
 330:24 332:24
 336:25 337:1
 338:12
**questioned** 280:14

**questioning**
 111:23 130:19
 131:14 308:24,25
 313:6
**questions** 3:13 6:9
 13:23 14:4,7
 21:12 57:6 58:5
 65:23 71:4 97:23
 117:14 131:12,17
 163:4 174:22
 198:21 251:25
 252:5,8,16,17,21
 260:6 267:24
 308:13 331:1
 343:15,19,20,22
 344:2 345:25
**quibble** 243:7
**quibbled** 231:18
**quibbling** 171:18
**quick** 217:22
 341:20
**quickly** 91:13
 108:18 119:10
 121:12 146:6
 190:23 251:25
 273:24 274:5
 287:20
**quiet** 319:25
**quietly** 320:5
**quite** 51:24 61:20
 65:24 77:12 88:16
 100:5 114:20
 124:24 128:13
 136:12 151:7
 180:13 183:21
 198:7 215:24
 216:13 225:19
 248:10 300:25
**quote** 210:22

**r**

**r** 32:19,20,20
 33:19 347:1
**raise** 96:4 218:13
 236:11 246:22
 248:18 307:14
**raising** 334:10
**range** 68:11 85:24
 151:5 198:3
 231:16 232:3,4
 233:4 307:7
**rapid** 279:3
**rapidity** 104:12
 108:9
**rapidly** 102:6
 273:2 274:8
**rare** 88:10 113:9
 113:11,17,19
 114:6,10 115:21
 115:21 189:2
**rarely** 45:12
**rate** 29:3,17 30:9
 32:7 33:22 80:19
 132:5,23 134:25
 135:7 239:11
 240:21 241:17
**ratio** 166:15
**rats** 227:15
**raw** 136:14,15
**ray** 154:20 158:14
**reach** 54:1 78:18
 127:24 346:8
**reached** 341:12
**reaches** 54:3
**reaction** 186:17
**reactions** 242:3
**read** 12:4 136:17
 143:17 149:10
 160:20 207:19
 220:25 275:17
 279:21 285:9

 292:15,20 300:15
 305:20,21 326:3
**readily** 21:21
**reading** 3:17
 152:25 153:1
 209:12 220:12
 231:13 236:2
 335:25
**ready** 194:18
 313:9
**real** 217:22 341:20
**realize** 73:21
 127:11 169:14
 197:2
**realized** 98:2
 341:18
**realizing** 198:21
**really** 20:11,24
 24:19 39:15,21
 47:9 48:14 55:14
 76:18 78:10 81:10
 103:8 104:10
 109:5 110:1 113:7
 115:19 122:12
 125:14 142:22
 154:25 171:19
 185:18 191:5
 233:21 239:17
 243:22 254:20
 257:20 261:7
 263:16 272:3
 277:6 279:25
 283:13 290:18
 293:3,16 294:4
 298:11 299:9
 301:3 307:10
 316:5 318:16
 324:11 332:22
 334:25
**realm** 76:11 239:6
 239:8 241:11

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 396 of 418 PageID #: 8673

**reason** 54:9,13
55:20,22 67:18
68:21 70:12 72:1
72:4 128:15
134:22 162:4,6,7
163:6 165:12
182:6 222:8,10
238:8 288:10
290:5 291:4
294:10,22,23
308:18 331:19
333:6,13 343:14
**reasonable** 252:22
253:5 312:2
344:13
**reasons** 7:3,3 42:3
102:15 104:10
210:23 241:13,21
250:15 264:20,22
291:8 294:14
**recall** 16:9 31:24
56:25 60:11 64:20
65:6,13 66:4
96:17 121:14
135:19 151:23
191:3 225:5,17,19
227:12 256:7
268:14 286:21
291:13 305:14
327:8 333:25
334:13,14 342:3
**receive** 73:12,18
214:18 220:20
225:15 234:19
255:4 265:20,21
**received** 20:3
97:17 99:2 106:12
111:7 122:15
145:10 147:3
151:21,23 152:10
153:4,20 165:9

219:11 220:11
231:14 232:14
234:8,18,22
236:15 241:14
264:11 303:20
329:20 330:16,16
334:3
**receives** 103:25
240:6 270:11
301:15
**receiving** 90:14
265:17,18
**receptors** 176:4,5
176:6 177:1,8
**recess** 82:21 97:4
139:3 142:2
154:16 160:9
192:22 251:20
310:4 313:18
315:19 345:21
**recognize** 216:18
254:14 262:6
289:6
**recognized** 215:14
**recollection** 40:20
64:23 66:16
103:14 155:23
251:1 254:6 278:9
307:21 319:14
**recommendations**
328:20
**record** 4:5,14 5:7
73:9 82:18,20,23
97:1,2,6 138:25
139:2,4 141:24
142:1,3 154:12,15
154:17,19 160:5,7
160:11 192:17,21
192:23 251:19,21
251:24 253:10
267:15,17,18,19

280:6 281:3,12
282:5,11 283:9
289:9,20 309:2
310:3,5,15,19,25
313:15,17,19,21
315:16,17,20,23
316:16 328:11
343:4,5 345:18,20
345:22 346:18
347:8
**recorded** 4:7
218:12 219:1,14
222:25 234:25
**recording** 235:10
**rectangle** 325:23
**red** 21:17 22:2
**redirect** 253:3,5
**reduce** 124:3
166:11 167:25
168:4
**reduced** 166:3,5
**reduces** 166:20
204:5 344:16
**reducing** 3:11
239:4
**reduction** 167:22
178:8
**reexamine** 252:4
**refer** 8:6 22:3
142:22 143:14
256:5 262:14
263:10 286:6
338:18
**reference** 338:18
338:19,19,19
339:5
**references** 303:22
**referred** 22:3
149:8
**referring** 148:25
184:18,19 338:21

**reflect** 156:14
220:21
**reflected** 156:3
287:17
**reflex** 224:20
248:11,15,17
249:7,11,15,19,25
251:7 253:20,25
254:4,8,13,17
255:5,10,17
256:18
**refraction** 324:14
**refusing** 69:10
**regard** 14:7
119:17 269:10
299:13
**regards** 310:22
**registered** 218:16
**regularly** 278:16
**regurgitation**
296:3,8,15 326:23
327:2,3
**reimbursed** 67:1
**related** 6:9 24:20
34:24 128:17
213:9 261:5
279:14,14 318:15
347:11
**relating** 200:22
**relation** 62:15
64:21 66:15 90:16
297:23
**relations** 318:16
**relationship** 85:2
140:1 169:5
170:16,23 171:7
173:16 178:13
**relative** 29:5 84:10
146:6 223:25
241:22 284:19
286:7 317:9

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 397 of 418 PageID #: 8074

**relatively** 39:10
123:19 191:18
204:4 260:23
**relax** 87:6
**relaxant** 29:20
88:13 89:25
134:17,24 197:8
202:14 209:24
**relaxation** 198:10
198:10 278:21
299:13
**relaxes** 298:17
**relevant** 182:8
**reliability** 305:20
**reliable** 269:22
305:17
**relied** 33:3
**relief** 69:18
**relieve** 297:14
298:6
**religion** 7:12
**religious** 7:2,10
293:6
**relish** 72:5
**rely** 33:3 42:24
43:2 64:6 124:24
244:4 300:20
306:16
**relying** 306:12,13
306:14,14
**remaining** 267:25
**remains** 342:23
**remember** 16:12
17:6,8,13,16,19,23
22:2 31:5 63:13
63:16 80:4 115:10
121:15 135:16
143:17 154:25
159:17 222:16
227:11 234:13
243:13,22 272:17

274:17 283:12,13
288:19 290:1
291:11 304:10,25
306:21 319:6
328:5
**remifentanil** 33:18
337:11 342:5
**remimazolam**
146:1,2 180:6
237:21
**reminded** 214:24
**remotely** 4:13
**remove** 54:10
320:11
**removed** 120:3
**render** 83:11
274:4
**repeat** 14:22 44:5
46:10,13,14 74:9
91:3 118:2 220:14
220:18 235:24
**repeatedly** 326:19
326:22
**repeating** 259:24
**rephrase** 262:25
268:12
**report** 2:11 3:10
8:6,20 10:8 11:19
21:24 22:3,11,15
46:7 58:11 62:17
62:22,23 63:6
72:9 73:3,13 74:1
74:3,5,11 76:24
79:25 82:24 83:9
84:17,21 86:18,19
87:2 90:23 139:19
139:23 140:23
150:17 153:24
154:5,20,21 157:8
158:12 165:18,18
165:24 174:3,25

175:7 178:23
180:1,17 184:1,9
201:9 204:10
205:17,21 206:15
209:20 211:22
213:4 214:19
217:11 228:12
236:22 237:20
255:19 268:12
275:1 280:8
287:17,18 288:16
301:22 305:24
306:12,17 311:21
326:15 328:23
329:11,19 330:20
331:7,12,16,16,20
331:22,22 335:7
337:3 339:16
340:4 341:16
344:5,6,7
**reported** 163:14
166:2 175:20
213:18 214:17
219:2 233:3
304:15 305:23
306:9,22 334:7
335:1,19 336:22
338:14 339:17
347:7
**reporter** 5:2,21,25
12:3,5,10 94:15
133:7 252:1
285:20,21 308:17
346:2 347:5,16
**reporters** 295:8
317:22 327:22
**reporting** 332:4
347:15
**reports** 46:7,7
58:9 60:1,6,7 63:5
154:23 268:13

285:19 292:16,20
295:4,22 326:22
327:6,10
**represent** 147:14
233:5,10
**representation**
71:7,15 75:7
**represented** 57:16
287:3
**representing**
57:19,20 223:16
**request** 173:10
280:23 281:1
282:2 313:5 314:4
314:10
**requested** 282:21
**requesting** 281:2
281:10 283:22
**required** 10:15
18:10 19:13 24:16
77:22 78:1 88:11
100:24 178:10
223:8 340:12
**requirements** 90:9
166:4
**research** 135:18
175:11
**reserve** 11:6
**reserved** 3:13
**residents** 25:12
27:6
**resistant** 96:17
98:15 294:1
**respect** 56:19
117:12
**respectively**
160:20 337:14
**respects** 50:25
**respiratory**
184:14 185:25
187:13 188:4,5

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 398 of 418 PageID #: 8075

213:12,14
respond 57:24
  76:3,7 77:1,3
  84:12 143:2
  144:12,15,16,19
  146:15 147:4
  151:20 218:15
  224:21 230:1
  243:20,23 244:17
  260:8
responded 75:23
  76:4,8 143:14
  145:10 153:19
  229:14 231:7
  302:11
responding 142:20
  147:22 148:4,6,7
  149:5 150:9,11
  158:6,7 260:18
responds 74:23,24
  75:20 76:19
  229:11
response 23:14
  29:23 30:10,11,11
  41:2,4 74:19 75:9
  99:8 127:9 140:7
  147:17 151:11
  218:11 243:10,11
  257:2,8 259:1,3,3
  261:8 276:21
  335:1,2 344:16
responses 23:13
  23:19 32:14 70:16
  77:23 239:13
  259:8,19,22,24
responsive 74:17
  183:22 220:12,21
  223:9 243:16
  264:17 283:24
responsiveness
  149:14,15,18

218:10,19,22,24
219:2 222:23,25
223:18,21
rest 83:9 145:22
  220:15
result 9:12,12
  93:19 155:15
  157:20 190:25
  196:14 213:20
  298:12 327:2
  333:4
resulting 150:21
  152:7
results 160:14
  176:8,20 214:8
  278:21 335:18
  336:14,16,21
  338:14
resuscitated
  115:11,24
resuscitation
  115:4
reversal 134:19
reverse 134:18,23
reves 2:21 217:18
  224:2,4 225:24
review 12:23
  59:24 62:25 65:7
  95:1 131:10 185:4
  193:8 305:13
reviewed 6:19,22
  21:25 22:1 58:9
  58:10,11 60:1,4,6
  61:6 79:25 152:16
reviewing 66:23
revised 184:2
rfp's 283:25
rhetorical 71:3
  131:21
rhythm 101:17
  109:1 121:8

rhythms 101:21
ridiculous 187:1,2
  196:2
right 8:15,21
  10:12,24 12:6
  20:25 21:5 27:12
  31:10,14 33:9
  42:8 43:9,21 45:3
  46:17 47:15 48:23
  49:4,5,10,14,22
  50:13 55:15 61:23
  69:22,25 71:6,8,11
  72:16 73:14,23
  77:18 80:9,21
  81:16 82:14 85:20
  86:7,12 89:9
  94:19 95:9,18,22
  102:19 106:11
  109:9,10,10
  110:23 111:4,8,19
  112:11,14,18
  113:10 118:6,8,20
  123:8,9 126:22
  127:2 128:10,19
  130:16 133:9
  135:7 140:19
  142:11 143:9,22
  144:17,20 145:7
  145:22 146:7,13
  146:17 147:1,5,22
  147:25 148:5,8,21
  149:6 151:15,18
  151:19,20 152:2,9
  152:12 153:20
  155:21,24 157:24
  158:4,7 160:1
  161:7 162:8 166:8
  166:12 168:15,19
  169:2 171:24
  172:2 173:18,22
  173:25 174:3,9,12

176:2,22 177:9,22
178:19 182:16
183:4,16,21
187:17 188:15
189:14,14,19
190:1,2 196:22
197:12,15 198:19
199:18,20 200:1,7
200:8,9,11,12,17
200:20,23 201:7
202:2 205:8,18
209:17 211:21
212:5,16,18,21
214:15 216:21,23
216:24 218:22
219:5,9,11 222:9
222:25 224:24
225:2 226:8,18
227:1,22 228:3
229:11 230:3,6,9
230:17,23 231:8
232:22 233:1,18
234:23 235:11,16
235:23 236:3,7,12
236:16,17 238:20
239:23 241:8
242:3,6,9,15
244:14 246:22,24
251:23 252:9,10
252:24 253:20
254:15 255:5
256:2 272:8,20
280:4 283:18
284:24 294:7
297:24 300:14
301:2 305:4
306:12,17 307:18
308:1 312:11
314:13 317:4
319:20 325:6,8,18
325:20,24 326:20

www.veritext.com    Veritext Legal Solutions    800-556-8974

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 399 of 418 PageID #: 8076

328:15 334:5,11
335:7,17 336:1,2,4
336:5,16 337:5,16
340:5,24 342:2,15
342:21 344:9
**rings** 99:23
**risk** 214:10 241:7
**risks** 184:13
**rob** 4:24
**rocking** 276:10
296:22,25,25
297:1,9,10,20,23
298:1,7,15,24
299:4
**rocuronium** 87:12
87:15,16 90:13
134:17 255:2
**role** 158:17 319:2
319:5
**room** 37:16 115:8
138:6 239:10
241:15 251:6
253:19,22 254:3
255:2 275:14,16
278:8,13 281:7
284:19,23 292:10
295:15,19 296:4
296:16,21 298:1
316:25 317:20
319:17,20 320:1,2
320:3,7,16,19,20
320:21,23 321:3
325:22,24,25
326:1,1 341:19
**rooms** 317:1
**rotation** 24:14
**rotations** 26:23
**row** 7:7 317:4
319:9,10,13
321:20 323:2,3,7,9

**rows** 317:3
**rub** 23:15 256:15
262:5 276:4
**rubbing** 112:2
**rude** 70:6,11,11
**rules** 3:4,5 15:13
320:13
**rush** 344:3

---

**s**

**s** 1:22 2:9 3:1
28:22 32:19,20,20
133:10 134:20
229:8,21 235:11
**safe** 186:22 215:4
**safely** 37:5 38:1,2
38:5
**saga** 128:16
**saith** 346:19
**salivation** 239:11
**salt** 269:16 272:19
**sample** 272:20
**samples** 156:11
272:19
**sane** 293:19
**sarah** 4:17
**sat** 284:19
**satisfied** 314:15
**satisfy** 308:15
312:3
**saturable** 176:10
176:22 177:19
**saturated** 103:18
176:7 177:1,2,9
178:14
**save** 89:5,9 141:21
**saw** 30:4 96:4
192:13 236:19
238:1 261:1 278:8
278:10 279:17,20
279:23 284:12,13
284:14,16 285:20

299:15 300:7
324:22,24 326:11
**saying** 9:21 19:12
19:16 22:16 23:3
28:13 31:9 34:5,8
36:10 40:1,3
43:19 46:2 47:15
56:3 58:1 79:12
83:19 85:9,19,22
86:12 103:23
112:9 120:25
122:17 132:15
169:23,24 170:20
172:1 173:2,21
176:25 177:4,6,24
182:14 183:9
189:24 197:22
207:13 208:5
214:14 220:10,19
222:7 252:19,20
263:24 266:17
272:10 273:25
282:1,3 294:25
301:14 305:14
308:7 311:16
334:4 336:20
337:3 339:7 340:4
342:22,22
**says** 27:20 38:2
105:17,24 112:3
142:7 147:13,17
148:14,15,18,20
148:23 150:17
151:14,15 152:4
153:5 155:1,7,10
155:12,15 157:9
157:14 160:15
161:18 162:12
164:22 167:21
170:16 171:7
176:3,20 178:7

184:11 185:14,24
197:13 199:24
202:12,25 203:11
205:9,24 206:8,11
206:18 207:1,3,11
207:15 209:14
210:19 212:23
213:16 214:8,13
214:16 217:13
218:10 219:19,21
220:5 221:5,16,23
223:14,19 224:19
227:3 229:10,18
230:8,12 232:18
233:25 235:7
249:14 252:2
255:22 256:7
263:11 288:19
331:4 335:18
337:9 340:1,9
342:18
**scale** 21:12 26:10
79:17 142:17,18
152:11 234:14,15
**scales** 26:9,12
**scanning** 220:15
**scares** 299:22
**scattered** 85:11
**scatters** 132:17
**scenario** 107:21
108:13 109:14,17
109:20 110:2,3,3
110:10,11,17
112:19,20 113:5
116:1 118:16,22
121:5 122:10
243:4,5 244:11
250:4,12 259:7
263:21
**scenarios** 121:10
122:3 183:23

www.veritext.com          Veritext Legal Solutions          800-556-8974

| | | | |
|---|---|---|---|
| **schedule** 290:12 332:21 | 335:10,14 336:18 | **sedate** 275:23 276:2,7 | 157:20 160:15,22 161:18 162:3,6,9 |
| **scheduled** 287:19 290:10 | **script** 198:20 | **sedated** 246:22 | 162:11,16 165:25 |
| **schultz** 2:17 194:11,12,23 | **scroll** 84:8 155:6 157:7 197:13,15 202:6 336:5,16 | **sedation** 26:9 88:5 120:19 121:2,2,2,3 | 166:14 167:9,21 168:1,10,13 169:6 |
| **science** 85:4 341:9 | **se** 188:6 | 123:23 124:10 | 169:14 170:3,5,10 |
| **scientific** 207:6 305:6 344:13 | **seat** 317:4 322:20 322:23 | 126:6,9 127:11 136:10,25,25 | 170:16,18 171:5,7 176:2,3,10,22,24 |
| **scientist** 214:25 327:17 | **seated** 316:24 | 142:13,17 145:3,7 146:1 147:1 | 178:7,16 180:17 180:23 181:9 |
| **scientists** 76:20 | **seats** 317:3 319:12 323:10 | 160:21 186:1 | 184:11,15,16 |
| **scope** 252:22 280:7 310:16 343:12 | **second** 16:17 36:25 38:15 62:6 66:14 73:23 83:6 | 188:15,17 207:18 207:18,21 234:14 234:15,20,23 | 185:14,22,22,24 186:9 190:5 191:5 194:21 195:4,6,9 |
| **score** 144:13,17,20 145:7 148:21 150:2 223:7 229:10 232:14 234:5,20,23 235:16 236:16 | 87:2 137:2 154:2 154:8 159:22 160:3 161:13 163:1 167:8 192:18 206:14 209:13 217:23 229:2 230:10 | 235:7 238:9,12,14 242:6 261:22 340:12 **sedative** 202:12 208:12 212:1,7 **see** 9:6 17:12 26:23 29:18 34:11 | 195:11,13 196:21 197:3,13 198:13 198:15 201:11,15 202:1,3,5,11 203:11,15 205:18 205:23,24 206:13 208:18 210:7 |
| **scores** 145:3 146:1 146:8 147:1 151:19,23 155:20 229:8,21 232:11 232:18 | 264:24 266:21 267:15 272:6 274:15 278:11 302:20 313:15 317:4 319:9,13 323:2 329:3 | 36:7 38:19 39:9 53:20,24 60:2 62:10 70:8 73:15 74:23 82:12 83:23 83:24,25,25 84:15 85:4 90:15 94:9 | 213:4 214:6,8 215:19 217:13 218:3,6,8,16,19 219:8,8,18,19,21 220:8 221:3,4,12 223:11,15 224:15 |
| **scott** 4:23 | 341:20 | 95:3 101:17 | 224:16,17,19 |
| **scratching** 253:16 | **secondly** 22:11 | 105:25 110:17 | 226:19 228:25 |
| **screamed** 250:7 | **seconds** 80:18 | 116:12 137:18 | 229:7,18,23,23,24 |
| **screen** 72:25 73:1 73:2 74:1 141:17 144:3,7 153:15,25 154:9 160:14 161:25 162:5,5,10 162:10 167:9 185:23 192:14 194:21 202:1 206:7 212:14 217:23 218:3 224:12 228:23,25 285:1 325:6,7 | 92:15 94:3,25 96:20 103:21 104:6,18 105:8 106:24 107:18 108:8 111:7,18 113:18,21 114:8 141:19 218:14 265:17 286:9,11 **secretary** 318:15 **section** 202:3 336:14 | 139:25 140:15 141:2 144:1,7,12 144:24,25 145:3,6 145:20,23 146:22 146:25 147:13,15 147:23,23 148:1,2 148:13,14,15,23 149:2,21,25 150:2 150:16,22 154:5,9 155:1,5,6,9,12,16 157:8,11,13,14,16 | 230:6,7,8,12,13,24 231:1 232:10,13 232:18 234:4 235:12,21 237:11 237:19,23 240:19 240:20 247:18,24 248:9,11 249:6,9 249:11 253:25 255:22 257:8,10 257:20 258:1,23 259:10 260:8 |

www.veritext.com     Veritext Legal Solutions     800-556-8974

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 401 of 418 PageID #: 8678

262:8 269:2
271:19 273:7,9
276:16,17,19,21
276:22,23,24
277:12,13,18
279:2,24 285:2,4
285:16,22,25
286:13 287:8
290:8,19 292:21
293:21,25 294:4
294:11,20 295:22
296:19,21,23
297:2,4,8 298:1
299:21 300:23
302:8 306:4 309:4
309:14,23 315:14
319:2 324:10,12
324:15,21 325:3,7
325:8,10,13,15,18
326:7,9,9,10
327:15,18,23
331:23 332:22,24
333:4 335:17,22
336:12,15 337:17
337:22,23 338:23
339:9,11 340:18
341:21 342:10,18
344:12,19
**seeing** 29:24
156:25 162:4
169:23 239:17
301:1
**seek** 69:17 293:10
293:25
**seen** 14:16,24 15:2
29:18 152:17
154:21,23 159:10
159:12,16 167:22
194:22 195:2
222:11 227:13,16
227:21,23 246:13

274:22 292:19
295:6 297:23
300:19 302:5,7,9
325:16
**select** 119:14
**selective** 289:12
**selectively** 289:5,9
**self** 294:24 295:1
296:17,20
**selling** 60:24
**send** 73:3 81:9
83:22 140:18,24
153:25 154:3
159:9 192:16
201:19 304:3
**sending** 81:5
159:11 160:1
194:16 304:2
**sensation** 298:24
299:1
**sense** 10:7 21:10
22:10 32:22 35:9
36:8 51:16 54:17
71:22 101:1
102:17 126:1
165:6 175:19
190:8 207:19
215:21,21 260:9
261:14 267:8,9,10
268:3 329:9
**sensitivity** 96:15
**sent** 73:16,20
141:4 193:8
194:14
**sentence** 152:4
153:2,8 168:6
176:19 203:18
206:18,22 207:4,5
207:19 208:1,9
209:20 210:5,6,6
210:11 214:16

338:18 339:21
340:7 342:25
**sentences** 261:15
**separate** 48:17
57:20 75:14
**separation** 190:19
**serious** 101:3
161:21 162:14
**serum** 176:7 178:9
**serve** 287:9 333:7
**served** 10:14
274:17 282:1
**serves** 266:24
**services** 213:17
**serving** 287:6
**session** 60:5 66:1
**sessions** 65:25,25
**set** 53:3 85:23
167:3 172:4,24
243:4,4 244:12
287:13 331:1
**setting** 5:11 23:21
27:18 41:19 42:11
47:16 182:21
183:7 202:10
210:1,22 238:3
240:6,20 256:2
259:6 278:13
279:10 295:13,13
296:13 297:25
**settings** 186:2
**seven** 8:18 15:23
252:8,13,15,23
253:1,2,7 268:8
281:19 309:7
311:21,25 313:5
314:1 315:5
330:21 343:16
**severe** 112:22,23
267:10

**sevoflurane** 32:18
220:6 221:15
**shake** 57:25
**shaked** 234:18
**shaking** 57:24
144:20 148:7
229:11
**shallow** 276:8
**share** 72:25 73:1,3
74:1 84:14 141:17
144:3 153:25
159:10 206:6
217:23 224:11
228:22 335:10
344:7
**sharing** 72:21
**sheet** 326:8,10
**shifted** 290:13
**shock** 121:7
**shooters** 117:2
**short** 123:7 124:24
125:2,4
**shorter** 129:7,9
316:7
**shorthand** 3:10
**shortly** 344:2
**show** 29:21 78:21
84:22,24 153:23
153:24,24 156:20
156:24 177:17
194:4,9 227:7,13
229:22 237:21,23
262:15 307:8,12
335:13 339:23,24
**showed** 86:23
139:15,16,16
170:17 171:5,8
201:5 262:13
268:14 333:23
339:16

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 402 of 418 PageID #: 8679

showing 154:20
196:3 288:13,20
335:19 336:22
338:15
shown 12:12 41:3
200:3 268:11,13
shows 170:23
171:9 172:18
178:13 223:24
339:15
shuler 4:25
side 16:5 25:17,18
25:20 27:13 47:19
124:3 134:24
145:4 175:24
187:18 189:4,12
189:13,17,23
190:16,23 232:19
244:5 249:12
266:16 320:9
325:24 326:1
sides 254:21
sight 162:22
sign 51:5
signal 30:1 80:11
210:12
signals 81:5,9 82:4
87:8 209:15 210:8
signature 3:18
347:22
significance
341:13
significant 37:20
169:20 226:21
signify 223:18
signs 28:1,16
29:14,14 33:5,5
43:13,20 44:14,25
45:20 46:20 47:5
47:14,24 48:3,18
49:2,2,8,14 50:12

50:15 51:5 94:13
160:21 244:15
256:22 259:25
261:21 262:13,15
264:4,5 276:17
silent 323:22
similar 17:20
32:22 40:23 50:23
50:24 78:23 81:12
112:8 127:13
130:19 131:6,14
134:4 179:16
198:8 212:6 259:3
267:8 299:12
304:23 345:14,14
similarly 114:2
simple 107:8
218:12 247:23
simply 21:20
152:14 159:2
212:3
simultaneous
221:10
simultaneously
221:9
single 330:6
331:12
sir 6:3 10:20
197:20
sit 121:14 256:6
278:10 321:5,7,8
321:10,11,16,22
321:24 322:1,18
site 181:16 183:19
sitting 316:21
320:5 322:5
323:13
situation 48:22
108:21 109:22
112:5 114:14
121:19 163:21

244:1 265:25
267:11
situations 88:7
89:2,4,7 112:6
113:8,10 114:11
121:10
six 9:5,6 15:23
16:6 59:11 68:9
117:2,4,6 229:19
281:18 294:4
size 92:16 102:24
skills 347:9
skin 122:7 123:1,3
123:8 139:17
256:16
sleep 34:15,16
52:16 178:10
207:11 299:12,12
302:16
sleepy 276:2
slight 96:23,24
164:23 165:2
slightly 39:5
116:16 175:21
slow 61:18 93:7
118:23 137:3
205:20 272:5
slower 137:2
slowing 134:24
slowly 93:9 102:11
110:16 115:14
small 39:9,10,12
39:13 96:18 99:24
102:5 114:11
135:16 185:19
191:18 257:19,21
284:22 319:20
324:10 325:16
snore 278:14
299:11

snoring 277:4,9
278:24 279:4,7,12
snow 314:14,17
sole 43:5 130:14
210:22
solely 44:18 228:1
solid 270:20
solo 46:16 120:10
120:15,16,18
121:1,25 122:4,6,9
123:1 130:4
solution 99:23
100:1,5 103:18
somebody 7:16
18:21 19:3,21
44:16 50:18 75:1
76:19 88:11 90:2
101:4 108:14,16
113:21 115:7
116:20 121:8
138:14 151:8
153:1 183:22
187:21 193:25
197:9 198:1
202:24 209:25
223:8 238:25
239:14,16,20
241:13,13,24
244:3 275:10
276:2 295:17
299:9 300:1
301:10 318:21,24
320:11
someone's 271:4
somewhat 15:5
54:20
sommer 4:19
soon 277:19
292:19
sooner 93:20

Page 55
www.veritext.com        Veritext Legal Solutions        800-556-8974
Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 403 of 418 PageID #: 8080

sorry   5:5 9:15
  10:20,21 12:5
  14:22 15:22 17:13
  17:18,23 22:1
  24:6 27:13 31:2
  35:16 37:9 51:9
  64:2 73:14,21
  88:19 89:12 90:15
  94:12,13 96:4
  107:7 108:4
  113:15,23,23
  139:18 148:12,12
  150:3 154:7
  161:22 185:20
  193:10 199:5
  205:20 220:14
  228:5 229:22
  253:17 267:21
  268:12 269:1
  272:15 277:16
  300:17 315:10
  336:4,4,6 341:3
sort   7:17 10:4
  11:12 15:12 19:12
  25:13,17 28:8
  30:6 31:19 33:3
  34:22 37:14 47:24
  50:23 53:23 66:18
  74:24 75:11 85:25
  88:10 96:15
  101:11 102:6
  103:11 108:4
  111:11 118:1
  123:23 127:8
  130:20 131:13
  133:17 137:15
  152:19 160:25
  168:7 172:24
  184:22,23 190:17
  193:22 215:10
  216:12 221:12

243:4 249:3
  256:14,17 257:20
  259:3 260:11
  261:17 265:8,24
  265:25 276:9,11
  278:24 279:1
  285:6,13,14
  286:18 295:14
  299:12,21 301:24
  307:3,6 317:21
  322:2 325:22
  331:17
sound   171:18
  278:24 288:17
sounds   261:9,19
  264:1 323:9
source   211:16
sources   70:3
speak   111:22
  284:5 328:22
speaking   89:15
  103:4 111:21
  122:14 162:25
  170:8 172:6 173:9
  190:7 239:5
specific   17:22
  20:25 23:1 26:11
  116:5 176:4
  268:20 292:4
specifically   14:3
  40:17 145:25
  157:6 212:24
  269:22
specificity   17:18
  18:1
specifics   21:2
specified   23:4
  259:2
specifies   17:21
specify   8:7 11:18
  153:7

spectrum   76:18
  259:20 260:17
speculation
  254:22
speed   188:1
  255:13,15
spell   61:1 133:3,7
  160:18
spelled   32:19
spelling   5:22 61:3
  133:9
spent   21:15 59:8
  66:17
spoke   284:7
  289:14,17
spoken   5:10 193:6
  303:23
spontaneous
  250:11 257:7
  276:16
spot   21:1,6
spots   336:15
spread   218:13
  233:13
squad   116:25
squeeze   76:9,19
  77:1,6,10,23,25
  78:4,7 79:2,8
  81:23,25 146:16
  147:5 180:8,10
  229:14 230:2
  231:8,19 234:18
  236:16 246:23
  256:4 257:16
  262:6 263:4
squiggly   136:22
stages   299:12
stamp   285:6
stand   94:17
  346:16

standard   20:6,17
  69:2,8
standing   319:16
  326:4
standpoint   85:14
  169:11 173:13
  207:6,7
start   14:12,14
  21:11 29:23 53:8
  92:25 94:5,23
  95:13 96:2,9
  101:16 108:15,16
  185:17 207:9
  215:18 248:2
  260:16 294:16
started   15:13
  62:23 152:22
  277:12,20 308:23
  308:24
starting   15:11
  103:10 115:4
  279:5
starts   93:7,9 119:2
  126:14,17 168:10
  273:2 338:8
state   3:7 6:16,18
  7:4,19,21 9:15,17
  9:22 10:3,6 11:4,5
  11:11,15 12:12,13
  12:17 13:1,10,24
  63:22 71:12,13,13
  72:2,5 104:24,25
  105:4,5,23 116:4
  119:7,8 150:21
  152:8 182:7
  207:14 236:23
  245:12 246:17
  249:4 250:19,25
  262:24 263:18,19
  290:21 322:8
  329:1 333:10

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 404 of 418 PageID #: 8081

347:2,5
**state's** 64:4
**stated** 22:21
171:12 218:24
**statement** 23:3
52:11 152:19,20
177:16 181:3,10
181:17 182:13
183:13,20 205:10
210:18 212:23
239:6 275:18
300:16 318:1
330:8,15,15 331:3
339:13 340:13
**statements** 68:5
205:12 245:17
255:22
**states** 1:4 4:10
8:18 10:1,5 12:19
13:4,13 14:3
68:21 119:16,17
205:25 213:18
245:6 250:23
**stating** 163:13
282:2
**statistical** 85:13
169:11,19 171:20
172:17 173:7,13
341:13
**statistically**
169:20 172:5
307:9
**stay** 175:23
**stayed** 320:7
323:22 343:4
**step** 39:9 120:3
264:8
**stepping** 295:12
**steps** 39:12,13
**sternal** 23:15
256:15 262:4

276:3
**stethoscope**
277:25
**stevens** 58:10 60:6
63:4 179:15
194:25 304:22
**sticking** 125:19,21
**stickler** 69:23
**stimulants** 29:23
41:4 83:17
**stimulate** 151:8
**stimulated** 219:5
219:10,12 257:11
**stimulating** 88:20
90:6,7 151:4
209:25 342:8
**stimulation** 54:23
55:3,3 74:22 78:3
82:5 150:19 152:5
234:9,19,22 235:1
235:9,16 236:7,10
236:11 243:10,11
243:20
**stimuli** 74:17,20
74:21 75:6,9 77:9
77:14 78:7 83:18
89:13,18 144:13
145:11 146:15,16
151:20 153:19
158:7 184:21
225:1 243:16
246:20 247:3
257:2 259:2,18
260:18 262:4
264:18 301:14,17
344:16
**stimulus** 41:2
74:22 77:3,4,5,6,9
129:6 140:7
142:21 143:2,4
144:16 151:12

248:14 254:10
256:13,14,15
257:8,10 258:20
258:21 259:14
260:8,10,14,15
262:5 301:9,18,20
301:20,21 302:1
**stipulated** 314:2
**stipulation** 3:8
**stood** 284:21
320:9
**stop** 61:18,19 62:9
81:5 84:14 98:22
102:10,12 104:5
108:9,24 111:6
112:15 153:22
187:11 188:4,5,9
198:11 212:6
213:3 224:1
227:18 315:8,13
**stopped** 61:23
68:22 103:21
112:21,22,25
174:8 238:14,18
265:11 343:18
**stops** 61:18 80:10
80:15 93:10,13
98:17,18,20
105:14 106:11
110:18 118:24
**story** 9:4 156:5
**straight** 16:8 85:7
85:9,16,19,23 86:3
169:21,25 171:14
171:16 173:3
**straightforward**
129:18,20 260:24
**strange** 115:20
**strapped** 262:7
**stream** 325:19

**streaming** 285:22
**street** 1:16 19:3,22
20:15
**stress** 93:8
**strict** 166:5,11,20
168:4
**strike** 165:13
**strip** 53:5,11
**strips** 53:22 62:4
**strong** 54:9 77:12
**stronger** 55:3
**strongest** 294:14
**strongly** 51:19
109:3
**struggle** 7:9
**stuck** 131:13
**student** 260:6,19
260:20,22
**studied** 102:16
127:22 140:8
152:21 157:6
169:9,10 171:1
213:15
**studies** 31:20
40:16,16,22 41:2,5
41:21 42:3,5,17,25
46:7 60:13,17
78:20 79:24 90:19
90:24 104:9
145:24 146:11
156:19,23 157:1
166:19 174:15,16
174:21 179:2,2,9
180:9 199:16
204:4 210:16
225:10 227:6,10
227:13,16,21
228:2,5 235:2
248:21 270:6
271:23,25 305:14
305:16,17,25

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 405 of 418 PageID #: 8082

308:14 330:20
331:11,13 339:5
**study** 2:13,14,15
2:17,18,19,20,21
2:22,23,24 40:17
40:18,25 60:19,22
61:6 62:7,11,15,20
90:25 91:3 143:9
143:13 145:6,10
146:16 147:11
149:6 152:1
155:18 157:24
158:2 159:9,9,10
159:12,15,19
160:13 163:16,17
164:7 165:22
166:22,25 167:5
167:16 169:4
170:11 171:13
172:9 173:17,20
173:24 174:2,11
174:12,13,16,18
174:21,24 175:14
176:14 177:25
179:3,4 180:4
191:14,16 194:11
194:12 199:12
201:5 203:9 204:9
213:11,12 214:2
214:14 218:1
219:21 222:24
223:2 224:2,23
225:4,6,24 226:8
226:10,16,19
227:25 228:10
229:5 230:2 235:3
235:7 236:9 237:2
237:13 269:17,19
269:20 270:4,8
272:6,12 273:12
306:5,6,7,10,11,16

307:14 308:22
309:13 311:18
313:11,22 329:17
330:5,8,20 333:21
333:23 334:16,17
334:18,22 336:10
337:10,12,15
338:22,25 339:6
343:16
**studying** 152:16
218:21,23 219:1
**stuff** 115:21
**subdued** 275:23
**subject** 23:10
83:12 91:4 143:14
145:13 146:15
147:22 148:4
153:19 175:22
220:12 225:15
232:13 304:7
305:4 314:22
**subject's** 230:16
**subjected** 129:6
234:15
**subjective** 15:6
75:3,9,15
**subjects** 143:19
147:3,4 148:6,7
151:21 153:4
155:20 164:10
219:4 220:10,20
229:19 231:5,7
233:16 234:8
236:2
**submission** 67:16
**submitted** 22:12
62:23 67:5,8,23
**subpoena** 282:1
**subsequent** 22:13
103:9

**substance** 195:4
267:7
**subtle** 261:4,4,6
**succinyl** 133:12
**succinylcholine**
133:3,4,6
**sudden** 39:6 162:9
299:19,22
**suffer** 265:20
266:6
**suffering** 266:11
266:15,19 267:12
267:13
**sufficient** 19:20,25
22:16,18,22
102:10 126:12
128:4,8,12 130:1
140:13 176:7
199:8 203:14,20
231:13 248:18
256:1,10 329:24
345:9
**sufficiently** 250:4
**suffocate** 95:9,10
**suffocating** 266:7
**suggest** 203:20
340:9,15,25
341:10
**suggested** 334:6
**suggesting** 204:5
340:21,23
**suggests** 51:19
340:15 341:7
**suite** 1:16
**summarized** 82:9
98:12
**summary** 7:1
**super** 127:22
**support** 19:1 20:7
20:20 21:19 61:12
61:15 172:9 174:3

174:20 185:9
189:6,7 329:17,20
**supports** 173:21
200:14
**suppose** 11:14
14:1 25:17 46:12
65:1 66:3 71:5
90:2 105:13
110:11 179:12
211:15,17,20
215:25 216:17
231:21 250:3,8
264:5 293:22
296:19 300:19
327:4
**supposed** 193:11
263:13 281:19
302:14,21 314:13
321:10,11,15,24
322:2,4 323:9
**suppression**
127:12,19 137:7,9
137:10,11,13,24
137:25 138:7,13
138:17,20
**sure** 5:7,14 8:1
14:3,5 19:25 21:5
22:19,20 25:12
26:6 38:16,17,19
39:16,24 40:5,15
40:21 43:9 46:10
47:18 60:9 61:2
61:23 64:8 67:3,7
67:9 68:8 73:11
73:17 74:10 79:18
80:9,24,25 82:6
84:24 87:11,24
96:8 101:9 105:10
106:7 107:2 112:2
114:1 116:24
117:21 118:1,4,6,7

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 406 of 418 PageID #: 8083

120:22,24 121:6
141:3,8,13 142:19
142:23 146:18
152:20 154:4,11
154:24 159:25
161:13 169:19
170:6 172:12
175:1 177:3
180:20 181:2,12
188:21 189:8
190:18 192:19
193:5 195:1,2
198:5 199:22
200:18 201:17
212:23 215:7
219:7 220:17,23
222:21 226:3,6,18
227:10,23 231:23
235:3,19,25 239:2
239:21 241:9
251:11 253:2,9
254:19,23 256:23
262:2 269:19
270:22 286:5,6,7
286:14 287:11,18
290:6,19 291:3,4,5
291:18 292:18
294:13 301:16
302:22 304:24
305:19 306:9
310:1 313:1
320:10 323:8
326:25 327:8,13
331:18 332:22
336:16 337:25
341:10 343:4
**surgeries** 122:21
128:20 132:22,25
138:12
**surgery** 24:14
52:9 54:6,17

125:9,10,11 128:9
128:13,18,19,21
129:10,11,12,13
129:23 130:5,8,10
130:11,22 131:19
132:20,22,25
238:5,10,15,23
239:1,4 295:19
**surgical** 77:14,25
78:3 122:5 123:16
125:3 128:4,5
240:13 243:20
**surprise** 289:11
**surprised** 16:6
233:21,24 237:18
296:9
**surprising** 272:3
**surprisingly** 78:21
**survive** 69:4
**susceptible** 93:23
**suspect** 249:9
329:25
**suspicious** 273:17
**sutherland** 4:23
58:18 59:19
**swear** 5:2
**switch** 120:5
274:14
**switched** 87:12
**sworn** 4:2 5:4
**system** 28:10,12
30:25 40:1 70:23
115:20 176:4
201:7 330:1

**t**

**t** 2:9 3:1,1 5:24
134:20 236:22
347:1,1
**table** 27:25 94:21
144:9,25 148:10
148:13 196:21

198:22 224:15,16
229:8 230:5,7
235:18,20 249:14
249:16,17 296:5
326:6
**tachycardia**
101:18
**tactile** 74:22
256:14 260:10
**take** 19:2 25:21
26:5,17 36:24
42:15 46:1 52:13
52:23 53:2,5,21
54:5,18 57:1
58:25 61:17 81:7
92:9 93:15,16
94:2 98:3,4
108:13 110:8,13
110:14 112:14,16
113:25 115:14,14
115:16,25 126:18
128:21,24 141:19
151:22 154:2,8,10
160:13 179:25
180:11 191:25
192:3 194:21
195:3 197:1
198:13 205:20
213:21 214:20
216:8 220:25
225:21 228:19
251:9 252:17
253:4 268:2
269:16 271:22
272:18 280:20
299:24 304:17
306:3 308:6
309:22,24 312:19
315:5 337:4 344:4
**taken** 3:4 15:15,16
30:11 55:13 71:18

98:7 138:16
163:24 210:11
269:11 273:21
**takes** 146:5 237:11
272:24 342:7
**talk** 20:21 28:11
32:23 48:17 51:4
58:20 63:10,19
64:11,13,15 74:1
76:13 80:6 92:22
97:8 105:8 106:8
106:11 107:2,3
120:6 132:11
133:22 139:7
146:10 193:1
195:13 206:17
228:14 243:12
247:17 253:11
274:15 275:9,20
278:11 280:24
284:3 291:21,25
292:3,6 295:4
304:22 305:24
309:23 320:2
338:17
**talked** 32:8 33:24
60:20 63:23,24
64:18,22 65:19
66:7 93:12 97:10
97:11 117:19
118:23 139:9
149:4 151:22
155:19 189:12
209:3 217:18
222:12,22 228:13
239:12 249:18
253:12 270:4
286:24 291:23
292:9 320:10
322:13

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 407 of 418 PageID #: 8084

**talking** 14:18
20:18 21:1 24:23
24:25 25:23 29:15
31:18 32:15 33:11
34:18 45:17 47:18
47:20 48:7,23
49:1 58:1 62:14
64:15 80:17 90:11
90:12 97:15 106:9
107:4,5 110:22
113:9,12,25 115:6
122:22 127:8
128:20 137:6,10
139:12 142:14
146:7,13 147:24
148:22 149:3,5,13
149:15 150:8
151:24 152:10,11
158:9 163:16
178:18 183:14
191:20,21 193:14
201:12 206:7
214:21 215:12
231:19 237:14
243:18 244:11
254:11,21 256:3
259:19 273:12
286:10 287:5
311:17 313:22
316:17 323:21,22
324:8 328:11
331:5 333:21
337:10 338:3
341:6,18 342:18
345:7,8
**talks** 185:5
**tape** 218:12
219:14 222:25
223:5 234:12
**taught** 18:8,11
19:11 21:19

**tax** 68:5
**teach** 25:15
260:19,21
**teaching** 21:15
27:5
**tear** 29:17,21,24
30:4,5,8
**tearing** 29:17 32:7
239:12 325:14
**tears** 285:18,20,21
300:7,10,11,22,22
300:23 301:1
325:17 327:22,22
**technically** 170:8
**telephone** 58:12
**tell** 13:1,4 19:4
33:22 42:14 55:18
68:16 99:15 111:4
112:12 114:18
116:10 119:14
133:8 140:25
141:8 152:14
179:1 186:7 192:5
201:25 204:3
228:16 245:12,25
267:4,5 275:4
279:19 282:14,24
284:9 286:25
289:20 304:2
309:10 311:23
313:7 315:3,7
324:5 327:13
329:11
**telling** 210:8
342:12
**tells** 262:24
**ten** 39:7 59:6 70:1
87:13 93:16,21
96:20 103:21
115:7 124:22
204:7 229:19

251:14 309:25
317:3,19 335:20
337:13
**tennessee** 1:5,23
1:25 3:5,8 4:11
6:8,17,20 17:10
58:14 63:23 64:11
64:16,19 65:16
66:2 67:8 71:12
71:13 72:5 107:8
107:9,21 111:2,13
112:7 116:5,18
242:25 244:19
245:4,14 246:7,8,9
247:1,14,24
255:25 258:3,6
262:24 266:22
288:25 290:22,24
304:7 347:2,5,15
**tennessee's** 17:16
17:17 22:8
**tenth** 204:1
**tenuous** 108:21
**term** 18:8 19:15
65:3 74:2,10,12,16
76:24 80:9 83:6
83:10,14 84:20,21
84:23,25 85:1,22
94:10 95:23 114:9
120:1 127:13
142:14,16,23
143:13 149:12
151:7 170:6
176:15 178:20
184:17 185:1
190:7 208:4 212:2
215:13 216:5,12
221:11 231:22,24
242:14 243:8
261:16 297:23
306:22 326:21,24

341:7
**terminally** 61:11
**terminix** 122:16
122:18 123:21
**terminology**
301:17
**terms** 8:14 13:6
19:10,12 21:12
26:5,19 32:24
41:13 48:19 51:18
52:5 55:8 60:4,5
66:17 74:19 78:22
82:8 85:9 90:8
95:1 96:15 108:22
134:4 141:21
156:12 158:23
159:6,19 166:16
179:16 190:22
198:6 209:7
221:20 231:13
238:25 239:13
242:14 250:2
257:1 262:15
263:1 265:4 266:8
295:8,15 306:1
308:15 313:3
326:12 332:3
340:22
**terrible** 296:11
**terry** 1:6 4:8,16
6:7
**test** 243:25 244:12
246:11
**testable** 244:1
**tested** 149:16
269:5
**testified** 8:5,9,9
13:17 111:1 118:4
174:6 280:20
300:10 304:6
324:23 326:19

www.veritext.com          Veritext Legal Solutions          800-556-8974

testify 55:21 71:9
71:18,18 243:3
287:13
testifying 9:16,18
10:14 11:20 13:17
246:9 304:10
333:17
testimony 6:17
9:10,15 10:2,3
15:25 16:8 17:4
56:19 57:8 88:8
117:23 120:25
179:18 208:7
209:22 280:7
287:12,16,20
294:19 326:13
333:19
testing 57:14
218:11 268:19
text 122:15
textbook 205:2
texting 304:1
texts 303:20,22
thank 5:19,25 70:2
72:8 73:10 82:11
122:17 129:4
251:17 268:5
thankfully 196:16
thanks 251:23
346:14,15
theoretically
110:13 129:6
300:25
theoreticals
302:15
theorizing 110:14
therapeutic 190:6
194:23 195:6
198:5,9
thing 19:6 26:3
27:16 28:5 30:16

30:20 35:4 55:9
55:10 63:13 68:6
70:6 73:6 80:5
81:12 115:13
123:21 146:3
162:25 163:2
242:24 260:11,13
288:13 290:15
293:5 294:3,7
296:18 299:21
301:5 327:18
331:15,25
things 7:4 27:12
27:15 28:9 30:23
31:9 42:23 44:17
44:18 48:25 52:19
52:21 53:18 54:24
67:15 70:22 78:10
105:12 114:20
115:16,20,21
139:11,13 185:7
185:18 237:1
239:3,9 256:12
258:11 259:9
260:19,21 273:10
283:20 284:14,16
286:2,15,18
290:13 291:23
295:5,15,20
300:12 309:10
329:7 331:24
341:9
think 5:15 7:3,14
7:17,25 9:2 10:4
10:13,15 11:8,16
11:18 12:13 13:11
13:15,22 14:7,15
14:24 15:19,25
16:17,18,24 17:3,4
17:6,20,25 18:4,5
18:12,14,17,18,19

18:20 19:6,7 20:5
20:13,17,22 21:9
22:22 23:1,3
24:10 26:11 30:14
31:7 34:13 35:20
36:2,13 37:2,22,23
41:5,6,15,16 42:21
43:2,3,7 45:8 46:2
46:11,25 47:2,25
48:4 51:6,11,11,13
51:16 52:4 54:8
56:7,21 57:1,4,13
57:19,22 59:10,18
59:18 60:3,3,9
61:21,22,24 62:23
63:12,12,17 64:21
65:12 66:8,17
67:24 68:19 69:17
70:6 71:10,19
76:2,23 79:4,10,11
79:15 80:3,25
81:2 85:8 87:1
88:24 90:23,24
91:24 95:3,24
96:1 100:23 101:9
103:11,13,17,19
104:19,21 105:1
107:15 108:10
112:11 113:8
114:11,21,22
116:2,15 117:16
118:2,21 120:21
121:4,4,24 122:1,3
122:8,8,10,24,25
125:7 126:14
129:10,14 130:20
133:11,13 134:13
134:14 135:4
136:3,14 138:24
146:14 152:25
156:1 158:1

159:16,25 162:21
163:11,14 164:2,4
164:6,13 165:10
166:21 169:12
170:22 172:14
174:12 175:17,22
178:21 179:17,18
180:2 181:6,11,20
182:3,6,12,14
183:19 184:20
185:21 189:22
190:1 191:5
193:20 195:1,16
196:6 198:17
200:18,20 202:16
203:19 205:19
209:21 212:11
214:22 215:25
219:7,11,12
223:22 231:10,13
237:17 239:6
240:20 241:10,11
243:1 245:4,9
246:3,12 247:12
248:21,22 250:13
250:13,16 252:13
252:25 253:3
254:5,7,16 255:16
256:9,11,13,19,20
256:25 258:1,23
260:16,23 261:7
264:10,23 268:21
268:22,25 269:15
269:17 270:24
272:2,8,15 278:6
280:4 285:15
286:1,3,20,20
288:11,15 290:3
290:12 291:16,18
293:14,19 295:7
295:11,16,22,24

Page 61
www.veritext.com    Veritext Legal Solutions    800-556-8974
Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 409 of 418 PageID #: 8086

| | | | |
|---|---|---|---|
| 297:22,24 299:5 | 261:1 279:23 | 156:4,14,15,15 | 267:22 270:18,19 |
| 299:23 300:13,21 | 285:20 291:8 | 160:8,11 162:5,11 | 271:12,15 273:14 |
| 300:25 301:4,11 | 296:3,10 305:24 | 163:1,23 192:21 | 300:18 |
| 301:21 302:2 | 313:8 333:13 | 192:24 194:18 | **timing** 11:12 |
| 303:10,25 304:4 | **thoughts** 323:25 | 218:15,18 220:25 | 62:18 105:12 |
| 305:1,25 306:8 | **three** 8:10 16:4,10 | 223:16 224:8,8 | 106:4 115:6 285:7 |
| 307:23 308:5,7 | 16:22,23 62:10 | 228:19 234:22 | **tissue** 81:11 |
| 309:8,18 310:12 | 107:24 117:5,5 | 236:23 237:7,11 | 156:11 301:23 |
| 310:17,19 311:6 | 120:8 161:2,5 | 240:3,5,14 251:19 | **title** 318:12 |
| 311:22 312:2 | 168:24 169:1 | 251:22 252:7 | **today** 5:13,13 6:9 |
| 313:4,6,7 316:6 | 275:12,25 314:21 | 253:21 254:9,12 | 33:15 55:21 56:11 |
| 319:1,2,4,22 320:7 | **threshold** 76:23 | 265:10,18,20,21 | 56:13,25 57:8,17 |
| 320:9 321:16 | 274:12 | 265:25 267:17,20 | 98:3 121:14 |
| 323:5,7 324:23 | **throat** 279:5,8 | 267:25 269:3,9,14 | 131:11 209:22 |
| 325:22 326:18,22 | 299:7 | 273:8,21 274:13 | 256:6 278:10 |
| 326:23 327:9 | **thrust** 297:16 | 275:22 276:6,14 | 303:20 312:3 |
| 330:7,13,24 332:7 | 298:4 | 277:4,8 278:5 | 334:24 |
| 332:19,24 333:1 | **thumb** 72:13 | 280:10 282:17 | **told** 11:15 12:13 |
| 334:19,19 337:2,3 | 141:14,19 218:13 | 283:1,16 285:6,6,9 | 12:17 42:16 72:22 |
| 337:18 338:20 | **thursday** 290:10 | 285:16 286:9,10 | 193:10 250:25 |
| 339:4,22 | **thursdays** 290:9 | 290:2 296:23 | 255:1 289:19 |
| **thinking** 16:17 | **tidal** 172:22 | 297:2 307:24 | 291:4 303:6,9 |
| 47:3 62:23 117:21 | **time** 10:1 11:14 | 308:8,11,15,17 | 304:3 305:12 |
| 117:22 272:16 | 16:19 21:14 25:22 | 309:13,15 310:3,6 | 309:10 311:2 |
| 286:2 302:15 | 26:24 40:5 46:1 | 311:11,12,13,16 | 314:18,23,24 |
| **thiopental** 33:16 | 53:19 59:11 66:11 | 311:18 312:5 | 315:12 322:15 |
| 33:16 49:21 50:11 | 66:17 67:1,8 | 313:7,17,20 314:1 | **tolerance** 165:14 |
| 123:14 216:24 | 80:16 82:20,23 | 314:5,6,11 315:5 | **tolerant** 163:24 |
| 217:4,6 220:5 | 87:9,16 92:23 | 315:18,21,25 | 164:2 |
| 221:14 344:19,25 | 93:14 96:13 97:3 | 331:25 332:8 | **tolerate** 90:3 |
| 345:11 | 97:6 103:7 105:21 | 337:24 338:10 | **tongue** 279:8 |
| **third** 16:4 66:15 | 106:2,5 114:1,13 | 341:25 342:11 | 298:18 299:6 |
| 99:11 186:10 | 115:17,25 120:6 | 343:19 344:4 | **tony** 1:9 4:9 |
| **thoroughly** 72:6 | 121:13,25 122:8 | 345:20,23 346:17 | **top** 66:6 80:4 |
| 221:1 | 125:19,22 127:6 | **times** 8:10 15:15 | 148:23 157:9 |
| **thought** 17:3 | 128:7,22,24 129:5 | 15:16,23 21:13 | 170:1 172:18 |
| 21:16 62:22 90:15 | 129:8 131:6,7 | 49:13,14 58:20,24 | 194:22 211:17 |
| 91:1 96:4 98:5 | 133:2 137:21,22 | 59:7 68:24 70:17 | 215:7 230:6 |
| 103:8,11 206:25 | 138:25 139:2,5 | 70:25 87:4 89:8 | 231:21 271:6,7,8 |
| 209:8 231:11 | 141:21 142:1,4 | 89:11 161:2,5 | 305:1 |
| 244:20 249:3 | 143:16 154:15,18 | 210:3 266:12 | |

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 410 of 418 PageID #: 8087

topic  212:22
total  43:16 59:11
    80:18 169:5 185:8
totality  248:21
touching  256:18
toxic  191:10,20
    193:18,19,20,21
    193:25 194:23
    195:9 197:11
toxicity  193:24
toxicologist  156:9
toxicology  268:13
tracheal  342:9
track  31:19 108:5
train  260:1
trained  18:21,23
    18:25 19:17,19
    20:2 22:8,24 23:5
    23:8,12,18,23 24:1
    25:12 256:21
training  18:10
    19:2 20:3,4,9,13
    20:13,14,15,16
    22:4,12,13,16,17
    22:21,25 24:9,12
    24:17,17,19 25:4,8
    26:14 45:11 65:25
    65:25 172:16
    258:8,13 260:1,5,6
    303:17
transcript  164:21
    347:6,8
transcripts  58:11
    63:4
transition  220:7
    223:3
translation  339:20
transmission  3:17
    87:7
transmit  80:10
    82:4

transmitted
    324:15
transplant  114:25
transported  34:23
    323:17,18,20
trap  76:16
trapezius  76:8,19
    77:1,6,10,23,24
    78:4,7 79:2,8
    81:23,25 146:16
    147:5 180:8,10
    229:14 230:2
    231:8,19 234:18
    236:15 246:23
    256:3 257:15
    262:6 263:4
trauma  137:15
    293:1
travel  290:17
    291:23
treat  48:16
treatment  293:11
tree  199:20
trend  341:12
trial  17:4 63:4
    150:18 287:13
    288:13 328:15
    330:10
trick  105:6
tried  89:24 169:17
    289:10
trish  318:17,19
    319:7
true  24:10 38:9,12
    43:6,15 45:4
    173:4 212:24
    221:25 239:6
    244:18 255:6
    265:19 271:21
    293:22 347:8

trust  174:24 175:1
    175:2 304:13
trustworthy  332:3
truth  55:18
truthful  65:22
    292:24
truthfully  55:21
    71:23 243:3
try  6:25 9:22
    65:21 91:6 114:16
    125:17 138:20
    196:2 197:15
    263:19 268:10
    283:6 313:15
    314:11 316:4
    331:8
trying  10:25 12:6
    15:5 35:16 36:12
    43:22 45:8,15
    70:10 89:4 94:18
    94:20 95:17 105:6
    116:1 120:17,19
    124:10 164:19
    171:18 190:20,21
    191:11 237:17,25
    241:10 248:4
    263:22 265:5
    282:21 283:15
    290:2 296:18
    297:6 298:21
    308:6,19 315:10
    327:19
tube  78:24 88:18
tuesdays  290:9
turn  62:3 277:20
    328:3 341:19
turned  103:14,19
    277:2 290:14
    294:12
turns  24:8 25:9
    62:8 102:20,23

131:1
twice  8:10
two  59:8,10,21
    62:10 74:15 75:13
    85:14 99:16,18,20
    105:25 107:11,23
    110:13,14,21,22
    111:14 112:16
    119:9 146:22,23
    158:20 161:2,8
    165:3 213:11
    216:9,10 275:19
    277:17 287:24
    290:4 291:2,9
    301:19 317:1,3,6,6
    318:9,22 319:22
    321:6,19 336:15
type  11:3 20:3,4,9
    20:12,16 25:8
    34:18 37:18 72:6
    85:2,6 99:8 134:2
    178:11 179:22
    180:3 191:16
    196:6 210:2 257:2
    258:19 259:8
    262:8 270:19,22
    294:17 297:19
    331:15
types  22:4 23:12
    26:16 29:14 32:13
    35:18 40:15 52:3
    70:21 77:22 94:13
    98:19 121:12
    138:11 164:7
    192:5 235:2
    241:16 245:17
    259:22 260:18
    264:3 306:2
typewriting  3:11
typical  188:25
    272:24

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 411 of 418 PageID #: 8088

**u**

**u**  3:1 32:19,20,20
 133:10
**u.c.**  25:11 114:19
**uh**  168:18,22
 178:17
**unable**  92:24
 181:3 182:1,18
 183:2
**unaware**  212:8
 238:22
**unbounded**
 313:25
**uncertain**  305:10
**unclear**  80:11 88:1
 212:3
**uncomfortable**
 90:6,21 130:9
**uncommon**  110:2
**unconscious**  39:3
 39:8,9,14,17,19
 48:11,15 49:5
 74:19 76:17,21
 93:4 98:14 138:19
 143:3,20 148:21
 156:16 182:4,5
 230:3 231:14,23
 231:25 232:1
 243:22 244:7,10
 245:21,22 274:4
 277:3
**unconsciousness**
 28:8 74:2,11,13,15
 75:22 76:12,14,25
 83:6,9,11 84:3,11
 88:5 123:24 140:2
 142:10,14,16,24
 149:13 166:17
 179:25 181:25
 184:14,17,24
 185:1 186:5 187:8

187:9 190:9
 217:14 220:8
 221:17,24 222:2,4
 223:4 224:4
 231:17,18 243:6,9
 256:1 274:9
 344:15
**understand**  6:8
 11:1 20:23 23:6
 26:4 31:8 34:4
 43:10 46:10 55:14
 55:17 57:21,23
 58:3,6 61:20,21
 69:4 70:7 76:12
 82:10 86:6 114:16
 120:25 121:6
 135:6 137:5 146:9
 172:13 189:21
 211:21 216:13
 217:2 241:18
 244:14 254:15
 265:3 266:15
 267:22 270:24
 303:2 305:19
 309:11,21 310:19
 315:13 316:13
 343:25
**understanding**
 6:12,14 29:3
 75:17 101:2 104:4
 114:23 140:11
 196:11,12 215:24
 244:2,4 247:4
 262:22 295:11
 307:3 327:5
**understands**  23:12
**understood**  151:1
 343:24
**undisclosed**  343:7
**unethical**  199:13

**unfortunate**
 296:13
**unfortunately**
 76:15 78:11
 114:20 189:4
 301:18 314:18
**unhelpful**  238:13
 238:16,17
**unilaterally**
 316:14
**unintended**
 190:23
**unit**  4:6 24:14
 241:15
**united**  1:4 4:10
 213:18
**unknown**  140:2,10
**unpleasant**  70:24
 71:21
**unpleasantness**
 70:21
**unresponsive**
 184:20 220:13,22
**untruthfully**  56:1
**unusual**  134:16
**update**  160:2
**usage**  135:5 206:8
**usages**  209:14
 212:14,19
**use**  13:6 26:12
 28:3,23 36:8
 37:15 38:10 42:6
 42:21 43:5 45:9
 45:13 51:2,15,17
 52:11 62:12 73:12
 74:2,10,14,25,25
 76:16,24 79:20
 80:9 83:9,10,14
 84:10,20,22 85:21
 94:10,12 95:10,11
 100:5 103:19

104:24 105:4
 108:5 112:2 114:9
 116:24 119:25
 122:20 123:3,17
 127:13,14 130:13
 130:23,25 132:22
 134:15 136:15
 142:14,23 143:1
 143:13 149:12,18
 151:6 161:4 175:2
 175:12 176:15
 178:20 184:17
 185:1 188:24,25
 189:2 190:7 202:9
 202:21 203:1,2
 204:17,18,19,20
 204:21 205:11
 207:13 208:4
 209:1,7 210:17,22
 211:2,3,22 212:25
 241:2,12,15,17,20
 241:23 249:4
 258:14 261:16
 266:8 268:2
 271:11 295:8
 306:21 312:4
 325:6 340:25
 341:4,10
**uses**  112:3 250:19
**ushered**  319:22
**usual**  98:21
**usually**  16:7 20:8
 48:12 59:4,19
 66:11 75:8 162:6
 193:25 194:1
 235:1 238:6 255:4
 256:13 279:8
 297:14 298:13
 341:11

Case 3:18-cv-01234  Document 184-13  Filed 03/17/22  Page 412 of 418 PageID #: 8089

**utility** 196:6

**v**

**v** 32:19
**value** 235:10
 339:24
**van** 58:9 60:1,7,13
 63:5 186:23
 242:20 244:8
 266:2 323:18,21
**vapor** 34:19
**variability** 26:18
 32:24 35:15 36:14
 36:18 37:18,20,24
 38:22 44:6,13
 158:17 159:4,5
 172:19,22,25
 173:1,2
**variable** 150:21
 152:7
**variations** 233:11
**varies** 160:25
**variety** 28:1,20
 42:2 74:20 183:23
 241:3,12
**various** 35:13 47:8
 68:21 74:17 75:4
 90:19 98:11
 158:16 184:21
 191:10
**vary** 52:17 54:13
 101:23 268:22
 269:13,21
**vasodilation** 191:3
 191:4
**vast** 26:11 118:9
 136:13
**vecuronium** 87:3
 87:10,13,20,22
 88:2,14,22 89:21
 90:13,18 91:9,16
 91:24 92:8,11

95:16 97:15,16,18
98:9,24 99:4,5,6
106:17,18 107:25
108:1,6,23 109:5
109:15 110:5,7,19
111:16,24 112:4,6
112:10,13 113:2
114:7 116:3,11,14
116:20 119:12,24
134:17 182:1
197:7,10,14,14,16
197:16,18,25
198:1,2,9,25 199:2
199:4 200:4,6,8
240:11,12,13
241:14 243:19
244:15,22,23
245:23 246:14,14
246:17 247:7,20
250:18,20 251:2
253:24 254:2
255:2 264:25
265:6,19,20 266:4
266:7,11,12,22,23
267:3,13 275:13
277:12 301:9
342:6
**vein** 80:8 109:9
 115:2 118:25
 267:10
**ventilator** 240:23
**ventricle** 109:9,10
**ventricular** 101:18
 101:19,20
**verbal** 23:15 74:21
 76:4 94:13 143:14
 147:17,22 148:4,6
 149:5 150:9,11
 218:16 243:10
 256:13 259:14
 260:7

**verbalize** 260:13
 260:15
**verbally** 57:24
**versa** 48:21
**versus** 4:9 17:18
 45:19 46:22 47:1
 85:7 166:17
 292:22
**vet** 253:13
**vet's** 193:3
**vice** 48:21
**victims** 293:7
**video** 4:4,7 5:1
 82:19,22 97:2,5
 139:1,4 141:25
 142:3 154:14,17
 160:7,10 192:20
 192:23 224:9,13
 251:18,21 267:16
 267:19 310:2,5
 313:16,19 315:17
 315:20 325:7,19
 345:19,22 346:4
 346:16,17
**videographer**
 82:13 224:7
**view** 275:16
 287:22,25 289:1
 312:14 314:24
 315:2 317:12
 319:14,15 322:25
 323:3,12 330:11
 332:5
**viewed** 308:2
 312:6,9 315:4
**viewing** 284:24,25
 288:7 293:12
 311:1 317:16
 332:14
**views** 7:2

**vigorously** 302:12
**virtually** 32:4,10
**virtue** 234:19
**visit** 225:6,16
**visual** 94:13
**visually** 94:14
**vivo** 226:19
**vocal** 261:13,14
**vocalization**
 261:16
**vocalizations**
 250:11
**vocalize** 261:12
**vocalizing** 261:14
**voice** 10:13
**volume** 103:19
**volunteer** 90:25
**volunteers** 90:25
 213:15
**vomited** 326:19,22
 326:23
**vomiting** 296:2,15
 300:2 327:3
**vs** 1:8 6:7
**vuyk** 2:18 201:13
 201:16,22 203:9

**w**

**waffle** 111:21
**waffling** 107:1
**wait** 56:8 61:25
 105:16,25 119:1
 160:3,6 185:21
 195:23 197:10,20
 277:21 292:13
**waited** 107:11
**waiting** 322:10
**waive** 289:3,5
**waived** 3:19
**waiver** 289:7,12
**waiving** 289:9

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 413 of 418 PageID #: 8090

wake 52:14 121:11
128:24
wakes 53:22
waking 151:10
walk 101:11
186:25 195:21
walked 278:4
walnut 1:16
want 7:21 13:1,3,9
15:13 20:12,16,25
21:8,10,20,20 26:5
30:17,18,20,21
34:14 36:22,23
38:19 39:23,24
42:21 43:2,9
52:11 54:15,25
56:17 64:8 67:14
67:17,22 68:3,22
69:22 72:24,24,25
74:4,5 79:20
81:16 82:16 83:5
86:17 91:4 97:22
98:4 100:15 105:7
110:25 112:2
119:9,9 120:24
121:11 125:15
127:13 128:11
129:10 133:6
134:14,18,25
138:5,5,7,12,16,23
140:22,24 141:1,5
145:16 146:9,10
151:23 153:23,23
154:10 160:3,4,13
161:12 162:19
172:12 182:22
183:6,8 187:9
191:14 198:20,24
201:18 202:1
206:20 211:2
228:17 235:23

238:9 240:25
246:16 248:8
252:3,15 253:2
256:19 266:18
270:20 272:5
273:16 274:14
278:11 282:9
283:5 290:19
292:2 293:23
306:3,10 308:6,11
308:17 309:11,14
310:8 311:12,16
312:1,18 313:6
314:6 316:9,18
317:6 320:15
322:1,4 332:8,20
332:22 341:1,17
341:21 343:1,9,24
344:3,7
wanted 5:6 151:16
252:5 333:2 343:3
wanting 213:24
wants 9:22 162:22
247:24
warden 63:9,14,16
63:19,24,24 64:12
64:13 107:11
258:7 260:1,1,5
263:14,15,17,18
264:2,25 277:2
303:11,18
warden's 258:8
323:19
warning 2:16
185:8 186:10,15
192:11 196:19
warrant 275:17
300:15 326:4
water 94:11,16,22
wave 137:1,4

waves 137:2
way 7:19,25 14:6,8
21:17 27:12,17,17
40:2 48:19 54:8
68:20 70:22 71:2
79:19 80:8 83:8
83:13 95:24
116:16 134:1
135:4 141:21
142:24 143:1,11
162:8 163:11
165:5,6,8 168:21
177:4 184:19
188:25 189:9
190:2 191:24
223:1 235:1
244:11,12,20,21
245:10 249:1
265:4 270:25
272:25 282:20
285:15 302:13
303:1 304:23
305:22 312:7
316:7 324:14,15
327:1 328:24
329:10 338:1
347:12
ways 99:16,18,20
244:8
we've 15:12 45:10
55:11 65:19
177:11 199:2
209:2 210:23
239:12 248:12
271:9 280:10
308:14 311:11,21
313:25 330:21
345:3
weak 94:8
weakly 109:5

wear 45:24 46:1
146:5
wears 146:5 342:6
web 181:16 183:19
wednesday 290:14
291:6
week 290:23,25
291:14,17 309:3
311:7 314:25
weekend 346:13
weeks 287:24
290:4 291:2,9
weight 44:15
welcome 133:2
went 97:7 98:1
102:7 192:25
223:17 236:16
250:9 276:15
277:10,14,15,16
278:6 286:12
303:8 306:2
313:11,21 317:18
322:5 337:12,15
whatsoever 83:18
234:9 236:7 240:7
wide 29:6
wife 69:7 97:10
139:9 253:12
291:21,24 292:6
williams 60:8
willing 9:9 10:2
290:19 328:17
332:5 333:7,9,14
willy 186:24
window 39:4
185:18 284:25
317:5,5,10,11
windows 317:7
wish 237:18
294:12

Case 3:18-cv-01234   Document 184-13   Filed 03/17/22   Page 414 of 418 PageID #: 8091

**withdraw** 67:18
**withdrawal** 61:12
  61:14 248:11,15
  248:17 249:7,10
  249:15,19,24
  251:7 253:20,25
  254:3,8,11,13,17
  255:5,9,17
**witness** 2:3 3:3,18
  3:19 4:3 5:3,4 9:1
  9:22 10:3 71:9
  73:20 82:15 114:4
  117:11,13 141:11
  141:14,18 251:9
  251:12,16 274:17
  274:20,23 282:7,9
  282:13 287:6,9
  292:10 295:4
  310:10 312:6,9
  314:23 316:2,19
  316:25 317:1
  319:17 322:16
  327:25 339:1
**witnessed** 280:12
  281:16 294:23
  309:1 314:20
  316:19 343:21
**witnesses** 47:19
  71:15,18 72:2,3
  186:23 195:17
  271:19 317:24
  318:4 322:12
  323:10
**witnessing** 328:8
**woefully** 128:14
**woman** 318:14
**wondering** 184:8
**word** 34:21 51:17
  83:14 84:10 86:12
  95:10,11 111:21
  112:3 142:23

  175:2,12 177:5
  183:21 207:22,24
  208:25 256:25
  327:9,11 340:14
  340:25 341:2
**worded** 14:6,9
  189:9
**wording** 11:25
  212:5
**words** 94:16
  245:19 261:15
  321:17 341:4,10
  344:20
**work** 7:19 8:8 9:9
  9:21 11:10 52:3
  53:15 55:25 66:22
  68:22 71:23 72:6
  83:23 93:5 101:6
  102:22 103:10
  156:10 165:4,6
  268:3 272:25
  279:22 282:3
  284:4 288:22
  290:7,12 294:3,17
  303:1 313:15
  314:8 329:2 346:8
  346:10
**worked** 8:17,24
  322:2,21
**working** 12:5
  333:17
**works** 48:20 237:4
  333:5
**world** 75:8
**worried** 88:17
  257:23
**worry** 146:4
  186:25 196:1
**worst** 7:4
**wound** 290:8

**write** 205:15 285:9
  286:16 327:18,20
  329:25 330:19
  331:7,21 337:11
  341:9
**writing** 21:24
  286:18 339:19
**written** 152:15
  161:22 183:18
  185:7
**wrong** 17:7 22:20
  25:14 27:10,16,16
  27:17 49:15 59:5
  112:12 135:20
  136:6 162:9 221:3
  258:7 266:2
  304:25 336:20
  337:2 338:13
**wrote** 142:12
  211:22 256:6
  311:21 330:5

| x |
|---|

**x** 2:1,9 150:5
  330:16

| y |
|---|

**y** 5:24 100:11
  133:10,12
**yeah** 5:16 8:16,20
  9:6 16:5,13,16
  27:2 34:9 38:18
  40:2,6 46:18 55:6
  59:10 67:8 69:12
  81:22 84:6,7 92:6
  94:6 103:24
  105:10,10 110:24
  111:20 115:21
  119:18 121:15
  126:11 133:15
  143:10 148:1
  157:25 159:20

  161:14,24 168:14
  188:21 189:8
  194:24 199:19
  212:24 221:24
  222:6 223:12
  226:3 227:3
  229:23 232:20
  234:24 239:5
  240:1 256:25
  260:23 265:3
  266:19 273:20
  290:25 291:18
  297:24 305:8
  307:2 308:9 315:9
  316:13 328:10,13
  332:11 334:17
  335:9 341:3,8,17
  344:20 345:13
**year** 16:15 61:5
  130:19 131:9
**years** 9:5,6 16:6
  27:7,9,10,11 31:21
  68:1,7,9 69:7,21
  69:24 70:5 87:12
  87:13,18 120:8,8
  199:14 202:20
  258:13 294:4
**yesterday** 63:3
  275:3,7 280:20
  281:16 283:2
  284:8 295:7 302:5
  303:9 309:1 312:7
  312:9 316:19
  327:15 329:14
  330:6 343:21
**young** 89:24

| z |
|---|

**zero** 15:8,10 52:24
**zoom** 4:13,17
  58:12,13,21 60:5
  162:6 185:18

Page 67

Case 3:18-cv-01234 Document 184-13 Filed 03/17/22 Page 415 of 418 PageID #: 8092

Tennessee Rules of Civil Procedure

Depositions Upon Oral Examination

Rule 30

Rule 30.05: Submission to Witness; Changes;
Signing.

When the testimony is fully transcribed the
deposition shall be submitted to the witness for
examination and shall be read to or by the witness,
unless such examination and reading are waived by
the witness and by the parties. Any changes in form
or substance which the witness desires to make
shall be entered upon the deposition by the officer
with a statement of the reasons given by the
witness for making them. The deposition shall then
be signed by the witness, unless the parties by
stipulation waive the signing or the witness is ill
or cannot be found or refuses to sign. If the
deposition is not signed by the witness within 30
days of its submission, the officer shall sign it
and state on the record the fact of the waiver or
of the illness or absence of the witness or the
fact of the refusal to sign together with the
reason, if any, given therefor; and the deposition

may then be used as fully as though signed unless
on a motion to suppress under Rule 32.04(4) the
court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.