EXHIBIT
35

# In The Matter Of:

*TERRY LYNN KING vs*
*TONY PARKER, et al.*

---

*VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF PHARMACIST*
*July 30, 2021*

---

*Gibson Court Reporting*
*606 West Main Street*
*Suite 350*
*Knoxville, TN 37902*



**Min-U-Script®**

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF PHARMACIST

July 30, 2021

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


TERRY LYNN KING,                          )
                                          )
          Plaintiff,                      )  CAPITAL CASE
                                          )
vs.                                       )  CASE NO.
                                          )  3:18-CV-01234
TONY PARKER, et al.,                      )
                                          )  VOLUME 1
          Defendants.                     )


APPEARANCES:

          FOR THE PLAINTIFF:

          ALEX KURSMAN, ESQ.
          HAYDEN NELSON-MAJOR, ESQ.
          ANA BALDRIDGE, ESQ.
          Assistant Federal Defenders
          Federal Community Defender Office
          for the Eastern District of Pennsylvania
          601 Walnut Street, Suite 545W
          Philadelphia, Pennsylvania  19106

          MICHAEL A. COTTONE, ESQ.
          Bass, Berry & Sims PLC
          150 Third Avenue South, Suite 2800
          Nashville, Tennessee  37201

**Gibson Court Reporting**

```
 1    APPEARANCES:   (Continued)

 2                    FOR THE DEFENDANTS:

 3                    ROBERT W. MITCHELL, ESQ.
                      SCOTT C. SUTHERLAND, ESQ.
 4                    MALLORY K. SCHILLER, ESQ.
                      DEAN S. ATYIA, ESQ.
 5                    CODY N. BRANDON, ESQ.
                      Tennessee Attorney General's Office
 6                    P.O. Box 20207
                      Nashville, Tennessee  37202

 7
      ALSO PRESENT: David Jenkins, Videographer
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Gibson Court Reporting**

                    S T I P U L A T I O N S

1

2              Volume I of the videotaped videoconference

3    deposition of PHARMACIST, called as a witness at the

4    instance of the Plaintiff, taken pursuant to all rules

5    applicable to the Federal Rules of Civil Procedure by

6    notice on the 30th day of July, 2021, at 9:02 a.m.

7    Central Time, before Rhonda S. Sansom, RPR, CRR, CRC,

8    Licensed Court Reporter, pursuant to stipulation of

9    counsel.

10             It being agreed that Rhonda S. Sansom, RPR,

11   CRR, CRC, Licensed Court Reporter, may report the

12   deposition in machine shorthand, afterwards reducing

13   the same to typewriting.

14             All objections except as to the form of the

15   questions are reserved to on or before the hearing.

16             It being further agreed that all formalities

17   as to notice, caption, certificate, transmission, et

18   cetera, including the reading of the completed

19   deposition by the witness and the signature of the

20   witness, are expressly waived.

21

22

23

24

25

**Gibson Court Reporting**

1                        I N D E X

2                  E X A M I N A T I O N S

3

4   PHARMACIST                                      PAGE

5   Examination by Ms. Nelson-Hayden                  7

6

7                    E X H I B I T S

8

9     NO.                  DESCRIPTION               PAGE

10    70   Prescriptions for Inmate Executions
           from the State of Tennessee Department
11         of Correction
           Bates Mays' Supp. Int. And Prod.
12         Responses 000066 to 75                    121

13    71   USP General Chapter <795>
           Pharmaceutical Compounding --
14         Nonsterile Preparations
           Official May 1, 2018                      136
15
      72   USP General Chapter <795>
16         Pharmaceutical Compounding -- Sterile
           Preparations
17         Official May 1, 2018                      137

18

19

20

21

22

23

24

25

**Gibson Court Reporting**

```
1              THE VIDEOGRAPHER:  We're on record at
2         9:02 a.m. on July 30th, 2021.  This is the
3         deposition of Pharmacist taken remotely via Zoom
4         in the matter of Terry Lynn King v. Tony Parker,
5         et al., Case No. 3:18-CV-01234, filed in the U.S.
6         District Court, Middle District of Tennessee,
7         Nashville Division.
8              Counsel will state their names and
9         affiliation for the record and the court reporter
10        will swear -- swear in the witness.
11             MS. NELSON-MAJOR:  Good morning.  My name
12        is Hayden Nelson-Major.  I'm with the Federal
13        Community Defender Office in Philadelphia.  Also
14        present in the room with me is Alex Kursman and
15        Ana Baldridge.  And along with Michael Cottone
16        from Bass, Berry & Sims, we represent Terry King
17        in this matter.
18             MR. MITCHELL:  Good morning.  My name is
19        Rob Mitchell.  I'm with the Tennessee Attorney
20        General's Office.  I represent the two defendants
21        in this case, Commissioner Tony Parker and Warden
22        Tony Mays, as well as the nonparty deponent today,
23        the Pharmacist.
24             With me in the office is Scott
25        Sutherland.  Other cocounsel that are listening in
```

```
 1          are Dean Atyia, Mallory Schiller, Cody Brandon.
 2          And cocounsel Miranda Jones may or may not tune in
 3          on portions during the day.
 4                  Now is as good a time as ever, Hayden,
 5          just to go over what we talked about off record.
 6          Objections such as expert opinion, lack of
 7          foundation, lack of personal knowledge, we're
 8          agreeing those are all kind of form objections for
 9          purposes of this deposition.  Is that your
10          understanding?
11                  MS. NELSON-MAJOR:  Yes.
12                  MR. MITCHELL:  Okay.  Great.
13                  MS. NELSON-MAJOR:  And before we get
14          started, I want to put one other sort of
15          housekeeping matter on the record, as well.
16                  That we are primarily using deposition
17          exhibits that were used previously in depositions,
18          with the exception of three that I provided to
19          Mr. Mitchell last night.
20                          PHARMACIST,
21   having been first duly sworn, testified as follows:
22                  MS. NELSON-MAJOR:  Okay.  Good morning,
23          Pharmacist.  As I stated, my name is Hayden
24          Nelson-Major, and I represent the plaintiff, Terry
25          King, in this matter of King v.  Parker which is
```

```
 1           currently pending in the Middle District of
 2           Tennessee.
 3                   We've already identified everyone else
 4           who is present on this Zoom, and I just wanted to
 5           take a minute to confirm that the court reporter
 6           and videographer can hear the answers and
 7           questions.  But if you're having trouble at any
 8           point, please let me know and we'll troubleshoot.
 9           Great.
10                                EXAMINATION
11   BY MS. NELSON-MAJOR:
12           Q.      So, Pharmacist, you understand that you
13   are here today to answer questions related to the King
14   case; is that right?
15           A.      I understand, yes.
16           Q.      Thank you for taking time to answer those
17   questions for us today.
18                   As you know, we're going to take this
19   deposition on an anonymous basis.  What that means is I
20   will not ask you any questions intended to make you
21   disclose your identity.
22                   To be fair, though, my understanding is
23   that you are the pharmacist that works with the Tennessee
24   Department of Correction in supplying lethal injections
25   for use in executions.  Is that right?
```

1       A.      Yes.

2       Q.      Do you have any other roles in

3  Tennessee's execution protocol?

4       A.      No.

5               MR. MITCHELL:  Object to the form.  You

6       can answer.

7  BY MS. NELSON-MAJOR:

8       Q.      Pharmacist, could you repeat your answer?

9  I think you got cut off a bit.

10      A.      No.

11      Q.      Let me go over a few ground rules before

12  we get started.  Have you ever had your deposition

13  taken before?

14      A.      No.

15      Q.      Someone from the Attorney General's

16  Office may have gone over some of these issues with

17  you, but I want to make sure we're on the same page.

18  Do you understand that you're under oath?

19      A.      Yes.

20      Q.      And you understand that means that you

21  need to tell the truth to the best of your ability?

22      A.      Yes.

23      Q.      Have you taken any medications today?

24      A.      No.

25      Q.      Have you consumed any alcohol or drugs in

```
1    the past 24 hours?
2         A.      I had one beer yesterday.
3         Q.      Is there any reason you cannot testify
4    truthfully or accurately today?
5         A.      No.
6         Q.      And are you represented by counsel today?
7         A.      Yes.
8         Q.      And who is that?
9         A.      I've spoken with Mr. Mitchell and
10   Mr. Sutherland.
11        Q.      Okay.  Even though this deposition is
12   being taken over Zoom the court reporter is making a
13   record based on what you say, so you will need to
14   respond to the questions verbally rather than making a
15   gesture.
16             In order for the court reporter to
17   accurately record the testimony, please wait for me to
18   finish my question before you give an answer.  And I
19   will do my best to do the same for you; I'll wait for
20   you to finish giving an answer before I ask the next
21   question.
22             If you don't understand any of my
23   questions, please let me know and I'll try to restate it
24   a different way.  If you do answer the question, I will
25   assume you understood the question.
```

**Gibson Court Reporting**

```
 1                    If you do need to take break at any point,
 2    just let me know; however, if there is a question
 3    pending, I'll ask that you answer that question before we
 4    go off the record.
 5                    From time to time, Mr. Mitchell or
 6    Mr. Sutherland -- Mr. Mitchell, he's the only one on the
 7    call -- may object to questions that I ask.  But you'll
 8    still need to answer those questions unless the objection
 9    is based on an assertion of privilege or statute.
10                    Do you understand that?
11        A.      Yes.
12        Q.      Do you have any questions for me before
13    we get started?
14        A.      I do not.
15        Q.      Okay.  What did you do to prepare for
16    this deposition?
17        A.      I reviewed USP compounding sterile 797.
18    I reviewed the Tennessee state statutes as well as
19    [State] state statutes.
20        Q.      Can you tell me why you reviewed [State]
21    state statutes in preparing for this deposition?
22                    MR. MITCHELL:  I'm going to object
23            pursuant to the protective order and instruct the
24            witness not to answer; specifically Page ID 5116,
25            DE107.
```

```
 1    BY MS. NELSON-MAJOR:
 2         Q.     Were you directed to review those
 3    materials by anyone?
 4         A.     Just to -- by -- by my attorneys, just to
 5    understand my background, my -- my job.
 6         Q.     How many times -- when you say
 7    "attorneys," is that Mr. Mitchell and Mr. Sutherland?
 8         A.     Correct.
 9         Q.     And how many times did you meet with
10    Mr. Mitchell and Mr. Sutherland?
11         A.     Twice.
12         Q.     And how long were those meetings?
13         A.     An hour.
14         Q.     They were each an hour?
15         A.     Yes, ma'am.
16         Q.     Okay.  And when were those meetings?
17         A.     The last one was this past Monday.  The
18    time before, I believe, was last Wednesday.
19         Q.     Besides Mr. Mitchell and Mr. Sutherland,
20    was anyone else present at those meetings?
21         A.     I believe there was one other gentlemen;
22    but I apologize, I don't remember his name.
23               MR. MITCHELL:  May the record reflect it
24         was cocounsel Cody Brandon from the Attorney
25         General's Office.
```

```
1                    MS. NELSON-MAJOR:  Thank you,
2         Mr. Mitchell.
3    BY MS. NELSON-MAJOR:
4         Q.      You listed three documents that -- or
5    three sets of documents that you had reviewed in the
6    course of these preparations:  USP 797, Tennessee
7    statutes, [State] statutes.
8                    Did you review any other documents?
9         A.      No, ma'am.
10        Q.      Okay.  Did any of those documents that
11   you reviewed, those three sets, refresh your
12   recollection as to any events or matters related to
13   this case in particular?
14        A.      No, ma'am.
15        Q.      Okay.  Outside of those three sets of
16   documents that you reviewed with your attorneys, did
17   you review any other materials?
18        A.      No.
19        Q.      And did you meet with anyone other than
20   Mr. Mitchell and Mr. Sutherland and Mr. Brandon?
21        A.      No.
22        Q.      Okay.  Did you review any transcripts of
23   any of the depositions already conducted in this
24   matter?
25        A.      I have not.
```

```
 1          Q.      Did you review any of the court filings
 2  in this case?
 3          A.      No.
 4          Q.      And did anyone else consult with you to
 5  prepare for another deposition in this case?
 6          A.      No.
 7          Q.      So how much time in total do you estimate
 8  that you spent preparing for this deposition?
 9          A.      Apart from the meetings, 30 minutes.
10          Q.      30 minutes?  And what did those 30
11  minutes consist of?
12          A.      Just reviewing the three documents that
13  we spoke of.
14          Q.      Did you talk to anyone else at the
15  pharmacy at which you are currently employed to prepare
16  for this deposition?
17          A.      Just my CFO, to inform her.
18          Q.      Your CFO?  So you didn't talk about any
19  substance, just informing her of the nature of the
20  deposition?
21          A.      Correct.
22          Q.      So you -- so you didn't have any
23  discussions with any other employees of the pharmacy?
24          A.      I did not.
25          Q.      And can you tell me in general terms what
```

1    that conversation with the CFO consisted of?

2              MR. MITCHELL:  And I'm going to object to

3         that question, pursuant to the protective order.

4         There may be another way to ask it,

5         Ms. Nelson-Major, that I can think of, but I am

6         going to object and instruct the witness not to

7         answer that specific question.

8    BY MS. NELSON-MAJOR:

9         Q.    Let me try it in a different way.  Did

10   you discuss with the CFO any of the activities or --

11   that you have conducted in preparing drugs for the

12   Tennessee Department of Correction for use in the

13   lethal injection protocol?

14        A.    I did not.

15        Q.    So the conversation was strictly limited

16   to informing the CFO of the fact that you were going to

17   be deposed today?

18              MR. MITCHELL:  Object to form.

19   BY MS. NELSON-MAJOR:

20        Q.    You can go ahead and answer, Pharmacist.

21        A.    Correct.

22        Q.    Okay.  I want to ask you a couple of

23   questions about your education and training.  What is

24   your highest level of education?

25        A.    A doctorate in pharmacy.

**Gibson Court Reporting**

1    Q.      And how many years of graduate school is

2    required to earn a doctorate in pharmacy?

3    A.      It was a total six-year program.

4    Q.      And is that program divided into

5    different parts?  When you say a total of six years,

6    can you break that down to me?

7    A.      It's not the school I went to.  It's just

8    six years straight, no undergrad.

9    Q.      And what type of training do you get in

10   the course of that degree?

11   A.      You get training in biology, chemistry,

12   understanding anatomy.  How drugs work, how to make

13   them.  Compounding courses.  Training in immunizing.

14   Q.      And in the course of those studies, how

15   many courses did you take that were relevant to

16   sterile -- or excuse me -- to compounding in general?

17   A.      Just compounding in general, there was

18   two years total, so there was one class in each

19   semester.

20   Q.      Okay.  And were those courses

21   concentrated on sterile compounding or nonsterile

22   compounding?

23   A.      It was a mixture of both.  I can't

24   exactly recall how much time was given to each.

25   Q.      Fair enough.  How long ago,

1    approximately, did you earn that degree?

2              MR. MITCHELL:  Objection.  Pursuant to

3         the protective order, I'm going to instruct the

4         Pharmacist not to answer that question.

5    BY MS. NELSON-MAJOR:

6         Q.      Let me state it another way.  Have you

7    been a practicing pharmacist for more than five years?

8              MR. MITCHELL:  I'm still going to object,

9         pursuant to Page ID 5116, and instruct the

10        Pharmacist not to answer.

11   BY MS. NELSON-MAJOR:

12        Q.      Have you completed any coursework beyond

13   your doctorate in pharmacy?

14        A.      Yes.

15        Q.      And what is that coursework?

16        A.      For sterile compounding, you have to get

17   extra certification to be able to compound.  So that

18   was an additional training I did on my own.

19        Q.      And what agency or body governs that

20   certification process?

21             MR. MITCHELL:  I'm going to object,

22        pursuant to the protective order, to the extent

23        that it requires naming a proper noun, a specific

24        noun.

25             Pharmacist, if you can answer in general

```
 1              terms, I'll permit you to answer.  But if you
 2              can't, just say you cannot.
 3      BY MS. NELSON-MAJOR:
 4              Q.      Let me try restating it in a different
 5      fashion.  Without naming the state, was it a state or a
 6      professional organization that provided that
 7      certificate to you?
 8              A.      It's a professional organization.
 9              Q.      And how long is that certificate valid
10      for?
11              A.      There's no expiration.
12              Q.      So you don't have to renew that
13      certificate?
14              A.      Not the certificate itself.
15              Q.      Is there something else that you have to
16      renew?
17              A.      Every two years, when you recertify your
18      license, you just have to do continuing education to
19      maintain it.
20              Q.      Now, you're referring to your -- your
21      pharmacist license?
22              A.      Yes.
23              Q.      And what are the continuing education
24      requirements for renewing your pharmacist license?
25              A.      You just have to meet a number of hours
```

```
 1    and then whatever additional requirements that are
 2    listed.
 3         Q.      Have any of your continuing education
 4    requirements been focused on compounding?
 5         A.      Yes.
 6         Q.      When was the most recent continuing
 7    education course related to compounding that you took?
 8         A.      Six months ago.
 9         Q.      And when you first obtained your
10    pharmacist license, did you have to take an exam of
11    some sort?
12         A.      Yes.
13         Q.      Can you describe that exam to me, what it
14    entails?
15         A.      Yes, there's two parts.  You have to take
16    a law exam and then NAPLEX, which is just the pharmacy
17    portion.
18         Q.      Did you say log exam or law?
19         A.      Law.
20         Q.      Law?  And what -- what is that?  Does
21    that entail sort of the provisions and legal provisions
22    that govern the practice of pharmacy?
23         A.      Correct.
24         Q.      Okay.  Are you currently a Board of
25    Pharmacy Board-certified sterile compounding
```

1   pharmacist?

2       A.      Yes.

3       Q.      Do you currently hold a certification

4   from the American Society of Health-System Pharmacists?

5       A.      No.

6       Q.      So that's --

7       A.      I'm sorry.  I'm sorry, I guess the

8   terminology you use, "Board certified," that is

9   correct.  I was wrong.  I am sorry.  I just got the

10  certificate to perform sterile compounding.  I am not

11  Board certified.

12      Q.      And my last question was whether you hold

13  a certificate from the American Society of

14  Health-Systems Pharmacists?

15      A.      I do not.

16      Q.      So your certification to compound was not

17  issued by that professional organization?

18      A.      I don't believe it is, but I -- I

19  apologize, I could be wrong.

20      Q.      Do you hold any other professional

21  licenses outside of the field of pharmacy?

22      A.      I do not.

23      Q.      Do you have any military training?

24      A.      I do not.

25      Q.      Beyond your pharmacy license and

1  doctorate in pharmacy, do you have any other medical

2  training?

3         A.      No.

4         Q.      Do you participate in any volunteer

5  programs?  And you can describe them generally, if you

6  do.

7               MR. MITCHELL:  I'm actually going to

8         object and instruct the Pharmacist not to answer

9         that question, pursuant to the protective order.

10 BY MS. NELSON-MAJOR:

11        Q.      Have you received any training in

12 connection with executions?

13        A.      No.

14        Q.      Are you currently employed?

15        A.      Yes.

16        Q.      Without naming the name of your current

17 employer, what kind of entity is it?  Is it a

18 for-profit business or a pharmacy within a hospital

19 system?

20        A.      It's a retail pharmacy.

21        Q.      You don't own this business?

22        A.      No.

23        Q.      Does this business sell commercially

24 manufactured drugs?

25               MR. MITCHELL:  Object to the form.

```
 1   BY MS. NELSON-MAJOR:
 2        Q.      You can answer, Pharmacist.
 3        A.      They do.
 4        Q.      That's a "Yes?"
 5        A.      Yes.
 6        Q.      And compounded drugs, as well?
 7        A.      Yes.
 8        Q.      Are the drugs that your -- that you
 9   compound exempt from compliance with current Good
10   Manufacturing Practice requirements?
11             MR. MITCHELL:  Object to the form.
12   BY MS. NELSON-MAJOR:
13        Q.      You can answer, Pharmacist.
14        A.      I'm sorry, can you say the question
15   again?
16        Q.      Of course.  It was a long one.
17             Are the drugs that you compound exempt from
18   compliance with current Good Manufacturing Practice
19   requirements?
20             MR. MITCHELL:  Object to the form.
21             THE WITNESS:  I can't answer with
22        certainty.
23   BY MS. NELSON-MAJOR:
24        Q.      So you are unaware of whether the drugs
25   that you manu- -- that you compound are subject to
```

```
 1   current Good Manufacturing Practice?
 2                  MR. MITCHELL:  Same objection.
 3   BY MS. NELSON-MAJOR:
 4        Q.      You can answer, Pharmacist.
 5        A.      I'm not aware that they're exempt.
 6        Q.      Is it your belief that they apply?
 7        A.      Yes.
 8                  MR. MITCHELL:  Same objection.
 9   BY MS. NELSON-MAJOR:
10        Q.      So it is your understanding that the
11   drugs that you compound are exempt -- or, I'm sorry,
12   are subject to current Good Manufacturing Practice
13   requirements?
14        A.      Correct.
15                  MR. MITCHELL:  Same objection.
16   BY MS. NELSON-MAJOR:
17        Q.      Can you restate your answer, Pharmacist?
18        A.      Yes.
19        Q.      Has your pharmacy been inspected by the
20   FDA?
21                  MR. MITCHELL:  I'm going to object,
22          pursuant -- you can answer.  You can answer.
23                  THE WITNESS:  No.
24   BY MS. NELSON-MAJOR:
25        Q.      So has your pharmacy been inspected by
```

```
 1   the state board of pharmacy in which it is located?
 2   And I'm not asking you to name the state in which it's
 3   located.
 4                   MR. MITCHELL:  Object to the form.
 5                   THE WITNESS:  Yes.
 6   BY MS. NELSON-MAJOR:
 7        Q.    When was the most recent inspection?
 8                   MR. MITCHELL:  I'm going to object,
 9          pursuant to the protective order, and instruct the
10          Pharmacist not to answer.
11   BY MS. NELSON-MAJOR:
12        Q.    Is your pharmacy a registered 503(b)
13   outsourcing facility?
14                   MR. MITCHELL:  I'm going to object, again
15          pursuant to the protective order, and instruct the
16          Pharmacist not to answer.
17   BY MS. NELSON-MAJOR:
18        Q.    How long have you been with your current
19   employer?
20        A.    Three years.
21        Q.    And what's your current job title?
22        A.    Pharmacist in charge.
23        Q.    And what are your duties as the
24   pharmacist in charge?
25        A.    Hiring the technicians, making sure their
```

```
 1    licenses are valid.  Making sure the pharmacy's license
 2    is valid.  Training requirements.  And running the
 3    pharmacy's daily duties.
 4          Q.      And can you describe for me more how you
 5    ensure that the pharmacy's license is valid?
 6          A.      Just renewing the license itself and
 7    making sure we maintain the requirements before
 8    renewal.
 9          Q.      How many other pharmacists are employed
10    at your pharmacy?
11                  MR. MITCHELL:  I'm going to object
12          pursuant to the protective order and instruct the
13          Pharmacist not to answer.
14    BY MS. NELSON-MAJOR:
15          Q.      And in the three years you've been with
16    this employer, have you always held the position of
17    pharmacist in charge?
18          A.      Yes.
19          Q.      How many people report to you in that
20    position?
21                  MR. MITCHELL:  Again, I'm going to object
22          pursuant to the protective order and instruct the
23          Pharmacist not to answer.
24    BY MS. NELSON-MAJOR:
25          Q.      Who do you report to?
```

```
 1                    MR. MITCHELL:  I'm going to object,
 2          pursuant to the protective order, to the extent
 3          that requires naming a proper noun or identifying
 4          a person.
 5                    MS. NELSON-MAJOR:  I'm not --
 6                    MR. MITCHELL:  If you can answer without
 7          doing that, you can answer.
 8                    MS. NELSON-MAJOR:  I apologize,
 9          Mr. Mitchell, for interrupting.
10   BY MS. NELSON-MAJOR:
11          Q.      Pharmacist, without giving an actual
12   name, can you describe who you report to in your
13   current position?
14          A.      The CFO and the CEO.
15          Q.      Is there anyone over you who supervises
16   the technical, sort of scientific, aspects of your
17   duties?
18                    MR. MITCHELL:  Objection.
19   BY MS. NELSON-MAJOR:
20          Q.      You can answer, Pharmacist.
21          A.      No.
22          Q.      Does your position require any special
23   training beyond your pharmacy degree?
24                    MR. MITCHELL:  Objection.
25                    THE WITNESS:  No.
```

```
 1   BY MS. NELSON-MAJOR:
 2        Q.      And before your employment with this
 3   particular pharmacy, what was your previous
 4   employment --
 5                MR. MITCHELL:  I'm going to --
 6   BY MS. NELSON-MAJOR:
 7        Q.      -- without naming the entity at which you
 8   worked for?
 9        A.      It was a home infusion pharmacy.
10        Q.      And how long were you employed with that
11   home infusion pharmacy?
12                MR. MITCHELL:  I'm going to again object,
13        pursuant to the protective order, and instruct the
14        Pharmacist not to answer.
15   BY MS. NELSON-MAJOR:
16        Q.      During your tenure at this home infusion
17   pharmacy, did you compound drugs?
18        A.      Yes.
19        Q.      Both sterile and nonsterile compounded
20   preparations?
21        A.      Only sterile.
22        Q.      And were you a pharmacist or the
23   pharmacist in charge at that home infusion pharmacy?
24        A.      Pharmacist.
25        Q.      All right.  I want to ask you a couple of
```

1    questions about your initial contact with the Tennessee

2    Department of Correction.  Does your pharmacy supply

3    the Tennessee Department of Correction with drugs for

4    use in executions conducted by lethal injection?

5           A.      Yes.

6           Q.      And if I refer to the Tennessee

7    Department of Correction as "TDOC," will you understand

8    what I'm referring to?

9           A.      Yes.

10          Q.      Are you the person at your pharmacy

11   responsible for filling TDOC's order for lethal

12   injection drugs?

13          A.      Yes.

14          Q.      Have you provided TDOC with commercially

15   manufactured drugs for use in executions?

16          A.      Yes.

17          Q.      Which drugs?  Which commercially

18   manufactured drugs have you applied -- excuse me,

19   supplied to TDOC for use in executions?

20          A.      Vecuronium bromide.

21          Q.      Is that the only commercially

22   manufactured drug you supply to TDOC for use in

23   executions?

24          A.      Yes.

25          Q.      Have you supplied TDOC with compounded

1   drugs for use in executions?

2        A.      Yes.

3        Q.      Which drugs?

4        A.      Midazolam and potassium chloride.

5        Q.      Have you ever provided commercially

6   manufactured versions of either of those drugs to TDOC

7   for use in executions?

8        A.      No.

9        Q.      Okay.  When was the first time that you

10  filled an order from TDOC for drugs to be used in an

11  execution?

12       A.      I believe that was in 2018.

13       Q.      Are you the only pharmacist at your

14  company that fills TDOC's orders for lethal injection

15  chemicals?

16       A.      Yes.

17       Q.      And are you the only pharmacist who

18  compounds drugs for TDOC for use in executions?

19       A.      No.

20       Q.      So other pharmacists are involved in the

21  compounding of lethal injection drugs for TDOC?

22       A.      Not pharmacists.

23       Q.      Can you describe to me the -- the role of

24  the other people involved in that process?

25       A.      Pharmacy technician.

```
 1          Q.        And are those technicians under your
 2   supervision when they're fulfilling those orders?
 3          A.        Yes.
 4          Q.        And approximately how many technicians
 5   are involved in filling those orders?
 6          A.        One.
 7          Q.        And has it always been the same
 8   technician involved in helping you fill those orders?
 9          A.        Yes.
10          Q.        I would like to ask you some questions
11   about how you came to supply TDOC with lethal injection
12   drugs.  When were you first contacted about supplying
13   drugs for use in executions?
14          A.        Three years ago, when I was -- when I
15   started at the company.
16          Q.        And who first, without naming names,
17   talked to you about supplying TDOC with lethal
18   injection drugs?
19          A.        The former owner.
20          Q.        The former owner of your pharmacy?
21          A.        Correct.
22          Q.        And that person is no longer the owner of
23   your pharmacy?
24          A.        They are not.
25          Q.        Can you describe to me that initial
```

```
 1    conversation you had with the former pharmacy owner?
 2                    MR. MITCHELL:  Object to the form.  You
 3         can answer.
 4                    THE WITNESS:  He asked if I would be
 5         willing to compound the medications and do the
 6         additional training of getting my license with the
 7         State of Tennessee in order to do that.
 8    BY MS. NELSON-MAJOR:
 9         Q.    And what was your response?
10         A.    "Yes."
11         Q.    And in that conversation, did he
12    specifically tell you which drugs you would be
13    compounding for TDOC?
14         A.    I don't recall.
15         Q.    Was there anyone else present for that
16    conversation?
17         A.    No.
18         Q.    Without naming names, did the pharmacy --
19    former pharmacy owner tell you who from TDOC had
20    contacted him about this request?
21         A.    No.
22         Q.    And what was your response to that
23    request from the pharmacy owner?
24         A.    That I would -- that I would do it.
25         Q.    Are you aware of, prior to your
```

```
 1   involvement -- involvement, whether your pharmacy was
 2   supplying drugs to TDOC for use in executions?
 3                    MR. MITCHELL:  Object to form.
 4                    THE WITNESS:  I am not aware.
 5   BY MS. NELSON-MAJOR:
 6        Q.      Is it your belief that this was the first
 7   time that TDO- -- excuse me -- that your pharmacy had
 8   provided drugs to TDOC?
 9        A.      From my understanding, yes.
10        Q.      And this initial conversation you had
11   with your pharmacy owner, was that in person or over
12   the phone, email?
13        A.      In person.
14        Q.      Did you ever have any conversations with
15   the CFO about supplying drugs to TDOC?
16        A.      She's aware that we do, but not questions
17   pertaining to it.
18        Q.      So you haven't had any direct
19   conversations with the CFO about providing lethal
20   injection drugs to TDOC?
21                    MR. MITCHELL:  Objection.
22                    THE WITNESS:  No, ma'am.
23   BY MS. NELSON-MAJOR:
24        Q.      What about the CEO?
25        A.      No.
```

 1          Q.       What about any other members of the
 2   administration or management team of your pharmacy?
 3                    MR. MITCHELL:  Object to form.
 4                    THE WITNESS:  No.
 5   BY MS. NELSON-MAJOR:
 6          Q.       So the former pharmacy owner is the only
 7   person that you discussed this request with?
 8          A.       Yes.
 9          Q.       And you -- you earlier mentioned that
10   you've been working with the same pharmacy technician
11   in preparing these drugs.  Did you have a conversation
12   with that person about the TDOC's request?
13                    MR. MITCHELL:  Same objection.
14                    THE WITNESS:  Yes.
15   BY MS. NELSON-MAJOR:
16          Q.       And what was that conversation?
17          A.       Just asking if he'd be comfortable making
18   them.
19          Q.       And what was his response?
20          A.       "Yes."
21          Q.       And you said that there were a number of
22   things you had to do in order to be -- obtain
23   authorization to prepare the drugs for TDOC.  I believe
24   you said you had to obtain a license from the State of
25   Tennessee.  Can you describe to me what that process

```
1    entailed?
2                    MR. MITCHELL:  I'm going to object,
3          pursuant to the protective order, but it's kind of
4          a partial objection.  Just, Pharmacist, if you --
5          if you can describe that without really giving
6          identification about who you are or where you're
7          located or what your pharmacy is, then you can
8          answer.  If you can't, please let us know.
9                    THE WITNESS:  I believe I can answer, if
10         you'll just give me a moment.
11                   MS. NELSON-MAJOR:  Take all the time you
12         need.
13                   (Pause.)
14                   THE WITNESS:  It's just an application, I
15         believe it's two or three pages, of the kind of
16         pharmacist you are.  You're just submitting an
17         application for the pharmacy itself.
18   BY MS. NELSON-MAJOR:
19         Q.      And Pharmacist, in trying to remember
20   that information, were you just looking at some of the
21   documents you have with you?
22         A.      No, I didn't look at anything.
23         Q.      And if you remember, I believe you said
24   2018.  When approximately did you have that
25   conversation with the pharmacy owner?
```

```
 1          A.       I believe it was in April or May.
 2          Q.       April or May of 2018?
 3          A.       Correct.
 4          Q.       Could you please pull up Exhibit 46.  Let
 5   me know when you have it up.
 6          A.       I have it.
 7          Q.       And take a moment to -- to look it over.
 8   You don't need to read it, I just want you to get a
 9   sense of what the document looks like.
10               (Pause.)
11   BY MS. NELSON-MAJOR:
12          Q.       Have you seen this document before?
13          A.       Yes.
14          Q.       What is it?
15          A.       A Pharmacy Services Agreement between
16   ourselves and Tennessee.
17          Q.       Were you involved in the drafting of this
18   document?
19          A.       No.
20          Q.       Do you know whether anyone associated
21   with your pharmacy was involved in drafting this
22   document?
23          A.       I'm not aware.
24          Q.       Can you turn to the last page of this
25   document?  Do you see what appears to be a redacted
```

1    signature block at the bottom of the page?

2         A.      Yes.

3         Q.      Is that your signature on the redacted

4    signature block?

5         A.      It is not.

6         Q.      Without naming names, do you know who at

7    your pharmacy signed this agreement on behalf of your

8    pharmacy?

9         A.      No.

10        Q.      Do you have authority in your role as

11   pharmacist in charge to sign contracts on behalf of

12   your pharmacy?

13        A.      Yes.

14        Q.      I'd like you to pull up Exhibit No. 6.

15        A.      I have it.

16        Q.      This is an email dated September 7, 2017.

17   Have you seen this email before?

18        A.      No.

19        Q.      So you didn't write or receive this

20   email?

21        A.      No.

22        Q.      Can you pull up Exhibit No. 7, please.

23        A.      I have it.

24        Q.      It's another email chain dated September

25   7th, 2017.  Did you write or receive any of these

1    emails?

2          A.        No.

3          Q.        Now please pull up Exhibit No. 8.

4          A.        I have it.

5          Q.        It's another email chain from September

6    17th, 2017.  Did you write or receive any of these

7    emails?

8          A.        No.

9          Q.        Okay.  And then Exhibit No. 9, please.

10         A.        I have it.

11         Q.        This is an email chain dated September

12   21st, 2017.  Did you write or receive any of these

13   emails?

14         A.        No.

15         Q.        In your role as pharmacist in charge do

16   you have, in general, contact with potential customers?

17         A.        Yes.

18         Q.        Are you involved in soliciting business

19   for your pharmacy?

20         A.        Yes.

21         Q.        What is the pharmacy owner's -- former

22   pharmacy owner's involvement in soliciting business on

23   behalf of the pharmacy when he was employed with the

24   pharmacy, if you know?

25                   MR. MITCHELL:  Object to both form and to

```
 1              the extent it would lead to identifying
 2              information.
 3                    Pharmacist, let us know if you think you
 4              can answer without identifying who the former
 5              pharmacy owner is.
 6                    THE WITNESS:  Yes, I -- I can answer.
 7    BY MS. NELSON-MAJOR:
 8         Q.      And what was that?
 9         A.      He's able to contact, reach out to
10    providers in any capacity to gain more business for the
11    pharmacy.
12         Q.      Did you have any direct contact with
13    representatives from TDOC related to the provision of
14    lethal injection chemicals?
15         A.      I'm sorry, can you say that again?
16         Q.      Did you ever talk to anyone at TDOC about
17    their request to your pharmacy for lethal injection
18    chemicals?
19         A.      Yes.
20         Q.      And without naming names, who were those
21    people?
22         A.      The drug procurer.
23         Q.      When did you first have contact with the
24    drug procurer?
25         A.      In 2019.
```

1        Q.       So you didn't have any contact with the
2    drug procurer about the initial request to supply
3    execution drugs to TDOC?
4        A.       No.
5        Q.       If you are aware, did that contact flow
6    through the pharmacy owner?
7        A.       At the time, yes.
8        Q.       And you say "at the time"; was there a
9    period of time where that changed?
10       A.       No.  Just that initial introduction was
11   through the past owner.
12       Q.       And after the pharmacy owner left, who
13   became the point person in your pharmacy for contact
14   with the TDOC?
15       A.       I did.
16       Q.       When did that occur?
17       A.       I believe December of 2019.
18       Q.       Since the departure of the pharmacy --
19   pharmacy owner, has anyone else at your pharmacy had
20   contact with TDOC that you're aware of?
21       A.       No.
22       Q.       So post December 2019, you are the sole
23   person at your pharmacy who has contact with TDOC?
24                MR. MITCHELL:  Object.
25                THE WITNESS:  Yes.

```
 1    BY MS. NELSON-MAJOR:

 2         Q.      So I want to ask you a couple of

 3    questions about the conversations you've had with the

 4    drug procurer.  Have you had email conversations?

 5         A.      Yes.

 6         Q.      In-person meetings?

 7         A.      No.

 8         Q.      Phone calls?

 9         A.      Yes.

10         Q.      And what are the nature -- the nature of

11    those conversations?

12                 MR. MITCHELL:  Object to form.

13    BY MS. NELSON-MAJOR:

14         Q.      You can answer, Pharmacist.

15         A.      Conversations are just about relaying to

16    me the medications will need to be made at a certain

17    time, the timing of when we would have them sent to

18    TDOC.  The availability to make sure we have things in

19    stock.

20         Q.      Have you ever had a conversation with the

21    drug procurer about any drug besides midazolam,

22    potassium chloride, or vecuronium bromide?

23                 MS. NELSON-MAJOR:  Object to form.

24                 THE WITNESS:  Yes.

25    BY MS. NELSON-MAJOR:
```

 1          Q.        And what other drugs have you discussed?

 2          A.        Pentobarbital.

 3          Q.        Is that the only other drug you've

 4  discussed?

 5          A.        Yes.

 6          Q.        And what did you discuss in relation to

 7  pentobarbital?

 8                    MS. NELSON-MAJOR:  Objection.

 9                    THE WITNESS:  Just asking if it's

10          available for us to order.

11  BY MS. NELSON-MAJOR:

12          Q.        And what did you do in response to that

13  request?

14          A.        Try to see if I could order it.

15          Q.        And when was that request made to you?

16          A.        I don't have a specific time, but the

17  times -- every time he would ask for midazolam or

18  potassium chloride or vecuronium he would also ask if I

19  was able to procure that, as well.

20          Q.        Do you know the first time, ballpark,

21  that the drug procurer asked you to look for

22  pentobarbital?

23          A.        It would have been in our -- probably our

24  first discussion back in December of 2019.

25          Q.        And when you say, "He asked me to look

1  for pentobarbital" -- or "asked me about pentobarbital

2  every time they placed an order for drugs," do you mean

3  every time they placed an order for drugs in relation

4  to an execution?

5       A.    Yes, in preparation, just to make sure we

6  could order or could make whatever he was going to need

7  at the time.

8       Q.    And these requests, have these been over

9  email or over the phone?

10       A.    Over the phone.

11       Q.    Do you document those conversations

12  anywhere?

13       A.    I do not.

14       Q.    Approximately how many times do you

15  believe that the drug procurer has asked you to

16  ascertain the availability of pentobarbital?

17       A.    Five.

18       Q.    Five times?  If you recall, when was the

19  last time the drug procurer asked you to ascertain the

20  availability of pentobarbital?

21       A.    This past March of 2021.

22       Q.    And in response to these requests, what

23  do you do?  What have you done?

24       A.    Searched the database that I use in order

25  to search for medications to see if it would be

 1   available for me to order.

 2        Q.      And is that database commercially

 3   manufactured drugs?

 4        A.      Yes.

 5        Q.      Is it a database strictly -- excuse me.

 6                Is that database only commercially

 7   manufactured drugs?

 8        A.      It's possible that they also have bulk

 9   items.  I can't say for certain.

10        Q.      What do you mean by "bulk items?"

11        A.      Bulk items are medications that can be

12   used to compound in a powder form.

13        Q.      Are you referring to an active

14   pharmaceutical ingredient, or API?

15        A.      Yes, ma'am.

16        Q.      What -- is this database something that

17   your pharmacy maintains or is it maintained by a

18   different entity?

19                MR. MITCHELL:  I'm -- you can answer.

20        Sorry, withdraw -- withdraw the pause.

21                THE WITNESS:  A different entity.

22   BY MS. NELSON-MAJOR:

23        Q.      Without naming the name of the state, if

24   it's maintained by a state agency, is this maintained

25   by a state or federal agency?

```
 1                    MR. MITCHELL:  And now -- now I'm going
 2         to object and instruct the Pharmacist not to
 3         answer, pursuant to the protective order, 5116.
 4   BY MS. NELSON-MAJOR:
 5         Q.      Let me try restating this.  Is this
 6   database maintained by a private entity?
 7                    MR. MITCHELL:  Same objection.  Don't
 8         answer.
 9   BY MS. NELSON-MAJOR:
10         Q.      Is this a database that you have
11   responsibility for maintaining?
12         A.      It's not.
13         Q.      So it's not your pharmacy's own internal
14   database?
15         A.      It's not.
16         Q.      Does this database include drugs that are
17   available from foreign sources?
18         A.      I'm sorry, what do you mean by "foreign?"
19         Q.      Manufacturers or drug producers located
20   outside of the United States.
21                    MR. MITCHELL:  I'm going to object to
22         form, but you can answer, Pharmacist.
23                    THE WITNESS:  It may, if the manufacturer
24         itself makes them out of the country.
25   BY MS. NELSON-MAJOR:
```

**Gibson Court Reporting**

1          Q.       This database; the entries in it, are

2    they provided by the people who are actually

3    manufacturing the drugs?

4                    MR. MITCHELL:  Well, again, object to the

5           form.  Instruct -- or not the form.  Objection

6           pursuant to the protective order and instruct the

7           Pharmacist not to answer.

8    BY MS. NELSON-MAJOR:

9          Q.       So other than searching this database,

10   have you done anything else in response to the drug

11   procurer's request that you ascertain the availability

12   of pentobarbital?

13         A.       No.

14         Q.       You haven't made any phone calls?

15         A.       No.

16         Q.       You haven't emailed any other suppliers?

17         A.       No.

18         Q.       Have you done any research on any legal

19   provisions that might apply to the manufacture or

20   importation of pentobarbital?

21         A.       No.

22         Q.       Has your pharmacy ever imported API from

23   overseas?

24                    MR. MITCHELL:  I'm going to object,

25           pursuant to the protective order, and instruct the

```
 1            Pharmacist not to answer that.
 2    BY MS. NELSON-MAJOR:
 3        Q.      Did you ever talk to the former pharmacy
 4    owner about importing API from overseas?
 5                MR. MITCHELL:  And I'm going to object to
 6            the form of that question.  I'm also going to
 7            instruct the Pharmacist not to answer that
 8            specific question.  If it's related to TDOC, then
 9            I will allow the Pharmacist to answer.
10    BY MS. NELSON-MAJOR:
11        Q.      Did you ever have a conversation with the
12    former pharmacy owner about potentially importing API
13    for use in compounding drugs for TDOC?
14                MR. MITCHELL:  Object to the form.  You
15            can answer, Pharmacist.
16                THE WITNESS:  No.
17    BY MS. NELSON-MAJOR:
18        Q.      Are you aware of whether the drug
19    procurer ever made a similar request to the drug owner
20    about ascertaining the availability of pentobarbital
21    for TDOC?
22                MR. MITCHELL:  Same objection.  Object to
23            form.  Go ahead.
24                THE WITNESS:  No.
25    BY MS. NELSON-MAJOR:
```

```
 1          Q.      Has anyone else at your pharmacy been
 2     involved in searching for pentobarbital for TDOC's use?
 3                  MR. MITCHELL:  Object to the form.
 4                  THE WITNESS:  No.
 5     BY MS. NELSON-MAJOR:
 6          Q.      And after you look up in this database,
 7     what do you do with the information you find?
 8          A.      I relay to the drug procurer if I was
 9     able to source it or not.
10          Q.      And what have those searches yielded?
11                  MR. MITCHELL:  Object to the form.  And
12          also object pursuant to the protective order, if
13          it's going to lead to identification of the
14          database.
15                  Pharmacist, if you can answer without
16          identifying the database, then -- then we'll
17          permit you to answer.
18                  THE WITNESS:  I'm sorry, I forgot what
19          you asked me.
20     BY MS. NELSON-MAJOR:
21          Q.      Fair enough.  Let me try to restate the
22     question.
23                  After you search in the database, what do
24     you do with the information you find in that database?
25          A.      Just relay to the drug procurer I was
```

 1    successful in what he asked me or if I wasn't -- I

 2    wasn't successful.

 3         Q.      Have you been successful in locating in

 4    this database a potential source of pentobarbital or

 5    pentobarbital API?

 6         A.      No.

 7         Q.      So this database has no indication,

 8    according to you, that there's a source of

 9    pentobarbital?

10         A.      Okay.  Let me rephrase that.  It's a --

11                 MR. MITCHELL:  Objection to form.

12                 THE WITNESS:  -- it's there, but I am

13         unable to -- what?  I don't know how to answer.

14    BY MS. NELSON-MAJOR:

15         Q.      Pharmacist, is there someone else in the

16    room with you?

17         A.      No, I'm by myself.

18         Q.      So let me break this down, and I might be

19    making this more complicated than it needs to be.

20                 So you searched the database.  What does

21    the database show you about availability of

22    pentobarbital or pentobarbital API?  I'm not asking you

23    to name a source, I'm just asking you to tell me

24    whether you are -- what that information is.

25         A.      It'll just have the detail of

1    pentobarbital itself.  It'll say the name and then if

2    there is a quantity available.  But then it goes deeper

3    into whether I'm able to order it or not.

4         Q.      And what does that mean, whether you're

5    able to order it or not?

6         A.      Depending on the type of pharmacy, they

7    distinguish if you're able to order certain medications

8    or not.

9         Q.      And is that an issue of your licensing or

10   some regulation that would prevent you from ordering a

11   particular type of pentobarbital or pentobarbital API?

12        A.      The license of the pharmacy.

13        Q.      The license of the pharmacy?  And so does

14   that database -- you had said you had found potential

15   sources of pentobarbital, or pentobarbital API.  Which

16   one?

17        A.      Of the pentobarbital.

18        Q.      And the database shows available

19   pentobarbital, but it is unavailable to your pharmacy

20   for purchase; is that right?

21        A.      From this last request, yes.

22        Q.      Has that been different for previous

23   requests?

24        A.      Sometimes there was none available.  It

25   changes.

1      Q.      So you said approximately five times

2  you've searched this database on behalf of TDOC.  Can

3  you tell me how many times it was available but

4  unavailable to your pharmacy?

5      A.      Just twice.

6      Q.      And what about the other three times you

7  searched?

8      A.      Showed a nonavailable quantity of zero.

9      Q.      So the two times that the database showed

10  available pentobarbital, what kind of pharmacy could

11  purchase that pentobarbital?

12      A.      A hospital.

13      Q.      And what about a hospital enables it to

14  purchase the pentobarbital that was available those two

15  times you searched the database?

16              MR. MITCHELL:  I'm sorry,

17      Ms. Nelson-Major, can you just repeat the

18      question?  Sorry.

19  BY MS. NELSON-MAJOR:

20      Q.      You said two times you searched the

21  database there was pentobarbital, but it was only

22  available for purchase by a hospital.  Why only a

23  hospital, if you know?

24      A.      I'm not -- I'm not aware.

25      Q.      So there's simply an indication in the

```
 1   database itself which tells you "This is only available
 2   for a hospital?"
 3        A.      Yes.
 4        Q.      Are you doing anything -- and I might
 5   have already asked this, so excuse me.  Are you doing
 6   anything beyond searching the database for
 7   pentobarbital?
 8        A.      No.
 9        Q.      Did you -- and you didn't call either
10   two -- either source that was available at the time
11   that you searched?
12        A.      No.
13        Q.      Why are you limiting your search to this
14   database?
15               MR. MITCHELL:  Object to form.
16               THE WITNESS:  We have a license agreement
17          with that database.
18   BY MS. NELSON-MAJOR:
19        Q.      Can you explain that to me, why that
20   limits your search?
21               MR. MITCHELL:  I'm -- I'm going to object
22          pursuant to the protective order and instruct the
23          Pharmacist not to answer.
24   BY MS. NELSON-MAJOR:
25        Q.      When you had the conversations with the
```

```
 1   drug procurer about searching for pentobarbital, did
 2   the drug procurer give you any instructions about how
 3   to conduct your search?
 4         A.      No.
 5         Q.      Did you tell the drug procurer that twice
 6   when you searched the database there was available
 7   pentobarbital, but it was only available to a hospital?
 8         A.      Yes.
 9         Q.      And when you relayed that information to
10   the drug procurer, was that by email or by phone?
11         A.      By phone.
12         Q.      Do you recall when you ran those two
13   searches that yielded available pentobarbital?
14         A.      This last search in March of 2021; but
15   the one prior, I do not remember.
16         Q.      Have you ever contacted a Department of
17   Corrections outside of Tennessee about looking for
18   pentobarbital?
19         A.      No.
20         Q.      I'd like for you to turn to Exhibit 35.
21         A.      Okay.  I have it.
22         Q.      And I'm sorry, I want to drop back to a
23   question that I asked you previously.
24                 I want to ask you another question about
25   that licensing agreement.  Does that licensing agreement
```

```
 1   prohibit you from looking at other databases of available
 2   pharmaceuticals?
 3                   MR. MITCHELL:  Object to the form.  And
 4           -- and I'm going to -- I'm going to instruct the
 5           Pharmacist not to answer.  You --you can answer
 6           "Yes"/"No," Pharmacist.
 7                   I'm sorry, I withdraw the objection.
 8                   THE WITNESS:  I'm not aware.
 9   BY MS. NELSON-MAJOR:
10       Q.      In the course of your duties, do you ever
11   consult other databases of available pharmaceuticals?
12       A.      Yes.
13       Q.      How many other databases do you search --
14   have you -- are available to you when searching for
15   drugs?
16       A.      Two.
17       Q.      Did you consult --
18       A.      I'm sorry, let me change that.  Three.
19       Q.      Three?  Did you consult either of the
20   other two available databases when trying to ascertain
21   the availability of pentobarbital for TDOC?
22       A.      No.
23       Q.      Why not?
24       A.      Those other databases are just for APIs.
25       Q.      Were you confining your search to
```

**Gibson Court Reporting**

```
 1    pentobarbital, as opposed to pentobarbital API?

 2         A.     Yes.

 3         Q.     Why?

 4                MR. MITCHELL:  Object to form.

 5                THE WITNESS:  I was not aware that

 6         pentobarbital was available as an API.

 7    BY MS. NELSON-MAJOR:

 8         Q.     Did the drug procurer direct you to limit

 9    your search to pentobarbital, as opposed to

10    pentobarbital API?

11         A.     No.

12         Q.     When you searched the one database that

13    you did search, did you search for available

14    pentobarbital API?

15         A.     No.

16         Q.     Sorry.  Turning back to Exhibit 35 that I

17    asked you to pick up.

18         A.     Yes, I have it.

19         Q.     It's an email dated June 26th, 2019.  Do

20    you recognize this email?

21         A.     No.

22         Q.     So you were not the recipient on this

23    email?

24         A.     No.

25         Q.     Do you see that it lists a number of
```

1   drugs:  midazolam, digoxin, morphine sulfate, and

2   propanolol?

3         A.      Yes, I see that.

4         Q.      Are you familiar with each of these

5   drugs?

6         A.      Yes.

7         Q.      In the course of your employment, have

8   you fulfilled orders for each of these drugs?

9         A.      You mean to anyone, or just to TDOC?

10         Q.      To anyone.

11               MR. MITCHELL:  Objection.

12               THE WITNESS:  Yes.

13   BY MS. NELSON-MAJOR:

14         Q.      Have you -- we know that you've

15   compounded midazolam.  Have you compounded any of the

16   other drugs before?

17               MR. MITCHELL:  Object to the form.

18               THE WITNESS:  Just digoxin.

19   BY MS. NELSON-MAJOR:

20         Q.      Digoxin?  Were you ever asked to look

21   into the availability of digoxin for use by TDOC in

22   executions?

23         A.      No.

24         Q.      Do you have any reason to believe that

25   you couldn't obtain digoxin for use in executions?

```
 1                    MR. MITCHELL:  I'll object to the form.
 2                    THE WITNESS:  Not that I'm aware of, no.
 3    BY MS. NELSON-MAJOR:
 4        Q.       Were you ever asked to look into the
 5    availability of morphine sulfate for the use in
 6    executions?
 7        A.       No.
 8        Q.       Do you have any reason to believe that
 9    you couldn't obtain morphine sulfate for use in
10    executions?
11                    MR. MITCHELL:  Same objection.
12                    THE WITNESS:  No.
13    BY MS. NELSON-MAJOR:
14        Q.       Were you ever asked to look into the
15    availability of propanolol for the use in executions?
16        A.       No.
17        Q.       Do you have any reason to believe that
18    you couldn't obtain propanolol for use in executions?
19                    MR. MITCHELL:  Same objection.
20                    THE WITNESS:  No.
21    BY MS. NELSON-MAJOR:
22        Q.       Were you ever asked to look into the
23    availability of secobarbital?
24        A.       No.
25        Q.       Do you have any reason to believe you
```

1    couldn't obtain secobarbital for use in executions?

2                      MR. MITCHELL:  Form.

3                      THE WITNESS:  I'm not aware, no.

4    BY MS. NELSON-MAJOR:

5        Q.      Were you asked to look into the

6    availability of ketamine for use in executions?

7        A.      No.

8        Q.      Do you have any reason to believe you

9    couldn't obtain ketamine for use in executions?

10                     MR. MITCHELL:  Form.

11                     THE WITNESS:  No.

12   BY MS. NELSON-MAJOR:

13       Q.      Were you ever asked to look into the

14   availability of any other drugs that I haven't named

15   for use in executions by TDOC?

16       A.      No.

17       Q.      In the course of your duties with your

18   current employer, do you ever prepare drugs for oral

19   administration?

20       A.      I'm sorry, can you say that again?

21       Q.      Of course.  In the course of your duties

22   with your current employer, do you ever prepare drugs

23   for oral administration?

24       A.      Yes.

25                     MS. NELSON-MAJOR:  So would it be okay if

```
 1          we took a break now for five, ten minutes?
 2               MR. MITCHELL:  Yes.  Should we say --
 3          could we do ten -- maybe 12, 10:15/11:15?
 4               MS. NELSON-MAJOR:  Sounds good.
 5               THE VIDEOGRAPHER:  We're off the record
 6          at 10:03.
 7               (Recess at 10:03 a.m. to 10:16 a.m.)
 8               THE VIDEOGRAPHER:  We're back on the
 9          record.  The time is 10:16 a.m.
10   BY MS. NELSON-MAJOR:
11          Q.     Pharmacist, did you talk to anyone during
12   that break?
13          A.     No.
14          Q.     I just wanted to confirm something that
15   you said.  Did you say that you have not searched for
16   pentobarbital API for TDOC?
17          A.     Correct.
18          Q.     Did you tell the drug procurer that you
19   were limiting your search to commercially manufactured
20   pentobarbital?
21          A.     No.
22          Q.     What did you tell the drug procurer about
23   how you were conducting drug researches?
24               MR. MITCHELL:  Object to the form.
25               THE WITNESS:  Nothing in detail, just
```

```
 1          that I was searching.
 2   BY MS. NELSON-MAJOR:
 3          Q.       And when you found those -- upon
 4   searching twice, you found the available pentobarbital
 5   but only available to hospitals, did you explain that
 6   in detail to the drug procurer?
 7          A.       Yes.
 8          Q.       What was the -- can you tell me what you
 9   told the drug procurer?
10               MR. MITCHELL:  Object to the form.  You
11          can answer.
12               THE WITNESS:  Exactly what you said; that
13          I wasn't able to purchase it for the pharmacy,
14          since we weren't a hospital nor a block payment.
15   BY MS. NELSON-MAJOR:
16          Q.       What was the drug procurer's response?
17          A.       "Okay."
18          Q.       The drug procurer didn't suggest any
19   followup after you conveyed that information?
20               MR. MITCHELL:  Objection.
21               THE WITNESS:  No.
22   BY MS. NELSON-MAJOR:
23          Q.       Did the drug procurer at any point tell
24   you to look for pentobarbital API?
25          A.       No.
```

1      Q.      When you get a request from a customer
2  for a certain drug, how do you determine whether you'll
3  compound the drug or look for a commercially
4  manufactured version?
5              MR. MITCHELL:  Object to the form.
6              THE WITNESS:  Depending on how -- what
7         the order from the doctor is.
8  BY MS. NELSON-MAJOR:
9      Q.      Can you explain that to me?
10      A.      It's a medication written on the order.
11  Sorry, I'm trying to see how to word it.
12              If it's something commonly used that I'm
13  aware is already commercially available and it's a tablet
14  or capsule or solution, whatever it may be, then we don't
15  look into compounding the medication itself.  We just
16  purchase whatever is commercially available.
17      Q.      So if you get a request for a drug that
18  you can't find in a commercially available version,
19  what do you generally do next?
20              MR. MITCHELL:  Form.
21              THE WITNESS:  See if it is available as
22         an API that we could make.
23  BY MS. NELSON-MAJOR:
24      Q.      When searching -- when you received the
25  request from TDOC for midazolam, what did you do to

```
 1    ascertain whether that was available?
 2                    MR. MITCHELL:  Object to the form, but
 3           you can answer.
 4                    THE WITNESS:  It is available as a
 5           commercially manufactured product.
 6    BY MS. NELSON-MAJOR:
 7        Q.      If it's available as a commercially
 8    manufactured product, why are you compounding it for
 9    TDOC?
10                    MR. MITCHELL:  Same objection.  You can
11           answer.
12                    THE WITNESS:  The strength that we were
13           asked to procure is not available, so we made it
14           in a compound instead of the commercially
15           available product.
16    BY MS. NELSON-MAJOR:
17        Q.      And how did you figure out that that
18    midazolam API was available for you to compound for
19    TDOC?
20        A.      It's available from the wholesalers that
21    we order from.
22        Q.      Did you consult any of the three
23    databases you had talked about earlier when figuring
24    out whether that midazolam was available?
25        A.      Yes.
```

**Gibson Court Reporting**

 1          Q.        And I'm specifically asking about

 2     midazolam in API form.  I'm sorry.

 3          A.        Yes.

 4          Q.        Was it the same database that you looked

 5     at when determining whether pentobarbital was available

 6     for TDOC?

 7          A.        No.

 8          Q.        It was one of the other two databases?

 9          A.        Yes.

10          Q.        And what about for the potassium chloride

11     that you compound for TDOC?  What did you do to

12     determine whether that was commercially available?

13                    MR. MITCHELL:  Object to the form.

14                    THE WITNESS:  Searched that same database

15          as the pentobarbital.

16     BY MS. NELSON-MAJOR:

17          Q.        And was the potassium chloride available

18     in a commercially manufactured form for TDOC?

19          A.        Not in the strength they were

20     requiring -- requesting.

21          Q.        And what did you do to determine that the

22     potassium chloride API was then available for you to

23     compound for TDOC?

24                    MR. MITCHELL:  Object to the form.  You

25          may answer.

```
 1                    THE WITNESS:  Searched the same database
 2          that I used to search for the midazolam.
 3   BY MS. NELSON-MAJOR:
 4          Q.      Before the pharmacy owner left the
 5   pharmacy, did you have conversations with the pharmacy
 6   owner about any efforts he might have made to look at
 7   -- look for pentobarbital for TDOC?
 8          A.      No.
 9          Q.      Are you still in contact with the
10   pharmacy owner?
11          A.      The past pharmacy owner?
12          Q.      That's right.
13          A.      No.
14          Q.      If you know, why did the pharmacy --
15   former pharmacy owner leave your pharmacy?
16                    MR. MITCHELL:  I'm going to object,
17          pursuant to the protective order.  Pharmacist, to
18          the extent you can answer without identifying, you
19          can answer.
20                    THE WITNESS:  I don't know specific
21          reasons.
22   BY MS. NELSON-MAJOR:
23          Q.      Now, I have a couple more questions about
24   these three databases.  So when you first get an order
25   for a particular drug, what is the first database you
```

 1    search for availability?

 2                 MR. MITCHELL:  Objection, pursuant to the

 3          protective order.  Do not answer that.

 4    BY MS. NELSON-MAJOR:

 5          Q.      I'm not asking for the name of the

 6    database.  As you've described them to me, there's one

 7    database that you searched for pentobarbital; and then

 8    there are two additional databases that you searched

 9    for for the midazolam and potassium chloride API.  Is

10    that right?

11          A.      Yes.

12          Q.      And the second and third database, is

13    that strictly API or does that also have commercially

14    manufactured drugs in it?

15          A.      Just API.

16          Q.      And you did not search those second and

17    third databases for the pentobarbital API?

18          A.      No.

19          Q.      Could you please pull up Exhibit 13.

20          A.      Okay.  I have it.

21          Q.      It's an email chain from July 20th, 2017.

22    Did you write or receive any of these emails?

23          A.      No.

24          Q.      There's a large redaction in the middle

25    of the page, and then above that there's a -- it says

 1    "regards."  But the -- the next two lines above that,

 2    it says:  "I have some news on the pento.  It's not

 3    good.  I had the DEA invite me over to discuss it."

 4              Do you know what this email is referring

 5    to?

 6         A.    No.

 7         Q.    Did anyone at your pharmacy ever discuss

 8    with you a meeting they had with the DEA about the

 9    TDOC's request for lethal injection chemicals?

10         A.    No.

11         Q.    Have you ever had any conversations with

12    the DEA about providing drugs to be used in lethal

13    injection?

14         A.    No.

15         Q.    Can you pull up Exhibit 15, please.

16         A.    Okay.  I have it.

17         Q.    This is an email chain from April 4th,

18    2017.  Did you write or receive any of these emails?

19         A.    No.

20         Q.    Have you ever been involved in the

21    manufacturing of pentobarbital API by a synthetic

22    route?

23         A.    No.

24         Q.    Does your pharmacy ever manufacture API

25    by the synthetic route?

```
 1            A.      I'm sorry, can you say that again?
 2            Q.      Does your pharmacy ever manufacture API
 3    itself via the synthetic route?
 4            A.      No, we do not manufacture API.
 5            Q.      Can you please look at Exhibit 17.
 6            A.      Okay.  I have it.
 7            Q.      And related to that last answer that you
 8    gave, is your pharmacy capable of manufacturing API via
 9    the synthetic route?
10            A.      No.
11            Q.      What sorts of facilities are required to
12    manufacture API?
13                    MR. MITCHELL:  Objection.
14                    THE WITNESS:  I'm not aware of what they
15        have to do to be able to manufacture APIs.
16    BY MS. NELSON-MAJOR:
17            Q.      Turning back to Exhibit 17, it's an email
18    chain from October 30th, 2019.
19            A.      Yes, I see it.
20            Q.      Did you write or receive any of these
21    emails?
22            A.      I did not.
23            Q.      And you earlier said that the former
24    pharmacy owner left in December of 2019; is that right?
25            A.      Yes.
```

```
 1           Q.      And you said you weren't aware of the

 2    details of that pharmacy owner's departure.  Are you

 3    aware generally of the reasons that the pharmacy owner

 4    left the pharmacy?

 5                   MR. MITCHELL:  Objection.

 6    BY MS. NELSON-MAJOR:

 7           Q.      You can answer, Pharmacist.

 8           A.      There was -- so he was majority owner --

 9                   MR. MITCHELL:  Pharmacist, maybe -- I'm

10           going to object, pursuant to the protective order,

11           depending on what your answer is going to be.

12                   I'm going to object, pursuant to the

13           protective order, and instruct you not to answer

14           anything beyond a "Yes" or "No."

15    BY MS. NELSON-MAJOR:

16           Q.      Did the pharmacy owner retire?

17           A.      No.

18           Q.      Was the pharmacy owner a licensed

19    pharmacist?

20           A.      No.

21           Q.      Was the pharmacy -- was the pharmacy

22    owner's departure at all related to the provision of

23    lethal injection drugs to TDOC?

24                   MR. MITCHELL:  Object to the form.  You

25           can answer, if you know.
```

1            THE WITNESS:  Not that I'm aware of.

2    BY MS. NELSON-MAJOR:

3        Q.      Did the pharmacy owner get in some sort

4    of trouble?

5            MR. MITCHELL:  Object to that form.

6            THE WITNESS:  No.

7    BY MS. NELSON-MAJOR:

8        Q.      Can you state your answer again,

9    Pharmacist?

10       A.      No.

11       Q.      Before the pharmacy owner left, did the

12   pharmacy owner share with you any of the correspondence

13   he had previously had with the drug procurer?

14       A.      No.

15       Q.      Can you please take a look at Exhibit 19.

16       A.      Okay, I have it.

17       Q.      Do you see that this is a memo dated May

18   3rd, 2019, and it's titled "Whether the Food and Drug

19   Administration has Jurisdiction over Articles Intended

20   for Use in Lawful Executions?"

21       A.      Yes, I see it.

22       Q.      Have you seen this memo before?

23       A.      No, I have not.

24       Q.      Are you aware that the Attorney General

25   has instructed the FDA to not exercise jurisdiction

```
 1    over importation of lethal injection drugs?
 2                    MR. MITCHELL:  I'm going to object to the
 3           form.  And could you specify what Attorney
 4           General?
 5    BY MS. NELSON-MAJOR:
 6           Q.      The United States Attorney General, not
 7    Mr. Mitchell.
 8           A.      No.
 9           Q.      Did anyone ever ask you to research legal
10    issues related to the -- to obtaining pentobarbital on
11    behalf of TDOC?
12           A.      No.
13           Q.      What about obtaining pentobarbital API?
14           A.      No.
15           Q.      Do you currently have pentobarbital API
16    in stock at your facility?
17           A.      No.
18           Q.      Have you ever filled a prescription for
19    pentobarbital in the course of your duties as a
20    pharmacist?
21           A.      No.
22           Q.      If you had pentobarbital API in stock,
23    would you be able to compound it for TDOC for use in
24    executions?
25                    MR. MITCHELL:  Object to the form.
```

```
 1                    THE WITNESS:  Yes.
 2                    MS. NELSON-MAJOR:  Just a moment, please.
 3                    (Pause.)
 4   BY MS. NELSON-MAJOR:
 5        Q.    Could you please pull up Exhibit 1.
 6        A.    Okay.  I have it.
 7        Q.    Have you seen this document before?
 8        A.    I'm just looking through it.
 9        Q.    Please take your time.
10                    (Pause.)
11                    THE WITNESS:  Yes.
12   BY MS. NELSON-MAJOR:
13        Q.    This is titled "Lethal Injection
14   Execution Manual, Execution Procedures for Lethal
15   Injection."
16                    Have you ever seen this document before?
17        A.    Not to the entirety --
18        Q.    And when you say --
19        A.    -- but I've seen some documents in here.
20        Q.    I'm so sorry to interrupt you.
21                    So you -- you haven't seen this entire
22   document before?
23        A.    No.
24        Q.    What portions of the document have you
25   seen before?
```

**Gibson Court Reporting**

```
 1          A.       Sorry, I just left a page.  Just a
 2   moment.
 3          Q.       Of course.  Take your time.
 4                   (Pause.)
 5                   THE WITNESS:  The portion where it says
 6          "Lethal Injection Chemical Setup and Preparation."
 7   BY MS. NELSON-MAJOR:
 8          Q.       And what page are you on, Pharmacist?
 9          A.       On Page 40.  Oh, I'm sorry, 39.
10          Q.       Is this the only portion of this document
11   that you've seen before?
12          A.       Through Page 40 -- 39 and 40.
13          Q.       Page -- Page 39 and 40 are the only pages
14   of this document that you've seen before?
15          A.       I'm just looking further.  If you want, I
16   can keep going.
17          Q.       Sure.  Take your time, please.
18                   (Pause.)
19                   THE WITNESS:  And I believe Page 94 is
20          the -- I don't remember the exhibit you showed me
21          earlier.  It looks the same.
22                   Other than that, that would be all.
23   BY MS. NELSON-MAJOR:
24          Q.       And what is your understanding of what
25   this document is?
```

1        A.        It just looks like a manual for the

2    execution process.

3        Q.        And the pages that you've seen before,

4    Page 39 to 40, when was the first time that you saw

5    those pages?

6        A.        I don't recall the exact time, but it

7    would have been at the end of 2018 -- or when I started

8    in 2018.

9        Q.        And who showed you or provided you with

10   pages 39 and 40?

11            MR. MITCHELL:  Object, pursuant to the

12        protective order.  If you can name a person by a

13        role, then I'll permit you to answer; but

14        otherwise, I won't.

15            THE WITNESS:  Previous owner.

16   BY MS. NELSON-MAJOR:

17       Q.        And the previous owner, how did he

18   provide you with pages 39 and 40?

19       A.        You mean like in what route?  Like if it

20   was printed, or --

21       Q.        Did he give you copies, or did he just

22   generally tell you about what was in them?  How did you

23   become familiar with those pages?

24       A.        He emailed them to me and asked me to

25   review them.

1          Q.        Review them for what purpose?

2          A.        Just to read through, make sure it made

3    sense, the steps.

4          Q.        Did he ask you to make any edits to those

5    pages?

6          A.        Yes.

7          Q.        Did you make edits to those pages?

8          A.        Yes.  I do remember editing, but I don't

9    remember what.

10         Q.        Are you aware of who drafted pages 39 to

11   40?

12         A.        No.

13                   MR. MITCHELL:  Form.  Go ahead.

14   BY MS. NELSON-MAJOR:

15         Q.        And did you provide those edits to the

16   pharmacy owner over email?

17         A.        Yes.

18         Q.        Did you make edits just that one time?

19         A.        It may have been twice; one or two times,

20   no more than that.

21         Q.        I know you said you don't recall exactly

22   what edits you made, but do you remember what topics or

23   issues you addressed in those edits?

24         A.        I can read through a little and see if

25   something reminds me of anything.

```
 1          Q.      Okay.  That'd be great.  Thank you.

 2                  (Pause.)

 3                  THE WITNESS:  I'm sorry, I don't

 4      remember.

 5  BY MS. NELSON-MAJOR:

 6          Q.      Do you remember making any -- any edits

 7      to the concentration of the drugs listed on these

 8      pages?

 9                  MR. MITCHELL:  Object to the form.

10                  THE WITNESS:  No, I don't.

11  BY MS. NELSON-MAJOR:

12          Q.      What about the overall doses of each drug

13      listed?

14                  MR. MITCHELL:  Same objection.

15                  THE WITNESS:  No.

16  BY MS. NELSON-MAJOR:

17          Q.      And when you sent those edits to the

18      pharmacy owner, was anyone else involved in that email

19      chain?

20          A.      Not that I recall.

21          Q.      Did you discuss your proposed edits with

22      anyone other than the pharmacy owner?

23          A.      No.

24                  MS. NELSON-MAJOR:  We'll request in

25      discovery all the correspondence related to the
```

**Gibson Court Reporting**

```
 1          edits that the pharmacy made -- Pharmacist made,
 2          as well as any of the actual documents that he
 3          made edits on.
 4                    MR. MITCHELL:  We'll look at that.
 5                    MS. NELSON-MAJOR:  Okay.
 6    BY MS. NELSON-MAJOR:
 7          Q.     And you said you first saw this document
 8    in 2018.  Do you know how long this current protocol
 9    has been in place for?
10          A.     No.
11          Q.     Were you asked for input outside of the
12    edits you made to Page 39 and 40?
13          A.     No.
14          Q.     Did you have any conversations with the
15    pharmacy owner about Page 39 and 40, outside of the
16    edits that you made?
17          A.     No.
18                    MR. MITCHELL:  Object to form.
19    BY MS. NELSON-MAJOR:
20          Q.     Did you have any conversations with the
21    pharmacy owner about the protocol, more generally?
22                    MR. MITCHELL:  Same objection.
23                    THE WITNESS:  No.
24    BY MS. NELSON-MAJOR:
25          Q.     What about with anyone else at your
```

**Gibson Court Reporting**

1  pharmacy?

2                    MR. MITCHELL:  Same objection.

3                    THE WITNESS:  No.

4  BY MS. NELSON-MAJOR:

5        Q.      Did you provide copies of these

6  instructions, Page 39 and 40, to anyone else at your

7  pharmacy?

8        A.      No.

9        Q.      In making those edits, did you consult

10  any documents outside of the Page 39 and 40?

11        A.      No.

12        Q.      If you know, do you know whether any

13  other professionals besides yourself were consulted in

14  the creation of this protocol?

15        A.      Do not know.

16        Q.      What drugs does the current protocol

17  contemplate TDOC using in executions?

18        A.      I'm aware of the midazolam, the

19  vecuronium bromide, and potassium chloride.

20        Q.      What is your understanding of the purpose

21  of using the midazolam in the lethal injection

22  protocol?

23                    MR. MITCHELL:  Object to the form.  You

24        can answer.

25                    THE WITNESS:  And my understanding of

```
 1          just what -- how the medication works itself would
 2          be to help with sedation.
 3   BY MS. NELSON-MAJOR:
 4          Q.      You said that's your ordinary
 5   understanding of midazolam.  What kind of drug is
 6   midazolam?
 7                  MR. MITCHELL:  Object to the form.
 8                  THE WITNESS:  A benzodiazepine.
 9   BY MS. NELSON-MAJOR:
10          Q.      And what DEA Schedule is it?
11          A.      Sorry, I don't recall off the top of my
12   head if it's Schedule III or IV.
13          Q.      You said either Schedule III or IV; is
14   that right?
15          A.      Yes, ma'am.
16          Q.      Can you tell me a little bit more about
17   the ordinary uses of midazolam that you mentioned?
18                  MR. MITCHELL:  Object to form.  You can
19          answer.
20                  THE WITNESS:  Apart from sedation, I
21          haven't seen it used in any other form.
22   BY MS. NELSON-MAJOR:
23          Q.      Can you explain to me what you mean by
24   "sedation?"
25                  MR. MITCHELL:  Pharmacist, you can
```

```
 1          answer.
 2                    THE WITNESS:  Okay.  Just putting whoever
 3          the intended person is into like a sleeping state.
 4   BY MS. NELSON-MAJOR:
 5          Q.      Is a sleeping state the same thing as
 6   anesthesia?
 7                    MR. MITCHELL:  Object to the form.
 8                    THE WITNESS:  Yes.  It can be used in
 9          anesthesia, as well.
10   BY MS. NELSON-MAJOR:
11          Q.      Are you aware of what types of procedures
12   that midazolam is used in?
13          A.      No, I'm not.
14          Q.      Is midazolam FDA approved as the sole
15   drug to produce and maintain anesthesia during a
16   painful surgical procedure?
17                    MR. MITCHELL:  Object to the form.  You
18          can answer.
19                    THE WITNESS:  I'm not aware that it's the
20          sole drug approved, no.
21   BY MS. NELSON-MAJOR:
22          Q.      When you say you're unaware, does that
23   mean it is your understanding that it is not FDA
24   approved for that purpose?
25                    MR. MITCHELL:  Same objection.
```

```
 1                    THE WITNESS:  That's not what I mean.  I
 2        know it's approved by the FDA for sedation, but
 3        that's not its sole purpose.  But I'm not aware of
 4        the other FDA-approved indications.
 5   BY MS. NELSON-MAJOR:
 6        Q.       I might have misspoke.  Let me try to ask
 7   the question again, because I wasn't asking about its
 8   sole purpose.
 9                    I'm asking whether it's been FDA approved
10   as the sole drug, meaning the only drug, to be used to
11   induce anesthesia during people's surgical procedures?
12                    MR. MITCHELL:  Form objection.
13                    THE WITNESS:  I can answer?
14   BY MS. NELSON-MAJOR:
15        Q.       Yes.
16        A.       No, it's not the only FDA-approved drug.
17        Q.       Has it been FDA approved to be used
18   alone, not coupled with another drug, to produce and
19   maintain anesthesia during a painful surgical
20   procedure?
21                    MR. MITCHELL:  Same objection.  You can
22        answer.
23                    THE WITNESS:  I -- I do not know.
24   BY MS. NELSON-MAJOR:
25        Q.       Does midazolam have an analgesic effect?
```

**Gibson Court Reporting**

```
 1                    MR. MITCHELL:  Form objection.  You can
 2          answer.
 3                    THE WITNESS:  I believe, yes, it does
 4          have an analgesic effect.
 5   BY MS. NELSON-MAJOR:
 6          Q.      Are you aware that midazolam has a
 7   ceiling effect?
 8                    MR. MITCHELL:  Same objection.  You can
 9          answer.
10                    THE WITNESS:  No.
11   BY MS. NELSON-MAJOR:
12          Q.      Do you know whether midazolam can produce
13   a level of surgical anesthesia?
14          A.      Yes.
15          Q.      Yes, it does produce a surgical level of
16   anesthesia?
17          A.      Depending on the surgery, yes.
18          Q.      What sorts of surgeries can midazolam
19   produce a surgical level of anesthesia?
20                    MR. MITCHELL:  Object to the form.
21                    THE WITNESS:  I would say minor, but I
22          can't tell you what the definition of "minor
23          surgery" is.
24   BY MS. NELSON-MAJOR:
25          Q.      Are you aware that there are different
```

1   levels of anesthetic depth?

2        A.      Yes.

3        Q.      And what is your understanding of those

4   different levels?

5               MR. MITCHELL:  Object to the form.  You

6        can answer.

7               THE WITNESS:  I don't have a deep

8        knowledge basis on different levels of anesthesia.

9   BY MS. NELSON-MAJOR:

10       Q.      Are you aware that midazolam cannot

11  produce general anesthesia?

12              MR. MITCHELL:  Object to the form.  You

13       can answer.

14              THE WITNESS:  Yes.

15  BY MS. NELSON-MAJOR:

16       Q.      Are you aware that midazolam can result

17  in a paradoxical reaction?

18              MR. MITCHELL:  Same objection.  You can

19       answer.

20              THE WITNESS:  Yes.

21  BY MS. NELSON-MAJOR:

22       Q.      Can you describe to me what a paradoxical

23  reaction is?

24              MR. MITCHELL:  Same objection.  You can

25       answer.

```
 1                    THE WITNESS:  Just a movement, maybe
 2          unintended.  They won't know, because they're
 3          under anesthesia.
 4   BY MS. NELSON-MAJOR:
 5          Q.      Do you know what the deepest level of
 6   anesthesia is that midazolam is capable of producing?
 7          A.      No.
 8                    MR. MITCHELL:  Same objection.  You can
 9          answer.
10   BY MS. NELSON-MAJOR:
11          Q.      Is midazolam acidic or alkaline?
12                    MR. MITCHELL:  Same objection.  You can
13          answer.
14                    THE WITNESS:  Sorry, I'm trying to
15          recall.  I don't remember.
16   BY MS. NELSON-MAJOR:
17          Q.      What kind of drug is vecuronium bromide?
18                    MR. MITCHELL:  Object to form.  You can
19          answer.
20                    THE WITNESS:  A neuromuscular blocker.
21   BY MS. NELSON-MAJOR:
22          Q.      And can you explain to me what a
23   neuromuscular blocker is?
24                    MR. MITCHELL:  Same objection.
25                    THE WITNESS:  Medication used so that
```

```
 1            when under surgery the....
 2    BY MS. NELSON-MAJOR:
 3            Q.      Pharmacist, I didn't catch the last bit
 4    of your answer.  Can you repeat it?
 5            A.      No, I'm sorry.  I'm just trying to word
 6    it the right way for you.
 7                    Medication used to help stop, when under
 8    anesthesia, any movement.
 9            Q.      What is your understanding of the purpose
10    of using the vecuronium bromide in the lethal injection
11    protocol?
12                    MR. MITCHELL:  Object to form, but you
13            can answer.
14                    THE WITNESS:  My understanding is that
15            it's used for what we were discussing, as a
16            neuromuscular blocker.
17    BY MS. NELSON-MAJOR:
18            Q.      To block the inmates from moving?
19            A.      Yes, ma'am.
20            Q.      Do you know what dosage the correct
21    protocol contemplates?
22            A.      No, ma'am; I don't remember.
23            Q.      What kind of drug is potassium chloride?
24            A.      It's -- sorry.  I mean, it -- it replaces
25    potassium.
```

```
 1          Q.       Is potassium chloride acidic or alkaline?
 2                   MR. MITCHELL:  Form, but you can answer.
 3                   THE WITNESS:  I don't know.
 4   BY MS. NELSON-MAJOR:
 5          Q.       What is your understanding of the purpose
 6   of including the potassium chloride in the lethal
 7   injection protocol?
 8                   MR. MITCHELL:  Same objection.  You can
 9          answer.
10   BY MS. NELSON-MAJOR:
11          Q.       You can answer, Pharmacist.
12          A.       Okay.  The potassium chloride is used as
13   an elevated dose normal for the human body, and it
14   increases heart rate, heart rhythm.
15          Q.       What is the goal of administering that
16   dose, in your understanding, in this current protocol?
17                   MR. MITCHELL:  Form objection.  You can
18          answer.
19                   THE WITNESS:  That's what would lead to
20          the lethal part of the procedure.
21   BY MS. NELSON-MAJOR:
22          Q.       Is vecuronium bromide acidic or alkaline?
23          A.       I do not know.
24                   MR. MITCHELL:  Form objection.
25   BY MS. NELSON-MAJOR:
```

1          Q.       In your opinion, how deep of sedation

2    will 500 milligrams of midazolam produce in inmates?

3                    MR. MITCHELL:  Form objection.  You can

4          answer.

5                    THE WITNESS:  I do not know.

6    BY MS. NELSON-MAJOR:

7          Q.       Do you believe that inmates will be under

8    general anesthesia when injected with 500 milligrams of

9    midazolam?

10                   MR. MITCHELL:  Same objection.  You can

11         answer.

12                   THE WITNESS:  Yes.

13   BY MS. NELSON-MAJOR:

14         Q.       On what do you base that opinion?

15         A.       That it's been used before.

16         Q.       When you say "used before," do you mean

17   in executions?

18         A.       Yes, just the purpose of this document.

19         Q.       Have you ever observed an execution?

20         A.       No.

21         Q.       Have you ever reviewed records related to

22   a particular execution?

23         A.       No.

24         Q.       And when you say that you based this

25   conclusion on the fact that it's included in the

 1   protocol, can you explain that to me?

 2                    MR. MITCHELL:  Same objection.  Well,

 3         form objection.  You can answer.

 4                    THE WITNESS:  That the protocol includes

 5         the doses of what is necessary to carry out the

 6         execution.

 7   BY MS. NELSON-MAJOR:

 8         Q.      So you're basing your conclusion that

 9   general anesthesia will be achieved on the fact that

10   it's in the protocol?

11         A.      No.

12         Q.      Are you basing it on -- no?

13                    MR. MITCHELL:  Form objection.  You can

14         answer.

15                    THE WITNESS:  No.

16   BY MS. NELSON-MAJOR:

17         Q.      Was that "No?"  Sorry, I couldn't quite

18   catch it.

19         A.      No.

20         Q.      Could you pull up Exhibit 7, please.

21                    MR. MITCHELL:  Was that 17, Hayden?

22                    MS. NELSON-MAJOR:  7, sorry.

23                    MR. MITCHELL:  Okay.

24                    THE WITNESS:  I have it.

25   BY MS. NELSON-MAJOR:

```
 1          Q.        Okay.  Have you seen this email before?

 2          A.        No.

 3          Q.        Can you turn to the second page?

 4          A.        Okay.  I have it.

 5          Q.        Okay.  And at the bottom of the page

 6    there's the text of an email, and I want to ask you

 7    about that text.  It states:

 8                    "I reviewed several protocols from states

 9                    that currently use that method.  Most have

10                    a three-drug protocol including a paralytic

11                    and potassium chloride.  Here is my concern

12                    with midazolam.  Being a benzodiazepine, it

13                    doesn't elicit strong analgesic effects.

14                    The subjects may be able to feel pain from

15                    the administration of the second and third

16                    drugs, potassium chloride especially."

17                    Do you --

18          A.        Yes, I see it.

19          Q.        Do you share those concerns about

20    midazolam?

21                    MR. MITCHELL:  Object to the form.  You

22          can answer.

23                    THE WITNESS:  Yes.  I know midazolam, as

24          we stated, does have analgesic effects.  But to

25          the degree, with what this is saying, the
```

```
 1          potassium chloride and the pain; yes, I would

 2          agree with this statement.

 3   BY MS. NELSON-MAJOR:

 4          Q.     Do you also share the concern that

 5   potassium chloride in particular may cause the inmate

 6   to cause -- to experience pain?

 7                 MR. MITCHELL:  Form objection.  You can

 8          answer.

 9                 THE WITNESS:  Yes.

10   BY MS. NELSON-MAJOR:

11          Q.     Can you explain that to me?

12                 MR. MITCHELL:  Same objection.

13                 THE WITNESS:  Without knowing the level

14          of the midazolam and how much analgesic effect is

15          occurring, even though the vecuronium is used --

16          being used as a paralytic agent, it would be -- we

17          wouldn't -- it would be unable to be -- to know

18          what level of pain the potassium chloride is

19          causing.

20   BY MS. NELSON-MAJOR:

21          Q.     What sort of pain would the potassium

22   chloride cause?

23                 MR. MITCHELL:  Same objection.  You can

24          answer.

25                 THE WITNESS:  I don't know how to explain
```

```
 1          that.
 2   BY MS. NELSON-MAJOR:
 3          Q.      If a person is in a surgical plane of
 4   anesthesia, are they able to feel pain?
 5                  MR. MITCHELL:  Same objection.  You can
 6          answer.
 7                  THE WITNESS:  I'm sorry, can you say that
 8          again?
 9   BY MS. NELSON-MAJOR:
10          Q.      If a person is in a surgical plane of
11   anesthesia, are they able to feel pain?
12                  MR. MITCHELL:  Same objection.  You can
13          answer.
14                  THE WITNESS:  They should not.
15   BY MS. NELSON-MAJOR:
16          Q.      What about a general level of anesthesia?
17   Should they be able to feel pain?
18                  MR. MITCHELL:  Same objection.
19                  THE WITNESS:  They should not.
20   BY MS. NELSON-MAJOR:
21          Q.      What about potassium chloride as a
22   chemical compound causes the risk of pain?
23                  MR. MITCHELL:  Same objection.  You can
24          answer.
25                  (Pause.)
```

**Gibson Court Reporting**

1   BY MS. NELSON-MAJOR:

2        Q.      You can answer, Pharmacist.

3        A.      Okay.  I'm not aware of what the pain

4   would feel like.  Since it's causing like a cardiac

5   arrest, I'm not -- I'm not aware of what pain, apart

6   from that.

7        Q.      Did you share your concerns about these

8   -- midazolam with anyone?

9             MR. MITCHELL:  Object to form.  You can

10        answer.

11            THE WITNESS:  No.

12  BY MS. NELSON-MAJOR:

13       Q.      Why not?

14            MR. MITCHELL:  Same objection.

15            THE WITNESS:  I assumed, when my role

16        started, that it was a protocol that had been in

17        use and in effect and termed to be suitable.

18  BY MS. NELSON-MAJOR:

19       Q.      In the normal course of your duties, do

20  you ever contact a customer about the appropriateness

21  of a drug that's been prescribed?

22            MR. MITCHELL:  Object to the form.  You

23        can answer.

24            THE WITNESS:  Yes, that's in my normal

25        job course.

```
 1   BY MS. NELSON-MAJOR:
 2        Q.     And what sorts of issues with a potential
 3   prescription would cause you to reach out to a customer
 4   to discuss your concerns?
 5                MR. MITCHELL:  Object to the form.  You
 6        can answer.
 7                THE WITNESS:  If it interacts with other
 8        medications that they're taking.
 9   BY MS. NELSON-MAJOR:
10        Q.     Is ketamine an analgesic?
11                MR. MITCHELL:  Object to the form.  You
12        can answer.
13                THE WITNESS:  Yes.
14   BY MS. NELSON-MAJOR:
15        Q.     What dose of midazolam is administered
16   pursuant to the protocol?
17                MR. MITCHELL:  Object to the form.  You
18        can answer.
19                THE WITNESS:  I'm trying to remember.
20        Just give me a moment.
21   BY MS. NELSON-MAJOR:
22        Q.     Of course.
23        A.     I believe it's 500 milligrams.
24        Q.     Is that a clinical dose?
25                MR. MITCHELL:  Object to the form.  You
```

```
 1          can answer.
 2                  THE WITNESS:  I don't remember the dosage
 3          range for midazolam.
 4   BY MS. NELSON-MAJOR:
 5          Q.      Is 500 milligrams of midazolam sufficient
 6   to induce surgical anesthesia?
 7                  MR. MITCHELL:  Form.  You can answer.
 8   BY MS. NELSON-MAJOR:
 9          Q.      You can answer.  I can restate the
10   question.
11          A.      Okay.  Go ahead.
12          Q.      Is 500 milligrams of midazolam sufficient
13   to induce general anesthesia?
14                  MR. MITCHELL:  Same objection.  You can
15          answer.
16                  THE WITNESS:  I believe it is, yes.
17   BY MS. NELSON-MAJOR:
18          Q.      And when someone is under general
19   anesthesia, are they able to feel pain?
20                  MR. MITCHELL:  Same objection.
21                  THE WITNESS:  It's my understanding that
22          they are not.
23   BY MS. NELSON-MAJOR:
24          Q.      And you just discussed your concerns that
25   an inmate might feel pain following the administration
```

```
 1   of the midazolam under the protocol; is that right?
 2        A.      Yes.
 3                MR. MITCHELL:  Same objection.
 4                THE WITNESS:  Yes.
 5   BY MS. NELSON-MAJOR:
 6        Q.      Yes?  Is that because they're not under
 7   general anesthesia?
 8                MR. MITCHELL:  Same objection.
 9                THE WITNESS:  No, I'm not saying it
10           because of that.
11   BY MS. NELSON-MAJOR:
12        Q.      Well, can you explain that to me, how
13   500 --
14        A.      Because --
15        Q.      I'm sorry, go ahead.
16                MR. MITCHELL:  Form objection.  You can
17           answer, though, Pharmacist.
18                THE WITNESS:  Okay.  It's just not 100
19           percent in anything, even if someone is under
20           anesthesia, that they're able to feel pain or not.
21           It's just our understanding that they don't, but
22           not necessarily 100-percent certainty.
23   BY MS. NELSON-MAJOR:
24        Q.      So you previously testified that
25   midazolam can't cause general anesthesia; is that
```

```
 1  right?
 2                  MR. MITCHELL:  Object to the form.
 3                  THE WITNESS:  I believe we were talking
 4          about for what level of anesthesia.
 5  BY MS. NELSON-MAJOR:
 6          Q.      Now I'm asking about general anesthesia.
 7                  MR. MITCHELL:  Same objection.  Is it --
 8          is that --
 9                  THE WITNESS:  Not used alone as a primary
10          drug.  That's what we discussed, yes.
11  BY MS. NELSON-MAJOR:
12          Q.      And that's your opinion for midazolam at
13  any dosage, right?
14                  MR. MITCHELL:  Same objection.
15                  THE WITNESS:  Yes.  So it would be the
16          same for whatever dose you're using.
17                  MS. NELSON-MAJOR:  Just a second.
18                  (Pause.)
19  BY MS. NELSON-MAJOR:
20          Q.      Have you ever been to the Riverbend
21  Maximum Security Institution?
22          A.      No.
23          Q.      So you've never seen the drugs that you
24  provide TDOC being prepared for use in an execution?
25                  MR. MITCHELL:  Object to form.
```

```
 1                    THE WITNESS:  No.
 2  BY MS. NELSON-MAJOR:
 3       Q.      You've never attended an execution?
 4       A.      I have not.
 5       Q.      Have you ever provided training to anyone
 6  else in connection with executions?
 7                    MR. MITCHELL:  Object to form.
 8                    THE WITNESS:  No.
 9  BY MS. NELSON-MAJOR:
10       Q.      I want to return to a question I just
11  asked you about whether any dose of midazolam is
12  sufficient to maintain general anesthesia -- or excuse
13  me, to cause general anesthesia.
14                    Would 20 milligrams be sufficient?
15                    MR. MITCHELL:  Object to the form.
16  BY MS. NELSON-MAJOR:
17       Q.      You can answer.
18       A.      I don't remember the lowest dose
19  recommendations or the highest dose recommendations for
20  anesthesia for the midazolam.
21       Q.      But it's your opinion that no dose would
22  be sufficient to maintain general anesthesia?
23                    MR. MITCHELL:  Object to the form.
24                    THE WITNESS:  Correct.
25  BY MS. NELSON-MAJOR:
```

1          Q.          What does the term "commercially

2   manufactured drug" mean?

3                    MR. MITCHELL:  Object to the form.  You

4          can answer.

5                    THE WITNESS:  It's a medication made by a

6          manufacturer that pharmacies can purchase to sell

7          to patients.

8   BY MS. NELSON-MAJOR:

9          Q.          And what does the term "compounded drugs"

10  mean?

11         A.          Medications where pharmacies purchase

12  APIs to change the chemical component into capsule or

13  solution, or whatever it can be made into, to dispense

14  as a prescription to patients.

15         Q.          Are compounded drugs FDA approved?

16                   MR. MITCHELL:  Object to the form.

17  BY MS. NELSON-MAJOR:

18         Q.          You can answer.

19         A.          They're approved.  The pharmacy is

20  still -- has to follow FDA guidelines, and the

21  medications themselves have to be of intended uses.

22  And the medications themselves have to be approved

23  already, just as medications themselves.

24         Q.          When you say the medication needs to be

25  approved already, are you talking about the

```
 1   commercially manufactured version of the drug needs to
 2   be approved already by the FDA?
 3        A.      Just the AP -- API itself, which may be
 4   related to another -- another -- what was the term you
 5   used?  Not the -- the commercially available product.
 6        Q.      So is the API FDA approved or needs to be
 7   FDA approved?
 8               MR. MITCHELL:  Object to the form.
 9               THE WITNESS:  The API has to be FDA
10          approved, and it has to -- yes, yes.
11   BY MS. NELSON-MAJOR:
12        Q.      Are there different risks associated with
13   compounded drugs than commercially manufactured drugs?
14               MR. MITCHELL:  Same objection.
15               THE WITNESS:  I'd say the risks are the
16          same.
17   BY MS. NELSON-MAJOR:
18        Q.      And what are those risks?
19               MR. MITCHELL:  Same objection.
20               THE WITNESS:  The sterility of the
21          medication.  The dosing of the medication that was
22          prepared in the correct facility that follows
23          guidelines.
24   BY MS. NELSON-MAJOR:
25        Q.      Are there any risks specific to the
```

```
 1   compounding process?
 2                  MR. MITCHELL:  Object to the form.  You
 3        can answer.
 4                  THE WITNESS:  Yes.
 5   BY MS. NELSON-MAJOR:
 6        Q.      What are those risks?
 7                  MR. MITCHELL:  Same objection.
 8                  THE WITNESS:  The integrity of the room
 9        that you're making the compound to not introduce
10        -- or to keep and maintain sterility of the
11        medication.
12                  That you, yourself, as the compounder are
13        properly gowned and garbed.
14   BY MS. NELSON-MAJOR:
15        Q.      What does the term "active pharmaceutical
16   ingredient" mean?
17        A.      That's what you've been referring to as
18   API.  So it's the ingredient that when you're
19   compounding is the main ingredient that -- that is
20   the -- what the prescription is written for.  That's
21   for whatever the intended purpose is.
22        Q.      If it's available, is your first choice
23   to fill a prescription with a commercially manufactured
24   version of a drug or a compounded version?
25                  MR. MITCHELL:  Form.
```

```
 1                    THE WITNESS:  Manufactured.
 2   BY MS. NELSON-MAJOR:
 3        Q.      Why?
 4                    MR. MITCHELL:  Same objection.
 5                    THE WITNESS:  Based on the guidelines.
 6   BY MS. NELSON-MAJOR:
 7        Q.      What guidelines?
 8        A.      Of the state statutes and the USP.
 9        Q.      And can you tell us what "USP" means?
10        A.      United States Pharmacopoeia.
11        Q.      Do the United States Pharmacopoeia
12   standards express a preference for commercially
13   manufactured drugs?
14                    MR. MITCHELL:  Form.  You can answer.
15                    THE WITNESS:  It's a precedent to use the
16           manufactured drugs; and then the USP is the
17           guidelines for in case it has to be compounded, or
18           needs to be.
19   BY MS. NELSON-MAJOR:
20        Q.      And do you know the reason why
21   commercially manufactured drugs are the first choice?
22                    MR. MITCHELL:  Same objection.
23                    THE WITNESS:  I don't know the actual
24           listed reason, no.
25   BY MS. NELSON-MAJOR:
```

1          Q.          In the practice of pharmacy, why would

2     you choose to fill an order with a commercially

3     manufactured version before relying on a compounded

4     version?

5          A.          Just the time, and that I already know

6     that it has done the tests -- or it should have already

7     had the testing to be released to the patients.

8          Q.          Under what circumstances do you compound

9     drugs?

10         A.          If something's not available as a

11    commercially prepared medication, or if it is available

12    but maybe is on backorder.

13         Q.          I want to ask you a couple of questions

14    about how you fill TDOC's orders for lethal injection

15    drugs.

16                     Does TDOC place a separate order for API?

17                     MR. MITCHELL:  Object to the form.

18                     THE WITNESS:  No.

19    BY MS. NELSON-MAJOR:

20         Q.          So TDOC does not purchase API from you?

21                     MR. MITCHELL:  Same objection.

22                     THE WITNESS:  No.

23    BY MS. NELSON-MAJOR:

24         Q.          Are you aware of whether TDOC purchased

25    API through your pharmacy prior to your involvement?

```
 1        A.        I'm not aware.
 2        Q.        Do customers typically purchase API
 3   through your pharmacy?
 4             MR. MITCHELL:  Same objection.
 5             THE WITNESS:  No.
 6   BY MS. NELSON-MAJOR:
 7        Q.        Why not?
 8             MR. MITCHELL:  Object to the -- I'm going
 9        to -- I'm going to object to the form, and I'm
10        also going to object pursuant to the protective
11        order.
12             If you think you can answer, Pharmacist,
13        I'll let you; otherwise, I'm going to instruct you
14        not.  So let us know if you think you can answer
15        that without betraying your identity.
16             THE WITNESS:  Yeah, I can answer.
17             MR. MITCHELL:  Okay.  You can do that,
18        then.
19             THE WITNESS:  Can you restate your
20        question again?
21             MS. NELSON-MAJOR:  I've now forgotten my
22        question, but let me see if I can.
23   BY MS. NELSON-MAJOR:
24        Q.        Why -- so you testified that customers
25   typically don't purchase API through your pharmacy, and
```

 1    then I asked you why not.  I think that's where we

 2    landed.

 3           A.      Okay.  The API is not intended -- it's

 4    just a bulk chemical of the medication that is supposed

 5    to terminally be what they need.  So they don't have

 6    the training to -- to make whatever it is they need.

 7               So that would be the reason why I would

 8    make it first, and then they would get whatever the

 9    prescription is for.

10           Q.      And so when you receive a prescription

11    that requires you to compound a drug, would you order

12    just enough API to fulfill that prescription?

13               MR. MITCHELL:  Object to the form.  You

14           can answer.

15               THE WITNESS:  No.

16    BY MS. NELSON-MAJOR:

17           Q.      Explain your answer, please.

18               MR. MITCHELL:  Objection.

19               THE WITNESS:  If it's a prescription that

20           I know we're going to be making on a regular

21           basis, then I would purchase more so I don't have

22           to purchase it every time to make just one batch

23           of that for one patient.

24    BY MS. NELSON-MAJOR:

25           Q.      Can you please pull up Exhibit 36.

```
 1          A.      Okay.  I have it.

 2          Q.      Do you see that this is an invoice to

 3    TDOC?

 4          A.      Yes.

 5          Q.      Do you recognize the form of this

 6    invoice?

 7          A.      Yes.

 8          Q.      Is this an invoice from your pharmacy?

 9          A.      Yes.

10          Q.      And do you see in the first line it says,

11    "Midazolam Bulk API in grams?"

12          A.      Yes.

13          Q.      And then under "QTY" -- I'm assuming

14    that's "quantity" -- it says "60?"

15          A.      Yes.

16          Q.      What do you understand this invoice to be

17    for?

18          A.      Midazolam that we purchased to compound

19    orders we receive from TDOC.

20          Q.      And how many grams of midazolam API did

21    you purchase in order to fill TDOC's orders?

22                  MR. MITCHELL:  Object to form.

23                  THE WITNESS:  I know I have records, but

24       I don't remember off the top of my head the exact

25       amount that we've purchased in total.
```

 1   BY MS. NELSON-MAJOR:

 2       Q.      When it says "Quantity, 60," is that 60

 3   grams or 60 units?

 4       A.      From my understanding, that would be 60

 5   grams.

 6       Q.      So does this indicate that your pharmacy

 7   purchased 60 grams of midazolam API for TDOC?

 8               MR. MITCHELL:  Form objection.

 9               THE WITNESS:  Yes, we purchased it for --

10       in purpose for TDOC.

11   BY MS. NELSON-MAJOR:

12       Q.      And those 60 grams, would they only be

13   used to fill TDOC's orders?

14       A.      Yes.

15               MR. MITCHELL:  Same objection.

16   BY MS. NELSON-MAJOR:

17       Q.      And how much did you charge TDOC for the

18   60 grams of midazolam?

19       A.      It should be the amount that is on there

20   on the line total, the $39,600.

21       Q.      And how many executions could be

22   conducted with 60 grams of midazolam?

23               MR. MITCHELL:  Form objection.

24               THE WITNESS:  I'll have to do the math.

25   BY MS. NELSON-MAJOR:

1      Q.      Do you recall how many milligrams the

2   execution protocol requires?

3      A.      Yes.  So the execution protocol was for

4   the 500 milligrams.  Then we have to make extra to send

5   off for the testing that we have to do before it's

6   released, as well, so it's not necessarily just that

7   500 milligrams that we make each time.

8      Q.      Do you know how many grams are consumed

9   by the testing you just referenced?

10     A.      Let me think.  Sorry, just a second.

11             I don't remember the exact number, but

12  it's probably between the 500 milligrams to a gram.

13     Q.      Did you obtain the API to fill this

14  order?

15             MR. MITCHELL:  Object to the form.

16             THE WITNESS:  The exhibit that we were

17         looking at?

18  BY MS. NELSON-MAJOR:

19         Q.      Yes.

20         A.      Yes, ma'am.

21         Q.      Did you buy it from a third party?

22         A.      Yes.

23         Q.      Do you know whether that API came from a

24  source outside of the United States?

25         A.      No, it did not.

1    Q.      What is the expiration date of the API?

2    A.      I know I have it recorded, but I don't

3    recall off the top of my head.

4    Q.      How do you record the expiration dates of

5    API that you purchase?

6    A.      For any API we -- we purchase, we input

7    it into our computers -- sorry, excuse me.

8           Okay.  When we purchase and receive, the

9    expiration date of the API is on the bottle.  And we just

10   print a label to highlight that expiration date and have

11   it in the computer system.

12   Q.      When you say "computer system," is that a

13   database that your pharmacy uses?

14   A.      Yes.

15   Q.      Is that for internal tracking?

16   A.      Yes.

17   Q.      Are all of the drugs -- excuse me, all

18   the API that you purchased for TDOC entered in that

19   database?

20          MR. MITCHELL:  Object to the form.  You

21      can answer.

22          THE WITNESS:  Yes.

23          MS. NELSON-MAJOR:  I'd request copies of

24      the database that are relevant to the API

25      purchased by the pharmacy for compounding drugs

 1          for use by TDOC in executions.

 2                    MR. MITCHELL:  We'll look at it.

 3     BY MS. NELSON-MAJOR:

 4          Q.     Is the midazolam API that you purchased

 5     for TDOC sterile or nonsterile?

 6          A.     Nonsterile.

 7          Q.     What makes API nonsterile?

 8                    MR. MITCHELL:  Object to the form.  You

 9          can answer.

10                    THE WITNESS:  Since it's a bulk powder,

11          it's officially always considered nonsterile.

12     BY MS. NELSON-MAJOR:

13          Q.     Why is bulk powder always considered

14     nonsterile?

15                    MR. MITCHELL:  Same objection.

16                    THE WITNESS:  It's not something

17          terminally sterilized before we receive it, so it

18          has that terminology of nonsterile product.

19     BY MS. NELSON-MAJOR:

20          Q.     Does the entity from which you purchase

21     the API provide you with reports of testing that was

22     conducted on the API?

23          A.     Yes.

24          Q.     What sorts of things do those reports

25     detail?

1          MR. MITCHELL:  Object to the form.  You

2     can answer.

3          THE WITNESS:  It's a certificate of

4     analysis.  It tells you the potency of the

5     product, the dried-on basis, water, the

6     solubility, the pH.  It can vary, but those are

7     usually the main -- the main items.

8          MS. NELSON-MAJOR:  I'd like to request

9     the certificates of analysis for all API purchased

10     by the pharmacy for use in compounding drugs for

11     TDOC.

12          MR. MITCHELL:  Noted.

13  BY MS. NELSON-MAJOR:

14     Q.     Outside of the December 20th, 2019,

15  order, do you recall purchasing other bulk amounts of

16  API midazolam for TDOC?

17     A.     I recall one other time.

18     Q.     When was that?

19     A.     It would have been in 2018.

20     Q.     Do you remember how many grams of API,

21  roughly, you purchased for TDOC?

22     A.     I do not.

23     Q.     Did you run out of that first order of

24  bulk midazolam API?

25          MR. MITCHELL:  Object to the form.

```
 1                    THE WITNESS:  I don't -- I don't think
 2        so.
 3   BY MS. NELSON-MAJOR:
 4        Q.      Did it expire?
 5        A.      I believe the expiration date is this
 6   year.
 7        Q.      If you had unexpired midazolam API in
 8   stock for TDOC, why did you purchase 60 more grams of
 9   midazolam API in 2019?
10                    MR. MITCHELL:  Form.  You can answer.
11                    THE WITNESS:  I was requested to.
12   BY MS. NELSON-MAJOR:
13        Q.      Without naming names, by who?
14        A.      The former owner.
15        Q.      Did the pharmacy former owner tell you
16   why you were to purchase additional midazolam API?
17        A.      No.
18        Q.      Did the pharmacy owner direct you as to
19   how much API to purchase?
20        A.      Yes.  Whatever I ordered was the quantity
21   he had requested.
22        Q.      Was that unusual, to have the pharmacy
23   owner direct you as to the quantity of a particular
24   drug to order?
25                    MR. MITCHELL:  Object to the form.
```

```
 1                    THE WITNESS:  Yes.
 2    BY MS. NELSON-MAJOR:
 3         Q.      What was unusual about it?
 4                    MR. MITCHELL:  Same objection.
 5                    THE WITNESS:  In terms of when I purchase
 6         other APIs or manufactured products, it's not a
 7         request from the owner.
 8                    Because I wasn't having contact with the
 9         drug procure -- procurer from TDOC I didn't know
10         what to order or when, so the former owner
11         would -- would request whenever something was
12         requested from the drug procurer.
13    BY MS. NELSON-MAJOR:
14         Q.      Did you ask the pharmacy owner any
15    questions about that direction?
16         A.      No.
17         Q.      Did you have a conversation about that
18    direction?
19         A.      No.
20         Q.      How do you choose between the two batches
21    of API that you have on hand when filling an order for
22    compounded midazolam from TDOC?
23                    MR. MITCHELL:  Object to the form.
24                    THE WITNESS:  I'm sorry, can you say that
25         again?
```

```
 1   BY MS. NELSON-MAJOR:
 2        Q.     So you told me that you have two batches
 3   of midazolam API that you've purchased for TDOC in
 4   storage.  How do you choose between those two batches
 5   when filling an order for compounded midazolam?
 6                   MR. MITCHELL:  Same objection.
 7                   THE WITNESS:  We just open whichever we
 8           received first.  Then we use that until it's
 9           finished.
10   BY MS. NELSON-MAJOR:
11        Q.     Do you know whether you've opened the 60
12   grams of bulk midazolam that was purchased on December
13   20th, 2019?
14        A.     I don't believe we have used it, no.
15        Q.     When you receive API, do you subject it
16   to any testing prior to compounding?
17        A.     No.
18        Q.     How much potassium chloride API do you
19   currently have in storage for TDOC?
20        A.     I don't remember.
21        Q.     Do you recall how many times TDOC has
22   ordered potassium chloride API from you?
23        A.     I believe I've ordered it once.
24        Q.     Do you recall when that was?
25        A.     2018, I believe.
```

1       Q.      What is the expiration date on that

2   potassium chloride API?

3       A.      I don't remember.

4       Q.      Is the expiration date included on the

5   certificate of analysis that you mentioned earlier?

6       A.      I don't believe it is.

7       Q.      Where is the expiration date noted?

8       A.      On the bottle itself that contains

9   whatever API it is.

10       Q.      And then you take that expiration date

11   and enter it into your internal database?

12       A.      Correct.

13       Q.      For the potassium chloride API; was that

14   purchased from a third party, as well?

15       A.      Yes.

16       Q.      Is that sterile or nonsterile?

17       A.      Nonsterile.

18       Q.      Is that also in bulk powder form?

19       A.      It is.

20       Q.      When you placed that order for potassium

21   chloride, did you receive a written direction from TDOC

22   to do that?

23       A.      No.  I was instructed, the same as the

24   midazolam, from my past owner.

25       Q.      And that instruction you received from

1   the previous owner, was that in writing?

2        A.      No.

3        Q.      Do you need a prescription to order API?

4                MR. MITCHELL:  Object to the form.  You

5        can answer.

6                THE WITNESS:  As a pharmacy, no, we don't

7        have to have a prescription before we order

8        something.

9   BY MS. NELSON-MAJOR:

10       Q.      Can you pull up Exhibit 45, please?

11       A.      I'm sorry; what was that, 45?

12       Q.      Four-five.

13       A.      Okay.  Yes, I have it.

14       Q.      An email dated August 13th, 2020.  Did

15  you write this email?

16       A.      Yes.

17       Q.      And without naming names, who did you

18  send it to?

19       A.      The drug procurer.

20       Q.      You see the subject says "requested

21  info?"

22       A.      Yes, I see.

23       Q.      Did you send this email in response to a

24  request from the drug procurer?

25       A.      Yes.

```
 1            Q.       What was that request?
 2            A.       I don't remember the specifics of the
 3    conversation or why I was providing the training
 4    requirements.  But I just generally remember that he
 5    was asking about the training requirements for when we
 6    do the compounding.
 7                     And then the information is just an
 8    update on the potassium chloride and midazolam, just to
 9    know the quantities and when the expirations were.
10            Q.       When you say "look up the training
11    requirements for sterile compounding," requirements
12    from where?  Without -- I'm asking whether these were
13    requirements from a professional organization or a
14    state or federal entity.
15                     MR. MITCHELL:  Pharmacist, can you answer
16            that without -- without giving a proper noun in
17            identifying, you know, an actual entity or an
18            actual state?
19                     THE WITNESS:  It's just a state
20            requirement to maintain for the initial
21            certification point.
22                     The initial certification is not state.
23            But then the second part, where it says two to
24            four hours every two years, would have been a
25            state requirement.
```

 1  BY MS. NELSON-MAJOR:

 2       Q.      Were the requirements that you provided

 3  in this email for certifi- -- certifications that you

 4  possess?

 5       A.      Yes.

 6       Q.      So I'm looking at the second line of the

 7  email, in which you write:  "I attached the information

 8  for what we made with the KCL and midazolam."

 9              Did you -- what attached information are

10  you discussing in this email?

11              MR. MITCHELL:  I'm going to object,

12          pursuant to the protective order; unless,

13          Pharmacist, you think you can answer

14          without -- without disclosing an identity or

15          anything that leads to an identity.  Do you think

16          you can?

17              THE WITNESS:  I'm trying to think of the

18          attached information.  I don't remember what it

19          was.

20              MS. NELSON-MAJOR:  We would request that

21          attached information in discovery.

22  BY MS. NELSON-MAJOR:

23       Q.      Following that line that I just read to

24  you, it says:  "For the Potassium we have 3742 grams

25  left and expires March 30th, '21."

1           Can you explain to me what the 3,742

2    grams is?

3           A.      The quantity of potassium chloride that

4    we had in stock.

5           Q.      Is the 3,742 grams API that you purchased

6    for TDOC specifically?

7           A.      Yes.

8           Q.      So TDOC purchased over 3,500 grams of

9    potassium chloride from your pharmacy?

10          A.      I've only purchased it for them, so I

11   would have to say yes.

12          Q.      Since you wrote this email, have you

13   ordered any additional API for TDOC?

14          A.      I don't believe so, no.

15          Q.      So you currently don't have any unexpired

16   potassium chloride in your possession?

17               MR. MITCHELL:  Object to the form.

18               THE WITNESS:  Not to my knowledge, no.

19   BY MS. NELSON-MAJOR:

20          Q.      Roughly speaking, how many executions

21   would 3,742 grams of potassium chloride supply?

22               MR. MITCHELL:  Object to the form.

23               THE WITNESS:  I don't know the number.

24          I'd have to do a calculation.

25   BY MS. NELSON-MAJOR:

```
 1        Q.      If each execution required 240 ml's of a
 2   2 mEq/ml solution, would that help you determine
 3   roughly how many executions you could supply with that
 4   amount of potassium chloride?
 5        A.      No, because I have to convert the grams
 6   of potassium into mEq's first.
 7        Q.      Do you typically order API in such large
 8   volumes?
 9             MR. MITCHELL:  Object to the form.
10             THE WITNESS:  Yes.
11   BY MS. NELSON-MAJOR:
12        Q.      How do you store the API that TDOC
13   orders?
14             MR. MITCHELL:  Object to the form.  You
15        can answer.
16             THE WITNESS:  In the pharmacy.
17   BY MS. NELSON-MAJOR:
18        Q.      Is it stored in a refrigerator?
19        A.      It is not.
20        Q.      Is it stored in a cardboard box?
21        A.      On the shelf, at room temperature.
22        Q.      And what does "room temperature" mean?
23             MR. MITCHELL:  Object to the form.
24             THE WITNESS:  The pharmacy is maintained
25        under 68 degrees Fahrenheit.
```

Case 3:18-cv-01234   Document 184-35   Filed 03/17/22   Page 118 of 227 PageID #: 10874

```
 1   BY MS. NELSON-MAJOR:

 2        Q.      Is that temperature important?

 3        A.      Yes.

 4                MR. MITCHELL:  Object to the form.

 5                THE WITNESS:  It's a requirement for all

 6        medications.

 7   BY MS. NELSON-MAJOR:

 8        Q.      For what medications?

 9        A.      Any medications that have the designation

10   that they are to be stored at room temperature.

11        Q.      Do you check the temperature in the

12   storage area?

13        A.      Yes.

14        Q.      How often?

15        A.      It's monitored 24 hours a day.

16        Q.      How is it monitored 24 hours a day?

17        A.      There's a -- I'm not sure.

18                We have a monitor that is almost like a

19   thermostat, essentially, with remotes in each room of

20   the pharmacy where medications are stored so that the

21   temperature can be monitored.

22        Q.      Does it provide an alert if it goes out

23   of range?

24        A.      Yes.

25        Q.      How does it alert you that it's gone out
```

1    of range?

2         A.      Just beeps.

3              MS. NELSON-MAJOR:  I think that's a good

4         stopping point, if we want to take a 10-minute

5         break.

6              MR. MITCHELL:  Are we -- are we going to

7         break for lunch?  Like should we subsume the two

8         together, or --

9              MS. NELSON-MAJOR:  Maybe that makes -- I

10        know it's a little bit early on our end, but maybe

11        that makes since to do it at this point, if it

12        works for you.

13             MR. MITCHELL:  Yes, absolutely.

14             THE VIDEOGRAPHER:  We are off the record

15        at 11:42 a.m.

16             (Recess at 11:42 a.m. to 12:33 p.m.)

17             THE VIDEOGRAPHER:  We're back on the

18        record.  The time is 12:33 p.m.

19   BY MS. NELSON-MAJOR:

20        Q.      Pharmacist, I wanted to go back and ask

21   you a couple of questions about midazolam.

22             Based on your testimony, it's my

23   understanding that it is your opinion that midazolam at

24   any dose cannot cause general anesthesia.  Am I

25   understanding that correctly?

1                MR. MITCHELL:  Object to the form.

2                THE WITNESS:  Yes.

3    BY MS. NELSON-MAJOR:

4        Q.     And your opinion is that vecuronium

5    bromide is not an anesthetic?

6                MR. MITCHELL:  Same objection.

7                THE WITNESS:  Yes.

8    BY MS. NELSON-MAJOR:

9        Q.     So to be clear, no matter how much

10   midazolam and vecuronium bromide you're given, that

11   will not cause general anesthesia?

12               MR. MITCHELL:  Same objection.

13               THE WITNESS:  Yes.

14   BY MS. NELSON-MAJOR:

15       Q.     So the 500 milligrams in the dose of

16   vecuronium bromide -- bromide will not produce general

17   anesthesia in an inmate before administration of the

18   potassium chloride.  Is that right?

19               MR. MITCHELL:  Same objection.

20               THE WITNESS:  Yes.

21   BY MS. NELSON-MAJOR:

22       Q.     So we won't know if the -- excuse me --

23   the inmate is feeling pain because the potassium

24   chloride is a paralytic; is that right?

25               MR. MITCHELL:  Same objection.

```
 1                    THE WITNESS:  I'm sorry, can you say that
 2        again?
 3   BY MS. NELSON-MAJOR:
 4        Q.      You testified that potassium chloride --
 5   you testified that potassium -- sorry.
 6                    Sorry.  Let me just back up for a second.
 7                    You testified that the vecuronium bromide
 8   is a paralytic; is that right?
 9        A.      Yes.  I used the term "neuromuscular
10   blocker," yes.
11        Q.      And that neuromuscular blocking agent
12   prevents an inmate from moving?
13        A.      Yes.
14                    MR. MITCHELL:  Object to the form.
15   BY MS. NELSON-MAJOR:
16        Q.      So that paralytic would mask any
17   suffering an inmate might experience upon
18   administration of the final drug; is that right?
19                    MR. MITCHELL:  Same objection.
20                    THE WITNESS:  Yes.
21   BY MS. NELSON-MAJOR:
22        Q.      Does pentobarbital produce general
23   anesthesia?
24                    MR. MITCHELL:  Same objection.
25                    THE WITNESS:  I don't know.
```

**Gibson Court Reporting**

1  BY MS. NELSON-MAJOR:

2  Q.      Are you aware of whether pentobarbital is

3  an anesthetic?

4  A.      No, I don't believe it is.  I only

5  understand its sedative properties.

6  Q.      Okay.  I'd like to turn back to the

7  compounding of the API.  So you explained to us how you

8  have a set amount of API in storage for TDOC.  How are

9  you notified about an order from TDOC to compound that

10 API?

11             MR. MITCHELL:  Objection.

12             THE WITNESS:  I receive a fax.

13 BY MS. NELSON-MAJOR:

14 Q.      And what does that fax say?

15 A.      It has the order of the compounds that

16 they need and the quantities.

17 Q.      Does that fax reference a particular

18 inmate for which the drugs are being ordered?

19 A.      Yes.

20 Q.      Could you please turn to Exhibit 70.

21             (Exhibit No. 70 marked.)

22             THE WITNESS:  Okay.  I have it.

23 BY MS. NELSON-MAJOR:

24 Q.      Now, do you recognize these documents?

25 A.      Yes.

```
 1          Q.       What are they?
 2          A.       These are prescriptions that I would have
 3   received as a fax.
 4          Q.       And without naming names, who do you
 5   receive that fax from?
 6                   MR. MITCHELL:  Object to form.  You can
 7          answer.
 8                   THE WITNESS:  I don't have a name.  It
 9          just comes via fax.
10   BY MS. NELSON-MAJOR:
11          Q.       Is there a prescription required for
12   filling a compounded preparation?
13          A.       Yes.
14          Q.       Where does that requirement come from?
15          A.       From the Board of Pharmacy statutes.
16          Q.       Do you require a prescription for all
17   three of the drugs in the lethal injection protocol?
18                   MR. MITCHELL:  Object to form.
19                   THE WITNESS:  Yes.
20   BY MS. NELSON-MAJOR:
21          Q.       So you receive a prescription for the
22   midazolam?
23          A.       Yes.
24          Q.       And the potassium chloride?
25          A.       Yes.
```

**Gibson Court Reporting**

1        Q.        And the vecuronium bromide?

2        A.        Yes.

3        Q.        Could you flip through Exhibit 70 and

4   tell me whether any of these prescriptions include an

5   order for vecuronium bromide?

6                  (Pause.)

7                  THE WITNESS:  No.

8   BY MS. NELSON-MAJOR:

9        Q.        Did you receive separate documents with

10  an order for vecuronium -- vecuronium bromide for each

11  of the inmates?

12                 MR. MITCHELL:  Object to the form.

13                 THE WITNESS:  I just took it as a verbal

14        order.

15  BY MS. NELSON-MAJOR:

16       Q.        Who did -- who gave you that verbal

17  order?

18                 MR. MITCHELL:  And again, pursuant to the

19        protective order, if you can answer by role or by

20        some nonidentifying information; otherwise, I'm

21        going to instruct you not to answer.

22                 THE WITNESS:  I'm unable to answer

23        without giving a name.

24  BY MS. NELSON-MAJOR:

25       Q.        So it wasn't the drug procurer that gave

1   you that verbal order?

2       A.      No.

3       Q.      Was it someone within your pharmacy that

4   gave you the verbal order?

5       A.      No.

6       Q.      Was it somebody involved in the carrying

7   out of the executions for TDOC that gave you that

8   order?

9               MR. MITCHELL:  Object to the form.

10              THE WITNESS:  I don't know if they are

11          involved in that process, to be honest.

12  BY MS. NELSON-MAJOR:

13      Q.      Did that verbal order come by a phone

14  call?

15      A.      Yes.

16      Q.      And do you receive a phone call for each

17  time the TDOC is ordering execution drugs for use in an

18  execution?

19      A.      For when I've -- yes.

20      Q.      So for each one of these paper

21  prescriptions in Exhibit 70 you also received a

22  separate phone call from someone placing an order for

23  vecuronium bromide?

24              MR. MITCHELL:  Object to the form.

25              THE WITNESS:  Yes.

```
 1    BY MS. NELSON-MAJOR:
 2         Q.      Do you know why you received those orders
 3    by phone call versus written document?
 4         A.      No.
 5         Q.      Is the person that makes that phone call
 6    to you a doctor?
 7         A.      No.
 8         Q.      Do you know whether that person that
 9    called you has any medical training?
10         A.      I'm not aware of their role.
11         Q.      When that person calls you -- and I'm not
12    asking you to tell me their name -- do they
13    specifically identify themselves by their name to you?
14         A.      Yes.
15         Q.      How do you know that person is affiliated
16    with the Department of Correction if they haven't
17    identified their role to you?
18              MR. MITCHELL:  Pharmacist, I'm going to
19         instruct you not to answer if the only way you're
20         able to answer is to give away identifying
21         information.  But if -- if you can -- if you can
22         answer that question without doing so, you can of
23         course answer.
24              THE WITNESS:  I'm not -- I mean....
25              I'm sorry, I don't know how to answer,
```

1          apart from I just know that it's in reference to

2          these patients that I'm purchasing it for under

3          this physician.

4   BY MS. NELSON-MAJOR:

5          Q.      Is the person that places that oral order

6   for vecuronium bromide -- bromide an attorney?

7          A.      I don't know.

8          Q.      Outside of filling orders for TDOC's

9   lethal injection drugs do you take oral prescriptions,

10  meaning telephone calls in which someone places an

11  order for a particular, as you said, patient?

12         A.      Yes.

13         Q.      And when you receive oral prescriptions,

14  are those from doctors?

15         A.      Can be.

16         Q.      Who else can place oral orders?

17                 MR. MITCHELL:  Objection.

18                 THE WITNESS:  Someone in -- that works

19         with them, their MA or nurse or CNA.

20  BY MS. NELSON-MAJOR:

21         Q.      And when you get that phone call from an

22  MA or a nurse or a CNA they're conveying a doctor's

23  order to you, right?

24         A.      Yes.

25         Q.      When you get that oral telephone call

 1    ordering the vecuronium bromide, do they tell you the

 2    inmate's name?

 3         A.      Yes.

 4         Q.      And do they specify the dose, the overall

 5    dose that they're seeking?

 6         A.      Yes.

 7         Q.      What about concentration?

 8         A.      No, we just do it as a total dose.

 9                 Well, you know, I'm sorry.  Yes, the

10    concentration, as well.

11         Q.      And when you get the orders for midazolam

12    does TDOC specify the vial size they want?

13         A.      Yes.

14         Q.      And the concentration?

15         A.      Yes.

16         Q.      What is the size of the vial in which you

17    place the compounded midazolam that you send to TDOC?

18                 MR. MITCHELL:  Objection.

19                 THE WITNESS:  Sorry, the size of the vial

20         itself or what's in it?

21    BY MS. NELSON-MAJOR:

22         Q.      The volume of the vial.

23         A.      Of the midazolam, it contains 5 ml's.

24         Q.      Have you ever filled an order for

25    midazolam that TDOC placed in a different-sized vial?

**Gibson Court Reporting**

```
 1          A.      No.

 2                  MR. MITCHELL:  Objection.

 3   BY MS. NELSON-MAJOR:

 4          Q.      Has the concentration of the midazolam

 5   that you've provided to TDOC ever changed?

 6          A.      No.

 7          Q.      What is the size of the vial in which you

 8   place the compounded potassium chloride that you send

 9   to TDOC?

10                  MR. MITCHELL:  Form.

11                  THE WITNESS:  60 ml's.

12   BY MS. NELSON-MAJOR:

13          Q.      Has that ever changed?

14          A.      No.

15          Q.      Has the concentration ever changed?

16          A.      No.

17          Q.      Can you please turn back to Exhibit 70

18   and look at Page 6.  And I apologize; they're not

19   numbered, so you're going to have to count them.

20          A.      That's okay.

21          Q.      At the bottom, it should say "Mays'

22   Supplemental Responses, Page 71."

23          A.      Okay.

24          Q.      What is this document?

25          A.      I do not know.
```

**Gibson Court Reporting**

 1          Q.        Did you just testify that Exhibit 70 are

 2   the prescriptions that you've received from TDOC

 3   ordering compounded drugs for use in lethal injection

 4   procedures?

 5          A.        I'm sorry, can you repeat that?

 6          Q.        You testified -- did you testify that it

 7   was your understanding that Exhibit 70 contained

 8   prescriptions from TDOC ordering lethal injection

 9   drugs?

10                    MR. MITCHELL:  Object to form.

11                    THE WITNESS:  Yes.

12   BY MS. NELSON-MAJOR:

13          Q.        And who is this prescription for?

14          A.        We're still talking about the one on

15   Page 7?

16          Q.        At the bottom right-hand corner, it

17   should be Bates stamped 71.

18          A.        Uh-huh.

19          Q.        Do you see at the top?  Am I looking at

20   it?

21          A.        Are we on Exhibit 70 still?

22          Q.        Yes.

23          A.        Okay.

24          Q.        Do you see at the top, it says

25   "Prescription for Stephen West?"

1        A.      Yes.

2        Q.      Okay.  Can you tell me what concentration

3   of potassium chloride this order was for?

4        A.      That says potassium chloride, 4 mEq's per

5   ml.

6        Q.      And then next to that, it says "No. 2

7   single-dose vials?"

8        A.      Yes.

9        Q.      What is a single-dose vial?

10       A.      A single-dose vial means that that vial

11  is just for one dose itself.  You won't be able to

12  extract multiple doses from one vial.

13       Q.      And can you turn to the next page in

14  Exhibit 70?

15       A.      Okay.

16       Q.      What is this prescription?  Who is it

17  for?

18       A.      Leroy Hall.

19       Q.      And what is the concentration of the

20  potassium chloride that was ordered for Leroy Hall?

21       A.      2 mEq's per ml.

22       Q.      Do you know why the concentration of

23  potassium chloride changed between prescriptions?

24       A.      Yes.

25       Q.      What happened?

```
 1        A.        We were unable to compound the potassium
 2   chloride at a 4 mEq-per-ml dose.
 3        Q.        How were you unable to compound the
 4   potassium chloride for a 4 mEq-per-ml dose?
 5        A.        The API would not dissolve.
 6        Q.        When the API does not dissolve, is that
 7   the same thing as something falling out of solution?
 8        A.        Yes, ma'am.
 9        Q.        And why is falling out of solution a
10   problem?
11             MR. MITCHELL:  Object to the form.
12             THE WITNESS:  Because you're wanting to
13        infuse any medication, if it's an injection, as a
14        complete liquid.  You don't want to be injecting a
15        powder.
16   BY MS. NELSON-MAJOR:
17        Q.        If the solution has fallen out of -- I'm
18   sorry, yes.
19             If a drug has fallen out of solution,
20   does that impact the amount of the drug that's actually
21   delivered to the patient?
22             MR. MITCHELL:  Objection.
23             THE WITNESS:  Yes, it could.  You can't
24        guarantee anymore what the dose is.
25   BY MS. NELSON-MAJOR:
```

1      Q.       Who discovered that the potassium
2   chloride was falling out of solution?
3                MR. MITCHELL:  Form.
4                THE WITNESS:  I did.
5   BY MS. NELSON-MAJOR:
6      Q.       How did you determine that?
7      A.       When we were initially trying to compound
8   the medication prior to a prescription for a specific
9   person, just when we had tried to do it the first time
10  I was not able to completely have it dissolved.
11     Q.       Did you compound a different batch of
12  potassium chloride in an attempt to fulfill -- to fill
13  the prescription for Mr. West?
14     A.       Yes.
15     Q.       Was that second batch compounded at a
16  different concentration?
17     A.       Yes.
18     Q.       What concentration was that?
19     A.       2 mEq's per ml.
20     Q.       What did you do with the potassium
21  chloride that was falling out of solution?
22     A.       Dispose of it properly.
23     Q.       And how do you dispose of a solution that
24  has fallen out properly?
25     A.       Putting the medication in a red bin

1   that's annotated for that kind of dispensing so that it

2   can't be used.

3           Q.      Could you turn to Exhibit 23, please.

4           A.      Okay.

5           Q.      It's an email dated August 8th, 2019.

6   Did you send this email?

7           A.      I don't think so.

8           Q.      I'm sorry, I didn't mean to cut you off.

9   Were you about to say something else?

10          A.      No, I think I just hit the table.  I'm

11  sorry.

12          Q.      All right.  Did you run any sort of test

13  on the potassium chloride that fell out of solution

14  once you identified the problem?

15          A.      I believe we did still send it out for

16  testing, yes.  But then we -- and I believe it passed,

17  but I just said that it was falling out.

18                  So that's when I suggested we make it as

19  2 mEq per ml instead of 4 mEq per ml.

20          Q.      What is a suitability or a methodology

21  test?

22          A.      I don't -- I can't tell you what in each

23  step they look at and test.  But it's just an overall

24  test that's saying whatever process we're using to

25  compound whichever medication we're making that it's

```
 1   staying sterile and that the potency is okay and
 2   bacterial endotoxin's okay.  And I'm not aware of what
 3   else that entails.
 4        Q.     So that batch of potassium chloride that
 5   fell out of solution, do you recall when that was
 6   compounded?
 7        A.     I don't remember the exact time, but I'm
 8   sure it would have been when that first -- that order
 9   that we were looking at that was for the 4 mEq's.  I
10   apologize, I forget the person's name it was.
11        Q.     Could you please turn to Exhibit 49.
12        A.     Okay.
13        Q.     Have you seen this document before?
14        A.     No.
15        Q.     Did the lawyers representing defendants
16   Mays and Parker ask you for information about the dates
17   on which you compounded and shipped drugs to TDOC?
18        A.     I don't recall that.
19        Q.     Can you turn to Page 5?
20        A.     Okay.
21        Q.     That's the subheading (a).  And it says:
22   "The compounding of chemicals intended for use in
23   executions"; and underneath that it lists a bunch of
24   dates.
25        A.     Okay.
```

**Gibson Court Reporting**

1          Q.      If you take a look at these dates, can

2    you tell me whether you have any reason to believe that

3    the dates listed here are not the dates on which you

4    compounded potassium chloride and midazolam for TDOC?

5                    MR. MITCHELL:  Object to form.

6                    THE WITNESS:  I don't remember the exact

7          dates.  The timing looks accurate.

8    BY MS. NELSON-MAJOR:

9          Q.      So did you first compound potassium

10   chloride for TDOC on August 5th, 2019?

11                   MR. MITCHELL:  Same objection.

12                   THE WITNESS:  I don't remember the exact

13         date.

14   BY MS. NELSON-MAJOR:

15         Q.      The potassium chloride that fell out of

16   solution you did not send to TDOC?

17         A.      I did not.

18         Q.      Prior to August 5th, 2019, the date on

19   which you first compounded potassium chloride, were you

20   providing TDOC with commercially manufactured potassium

21   chloride?

22         A.      I did not.

23         Q.      And I think you -- you testified earlier

24   that you first provided lethal injection drugs to TDOC

25   in 2018; is that right?

1          A.      Yes.

2          Q.      In what month, if you recall?

3          A.      It would have been that this one on this

4     Page 5 may be correct -- July in 2018.  It had to have

5     been between -- yeah, I would say that that's probably

6     accurate.

7          Q.      So prior to August 5th, 2019, the date on

8     which you first compounded potassium chloride for TDOC,

9     you never provided another version of potassium

10    chloride to TDOC?

11         A.      I did not.

12         Q.      Do you know whether TDOC was ordering

13    potassium chloride from a different pharmacy up until

14    that point?

15         A.      I do not.

16         Q.      Okay.  So a bit earlier we talked about

17    the United States Pharmacopoeia, also known as USP.

18    Does the USP publish reference standards?

19         A.      References to what?

20         Q.      Guidelines that govern various parts of

21    the practice of pharmacy.

22         A.      Yes.

23                 (Exhibit No. 71 marked.)

24    BY MS. NELSON-MAJOR:

25         Q.      Can you please turn to Exhibit 71.

 1          A.      Okay.

 2          Q.      Do you recognize this document?

 3          A.      Yes.

 4          Q.      What is it?

 5          A.      It is the standards made by USP for

 6    compounding nonsterile preparations.

 7                  (Exhibit No. 72 marked.)

 8    BY MS. NELSON-MAJOR:

 9          Q.      And then can you please turn to Chapter

10    72?  I'm sorry, Exhibit 72, not Chapter 72.

11          A.      Okay.  I was like, "I don't know any

12    chapters."  Okay.

13          Q.      Do you recognize this document?

14          A.      Yes.

15          Q.      What is it?

16          A.      The USP Chapter 797, which is for sterile

17    compounded preparations.

18          Q.      Can you give me some examples of what a

19    nonsterile compounded preparation is?

20          A.      A capsule, a tablet, oral solution,

21    suspension.

22          Q.      And what distinguishes a nonsterile

23    compounded preparation from a sterile compounded

24    preparation?

25                  MR. MITCHELL:  Same objection.

```
 1                    THE WITNESS:  A sterile solution has to
 2           follow these guidelines.  It has to fit within the
 3           regulations that this details.
 4    BY MS. NELSON-MAJOR:
 5           Q.       And are compounded preparations for use
 6    in injection categorically sterile compounded
 7    preparations?
 8           A.       Yes.
 9                    MR. MITCHELL:  Form.
10    BY MS. NELSON-MAJOR:
11           Q.       And are there any other statutes in the
12    USP that govern compounding?
13                    MR. MITCHELL:  Form.
14                    THE WITNESS:  Compounding specifically,
15           no.
16    BY MS. NELSON-MAJOR:
17           Q.       As a licensed pharmacist, are you
18    required to abide by the USP standards that we just
19    discussed when compounding drugs?
20           A.       Yes.
21           Q.       Are there any agencies that enforce
22    compliance with USP standards?
23                    MR. MITCHELL:  I'm going to object,
24           pursuant to the protective order, any -- I mean,
25           can you just reword that question,
```

1          Ms. Nelson-Major?

2    BY MS. NELSON-MAJOR:

3          Q.       I'm not asking you to name a particular

4    agency that has enforcement oversight over your

5    pharmacy; rather, I'm asking are these advisory

6    guidelines, or is there some body out there that has

7    authority to ensure that your pharmacy is following

8    these guidelines?

9          A.       Yes.

10          Q.       And what bodies, without naming the name

11    of the state, are responsible for enforcing those

12    guidelines?

13          A.       The Board of Pharmacy.

14          Q.       Are sterile and nonsterile preparations

15    compounded in the same area in your pharmacy?

16          A.       No.

17          Q.       Is there a dedicated area in your

18    pharmacy for sterile compounding?

19          A.       Yes.

20          Q.       Is that area separated from the rest of

21    the pharmacy by a door?

22          A.       Yes.

23          Q.       And in that sterile compounding area is

24    there positive air pressure?

25          A.       Yes.

1          Q.      And why is that?

2                  MR. MITCHELL:  Object to the form.

3                  THE WITNESS:  So -- am I okay?

4    BY MS. NELSON-MAJOR:

5          Q.      Go ahead.

6          A.      The positive air pressure, it ensures

7    that the air from outside that door that's

8    distinguishing where the sterile compounding is taking

9    place and the general pharmacy area, that that air from

10   the outside general pharmacy area isn't coming into the

11   sterile compounding area and contaminating.

12         Q.      And is that air flow pressure

13   differential certified by some agency or company?

14         A.      Yes.

15         Q.      Is that a private company that certifies

16   your air pressure?

17         A.      That initially did it, yes; and then

18   retests, yes.

19         Q.      And how often are those retests done?

20         A.      Every six months.

21         Q.      How often does that volume of air

22   exchange in that sterile compounding area?

23                 MR. MITCHELL:  Objection.

24                 THE WITNESS:  It can change pretty often.

25   BY MS. NELSON-MAJOR:

Case 3:18-cv-01234   Document 184-35   Filed 03/17/22   Page 142 of 227 PageID #: 10898

```
 1        Q.        Is the rate of change something that you
 2   monitor?
 3        A.        Yes.
 4        Q.        And how do you monitor that?
 5        A.        We just have a gauge that we can see the
 6   pressure differentials, but we just have to annotate it
 7   and document it daily.
 8        Q.        Do you have to provide those logs to the
 9   Board of Pharmacy?
10        A.        On request, yes.
11                  MS. NELSON-MAJOR:  I'd request the logs
12            for the time period in which that compounded
13            preparations were made for TDOC.
14                  MR. MITCHELL:  We'll look into that.
15   BY MS. NELSON-MAJOR:
16        Q.        Do you conduct media field testing?
17        A.        Yes.
18        Q.        What is media field testing?
19        A.        Media field testing is just testing the
20   techniques for anyone who is compounding -- sterile
21   compounding, I'm sorry -- in the pharmacy, that they
22   are still using regular -- the techniques guided by USP
23   properly.
24        Q.        And do you conduct media field testing
25   for high-risk compounding?
```

1        A.      Yes.

2        Q.      Medium compounding?

3        A.      You only have to do it for one.  So since

4   we do the highest -- high risk, then we perform that

5   test for the high risk.

6        Q.      And how often do you have to do that?

7        A.      Every six months.

8        Q.      And you earlier mentioned that there was

9   a pharmacy technician who was involved in helping you

10  prepare the compounded preparations for TDOC.  Does

11  that person do media field testing, as well?

12       A.      Yes.

13              MS. NELSON-MAJOR:  I'd request copies of

14         the media field testing reports for both the

15         pharmacist and the pharmacist technicians during

16         the time period in which the drugs were

17         compounded.

18              MR. MITCHELL:  We'll look into that.

19  BY MS. NELSON-MAJOR:

20       Q.      Do you also conduct gloved fingertip

21  sampling?

22       A.      Yes.

23       Q.      And what is that?

24       A.      Testing your technique of properly

25  handwashing and donning and garbing and putting on your

```
 1    gloves to maintain clean surfaces.
 2              And then you use a TSA plate to
 3    essentially just put your fingertips on, and then it's
 4    incubated to see if there's any growth.
 5         Q.      And how often do you do that gloved
 6    fingertip sampling?
 7         A.      Every six months.
 8         Q.      And when was the last time you did that
 9    test?
10         A.      It was the end of January, I believe.
11         Q.      And does the pharmacy technician who's
12    involved in helping you prepare the compounded
13    preparations for TDOC also do that gloved fingertip
14    sampling?
15         A.      Yes.
16         Q.      And do you keep records of those tests,
17    as well?
18         A.      Yes.
19              MS. NELSON-MAJOR:  And I imagine
20         Mr. Mitchell knows what I'm going to say next,
21         but I'd request copies of those records, as well,
22         for the relevant time period.
23    BY MS. NELSON-MAJOR:
24         Q.      If you could approximate, what portion of
25    your work is dedicated to filling compounded
```

1    prescriptions versus commercially manufactured orders?

2         A.     It's hard to quantify it that way, just

3    because we -- I do both all day.  The compounded is

4    mostly nonsterile.  It's more time-consuming.  So it

5    still takes all day, but the percentage of actual

6    prescriptions is not as high, if that makes sense.

7         Q.     And of the work you do compounding

8    preparations, what proportion would you say is devoted

9    to sterile compounded preparations?

10        A.     I would say 20 to 30 percent.

11        Q.     Is the compounding of midazolam for

12   injection subject to USP 797?

13             MR. MITCHELL:  Objection.

14             THE WITNESS:  Yes.

15   BY MS. NELSON-MAJOR:

16        Q.     Because it's a sterile preparation?

17        A.     Yes.

18        Q.     What contamination risk level in Chapter

19   797 do you assign to the midazolam that you compound

20   for TDOC?

21             MR. MITCHELL:  Same objection.

22             THE WITNESS:  It's a high risk.

23   BY MS. NELSON-MAJOR:

24        Q.     Why is that high risk level assigned?

25        A.     Because it is -- it is started as a

1  nonsterile ingredient before compounding.

2      Q.      So when you receive an order for a

3  compounded midazolam from TDOC, can you explain to me

4  what you do to that API to prepare it for use by TDOC?

5              MR. MITCHELL:  Form objection.

6              THE WITNESS:  Yes.  We have a log, a

7          master log of a formula that we follow each time

8          it is compounded.  There are certain ingredients

9          used to dissolve the midazolam so that it is no

10         longer in a powder form but uniform in the liquid.

11             And then we dilute it so that the total

12         volume is the volume and concentration that is

13         requested.

14 BY MS. NELSON-MAJOR:

15     Q.      All right.  Are the ingredients that you

16 add to the midazolam API sterile or nonsterile?

17     A.      Both.

18     Q.      What sterile ingredients do you add to

19 the midazolam API?

20     A.      I'm trying to remember what we bring --

21 use to bring to the total volume.  It's either sterile

22 water or sterile sodium chloride, but I don't remember

23 off the top of my head what it is.

24     Q.      Is sterile sodium chloride sterile

25 saline?

```
 1          A.       Yes, ma'am.

 2          Q.       In addition to the saline or sterile

 3   water that you just mentioned, what else do you add to

 4   the midazolam API?

 5          A.       The only thing that I remember right now

 6   is hydrochloric acid, which helps to use to dissolve

 7   it.

 8          Q.       Is that hydrochloric acid sterile or

 9   nonsterile?

10          A.       It's nonsterile.

11          Q.       Are you the person who actually adds

12   those ingredients to the midazolam API?

13                   MR. MITCHELL:  Objection.

14                   THE WITNESS:  No.

15   BY MS. NELSON-MAJOR:

16          Q.       Who does that, without naming names?

17          A.       The technician we have discussed.

18          Q.       Are you present when the technician does

19   that compounding?

20          A.       Yes.

21          Q.       Why does the technician have the

22   ingredients, as opposed to you?

23          A.       The technician has the capability and

24   training to make compounds.  I'm needed for other

25   things throughout the day, as well, so I can monitor
```

 1   very closely and still be available for other things.

 2         Q.      But to be clear, you're in the room while

 3   the technician is physically adding the ingredients to

 4   the API; is that right?

 5         A.      No, I'm not in the sterile compounding

 6   room.  It's a clear -- not glass, but like a plastic

 7   that I can see through.

 8         Q.      Can you see the volume of the ingredients

 9   as the technician is measuring them?

10         A.      Yes.

11         Q.      How can you see that?

12                 MR. MITCHELL:  Objection.

13                 THE WITNESS:  He either shows it to me,

14         or I can see through -- through the room I can see

15         him.  Because it's clear; like a window, almost.

16   BY MS. NELSON-MAJOR:

17         Q.      How does he show it to you?

18         A.      He'll tilt it in a way so that I can see

19   it from where I'm standing.  Even though he's within

20   the hood, I can still read clearly what he's measuring.

21         Q.      And what is "it?"  Is it a scale?

22         A.      Yeah, a scale, or if it's a measurement

23   in a syringe.  Whatever -- whatever measurement he's

24   making, yes.

25         Q.      So when the technician is preparing a

1    sterile compound, you said he's in a hood?

2           A.      Yes, ma'am.

3           Q.      Can you describe what that is to me?

4           A.      Yes.  It's a biological safety cabinet,

5    so it meets the requirements of USP 797 of an

6    engineering control that we're allowed to use that will

7    maintain the integrity that they want while we're

8    compounding.

9           Q.      Do you maintain a visual on the

10   technician during that entire process, or are you

11   coming and going?

12          A.      I'm not there 100 percent, no.  Yeah,

13   it's in and out.

14          Q.      Who fills out that master log formula

15   that you mentioned?

16          A.      The original master log was made by

17   myself.

18          Q.      And is the compounding process each time

19   it happens documented in some way?

20          A.      Yes.

21          Q.      And how is that documented?

22          A.      That master log is reprinted, and it

23   generates a lot number with a date specific for when

24   it's made and cross-references for who it was made for.

25          Q.      And does the technician fill that in with

```
 1   amounts of each ingredient added in some way?
 2        A.     Yes, as he's performing it.  And I check
 3   him.
 4              MS. NELSON-MAJOR:  I'd request both the
 5        original master log formula, as well as any one
 6        generated in the compounding of midazolam or
 7        potassium chloride for TDOC.
 8              MR. MITCHELL:  I made a note of it.
 9        Maybe if you could send a follow-up email.
10   BY MS. NELSON-MAJOR:
11        Q.     Okay.  I'd like to ask about the
12   potassium chloride now.  Is the compounding of
13   potassium chloride subject to USP Chapter 797?
14        A.     Yes.
15        Q.     So it's also a sterile preparation?
16        A.     Yes.
17        Q.     And what contamination risk level in
18   Chapter 797 do you assign to the potassium chloride
19   preparation?
20              MR. MITCHELL:  Objection.
21              THE WITNESS:  High risk.
22   BY MS. NELSON-MAJOR:
23        Q.     And why is the high risk level assigned?
24        A.     Because it is starting with the API that
25   is nonsterile in powder form; so it's automatic high
```

Case 3:18-cv-01234   Document 184-35   Filed 03/17/22   Page 151 of 227 PageID #: 10907

1  risk, as well.

2      Q.      And to the potassium chloride API, what

3  ingredients are added?

4      A.      I believe it's just sterile water alone.

5      Q.      And again, is that something the pharmacy

6  technician does or that you do?

7      A.      Yes.  We follow the same process with the

8  midazolam as the potassium chloride.

9      Q.      So the potassium chloride is also

10  compounded under that hood you described?

11      A.      Yes, ma'am.

12      Q.      And the same master log formula, as well?

13      A.      No, It's a separate formula, because it's

14  two -- it's in two different vials, two different

15  formulas.  Yes, so each compound has its own master

16  formula.  They don't combine.

17      Q.      After you're finished -- or excuse me,

18  after the pharmacy technician is finished adding the

19  ingredients to the API, what happens to the compounded

20  preparation?

21      A.      It's placed in its -- in the vials.

22      Q.      Are they sterilized in any way?

23      A.      So the vials themselves are already

24  sterile.  While we're -- so that the medication itself

25  will be in a syringe.  That syringe will have a filter.

**Gibson Court Reporting**

1    A filter -- it's not a needle, but it's a filter that

2    you put on it to internally sterilize it while it's

3    going into the final container, the vial.

4           Q.      And what size is the filter on that

5    syringe?

6           A.      I believe that's a 2-micron filter --

7    sorry, 0.2-micron filter.

8           Q.      And how are the vials presterilized?

9    What process is used?

10          A.      I don't sterilize them in the pharmacy.

11   I purchase them as sterile vials.  I'm not aware of the

12   process they do to make them sterile.

13          Q.      Do you print a beyond use date on the

14   vials?

15          A.      Yes, ma'am.

16          Q.      What is a beyond use date?

17          A.      45 days.

18          Q.      And can you explain what the term "beyond

19   use date" means?

20          A.      Yeah.  Beyond use date is different from

21   an expiration date, in that it's a date at which you

22   are no longer able to dispense or transport a

23   medication for use, or some kind sterile preparation

24   for use.

25          Q.      What happens to a drug after its beyond

1   use date?

2               MR. MITCHELL:  Form.

3               THE WITNESS:  Could be anything.  It

4       could be the sterility is lost, the potency

5       changes.

6   BY MS. NELSON-MAJOR:

7       Q.      And you said the beyond use date is 45

8   days.  Is that for both the midazolam and the potassium

9   chloride?

10      A.      Yes.

11      Q.      Is that a date that you determined?

12      A.      No.

13      Q.      Who determined that date?

14      A.      In USP 797, it has the guideline that I

15  follow.

16      Q.      So the beyond use date doesn't vary from

17  preparation to preparation?

18      A.      It can, depending on the risk level or

19  what storage you're -- what -- how you're storing it,

20  what temperature that you're storing it in.

21      Q.      Can you explain to me how the temperature

22  of the storage affects the calculation of the beyond

23  use date?

24      A.      So within USP 797 it has a designation

25  for room temperature in the refrigerator and in the

1    freezer.  And it also has those three things.

2         Q.      So the beyond use date; is that affected

3    by the type of vial in which the drug is stored?

4         A.      Not to my knowledge, no.

5         Q.      And so the beyond use date determination

6    is not individualized to the particular preparation

7    you're making?

8              MR. MITCHELL:  Object to the form.

9              THE WITNESS:  You mean as each individual

10        medication?

11   BY MS. NELSON-MAJOR:

12        Q.      Yes, that's what I mean.

13        A.      Yeah.  No, it's the same.

14        Q.      So you wouldn't rely on a chemical, let's

15   say for example, when determining the beyond use date?

16        A.      No.

17        Q.      And you wouldn't consult other studies or

18   literature about the particular drug you're working

19   with when determining the beyond use date?

20        A.      You can, if -- if you want to make it

21   less than what USP says.  You can't extend it beyond

22   without doing studies.

23        Q.      In addition to the beyond use date, do

24   you print any other information on the vials that you

25   prepare for TDOC?

1       A.      I'm sorry, can you say that again?

2       Q.      So you testified that you print the

3  beyond use date on the vials provided to TDOC.  Do you

4  print any other information on the vials?

5       A.      Yes.

6       Q.      What information do you print on the

7  vials besides the beyond use date?

8       A.      It'll have the name, the concentration,

9  the volume, directions, patient's name, prescription

10  number, how to store it.  The quantity in the vial, if

11  I didn't say that already.

12              I may be leaving something out.

13       Q.      When you say "directions," directions for

14  what?

15       A.      On the intended use.  So whatever the

16  prescription itself said, "Use as directed," or....

17       Q.      And when you say you contain -- you print

18  information about storing the drugs, what do you mean

19  by that?

20       A.      If it's to be kept at room temperature,

21  refrigerated, or frozen; whatever that is, that's on

22  the vial as well.

23       Q.      Do you keep copies of the labels that you

24  affix to the vials for TDOC?

25       A.      They are saved in the database we use,

1    yes.
2                   MR. MITCHELL:  I'd request copies of the
3         database printout for all of the potassium
4         chloride and midazolam compounded for TDOC.
5    BY MS. NELSON-MAJOR:
6         Q.      So after you have labeled the vials,
7    where do you store them in your pharmacy?
8         A.      In the freezer.
9         Q.      Is that a medical-grade freezer?
10        A.      It's a regular freezer.  We just have to
11   maintain the temperatures in the logs of that.
12        Q.      When you say "regular freezer," do you
13   mean the type of freezer that you might find in
14   someone's home?
15        A.      Yes.
16        Q.      Does it have a built-in thermometer
17   gauge?
18        A.      It's not built in, no; it's external.
19        Q.      So you don't have to open the freezer to
20   read the temperature?
21        A.      No.
22        Q.      Does it have an alarm to alert you if it
23   goes out of temperature range?
24        A.      Yes.
25        Q.      And what temperature is the freezer kept

```
 1  at?
 2      A.      Between negative 25 to negative 10
 3  degrees Celsius.
 4      Q.      And why is that temperature range set to
 5  that?
 6      A.      That's what's determined in USP 797 to
 7  have that 45-day BUD.
 8      Q.      And why is it important to follow that
 9  temperature range?
10      A.      Because if I don't follow that, then I'm
11  not following their guidelines.
12      Q.      And as a scientific or pharmacological
13  matter, why is that range important?
14              MR. MITCHELL:  Object to form.
15              THE WITNESS:  Just to maintain the
16          integrity of whatever that was made.
17  BY MS. NELSON-MAJOR:
18      Q.      And what purpose does that alarm system
19  serve?
20              MR. MITCHELL:  Same objection.
21              THE WITNESS:  To notify if the range that
22          you set the temperature gauge to has gone out
23          of -- the freezer or refrigerator is out of the
24          range that you -- that you would like or need.
25  BY MS. NELSON-MAJOR:
```

1      Q.      And what would happen if that alert

2   sounded?  What would you do?

3      A.      I would take whatever corrective action

4   course I needed to ensure that the temperature was

5   properly adjusted.

6      Q.      Is it important to have an external

7   temperature monitor on the freezer versus an internal

8   temperature monitor?

9      A.      Sorry.  When you say "external," with --

10   are you meaning like it's built into the freezer

11   itself, or --

12      Q.      The way I understood it is your

13   temperature thermometer is something you can see

14   without opening the freezer door; is that correct?

15      A.      Yes, that's correct.

16      Q.      So why is it important to be able to

17   read -- or is it important to be able to read the

18   temperature without opening the freezer?

19              MR. MITCHELL:  Object to the form.

20              THE WITNESS:  So you don't have to open

21      it for -- for no nec- -- unnecessary reason.

22   BY MS. NELSON-MAJOR:

23      Q.      And why would you want to avoid

24   unnecessarily opening the freezer?

25              MR. MITCHELL:  Same objection.

```
 1                    THE WITNESS:  Just to maintain the
 2          temperature and integrity of whatever's in there.
 3   BY MS. NELSON-MAJOR:
 4          Q.     Would you store compounded drugs in a
 5   refrigerator or freezer without those features?
 6                    MR. MITCHELL:  Same objection.
 7                    THE WITNESS:  No.
 8   BY MS. NELSON-MAJOR:
 9          Q.     Why not?
10                    MR. MITCHELL:  Same objection.
11                    THE WITNESS:  Because based on our
12          guidelines, we have to be able to monitor the
13          temperatures.
14   BY MS. NELSON-MAJOR:
15          Q.     What could happen to the drugs if the
16   temperature exceeds the range you provided for us?
17                    MR. MITCHELL:  Form objection.
18                    THE WITNESS:  It could render them
19          useless so that they're not able to be used.
20   BY MS. NELSON-MAJOR:
21          Q.     Are the drugs that you compound for TDOC
22   subject to a visual inspection at some point in the
23   compounding process?
24                    MR. MITCHELL:  Objection.
25                    THE WITNESS:  Yes.
```

 1   BY MS. NELSON-MAJOR:

 2        Q.      When does that visual inspection occur?

 3        A.      Throughout the process and at the end,

 4   whenever it's put into the end vial or whatever storage

 5   container.

 6        Q.      And who does that visual inspection?

 7        A.      I do.

 8        Q.      But at some point, the pharmacy

 9   technician called you into the room to take a look at

10   the compounded preparation?

11        A.      While he's compounding I'm just there

12   walking in and out, watching him.  And then whenever he

13   puts it into that final storage container and it's

14   brought out of the compounding area, I do a last visual

15   inspection.

16        Q.      Is a layperson qualified to conduct that

17   visual inspection?

18             MR. MITCHELL:  Same objection -- or form

19        objection.

20             THE WITNESS:  I'm not aware of anyone

21        other than myself who would be able to before

22        dispensing.

23   BY MS. NELSON-MAJOR:

24        Q.      In the course of your graduate degree in

25   pharmacy, did you receive instruction on the proper way

1  to conduct a visual inspection?

2       A.      I don't remember specific directions

3  on -- on it, but I know that I've learned it somewhere.

4  I just don't remember where.

5       Q.      To conduct a visual inspection, do you

6  simply hold up the vial and take a look at it or is

7  there something more involved in that process?

8              MR. MITCHELL:  Object to form.

9              THE WITNESS:  Essentially, yes, you're

10         looking at the vial, the integrity of the vial,

11         whatever is contained inside it to make sure that

12         it does -- you don't see any particulates or

13         anything visually.

14             You put it behind -- in front of a

15         contrasting color so you can determine any

16         visual -- anything visually that you can.

17  BY MS. NELSON-MAJOR:

18       Q.      After the compounding is completed, do

19  you test the drugs that you compounded for TDOC?

20       A.      Yes.

21       Q.      What sorts of tests do you perform?

22       A.      Sterility testing, potency testing, and

23  bacterial endotoxin testing.

24       Q.      Do you test the pH of the completed

25  prepar- -- preparation?

**Gibson Court Reporting**

1     A.     Yes.

2     Q.     What does sterility testing measure?

3     A.     It's measuring if there's any growth of

4  any fungus or bacteria within the final compounded

5  preparation that was made.

6     Q.     Who performs the sterility testing of the

7  drugs you compound for TDOC -- I'm sorry, without

8  naming the entity.  Let me try it this way.

9            Does your pharmacy perform the sterility

10  testing of the drugs you compound for TDOC?

11     A.     It's a third party.

12     Q.     And again, without naming names, have you

13  always used the same third party to test the drugs you

14  compound for TDOC?

15     A.     Yes.

16     Q.     Are you aware of whether this third party

17  has ever been issued a warning letter by the FDA?

18     A.     Yes.

19     Q.     The testing lab has been issued a warning

20  letter by the FDA?

21     A.     I don't -- I don't know how to answer

22  without kind of explaining who they are.  I'm sorry.

23     Q.     Let me try it this way.  Has the testing

24  lab -- I'm sorry, the third party that you work with,

25  are they regularly inspected by the FDA that you're

```
 1   aware?
 2        A.      I'm not aware of the frequency, no.
 3        Q.      Are you aware of whether they have been
 4   inspected by the FDA at some point?
 5        A.      Yes.
 6        Q.      Are you aware whether those inspections
 7   led to any negative findings by the FDA?
 8              MR. MITCHELL:  Object to the form.
 9              THE WITNESS:  Yes.
10   BY MS. NELSON-MAJOR:
11        Q.      Without providing the name of the testing
12   facility, can you describe to me the nature of those
13   negative findings?
14              MR. MITCHELL:  And I'm going to object,
15         to the extent -- pursuant to the protective order,
16         to the extent that the answer will identify or
17         lead to the identification of that testing agency.
18              Pharmacist, if you think you can answer
19         without doing so then I'll let you answer;
20         otherwise, I'll instruct you not to answer.
21              And if there's confusion about this
22         point, maybe we can table this for later and take
23         this up at the end, Ms. Nelson-Major.
24              And you may have a whole line of
25         questioning of this -- this ilk; and if that's the
```

 1       case, maybe we can take it up at the end,
 2       depending -- depending on what the Pharmacist
 3       thinks he or she can answer right now.
 4              THE WITNESS:  I don't think I can really
 5       answer that without being able to let out who it
 6       is.
 7              MS. NELSON-MAJOR:  I'm fine with that,
 8       Mr. Mitchell.  I have a couple of questions that I
 9       don't -- that are tangential to this topic, but I
10       don't think we'll get into the meat of it.
11  BY MS. NELSON-MAJOR:
12       Q.     Does your pharmacy still work with this
13  third-party testing agency?
14       A.     Yes.
15       Q.     So when did you learn of the negative
16  findings that we've been talking about?
17              MR. MITCHELL:  I'm going to -- can we
18       just incorporate that within the same objection,
19       because that may implicate the same thing.  And
20       we'll just take that up at the end, if that's
21       okay.
22              MS. NELSON-MAJOR:  Okay.  That's fine.
23  BY MS. NELSON-MAJOR:
24       Q.     Does this same lab also perform the
25  testing for potency?

```
 1          A.      Yes.

 2          Q.      And then bacterial endotoxins?

 3          A.      Yes.

 4          Q.      And the pH?

 5          A.      The pH is actually done internally.

 6          Q.      Do you test the pH before the compounded

 7  preparation is put into the vials or after?

 8          A.      Before.

 9          Q.      And who performs that pH testing at your

10  pharmacy?

11          A.      The technician.

12          Q.      And how is that test performed?

13                  MR. MITCHELL:  Object to the form.

14                  THE WITNESS:  With a pH meter.

15  BY MS. NELSON-MAJOR:

16          Q.      As to the sterility testing, how is that

17  performed?  If you're aware.

18          A.      I am not.

19          Q.      What about the potency testing?

20          A.      Yeah, I'm not aware of the mechanics of

21  it.

22          Q.      What about the bacterial endotoxins?

23          A.      No, ma'am; the same.

24          Q.      Why do you test for pH?

25          A.      There's a range within the log of what pH
```

1   should be.  So prior to putting it in that end vial or

2   container, we just make sure that it's in the range

3   that's requested.

4          Q.      And when you say "log," are you referring

5   to the master log formula?

6          A.      Yes.

7          Q.      And is that something you record or that

8   the technician records?

9          A.      The technician records it after he

10  performs the pH analysis.

11         Q.      And so you said that you have this third

12  party conduct three tests:  sterility, potency, and

13  bacterial endotoxins.  Why are these three tests

14  performed?

15                 MR. MITCHELL:  Form.

16                 THE WITNESS:  I do not -- whenever I

17         started doing this and communicating that we were

18         going to be making these for TDOC, those were the

19         tests that were requested.

20  BY MS. NELSON-MAJOR:

21         Q.      Requested by whom, if you know, without

22  naming names?

23         A.      I didn't communicate directly with TDOC.

24  It would have been with my past owner.

25         Q.      Did the past owner tell you that this was

```
 1    the universe of tests that you should complete on each

 2    compounded preparation for TDOC?

 3           A.      Yes.

 4           Q.      Are these collection of tests typical of

 5    what you do for a prescription in the ordinary course

 6    of business?

 7           A.      Of a compounded sterile preparation?

 8           Q.      Yes.

 9           A.      Yes, they're normal tests.

10           Q.      Are there other tests that you routinely

11    run on sterile compounded preparations that you don't

12    run on the compounded preparations for TDOC?

13                   MR. MITCHELL:  Object to form.

14                   THE WITNESS:  No.

15    BY MS. NELSON-MAJOR:

16           Q.      Besides the potassium chloride that fell

17    out of solution, have you ever decided not to ship a

18    compounded preparation to TDOC based on the results of

19    these tests?

20           A.      Yes.

21           Q.      How many times has that happened?

22           A.      Only twice.

23           Q.      Do you remember when?

24           A.      It would have been the first time when we

25    were making -- the first time.  So that would have been
```

**Gibson Court Reporting**

1  in 2018.

2  　　　　Q.　　　The first time was the midazolam?

3  　　　　A.　　　Yes, apart from the potassium chloride we

4  already discussed.

5  　　　　Q.　　　And so when you said the second time,

6  you're referring to the potassium chloride that fell

7  out of solution?

8  　　　　A.　　　No, I believe the first two times of the

9  midazolam were not -- were not sent out.  They were

10 redone.

11 　　　　Q.　　　I want to talk about the first time you

12 decided not to send the midazolam out.  Which test

13 caused you not to send the midazolam out?

14 　　　　A.　　　The potency.

15 　　　　Q.　　　And what about the second time?

16 　　　　A.　　　The potency.

17 　　　　Q.　　　Was the -- for the first time, was the

18 potency lower or higher than you expected?

19 　　　　A.　　　Lower.

20 　　　　Q.　　　What about the second time?

21 　　　　A.　　　Lower.

22 　　　　Q.　　　Did you make changes to the methodology

23 for compounding midazolam based on these two test

24 results?

25 　　　　A.　　　Not the methodology, no.

1    Q.     What if any adjustments did you make?

2    A.     We made adjustments to the master formula

3  for the amount of hydrochloric acid to dissolve the

4  midazolam, the number that was needed to dissolve it

5  properly.

6    Q.     Was it not fully dissolving during the

7  first two times?

8    A.     No, we added too much.  So because -- so

9  since the potency came back low we were adding too

10  much, and it was essentially disintegrating it and

11  making it not there.  So instead of, what, 50

12  milligrams per ml, it was like 35 or something to that

13  matter.

14    Q.     Did you have discussions with anyone at

15  TDOC about these initial failed preparations?

16    A.     I did not.

17    Q.     Did someone else at your pharmacy, if

18  you're aware?

19    A.     It would have been the past owner.

20    Q.     Have you ever had to recall a shipment of

21  compounded drugs?

22    A.     I have not, no.

23    Q.     What is the acceptable pH range for the

24  midazolam that you compound for TDOC?

25    A.     I don't remember, but it isn't -- it's

1    specifically stated in the master log.

2         Q.    And what about the potassium chloride?

3    Do you recall the acceptable pH range for that?

4         A.    I don't remember, no.

5         Q.    Do you provide copies of the reports that

6    you identified just now to TDOC each time you compound

7    the preparation for use in executions?

8                   MR. MITCHELL:  Form.

9                   THE WITNESS:  I don't know if I've

10              actually given -- I don't remember if I actually

11              give the report.  No, I think I just communicate

12              what -- what it was, but not the report itself.

13   BY MS. NELSON-MAJOR:

14        Q.    Do you keep records of those reports?

15        A.    Yes.

16                  MS. NELSON-MAJOR:  I'd request copies of

17              those reports in discovery.

18   BY MS. NELSON-MAJOR:

19        Q.    If you could please turn to Exhibit 21,

20   please.

21        A.    Okay.

22        Q.    It's an email dated November 26, 2019.

23   Did you send this email?

24        A.    I don't believe so, no.

25        Q.    Is there someone else at your pharmacy

```
 1   who would send lab reports to TDOC?
 2                 MR. MITCHELL:  Object to the form.
 3                 THE WITNESS:  It would have been the
 4        pharmacy -- previous pharmacy owner.
 5   BY MS. NELSON-MAJOR:
 6        Q.      Could you please turn to Exhibit 22.
 7        A.      Okay.
 8        Q.      It's an email dated August 9th, 2019,
 9   subject, "results."  Did you send this email?
10        A.      No.
11        Q.      Do you see that it says:  "Attached is
12   our in house sterility report?"
13        A.      Yes, I see that.
14        Q.      Does your pharmacy conduct sterility
15   testing in-house?
16        A.      Yes.
17        Q.      How do you make a decision about where
18   the sterility testing should be done?
19        A.      We are allowed to perform in-house
20   sterility testing.  I didn't -- I don't -- I didn't
21   make that determination on this midazolam and potassium
22   chloride, on if it was in-house or external.  It was
23   just determined and told to me that it would be an
24   external test.
25        Q.      So you don't recall ever running a
```

1  sterility test of TDOC's compounded preparations

2  in-house?

3       A.     I do not.

4       Q.     Could you please turn to Exhibit 23.

5  We've taken a look at this before.

6       A.     Yes.

7       Q.     It's an email dated August 8th, 2019.

8  Subject, "Suitability Test."

9       A.     Yes.

10      Q.     When you run a suitability test, what

11 kind of documentation do you create?

12              MR. MITCHELL:  Objection.

13              THE WITNESS:  We send API that

14      we're -- we're using, the concentration it's

15      supposed to be, the total volume in the vial, the

16      number of vials we'll typically be making, the

17      master formula, what our storage requirements are.

18              I believe that's all.

19 BY MS. NELSON-MAJOR:

20      Q.     Where do you send that information?

21      A.     That goes to the same third-party testing

22 that we use.

23      Q.     And do you run a suitability test each

24 time you compound?

25      A.     No, ma'am.

```
 1        Q.      Do you run it at just the initial
 2   compounding stage?
 3        A.      Yes.
 4        Q.      And did you run a suitability test for
 5   both midazolam and potassium chloride?
 6        A.      Yes.
 7                MR. MITCHELL:  Object to the form.
 8                MS. NELSON-MAJOR:  I'd request copies of
 9        all of the suitability and methodology testing
10        completed related to the midazolam and potassium
11        chloride.
12                MR. MITCHELL:  I thought that was already
13        requested.  I mean, you might have it.
14   BY MS. NELSON-MAJOR:
15        Q.      Okay.  Could we turn to Exhibit 24.  It's
16   an email dated August 8th, 2019; the subject, "kcl
17   protocol."
18        A.      Yes.
19        Q.      Did you write or receive any of these
20   emails?
21        A.      I did not.
22        Q.      Could you look at the bottom of the page.
23   It says:  "I made edits to the instructions.  Could you
24   have the pharmacist review and confirm that these are
25   good?"
```

```
 1                  Do you know --
 2        A.       Yes, I see it.
 3        Q.       Sorry.  Do you know what instructions for
 4   kcl protocol this email is referring to?
 5        A.       Yes.
 6        Q.       And what are they?
 7        A.       It's just the steps taken once they were
 8   received and how to prepare the proper steps to remove
 9   the medication from the vials to prepare to be used.
10        Q.       And did you write those instructions?
11        A.       I made edits, as he said, but I don't --
12   I don't recall that I specifically did each step in its
13   entirety.
14        Q.       So your belief is that somebody else
15   wrote the first draft of those instructions?
16        A.       Yes, I believe.
17        Q.       Without naming names, do you know who
18   wrote -- wrote the first draft of those instructions?
19        A.       I'm not certain who it was.
20        Q.       Was it someone with your pharmacy?
21        A.       It may have been the previous owner, but
22   I'm not positive.
23        Q.       And were the edits made to this protocol
24   because the potassium chloride was falling out of
25   solution?
```

```
 1          A.      No.

 2          Q.      What edits were made then?

 3          A.      I believe it was just clarity in the

 4   steps, just to make it make sense and understandable.

 5                  MS. NELSON-MAJOR:  Mr. Mitchell, I

 6          believe I've already requested the different

 7          versions of the KCL protocol; but if I have not,

 8          I'm requesting those now.

 9                  MR. MITCHELL:  The versions of?

10                  MS. NELSON-MAJOR:  The KCL instructions

11          referenced in Exhibit 24.

12                  MR. MITCHELL:  Okay.  Okay.  Yeah, yeah,

13          yeah, yeah, yeah; I think actually that came up in

14          the Drug Procurer's deposition.

15                  MS. NELSON-MAJOR:  That's right.

16                  I'm looking at my notes and wondering if

17          it's a good time to break, if everyone -- so is

18          that okay, for 10 minutes?

19                  MR. MITCHELL:  Good for us.  Pharmacist,

20          that good with you?

21                  THE WITNESS:  Yeah, That's fine.

22                  MS. NELSON-MAJOR:  Come back at 2:00.

23                  THE VIDEOGRAPHER:  We're off the record.

24          The time is 1:49 p.m.

25                  (Recess from 1:49 p.m. to 2:01 p.m.)
```

```
 1                    THE VIDEOGRAPHER:  We're back on the
 2            record.  The time is 2:01 p.m.
 3   BY MS. NELSON-MAJOR:
 4            Q.      Pharmacist, I think I asked you to pull
 5   up Exhibit 25.  We could start there.
 6            A.      Okay.  I have it.
 7            Q.      And email dated July 31st, 2019.
 8            A.      Yes, I see it.
 9            Q.      Did you send or receive this email?
10            A.      I did not.
11            Q.      And can you please turn to Exhibit 26.
12            A.      Okay.
13            Q.      It's an email dated July 24th, 2019.
14            A.      Yes, I see it.
15            Q.      Did you send or receive this email?
16            A.      No.
17            Q.      Can you turn to Exhibit 28.
18            A.      Okay.
19            Q.      It's an email dated May 9th, 2019.  Did
20    you send or receive this email?
21            A.      No.
22            Q.      Can you turn to Exhibit 29, please.
23            A.      Okay.
24            Q.      Did you send or receive this email?
25            A.      No.
```

1    Q.    Can you turn to Exhibit 30, please.

2    A.    Okay.

3    Q.    It's an email dated August 6th, 2018,

4  with the subject "USP 71."  Do you know what USP 71 is?

5    A.    That's a chapter within USP.  I believe

6  that's on sterility.

7    Q.    Did you write or send this email?

8    A.    No.

9    Q.    Can you turn to Exhibit 31, please.

10    A.    Okay.

11    Q.    An email dated July 12th, 2018.  Did you

12  send or receive this email?

13    A.    No.

14    Q.    Can you turn to Exhibit 32, please.

15    A.    Yes.

16    Q.    It's an email dated November 14th, 2017.

17  Did you write or send this -- I'm sorry, did you write

18  or receive this email?

19    A.    No.

20    Q.    And lastly, can you turn to Exhibit 33.

21    A.    Okay.

22    Q.    It's an email dated July 17th, 2018.  It

23  says:  "Attached is a sample prescription for ordering

24  a compounded preparation."  Did you send or receive

25  this email?

1          A.      No.

2          Q.      Do you know who created the sample

3     prescription for TDOC?

4          A.      I don't remember.

5          Q.      I want to turn to transferring the

6     compounded preparations to TDOC.  How do you prepare

7     the compounded preparations of midazolam and potassium

8     chloride for shipment to TDOC?

9          A.      They're within a styrofoam box that can

10    be cut for -- for keeping medications cold.  The

11    medications themselves, dry ice.  That is sealed and

12    then put in -- that is sealed with a temperature -- I

13    don't know the correct terminology, but a gauge to

14    ensure that the recipient can acknowledge that the

15    medication itself was received in the proper

16    temperatures.  It's just a blue dot.

17               And that is closed with a styrofoam lid,

18    put inside a box, and it's taped before shipment.

19         Q.      And how does the blue dot work?  What is

20    the blue dot?

21         A.      It's essentially like just a color

22    representation to maintain -- for you to know whether

23    the temperature is in the allotted range.  And if it's

24    below that, then I believe it fades to I think it's a

25    white color.  I don't remember the exact color.

```
 1                    It changes color depending on the range.
 2        Q.        Have you ever discussed how that dot
 3   functions with anyone at TDOC?
 4        A.        No.
 5        Q.        And what is the allotted temperature, I
 6   think is the phrase you used?
 7        A.        It is one to maintain that freezer
 8   temperature of negative 10 to negative 25 degrees
 9   Celsius.
10        Q.        Do you ship all three of the drugs on dry
11   ice?
12        A.        Potassium chloride and the midazolam.
13        Q.        Do you ship the vecuronium bromide
14   separately?
15        A.        Yes, that is not in ice.
16        Q.        How is that shipped?
17        A.        Just wrapped in bubble wrap in a box.
18        Q.        And does that box have any temperature
19   controls?
20        A.        No.
21        Q.        Without disclosing names, who is
22   responsible for receiving the drugs at TDOC?
23                    MR. MITCHELL:  Object to the form.
24                    THE WITNESS:  The drug procurer.
25   BY MS. NELSON-MAJOR:
```

```
 1          Q.       And again, without disclosing names, who
 2    do you believe is responsible for preparing the drugs
 3    for use in execution?
 4                    MR. MITCHELL:  Same objection.
 5                    THE WITNESS:  I'm not aware of who
 6          prepares them.
 7    BY MS. NELSON-MAJOR:
 8          Q.       Are you aware of what kind of training
 9    and expertise that person has?
10          A.       I am not.
11          Q.       Have you ever spoken to the person who is
12    responsible for preparing the drugs for use in
13    executions?
14                    MR. MITCHELL:  Object to the form.
15                    THE WITNESS:  I have not.
16    BY MS. NELSON-MAJOR:
17          Q.       Do you know whether anyone else at your
18    pharmacy has had a conversation with someone -- with a
19    person who's responsible for preparing drugs?
20          A.       No.
21          Q.       What sort of expertise or training should
22    someone have regarding the preparing of drugs?
23                    MR. MITCHELL:  Object to the form.
24                    THE WITNESS:  You don't have to be
25          trained in the sense where you have a license to
```

```
 1          do it, but who -- whoever is doing it should be
 2          able to determine that they have the basic
 3          understanding to be able to do it properly.  So
 4          taught by somebody who does know or is trained.
 5   BY MS. NELSON-MAJOR:
 6          Q.      How soon after compounding the drugs do
 7   you ship them to TDOC?
 8          A.      Once we receive the sterility -- all the
 9   testing from the third party that everything has
10   passed, then we send it maybe within the next 24 to 48
11   hours after that.
12          Q.      So you wait until all the results come
13   back before you ship the drugs to TDOC?
14          A.      Yes.
15          Q.      I'm going to ask you to turn to Exhibit
16   49 again.
17          A.      I'm sorry, 49?
18          Q.      Four-nine.
19          A.      Okay.
20          Q.      And turn to Page 5 again.
21          A.      Okay.
22          Q.      And as we previously discussed, this
23   document lists the dates on which potassium chloride
24   and midazolam were compounded, as well as the dates on
25   which you shipped compounded midazolam and potassium
```

**Gibson Court Reporting**

1    chloride to TDOC.

2              I believe that you testified that these

3    dates look accurate to you; is that right?

4         A.    Yes.

5         Q.    Do you keep records of the dates on which

6    you compounded drugs for TDOC?

7         A.    Yes.

8         Q.    Is that part of the master formula log?

9         A.    Yes.

10         Q.    Okay.  And it's also part of the internal

11    database you referenced before, right?

12         A.    Yes.

13         Q.    Do either of those things also record the

14    dates on which you shipped the drugs to TDOC?

15         A.    No.

16         Q.    Do you track elsewhere the dates on which

17    you sent drugs to TDOC?

18         A.    No.

19         Q.    So under subheading (a), again, it

20    states:  "The compounding of chemicals intended to use

21    in executions."

22              And according to this document, the first

23    time you compounded midazolam for TDOC was July 20th,

24    2018.  Is that right?

25              MR. MITCHELL:  Form.

```
1                    THE WITNESS:  Yes.

2    BY MS. NELSON-MAJOR:

3         Q.      And lower down on the page, under

4    subheading (b), it provides a number of shipment dates.

5    Is the first time on which you shipped drugs to TDOC

6    July 26th, 2018?

7         A.      I don't remember.

8         Q.      Would a delay of six days be unusual

9    between compounding and shipping the drugs?

10                   MR. MITCHELL:  Object to the form.

11                   THE WITNESS:  No.

12   BY MS. NELSON-MAJOR:

13        Q.      Were all of the tests completed within

14   those six days?

15                   MR. MITCHELL:  Object to the form.

16                   THE WITNESS:  It wouldn't have been, no.

17   BY MS. NELSON-MAJOR:

18        Q.      Is the turnaround time on the tests

19   longer than six days?

20                   MR. MITCHELL:  Object to the form.

21                   THE WITNESS:  I believe so, yes.

22   BY MS. NELSON-MAJOR:

23        Q.      Could you provide a ballpark on how long

24   it takes that third party to perform and return results

25   to you?
```

**Gibson Court Reporting**

```
 1                    MR. MITCHELL:  Same objection.
 2                    THE WITNESS:  I would say about seven
 3        days.
 4   BY MS. NELSON-MAJOR:
 5        Q.       So if the testing company was unable to
 6   complete the testing in six days, as you testified, why
 7   did you ship drugs to TDOC?
 8                    MR. MITCHELL:  Object to the form.
 9                    THE WITNESS:  I don't remember.
10   BY MS. NELSON-MAJOR:
11        Q.       So after that first compounding of
12   midazolam, it looks like you compounded midazolam on
13   September 21st, October 25th, and November 16th of
14   2018.  Does that look right to you?
15                    MR. MITCHELL:  Object to form.
16                    THE WITNESS:  I -- I really don't
17        remember, but it could be right.
18   BY MS. NELSON-MAJOR:
19        Q.       If you compounded midazolam each time, is
20   there a reason why you wouldn't ship each compounded
21   batch of midazolam to TDOC after completing it?
22                    MR. MITCHELL:  Same objection.
23                    THE WITNESS:  Yes.  If we compounded it
24        and then in the end they weren't going to use it,
25        then we still would have made it in case.  But
```

```
 1          then maybe they told us they weren't going to use
 2          it after all, so we wouldn't have sent it.  We
 3          still had it.
 4     BY MS. NELSON-MAJOR:
 5          Q.      Has TDOC canceled orders for compounded
 6     drugs before?
 7               MR. MITCHELL:  Objection.
 8               THE WITNESS:  Yes.
 9     BY MS. NELSON-MAJOR:
10          Q.      And who conveys to you that the order's
11     being canceled, without naming names?
12          A.      The drug procurer.
13          Q.      And during those conversations with the
14     drug procurer, does the drug procurer tell you why the
15     order's being canceled?
16               MR. MITCHELL:  Objection to form.
17               THE WITNESS:  I don't believe so.
18     BY MS. NELSON-MAJOR:
19          Q.      What happens to the drugs that are
20     compounded for an order that subsequently canceled?
21          A.      They're disposed of properly.
22          Q.      For each time you compounded midazolam,
23     did you have a prescription to do so?
24          A.      Apart from when we did the initial
25     testing -- which was never sent, just sent for testing.
```

**Gibson Court Reporting**

```
 1   But yes.
 2        Q.      And the same for potassium chloride?
 3        A.      Yes.
 4        Q.      Has it ever taken significantly longer
 5   than seven days to get the lab reports back?
 6               MR. MITCHELL:  Object to form.
 7               THE WITNESS:  I would say that's the
 8        normal range; seven -- seven days, I believe.
 9   BY MS. NELSON-MAJOR:
10        Q.      This document lists July 14th, as the --
11   2020, as the last day on which you compounded midazolam
12   and potassium chloride.  Do you recall whether you more
13   recently compounded either drug for TDOC?
14        A.      I don't remember the most current one we
15   did.
16        Q.      Do you know how the drugs are stored at
17   TDOC once received?
18        A.      I do -- I do not.
19        Q.      Have you ever discussed with anyone at
20   TDOC the temperature at which compounded drugs should
21   be stored?
22        A.      No.
23        Q.      Is a commercially available mini-fridge
24   an acceptable place to store compounded drugs?
25               MR. MITCHELL:  Object to the form.
```

```
 1              THE WITNESS:  As long as the temperature
 2        requirements are met, then yes.
 3  BY MS. NELSON-MAJOR:
 4        Q.      Would it be an appropriate place to store
 5  compounded drugs if it doesn't have a temperature gauge
 6  on the outside of the door?
 7              MR. MITCHELL:  Same objection.
 8              THE WITNESS:  Yes.
 9  BY MS. NELSON-MAJOR:
10        Q.      Are you aware of the temperature ranges
11  that a commercially available mini-fridge maintains in
12  the freezer compartment?
13        A.      No.
14        Q.      What about the refrigerator compartment?
15  Are you aware of the ranges your standard mini-fridge
16  can maintain there?
17        A.      I do not.
18        Q.      Can you please pull up Exhibit No. 2.
19        A.      Okay.  I have it.
20        Q.      Do you recognize this document?
21        A.      I do.
22        Q.      What is it?
23        A.      These are the instructions of preparing
24  the midazolam --
25        Q.      Did you --
```

```
 1          A.        -- from what we compounded.
 2          Q.        I'm sorry to cut you off, Pharmacist.
 3                    Did you write -- did you write this
 4   document?
 5          A.        I assisted.
 6          Q.        And without naming names, who did you
 7   assist in writing this document?
 8          A.        The past pharmacy owner.
 9          Q.        And when you say "assisted," what does
10   that mean?
11          A.        I don't remember me typing everything out
12   specifically.  I know I made edits and clarified, made
13   sure that the steps were in correct order.
14          Q.        Was it unusual for the pharmacy --
15   previous pharmacy owner to be involved in the drafting
16   of instructions for prepared compounded drugs?
17                    MR. MITCHELL:  Object to the form.
18                    THE WITNESS:  Yes.
19   BY MS. NELSON-MAJOR:
20          Q.        Why was it unusual?
21                    MR. MITCHELL:  Same objection.
22                    THE WITNESS:  It didn't take the normal
23        course with other accounts that we had.
24   BY MS. NELSON-MAJOR:
25          Q.        Is this the only time the pharmacy owner
```

Case 3:18-cv-01234   Document 184-35   Filed 03/17/22   Page 189 of 227 PageID #: 10945

```
 1   has assisted in the preparation of instructions for

 2   compounded drugs?

 3                   MR. MITCHELL:  Same objection.

 4                   THE WITNESS:  Yes.

 5   BY MS. NELSON-MAJOR:

 6        Q.      Does the pharmacy owner have any training

 7   in the preparation of compounded drugs?

 8                   MR. MITCHELL:  Form.

 9                   THE WITNESS:  I'm not aware.

10   BY MS. NELSON-MAJOR:

11        Q.      Did the pharmacy owner convey to you

12   whether TDOC asked you to prepare these instructions?

13        A.      Yes.

14        Q.      And what did the pharmacy owner say in

15   that regard?

16        A.      He just said that he wants -- we needed

17   to prepare this to give accurate step-by-step

18   instructions so they could understand and make it as

19   easily readable and understandable as possible.

20        Q.      Is it unusual to type up instructions of

21   this kind to accompany preparations that you compound

22   for other customers?

23                   MR. MITCHELL:  Form objection.

24                   THE WITNESS:  No.

25   BY MS. NELSON-MAJOR:
```

Case 3:18-cv-01234   Document 184-35   Filed 03/17/22   Page 190 of 227 PageID #: 10946

```
 1        Q.       Has this document been edited or changed
 2   from the original version at all?
 3                    MR. MITCHELL:  Same objection.
 4                    THE WITNESS:  I have not made any changes
 5        to this original, no.
 6   BY MS. NELSON-MAJOR:
 7        Q.       Do you recall when these original
 8   instructions were finalized?
 9        A.       Not the exact date, but it would have
10   been in 2018.
11        Q.       Did you provide this document to TDOC?
12        A.       No.
13        Q.       Did the pharmacy owner provide it to
14   TDOC, if you're aware?
15        A.       I believe so, yes.
16        Q.       And each time you send compounded drugs
17   to TDOC, do you provide these instructions with the
18   shipment?
19        A.       I do not.
20        Q.       Are these instructions the same
21   instructions that you provide printed on the vials?
22        A.       No.
23        Q.       How are they different?
24                    MR. MITCHELL:  Object to form.
25                    THE WITNESS:  On the vials, I believe
```

Case 3:18-cv-01234   Document 184-35   Filed 03/17/22   Page 191 of 227 PageID #: 10947

```
 1          they just say "Inject as directed," or -- yeah,
 2          "Inject as directed."
 3   BY MS. NELSON-MAJOR:
 4          Q.      Do you see the first paragraph states:
 5                  "USP Chapter 797 sets the following BUDs on
 6                  high-risk compounded preparations:  24
 7                  hours at room temperature, three days at
 8                  cold temperature, (refrigerated), and 45
 9                  days frozen."
10                  What does "Cold temperature (refrigerated)"
11   mean?
12          A.      That it's good for 45 days in a
13   refrigerator.
14          Q.      Do you know what temperature range
15   corresponds to cold temperature?
16          A.      2 to 8 degrees Celsius.
17          Q.      Did you ever convey that information to
18   anyone at TDOC?
19          A.      I have not.
20          Q.      What does "frozen" mean, as far as
21   temperature?
22          A.      Negative 25 to negative 10 degrees
23   Celsius.
24          Q.      Have you ever conveyed that information
25   to anyone at TDOC?
```

```
 1          A.      I have not.
 2          Q.      And then the next sentence states:
 3                  "Once thawed at room temperature, the
 4                  preparation must be used within 24 hours
 5                  and cannot be refrozen to extend that time.
 6                  If thawed in refrigerator, it must be used
 7                  in three days."
 8                  What does "thawed" mean?
 9          A.      To allow the medication from its frozen
10   state into a liquefied state.
11          Q.      What happens if the refrigerator exceeds
12   the cold temperature range that you just provided?
13                  MR. MITCHELL:  Object to the form.
14                  THE WITNESS:  Then the medication, if
15          it's without -- if it's above the necessary
16          temperature requirements, then it should be used
17          within those 24 hours.
18   BY MS. NELSON-MAJOR:
19          Q.      What would happen to the medication if it
20   exceeded the cold temperature range for more than three
21   days in the refrigerator?
22                  MR. MITCHELL:  Form objection.
23                  THE WITNESS:  It could lose its
24          sterility, it could lose its potency.
25   BY MS. NELSON-MAJOR:
```

1     Q.     And at that point, what should happen to

2  the medication?

3     A.     It should not be used and disposed of

4  properly.

5     Q.     What if the previously frozen medication

6  remains in the refrigerator for more than 24 hours?

7  What could happen then?

8              MR. MITCHELL:  Form objection.

9              THE WITNESS:  It's okay, as long as it's

10        in there for no more than three days.  So 24 hours

11        is within that allotted time period.

12  BY MS. NELSON-MAJOR:

13     Q.     What if the medication is stored in the

14  refrigerator for more than 24 hours at a temperature

15  above the cold temperature range you provided?

16              MR. MITCHELL:  Form objection.

17              THE WITNESS:  If it's not used within 24

18        hours of the temperature that is suggested by USP

19        797, then it's not supposed to be used.

20  BY MS. NELSON-MAJOR:

21     Q.     Did you ever discuss with anyone at TDOC

22  what they should do with these drugs under any of these

23  scenarios we just discussed?

24     A.     No.

25     Q.     Do you see underneath that introductory

1    paragraph, it states "Items you need?"

2         A.      Yes.

3         Q.      It says "gloves, alcohol swabs, bags of

4    saline, and syringes?"

5         A.      Yes.

6         Q.      Do you provide TDOC with those items?

7         A.      I do not.

8         Q.      And it specifies that the syringes should

9    be 50 ml-per-cc syringes; is that right?

10        A.      Yes, I see that.

11        Q.      Why do you provide a particular syringe

12   size in these instructions?

13        A.      Depending on the amount of liquid that

14   they're drawing up, it's important to know the size of

15   syringe you need.  So that would have been why we put

16   the size.

17        Q.      What would happen if a larger syringe

18   size is used in preparing the drugs?

19             MR. MITCHELL:  Object to the form.

20             THE WITNESS:  You can use a larger

21        syringe size, as long as you're able to see

22        accurately the quantity that you're drawing up.

23   BY MS. NELSON-MAJOR:

24        Q.      In order to accurately draw up the

25   quantity, would you need to then adjust the

1  instructions that you provided?

2            MR. MITCHELL:  Object to the form.

3            THE WITNESS:  I'm sorry; if their

4     quantity that they're measuring changes, would I

5     need to change the 50 ml/cc?

6  BY MS. NELSON-MAJOR:

7     Q.     For example, if a 60 ml/cc syringe is

8  used?

9     A.     No, I don't believe it would be necessary

10  to change the directions.

11     Q.     So under "Preparation," Step 1 states:

12  "Remove four vials of midazolam from the freezer and

13  place in the refrigerator 24 hours prior to use as to

14  allow it to thaw."

15            Why 24 hours before use?

16     A.     Just to ensure that it thaws out properly

17  and just to give enough time.

18     Q.     Is 24 hours a standard instruction that

19  you give for the thawing of compounded preparations?

20     A.     Yes.  It's -- it's a standard that I have

21  used for my patients, yes.

22     Q.     Step 6 directs the person preparing the

23  syringes to follow aseptic technique.  What is aseptic

24  technique?

25     A.     Aseptic technique is just trying to

1    maintain the integrity of the product.  And then the

2    ways to maintain that are the details that are listed

3    after that.

4         Q.     If you turn to the next page, I'd like

5    you to take a look at Step 10, which states:

6                   "These instructions list drawing the

7                   midazolam first followed by saline but the

8                   order can be reversed and the saline may be

9                   drawn first followed by the midazolam."

10                  Why did you include this step?

11                  MR. MITCHELL:  Object to the form.

12                  THE WITNESS:  Just so it's known that the

13         order doesn't change the integrity of the

14         medication itself; that if -- if either order is

15         used, it's okay.

16   BY MS. NELSON-MAJOR:

17        Q.     Setting aside the note about the order of

18   the midazolam versus saline, do these instructions

19   require someone to complete Steps 1 to 18, one after

20   the other?

21        A.     Sorry.  If I could just look at it a

22   minute, I'll answer you.

23                  MR. MITCHELL:  Object to the form.

24                  (Pause.)

25                  THE WITNESS:  Yes.  It would do it each

```
 1          time, each step individually, and then restart.
 2     BY MS. NELSON-MAJOR:
 3          Q.      Would it be a deviation from your
 4     instructions to draw up the saline and then wait an
 5     hour or more to draw up the midazolam?
 6                    MR. MITCHELL:  Object to the form.
 7                    THE WITNESS:  No, that wouldn't be a
 8          problem.
 9     BY MS. NELSON-MAJOR:
10          Q.      Would that be a breach of aseptic
11     technique?
12          A.      No.
13          Q.      Steps 11 to 16 direct the withdrawing of
14     5 milliliters of midazolam and 48 milliliters of
15     saline.  Why saline?
16          A.      Saline?  Because of the quantity being
17     used, the normal saline is the correct pH that can be
18     infused to a patient.  So we already know that they
19     won't have a reaction if that's mixed with midazolam,
20     so we wouldn't be running any risks.
21          Q.      Could you use bacteriostatic water
22     instead of the saline?
23          A.      You could use bacteriostatic water,
24     depending on the quality and the quantity of the
25     medication you're mixing it with.
```

```
 1        Q.       So this particular quantity of medication
 2   and quantity of diluent that you're mixing, could you
 3   use bacteriostatic water?
 4        A.       For this quantity, I would just use
 5   normal saline.
 6        Q.       Why does the midazolam need to be diluted
 7   before injection?
 8        A.       Just to follow their protocol of the
 9   amounts that they wanted to.  That's how it was
10   adapted.
11        Q.       And you say to follow the amounts in
12   their protocol; are you talking about the overall
13   volume of the syringe, or the concentration or the
14   quantity of midazolam?
15        A.       All that you said.
16        Q.       Why didn't you prepare the midazolam in
17   the concentration, quantity, and volume as contemplated
18   by the protocol?
19             MR. MITCHELL:  Object to the form.
20             THE WITNESS:  I prepared it as requested
21        by my previous owner.
22   BY MS. NELSON-MAJOR:
23        Q.       So the previous owner directed you to
24   prepare the midazolam in a quantity, concentration, and
25   volume that would require dilution?
```

```
 1                    MR. MITCHELL:  Same objection.
 2                    THE WITNESS:  Yes.
 3      BY MS. NELSON-MAJOR:
 4          Q.      Did the pharmacy owner explain to you why
 5      he was requesting that you prepare the midazolam in
 6      that fashion?
 7          A.      No.
 8          Q.      Step 15 requires an inspection of the
 9      syringe "to ensure you see no particulates or
10      discoloring" and further states it "should be clear
11      liquid and without debris."
12                    What happens if particulates are present?
13          A.      Then it shouldn't be used.
14          Q.      Did you convey that information to anyone
15      at TDOC?
16          A.      No.
17          Q.      What does discoloration indicate?
18                    MR. MITCHELL:  Object to the form.
19                    THE WITNESS:  It could indicate anything;
20          the medication, the API, being nonsterile.  Or
21          just anything that's not clear, you just shouldn't
22          use it.
23      BY MS. NELSON-MAJOR:
24          Q.      Did you convey that to TDOC?
25          A.      No.
```

**Gibson Court Reporting**

```
 1        Q.       Step 16 states:  "Do not inject the
 2   midazolam into the bag of normal saline."  Why did you
 3   include that step?
 4                  (Pause.)
 5                  THE WITNESS:  Because they need to take
 6        out a volume.  Sorry, let me just double-check
 7        first before I say it.
 8                  Because they're extracting the normal
 9        saline from that 50-cc bag that they need to make
10        it the correct concentration that they need.
11   BY MS. NELSON-MAJOR:
12        Q.       If in preparing the syringes TDOC draws
13   out too much saline, should that also not be injected
14   into the bag?
15                  MR. MITCHELL:  Object to the form.
16                  THE WITNESS:  They should just be drawing
17        out the quantity needed to make it a proper
18        concentration.
19   BY MS. NELSON-MAJOR:
20        Q.       What if they draw out too much while
21   trying to do that?
22        A.       Then it would change the concentration of
23   the solution that is labeled -- as it is labeled.
24        Q.       If they noticed they've drawn out too
25   much saline, would it be a breach of aseptic technique
```

1  to inject the extra saline back into the saline bag?

2                MR. MITCHELL:  Object to the form.

3                THE WITNESS:  It would not.

4  BY MS. NELSON-MAJOR:

5       Q.      Could doing so affect the concentration

6  of midazolam in the syringe?

7                MR. MITCHELL:  Same objection.

8                THE WITNESS:  If you're....

9                (Pause.)

10               MR. MITCHELL:  Pharmacist, are you

11         pausing or are you answering?  I wasn't hearing

12         anything, at least on my end.

13               THE WITNESS:  No, I'm just reading.  I'm

14         sorry.

15               They're using the same syringe that they

16         already have the midazolam to draw out the normal

17         saline.  And then the concentration, or the amount

18         that was pulled out of -- pulled into the syringe

19         was too much, then no, they wouldn't be able to --

20         to push out the excess because then you'd be

21         pushing out midazolam, as well.

22  BY MS. NELSON-MAJOR:

23       Q.      Do the BUD times that you provided in

24  that intro paragraph change once the midazolam has been

25  mixed with saline?

```
 1          A.       No, it would stay the same.
 2          Q.       Is there any reason that the midazolam
 3   mixed with saline would need to be administered within
 4   an hour of mixing?
 5                    MR. MITCHELL:  Object to the form.
 6                    THE WITNESS:  Depending on where it's
 7            prepared.  If according to USP 797 it's considered
 8            to be immediate use, then yes, you would do it in
 9            an hour.
10   BY MS. NELSON-MAJOR:
11          Q.       According to your instructions in your
12   preparation requirements that you followed, is there
13   any reason why TDOC would need to administer the
14   midazolam that you compounded within one hour of mixing
15   it with saline?
16                    MR. MITCHELL:  Object to the form.
17                    THE WITNESS:  Can you say that again?
18   BY MS. NELSON-MAJOR:
19          Q.       Is this any reason that TDOC has to
20   administer the midazolam within one hour of mixing it
21   with saline?
22                    MR. MITCHELL:  Same objection.
23                    THE WITNESS:  If they're just doing it
24            like at bedside or in an open area, then it would
25            be within an hour.
```

1    BY MS. NELSON-MAJOR:

2         Q.      Is that true of all the drugs?

3         A.      Yes.  Any -- any medication that is done

4    in a normal room is to be used with an hour window of

5    being compounded.

6         Q.      So the potassium chloride, after being

7    drawn up in a syringe, must be used within one hour as

8    well?

9              MR. MITCHELL:  Object to the form.

10             THE WITNESS:  Yes.

11   BY MS. NELSON-MAJOR:

12        Q.      What happens if one of those compounded

13   drugs is administered more than an hour after it is

14   drawn up in the syringe?

15             MR. MITCHELL:  Same objection.

16             THE WITNESS:  After an hour, you can't

17        guarantee by the guidelines that you are still

18        maintaining sterility and potency.

19   BY MS. NELSON-MAJOR:

20        Q.      Can you please turn to Exhibit 4.

21        A.      Okay.

22        Q.      Do you recognize this document?

23        A.      Yes.

24        Q.      What is it?

25        A.      It's the potassium chloride preparation.

```
 1          Q.      Did you write this document?

 2          A.      I assisted in the same way as the

 3   midazolam.

 4          Q.      And by "the same way," do you mean that

 5   the pharmacy owner drafted the document and then sought

 6   your input?

 7          A.      Yes.

 8          Q.      Did you make edits to this document?

 9          A.      I know I reviewed it, but I don't

10   remember what I edited.

11          Q.      Did you provide this document to TDOC?

12          A.      I did not.

13          Q.      Are you aware of whether the pharmacy

14   owner provided this document to TDOC?

15          A.      He did.

16          Q.      And if you're aware, do you know how many

17   times he provided this document to TDOC?

18          A.      I am not.

19          Q.      Do you send this document with compounded

20   preparations time -- preparations each time you send it

21   to TDOC?

22          A.      No.

23          Q.      Are these instructions different in any

24   way than the instructions you provide on the vials of

25   compounded potassium chloride?
```

```
 1                    MR. MITCHELL:  Object to the form.
 2                    THE WITNESS:  No.
 3   BY MS. NELSON-MAJOR:
 4        Q.      Did these instructions provide
 5   information about the beyond use date for potassium
 6   chloride?
 7        A.      No.
 8        Q.      Is there a reason you provided beyond use
 9   date information on the midazolam instructions but not
10   the potassium chloride instructions?
11        A.      No.
12                    MR. MITCHELL:  Object to the form.
13   BY MS. NELSON-MAJOR:
14        Q.      The potassium chloride instructions don't
15   contain any reference to potassium chloride being a
16   high-risk preparation, unlike the midazolam
17   instructions; is that right?
18                    MR. MITCHELL:  Object to the form.
19                    THE WITNESS:  I don't see that on here,
20        no.
21   BY MS. NELSON-MAJOR:
22        Q.      Did you discuss with the TDOC the beyond
23   use date of potassium chloride, outside of these
24   instructions?
25        A.      Yes.
```

```
 1        Q.      And without naming names, who were those
 2   conversations with?
 3        A.      My discussion directly was with the
 4   pharmacy -- previous pharmacy owner.
 5        Q.      Can you describe that conversation?
 6        A.      Yes.  We just discussed that the
 7   potassium chloride would have the same storage
 8   requirements as the midazolam, as it was also a
 9   high-risk preparation.
10        Q.      Was anyone from TDOC present for that
11   conversation?
12        A.      No.
13        Q.      Did you inform anyone at TDOC that
14   potassium chloride is a high-risk preparation?
15        A.      No.
16        Q.      Is the midazolam un- -- more unstable
17   than the potassium chloride?
18                MR. MITCHELL:  Object to the form.
19                THE WITNESS:  No.
20   BY MS. NELSON-MAJOR:
21        Q.      Do you see under "Items you will need" it
22   says two vials of potassium chloride, gloves, alcohol
23   swabs, and syringes?
24        A.      Yes.
25        Q.      What size of syringe does this specify?
```

```
 1          A.      60 ml.
 2          Q.      And why have you used a 60-ml syringe in
 3   these instructions?
 4          A.      Because the quantity of the potassium
 5   chloride that they're extracting is 60 ml's.
 6          Q.      If TDOC used a 50-milli- -- milliliter
 7   syringe, would that impact the volume of potassium
 8   chloride delivered to an inmate?
 9                  MR. MITCHELL:  Objection.
10                  THE WITNESS:  Yes.  They wouldn't be able
11          to measure and know.
12   BY MS. NELSON-MAJOR:
13          Q.      So the midazolam and potassium chloride
14   instructions require different sizes of syringes,
15   right?
16          A.      Based on these instructions, yes.
17          Q.      According to these instructions, is the
18   potassium chloride mixed with anything to dilute it?
19          A.      It is not.
20          Q.      So unlike the midazolam, the potassium
21   chloride is provided to TDOC at the concentration at
22   which it is to be administered?
23                  MR. MITCHELL:  Object to the form.
24                  THE WITNESS:  Yes.
25   BY MS. NELSON-MAJOR:
```

1    Q.    Why the difference between the two

2  preparations?

3    A.    We weren't able to make the potassium

4  chloride at the original 4 mEq per ml, as we discussed

5  previously, and then it was changed to this 2 mEq per

6  ml.

7    Q.    I understand that.  At the adjusted

8  concentration, however, no additional saline or

9  bacteriostatic water is directed to be diluted with

10 potassium chloride; is that right?

11   A.    Yes.

12   Q.    Did the pharmacy owner direct you to

13 prepare that initial batch of potassium chloride at

14 that concentration and volume?

15            MR. MITCHELL:  Object to the form.

16            THE WITNESS:  Yes.

17 BY MS. NELSON-MAJOR:

18   Q.    Does the vecuronium bromide that you

19 provide to TDOC for use in executions come in powder or

20 liquid form?

21   A.    I don't remember.

22   Q.    If you provided vecuronium bromide in a

23 liquid form, would that be a compounded drug or a

24 commercially manufactured drug?

25   A.    It could be either.

```
 1        Q.        If you're dealing with vecuronium bromide
 2   in powder form, what needs to happen to it before it is
 3   administered to a patient?
 4                  MR. MITCHELL:  Object to the form.
 5                  THE WITNESS:  It would be diluted.
 6   BY MS. NELSON-MAJOR:
 7        Q.        And what should it be diluted with?
 8        A.        Whatever is indicated by the
 9   manufacturer; most likely, sterile water or normal
10   saline.
11        Q.        But not bacteriostatic water?
12        A.        It could be, but I'm not aware.
13        Q.        Do you need medical training to
14   reconstitute a drug from powder form?
15                  MR. MITCHELL:  Object to the form.
16                  THE WITNESS:  No.
17   BY MS. NELSON-MAJOR:
18        Q.        So reconstituting a powered drug into a
19   solution is not the practice of pharmacy?
20                  MR. MITCHELL:  Same objection.
21                  THE WITNESS:  No.
22   BY MS. NELSON-MAJOR:
23        Q.        Did you provide written instructions to
24   TDOC for storing and preparing the vecuronium bromide?
25        A.        No.
```

**Gibson Court Reporting**

```
 1          Q.      Why did you provide written instructions
 2   for potassium chloride and midazolam but not the
 3   vecuronium bromide?
 4              MR. MITCHELL:  Same objection.
 5              THE WITNESS:  We are compounding the
 6          potassium chloride and the midazolam, so we
 7          provided instructions.
 8   BY MS. NELSON-MAJOR:
 9          Q.      Would the commercially manufactured
10   vecuronium bromide come with instructions?
11          A.      Yes.
12          Q.      And where do those instructions come
13   from?
14          A.      They are either on the vial or in the
15   package insert in the packaging that it comes in.
16              MS. NELSON-MAJOR:  I'd request copies of
17          the instructions contained on the vials of
18          vecuronium bromide or in the package insert for
19          the vecuronium bromide that the pharmacy has
20          provided to TDOC.
21   BY MS. NELSON-MAJOR:
22          Q.      Did you ever --
23              MS. NELSON-MAJOR:  I'm sorry, Rob?
24              MR. MITCHELL:  I said I would look into
25          that, and I was on mute and I unmuted.  Sorry.
```

 1   BY MS. NELSON-MAJOR:

 2        Q.     Did you ever discuss how the vecuronium

 3   bromide should be stored and prepared with anyone at

 4   TDOC?

 5        A.     No.

 6        Q.     Did you ever have a discussion related to

 7   any of the other two drugs with anyone at TDOC?

 8               I'm sorry, let me restate that.

 9               Did you ever have discussions related to

10   the preparation of the other two drugs with anyone at

11   TDOC?

12        A.     No.

13        Q.     Have you ever spoken with anyone directly

14   who's involved in carrying out the executions?

15               MR. MITCHELL:  Object to the form.

16               THE WITNESS:  No.

17   BY MS. NELSON-MAJOR:

18        Q.     So you've never spoken to the EMTs who

19   are involved in the executions?

20        A.     No.

21        Q.     Or members of the IV team?

22        A.     No.

23        Q.     Or the executioner?

24        A.     No.

25        Q.     Or the physician?

```
 1          A.      No.

 2          Q.      Please turn to Exhibit 1.

 3          A.      Okay.

 4          Q.      And I'd like you to turn to Page 39.

 5          A.      Okay.

 6          Q.      And you previously testified that you

 7   were somewhat involved in the drafting of this page of

 8   the protocol.  Can you look at the subheading (c) at

 9   the very bottom that says "Vecuronium Bromide?"

10          A.      Yes.

11          Q.      Could you take a look at this paragraph

12   and let me know if you recall whether or not you

13   drafted this particular portion of Page 39?

14          A.      No, I don't recall.

15          Q.      Do you see that the first sentence

16   directs that the vecuronium should be reconstituted

17   with bacteriostatic water?

18          A.      Yes.

19          Q.      In the event that some or all of the

20   prepared syringes are not administered, what should

21   happen to them?

22                  MR. MITCHELL:  Object to the form.

23                  THE WITNESS:  I'm sorry, are you saying

24        all the midazolam, saline, vecuronium bromide, the

25        potassium chloride?  For everything in total?
```

1    BY MS. NELSON-MAJOR:

2        Q.     We can take each one, one by one, if your

3    answer changes.

4               What happens -- what should happen to any

5    midazolam syringes that are not administered during an

6    execution?

7               MR. MITCHELL:  Object to the form.

8               THE WITNESS:  They should be disposed of

9        properly.  That would be true for anything that's

10       unused.

11   BY MS. NELSON-MAJOR:

12       Q.     Can the prepared syringes be used in an

13   execution on a different date?

14       A.     They should not.

15       Q.     Could unopened vials, meaning that they

16   weren't drawn up into the syringe, be used in a

17   subsequent execution?

18       A.     If they were vials that weren't outside

19   the temperature ranges, as we discussed, and they were

20   still in the freezer.  As long as they're before the

21   BUD, then yes.

22       Q.     And would your answers to those questions

23   be the same if we were talking about potassium

24   chloride, as well?

25       A.     Yes.

1          Q.          How should vials that are beyond their
2    use date be disposed of?
3          A.          There are containers that are used that
4    are proper waste containers for medication that can be
5    disposed of.
6          Q.          Could you turn to Exhibit 5.
7          A.          Okay.  I have it.
8          Q.          Do you recognize this document?
9          A.          Yes.
10         Q.          What is it?
11         A.          This is a report ran from our database on
12   the lot numbers of the midazolam and the potassium
13   chloride made by our pharmacy.
14         Q.          And do you track every drug that you
15   compound for customers in this database?
16         A.          Yes.
17         Q.          Both compounded and commercially
18   available drugs, as well?
19         A.          No.
20         Q.          So is this database only used to track
21   compounded preparations?
22         A.          Yes.
23         Q.          Did you provide this log to the TDOC at
24   some point?
25         A.          I do remember making this log.  I just

1    don't know who I gave it to.

2         Q.      Does the pharmacist who prepares the

3    drugs enter the dates into this database?

4                 MR. MITCHELL:   Objection.

5                 THE WITNESS:  No, they autopopulate.

6    BY MS. NELSON-MAJOR:

7         Q.      Where do they autopopulate from?

8         A.      When you're creating the master log for

9    that, whatever day you're making it, that "Date made"

10   will autopopulate.

11        Q.      Does the "Discard after date" also

12   autopopulate?

13        A.      It defaults to this one date because it's

14   assuming room temperature.  But in the master formula,

15   it can tell you the refrigerated dates and freezer

16   dates, based on USP 797.

17        Q.      So I just want to make sure I'm clear on

18   that.  The "Discard after date" column you're saying is

19   just one day autopopulated, post date made; is that

20   right?

21        A.      Yes.

22        Q.      Could you look at the last entry for me:

23   "Date made, July 14th, 2020."

24        A.      Yes, I see.

25        Q.      And then what's the discard date for that

1   potassium -- I'm sorry, that midazolam?

2        A.      On here, it says August 14th, 2020.

3        Q.      Is there a reason why that one day post

4   date made didn't autopopulate here?

5        A.      No, there's not a reason for it.

6        Q.      And then if you look at the entry above

7   that for midazolam made on January 1st, 2020.

8        A.      Yes, I see that.

9        Q.      What's the discard date for that?

10       A.      It says January 17th.

11       Q.      Is there a reason why that's not one day

12   post the date made date?

13       A.      No.

14       Q.      So looking through this sheet, can you

15   point me to a date on which you compounded midazolam

16   for which the discard date is one day post the date

17   made?

18               (Pause.)

19               THE WITNESS:  No, I don't see it on here

20       like that.

21   BY MS. NELSON-MAJOR:

22       Q.      What would explain -- do you have any

23   idea -- I can rephrase that.

24               Do you have any idea why the discard dates

25   are different than your explanation for how they're

```
 1   autopopulated?

 2         A.      No.

 3                 MR. MITCHELL:  Object to the form.

 4                 THE WITNESS:  No.

 5   BY MS. NELSON-MAJOR:

 6         Q.      Can we look at the column that's titled

 7   "QUTY Made?"  I'm assuming that means "quantity made,"

 8   right?

 9         A.      Yes.

10         Q.      Do you enter the data in that column?

11         A.      No.

12         Q.      Where does that data come from?

13         A.      From the formula of the quantity that we

14   made.

15         Q.      And does that come from the master

16   formula log?

17         A.      Yes.

18         Q.      So the quantity made, what does that

19   correspond to?

20                 MR. MITCHELL:  Objection.

21                 THE WITNESS:  The quantity in total that

22         was made for that lot.

23   BY MS. NELSON-MAJOR:

24         Q.      So, for example, on May 8th, 2018, the

25   first entry, you made 90 ml's of midazolam?
```

```
 1          A.      Yes.

 2          Q.      And then going down that column, I see

 3   55, 60, 30, 60, 60, 55, 60, 85, 85, 85, 85.

 4                  Do you know why different quantities were

 5   made on different dates?

 6          A.      Depending on the quantity requested on

 7   the prescription and the quantity requested by the lab

 8   is how the total quantity made is determined.

 9          Q.      Has the amount requested by the lab

10   varied over time with respect to the midazolam?

11          A.      In general, yes.  Not just to midazolam.

12          Q.      Do you know why it has varied over time?

13          A.      Just requirements.  And I just make the

14   quantity based on how much extra they tell me I need to

15   make or send in to them.

16          Q.      How do you use these records at work?

17                  MR. MITCHELL:  Objection.

18                  THE WITNESS:  This record, I don't

19          generally -- I don't usually make this report.

20   BY MS. NELSON-MAJOR:

21          Q.      What's the purpose of recording the date

22   made in this database?

23          A.      The date made is just to know when it was

24   made, and then we can base -- we know the lot number

25   off of that.  And then also the BUD, depending on that
```

1   date made.

2        Q.      Do you provide the information contained

3   in this database to entities outside of your pharmacy,

4   without naming names?

5               MR. MITCHELL:  Object to the form.

6               THE WITNESS:  No, I don't believe that I

7        have.

8   BY MS. NELSON-MAJOR:

9        Q.      Do you ever rely on the discard after

10  date in making recommendations to customers about the

11  BUD?

12       A.      No, I don't.

13       Q.      Has your pharmacy ever been issued a Form

14  FDA 483?

15              MR. MITCHELL:  I'm going to object

16       pursuant to the protective order.  I'm also going

17       to object to the form.

18              But object pursuant to the protective

19       order to the extent that'll require the disclosure

20       of identifying information.  If you can -- if you

21       can answer without doing so, you can answer.

22              THE WITNESS:  No.

23  BY MS. NELSON-MAJOR:

24       Q.      Has the pharmacy at which you work been

25  investigated for failing to comply with any local,

```
 1   state, or federal regulations or law?
 2                   MR. MITCHELL:  Object to the form.
 3                   THE WITNESS:  No.
 4   BY MS. NELSON-MAJOR:
 5        Q.      Has your pharmacy ever been directed to
 6   recall lots of compounded drugs?
 7        A.      Yes.
 8        Q.      Without naming the name of a state, were
 9   you directed to do so by a state Board of Pharmacy?
10        A.      No.
11        Q.      Were you directed by the manufacturer of
12   the API to do so?
13        A.      No.
14        Q.      Were you directed by the FDA to do so?
15        A.      No.
16        Q.      Why were you directed -- how many times
17   have you been directed to recall lots of compounded
18   drugs?
19        A.      Once.
20        Q.      What was the issue with that lot of
21   drugs?
22        A.      It was determined to be mislabeled.
23        Q.      Were you the pharmacist that had
24   compounded that lot of drugs?
25        A.      No.
```

```
 1                    MR. MITCHELL:  Object to the form.
 2   BY MS. NELSON-MAJOR:
 3        Q.      What kind of drug was it?
 4        A.      I don't know.
 5        Q.      How did it come to light that the drug
 6   had been mislabeled?
 7        A.      I don't know.
 8        Q.      Are you aware of whether there were any
 9   adverse medical events related to the recall of that
10   drug?
11        A.      I am not aware, no.
12        Q.      Was the issue with this recall related to
13   the reason why the pharmacy owner left your pharmacy?
14        A.      No.
15        Q.      Has the state Board of Pharmacy ever
16   opened an enforcement or disciplinary action against
17   you?
18        A.      Against me or the pharmacy?
19        Q.      Against you.
20        A.      Yes.
21        Q.      When was that action opened?
22                    MR. MITCHELL:  I'm going to object,
23           pursuant to the protective order, to when that
24           action was opened.
25   BY MS. NELSON-MAJOR:
```

1       Q.      What was the outcome of that action?

2       A.      I had to pay a fine.

3       Q.      And what was the nature of the violation?

4       A.      Technician license had expired.

5       Q.      Is this the same technician who is

6  involved in assisting you in the preparation of

7  compounded drugs for TDOC?

8       A.      It is not.

9       Q.      Did this occur at the current pharmacy in

10  which you're employed or was that at a previous

11  employer?

12       A.      Previous employer.

13       Q.      Has the state Board of Pharmacy ever

14  opened an enforcement or disciplinary action against

15  the pharmacy that you are currently employed at?

16       A.      No.

17       Q.      Were you aware that the technician's

18  license had been expired?

19       A.      No.

20       Q.      Did you ever tell the TDOC about the

21  FDA's negative finding against the third-party testing

22  facility that you have used to test TDOC's lethal

23  injection chemicals?

24            MR. MITCHELL:  Object to form.

25            THE WITNESS:  No.

1  BY MS. NELSON-MAJOR:

2      Q.      Could you state that answer again,

3  Pharmacist?

4      A.      No.

5              MS. NELSON-MAJOR:  I don't have much

6          left, but I think now might be a good time to take

7          a couple-minute break, and then we could hopefully

8          wrap up soon.

9              MR. MITCHELL:  Do you want to -- we can

10         go off the record.

11             THE VIDEOGRAPHER:  We're off the record

12         at 3:13 p.m.

13             (Recess at 3:13 p.m. to 3:25 p.m.)

14             THE VIDEOGRAPHER:  We're back on record.

15         The time is 3:25 p.m.

16  BY MS. NELSON-MAJOR:

17      Q.      Pharmacist, I'd like to ask you a couple

18  of questions about the violation letter issued to the

19  third-party testing company that your pharmacy

20  contracts with.

21              Do you know when the events that

22  triggered the violation letter occurred?

23              MR. MITCHELL:  I'm going to object.

24         Well, you can answer.  To the extent it's a

25         yes-or-no question, you can answer.  But

```
 1            otherwise, I'm going to instruct you not to answer
 2            pursuant to the protective order, DE107, Page ID
 3            5116.
 4                    Pharmacist, you're on mute.
 5                    THE WITNESS:  I can't answer "Yes" or
 6            "No."
 7   BY MS. NELSON-MAJOR:
 8       Q.     You're unaware of when the events that
 9   triggered the violation letter occurred?
10       A.     I'm aware of the year.
11       Q.     And what year was that?
12                    MR. MITCHELL:  No, I'm going to object
13            again.  Pursuant to the protective order, do not
14            answer.
15   BY MS. NELSON-MAJOR:
16       Q.     Did the violation relate to testing that
17   the third-party company performed for your pharmacy?
18       A.     No.
19       Q.     Did you take any notes during the
20   deposition today?
21       A.     No.
22       Q.     And do you have any documents in the room
23   with you other than the exhibits that we discussed?
24       A.     No.
25                    MS. NELSON-MAJOR:  I don't have any
```

```
 1          further questions, but I would request that we
 2          leave the deposition open in order to resolve the
 3          objections that were raised today.
 4                    MR. MITCHELL:  We don't object to leaving
 5          the deposition open for that reason, but we would
 6          ask that we're permitted to talk -- talk to the
 7          Pharmacist and still employ the Pharmacist without
 8          waiving attorney-client or anything like that.
 9                    MS. NELSON-MAJOR:  That's fine.
10                    MR. MITCHELL:  One other thing I want to
11          bring up on the record.  We would like to request
12          that all mentions of [State] be stricken and just
13          reinsert the word "state" in brackets or something
14          like that.  I don't know if that's something you
15          would agree to, Ms. Nelson-Major, or not.
16                    MS. NELSON-MAJOR:  I agree with that.
17                    MR. MITCHELL:  Did you get that,
18     Ms. Sansom?
19                    THE COURT REPORTER:  I did.
20                    MR. MITCHELL:  Okay.  Thank you.
21                    THE VIDEOGRAPHER:  We're off the record.
22          The time is 3:28 p.m.
23                    (Proceedings adjourned sine die at 3:28
24          p.m.)
25
```

1          C E R T I F I C A T E

2

3   STATE OF TENNESSEE

4   COUNTY OF KNOX

5           I, Rhonda S. Sansom, RPR, CRR, CRC, LCR #685,

6   licensed court reporter in and for the State of

7   Tennessee, do hereby certify that Volume 1 of the above

8   videoconference deposition of PHARMACIST was reported

9   by me and that the foregoing 224 pages of the

10  transcript is a true and accurate record to the best of

11  my knowledge, skills, and ability.

12          I further certify that I am not related

13  to nor an employee of counsel or any of the parties to

14  the action, nor am I in any way financially interested

15  in the outcome of this action.

16          I further certify that I am duly licensed

17  by the Tennessee Board of Court Reporting as a Licensed

18  Court Reporter as evidenced by the LCR number and

19  expiration date following my name below.

20

21

22          _____

23          Rhonda S. Sansom, RPR, CRR, CRC
            Tennessee LCR# 0685
24          Expiration Date:  6/30/22

25

RhondaSansom@gibsonreporters.
2021.08.06 14:36:54
Signer:
  CN=RhondaSansom@gibsonreporters.com

**Gibson Court Reporting**