EXHIBIT

50

# In The Matter Of:

*TERRY LYNN KING vs*
*TONY PARKER, et al.*

---

*VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF PHARMACY OWNER*

*October 1, 2021*

---

*Gibson Court Reporting*
*606 West Main Street*
*Suite 350*
*Knoxville, TN 37902*



**Min-U-Script®**

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF PHARMACY OWNER

October 1, 2021

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TERRY LYNN KING, | ) |
| | ) |
| Plaintiff, | ) CAPITAL CASE |
| | ) |
| vs. | ) CASE NO. |
| | ) 3:18-CV-01234 |
| TONY PARKER, et al., | ) |
| | ) |
| Defendants. | ) |

APPEARANCES:

FOR THE PLAINTIFF:

HAYDEN NELSON-MAJOR, ESQ.
ALEX KURSMAN, ESQ.
ANA BALDRIDGE, ESQ.
Assistant Federal Defenders
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545W
Philadelphia, Pennsylvania  19106

JEREMY GUNN, ESQ.
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, Tennessee  37201

**Gibson Court Reporting**

```
 1   APPEARANCES:   (Continued)

 2                  FOR THE DEFENDANTS:

 3                  MIRANDA H. JONES, ESQ.
                    ROBERT W. MITCHELL, ESQ.
 4                  SCOTT C. SUTHERLAND, ESQ.
                    CODY N. BRANDON, ESQ.
 5                  Tennessee Attorney General's Office
                    P.O. Box 20207
 6                  Nashville, Tennessee  37202

 7   ALSO PRESENT: David Jenkins, Videographer

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Gibson Court Reporting**

```
 1              S T I P U L A T I O N S
 2              The videotaped videoconference deposition of
 3    PHARMACY OWNER, called as a witness at the instance of
 4    the Plaintiff, taken pursuant to all rules applicable
 5    to the Federal Rules of Civil Procedure by notice on
 6    the 1st day of October, 2021, at 10:00 a.m., before
 7    Rhonda S. Sansom, RPR, CRR, CRC, Licensed Court
 8    Reporter, pursuant to stipulation of counsel.
 9              It being agreed that Rhonda S. Sansom, RPR,
10    CRR, CRC, Licensed Court Reporter, may report the
11    deposition in machine shorthand, afterwards reducing
12    the same to typewriting.
13              All objections except as to the form of the
14    questions are reserved to on or before the hearing.
15              It being further agreed that all formalities
16    as to notice, caption, certificate, transmission, et
17    cetera, including the reading of the completed
18    deposition by the witness and the signature of the
19    witness, are expressly waived.
20
21
22
23
24
25
```

```
 1              I N D E X
 2          E X A M I N A T I O N S
 3
 4    PHARMACY OWNER                        PAGE
 5    Examination by Ms. Nelson Major         6
 6
 7            E X H I B I T S
 8         (No Exhibits Were Marked.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Gibson Court Reporting**

1              THE VIDEOGRAPHER:  We're on record at

2      10:00 a.m. Eastern time on October 1st, 2021.

3              This is the video deposition of Pharmacy

4      Owner, taken remotely via Zoom in the matter of

5      Terry Lynn King versus Tony Parker, et al., Case

6      No. 3:18-CV-0124, filed in the U.S. District

7      Court, Middle District of Tennessee, Nashville

8      Division.

9              Counsel will state their names and

10      affiliation for the record and the court reporter

11      will swear in the witness.

12              MS. NELSON MAJOR:  Hayden Nelson Major

13      with the Federal Community Defender Office for the

14      Eastern District of Pennsylvania on behalf of

15      plaintiff Terry King.

16              Also with me on the Zoom are Anna

17      Baldridge and Alex Kursman with my office, and

18      Jeremy Gunn with the law firm Bass, Berry & Sims.

19              MR. SUTHERLAND:  Good morning, everyone.

20      I'm Scott Sutherland with the Tennessee Attorney

21      General's Office, and I represent the defendants

22      in this case and the deponent this morning.

23              With me on the Zoom is Assistant Attorney

24      General Miranda Jones, Assistant Attorney General

25      Cody Brandon.

```
 1                    I anticipate that Rob Mitchell will join
 2          us, and maybe Mallory Schiller.  Thank you.
 3                         PHARMACY OWNER,
 4    having been first duly sworn, testified as follows:
 5                         EXAMINATION
 6    BY MS. NELSON MAJOR:
 7          Q.     Good morning.  As I said, my name is
 8    Hayden Nelson Major, and I'm an attorney with the
 9    Federal Community Defender Office in Philadelphia.  And
10    my colleagues and I represent the plaintiff in this
11    matter, as I said, Terry King, and it's currently
12    pending in the Middle District of Tennessee.
13                    Pharmacy Owner, you understand that you're
14    here today to answer questions related -- sorry, one
15    second -- related to the King case; is that right?
16          A.     That's right.
17          Q.     Thank you for taking the time to answer
18    questions in this matter.
19                    What is your understanding about what the
20    case is related to?
21          A.     I don't have much of an understanding at
22    all.  I know it's -- I suspect it's with the compounded
23    drugs used in lethal injection.
24          Q.     As you know, we are going to take your
25    deposition on an anonymous basis.  What that means is I
```

```
 1    will not ask you questions intended to make you
 2    disclose your identity.
 3              To be clear, though, it's my
 4    understanding that you were previously affiliated with
 5    the pharmacy that supplies the Tennessee Department of
 6    Correction with the drugs used in lethal injection
 7    executions.  Is that right?
 8         A.     Yes.
 9         Q.     I would like to cover a couple of ground
10    rules before we get started.  Have you been taken --
11    has your deposition ever been taken before?
12         A.     Yes.
13         Q.     How many times?
14         A.     One time.
15         Q.     When was that?
16         A.     Six years ago.
17         Q.     What was the case about?
18         A.     A physician was being sued, and I was
19    asked to be -- asked to give a deposition based on my
20    knowledge of the -- what had transpired in the
21    operating room.
22         Q.     Was your knowledge about what transpired
23    in the operating room related to your role with the
24    pharmacy in question?
25         A.     No.
```

1       Q.      Someone at the Attorney General's Office
2   may have already gone over some of these topics with
3   you, but I want to make sure that we're on the same
4   page.
5               You understand that you're under oath,
6   right?
7       A.      Yes.
8       Q.      And do you understand that means you need
9   to tell the truth to the best of your ability?
10      A.      I do.
11      Q.      Have you taken any medications today?
12      A.      No.
13      Q.      Have you consumed any alcohol or drugs in
14  the past 24 hours?
15      A.      No.
16      Q.      Is there any reason that you cannot
17  testify truthfully or accurately today?
18      A.      There is not.
19      Q.      Are you represented by counsel today?
20      A.      The Tennessee Attorney General's Office.
21      Q.      Even though your deposition is being
22  taken over Zoom and the court reporter is making a
23  record based on what you say, you need to respond
24  verbally because we also can't see you right now.
25              Do you understand that?

1        A.        Understood.

2        Q.        Okay.  In order for the court reporter to

3    accurately record your testimony, please wait for me to

4    finish my question before you give an answer.  And I'll

5    do the same for you, I'll wait for you to finish your

6    answer before I start asking the next question.

7                If you don't understand a question, please

8    let me know and I'll do my best to clarify.  But if you

9    answer a question, I'll assume that you've understood the

10   question that I've asked.

11               If you need to take a break at any time,

12   just let me know; but if there's a question pending, I'll

13   ask that you answer the question before we break.

14               Mr. Sutherland may object from time to

15   time, but you have to answer my questions unless the

16   objection is based on an assertion of privilege or a

17   statute.

18               Do you understand that?

19       A.        I do.

20       Q.        Do you have any questions before we get

21   started?

22       A.        I do not.

23       Q.        What did you do to prepare for the

24   deposition today?

25       A.        I briefly skimmed over the docket that I

1    found online and had a meeting with Mr. Sutherland in

2    the Attorney General's Office.

3            Q.      When you say you skimmed the docket, did

4    you look at any of the filings in that case?

5            A.      It was a brief skim.  I can't recall any

6    specific filing.

7            Q.      And how did you find that docket?

8            A.      A Google search.

9            Q.      When did you meet with Mr. Sutherland?

10           A.      Two days ago.

11           Q.      How long was that meeting?

12           A.      Approximately two hours.

13           Q.      Was there anyone else present at that

14   meeting?

15           A.      Mr. Mitchell was in and out.

16           Q.      Did you review any documents during that

17   meeting?

18           A.      I did.

19           Q.      What documents did you review?

20           A.      There were protocols and an email.

21           Q.      Can you describe the protocols for me?

22           A.      The protocols were Tennessee's protocols

23   for lethal injection, protocols A and B.

24           Q.      Did you review more than one version of

25   the protocols?

1      A.      No, just the one.

2      Q.      And the email that you reviewed, what was

3  that email?

4      A.      The email was an email to the Drug

5  Procurer regarding availability of midazolam.

6      Q.      Did you send that email to the Drug

7  Procurer?

8      A.      Yes, I did.

9      Q.      Do you recall what year that email was

10  dated?

11      A.      I do not.

12      Q.      Did you bring that email with you to the

13  meeting?

14      A.      No, I didn't.

15      Q.      Did Mr. Sutherland provide it to you?

16      A.      It was provided, yes.

17      Q.      Outside of the protocols and the email

18  that you just referenced, did you review any other

19  additional documents?

20      A.      Not that I recall.

21      Q.      And it's your understanding that

22  Mr. Sutherland is representing you today at this

23  deposition; is that right?

24      A.      Yes.

25      Q.      Other than the docket you found on

1  Google, did you review any other material on your own
2  to prepare for this deposition?
3       A.      No.
4       Q.      Did you meet with anyone other than
5  Mr. Sutherland and Mr. Mitchell in preparation for this
6  deposition?
7       A.      I did not.
8       Q.      Did you review the transcripts of any
9  other depositions conducted in this case?
10      A.      I did not.
11      Q.      Did you consult with anyone outside of
12  Mr. Mitchell and Mr. Sutherland in preparation, such as
13  the Warden or the Commissioner?
14      A.      Did not.
15      Q.      Did you discuss your deposition with
16  anyone other than Mr. Sutherland and Mr. Mitchell?
17      A.      Not the details, no.
18      Q.      Something else about the deposition?
19      A.      I told my wife that I had to fly to
20  Nashville to give a deposition.
21      Q.      How much time in total do you estimate
22  that you spent preparing for this deposition?
23      A.      Two hours, approximately.
24      Q.      What is your highest level of education?
25      A.      Some college.

```
 1         Q.      How many years?
 2         A.      Three and a half.
 3         Q.      But you didn't graduate with a degree?
 4         A.      I did not obtain a degree.
 5         Q.      What were -- what was the focus of these
 6    three and-a-half years?
 7         A.      Primarily biology and business.
 8         Q.      Did you take any courses during those
 9    three and-a-half years related to pharmacy?
10         A.      I did not.
11         Q.      You're not a licensed pharmacist?
12         A.      No, I am not.
13         Q.      Have you ever received any kind of
14    training in pharmacy?
15         A.      I have not.
16         Q.      Do you hold any certifications?
17         A.      I do not.
18         Q.      So your highest level of education is a
19    high school diploma, as far as a degree received?
20         A.      Yes.
21         Q.      Do you hold any professional licenses?
22         A.      I do not.
23         Q.      Do you have any military training?
24         A.      No.
25         Q.      What about medical training?
```

**Gibson Court Reporting**

```
 1          A.       Basic CPR.
 2          Q.       Do you participate in any volunteer
 3   programs?
 4          A.       No.
 5          Q.       Have you ever received any training in
 6   connection with executions?
 7          A.       I have not.
 8          Q.       Are you currently employed?
 9          A.       Yes.
10          Q.       At what kind of -- kind of entity --
11                   (Cellphone interruption.)
12                   MS. NELSON MAJOR:  Sorry about that.
13   BY MS. NELSON MAJOR:
14          Q.       At what kind of entity are you currently
15   employed?
16          A.       Medical sales.
17          Q.       At a for-profit business?
18          A.       Yes.
19          Q.       Does that company sell pharmaceuticals?
20          A.       Yes.
21          Q.       Does it sell compounded preparations?
22          A.       No.
23          Q.       How long have you been with your current
24   employer?
25          A.       In total, about 21 years, with a
```

 1   five-year break in 2015.

 2        Q.      Was the five-year break from 2015 to

 3   2020?

 4        A.      Yes.  It would be January 2020.

 5        Q.      What is your current job title?

 6        A.      Sales representative.

 7        Q.      And what are your duties?

 8        A.      Sell medical products to various

 9   physicians.

10        Q.      And what was your employment prior to

11   this position during that 2015-to-2020 gap?

12        A.      Pharmacy owner.

13        Q.      And that's at the pharmacy that supplies

14   Tennessee Department of Correction with drugs for use

15   in lethal injection?

16        A.      Correct.

17        Q.      Now, I want to ask you a couple of

18   questions about that pharmacy.  Did you start that

19   business?

20        A.      Yes, I did.

21        Q.      By yourself?

22        A.      No.

23        Q.      Prior to founding that pharmacy, had you

24   had any experience in the pharmaceutical industry?

25        A.      Yes.

1          Q.        What was that experience?

2          A.        Marketing compounded medications.

3          Q.        Is that work that you did at your both

4    former and current employer?

5          A.        Not in relation to my current employer,

6    no.

7          Q.        Prior to starting the pharmacy in

8    question, how long had you been involved in marketing

9    compounded preparations?

10         A.        Approximately a year and a half.

11         Q.        And when you formed the pharmacy in

12   question, what were the steps that you had to take to

13   start that business?

14         A.        Recruit and hire qualified personnel and

15   obtain the proper state licensing.

16         Q.        Did you have to set up a corporate

17   entity?

18         A.        We did, yes.

19         Q.        What were your -- once the pharmacy was

20   founded, what were your duties as owner of the

21   pharmacy?

22         A.        Primarily marketing and managing

23   operations.

24         Q.        How many other owners were there?

25         A.        Three minority owners.

```
 1          Q.      What were their duties?
 2          A.      One was finance, two were passive.
 3          Q.      What do you mean by "passive?"
 4          A.      They had no responsibilities or duties to
 5    the pharmacy.
 6          Q.      Were you the only owner who was involved
 7    in marketing?
 8          A.      The only owner, yes.
 9          Q.      And the only owner that was involved in
10    managing operations, as you put it?
11          A.      No.
12          Q.      How many other owners were involved in
13    managing operations?
14          A.      One.
15          Q.      And what did managing operations entail?
16          A.      Ensuring adequate staff, licensing
17    regulations, and general business management;
18    marketing, advertising, et cetera.
19          Q.      Without naming names, did anyone at the
20    pharmacy report to you?
21          A.      Yes.
22          Q.      Who?  Without naming names under the
23    rules, please.
24          A.      The pharmacist and the con- -- controller
25    and the marketing team.
```

```
 1          Q.      How often were you physically present at
 2   the pharmacy?
 3          A.      Every day.
 4          Q.      Was being owner your full-time job?
 5          A.      Yes, it was.
 6          Q.      Were you responsible for hiring staff?
 7          A.      Nonpharmacy qualified staff.  So
 8   controller, yes; marketing personnel, yes.
 9          Q.      Was somebody else responsible for hiring
10   pharmacy staff?
11          A.      Yes.
12          Q.      Without naming any names, who was that
13   person?
14          A.      The Pharmacist in Charge.
15          Q.      Again, without naming names, who was
16   responsible for hiring the Pharmacist in Charge?
17          A.      The pharmacy owners.
18          Q.      As part of your duties, did you verify
19   staff compliance with licensing requirements?
20          A.      That would have been the responsibility
21   of the Pharmacist in Charge.
22          Q.      Who verified the Pharmacist in Charge's
23   licensing?
24          A.      The pharmacy owners.
25          Q.      Were you responsible for ensuring
```

```
 1    compliance with industry standards?
 2         A.      Along with the Pharmacist in Charge, yes.
 3         Q.      Did you observe the actual filling of
 4    prescriptions as Pharmacy Owner?
 5         A.      From time to time, yes, I would see them
 6    filling prescriptions.
 7         Q.      Were those observations casual?
 8         A.      Yes.
 9                 MR. SUTHERLAND:  Object to the form.
10    BY MS. NELSON MAJOR:
11         Q.      As an owner, did you share in the profits
12    that the pharmacy made?
13         A.      Yes.
14         Q.      During your tenure, did the pharmacy sell
15    commercially manufactured drugs?
16         A.      Yes.
17         Q.      And what is your understanding of the
18    term "commercially manufactured drug?"
19         A.      My understanding is that a commercially
20    manufactured drug is a drug produced by large
21    pharmaceutical manufacturers for the sale to the
22    general public.
23         Q.      And during your tenure, did the business
24    sell compounded drugs?
25         A.      Can you repeat that?
```

```
 1          Q.        During your tenure with the pharmacy, did
 2    the pharmacy sell compounded preparations?
 3          A.        Yes.
 4          Q.        And what is your understanding of a
 5    compounded preparation?
 6          A.        One or more drugs compounded, or -- or is
 7    mixed together, if you want to put it that way, to
 8    either alter the strength, quality, or delivery of a
 9    drug mechanism.
10          Q.        During your tenure, the did pharmacy
11    manufacture active pharmaceutical ingredients?
12          A.        No.
13          Q.        And what is your understanding of the
14    term "active pharmaceutical ingredient?"
15          A.        It's a bulk compound which is a primary
16    ingredient in a specific medication.
17          Q.        If you could approximate, what portion of
18    the pharmacy's business during your tenure consisted of
19    compounding?
20          A.        It varied.  In the early days of the
21    pharmacy, it was 90 percent of our business.  At my
22    departure, it was maybe 20 to 30 percent.
23          Q.        Why did it change?
24          A.        Insurance reimbursement.
25          Q.        Can you explain that?
```

**Gibson Court Reporting**

1      A.      Medical insurance.  Pharmacy benefits
2  would no longer cover compounded medication.
3      Q.      Do you have an understanding of why they
4  would no longer cover that?
5      A.      I do not.  That would have to be an --
6              MR. SUTHERLAND:  Object to the form.
7              THE WITNESS:  -- insurance question.
8  BY MS. NELSON MAJOR:
9      Q.      During your tenure, were the drugs in the
10  pharmacy compounded subject to good manufacturing
11  practice requirements, or CGMPs?
12      A.      Yes.
13      Q.      During your tenure, was the pharmacy
14  inspected by the FDA?
15      A.      It was not.
16      Q.      During your tenure, was the pharmacy
17  registered with the FDA as a 503(b) facility?
18      A.      It was not.
19      Q.      During your tenure, was the pharmacy
20  inspected by the state Board of Pharmacy in which it
21  was located?
22      A.      Yes.
23      Q.      How often?
24      A.      I don't recall.  Once a year.
25      Q.      During your tenure, was the pharmacy ever

1  issued a negative finding during one of those
2  inspections?
3        A.      No.
4        Q.      When did you leave the pharmacy?
5        A.      December 2019.
6        Q.      What were your reasons for leaving?
7        A.      New pharmacy ownership terminated my
8  management agreement.
9        Q.      Why did they terminate your management
10  agreement?
11       A.      They no -- no longer needed me to manage
12  the pharmacy.
13       Q.      Since leaving the pharmacy in December of
14  2019, have you had any contacts with anyone else at the
15  pharmacy?
16       A.      No.
17       Q.      Since leaving the pharmacy in December of
18  2019, have you had any contact with anyone associated
19  with the Tennessee Department of Correction?
20       A.      Only the Drug Procurer.
21       Q.      How often have you had contact with the
22  Drug Procurer since leaving the pharmacy?
23       A.      Very seldom.  Maybe three times.
24       Q.      What did you discuss during those
25  meetings with the Drug Procurer?

**Gibson Court Reporting**

1     A.     Continued sourcing efforts for the

2 Department of Correction of Tennessee and to be

3 notified of an upcoming deposition.

4     Q.     When did those conversations happen?

5     A.     The first one, early in 2020.  And the

6 most recent was three weeks ago, four weeks ago.

7     Q.     The conversation that happened three or

8 four weeks ago, what did you discuss at that point?

9     A.     The Drug Procurer asked if I would be

10 willing to come up to Nashville to give a deposition in

11 this case, and what dates worked best, and my

12 availability.

13     Q.     Did you talk about the substance of your

14 testimony?

15     A.     No.

16     Q.     The conversation that you had in early

17 2020, what was topic of that conversation?

18     A.     The topic was whether or not I would be

19 willing and able to continue to assist in sourcing

20 chemicals for lethal injection for the Department of

21 Correction.

22     Q.     And what did you say to that request?

23     A.     I agreed that I would help.

24     Q.     What drugs did the Drug Procurer ask you

25 to look into during that conversation?

1    A.    Specific -- specifically, vecuronium

2    bromide comes to mind, but I can't be certain that was

3    the only one.

4    Q.    Did the Drug Procurer offer to pay you a

5    sum of money to continue that search?

6    A.    Yes.

7    Q.    How much?

8    A.    I don't know that a dollar amount was

9    ever established.  I can't recall.

10    Q.    Was there an exchange of contracts?

11    A.    I don't know that I ever received one.

12    Q.    Did the Drug Procurer tell you whether

13    they were interested in compounded or commercially

14    available vecuronium bromide during that conversation?

15    A.    I don't recall.

16    Q.    During that conversation, did the Drug

17    Procurer -- Procurer ask you to look into the

18    availability of pentobarbital?

19    A.    I don't recall that, no.

20    Q.    You said you had had three conferences

21    with the Drug Procurer; early 2020, one three or four

22    weeks ago.  When was the third conversation?

23    A.    There were multiple conversations.  The

24    third would have been in early 2020.

25    Q.    When you say "multiple conversations,"

```
 1   are you saying there were more than the three times you
 2   talked to the Drug Procurer?
 3        A.       No, "multiple" meaning the two.
 4        Q.       Was that other conversation also about
 5   vecuronium bromide?
 6        A.       Yes.
 7        Q.       Were those conversations over the phone?
 8        A.       They were.
 9        Q.       Did you exchange any emails?
10        A.       Not that I can remember.
11        Q.       Did the Drug Procurer tell you why he was
12   contacting you, rather than the pharmacy?
13        A.       Not that I can remember, no.
14        Q.       Did the Drug Procurer indicate to you
15   that the Tennessee Department of Correction was
16   currently unable to locate vecuronium bromide?
17        A.       Yes.
18        Q.       And as a result of those conversations,
19   what did you do?
20        A.       Not much.  I was in the process of trying
21   to find new employment.  And it was right in the
22   beginning of the pandemic, so there wasn't a lot going
23   on.
24        Q.       Did you make any efforts to locate
25   vecuronium -- excuse me -- vecuronium bromide?
```

**Gibson Court Reporting**

```
 1                    I think you might have been on mute when
 2    you answered.
 3           A.       Sorry.  There you go.
 4                    Not much of an effort.  I think I made
 5    one phone call.
 6           Q.       Without naming names, who did you call?
 7           A.       An associate pharmacy.
 8           Q.       And what did the associate pharmacy tell
 9    you?
10           A.       They couldn't help.
11           Q.       Are you currently looking for vecuronium
12    bromide for the Tennessee Department of Correction?
13           A.       I am not.
14           Q.       Have you discussed your upcoming
15    deposition with the pharmacist at your former pharmacy?
16           A.       I have not.
17           Q.       When did you first have contact with
18    someone from the Tennessee Department of Correction
19    related to executions?
20           A.       Sometime around the end of 2017,
21    beginning of 2018.
22           Q.       If I refer to the Tennessee Department of
23    Correction as "TDOC," will that be clear to you?
24           A.       Yes.
25           Q.       Were you the first person at your
```

1  pharmacy to have contact with TDOC?

2       A.      Yes, I was.

3       Q.      Without naming their name, what was the

4  position of the person from TDOC who first contacted

5  you?

6       A.      Their position?

7       Q.      Their position with TDOC.

8       A.      Drug Procurer.

9       Q.      And when did the Drug Procurer first

10 reach out to you, if you recall?

11      A.      End of 2017, beginning of 2018.

12      Q.      Was that contact over email?

13      A.      Phone calls, I remember.

14      Q.      Did the Drug Procurer tell you why they

15 contacted your particular pharmacy?

16      A.      Yes.

17      Q.      What was that reason?

18      A.      They were looking for a compounding

19 pharmacy to provide them with lethal injection drugs.

20      Q.      Did the Drug Procurer tell you how he --

21 how they found your pharmacy in particular?

22      A.      I don't recall.

23      Q.      Did the Drug Procurer mention particular

24 drugs during that conversation?

25      A.      Yes.

```
 1          Q.      Which drugs?
 2          A.      Pentobarbital, midazolam, vecuronium
 3   bromide, and potassium chloride.
 4          Q.      And the Drug Procurer told you that they
 5   were specifically -- specifically looking for
 6   compounded preparations?
 7          A.      No.
 8          Q.      Did the Drug Procurer ask you to do
 9   something?
10          A.      I'm a little confused with the question.
11   Asked me to do something in specific?
12                  MR. SUTHERLAND:  Object.  Object to the
13          form.
14   BY MS. NELSON MAJOR:
15          Q.      The Drug Procurer mentioned four drugs to
16   you.  Did the Drug Procurer ask you to look into the
17   availability of those drugs?
18          A.      Yes.
19          Q.      Did the Drug Procurer ask whether the
20   pharmacy was willing to provide those drugs to TDOC for
21   use in executions?
22          A.      Yes.
23          Q.      And what was your answer?
24          A.      The answer was initially yes, if we can
25   get licensed in Tennessee.
```

```
 1          Q.      Did you make that decision by yourself?
 2          A.      No.
 3          Q.      Who did you make that decision with?
 4          A.      The pharmacy ownership group.  And I also
 5   consulted with our Pharmacist in Charge.
 6          Q.      Did you have any concerns about the
 7   pharmacy providing drugs to TDOC for use in executions?
 8                  MR. SUTHERLAND:  I'm going to object to
 9          the form.  You can answer.
10                  THE WITNESS:  I did not.
11   BY MS. NELSON MAJOR:
12          Q.      Did anyone else in that decision-making
13   team express concerns to you about providing drugs to
14   TDOC for use in executions?
15                  MR. SUTHERLAND:  Same objection.  You can
16          answer.
17                  THE WITNESS:  Nothing was expressed to
18          me.
19   BY MS. NELSON MAJOR:
20          Q.      What is your position on the death
21   penalty?
22                  MR. SUTHERLAND:  Objection to form.  You
23          can answer.
24                  THE WITNESS:  I'm for the death penalty.
25   BY MS. NELSON MAJOR:
```

```
 1            Q.      How did you arrive at that position?
 2                    MR. SUTHERLAND:  Same objection.
 3                    THE WITNESS:  My belief in capital
 4        punishment?
 5  BY MS. NELSON MAJOR:
 6            Q.      Yes.
 7            A.      How I arrived at that?  I really don't
 8  know how to answer that to you.  I would imagine it's
 9  probably part of my upbringing.
10            Q.      Did the Drug Procurer give you
11  instructions on how to look for those four drugs?
12            A.      No.
13            Q.      What did you do to look for those four
14  drugs?
15                    MR. SUTHERLAND:  You can -- you can
16        answer the question without identifying specific
17        sources or individuals or companies that you --
18                    THE WITNESS:  We searched a number of
19        drug suppliers that we use for the pharmacy, and
20        even some that we don't use but that are known
21        drug suppliers.
22  BY MS. NELSON MAJOR:
23            Q.      When you say "we," who is "we?"
24                    MR. SUTHERLAND:  Don't identify anyone by
25        name.
```

```
 1                 THE WITNESS:  Myself, the Pharmacist in
 2        Charge.
 3  BY MS. NELSON MAJOR:
 4        Q.     Was the Pharmacist in Charge the same
 5  person -- the same person throughout your entire tenure
 6  with the pharmacy?
 7        A.     No.
 8        Q.     When did the Pharmacist in Charge change?
 9        A.     I can't recall the exact date.  Maybe
10  sometime in 2017.
11        Q.     Specifically about your search for
12  pentobarbital, did you contact other pharmacies?
13        A.     No.
14        Q.     Did you contact other suppliers?
15        A.     Yes.
16        Q.     How did you make those contacts?
17        A.     Phone calls.
18        Q.     How many suppliers did you contact in
19  your research for pentobarbital?
20        A.     I can't recall.  Several.
21        Q.     Less than five?
22        A.     More than five.
23        Q.     More than ten?
24               MR. SUTHERLAND:  Object to the form, and
25        all the -- all this line of questioning.  Same
```

```
 1         objection.
 2                   THE WITNESS:  Yes, more than ten.
 3    BY MS. NELSON MAJOR:
 4         Q.      More than 20?
 5         A.      I'm not sure.
 6         Q.      Did you document the pharmacies that you
 7    contacted in any way?
 8         A.      I didn't contact any pharmacies; so, no.
 9         Q.      Did you document the suppliers that you
10    contacted?
11         A.      I kept a list at the time, yes.
12         Q.      And over the course of how many days did
13    you make these contacts?
14                   MR. SUTHERLAND:  Object to the form.
15                   THE WITNESS:  I don't know that.
16    BY MS. NELSON MAJOR:
17         Q.      Was it several months?
18         A.      Possibly, yes.
19         Q.      How many suppliers did the Pharmacist in
20    Charge contact?
21         A.      I do not know.
22                   MR. SUTHERLAND:  Object to the form.
23    BY MS. NELSON MAJOR:
24         Q.      Did the Pharmacist in Charge discuss with
25    you their efforts to look for pentobarbital?
```

1      A.      Yes.

2      Q.      When you were contacting suppliers, did

3  you tell the supplier you were looking for commercially

4  manufactured pentobarbital?

5              MR. SUTHERLAND:  Object to form.  You can

6         answer.

7              THE WITNESS:  Yes.

8  BY MS. NELSON MAJOR:

9      Q.      Did you tell them that you were also

10  interested in pentobarbital API?

11      A.      That would depend on the supplier I was

12  talking to.

13      Q.      So for some suppliers you did ask about

14  pentobarbital API?

15      A.      Yes.

16      Q.      How did you make the decision about which

17  pharmacies to ask about pentobarbital API?

18              MR. SUTHERLAND:  Object to the form.  You

19         can answer.

20              THE WITNESS:  I did not ask pharmacies

21         about APIs.

22  BY MS. NELSON MAJOR:

23      Q.      Excuse me.  How did you make the decision

24  about which suppliers to ask about pentobarbital API?

25      A.      Some suppliers sell APIs.  Those are

1  known suppliers.  And some suppliers sell commercially

2  manufactured pentobarbital.

3      Q.      And how do you know that information

4  about the suppliers?

5              You're on mute, Pharmacy Owner.

6      A.      We know through our vendors who we

7  purchase -- the pharmacy would purchase commercially

8  manufactured drugs versus vendors that we used for our

9  compounding business.  We -- we knew who supplied APIs

10  and we knew who supplied commercially manufactured

11  drugs.

12      Q.      When you made these phone calls, did you

13  tell them the amount of pentobarbital that you were

14  looking for?

15      A.      Yes.

16      Q.      What was that amount?

17      A.      I can't recall what the exact amount is.

18      Q.      Do you have a general recollection of

19  what the amount was?

20      A.      Whatever was required for Protocol A.

21      Q.      So you were looking for enough

22  pentobarbital for one execution when you made the phone

23  calls to the suppliers?

24      A.      I'm sure not.

25      Q.      Can you explain that?

1    A.    In order for us to validate and test

2  product, the compounded product, we would need more

3  than what's required by Protocol A.  So I'm not sure of

4  the exact number we were looking for, but enough to --

5  enough for Protocol A, plus whatever we needed to test

6  the batch.

7    Q.    Did the Drug Procurer instruct you on an

8  amount to ask about when contacting suppliers?

9    A.    No.

10    MR. SUTHERLAND:  Object to the form.

11  BY MS. NELSON MAJOR:

12    Q.    When you contacted the suppliers, did you

13  tell them what you were planning to use the

14  pentobarbital for?

15    A.    In compounding, yes.

16    Q.    Did you tell the suppliers that you

17  intended to provide it to the Tennessee Department of

18  Correction for use in executions?

19    MR. SUTHERLAND:  Objection to the form.

20    You can answer.

21    THE WITNESS:  No.

22  BY MS. NELSON MAJOR:

23    Q.    Did you search any databases during this

24  initial search?

25    A.    No, not that I can....

```
 1          Q.        Are you aware of whether the Pharmacist
 2    in Charge searched any databases?
 3          A.        I am not.
 4          Q.        Did this search for pentobarbital
 5    continue into 2018?
 6          A.        Yes.
 7          Q.        Did you discuss your efforts with the
 8    Drug Procurer?
 9          A.        Yes, I did.
10          Q.        How?  Over the phone, or email?
11          A.        Probably both.
12          Q.        And what did you relay to the Drug
13    Procurer about those efforts?
14          A.        That we couldn't get pentobarbital.
15          Q.        How often did you update the Drug
16    Procurer?
17          A.        I don't recall.  I think we had monthly
18    conversations.
19          Q.        Did any of the suppliers indicate to you
20    that they had pentobarbital in an amount lesser than
21    the one you had inquired about?
22          A.        Yes.
23          Q.        I'm sorry, I couldn't quite catch your
24    answer.
25          A.        Yes.
```

1    Q.    Do you recall how much pentobarbital that
2  supplier indicated to you that they could provide you
3  with?
4    A.    No.
5    Q.    Was it more than one supplier that
6  indicated to you that they would provide you with
7  pentobarbital, but not at the amount that you had
8  requested?
9    A.    Several of them had the availability of
10  pentobarbital.
11    Q.    Did you relay that information to the
12  Drug Procurer?
13    A.    Yes.
14    Q.    What was the Drug Procurer's response?
15    A.    "Can we order it?"
16    Q.    And did you in fact order the
17  pentobarbital?
18    A.    We could not.
19    Q.    Why could you -- why could the pharmacy
20  not order the pentobarbital?
21    A.    The drug supplier required a signed
22  affidavit that it not be used in executions.
23    Q.    Was that true of all of the drug
24  suppliers that indicated to you that they had
25  pentobarbital but not at the amount that you required?

```
1          A.      Yes.
2          Q.      Could you please pull up Exhibit 13.
3   Take a minute to look it over once you have it up.
4                  (Witness reviews document.)
5                  THE WITNESS:  Okay.  I'm familiar with
6          it.
7   BY MS. NELSON MAJOR:
8          Q.      Did you write or receive any of these
9   emails?
10         A.      I wrote that email.
11         Q.      At the bottom of the first page, there's
12  an email from July 20th, 2017, at 12:19 p.m.  Do you
13  see that?
14                 Pharmacy Owner, do you see that email at
15  the bottom of the first page?
16         A.      Yes, I do.
17         Q.      It states:  "Has there been any positive
18  progress on your end?"  Did you write this email?
19         A.      That one, no.
20         Q.      Did the Drug Procurer write this email to
21  you?
22         A.      Yes.
23         Q.      What was your understanding of what the
24  Drug Procurer was asking you about?
25                 MR. SUTHERLAND:  Object to the form.
```

```
1              THE WITNESS:  My understanding is he was
2         asking how the search for pentobarbital was going.
3  BY MS. NELSON MAJOR:
4         Q.      And was your response to that email at
5  the top of the page at 5:05 p.m.?
6         A.      Yes, that's my response.
7         Q.      And you wrote:  "I have some news on the
8  pento.  It's not good.  I had the DEA invite me over to
9  discuss it."
10             What was the news on pento?
11        A.      That we could not import it from outside
12 of the United States.
13        Q.      Is that what the DEA told you?
14        A.      Yes.
15        Q.      How did the DEA invite you over?
16        A.      We were in the process of opening
17 multiple pharmacy locations and applied for several DEA
18 licenses, and they asked to interview me.
19        Q.      When did you meet with the DEA?
20        A.      I don't recall the date.
21        Q.      When they asked to meet with you, did
22 they tell you why?
23        A.      Yes.
24        Q.      And what was that?
25        A.      They wanted to interview me regarding the
```

1  multiple DEA licenses that we were applying for.

2      Q.      Did that meeting happen in person?

3      A.      Yes, it did.

4      Q.      At that meeting, did you volunteer

5  information about the efforts you were making on behalf

6  of TDOC?

7      A.      I did not.

8      Q.      Were you the only person from your

9  pharmacy who attended that meeting?

10     A.      Yes.

11     Q.      Was there anyone else present there?

12     A.      Several DEA officers.

13     Q.      If you did not volunteer information

14  about the efforts you were making on behalf of TDOC,

15  how was the DEA, if you know, aware of those efforts?

16     A.      I asked the DEA what the status would

17  be -- or on the importation of pentobarbital from

18  outside the United States.

19     Q.      Did you tell the DEA that you were

20  inquiring about pentobarbital for use in executions?

21     A.      No, I did not.

22     Q.      How long was that meeting?

23     A.      30, 45 minutes.

24     Q.      And what was the DEA's response to that

25  inquiry you just described?

**Gibson Court Reporting**

```
 1          A.      That pentobarbital is available in the
 2   United States and therefore cannot be imported.
 3          Q.      During that conversation, did you inquire
 4   about importation of pentobarbital API?
 5          A.      No.
 6          Q.      Is that the only contact you had with the
 7   DEA related to your efforts to import pentobarbital?
 8                  MR. SUTHERLAND:  I'm going to object to
 9          the form.  The witness hasn't said that was the
10          purpose of the contact.
11                  THE WITNESS:  Right.  The purpose of my
12          visit with the DEA was regarding our multiple
13          pharmacy locations.  It was a sidebar question.
14   BY MS. NELSON MAJOR:
15          Q.      Did you indicate to the pharmacy --
16   excuse me, the DEA -- what the purpose of the
17   pentobarbital would be at all?
18          A.      I did not.
19          Q.      What did you tell the Drug Procurer about
20   the meeting?
21          A.      I told the Drug Procurer that I would not
22   be able to import pentobarbital.
23          Q.      Did you tell the Drug Procurer that you
24   did not tell the DEA about the intended purpose of the
25   pentobarbital?
```

1    A.    I don't recall that, no.

2    Q.    You don't recall, or you don't believe

3  that you did?

4    A.    I don't believe that I did.

5    Q.    Did you do any other further research

6  regarding the possibility of importing pentobarbital?

7    A.    No.

8    Q.    Can you pull up Exhibit 6, please.

9          Have you seen this email before?

10    A.    I can't recall if I've seen that one or

11  not.  It doesn't look familiar.

12    Q.    At some point, did the Drug Procurer

13  convey to you that TDO- -- TDOC had made a decision to

14  pursue a three-drug midazolam protocol?

15    A.    Yes.

16    Q.    Can you pull up Exhibit 7, please.  And

17  turn to the second page when you have it open, please.

18    A.    Okay.

19    Q.    On the second page, there's an email

20  dated 12:58 p.m.  Did you write this email?

21    A.    Yes, I did.

22    Q.    And who did you send this email to?

23    A.    Drug Procurer.

24    Q.    And this email subject is "Update" --

25  although the T and the A are transposed.

```
 1                    At the beginning of your email, you write:
 2      "That stuff is readily available with potassium
 3      chloride."  What is "that stuff?"
 4           A.      I don't recall that.
 5           Q.      Reading on, it says:
 6                    "I reviewed several protocols from other
 7                    states that currently use that method.
 8                    Most have a three-drug protocol including a
 9                    paralytic, potassium chloride.  Here is my
10                    concern with midazolam."
11                    Does that refresh your recollection as to
12      what "that stuff" in the first sentence is referring to?
13           A.      It does not.
14           Q.      You write that you reviewed several
15      protocols from states that currently use that method.
16      What states' protocols did you review?
17           A.      I don't recall.
18           Q.      Were they protocols for lethal injection
19      executions?
20           A.      Yes, they were.
21           Q.      How did you get access to those
22      protocols?
23           A.      Google searching
24           Q.      Why did you review other states'
25      protocols?
```

1      A.      To search what other states were doing.

2      Q.      Did the Drug Procurer ask you to review

3  any protocols from other states?

4      A.      I don't remember.

5      Q.      Were you reviewing protocols of states

6  that use a particular method of lethal injection?

7      A.      Nothing specific, just lethal injection.

8      Q.      And then you write further:

9              "Here is my concern with midazolam.  Being

10             a benzodiazepine, it does not elicit strong

11             analgesic effects.  The subjects may be

12             able to feel pain during the administration

13             of the second and third drugs, potassium

14             chloride especially."

15     Q.      Did the Drug Procurer ask you whether you

16  had any concerns about midazolam?

17     A.      Not that I can recall.

18     Q.      How did you arrive at these concerns?

19     A.      I think it's been the position of

20  opponents of capital punishment for years.  It's in

21  several news articles that I read.  It's kind of the --

22  it's been a standard in the argument for years.

23     Q.      Why did you express concerns about the

24  potassium chloride in particular?

25     A.      Again, those were arguments being made

1    against other departments of corrections.

2         Q.    Did the Drug Procurer respond to your

3    concerns that you raised in this email?

4         A.    Not that I recall.

5         Q.    Did you discuss it on the telephone?

6         A.    Not that I recall.

7         Q.    Did anyone else at TDOC ever discuss with

8    you the concerns you had about -- that you expressed in

9    this email?

10        A.    No.

11        Q.    The email continues:  "Consider the use

12   of an alternative like ketamine, or use in conjunction

13   with an opioid."

14              Why did you suggest ketamine?

15        A.    Those were drugs being used in other

16   states.

17        Q.    Why did you suggest adding an opioid?

18        A.    The argument is that midazolam is a

19   benzodiazepine and has no analgesic effect.  I

20   suggested an opioid, again, because that was something

21   being done in other states and it is an analgesic.

22        Q.    Did you ever discuss the possibility of

23   TDOC using ketamine with the Drug Procurer?

24        A.    Other than that email, no.

25        Q.    Did you have any other conversations

1   about the addition of an opioid?

2        A.     Not that I can recall.

3        Q.     All right.  Will you please pull up

4   Exhibit 8.  It's an email chain from the same date,

5   September 7, 2017.

6             If you look at the bottom of the page --

7        A.     Okay.

8        Q.     -- there's an email dated 12:33 p.m.,

9   which says:

10            "Well, as you say, it'll probably be good

11            to see what other options are readily

12            available, other than midazolam; like

13            etomidate, ketamine, sodium thiopental, et

14            cetera."

15            Did the Drug Procurer write this email to

16  you?

17       A.     Yes.

18       Q.     Did you look into the availability of

19  these three drugs in response to the Drug Procurer's

20  email?

21       A.     I did.

22       Q.     There's an email at the top of the page

23  from 1:39.  Was this your response?

24       A.     Yes, it was.

25       Q.     It says, you wrote:  "Etomidate, limited

```
 1    supply."  What does "limited supply" mean?
 2                  MR. SUTHERLAND:  Object to the form.
 3                  THE WITNESS:  I can't recall.  Typically,
 4         it would mean that the availability is low, not
 5         enough supply.
 6    BY MS. NELSON MAJOR:
 7         Q.     And "Ketamine, ample supply."  What did
 8    you mean by "ample supply?"
 9                  MR. SUTHERLAND:  Object to the form.  You
10         can answer.
11                  THE WITNESS:  It's readily available.
12    BY MS. NELSON MAJOR:
13         Q.     And why did you write that sodium
14    thiopental was no longer available?
15         A.     It was an older drug and no longer being
16    manufactured.
17         Q.     What quantities were you looking for when
18    you did this search?
19         A.     I don't recall.
20         Q.     How did you determine the availability of
21    these three drugs?
22         A.     Through our vendors.
23         Q.     Did you call vendors?
24         A.     Call vendors?  Yes.
25         Q.     Did you do anything else?
```

**Gibson Court Reporting**

1          A.          Searched our -- our vendor -- our vendor
2    portal.  Our vendor portal.
3          Q.          Is the vendor portal a database that the
4    pharmacy maintained?
5          A.          No.
6          Q.          Is it maintained by a separate entity?
7          A.          Drug distributors.
8          Q.          Does that vendor portal have both
9    commercially manufactured and APIs listed?
10         A.          I'm not sure.  I know it has commercially
11   manufactured.
12         Q.          When you searched that portal, do you
13   have to enter in an amount of the drug that you're
14   looking for?
15         A.          No.
16         Q.          Did the pharmacy just use one portal or
17   were there multiple portals?
18         A.          Multiple.
19         Q.          How many?
20         A.          I don't know.
21         Q.          Were all of the portals available limited
22   to commercially manufactured drugs?
23         A.          No.
24         Q.          How many of the portals included API?
25         A.          I don't know.

1      Q.      If you were looking for an API in

2   particular, was there a particular database that you

3   would consult?

4      A.      We did have primary vendors for our APIs,

5   so we would go to those guys first.

6      Q.      When you say -- when you say go to them

7   first, do you mean call them first?

8      A.      No.  We would search them first, whether

9   it's a phone call or whatever the preferred method was.

10     Q.      In the Drug Procurer's initial email to

11  you in Exhibit 8, the Drug Procurer writes:

12  "Etomidate, ketamine, sodium thiopental, et cetera."

13  Did you take that as directions to look for drugs other

14  than the ones listed in that email?

15     A.      I did not.

16     Q.      So the search in response to that email

17  was limited to etomidate, ketamine, and sodium

18  thiopental?

19     A.      Yes.

20     Q.      Can you please pull up Exhibit 9.  And

21  take a look at the email that begins on the bottom of

22  the first page and carries over to the second page.

23  It's timestamped 8:44 a.m.

24             Did you write any portions of this email?

25     A.      No.

1     Q.     Did the Drug Procurer write this email?

2     A.     I'm not sure.

3     Q.     Maybe we can take it a piece at a time

4  and see if you recall any of the portions.

5            The initial paragraph of the email says:

6            "So the word from the powers that be is

7            that we want to move forward with ordering

8            the items for a three-drug protocol,

9            including midazolam, vecuronium bromide,

10           and potassium chloride."

11           After reading that, do you recall whether

12  the Drug Procurer wrote that?

13     A.     I don't know if it was the Drug Procurer.

14  I don't know.  I just can't recall.

15     Q.     Do you recall whether it was someone from

16  TDOC, regardless of position?

17     A.     I don't.

18           MS. NELSON MAJOR:  Maybe this would be a

19        good point to stop and take a ten-minute break.

20        We've been going for about an hour straight.  We

21        can come back at 20 after, if that's okay with

22        you, Mr. Sutherland?

23           MR. SUTHERLAND:  It is, Ms. Nelson Major.

24        Thank you.

25           THE VIDEOGRAPHER:  We're off the record

```
 1              at 11:09 a.m.
 2                    (Recess at 11:09 a.m. to 11:21 a.m.)
 3                    THE VIDEOGRAPHER:  We are back on the
 4              record at 11:21 a.m.
 5    BY MS. NELSON MAJOR:
 6         Q.        Pharmacy Owner, we are still looking at
 7    Exhibit 9, that second page.  You testified that you
 8    don't recall whether the Drug Procurer wrote this email
 9    or not.
10              Do you recall whether you received this
11    email at some point or not?
12         A.        Yes.
13         Q.        You do recall receiving this email?
14         A.        Yes.
15         Q.        So the first paragraph states, as we just
16    talked about, that:
17                    "The word from the powers that be is that
18                    we want to move forward with ordering items
19                    for a three-drug protocol, including
20                    midazolam, vecuronium, and potassium
21                    chloride."
22                    What was your understanding of that
23    statement?
24         A.        That they were ready to proceed with
25    ordering drugs for lethal injection.
```

```
1          Q.      And particularly, the three drugs listed?
2          A.      Yes.
3          Q.      And then the next paragraph states that:
4    "The protocol calls for the following dosages."  And
5    No. 1 is:
6                  "5-gram doses of midazolam.  Our previous
7                  protocol called for 5 grams of sodium
8                  thiopental, so we intend to do 5 grams of
9                  midazolam.
10                 Does that need to be compounded and of a
11                 certain concentration-slash-purity, based
12                 on what you have seen in other protocols?"
13                 Was that a question posed to you?
14         A.      Yes.
15         Q.      And then the next sentence states:
16                 "5 grams seems like a lot.  It is 10 times
17                 the amount used by other states.  The
18                 protocols I reviewed for Arkansas, Ohio,
19                 and Virginia call for only 500 milligrams
20                 of midazolam.  Highest concentration
21                 available is 5 milligrams per ml in 10-l"
22                 -- "10-ml vials.  You would need 10 vials."
23                 Is that the response that you wrote in
24    response to that question?
25         A.      Yes.
```

1    Q.      Were you recommending that the TDOC use
2    500 milligrams of midazolam instead of 5 grams?
3                MR. SUTHERLAND:  Object to the form.
4                THE WITNESS:  I was making no
5          recommendations.
6    BY MS. NELSON MAJOR:
7    Q.      Was it your opinion that 5 milligrams was
8    an inappropriate dose in light of what you had reviewed
9    from other states?
10               MR. SUTHERLAND:  Object to the form.
11               THE WITNESS:  5 milligrams would have
12         been inappropriate, I believe, for anyone.
13   BY MS. NELSON MAJOR:
14   Q.      And 5 milligrams or 5 grams?
15   A.      I thought you asked 5 milligrams.
16   Q.      I'm sorry, I misspoke, then.  Was it your
17   opinion that 5 grams was an inappropriate dose?
18               MR. SUTHERLAND:  Object to the form.
19               THE WITNESS:  I have no opinion, one way
20         or the other.
21   BY MS. NELSON MAJOR:
22   Q.      What was your intent in providing this
23   information to TDOC?
24   A.      Just to point out what other states were
25   doing.

1     Q.      Why did you review protocols from
2  Arkansas, Ohio, and Virginia?
3     A.      It was part of the research that I had
4  done for the three-drug cocktail.
5     Q.      Had you reviewed any execution protocols
6  prior to your involvement with TDOC?
7     A.      No.
8     Q.      How did you know the highest
9  concentration of midazolam available?
10           MR. SUTHERLAND:  Object to the form.
11           THE WITNESS:  I only know what the drug
12       suppliers have that's commercially available
13       stock.
14  BY MS. NELSON MAJOR:
15     Q.      So the highest concentration is something
16  you found by contacting the drug suppliers?
17     A.      I don't believe I contacted the drug
18  suppliers for their strength.
19     Q.      Then how would you know the available
20  strength?
21     A.      I can't recall how I looked that up.
22  Yeah, I can't recall how I looked it up.
23     Q.      And No. 2 states:  "100 milligrams, 1
24  milligram per 1-ml dose of vecuronium available as
25  powder and 1 milligram per ml in 10-ml vials."

```
 1                    And then the response is:  It would need to
 2      be reconstituted and you would need 10 vials."
 3                    Did you write that response?
 4          A.       I did.
 5          Q.       What does "reconstitute" means?
 6          A.       Changed from a crystalline form or a
 7      powder form to an aqueous solution for injection.
 8          Q.       How did you know that the vecuronium
 9      needed to be reconstituted?
10          A.       It was in the package insert.
11          Q.       Had you consulted a package insert in
12      writing this response?
13          A.       Yes.
14          Q.       Did the pharmacy have vecuronium on hand?
15          A.       I don't recall if we had any in-house at
16      this time.
17          Q.       No. 3 states:  "100 ml of a 2 mEq-per-ml
18      concentrate dose of potassium chloride."  And it
19      states:  "Typical dosing is 240 mEq.  Strengths
20      available are 2 mEq per ml in 20-ml vials.  You will
21      need six."
22                    What did you mean by "typical dosing?"
23          A.       Dosing that was used in other states.
24          Q.       And again, how did you know the available
25      strengths?
```

```
 1          A.      I don't recall how I looked that up,
 2    either.
 3          Q.      How did you know how many vials would be
 4    needed?
 5          A.      Well, I knew what vials were available.
 6          Q.      After the discussion of doses that we
 7    just went through, the next question is posed halfway
 8    down the page.  It states:  "We would like to order
 9    enough of the above for 20 inmates.  Can that be done?
10    What would the cost be?"
11                  Are those questions that were posed to you?
12          A.      Yes.
13          Q.      The response states:  "The only problem I
14    see will be with vecuronium.  It goes on back order
15    often.  Supply is usually limited."
16                  Did you write that response?
17          A.      Yes.
18          Q.      How did you know that the supply of
19    vecuronium goes on back order often?
20          A.      Information came from a drug supplier.
21          Q.      Further on toward the bottom of the email
22    there are some questions about shelf life and
23    compounding.  It's the last full paragraph on that
24    page.
25                  Did the Drug Procurer write those
```

```
1    questions to you?
2         A.      I don't know.  I'm not sure.
3         Q.      And then the response is:  "There will be
4    no need to compound unless you wanted us to prep the
5    syringes for you."
6                 Did you write that response?
7         A.      Yes.
8         Q.      Did you anticipate filling TDOC's order
9    for all three drugs with commercially available
10   versions at that point?
11        A.      If they were available, yes.
12        Q.      And did you in fact initially provide
13   TDOC with commercially available versions of all three
14   drugs?
15        A.      We did.
16        Q.      And at some point, did you switch to
17   compounded preparations for TDOC?
18        A.      Yes.
19        Q.      Did you switch to compounded preparations
20   for all three drugs?
21        A.      No.
22        Q.      Which drugs did you at some point switch
23   to compounding?
24        A.      Midazolam and the potassium chloride.
25        Q.      Outside of your contact with TDOC, how
```

```
 1    often did you discuss with a customer the
 2    concentrations and volumes necessary to fill a
 3    prescription?
 4           A.     Me, never.
 5           Q.     Who was generally responsible for these
 6    conversations?
 7           A.     The Pharmacist in Charge.
 8           Q.     Why was the Pharmacist in Charge
 9    generally responsible for those conversations?
10           A.     That's her job.
11           Q.     And outside of your contact with TDOC,
12    how often did you research the availability of
13    particular drugs for customers?
14           A.     It's not something I would normally do.
15           Q.     Other than TDOC, have you done it for
16    other customers?
17           A.     Not typically, no.
18           Q.     When you say "Not typically," was there a
19    time where you did do it for customers other than TDOC?
20           A.     I can't recall.
21           Q.     You can't recall, or you don't believe
22    you did?
23                  MR. SUTHERLAND:  Form.
24                  THE WITNESS:  I can't recall doing it for
25           other customers.
```

1   BY MS. NELSON MAJOR:

2        Q.      During your tenure with the pharmacy, how

3   often did you discuss with a customer whether a

4   particular drug was commercially manufactured or

5   available in a commercially manufactured form?

6        A.      From time to time in my marketing duties.

7        Q.      You testified that TDOC is the only

8   customer that you ever discussed concentrations and

9   volumes necessary to fill a prescription with.  Why did

10  you have that conversation with TDOC?

11       A.      Can you repeat that, please?

12       Q.      You said generally it was the Pharmacist

13  in Charge's duty to discuss concentrations and volumes

14  necessary to fill a prescription with a customer.  Why

15  did you have that conversation with TDOC?

16       A.      I was their point of contact for the

17  pharmacy.

18       Q.      Can you pull up Exhibit 47, please.  It's

19  an email chain from October 18th, 2017.  Did you write

20  or receive any of these emails?

21       A.      You said Exhibit 47?

22       Q.      Yes.

23               (Witness reviews document.)

24               THE WITNESS:  Okay.

25  BY MS. NELSON MAJOR:

1     Q.      Did you write or receive any of these

2  emails?

3     A.      Yes.

4     Q.      Who were you corresponding with?

5         MR. SUTHERLAND:  Don't identify anybody

6     by name.

7         THE WITNESS:  Drug Procurer.

8  BY MS. NELSON MAJOR:

9     Q.      At the bottom of the first page is an

10  email sent at 8:33 a.m.  Did you write this email?

11     A.      It's not familiar.

12     Q.      Further up the email -- of this email

13  chain there's an email sent at 10:47 a.m., and there's

14  a list of drugs and quantities.  Do you see that email?

15     A.      I do.

16     Q.      Did you write that email?

17     A.      Yes.

18     Q.      You wrote:  "A list of what has been

19  received from our suppliers."  And you write:

20  "Midazolam, 1,000 milligrams.  Vecuronium, 200

21  milligrams.  Potassium chloride, 2,000

22  milliequivalents."

23         What was that list?

24         MR. SUTHERLAND:  Object to the form.

25         THE WITNESS:  It was a list of drugs

```
 1            received by the pharmacy.
 2   BY MS. NELSON MAJOR:
 3        Q.      It was drugs received by the pharmacy on
 4   behalf of TDOC?
 5        A.      Yes.
 6        Q.      Were these quantities of commercially
 7   manufactured drugs?
 8        A.      Can you repeat that, please?
 9        Q.      Was this list of quantities for
10   commercially manufactured versions of the drugs?
11        A.      Yes.
12        Q.      You then write:  "I'm working on revising
13   the BAA and agreement."  What does "BAA" stand for?
14        A.      The Business Associate Agreement.
15        Q.      What is a Business Associate Agreement in
16   this context?
17        A.      An agreement between the company and TDOC
18   for providing them with pharmaceuticals.
19        Q.      What provisions does that agreement
20   contain, more specifically?
21        A.      I don't recall.  I know it had a HIPAA
22   compliance.
23        Q.      Outside of your work with TDOC, how often
24   did you draft BAAs for customers?
25        A.      I didn't draft it.
```

1      Q.      You revised it?

2      A.      I did not revise it.

3      Q.      So when you wrote, "I'm working on

4   revising the BAA and agreement," you meant something

5   else other than revising the agreement there?

6      A.      I meant that our legal counsel was

7   revising.

8      Q.      And what document were you referring to

9   when you wrote "agreement?"

10      A.      I don't recall.

11      Q.      Can you please pull up Exhibit 3.  It's

12   an email chain dated October 26th and 27th of 2017.

13   Can you please turn to the second page when you have it

14   up.

15      A.      Okay.

16      Q.      Did the Drug Procurer send this email to

17   you?

18      A.      Yes.

19      Q.      The Drug Procurer wrote to you:

20              "In addition to what you are sending me

21              today, can you break down how they all need

22              to be stored and what we will need to do

23              when the time comes to prepare it for the

24              injections."

25              What was your understanding of what the

```
1    Drug Procurer was asking you to do?
2                MR. SUTHERLAND:  Sorry.  Ms. Nelson
3        Major, can you reorient me to this?  Oh, never
4        mind.  I've got it.
5                MS. NELSON MAJOR:  It's on the second
6        page.
7                MR. SUTHERLAND:  Gotcha.
8    BY MS. NELSON MAJOR:
9        Q.      Pharmacy Owner, what was your
10   understanding of what the Drug Procurer was asking you
11   to do?
12               MR. SUTHERLAND:  Object to the form.
13               THE WITNESS:  To provide storage and
14       handling instructions for the medication.
15   BY MS. NELSON MAJOR:
16       Q.      And if you could turn to the first page
17   of Exhibit 3, there's an email at the bottom sent at
18   3:30 p.m.  Was this your response to the Drug
19   Procurer's request to break down how the drugs needed
20   to be stored and prepared?
21       A.      Yes.
22       Q.      You wrote:  "I will have my pharmacist
23   write up a protocol."
24               Did your pharmacist in fact write up a
25   protocol in 2017?
```

**Gibson Court Reporting**

1      A.      Yes.

2      Q.      And was that protocol, did it include

3 instructions for preparing and storing all three drugs?

4      A.      I can't remember.

5      Q.      Did you review the protocol that the

6 pharmacist wrote?

7      A.      I read it over, yes.

8      Q.      If you know; the pharmacist who wrote up

9 that protocol, are they still employed by the pharmacy?

10      A.      I do not know.

11      Q.      And the next sentence states: "All drugs

12 are required to be stored in a secure location at room

13 temperature between 15 and 30 degrees Celsius."

14      Is this referring to compounded or

15 commercially manufactured drugs?

16      A.      Commercially manufactured.

17      Q.      And where did you get this temperature

18 range?

19      A.      Package insert.

20      Q.      Package insert to what?

21      A.      Package insert to the commercially

22 manufactured drugs.

23      Q.      Did all three drugs have the same

24 temperature range in their package inserts?

25      A.      I don't recall if it was that specific

1   range, but it was the -- I don't recall.  I'm sure it

2   did.

3         Q.      Did you personally look at the package

4   inserts when writing this email?

5         A.      Yes.

6         Q.      Could you please turn to Exhibit 32.

7   It's an email from November 14th, 2017.

8              Did the Drug Procurer write this email to

9   you?

10        A.      It doesn't look familiar, no.

11        Q.      And if you'll please pull up Exhibit 73.

12   It's an email chain dated November 28th, 2017.  Did you

13   write this email?

14        A.      Yes.

15        Q.      Did you write it to the Drug Procurer?

16        A.      Yes.

17        Q.      You wrote:  "Attached is the executed

18   agreement and revisions to the protocol."  What is the

19   protocol that you were referring to?

20        A.      Protocol B in the Tennessee execution

21   protocols.  I'm sorry, that wasn't theirs; it was our

22   protocol for Tennessee's Protocol B.

23        Q.      What do you mean when you said "it was

24   our protocol?"

25        A.      How to prepare and draw up the

1  medication.

2       Q.       And then you further write:

3                "Only one change was noted.  Where the

4                potassium chloride was concerned, in order

5                to reach the required dose you need 120

6                milliliters.  Using 50-cc syringes would

7                only allow for 100 milliliters,

8                necessitating the need for a third syringe

9                with 20 milliliters.

10               "You can eliminate the third syringe by

11               using two 60-cc syringes in place of the 50

12               cc's."

13               Did you come up with this change on your

14 own?

15      A.       No.

16      Q.       Who else did you consult when making

17 these changes?

18      A.       The Pharmacist in Charge.

19               MR. SUTHERLAND:  Without identifying any

20        person by name.

21 BY MS. NELSON MAJOR:

22      Q.       I'm sorry.  Again, without identifying a

23 person by name, who did you consult with?  I just

24 didn't catch your answer.

25      A.       The Pharmacist in Charge.

1       Q.       Then you ended the email by saying:  "Do
2  you all want us to provide you with the syringes and
3  needles?"
4              Did the pharmacy in fact provide TDOC
5  with syringes and needles?
6       A.       I can't recall.
7       Q.       You also wrote that:
8              "One thing to note is that each
9              10-milligram vecuronium vial will need to
10             be reconstituted with 10 milliliters of
11             bacteriostatic water before use, which we
12             will provide."
13             Why bacteriostatic water?
14             MR. SUTHERLAND:  Object to the form.
15             THE WITNESS:  It's what the manufacturer
16        recommended.
17  BY MS. NELSON MAJOR:
18       Q.       And why did you tell TDO- -- TDOC to use
19  10 milliliters of bacteriostatic water?
20             MR. SUTHERLAND:  Same objection.
21             THE WITNESS:  Manufacturer's
22        recommendation.
23  BY MS. NELSON MAJOR:
24       Q.       Did you ever speak with anyone other than
25  TD- -- oh, sorry, excuse me.  Anyone than the Drug

 1   Procurer affiliated with TDOC about reconstituting the

 2   vecuronium bromide?

 3        A.      No.

 4        Q.      So you never spoke with anyone on the

 5   Execution Team about how to reconstitute vecuronium

 6   bromide?

 7        A.      I did not.

 8        Q.      Do you know whether the Pharmacist in

 9   Charge ever had a conversation with anyone on the

10   Execution Team about reconstituting vecuronium bromide?

11        A.      I do not.

12        Q.      Please pull up Exhibit 34.  It's an email

13   chain dated December 15th, 2017.

14        A.      Okay.

15        Q.      Did you write or receive any of these

16   emails?

17        A.      No.

18        Q.      Do you recall ever having a conversation

19   with the Drug Procurer about a court case?

20                MR. SUTHERLAND:  Object to the form.  You

21        can answer.

22                THE WITNESS:  Yes.

23   BY MS. NELSON MAJOR:

24        Q.      What was the court case that you

25   discussed?

```
 1          A.       I don't recall details.
 2          Q.       Do you recall generally what the case was
 3   about?
 4          A.       Lethal injection drugs.
 5          Q.       Do you recall whether it was about lethal
 6   injection drugs in Tennessee?
 7          A.       I don't recall.
 8          Q.       If you could turn to Exhibit 46.
 9                   One last question about the court case.
10   When you and the Drug Procurer discussed the court case,
11   did the Drug Procurer explain to you why the -- why --
12   why they were raising the court case with you?
13          A.       No.
14          Q.       So turning to Exhibit 46.
15          A.       Okay.
16          Q.       Have you seen this document before?
17          A.       Looks familiar, yes.
18          Q.       What is it?
19          A.       It's our pharmacy agreement with the
20   Tennessee Department of Correction.
21          Q.       If you turn to the last page of the
22   document, there's a redacted signature block.  Is your
23   signature in that redacted block?
24          A.       I don't know.
25          Q.       You don't recall whether or not you
```

1   signed this contract on behalf of the pharmacy?

2       A.      Yes, I did sign a contract on behalf of

3   the pharmacy.

4       Q.      Did you draft this document?

5       A.      No, I did not.

6       Q.      Did you make any edits to this document?

7       A.      No.

8       Q.      Did TDOC agree to pay your pharmacy an

9   annual fee?

10      A.      They did.

11      Q.      How much was that annual fee?

12      A.      I think 5,000.  I'll have to refer you to

13  the contract.

14      Q.      Was that in addition to payment for

15  whatever drugs the pharmacy supplied TDOC with?

16      A.      Yes.

17      Q.      And what was your understanding of what

18  that annual fee was for?

19      A.      Providing lethal injection chemicals to

20  the Department of Tennessee -- or Department of

21  Correction of Tennessee.

22      Q.      On the first page of the agreement do you

23  see Paragraph 1.1, and it's titled "Controlled

24  Substance?"

25      A.      Yes.

```
 1          Q.      And it states:
 2                  "Upon a written request which may be sent
 3                  electronically, by facsimile or electronic
 4                  mail by the Department, Pharmacy shall
 5                  provide the Department with requested
 6                  controlled substances."
 7                  Why did the agreement require a written
 8  request?
 9                  MR. SUTHERLAND:  Object to the form.  You
10          can answer.
11                  THE WITNESS:  All controlled substance
12          prescriptions require written requests, according
13          to state boards of pharmacy.
14  BY MS. NELSON MAJOR:
15          Q.      Are the three drugs -- midazolam,
16  potassium chloride, and vecuronium bromide -- all
17  controlled drugs?
18          A.      No.
19          Q.      Which ones aren't?
20          A.      Vecuronium and potassium.
21          Q.      And how do you know that?
22          A.      They're not on the list of controlled
23  substances.
24          Q.      If you turn to the next page, do you see
25  Paragraph 1.3, titled "Limitation on Services?"
```

```
 1        A.      Yes.
 2        Q.      And it states:
 3                "Pharmacy shall only provide controlled
 4                substances and compounding preparations
 5                that it can prepare to ensure compliance
 6                with pharmaceutical standards for identity,
 7                strength, quality, and purity of the
 8                compounded drug that are consistent with
 9                the United States Pharmacopoeia guidelines
10                and accreditation departments."
11                What are the accreditation departments
12        referred to in this paragraph?
13        A.      The boards of pharmacy.
14        Q.      And what are the United States
15        Pharmacopoeia guidelines?
16        A.      A set of universally accepted guidelines
17        for the preparations and -- well, it's more than just
18        preparations of sterile and nonsterile compounding and
19        pharmacy operations.
20        Q.      Are you aware of whether TDOC had
21        contracts with any other pharmacies to locate drugs for
22        use in executions?
23        A.      I am not aware.
24        Q.      Are you aware of whether TDOC had
25        contracts with any other pharmacies to compound drugs
```

1  for use in executions?

2       A.     I am not.

3       Q.     Did the pharmacy at some point obtain a

4  pharmacy license from the State of Tennessee?

5       A.     Yes, we did.

6       Q.     When?

7       MR. SUTHERLAND:  I'm going to object to

8       the question and instruct the Pharmacy Owner not

9       to answer, based on the protective order.

10 BY MS. NELSON MAJOR:

11      Q.     Did you obtain that pharmacy license to

12 provide TDOC with drugs for use in lethal injection

13 executions?

14      A.     Yes.

15      Q.     During your tenure with the pharmacy, how

16 many different pharmacists were responsible for filling

17 TDOC's orders for lethal injection drugs?

18      THE WITNESS:  Please repeat that.

19 BY MS. NELSON MAJOR:

20      Q.     During your time with the pharmacy, how

21 many different pharmacists were responsible for filling

22 TDOC's orders for lethal injection drugs?

23      A.     One.

24      Q.     So during your tenure, there was a single

25 pharmacist who was involved in filling TDOC's order for

```
 1   lethal injection drugs?
 2              MR. SUTHERLAND:  Object to the form.  You
 3        can answer.
 4              THE WITNESS:  That I remember, yes.
 5   BY MS. NELSON MAJOR:
 6        Q.     Please turn to Exhibit No. 1.  It's a
 7   long document.  Do you want to take a minute and look
 8   through it?
 9        A.     Yes, please.
10              (Witness reviews document.)
11              THE WITNESS:  Okay.
12   BY MS. NELSON MAJOR:
13        Q.     Have you seen this document before?
14        A.     Parts of it.
15        Q.     And what is this document?
16        A.     It's the lethal injection protocol for
17   the Department of Correction of Tennessee.
18        Q.     When was the first time you saw this
19   document?
20        A.     I don't recall the date.
21        Q.     Do you recall the year?
22        A.     2018, 2017.
23        Q.     Do you know how long the current protocol
24   has been in place?
25        A.     I do not.
```

1      Q.      Were you involved in the creation of this

2  protocol?

3      A.      No.

4      Q.      So you didn't provide any information

5  related to the drugs to be used?

6      A.      I did not.

7      Q.      You didn't provide any information to

8  TDOC about potential doses to be used?

9      A.      I did not.

10     Q.      Did you provide any input on the portions

11  of the protocol that discuss storing drugs?

12     A.      No.

13     Q.      What about preparing the syringes?

14     A.      I did not, no.

15     Q.      Did you review any drafts of this

16  protocol?

17     A.      No.

18     Q.      Did you provide any edits to this

19  protocol?

20     A.      No.

21     Q.      Do you know if anyone else at your

22  pharmacy was involved in the creation of the protocol?

23     A.      Not that I'm aware of.

24     Q.      Who provided the protocol to you?

25             MR. SUTHERLAND:  Don't identify anybody

```
 1        by name.
 2                THE WITNESS:  The Drug Procurer.
 3   BY MS. NELSON MAJOR:
 4        Q.      And did the Drug Procurer ask you to
 5   review the protocol?
 6        A.      He asked the pharmacy to review the
 7   protocol, yes.
 8        Q.      And did you provide the protocol to the
 9   pharmacist to review?
10        A.      Yes.
11        Q.      And did the pharmacist make any changes
12   to the protocol?
13                MR. SUTHERLAND:  Object to the form.  You
14        can answer.
15                THE WITNESS:  I can't recall.
16   BY MS. NELSON MAJOR:
17        Q.      Did you discuss with the pharmacist their
18   review of the protocol?
19        A.      I don't recall.
20        Q.      Did the Drug Procurer describe to you in
21   any way the process that TDOC used for creating this
22   protocol?
23        A.      No.
24        Q.      Do you know whether TDOC consulted any
25   professionals when creating this protocol?
```

```
 1                    MR. SUTHERLAND:  Object to the form.  You
 2        can answer.
 3                    THE WITNESS:  I do not know.
 4   BY MS. NELSON MAJOR:
 5        Q.      Do you know what, if any, research was
 6   relied upon by TDOC when creating this protocol?
 7                    MR. SUTHERLAND:  Same objection.
 8                    THE WITNESS:  I don't know.
 9   BY MS. NELSON MAJOR:
10        Q.      Can you turn to Page 34.
11        A.      Okay.
12        Q.      And the title is "Chemicals Used in
13   Lethal Injection."  Have you seen this page before?
14        A.      I have not.
15        Q.      This page lists the three drugs to be
16   used in the protocol, the first being midazolam.  What
17   is your understanding of the purpose of using midazolam
18   in the protocol?
19                    MR. SUTHERLAND:  Object to the form.
20                    THE WITNESS:  I don't know.
21   BY MS. NELSON MAJOR:
22        Q.      What kind of drug is midazolam?
23                    MR. SUTHERLAND:  Object to the form.
24                    THE WITNESS:  It's a benzodiazepine.
25   BY MS. NELSON MAJOR:
```

```
 1          Q.      Can you repeat the answer for the court
 2   reporter, please?
 3          A.      A benzodiazepine.
 4          Q.      What is your understanding of the
 5   ordinary uses of midazolam?
 6          A.      I'm not sure.
 7          Q.      Do you know whether midazolam is
 8   typically used as an anesthetic?
 9                  MR. SUTHERLAND:  Object to the form.  You
10       can answer.
11                  THE WITNESS:  An anesthetic alone, no.
12   BY MS. NELSON MAJOR:
13          Q.      Is midazolam FDA approved by itself to
14   produce and maintain anesthesia during a painful
15   surgical procedure?
16                  MR. SUTHERLAND:  Object to the form.
17                  THE WITNESS:  I don't know.
18   BY MS. NELSON MAJOR:
19          Q.      Does midazolam have an analgesic effect?
20                  MR. SUTHERLAND:  Object to the form.
21                  THE WITNESS:  I don't know.
22   BY MS. NELSON MAJOR:
23          Q.      Does midazolam have a ceiling effect?
24                  MR. SUTHERLAND:  Same objection.
25                  THE WITNESS:  I don't know.
```

```
 1   BY MS. NELSON MAJOR:
 2        Q.     Do you know what the term "ceiling
 3   effect" means?
 4               MR. SUTHERLAND:  Same objection.
 5               THE WITNESS:  No.
 6   BY MS. NELSON MAJOR:
 7        Q.     Can midazolam result in a paradoxical
 8   reaction?
 9               MR. SUTHERLAND:  Same objection.
10               THE WITNESS:  I don't know.
11   BY MS. NELSON MAJOR:
12        Q.     Is midazolam acidic or alkaline?
13               MR. SUTHERLAND:  Same objection.
14               THE WITNESS:  I don't know.
15   BY MS. NELSON MAJOR:
16        Q.     The second drug listed is vecuronium
17   bromide.  What is your understanding of the purpose of
18   using the vecuronium bromide in the protocol?
19               MR. SUTHERLAND:  Object to the form.
20               THE WITNESS:  I don't know.
21   BY MS. NELSON MAJOR:
22        Q.     What kind of drug is vecuronium bromide?
23               MR. SUTHERLAND:  Same objection -- or
24        object to the form.
25               THE WITNESS:  Paralytic.
```

```
 1   BY MS. NELSON MAJOR:
 2        Q.      And is vecuronium bromide acidic or
 3   alkaline?
 4               MR. SUTHERLAND:  Object to the form.
 5               THE WITNESS:  I don't know.
 6   BY MS. NELSON MAJOR:
 7        Q.      And then the last drug is potassium
 8   chloride.  What is your understanding of the purpose of
 9   using potassium chloride in the protocol?
10               MR. SUTHERLAND:  Object to the form.
11               THE WITNESS:  I don't know.
12   BY MS. NELSON MAJOR:
13        Q.      What kind of drug is potassium chloride?
14               MR. SUTHERLAND:  Same objection.
15               THE WITNESS:  An electrolyte.
16   BY MS. NELSON MAJOR:
17        Q.      And is potassium chloride acidic or
18   alkaline?
19               MR. SUTHERLAND:  Object to the form.
20               THE WITNESS:  I don't know.
21   BY MS. NELSON MAJOR:
22        Q.      The next section, pages 35 to 36, is
23   titled "Compounded Preparations:  Procurement, Storage,
24   Accountability, and Transfer of the Chemical."
25               Have you seen pages 35 and 36 before?
```

```
 1        A.      No.
 2        Q.      So it's fair to say that you didn't
 3   review or edit the section in any way?
 4        A.      Yes, that's fair.
 5        Q.      Do you know whether anyone at the
 6   pharmacy reviewed the section?
 7        A.      I do not.
 8        Q.      Will you please go to the next page, 37
 9   and 38.  This section is titled "Commercially
10   Manufactured Drugs:  Procurement, Storage,
11   Accountability, and Transfer of the Chemicals."
12                Have you seen this page before?
13        A.      No.
14        Q.      So it's fair to say that you didn't write
15   or edit this section in any way?
16        A.      I did not.
17        Q.      Could you please turn to pages 39 and 40.
18   This section is titled "Lethal Injection Chemical
19   Set-Up and Preparation."
20                Have you seen pages 39 and 40 before?
21        A.      I have not.
22        Q.      So it's fair to say you haven't reviewed
23   or edited this section in any way?
24        A.      I have not.
25        Q.      Do you know if anyone else at the
```

```
 1   pharmacy reviewed this section?
 2        A.      I don't know.
 3        Q.      Would you please turn to pages 41 to 43.
 4   These two sections involve the setting up and insertion
 5   of the IV catheters.  Have you seen these pages before?
 6        A.      I have not.
 7        Q.      So it's fair to say you didn't write or
 8   review these sections in any way?
 9        A.      Yes.
10        Q.      Do you know whether anyone else at the
11   pharmacy reviewed these sections?
12        A.      I do not.
13        Q.      Have you been to the Riverbend Maximum
14   Security Institution in Tennessee?
15        A.      I have not.
16        Q.      Have you ever attended an execution?
17        A.      No.
18        Q.      Have you ever provided training to anyone
19   else in connection with executions?
20        A.      No.
21        Q.      Have you had contact with representatives
22   from departments of correction outside of Tennessee?
23        A.      No.
24        Q.      If a drug is available both in a
25   commercially manufactured form and a compounded
```

```
 1   preparation, what would the pharmacy's first choice be
 2   to fill an order?
 3                 MR. SUTHERLAND:  Object to the form.
 4                 THE WITNESS:  Can you restate that?
 5   BY MS. NELSON MAJOR:
 6        Q.      Let me try rephrasing it.  Under what
 7   circumstances would a pharmacy compound a drug?
 8        A.      Physician request.
 9        Q.      You previously stated that at some point
10   the pharmacy switched to providing TDOC with compounded
11   midazolam.  Do you recall when that happened?
12        A.      I do not.
13        Q.      Do you recall why the pharmacy switched
14   to compounding for midazolam?
15        A.      No, I don't.
16        Q.      Are you aware that a manufacturer
17   demanded that TDOC return the commercially manufactured
18   midazolam?
19        A.      Yes.
20        Q.      How are you aware of that?
21        A.      Our vendor alerted us.
22        Q.      When did that occur?
23        A.      I can't recall.
24        Q.      And how did the vendor alert you?
25        A.      I can't recall.
```

1    Q.    And what did the vendor instruct you to
2  do?
3    A.    Make an attempt to retrieve the
4  midazolam.
5    Q.    Did they tell you why?
6    A.    They did.
7    Q.    And what was that reason?
8    A.    They did not want their drugs involved in
9  lethal injection.
10   Q.    Did you convey that information to the
11 Drug Procurer?
12   A.    Yes.
13   Q.    Are you aware of whether TDOC returned
14 the commercially manufactured midazolam?
15   A.    Not aware.
16   Q.    Did TDOC provide you with the
17 commercially manufactured midazolam that they had in
18 their possession?
19         MR. SUTHERLAND:  Object to the form.
20         THE WITNESS:  They did not.
21 BY MS. NELSON MAJOR:
22   Q.    Did the Drug Procurer discuss with you
23 what they intended to do?
24         MR. SUTHERLAND:  Same objection.
25         THE WITNESS:  Not that I can recall.

```
 1   BY MS. NELSON MAJOR:
 2        Q.      After you were alerted to this request by
 3   the vendor, did you continue to provide TDOC with
 4   commercially manufactured midazolam?
 5        A.      No.
 6        Q.      When placing the order for the
 7   commercially manufactured midazolam from this
 8   manufacturer, had you informed them of the intended
 9   use?
10        A.      No.
11        Q.      Did the manufacturer tell you how they
12   had learned that you had provided their drugs to TDOC
13   for use in executions?
14        A.      They did not.
15        Q.      Did you and the Drug Procurer discuss how
16   you would source midazolam after receiving this alert
17   from the vendor?
18        A.      I can't recall.
19        Q.      What did you do after receiving this
20   vendor to fill the orders for midazolam for TDOC?
21        A.      Sorry, repeat that again?
22        Q.      How did you fill TDOC's order for
23   midazolam after you received this order?
24        A.      I can't -- I can't recall.
25        Q.      Did you switch to compounding midazolam?
```

1       A.      At some point, yes.

2       Q.      And when you switched to compounding

3  midazolam, how did the pharmacy locate the API to

4  compound the midazolam?

5                   MR. SUTHERLAND:  Object to the form.

6                   THE WITNESS:  I searched through our

7          vendors.

8  BY MS. NELSON MAJOR:

9       Q.      At some point, did you also stop

10 providing potassium to TDOC in its commercially

11 manufactured form?

12                  MR. SUTHERLAND:  Object to the form.

13                  THE WITNESS:  Yes.

14 BY MS. NELSON MAJOR:

15      Q.      Do you recall when that happened?

16      A.      I do not.

17      Q.      Why did you switch to compounding the

18 potassium chloride?

19      A.      Drug availability.

20      Q.      Had you received a similar notice from

21 the manufacturer of the potassium chloride about using

22 their commercially manufactured drugs for use in

23 executions?

24      A.      I can't recall.

25      Q.      I want to ask you a couple of questions

```
 1    about the storage and preparation of the drugs that the
 2    pharmacy provided to TDOC.
 3               Do you know how the drugs are stored at
 4    TDOC once received?
 5         A.    I do not.
 6         Q.    Did anyone ever discuss with you the kind
 7    of freezer or refrigerator that TDOC uses to store the
 8    lethal injection chemicals?
 9         A.    No.
10         Q.    Is a commercial mini-fridge an acceptable
11    place to store compounded drugs?
12               MR. SUTHERLAND:  Object to the form.  You
13         can answer.
14               THE WITNESS:  I don't know.
15    BY MS. NELSON MAJOR:
16         Q.    Have you ever discussed with anyone at
17    TDOC the temperature at which the compounded drugs
18    should be stored?
19         A.    I did not.
20         Q.    Do you know whether the Pharmacist ever
21    discussed with anyone at TDOC the temperature at which
22    the compounded drugs should be stored?
23         A.    Yes.
24         Q.    Do you know who the Pharmacist had that
25    conversation with?
```

```
 1          A.      I do not.
 2          Q.      How are you aware of that conversation?
 3          A.      I can't recall.  I believe I spoke to the
 4    Pharmacist about it.
 5          Q.      During your tenure at the pharmacy, did
 6    the Pharmacist have conversations with the Drug
 7    Procurer outside of your presence?
 8          A.      Yes.
 9          Q.      How frequent were those conversations, if
10    you're aware?
11          A.      I don't know.
12          Q.      Do you know whether the Pharmacist ever
13    had conversations with anyone other than the Drug
14    Procurer affiliated with TDOC?
15          A.      I do not.
16          Q.      If you could please pull up Exhibit 2.
17    Okay.  Do you recognize this document?
18          A.      Yes.
19          Q.      What is it?
20          A.      It's a drug preparation protocol.
21          Q.      For which drug?
22          A.      Midazolam.
23          Q.      Did you write this document?
24          A.      I did not.
25          Q.      Do you know who wrote this document?
```

```
1          A.        The Pharmacist in Charge.
2          Q.        Do you recall when the Pharmacist in
3   Charge wrote this document?
4                    MR. SUTHERLAND:  Object to the form.
5                    THE WITNESS:  No.
6   BY MS. NELSON MAJOR:
7          Q.        Can you restate your answer?
8          A.        No.
9          Q.        Did you review this document after it was
10  drafted by the Pharmacist?
11         A.        I did read it, yes.
12         Q.        Did you make any edits?
13         A.        No.
14         Q.        Did you provide this document to TDOC?
15         A.        Yes.
16         Q.        Without naming names, who did you provide
17  it to?
18         A.        The Drug Procurer.
19         Q.        Did you show this document to the Drug
20  Procurer just the one time?
21         A.        I don't recall.
22         Q.        Do you know whether the pharmacy sent
23  copies of this document with each shipment of the
24  compounded midazolam?
25         A.        I don't recall.
```

```
 1          Q.        Is this the only version of midazolam
 2    instructions that you provided to TDOC?
 3          A.        To my knowledge, yes.
 4          Q.        When you reviewed this document, what
 5    were you looking for?
 6                    MR. SUTHERLAND:  Object to the form.
 7                    THE WITNESS:  I was reading it for my own
 8          personal knowledge.
 9    BY MS. NELSON MAJOR:
10          Q.        Besides the Drug Procurer, did you ever
11    discuss how the midazolam should be prepared or stored
12    with anyone else associated with TDOC?
13                    MR. SUTHERLAND:  Object to the form.
14                    THE WITNESS:  I did not.
15    BY MS. NELSON MAJOR:
16          Q.        At some point, did the pharmacy also
17    prepare instructions for the preparation and storage of
18    the potassium chloride?
19          A.        I believe so, yes.
20          Q.        How many different versions of those
21    instructions were prepared for TDOC?
22          A.        I don't know.
23                    MS. NELSON MAJOR:  I'm wondering if now
24          is not a bad time to stop for a break.  I don't
25          want to get into another lengthy section, because
```

```
 1            we've been going for an hour.  Is that okay?
 2                 MR. SUTHERLAND:  Are you talking about a
 3            lunch break or just a break-break?
 4                 MS. NELSON MAJOR:  Is it too early for
 5            you all?
 6                 MR. SUTHERLAND:  It's not too early for
 7            me.  It's whatever -- whatever --
 8                 MS. NELSON MAJOR:  I'm fine with that.
 9            We can do a lunch break now.
10                 MR. SUTHERLAND:  Okay.  I know it's 12:20
11            for some folks, so I'm happy to do that.
12                 MS. NELSON MAJOR:  Okay.
13                 THE VIDEOGRAPHER:  We are off the record
14            at 12:18 p.m.
15                 (Recess at 12:18 p.m. to 1:00 p.m.)
16                 THE VIDEOGRAPHER:  We're back on the
17            record.  The time is 1:00 p.m.
18       BY MS. NELSON MAJOR:
19            Q.     When we left off last, we were talking
20       about the instructions for preparing and storing the
21       potassium chloride.
22            A.     Okay.
23            Q.     And I had asked you to pull up, I
24       believe, Exhibit 74.  Let me know when you have that
25       up.
```

```
 1          A.      Okay.  I've got it pulled up.

 2          Q.      Do you recognize this document?

 3          A.      Yes, I've seen it.

 4          Q.      What is it?

 5          A.      Preparation instructions for potassium

 6   chloride.

 7          Q.      Who wrote this document, if you know?

 8                  MR. SUTHERLAND:  I'm sorry, Ms. Nelson

 9          Major, did you say 74 or 4?

10                  MS. NELSON MAJOR:  74.

11                  MR. SUTHERLAND:  Because I have potassium

12          chloride preparation instructions as 4 in the

13          binder.

14                  MS. NELSON MAJOR:  This is a different

15          version than Exhibit 4.

16                  MR. SUTHERLAND:  Gotcha.

17                  THE WITNESS:  As to who wrote the

18          document?

19   BY MS. NELSON MAJOR:

20          Q.      Yes, who wrote --

21                  THE WITNESS:  The Pharmacist in Charge.

22   BY MS. NELSON MAJOR:

23          Q.      I'm sorry, can you say that again?

24          A.      The Pharmacist in Charge.

25          Q.      How many pharmacists in charge did the
```

1   pharmacy employ at any given time?

2          A.      There was only one Pharmacist in Charge.

3          Q.      And were there pharmacists not in charge

4   or below the Pharmacist in Charge?

5          A.      There were on a PRN basis for pharmacy.

6   But there was only one pharmacist at the pharmacy at a

7   time -- at the time.

8          Q.      And what do you mean by "PRN basis?"

9          A.      We had contracted with other pharmacists

10  who were not pharmacists in charge but who would come

11  in and cover when our Pharmacist in Charge would want

12  to take vacation or leave or something of that nature.

13         Q.      Did those PRN pharmacists have any

14  involvement in the work you were doing on behalf of

15  TDOC?

16         A.      No.

17         Q.      Did you ask the Pharmacist in Charge to

18  write this document?

19         A.      Yes, I believe I did.

20         Q.      Did you review this document after the

21  Pharmacist in Charge wrote it?

22         A.      I read it over, yes.

23         Q.      Did you make any edits?

24         A.      No.

25         Q.      What is the concentration of potassium

1  chloride specified in this Exhibit 74?

2      A.      It looks like 4 mEq's per ml.

3      Q.      And what information did you give the

4  Pharmacist in Charge when you told this person to draft

5  this set of instructions?

6      A.      I don't recall anything that I gave them

7  specifically other than the protocol provided by

8  Tennessee Department of Correction.

9      Q.      Do you recall whether this version of

10 instructions was drafted at a time when you were

11 providing TDOC with commercially manufactured drugs?

12     A.      I don't recall.

13     Q.      Do you recall what year this set of

14 instructions was written?

15     A.      No.

16     Q.      And can you please pull up Exhibit 75.

17 Do you recognize this document, as well?

18     A.      It looks like the previous document.

19     Q.      On each document, there's a list of

20 "Items You Will Need."  Do you see that at the top of

21 both documents?

22     A.      Yes.

23     Q.      And both documents list a bag of saline;

24 is that right?

25     A.      Yes.

1      Q.      Do the documents call for different-sized
2  bags of saline?
3      A.      Yes, they do.  Sorry, I had to verify.
4      Q.      Do you know why the size of the bag of
5  saline changed between these two documents?
6      A.      I don't.
7      Q.      Looking at Exhibit 74, can you take a
8  look at steps 10 to 13?
9      A.      Okay.
10     Q.      Do these steps direct that the potassium
11 chloride be diluted with saline?
12             MR. SUTHERLAND:  Object to the form.
13 BY MS. NELSON MAJOR:
14     Q.      You can answer, Pharmacy Owner.
15     A.      Sorry, I'm reading the instructions.
16     Q.      That's okay.  Take your time.
17             (Witness reviews document.)
18             THE WITNESS:  It does appear to instruct
19         them to dilute the -- dilute the potassium
20         chloride with saline.
21 BY MS. NELSON MAJOR:
22     Q.      And how many milliliters of saline do the
23 instructions direct to be drawn up into the syringe?
24     A.      30.
25     Q.      And then how many milliliters of

```
 1   potassium chloride are directed to be drawn up in the
 2   same syringe?
 3        A.      Same volume, 30 ml's.
 4        Q.      And turning back to Exhibit 75, could you
 5   please take a moment and read steps 12 to 17.  They're
 6   long, so just let me know when you're done.
 7              (Witness reviews document.)
 8              MR. SUTHERLAND:  Which steps again,
 9        Ms. Nelson Major?
10              MS. NELSON MAJOR:  12 to 17.
11              (Pause.)
12              THE WITNESS:  Okay.
13   BY MS. NELSON MAJOR:
14        Q.      Does Exhibit 75 direct that the potassium
15   chloride be diluted?
16              MR. SUTHERLAND:  Sorry, you froze on my
17        end.  I did not hear the question.
18              MS. NELSON MAJOR:  Sorry about that.  Let
19        me say it again.
20   BY MS. NELSON MAJOR:
21        Q.      The version of instructions on Exhibit
22   75; does that direct that the potassium chloride be
23   diluted, as well?
24        A.      Yes, it does.
25        Q.      Does Exhibit 75 have the same process for
```

1    diluting the potassium chloride that Exhibit 74 does?

2           A.      It does not.

3           Q.      How is it different?

4           A.      Exhibit 74 has the dilution of potassium

5    chloride in a syringe.  Exhibit 75 has the dilution of

6    potassium chloride in the 100-ml bag of saline.

7           Q.      Was this version of instructions also

8    provided to TDOC at some point?

9           A.      Yes.

10          Q.      Why did the process for diluting the

11   potassium chloride change?

12                  MR. SUTHERLAND:  Object to the form.

13                  THE WITNESS:  I don't know.

14   BY MS. NELSON MAJOR:

15          Q.      Did the pharmacy -- excuse me, the

16   Pharmacist in Charge discuss with you this change?

17          A.      Not that I recall.

18          Q.      When you provided Exhibit 75 to TDOC, did

19   you instruct them to no longer use the previous version

20   of instructions that you had provided?

21          A.      I don't recall.

22          Q.      Did the pharmacy encounter some issue

23   with diluting potassium chloride at some point?

24          A.      I don't know.

25          Q.      Do you know whether TDOC used either set

```
 1   of instructions during an execution?
 2        A.     I do not.
 3        Q.     If you could please turn to Exhibit 4.
 4   Do you recognize this document?
 5        A.     Yes.
 6        Q.     What is it?
 7        A.     Potassium chloride preparation
 8   instructions.
 9        Q.     Do you know who wrote this document?
10        A.     Pharmacist in Charge.
11        Q.     Was it the same Pharmacist in Charge who
12   wrote all three of these documents?
13        A.     Yes, to my knowledge.
14        Q.     Under "Items You Will Need," do you see
15   where it lists "potassium chloride solution?"
16        A.     Yes.
17        Q.     And what's the concentration in
18   Exhibit 4?
19        A.     15 percent.
20        Q.     And what -- how is the concentration
21   expressed in milliequivalents per ml?
22        A.     In mEq's per ml.
23        Q.     And is that different than the other two
24   versions of instructions that we just reviewed?
25               MR. SUTHERLAND:  Object to the form.
```

**Gibson Court Reporting**

```
 1                      THE WITNESS:  The instructions are
 2          different, yes.
 3   BY MS. NELSON MAJOR:
 4          Q.      Is the concentration listed on the sets
 5   of instructions different?
 6                      MR. SUTHERLAND:  Object to the form.  You
 7          can answer.
 8                      THE WITNESS:  They are.
 9   BY MS. NELSON MAJOR:
10          Q.      Why did the concentration change from 4
11   mEq to 2 mEq?
12                      MR. SUTHERLAND:  Object to the form.
13                      THE WITNESS:  I don't recall.
14   BY MS. NELSON MAJOR:
15          Q.      On Exhibit 4, could you please take a
16   look at Step 11.
17                      (Witness reviews document.)
18                      THE WITNESS:  Okay.
19   BY MS. NELSON MAJOR:
20          Q.      Does the instructions at Exhibit 4
21   require the dilution of the potassium chloride?
22          A.      No.
23          Q.      Why not?
24          A.      I don't know.
25                      MR. SUTHERLAND:  Object to the form.
```

1    BY MS. NELSON MAJOR:

2         Q.      Did you send this version of instructions

3    to TDOC?

4                 MR. SUTHERLAND:  Object to the form.

5                 THE WITNESS:  Yes.

6    BY MS. NELSON MAJOR:

7         Q.      Did you send it to the Drug Procurer?

8         A.      I did.

9         Q.      When you sent this version of

10   instructions to TDOC, did you instruct them to stop

11   using the other two versions of instructions?

12                MR. SUTHERLAND:  Object to the form.

13                THE WITNESS:  I don't recall the order in

14       which they were sent.

15   BY MS. NELSON MAJOR:

16        Q.      When -- regardless of the order they were

17   sent, at the time you sent the third version, the final

18   version of the instructions, did you instruct TDOC to

19   disregard the prior versions you had sent?

20        A.      I don't recall.

21        Q.      Do you know whether TDOC used the version

22   of instructions at Exhibit 4 during execution?

23        A.      I don't.  I don't know.

24        Q.      Besides the Drug Procurer, did you ever

25   discuss how the potassium chloride should be prepared

```
 1   with anyone else associate -- associated with TDOC?
 2                   MR. SUTHERLAND:  Object to the form.
 3                   THE WITNESS:  I did not.
 4   BY MS. NELSON MAJOR:
 5        Q.      Could you repeat the answer, Pharmacy
 6   Owner?
 7        A.      I did not.
 8        Q.      Are you aware of whether the Pharmacist
 9   in Charge had conversations with anyone at TDOC about
10   this preparation of the potassium chloride syringes?
11        A.      I am not.
12        Q.      During your tenure, did the vecuronium
13   bromide that the pharmacy provided to TDOC for use in
14   executions come in powder or liquid form?
15        A.      I remember powder form.
16        Q.      How is the powder vecuronium bromide
17   prepared for syringes?
18                   MR. SUTHERLAND:  Object to the form.
19                   THE WITNESS:  I believe it was
20        reconstituted with bacteriostatic water.
21   BY MS. NELSON MAJOR:
22        Q.      Have you ever reconstituted a drug?
23        A.      No.
24        Q.      At the pharmacy, who was responsible for
25   reconstituting drugs when needed?
```

```
 1          A.       The Pharmacist or pharmacy tech, I'm not

 2    sure.

 3          Q.       Do you need medical training to

 4    reconstitute a drug from a powder form?

 5                   MR. SUTHERLAND:  Object to the form.

 6                   THE WITNESS:  I don't know.

 7    BY MS. NELSON MAJOR:

 8          Q.       Did you provide written instructions to

 9    TDOC regarding the storage and preparation of the

10    vecuronium bromide?

11          A.       I believe we did, yes.

12          Q.       Similar to the potassium chloride

13    instructions we just reviewed?

14          A.       I remember just reviewing preparation

15    instructions, not storage and handling of the potassium

16    chloride.

17          Q.       Did the Pharmacist in Charge also write

18    the preparation instructions for vecuronium bromide?

19          A.       No.

20          Q.       Who wrote those instructions?

21          A.       The manufacturer.

22          Q.       Did you ever discuss how the vecuronium

23    bromide should be prepared with anyone associated with

24    TDOC?

25          A.       No, I don't think so.
```

**Gibson Court Reporting**

```
 1          Q.      Have you ever spoken to the physician who
 2   was involved in the carrying out of executions in
 3   Tennessee?
 4          A.      I did not.
 5          Q.      Have you ever spoken to the person
 6   referred to in the protocol as the Executioner?
 7          A.      No.
 8          Q.      Do you know whether the Pharmacist in
 9   Charge has spoken to either of these people?
10          A.      I do not.
11          Q.      After the syringes are prepared for use
12   in an execution, is there a timeframe in which they
13   must be administered?
14                  MR. SUTHERLAND:  Object to form.
15                  THE WITNESS:  I don't know.
16   BY MS. NELSON MAJOR:
17          Q.      And I'm going to ask you a couple of
18   questions about how TDOC placed orders for the lethal
19   injection drugs with the pharmacy.
20                  Did TDOC place separate orders for the API
21   that you purchased?
22          A.      I can't recall.
23          Q.      Did TDOC --
24          A.      They --
25          Q.      Sorry.
```

```
 1        A.        TDOC didn't order APIs, only finished

 2   product.

 3        Q.        So TDOC did not place orders for bulk API

 4   with the pharmacy?

 5        A.        Not that I can recall, no.

 6        Q.        Did TDOC order more drugs than was

 7   required for use in a single execution at one time?

 8        A.        Yes.

 9        Q.        Was that true of both compounded and

10   commercially manufactured drugs?

11        A.        I can't recall.

12        Q.        How were you notified that TDOC wished to

13   place an order for lethal injection drugs?

14        A.        Typically, I was contacted by the Drug

15   Procurer.

16        Q.        Did TDOC send a written prescription?

17        A.        I don't know if they did.

18        Q.        If they did, was it not sent to you?

19        A.        It was sent to the pharmacy, which would

20   have been received by the Pharmacist in Charge.

21        Q.        Could you pull up page -- excuse me,

22   Exhibit 76.  Do you recognize this document?

23        A.        Yes.

24        Q.        What is it?

25        A.        It's a sample prescription.
```

**Gibson Court Reporting**

```
 1          Q.      Did you write this?

 2          A.      I did not.

 3                  MR. SUTHERLAND:  Object to the form.

 4   BY MS. NELSON MAJOR:

 5          Q.      Do you know who wrote this?

 6                  MR. SUTHERLAND:  Don't identify anyone.

 7                  THE WITNESS:  I do not know who wrote

 8       that.

 9   BY MS. NELSON MAJOR:

10          Q.      Was it the Pharmacist in Charge?

11                  MR. SUTHERLAND:  Same -- object to the

12       form, based on his prior answer.

13                  THE WITNESS:  I don't know.

14   BY MS. NELSON MAJOR:

15          Q.      When placing orders with the pharmacy,

16   did TDOC specify the vial size that they required?

17          A.      They would be required to provide the

18   strength and the dosage.

19          Q.      By "strength," do you mean concentration?

20          A.      Yes.

21          Q.      Did the concentration of midazolam that

22   the pharmacy sent to TDOC ever change during your

23   tenure?

24          A.      I don't know.

25          Q.      Did the vial size of the midazolam that
```

 1   the pharmacy sent to TDOC ever change during your

 2   tenure?

 3                   MR. SUTHERLAND:  Object to the form.

 4                   THE WITNESS:  I don't know.

 5   BY MS. NELSON MAJOR:

 6        Q.     Did the vial size of the potassium

 7   chloride ever change during your tenure with the

 8   pharmacy?

 9                   MR. SUTHERLAND:  Object to the form.

10                   THE WITNESS:  I don't know.

11   BY MS. NELSON MAJOR:

12        Q.     What about the concentration of the

13   potassium chloride?

14                   MR. SUTHERLAND:  Object to the form.

15                   THE WITNESS:  Possibly from the

16        commercially available concentrations to

17        compounded concentrations.

18   BY MS. NELSON MAJOR:

19        Q.     Did the Pharmacist in Charge ever discuss

20   with you the potassium chloride falling out of

21   solution?

22        A.     I vaguely remember a conversation of the

23   possibility of that, yes.

24        Q.     What does it mean when a drug falls out

25   of solution?

```
 1                    MR. SUTHERLAND:  Object to the form.
 2                    THE WITNESS:  My understanding is that it
 3          forms a precipitant in the solution.
 4   BY MS. NELSON MAJOR:
 5          Q.     The potassium chloride that was falling
 6   out of solution, do you know whether it was sent to
 7   TDOC?
 8                    MR. SUTHERLAND:  Object to the form.
 9                    THE WITNESS:  It was not, that I'm aware
10          of.
11   BY MS. NELSON MAJOR:
12          Q.     Did you in any way participate in the
13   actual filling of the TDOC's orders?
14                    MR. SUTHERLAND:  Object to the form of
15          the question.
16                    THE WITNESS:  Yes.
17   BY MS. NELSON MAJOR:
18          Q.     What was your involvement in the filling
19   of the orders?
20          A.     I would supply the dry ice per the
21   packaging and take it to FedEx for shipping.
22          Q.     Were all three drugs shipped on dry ice?
23          A.     No.
24          Q.     Which drugs were shipped on dry ice?
25          A.     Only compounded preparations.
```

**Gibson Court Reporting**

```
 1          Q.       Did you pack the compounded preparations
 2    for shipment?
 3          A.       Yes.
 4          Q.       Was there any kind of temperature gauge
 5    inside of the boxes in which the compounded
 6    preparations were shipped?
 7          A.       Yes.
 8          Q.       What was the temperature gauge?
 9          A.       The temperature gauge was a maximum.  It
10    would indicate if a certain temperature had been
11    reached.
12          Q.       How would it indicate that?
13          A.       It would change colors.
14          Q.       Did you ever let anyone at TDOC know
15    about the temperature gauge?
16          A.       I don't recall.
17          Q.       Where did you obtain the dry ice?
18               MR. SUTHERLAND:  You can -- you can
19          identify just generally a type of place you would
20          have gotten it, but not by specifying a name or
21          location.
22               THE WITNESS:  Dry ice supplier.
23    BY MS. NELSON MAJOR:
24          Q.       Outside of the shipments to TDOC, how
25    often did you pack compounded preparations for
```

 1  shipments to the pharmacy's customers?

 2        A.      Zero.

 3        Q.      Why did you do it for the TDOC orders?

 4        A.      To ensure that the process would be

 5  followed.

 6        Q.      Who at the pharmacy normally -- without

 7  naming names -- packs compounded preparations for

 8  shipments?

 9        A.      Either the Pharmacist or a pharmacy tech.

10        Q.      Did you have concerns that the Pharmacist

11  would not properly pack and ship TDOC's orders?

12        A.      I did not.

13        Q.      What about the pharmacy technicians?

14        A.      I did not.

15        Q.      During your time with the pharmacy, how

16  often did you enter the areas in which the

17  prescriptions were actually filled?

18        A.      On a daily basis.

19                MR. SUTHERLAND:  Object to the form.

20  BY MS. NELSON MAJOR:

21        Q.      What about the areas in which the drugs

22  are being compounded?

23        A.      The drugs are being compounded in a clean

24  room.  I did not access the clean room.

25        Q.      Does the pharmacy test the drugs that it

```
 1    compounded for TDOC?
 2         A.      Through a third party, yes.
 3         Q.      Was every batch that was compounded for
 4    TDOC subject to testing?
 5         A.      Yes.
 6         Q.      And was all that testing performed by
 7    that third party?
 8         A.      Yes, it was.
 9         Q.      Has that third party ever been issued a
10    warning letter by the FDA?
11                 MR. SUTHERLAND:  Object to the form.
12                 THE WITNESS:  I'm not sure.
13    BY MS. NELSON MAJOR:
14         Q.      Are you aware of whether that third party
15    has ever been issued a violation notice by a state
16    board of pharmacy?
17         A.      I am not.
18         Q.      You said that you're not sure whether the
19    third party has been issued a warning letter from the
20    FDA.  Are you aware of a particular letter issued to
21    the third-party testing company?
22                 MR. SUTHERLAND:  Object to the form.
23                 THE WITNESS:  No, I'm not.
24    BY MS. NELSON MAJOR:
25         Q.      Did the pharmacy ever decide not to ship
```

1    a compounded preparation to TDOC based on the results

2    of those tests?

3          A.      I can't recall.

4          Q.      Do you know whether T- -- excuse me --

5    the pharmacy ever recalled drugs that it might have

6    shipped to TDOC for some reason?

7          A.      Not that I can recall, no.

8          Q.      Did you provide copies of the reports of

9    the testing to TDOC?

10         A.      Yes, I did.

11         Q.      Did you personally send the reports to

12   the Drug Procurer?

13         A.      Yes, I did.

14         Q.      Did you discuss the results with the Drug

15   Procurer over the phone?

16         A.      I can't recall discussing it.

17         Q.      Outside of your involvement with TDOC,

18   how often did you send testing results to the

19   pharmacy's customers?

20         A.      I didn't.

21         Q.      Could you please pull up Exhibit 77.  Do

22   you recognize this document?

23         A.      I do.

24         Q.      What is it?

25         A.      It's a sterility report.

```
 1          Q.      And for which drug?

 2          A.      Midazolam.

 3          Q.      Is this a report that you received from

 4     the third-party testing company?

 5          A.      Yes.

 6          Q.      And what was the result of the potency

 7     test for this batch of midazolam?

 8          A.      92.4 percent.

 9          Q.      And what does that number mean?

10                  MR. SUTHERLAND:  Object to the form?

11                  MS. NELSON MAJOR:  You're on mute,

12          Pharmacy Owner, if you're answering.

13                  THE WITNESS:  Okay.  It means that the

14          potency of the tested material is 92.4 percent of

15          the potency sent, of the target potency.

16     BY MS. NELSON MAJOR:

17          Q.      What is the acceptable minimum potency

18     required by the pharmacy?

19                  MR. SUTHERLAND:  Object to the form.

20                  THE WITNESS:  Whatever the USP 797

21          guidelines suggest.

22     BY MS. NELSON MAJOR:

23          Q.      Did the pharmacy ever manufacture a

24     compounded midazolam preparation that fell below that

25     minimum potency standard for TDOC?
```

**Gibson Court Reporting**

```
 1           A.      I can't recall.
 2           Q.      Did the pharmacy ship this particular
 3   batch of midazolam to TDOC?
 4                   MR. SUTHERLAND:  Ms. Nelson Major, after
 5           this answer, can we take a five-minute break?
 6                   MS. NELSON MAJOR:  Yes.
 7                   MR. SUTHERLAND:  Thank you.
 8                   THE WITNESS:  I don't recall.
 9                   THE VIDEOGRAPHER:  Okay.  We're going off
10           the record at 1:33 p.m.
11                   (Recess at 1:33 p.m. to 1:40 p.m.)
12                   THE VIDEOGRAPHER:  We're on record at
13           1:40 p.m.
14   BY MS. NELSON MAJOR:
15           Q.      Pharmacy Owner, if you could please pull
16   up Exhibit 78.  Do you recognize this document?
17           A.      It's still loading.
18           Q.      I'm sorry.  Okay.
19           A.      Yes, I do.
20           Q.      What is this document?
21           A.      Another lab report.
22           Q.      Is this a report from the third-party
23   testing company?
24           A.      Yes, it is.
25           Q.      And for which drug?
```

```
 1        A.        Midazolam.
 2        Q.        And what was the result of this potency
 3   test?
 4        A.        114 percent.
 5        Q.        Does the USP also set a maximum
 6   acceptable potency range?
 7        A.        They do.
 8                  MR. SUTHERLAND:  Form.
 9   BY MS. NELSON MAJOR:
10        Q.        And what would the pharmacy do if the
11   potency came back above that range?
12                  MR. SUTHERLAND:  Object to the form.
13                  THE WITNESS:  Typically, it would be
14        discarded.
15   BY MS. NELSON MAJOR:
16        Q.        Did the pharmacy ship the batch of
17   midazolam that is tested in the lab report at Exhibit
18   78 to TDOC?
19        A.        I'm not sure.
20        Q.        Could you please pull up Exhibit 23.
21   It's an email dated August 8th, 2019.
22        A.        Okay.
23        Q.        Did you send this email?
24        A.        Yes.
25        Q.        Did you send it to the Drug Procurer?
```

1    A.    Yes, I did.

2    Q.    You wrote:  "Here is the

3  suitability-slash-methodology test for the KCl that was

4  falling out of solution."

5           What is a suitability-slash-methodology

6  test?

7           MR. SUTHERLAND:  Object to the form.

8           THE WITNESS:  Suitability methodology is

9       a test performed on the method on how it's

10      compounded in our pharmacy.

11  BY MS. NELSON MAJOR:

12    Q.    Is that a test that would have been run

13  by a third-party testing company?

14    A.    Yes.

15    Q.    How was it determined that the potassium

16  chloride was falling out of solution?

17           MR. SUTHERLAND:  Object to the form.

18           THE WITNESS:  I don't know.

19  BY MS. NELSON MAJOR:

20    Q.    Do you know whether TDOC discovered that

21  the potassium chloride was falling out of solution?

22    A.    I don't know.

23    Q.    You described packing the compounded

24  midazolam for shipment to TDOC on dry ice.  What

25  temperature should the potassium -- excuse me, the

```
 1    compounded midazolam be shipped at?
 2                    MR. SUTHERLAND:  Object to the form.
 3                    THE WITNESS:  I don't recall.
 4    BY MS. NELSON MAJOR:
 5         Q.      Without disclosing their name, who was
 6    responsible for receiving the drugs that you ship to
 7    TDOC?
 8                    MR. SUTHERLAND:  Object to the form.
 9                    THE WITNESS:  I don't recall.
10    BY MS. NELSON MAJOR:
11         Q.      Without disclosing names, who is
12    responsible for preparing the drugs for use in
13    executions?
14                    MR. SUTHERLAND:  Object to the form.
15                    THE WITNESS:  I don't know.
16    BY MS. NELSON MAJOR:
17         Q.      Are you aware of what kind of training
18    that person has?
19         A.      No.
20         Q.      How soon after compounding drugs for TDOC
21    did the pharmacy ship a batch to TDOC?
22         A.      I don't recall, but it would have to be
23    after the test results.
24         Q.      Did you continue to search for
25    pentobarbital after the Drug Procurer informed you in
```

**Gibson Court Reporting**

```
 1   2017 that TDOC had made the decision to use the
 2   three-drug midazolam protocol?
 3           A.      Yes.
 4           Q.      Why did you continue that search?
 5           A.      I was asked to do so by the Drug
 6   Procurer.
 7           Q.      When were you asked by the Drug Procurer
 8   to continue that search?
 9           A.      I don't recall.
10           Q.      Did the Drug Procurer instruct you on a
11   particular interval at which to search for
12   pentobarbital?
13           A.      He did not.
14           Q.      Did the Drug Procurer ask you to locate
15   commercially manufactured pentobarbital?
16                   MR. SUTHERLAND:  Object to the form.
17                   THE WITNESS:  Yes.
18   BY MS. NELSON MAJOR:
19           Q.      Did the Drug Procurer tell you how many
20   grams to look for?
21                   MR. SUTHERLAND:  Object to the form.
22                   THE WITNESS:  No.
23   BY MS. NELSON MAJOR:
24           Q.      Did the Drug Procurer ask you to look for
25   pentobarbital API?
```

```
 1          A.       Not that I can recall.
 2          Q.       Again, I want to be clear.  I'm asking
 3    about the time period after TDOC made the decision to
 4    go with the midazolam three-drug protocol in 2017.  In
 5    that time period, what did you do to attempt to locate
 6    a source for commercially manufactured pentobarbital?
 7          A.       Continued searching various vendors for
 8    both API and commercially available pentobarbital.
 9          Q.       How long did you try to locate a source
10    for commercially manufactured pentobarbital?
11          A.       I don't recall.
12                   MR. SUTHERLAND:  Object to form.
13    BY MS. NELSON MAJOR:
14          Q.       Was it a one-time thing?
15          A.       It was not.
16          Q.       Did you continue that search up until the
17    time you left the pharmacy?
18          A.       Yes.
19          Q.       When you were contacting potential
20    sources, did you specifically ask for commercially
21    manufactured pentobarbital?
22          A.       It depended on the source.
23          Q.       As part of those efforts, did you
24    research potential foreign sources of commercially
25    manufactured pentobarbital?
```

```
1          A.       Yes.

2          Q.       And how did you do that search?

3          A.       A drug supplier query.

4          Q.       Is that the vendor portal you discussed

5     earlier?

6          A.       No.

7          Q.       Is it a separate portal?

8          A.       It's not a portal, it's just an Internet

9     search for drug suppliers.

10         Q.       How did you conduct that Internet search

11    for drug suppliers?

12         A.       Searched for "drug suppliers."

13         Q.       Did you do a Google search?

14         A.       Possibly Google or Internet Explorer,

15    sure.

16         Q.       Other than searching Internet Explorer or

17    possibly Google, were there other sources you searched

18    when looking for commercially manufactured sources of

19    pentobarbital?

20         A.       I don't recall.

21         Q.       And after doing those Internet searches

22    for potential foreign sources, what did you do?

23                  MR. SUTHERLAND:  Object to the form.

24                  THE WITNESS:  I would inquire about their

25         chemicals.
```

 1   BY MS. NELSON MAJOR:

 2        Q.      Did you come across potential sources

 3   when doing those Internet searches for foreign sources?

 4        A.      Yes, there are foreign manufacturers of

 5   pentobarbital.

 6        Q.      How many foreign sources of pentobarbital

 7   did you contact on behalf of TDOC?

 8        A.      I don't recall.  Not many.

 9        Q.      When you contacted those potential

10   foreign sources, did you ask about commercially

11   manufactured pentobarbital?

12        A.      It would have been both API and

13   commercially available.

14        Q.      Were any of those foreign sources that

15   you spoke with in possession of pentobarbital?

16        A.      Yes.

17        Q.      Were any of those sources willing to

18   import pentobarbital to the pharmacy?

19                MR. SUTHERLAND:  Objection to the form.

20                THE WITNESS:  The searches were before

21        the DEA said we could not import, so we ceased our

22        foreign searches.

23   BY MS. NELSON MAJOR:

24        Q.      So the sources that you contacted prior

25   to the DEA meeting, did any of those sources have

```
 1   pentobarbital available to them?

 2        A.     Yes, many of them -- many of them have

 3   pentobarbital.  They're manufacturers.

 4        Q.     And did they have commercially

 5   manufactured or API available?

 6        A.     Both.

 7        Q.     Did you discuss quantities with those

 8   sources?

 9        A.     Can't recall.

10        Q.     Did you attempt to place an order with

11   any of those sources for TDOC?

12        A.     I did not.

13        Q.     Were the sources located in Europe?

14        A.     Yes.

15        Q.     Were they all located in Europe?

16        A.     No.

17        Q.     Where were the other sources located that

18   weren't located in Europe?

19        A.     India.

20        Q.     Did those sources indicate to you that

21   they were able to provide you with pentobarbital?

22        A.     They did not.

23        Q.     Did you convey this information to the

24   Drug Procurer?

25        A.     I can't recall.
```

1   Q.      Did you ever ask these potential foreign

2   sources if they were able to provide you with

3   pentobarbital?

4   A.      No.

5   Q.      You earlier discussed your meeting with

6   the DEA.  Did you go ahead and obtain a license to

7   import drugs for the pharmacy?

8   A.      Did not.

9   Q.      Does the pharmacy ever import

10  commercially manufactured drugs from overseas?

11  A.      No.

12  Q.      What about API?

13  A.      No.

14  Q.      When did you last try to locate

15  commercially manufactured pentobarbital for TDOC?

16  A.      I can't recall.

17  Q.      Do you recall the year?

18          MR. SUTHERLAND:  Object to the form.

19          THE WITNESS:  I do not.

20  BY MS. NELSON MAJOR:

21  Q.      Do you recall when you last tried to

22  locate pentobarbital API for TDOC?

23  A.      I do not.

24  Q.      Could you please pull up Exhibit 17.

25  It's an email dated October 30th, 2019.

```
 1                    Did you send --
 2          A.        Okay.
 3          Q.        Excuse me.  Do you recognize this email
 4    chain?
 5          A.        Yes.
 6          Q.        There's an email at the bottom of the
 7    page, 9:23 a.m., "Subject, API."  And the body is "Is
 8    this at all a possibility?"
 9                    Is this an email that the Drug Procurer
10    sent to you?
11          A.        I guess.
12          Q.        And it's largely redacted, but do you
13    have a recollection of what the Drug Procurer was
14    asking you about?
15          A.        I do not.
16          Q.        And at the top of the email chain there's
17    an email sent at 11:07 a.m.  Did you write this email
18    to the Drug Procurer?
19          A.        Yes.
20          Q.        You wrote:
21                    "It's possible we could order it, but
22                    getting it imported would be an issue.
23                    It's a Schedule II drug, and the DEA has
24                    already advised us that they do not allow
25                    importation of drugs that are readily
```

```
 1                    available in the U.S.  There may be a
 2                    loophole in there, given that the product
 3                    is technically not readily available."
 4                    What drug are you referring to in this
 5     email?
 6          A.        I don't remember.
 7          Q.        Can you pull up Exhibit 19.  It's a
 8     document dated May 3rd, 2019, titled "Whether the Food
 9     and Drug Administration has Jurisdiction over Articles
10     Intended for Use in Lawful Executions."
11                    Have you seen this document before?
12          A.        I can't recall.
13          Q.        Are you aware that the U.S. Attorney
14     General has instructed the DE- -- excuse me, instructed
15     the FDA not to exercise jurisdiction over the
16     importation of lethal injection drugs?
17          A.        I'm not aware, no.
18          Q.        If you had known that, would you have
19     changed your search for pentobarbital on behalf of
20     TDOC?
21                    MR. SUTHERLAND:  Objection to the form.
22                    THE WITNESS:  I can't say.
23     BY MS. NELSON MAJOR:
24          Q.        After the meeting with the DEA, did you
25     and the Drug Procurer have any further conversations
```

1    about the possibility of importing pentobarbital from

2    an overseas source?

3            A.      I can't recall.

4            Q.      And can you please pull up Exhibit 18.

5    It's an email dated June 20th, 2018.  Did you write or

6    receive this email?

7            A.      Received it, I believe.

8            Q.      And who sent this email to you, if you

9    recall?

10           A.      I don't recall.

11           Q.      During your tenure with the pharmacy, did

12   the pharmacy ever compound pentobarbital for customers

13   other than TDOC?

14                   MR. SUTHERLAND:  I'm going to object to

15           the form of that question.

16                   THE WITNESS:  The pharmacy never

17           compounded pentobarbital.

18   BY MS. NELSON MAJOR:

19           Q.      Could the pharmacy have compounded

20   pentobarb- -- excuse me, pentobarbital if provided with

21   the API?

22           A.      I don't know.

23           Q.      Did you ever have a conversation with the

24   Pharmacist in Charge about whether they would be able

25   to compound pentobarbital if you had the API?

1          A.          I'm sure I did.

2          Q.          And do you recall whether the Pharmacist

3     in Charge indicated that that's something they could in

4     fact do?

5                      MR. SUTHERLAND:  Objection to the form.

6                      THE WITNESS:  I don't know.  I mean, I

7          don't recall.

8     BY MS. NELSON MAJOR:

9          Q.          Could you please take a look at Exhibit

10    15.  It's an email dated April 4th, 2017.

11                     Did you write or receive any of these

12    emails?

13         A.          They don't look familiar.

14         Q.          During your time with the pharmacy, did

15    the pharmacy manufacture API for drugs other than

16    pentobarbital?

17                     MR. SUTHERLAND:  Objection to the form.

18                     THE WITNESS:  I'm sorry, ask that again.

19    BY MS. NELSON MAJOR:

20         Q.          During your time at the pharmacy, did the

21    pharmacy ever manufacture API for drugs other than

22    pentobarbital?

23         A.          We did not manufacture APIs.

24         Q.          Did you and the Drug Procurer discuss the

25    pharmacy continuing to search for pentobarbital after

```
1   your departure?
2                  MR. SUTHERLAND:  Object to the form.
3                  THE WITNESS:  Not specifically.
4   BY MS. NELSON MAJOR:
5        Q.      Did you have a general conversation?
6        A.      A general conversation in continuing my
7   efforts to help them source drugs for lethal injection,
8   yes.
9        Q.      The Drug Procurer and you discussed you
10  continuing those efforts once you were no longer
11  affiliated with the pharmacy?
12       A.      Correct.
13       Q.      Was that discussion limited to you
14  continuing to attempt to source pentobarbital?
15                 MR. SUTHERLAND:  Object to the form.
16                 THE WITNESS:  Among the other ones, as
17       well.
18  BY MS. NELSON MAJOR:
19       Q.      And what do you mean by "the other ones?"
20       A.      The other drugs:  midazolam, vecuronium,
21  potassium chloride.
22       Q.      And you indicated you at least on one
23  occasion continued to search for vecuronium after your
24  departure.  Have you in fact searched for pentobarbital
25  on behalf of TDOC following your departure from the
```

1    pharmacy?

2        A.     I have not, no.

3        Q.     Did you and the Drug Procurer discuss the

4    pharmacy continuing to search for pentobarbital when

5    you were no longer involved with the pharmacy?

6        A.     We did not.

7        Q.     Did you discuss with anyone else at the

8    pharmacy continuing the search for pentobarbital once

9    you left?

10        A.     I did not.

11        Q.     Would you please turn to Exhibit 35.

12    It's an email dated June 26th, 2019.  Do you recognize

13    this email?

14        A.     I don't recognize it, no.

15        Q.     Do you recall discussing with the Drug

16    Procurer a possible alternative drug called digoxin?

17        A.     I don't recall.

18        Q.     Do you recall ever discussing with the

19    Drug Procurer a drug called morphine sulfate?

20        A.     I don't recall.

21        Q.     Do you recall ever discussing a drug

22    called propanolol?

23        A.     I can't recall.

24        Q.     Did you ever look into the possible

25    availability of digoxin for use by TDOC in lethal

```
1   injections?
2         A.      Not that I can recall.
3         Q.      Do you have any reason to believe that
4   the pharmacy would be unable to obtain digoxin for use
5   in lethal injection procedures?
6                 MR. SUTHERLAND:  Objection.
7                 THE WITNESS:  I don't know.
8   BY MS. NELSON MAJOR:
9         Q.      Can you state your answer again?
10        A.      I don't know.
11        Q.      What about morphine sulfate?
12                MR. SUTHERLAND:  Same objection.
13                THE WITNESS:  I don't know.
14  BY MS. NELSON MAJOR:
15        Q.      And what about propanolol?
16                MR. SUTHERLAND:  Same objection.
17                THE WITNESS:  Same answer.
18  BY MS. NELSON MAJOR:
19        Q.      Were you ever asked to look into the
20  availability of secobarbital?
21        A.      Not that I can recall.
22        Q.      Do you have any reason to believe that
23  the pharmacy would be unable to source secobarbital for
24  use in executions?
25                MR. SUTHERLAND:  Object to the form.
```

```
 1                    THE WITNESS:  I don't know.
 2    BY MS. NELSON MAJOR:
 3        Q.        Were you ever asked to look into the
 4    availability of any other drugs that I haven't named
 5    for use in executions by TDOC?
 6        A.        Not that I can recall.
 7        Q.        In the course of its normal business, did
 8    the pharmacy prepare drugs for oral administration?
 9        A.        Yes.
10        Q.        During your tenure, was the pharmacy ever
11    issued a Form FDA 483?
12        A.        No.
13                  MR. SUTHERLAND:  Object to the form.
14    BY MS. NELSON MAJOR:
15        Q.        During your tenure, was the pharmacy ever
16    investigated for failing to comply with any local,
17    state, or federal regulations or law?
18        A.        No.
19        Q.        During your tenure, was the pharmacy ever
20    directed to recall drugs that it had sold to a
21    customer?
22        A.        Not that I'm aware of.
23        Q.        During your tenure, did the State Board
24    of Pharmacy ever open an enforcement or disciplinary
25    action against the pharmacy?
```

**Gibson Court Reporting**

```
 1          A.      Yes.
 2          Q.      What was the nature of that action?
 3              MR. SUTHERLAND:  Object and order the
 4      Pharmacy Owner not to answer the question based on
 5      the protective order, unless it had something to
 6      do with the services that it was providing to
 7      TDOC.
 8              THE WITNESS:  It was not involving
 9      anything associated with TDOC.
10              MS. NELSON MAJOR:  Mr. Sutherland, could
11      you explain to me a bit more about how the
12      connection to the provision of drugs to TDOC could
13      potentially implicate the protective order if the
14      issue at hand has nothing to do with the provision
15      of drugs to TDOC?
16              MR. SUTHERLAND:  My screen was frozen.  I
17      didn't get that.
18              MS. NELSON MAJOR:  I'm asking you to
19      explain the basis of your objection.  I'm not
20      quite grasping how that implicates the protective
21      order.
22              MR. SUTHERLAND:  The basis would be, if
23      he tells you nature of it, a search of -- I guess
24      what I would say is, you could ask him if it
25      resulted in any form -- formal action.  And if it
```

1          did result in formal action, then we can revisit

2          it.  Because I don't want to get into anything

3          where somebody could search for an investigation

4          that resulted in formal action that would identify

5          the pharmacy.

6                    MS. NELSON MAJOR:  Okay.

7     BY MS. NELSON MAJOR:

8          Q.     Was a disciplinary action brought against

9     a staff member at the pharmacy?

10         A.     No.

11         Q.     Was it brought against the pharmacy

12    itself?

13         A.     The pharmacy itself.

14         Q.     Could you please pull up Exhibit 79.

15         A.     Okay.

16         Q.     Do you recognize this document?

17         A.     Yes, I do.

18         Q.     What is it?

19         A.     Disciplinary action by the pharmacy.

20         Q.     Is this the disciplinary action that you

21    were just referring to?

22         A.     Yes.

23         Q.     Besides the disciplinary action

24    referenced in Exhibit 79, are you aware of other

25    disciplinary actions brought against the pharmacy or

```
 1   its personnel?
 2         A.      Against the pharmacy, no; against
 3   personnel, yes.
 4         Q.      What is Exhibit 79?
 5         A.      A board order.
 6         Q.      What is a board order?
 7         A.      Detailing -- detailing the reason for the
 8   reprimand.
 9         Q.      And what was the reason for the
10   reprimand?
11         A.      Failure to disclose a misdemeanor on the
12   initial application for the pharmacy license.
13         Q.      Does the pharmacy application require
14   disclosure of certain individuals' criminal history?
15         A.      It does.
16         Q.      And whose criminal history was not
17   disclosed -- without naming names -- on that license
18   application?
19         A.      A minority partner.
20         Q.      Who filled out the application, without
21   naming names?
22         A.      The Pharmacy Owner.
23         Q.      Was that Pharmacy Owner you that filled
24   out the application?
25         A.      Yes.
```

1      Q.      Was it your criminal conviction that was

2   not disclosed in the application?

3                MR. SUTHERLAND:  Objection.  Object to

4        the form, based on his prior answer.

5                THE WITNESS:  It was not myself.

6   BY MS. NELSON MAJOR:

7      Q.      It was a different Pharmacy Owner's

8   conviction?

9      A.      Yes.

10     Q.      And what was the outcome of this

11  disciplinary action?

12     A.      We were fined $1,500.

13     Q.      You also mentioned that an employee of

14  the pharmacy was subject to disciplinary action.

15  Without naming names, what role did that person occupy

16  at the pharmacy?

17     A.      Pharmacist.

18     Q.      How many disciplinary actions are you

19  aware of?

20     A.      Just one.

21     Q.      And what was the general nature of that

22  disciplinary action?

23     A.      I can't recall.

24     Q.      Were you aware of that disciplinary

25  action at the time you hired the Pharmacist in Charge?

```
1          A.      Yes.

2          Q.      Was that disciplinary action connected to

3   an event that happened prior to the Pharmacist in

4   Charge's employment with your pharmacy?

5          A.      Yes.

6          Q.      What was the outcome of that disciplinary

7   action brought against the Pharmacist in Charge?

8          A.      I don't recall.

9                  MS. NELSON MAJOR:  Can we take a

10         ten-minute break at this point?

11                 MR. SUTHERLAND:  Certainly.

12                 MS. NELSON MAJOR:  Thank you.  Come back

13         at 25 after?

14                 MR. SUTHERLAND:  Sounds good.

15                 THE VIDEOGRAPHER:  We're off the record

16         at 2:13 p.m.

17                 (Recess at 2:13 p.m. to 2:23 p.m.)

18                 THE VIDEOGRAPHER:  We're on record.  The

19         time is 2:21 p.m.

20  BY MS. NELSON MAJOR:

21         Q.      Pharmacy Owner, when was the last time

22  you talked to a supplier in Europe about pentobarbital?

23         A.      I don't know.

24         Q.      Was that conversation before or after the

25  DEA meeting?
```

**Gibson Court Reporting**

```
 1            A.       Before.
 2            Q.       So you haven't had any conversation with
 3   a potential foreign source related to importing
 4   pentobarbital since that time?
 5            A.       Not that I can recall.
 6            Q.       And would the same be true of the sources
 7   you discussed in India?
 8            A.       Yes.
 9            Q.       Do you have any reason to believe that
10   the sources in Europe wouldn't supply TDOC with
11   pentobarbital, notwithstanding the DEA issue?
12                     MR. SUTHERLAND:  Object to the form.
13                     THE WITNESS:  I have no idea.
14   BY MS. NELSON MAJOR:
15            Q.       What about the sources in India?
16            A.       I don't know.
17            Q.       You previously talked about oral
18   preparations, and you indicated that the pharmacy does
19   in fact prepare oral preparations.  What sorts of drugs
20   does the pharmacy prepare for oral administration?
21            A.       It could be antibiotics, various other
22   drugs.
23            Q.       Are oral preparations a routine part of
24   the pharmacy's business?
25            A.       Yes.
```

**Gibson Court Reporting**

```
 1        Q.      Who paid for your plane ticket to
 2   Tennessee today?
 3        A.      I did.
 4        Q.      Did you also pay for your hotel?
 5        A.      I did.
 6                MS. NELSON MAJOR:  Just a moment.
 7                (Pause.)
 8                MS. NELSON MAJOR:  I don't have any
 9        further questions.
10                MR. SUTHERLAND:  All right.  Thank you.
11                THE VIDEOGRAPHER:  We're off the record.
12        The time is 2:24 p.m.
13            (Proceedings concluded at 2:24 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    C E R T I F I C A T E

2

3   STATE OF TENNESSEE

4   COUNTY OF KNOX

5           I, Rhonda S. Sansom, RPR, CRR, CRC, LCR #685,

6   licensed court reporter in and for the State of

7   Tennessee, do hereby certify that the above

8   videoconference deposition of PHARMACY OWNER was

9   reported by me and that the foregoing 137 pages of the

10  transcript is a true and accurate record to the best of

11  my knowledge, skills, and ability.

12          I further certify that I am not related

13  to nor an employee of counsel or any of the parties to

14  the action, nor am I in any way financially interested

15  in the outcome of this action.

16          I further certify that I am duly licensed

17  by the Tennessee Board of Court Reporting as a Licensed

18  Court Reporter as evidenced by the LCR number and

19  expiration date following my name below.

20

21

22  _____
                     Rhonda S. Sansom, RPR, CRR, CRC
23  RhondaSansom@gibsonreporters.  Tennessee LCR# 0685
    2021.10.04 17:15:28           Expiration Date:  6/30/22
24  Signer:
     CN=RhondaSansom@gibsonreporters.com

25
```

**Gibson Court Reporting**