# EXHIBIT 2

# KING

## vs.

## PARKER, et al.

---

# DEBRA K. INGLIS

# October 13, 2021



**Tonya Stolze, LCR**

Chattanooga (423)266-2332   Jackson (731)425-1222
Knoxville (865)329-9919   Nashville (615)595-0073   Memphis (901)522-4477
www.elitereportingservices.com

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
               MIDDLE DISTRICT OF TENNESSEE
 2                  NASHVILLE DIVISION
   _____
 3

 4
   TERRY LYNN KING,
 5
            Plaintiff,          CAPITAL CASE
 6
   vs.                          Case No. 3:18-CV-01234
 7
   TONY PARKER, ET AL,          JUDGE CAMPBELL
 8
            Defendants.
 9 _____

10

11

12

13

14                  Videoconference Deposition of:
                    DEBRA K. INGLIS
15
                    Taken on behalf of the Plaintiff
16                  October 13, 2021

17                  Commencing at 9:05 a.m.

18

19

20

21
   _____
22
           ELITE-BRENTWOOD REPORTING SERVICES
23           www.elitereportingservices.com
                 TONYA D. STOLZE, LCR
24                P.O. Box 292382
             Nashville, Tennessee 37229
25                (615)595-0073
```

Case 3:18-cv-01234 Document 165-1 Filed 04/05/22 Page 3 of 266 PageID #: 11425
Elite-Brentwood Reporting Services (615)595-0073
www.EliteReportingServices.com

```
1

2                  A P P E A R A N C E S

3

4    For the Plaintiff:

5             MS. LYNNE LEONARD
                 Assistant Federal Defender
6                 Federal Community Defender Office
                 Capital Habeas Unit
7                 Eastern District of Pennsylvania
                 601 Walnut Street, Suite 545W
8                 Philadelphia, PA  19106
                 (215)928-0520
9                 Lynne_Leonard@fd.org

10

              MS. SARAH B. MILLER
11                Attorney at Law
                 Bass Berry & Sims, PLC
12                150 Third Avenue South, Suite 2800
                 Nashville, TN  37201
13                (615)742-7713
                 smiller@bassberry.com
14

15

     For the Defendants:
16
              MR. SCOTT C. SUTHERLAND
17            MR. CODY N. BRANDON
                 Deputy Attorneys General
18                Law Enforcement and Special Prosecutions
                 Division
19                John Sevier Building
                 500 Dr. Martin L. King Jr., Blvd.
20                Nashville, TN  37243
                 (615)532-7400
21                Scott.Sutherland@ag.tn.gov
                 Cody.Brandon@ag.tn.gov
22

23

     Also Present:
24            MR. DEAN ATYIA, Attorney at Law

25            MS. SOPHIA GORDON - Videographer
```

Case 3:18-cv-01234 Document 184 Filed 09/05/22 Page 4 of 266 PageID #: 11428
ELITE Breanne Reporting Services (615)595-0073
www.EliteReportingServices.com

```
                        I  N  D  E  X

                                                    Page

Examination                                            6
by Ms. Leonard



                    E  X  H  I  B  I  T  S

                                                    Page

(None marked.)
```

*Elite Reporting Services* (615) 595-0073
*www.EliteReportingServices.com*

```
 1

 2               S  T  I  P  U  L  A  T  I  O  N  S

 3

 4

 5           The videoconference deposition of DEBRA K.

 6   INGLIS, was taken by counsel for the Plaintiff, by

 7   Notice, at 150 3rd Avenue South, Suite 1100,

 8   Nashville, Tennessee, on October 13, 2021, for all

 9   purposes under the Tennessee Rules of Civil

10   Procedure.

11           All formalities as to caption, notice,

12   statement of appearance, et cetera, are waived.  All

13   objections, except as to the form of the question,

14   are reserved to the hearing, and that said

15   videoconference deposition may be read and used in

16   evidence in said cause of action in any trial

17   thereon or any proceeding herein.

18           It is agreed that TONYA D. STOLZE, LCR,

19   Notary Public and Court Reporter for the State of

20   Tennessee, may swear the witness, and that the

21   reading and signing of the completed deposition by

22   the witness was not discussed.

23

24

25
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1                          *   *   *

 2

 3            THE VIDEOGRAPHER:  We are now on the

 4  record.  Today is Wednesday, October 13th, 2021.

 5  The time on the video monitor is 9:05 a.m.  This

 6  marks the beginning of the deposition of Debbie

 7  Inglis.  Will counsel please introduce yourselves

 8  and state whom you represent.

 9            MS. LEONARD:  My name is Lynne Leonard.

10  I'm from the Federal Community Defender Office in

11  Philadelphia, and my colleagues and I represent the

12  Plaintiff, Terry King.

13            MR. SUTHERLAND:  Good morning.  My name

14  is Scott Sutherland, and I'm with the Tennessee

15  Attorney General's Office.  We represent the

16  Defendants in the case, Tony Parker and Tony Mayes,

17  and the witness, who's here today, Ms. Inglis.  To

18  my right is Cody Brandon, Assistant Attorney

19  General, Cody Brandon, and to his right is Dean

20  Atyia, also with our office.

21                          *   *   *

22

23            DEBRA KAY INGLIS,

24  was called as a witness, and after having been duly

25  sworn, testified as follows:
```

**Elite Reporting Services** * (615) 595-0073
www.EliteReportingServices.com

```
 1                    EXAMINATION

 2   QUESTIONS BY MS. LEONARD:

 3   Q.     Good morning, Ms. Inglis.

 4   A.     Good morning.

 5   Q.     As I said my name is Lynne Leonard.  I'm an

 6   attorney at the Federal Community Defender Office in

 7   Philadelphia, and I'm representing Terry King in

 8   King v. Parker, et all.  Thank you for taking the

 9   time to come here today and answer my questions.

10   You've been deposed several times before; is that

11   right?

12   A.     Yes.

13   Q.     Approximately how many times would you say

14   you've been deposed?

15   A.     Oh, my gosh.  I'm thinking at least five,

16   maybe more.

17   Q.     Okay.  And approximately how many of those

18   were related to executions in Tennessee?

19   A.     Most of them.

20   Q.     Most of the five?

21   A.     Uh-huh.

22   Q.     Okay.  Is there any reason you cannot testify

23   truthfully or accurately today?

24   A.     No.

25   Q.     You're not feeling ill?
```

Elite Reporting Services • (615) 595-0073
www.EliteReportingServices.com

```
 1   A.      No.

 2   Q.      You're not on any medication that would --

 3   A.      No.

 4   Q.      Okay.  Are you represented by counsel today?

 5   A.      Yes.

 6   Q.      And is that Mr. Sutherland?

 7   A.      Yes.

 8   Q.      Okay.  If you need to take a break at any

 9   time, just let me know.

10   A.      Sure.

11   Q.      We're all drinking lots of coffee and water,

12   so don't hesitate to ask for a break, if you need

13   one?

14   A.      Sure.

15   Q.      What did you do to prepare for today's

16   deposition?

17   A.      I reviewed the protocol a few times.  I

18   reviewed responses from Warden Mayes to Requests for

19   Admissions.  Let me think.  I think that's the

20   majority of what I did.  I did meet with

21   Mr. Sutherland, Mr. Mitchell, and Mr. Dean At --

22   what's Dean -- Dean, your last name?

23   Q.      Atyia.  Dean Atyia.

24   A.      Atyia.  Okay.  Yes.

25   Q.      I think I'm saying that right.
```

Elite Document Reporting Services
www.EliteReportingServices.com

```
 1   A.      Uh-huh.

 2   Q.      Excuse me if I'm not.

 3   A.      Yes, I did that.

 4   Q.      Was anyone else in the meetings besides

 5   Mr. Sutherland, Mr. Mitchell, and Mr. Atyia?

 6   A.      Not when they were prepping for my

 7   deposition.

 8   Q.      Okay.  And how many times did you meet with

 9   those gentlemen?

10   A.      Once.

11   Q.      And about how long was that meeting?

12   A.      Three to four hours.

13   Q.      Okay.  Did that take place earlier this week?

14   A.      That took place last Friday.

15   Q.      Okay.  And then did you -- you said you

16   reviewed the protocol --

17   A.      Uh-huh.

18   Q.      -- and some of the Requests for Admissions

19   from Defendant Mayes.  Were there any other

20   documents that you reviewed in preparation for

21   today?

22   A.      I can't think of any specifically.

23   Q.      Okay.  Did you review anything else on your

24   own to prepare for today?

25   A.      I can't think of anything.
```

Case 3:18-cv-01234-B Document 185-1 Filed 04/05/22 Page 10 of 266 PageID #: 11432
FL124 B Document 185-1 Filed 04/05/22 Page 10 of 266 PageID #: 11432
www.EliteReportingServices.com

```
 1   Q.     Did anything that you review refresh your
 2   recollection of any specific issues?
 3            MR. SUTHERLAND:  Object to the form.
 4   Lynne, if you don't mind, I'll just reiterate that
 5   all objections will be, with your agreement,
 6   subsumed and not objections to form.  Ms. Inglis, if
 7   you'll just pause before you answer --
 8            THE WITNESS:  Okay.
 9            MR. SUTHERLAND:  -- just for two seconds
10   to let me say something so I'll object to the form
11   of that, but you can answer.
12            THE WITNESS:  I will.
13            MS. LEONARD:  And we agree to that
14   stipulation about the objections.
15            MR. SUTHERLAND:  Thank you.
16   BY MS. LEONARD:
17   Q.     Did you meet with anyone other than your
18   attorneys at any point to prepare for this
19   deposition?
20   A.     I don't think so, no.
21   Q.     Did you talk to anyone else involved in this
22   case, perhaps Defendant Mayes or Defendant Parker,
23   or anyone on the Execution Team?
24   A.     Not in preparation for this deposition.
25   Q.     Okay.  Did you review the transcripts of any
```

Elite Reporting Services
www.EliteReportingServices.com

```
1   of the other depositions taken in this case?
2   A.      No.
3   Q.      Did you review any of the past transcripts of
4   depositions you provided in other cases related to
5   Tennessee inject --
6   A.      I did not.
7   Q.      -- executions?  Did anyone consult with you
8   to prepare for another deposition in this case?
9   A.      No.
10  Q.      Did Commissioner Parker talk with you about
11  his 30(b)(6) deposition two weeks ago?
12  A.      No.
13  Q.      Did you review any of the papers that have
14  been filed with the Court in this case?
15  A.      I don't remember specifically.  I'm sure I
16  saw the original complaint, and I also indicated
17  that I reviewed the responses of Defendant Mayes to
18  the Request for Admissions.
19  Q.      Okay.  But you didn't review the complaint
20  last week in your meeting or any time --
21  A.      No.
22  Q.      -- in preparation for today?
23  A.      No.
24  Q.      Did you discuss the deposition with anyone
25  other than your counsel?
```

```
 1   A.      No.

 2   Q.      How much time in total do you estimate you

 3   spent preparing for the deposition?

 4   A.      Including the time spent with counsel, maybe

 5   eight hours.

 6   Q.      Okay.  And that was reviewing materials?

 7   A.      Yes.

 8   Q.      The materials that you listed in meeting with

 9   your counsel?

10   A.      Right.

11   Q.      Okay.  Great.  What is your highest level of

12   education?

13   A.      I have a law degree.

14   Q.      Okay.  And where did you get that degree?

15   A.      Vanderbilt --

16   Q.      What year was that?

17   A.      -- School of Law.  1984.

18   Q.      And do you have an undergraduate degree as

19   well?

20   A.      Yes.

21   Q.      And what is that degree in?

22   A.      It's a Bachelor of Arts from the University

23   of Tennessee.

24   Q.      And what year was that?

25   A.      Hold on.  Let me think.  Let's see.  '79 or
```

Elite Reporting Services
www.EliteReportingServices.com

1  '80.

2  Q.    Okay.  What was the -- you said it was a

3  Bachelor of Arts?

4  A.    Uh-huh.

5  Q.    What was the subject you studied?

6  A.    Organismal and Systems Biology.

7  Q.    Oh, wow, and then you became a lawyer?

8  A.    Yes.

9  Q.    Okay.  What type of training did you get as

10 part of your Bachelor's Degree?

11 A.    Oh, I just prepared for classes -- the

12 classes I took.

13 Q.    So did that involve some lab work?

14 A.    A few courses had some lab work.

15 Q.    Okay.  And what type of information did you

16 learn as part of that -- in part of that degree?

17 A.    Nothing really pertinent to -- to this.

18 Q.    So do you have any medical training?

19 A.    No.

20 Q.    Do you have any scientific expertise?

21 A.    No.

22 Q.    Okay.  Where did you go to high school?

23 A.    Maplewood High School here in Nashville.

24 Q.    Okay.  Did you get any special training at

25 your high school?

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
 1   A.      No.

 2   Q.      Did you specialize in any subjects?

 3   A.      No.

 4   Q.      Was it just a regular high school, a

 5   regular --

 6   A.      Sure.

 7   Q.      -- curriculum?

 8   A.      Yes.

 9   Q.      Have you completed any other training

10   courses?

11   A.      Can you be more specific?

12   Q.      Do you have any -- are you CPR trained?

13   A.      No.

14   Q.      Have you ever been a lifeguard?

15   A.      No.

16   Q.      Any other special training of that variety

17   that you can think of, some sort of coursework that

18   you would have taken to have some special

19   capabilities?

20   A.      Nothing similar to lifeguard or CPR.

21   Q.      Okay.  Any military training?

22   A.      No.

23   Q.      And you said no medical training?

24   A.      No.

25   Q.      Do you hold any certifications or
```

Case 3:18-cv-01124-B Document 185 Filed 04/05/22 Page 15 of 266 PageID #: 11437
EliteReportingServices.com
www.EliteReportingServices.com

1  certificates?

2  A.     I don't think so.

3  Q.     You're not -- you don't have a real estate

4  certificate or license or you're not a mortgage

5  broker?

6  A.     No.

7  Q.     Okay.  Do you participate in any volunteer

8  programs?

9  A.     No.

10  Q.     Are you currently employed?

11  A.     Yes.

12  Q.     By whom?

13  A.     The State of Tennessee, Department of

14  Correction.

15  Q.     Okay.  And is it okay if I refer to that as

16  TDOC?

17  A.     Sure.

18  Q.     Great.  And how long have you been with TDOC?

19  A.     Since 1994.

20  Q.     What motivated you to join TDOC?

21          MR. SUTHERLAND:  Object to the form.

22  You can answer.

23          THE WITNESS:  Okay.  I was interested in

24  criminal law.  I was in the criminal division

25  doing -- I had done some, you know, appellate work,

Elite Reporting Services
www.EliteReportingServices.com

```
 1   special litigation, including habeas, then I became
 2   the head of the Capital Litigation Team, and then
 3   the opportunity came available for the General
 4   Counsel position at the Department of Correction,
 5   and someone encouraged me to apply.
 6            And at that time I was thinking --
 7   because I was young in my career -- that I would,
 8   you know, eventually do something else.  And so this
 9   was an opportunity to stay in the criminal justice
10   system but also expand my experience into civil
11   matters and employment law and things like that, and
12   so that's what led me to apply.
13   BY MS. LEONARD:
14   Q.      Okay.  So you started as the general counsel
15   at TDOC; is that right?
16   A.      That's right.
17   Q.      And that was in 1994?
18   A.      Right.
19   Q.      Okay.  And is that still your current job
20   title today?
21   A.      That and I'm also the Deputy Commissioner of
22   Administration.
23   Q.      Are those two separate roles?
24   A.      Well, yes.  Yes.
25   Q.      What's -- what is your role as Deputy
```

Case 3:18-cv-01234-B Document 185 Reported Filed 04/05/22 ceBage 17 of 266 Page ID #: 11439
EliteReportingServices.com
www.EliteReportingServices.com

```
 1   Commissioner?

 2   A.      I oversee human resources, offender

 3   administration, which includes sentence management,

 4   and records management.  The Assistant Commissioner

 5   for operational support reports to me.  That

 6   includes training, facilities management,

 7   maintenance, other things.  I'm also the liaison

 8   with STS, which is Strategic Technology Solutions,

 9   which is another branch under Finance &

10   Administration, and then I'm also still General

11   Counsel over the Legal Division.

12   Q.      Okay.  What's your role as General Counsel?

13   A.      Provide legal advice, oversee all legal

14   things for the department.

15   Q.      I think you mentioned one of your areas that

16   you manage is sentence management.  Is that what you

17   said?

18   A.      Yes.

19   Q.      And what does sentence management mean?

20   A.      Sentence computation, which, you know,

21   obviously includes calculation of sentences,

22   providing sentence information, providing, you know,

23   sentence credits that are awarded, authorizing

24   release, anything that you might imagine relates to

25   the length of someone's sentence.
```

```
 1   Q.    Okay.  So does that ultimately include the

 2   management of executions?

 3   A.    No.

 4   Q.    And why not?

 5   A.    They -- they just don't have any role in

 6   that.

 7   Q.    Okay.  So you don't have a role in execution

 8   management as opposed to sentence management?

 9   A.    Not as Deputy Commissioner.

10   Q.    Okay.  Do you have that role wearing your hat

11   as General Counsel?

12   A.    As General Counsel I provide legal advice on

13   all areas including execution.

14   Q.    Okay.  How long have you held each of these

15   job titles?

16   A.    Well, General Counsel since 1994.  I'm sorry.

17   I'm not exactly sure when I was also given the

18   Deputy Commissioner role.  Four or five years ago

19   maybe.

20   Q.    Okay.  Within the last five years is fair to

21   say?

22   A.    Yes.

23   Q.    Okay.  Does anyone report to you in your role

24   as Deputy Commissioner?

25   A.    Yes.
```

Case 3:18-cv-01234 Document 185-2 Filed 04/05/22 Page 19 of 266 PageID #: 11441
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
1    Q.       Who reports to you?

2    A.       My Deputy General Counsel, my Executive

3    Assistant, and Administrative Assistant.  I'm trying

4    to include everyone.  The Assistant Commissioner of

5    Operational Support.  The Director of Offender

6    Administration.  The Director of Human Resources.  I

7    think that's it.

8    Q.       Okay.  Does anyone report to you as General

9    Counsel?

10   A.       Yes.  The Deputy General Counsel, the

11   Administrative Assistant, the Executive

12   Administrative Assistant.  I think that's it.

13   Q.       And do you have a legal department at TDOC?

14   A.       Yes.

15   Q.       You're responsible for overseeing that

16   department?

17   A.       Yes.

18   Q.       Approximately how many lawyers are a part of

19   the Legal Division at TDOC?

20   A.       Let's see.  One, two, three, four, five --

21   seven, if you include me.

22   Q.       Okay.  Are there any lawyers at TDOC who do

23   not report to you?

24   A.       Yes.

25   Q.       And who are they?
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1    A.    Tory Grimes, who is our Legislative liaison.

 2   He used to work in the Legal Division, and Kelly --

 3              MR. SUTHERLAND:  You can answer.  You

 4   can answer the question.

 5              THE WITNESS:  Sure.  Okay.  And our

 6   Inspector General.

 7   BY MS. LEONARD:

 8    Q.    Okay.  So they're the only two lawyers that

 9   do not report to you at TDOC?

10    A.    Actually, there's another person that has a

11   legal degree in community supervision.

12    Q.    Okay.  And is it -- the reason they're not

13   reporting to you is because they're not working in

14   their capacity as lawyers for TDOC --

15    A.    Correct.

16    Q.    -- at this moment?  Okay.  And who do you

17   report to?

18    A.    The Commissioner.

19    Q.    And that's in both roles as General Counsel

20   and as Deputy Commissioner?

21    A.    Yes.

22    Q.    Okay.  Do you work with the Attorney

23   General's Office in either of your capacities with

24   TDOC?

25    A.    Well, I consult with the Attorney General's
```

Case 3:18-cv-01234 Document 185 Filed 04/05/22 Page 21 of 266 PageID #: 11443
Elite Reporting Services
www.EliteReportingServices.com

```
 1  Office quite a bit.

 2  Q.     How frequently would you say?

 3  A.     Constantly.

 4  Q.     Constantly.  So several times a week?

 5  A.     Yes.

 6  Q.     Who's your primary contact with the Attorney

 7  General's office?

 8  A.     Stephanie Reevers is generally over the

 9  Department of Correction.

10  Q.     Okay.  And what do you consult with them

11  about?

12  A.     Oh, my gosh, so many different things --

13              MR. SUTHERLAND:  I think it's fine to

14  generally discuss what she talks about.

15  BY MS. LEONARD:

16  Q.     Yeah.  I'm not asking for the substance of

17  the discussions or any legal content of discussions,

18  just the general reasons that you would be

19  consulting with the Attorney General's office or the

20  broad topics?

21  A.     Pending litigation, asking for advice about

22  issues that come up, I mean, there -- I mean, it's

23  vast.

24  Q.     Do you report directly to the Governor?

25  A.     No.
```

```
 1   Q.      Does the Commissioner rely on your legal

 2   advice?

 3   A.      I think he takes it into consideration.

 4   Q.      Does the Commissioner rely on anyone else's

 5   legal advice?

 6   A.      I don't know.

 7   Q.      Does anyone else rely on your legal advice?

 8   A.      Well, I think generally employees of the

 9   Department rely on my legal advice.

10   Q.      Okay.  What prompted you to take on the

11   Deputy Commissioner role?

12   A.      The Commissioner asked me to.

13   Q.      So you didn't seek out the position?

14   A.      No.

15   Q.      Did you apply for the position?

16   A.      No.

17   Q.      Was it competitive?

18   A.      No.

19   Q.      Did they consider any applicants from outside

20   of TDOC?

21   A.      I don't know.

22   Q.      Does that role pay additional compensation on

23   top of your General Counsel salary?

24   A.      Yes.

25   Q.      Are there additional benefits as well?
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1   A.      One is we're provided a car.

 2   Q.      Okay.  What motivated you to take on the new

 3   role after you were asked?

 4               MR. SUTHERLAND:  Objection to the form.

 5   You can answer.

 6               THE WITNESS:  Primarily because the

 7   Commissioner asked me to.

 8   BY MS. LEONARD:

 9   Q.      Okay.  Does this -- does this position

10   require any special training?

11   A.      I don't think there's any additional

12   training.  I had been with the Department for many

13   years and, you know, was familiar with the

14   operation.

15   Q.      Was this a new position?

16   A.      No.

17   Q.      So this was a position that someone else

18   vacated, and then you were asked to step into the

19   role?

20   A.      That's right.

21   Q.      Okay.  What was your prior employment before

22   you became General Counsel at TDOC?

23   A.      I was employed at the State Attorney

24   General's office.

25   Q.      And what position did you hold there?
```

Case 3:18-cv-01234-B Document 185 Reporting Services Page 24 of 266 Page ID #: 11446
ELITE Document 185 Reporting Services Page 24 of 266 Page ID #: 11446
www.EliteReportingServices.com

```
1    A.      I was an Assistant Attorney General, started
2    out in the General Civil Division.  I moved to the
3    Criminal Division.  I became a team leader in the
4    Appellate Division.  I became the Head of the
5    Special Litigation Division.  I became the Head of
6    the Capital Litigation Team.
7    Q.      Okay.  How many years total were you there at
8    the -- were you at the Attorney General's Office.
9    A.      I think eight years.
10   Q.      Okay.  Do you have a membership in any
11   professional organizations?
12   A.      Just the American Correctional Association.
13   Q.      How long have you been a member of that?
14   A.      Four years maybe.  I'm not exactly sure.
15   Q.      Do you have a particular role in the ACA?
16   A.      I am a Commissioner on the Accreditation
17   Committee.
18   Q.      Okay.  So what's that require of you?
19   A.      That requires me to -- okay.  So the American
20   Correctional Association, I'll say ACA, has auditors
21   that go out and audit correctional facilities on a
22   periodic basis, generally every three years, and the
23   auditors prepare a report, and then that report goes
24   to the Commission.
25          And there's a panel of us that will hold a
```

Case 3:18-cv-01234-B Document 185 Reported Filed 04/05/22 ce Page 25 of 266 Page ID #: 1147
ELITE B Document 185 Reported Filed 04/05/22 ce Page 25 of 266 Page ID #: 1147
www.EliteReportingServices.com

1  hearing, and representatives from the facility will

2  be there; and we ask questions about the audit.  And

3  then we either, you know, recommend approval,

4  re-accreditation or initial accreditation or not.

5  Q.     Okay.  And roughly how many times a year do

6  you meet in that capacity?

7  A.     Four or five.

8  Q.     Are you the individual at TDOC with the most

9  personal knowledge of the last 30 years history of

10 Tennessee's execution protocols?

11              MR. SUTHERLAND:  I'm going to object to

12 the form.  You can answer.

13              THE WITNESS:  No, I don't think so.

14 BY MS. LEONARD:

15 Q.     Who would you say is the person with the most

16 personal knowledge of that history?

17 A.     Thirty years?

18 Q.     (Nods head.)

19 A.     I don't think I can identify anyone.

20 Q.     How about the last 20 years of history of the

21 Tennessee execution protocols?

22 A.     Again, I don't think I can identify anyone.

23 Q.     Who do you think has more knowledge than you

24 do -- personal knowledge of this topic?

25 A.     I can't identify --

Elite Reporting Services * Excellence in Reporting Since 1973
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  The same objection.

 2              THE WITNESS:  -- anyone.

 3   BY MS. LEONARD:

 4   Q.    Has anyone been around TDOC longer than you

 5   have?

 6   A.    Oh, sure.  The Commissioner, for example.

 7   Q.    How long was the Commissioner -- how much

 8   longer than you was the Commissioner at TDOC?

 9   A.    He has well over 40 years, maybe 45.  We have

10   some people that have 48 years.

11   Q.    And the Commissioner's about to retire; is

12   that right?

13   A.    That's right.

14   Q.    So you may -- may catch up.

15   A.    I might.  I don't know if I can last that

16   long.

17   Q.    How many wardens have there been at Riverbend

18   since 1994?

19   A.    That's going to be tough.  I can think of,

20   let's see, one, two, three, four.  Since when?

21   Q.    1994 when you started at TDOC.

22   A.    Five, I can't say exactly but at least five.

23   Q.    Okay.  And has Commissioner Parker been the

24   only commissioner of TDOC since 1994?

25   A.    No.
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1    Q.    How many other commissioners have there been?
 2    A.    I think I've served under maybe six
 3    commissioners.
 4    Q.    And how many governors of Tennessee have
 5    there been since 1994?
 6    A.    Oh, I'm not going to be able to answer that.
 7    McWherter, Sundquist, Haslam, Governor Lee.  I'm
 8    probably missing somebody.
 9    Q.    Okay.  Do you hold any roles in Tennessee's
10    execution protocol?
11    A.    No.
12    Q.    Have you ever held any roles in Tennessee's
13    execution protocols at any point?
14    A.    No, other than providing legal guidance like
15    I do with every aspect of the Department's --
16    Q.    Right.
17    A.    -- operations.
18    Q.    You've never been a part of the execution
19    team?
20    A.    No.
21    Q.    Have you witnessed executions?
22    A.    Not -- I haven't been a witness in the
23    witness room.  I have observed some through
24    closed-circuit.
25    Q.    Through closed-circuit TV?
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1   A.      Yes.

 2   Q.      But you've never been in any witness room --

 3   A.      No.

 4   Q.      -- official witness room or any other witness

 5   room immediately in the Capital Punishment Unit?

 6   A.      No, I have not.

 7   Q.      Have you provided training to anyone in

 8   conjunction with Tennessee executions?

 9   A.      I can't say that I've provided any formal

10   training.  I just provided legal advice.

11   Q.      Have you been involved in executions outside

12   of Tennessee at any point?

13   A.      No.

14   Q.      Have you ever witnessed an execution outside

15   of Tennessee?

16   A.      No.

17   Q.      So you said you've provided legal advice in

18   conjunction with the development of the protocols.

19   How many protocols have you been involved in

20   developing?

21   A.      All right.  I'm going to have trouble coming

22   up with a number.  There was a protocol in place

23   when I came to the Department.  I really can't say a

24   number.  I'm sorry.

25   Q.      So maybe -- I'm hoping you can sort of walk
```

Elite Reporting Services
www.EliteReportingServices.com

1    me through what the history has been of the

2    Tennessee execution protocol since you started.  So

3    you said there was one in 1994 when you started?

4    A.     Right.

5    Q.     And then at what point did that protocol

6    change roughly?

7    A.     I can't remember the year.  I'm sorry.  I'm

8    sorry.  I can't remember the year, but the chemicals

9    involved did not change for -- until we were unable

10   to get sodium thiopental.

11   Q.     Okay.  So let's back up a second.  What was

12   the protocol in 1994?

13   A.     Sodium thiopental.  I think it was

14   pancuronium bromide at that point and potassium

15   chloride.

16   Q.     And then that changed when you were no longer

17   able to get sodium thiopental?

18   A.     Yes.

19   Q.     Would that have been late '90s, early 2000s?

20   Can you ballpark any rough time?

21   A.     I think it was later than that.

22   Q.     Later 2000s?

23          MR. SUTHERLAND:  Object to the form.

24   You can answer.

25          THE WITNESS:  Sometime in 2000s.  I

```
 1  can't remember the year.

 2  BY MS. LEONARD:

 3  Q.      Okay.  Why was the Department no longer able

 4  to get the sodium thiopental?

 5  A.      It was just no longer available to

 6  Departments of Correction and then later to anyone

 7  in the United States.

 8  Q.      So then what happened when the sodium

 9  thiopental became unavailable?

10  A.      We reviewed our protocol.  And we eventually

11  ended up with a protocol involving pentobarbital.

12  Q.      And when you say we reviewed the protocol,

13  who is "we"?

14  A.      Well, the Department of Correction in

15  general, that would have been --

16              MR. SUTHERLAND:  Yeah.  Let's --

17              THE WITNESS:  I'm sorry.

18              MR. SUTHERLAND:  -- don't mention any

19  persons by name other than the Commissioner, the

20  warden, and the associate warden of security, and we

21  can see where it goes.

22  BY MS. LEONARD:

23  Q.      Well, yeah, but if you can give me titles

24  perhaps or roles that this person's had at that

25  time.
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1    A.     Well, I think that would identify those

 2    people.

 3               MR. SUTHERLAND:  If they're known, like

 4    the Commissioner, people that are known in this

 5    litigation, if they're not known in the litigation,

 6    then don't mention their name or you can call their

 7    role.

 8               THE WITNESS:  Okay.  The folks would be

 9    the Commissioner, the warden, and I actually think

10    that's all I could say without identifying people.

11    BY MS. LEONARD:

12    Q.     Can you give me -- I'm just trying to think

13    of ways to -- I'm not looking for anybody that's on

14    the execution team, but I'm just trying to

15    understand who is it.  When you say we reviewed the

16    protocol after sodium thiopental was no longer

17    available --

18               MR. SUTHERLAND:  Like, for example, the

19    drug procurer, who's -- I mean, that would be a

20    title of a person that we've used in the litigation,

21    the executioner -- I mean, if those are people that

22    would have participated, we've used those sort of

23    over general identifiers as ways to sort of get

24    information but not, you know...

25               THE WITNESS:  Right.  But we're kind of
```

EliteReportingServices.com
www.EliteReportingServices.com

```
 1   going back before then.
 2               MR. SUTHERLAND:  Oh, gotcha.  Okay.
 3               THE WITNESS:  Yeah.
 4               MR. SUTHERLAND:  And so to the extent
 5   that you can identify people by role, you can
 6   answer.  If it discloses someone's identity, then I
 7   would instruct you not to answer.
 8               THE WITNESS:  Okay.  I mean, it would
 9   include the warden, the Commissioner.  It would
10   include me.  It would include another member of the
11   executive [sic] team, and then another -- another
12   employee of central office.
13   BY MS. LEONARD:
14   Q.    Okay.  At that time?
15   A.    Yes.
16   Q.    Okay.  And that -- that was the "we" that
17   reviewed -- that's the comprehensive "we" that
18   reviewed the protocol?
19   A.    Right.
20   Q.    And then what did that group of you do to
21   review the protocol?
22   A.    Well, we met a number of times.  We talked to
23   a couple of anesthesiologists.  We talked to a
24   physician.  We reviewed other protocols.  That's --
25   I think that's pretty much it.
```

```
 1    Q.     Roughly how many anesthesiologists is a
 2    couple?
 3    A.     Two.
 4    Q.     Two anesthesiologists and then a separate
 5    medical doctor?
 6    A.     Yes.
 7    Q.     And what was that individual's expertise
 8    then?
 9    A.     A medical doctor.
10    Q.     Was he just a general practitioner or a --
11    A.     Yes.
12    Q.     He wasn't a surgeon?
13    A.     Medical practitioner.
14    Q.     Okay.  Did you speak with any pharmacists?
15    A.     I can't recall if we did.
16    Q.     Or pharmacologists?
17    A.     I can't recall.
18    Q.     Did you consult with any other lawyers at
19    that time?
20    A.     No.
21    Q.     Okay.  And then --
22    A.     We might have consulted with the Attorney
23    General's Office but briefly.
24    Q.     What other states' protocols did you review
25    at that time?
```

Elite Reporting Services • www.EliteReportingServices.com

```
 1   A.      I'm probably not going to be able to come up

 2   with those.  That was quite a while ago.  You know,

 3   there's -- there are only a certain number of states

 4   that have lethal injection protocols.  I think we

 5   looked at most of those, looked at case law -- I

 6   did, but that's too long ago for me to remember

 7   which states we're talking about.

 8   Q.      Do you remember roughly how many states you

 9   reviewed?

10   A.      Not really.

11   Q.      Was it more than five?

12   A.      It could have been.

13   Q.      More than ten?

14   A.      I can't say.

15   Q.      Okay.  We can come back and see if we can

16   refresh your recollection on some of those states.

17   What happened after the commission met?  And I

18   shouldn't call this a commission.  What would you

19   call it, a commission, a committee, a review team?

20   A.      Working group.

21   Q.      Working group.  So after this working group

22   met and reviewed the protocol, what happened next?

23   A.      We made a recommendation to the Commissioner,

24   the then Commissioner.

25   Q.      What was the recommendation?
```

1    A.     At that time the recommendation was to go

2    with a one drug -- one-drug protocol using

3    Pentobarbital.

4    Q.     And why did you make that recommendation?

5    A.     Just based on the information that we had

6    received.

7    Q.     And why is it that you suggested moving from

8    a one-drug protocol when you had previously been

9    using a three-drug protocol?

10   A.     Just based on the information that we

11   received.

12   Q.     And what information was that?

13   A.     About what pentobarbital would do at a large

14   dose, and that's -- that's pretty much it.

15   Q.     So did you believe that pentobarbital would

16   be more effective for executions than the previous

17   three drugs you had been using?

18          MR. SUTHERLAND:  Objection to the form.

19   You can answer.

20          THE WITNESS:  Well, that was our

21   recommendation.

22   BY MS. LEONARD:

23   Q.     And that was based on the information you

24   received from the anesthesiologists or the medical

25   doctor, who --

```
 1   A.     Another -- yes.  Everyone that we consulted

 2   with.

 3   Q.     All collectively said that the Pentobarbital

 4   was the way to go?

 5   A.     No, but collectively the information we

 6   received, that was our recommendation.

 7   Q.     Okay.  So did some of the experts suggest

 8   that you should not use pentobarbital?

 9   A.     The experts didn't suggest anything.  They

10   just provided information about the pros and cons of

11   different things.

12   Q.     And what did they tell you that the pros were

13   of the pentobarbital?

14   A.     I can't recall at this point.

15   Q.     But you recall that you made the

16   recommendation --

17   A.     Yes.

18   Q.     -- to ultimately adopt -- it seems like those

19   pros are pretty convincing, I guess, if ultimately

20   that was the basis of your recommendation?

21          MR. SUTHERLAND:  Objection to the form.

22   You can answer.

23          THE WITNESS:  That was our

24   recommendation.

25   / /
```

Elite Reporting Services
www.EliteReportingServices.com

BY MS. LEONARD:

Q.    Okay.  So your working group suggested the changes.  Who made the final decision about whether to adopt that recommendation?

A.    The Commissioner.

Q.    And did the Commissioner adopt that recommendation?

A.    No.

Q.    What did the Commissioner do?

A.    The Commissioner adopted a -- you know, adopted a three-drug protocol.

Q.    Why did the Commissioner adopt that three-drug protocol rather than the one-drug protocol your team recommended?

        MR. SUTHERLAND:  Object to the form. You can answer, if you know.

        THE WITNESS:  Yeah.  I think, you know, you would have to ask him that.  But I believe it was -- it's my understanding there was a concern about being -- no state had used a one-drug protocol at that point.

BY MS. LEONARD:

Q.    I see.  Did you personally agree with the recommendation to move to a one-drug protocol?

A.    That was --

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 38 of 266 PageID #: 11460
ELITE B Enterprise Reporting Service
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Object to the form.
 2    You can answer.
 3              THE WITNESS:  Okay.  That wasn't my
 4    role.  That was the Commissioner's decision.
 5    BY MS. LEONARD:
 6    Q.    Right.  I'm just asking if you personally, as
 7    a member of the working group, agreed with that --
 8    the group's recommendation?
 9    A.    I did, but I did not oppose the
10    Commissioner's decision.
11    Q.    Sure.  In your opinion would it be preferable
12    for TDOC to be using a one-drug protocol versus a
13    three-drug protocol?
14              MR. SUTHERLAND:  Object to the form.
15    You can answer.
16              THE WITNESS:  If we could get
17    pentobarbital, we would use that.  But we have not
18    been able to get pentobarbital.
19    BY MS. LEONARD:
20    Q.    Why would you use pentobarbital, if you could
21    get it?
22    A.    That --
23              MR. SUTHERLAND:  The same objection.
24              THE WITNESS:  Okay.
25              MR. SUTHERLAND:  You can answer.
```

Case 3:18-cv-01234-B Document 185-2 Filed 04/05/22 Page 39 of 266 Page ID #: 11461
Elite Reporting Services
www.EliteReportingServices.com

```
 1              THE WITNESS:  Other states have used it
 2    successfully.
 3    BY MS. LEONARD:
 4    Q.     Okay.  And other states have also used a
 5    three-drug protocol successfully; is that right?
 6    A.     Right.
 7    Q.     Okay.  But you still think it would be
 8    preferable to use the one-drug, pentobarbital,
 9    protocol, if you could get pentobarbital?
10    A.     What I can say is that we adopted a one-drug
11    protocol using pentobarbital, and we had to abandon
12    that because we were not able to obtain it.
13    Q.     And when the working group made this
14    recommendation, did you make -- include in your
15    recommendation any guidance as to whether the drug
16    should be manufactured or compounded?
17    A.     No.
18    Q.     Why not?
19              MR. SUTHERLAND:  Object to the form.
20              THE WITNESS:  That --
21              MR. SUTHERLAND:  You can answer.
22              THE WITNESS:  Okay.  That wasn't an
23    issue at that point.
24    BY MS. LEONARD:
25    Q.     What do you mean by it was not an issue at
```

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 40 of 266 PageID #: 11462
ELITE B Document Reporting Service 615 255-2073
www.EliteReportingServices.com

```
 1   that point?

 2   A.     We did not consider that at all.

 3   Q.     Okay.  So did you collect any information

 4   about the differences between manufactured and

 5   compounded drugs from the persons you consulted?

 6   A.     Not at that point, no.

 7   Q.     And the working group didn't do any research

 8   on the difference between manufactured and

 9   compounded drugs?

10   A.     Not at that point.

11   Q.     Okay.  So the recommendation was simply for a

12   one-drug, pentobarbital, protocol?

13   A.     Yes.

14   Q.     No other specifications about the source of

15   the pentobarbital or the compound or anything like

16   that?

17   A.     No.

18   Q.     Okay.  Just --

19   A.     At that point it's my recollection that

20   commercially manufactured pentobarbital was

21   available.

22   Q.     Okay.  So it basically didn't occur to the

23   working group --

24   A.     No.

25   Q.     -- to look into any alternatives to that?
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1    A.     No.

 2    Q.     Was that something -- when you say that

 3    you -- it was your understanding that it was

 4    available, is that an understanding that you had

 5    from the people you consulted?

 6                MR. SUTHERLAND:  Object to the form.

 7    You can answer.

 8                THE WITNESS:  I'm -- I'm not sure

 9    because that was so long ago, but my recollection is

10    availability of pentobarbital was not an issue at

11    that point.

12    BY MS. LEONARD:

13    Q.     I see.  Okay.  So this was around, you said,

14    maybe the mid to late 2000s.  What happened after

15    that?

16    A.     Can you be more specific?

17    Q.     Sure.  When was the current protocol adopted?

18    A.     I think June or July of 2017.

19    Q.     And so what you're saying happened maybe 10,

20    12, 15 years before --

21    A.     Uh-huh.

22    Q.     -- that?  What -- how many more protocols

23    were there between say the mid 2000s and you said

24    2017?

25    A.     I don't know.  But if there were other
```

Elite Reporting Services
www.EliteReportingServices.com

1    versions, they would have been -- I don't think they
2    would have changed the chemicals used.
3    Q.    So once the Commissioner turned down the
4    recommendation for the one drug, pentobarbital, and
5    he adopted a three-drug protocol, then that was up
6    until 2017?
7    A.    I'm a little concerned about saying years,
8    but we had the three-drug protocol until we adopted
9    the one-drug, pentobarbital, protocol.  And I'm not
10   exactly sure when that was.
11   Q.    Okay.  Let's -- yeah.  Let me back up a
12   second.  So when the Commissioner adopted a
13   three-drug protocol, what three drugs were involved
14   in that protocol?
15   A.    I think at that time we still had -- I think
16   we still had sodium thiopental, and I think at that
17   time it was pancuronium bromide and potassium
18   chloride.
19   Q.    Okay.  So is that the same that the protocol
20   was before the working group met?
21   A.    I believe so, yes.
22   Q.    Okay.  And you suggested that at some point
23   that changed to the one-drug, pentobarbital,
24   protocol?
25   A.    Yes.

Elite Reporting Services
www.EliteReportingServices.com

1   Q.     And what prompted that change?

2   A.     I think that was when sodium thiopental

3   became unavailable and other states had actually

4   used the one-drug, pentobarbital, protocol.

5   Q.     Okay.  And did the -- did you have a similar

6   situation where the working group got together and

7   reviewed the protocol and made this recommendation?

8   A.     We didn't have a working group, but I know

9   that, you know, there were discussions among the

10  people that were -- would be involved in an

11  execution.

12  Q.     And so again without identifying people by

13  name, what were the -- who were these people that

14  were involved by title or by position?

15  A.     Well, obviously, it would have included the

16  Commissioner, probably the warden.  Again, my memory

17  is a little vague on -- on all of that, but again

18  there -- there was no working group at that point.

19  Q.     Okay.  So unlike the first time around when

20  you were involved, there was no working group that

21  consulted with experts.  This was more just informal

22  discussions with the people who were involved in

23  executions?

24  A.     Yes.  And, although, I don't recall exactly

25  but I'm sure -- you know, we always try to consult

```
 1   with other states concerning their use of a
 2   particular protocol and their experience with it.
 3   Q.     Okay.  And do you remember what states you
 4   consulted with this time?
 5   A.     No, I don't know.  I believe Ohio was maybe
 6   the first one to use pentobarbital as a one-drug
 7   protocol, so we probably would have talked to them.
 8   Q.     Okay.  So to make sure I'm understanding
 9   correctly, as you see it, one of the big reasons the
10   Commissioner didn't adopt the one-drug, pento,
11   protocol when your committee recommended it was
12   because it hadn't been used in other states.  And so
13   then when it was used in other states, that was what
14   prompted the change to the one-drug protocol?
15   A.     Well, that and the unavailability, I think,
16   of Sodium Thiopental.
17   Q.     Okay.  And at that time pentobarbital was
18   available?
19   A.     When we adopted it, it was.
20   Q.     Okay.  And how long roughly was the one-drug,
21   Pento, protocol in place?
22   A.     I'm not -- I'm not sure.
23   Q.     At what point did that change?
24   A.     I think maybe in 2017.
25   Q.     So that would have been around the time that
```

```
 1   the current protocol was adopted?

 2   A.      I believe so.  I hope I'm right on that.

 3   Q.      And what prompted that change?

 4   A.      The unavailability of pentobarbital.

 5   Q.      Okay.  And what happened at that point?  Was

 6   there a working group to review the one-drug

 7   protocol?

 8   A.      Not a working group, no.

 9   Q.      Who got together to discuss changing the

10   protocol this most recent time?

11   A.      The Commissioner, the drug procurer, me.  I

12   think that's primarily it.

13   Q.      Any folks from the AG's office?

14   A.      At some point I think they were involved.

15   Q.      And folks from the Governor's office?

16   A.      Yes.  Eventually, yes.

17   Q.      Okay.  And roughly how many people total

18   would you say were involved in considering the move

19   from the one-drug protocol back to a three-drug

20   protocol?

21   A.      Okay.  Can you be more specific?  Like are

22   you asking anyone that we talked to about it or

23   anyone who made a recommendation?

24   Q.      Yeah.  I'm just trying to understand what

25   your process was.  So you indicated that a group of
```

Elite Reporting Services
www.EliteReportingServices.com

```
1    people talked, it sounds like, internally, including
2    you and the Commissioner and the drug procurer and a
3    couple of other individuals at TDOC, and then it
4    sounds like there was some involvement from the AG's
5    office, some additional involvement from the
6    Governor's office.  All and all roughly how many
7    people in those groups combined were there?
8    A.     Okay.  This is just going to be a really
9    rough estimate.
10   Q.     Sure.
11   A.     Ten.
12   Q.     Okay.  And then who did you consult with
13   outside of that group?
14   A.     I don't -- I don't know that I personally
15   consulted with anyone outside that group.
16   Q.     Did the group consult with any experts?
17           MR. SUTHERLAND:  Object to the form.
18   You can answer, if you know.
19           THE WITNESS:  I don't know.
20   BY MS. LEONARD:
21   Q.     You don't know whether this group that you
22   were a part of consulted with any experts?
23   A.     No.  I can't -- I can't answer that
24   specifically.  No.
25   Q.     Did the group do any medical research?
```

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 47 of 266 PageID #: 11469
EliteReportingServices.com
www.EliteReportingServices.com

```
 1                MR. SUTHERLAND:  The same objection.
 2    You can answer.
 3                THE WITNESS:  I wasn't specifically
 4    responsible for that.  I think the drug procurer did
 5    some consulting with outside folks.
 6    BY MS. LEONARD:
 7    Q.    And would the outside folks include doctors?
 8                MR. SUTHERLAND:  Object to the form.
 9    You can answer, if you know.
10                THE WITNESS:  I -- I don't know.
11    BY MS. LEONARD:
12    Q.    So the only time you can remember that anyone
13    at TDOC consulted with anesthesiologists or a
14    medical doctor was back a number of years ago when
15    you were considering revisions to the first sodium
16    thiopental protocol; is that right?
17    A.    No.  I can't say that because I don't know
18    what the drug procurer -- who the drug procurer
19    consulted with.
20    Q.    Okay.  Would the drug procurer be the only
21    individual who would have consulted with someone
22    outside of TDOC?
23                MR. SUTHERLAND:  Object to the form.
24    You can answer, if you know.
25                THE WITNESS:  I don't know that.
```

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 48 of 266 PageID #: 11470
ELITE Courtroom Reporting Service (615) 595-0073
www.EliteReportingServices.com

1   BY MS. LEONARD:

2   Q.     But you personally did not?

3   A.     I did not.

4   Q.     Okay.  And so you think the drug procurer may

5   have but you're not sure?

6              MR. SUTHERLAND:  Object to the form.

7   You can answer.

8              THE WITNESS:  Right.  And I don't know

9   if the Commissioner did or if anyone else did.

10  That's all I can answer is I didn't.

11  BY MS. LEONARD:

12  Q.     Okay.  So there wasn't any sort of -- unlike

13  the time we talked about before with the working

14  group, there wasn't any sort of working group, so to

15  say -- so to speak, for this time around that did

16  the same thing, consulted with anesthesiologists,

17  and reviewed other states' protocols.  There was not

18  a similar process again.

19  A.     There was --

20             MR. SUTHERLAND:  Object to the form.

21  You can answer.

22             THE WITNESS:  Okay.  There was no formal

23  working group.

24  BY MS. LEONARD:

25  Q.     Okay.  And so how did -- how did you arrive

Case 3:18-cv-01234-B Document 135-1 Filed 04/05/22 Page 49 of 266 PageID #: 114
E01234 B Document 135 Reporting Service 615 255-0970
www.EliteReportingServices.com

```
 1   then at the current version of the protocol?
 2                MR. SUTHERLAND:  Object to the form.
 3   You can answer.
 4                THE WITNESS:  That was the
 5   Commissioner's decision.
 6   BY MS. LEONARD:
 7   Q.     And did he make that decision upon a
 8   recommendation?
 9                MR. SUTHERLAND:  Object to the form.
10   You can answer.
11                THE WITNESS:  Not a recommendation from
12   me.  I think he arrived at that based on information
13   concerning the drug procurer's efforts to obtain
14   Pentobarbital.
15   BY MS. LEONARD:
16   Q.     Okay.  So you said you never made a
17   recommendation; is that right?
18   A.     I don't think I did, no.
19   Q.     Did anyone else at TDOC make a recommendation
20   to the Commissioner?
21                MR. SUTHERLAND:  Object to the form.
22   You can answer.
23                THE WITNESS:  Again, I think he made his
24   decision based on information from the drug procurer
25   about what was available.
```

BY MS. LEONARD:

Q.     So you think that the drug procurer made a recommendation?

A.     I don't know that --

            MR. SUTHERLAND:  The same objection.

            THE WITNESS:  Sorry.  I don't know that I would call that a recommendation.  It was information that he provided.

BY MS. LEONARD:

Q.     Okay.  And you said that the Commissioner made the final decision to adopt the current three-drug protocol?

A.     Right.

Q.     Did he do that alone?

            MR. SUTHERLAND:  Object to the form. You can answer.

            THE WITNESS:  Yes.  As Commissioner that's his decision.

BY MS. LEONARD:

Q.     Okay.  And is he the individual who authorizes the state to conduct executions under three-drug protocol?

            MR. SUTHERLAND:  Object to the form. You can answer.

            THE WITNESS:  All right.  Can you repeat

Elite Reporting Services
www.EliteReportingServices.com

```
 1   the question?

 2   BY MS. LEONARD:

 3   Q.     Sure.  Is the Commissioner the individual who

 4   authorizes the state to conduct executions under the

 5   three-drug protocol?

 6             MR. SUTHERLAND:  The same objection.

 7             THE WITNESS:  Okay.  The Commissioner is

 8   carrying out the orders of the Court.  And the

 9   Commissioner is under statutory authority to do that

10   by lethal injection.  The Commissioner adopts the

11   lethal injection protocol.  So does that answer your

12   question?

13   BY MS. LEONARD:

14   Q.     Yeah.  That's helpful.  Thank you.

15   A.     Okay.

16   Q.     Is the state required to follow this

17   protocol?

18             MR. SUTHERLAND:  Object to the form.

19   You can answer.

20             THE WITNESS:  Yeah.  To the extent -- I

21   mean, the protocol is a guideline and can't provide

22   all details, but, yes, that is our procedure.

23   BY MS. LEONARD:

24   Q.     Okay.  Are there any other protocols that the

25   state can follow for executions?
```

```
 1    A.      No.  There's only one protocol.
 2    Q.      Is there an electrocution protocol?
 3    A.      Oh, yes.
 4    Q.      But there's only one lethal injection
 5    protocol?
 6    A.      Right.
 7    Q.      So the only options in Tennessee are for
 8    execution by lethal injection or execution by
 9    electrocution; is that right?
10    A.      Right.
11    Q.      And there's a separate protocol for each of
12    those?
13    A.      Right.
14    Q.      So you mentioned before that you were
15    involved in some way in the creation of the lethal
16    injection execution protocol that currently exists;
17    is that right?
18    A.      I had some involvement, yes.
19    Q.      What type of involvement?
20    A.      As legal counsel.
21    Q.      And so was your -- what was your role in
22    these meetings that you mentioned earlier?
23    A.      Providing legal advice.
24    Q.      How many meetings roughly did you have?
25    A.      When are you talking about?
```

```
 1   Q.      From the time when you started considering

 2   the move back to the three-drug protocol until it

 3   was ultimately adopted?

 4   A.      Well, again, there was no formal working

 5   group at that point and so I don't know how many

 6   meetings there might have been or how many

 7   discussions.

 8   Q.      How many discussions would you say you were a

 9   part of?

10   A.      Gosh, I don't have any idea.

11   Q.      Dozens?

12   A.      Probably dozens, yeah, or at least a dozen.

13   Q.      Okay.  And you said you're not sure

14   whether -- you never consulted with any doctors; is

15   that right?

16   A.      At the time we were moving from pentobarbital

17   to the three-drug --

18   Q.      Uh-huh.

19   A.      -- current?

20   Q.      Yes.

21   A.      I don't think I did personally.

22   Q.      And you're not sure if anybody else did?

23   A.      No.  I couldn't testify to that.

24   Q.      And no one ever asked you whether you thought

25   it would be a good idea for TDOC to consult with
```

ELITE Courtroom Reporting & Acquiescence Solutions Provided
www.EliteReportingServices.com

```
 1   experts?

 2                MR. SUTHERLAND:  Object to the form.

 3   You can answer.

 4                THE WITNESS:  I don't recall that, no.

 5   BY MS. LEONARD:

 6   Q.    But did people you were working with at TDOC

 7   know that you had been a part of this earlier

 8   working group?

 9   A.    I don't know how familiar they were with

10   that.

11   Q.    Did they know that you had had previous

12   experience in developing execution protocols?

13   A.    Well, obviously, they knew I've been General

14   Counsel for a long time, so they probably assumed I

15   had.

16   Q.    Okay.  And yet nobody asked you whether it

17   might be a good idea to consult with experts?

18   A.    I don't --

19                MR. SUTHERLAND:  The same objection.

20                THE WITNESS:  Sorry.  I don't recall

21   that specific question.

22   BY MS. LEONARD:

23   Q.    Okay.  And I know you said you didn't consult

24   with doctors this time around.  Did you consult with

25   pharmacists?
```

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 55 of 266 PageID #: 11457
ELITE Court Reporting & Videoconference (615) 595-0073
www.EliteReportingServices.com

```
 1   A.      I didn't.  The drug procurer, I believe, did.

 2   Q.      How about pharmacologists?

 3   A.      I don't know.

 4   Q.      Did the drug procurer or anyone else consult

 5   with the owner of the pharmacy that TDOC was working

 6   with?

 7           MR. SUTHERLAND:  Object to the form.

 8   You can answer.

 9           THE WITNESS:  I understand the drug

10   procurer did, but I don't have personal knowledge of

11   that.

12   BY MS. LEONARD:

13   Q.      Okay.  How about do you know whether anyone

14   spoke with a pharmacist who fills TDOC's orders for

15   drugs?

16   A.      For -- can you clarify that?  For what drugs?

17   Q.      For lethal injection drugs?

18   A.      Did anyone consult with the pharmacy that --

19   Q.      The pharmacists.  I'm sorry.  Yes.

20   A.      I believe the drug procurer did, but again I

21   don't have personal knowledge.

22   Q.      Okay.  So why this most recent time around,

23   when TDOC moved from the one-drug protocol back to

24   the three-drug protocol, did you not recommend

25   consulting with experts?
```

```
 1            MR. SUTHERLAND:  Object to the form.

 2    You can answer.

 3            THE WITNESS:  Well, as I indicated, I

 4    believe the drug procurer did consult with the

 5    pharmacist.  We also -- I believe the Commissioner

 6    consulted with other states, who have used a similar

 7    protocol.  I don't recall that I was asked for a

 8    recommendation about that specifically.

 9    BY MS. LEONARD:

10    Q.    And you never offered a recommendation having

11    had the past experience that you did?

12    A.    No.

13    Q.    Did you -- as a member of the working group

14    the first time around, did you find the expert

15    consultation helpful to making a recommendation?

16    A.    It was sort of helpful.  Yes.  They were kind

17    of reluctant to be involved, and they wouldn't make

18    any recommendations.  They would only answer

19    questions about, you know, pros and cons basically.

20    Q.    Okay.  What other sources did you consider in

21    coming up with the current iteration of the

22    protocol?

23            MR. SUTHERLAND:  Object to the form.

24    You can answer.

25            THE WITNESS:  I think primarily other
```

Elite Reporting Services
www.EliteReportingServices.com

1    states that have used that protocol and their

2    experience and the drug procurer's discussions with

3    pharmacists.

4    BY MS. LEONARD:

5    Q.     Did you read any other articles?

6                  MR. SUTHERLAND:  Object to the form.

7    You can answer.

8                  THE WITNESS:  I don't recall personally

9    whether I reviewed any articles or not.

10   BY MS. LEONARD:

11   Q.    Who drafted the current iteration of the

12   protocol?

13                 MR. SUTHERLAND:  You can say

14   generally --

15                 THE WITNESS:  Okay.

16                 MR. SUTHERLAND:  -- without identifying

17   the person, if there is a person specifically.

18                 THE WITNESS:  I think -- I mean, it was

19   kind of a group effort based on the drug procurer's

20   information received from the pharmacist and

21   information received from other states.

22   BY MS. LEONARD:

23   Q.    So who was part of this group effort?

24   A.    The Commissioner, the drug procurer.  There

25   may have been other people who reviewed it before it

Elite Reporting Services
www.EliteReportingServices.com

1   was adopted, but that's my recollection.

2   Q.    Okay.  So just to be clear, so you're saying

3   that the drug procurer and the Commissioner drafted

4   the protocol?

5            MR. SUTHERLAND:  Object to the form.

6   You can answer.

7            THE WITNESS:  They provided input.

8   BY MS. LEONARD:

9   Q.    And who actually typed up the protocol?

10  A.    Typed it?  I --

11           MR. SUTHERLAND:  Without identifying the

12  person.

13           THE WITNESS:  I probably typed it.

14  BY MS. LEONARD:

15  Q.    And did you also provide input?

16  A.    Not -- no, not really because I wasn't the

17  drug procurer.  I had not talked to a pharmacist.  I

18  was not the one who consulted with other states

19  concerning their experience using this particular

20  protocol.

21  Q.    So what did you use as the basis for your

22  draft?

23           MR. SUTHERLAND:  Object to the form.

24  You can answer.

25           THE WITNESS:  Okay.  Okay.  That was

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 59 of 266 PageID #: 11487
ELITE Court Reporting Services, LLC (615) 595-0073
www.EliteReportingServices.com

```
 1   many years ago.  I don't remember the form.  I just
 2   remember somehow getting the information.
 3   BY MS. LEONARD:
 4   Q.    So the information sort of magically came to
 5   you, and it resulted in the protocol we have now?
 6               MR. SUTHERLAND:  Object to the form.
 7               THE WITNESS:  Not magically, no.
 8   BY MS. LEONARD:
 9   Q.    So where did it come from?
10   A.    What I just said was I don't recall
11   specifically what form it was in.  I did tell you
12   who the information came from.
13   Q.    And that would be the Commissioner and the
14   drug procurer?
15   A.    I think so, yes, primarily.
16   Q.    Did they sit there with you while you were
17   typing it up?
18   A.    I don't recall.
19   Q.    So did they give you notes?
20   A.    I don't recall.
21   Q.    Could you look at Exhibit 1 in the binder?
22   A.    (Complies.)
23   Q.    If you'll turn to Page 6.
24   A.    (Complies.)
25   Q.    Do you see the date next to the
```

1   Commissioner's signature there is July 5th, 2018?

2   A.      Yes.

3   Q.      And that's also at the bottom left-hand

4   corner of, I believe, every page of this exhibit?

5   A.      Uh-huh.

6   Q.      Does that refresh your recollection that the

7   protocol was adopted on July 5th, 2018?

8              MR. SUTHERLAND:  Object to the form.

9   You can answer.

10             THE WITNESS:  Yes.

11  BY MS. LEONARD:

12  Q.      Okay.  And so that was roughly three and a

13  half years ago, not quite?

14  A.      Right.  Yes.

15  Q.      And you don't remember how you drafted this?

16  A.      Not --

17             MR. SUTHERLAND:  Object to the form.

18             THE WITNESS:  -- specifically.  Sorry.

19  BY MS. LEONARD:

20  Q.      Okay.

21  A.      Not specifically.

22  Q.      But it wasn't based on any information that

23  you personally had?

24  A.      Not any information that I personally

25  obtained from an expert.

```
 1   Q.     And you don't remember whether you had

 2   someone else's notes?

 3   A.     No.

 4   Q.     And you don't remember whether someone else

 5   had conversations with you about this?

 6              MR. SUTHERLAND:  Object to the form.

 7              THE WITNESS:  I'm sure there were

 8   conversations, but I don't remember specifically

 9   what they were.

10   BY MS. LEONARD:

11   Q.     Okay.  But you were the person who typed up

12   this protocol; is that right?

13   A.     I believe I typed it up.

14   Q.     And then who reviewed the protocol after you

15   typed this up?

16              MR. SUTHERLAND:  Don't identify anybody

17   by name.

18              THE WITNESS:  I'm speculating a little

19   bit, but it would have included the Commissioner,

20   the drug procurer, the warden, maybe the Assistant

21   Commissioner of prisons.  I don't know for sure

22   everyone that reviewed it.

23   BY MS. LEONARD:

24   Q.     Did those individuals send it back to you for

25   any revisions?
```

Elite Reporting Services  *  (615) 595-0073
www.EliteReportingServices.com

```
1    A.      I don't recall.

2    Q.      Did those individuals adopt it on the spot?

3             MR. SUTHERLAND:  Object to the form.

4             THE WITNESS:  Okay.  The Commissioner is

5    the only one that would adopt it.

6    BY MS. LEONARD:

7    Q.      So the final decision was the Commissioner's

8    alone?

9    A.      Yes.

10   Q.      And were there any meetings to discuss the

11   draft of the protocol?

12   A.      Not that I recall.  Not the draft, no.

13   Q.      Okay.  So you drafted this -- it looks like

14   it's a 104-page protocol based on information that

15   you don't remember but was not personally your

16   knowledge, and then you don't recall what happened

17   to it after that other than it was adopted?

18   A.      There were -- I mean, it might be a

19   hundred-page protocol, but there were, you know,

20   only specific sections that were revised.

21   Q.      And which specific sections were those?

22   A.      The sections concerning the chemicals used.

23   Let me look at the...

24   Q.      There's a table of contents on Page 2, if

25   that's helpful.
```

Elite Reporting Services
www.EliteReportingServices.com

1    A.     Right.  That's what I'm looking at.  There
2    would be changes in Section 5.
3    Q.     Okay.  So the section dealing with the
4    procurement and the preparation of the chemicals?
5    A.     Right.
6    Q.     Were there changes to any other sections in
7    this protocol?
8    A.     I don't know for sure.  But it's possible
9    there could have been changes, probably not relevant
10   to this litigation, concerning titles or, you know,
11   things like that.
12   Q.     Sure.  Sure.  But the only thing that you
13   remember changing substantively, let's say, is the
14   Section 5 --
15   A.     Right.
16   Q.     -- under procurement?  And that was based on
17   information primarily from the drug procurer?
18   A.     And the Commissioner.
19   Q.     And the Commissioner.  Did the drug procurer
20   draft any portions of this protocol?
21            MR. SUTHERLAND:  Object to the form.
22   You can answer.
23            THE WITNESS:  I don't recall if he or
24   she gave me any specific language.  I just don't.
25   Yeah.  I'm sorry.  I don't want to say something I'm

Case 3:18-cv-01234-B Document 185-2 Filed 04/05/22 Page 64 of 266 PageID #: 11486
ELITE B Document 185-2 Filed 04/05/22 PageID #: 11486
www.EliteReportingServices.com

1   not sure about.

2   BY MS. LEONARD:

3   Q.      Sure.  Let's go to Page 6.  In the very last

4   sentence on this page it says:  It will be reviewed

5   annually or as needed by a designated panel.  Do you

6   see the sentence I'm looking at?

7   A.      I do.

8   Q.      What is this annual review?

9   A.      Actually, what we do and it's -- and it's

10  really as needed, that people who would be involved

11  in the process look at it and recommend any changes

12  that are necessary.  In general, you know, there

13  haven't really been many changes.

14  Q.      Who were the people involved in the process?

15          MR. SUTHERLAND:  Don't identify anybody

16  by name.

17          THE WITNESS:  Commissioner, Assistant

18  Commissioner of prisons, the warden.  I'm sure I

19  would have the drug procurer look at it, me, maybe

20  the executioner.

21  BY MS. LEONARD:

22  Q.      And what's the purpose of the annual review?

23  A.      Just to see --

24          MR. SUTHERLAND:  Object to the form.

25          THE WITNESS:  -- if anything needs to be

Case 3:18-cv-01234-B Document 185 Reported 04/05/22 cePage 65 of 266 PageID #: 11437
ELITE B Document 185 Reported 04/05/22 ce Page 65 of 266 PageID #: 11437
www.EliteReportingServices.com

```
 1   changed.  Sorry.

 2   BY MS. LEONARD:

 3   Q.     And you said nothing has been changed since

 4   July of 2018?

 5   A.     Right.

 6   Q.     Has the protocol been reviewed by this group

 7   since 2018?

 8             MR. SUTHERLAND:  Object to the form.

 9   You can answer.

10             THE WITNESS:  Yeah.  It's kind of

11   reviewed on an ongoing basis.

12   BY MS. LEONARD:

13   Q.     And is this group that you just described, is

14   that what this, quote, designated panel is, as it

15   says, on Page 6?

16   A.     Yes.  Although, we don't, you know, come to a

17   conference room and meet together.  We just

18   independently review it.

19   Q.     Sure.  What makes this group designated?

20             MR. SUTHERLAND:  Object to the form.

21   You can answer.

22             THE WITNESS:  Based on their roles.

23   BY MS. LEONARD:

24   Q.     And so are they designated by the

25   Commissioner?
```

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 66 of 266 PageID #: 11438
ELITE REPORTING SERVICES
www.EliteReportingServices.com

```
 1   A.     Yes.

 2              MS. LEONARD:  Okay.  Do you want to take

 3   a short break here?

 4              MR. SUTHERLAND:  Sure.

 5              MS. LEONARD:  I need to run to the

 6   ladies room.

 7              THE VIDEOGRAPHER:  We are going off the

 8   record.  The time on the monitor is 10:11 a.m.

 9                   (A short break.)

10              THE VIDEOGRAPHER:  We are back on the

11   record.  The time on the monitor is 10:23 a.m.

12   BY MS. LEONARD:

13   Q.     Who at TDOC procures the lethal drugs that

14   Tennessee uses in executions?

15              MR. SUTHERLAND:  I'm going to --

16              THE WITNESS:  I'm not going to answer

17   that.

18   BY MS. LEONARD:

19   Q.     Not by name but by --

20              MR. SUTHERLAND:  Yeah.

21   BY MS. LEONARD:

22   Q.     What is the role --

23              MR. SUTHERLAND:  You can -- you can --

24   BY MS. LEONARD:

25   Q.     -- of the person?
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Yeah.

 2              THE WITNESS:  Drug procurer.

 3  BY MS. LEONARD:

 4  Q.    Okay.  And that's the only single individual?

 5  A.    Yes.

 6  Q.    And is that the same person who looks for

 7  pentobarbital?

 8  A.    Yes.  Yes.  Works with the pharmacist to

 9  locate it.

10  Q.    So the drug procurer works with the

11  pharmacist to locate both -- the three drugs that

12  are in the current protocol as well as

13  pentobarbital?

14  A.    Right.

15  Q.    Is that person involved in efforts -- equal

16  efforts to procure both the three drugs and the

17  pentobarbital?

18              MR. SUTHERLAND:  Object to the form.

19              THE WITNESS:  Yes.

20  BY MS. LEONARD:

21  Q.    How do you know that?

22              MR. SUTHERLAND:  I'm going to object to

23  the form of the question.  You can answer.

24              THE WITNESS:  Right.  I don't have

25  personal knowledge because I'm not the one doing it,
```

```
 1    but that is my understanding based upon

 2    conversations with the drug procurer.

 3    BY MS. LEONARD:

 4    Q.    Okay.  And is TDOC currently able to obtain

 5    pentobarbital?

 6    A.    No.

 7    Q.    Why not?

 8    A.    It's --

 9          MR. SUTHERLAND:  Object to the form.

10    You can answer.

11          THE WITNESS:  Okay.  It's my

12    understanding we cannot obtain it from any source.

13    BY MS. LEONARD:

14    Q.    And is there a reason that these sources

15    weren't provided to you?

16          MR. SUTHERLAND:  The same objection.

17          THE WITNESS:  Because we're a Department

18    of Correction and use it lethal injection.

19    BY MS. LEONARD:

20    Q.    But does that apply both to the manufactured

21    pentobarbital, as well as API to compound

22    pentobarbital?

23          MR. SUTHERLAND:  Objection to the form.

24    You can answer.

25          THE WITNESS:  It's my understanding
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
1    that, yes, it applies to both.

2    BY MS. LEONARD:

3    Q.    This understanding comes from the drug

4    procurer, you said?

5    A.    Yes.

6    Q.    When's the last time that you spoke with the

7    drug procurer about this?

8    A.    About this?  I don't know.  I speak to the

9    drug procurer on a regular basis though.

10   Q.    What is a regular basis?  Daily?

11   A.    Daily, yeah.

12   Q.    Okay.  So did you talk to him about it

13   yesterday?

14   A.    About this, no.

15   Q.    Did you talk to him about it within the last

16   week?

17   A.    About this, no.

18   Q.    In the last month?

19   A.    I don't recall.

20   Q.    In the last three months?

21   A.    Again, I don't recall.  Like I said I

22   interact with the drug procurer on an almost daily

23   basis.  I don't recall talking about this

24   specifically in the last few weeks.

25   Q.    Okay.  But it could have been within the last
```

```
 1    three months?

 2              MR. SUTHERLAND:  Object to the form.

 3    You can answer.

 4              THE WITNESS:  Again, I don't remember a

 5    specific conversation and so I can't speculate about

 6    how long ago that would have been.

 7    BY MS. LEONARD:

 8    Q.    When's the last time that you talked with the

 9    drug procurer about obtaining the three drugs that

10    are currently part of protocol?

11              MR. SUTHERLAND:  Object to the form.

12    You can answer.

13              THE WITNESS:  I mean, I really -- I

14    really can't recall.  I can't -- I would expect the

15    drug procurer to let me know if anything changes in

16    terms of our availability to get lethal injection

17    chemicals.

18    BY MS. LEONARD:

19    Q.    So you speak with the drug procurer daily or

20    at least on a regular basis you said?

21    A.    On a regular basis, yes.

22    Q.    But it sounds like not much about procuring

23    the lethal injection drugs?

24    A.    Right.

25              MR. SUTHERLAND:  Object to the form.
```

ELITE Court Reporting Services ence 615.595.0073
www.EliteReportingServices.com

```
 1   You can answer.
 2            THE WITNESS:  Sorry.  Right.  The drug
 3   procurer would let me know if there's any change in
 4   status.
 5   BY MS. LEONARD:
 6   Q.     Does TDOC currently have lethal injection --
 7   injection chemicals on hand to use in executions?
 8   A.     Not -- okay.  Go ahead.  Sorry.
 9            MR. SUTHERLAND:  Object to the form.
10   You can answer.
11            THE WITNESS:  Okay.  On hand -- when you
12   say "on hand", can you be more specific?  Are you
13   talking about in our physical custody?
14   BY MS. LEONARD:
15   Q.     Yes.
16   A.     I --
17            MR. SUTHERLAND:  The same objection.
18   You can answer, if you know.
19            THE WITNESS:  Okay.  I don't know for
20   sure if we have any on hand.  The things that would
21   be compounded, we would not have on hand.
22   BY MS. LEONARD:
23   Q.     Okay.  And you don't know whether you have
24   any midazolam, vecuronium bromide, or potassium
25   chloride in TDOC's possession at this very moment?
```

```
 1              MR. SUTHERLAND:  The same objection.

 2              THE WITNESS:  I don't believe so, but we

 3  have it available.

 4  BY MS. LEONARD:

 5  Q.    What do you mean by "available"?

 6  A.    We have -- we have a pharmacist that has the

 7  availability to compound midazolam and potassium

 8  chloride.  I can't say for sure about vecuronium

 9  bromide because, I mean, that's really not my role.

10  Q.    Why is -- well, let me backup.  Is it your

11  role to oversee the procurement of midazolam and the

12  potassium chloride?

13  A.    No.

14  Q.    Then what do you mean by it's not your role

15  with respect to the vecuronium bromide?

16  A.    I'm not the drug procurer.  I haven't gone

17  out to the armory to see what's available.  There

18  are other people who could speak more accurately as

19  to that.

20              MR. SUTHERLAND:  Just -- just so the

21  record's clear, I'm going to object to any -- the

22  substance of any communications between Ms. Inglis

23  and the Department and Department personnel based on

24  attorney-client privilege that have occurred since

25  the last litigation, which would have been July of
```

Elite Reporting Services
www.EliteReportingServices.com

1    2018.

2          So any -- any communications between

3    Ms. Inglis and the Commissioner, Ms. Inglis and the

4    drug procurer, I'm going to object and instruct her

5    not to answer based on attorney-client privilege

6    just so you know since the last litigation.

7          MS. LEONARD:  And why?  What's the

8    rationale for that?

9          MR. SUTHERLAND:  Because she's chief

10   counsel for the Department.

11         MS. LEONARD:  Right.  But in

12   conversations where she's not providing legal

13   advice.

14         MR. SUTHERLAND:  She's -- to the extent

15   that she is communicating with the client about the

16   protocol, I'm going to -- I mean, I'll listen to the

17   questions, but I'm going to be pretty -- just pretty

18   active about the conversations between her and the

19   Commissioner and conversations between her and the

20   drug procurer.

21         MS. LEONARD:  Okay.  I mean, I

22   understand that.  I'm not -- and to be clear --

23         MR. SUTHERLAND:  Just since July.  Just

24   since July --

25         MS. LEONARD:  Since July 2018.  And to

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 74 of 266 PageID #: 11496
Elite Reporting Services
www.EliteReportingServices.com

```
 1   be clear I'm not trying to get to the substance of
 2   any legal advice that you've provided to anyone.
 3   But, however, if you've had conversations or even if
 4   there's portions of conversations that you've had
 5   that are not about the law and not about legal
 6   advice, those may come up so we'll see how it goes.
 7   BY MS. LEONARD:
 8   Q.     Is a single-drug protocol preferable to a
 9   multi-drug protocol?
10          MR. SUTHERLAND:  Object to the form.
11   You can answer it, if you know.
12          THE WITNESS:  If it's available, that
13   was the choice that we made, then it became
14   unavailable.
15   BY MS. LEONARD:
16   Q.     I'm just asking broad strokes.  Would you say
17   that a single drug is preferable to a multi-drug
18   protocol?
19          MR. SUTHERLAND:  Object to the form.
20          THE WITNESS:  A single-drug protocol is
21   more simple, if we could actually carry it out.
22   BY MS. LEONARD:
23   Q.     What makes it more simple?
24   A.     It's one drug.
25   Q.     And so what parts of the process are simpler
```

ELITE Court Reporting Services
www.EliteReportingServices.com

```
 1   by the fact that it's one drug?

 2              MR. SUTHERLAND:  The same objection.

 3              THE WITNESS:  Just the fact that it's

 4   one drug that has to be injected.

 5   BY MS. LEONARD:

 6   Q.    So you only have to inject one drug?

 7   A.    Yes.

 8   Q.    And you only have to procure one drug?

 9   A.    Yes.

10   Q.    So overall that would probably be preferable

11   to three drugs?

12              MR. SUTHERLAND:  Object to the form.

13              THE WITNESS:  Yes, if it's available.

14   BY MS. LEONARD:

15   Q.    Would two drugs be preferable to three drugs?

16              MR. SUTHERLAND:  Object to the form.

17              THE WITNESS:  I can't really answer a

18   broad question like that.  It would depend on what

19   drugs we're talking about and if any other state had

20   used it and had experience with it.

21   BY MS. LEONARD:

22   Q.    Would two drugs be simpler than three drugs?

23              MR. SUTHERLAND:  The same objection.

24              THE WITNESS:  Simpler.  That's not the

25   only consideration though.
```

```
 1   BY MS. LEONARD:

 2   Q.    Sure, but simpler in the same way that we

 3   just talked about with one versus three, right,

 4   so --

 5   A.    Again --

 6              MR. SUTHERLAND:  The same objection.

 7              THE WITNESS:  -- but that's not the only

 8   consideration.

 9   BY MS. LEONARD:

10   Q.    Sure.

11              MR. SUTHERLAND:  Yeah.  Let me -- just

12   if you can give me just like one second --

13              THE WITNESS:  I'm sorry.

14              MR. SUTHERLAND:  -- because I don't want

15   to interrupt you and --

16              THE WITNESS:  I'll do that.

17              MR. SUTHERLAND:  -- to make sure the

18   record is clear.  I apologize.

19   BY MS. LEONARD:

20   Q.    What would happen if TDOC did not use a

21   paralytic?

22              MR. SUTHERLAND:  Objection to the form.

23   You can answer, if you know.

24              THE WITNESS:  Okay.  It would

25   probably -- the paralytic speeds up death by
```

Elite Reporting Services
www.EliteReportingServices.com

1    stopping respiration, so that would happen.  But no
2    one has used a two-drug protocol not using a
3    paralytic that I'm aware of, and so we really don't
4    know what would happen.
5    BY MS. LEONARD:
6    Q.     Sorry.  So when you say that it speeds up
7    death by stopping breathing, that would happen, what
8    do you mean "that would happen"?
9          MR. SUTHERLAND:  The same objection.
10          THE WITNESS:  I said it would speed up
11    death.
12    BY MS. LEONARD:
13    Q.     And so if you did not use it, what would
14    happen?
15    A.     It could be a slower death.  But, again, we
16    -- the primary thing is no one's ever used it so we
17    really are not -- don't know exactly what would
18    happen.
19    Q.     Have you ever consulted any experts on what
20    would happen?
21    A.     I can't recall for sure if we consulted on
22    that specific topic when we had the working group
23    that was going on but certainly not recently.
24    Q.     What makes you think that the paralytic
25    speeds up death?

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 78 of 266 PageID #: 11570
EliteReportingServices.com
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Object to the form.
 2    You can answer, if you know.
 3              THE WITNESS:  Okay.  I definitely have
 4    no medical expertise.  It's my understanding that as
 5    part of the paralytic, it stops your respiration.
 6    BY MS. LEONARD:
 7    Q.    Where did that understanding come from?
 8              MR. SUTHERLAND:  Don't identify anybody
 9    by name, if there is someone.
10              THE WITNESS:  Yeah.  I can't say
11    specifically where that came from.  Just, you know,
12    through the years of doing this I'm aware of, you
13    know, that the second drug is a paralytic, and that
14    that's one aspect of what it does to the body.
15    BY MS. LEONARD:
16    Q.    But you -- you don't know why it is you think
17    that?
18              MR. SUTHERLAND:  The same objection.
19              THE WITNESS:  Yeah.  I can't say
20    specifically where I learned that.
21    BY MS. LEONARD:
22    Q.    And you've never had any medical training?
23    A.    Right.
24    Q.    And you've never witnessed an execution live?
25    A.    Not --
```

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 79 of 266 PageID #: 11501
ELITE B Document 185 Reporting Services Page 79 of 266 PageID #: 11501
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Object to the form.
 2   You can answer.
 3              THE WITNESS:  Okay.  I've never been in
 4   a witness room observing an execution.  I have seen
 5   one over closed-circuit TV.
 6   BY MS. LEONARD:
 7   Q.     If an expert told you that a paralytic would
 8   not slow down death, would that change your opinion?
 9              MR. SUTHERLAND:  Object to the form.
10   You can answer.
11              THE WITNESS:  Yeah.  I can't really
12   answer that.  It would depend on what other experts
13   said.
14   BY MS. LEONARD:
15   Q.     But you've never consulted experts on this
16   issue?
17   A.     I haven't personally.
18   Q.     Has anyone else in TDOC consulted experts on
19   this issue?
20              MR. SUTHERLAND:  Object to the form.
21              THE WITNESS:  I don't know.
22   BY MS. LEONARD:
23   Q.     You suggested that a one-drug protocol is
24   simpler than a three-drug protocol.  Does simpler
25   mean it's better?
```

```
 1   A.      No.
 2               MR. SUTHERLAND:  Object to the form.
 3               THE WITNESS:  Sorry.
 4               MR. SUTHERLAND:  Just pause for just a
 5   minute, please.
 6               THE WITNESS:  I will.  I'm sorry.
 7               MR. SUTHERLAND:  That's okay.
 8               THE WITNESS:  No.  I can't say that that
 9   means it's better.
10   BY MS. LEONARD:
11   Q.      Why not?
12               MR. SUTHERLAND:  The same objection.
13               THE WITNESS:  Simpler isn't always
14   better.
15   BY MS. LEONARD:
16   Q.      Is -- is a three-drug protocol more
17   complicated than a one-drug protocol?
18               MR. SUTHERLAND:  Object to the form.
19   You can answer.
20               THE WITNESS:  There are more steps, but
21   we've had experience with the three-drug protocol
22   and many other states have, also.  So the -- you
23   know, the driving consideration is not it being the
24   most simple that we can come up with.
25
```

```
 1  BY MS. LEONARD:

 2  Q.     What's the driving consideration?

 3              MR. SUTHERLAND:  Object to the form.

 4              THE WITNESS:  Driving consideration is

 5  just making sure that we have a protocol that's been

 6  tested.  It's been successful, and we know what to

 7  expect with it.

 8  BY MS. LEONARD:

 9  Q.     So do you defer to other states' experience

10  more than expert advice?

11              MR. SUTHERLAND:  Object to the form.

12              THE WITNESS:  I'm not saying that we

13  defer.  We consider experts, I'm sure, and also

14  firsthand experience from other states.

15  BY MS. LEONARD:

16  Q.     But you've never witnessed an execution in

17  another state?

18  A.     I haven't, no.

19  Q.     And you don't recall whether you have --

20  well, scratch that.  You have not spoken with any

21  experts about this particular protocol?

22              MR. SUTHERLAND:  Object to the form.

23              THE WITNESS:  I haven't personally

24  spoken to an expert on this.

25  / /
```

Elite Reporting Services • www.EliteReportingServices.com
504

```
 1   BY MS. LEONARD:

 2   Q.    And you're not sure whether others have?

 3            MR. SUTHERLAND:  The same objection.

 4            THE WITNESS:  I can't -- yeah.  I can't

 5   say specifically.  I know we're aware of there being

 6   there expert testimony out there that does support

 7   the three-drug protocol, but I can't say who else

 8   may have consulted an expert; and I haven't

 9   consulted an expert.

10   BY MS. LEONARD:

11   Q.    Okay.  Since the current protocol was put in

12   place, have any prisoners opted to be executed by

13   electrocution rather than lethal injection?

14   A.    Yes.

15   Q.    How many?

16   A.    I don't have a number in my head right now.

17   A few.

18   Q.    Did you speak with any of those prisoners

19   about that choice?

20   A.    No.

21   Q.    Do you know why they made that choice?

22   A.    I have no personal knowledge about why they

23   made that choice.

24   Q.    Did you witness those executions through the

25   closed-circuit TV?
```

Case 3:18-cv-01234-B Document 185 Reported Filed 04/05/22 ce Page 83 of 266 PageID #: 11905
ELITE Court Reporting Service (615) 595-0073
www.EliteReportingServices.com

1    A.    Yes.

2    Q.    And what did you see during those executions?

3            MR. SUTHERLAND:  Object to the form, and

4    I'm going to instruct the witness not to answer.  It

5    has nothing to do with the litigation.  The

6    electrocution protocol is not at issue in this case.

7            MS. LEONARD:  No, but the

8    constitutionality of the lethal injection protocol

9    is.

10           MR. SUTHERLAND:  You can ask her what

11   she observed in the others, but we're not going to

12   talk about -- it is not an alternative that you-all

13   have pled, and so we're not going to talk about

14   protocols that aren't apart of this, just like we're

15   not talking about sodium thiopental.

16           MS. LEONARD:  We might.  We haven't got

17   there yet.

18           MR. SUTHERLAND:  I'm going to instruct

19   the witness not to answer questions about the

20   electrocution protocol.

21           MS. LEONARD:  On the basis of relevance?

22           MR. SUTHERLAND:  Yes.  It has nothing to

23   do with it.

24           MS. LEONARD:  I don't think that's a

25   proper objection in a deposition.

Case 3:18-cv-01234-B Document 185 Reported Filed 04/05/22 ce Page 84 of 266 PageID #: 11906
Elite Reporting Services
www.EliteReportingServices.com

```
 1            MR. SUTHERLAND:  Okay.  Well, you can
 2    note -- note it.  We're not going to talk about
 3    electrocution.
 4            MS. LEONARD:  Let's take a break for a
 5    second.
 6            MR. SUTHERLAND:  Sure.
 7            THE VIDEOGRAPHER:  We are going off the
 8    record.  The time is 10:41 a.m.
 9                 (A short break.)
10            THE VIDEOGRAPHER:  We are back on the
11    record.  The time is 10:49 a.m.
12            MR. SUTHERLAND:  Do you want to --
13            MS. LEONARD:  Sure.  If you want to put
14    on the record what we just talked about.
15            MR. SUTHERLAND:  Yeah.  So the question
16    to Ms. Inglis was what did she observe in an
17    electrocution execution, and we object because the
18    Legislature by statute has limited witnesses to
19    executions for a number of reasons, one of which
20    would be to protect the confidentiality and
21    integrity of the execution process and because in
22    this instance the question has to do with the
23    protocol that has nothing to do with this litigation
24    and so we would -- I would instruct Ms. Inglis not
25    to answer the question, and we just indicated we
```

ELITE B Courtroom Reporting & Conference Services (615) 595-0073
www.EliteReportingServices.com

1    would seek a protective order if -- to prohibit the
2    disclosure, if necessary.
3              MS. LEONARD:  And I'll put on the record
4    for now that our position is that Ms. Inglis has
5    already testified that she has witnessed these
6    executions, and not only that, but she has not done
7    that as one of the official witnesses, as it were,
8    but rather as a participant by closed-circuit TV,
9    not in the witness room --
10             MR. SUTHERLAND:  I understand.
11             MS. LEONARD:  -- among other things, but
12   we may -- might circle back to this later but for
13   now let's move forward, I think.
14   BY MS. LEONARD:
15   Q.    Could you turn to Exhibit 14, Ms. Inglis,
16   1-4.
17   A.    (Complies.)
18   Q.    Do you see these are handwritten notes?
19   A.    Correct.
20   Q.    Have you seen these notes before?
21   A.    I may have.  I don't recall specifically.
22   Q.    Did you write these notes?
23   A.    No, I did not.
24   Q.    This is not your handwriting?
25   A.    No.

Case 3:18-cv-01234-B Document 185 Filed 04/05/22  Page 86 of 266  PageID #: 11508
ELITE B Document Reporting Services Page 86 of 266 PageID #: 11508
www.EliteReportingServices.com

```
 1    Q.    Did you discuss these notes with anyone?

 2    A.    Not that I recall.

 3    Q.    Would it surprise you to hear that the drug

 4    procurer said that he wrote these notes?

 5                MR. SUTHERLAND:  Object to the form.

 6    You can answer.

 7                THE WITNESS:  It wouldn't surprise me.

 8    I just don't know if the drug procurer did write

 9    these notes.

10    BY MS. LEONARD:

11    Q.    Okay.  I see.  Let's go to Exhibit 16.  Do

12    you see this is a PowerPoint presentation?

13    A.    Correct.

14    Q.    Are you familiar with this PowerPoint?

15    A.    I've seen it, yes.

16    Q.    Who created this PowerPoint?

17                MR. SUTHERLAND:  Don't identify anybody,

18    if you know by name who it is.

19                THE WITNESS:  The drug procurer.

20    BY MS. LEONARD:

21    Q.    Did you instruct the drug procurer to create

22    it?

23    A.    I did not.

24    Q.    Who instructed the drug procurer to create

25    this?
```

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 87 of 266 PageID #: 11909
ELITE B Courtroom Reporting & Service 715 265 0973
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  I object to the form

 2    and don't identify anybody by name.

 3              THE WITNESS:  I don't know.

 4    BY MS. LEONARD:

 5    Q.    Why was this PowerPoint created?

 6              MR. SUTHERLAND:  Object to the form.

 7    You can answer.

 8              THE WITNESS:  It was created to do a

 9    presentation to the Governor's office.

10    BY MS. LEONARD:

11    Q.    And what was the subject of that

12    presentation?

13              MR. SUTHERLAND:  Object to the form.

14    You can answer.

15              THE WITNESS:  To talk about -- to brief

16    the Governor on the current state of the

17    Department's ability to carry out a lethal

18    injection.

19    BY MS. LEONARD:

20    Q.    Who was this PowerPoint presented to?

21              MR. SUTHERLAND:  I guess I don't have a

22    problem identifying -- I don't want to -- let's just

23    not identify specific individuals that were present.

24    We can talk about roles or positions or whatever of

25    people that were present, if that's what you're
```

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 88 of 266 PageID #: 11510
Elite Reporting Services
www.EliteReportingServices.com

1 asking.

2 BY MS. LEONARD:

3 Q.     Yeah.  I don't need specific names, but who

4 was the audience generally for this?

5 A.     Folks from the Governor's office, folks from

6 TDOC, folks from the Attorney General's office.

7 Q.     Anyone else?

8 A.     Not that I recall.

9 Q.     Was this PowerPoint used during any other

10 presentations?

11 A.     Not to my knowledge.

12 Q.     When did that presentation take place?

13         MR. SUTHERLAND:  Object to the form.

14 You can answer.

15         THE WITNESS:  I'm assuming it's

16 August 31st, 2017, because that's what's on the

17 PowerPoint.

18 BY MS. LEONARD:

19 Q.     Is that the date it was presented or the date

20 it was created?

21         MR. SUTHERLAND:  Object to the form.

22         THE WITNESS:  I don't know.

23         MR. SUTHERLAND:  You can answer.  Go

24 ahead.

25         THE WITNESS:  Sorry.  I don't know.

Case 3:18-cv-01234-B Document 185 Filed 04/05/22 Page 89 of 266 PageID #: 11971
ELITE Litigation Reporting Services
www.EliteReportingServices.com

BY MS. LEONARD:

Q.    Okay.  Who presented this PowerPoint?

        MR. SUTHERLAND:  Don't identify anybody
by name.

        THE WITNESS:  The Department generally.

BY MS. LEONARD:

Q.    Did multiple people present it?

A.    It's kind of hard to answer.  I mean,
everyone that was in the meeting participated.

Q.    So who -- when you say the Department
presented this, what individual or individuals
presented this on behalf of the Department without
giving me that individual or individuals' names?

A.    I don't recall whether -- you know, who was
leading the discussion, whether it was the
Commissioner, the drug procurer, or someone else.

Q.    Did you present this?

A.    I did not.

Q.    Did the drug procurer present this?

        MR. SUTHERLAND:  Object to the form.
You can answer.

        THE WITNESS:  I already indicated that I
didn't recall whether it was the Commissioner or the
drug procurer or someone else.

/ /

BY MS. LEONARD:

Q.      But you were present at this presentation?

A.      I was.

Q.      Have Tennessee's execution protocols changed since this PowerPoint was created?

A.      Yes.

Q.      In what way?

A.      We went to a three-drug protocol using midazolam, vecuronium bromide, and potassium chloride.

Q.      So what was the protocol that was in place at the time this PowerPoint was created?

A.      It was pentobarbital.

Q.      Okay.  When this was presented, did you recommend the three-drug protocol to replace the one-drug protocol?

A.      I did not make that recommendation in this meeting.

Q.      Did the drug procurer make that recommendation?

        MR. SUTHERLAND:  Object to the form.
You can answer.

        THE WITNESS:  I don't recall.  I mean, I think -- based on my memory the Department presented the facts that are set out in this PowerPoint.  I'm

Case 3:18-cv-01234 Document 185 Filed 04/05/22 Page 91 of 266 PageID #: 11513
Elite Reporting Services
www.EliteReportingServices.com
91

```
 1    not sure whether there was a recommendation, but
 2    there were certainly a clear indication to the
 3    Governor that we were not going to be able to carry
 4    out an execution using pentobarbital.
 5    BY MS. LEONARD:
 6    Q.    Was that indication the purpose of presenting
 7    this PowerPoint?
 8    A.    The purpose was to inform the Governor of our
 9    current state relative to our ability to carry out
10    an execution.
11    Q.    Did you discuss this PowerPoint with the drug
12    procurer before it was presented?
13    A.    I don't recall having a discussion, no.
14    Q.    Did you see this PowerPoint before it was
15    presented?
16    A.    I think I did, yes.
17    Q.    Did you give any input into the content of
18    this PowerPoint?
19    A.    I don't recall whether I recommended any
20    revisions or not.
21    Q.    Okay.  Let's turn to Page 8.
22    A.    (Complies.)
23    Q.    I'll just give you a minute to review this.
24    You didn't review this in preparation for the
25    deposition today, right?
```

```
 1    A.     I did not.

 2    Q.     I'll just give you a minute to refresh

 3    yourself on it.

 4           MR. SUTHERLAND:  Is this like the Bates

 5    Number 00000 --

 6           MS. LEONARD:  Yes.  Yes.

 7           MR. SUTHERLAND:  Oh, I see.

 8           MS. LEONARD:  Yeah.  They match up

 9    fortunately.

10           THE WITNESS:  (Reviewing document.)

11    Okay.

12    BY MS. LEONARD:

13    Q.     Does the redacted portion here refer to a

14    state?

15           MR. SUTHERLAND:  Object to the extent

16    that it would identify any particular state but to

17    say state or other entity is fine.

18    BY MS. LEONARD:

19    Q.     It's just a yes or no question.

20    A.     Yes.

21    Q.     So the second sentence of this says:

22    Redacted was also unwilling to offer any guidance as

23    to how redacted was able to find its current source.

24    Do both of those redactions in the same sentence --

25    in that sentence refer to the same entity?
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Object to the form.
 2    You can answer, if you know.
 3              THE WITNESS:  Well, to be honest I'd
 4    have to see the un-redacted portion.  But as I read
 5    this, I would expect that it's the same.
 6    BY MS. LEONARD:
 7    Q.    Okay.  And did that entity share why it was
 8    unwilling to offer that guidance?
 9              MR. SUTHERLAND:  Object to the form.
10    You can answer, if you know.
11              THE WITNESS:  I don't -- I don't know if
12    they specifically shared why, but my experience has
13    been that no state wants to jeopardize any source
14    that they might have.
15    BY MS. LEONARD:
16    Q.    And what do you mean by "jeopardize"?
17              MR. SUTHERLAND:  Object to the form.
18              THE WITNESS:  They want to protect their
19    source from any possible disclosure.
20    BY MS. LEONARD:
21    Q.    Okay.  You've mentioned a couple times
22    discussions with other states that use lethal
23    injection, and it sounds like that's been a source
24    of this -- much of the information that you have; is
25    that right?
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1                 MR. SUTHERLAND:  Object to the form.

         2    You can answer.

         3                 THE WITNESS:  Okay.  Yes, quite a bit.

         4    BY MS. LEONARD:

         5    Q.     What states currently have a supply of

         6    pentobarbital that they use for executions?

         7                 MR. SUTHERLAND:  Object to the form.

         8    You can answer, if you have knowledge.

         9                 MS. LEONARD:  I'm just going to put on

        10    the record, Ms. Inglis is a lawyer.  And she knows,

        11    you know, we've agreed that it's objections to form

        12    so if you can please let out the "if you know" or if

        13    the whatever.  She knows that if you say objection

        14    to form, she's allowed to answer unless the basis is

        15    privileged.

        16                 THE WITNESS:  He is representing me, so

        17    I appreciate any interjection he has.  Do you have a

        18    problem --

        19                 MS. LEONARD:  That's fine.

        20                 MR. SUTHERLAND:  I note your --

        21                 MS. LEONARD:  Yeah.  I just -- I don't

        22    really appreciate the speaking objection is what I'm

        23    trying to get on the record.

        24                 MR. SUTHERLAND:  Understood.

        25                 MS. LEONARD:  I think that she's clear

Case 3:18-cv-01234-B Document 185 Reporter Filed 04/05/22 ce Page 95 of 266 Page ID #: 11517
ELITE B Document 185 Reporter Filed 04/05/22 ce Page 95 of 266 Page ID #: 11517
www.EliteReportingServices.com

```
 1   on what she can and can't answer.

 2               MR. SUTHERLAND:  I understand.  You can

 3   answer.

 4               THE WITNESS:  Okay.  Can you repeat the

 5   question?

 6   BY MS. LEONARD:

 7   Q.    Sure.  What states currently have a supply of

 8   pentobarbital that they use in executions?

 9   A.    I don't know the current state of each

10   state's supply of pentobarbital.

11   Q.    What states currently have a pentobarbital

12   protocol?

13               MR. SUTHERLAND:  Objection to the form.

14               THE WITNESS:  Okay.  I believe Texas is

15   using pentobarbital.  I don't know if they have a

16   current supply, and I believe the Bureau of Prisons

17   has a protocol using pentobarbital.  But, again, I

18   don't know what their supply is and where they

19   obtained it.  Those are the only two that come to

20   mind.

21   BY MS. LEONARD:

22   Q.    Are there any other states that use

23   Pentobarbital in executions?

24               MR. SUTHERLAND:  Object to the form.

25               THE WITNESS:  Okay.  Yes.  I indicated
```

```
 1   those are the only two that I -- that come to mind

 2   today.

 3   BY MS. LEONARD:

 4   Q.    So when you testified previously that you've

 5   talked with other states that use this protocol,

 6   it's fair to assume that's only Texas and the BOP?

 7            MR. SUTHERLAND:  Object to the form.

 8   You can answer.

 9            THE WITNESS:  Okay.  I believe when I

10   mentioned that, that had to do with using midazolam.

11   BY MS. LEONARD:

12   Q.    Okay.  So who uses midazolam?

13   A.    I don't know every state, and I haven't

14   personally contacted every state.  It's my

15   understanding the Commissioner has talked to a

16   number of people.  Virginia is one, and I can't

17   recall exactly which -- which states he might have

18   talked to but I --

19   Q.    And I believe you testified earlier that

20   there were something like five states --

21            MR. SUTHERLAND:  Object to the form.

22   BY MS. LEONARD:

23   Q.    -- that you talked to, but the only one you

24   can remember, that you think was in reference to

25   midazolam, was Virginia?
```

Case 3:18-cv-01234-B Document 185-2 Filed 04/05/22 Page 97 of 266 PageID #: 11959
Elite Reporting Services
www.EliteReportingServices.com

```
1    A.     I don't recall testifying to that.  Maybe you
2    can refresh my memory.
3    Q.     Maybe you could refresh mine actually.  So
4    who -- when you -- did you talk to other states when
5    you were coming up with the midazolam protocol?
6              MR. SUTHERLAND:  Object to the form.
7              THE WITNESS:  Okay.  Let me -- let me
8    think.  I don't recall that I did personally.  I
9    know the Commissioner or I understand the
10   Commissioner talked to several other commissioners.
11   BY MS. LEONARD:
12   Q.     How many is "several"?
13   A.     I don't know.
14   Q.     A ballpark figure?
15   A.     I don't know.
16   Q.     Two?
17   A.     I don't know.
18             MR. SUTHERLAND:  Object to the form.
19   BY MS. LEONARD:
20   Q.     So you don't -- you don't know the source of
21   the Commissioner's information?
22   A.     I think you would have to ask the
23   Commissioner that.
24   Q.     Was this the information that you used to
25   draft the protocol?
```

```
 1              MR. SUTHERLAND:  Object to the form.
 2              THE WITNESS:  Yes.  It was the decision
 3     of the Commissioner, and I think that was the basis
 4     of his information.
 5     BY MS. LEONARD:
 6     Q.    Sure.  I understand it was his decision.
 7     A.    Okay.
 8     Q.    But I'm asking what information did you use
 9     to draft the protocol?
10              MR. SUTHERLAND:  Objection to the form.
11              THE WITNESS:  I looked at some other
12     states' protocols or we did and again right now --
13              MR. SUTHERLAND:  I interject.  Are you
14     asking her what you did or are you asking her what
15     TDOC did?
16              MS. LEONARD:  I'm asking her what she
17     did.
18              MR. SUTHERLAND:  Okay.
19              THE WITNESS:  I'm trying to remember if
20     I personally called any state about their protocol.
21     I don't think so, but I know that we had access to
22     other protocols.
23     BY MS. LEONARD:
24     Q.    Did you read other states' protocols?
25     A.    I'm sure I did.  I don't know particularly
```

```
 1   what states.

 2   Q.     Did you read one-drug protocols?

 3   A.     I have in the past.

 4   Q.     Which ones?

 5   A.     Ohio's when they had pentobarbital as a

 6   single drug.

 7   Q.     Is that it?

 8   A.     That's all I can recall right now.

 9   Q.     And what three-drug protocols have you read?

10   A.     Gosh, I don't -- I'm not going to be able to

11   know -- to recall exactly which states.  And I know

12   that in drafting this, we also had access to the

13   recommendation from the former pharmacy owner.

14   Q.     Recommendations as to what?

15   A.     The --

16            MR. SUTHERLAND:  Object to the form.

17            THE WITNESS:  Okay.  The particular

18   protocol.

19   BY MS. LEONARD:

20   Q.     The particular protocol that that person

21   thought that TDOC should be using?

22            MR. SUTHERLAND:  Object to the form.

23            THE WITNESS:  That -- yeah.  That --

24   yeah, that indicated that this is what has been used

25   in other states.
```

Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com

BY MS. LEONARD:

Q.    Okay.  Did you discuss execution protocols with anyone in other states?

        MR. SUTHERLAND:  Object to the form.

        THE WITNESS:  Through the years I'm sure I have.  I don't know that -- I don't remember discussing with other states in particular when we adopted the current protocol.

BY MS. LEONARD:

Q.    Have you ever visited other states to see their execution facilities?

A.    Yes.

Q.    Which states?

A.    Virginia and the Bureau of Prisons.

Q.    When did you visit those places?

A.    Years ago.

Q.    How many years ago roughly?

A.    Oh, it was quite a while ago.  It might have been while the committee was functioning.

Q.    Which committee?

A.    The one we've discussed that reviewed various options, talked to some anesthesiologists and some other folks.  I think it was probably during that process.

Q.    What was Virginia's protocol at that time?

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 101 of 266 PageID #: 11523
ELITE Document Reporting Service (615) 595-0073
www.EliteReportingServices.com

```
1   A.      It was -- it was far enough back that I
2   believe it was sodium thiopental.
3   Q.      Three-drug protocols beginning with sodium
4   thiopental?
5   A.      I believe so.
6   Q.      And what was the BOP's protocol at that time?
7   A.      I think it was the same.
8   Q.      And that was also around the same time that
9   you visited their facilities?
10  A.      I think so.
11  Q.      And that's at Terre Haute?
12  A.      Yes.
13  Q.      Have other states ever visited here to see
14  Tennessee's facilities?
15  A.      I haven't been involved in any visits, but
16  something in the back of my mind thinks that some
17  state has visited.  I don't know if it was --
18  probably not the Bureau of Prisons.  It might have
19  been the military.  But, again, I wasn't involved in
20  that, and I can't be any more specific about that.
21  Q.      Would you have been informed about that visit
22  in either of your roles as General Counsel or Deputy
23  Commissioner?
24  A.      I wouldn't have had to -- well, again, this
25  was a while back, and I don't have specific memory.
```

Elite-Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
 1    But I would expect that someone in my role as

 2    General Counsel would have told me that that was

 3    going to happen and asked if that was okay.

 4    Q.     Okay.

 5    A.     Again, that's a very, very vague

 6    recollection.

 7    Q.     Have you reached out to any of the states

 8    currently using pentobarbital since this PowerPoint

 9    was created?

10              MR. SUTHERLAND:  Object to the form and

11    don't identify any state.

12              THE WITNESS:  I think it was probably

13    before the PowerPoint was prepared, but I have, you

14    know, reached out to some states.

15    BY MS. LEONARD:

16    Q.     I'm sorry.  I didn't want to interrupt you.

17    A.     I mean, I do -- I have talked to a few

18    states.  Whether it was before or after, I think it

19    was probably before, and then I think I've made at

20    least one contact since then.

21    Q.     Since the time of PowerPoint?

22    A.     Yes.

23    Q.     Okay.  And when you say "a few states",

24    roughly how many states did you contact?

25    A.     Well, I know one for sure.  I'm trying to
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 103 of 266 PageID #: 11625
EliteReportingServices.com
www.EliteReportingServices.com

1    think if there's -- probably -- maybe three.

2    Q.     And were all three of those states using

3    pentobarbital?

4    A.     If it's three, then yes.  One for sure, and

5    then another jurisdiction after that.  I think maybe

6    there were two more that I thought might have a lead

7    on pentobarbital.

8    Q.     And you contacted those after the date of

9    this presentation or you're saying -- just to make

10   sure I'm clear, you're saying you only had one

11   contact since then?

12   A.     Yes.  I think I personally have only had one

13   contact since then.

14   Q.     Okay.  And is that -- was that contact with a

15   state that's currently using pentobarbital for their

16   executions?

17   A.     A jurisdiction that's using pentobarbital.

18   Q.     Okay.  And in total what you're saying not

19   limiting it to the time frame after this

20   presentation, you think you've had conversations

21   with three?

22   A.     Yeah.

23   Q.     Okay.  And you don't know what states

24   currently use pentobarbital in their executions

25   other than Texas and the Federal BOP?

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 104 of 266 PageID #: 11626
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Object to the form.

 2              THE WITNESS:  Okay.  No.  I can't say

 3   sitting here today that I know.

 4   BY MS. LEONARD:

 5   Q.     But you do know that the other two states

 6   that you reached out to use pentobarbital?

 7   A.     At that time --

 8              MR. SUTHERLAND:  Object to the form --

 9              THE WITNESS:  -- they did.  I'm sorry.

10   BY MS. LEONARD:

11   Q.     Okay.  Have you ever contacted Missouri about

12   pentobarbital?

13   A.     I don't believe I have.

14   Q.     Have you contacted South Dakota about

15   pentobarbital?

16   A.     I haven't personally.

17   Q.     Have you contacted --

18              MR. SUTHERLAND:  I'm going to object and

19   not get into specific states that she has contacted.

20              MS. LEONARD:  And what's the basis for

21   that?

22              MR. SUTHERLAND:  Information concerning

23   possible sources of pentobarbital.

24              MS. LEONARD:  I don't know how the exact

25   state is going to get into sources.
```

Elite Document Reporting Services 0d509964b9c5b420
www.EliteReportingServices.com

1          MR. SUTHERLAND:  I mean, she can tell

2   you that there are states, but I'm not going let her

3   answer questions about specific people the

4   Department has contacted in trying to obtain lethal

5   injection chemicals.

6          MS. LEONARD:  I'm not asking about

7   specific people to be clear.

8          MR. SUTHERLAND:  I understand.  She

9   can -- I will -- I will say she can tell -- she can

10  testify about that she contacted states, but I'm

11  going to instruct her not to identify specific

12  states because of the Court's protective order.

13         MS. LEONARD:  All right.  We may circle

14  back to that, too.

15  BY MS. LEONARD:

16  Q.     Let's go to Page 9.

17  A.     (Complies.)

18  Q.     The last bullet point on this page says:

19  Search involved cold calling US based active

20  pharmaceutical ingredient, API, supply companies.

21  Who, without giving me a name, was responsible for

22  making these cold calls?

23  A.     That would have been the drug procurer.

24  Q.     What was the result of those calls?

25         MR. SUTHERLAND:  Object to the form.

Case 3:18-cv-01234-Document 195-1 Filed 04/05/21 Page 106 of 266 PageID #: 11628
EliteReporting Services.com
www.EliteReportingServices.com

```
 1              THE WITNESS:  They were unsuccessful.
 2   BY MS. LEONARD:
 3   Q.     Were any non US based API supply companies
 4   contacted?
 5              MR. SUTHERLAND:  Object to the form.
 6              THE WITNESS:  I don't know personally.
 7   BY MS. LEONARD:
 8   Q.     You wouldn't have been informed about that?
 9              MR. SUTHERLAND:  Object to the form.
10              THE WITNESS:  What I can say is that I
11   don't have any information about that.
12   BY MS. LEONARD:
13   Q.     Okay.  So you never spoke with the drug
14   procurer about whether the drug procurer reached out
15   to non US based API companies?
16   A.     I don't know if the drug procurer did that
17   specifically.  I don't think we had that discussion.
18   Q.     And do you see in the previous bullet point
19   the second sentence says:  Finally a compounding
20   pharmacy agreed to both compound the LIC and aide in
21   the search for a source.  What is your understanding
22   of how that compounding pharmacy searches for
23   Midazolam?
24              MR. SUTHERLAND:  Object to the form.
25              THE WITNESS:  I can't get into
```

```
 1    specifics.  I didn't have any discussions with that

 2    compounding pharmacy, but my understanding would be

 3    that they use their -- the sources that they

 4    generally use, the major drug companies around the

 5    country.  But, again, I am not -- I didn't have any

 6    discussions with the pharmacy.

 7    BY MS. LEONARD:

 8    Q.    You've never communicated directly with a

 9    compounding pharmacy about how they search for

10    midazolam?

11    A.    No.

12    Q.    Have you communicated with the compounding

13    pharmacy about how they search for vecuronium

14    bromide?

15    A.    No, I have not.

16    Q.    How about potassium chloride?

17    A.    No.

18    Q.    So what is your understanding of how they

19    search for vecuronium bromide?

20    A.    It would be --

21            MR. SUTHERLAND:  Object to the form.

22            THE WITNESS:  Okay.  Again, I don't

23    know, but that's -- it would be the same answer.

24    BY MS. LEONARD:

25    Q.    And is that also the same answer for the
```

1   potassium chloride?

2   A.     Yes.

3   Q.     How does this compounding pharmacy search for

4   pentobarbital?

5             MR. SUTHERLAND:  Object to the form.

6             THE WITNESS:  Again, I haven't had

7   discussions with the compounding pharmacy.  So I

8   think -- I would assume they use their regular

9   sources, but I don't know.

10  BY MS. LEONARD:

11  Q.     Are you aware that the pharmacist who

12  compounds the drugs has been disciplined by the

13  State Board of Pharmacy?

14            MR. SUTHERLAND:  Object to the form.

15            THE WITNESS:  Yes.

16  BY MS. LEONARD:

17  Q.     Are you aware that the pharmacy that supplies

18  TDOC with its lethal injection drugs was disciplined

19  for providing false information in its application

20  for a pharmacy license?

21  A.     Yes.

22            MR. SUTHERLAND:  Object to the form.

23            THE WITNESS:  I'm sorry.

24  BY MS. LEONARD:

25  Q.     Are you aware that the laboratory that the

Case 3:18-cv-01234-Document 195 Reported 04/05/21 cPage 109 of 266 PageID #: 11631
EliteReportingServices.com 0d509964b9c5b420 Page 109 of 266 PageID #: 11631
www.EliteReportingServices.com

1  pharmacy uses to test the drugs has been issued a

2  violation letter?

3              MR. SUTHERLAND:  Object to the form.

4              THE WITNESS:  No.

5  BY MS. LEONARD:

6  Q.    On Page 10 the first sentence reads:

7  Collectively contact was made with close to 100

8  potential sources, including the three major US

9  chemical wholesalers.  None of these worked for one

10 or more of the following reasons, and then the

11 bullet points cover those reasons.  How many

12 individuals at TDOC were involved in making these

13 contacts?

14             MR. SUTHERLAND:  Object to the form.

15             THE WITNESS:  I think there was one

16 person, the drug procurer, that this is discussing.

17 BY MS. LEONARD:

18 Q.    Do you have any records documenting those

19 contacts with these sources?

20 A.    I don't.

21 Q.    Does TDOC have any of these records?

22             MR. SUTHERLAND:  Object to the form.

23             THE WITNESS:  There were, you know,

24 probably, but that would have been something that

25 had been turned over in discovery.

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 110 of 266 PageID #: 11682
Elite-Document Reporting Services  (615) 595-0073
www.EliteReportingServices.com

```
 1            MS. LEONARD:  Okay.  Well, to the extent

 2    there's any outstanding records about these

 3    contacts, we would request those, too.

 4            MR. SUTHERLAND:  (Nods head.)

 5    BY MS. LEONARD:

 6    Q.    Did you review the discovery in this case?

 7    A.    No, not...

 8    Q.    So what makes you think that it would have --

 9    these records would have been turned over in

10    discovery already?

11    A.    That's my expectation.

12    Q.    Fair enough.  When this says contact was made

13    with close to 100 potential sources, were all of

14    those sources based in the US?

15            MR. SUTHERLAND:  Object to the form.

16            THE WITNESS:  I don't know.

17    BY MS. LEONARD:

18    Q.    Did you ever ask the drug procurer about

19    that?

20    A.    No.

21    Q.    And the drug procurer never volunteered that

22    to you?

23    A.    No.

24    Q.    Did you ever talk with other states about

25    whether they were importing pentobarbital from
```

Case 3:18-cv-01234-Document 195 Report Filed 04/05/22 Page 111 of 266 PageID #: 11693
EliteReportingServices.com
www.EliteReportingServices.com

```
 1   overseas?

 2   A.      Not that I recall, no.

 3   Q.      One of the reasons on this page that these

 4   sources didn't work out says that some of the

 5   companies, quote, did not have sufficient quantities

 6   of the needed form of pentobarbital.  Do you see

 7   that in the second bullet point?

 8   A.      Uh-huh.

 9   Q.      Does that mean that you were only willing to

10   purchase pentobarbital if the company had it in a

11   threshold quantity?

12   A.      No.

13   Q.      What does that bullet point mean?

14           MR. SUTHERLAND:  Object to the form.

15           THE WITNESS:  When we were searching, of

16   course, you know, we indicated that we would be

17   willing to purchase a certain amount.  But that

18   doesn't mean that we wouldn't have taken, you know,

19   a lesser amount.  But it had to be enough at least

20   for one execution.

21   BY MS. LEONARD:

22   Q.      How much is that?

23   A.      That's --

24           MR. SUTHERLAND:  Object to the form.

25   You can answer.
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/21 Page 112 of 266 PageID #: 11504
Elite-Document Reporting Services
www.EliteReportingServices.com

```
 1              THE WITNESS:  For pentobarbital I would
 2    have to, you know, look back at that particular
 3    protocol, but I think it might have been
 4    500 milligrams.
 5    BY MS. LEONARD:
 6    Q.    Okay.  Then on Page 11 the PowerPoint says --
 7    in the first sentence, that the search was broadened
 8    into the possibility of importing the chemical from
 9    overseas.  At what point was the search broadened in
10    this matter?
11    A.    I don't recall.
12    Q.    How was the search broadened?
13              MR. SUTHERLAND:  Object to the form.
14              THE WITNESS:  I don't know.  That would
15    be a question for the drug procurer.
16    BY MS. LEONARD:
17    Q.    You never discussed that with the drug
18    procurer?
19    A.    No.
20    Q.    You didn't give him any instructions
21    regarding the search?
22              MR. SUTHERLAND:  Object to the form.
23              THE WITNESS:  I didn't give the drug
24    procurer any instructions about that.
25    / /
```

```
 1   BY MS. LEONARD:

 2   Q.     How many suppliers were contacted?

 3              MR. SUTHERLAND:  The same objection.

 4              THE WITNESS:  Again, I don't know.

 5   BY MS. LEONARD:

 6   Q.     Did any of the oversea suppliers tell TDOC

 7   that they were willing to supply the API for

 8   pentobarbital?

 9   A.     Again, I don't know.

10   Q.     You wouldn't have been told this information?

11   A.     I wasn't.

12   Q.     And you never asked anybody about this

13   information?

14   A.     No.

15   Q.     On Page 12 in the second bullet point it

16   reads:  After meeting the agents informed redacted

17   that redacted because according to them, there is a

18   supply of pentobarbital available in the United

19   States.  And then there's a bullet point after that

20   that I'll give you a minute to read.

21   A.     (Reviewing document.)  Okay.

22   Q.     Can you tell me what the last bullet point

23   means?

24              MR. SUTHERLAND:  Object to the form.

25   You can answer.
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 114 of 266 PageID #: 11526
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1                  THE WITNESS:  Okay.  I believe that it
 2      means that in terms of the law pertaining to
 3      importation of drugs, it's not relevant that we
 4      could not obtain pentobarbital for use in an
 5      execution because it was otherwise available, you
 6      know, for example in a hospital setting.
 7      BY MS. LEONARD:
 8      Q.    Did you -- well, let me ask you:  In the
 9      first bullet point, what's redacted there?  Who's in
10      the redaction, the agents informed?
11                  MR. SUTHERLAND:  I'm sorry.  Are you
12      asking for a specific --
13      BY MS. LEONARD:
14      Q.    Not the name, just what is the entity or
15      individual or what is it that's -- the agents
16      informed blank?
17                  MR. SUTHERLAND:  Yeah.  You can
18      generally describe it, if you know.
19                  THE WITNESS:  I believe that that was
20      the former pharmacy owner.
21      BY MS. LEONARD:
22      Q.    Did you ask the former pharmacy owner about
23      his discussion with the DEA?
24      A.    I did not.
25      Q.    Did anyone else at TDOC ask him about that?
```

```
 1              MR. SUTHERLAND:  Object to the form.

 2              THE WITNESS:  I'm pretty sure the drug

 3    procurer did.

 4    BY MS. LEONARD:

 5    Q.    And did the drug procurer talk with you about

 6    that?

 7    A.    I know -- I know that he made me aware of

 8    that meeting.

 9    Q.    What did he tell you about the meeting?

10    A.    Just basically what's here.

11    Q.    So why was the statement included in the

12    PowerPoint?

13              MR. SUTHERLAND:  Object to the form.

14              THE WITNESS:  Again, I did not prepare

15    the PowerPoint.  I believe that -- that that was

16    included because it was part of the search for

17    Pentobarbitol.

18    BY MS. LEONARD:

19    Q.    Sorry.  To clarify, "It was part of search",

20    meaning the DEA meeting was part of the search?

21    A.    Yes.

22    Q.    Do you believe that this statement is

23    accurate?

24              MR. SUTHERLAND:  Object to the form.

25              THE WITNESS:  Which statement?
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1    BY MS. LEONARD:

 2    Q.     Well, we'll take them one by one.  Do you

 3    believe that at the meeting the agents informed the

 4    former pharmacy owner that blank, blank, blank

 5    because according to them there's a supply of

 6    Pentobarbital available in the United States?  Do

 7    you believe that's really what happened at that

 8    meeting?

 9             MR. SUTHERLAND:  Object to the form.

10             THE WITNESS:  I have no reason to

11    disbelieve it.

12    BY MS. LEONARD:

13    Q.     And do you believe that when told that the

14    companies who do have a supply would not sell their

15    supply for using lethal injection, the blank -- we

16    could fairly assume the DEA agents explained that it

17    didn't matter, and that it was an issue to take up

18    with the companies themselves.  Do you believe

19    that's accurate?

20             MR. SUTHERLAND:  Object to the form.

21             THE WITNESS:  Again, I have no reason to

22    disbelieve it.

23    BY MS. LEONARD:

24    Q.     What did you do --

25    A.     I don't have personal knowledge though.
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1   Q.     What did you do to ensure that these were
 2   accurate statements?
 3   A.     I -- I did not do anything to ensure they
 4   were accurate.  I assumed that the drug procurer was
 5   being accurate.
 6   Q.     You assumed the drug procurer was being
 7   accurate, but you didn't talk to him any further
 8   about that?
 9   A.     I don't know about any further.  We had a
10   discussion about it, and I had no reason to doubt
11   the credibility of the drug procurer.
12   Q.     Was the drug procurer part of the DEA
13   meeting?
14   A.     No.
15              MR. SUTHERLAND:  Object to the form.
16              THE WITNESS:  Not to my knowledge.
17   BY MS. LEONARD:
18   Q.     So you were relying on the drug procurer's
19   secondhand relay of the information he got from the
20   former pharmacy owner?
21   A.     Well, I wasn't relying on anything.  But,
22   yes, I think that information confirmed what we
23   understood to be the case.
24   Q.     Did you want the Commissioner and the other
25   decision-makers to have the most accurate
```

Elite Reporting Services   (615) 595-0073
www.EliteReportingServices.com

```
 1    information?

 2    A.     Sure.

 3    Q.     And yet you didn't take any steps to ensure

 4    that this was what actually happened at that

 5    meeting?

 6    A.     No.  That was not --

 7                  MR. SUTHERLAND:  Object to the form.

 8                  THE WITNESS:  -- my role.  I'm sorry.

 9    That was not my role.

10    BY MS. LEONARD:

11    Q.     The next page says:  Redacted is now

12    researching FDA regulations as a result of this case

13    to determine what, if any, process can be undertaken

14    to obtain FDA approval for the importation of

15    Pentobarbital.  Is "redacted" in this sentence you?

16    A.     No.

17    Q.     Is "redacted" the drug procurer?

18                  MR. SUTHERLAND:  Objection to the form.

19                  THE WITNESS:  I don't know.

20    BY MS. LEONARD:

21    Q.     You don't know who was researching the FDA

22    regulations?

23    A.     I don't personally.

24    Q.     Do you know the results of that researcher?

25    A.     All I know is that, I believe, the Texas case
```

Case 3:18-cv-01234-BLD Document 195-1 Filed 04/05/22 Page 169 of 266 Page ID #: 11541
Elite Reporting Services
www.EliteReportingServices.com

```
 1    has not resulted in Texas being able to have their

 2    sodium thiopental released to them.

 3    Q.      How do you know that?

 4    A.      I followed the case, and I haven't heard

 5    anything in years that indicated that they had won

 6    that case.

 7    Q.      Okay.  But you're not the individual that was

 8    researching the FDA regulations as a result of that

 9    case?

10    A.      I was not.

11              MR. SUTHERLAND:  Objection to the form.

12              THE WITNESS:  Oh, sorry.

13    BY MS. LEONARD:

14    Q.      And you don't know -- and you don't know who

15    was?

16              MR. SUTHERLAND:  The same objection.

17              THE WITNESS:  No.

18    BY MS. LEONARD:

19    Q.      And you're the General Counsel at TDOC?

20    A.      That's right.

21    Q.      And you testified earlier that all of the

22    lawyers except for those that are not working in a

23    legal capacity for TDOC report to you?

24              MR. SUTHERLAND:  Object to the form.

25              THE WITNESS:  They do.
```

```
 1   BY MS. LEONARD:

 2   Q.      And you don't know who was conducting this

 3   legal research?

 4                MR. SUTHERLAND:  Object to the form.

 5                THE WITNESS:  Well, first of all, I

 6   don't know that it was legal research but that's

 7   correct.  I did not prepare this PowerPoint.

 8   BY MS. LEONARD:

 9   Q.      But you saw the PowerPoint, right?

10   A.      I did.

11   Q.      And you saw it before it was presented?

12   A.      I'm sure I did.

13   Q.      And you weren't curious about who was doing

14   this research into legal topics?

15                MR. SUTHERLAND:  Object to the form.

16                THE WITNESS:  I might have known looking

17   at an un-redacted PowerPoint, but I don't know today

18   looking at the redacted PowerPoint.

19   BY MS. LEONARD:

20   Q.      The last sentence on this page says:  Thus

21   far the approval process appears to be very

22   cumbersome unless an exception can be claimed to

23   lessen the burden.  What was cumbersome about the

24   approval process?

25                MR. SUTHERLAND:  Object to the form.
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 121 of 266 PageID #: 11543
ELITE-Document Reporting Services • (615) 595-0073
www.EliteReportingServices.com

```
 1              THE WITNESS:  Okay.  I don't -- I don't
 2   know specifically, but we did know that Texas had
 3   been unsuccessful in being able to import sodium
 4   thiopental.
 5   BY MS. LEONARD:
 6   Q.    What kind of exceptions could be claimed?
 7              MR. SUTHERLAND:  Object to the form.
 8              THE WITNESS:  Again, I don't know.  I
 9   was not looking into that particular aspect.  The
10   drug procurer was and prepared this PowerPoint.
11   BY MS. LEONARD:
12   Q.    Did you seek an exception to be allowed to
13   import pentobarbital?
14   A.    I didn't.
15   Q.    Did the drug procurer seek one?
16              MR. SUTHERLAND:  Objection to the form.
17              THE WITNESS:  I believe the drug
18   procurer requested that the former pharmacy owner
19   attempt to obtain a license or a certificate to
20   import, and that was unsuccessful.
21   BY MS. LEONARD:
22   Q.    And do you know whether the drug procurer
23   also looked into an exception to import
24   pentobarbital from overseas?
25   A.    I expect that the drug procurer did.
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
 1   Q.     But you don't know?

 2   A.     No.

 3   Q.     You never asked him?

 4   A.     No.

 5   Q.     Is that something you would expect that he

 6   would tell you?

 7              MR. SUTHERLAND:  Object to the form.

 8              THE WITNESS:  I -- I did not ask the

 9   drug procurer, and I don't recall any update about

10   that.

11   BY MS. LEONARD:

12   Q.     Are you aware of the approval process to

13   import pentobarbital today?

14   A.     No.  I'm really not an expert on that.

15   Q.     When did you most recently research this

16   approval process?

17   A.     Not recently.  Again, that was the role of

18   the drug procurer.

19   Q.     And when's the last time that the drug

20   procurer researched this issue?

21   A.     I don't know.

22              MR. SUTHERLAND:  Object to the form.

23              THE WITNESS:  I'm sorry.  I don't know.

24   BY MS. LEONARD:

25   Q.     You haven't asked the drug procurer about
```

Case 3:18-cv-01234-BJD-LLL  Document 195-1  Filed 04/05/22  Page 123 of 266 PageID #: 11345
ELITE Document Reporting Services - (615) 595-0073
www.EliteReportingServices.com

```
 1   this?
 2             MR. SUTHERLAND:  Object to the form.
 3             THE WITNESS:  No, not recently.
 4   BY MS. LEONARD:
 5   Q.    Is this something that you would assume if he
 6   had an update, he would tell you?
 7             MR. SUTHERLAND:  Object to the form.
 8             THE WITNESS:  Yes.
 9   BY MS. LEONARD:
10   Q.    Has anyone at TDOC attempted to obtain
11   pentobarbital from overseas since this PowerPoint
12   was presented in August of 2017?
13             MR. SUTHERLAND:  Object to the form.
14             THE WITNESS:  I don't know for sure
15   based on the date of the PowerPoint.  But, again, I
16   think I mentioned the attempt to have the former
17   pharmacy owner look into that and get licensed to do
18   that, and that again was unsuccessful.
19   BY MS. LEONARD:
20   Q.    Have you attempted to obtain pentobarbital
21   from overseas since this PowerPoint was presented?
22   A.    I haven't, no.
23   Q.    Why not?
24   A.    That's not my role.
25   Q.    And is that because the drug procurer is the
```

1    sole individual responsible for this?

2    A.     Yes.  He's been -- the drug procurer has been

3    given that responsibility.

4    Q.     When you refer to the former pharmacy owner

5    that way, did the former pharmacy owner subsequently

6    leave the pharmacy?

7    A.     Yes.  That's my understanding.

8    Q.     When approximately did that individual leave

9    the pharmacy?

10   A.     Gosh, I don't -- I don't know.  I think he

11   sold his interest.  I don't know when that was.  Let

12   me think.  I know that it was sort of the beginning

13   of a new year.  I don't know if that's 2019, 2020.

14   I just don't know.

15   Q.     So other than what you heard about the former

16   pharmacy owner trying to obtain a license, you're

17   not aware of any other attempts to obtain

18   pentobarbital from overseas since this PowerPoint

19   was presented?

20            MR. SUTHERLAND:  Object to the form.

21            THE WITNESS:  I can't say for certain

22   that there have been no efforts.  I believe the drug

23   procurer probably has been, you know, sort of

24   keeping tabs on that situation.  Again, I don't have

25   personal knowledge.

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 125 of 266 PageID #: 11347
Elite Document Reporting Service, Inc. (615) 595-0073
www.EliteReportingServices.com

BY MS. LEONARD:

Q.    And the drug procurer just can keep this information to himself?

        MR. SUTHERLAND:  Object to the form.

        THE WITNESS:  I don't know what you're asking.  The drug procurer probably would not.  If there was any success, certainly the drug procurer would let the Commissioner know about that certainly.

BY MS. LEONARD:

Q.    Is the drug procurer required to keep you updated on his or her efforts to obtain pentobarbital?

A.    There's no specific requirement.  But, again, you know, as I mentioned, we have sort of constant contact.

Q.    So other than the drug procurer volunteering information to you, you have no way of knowing what his efforts might or might not be to obtain pentobarbital?

A.    No.  The drug procurer would be the one to testify about that.

Q.    Right.  But there's -- but you would not know other than that individual just simply volunteering information?

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 cPage 126 of 266 PageID #: 11348
Elite-Document Reporting Services, LLC (615) 595-0073
www.EliteReportingServices.com

```
 1   A.     Yeah.  I --

 2              MR. SUTHERLAND:  Object to the form.

 3              THE WITNESS:  Sorry, other than what

 4   I've said.

 5   BY MS. LEONARD:

 6   Q.     Two more quick questions about this

 7   PowerPoint.  On Page 16 it says:  A few years ago

 8   approximately 13 states reached out to the

 9   Department of Justice seeking aide in locating a

10   source for LIC chemicals or/and gaining access to

11   any supply that the Federal government currently

12   had.  This did not result in any action by DOJ.  Did

13   TDOC ever reach out to DOJ?

14   A.     Yes.

15   Q.     When?

16   A.     I don't have a date.

17   Q.     And what did TDOC ask DOJ for?

18              MR. SUTHERLAND:  Object to the form.

19              THE WITNESS:  I believe we were one of

20   the states that did exactly what this PowerPoint

21   says.  Subsequently I've reached out to the Bureau

22   of Prisons.

23   BY MS. LEONARD:

24   Q.     Subsequently you have?

25   A.     Yes.
```

Case 3:18-cv-01234-Document 195 Report Filed 04/05/22 Page 127 of 266 PageID #: 11349
Elite Document & Reporting Services (615) 595-0073
www.EliteReportingServices.com

1   Q.     How recently?

2   A.     I'm guessing maybe a year ago when they

3   announced that they were adopting a pentobarbital

4   protocol.

5   Q.     Okay.  And did you only have one contact at

6   that time?

7   A.     Yeah.  I think I only had one contact, and it

8   was -- they completely shut me down.

9   Q.     Did they tell you that they couldn't give you

10  any?

11  A.     Oh, I wasn't asking to -- for them to provide

12  me with pentobarbital.  I was asking about their

13  source.

14  Q.     Okay.  So they shut down your questions about

15  the source?

16  A.     Absolutely.

17  Q.     I see.  Was the drug procurer involved in

18  that contact at all?

19  A.     No.

20  Q.     So you did that on your own?

21  A.     Yes.

22  Q.     And is that the only time that you've looked

23  for pentobarbital since this PowerPoint?

24  A.     Probably since this PowerPoint I haven't had

25  any other contacts.  Again, the drug procurer has

```
 1    sort of taken on that role.

 2    Q.     I'll just give you a few seconds here to

 3    review the second paragraph on this page.

 4    A.     (Reviewing document.)  Okay.

 5    Q.     What does that paragraph mean?

 6              MR. SUTHERLAND:  Object to the form.

 7              THE WITNESS:  Again, I didn't draft

 8    this, but it's my understanding that there is a

 9    provision in Federal law for the Federal government

10    to be able to step in and obtain some, you know,

11    assistance to states and -- when supplies are low.

12    And, again, based on the first paragraph, there was

13    no willingness to do that.

14    BY MS. LEONARD:

15    Q.     Okay.  The last page has a little man with a

16    big question mark, which appears to invite

17    questions.  Did anyone ask questions?

18    A.     I'm sure there were questions throughout the

19    presentation, but I don't recall what they were.

20    Q.     Did anyone make statements at the end of the

21    presentation?

22    A.     That's possible, but again I don't recall --

23    Q.     Okay.

24    A.     -- what they were.

25    Q.     And what happened after this presentation?
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 129 of 266 PageID #: 1351
Elite-Document Reporting Services
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Object to the form.

 2              THE WITNESS:  Can you be more specific?

 3   BY MS. LEONARD:

 4   Q.    Sure.  You had indicated earlier that the

 5   purpose was -- I don't want to put words in your

 6   mouth -- but the purpose was to update the

 7   Governor's office and other entities about the

 8   search for pentobarbital, and that this clearly --

 9   this indicated clearly that pentobarbital's no

10   longer available to TDOC; is that right?

11   A.    Correct.

12   Q.    So once that information was made clear on

13   this PowerPoint, what happened?

14              MR. SUTHERLAND:  The same objection.

15              THE WITNESS:  Okay.  We eventually

16   adopted the three-drug protocol using midazolam.

17              MS. LEONARD:  Okay.  Let's take a short

18   break here.  What time is it?  I mean, I guess we

19   could do -- it's maybe early for lunch, but do you

20   want to do a lunch break now or do you want to do a

21   shorter break --

22              MR. SUTHERLAND:  That's fine.

23              MS. LEONARD:  -- and go for another hour

24   or so?

25              MR. SUTHERLAND:  It's up to you.  It
```

Case 3:18-cv-01234-Document 195 Report Filed 04/05/22 cage 130 of 266 PageID #: 11382
EliteReportingServices (615) 595-0073
www.EliteReportingServices.com

```
 1   doesn't matter to me.
 2            MS. LEONARD:  Are you ready for a lunch
 3   break now?
 4            THE WITNESS:  I'm good.  I'm fine either
 5   way.
 6            MS. LEONARD:  Okay.  We can do lunch now
 7   then and maybe for -- come back around say 12:30.
 8            MR. SUTHERLAND:  Sure.
 9            MS. LEONARD:  Is that enough time?
10            MR. SUTHERLAND:  Yeah.
11            MS. LEONARD:  All right.
12            THE VIDEOGRAPHER:  We are going off the
13   record.  The time is 11:43 a.m.
14            (A lunch break was taken.)
15            THE VIDEOGRAPHER:  We are back on the
16   record.  The time is 12:34 p.m.
17   BY MS. LEONARD:
18   Q.     All right.  Let's turn to Exhibit 6.  Do you
19   see this is an e-mail that was sent on
20   September 7th, 2017?
21   A.     Yes.
22   Q.     And it says:  So the word from the powers
23   that be is that they first want to try to find
24   midazolam and then go from there, if there are none
25   out there to get.  Who are the "powers that be"?
```

Case 3:18-cv-01234-Document 19 Report Filed 04/05/22 Page 131 of 266 PageID #: 1153
Elite Reporting Services · (615) 595-0073
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Object to the form.
 2   You can answer.
 3              THE WITNESS:  I didn't write this so I
 4   can't say for sure.  Probably the Commissioner.
 5   BY MS. LEONARD:
 6   Q.     Would the powers that be include you?
 7   A.     No.
 8   Q.     Was it the Commissioner who decided to look
 9   for midazolam?
10   A.     Yeah, I believe so.
11   Q.     And did the Commissioner also decide to look
12   for the other two drugs in the protocol at this
13   point?
14   A.     I don't recall at that -- at that point that
15   we had a problem getting the other two, so I might
16   be wrong but, you know, our primary concern at this
17   point was the midazolam.
18   Q.     Who decided that the vecuronium bromide and
19   the potassium chloride should be the second two
20   drugs in the protocol?
21   A.     I don't recall.  I think they have been part
22   of the protocol since I got to the Department except
23   for the period where there was pentobarbital.  So I
24   can't really say where that originally came from.
25   It's what has been used by many, many other states.
```

Elite-Brentwood Reporting Services · (615) 595-0073
www.EliteReportingServices.com

```
 1   Q.    Right.  Was this the first time that anyone
 2   at TDOC looked for midazolam?
 3   A.    I don't know for sure.  This was around the
 4   time that we knew we had to search for something
 5   else.  So it might have been the first time, but
 6   before the PowerPoint I suspect there was some
 7   effort to see that it was available.  But I -- I
 8   don't have any specifics on that.
 9   Q.    So the PowerPoint we saw before the break was
10   dated August 31st, 2017, right?
11   A.    Right.
12   Q.    So we know that was either the date it was
13   created or the date it was presented at latest?
14   A.    Right.
15   Q.    And this September 7th, 2017, is about a week
16   later; is that right?
17   A.    Yes.
18   Q.    So was the decision made to look for
19   Midazolam on the day of the PowerPoint presentation?
20         MR. SUTHERLAND:  Object to the form.
21   You can answer.
22         THE WITNESS:  Okay.  I mean, there's the
23   discussion when the PowerPoint was presented.  At
24   that point we did, I think, have a decision that we
25   were going to try to get the midazolam and go with
```

Case 3:18-cv-01234-BD Document 195-1 Filed 04/05/22 Page 133 of 266 PageID #: 1555
Elite-Brentwood Reporting Services·www.EliteReportingServices.com
www.EliteReportingServices.com

1    that protocol.

2    BY MS. LEONARD:

3    Q.    So sometime in between the presentation and

4    the date of this e-mail is when that decision was

5    made?

6    A.    Yes, because that decision the Commissioner

7    would have wanted to present that to the Governor's

8    office.

9    Q.    When was the drug procurer instructed to look

10   for midazolam?

11   A.    I don't have a date on that.

12   Q.    Would that also have been sometime between

13   August 31st and September 7th?

14              MR. SUTHERLAND:  Objection to the form.

15              THE WITNESS:  Again, it would be

16   speculation.  I think at that point we probably knew

17   that some other states were using midazolam.  And

18   the drug procurer might have done, you know, some

19   work to see if midazolam was readily available.  But

20   I don't have any specifics on that.  It could have

21   been after.  I just don't know.

22   BY MS. LEONARD:

23   Q.    If the drug procurer looked for Midazolam

24   prior to August 31st, 2017, why was that information

25   not included in the PowerPoint?

1           MR. SUTHERLAND:  Object to the form.

2           THE WITNESS:  I don't know whether it

3 was included in the PowerPoint.

4 BY MS. LEONARD:

5 Q.    Well, we just went through the PowerPoint

6 before the break and --

7 A.    Not as to that specific question though.  I

8 mean, I can look back at it.

9 Q.    Sure.  We can do that.  It's Exhibit 16, the

10 PowerPoint.  If you want to take a minute to flip

11 through.

12 A.    On Page 14 it does mention that Arkansas had

13 subsequently obtained a supply of midazolam.  On

14 Page 15 it mentions Alabama's use of midazolam.  So,

15 again, that's the only mention in the PowerPoint.

16 That -- that still doesn't help me know for sure

17 when the search began.

18 Q.    So is there a reason that the search would

19 have been underway at that point that it would not

20 have been included in the PowerPoint?

21 A.    I don't know.

22           MR. SUTHERLAND:  Object to the form.

23           THE WITNESS:  I'm sorry.  I don't know.

24 BY MS. LEONARD:

25 Q.    Let's look at Exhibit 7.

Case 3:18-cv-01234-BROwn-vord Report9495/21ce Page 135 of 265 PageID #: 11557
Elite-Document Reporting Services 1351 266 PageID #: 11557
www.EliteReportingServices.com

```
 1    A.      (Complies.)

 2    Q.      Is this a response to the e-mail that we just

 3    discussed?

 4                MR. SUTHERLAND:  Object to the form.

 5                THE WITNESS:  The timing seems right,

 6    but I don't know.

 7    BY MS. LEONARD:

 8    Q.      Sure.  It says on -- let's go to the next

 9    page of this exhibit.  So it's Page 1974 at the

10    bottom?

11    A.      Uh-huh.

12    Q.      The first sentence in the e-mail sent at

13    12:58 p.m. says:  That stuff is readily available

14    along with potassium chloride.  Is that stuff

15    midazolam?

16                MR. SUTHERLAND:  Object to the form.

17                THE WITNESS:  I don't know.

18    BY MS. LEONARD:

19    Q.      And then the second sentence says:  I

20    reviewed several protocols from states that

21    currently use that method.  What states' protocols

22    were reviewed?

23                MR. SUTHERLAND:  Object to the form.

24                THE WITNESS:  I don't know.

25    / /
```

Elite Document Reporting Service (615) 595-0073
www.EliteReportingServices.com

BY MS. LEONARD:

Q.     Do you know who wrote this e-mail?

A.     It looks to be the former pharmacy owner.

Q.     Did you ever talk with the pharmacy -- former
pharmacy owner -- excuse me -- about this e-mail?

A.     No, I did not.

Q.     Did you ever talk with the former pharmacy
owner about what states' protocols he reviewed?

A.     No.

Q.     And then if you keep reading, it says:  Here
is my concern with midazolam.  Being a
benzodiazepine it does not elicit strong analgesic
effects.  Subjects may be able to feel pain from the
administration of the second and third drugs,
potassium chloride especially.  What did TDOC do
with this e-mail?

            MR. SUTHERLAND:  Object to the form.

            THE WITNESS:  I don't -- I don't want to
speculate.  I'm sure -- well, I expect that the
Commissioner was aware of it, and we had other
sources of information, particularly states that had
conducted executions using midazolam.  And this
appears to be --- the former pharmacy owner reviewed
protocols from other states, and that might be what
he's referring to here is information based on

Case 3:18-cv-01234-Document 195 Report Filed 04/05/21 Page 137 of 266 Page ID #: 11559
Elite Document Reporting Service, LLC (615) 595-0073
www.EliteReportingServices.com

```
1   litigation surrounding the use of midazolam.  But,

2   again, I -- I don't know any more than that.

3   BY MS. LEONARD:

4   Q.      What did you do with this e-mail?

5   A.      I personally didn't do anything with it.

6   Q.      What did you think when you saw this e-mail?

7   A.      I don't recall when I first saw it.  But,

8   again, we knew that it's been used and successfully

9   in a number of other states.  So it didn't cause

10  much concern.

11  Q.      Did you discuss this e-mail with anybody else

12  at TDOC?

13  A.      I don't recall.

14  Q.      And you didn't have any concerns after

15  reading this e-mail?

16  A.      No, not based on other information that we

17  had.

18  Q.      And what was that other --

19  A.      Other states' successful use of the protocol.

20  Q.      Did you consult with a doctor after you

21  received this e-mail?

22  A.      I don't recall consulting with a doctor.

23  Q.      Did you consult with a pharmacologist?

24  A.      No, I don't think so.

25  Q.      Did you consult with an anesthesiologist?
```

Elite-Document Reporting Services.com
www.EliteReportingServices.com

```
 1   A.    No.  At that point anesthesiologists were
 2   really not willing to advise us.
 3   Q.    Does that include the two anesthesiologists
 4   that you spoke with years prior when --
 5   A.    Years prior, yes.
 6   Q.    Okay.  So those two were no longer willing to
 7   provide you with any information?
 8   A.    I know one definitely was not, and I couldn't
 9   locate the other one.
10   Q.    Did you conduct any independent research
11   after you read this e-mail?
12   A.    No.
13   Q.    Was there any discussion about searching for
14   drugs other than midazolam that might elicit
15   analgesic effects?
16   A.    I think some other chemicals were mentioned.
17   I wasn't personally involved in that search though.
18   Q.    Did anyone discuss continuing the search for
19   pentobarbital?
20   A.    Yes.  It was my understanding that we had
21   requested that the former pharmacy owner continue
22   that search of pentobarbital.
23   Q.    Had requested it when exactly?
24   A.    Well --
25              MR. SUTHERLAND:  I'm sorry.  What's your
```

Case 3:18-cv-01234-Document 1 Reporting 04/05/22 Page 139 of 266 PageID #: 1561
EliteReportingServices.com
www.EliteReportingServices.com

1   question again?  Would you repeat that?  I'm sorry.

2   BY MS. LEONARD:

3   Q.    Sure.  You indicated that you continued to --

4   that you requested that the former pharmacy owner

5   continue the search for pentobarbital.  When did you

6   make that request?

7            MR. SUTHERLAND:  Object to the form.

8            THE WITNESS:  Okay.  That would have

9   been the drug procurer.  I think -- I'm not going to

10  know a specific date, but it would have been at the

11  point where the pentobarbital that we had had

12  expired; and we were looking to replenish that

13  supply.

14  BY MS. LEONARD:

15  Q.    When did that last batch of pentobarbital

16  expire?

17  A.    I don't have the date on that.  It was while

18  the litigation was pending challenging the

19  pentobarbital protocol.

20  Q.    The e-mail then advises that you consider the

21  use of an alternative like ketamine or use in

22  conjunction with an opioid.  Did you consider that

23  at all?

24  A.    I didn't.  I can't say whether the

25  Commissioner did.  Again, I know that the

```
 1   Commissioner was not anxious to use a protocol that
 2   had not been tested and used successfully in other
 3   states.
 4   Q.    Did you attempt to obtain ketamine?
 5   A.    I didn't.  I don't know if the drug procurer
 6   did or not.
 7   Q.    Why did you not attempt to obtain ketamine?
 8   A.    That wasn't my role at the time.
 9   Q.    Did you instruct the drug procurer to obtain
10   ketamine?
11   A.    I did not.
12   Q.    Did you instruct him to search for any other
13   drugs?
14   A.    I did not.
15   Q.    Why does TDOC not use an opioid?
16          MR. SUTHERLAND:  Object to the form.
17          THE WITNESS:  I don't know.  Again, as
18   I've indicated we want to use something that's been
19   tested and successfully implemented in another
20   jurisdiction.
21   BY MS. LEONARD:
22   Q.    It says here availability of the paralytic
23   agent is spotty.  Have you ever had any trouble
24   obtaining the paralytic agent?
25   A.    I think, yes, there was a time when it was
```

Case 3:18-cv-01234-Document 195-1 Reporting Services 04/05/22 cage 141 of 266 PageID #: 11583
EliteReportingServices.com (615) 595-0073
www.EliteReportingServices.com

```
 1   scarce.

 2   Q.     And did you consider going forward with the

 3   execution with only two drugs?

 4   A.     No.

 5   Q.     Why not?

 6   A.     That wasn't our protocol --

 7              MR. SUTHERLAND:  Object to the form.

 8              THE WITNESS:  Oh, sorry.  Yeah.  That

 9   wasn't our protocol, and that had not been used in

10   any other jurisdiction.

11   BY MS. LEONARD:

12   Q.     Let's go to Exhibit 8.  This is another

13   September 7th, 2017, e-mail.  It says here at the

14   top of the page:  Etomidate, limited supply of

15   ketamine.  Ample supply of sodium thiopental no

16   longer available.  Is this e-mail from the former

17   pharmacy owner?

18              MR. SUTHERLAND:  Object to the form.

19              THE WITNESS:  I mean, it appears to be.

20   Again, I wasn't the recipient of this e-mail, but

21   that would be my best guess.

22   BY MS. LEONARD:

23   Q.     What is etomidate?

24              MR. SUTHERLAND:  Objection to the form.

25              THE WITNESS:  I'm really not familiar
```

Case 3:18-cv-01234-Document 195 report-Filed 04/05/21 case 142 of 266 PageID #: 11504
Elite Reporting Services
www.EliteReportingServices.com

```
 1  with it.
 2  BY MS. LEONARD:
 3  Q.      Have you ever heard of etomidate?
 4  A.      I've heard the name, yes.
 5  Q.      What is ketamine?
 6              MR. SUTHERLAND:  The same objection.
 7              THE WITNESS:  I believe that's maybe a
 8  horse tranquilizer.
 9  BY MS. LEONARD:
10  Q.      And why did you not instruct the pharmacy to
11  obtain that?
12  A.      I think at that time that wasn't being used
13  by anyone.
14  Q.      And was anyone using etomidate at the time?
15  A.      Not to my knowledge?
16  Q.      Okay.  Let's go to Exhibit 9.  Actually,
17  let's go back to Exhibit 16 for a second, which is
18  the PowerPoint.  On Page 15, the bottom bullet point
19  says:  Florida is using a drug, etomidate, that has
20  never been used in the United States for execution.
21  Do you see that?
22  A.      I do.
23  Q.      Is that an accurate statement?  Was that an
24  accurate statement at the time of this PowerPoint, I
25  should say?
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Objection to the form.

 2              THE WITNESS:  I don't know if they had

 3    adopted the protocol or actually used the protocol.

 4    I didn't -- again, I didn't draft this.

 5    BY MS. LEONARD:

 6    Q.    But sitting here --

 7    A.    I don't -- I don't know that they -- at that

 8    point they had actually used it.

 9    Q.    Okay.  But sitting here today you can't tell

10    me what etomidate is?

11    A.    No.

12    Q.    Did you ask anyone at the conclusion of this

13    PowerPoint what etomidate was?

14    A.    No.

15    Q.    Did everyone else that attended the

16    presentation know what it was?

17              MR. SUTHERLAND:  Object to the form.

18              THE WITNESS:  I don't know.

19    BY MS. LEONARD:

20    Q.    Did anyone else know what it was?

21              MR. SUTHERLAND:  The same objection.

22              THE WITNESS:  I think the drug procurer

23    did, but I don't know what other people knew.

24    BY MS. LEONARD:

25    Q.    Okay.  We'll go back to Exhibit 9.
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 144 of 266 PageID #: 11586
Elite Document Reporting Service 1-415-591-3335 PageID #: 11586
www.EliteReportingServices.com

```
 1    A.      (Complies.)

 2    Q.      This is the second page on the exhibit, so it

 3    says 000144 at the bottom.  And it says here at top:

 4    So the word from the powers that be is that we want

 5    to move forward with ordering the items for a

 6    three-drug protocol including midazolam, vecuronium,

 7    and potassium chloride.  Did TDOC stop its search

 8    for pentobarbital at this time?

 9    A.      I don't --

10              MR. SUTHERLAND:  Objection to form.

11              THE WITNESS:  I'm sorry.  No, I don't

12    think so.

13    BY MS. LEONARD:

14    Q.      How do you know?

15    A.      I mean, it's my understanding from the drug

16    procurer that we would continue to do that.  And we

17    even kept that in the protocol when we provided the

18    alternative of midazolam, three-drug protocol.  So

19    we were keeping that in the event that it became

20    available.

21    Q.      And are the powers that be in this e-mail the

22    same powers that be that we saw in the previous

23    exhibit?

24              MR. SUTHERLAND:  Object to the form.

25              THE WITNESS:  Yeah.  I think I've
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 145 of 266 PageID #: 11457
EliteReportingServices.com
www.EliteReportingServices.com

1  already testified that I don't -- you know, I can't
2  say who all the powers that be are, but I would
3  assume it includes the Commissioner.
4  BY MS. LEONARD:
5  Q.      And you were not included in any of those
6  discussions?
7  A.      Not in this e-mail.
8  Q.      Were you included in any of the discussions
9  that gave rise to this e-mail, which says:  The
10 powers that be want to move forward with ordering
11 the items for the three-drug protocol?
12 A.      Well, I was at the meeting when the
13 PowerPoint was presented.
14 Q.      Was that the only meeting that gave rise to
15 this decision?
16 A.      There was probably some subsequent discussion
17 direction from the Commissioner to go forward with
18 midazolam.
19 Q.      And were you part of those discussions?
20 A.      I don't recall specific discussions, but I
21 expect that I was.
22 Q.      You testified that you did not create the
23 PowerPoint; is that right?
24 A.      Right.
25 Q.      And you were not the individual who made the

Case 3:18-cv-01234-Document 195-2 Filed 04/05/22 Page 146 of 266 PageID #: 11568
Elite Document Reporting Services
www.EliteReportingServices.com

decision to adopt the three-drug protocol?

A.     No.  That would have been the Commissioner.

Q.     And you were not part of that decision at all?

A.     No, it --

          MR. SUTHERLAND:  Object to the form.

          THE WITNESS:  I'm sorry.  No.  That's -- that's a Commissioner decision.

BY MS. LEONARD:

Q.     That he makes alone?

A.     Yes.

Q.     Okay.  So why were you at that PowerPoint presentation?

A.     For -- I mean, just so that I would have information and in case, you know, I had historical knowledge in case questions came up that I needed to respond to.

Q.     And so did you use the information that you gleaned at that PowerPoint in those subsequent discussions that you just mentioned?

          MR. SUTHERLAND:  Objection to the form.

          THE WITNESS:  Really, what was in the PowerPoint was stuff that I already knew.  The purpose of the PowerPoint was to present the current state that we were in in terms of being able to

```
1    carry out on an execution, and I was already
2    familiar with that.
3    BY MS. LEONARD:
4    Q.    So what was in the PowerPoint was stuff you
5    already knew, but you didn't know everything that
6    was in the PowerPoint; right?
7    A.    No.
8    Q.    And you didn't ask questions about the things
9    that you didn't understand?
10              MR. SUTHERLAND:  Objection to the form.
11              THE WITNESS:  I don't recall any
12    specific question that I asked.
13   BY MS. LEONARD:
14   Q.    And why didn't you ask any questions if you
15   didn't understand everything that was in the
16   PowerPoint?
17              MR. SUTHERLAND:  The same objection.
18              THE WITNESS:  Okay.  I relied on the
19   drug procurer, who prepared the PowerPoint, and had
20   been the one that had actually been involved in
21   conversations and in the search for drugs.
22   BY MS. LEONARD:
23   Q.    Is the drug procurer a pharmacist?
24   A.    No.
25   Q.    Was the drug procurer a medical doctor?
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 148 of 266 PageID #: 11570
Elite Reporting Services
www.EliteReportingServices.com

```
 1    A.      No.

 2    Q.      Why did you feel it was appropriate to rely

 3    on the drug procurer's advice in this PowerPoint

 4    given that he's neither a medical doctor nor a

 5    pharmacist?

 6    A.      The drug procurer had been the one doing the

 7    search and talking to other people, including the

 8    former pharmacy owner, who employed pharmacists,

 9    and, you know, I'm not sure.  The drug procurer

10    probably could answer better as to what in

11    particular he relied on.  But I wasn't relying on

12    his medical knowledge, but I was relying on the drug

13    procurer's search efforts in researching this.

14    Q.      Is the drug procurer a lawyer?

15            MR. SUTHERLAND:  I'm going to object and

16    instruct the witness not to answer the question

17    based on the Court's protective order.

18    BY MS. LEONARD:

19    Q.      Given that you're TDOC's General Counsel, did

20    you feel that you had a role in helping TDOC

21    determine whether this was a constitutionally

22    acceptable protocol?

23    A.      Yes.

24    Q.      Okay.  And you -- well, let me scratch that.

25    So why is it that the powers that be decided to move
```

```
 1   forward with the three-drug protocol?

 2              MR. SUTHERLAND:  Object to the form.

 3              THE WITNESS:  I can't answer that.

 4   BY MS. LEONARD:

 5   Q.     Is that because you don't know?

 6   A.     It's because you're asking me for information

 7   about the thought process of someone else.  I can't

 8   speak from personal knowledge about that.

 9   Q.     So you were involved in these discussions,

10   but you don't have any idea why this decision was

11   made?

12              MR. SUTHERLAND:  The same objection.

13              THE WITNESS:  Okay.  It's my

14   understanding that this has been a protocol that has

15   been used in several other states successfully.  The

16   Commissioner had discussions with correctional

17   experts who had been involved in those types of

18   executions and for that reason felt comfortable with

19   adopting this protocol.

20   BY MS. LEONARD:

21   Q.     Do you believe that this is a

22   constitutionally acceptable protocol?

23   A.     Yes.

24              MR. SUTHERLAND:  Objection to the form.

25              THE WITNESS:  Sorry.  I do.
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 150 of 266 PageID #: 1472
Elite Reporting Services  *  (501) 593-0053
www.EliteReportingServices.com

BY MS. LEONARD:

Q.    Did anyone at TDOC ask you your opinion on that while they were making this decision?

A.    I don't believe anyone asked me point-blank about that.  But if I had thought it was not constitutional, I would have spoken up.

Q.    Okay.  Let's go to Exhibit 12.  In the e-mail on the bottom half of this page at 9:35 a.m., the second sentence says:  We would need at least 100 grams to start with.  Why did you ask for at least 100 grams to start with?

            MR. SUTHERLAND:  Objection to the form.

            THE WITNESS:  Okay.  I didn't ask that question, so I really can't respond.

BY MS. LEONARD:

Q.    Were you aware that TDOC was looking for at least 100 grams to start with?

A.    You know, ideally we wanted enough of a supply to support us changing the protocol.  Again, I think we -- we would, you know, want at least enough to do at least one or two executions, certainly one, and that would include, you know, two sets of the 500 milligrams.  But, again, we were, you know, looking for whatever we could get, and things went farther than just that discussion.

Case 3:18-cv-01234-Document 195-2 Filed 04/05/22 Page 151 of 266 PageID #: 1473
Elite Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1   Q.     Okay.  To be clear this is -- I shouldn't
 2   have skipped over the first sentence, which is, I'm
 3   looking to purchase pentobarbital.  So this is in
 4   the search for pentobarbital?
 5   A.     Uh-huh.
 6   Q.     How many grams of pentobarbital are needed
 7   for a single execution?
 8                 MR. SUTHERLAND:  Object to the form.
 9                 THE WITNESS:  I don't recall.
10   BY MS. LEONARD:
11   Q.     So do you know how many executions could be
12   carried out with 100 grams of pentobarbital?
13                 MR. SUTHERLAND:  The same objection.
14                 THE WITNESS:  Yeah.  And because I don't
15   recall exactly how much was used, it would be double
16   whatever that protocol called for for each
17   execution.
18   BY MS. LEONARD:
19   Q.     Okay.  So you don't know why TDOC would have
20   asked for at least 100 grams to start with?
21   A.     No.  Other than, you know, we wanted to have
22   enough.  We wanted to have a supply.  I mean, this
23   was going to be -- this is the protocol that we were
24   going to use going forward.  So, you know, I
25   think there was an effort to determine just how
```

Case 3:18-cv-01234-Document Report Filed 04/05/22 Page 152 of 266 PageID #: 11574
Elite-Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1   available it was.

 2   Q.      Does pentobarbital have a beyond use date?

 3   A.      I'm sure it does.

 4   Q.      Do you know roughly how long that is?

 5   A.      No.

 6   Q.      At this time would TDOC have been willing to

 7   engage in further conversations with a source that

 8   could have provided only fewer than a hundred grams

 9   to start with?

10   A.      Yes.

11   Q.      How do you know that?

12   A.      I just know that we were looking for it and

13   that at that time was our preferred method.

14   Q.      But you don't know how many a hundred -- how

15   many executions a hundred grams would achieve?

16   A.      Not this morning.

17   Q.      But you know it's at least one or two?

18   A.      It should be --

19           MR. SUTHERLAND:  Objection to form.

20   BY MS. LEONARD:

21   Q.      Okay.  Exhibit 13 is another e-mail.  This

22   one's dated July 20th, 2017.  It says in part:  I

23   have some news on the pento.  It's not good.  I had

24   the DEA invite me over to discuss it.  I can call

25   you tomorrow to fill you in on the details.  Are you
```

```
 1   available?  Did anyone from TDOC discuss this DEA
 2   meeting?
 3              MR. SUTHERLAND:  Object to the form.
 4              THE WITNESS:  I was aware that it
 5   happened.  I don't know what all discussions were
 6   involved.  The drug procurer first received this
 7   information.
 8   BY MS. LEONARD:
 9   Q.     How are you aware of the DEA meeting?
10   A.     The drug procurer, I'm sure, mentioned it to
11   me.
12   Q.     Was the drug procurer present at the DEA
13   meeting?
14              MR. SUTHERLAND:  Object to the form.
15              THE WITNESS:  Not to my knowledge.
16   BY MS. LEONARD:
17   Q.     Who was present at the DEA meeting?
18              MR. SUTHERLAND:  The same objection.
19              THE WITNESS:  The former pharmacy owner
20   and I -- I have no idea who else might have been in
21   the meeting.  It sounds like DEA agents were there.
22   BY MS. LEONARD:
23   Q.     Presumably.  Was anyone from TDOC there?
24   A.     No, not that I know of.
25
```

Elite-Brentwood Reporting Service  (615) 595-0073
www.EliteReportingServices.com

1    Q.    Would you have been aware if somebody from

2    TDOC attended a meeting with the DEA?

3                   MR. SUTHERLAND:  Object to the form.

4                   THE WITNESS:  I expect I would.  But,

5    again, this e-mail, I think, is the first

6    notification we had; and it had already happened.

7    BY MS. LEONARD:

8    Q.    Do you know what the DEA said about whether

9    they could provide pentobarbital during this

10   meeting?

11                  MR. SUTHERLAND:  Object to the form.

12                  THE WITNESS:  It's my understanding the

13   discussion was whether the Department could obtain

14   it through importation, and the gist of the meeting

15   was we could not.

16   BY MS. LEONARD:

17   Q.    Why not?

18                  MR. SUTHERLAND:  The same objection.

19                  THE WITNESS:  The DEA indicated that

20   they would not grant a license to import it, but I

21   don't have the details.  I don't want to talk about

22   specifics about a meeting that I wasn't present on.

23   This is kind of the extent of my knowledge.

24   BY MS. LEONARD:

25   Q.    Did the former pharmacy owner discuss

```
 1   executions with the DEA during that meeting?
 2              MR. SUTHERLAND:  Object to the form.
 3              THE WITNESS:  I don't know.
 4   BY MS. LEONARD:
 5   Q.    Did the drug -- did you ask the drug procurer
 6   if the drug procurer knows that?
 7              MR. SUTHERLAND:  The same objection.
 8              THE WITNESS:  No.
 9   BY MS. LEONARD:
10   Q.    So you don't even know whether the topic of
11   executions came up at this meeting?
12   A.    Well, it's my understanding that was the
13   whole point of it -- of the meeting, and they -- the
14   DEA would not allow importation for use in
15   executions.
16   Q.    Okay.  And you relied on the drug procurer's
17   representations to you about that meeting?
18   A.    Sure.
19   Q.    Let's look at Exhibit 18.  This says,
20   starting on the second sentence:  We are still
21   searching for a USP grade Pentobarbital.  The e-mail
22   is dated June 20th, 2018.  Why were you still
23   searching for pentobarbital at that time?
24              MR. SUTHERLAND:  Object to the form.
25              THE WITNESS:  Yeah.  I believe at that
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 156 of 266 PageID #: 11578
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1   point we still had pentobarbital as an option in our

2   protocol.

3   BY MS. LEONARD:

4   Q.     Okay.  And then a couple of sentences later

5   -- this is on the third line.  It says:  We would

6   need at least 10 grams.  In the previous e-mails I

7   mentioned needing overall 100 grams, but I want to

8   see what, if any, amount might be available to

9   order.  Why is it that TDOC now only is asking for

10  10 grams?

11              MR. SUTHERLAND:  The same objection.

12              THE WITNESS:  I think at this point it

13  sounds like we just wanted whatever we could get, if

14  it was sufficient for an execution or two.  But,

15  again, I already mentioned I don't remember on the

16  pentobarbital protocol what that amount was, so I'm

17  not sure what the 10 grams represents.

18  BY MS. LEONARD:

19  Q.     Let's go to Exhibit 17.  This says:  It's

20  possible we could order it but getting it imported

21  would be the issue.  It's a Scheduled II drug, and

22  the DEA has already advised us that they do not

23  allow the importation of drugs that are considered,

24  quote, readily available in the US.  Is it the API

25  for pentobarbital?

Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1                    MR. SUTHERLAND:  Object to the form.

 2                    THE WITNESS:  I can't -- given the date

 3      it probably was API, but I don't -- I don't know

 4      whether it was commercially manufactured or API.

 5      BY MS. LEONARD:

 6      Q.    Why were you still searching for

 7      pentobarbital in October of 2019?

 8                    MR. SUTHERLAND:  Object to the form.

 9                    THE WITNESS:  We wanted to know whether

10      it was available currently at that time.

11      BY MS. LEONARD:

12      Q.    And if it had been, would you have switched

13      to using a single-drug, pentobarbital, protocol?

14                    MR. SUTHERLAND:  Object to the form.

15                    THE WITNESS:  That would have been the

16      Commissioner's decision.

17      BY MS. LEONARD:

18      Q.    Would you have recommended that to the

19      Commissioner?

20      A.    I would have left that to him.

21      Q.    Would he have sought a recommendation from

22      you?

23                    MR. SUTHERLAND:  Object to the form.

24                    THE WITNESS:  It's hard -- probably but

25      it's hard for me to say.
```

Case 3:18-cv-01234-Document 195 Filed 04/05/22 Page 158 of 266 PageID #: 11560
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

BY MS. LEONARD:

Q.     When did --

A.     That was the protocol that we adopted when it was available.

Q.     The last sentence of this e-mail says:  There may be a loophole in there given that the product is technically not readily available.  What does it mean that the product is "technically not readily available"?

            MR. SUTHERLAND:  Object to the form.

            THE WITNESS:  It's not available to Departments of Corrections for use in executions.

BY MS. LEONARD:

Q.     And who told you that?

            MR. SUTHERLAND:  Don't identify anybody by name.

            THE WITNESS:  Okay.  Well, we discussed the drug procurer's efforts to search for pentobarbital and engage the assistance of the former pharmacy owner.  We all -- you know, we were aware that other states were having trouble getting it, and any state that had it was not willing to talk to us about the source.  So I think what that's referring to is it's not readily available to Departments of Correction for use in execution.

Case 3:18-cv-01234-Document 195 Filed 04/05/21 Page 159 of 266 PageID #: 11581
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1   BY MS. LEONARD:
 2   Q.    Okay.  And what would the loophole in there
 3   be?
 4              MR. SUTHERLAND:  The same objection.
 5              THE WITNESS:  Okay.  I did not draft
 6   this.  This may be a reference to is that an
 7   argument that we can make to get around the readily
 8   available issue.  Could we argue that it's not
 9   readily available to us?
10   BY MS. LEONARD:
11   Q.    Did you try to do that?
12   A.    I personally did not.  I do believe that that
13   was -- I think one of the previous e-mails that we
14   looked at indicated that the DEA did not buy that
15   argument when they met with the former pharmacy
16   owner.
17   Q.    And you were not present for that meeting,
18   you said?
19   A.    No.
20              MR. SUTHERLAND:  Objection to the form.
21              THE WITNESS:  I'm sorry.
22   BY MS. LEONARD:
23   Q.    Were you ever in direct communication with
24   the DEA about execution drugs?
25   A.    Not about midazolam or anything current.
```

1    Q.    Did you ever contact the DEA about

2    pentobarbital?

3    A.    I did not.

4    Q.    Did you ever contact the FDA about

5    pentobarbital?

6    A.    No.

7    Q.    Did the drug procurer ever contact the DEA

8    about pentobarbital?

9              MR. SUTHERLAND:  Object to the form.

10             THE WITNESS:  I don't know.

11   BY MS. LEONARD:

12   Q.    Did the drug procurer ever talk to the FDA

13   about pentobarbital?

14   A.    I don't know.

15             MR. SUTHERLAND:  The same objection.

16             THE WITNESS:  Sorry.

17   BY MS. LEONARD:

18   Q.    So when -- so when we're talking about what

19   was shared with the DEA, we're talking about this

20   meeting between the former pharmacy owner and the

21   DEA; is that right?

22   A.    Right.  That's my understanding of the

23   meeting.

24   Q.    And your understanding is that the former

25   pharmacy owner made that argument about technically

Case 3:18-cv-01234-Document 195 Filed 04/05/22 Page 161 of 266 PageID #: 11583
Elite-Document Reporting Services - (615) 595-0073
www.EliteReportingServices.com

```
 1   being not readily available to the DEA?

 2   A.      That's my understanding.

 3   Q.      And then in your words I think you said the

 4   DEA didn't buy it?

 5   A.      Correct.

 6   Q.      When did TDOC most recently search for

 7   pentobarbital?

 8               MR. SUTHERLAND:  Objection to the form.

 9               THE WITNESS:  I think recently, but I

10   don't have any dates.

11   BY MS. LEONARD:

12   Q.      Let's look at Exhibit 19.

13   A.      (Complies.)

14   Q.      Are you familiar with this memorandum?

15   A.      I am.

16   Q.      What is your understanding of this

17   memorandum?

18   A.      Well, it's a memorandum from the Attorney

19   General's Office making the argument that the FDA

20   does not have jurisdiction to regulate articles

21   intended for use in -- by states in executions.

22   Q.      And does that include lethal injection

23   chemicals?

24   A.      Yes.  I think that's the argument in this

25   opinion.
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1   Q.     Have you discussed this memorandum with

 2   anyone at TDOC?

 3   A.     I'm sure I have.  Probably with the drug

 4   procurer, maybe with the Commissioner, but I don't

 5   have a specific memory of an occasion where we

 6   discussed this.

 7   Q.     What would you have told the drug procurer

 8   about this?

 9              MR. SUTHERLAND:  Object to the form.

10              THE WITNESS:  I don't know that I told

11   the drug procurer anything about this.  I think we

12   probably discussed it together.  The problem is

13   there was a court opinion looking at this issue in

14   terms of obtaining sodium thiopental through

15   importation, and the Court determined that the FDA

16   had to regulate it, and then as a result of that I

17   believe at that time we had some sodium thiopental

18   that was obtained by the DEA from us.

19   BY MS. LEONARD:

20   Q.     Did you ever discuss this memorandum with the

21   former pharmacy owner, who had the visit from the

22   DEA?

23   A.     I did not.

24   Q.     Did the drug procurer discuss this memorandum

25   with the former pharmacy owner?
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 163 of 266 PageID #: 11585
Elite-Brentwood Reporting Services · (615) 595-0073
www.EliteReportingServices.com

```
 1   A.     I don't know.

 2           MR. SUTHERLAND:  Object to the form.

 3           THE WITNESS:  Okay.  Sorry.  I don't

 4   know.

 5   BY MS. LEONARD:

 6   Q.     Has TDOC attempted to obtain pentobarbital

 7   overseas since the date this memorandum was issued?

 8   The date was May 3rd, 2019.

 9   A.     I'll have to look back at some e-mails.  No,

10   probably not since May of 2019.

11   Q.     Why not?

12   A.     Because we had already been told that we were

13   not going to be able to import.

14   Q.     Are you aware that since this memorandum was

15   issued, other states have been successful in

16   obtaining pentobarbital overseas?

17   A.     I don't know whether they imported it or not.

18   I just know we tried to get information about how

19   they've obtained it, and no information has been

20   shared with us.

21   Q.     Are you aware that the DEA has not intervened

22   in any importation of execution drugs since this

23   memorandum was issued?

24   A.     No.

25   Q.     Did you contact the DEA about this
```

Case 3:18-cv-01234-Document 195-1 Report Filed 04/05/22 Page 164 of 266 PageID #: 11526
Elite Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1   memorandum?

 2   A.      No, I didn't.

 3   Q.      Did you contact the FDA?

 4   A.      I did not.

 5   Q.      Did anyone else at TDOC make those contacts?

 6              MR. SUTHERLAND:  Objection to the form.

 7              THE WITNESS:  Not to my knowledge.

 8   BY MS. LEONARD:

 9   Q.      Why not?

10              MR. SUTHERLAND:  The same objection.

11              THE WITNESS:  Because we're -- you know,

12   we know the Court opinion is out there, and there's

13   been -- you know, there's an injunction in place.

14   BY MS. LEONARD:

15   Q.      To this day?

16   A.      Sorry.  What?

17   Q.      To this day?

18   A.      To this day --

19   Q.      There's an injunction in place to this day?

20   A.      I -- I think so.  I mean, I don't know that

21   there's been any other movement in the case.

22   Q.      When's the last time that you researched that

23   case?

24   A.      I -- I can't give you a date.

25   Q.      And what's your understanding of the
```

1  injunction?

2  A.     That the FDA has to regulate it and not

3  permit importation.

4  Q.     And you believe that's still in place

5  presently?

6  A.     I think so.

7  Q.     Let's go to Exhibit 35, which I think is both

8  -- it might be the first one in the next set here,

9  Book 2.  This is a June 26th, 2019, e-mail with a

10 subject line, Proposed alternative.  And it just has

11 a list that says, midazolam -- and I can't say this

12 -- digoxin (phonetics), morphine sulfate, and

13 propranolol (phonetics).  I can't say that one

14 either.  Are these alternative drugs that can be

15 used in executions?

16             MR. SUTHERLAND:  Objection to the form.

17             THE WITNESS:  It appears that's probably

18 what that's referencing.

19 BY MS. LEONARD:

20 Q.     Did anyone at TDOC look for any of these

21 drugs to use in executions?

22             MR. SUTHERLAND:  Objection to the form.

23             THE WITNESS:  I don't know.

24 BY MS. LEONARD:

25 Q.     Well, other than midazolam, I suppose, right?

```
 1   A.     Right.

 2   Q.     Do you have any reason to believe that TDOC

 3   cannot obtain these drugs for use in executions?

 4   A.     I don't know whether we could or not.

 5   Q.     You've never looked into it?

 6   A.     I haven't, no.

 7   Q.     Has TDOC ever considered using an oral

 8   administration of drugs for executions?

 9              MR. SUTHERLAND:  Objection to the form.

10              THE WITNESS:  No.

11   BY MS. LEONARD:

12   Q.     Why not?

13              MR. SUTHERLAND:  The same objection.

14              THE WITNESS:  Okay.  I'm not aware that

15   any state has done that.  We don't know what that

16   kind of a protocol would involve, and I don't know

17   how we would be able to force an inmate to drink the

18   oral chemicals.

19   BY MS. LEONARD:

20   Q.     You said a couple times today that other

21   states have not used certain methods, and that seems

22   to be important to TDOC in considering its own

23   protocols.  Is that a fair characterization?

24   A.     Yes.

25   Q.     Why is it important to TDOC that other states
```

1  have used a protocol before TDOC would adopt it?

2  A.     Because we would -- we could rely on the

3  experience of other states in knowing that a

4  particular protocol has been successfully

5  implemented.

6  Q.     What other states use the same three-drug

7  protocol that Tennessee currently uses?

8  A.     Okay.  That's -- I'm not going to be able to

9  name them all.  I believe Virginia, maybe Georgia,

10  Alabama.  Again, I don't know.  There's several.

11  Q.     Are you aware of past botched executions in

12  states that use this protocol?

13                 MR. SUTHERLAND:  Objection to the form.

14                 THE WITNESS:  Not -- I'm not aware of

15  botched executions using this protocol based on the

16  protocol itself --

17  BY MS. LEONARD:

18  Q.     What do you mean --

19  A.     -- not working.

20  Q.     What do you mean "by based on the protocol

21  itself not working"?

22  A.     I believe in Oklahoma there was an execution

23  that did not go well based on the fact that the

24  venous access was not good, but again it wasn't the

25  fact of the use of Midazolam.  It was based on, you

```
 1   know, the access to the vein.
 2   Q.     And was that an issue that had to do with the
 3   training of the individuals that were carrying out
 4   the execution?
 5              MR. SUTHERLAND:  Objection to the form.
 6              THE WITNESS:  I don't know.
 7   BY MS. LEONARD:
 8   Q.     You testified earlier that consistent with
 9   the prior e-mail we saw sometimes, it's been
10   difficult to obtain a paralytic; is that right?
11   A.     Yeah, on occasion that's true.
12   Q.     At those times has TDOC considered removing
13   the paralytic?
14   A.     No.
15   Q.     And that's only because other states have not
16   done that?
17   A.     Right, relying on experience of other
18   correctional professionals.
19   Q.     And what -- do you know why it is that these
20   other states have not tried to remove the paralytic?
21   A.     No, I wouldn't know that.
22   Q.     You've never asked them?
23   A.     No.
24   Q.     And you've never asked any experts?
25   A.     No.
```

```
 1   Q.     And you've never conducted your own

 2   independent research?

 3   A.     No.

 4   Q.     Aside from the pharmacy that TDOC is

 5   currently using, have you inquired with any other

 6   companies to obtain midazolam?

 7   A.     I don't believe we have.  I mean, obviously,

 8   if --

 9          MR. SUTHERLAND:  Are you asking her if

10   she has or are you -- because she's saying "we", and

11   so I'm trying to figure out what you're -- are you

12   asking if she's done something or are you asking if

13   TDOC has done something?

14   BY MS. LEONARD:

15   Q.     I'm asking -- well, let's -- yeah.  Let's

16   clarify that.  Other than the pharmacy that TDOC is

17   currently using, have you inquired with any other

18   companies to obtain midazolam?

19          MR. SUTHERLAND:  Are you talking about

20   her?

21   BY MS. LEONARD:

22   Q.     Yes.  Have you personally?

23   A.     I have not.

24   Q.     Has the drug procurer?

25   A.     I don't know.
```

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Object to the form.

 2   BY MS. LEONARD:

 3   Q.     Has anyone else at TDOC?

 4              MR. SUTHERLAND:  The same objection.

 5              THE WITNESS:  I can't answer that.

 6   BY MS. LEONARD:

 7   Q.     How about vecuronium bromide?

 8              MR. SUTHERLAND:  The same objection.

 9              THE WITNESS:  The same answer.

10   BY MS. LEONARD:

11   Q.     And the same thing for potassium chloride.

12              MR. SUTHERLAND:  The same objection.

13              THE WITNESS:  Yes.

14   BY MS. LEONARD:

15   Q.     So as General Counsel and Deputy

16   Commissioner, you don't know whether anyone at TDOC

17   has been in talks with any other pharmacies aside

18   from the one you use?

19   A.     Not --

20              MR. SUTHERLAND:  The same objection.

21              THE WITNESS:  Okay.  Not to my personal

22   knowledge.

23              MS. LEONARD:  Okay.  Let's maybe just

24   take a quick break.

25              MR. SUTHERLAND:  Long enough to go
```

Elite-Document Reporting Services (615) 595-0073
www.EliteReportingServices.com

1   across the hall.

2            MS. LEONARD:  Yeah, basically.

3            THE VIDEOGRAPHER:  We are going off the

4   record.  The time is 1:24 p.m.

5                 (A short break.)

6            THE VIDEOGRAPHER:  We are back on the

7   record.  The time is 1:33 p.m.

8   BY MS. LEONARD:

9   Q.     All right.  I'm going to take us to Exhibit

10  1, which is the protocol.  Let's go to Page 8 of

11  this exhibit.  Do you see on Page 8 there's a

12  definition of the execution team about a third of

13  the way down the page?

14  A.     Yes.

15  Q.     Without identifying them, do you know who

16  fills each of the roles listed in that definition?

17  A.     I don't know all of them by name.

18  Q.     Which roles do you not know who fills --

19  A.     Escort officers.  I'm not sure about the

20  facility maintenance supervisor or the ITS security

21  systems technician.  I don't know every one on the

22  extraction team.  That's pretty much it.

23  Q.     How many people total are on the execution

24  team?

25  A.     I don't have a number.  I don't know how many

Case 3:18-cv-01234-Document 19 Report Filed 04/05/22 ce Page 172 of 266 Page ID #: 11594
ELITE Document Reporting Service (615) 595-0073
www.EliteReportingServices.com

```
1   are on the extraction team.  And you see the escort
2   officers, I don't know how many those are, how many
3   technicians.
4   Q.      Do you know whether each role is always
5   filled by the same individual?
6   A.      Not necessarily, no.
7   Q.      Let's go to Page 10.  Have you seen this
8   blueprint before today?
9   A.      I have.
10  Q.      What for?
11          MR. SUTHERLAND:  Object to the form.
12          THE WITNESS:  Okay.  I mean, I'm
13  familiar with the execution protocol, and that's
14  part of it.
15  BY MS. LEONARD:
16  Q.      When did you most recently review this
17  diagram?
18  A.      I've reviewed the protocol in total in
19  preparation for this deposition.
20  Q.      So within the past couple of days?
21  A.      Uh-huh.
22  Q.      And you testified earlier that you have been
23  present at Tennessee executions?
24  A.      Not present in the witness room or the
25  Capital Punishment Unit.  I've been in the warden's
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
 1    office.
 2    Q.      Okay.  And that's located outside of the
 3    Capital Punishment Unit on this page; is that right?
 4    A.      Right.
 5    Q.      And is that in a completely separate
 6    building?
 7    A.      Uh-huh.
 8    Q.      What were you able to see from your location
 9    in the warden's office?
10    A.      It was just a closed-circuit view of what was
11    going on.  I could see the preparation.  I could see
12    the actual carrying out of the execution.
13    Q.      Roughly how large is the screen that you were
14    looking at?
15    A.      It was just a regular computer screen.
16    Q.      So like roughly the size of that laptop, for
17    example?
18    A.      Maybe a little larger than that.  It wasn't a
19    laptop.  It was a monitor but, you know, a little
20    larger than that.  A normal desktop.
21    Q.      Maybe a 14- or 15-inch screen --
22    A.      It could be, yeah.
23    Q.      -- or something like that?
24    A.      Uh-huh.
25    Q.      And what was -- what did the screen show you
```

1    when you were looking into it?

2              MR. SUTHERLAND:  So, I guess, are you

3    talking generally?

4              MS. LEONARD:  Yeah.

5    BY MS. LEONARD:

6    Q.    What was the view?  So, you know, let me try

7    to explain this a little better.  What part of the

8    execution chamber could you see through the camera?

9    A.    Pretty much the entire execution chamber.

10   Q.    So with reference to this diagram -- sorry.

11   I don't mean to interrupt you, but maybe this will

12   make it easier -- you could see -- and this says

13   execution chamber on Page 10 -- you could see mostly

14   that whole area.  Is that what you mean?

15   A.    Yes.

16   Q.    Where is the camera located in the execution

17   chamber that feeds to the screen that you could see?

18   A.    I'm not --

19             MR. SUTHERLAND:  Object to the form.

20             THE WITNESS:  Sorry.  I'm not sure about

21   that, and there are other views that feed into it so

22   that can be changed, but I can't say specifically

23   where that camera is.

24   BY MS. LEONARD:

25   Q.    Is there only one screen in the warden's

Case 3:18-cv-01234-Document 195 Report Filed 04/05/22 Page 175 of 266 PageID #: 11697
ELITE-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
1    office?

2    A.      Yes.

3    Q.      How many different views could feed into that

4    one screen?

5    A.      I don't know.  Two or three at least.

6    Q.      And what are each of those views showing you?

7    A.      Just different areas.  I'm not sure if that

8    includes the death watch area, but it's primarily

9    the execution chamber.  And that's something that

10   can be zoomed in on or, you know, zoomed out.

11   Q.      Who controls the zooming on the camera?

12   A.      The Commissioner.

13   Q.      Does anyone else ever control that?

14   A.      Not that I've seen.

15   Q.      Is the Commissioner in the warden's office

16   with you during an execution?

17   A.      Right.  Yes.

18   Q.      And so he controls the camera right from

19   there?

20   A.      Uh-huh.

21   Q.      Is there more than one camera in the

22   execution chamber that feeds to the screen in the

23   warden's office?

24           MR. SUTHERLAND:  Objection to the form.

25           THE WITNESS:  And, again, I don't know.
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

BY MS. LEONARD:

Q.    When you are watching the screen, does it
ever flip to a different view, say, you know, one --
in one minute you're looking at it and you're seeing
a view from the right side of the gurney, but then
there's a view that's on the left side of the
gurney?  Does that ever happen?

A.    I don't recall that ever happening.

Q.    So it's more just a single view or a single
angle, but then that could be zoomed in on?

A.    Uh-huh.

Q.    Okay.  So, for example, if it -- I'm not
saying this is what it is but if it's on the
gurney's right side, it doesn't switch that view but
it could go, say, zoom in on the IV site, for
example?

A.    Yes, not -- not as closeup as the camera --
the pan tilt zoom camera in the executioner's area.

Q.    Okay.

A.    But, yeah, we can zoom in.

Q.    Right.  And so roughly what can you see
during the execution on that 14- or 15-inch video
screen?

A.    Well, we can see the gurney go in, zoom in on
whatever is going on.  We can see the warden,

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
1   associate warden of security.  We can see the EMTs
2   starting the catheter, getting the IV started,
3   pretty much, you know, everything that goes in --
4   goes on in the chamber itself.
5   Q.    Can you see anything that goes on in the
6   lethal injection room?
7   A.    No.
8   Q.    Can you see anything that goes on in either
9   of the witness rooms?
10  A.    I think there is a view.  Yes.  You can see
11  the witness rooms.
12  Q.    What are you able to hear from the warden's
13  office during an execution?
14  A.    There's no audio.
15  Q.    So you can't hear anything?
16  A.    Right.
17  Q.    Why is there no audio to the warden's office?
18            MR. SUTHERLAND:  Objection to the form.
19            THE WITNESS:  I don't know.
20  BY MS. LEONARD:
21  Q.    Who else was with you in the warden's office
22  during the executions?
23            MR. SUTHERLAND:  Don't identify anyone
24  by name.
25            THE WITNESS:  Okay.  The -- there is
```

Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1    sometimes a representative from the Governor's
 2    office.
 3    BY MS. LEONARD:
 4    Q.     Sometimes but not always?
 5    A.     There might have been a time or two when
 6    there wasn't, so I don't want to say a hundred
 7    percent every time that they've been there but
 8    usually they are.
 9    Q.     So it's you, the Commissioner, usually a
10    representative from the Governor's office.  Anyone
11    else?
12    A.     The drug procurer sometimes.
13    Q.     He's sometimes with you in the warden's
14    office?
15    A.     Uh-huh.
16    Q.     Anyone else?
17    A.     No.
18    Q.     Is there anyone from the AG's office in the
19    warden's office with you?
20    A.     No.
21    Q.     Why are you watching the execution on the
22    closed-circuit TV?
23                MR. SUTHERLAND:  Object to the form.
24                THE WITNESS:  Okay.  Just so we can see
25    or -- or I know the Commissioner wants to see that
```

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

```
 1   everything is proceeding without any issues.
 2   BY MS. LEONARD:
 3   Q.    And if something were to arise, what would
 4   happen?
 5               MR. SUTHERLAND:  Object to the form.
 6               THE WITNESS:  I mean, I really can't
 7   answer that without like a specific scenario.
 8   BY MS. LEONARD:
 9   Q.    Sure.  So if there were a problem, like the
10   one you described earlier in Oklahoma with accessing
11   a vein --
12   A.    Uh-huh.
13   Q.    -- what would the Commissioner do?
14               MR. SUTHERLAND:  Object to the form.
15               THE WITNESS:  Well, that's -- that's
16   never happened so I don't want to speak for what the
17   Commissioner would do.
18   BY MS. LEONARD:
19   Q.    Is there a scenario in which the Commissioner
20   would call off an execution?
21               MR. SUTHERLAND:  Object to the form.
22               THE WITNESS:  I can't say that there's
23   no circumstance where that would happen, but I don't
24   know of any particular circumstance where that would
25   happen.
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
 1   BY MS. LEONARD:

 2   Q.     Okay.  But that's the purpose --

 3   A.     It would be, you know, based on whatever the

 4   scenario was.  He'd make that decision.

 5   Q.     Okay.  Sure.  So that's why -- I'm just

 6   trying to understand.  So he's watching on the

 7   closed-circuit TV so that he can make that decision,

 8   if need be?

 9   A.     That would help --

10          MR. SUTHERLAND:  Object to the form.

11          THE WITNESS:  Sorry.  That would help

12   him make that decision.

13   BY MS. LEONARD:

14   Q.     And does the Commissioner make that decision

15   alone?

16          MR. SUTHERLAND:  The same objection.

17          THE WITNESS:  We've never had that

18   situation arise.

19   BY MS. LEONARD:

20   Q.     Do you have the authority to call off an

21   execution?

22   A.     No.

23   Q.     Does anyone else have the authority to call

24   off an execution aside from the Commissioner?

25          MR. SUTHERLAND:  Object to the form.
```

Case 3:18-cv-01234-DPJ-FKB  Document 195  Filed 04/05/22  Page 181 of 266  PageID #: 11693
EliteReportingServices.com (601) 573-9100
www.EliteReportingServices.com

```
 1                THE WITNESS:  The Governor.
 2    BY MS. LEONARD:
 3    Q.     And how does -- how do the people in the
 4    warden's office during an execution communicate with
 5    the Governor?
 6    A.     By telephone.
 7    Q.     And does the representative from the
 8    Governor's office have the Governor proxy to call
 9    off the execution?
10                MR. SUTHERLAND:  Object to the form.
11                THE WITNESS:  No, I don't think so.
12    BY MS. LEONARD:
13    Q.     Who speaks over the phone with the Governor?
14    A.     The Commissioner.
15    Q.     Do you ever speak with the Governor over the
16    phone?
17    A.     No.
18    Q.     Do you ever consult with the Commissioner as
19    to whether to call off an execution?
20                MR. SUTHERLAND:  So are you talking
21    about hypothetically?
22                MS. LEONARD:  Uh-huh.
23                MR. SUTHERLAND:  I mean, we're starting
24    to get into conversations that the Commissioner and
25    his lawyer might have without regard to any facts.
```

```
 1   So, I mean --

 2            MS. LEONARD:  I'll ask a different -- I

 3   will ask a different question.

 4            MR. SUTHERLAND:  That's fine.

 5   BY MS. LEONARD:

 6   Q.    Why are you in the warden's office during an

 7   execution?

 8   A.    I'm there in case legal issues arise.  It

 9   could be something like a request from a religious

10   adviser.  It could just vary and questions about,

11   for example, once we had a victim's family member

12   coming to see the execution but did not have the

13   proper ID and so --

14            MR. SUTHERLAND:  Yeah.  Let me just

15   interrupt you.  Let's -- I don't want you to discuss

16   any specific communications you had with the

17   Commissioner about legal advice that you gave him or

18   a representative at TDOC --

19            THE WITNESS:  Okay.

20            MR. SUTHERLAND:  -- under

21   attorney-client privilege to the extent that it has

22   occurred since July or August of '18.

23   BY MS. LEONARD:

24   Q.    So did this incident with the forgotten ID

25   take place before July 2018?
```

```
 1    A.     I don't remember.  I don't remember which
 2    execution it was.
 3    Q.     How many lethal injection executions has
 4    Tennessee carried out since the adoption of this
 5    protocol?
 6    A.     I think just two.
 7    Q.     And do you recall roughly when those
 8    executions took place?
 9    A.     The summer of 2019.  Don't hold me to the
10    date.
11    Q.     If I told you August 2018 and May 2019, would
12    that sound right?
13    A.     That could be, yeah.
14    Q.     Okay.  And you don't remember which of
15    those -- do you remember if it was at one of those,
16    that this person had the forgotten ID issue?
17    A.     No, I don't know.
18    Q.     When was the last time that Tennessee
19    executed someone by lethal injection prior to those
20    two executions?
21    A.     I don't have that date or year.  Sorry.
22    Q.     And you testified earlier that you have not
23    attended any executions outside of Tennessee?
24    A.     No.  No actual executions.
25    Q.     Have you toured the chambers in other states?
```

```
 1   A.     A couple of jurisdictions.

 2   Q.     Okay.  But you've never been to an actual --

 3   a live execution?

 4   A.     Correct.

 5   Q.     Have you had discussions with the Governor

 6   about executions that are not related to legal

 7   issues?

 8   A.     No.

 9   Q.     Have you had discussions with the

10   Commissioner about executions not related to legal

11   issues?

12   A.     No.  All those discussions would be in my

13   capacity as General Counsel.

14   Q.     Okay.  Let's go to Page 13 of Exhibit 1.

15   A.     (Complies.)

16   Q.     If you'd flip through the next of couple

17   pages between Pages 13 and 29, you'll see it looks

18   like it's -- a listing of the primary role and the

19   various duties of these players in the execution

20   process.  Does that look right to you?

21   A.     Uh-huh.  Yes.

22   Q.     Why is it that the executioner is not listed

23   on any of these pages?

24          MR. SUTHERLAND:  Object to the form.

25          THE WITNESS:  I don't know.  Although,
```

```
 1    the executioner's duties are pretty well spelled out
 2    in the protocol.
 3    BY MS. LEONARD:
 4    Q.      So where does the executioner get his
 5    understanding of his role and duties?
 6    A.      It would be in Section 5.
 7    Q.      So is that the section about the procurement
 8    and the preparation of the chemicals?
 9    A.      Uh-huh.  And the introduction.
10    Q.      Did you create the role of executioner?
11    A.      No, I did not.
12    Q.      Who created that role?
13            MR. SUTHERLAND:  Objection to the form.
14            THE WITNESS:  I don't know.  I mean,
15    we've always had an executioner since the time I
16    joined the Department.
17    BY MS. LEONARD:
18    Q.      That's one of the sections that you did not
19    revise when you drafted this protocol?
20    A.      No.
21            MR. SUTHERLAND:  The same objection.
22            THE WITNESS:  No.  The same objection?
23    Okay.  No.  They were --
24            MR. SUTHERLAND:  I'm sorry.  What's the
25    question?
```

```
 1   BY MS. LEONARD:

 2   Q.     I can -- I can do a better job of phrasing

 3   that.  Before lunch, I believe, you testified that

 4   when you were drafting this protocol, you took much

 5   of it from previous iterations of the protocol; is

 6   that right?

 7   A.     Right.

 8   Q.     And you identified Section 5 about the

 9   procurement of chemicals as the only section that

10   had major revisions?

11   A.     Yeah.  I believe that was the only one with

12   major revisions.

13   Q.     Okay.  And so what I'm asking is:  Did you

14   take this section of the protocol from previous

15   iterations or did you write this from scratch and --

16   to lead up to July of 2018?

17   A.     No.  We didn't draft it from scratch.  What

18   are you pointing to when you say "this section"?

19   Q.     This section, the Section 13 through 29,

20   which seems to be the roles and the duties of each

21   of these --

22   A.     Oh.

23   Q.     -- individuals?

24   A.     I don't think there were any revisions to

25   that section with the July 2018 revision.
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

1    Q.    Okay.  So this -- I understand there might

2    have been typographical errors or other minor

3    revisions, but there were no major substantive

4    revisions to these roles or duties?

5    A.    No.  There -- at some point the title of the

6    Director of Communications and Public Relations

7    changed.  I don't know exactly when that was.

8    Assistant Commissioner of Prisons has -- has had a

9    different title at some point.  So I don't -- but I

10   don't -- we would have updated things like that.

11   Q.    Okay.  Let's go to Page 32.  And this says:

12   Training of execution team members at the top.

13   A.    Uh-huh.

14   Q.    Item 1 says:  All execution team members must

15   read the lethal injection execution manual when they

16   become members of the execution team.  Do the

17   execution team members receive any additional

18   reading materials?

19           MR. SUTHERLAND:  Objection to form.

20           THE WITNESS:  Not that I'm aware of.

21   Just not to my knowledge.

22   BY MS. LEONARD:

23   Q.    Do they receive any other training?

24   A.    Yes.  I mean, it depends on their role.

25   Q.    Who -- so you are largely responsible for the

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 188 of 266 PageID #: 11660
Elite Reporting Services  *  (615) 595-0073
www.EliteReportingServices.com

1   drafting of this lethal injection execution manual;
2   is that right?
3          MR. SUTHERLAND:  Objection to the form.
4          THE WITNESS:  I wouldn't say that I was
5   primarily responsible for the actual content.  You
6   asked earlier was I the one, you know, doing the
7   typing and I was, but I was getting input.
8   BY MS. LEONARD:
9   Q.     Okay.  The same section says:  Additionally,
10  the warden or designee holds a class during which
11  the manual is reviewed and clearly understood by all
12  participants.  Do you know what this class is?
13  A.     Nothing other than, you know, what it says.
14  They'd be in a room, and they review the protocol.
15  Q.     Is the class simply reading the entire
16  protocol out loud from start to finish?
17         MR. SUTHERLAND:  Objection to the form.
18         THE WITNESS:  Okay.  I don't know that.
19  I haven't been present at those classes.
20  BY MS. LEONARD:
21  Q.     You've never attended one of these classes?
22  A.     Not -- not the specific one that's being
23  referred to here.
24  Q.     Which classes have you been to?
25  A.     I have been to run-throughs, practices on

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 189 of 266 PageID #: 11871
Elite-Document Reporting Services
www.EliteReportingServices.com

```
 1   occasion.
 2   Q.     Is that what's referenced in Item 2 on this
 3   page?
 4   A.     Yes.
 5   Q.     Where it says:  The execution team simulates
 6   Day 3 of the death watch and the steps outlined in
 7   Section 4 for at least one hour each month?
 8   A.     Yes.
 9   Q.     How many of those sessions have you attended?
10   A.     Since when?
11   Q.     Ever.  Total.
12   A.     Since 1994?  I couldn't hazard a guess.
13   Q.     Several per year, would you say?
14   A.     Some years, yes, and then some years not at
15   all.
16   Q.     Does it depend on how many executions are
17   carried out in any given year?
18   A.     The number of walk-throughs that they have
19   does depend on the number of executions that are
20   coming up.  It gets more frequent at that point.
21   Q.     What determines whether you personally
22   attend?
23   A.     It would just be my decision.
24   Q.     So you're not required to attend those?
25   A.     No.
```

```
 1   Q.      Why do you attend?

 2   A.      So I'm familiar with the process.  And

 3   occasionally there are other people who might need

 4   to see it -- see one of those to get a better

 5   understanding of the process.

 6   Q.      To see one of those sessions --

 7   A.      Uh-huh.

 8   Q.      -- one of the trainings?

 9   A.      Uh-huh.

10   Q.      And then --

11   A.      The -- the practices --

12   Q.      So you --

13   A.      -- which it does constitute training, but

14   it's not the -- it's not the class you're talking --

15   you referred to in Section 1.

16   Q.      Right.  I understand.  So you're saying that

17   somebody might need to see this practice session?

18   A.      Right.

19   Q.      And you would be the person that would

20   accompany that person?

21   A.      It would depend on who it was.

22   Q.      Okay.  How does TDOC know that the

23   participants are clearly understanding the manual?

24           MR. SUTHERLAND:  Object to the form.

25           THE WITNESS:  Okay.  I can't speak for
```

Case 3:18-cv-01234-BJD Document 195 Report Filed 04/05/22 Page 191 of 266 PageID #: 11813
EliteReportingServices.com (615) 595-0073
www.EliteReportingServices.com

```
 1   the warden on that.

 2   BY MS. LEONARD:

 3   Q.    So you're not sure how they assess the

 4   understanding of the execution team?

 5             MR. SUTHERLAND:  The same objection.

 6   BY MS. LEONARD:

 7   Q.    Is there any type of assessment that follows

 8   the class?

 9             MR. SUTHERLAND:  The same objection.

10             THE WITNESS:  I don't know.

11   BY MS. LEONARD:

12   Q.    And then jumping back to Point 2, it says

13   that the simulation includes all steps of the

14   execution process with the following exceptions, and

15   A is that volunteers play the roles of the condemned

16   inmate and the physician.  Have you ever been one of

17   those volunteers?

18   A.    No.

19   Q.    Why not?

20   A.    I've never been asked to.

21   Q.    Would you do it if you were asked?

22   A.    If they needed me to, yes.

23   Q.    Who were the volunteers, not identifying them

24   by name?

25   A.    Correctional personnel.
```

Elite Reporting Services * www.EliteReportingServices.com

1    Q.    And then three says that all training that
2    occurs is documented.  Who's responsible for keeping
3    the documentation?
4    A.    Ultimately the warden.
5    Q.    Where is that documentation kept?
6    A.    The warden's secretary has it.
7    Q.    Is that in his office?
8    A.    Yes.
9    Q.    What is the documentation used for?
10   A.    To document that they've had the training.
11   Q.    And do you ever review the documentation?
12   A.    Occasionally I've had to respond to public
13   records requests and discovery so I've seen them.
14   Q.    Have you ever reviewed it for any other
15   purpose other than responding to a records request
16   or discovery?
17   A.    Not that I recall.
18   Q.    Is the documentation ever used in training?
19   A.    No.  The documentation is just a roster, and
20   it documents the date and time of the training and
21   who attended it.
22   Q.    Okay.  And the bottom of the page does have a
23   special section for the executioner that it seems
24   you alluded to earlier saying that the executioner
25   receives initial and periodic instruction from a

1  qualified medical professional?

2  A.     Uh-huh.

3  Q.     Without giving me a name, who is that

4  qualified medical professional?

5  A.     That can be a physician or an EMT, depending

6  on the particular topic.

7  Q.     Is it not always the same person?

8  A.     I can't say for sure whether it's always been

9  the same person.

10 Q.     If it's a doctor, is it the doctor who's

11 named as the physician on the execution team?

12          MR. SUTHERLAND:  Object to the form.

13          THE WITNESS:  I believe so, yes.

14 BY MS. LEONARD:

15 Q.     And I'm going to ask the same question I

16 asked about the last section.  Was this section

17 revised substantively in the lead up to issuing the

18 2018 protocol?

19 A.     Nothing stands out to me as being something

20 that's been revised for the 2018 protocol.

21 Q.     Okay.  So all of this was also the same with

22 the one-drug, pentobarbital, protocol?

23 A.     I think so.

24 Q.     Okay.  Let's go to Page 34.  How is the

25 dosage amount of each chemical determined?

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 194 of 266 PageID #: 11626
Elite-Brentwood Reporting Service  (615) 595-0073
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Objection to form.

 2              THE WITNESS:  Can you clarify the

 3   question?

 4   BY MS. LEONARD:

 5   Q.     Sure.  You see on Page 34 it says:  The

 6   Department will use the following protocol for

 7   carrying out executions by lethal injection, and

 8   then it lists a certain amount of each of the three

 9   drugs.  Who came up with each of those amounts?

10              MR. SUTHERLAND:  Don't identify the

11   person.

12              THE WITNESS:  I don't recall

13   specifically who did.

14   BY MS. LEONARD:

15   Q.     Was it someone from inside TDOC?

16   A.     I think it would be based on other states'

17   protocols and input from the former pharmacy owner.

18   Q.     Did you copy this directly out of another

19   state's protocol?

20              MR. SUTHERLAND:  Objection to the form.

21   You can answer.

22              THE WITNESS:  Yeah.  I don't recall if

23   that's -- you know, if another state's protocol was,

24   you know, in front of me and I used that or if it

25   was guidance from the former pharmacy owner.
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 195 of 266 PageID #: 11637
EliteReportingServices.com
www.EliteReportingServices.com

```
 1   BY MS. LEONARD:

 2   Q.     You didn't consult with any outside experts

 3   about these amounts?

 4   A.     Not a medical expert.

 5   Q.     How about a pharmacy expert?

 6   A.     Well, yes, and then also other correctional

 7   professionals in other jurisdictions.

 8   Q.     Sure.  What type of pharmacy experts did you

 9   consult?

10   A.     Well --

11              MR. SUTHERLAND:  Are we talking about --

12   and, again, just to clarify.  Her personally or the

13   Department?

14   BY MS. LEONARD:

15   Q.     Yes, you personally?

16   A.     No, I did not.

17   Q.     Okay.  So you just copied this out of another

18   state's protocol?

19   A.     I think, you know, I testified I don't recall

20   what I copied it from or that, you know, the source

21   of it.

22   Q.     Okay.  But you personally didn't ask anybody

23   whether these amounts had any grounding in science?

24   A.     I did not.

25   Q.     Or in medicine?
```

Elite-Brentwood Reporting Services  www.EliteReportingServices.com

```
 1   A.     I did not.

 2   Q.     Or in pharmacy?

 3   A.     I did not.

 4   Q.     Is midazolam FDA approved as the sole drug to

 5   produce and maintain anesthesia?

 6               MR. SUTHERLAND:  Objection to the form.

 7               THE WITNESS:  Yeah.  I'm not a medical

 8   expert, and I don't know the answer to that.

 9   BY MS. LEONARD:

10   Q.     Are the drugs that you use for executions

11   compounded?

12   A.     Some are.

13   Q.     Which ones?

14   A.     The midazolam and the potassium chloride now.

15   Q.     And is the vecuronium bromide manufactured

16   then?

17   A.     That's my understanding.

18   Q.     Why is the vecuronium bromide manufactured?

19   A.     Because --

20               MR. SUTHERLAND:  Objection to the form.

21               THE WITNESS:  Okay.  Sorry.  Because

22   it's available in that form.

23   BY MS. LEONARD:

24   Q.     And the other two drugs are not available in

25   that form?
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/21 Page 197 of 266 PageID #: 11519
EliteReportingServices.com
www.EliteReportingServices.com

```
 1    A.      Right.

 2    Q.      Okay.  And if the midazolam and the potassium

 3    chloride were available as manufactured drugs, would

 4    TDOC be using those instead of the compounds?

 5    A.      Probably so, but that would be the

 6    Commissioner's call.

 7    Q.      Would TDOC ever use expired drugs for an

 8    execution?

 9    A.      No.

10    Q.      Why not?

11            MR. SUTHERLAND:  Objection to the form.

12            THE WITNESS:  Because they would be

13    expired.  We don't -- we want to use effective

14    drugs.

15    BY MS. LEONARD:

16    Q.      Then what makes you think that the expired

17    drugs would be ineffective?

18    A.      We would have to -- I mean, we know they're

19    effective if they have not expired.  If they had

20    expired, they would have to be tested, and we've

21    never had to do that.  We just don't use expired

22    drugs at all.

23    Q.      So once you have the -- once the drugs

24    expire, what do you do with them?

25    A.      They're disposed of.
```

```
 1    Q.     On the next page, Page 35, it says on the

 2    first number there under Storage of LIC:  When the

 3    LIC is received, a member of the execution team and

 4    the warden take the LIC to the armory area of

 5    Building 7 at RMSI.  Without telling me the name,

 6    which member of the execution team does this with

 7    the warden?

 8    A.     The executioner.

 9    Q.     Is it always the executioner?

10    A.     I can't say for certain but it generally is.

11    Q.     Why is it the executioner's role to do this?

12              MR. SUTHERLAND:  Object to the form.

13              THE WITNESS:  The executioner is going

14    to be the one to prepare the drugs and administer

15    the drugs, and so the executioner takes the

16    responsibility of transporting the drugs.

17    BY MS. LEONARD:

18    Q.     Have you personally ever seen the storage

19    container of LIC?

20    A.     Yes.

21    Q.     When's the last time that you saw it?

22    A.     It's probably been a few years since I've

23    been in the armory.  I've seen pictures, but it's

24    probably been a few years since I was physically

25    there.
```

Case 3:18-cv-01234-Document 195 Filed 04/05/22 Page 199 of 266 PageID #: 11621
Elite Document Reporting Services
www.EliteReportingServices.com

```
 1   Q.    Has everyone on the execution team seen the
 2   storage container?
 3   A.    No, not everybody on the execution team.
 4   Q.    Who -- who on the execution team -- again,
 5   please, don't tell me their names, but identifying
 6   by roles on the execution team, has seen that
 7   storage container?
 8              MR. SUTHERLAND:  Objection to the form.
 9              THE WITNESS:  Okay.  The executioner,
10   the warden, associate warden, other -- other
11   folks -- it could be other folks who are present in
12   the executioner's room.  Again, I -- you know,
13   you're asking me something -- I'm not out there
14   every day.  I don't know.
15   BY MS. LEONARD:
16   Q.    Let's flip to Page 39.
17   A.    (Complies.)
18   Q.    Number 4 on that page says:  Preparation in
19   accordance with the directions of the pharmacy with
20   which the department has a pharmacy services
21   agreement to create one set of syringes as follows,
22   and then it lists the instructions there.  Does the
23   execution team have written instructions on how to
24   prepare each of the three drugs?
25              MR. SUTHERLAND:  Object to the form.
```

```
 1              THE WITNESS:  Okay.  They've had
 2    training on all of them.  They have specific
 3    directions for preparing the compounded chemicals.
 4    BY MS. LEONARD:
 5    Q.    So that's for the midazolam and the potassium
 6    chloride?
 7    A.    Uh-huh.
 8    Q.    Where do those instructions come from?
 9              MR. SUTHERLAND:  Object to the form.
10              THE WITNESS:  The pharmacist.
11    BY MS. LEONARD:
12    Q.    And is that -- does the pharmacist include
13    those with every shipment of the drugs?
14              MR. SUTHERLAND:  The same objection.
15              THE WITNESS:  I can't say for sure.
16    BY MS. LEONARD:
17    Q.    Is that something that the pharmacist only
18    gave the execution team once, and they refer to the
19    same set?
20              MR. SUTHERLAND:  The same objection.
21              THE WITNESS:  I know that at least one
22    set of instructions has been updated.  But, yes, if
23    there needed to be changes, the pharmacy --
24    pharmacist would provide revised instructions.
25    / /
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 201 of 266 PageID #: 11623
EliteReportingServices.com
www.EliteReportingServices.com

```
 1   BY MS. LEONARD:

 2   Q.    Have they been updated more than once?

 3   A.    No, I don't think so.

 4   Q.    Do you play any role in helping create these

 5   instructions?

 6   A.    No.

 7   Q.    Is there any conflict between these

 8   instructions and the protocol?

 9   A.    Well, to the extent the protocol provides

10   that they are prepared in accordance with the

11   instructions, then no.

12   Q.    So why is it that it says that the

13   preparation should be in accordance with the

14   directions of the pharmacy but then nevertheless

15   provides its own set of instructions here?

16         MR. SUTHERLAND:  What instructions are

17   we talking about?

18         MS. LEONARD:  If you're looking at Pages

19   39 and 44 [sic], small letters A, B, C, D, E, F.

20         MR. SUTHERLAND:  Okay.

21         THE WITNESS:  39 and 40?

22         MS. LEONARD:  Yeah.  So under where it

23   says:  Preparation in accordance with the

24   directions -- I guess, what I'm wondering is why

25   doesn't the sentence just end there, Preparation in
```

```
 1   accordance with the directions of the pharmacy with

 2   which the Department has a pharmacy services

 3   agreement to create one set of syringes as follows,

 4   full stop, period.  Why is it that A through F are

 5   in the protocol?

 6              MR. SUTHERLAND:  Object to the form.

 7              THE WITNESS:  Okay.  I think probably

 8   for transparency.  This is also sort of -- it's a

 9   public document except for the section that deals

10   with security and so that's why -- that's why it's

11   set out here what we use and how much.

12   BY MS. LEONARD:

13   Q.     Okay.  But to the extent that A through F

14   conflict with the operative version of the

15   pharmacist's instructions, the pharmacist's

16   instructions would rule?

17   A.     Yes.

18   Q.     And who made that determination?

19   A.     What determination?

20   Q.     That to the extent there's a conflict between

21   the instructions and A through F on Pages 39 through

22   40, the pharmacist's instructions would rule?

23   A.     First of all, I'm not aware that there is a

24   conflict.  But to the extent this is the

25   Commissioner's protocol, it would be the
```

1    Commissioner.

2    Q.    And how do you ensure that the executioner's

3    qualified to follow the pharmacist's instructions?

4              MR. SUTHERLAND:  Object to the form.

5              THE WITNESS:  Okay.  I personally do not

6    do that.  That's not my role.

7    BY MS. LEONARD:

8    Q.    Do you believe that the executioner is

9    qualified to follow the instructions?

10   A.    I do.

11             MR. SUTHERLAND:  The same objection.

12   BY MS. LEONARD:

13   Q.    And why do you believe that?

14   A.    Because of the executioner's experience and

15   training.

16   Q.    And when you were drafting this section,

17   where did the information come from that you used to

18   draft this?

19             MR. SUTHERLAND:  Object to the form.

20             THE WITNESS:  Okay.  I think with the

21   exception of the particular drugs, this came from

22   prior versions.

23   BY MS. LEONARD:

24   Q.    So you're saying that on Page 39, Items 1

25   through 3, came from prior sections and then on Page

```
 1   45 through 7 came from prior sections?
 2   A.      I don't see anything different from prior
 3   versions.
 4   Q.      Okay.  So the only thing that's substantively
 5   new is basically what's included in Item 4 on Pages
 6   39 and 40?
 7   A.      Yeah.  I think that was probably the only
 8   revision, and it would have been updated to
 9   (inaudible) midazolam.
10   Q.      And where did you get that portion of these
11   pages from?
12              MR. SUTHERLAND:  The same objection.
13              THE WITNESS:  Okay.  Can you clarify
14   what -- what portion are you talking about?
15   BY MS. LEONARD:
16   Q.      Sure.  Item 4, Steps A through F, where did
17   that come from?
18   A.      Well, as I indicated most of that appears to
19   be the same as from previous versions.
20   Q.      Except for the midazolam portion?
21   A.      Right.
22   Q.      And so where did the midazolam portion come
23   from?
24              MR. SUTHERLAND:  The same objection.
25              THE WITNESS:  It would have been based
```

Elite-Brentwood Reporting Services 205/266
www.EliteReportingServices.com

```
1    on sort of the prior three-drug protocol but with
2    information from other protocols and the pharmacy --
3    former pharmacy owner.
4    BY MS. LEONARD:
5    Q.    Were you in touch directly with the former
6    pharmacy owner about these instructions?
7              MR. SUTHERLAND:  Object to the form.
8              THE WITNESS:  I was not.
9    BY MS. LEONARD:
10   Q.    Only the drug procurer was in touch directly
11   with the former pharmacy owner?
12             MR. SUTHERLAND:  The same objection.
13             THE WITNESS:  I can't say that for sure,
14   but that was the primary role.
15   BY MS. LEONARD:
16   Q.    Okay.  So you got these instructions from the
17   drug procurer who got them from the former pharmacy
18   owner?
19             MR. SUTHERLAND:  The same objection.
20             THE WITNESS:  Okay.  Are you talking
21   specifically about midazolam?
22   BY MS. LEONARD:
23   Q.    Yes.
24   A.    I think that's probably the case.
25   Q.    Okay.  Let's go to Page 42.  Who makes the
```

Elite Reporting Services
www.EliteReportingServices.com

1 decision to call the physician into the chamber to
2 perform a cut-down procedure?
3 A.    That would probably be the warden.
4 Q.    And why do you say "probably"?
5 A.    We've never had to do that.
6 Q.    But if it were to arise, you would think that
7 the warden would do that?
8 A.    I do.  The warden would be there, you know,
9 present in the chamber, and seeing the difficulty in
10 getting IV started.
11 Q.    And was it or why is it that the physician
12 doesn't attempt to insert a central line before
13 performing a cut-down?
14 A.    Well --
15             MR. SUTHERLAND:  I object to the form.
16 You can answer.
17             THE WITNESS:  I believe the protocol
18 somewhere allows the physician to decide how they
19 would do that.
20 BY MS. LEONARD:
21 Q.    Let's go to Page 44.  Why are the prisoner's
22 hands taped to the arm support?
23             MR. SUTHERLAND:  Object to the form.
24             THE WITNESS:  To prevent them from
25 moving.  It's to stabilize the inmate's arm.

Case 3:18-cv-01234-Document 19 reported Filed 04/05/21 cerage 207 of 266 PageID #: 12629
Elite-Document Reporting Services 2075125765 Page
www.EliteReportingServices.com

BY MS. LEONARD:

Q.    What type of movement are you seeking to prevent?

A.    Anything that would interfere with the access.

Q.    Are you aware that taping the inmate's hands down could interfere with the consciousness check?

A.    No.

Q.    Are you aware that moving a finger is an indication of consciousness?

A.    Not specifically.

Q.    Okay.  Let's go to Page 66.

A.    (Complies.)

Q.    About halfway down the page in Section 6 there, it says:  The warden shall wait two minutes following the administration of midazolam and the saline flush before assessing the consciousness of the inmate.  Why is this waiting period two minutes?

MR. SUTHERLAND:  Object to the form.

THE WITNESS:  I don't remember where specifically two minutes came from, but that is to give -- give time for the drugs to take effect.

BY MS. LEONARD:

Q.    And you don't remember why two minutes was selected?

```
 1    A.     I don't.  There might -- that might have been

 2    mentioned in another protocol.  Possibly mentioned

 3    in case law that, you know, described a particular

 4    protocol that was under review.  I just can't say

 5    for sure.

 6    Q.     But in the next section, Number 7, describes

 7    basically what we're calling the consciousness

 8    check.  Do you want just a moment to read that

 9    section?  It's a little lengthy.

10    A.     (Reviewing document.)  Okay.

11    Q.     What does it mean to be unconscious as used

12    in this paragraph?

13                 MR. SUTHERLAND:  Object to the form.

14                 THE WITNESS:  Insensate, I think, is

15    what that's referring to.

16    BY MS. LEONARD:

17    Q.     How can you tell whether a person is

18    insensate versus unresponsive?

19                 MR. SUTHERLAND:  The same objection.

20                 THE WITNESS:  I think the -- if they're

21    not responding to stimulus, that indicates that

22    they're insensate.  Again, I'm not a medical

23    professional.

24    BY MS. LEONARD:

25    Q.     So your understanding is that
```

Elite-Document Reporting Services · (615) 595-0073
www.EliteReportingServices.com

```
1   unresponsiveness necessarily indicates insensate?
2   A.     I would --
3              MR. SUTHERLAND:  Object to the form.
4              THE WITNESS:  Yeah.  I'd leave that to
5   medical experts.
6   BY MS. LEONARD:
7   Q.     Did you type up this section?
8   A.     It's possible that I did at the point we
9   added the consciousness check.
10  Q.     And where did you get this information from?
11  A.     We did talk to a physician who recommended a
12  few things and then another physician about the
13  trapezius muscle and probably other protocols, and
14  I'm not sure what consciousness check is in the Baze
15  opinion.  But, you know, I can't sit here today and
16  tell you, you know, anymore than that really.  I
17  know we had input from two physicians.
18  Q.     Was one of those physicians the physician who
19  was involved with the execution team?
20  A.     No.
21  Q.     So both of those physicians were two other
22  outside individuals who are not involved with the
23  executions in any other way?
24  A.     They -- one of them had been involved in the
25  past and has -- hasn't been involved in a while.
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/21 Page 210 of 266 PageID #: 12682
EliteReporting Services.com
www.EliteReportingServices.com

```
1    And then, yes, another one is not involved in the
2    executions.
3    Q.     Are either or both of these doctors
4    anesthesiologists?
5    A.     No.
6    Q.     Did either or both of these doctors explain
7    any medical standards related to checking for
8    consciousness to you?
9    A.     Not to me personally.
10   Q.     Are you aware of any medical standards really
11   to checking for consciousness?
12   A.     Well, I think, these are examples that
13   physicians gave us as ways to check for
14   consciousness and sedation.
15   Q.     And did you do any other independent research
16   on checking for consciousness?
17   A.     I -- I might have at some point, but I didn't
18   rely on -- on my research because, again, I'm not
19   qualified.  I'm not a medical professional.
20   Q.     And so you relied on the advice of the two
21   doctors you spoke with and that's it?
22   A.     That's in part.
23   Q.     What else?
24   A.     It could -- could have included reviewing
25   other protocols.
```

Elite-Brentwood Reporting Services • (615) 595-0073
www.EliteReportingServices.com

```
 1   Q.     But you're not sure?

 2   A.     No.  I've done this for a long time, and they

 3   all kind of -- everything kind of blurs together

 4   when you're talking about when did we add a certain

 5   thing and, you know, what did I do at that moment?

 6   Q.     Are the members of the execution team trained

 7   in medical standards for assessing consciousness?

 8               MR. SUTHERLAND:  Object to the form.

 9               THE WITNESS:  By "execution team" you

10   mean the whole team?

11   BY MS. LEONARD:

12   Q.     Or anyone on it?

13   A.     The warden is trained.

14   Q.     Is he the only one who's trained?

15   A.     He's probably the only one specifically

16   trained for that.

17   Q.     Who trains the warden in the consciousness

18   check?

19               MR. SUTHERLAND:  Don't identify anybody

20   by name.

21               THE WITNESS:  I won't.  A physician did.

22   BY MS. LEONARD:

23   Q.     And when's the last time that the warden

24   received that training?

25               MR. SUTHERLAND:  Object to the form.
```

Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
 1                    THE WITNESS:  I don't know.
 2   BY MS. LEONARD:
 3   Q.     Is there any requirement for how frequently
 4   the warden has to be trained in checking for
 5   consciousness?
 6   A.     No.  He would have been trained when this
 7   consciousness check was added.
 8   Q.     So that could have been --
 9   A.     And then -- and then when it -- I think it
10   was revised to include the trapezius muscle check.
11   Q.     When was that revision made?
12   A.     I don't -- I don't have a date on that.
13   Q.     Was that after July of 2018?
14   A.     No, it was probably before.
15   Q.     Okay.  So -- so it's possible that the warden
16   hasn't been trained in checking consciousness since
17   the summer of 2018?
18                    MR. SUTHERLAND:  Object to the form.
19                    THE WITNESS:  You know, I -- I would
20   really rely on what the, you know, the warden would
21   say about that.  But also these are pretty basic
22   checks for consciousness that probably does not
23   require ongoing, you know, updated training.
24   BY MS. LEONARD:
25   Q.     Why did you add the consciousness check?
```

Elite Reporting Services · (615) 595-0073
www.EliteReportingServices.com

```
 1              MR. SUTHERLAND:  Object to the form.

 2              THE WITNESS:  Okay.  That was to ensure

 3    that the first drug had rendered the inmate

 4    insensate before we began with the other two drugs.

 5    BY MS. LEONARD:

 6    Q.     When Tennessee was previously using a

 7    three-drug protocol, was the consciousness check

 8    included at that time?

 9              MR. SUTHERLAND:  Object to the form.

10              THE WITNESS:  Okay.  I know at some --

11    for some period there was not a consciousness check.

12    I'm going to have trouble remembering today if that

13    was -- I think it was added before 2018 when we

14    had -- when we had a three-drug protocol.  But it

15    was not in place the entire time we had a three-drug

16    protocol.

17    BY MS. LEONARD:

18    Q.     Okay.  So what you're saying is this is

19    not -- July 5th, 2018, is not the first time the

20    consciousness check ever appeared --

21    A.     Right.

22    Q.     -- in a Tennessee protocol?  But you can't

23    remember when exactly --

24    A.     I think that's correct.

25    Q.     Okay.  Let's go to Page 69.
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/21 Page 214 of 266 PageID #: 12536
EliteReportingServices.com
www.EliteReportingServices.com

```
 1    A.     Okay.

 2    Q.     This says contingency issues at the top, and

 3    then there's about half a page of writing.  Are the

 4    contingency issues listed on this page the only

 5    contingency issues that the execution team is

 6    prepared to address?

 7              MR. SUTHERLAND:  Object to the form.

 8              THE WITNESS:  Those are the only

 9    specific ones mentioned in the protocol.  If any

10    other contingency issues came up, I think the warden

11    would seek guidance from the Commissioner.

12    BY MS. LEONARD:

13    Q.     And how would he do that?

14    A.     By phone.

15    Q.     So he uses the phone in the execution chamber

16    to call the Commissioner in the warden's office?

17    A.     Probably so.  It hasn't come up, but that's

18    available for communication.

19    Q.     Does the team train for that scenario during

20    their practices --

21              MR. SUTHERLAND:  Object to form.

22              THE WITNESS:  Other contingencies, no.

23    I know they train on these contingencies, but again

24    we can't anticipate every contingency.

25
```

BY MS. LEONARD:

Q.   Do they practice generally sort of the --
we'll call it the unknown contingency that you're
describing where if something comes up that can't be
foreseen necessarily and the warden practices
stopping the execution and calling the Commissioner?

            MR. SUTHERLAND:  Object to the form.

            THE WITNESS:  Okay.  I don't know the
extent to which he has done that.

BY MS. LEONARD:

Q.   Have you ever seen that happen in one of the
practices you've attended?

A.   I haven't.  I think occasionally they have
practiced going to the other line.  But, again, I
can't really speak to that.

Q.   Why is it important to address contingencies?

            MR. SUTHERLAND:  Objection to form.

            THE WITNESS:  To prepare for them.  But
there are, you know, a lot of possible
contingencies, and they could not all be anticipated
and put into the protocol.

BY MS. LEONARD:

Q.   Who came up with the three contingencies that
are listed on this page?

            MR. SUTHERLAND:  Objection to the form.

Case 3:18-cv-01234-Document 195-1 Filed 04/05/22 Page 216 of 266 PageID #: 11548
EliteReporting Services Court Reporting 615-595-0073
www.EliteReportingServices.com

```
 1              THE WITNESS:  I don't know.  They've
 2   been in the protocol for a long time.
 3   BY MS. LEONARD:
 4   Q.      So this is one of the sections that was not
 5   substantively revised in recent years?
 6   A.      Yeah.  I don't think it's been revised.
 7   Q.      You didn't feel there's any need to revise
 8   this despite changing back to a three-drug protocol
 9   from being in a one-drug protocol?
10              MR. SUTHERLAND:  Objection to the form.
11              THE WITNESS:  No.  And this section was
12   predated to pentobarbital.
13   BY MS. LEONARD:
14   Q.      So this came from the earlier three-drug
15   protocols?
16   A.      Right.
17   Q.      Okay.  So who drafted that protocol?
18              MR. SUTHERLAND:  Objection to the form.
19   Which protocol --
20              THE WITNESS:  Yeah.
21              MR. SUTHERLAND:  -- are we talking
22   about?
23   BY MS. LEONARD:
24   Q.      The -- when you started in 1994, you had
25   indicated there was a three-drug protocol in place?
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/21 cPage 217 of 266 PageID #: 11539
Elite-Document Reporting Services
www.EliteReportingServices.com

```
 1   A.      Right.

 2   Q.      Who drafted that protocol?

 3   A.      I don't know.

 4   Q.      Do you know around what year that was

 5   drafted?

 6   A.      No.

 7   Q.      But it was certainly before 1994?

 8   A.      Yes.

 9   Q.      Okay.  And this hasn't been substantively

10   updated since then?

11   A.      Well, I can't say that for sure.  I just know

12   that we've addressed these contingency issues for a

13   long time.

14   Q.      In one of these contingencies it says that

15   the executioner would switch to the secondary IV

16   line and begin administering the second set of

17   syringes.  If he does that, how much total midazolam

18   is being injected into the prisoner?

19   A.      Well, it would depend on how much of the

20   midazolam from the first set got into the inmate.

21   But assuming that it all did, then it would be -- it

22   would be double the amount the protocol calls for.

23   Again, sometimes the need to switch to the other

24   line is due to maybe a problem with access.

25   Q.      And do you know what the effects of that
```

Elite Reporting Services
www.EliteReportingServices.com

```
 1   quantity of midazolam are on a person?
 2   A.     No.  I'm not a medical expert.
 3   Q.     Have you ever consulted with a medical
 4   expert?
 5              MR. SUTHERLAND:  Object to the form.
 6              THE WITNESS:  Yeah.  You'll have to be
 7   more specific.
 8   BY MS. LEONARD:
 9   Q.     Did you ask one of the two doctors you
10   mentioned a couple of minutes ago about what would
11   happen if someone were injected with that much
12   midazolam?
13   A.     I don't recall that.  I don't know.  I know
14   in the past when we were dealing with the three-drug
15   protocol, we had -- that would be a thousand
16   milligrams total.  We've had an anesthesiologist
17   advise about starting from scratch on the other arm.
18   Q.     And what did that anesthesiologist say about
19   doing that?
20   A.     That that was appropriate.
21   Q.     Appropriate for what purpose?
22   A.     To -- to start from the beginning with the
23   other set of syringes because we don't know the
24   extent to which the first drug actually made it into
25   the inmate's blood system.
```

```
 1   Q.    Are you aware that midazolam has a ceiling
 2   effect?
 3              MR. SUTHERLAND:  Objection to the form.
 4              THE WITNESS:  I've heard that.
 5   BY MS. LEONARD:
 6   Q.    Do you know what I mean by "ceiling effect"?
 7   A.    Yes.
 8   Q.    What's your understanding of a ceiling
 9   effect?
10   A.    It's the point beyond which additional
11   midazolam would not increase the effect.
12   Q.    Did the anesthesiologist you consulted with
13   mention that in your discussion about switching to
14   the secondary IV line?
15   A.    No.
16   Q.    Did that anesthesiologist mention a ceiling
17   effect at all?
18   A.    Not that I recall.
19   Q.    How did you become aware that midazolam may
20   have a ceiling effect?
21              MR. SUTHERLAND:  Are we talking about
22   before the adoption of the midazolam protocol?
23              MS. LEONARD:  I'm talking about when
24   this was drafted.
25              MR. SUTHERLAND:  Okay.
```

Case 3:18-cv-01234-Document 1 Report Filed 04/05/22 Page 220 of 266 PageID #: 1542
EliteReportingServices.com
www.EliteReportingServices.com

```
 1                    THE WITNESS:  The 2018?

 2                    MS. LEONARD:  Uh-huh.

 3                    MR. SUTHERLAND:  I don't remember her

 4     testifying that an anesthesiologist was consulted

 5     before the 2018.

 6     BY MS. LEONARD:

 7     Q.      Did you just testify that you talked to an

 8     anesthesiologist about switching to a secondary line

 9     when that person said it was appropriate?

10     A.      Not for the 2018 protocol.  That would have

11     been years ago when we came up with -- well, the

12     Commissioner at that time ultimately decided to

13     maintain the three-drug protocol.

14     Q.      Right.  Okay.  So you're still --

15     A.      So that's when -- that's years ago.

16     Q.      But you're still relying on that knowledge in

17     answering my questions now because what I had asked

18     was, Are you aware of these things?  And you said

19     you were.  And I asked why, and that's what you're

20     going back to?  Is that what you wanted to clarify?

21     A.      You --

22                    MR. SUTHERLAND:  No.  You were asking

23     about a ceiling effect and consulting with an

24     anesthesiologist, and I think -- my understanding is

25     I don't think there was an anesthesiologist
```

Elite-Document Reporting Services
www.EliteReportingServices.com

```
 1   consulted about the midazolam protocol, let alone a
 2   ceiling effect.
 3            THE WITNESS:  That's -- that's correct.
 4   But you had also asked about switching from one arm
 5   to the next.
 6   BY MS. LEONARD:
 7   Q.     Right.
 8   A.     And starting -- how much -- you asked about
 9   how much midazolam would that be, and so I was
10   referring to the concept of switching from one line
11   to the other, you know, if -- if there's still
12   consciousness.
13   Q.     Right.  Okay.  And you had said that the
14   reason you think that switching from one arm to the
15   other is okay is because an anesthesiologist had
16   indicated that that's appropriate?
17   A.     In part, yes.
18   Q.     Okay.  Did that anesthesiologist say anything
19   about a ceiling effect?
20   A.     No.
21   Q.     How do you --
22   A.     Not that I recall.
23   Q.     How do you know that a ceiling effect -- that
24   midazolam might have a ceiling effect?
25   A.     Just through --
```

```
 1              MR. SUTHERLAND:  Object to the form.

 2              THE WITNESS:  Through litigation I've

 3  seen that being alleged.

 4  BY MS. LEONARD:

 5  Q.     Okay.  But no one's ever told you that --

 6  A.     No.

 7  Q.     -- in conjunction with developing one of

 8  these protocols?

 9  A.     No.

10              MR. ATYIA:  Hey, Lynne, when you get to

11  a stopping point, I need to take a real quick

12  five-minute restroom break.

13              MS. LEONARD:  Yeah.  We can do that now.

14  Do you want to do that now?

15              MR. ATYIA:  Is that okay?

16              MS. LEONARD:  Yeah.

17              THE VIDEOGRAPHER:  We are going off the

18  record.  The time is 2:33 p.m.

19                    (A short break.)

20              THE VIDEOGRAPHER:  We are back on the

21  record.  The time is 2:45 p.m.

22  BY MS. LEONARD:

23  Q.     Earlier you spoke about using other states'

24  protocols, I think you said, because those states

25  have been able to successfully use the protocols; is
```

Case 3:18-cv-01234-Document 19 Reporting Services 04/05/22 Page 223 of 266 Page D #: 12845
Elite Reporting Services
www.EliteReportingServices.com

```
 1    that right?
 2    A.     Yes.
 3    Q.     What do you mean by "successfully"?
 4    A.     The using it and having everything go as
 5    anticipated, that's -- that's pretty much it and,
 6    you know, correctional professionals in those states
 7    describing their experience.
 8    Q.     Would you consider it successful just based
 9    on the person dying?
10    A.     No.
11    Q.     So what would make an execution not
12    successful?
13               MR. SUTHERLAND:  Objection to the form.
14               THE WITNESS:  Okay.  If it didn't go as
15    planned, if there was problems with access, it could
16    be any number of things.
17    BY MS. LEONARD:
18    Q.     So if using this current protocol the
19    prisoner was not unconscious following the
20    administration of midazolam and then the execution
21    team switched to the secondary IV line and continued
22    with the rest of the execution, would that be a
23    successful execution?
24    A.     Yes.
25    Q.     Why would you consider that successful?
```

Elite-Document Reporting Services
www.EliteReportingServices.com

```
 1   A.    Because with the second set the inmate would
 2   have been rendered insensate, and there would have
 3   been a consciousness check, and then the other two
 4   drugs would have been -- would have proceeded.  So,
 5   yes, that would be successful.
 6   Q.    And your understanding of a person being
 7   insensate is based only on unresponsiveness in the
 8   consciousness check and the protocol?
 9            MR. SUTHERLAND:  Objection to the form.
10            THE WITNESS:  Okay.  Again, that -- I
11   mean, that's a medical question that's beyond my
12   expertise.
13   BY MS. LEONARD:
14   Q.    Where did you -- why is it that you think
15   that being insensate is indicated by
16   unresponsiveness?
17            MR. SUTHERLAND:  Objection to the form.
18            THE WITNESS:  I mean, it's just
19   something I've kind of become familiar with based on
20   litigation, reading case law, talking to people
21   about the purpose of the consciousness check, the
22   purpose of the first drug.  I can't get anymore
23   specific than that.
24   BY MS. LEONARD:
25   Q.    Has anyone ever told you that the person
```

Case 3:18-cv-01234-Document 195 Report Filed 04/05/22 Page 225 of 266 PageID #: 12347
Elite Reporting Services
www.EliteReportingServices.com

```
 1   could be unresponsive under the consciousness check
 2   but then awakened by the administration of the
 3   paralytic?
 4   A.     No.
 5   Q.     You've never heard that before?
 6   A.     No.
 7   Q.     And you've never seen that in any litigation?
 8   A.     Not that I recall.
 9   Q.     Would it concern you if that were the case,
10   i.e., that the inmate was asleep, let's say, after
11   the administration of midazolam, but then the
12   administration of the paralytic woke that person up?
13              MR. SUTHERLAND:  Objection to the form.
14              THE WITNESS:  Okay.  I've never heard
15   that scenario.
16   BY MS. LEONARD:
17   Q.     Would it be concerning to you though if that
18   is what's happening?
19   A.     Yes.  I just am not aware that it has
20   happened, and that's why we do the consciousness
21   check.
22   Q.     Right.  And what I'm saying is it's possible
23   to pass the consciousness check, as it were, but
24   then be woken up by the administration of vecuronium
25   bromide, which do you know whether vecuronium
```

Elite Document Reporting Service - www.EliteReportingServices.com

1  bromide is acidic or alkaline?

2  A.     No.

3         MR. SUTHERLAND:  I'm going to object to

4  the form of the question.

5         THE WITNESS:  Okay.  I'm sorry.  No.

6  You're getting beyond my expertise.

7  BY MS. LEONARD:

8  Q.     Okay.  So the administration of vecuronium

9  bromide is a pretty serious event on the human body

10  arguably at least more severe than the trapezius

11  squeeze or the eyelash brush or anything else listed

12  in the consciousness check.  So would it concern you

13  to know that the prisoner may wake up and become

14  sensate again with the administration of the

15  vecuronium bromide?

16         MR. SUTHERLAND:  Object to the form.

17         THE WITNESS:  Okay.  I don't know that

18  at all.  I mean, I don't know what else to say.

19  BY MS. LEONARD:

20  Q.     I understand that you're saying you don't

21  know that that's what happens.  But if an expert

22  were to tell you that, would you be concerned?

23         MR. SUTHERLAND:  Object to the form.

24         THE WITNESS:  It would depend on what

25  other experts also said.

Case 3:18-cv-01234-Document 195 Report filed 04/05/22 cPage 227 of 266 Page27D5#: 12349
Elite Reporting Services
www.EliteReportingServices.com

```
 1   BY MS. LEONARD:

 2   Q.    And why would that concern you?

 3          MR. SUTHERLAND:  Object to the form.

 4          THE WITNESS:  Because the purpose of the

 5   protocol is to render the inmate insensate so that

 6   the second and third drugs can work without pain.

 7   And if that didn't happen, that would concern me.

 8   BY MS. LEONARD:

 9   Q.    Do the second and third drugs cause pain?

10          MR. SUTHERLAND:  Object to the form.

11          THE WITNESS:  If they -- if they were

12   the only drugs used, yes, if the person was

13   conscious, yes.

14   BY MS. LEONARD:

15   Q.    So the only thing that's preventing the

16   person from feeling pain is the midazolam?

17          MR. SUTHERLAND:  Object to the form.

18          THE WITNESS:  My lay opinion is yes.

19   BY MS. LEONARD:

20   Q.    And you're basing that opinion mostly on

21   reading other states' protocols that have worked in

22   the past?

23          MR. SUTHERLAND:  Objection to the form.

24          THE WITNESS:  Okay.  Just, you know,

25   experience I've had just through the years in
```

Elite Reporting Services • www.EliteReportingServices.com

1  dealing with protocols, I know, you know, the
2  purpose of the three drugs.  And so it wouldn't be
3  solely reading another state's protocol.  It would
4  just be sort of an accumulation.  It would be based
5  on the experience the Department has had with
6  three-drug protocols.
7  BY MS. LEONARD:
8  Q.    And what has that experience been?
9  A.    We haven't had any issues.
10 Q.    How do you know that?
11 A.    Well, as General Counsel we haven't had an
12 issue during the time I've been here.
13 Q.    And how do you know that the midazolam is
14 rendering a prisoner as insensate?
15 A.    Based on, you know, conversations I've had
16 with wardens through the years and with people who
17 have actually been there and experienced it and the
18 impact of the drugs on the inmate.
19 Q.    But you've never talked to a prisoner who's
20 been injected with the three drugs, have you?
21 A.    Of course not.
22        MR. SUTHERLAND:  Object to the form.
23 BY MS. LEONARD:
24 Q.    So when you say people who have been there,
25 you really only mean the members of the execution

```
 1    team who have been there?

 2    A.      Right.

 3    Q.      Have you ever talked with someone who's been

 4    administered midazolam in any other setting?

 5    A.      No.

 6    Q.      Have you ever had midazolam administered to

 7    you?

 8    A.      No.

 9    Q.      So what is it that makes you so sure that the

10    consciousness check is effective?

11              MR. SUTHERLAND:  Object to the form.

12              THE WITNESS:  Okay.  Well, as I

13    indicated, I think a couple of physicians have

14    mentioned these as viable ways to do a consciousness

15    check.  You know, and there's literature out there

16    that also talks about various ways of consciousness

17    checking, and some case law has, you know, discussed

18    a consciousness check.

19    BY MS. LEONARD:

20    Q.      Would you personally feel comfortable going

21    for a surgery and receiving only midazolam as the

22    anesthetic?

23              MR. SUTHERLAND:  Objection to the form.

24              THE WITNESS:  I -- I would rely on my

25    physician about that.
```

Elite-Brentwood Reporting Services 615/595-0073
www.EliteReportingServices.com

```
 1   BY MS. LEONARD:

 2   Q.    Would you feel comfortable if the only

 3   assessment of your consciousness was the

 4   consciousness check that's detailed in this

 5   protocol?

 6             MR. SUTHERLAND:  The same objection.

 7             THE WITNESS:  I guess the same answer.

 8   I would rely on my physician.

 9   BY MS. LEONARD:

10   Q.    Are you aware that medical doctors frequently

11   use machines to assess consciousness in medical

12   settings?

13   A.    I think probably so.

14   Q.    Why is it that TDOC is not using machines to

15   assess consciousness?

16   A.    That would require some cooperation from

17   others that we probably can't get, and we're

18   comfortable with the consciousness check that we

19   have in the current protocol.

20   Q.    So if you were going in for open heart

21   surgery and your doctor advised that you would get

22   midazolam and they would use only this consciousness

23   check and nothing else, you would go along with that

24   advice?

25   A.    I would go along with my physician's
```

Elite Reporting Services • (615) 595-0073
www.EliteReportingServices.com

1 recommendation?

2 Q. A brave woman. And why is it that you think

3 that the vecuronium bromide does not wake the

4 prisoner up?

5 MR. SUTHERLAND: Objection to the form.

6 THE WITNESS: Well, I haven't heard of

7 that happening. And I believe that the midazolam is

8 sufficient with the consciousness check to ensure

9 that that won't happen.

10 BY MS. LEONARD:

11 Q. Well, would there be any way for someone to

12 know whether that happened given that vecuronium

13 bromide is a paralytic?

14 MR. SUTHERLAND: Objection to the form.

15 THE WITNESS: No. It's based on the

16 consciousness check and the midazolam.

17 BY MS. LEONARD:

18 Q. You mentioned earlier that you toured other

19 states. What states did you tour?

20 A. Virginia and the Bureau of Prisons.

21 Q. And that's it?

22 A. Uh-huh.

23 Q. Okay.

24 A. Me personally that's all.

25 Q. Right. I'm asking about you personally. Are

```
 1    you aware that some states perform executions by

 2    firing squad?

 3    A.      I'm aware that Utah has.

 4    Q.      Do you know of any other states that still

 5    have firing squad on the books?

 6    A.      Not that I can recall right now.

 7    Q.      Have you ever witnessed an execution by

 8    firing squad?

 9    A.      No.

10    Q.      Have you ever discussed execution by firing

11    squad with someone outside of Tennessee?

12    A.      No.

13    Q.      Have you ever discussed execution by firing

14    squad with someone at TDOC?

15    A.      Only in the context of litigation that, you

16    know, with firing squad being alleged as an

17    available alternative.

18    Q.      And have you looked into using firing squad

19    as an alternative to lethal injection?

20    A.      I have not.

21    Q.      Why not?

22    A.      Because we feel like we have a constitutional

23    protocol.

24    Q.      Could TDOC execute somebody by firing squad?

25            MR. SUTHERLAND:  Object to the form.
```

```
 1              THE WITNESS:  Yeah, I really can't say.
 2    I don't know what such a protocol would look like.
 3    So that would -- that would take a lot of research
 4    and I just -- I don't feel comfortable saying that
 5    we could at this point.
 6    BY MS. LEONARD:
 7    Q.      Have you ever discussed execution by firing
 8    quad with someone in Utah?
 9    A.      No.
10    Q.      Have you ever discussed execution by oral
11    administration of drugs with anyone at TDOC?
12    A.      Just the same answer as with the firing
13    squad.  Just in the context that that's been alleged
14    as a -- an alternative.
15    Q.      And I think you briefly touched on this
16    earlier, but why is it that TDOC has not considered
17    this as an alternative?
18    A.      Well, I'm not aware that any state uses it so
19    we don't have experience with it.  I don't know what
20    such a protocol would look like.  I don't know how
21    we would ensure that the inmate would willingly take
22    it.
23    Q.      Could TDOC obtain the equipment to administer
24    drugs orally?
25              MR. SUTHERLAND:  Objection to the form.
```

Elite-Document Reporting Services
www.EliteReportingServices.com

```
 1              THE WITNESS:  I have no idea what
 2    equipment, if any, would be required.
 3    BY MS. LEONARD:
 4    Q.     Have you ever looked at any other states'
 5    protocols -- scratch that.  Have you ever reviewed
 6    other -- other materials that states might use in
 7    conjunction with their executions aside from lethal
 8    injection protocols?
 9    A.     Not that I recall.
10    Q.     So the only thing you've ever reviewed from
11    other states has been their lethal injection
12    protocols?
13    A.     I don't know if I've looked at an
14    electrocution protocol.  It's, you know, primarily
15    protocols.
16              MS. LEONARD:  I think I'm almost
17    finished.  Maybe we should take just a two-minute
18    break to touch base and then come back?
19              THE VIDEOGRAPHER:  We are going off the
20    record.  The time is 3:00 p.m.
21                   (A short break.)
22              THE VIDEOGRAPHER:  We are back on the
23    record.  The time is 3:05 p.m.
24    BY MS. LEONARD:
25    Q.     Just a very short handful of final questions.
```

Case 3:18-cv-01234-Document 195-1 Filed 04/05/21 Page 235 of 266 PageID #: 11557
Elite Reporting Services
www.EliteReportingServices.com

```
 1    Did you testify earlier that the person who trained
 2    the warden in the consciousness check is the
 3    physician on the execution team?
 4    A.    No.
 5    Q.    Who trains the warden on the consciousness
 6    check?
 7    A.    A different physician.
 8    Q.    Okay.  But it's not the person -- the
 9    physician who's presently on the execution team?
10    A.    Right.
11    Q.    And was the physician who's presently on the
12    execution team a person who you consulted with on
13    developing the consciousness check?
14              MR. SUTHERLAND:  I'm going to object to
15    the form of the question.
16              THE WITNESS:  No, I don't believe so.
17    BY MS. LEONARD:
18    Q.    Did you consult with the physician who's
19    currently on the execution team in adopting the
20    three-drug protocol?
21              MR. SUTHERLAND:  The same objection.
22              THE WITNESS:  No, I don't think so.
23    BY MS. LEONARD:
24    Q.    How did you get in touch with the physician
25    who's currently on the execution team?
```

```
 1              MR. SUTHERLAND:  Object to the form.
 2              THE WITNESS:  I -- I wasn't involved in
 3   getting in touch with him or her.
 4   BY MS. LEONARD:
 5   Q.      Have you ever spoken with that person
 6   directly?
 7   A.      I don't -- if at all, it would have just been
 8   to say hello.
 9   Q.      Are you aware that that individual has had
10   his general surgery certificate revoked due to some
11   medical malpractice lawsuits?
12   A.      I have heard that.  I know we did check
13   licensure, and he was still a licensed physician.
14   Q.      Do you know how many medical malpractice
15   lawsuits have been filed against that physician?
16   A.      No.
17   Q.      Would it concern you to know that it's over a
18   dozen?
19   A.      Would it concern me?  It wouldn't concern me
20   in terms of the ability to determine death and if
21   necessary do a cut-down procedure for whatever that
22   physician would choose.
23   Q.      And why would that not impact your assessment
24   of his ability to do the cut-down procedure?
25   A.      It's my understanding it's a pretty simple
```

```
 1   procedure.

 2   Q.     Does the cut-down procedure require the use

 3   of an anesthetic?

 4                 MR. SUTHERLAND:  Objection to the form.

 5                 THE WITNESS:  Okay.  I'm not a medical

 6   expert.  I believe it would be the local anesthetic.

 7   BY MS. LEONARD:

 8   Q.     Do you feel there's any testimony that you

 9   want to clarify or change today?

10   A.     Not that I can think of.

11   Q.     Anything that you want to restate or

12   supplement?

13   A.     No.

14   Q.     And you didn't talk to your counsel during

15   any of the breaks today?

16   A.     Absolutely not.

17   Q.     Okay.  Great.  Then I think that -- that's

18   all that I have.  So thank you, Ms. Inglis, for your

19   time.  We appreciate you coming in today to answer

20   these questions.

21   A.     Okay.

22                 MS. LEONARD:  I think we can go off the

23   record.

24                 THE VIDEOGRAPHER:  This marks the end of

25   this deposition.  The time is 3:08 p.m.
```

Case 3:18-cv-01234-BJD-MCR   Document 195-2   Filed 04/05/21   Page 238 of 266 PageID #: 11560
Elite Deventer Reporting Services
www.EliteReportingServices.com

1                          *    *    *

2                 THE REPORTER:  Ms. Leonard, would you

3    like to order her transcript?

4                 MS. LEONARD:  Oh, yes, please, to the

5    Federal Defender Office.  Yes.

6                 THE REPORTER:  I think I've got that

7    information.  And would you like a copy, Mr.

8    Sutherland?

9                 MR. SUTHERLAND:  Yes, ma'am.

10                THE REPORTER:  Okay.  Thank you.

11                 FURTHER DEPONENT SAITH NOT
                   (Proceedings concluding at 3:08 p.m.)
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Elite Reporting Services
www.EliteReportingServices.com

```
 1                    REPORTER'S CERTIFICATE

 2    STATE OF TENNESSEE        )

 3    COUNTY OF RUTHERFORD      )

 4

 5              I, TONYA D. STOLZE, Licensed Court

 6    Reporter, with offices in Smyrna, Tennessee, hereby

 7    certify that I reported the foregoing

 8    videoconference deposition of DEBRA K. INGLIS by

 9    machine shorthand to the best of my skills and

10    abilities, and thereafter the same was reduced to

11    typewritten form by me.

12              I am not related to any of the parties

13    named herein, nor their counsel, and have no

14    interest, financial or otherwise, in the outcome of

15    the proceedings.

16              I further certify that in order for this
      document to be considered a true and correct copy,
17    it must bear my original signature, and that any
      unauthorized reproduction in whole or in part and/or
18    transfer of this document is not authorized, will
      not be considered authentic, and will be in
19    violation of Tennessee Code Annotated 39-14-104,
      Theft of Services.

20

21    _____
      Tonya D. Stolze, LCR
22    Elite-Brentwood Reporting Services

23

24

25    LCR # 272 - Expires:  6/30/2022
```

Elite-Brentwood Reporting Services www.EliteReportingServices.com

**0**

**00000** 91:5

**000144** 143:3

**1**

**1** 58:21 170:10
183:14 186:14
189:15 202:24

**1-4** 84:16

**10** 40:19 108:6
155:6,10,17 171:7
173:13

**100** 108:7 109:13
149:10,11,17
150:12,20 155:7

**104-page** 61:14

**10:11** 65:8

**10:23** 65:11

**10:41** 83:8

**10:49** 83:11

**11** 111:6

**11:43** 129:13

**12** 40:20 112:15
149:7

**12:30** 129:7

**12:34** 129:16

**12:58** 134:13

**13** 125:8 151:21
183:14,17 185:19

**13th** 5:4

**14** 84:15 133:12

**14-** 172:21 175:22

**15** 40:20 133:14
141:18

**15-inch** 172:21
175:22

**16** 85:11 125:7
133:9 141:17

**17** 155:19

**18** 154:19 181:22

**19** 160:12

**1974** 134:9

**1984** 11:17

**1994** 14:19 15:17
17:16 25:18,21,24
26:5 28:3,12
188:12 215:24
216:7

**1:24** 170:4

**1:33** 170:7

**2**

**2** 61:24 164:9
188:2 190:12

**20** 24:20

**2000s** 28:19,22,25
40:14,23

**2017** 40:18,24
41:6 43:24 87:16
122:12 129:20
131:10,15 132:24
140:13 151:22

**2018** 59:1,7 64:4,7
72:1,25 154:22
181:25 182:11
185:16,25 192:18,
20 211:13,17
212:13,19 219:1,
5,10

**2019** 123:13 156:7
162:8,10 164:9
182:9,11

**2020** 123:13

**2021** 5:4

**20th** 151:22
154:22

**26th** 164:9

**29** 183:17 185:19

**2:33** 221:18

**2:45** 221:21

**3**

**3** 188:6 202:25

**30** 24:9

**30(b)(6)** 10:11

**31st** 87:16 131:10
132:13,24

**32** 186:11

**34** 192:24 193:5

**35** 164:7 197:1

**39** 198:16 200:19,
21 201:21 202:24
203:6

**3:00** 233:20

**3:05** 233:23

**3:08** 236:25
237:11

**3rd** 162:8

**4**

**4** 188:7 198:18
203:5,16

**40** 25:9 200:21
201:22 203:6

**42** 204:25

**44** 200:19 205:21

**45** 25:9 203:1

**48** 25:10

**5**

**5** 62:2,14 184:6
185:8

**500** 111:4 149:23

**5th** 59:1,7 212:19

**6**

**6** 58:23 63:3 64:15
129:18 206:14

**66** 206:12

**69** 212:25

**7**

**7** 133:25 197:5
203:1 207:6

**79** 11:25

**7th** 129:20 131:15
132:13 140:13

**8**

**8** 90:21 140:12
170:10,11

**80** 12:1

**9**

**9** 104:16 141:16
142:25

**90s** 28:19

**9:05** 5:5

**9:35** 149:8

**A**

**a.m.** 5:5 65:8,11
83:8,11 129:13
149:8

**abandon** 38:11

**ability** 86:17 90:9
235:20,24

**Absolutely**
126:16 236:16

**ACA** 23:15,20

**acceptable**
147:22 148:22

**access** 97:21
98:12 125:10
166:24 167:1
206:5 216:24
222:15

**accessing**
178:10

**accompany**
189:20

accordance 198:19 200:10,13, 23 201:1

accreditation 23:16 24:4

accumulation 227:4

accurate 114:23 115:19 116:2,4,5, 7,25 141:23,24

accurately 6:23 71:18

achieve 151:15

acidic 225:1

action 125:12

active 72:18 104:19

actual 172:12 182:24 183:2 187:5

add 210:4 211:25

added 208:9 211:7 212:13

additional 21:22, 25 22:11 45:5 186:17 218:10

Additionally 187:9

address 213:6 214:16

addressed 216:12

administer 197:14 232:23

administered 228:4,6

administering 216:16

administration 15:22 16:3,10 18:6 135:14 165:8 206:16 222:20 224:2,11,12,24 225:8,14 232:11

Administrative 18:3,11,12

Admissions 7:19 8:18 10:18

adopt 35:18 36:4, 6,12 43:10 49:11 61:2,5 145:1 166:1

adopted 36:10,11 38:10 40:17 41:5, 8,12 43:19 44:1 52:3 57:1 59:7 61:17 99:8 128:16 142:3 157:3

adopting 126:3 148:19 234:19

adoption 182:4 218:22

adopts 50:10

advice 16:13 17:12 20:21 21:2, 5,7,9 27:10,17 51:23 72:13 73:2, 6 80:10 147:3 181:17 209:20 229:24

advise 137:2 217:17

advised 155:22 229:21

adviser 181:10

advises 138:20

AG's 44:13 45:4 177:18

agent 139:23,24

agents 112:16 113:10,15 115:3, 16 152:21

agree 9:13 36:23

agreed 37:7 93:11 105:20

agreement 9:5 198:21 201:3

ahead 70:8 87:24

aide 105:20 125:9

Alabama 166:10

Alabama's 133:14

alkaline 225:1

alleged 221:3 231:16 232:13

allowed 93:14 120:12

alluded 191:24

alternative 82:12 138:21 143:18 164:10,14 231:17, 19 232:14,17

alternatives 39:25

American 23:12, 19

amount 110:17, 19 155:8,16 192:25 193:8 216:22

amounts 193:9 194:3,23

Ample 140:15

analgesic 135:12 137:15

anesthesia 195:5

anesthesiologist 136:25 217:16,18 218:12,16 219:4, 8,24,25 220:15,18

anesthesiologists 31:23 32:1,4 34:24 46:13 47:16 99:22 137:1,3 209:4

anesthetic 228:22 236:3,6

angle 175:10

announced 126:3

annual 63:8,22

annually 63:5

answering 219:17

anticipate 213:24

anticipated 214:20 222:5

anxious 139:1

anymore 208:16 223:22

API 67:21 104:20 105:3,15 112:7 155:24 156:3,4

apologize 75:18

appeared 212:20

appears 119:21 127:16 135:23 140:19 164:17 203:18

appellate 14:25 23:4

applicants 21:19

application 107:19

applies 68:1

apply 15:5,12 21:15 67:20

approval 24:3 117:14 119:21,24 121:12,16

approved 195:4

approximately 6:13,17 18:18 123:8 125:8

area 173:14 174:8 175:18 197:4

areas 16:15 17:13 174:7

arguably 225:10

argue 158:8

argument 158:7, 15 159:25 160:19, 24

arise 178:3 179:18 181:8 205:6

Arkansas 133:12

arm 205:22,25 217:17 220:4,14

armory 71:17 197:4,23

EliteReportingServices.com

arrive 47:25

arrived 48:12

articles 56:5,9
160:20

Arts 11:22 12:3

asleep 224:10

aspect 26:15
77:14 120:9

assess 190:3
229:11,15

assessing
206:17 210:7

assessment
190:7 229:3
235:23

assistance
127:11 157:19

Assistant 5:18
16:4 18:3,4,11,12
23:1 60:20 63:17
186:8

associate 29:20
176:1 198:10

Association
23:12,20

assume 95:6
107:8 115:16
122:5 144:3

assumed 53:14
116:4,6

assuming 87:15
216:21

attempt 120:19
122:16 139:4,7
205:12

attempted
122:10,20 162:6

attempts 123:17

attend 188:22,24
189:1

attended 142:15
153:2 182:23
187:21 188:9
191:21 214:12

attorney 5:15,18

6:6 19:22,25 20:6,
19 22:23 23:1,8
32:22 87:6 160:18

attorney-client
71:24 72:5 181:21

attorneys 9:18

Atyia 5:20 7:23,24
8:5 221:10,15

audience 87:4

audio 176:14,17

audit 23:21 24:2

auditors 23:20,23

August 87:16
122:12 131:10
132:13,24 181:22
182:11

authority 50:9
179:20,23

authorizes 49:21
50:4

authorizing
16:23

availability 40:10
69:16 71:7 139:22

awarded 16:23

aware 76:3 77:12
81:5 107:11,17,25
114:7 121:12
123:17 135:20
149:16 152:4,9
153:1 157:21
162:14,21 165:14
166:11,14 186:20
201:23 206:6,9
209:10 218:1,19
219:18 224:19
229:10 231:1,3
232:18 235:9

awokened 224:2

---

**B**

Bachelor 11:22
12:3

Bachelor's 12:10

back 28:11 31:1
33:15 41:11 44:19

46:14 52:2 54:23
60:24 65:10 83:10
84:12 100:1,16,25
104:14 111:2
129:7,15 133:8
141:17 142:25
162:9 170:6
190:12 215:8
219:20 221:20
233:18,22

backup 71:10

ballpark 28:20
96:14

base 233:18

based 34:5,10,23
48:12,24 56:19
59:22 61:14 62:16
64:22 67:1 71:23
72:5 89:24 104:19
105:3,15 109:14
122:15 127:12
135:25 136:16
147:17 166:15,20,
23,25 179:3
193:16 203:25
222:8 223:7,19
227:4,15 230:15

basic 211:21

basically 39:22
55:19 114:10
170:2 203:5 207:7

basing 226:20

basis 23:22 35:20
57:21 64:11 68:9,
10,23 69:20,21
82:21 93:14 97:3
103:20

batch 138:15

Bates 91:4

Baze 208:14

began 133:17
212:4

begin 216:16

beginning 5:6
100:3 123:12
217:22

behalf 88:12

benefits 21:25

benzodiazepine
135:12

big 43:9 127:16

binder 58:21

Biology 12:6

bit 20:1 60:19 93:3

blank 113:16
115:4,15

blood 217:25

blueprint 171:8

blurs 210:3

Board 107:13

body 77:14 225:9

Book 164:9

books 231:5

BOP 95:6 102:25

BOP's 100:6

botched 166:11,
15

bottom 59:3
134:10 141:18
143:3 149:8
191:22

branch 16:9

Brandon 5:18,19

brave 230:2

break 7:8,12 65:3,
9 83:4,9 128:18,
20,21 129:3,14
131:9 133:6
169:24 170:5
221:12,19 233:18,
21

breaks 236:15

breathing 76:7

briefly 32:23
232:15

broad 20:20 73:16
74:18

broadened
111:7,9,12

broker 14:5

bromide 28:14
41:17 70:24 71:9,
15 89:9 106:14,19
130:18 169:7
195:15,18 224:25
225:1,9,15 230:3,
13

brush 225:11

building 172:6
197:5

bullet 104:18
105:18 108:11
110:7,13 112:15,
19,22 113:9
141:18

burden 119:23

Bureau 94:16
99:14 100:18
125:21 230:20

buy 158:14 160:4

———————

**C**

calculation 16:21

call 30:6 33:18,19
49:7 151:24
178:20 179:20,23
180:8,19 196:6
205:1 213:16
214:3

called 5:24 97:20
150:16

calling 104:19
207:7 214:6

calls 104:22,24
216:22

camera 173:8,16,
23 174:11,18,21
175:17,18

capabilities
13:19

capacities 19:23

capacity 19:14
24:6 118:23
183:13

Capital 15:2 23:6

27:5 171:25 172:3

car 22:1

career 15:7

carried 150:12
182:4 188:17

carry 73:21 86:17
90:3,9 146:1

carrying 50:8
167:3 172:12
193:7

case 5:16 9:22
10:1,8,14 33:5
82:6 109:6 116:23
117:12,25 118:4,
6,9 145:15,16
163:21,23 181:8
204:24 207:3
223:20 224:9
228:17

cases 10:4

catch 25:14

catheter 176:2

ceiling 218:1,6,8,
16,20 219:23
220:2,19,23,24

central 31:12
205:12

certificate 14:4
120:19 235:10

certificates 14:1

certifications
13:25

challenging
138:18

chamber 173:8,9,
13,17 174:9,22
176:4 205:1,9
213:15

chambers 182:25

change 28:6,9
42:1 43:14,23
44:3 70:3 78:8
236:9

changed 28:16
41:2,23 64:1,3
89:4 173:22 186:7

changing 44:9
62:13 149:19
215:8

characterization
165:23

check 206:7
207:8 208:9,14
209:13 210:18
211:7,10,25
212:7,11,20
223:3,8,21 224:1,
21,23 225:12
228:10,15,18
229:4,18,23
230:8,16 234:2,6,
13 235:12

checking 209:7,
11,16 211:4,16
228:17

checks 211:22

chemical 108:9
111:8 192:25

chemicals 28:8
41:2 61:22 62:4
69:17 70:7 104:5
125:10 137:16
160:23 165:18
184:8 185:9 199:3

chief 72:9

chloride 28:15
41:18 70:25 71:8,
12 89:10 106:16
107:1 130:19
134:14 135:15
143:7 169:11
195:14 196:3
199:6

choice 73:13
81:19,21,23

choose 235:22

circle 84:12
104:13

circumstance
178:23,24

civil 15:10 23:2

claimed 119:22
120:6

clarify 54:16

114:19 168:16
193:2 194:12
203:13 219:20
236:9

class 187:10,12,
15 189:14 190:8

classes 12:11,12
187:19,21,24

clear 57:2 71:21
72:22 73:1 75:18
90:2 93:25 102:10
104:7 128:12
150:1

client 72:15

close 108:7
109:13

closed-circuit
26:24,25 78:5
81:25 84:8 172:10
177:22 179:7

closeup 175:17

Cody 5:18,19

coffee 7:11

cold 104:19,22

colleagues 5:11

collect 39:3

collectively 35:3,
5 108:7

combined 45:7

comfortable
148:18 228:20
229:2,18 232:4

commercially
39:20 156:4

commission
23:24 33:17,18,19

commissioner
10:10 15:21 16:1,
4 17:9,18,24 18:4
19:18,20 21:1,4,
11,12 22:7 23:16
25:6,7,8,23,24
29:19 30:4,9 31:9
33:23,24 36:5,6,9,
10,12 41:3,12
42:16 43:10 44:11
45:2 47:9 48:20

Case 3:18-cv-01234-BJD-JRK Document 195-2 Filed 04/05/21 Page 244 of 266 PageID 4166
EU123-4 - Document Report - Filed 04/05/21 - Exhibit 2(4-5) 266 Pages
www.EliteReportingServices.com

49:10,17 50:3,7,9, 10 55:5 56:24 57:3 58:13 60:19, 21 61:4 62:18,19 63:17,18 64:25 72:3,19 88:16,23 95:15 96:9,10,23 97:3 100:23 116:24 124:8 130:4,8,11 132:6 135:20 138:25 139:1 144:3,17 145:2,8 148:16 156:19 161:4 169:16 174:12,15 177:9,25 178:13, 17,19 179:14,24 180:14,18,24 181:17 183:10 186:8 202:1 213:11,16 214:6 219:12

**Commissioner's** 25:11 37:4,10 48:5 59:1 61:7 96:21 156:16 196:6 201:25

**commissioners** 26:1,3 96:10

**committee** 23:17 33:19 43:11 99:19,20

**communicate** 180:4

**communicated** 106:8,12

**communicating** 72:15

**communication** 158:23 213:18

**communications** 71:22 72:2 181:16 186:6

**community** 5:10 6:6 19:11

**companies** 104:20 105:3,15 106:4 110:5 115:14,18 168:6, 18

**company** 110:10

**compensation** 21:22

**competitive** 21:17

**complaint** 10:16, 19

**completed** 13:9

**completely** 126:8 172:5

**complicated** 79:17

**Complies** 58:22, 24 84:17 90:22 104:17 134:1 143:1 160:13 183:15 198:17 206:13

**compound** 39:15 67:21 71:7 105:20

**compounded** 38:16 39:5,9 70:21 195:11 199:3

**compounding** 105:19,22 106:2, 9,12 107:3,7

**compounds** 107:12 196:4

**comprehensive** 31:17

**computation** 16:20

**computer** 172:15

**concept** 220:10

**concern** 36:19 130:16 135:11 136:10 224:9 225:12 226:2,7 235:17,19

**concerned** 41:7 225:22

**concerns** 136:14

**concluding** 237:11

**conclusion** 142:12

**condemned** 190:15

**conduct** 49:21 50:4 137:10

**conducted** 135:22 168:1

**conducting** 119:2

**conference** 64:17

**confidentiality** 83:20

**confirmed** 116:22

**conflict** 200:7 201:14,20,24

**conjunction** 27:8,18 138:22 221:7 233:7

**cons** 35:10 55:19

**conscious** 226:13

**consciousness** 206:7,10,17 207:7 208:9,14 209:8, 11,14,16 210:7,17 211:5,7,16,22,25 212:7,11,20 220:12 223:3,8,21 224:1,20,23 225:12 228:10,14, 16,18 229:3,4,11, 15,18,22 230:8,16 234:2,5,13

**consideration** 21:3 74:25 75:8 79:23 80:2,4

**considered** 155:23 165:7 167:12 232:16

**consistent** 167:8

**constant** 124:15

**Constantly** 20:3, 4

**constitute** 189:13

**constitutional** 149:6 231:22

**constitutionality** 82:8

**constitutionally** 147:21 148:22

**consult** 10:7 19:25 20:10 32:18 42:25 45:12,16 52:25 53:17,23,24 54:4,18 55:4 136:20,23,25 180:18 194:2,9 234:18

**consultation** 55:15

**consulted** 32:22 35:1 39:5 40:5 42:21 43:4 45:15, 22 46:13,19,21 47:16 52:14 55:6 57:18 76:19,21 78:15,18 81:8,9 217:3 218:12 219:4 220:1 234:12

**consulting** 20:19 46:5 54:25 136:22 219:23

**contact** 20:6 101:20,24 102:11, 13,14 108:7 109:12 124:16 126:5,7,18 159:1, 4,7 162:25 163:3

**contacted** 95:14 102:8 103:11,14, 17,19 104:4,10 105:4 112:2

**contacts** 108:13, 19 109:3 126:25 163:5

**container** 197:19 198:2,7

**content** 20:17 90:17 187:5

**contents** 61:24

**context** 231:15

232:13

**contingencies** 213:22,23 214:16, 20,23 216:14

**contingency** 213:2,4,5,10,24 214:3 216:12

**continue** 137:21 138:5 143:16

**continued** 138:3 222:21

**continuing** 137:18

**control** 174:13

**controls** 174:11, 18

**conversation** 69:5

**conversations** 60:5,8 67:2 72:12, 18,19 73:3,4 102:20 146:21 151:7 180:24 227:15

**convincing** 35:19

**cooperation** 229:16

**copied** 194:17,20

**copy** 193:18 237:7

**corner** 59:4

**correct** 19:15 84:19 85:13 119:7 128:11 160:5 183:4 212:24 220:3

**Correction** 14:14 15:4 20:9 29:6,14 67:18 157:25

**correctional** 23:12,20,21 148:16 167:18 190:25 194:6 222:6

**Corrections** 157:12

**correctly** 43:9

**counsel** 5:7 7:4 10:25 11:4,9 15:4, 14 16:11,12 17:11,12,16 18:2, 9,10 19:19 21:23 22:22 51:20 53:14 72:10 100:22 101:2 118:19 147:19 169:15 183:13 227:11 236:14

**country** 106:5

**couple** 31:23 32:2 45:3 92:21 155:4 165:20 171:20 183:1,16 217:10 228:13

**courses** 12:14 13:10

**coursework** 13:17

**court** 10:14 50:8 161:13,15 163:12

**Court's** 104:12 147:17

**cover** 108:11

**CPR** 13:12,20

**create** 85:21,24 144:22 184:10 198:21 200:4 201:3

**created** 85:16 86:5,8 87:20 89:5, 12 101:9 131:13 184:12

**creation** 51:15

**credibility** 116:11

**credits** 16:23

**criminal** 14:24 15:9 23:3

**cumbersome** 119:22,23

**curious** 119:13

**current** 15:19 40:17 44:1 48:1 49:11 52:19 55:21

56:11 66:12 81:11 86:16 90:9 91:23 94:9,16 99:8 145:24 158:25 222:18 229:19

**curriculum** 13:7

**custody** 70:13

**cut-down** 205:2, 13 235:21,24 236:2

---

**D**

**daily** 68:10,11,22 69:19

**Dakota** 103:14

**date** 58:25 87:19 102:8 122:15 125:16 131:12,13 132:4,11 138:10, 17 151:2 156:2 162:7,8 163:24 182:10,21 191:20 211:12

**dated** 131:10 151:22 154:22

**dates** 160:10

**day** 131:19 163:15,17,18,19 188:6 198:14

**days** 171:20

**DEA** 113:23 114:20 115:16 116:12 151:24 152:1,9,12,17,21 153:2,8,19 154:1, 14 155:22 158:14, 24 159:1,7,19,21 160:1,4 161:18,22 162:21,25

**dealing** 62:3 217:14 227:1

**deals** 201:9

**Dean** 5:19 7:21, 22,23

**death** 75:25 76:7, 11,15,25 78:8 174:8 188:6

235:20

**Debbie** 5:6

**DEBRA** 5:23

**decide** 130:11 205:18

**decided** 130:8,18 147:25 219:12

**decision** 36:3 37:4,10 48:5,7,24 49:11,18 61:7 97:2,6 131:18,24 132:4,6 144:15 145:1,3,8 148:10 149:3 156:16 179:4,7,12,14 188:23 205:1

**decision-makers** 116:25

**Defendant** 8:19 9:22 10:17

**Defendants** 5:16

**Defender** 5:10 6:6 237:5

**defer** 80:9,13

**definition** 170:12, 16

**degree** 11:13,14, 18,21 12:10,16 19:11

**department** 14:13 15:4 16:14 18:13,16 20:9 21:9 22:12 27:23 29:3,14 67:17 71:23 72:10 88:5, 10,12 89:24 104:4 125:9 130:22 153:13 184:16 193:6 194:13 198:20 201:2 227:5

**Department's** 26:15 86:17

**Departments** 29:6 157:12,25

**depend** 74:18 78:12 188:16,19 189:21 216:19

ELITE Reporting Services
www.EliteReportingServices.com

225:24

depending 192:5

depends 186:24

DEPONENT 237:11

deposed 6:10,14

deposition 5:6
7:16 8:7 9:19,24
10:8,11,24 11:3
82:25 90:25
171:19 236:25

depositions 10:1,4

Deputy 15:21,25
17:9,18,24 18:2,
10 19:20 21:11
100:22 169:15

describe 113:18

describes 207:6

describing 214:4
222:7

designated 63:5
64:14,19,24

designee 187:10

desktop 172:20

detailed 229:4

details 50:22
151:25 153:21

determination 201:18,19

determine 117:13
147:21 150:25
235:20

determined 161:15 192:25

determines 188:21

developing 27:20
53:12 221:7
234:13

development 27:18

diagram 171:17
173:10

difference 39:8

differences 39:4

difficult 167:10

difficulty 205:9

digoxin 164:12

direct 158:23

direction 144:17

directions 198:19
199:3 200:14,24
201:1

directly 20:24
106:8 193:18
204:5,10 235:6

Director 18:5,6
186:6

disbelieve 115:11,22

disciplined 107:12,18

discloses 31:6

disclosure 84:2
92:19

discovery 108:25
109:6,10 191:13,
16

discuss 10:24
20:14 44:9 61:10
85:1 90:11 99:2
136:11 137:18
151:24 152:1
153:25 161:20,24
181:15

discussed 99:21
111:17 134:3
157:17 161:1,6,12
228:17 231:10,13
232:7,10

discussing 99:7
108:16

discussion 88:15
90:13 105:17
113:23 116:10
131:23 137:13
144:16 149:25
153:13 218:13

discussions

20:17 42:9,22
52:7,8 56:2 92:22
106:1,6 107:7
144:6,8,19,20
145:20 148:9,16
152:5 183:5,9,12

disposed 196:25

division 14:24
16:11 18:19 19:2
23:2,3,4,5

doctor 32:5,9
34:25 46:14
136:20,22 146:25
147:4 192:10
229:21

doctors 46:7
52:14 53:24
209:3,6,21 217:9
229:10

document 91:10
112:21 127:4
191:10 201:9
207:10

documentation
191:3,5,9,11,18,
19

documented 191:2

documenting 108:18

documents 8:20
191:20

DOJ 125:12,13,17

dosage 192:25

dose 34:14

double 150:15
216:22

doubt 116:10

dozen 52:12
235:18

dozens 52:11,12

draft 57:22 61:11,
12 62:20 96:25
97:9 127:7 142:4
158:5 185:17
202:18

drafted 56:11
57:3 59:15 61:13
184:19 215:17
216:2,5 218:24

drafting 98:12
185:4 187:1
202:16

drink 165:17

drinking 7:11

driving 79:23
80:2,4

drug 30:19 34:2
38:15 41:4 44:11
45:2 46:4,18,20
47:4 48:13,24
49:2 54:1,4,9,20
55:4 56:2,19,24
57:3,17 58:14
60:20 62:17,19
63:19 66:2,10
67:2 68:3,7,9,22
69:9,15,19 70:2
71:16 72:4,20
73:17,24 74:1,4,6,
8 77:13 85:3,8,19,
21,24 88:16,19,24
89:19 90:11 98:6
104:23 105:13,14,
16 106:4 108:16
109:18,21 111:15,
17,23 114:2,5
116:4,6,11,12,18
117:17 120:10,15,
17,22,25 121:9,
18,19,25 122:25
123:2,22 124:2,6,
7,11,17,21
126:17,25 132:9,
18,23 138:9
139:5,9 141:19
142:22 143:15
146:19,23,25
147:3,6,9,12,14
152:6,10,12
154:5,6,16 155:21
157:18 159:7,12
161:3,7,11,24
168:24 177:12
195:4 204:10,17
212:3 217:24
223:22

drugs 34:17 39:5,
9 41:13 54:15,16,

17 65:13 66:11,16
69:9,23 74:11,15,
19,22 107:12,18
108:1 113:3
130:12,20 135:14
137:14 139:13
140:3 146:21
155:23 158:24
162:22 164:14,21
165:3,8 193:9
195:10,24 196:3,
7,14,17,22,23
197:14,15,16
198:24 199:13
202:21 206:22
212:4 223:4
226:6,9,12 227:2,
18,20 232:11,24

**due** 216:24 235:10

**duly** 5:24

**duties** 183:19
184:1,5 185:20
186:4

**dying** 222:9

──────────

**E**

**e-mail** 129:19
132:4 134:2,12
135:2,5,16 136:4,
6,11,15,21 137:11
138:20 140:13,16,
20 143:21 144:7,9
149:7 151:21
153:5 154:21
157:5 164:9 167:9

**e-mails** 155:6
158:13 162:9

**earlier** 8:13 51:22
53:7 95:19 118:21
128:4 167:8
171:22 178:10
182:22 187:6
191:24 215:14
221:23 230:18
232:16 234:1

**early** 28:19
128:19

**easier** 173:12

**education** 11:12

**effect** 206:22
218:2,6,9,11,17,
20 219:23 220:2,
19,23,24

**effective** 34:16
196:13,19 228:10

**effects** 135:13
137:15 216:25

**effort** 56:19,23
131:7 150:25

**efforts** 48:13
66:15,16 123:22
124:12,19 147:13
157:18

**electrocution**
51:2,9 81:13 82:6,
20 83:3,17 233:14

**elicit** 135:12
137:14

**else's** 21:4 60:2

**employed** 14:10
22:23 147:8

**employee** 31:12

**employees** 21:8

**employment**
15:11 22:21

**EMT** 192:5

**EMTS** 176:1

**encouraged** 15:5

**end** 127:20 200:25
236:24

**ended** 29:11

**engage** 151:7
157:19

**ensure** 116:1,3
117:3 202:2 212:2
230:8 232:21

**entire** 173:9
187:15 212:15

**entities** 128:7

**entity** 91:17,25
92:7 113:14

**equal** 66:15

**equipment**

232:23 233:2

**errors** 186:2

**escort** 170:19
171:1

**estate** 14:3

**estimate** 11:2
45:9

**et all** 6:8

**etomidate**
140:14,23 141:3,
14,19 142:10,13

**event** 143:19
225:9

**eventually** 15:8
29:10 44:16
128:15

**exact** 103:24

**EXAMINATION**
6:1

**examples** 209:12

**exception** 119:22
120:12,23 202:21

**exceptions** 120:6
190:14

**excuse** 8:2 135:5

**execute** 231:24

**executed** 81:12
182:19

**execution** 9:23
17:7,13 24:10,21
26:10,13,18 27:14
28:2 30:14 42:11
51:8,16 53:12
77:24 78:4 80:16
83:17,21 89:4
90:4,10 99:2,11
110:20 113:5
140:3 141:20
146:1 150:7,17
155:14 157:25
158:24 162:22
166:22 167:4
170:12,23 171:13
172:12 173:8,9,
13,16 174:9,16,22
175:22 176:13
177:21 178:20

179:21,24 180:4,
9,19 181:7,12
182:2 183:3,19
186:12,14,15,16,
17 187:1 188:5
190:4,14 192:11
196:8 197:3,6
198:1,3,4,6,23
199:18 208:19
210:6,9 213:5,15
214:6 222:11,20,
22,23 227:25
231:7,10,13
232:7,10 234:3,9,
12,19,25

**executioner**
30:21 63:20
183:22 184:4,10,
15 191:23,24
197:8,9,13,15
198:9 202:8
216:15

**executioner's**
175:18 184:1
197:11 198:12
202:2,14

**executions** 6:18
10:7 17:2 26:21
27:8,11 34:16
42:23 49:21 50:4,
25 65:14 70:7
81:24 82:2 83:19
84:6 93:6 94:8,23
102:16,24 135:22
148:18 149:21
150:11 151:15
154:1,11,15
157:12 160:21
164:15,21 165:3,8
166:11,15 171:23
176:22 182:3,8,
20,23,24 183:6,10
188:16,19 193:7
195:10 208:23
209:2 231:1 233:7

**executive** 18:2,11
31:11

**exhibit** 58:21 59:4
84:15 85:11
129:18 133:9,25
134:9 140:12
141:16,17 142:25
143:2,23 149:7
151:21 154:19

155:19 160:12
164:7 170:9,11
183:14

**exists** 51:16

**expand** 15:10

**expect** 69:14 80:7
92:5 101:1 120:25
121:5 135:19
144:21 153:4

**expectation**
109:11

**experience** 15:10
43:2 53:12 55:11
56:2 57:19 74:20
79:21 80:9,14
92:12 166:3
167:17 202:14
222:7 226:25
227:5,8 232:19

**experienced**
227:17

**expert** 55:14
59:25 78:7 80:10,
24 81:6,8,9
121:14 194:4,5
195:8 217:2,4
225:21 236:6

**expertise** 12:20
32:7 77:4 223:12
225:6

**experts** 35:7,9
42:21 45:16,22
53:1,17 54:25
76:19 78:12,15,18
80:13,21 148:17
167:24 194:2,8
208:5 225:25

**expire** 138:16
196:24

**expired** 138:12
196:7,13,16,19,
20,21

**explain** 173:7
209:6

**explained** 115:16

**extent** 31:4 50:20
72:14 91:15 109:1
153:23 181:21
200:9 201:13,20,

24 214:9 217:24

**extraction** 170:22
171:1

**eyelash** 225:11

———————

**F**

**facilities** 16:6
23:21 99:11
100:9,14

**facility** 24:1
170:20

**fact** 74:1,3 166:23,
25

**facts** 89:25
180:25

**fair** 17:20 95:6
109:12 165:23

**fairly** 115:16

**false** 107:19

**familiar** 22:13
53:9 85:14 140:25
146:2 160:14
171:13 189:2
223:19

**family** 181:11

**farther** 149:25

**FDA** 117:12,14,21
118:8 159:4,12
160:19 161:15
163:3 164:2 195:4

**Federal** 5:10 6:6
102:25 125:11
127:9 237:5

**feed** 173:21 174:3

**feeds** 173:17
174:22

**feel** 135:13 147:2,
20 215:7 228:20
229:2 231:22
232:4 236:8

**feeling** 6:25
226:16

**felt** 148:18

**fewer** 151:8

**figure** 96:14
168:11

**filed** 10:14 235:15

**fill** 151:25

**filled** 171:5

**fills** 54:14 170:16,
18

**final** 36:3 49:11
61:7 233:25

**Finally** 105:19

**Finance** 16:9

**find** 55:14 91:23
129:23

**fine** 20:13 91:17
93:19 128:22
129:4 181:4

**finger** 206:9

**finish** 187:16

**finished** 233:17

**firing** 231:2,5,8,
10,13,16,18,24
232:7,12

**firsthand** 80:14

**five-minute**
221:12

**flip** 133:10 175:3
183:16 198:16

**Florida** 141:19

**flush** 206:17

**folks** 30:8 44:13,
15 46:5,7 87:5,6
99:23 198:11

**follow** 50:16,25
202:3,9

**force** 165:17

**foreseen** 214:5

**forgotten** 181:24
182:16

**form** 9:3,6,10
14:21 22:4 24:12
28:23 34:18 35:21
36:15 37:1,14
38:19 40:6 45:17
46:8,23 47:6,20

48:2,9,21 49:15,
23 50:18 53:2
54:7 55:1,23 56:6
57:5,23 58:1,6,11
59:8,17 60:6 61:3
62:21 63:24 64:8,
20 66:18,23 67:9,
23 69:2,11,25
70:9 73:10,19
74:12,16 75:22
77:1 78:1,9,20
79:2,18 80:3,11,
22 82:3 85:5 86:1,
6,13 87:13,21
88:20 89:21 92:1,
9,17 93:1,7,11,14
94:13,24 95:7,21
96:6,18 97:1,10
98:16,22 99:4
101:10 103:1,8
104:25 105:5,9,24
106:21 107:5,14,
22 108:3,14,22
109:15 110:6,14,
24 111:13,22
112:24 114:1,13,
24 115:9,20
116:15 117:7,18
118:11,24 119:4,
15,25 120:7,16
121:7,22 122:2,7,
13 123:20 124:4
125:2,18 127:6
128:1 130:1
131:20 132:14
133:1,22 134:4,
16,23 135:17
138:7 139:16
140:7,18,24
142:1,17 143:10,
24 145:6,21
146:10 148:2,24
149:12 150:8
151:19 152:3,14
153:3,11 154:2,24
156:1,8,14,23
157:10 158:20
159:9 160:8 161:9
162:2 163:6
164:16,22 165:9
166:13 167:5
169:1 171:11
173:19 174:24
176:18 177:23
178:5,14,21
179:10,25 180:10

183:24 184:13
186:19 187:3,17
189:24 192:12
193:1,20 195:6,
20,22,25 196:11
197:12 198:8,25
199:9 201:6
202:4,19 204:7
205:15,23 206:19
207:13 208:3
210:8,25 211:18
212:1,9 213:7,21
214:7,17,25
215:10,18 217:5
218:3 221:1
222:13 223:9,17
224:13 225:4,16,
23 226:3,10,17,23
227:22 228:11,23
230:5,14 231:25
232:25 234:15
235:1 236:4

**formal** 27:9 47:22
52:4

**fortunately** 91:9

**forward** 84:13
140:2 143:5
144:10,17 148:1
150:24

**frame** 102:19

**frequent** 188:20

**frequently** 20:2
211:3 229:10

**Friday** 8:14

**front** 193:24

**full** 201:4

**functioning**
99:19

---

**G**

**gaining** 125:10

**gave** 62:24 144:9,
14 181:17 199:18
209:13

**general** 5:19 15:3,
14 16:10,12
17:11,12,16 18:2,
8,10 19:6,19

20:18 21:23 22:22
23:1,2 29:15
30:23 32:10 53:13
63:12 100:22
101:2 118:19
147:19 169:15
183:13 227:11
235:10

**General's** 5:15
19:23,25 20:7,19
22:24 23:8 32:23
87:6 160:19

**generally** 20:8,14
21:8 23:22 56:14
87:4 88:5 106:4
113:18 173:3
197:10 214:2

**gentlemen** 8:9

**Georgia** 166:9

**gist** 153:14

**give** 29:23 30:12
58:19 75:12
90:17,23 91:2
111:20,23 112:20
126:9 127:2
163:24 206:22

**giving** 88:13
104:21 192:3

**gleaned** 145:19

**good** 5:13 6:3,4
52:25 53:17 129:4
151:23 166:24

**gosh** 6:15 20:12
52:10 98:10
123:10

**gotcha** 31:2

**government**
125:11 127:9

**Governor** 20:24
26:7 86:16 90:3,8
180:1,5,8,13,15
183:5

**Governor's**
44:15 45:6 86:9
87:5 128:7 132:7
177:1,10 180:8

**governors** 26:4

**grade** 154:21

**grams** 149:10,11,
17 150:6,12,20
151:8,15 155:6,7,
10,17

**grant** 153:20

**Great** 11:11 14:18
236:17

**Grimes** 19:1

**grounding**
194:23

**group** 31:20
33:20,21 36:2
37:7 38:13 39:7,
23 41:20 42:6,8,
18,20 44:6,8,25
45:13,15,16,21,25
47:14,23 52:5
53:8 55:13 56:19,
23 64:6,13,19
76:22

**group's** 37:8

**groups** 45:7

**guess** 35:19
86:21 128:18
140:21 173:2
188:12 200:24
229:7

**guessing** 126:2

**guidance** 26:14
38:15 91:22 92:8
193:25 213:11

**guideline** 50:21

**gurney** 175:5,7,
24

**gurney's** 175:14

---

**H**

**habeas** 15:1

**half** 59:13 149:8
213:3

**halfway** 206:14

**hall** 170:1

**hand** 70:7,11,12,
20,21

**handful** 233:25

**hands** 205:22
206:6

**handwriting**
84:24

**handwritten**
84:18

**happen** 75:20
76:1,4,7,8,14,18,
20 101:3 175:7
178:4,23,25
214:11 217:11
226:7 230:9

**happened** 29:8
33:17,22 40:14,19
44:5 61:16 115:7
117:4 127:25
128:13 152:5
153:6 178:16
224:20 230:12

**happening** 175:8
224:18 230:7

**hard** 88:8 156:24,
25

**Haslam** 26:7

**hat** 17:10

**Haute** 100:11

**hazard** 188:12

**head** 15:2 23:4,5
24:18 81:16 109:4

**hear** 85:3 176:12,
15

**heard** 118:4
123:15 141:3,4
218:4 224:5,14
230:6 235:12

**hearing** 24:1

**heart** 229:20

**held** 17:14 26:12

**helpful** 50:14
55:15,16 61:25

**helping** 147:20
200:4

**hesitate** 7:12

**Hey** 221:10

**high** 12:22,23,25
13:4

**highest** 11:11

**historical** 145:15

**history** 24:9,16,
20 28:1

**hold** 11:25 13:25
22:25 23:25 26:9
182:9

**holds** 187:10

**honest** 92:3

**hope** 44:2

**hoping** 27:25

**horse** 141:8

**hospital** 113:6

**hour** 128:23 188:7

**hours** 8:12 11:5

**human** 16:2 18:6
225:9

**hundred** 151:8,
14,15 177:6

**hundred-page**
61:19

**hypothetically**
180:21

**I**

**i.e.** 224:10

**ID** 181:13,24
182:16

**idea** 52:10,25
53:17 148:10
152:20 233:1

**ideally** 149:18

**identified** 185:8

**identifiers** 30:23

**identify** 24:19,22,
25 30:1 31:5
60:16 63:15 77:8
85:17 86:2,23
88:3 91:16 101:11
104:11 157:15
176:23 193:10

210:19

**identifying** 30:10
42:12 56:16 57:11
86:22 170:15
190:23 198:5

**identity** 31:6

**II** 155:21

**ill** 6:25

**imagine** 16:24

**immediately** 27:5

**impact** 227:18
235:23

**implemented**
139:19 166:5

**import** 120:3,13,
20,23 121:13
153:20 162:13

**important**
165:22,25 214:16

**importation**
113:3 117:14
153:14 154:14
155:23 161:15
162:22 164:3

**imported** 155:20
162:17

**importing** 109:25
111:8

**inaudible** 203:9

**incident** 181:24

**include** 17:1 18:4,
21 31:9,10 38:14
46:7 130:6 137:3
149:22 160:22
199:12 211:10

**included** 42:15
60:19 114:11,16
132:25 133:3,20
144:5,8 203:5
209:24 212:8

**includes** 16:3,6,
21 144:3 174:8
190:13

**including** 11:4
15:1 17:13 45:1
108:8 143:6 147:7

**increase** 218:11

**independent**
137:10 168:2
209:15

**independently**
64:18

**indication** 90:2,6
206:10

**individual** 24:8
46:21 49:20 50:3
66:4 88:11,13
113:15 118:7
123:1,8 124:24
144:25 171:5
235:9

**individual's** 32:7

**individuals** 45:3
60:24 61:2 86:23
88:11 108:12
167:3 185:23
208:22

**individuals'**
88:13

**ineffective**
196:17

**inform** 90:8

**informal** 42:21

**information**
12:15 16:22 30:24
34:5,10,12,23
35:5,10 39:3
48:12,24 49:8
56:20,21 58:2,4,
12 59:22,24 61:14
62:17 92:24
96:21,24 97:4,8
103:22 105:11
107:19 112:10,13
116:19,22 117:1
124:3,18,25
128:12 132:24
135:21,25 136:16
137:7 145:15,18
148:6 152:7
162:18,19 202:17
204:2 208:10
237:7

**informed** 100:21
105:8 112:16
113:10,16 115:3

**Inglis** 5:7,17,23
6:3 9:6 71:22 72:3
83:16,24 84:4,15
93:10 236:18

**ingredient**
104:20

**initial** 24:4 191:25

**inject** 10:5 74:6

**injected** 74:4
216:18 217:11
227:20

**injection** 33:4
50:10,11 51:4,8,
16 54:17 67:18
69:16,23 70:6,7
81:13 82:8 86:18
92:23 104:5
107:18 115:15
160:22 176:6
182:3,19 186:15
187:1 193:7
231:19 233:8,11

**injunction**
163:13,19 164:1

**inmate** 165:17
190:16 206:18
212:3 216:20
223:1 224:10
226:5 227:18
232:21

**inmate's** 205:25
206:6 217:25

**input** 57:7,15
90:17 187:7
193:17 208:17

**inquired** 168:5,17

**insensate**
207:14,18,22
208:1 212:4
223:2,7,15 226:5
227:14

**insert** 205:12

**inside** 193:15

**Inspector** 19:6

**instance** 83:22

**instruct** 31:7 72:4
82:4,18 83:24
85:21 104:11

139:9,12 141:10 147:16

**instructed** 85:24 132:9

**instruction** 191:25

**instructions** 111:20,24 198:22, 23 199:8,22,24 200:5,8,11,15,16 201:15,16,21,22 202:3,9 204:6,16

**integrity** 83:21

**intended** 160:21

**interact** 68:22

**interest** 123:11

**interested** 14:23

**interfere** 206:4,7

**interject** 97:13

**interjection** 93:17

**internally** 45:1

**interrupt** 75:15 101:16 173:11 181:15

**intervened** 162:21

**introduce** 5:7

**introduction** 184:9

**invite** 127:16 151:24

**involve** 12:13 165:16

**involved** 9:21 27:11,19 28:9 41:13 42:10,14, 20,22 44:14,18 51:15 55:17 63:10,14 66:15 100:15,19 104:19 108:12 126:17 137:17 146:20 148:9,17 152:6 208:19,22,24,25 209:1 235:2

**involvement** 45:4,5 51:18,19

**involving** 29:11

**issue** 38:23,25 40:10 78:16,19 82:6 115:17 121:20 155:21 158:8 161:13 167:2 182:16 227:12

**issued** 108:1 162:7,15,23

**issues** 9:2 20:22 178:1 181:8 183:7,11 213:2,4, 5,10 216:12 227:9

**issuing** 192:17

**Item** 186:14 188:2 203:5,16

**items** 143:5 144:11 202:24

**iteration** 55:21 56:11

**iterations** 185:5, 15

**IV** 175:15 176:2 205:10 216:15 218:14 222:21

---

**J**

**jeopardize** 92:13, 16

**job** 15:19 17:15 185:2

**join** 14:20

**joined** 184:16

**July** 40:18 59:1,7 64:4 71:25 72:23, 24,25 151:22 181:22,25 185:16, 25 211:13 212:19

**jumping** 190:12

**June** 40:18 154:22 164:9

**jurisdiction** 102:5,17 139:20

140:10 160:20

**jurisdictions** 183:1 194:7

**justice** 15:9 125:9

---

**K**

**KAY** 5:23

**keeping** 123:24 143:19 191:2

**Kelly** 19:2

**ketamine** 138:21 139:4,7,10 140:15 141:5

**kind** 30:25 55:16 56:19 64:10 88:8 120:6 153:23 165:16 210:3 223:19

**King** 5:12 6:7,8

**knew** 53:13 131:4 132:16 136:8 142:23 145:23 146:5

**knowing** 124:18 166:3

**knowledge** 24:9, 16,23,24 54:10,21 61:16 66:25 81:22 87:11 93:8 115:25 116:16 123:25 141:15 145:16 147:12 148:8 152:15 153:23 163:7 169:22 186:21 219:16

---

**L**

**lab** 12:13,14

**laboratory** 107:25

**ladies** 65:6

**language** 62:24

**laptop** 172:16,19

**large** 34:13 172:13

**largely** 186:25

**larger** 172:18,20

**late** 28:19 40:14

**latest** 131:13

**law** 11:13,17 14:24 15:11 33:5 73:5 113:2 127:9 207:3 223:20 228:17

**lawsuits** 235:11, 15

**lawyer** 12:7 93:10 147:14 180:25

**lawyers** 18:18,22 19:8,14 32:18 118:22

**lay** 226:18

**lead** 102:6 185:16 192:17

**leader** 23:3

**leading** 88:15

**learn** 12:16

**learned** 77:20

**leave** 123:6,8 208:4

**led** 15:12

**Lee** 26:7

**left** 156:20 175:6

**left-hand** 59:3

**legal** 16:11,13 17:12 18:13,19 19:2,11 20:17 21:1,5,7,9 26:14 27:10,17 51:20,23 72:12 73:2,5 118:23 119:3,6,14 181:8,17 183:6,10

**Legislative** 19:1

**Legislature** 83:18

**length** 16:25

**lengthy** 207:9

**Leonard** 5:9 6:2,5 9:13,16 15:13

19:7 20:15 22:8
24:14 25:3 29:2,
22 30:11 31:13
34:22 36:1,22
37:5,19 38:3,24
40:12 45:20 46:6,
11 47:1,11,24
48:6,15 49:1,9,19
50:2,13,23 53:5,
22 54:12 55:9
56:4,10,22 57:8,
14 58:3,8 59:11,
19 60:10,23 61:6
63:2,21 64:2,12,
23 65:2,5,12,18,
21,24 66:3,20
67:3,13,19 68:2
69:7,18 70:5,14,
22 71:4 72:7,11,
21,25 73:7,15,22
74:5,14,21 75:1,9,
19 76:5,12 77:6,
15,21 78:6,14,22
79:10,15 80:1,8,
15 81:1,10 82:7,
16,21,24 83:4,13
84:3,11,14 85:10,
20 86:4,10,19
87:2,18 88:1,6
89:1 90:5 91:6,8,
12,18 92:6,15,20
93:4,9,19,21,25
94:6,21 95:3,11,
22 96:11,19 97:5,
16,23 98:19 99:1,
9 101:15 103:4,
10,20,24 104:6,
13,15 105:2,7,12
106:7,24 107:10,
16,24 108:5,17
109:1,5,17 110:21
111:5,16 112:1,5
113:7,13,21
114:4,18 115:1,
12,23 116:17
117:10,20 118:13,
18 119:1,8,19
120:5,11,21
121:11,24 122:4,
9,19 124:1,10
125:5,23 127:14
128:3,17,23
129:2,6,9,11,17
130:5 132:2,22
133:4,24 134:7,18
135:1 136:3

138:2,14 139:21
140:11,22 141:2,9
142:5,19,24
143:13 144:4
145:9 146:3,13,22
147:18 148:4,20
149:1,15 150:10,
18 151:20 152:8,
16,22 153:7,16,24
154:4,9 155:3,18
156:5,11,17
157:1,13 158:1,
10,22 159:11,17
160:11 161:19
162:5 163:8,14
164:19,24 165:11,
19 166:17 167:7
168:14,21 169:2,
6,10,14,23 170:2,
8 171:15 173:4,5,
24 175:1 176:20
177:3 178:2,8,18
179:1,13,19
180:2,12,22
181:2,5,23 184:3,
17 185:1 186:22
187:8,20 190:2,6,
11 192:14 193:4,
14 194:1,14
195:9,23 196:15
197:17 198:15
199:4,11,16
200:1,18,22
201:12 202:7,12,
23 203:15 204:4,
9,15,22 205:20
206:1,23 207:16,
24 208:6 210:11,
22 211:2,24
212:5,17 213:12
214:1,10,22
215:3,13,23 217:8
218:5,23 219:2,6
220:6 221:4,13,
16,22 222:17
223:13,24 224:16
225:7,19 226:1,8,
14,19 227:7,23
228:19 229:1,9
230:10,17 232:6
233:3,16,24
234:17,23 235:4
236:7,22 237:2,4

**lessen** 119:23

**lesser** 110:19

**let alone** 220:1

**lethal** 33:4 50:10,
11 51:4,8,15
54:17 65:13 67:18
69:16,23 70:6
81:13 82:8 86:17
92:22 104:4
107:18 115:15
160:22 176:6
182:3,19 186:15
187:1 193:7
231:19 233:7,11

**letter** 108:2

**letters** 200:19

**level** 11:11

**liaison** 16:7 19:1

**LIC** 105:20 125:10
197:2,3,4,19

**license** 14:4
107:20 120:19
123:16 153:20

**licensed** 122:17
235:13

**licensure** 235:13

**lifeguard** 13:14,
20

**limited** 83:18
140:14

**limiting** 102:19

**list** 164:11

**listed** 11:8 170:16
183:22 213:4
214:24 225:11

**listen** 72:16

**listing** 183:18

**lists** 193:8 198:22

**literature** 228:15

**litigation** 15:1,2
20:21 23:5,6 30:5,
20 62:10 71:25
72:6 82:5 83:23
136:1 138:18
221:2 223:20
224:7 231:15

**live** 77:24 183:3

**local** 236:6

**locate** 66:9,11
137:9

**located** 172:2
173:16

**locating** 125:9

**location** 172:8

**long** 8:11 14:18
17:14 23:13 25:7,
16 33:6 40:9
43:20 53:14 69:6
151:4 169:25
210:2 215:2
216:13

**longer** 25:4,8
28:16 29:3,5
30:16 128:10
137:6 140:16

**looked** 33:5 97:11
120:23 126:22
131:2 132:23
158:14 165:5
231:18 233:4,13

**loophole** 157:6
158:2

**lot** 214:19 232:3

**lots** 7:11

**loud** 187:16

**low** 127:11

**lunch** 128:19,20
129:2,6,14 185:3

**Lynne** 5:9 6:5 9:4
221:10

---

**M**

**machines**
229:11,14

**made** 33:23 35:15
36:3 38:13 42:7
44:23 48:16,23
49:2,11 73:13
81:21,23 101:19
108:7 109:12
114:7 128:12
131:18 132:5
144:25 148:11
159:25 201:18

**EliteReportingServices.com**
**www.EliteReportingServices.com**

matter 111:10 115:17 129:1

matters 15:11

Mayes 5:16 7:18 8:19 9:22 10:17

Mcwherter 26:7

meaning 114:20

means 79:9 112:23 113:2

medical 12:18 13:23 32:5,9,13 34:24 45:25 46:14 77:4,22 146:25 147:4,12 192:1,4 194:4 195:7 207:22 208:5 209:7,10,19 210:7 217:2,3 223:11 229:10,11 235:11, 14 236:5

medication 7:2

medicine 194:25

meet 7:20 8:8 9:17 24:6 64:17

meeting 8:11 10:20 11:8 88:9 89:18 112:16 114:8,9,20 115:3, 8 116:13 117:5 144:12,14 152:2, 9,13,17,21 153:2, 10,14,22 154:1, 11,13,17 158:17 159:20,23

meetings 8:4 51:22,24 52:6 61:10

member 23:13 31:10 37:7 55:13 181:11 197:3,6

members 186:12, 14,16,17 210:6 227:25

membership 23:10

memorandum 160:14,17,18 161:1,20,24

211:11 217:24

magically 58:4,7

maintain 195:5 219:13

maintenance 16:7 170:20

major 106:4 108:8 185:10,12 186:3

majority 7:20

make 34:4 38:14 43:8 48:7,19 55:17 75:17 89:17,19 102:9 127:20 138:6 158:7 163:5 173:12 179:4,7, 12,14 222:11

makes 64:19 73:23 76:24 109:8 145:10 196:16 204:25 228:9

making 55:15 80:5 104:22 108:12 149:3 160:19

malpractice 235:11,14

man 127:15

manage 16:16

management 16:3,4,6,16,19 17:2,8

manual 186:15 187:1,11 189:23

manufactured 38:16 39:4,8,20 67:20 156:4 195:15,18 196:3

Maplewood 12:23

mark 127:16

marks 5:6 236:24

match 91:8

materials 11:6,8 186:18 233:6

162:7,14,23 163:1

memory 42:16 89:24 96:2 100:25 161:5

mention 29:18 30:6 133:12,15 218:13,16

mentioned 16:15 51:14,22 92:21 95:10 122:16 124:15 137:16 145:20 152:10 155:7,15 207:2 213:9 217:10 228:14 230:18

mentions 133:14

met 31:22 33:17, 22 41:20 158:15

method 134:21 151:13

methods 165:21

mid 40:14,23

midazolam 70:24 71:7,11 89:9 95:10,12,25 96:5 105:23 106:10 128:16 129:24 130:9,17 131:2, 19,25 132:10,17, 19,23 133:13,14 134:15 135:11,22 136:1 137:14 143:6,18 144:18 158:25 164:11,25 166:25 168:6,18 195:4,14 196:2 199:5 203:9,20,22 204:21 206:16 216:17,20 217:1, 12 218:1,11,19,22 220:1,9,24 222:20 224:11 226:16 227:13 228:4,6,21 229:22 230:7,16

military 13:21 100:19

milligrams 111:4 149:23 217:16

mind 9:4 94:20 95:1 100:16

mine 96:3

minor 186:2

minute 79:5 90:23 91:2 112:20 133:10 175:4

minutes 206:15, 18,21,24 217:10

missing 26:8

Missouri 103:11

Mitchell 7:21 8:5

moment 19:16 70:25 207:8 210:5

monitor 5:5 65:8, 11 172:19

month 68:18 188:7

months 68:20 69:1

morning 5:13 6:3, 4 151:16

morphine 164:12

mortgage 14:4

motivated 14:20 22:2

mouth 128:6

move 36:24 44:18 52:2 84:13 143:5 144:10 147:25

moved 23:2 54:23

movement 163:21 206:2

moving 34:7 52:16 205:25 206:9

multi-drug 73:9, 17

multiple 88:7

muscle 208:13 211:10

---

**N**

---

named 192:11

Case 3:18-cv-01234-E Document 195 Report Filed 04/05/22 Page 254 of 266 PageID #: 1576
EliteReportingServices.com
www.EliteReportingServices.com

names 87:3 88:13
198:5

Nashville 12:23

necessarily
171:6 208:1 214:5

needed 63:5,10
110:6 145:16
150:6 190:22
199:23

needing 155:7

news 151:23

nods 24:18 109:4

normal 172:20

note 83:2 93:20

notes 58:19 60:2
84:18,20,22 85:1,
4,9

notification
153:6

number 27:22,24
31:22 33:3 46:14
81:16 83:19 91:5
95:16 136:9
170:25 188:18,19
197:2 198:18
207:6 222:16

---

**O**

object 9:3,10
14:21 24:11 28:23
36:15 37:1,14
38:19 40:6 45:17
46:8,23 47:6,20
48:2,9,21 49:15,
23 50:18 53:2
54:7 55:1,23 56:6
57:5,23 58:6 59:8,
17 60:6 61:3
62:21 63:24 64:8,
20 66:18,22 67:9
69:2,11,25 70:9
71:21 72:4 73:10,
19 74:12,16 77:1
78:1,9,20 79:2,18
80:3,11,22 82:3
83:17 85:5 86:1,6,
13 87:13,21 88:20
89:21 91:15 92:1,
9,17 93:1,7 94:24

95:7,21 96:6,18
97:1 98:16,22
99:4 101:10
103:1,8,18 104:25
105:5,9,24 106:21
107:5,14,22
108:3,14,22
109:15 110:14,24
111:13,22 112:24
114:1,13,24
115:9,20 116:15
117:7 118:24
119:4,15,25 120:7
121:7,22 122:2,7,
13 123:20 124:4
125:2,18 127:6
128:1 130:1
131:20 133:1,22
134:4,16,23
135:17 138:7
139:16 140:7,18
142:17 143:24
145:6 147:15
148:2 150:8
152:3,14 153:3,11
154:2,24 156:1,8,
14,23 157:10
159:9 161:9 162:2
169:1 171:11
173:19 177:23
178:5,14,21
179:10,25 180:10
183:24 189:24
192:12 197:12
198:25 199:9
201:6 202:4,19
204:7 205:15,23
206:19 207:13
208:3 210:8,25
211:18 212:1,9
213:7,21 214:7
217:5 221:1
225:3,16,23
226:3,10,17
227:22 228:11
231:25 234:14
235:1

objection 22:4
25:1 34:18 35:21
37:23 46:1 49:5
50:6 53:19 67:16,
23 70:17 71:1
74:2,23 75:6,22
76:9 77:18 79:12
81:3 82:25 93:13,
22 94:13 97:10

112:3 117:18
118:11,16 120:16
128:14 132:14
140:24 141:6
142:1,21 143:10
145:21 146:10,17
148:12,24 149:12
150:13 151:19
152:18 153:18
154:7 155:11
158:4,20 159:15
160:8 163:6,10
164:16,22 165:9,
13 166:13 167:5
169:4,8,12,20
174:24 176:18
179:16 184:13,21,
22 186:19 187:3,
17 190:5,9 193:1,
20 195:6,20
196:11 198:8
199:14,20 202:11
203:12,24 204:12,
19 207:19 214:17,
25 215:10,18
218:3 222:13
223:9,17 224:13
226:23 228:23
229:6 230:5,14
232:25 234:21
236:4

objections 9:5,6,
14 93:11

observe 83:16

observed 26:23
82:11

observing 78:4

obtain 38:12
48:13 67:4,12
104:4 113:4
117:14 120:19
122:10,20 123:16,
17 124:12,19
127:10 139:4,7,9
141:11 153:13
162:6 165:3
167:10 168:6,18
232:23

obtained 59:25
94:19 133:13
161:18 162:19

obtaining 69:9
139:24 161:14

162:16

occasion 161:5
167:11 188:1

occasionally
189:3 191:12
214:13

occur 39:22

occurred 71:24
181:22

occurs 191:2

October 5:4
156:7

offender 16:2
18:5

offer 91:22 92:8

offered 55:10

office 5:10,15,20
6:6 19:23 20:1,7,
19 22:24 23:8
31:12 32:23
44:13,15 45:5,6
86:9 87:5,6 128:7
132:8 160:19
172:1,9 174:1,15,
23 176:13,17,21
177:2,10,14,18,19
180:4,8 181:6
191:7 213:16
237:5

officers 170:19
171:2

official 27:4 84:7

Ohio 43:5

Ohio's 98:5

Oklahoma
166:22 178:10

one's 76:16
151:22 221:5

one-drug 34:2,8
36:13,20,24 37:12
38:8,10 39:12
41:9,23 42:4 43:6,
10,14,20 44:6,19
54:23 78:23 79:17
89:16 98:2 192:22
215:9

ongoing 64:11
211:23

open 229:20

operation 22:14

operational 16:5
18:5

operations 26:17

operative 201:14

opinion 37:11
78:8 149:2 160:25
161:13 163:12
208:15 226:18,20

opioid 138:22
139:15

opportunity 15:3,
9

oppose 37:9

opposed 17:8

opted 81:12

option 155:1

options 51:7
99:22

or/and 125:10

oral 165:7,18
232:10

orally 232:24

order 84:1 104:12
147:17 155:9,20
237:3

ordering 143:5
144:10

orders 50:8 54:14

Organismal 12:6

organizations
23:11

original 10:16

originally 130:24

outlined 188:6

outstanding
109:2

oversea 112:6

overseas 110:1

111:9 120:24
122:11,21 123:18
162:7,16

oversee 16:2,13
71:11

overseeing 18:15

owner 54:5 98:13
113:20,22 115:4
116:20 120:18
122:17 123:4,5,16
135:3,5,8,23
137:21 138:4
140:17 147:8
152:19 153:25
157:20 158:16
159:20,25 161:21,
25 193:17,25
204:3,6,11,18

**P**

p.m. 129:16
134:13 170:4,7
221:18,21 233:20,
23 236:25 237:11

pages 183:17,23
200:18 201:21
203:5,11

pain 135:13 226:6,
9,16

pan 175:18

pancuronium
28:14 41:17

panel 23:25 63:5
64:14

papers 10:13

paragraph 127:3,
5,12 207:12

paralytic 75:21,
25 76:3,24 77:5,
13 78:7 139:22,24
167:10,13,20
224:3,12 230:13

Parker 5:16 6:8
9:22 10:10 25:23

part 12:10,16
18:18 26:18 45:22
52:9 53:7 56:23
69:10 77:5

114:16,19,20
116:12 130:21
144:19 145:3
151:22 171:14
173:7 209:22
220:17

participant 84:8

participants
187:12 189:23

participate 14:7

participated
30:22 88:9

parts 73:25

pass 224:23

past 10:3 55:11
98:3 166:11
171:20 208:25
217:14 226:22

pause 9:7 79:4

pay 21:22

pending 20:21
138:18

pento 43:10,21
151:23

pentobarbital
29:11 34:3,13,15
35:3,8,13 37:17,
18,20 38:8,9,11
39:12,15,20 40:10
41:4,9,23 42:4
43:6,17 44:4
48:14 52:16 66:7,
13,17 67:5,21,22
89:13 90:4 93:6
94:8,10,11,15,17,
23 98:5 101:8
102:3,7,15,17,24
103:6,12,15,23
107:4 109:25
110:6,10 111:1
112:8,18 113:4
115:6 117:15
120:13,24 121:13
122:11,20 123:18
124:13,20 126:3,
12,23 128:8
130:23 137:19,22
138:5,11,15,19
143:8 150:3,4,6,
12 151:2 153:9

154:21,23 155:1,
16,25 156:7,13
157:19 159:2,5,8,
13 160:7 162:6,16
192:22 215:12

pentobarbital's
128:9

Pentobarbitol
114:17

people 25:10
30:2,4,10,21 31:5
40:5 42:10,12,13,
22 44:17 45:1,7
53:6 56:25 63:10,
14 71:18 86:25
88:7 95:16 104:3,
7 142:23 147:7
170:23 180:3
189:3 223:20
227:16,24

percent 177:7

perform 205:2
231:1

performing
205:13

period 130:23
201:4 206:18
212:11

periodic 23:22
191:25

permit 164:3

person 19:10
24:15 30:20 56:17
57:12 60:11 65:25
66:6,15 98:20
108:16 182:16
189:19,20 192:7,9
193:11 207:17
217:1 219:9 222:9
223:6,25 224:12
226:12,16 234:1,
8,12 235:5

person's 29:24

personal 24:9,16,
24 54:10,21 66:25
81:22 115:25
123:25 148:8
169:21

personally 36:23
37:6 45:14 47:2

www.EliteReportingServices.com

52:21 56:8 59:23,
24 61:15 78:17
80:23 95:14 96:8
97:20 102:12
103:16 105:6
117:23 136:5
137:17 158:12
168:22 188:21
194:12,15,22
197:18 202:5
209:9 228:20
230:24,25

**personnel** 71:23
190:25

**persons** 29:19
39:5

**pertaining** 113:2

**pertinent** 12:17

**pharmaceutical**
104:20

**pharmacies**
169:17

**pharmacist**
54:14 55:5 56:20
57:17 66:8,11
71:6 107:11
146:23 147:5
199:10,12,17,24

**pharmacist's**
201:15,22 202:3

**pharmacists**
32:14 53:25 54:19
56:3 147:8

**pharmacologist**
136:23

**pharmacologists**
32:16 54:2

**pharmacy** 54:5,
18 98:13 105:20,
22 106:2,6,9,13
107:3,7,13,17,20
108:1 113:20,22
115:4 116:20
120:18 122:17
123:4,5,6,9,16
135:3,4,5,7,23
137:21 138:4
140:17 141:10
147:8 152:19
153:25 157:20

158:15 159:20,25
161:21,25 168:4,
16 193:17,25
194:5,8 195:2
198:19,20 199:23
200:14 201:1,2
204:2,3,6,11,17

**Philadelphia**
5:11 6:7

**phone** 180:13,16
213:14,15

**phonetics**
164:12,13

**phrasing** 185:2

**physical** 70:13

**physically**
197:24

**physician** 31:24
190:16 192:5,11
205:1,11,18
208:11,12,18
210:21 228:25
229:8 234:3,7,9,
11,18,24 235:13,
15,22

**physician's**
229:25

**physicians**
208:17,18,21
209:13 228:13

**pictures** 197:23

**place** 8:13,14
27:22 43:21 81:12
87:12 89:11
163:13,19 164:4
181:25 182:8
212:15 215:25

**places** 99:15

**Plaintiff** 5:12

**planned** 222:15

**play** 190:15 200:4

**players** 183:19

**pled** 82:13

**point** 9:18 26:13
27:12 28:5,14
35:14 36:21 38:23
39:1,6,10,19

40:11 41:22 42:18
43:23 44:5,14
52:5 104:18
105:18 110:7,13
111:9 112:15,19,
22 113:9 130:13,
14,17 131:24
132:16 133:19
137:1 138:11
141:18 142:8
154:13 155:1,12
186:5,9 188:20
190:12 208:8
209:17 218:10
221:11 232:5

**point-blank**
149:4

**pointing** 185:18

**points** 108:11

**portion** 91:13
92:4 203:10,14,
20,22

**portions** 62:20
73:4

**position** 15:4
21:13,15 22:9,15,
17,25 42:14 84:4

**positions** 86:24

**possession**
70:25

**possibility** 111:8

**Possibly** 207:2

**potassium** 28:14
41:17 70:24 71:7,
12 89:9 106:16
107:1 130:19
134:14 135:15
143:7 169:11
195:14 196:2
199:5

**potential** 108:8
109:13

**Powerpoint**
85:12,14,16 86:5,
20 87:9,17 88:2
89:5,12,25 90:7,
11,14,18 101:8,
13,21 111:6
114:12,15 119:7,
9,17,18 120:10

122:11,15,21
123:18 125:7,20
126:23,24 128:13
131:6,9,19,23
132:25 133:3,5,
10,15,20 141:18,
24 142:13 144:13,
23 145:12,19,23,
24 146:4,6,16,19
147:3

**powers** 129:22,25
130:6 143:4,21,22
144:2,10 147:25

**practice** 189:17
214:2

**practiced** 214:14

**practices** 187:25
189:11 213:20
214:5,12

**practitioner**
32:10,13

**predated** 215:12

**preferable** 37:11
38:8 73:8,17
74:10,15

**preferred** 151:13

**preparation** 8:20
9:24 10:22 62:4
90:24 171:19
172:11 184:8
198:18 200:13,23,
25

**prepare** 7:15 8:24
9:18 10:8 23:23
114:14 119:7
197:14 198:24
214:18

**prepared** 12:11
101:13 120:10
146:19 200:10
213:6

**preparing** 11:3
199:3

**prepping** 8:6

**present** 86:23,25
88:7,17,19 89:2
132:7 145:24
152:12,17 153:22
158:17 171:23,24

187:19 198:11 205:9

**presentation**
85:12 86:9,12 87:12 89:2 102:9, 20 127:19,21,25 131:19 132:3 142:16 145:13

**presentations**
87:10

**presented** 86:20 87:19 88:2,11,12 89:14,24 90:12,15 119:11 122:12,21 123:19 131:13,23 144:13

**presenting** 90:6

**presently** 164:5 234:9,11

**pretty** 31:25 34:14 35:19 72:17 114:2 170:22 173:9 176:3 184:1 211:21 222:5 225:9 235:25

**prevent** 205:24 206:3

**preventing** 226:15

**previous** 34:16 53:11 105:18 143:22 155:6 158:13 185:5,14 203:19

**previously** 34:8 95:4 212:6

**primarily** 22:6 44:12 55:25 58:15 62:17 174:8 187:5 233:14

**primary** 20:6 76:16 130:16 183:18 204:14

**prior** 22:21 132:24 137:4,5 167:9 182:19 202:22,25 203:1,2 204:1

**prisoner** 216:18 222:19 225:13

227:14,19 230:4

**prisoner's**
205:21

**prisoners** 81:12, 18

**prisons** 60:21 63:18 94:16 99:14 100:18 125:22 186:8 230:20

**privilege** 71:24 72:5 181:21

**privileged** 93:15

**problem** 86:22 93:18 130:15 161:12 178:9 216:24

**problems** 222:15

**procedure** 50:22 205:2 235:21,24 236:1,2

**proceeded** 223:4

**proceeding**
178:1

**proceedings**
237:11

**process** 44:25 47:18 63:11,14 73:25 83:21 99:24 117:13 119:21,24 121:12,16 148:7 183:20 189:2,5 190:14

**procure** 66:16 74:8

**procurement**
62:4,16 71:11 184:7 185:9

**procurer** 30:19 44:11 45:2 46:4, 18,20 47:4 48:24 49:2 54:1,4,10,20 55:4 56:24 57:3, 17 58:14 60:20 62:17,19 63:19 66:2,10 67:2 68:4, 7,9,22 69:9,15,19 70:3 71:16 72:4, 20 85:4,8,19,21,

24 88:16,19,24 89:19 90:12 104:23 105:14,16 108:16 109:18,21 111:15,18,24 114:3,5 116:4,6, 11,12 117:17 120:10,15,18,22, 25 121:9,18,20,25 122:25 123:2,23 124:2,6,7,11,17, 21 126:17,25 132:9,18,23 138:9 139:5,9 142:22 143:16 146:19,23, 25 147:6,9,14 152:6,10,12 154:5,6 159:7,12 161:4,7,11,24 168:24 177:12 204:10,17

**procurer's** 48:13 56:2,19 116:18 147:3,13 154:16 157:18

**procures** 65:13

**procuring** 69:22

**produce** 195:5

**product** 157:6,8

**professional**
23:11 192:1,4 207:23 209:19

**professionals**
167:18 194:7 222:6

**programs** 14:8

**prohibit** 84:1

**prompted** 21:10 42:1 43:14 44:3

**proper** 82:25 181:13

**Proposed** 164:10

**propranolol**
164:13

**pros** 35:10,12,19 55:19

**protect** 83:20 92:18

**protective** 84:1 104:12 147:17

**protocol** 7:17 8:16 26:10 27:22 28:2,5,12 29:10, 11,12 30:16 31:18,21 33:22 34:2,8,9 36:11,13, 14,20,24 37:12,13 38:5,9,11 39:12 40:17 41:5,8,9,13, 14,19,24 42:4,7 43:2,7,11,14,21 44:1,7,10,19,20 46:16 48:1 49:12, 22 50:5,11,17,21 51:1,2,5,11,16 52:2 54:23,24 55:7,22 56:1,12 57:4,9,20 58:5 59:7 60:12,14 61:11,14,19 62:7, 20 64:6 66:12 69:10 72:16 73:8, 9,18,20 76:2 78:23,24 79:16, 17,21 80:5,21 81:7,11 82:6,8,20 83:23 89:8,11,15, 16 94:12,17 95:5 96:5,25 97:9,20 98:18,20 99:8,25 100:6 111:3 126:4 128:16 130:12,20, 22 132:1 136:19 138:19 139:1 140:6,9 142:3 143:6,17,18 144:11 145:1 147:22 148:1,14, 19,22 149:19 150:16,23 155:2, 16 156:13 157:3 165:16 166:1,4,7, 12,15,16,20 170:10 171:13,18 182:5 184:2,19 185:4,5,14 187:14,16 192:18, 20,22 193:6,19,23 194:18 200:8,9 201:5,25 204:1 205:17 207:2,4 212:7,14,16,22 213:9 214:21 215:2,8,9,17,19,

25 216:2,22
217:15 218:22
219:10,13 220:1
222:18 223:8
226:5 227:3
229:5,19 231:23
232:2,20 233:14
234:20

**protocols** 24:10,
21 26:13 27:18,19
31:24 32:24 33:4
40:22 47:17 50:24
53:12 82:14 89:4
97:12,22,24 98:2,
9 99:2 100:3
134:20,21 135:8,
24 165:23 193:17
204:2 208:13
209:25 215:15
221:8,24,25
226:21 227:1,6
233:5,8,12,15

**provide** 16:13
17:12 50:21 57:15
126:11 137:7
153:9 199:24

**provided** 10:4
22:1 27:7,9,10,17
35:10 49:8 57:7
67:15 73:2 143:17
151:8

**providing** 16:22
26:14 51:23 72:12
107:19

**provision** 127:9

**proxy** 180:8

**public** 186:6
191:12 201:9

**Punishment** 27:5
171:25 172:3

**purchase** 110:10,
17 150:3

**purpose** 63:22
90:6,8 128:5,6
145:24 179:2
191:15 217:21
223:21,22 226:4
227:2

**put** 81:11 83:13
84:3 93:9 128:5
214:21

---

**Q**

**quad** 232:8

**qualified** 192:1,4
202:3,9 209:19

**quantities** 110:5

**quantity** 110:11
217:1

**question** 19:4
50:1,12 53:21
66:23 74:18
83:15,22,25 91:19
94:5 111:15
127:16 133:7
138:1 146:12
147:16 149:14
181:3 184:25
192:15 193:3
223:11 225:4
234:15

**questions** 6:2,9
24:2 55:19 72:17
82:19 104:3 125:6
126:14 127:17,18
145:16 146:8,14
181:10 219:17
233:25 236:20

**quick** 125:6
169:24 221:11

**quote** 64:14 110:5
155:24

---

**R**

**rationale** 72:8

**re-accreditation**
24:4

**reach** 125:13

**reached** 101:7,14
103:6 105:14
125:8,21

**read** 56:5 92:4
97:24 98:2,9
112:20 137:11
186:15 207:8

**readily** 132:19
134:13 155:24
157:7,8,24 158:7,

9 160:1

**reading** 135:10
136:15 186:18
187:15 223:20
226:21 227:3

**reads** 108:6
112:16

**ready** 129:2

**real** 14:3 221:11

**reason** 6:22 19:12
67:14 115:10,21
116:10 133:18
148:18 165:2
220:14

**reasons** 20:18
43:9 83:19
108:10,11 110:3

**recall** 32:15,17
35:14,15 42:24
53:4,20 55:7 56:8
58:10,18,20 61:1,
12,16 62:23
68:19,21,23 69:14
76:21 80:19 84:21
85:2 87:8 88:14,
23 89:23 90:13,19
95:17 96:1,8 98:8,
11 110:2 111:11
121:9 127:19,22
130:14,21 136:7,
13,22 144:20
146:11 150:9,15
175:8 182:7
191:17 193:12,22
194:19 217:13
218:18 220:22
224:8 231:6 233:9

**receive** 186:17,23

**received** 34:6,11,
24 35:6 56:20,21
136:21 152:6
197:3 210:24

**receives** 191:25

**receiving** 228:21

**recent** 44:10
54:22 215:5

**recently** 76:23
121:15,17 122:3
126:1 160:6,9
171:16

**recipient** 140:20

**recollection** 9:2
33:16 39:19 40:9
57:1 59:6 101:6

**recommend** 24:3
54:24 63:11 89:15

**recommendation**
33:23,25 34:1,4,
21 35:6,16,20,24
36:4,7,24 37:8
38:14,15 39:11
41:4 42:7 44:23
48:8,11,17,19
49:3,7 55:8,10,15
89:17,20 90:1
98:13 156:21
230:1

**recommendation
s** 55:18 98:14

**recommended**
36:14 43:11 90:19
156:18 208:11

**record** 5:4 65:8,
11 75:18 83:8,11,
14 84:3 93:10,23
129:13,16 170:4,7
221:18,21 233:20,
23 236:23

**record's** 71:21

**records** 16:4
108:18,21 109:2,9
191:13,15

**redacted** 91:13,
22,23 112:16,17
113:9 117:11,15,
17 119:18

**redaction** 113:10

**redactions** 91:24

**Reevers** 20:8

**refer** 14:15 91:13,
25 123:4 199:18

**reference** 95:24
158:6 173:10

**referenced** 188:2

**referencing**
164:18

**referred** 187:23

U.S. Legal Support | www.EliteReportingServices.com

189:15

**referring** 135:25 157:24 207:15 220:10

**refresh** 9:1 33:16 59:6 91:2 96:2,3

**regard** 180:25

**regular** 13:4,5 68:9,10 69:20,21 107:8 172:15

**regulate** 160:20 161:16 164:2

**regulations** 117:12,22 118:8

**reiterate** 9:4

**related** 6:18 10:4 183:6,10 209:7

**relates** 16:24

**Relations** 186:6

**relative** 90:9

**relay** 116:19

**release** 16:24

**released** 118:2

**relevance** 82:21

**relevant** 62:9 113:3

**relied** 146:18 147:11 154:16 209:20

**religious** 181:9

**reluctant** 55:17

**rely** 21:1,4,7,9 147:2 166:2 209:18 211:20 228:24 229:8

**relying** 116:18,21 147:11,12 167:17 219:16

**remember** 10:15 28:7,8 29:1 33:6,8 43:3 46:12 58:1,2 59:15 60:1,4,8 61:15 62:13 69:4 95:24 97:19 99:6 155:15 182:1,14,

15 206:20,24 212:23 219:3

**remembering** 212:12

**remove** 167:20

**removing** 167:12

**render** 226:5

**rendered** 212:3 223:2

**rendering** 227:14

**repeat** 49:25 94:4 138:1

**replace** 89:15

**replenish** 138:12

**report** 17:23 18:8, 23 19:9,17 20:24 23:23 118:23

**REPORTER** 237:2,6,10

**reporting** 19:13

**reports** 16:5 18:1

**represent** 5:8,11, 15

**representations** 154:17

**representative** 177:1,10 180:7 181:18

**representatives** 24:1

**represented** 7:4

**representing** 6:7 93:16

**represents** 155:17

**request** 10:18 109:3 138:6 181:9 191:15

**requested** 120:18 137:21,23 138:4

**requests** 7:18 8:18 191:13

**require** 22:10 23:18 211:23

229:16 236:2

**required** 50:16 124:11 188:24 233:2

**requirement** 124:14 211:3

**requires** 23:19

**research** 39:7 45:25 119:3,6,14 121:15 137:10 168:2 209:15,18 232:3

**researched** 121:20 163:22

**researcher** 117:24

**researching** 117:12,21 118:8 147:13

**resources** 16:2 18:6

**respect** 71:15

**respiration** 76:1 77:5

**respond** 145:17 149:14 191:12

**responding** 191:15 207:21

**response** 134:2

**responses** 7:18 10:17

**responsibility** 123:3 197:16

**responsible** 18:15 46:4 104:21 123:1 186:25 187:5 191:2

**rest** 222:22

**restate** 236:11

**restroom** 221:12

**result** 104:24 117:12 118:8 125:12 161:16

**resulted** 58:5 118:1

**results** 117:24

**retire** 25:11

**review** 8:23 9:1, 25 10:3,13,19 31:21 32:24 33:19 44:6 63:8,22 64:18 90:23,24 109:6 127:3 171:16 187:14 191:11 207:4

**reviewed** 7:17,18 8:16,20 10:17 29:10,12 30:15 31:17,18,24 33:9, 22 42:7 47:17 56:9,25 60:14,22 63:4 64:6,11 99:21 134:20,22 135:8,23 171:18 187:11 191:14 233:5,10

**reviewing** 11:6 91:10 112:21 127:4 207:10 209:24

**revise** 184:19 215:7

**revised** 61:20 192:17,20 199:24 211:10 215:5,6

**revision** 185:25 203:8 211:11

**revisions** 46:15 60:25 90:20 185:10,12,24 186:3,4

**revoked** 235:10

**rise** 144:9,14

**Riverbend** 25:17

**RMSI** 197:5

**role** 15:25 16:12 17:5,7,10,18,23 21:11,22 22:3,19 23:15 30:7 31:5 37:4 51:21 65:22 71:9,11,14 101:1 117:8,9 121:17 122:24 127:1 139:8 147:20 171:4 183:18

Case 3:18-cv-01234-Document 195 Filed 04/05/22 Page 260 of 266 PageID #: 1302
EliteReportingServices.com
www.EliteReportingServices.com

184:5,10,12
186:24 197:11
200:4 202:6
204:14

**roles** 15:23 19:19
26:9,12 29:24
64:22 86:24
100:22 170:16,18
185:20 186:4
190:15 198:6

**room** 26:23 27:2,
4,5 64:17 65:6
78:4 84:9 171:24
176:6 187:14
198:12

**rooms** 176:9,11

**roster** 191:19

**rough** 28:20 45:9

**roughly** 24:5 28:6
32:1 33:8 43:20
44:17 45:6 51:24
59:12 99:17
101:24 151:4
172:13,16 175:21
182:7

**rule** 201:16,22

**run** 65:5

**run-throughs**
187:25

---

**S**

**SAITH** 237:11

**salary** 21:23

**saline** 206:17

**scarce** 140:1

**scenario** 178:7,
19 179:4 213:19
224:15

**Scheduled**
155:21

**school** 11:17
12:22,23,25 13:4

**science** 194:23

**scientific** 12:20

**Scott** 5:14

**scratch** 80:20
147:24 185:15,17
217:17 233:5

**screen** 172:13,15,
21,25 173:17,25
174:4,22 175:2,23

**search** 104:19
105:21 106:9,13,
19 107:3 111:7,9,
12,21 114:16,19,
20 128:8 131:4
133:17,18 137:17,
18,22 138:5
139:12 143:7
146:21 147:7,13
150:4 157:18
160:6

**searches** 105:22

**searching** 110:15
137:13 154:21,23
156:6

**secondary**
216:15 218:14
219:8 222:21

**secondhand**
116:19

**seconds** 9:9
127:2

**secretary** 191:6

**section** 62:2,3,14
184:6,7 185:8,9,
14,18,19,25 187:9
188:7 189:15
191:23 192:16
201:9 202:16
206:14 207:6,9
208:7 215:11

**sections** 61:20,
21,22 62:6 184:18
202:25 203:1
215:4

**security** 29:20
170:20 176:1
201:10

**sedation** 209:14

**seek** 21:13 84:1
120:12,15 213:11

**seeking** 125:9
206:2

**selected** 206:25

**sell** 115:14

**send** 60:24

**sensate** 225:14

**sentence** 16:3,
16,19,20,22,23,25
17:8 63:4,6 91:21,
24,25 105:19
108:6 111:7
117:15 119:20
134:12,19 149:9
150:2 154:20
157:5 200:25

**sentences** 16:21
155:4

**separate** 15:23
32:4 51:11 172:5

**September**
129:20 131:15
132:13 140:13

**served** 26:2

**services** 198:20
201:2

**session** 189:17

**sessions** 188:9
189:6

**set** 89:25 164:8
198:21 199:19,22
200:15 201:3,11
216:16,20 217:23
223:1

**sets** 149:23

**setting** 113:6
228:4

**settings** 229:12

**severe** 225:10

**share** 92:7

**shared** 92:12
159:19 162:20

**shipment** 199:13

**short** 65:3,9 83:9
128:17 170:5
221:19 233:21,25

**shorter** 128:21

**show** 172:25

**showing** 174:6

**shut** 126:8,14

**sic** 31:11 200:19

**side** 175:5,6,14

**signature** 59:1

**similar** 13:20 42:5
47:18 55:6

**simple** 73:21,23
79:24 235:25

**simpler** 73:25
74:22,24 75:2
78:24 79:13

**simply** 39:11
124:24 187:15

**simulates** 188:5

**simulation**
190:13

**single** 66:4 73:17
98:6 150:7 175:9

**single-drug** 73:8,
20 156:13

**sit** 58:16 208:15

**site** 175:15

**sitting** 103:3
142:6,9

**situation** 42:6
123:24 179:18

**size** 172:16

**skipped** 150:2

**slow** 78:8

**slower** 76:15

**small** 200:19

**sodium** 28:10,13,
17 29:4,8 30:16
41:16 42:2 43:16
46:15 82:15
100:2,3 118:2
120:3 140:15
161:14,17

**sold** 123:11

**sole** 123:1 195:4

solely 227:3

Solutions 16:8

someone's 16:25
31:6

sort 13:17 27:25
30:22,23 47:12,14
55:16 58:4
123:12,23 124:15
127:1 201:8 204:1
214:2 227:4

sought 156:21

sound 182:12

sounds 45:1,4
69:22 92:23
152:21 155:13

source 39:14
67:12 91:23
92:13,19,23 96:20
105:21 125:10
126:13,15 151:7
157:23 194:20

sources 55:20
67:14 103:23,25
106:3 107:9
108:8,19 109:13,
14 110:4 135:21

South 103:14

speak 32:14
47:15 68:8 69:19
71:18 81:18 148:8
178:16 180:15
189:25 214:15

speaking 93:22

speaks 180:13

special 12:24
13:16,18 15:1
22:10 23:5 191:23

specialize 13:2

specific 9:2 13:11
40:16 44:21 53:21
61:20,21 62:24
69:5 70:12 76:22
86:23 87:3
100:20,25 103:19
104:3,7,11 113:12
124:14 128:2
133:7 138:10
144:20 146:12

161:5 178:7
181:16 187:22
199:2 213:9 217:7
223:23

specifically 8:22
10:15 45:24 46:3
55:8 56:17 58:11
59:18,21 60:8
68:24 77:11,20
81:5 84:21 92:12
105:17 120:2
173:22 193:13
204:21 206:11,21
210:15

specifications
39:14

specifics 106:1
131:8 132:20
153:22

speculate 69:5
135:19

speculating
60:18

speculation
132:16

speed 76:10

speeds 75:25
76:6,25

spelled 184:1

spent 11:3,4

spoke 54:14 68:6
105:13 137:4
209:21 221:23

spoken 80:20,24
149:6 235:5

spot 61:2

spotty 139:23

squad 231:2,5,8,
11,14,16,18,24
232:13

squeeze 225:11

stabilize 205:25

standards 209:7,
10 210:7

stands 192:19

start 149:10,11,17
150:20 151:9
187:16 217:22

started 15:14
23:1 25:21 28:2,3
52:1 176:2 205:10
215:24

starting 154:20
176:2 180:23
217:17 220:8

state 5:8 14:13
22:23 36:20 49:21
50:4,16,25 74:19
80:17 86:16 90:9
91:14,16,17 92:13
94:9 95:13,14
97:20 100:17
101:11 102:15
103:25 107:13
145:25 157:22
165:15 232:18

state's 94:10
193:19,23 194:18
227:3

statement
114:11,22,25
141:23,24

statements 116:2
127:20

states 29:7 33:3,
7,8,16 38:1,4 42:3
43:1,3,12,13 55:6
56:1,21 57:18
79:22 80:14 92:22
93:5 94:7,11,22
95:5,17,20 96:4
98:1,11,25 99:3,7,
10,13 100:13
101:7,14,18,23,24
102:2,23 103:5,19
104:2,10,12
109:24 112:19
115:6 125:8,20
127:11 130:25
132:17 134:20
135:21,24 136:9
139:3 141:20
148:15 157:21
160:21 162:15
165:21,25 166:3,
6,12 167:15,20
182:25 221:24
222:6 230:19

231:1,4 233:6,11

states' 32:24
47:17 80:9 97:12,
24 134:21 135:8
136:19 193:16
221:23 226:21
233:4

status 70:4

statute 83:18

statutory 50:9

stay 15:9

step 22:18 127:10

Stephanie 20:8

steps 79:20 117:3
188:6 190:13
203:16

stimulus 207:21

stipulation 9:14

stop 143:7 201:4

stopping 76:1,7
214:6 221:11

stops 77:5

storage 197:2,18
198:2,7

Strategic 16:8

strokes 73:16

strong 135:12

STS 16:8

studied 12:5

stuff 134:13,14
145:23 146:4

subject 12:5
86:11 164:10

subjects 13:2
135:13

subsequent
144:16 145:19

subsequently
123:5 125:21,24
133:13

substance 20:16
71:22 73:1

**substantive** 186:3

**substantively**
62:13 192:17
203:4 215:5 216:9

**subsumed** 9:6

**success** 124:7

**successful** 80:6
136:19 162:15
222:8,12,23,25
223:5

**successfully**
38:2,5 136:8
139:2,19 148:15
166:4 221:25
222:3

**sufficient** 110:5
155:14 230:8

**suggest** 35:7,9

**suggested** 34:7
36:2 41:22 78:23

**sulfate** 164:12

**summer** 182:9
211:17

**Sundquist** 26:7

**supervision**
19:11

**supervisor**
170:20

**supplement**
236:12

**suppliers** 112:2,6

**supplies** 107:17
127:11

**supply** 93:5 94:7,
10,16,18 104:20
105:3 112:7,18
115:5,14,15
125:11 133:13
138:13 140:14,15
149:19 150:22

**support** 16:5 18:5
81:6 149:19
205:22

**suppose** 164:25

**surgeon** 32:12

**surgery** 228:21
229:21 235:10

**surprise** 85:3,7

**surrounding**
136:1

**suspect** 131:6

**Sutherland** 5:13,
14 7:6,21 8:5 9:3,
9,15 14:21 19:3
20:13 22:4 24:11
25:1 28:23 29:16,
18 30:3,18 31:2,4
34:18 35:21 36:15
37:1,14,23,25
38:19,21 40:6
45:17 46:1,8,23
47:6,20 48:2,9,21
49:5,15,23 50:6,
18 53:2,19 54:7
55:1,23 56:6,13,
16 57:5,11,23
58:6 59:8,17 60:6,
16 61:3 62:21
63:15,24 64:8,20
65:4,15,20,23
66:1,18,22 67:9,
16,23 69:2,11,25
70:9,17 71:1,20
72:9,14,23 73:10,
19 74:2,12,16,23
75:6,11,14,17,22
76:9 77:1,8,18
78:1,9,20 79:2,4,
7,12,18 80:3,11,
22 81:3 82:3,10,
18,22 83:1,6,12,
15 84:10 85:5,17
86:1,6,13,21
87:13,21,23 88:3,
20 89:21 91:4,7,
15 92:1,9,17 93:1,
7,20,24 94:2,13,
24 95:7,21 96:6,
18 97:1,10,13,18
98:16,22 99:4
101:10 103:1,8,
18,22 104:1,8,25
105:5,9,24 106:21
107:5,14,22
108:3,14,22
109:4,15 110:14,
24 111:13,22
112:3,24 113:11,

17 114:1,13,24
115:9,20 116:15
117:7,18 118:11,
16,24 119:4,15,25
120:7,16 121:7,22
122:2,7,13 123:20
124:4 125:2,18
127:6 128:1,14,
22,25 129:8,10
130:1 131:20
132:14 133:1,22
134:4,16,23
135:17 137:25
138:7 139:16
140:7,18,24 141:6
142:1,17,21
143:10,24 145:6,
21 146:10,17
147:15 148:2,12,
24 149:12 150:8,
13 151:19 152:3,
14,18 153:3,11,18
154:2,7,24 155:11
156:1,8,14,23
157:10,15 158:4,
20 159:9,15 160:8
161:9 162:2
163:6,10 164:16,
22 165:9,13
166:13 167:5
168:9,19 169:1,4,
8,12,20,25 171:11
173:2,19 174:24
176:18,23 177:23
178:5,14,21
179:10,16,25
180:10,20,23
181:4,14,20
183:24 184:13,21,
24 186:19 187:3,
17 189:24 190:5,9
192:12 193:1,10,
20 194:11 195:6,
20 196:11 197:12
198:8,25 199:9,
14,20 200:16,20
201:6 202:4,11,19
203:12,24 204:7,
12,19 205:15,23
206:19 207:13,19
208:3 210:8,19,25
211:18 212:1,9
213:7,21 214:7,
17,25 215:10,18,
21 217:5 218:3,
21,25 219:3,22

221:1 222:13
223:9,17 224:13
225:3,16,23
226:3,10,17,23
227:22 228:11,23
229:6 230:5,14
231:25 232:25
234:14,21 235:1
236:4 237:8,9

**switch** 175:14
216:15,23

**switched** 156:12
222:21

**switching** 218:13
219:8 220:4,10,14

**sworn** 5:25

**syringes** 198:21
201:3 216:17
217:23

**system** 15:10
217:25

**systems** 12:6
170:21

---

**T**

**table** 61:24

**tabs** 123:24

**takes** 21:3 197:15

**taking** 6:8

**talk** 9:21 10:10
68:12,15 82:12,13
83:2 86:15,24
96:4 109:24 114:5
116:7 135:4,7
153:21 157:23
159:12 208:11
236:14

**talked** 31:22,23
43:7 44:22 45:1
47:13 57:17 69:8
75:3 83:14 95:5,
15,18,23 96:10
99:22 101:17
219:7 227:19
228:3

**talking** 33:7 51:25
68:23 70:13 74:19
82:15 147:7

159:18,19 168:19
173:3 180:20
189:14 194:11
200:17 203:14
204:20 210:4
215:21 218:21,23
223:20

**talks** 20:14 169:17
228:16

**taped** 205:22

**taping** 206:6

**TDOC** 14:16,18,
20 15:15 18:13,
19,22 19:9,14,24
21:20 22:22 24:8
25:4,8,21,24
37:12 45:3 46:13,
22 48:19 52:25
53:6 54:5,23
65:13 67:4 70:6
75:20 78:18 87:6
97:15 98:21
107:18 108:12,21
112:6 113:25
118:19,23 122:10
125:13,17 128:10
131:2 135:15
136:12 139:15
143:7 147:20
149:2,16 150:19
151:6 152:1,23
153:2 155:9 160:6
161:2 162:6 163:5
164:20 165:2,7,
22,25 166:1
167:12 168:4,13,
16 169:3,16
181:18 189:22
193:15 196:4,7
229:14 231:14,24
232:11,16,23

**TDOC's** 54:14
70:25 147:19

**team** 9:23 15:2
23:3,6 26:19
30:14 31:11 33:19
36:14 170:12,22,
24 171:1 186:12,
14,16,17 188:5
190:4 192:11
197:3,6 198:1,3,4,
6,23 199:18
208:19 210:6,9,10

213:5,19 222:21
228:1 234:3,9,12,
19,25

**technically**
157:7,8 159:25

**technician**
170:21

**technicians**
171:3

**Technology** 16:8

**telephone** 180:6

**telling** 197:5

**ten** 33:13 45:11

**Tennessee** 5:14
6:18 10:5 11:23
14:13 24:21 26:4
27:8,12,15 28:2
51:7 65:14 166:7
171:23 182:4,18,
23 212:6,22
231:11

**Tennessee's**
24:10 26:9,12
89:4 100:14

**terms** 69:16 113:2
145:25 161:14
235:20

**Terre** 100:11

**Terry** 5:12 6:7

**test** 108:1

**tested** 80:6 139:2,
19 196:20

**testified** 5:25
84:5 95:4,19
118:21 144:1,22
167:8 171:22
182:22 185:3
194:19

**testify** 6:22 52:23
104:10 124:22
219:7 234:1

**testifying** 96:1
219:4

**testimony** 81:6
236:8

**Texas** 94:14 95:6

102:25 117:25
118:1 120:2

**thing** 47:16 62:12
76:16 169:11
203:4 210:5
226:15 233:10

**things** 15:11 16:7,
14 20:12 35:11
62:11 70:20 84:11
146:8 149:25
186:10 208:12
219:18 222:16

**thinking** 6:15
15:6

**thinks** 100:16

**thiopental** 28:10,
13,17 29:4,9
30:16 41:16 42:2
43:16 46:16 82:15
100:2,4 118:2
120:4 140:15
161:14,17

**Thirty** 24:17

**thought** 52:24
98:21 102:6 148:7
149:5

**thousand** 217:15

**three-drug** 34:9
36:11,13 37:13
38:5 41:5,8,13
44:19 49:12,22
50:5 52:2,17
54:24 78:24
79:16,21 81:7
89:8,15 98:9
100:3 128:16
143:6,18 144:11
145:1 148:1 166:6
204:1 212:7,14,15
215:8,14,25
217:14 219:13
227:6 234:20

**threshold** 110:11

**tilt** 175:18

**time** 5:5 6:9 7:9
10:20 11:2,4 15:6
28:20 29:25 31:14
32:19,25 34:1
41:15,17 42:19
43:4,17,25 44:10

46:12 47:13,15
52:1,16 53:14,24
54:22 55:14 65:8,
11 68:6 69:8 83:8,
11 89:12 99:25
100:6,8 101:21
102:19 103:7
121:19 126:6,22
128:18 129:9,13,
16 131:1,4,5
139:8,25 141:12,
14,24 143:8
151:6,13 154:23
156:10 161:17
163:22 170:4,7
177:5,7 182:18
184:15 191:20
197:21 206:22
210:2,23 212:8,
15,19 215:2
216:13 219:12
221:18,21 227:12
233:20,23 236:19,
25

**times** 6:10,13
7:17 8:8 20:4 24:5
31:22 92:21
165:20 167:12

**timing** 134:5

**title** 15:20 30:20
42:14 186:5,9

**titles** 17:15 29:23
62:10

**today** 5:4,17 6:9,
23 7:4 8:21,24
10:22 15:20 90:25
95:2 103:3 119:17
121:13 142:9
165:20 171:8
208:15 212:12
236:9,15,19

**today's** 7:15

**told** 78:7 101:2
112:10 115:13
157:14 161:7,10
162:12 182:11
221:5 223:25

**tomorrow** 151:25

**Tony** 5:16

**top** 21:23 140:14
143:3 186:12

213:2

**topic** 24:24 76:22
154:10 192:6

**topics** 20:20
119:14

**Tory** 19:1

**total** 11:2 23:7
44:17 102:18
170:23 171:18
188:11 216:17
217:16

**touch** 204:5,10
233:18 234:24
235:3

**touched** 232:15

**tough** 25:19

**tour** 230:19

**toured** 182:25
230:18

**train** 213:19,23

**trained** 13:12
210:6,13,14,16
211:4,6,16 234:1

**training** 12:9,18,
24 13:9,16,21,23
16:6 22:10,12
27:7,10 77:22
167:3 186:12,23
189:13 191:1,10,
18,20 199:2
202:15 210:24
211:23

**trainings** 189:8

**trains** 210:17
234:5

**tranquilizer**
141:8

**transcript** 237:3

**transcripts** 9:25
10:3

**transparency**
201:8

**transporting**
197:16

**trapezius** 208:13
211:10 225:10

**trouble** 27:21
139:23 157:21
212:12

**true** 167:11

**truthfully** 6:23

**turn** 58:23 84:15
90:21 129:18

**turned** 41:3
108:25 109:9

**TV** 26:25 78:5
81:25 84:8 177:22
179:7

**two-drug** 76:2

**two-minute**
233:17

**type** 12:9,15 51:19
190:7 194:8 206:2
208:7

**typed** 57:9,10,13
60:11,13,15

**types** 148:17

**typing** 58:17
187:7

**typographical**
186:2

---

**U**

**Uh-huh** 6:21 8:1,
17 12:4 40:21
52:18 59:5 110:8
134:11 150:5
171:21 172:7,24
174:20 175:11
177:15 178:12
180:22 183:21
184:9 186:13
189:7,9 192:2
199:7 219:2
230:22

**ultimately** 17:1
35:18,19 52:3
191:4 219:12

**un-redacted** 92:4
119:17

**unable** 28:9

**unavailability**

43:15 44:4

**unavailable** 29:9
42:3 73:14

**unconscious**
207:11 222:19

**undergraduate**
11:18

**understand**
30:15 44:24 54:9
72:22 84:10 94:2
96:9 97:6 104:8
146:9,15 179:6
186:1 189:16
225:20

**understanding**
36:19 40:3,4 43:8
67:1,12,25 68:3
77:4,7 95:15
105:21 106:2,18
123:7 127:8
137:20 143:15
148:14 153:12
154:12 159:22,24
160:2,16 163:25
184:5 189:5,23
190:4 195:17
207:25 218:8
219:24 223:6
235:25

**understood**
93:24 116:23
187:11

**undertaken**
117:13

**underway** 133:19

**Unit** 27:5 171:25
172:3

**United** 29:7
112:18 115:6
141:20

**University** 11:22

**unknown** 214:3

**unlike** 42:19
47:12

**unresponsive**
207:18 224:1

**unresponsivene
ss** 208:1 223:7,16

**unsuccessful**
105:1 120:3,20
122:18

**unwilling** 91:22
92:8

**update** 121:9
122:6 128:6

**updated** 124:12
186:10 199:22
200:2 203:8
211:23 216:10

**USP** 154:21

**Utah** 231:3 232:8

---

**V**

**vacated** 22:18

**vague** 42:17
101:5

**Vanderbilt** 11:15

**variety** 13:16

**vary** 181:10

**vast** 20:23

**vecuronium**
70:24 71:8,15
89:9 106:13,19
130:18 143:6
169:7 195:15,18
224:24,25 225:8,
15 230:3,12

**vein** 167:1 178:11

**venous** 166:24

**version** 48:1
201:14

**versions** 41:1
202:22 203:3,19

**versus** 37:12 75:3
207:18

**viable** 228:14

**victim's** 181:11

**video** 5:5 175:22

**view** 172:10 173:6
175:3,5,6,9,14
176:10

www.EliteReportingServices.com

views 173:21
174:3,6

violation 108:2

Virginia 95:16,25
99:14 166:9
230:20

Virginia's 99:25

visit 99:15 100:21
161:21

visited 99:10
100:9,13,17

visits 100:15

volunteer 14:7

volunteered
109:21

volunteering
124:17,24

volunteers
190:15,17,23

_____

**W**

wait 206:15

waiting 206:18

wake 225:13
230:3

walk 27:25

walk-throughs
188:18

wanted 132:7
149:18 150:21,22
155:13 156:9
219:20

warden 7:18
29:20 30:9 31:9
42:16 60:20 63:18
175:25 176:1
187:10 190:1
191:4 197:4,7
198:10 205:3,7,8
206:15 210:13,17,
23 211:4,15,20
213:10 214:5
234:2,5

warden's 171:25
172:9 173:25
174:15,23 176:12,

17,21 177:13,19
180:4 181:6 191:6
213:16

wardens 25:17
227:16

watch 174:8
188:6

watching 175:2
177:21 179:6

water 7:11

ways 30:13,23
209:13 228:14,16

wearing 17:10

Wednesday 5:4

week 8:13 10:20
20:4 68:16 131:15

weeks 10:11
68:24

when's 68:6 69:8
121:19 163:22
197:21 210:23

wholesalers
108:9

willingly 232:21

willingness
127:13

witnessed 26:21
27:14 77:24 80:16
84:5 231:7

witnesses 83:18
84:7

woke 224:12

woken 224:24

woman 230:2

won 118:5

wondering
200:24

word 129:22
143:4

words 128:5
160:3

work 12:13,14
14:25 19:2,22
110:4 132:19

226:6

worked 108:9
226:21

working 19:13
33:20,21 36:2
37:7 38:13 39:7,
23 41:20 42:6,8,
18,20 44:6,8
47:13,14,23 52:4
53:6,8 54:5 55:13
76:22 118:22
166:19,21

works 66:8,10

wow 12:7

write 84:22 85:8
130:3 185:15

writing 213:3

written 198:23

wrong 130:16

wrote 85:4 135:2

_____

**Y**

year 11:16,24 24:5
28:7,8 29:1
123:13 126:2
182:21 188:13,17
216:4

years 17:18,20
22:13 23:7,9,14,
22 24:9,17,20
25:9,10 40:20
41:7 46:14 58:1
59:13 77:12 99:5,
16,17 118:5 125:7
137:4,5 188:14
197:22,24 215:5
219:11,15 226:25
227:16

yesterday 68:13

you-all 82:12

young 15:7

_____

**Z**

zoom 175:15,18,
20,24

zoomed 174:10
175:10

zooming 174:11

Case 3:18-cv-01234-Document 195-1 Filed 04/05/21 Page 266 of 266 PageID #: 1368
EliteReporting Service of Tennessee, LLC
www.EliteReportingServices.com