# EXHIBIT 20

**In The Matter Of:**

*TERRY LYNN KING vs*
*TONY PARKER, et al.*

---

*VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF PHYSICIAN*
*October 12, 2021*

---

*Gibson Court Reporting*
*606 West Main Street*
*Suite 350*
*Knoxville, TN 37902*



Min-U-Script®

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF PHYSICIAN

October 12, 2021

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


TERRY LYNN KING,                        )
                                        )
          Plaintiff,                    )  CAPITAL CASE
                                        )
vs.                                     )  CASE NO.
                                        )  3:18-CV-01234
TONY PARKER, et al.,                    )
                                        )
          Defendants.                   )


APPEARANCES:

              FOR THE PLAINTIFF:

              ALEX KURSMAN, ESQ.
              LYNNE LEONARD, ESQ.
              ANA BALDRIGE, ESQ.
              HAYDEN NELSON-MAJOR, ESQ.
              Assistant Federal Defenders
              Federal Community Defender Office
              for the Eastern District of Pennsylvania
              601 Walnut Street, Suite 545W
              Philadelphia, Pennsylvania  19106

              JEREMY GUNN, ESQ.
              Bass, Berry & Sims PLC
              150 Third Avenue South, Suite 2800
              Nashville, Tennessee  37201

              SCOTT C. SUTHERLAND, ESQ.
              DEAN S. ATYIA, ESQ.
              CODY N. BRANDON, ESQ.
              Tennessee Attorney General's Office
              P.O. Box 20207
              Nashville, Tennessee  37202


ALSO PRESENT: David Jenkins, Videographer
              Jules Welsh, Esq.

**Gibson Court Reporting**

S T I P U L A T I O N S

The videotaped videoconference deposition of PHYSICIAN, called as a witness at the instance of the Plaintiff, taken pursuant to all rules applicable to the Federal Rules of Civil Procedure by notice on the 12th day of October, 2021, at 10:00 a.m., before Rhonda S. Sansom, RPR, CRR, CRC, Licensed Court Reporter, pursuant to stipulation of counsel.

It being agreed that Rhonda S. Sansom, RPR, CRR, CRC, Licensed Court Reporter, may report the deposition in machine shorthand, afterwards reducing the same to typewriting.

All objections except as to the form of the questions are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, et cetera, including the reading of the completed deposition by the witness and the signature of the witness, are expressly waived.

```
 1                    I N D E X

 2               E X A M I N A T I O N S

 3

 4    PHYSICIAN                                    PAGE

 5    Examination by Ms. Nelson-Major               6

 6

 7                    E X H I B I T S

 8

 9     No.              Description               Page

10     80  Agreement Between the Tennessee
           Department of Correction and [Redacted]
11         re Provider
           Bates Ds' First Resp. to RFP 000170-171   28
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Gibson Court Reporting**

1           THE VIDEOGRAPHER:  We're on the record at

2      10:00 a.m. Eastern Standard Time on October 12th,

3      2021.

4           This is the video deposition of Physician

5      taken remotely via Zoom in the matter of Terry

6      Lynn King versus Tony Parker, et al., Case No.

7      3:18-CV-01234, filed in the U.S. District Court,

8      Middle District of Tennessee, Nashville Division.

9           Counsel will state their names and

10      affiliations for the record, and the court

11      reporter will swear in the witness.

12           MS. NELSON-MAJOR:  Good morning.  My name

13      is Hayden Nelson-Major.  I'm with the Federal

14      Community Defender Office for the Eastern District

15      of Pennsylvania.  I represent the plaintiff in

16      this matter, Terry King.

17           Also on the Zoom today from my office is

18      Lynne Leonard, Ana Baldrige, and Alex Kursman.

19           Also from my office is Jules Welsh, a new

20      attorney with our office who is not representing

21      Mr. King but is just joining to observe today for

22      educational purposes.

23           And lastly, also representing Terry King

24      is Jeremy Gunn with Bass, Berry & Sims.

25           MR. SUTHERLAND:  Good morning.  Scott

```
 1        Sutherland with the Tennessee Attorney General's

 2        Office.  We represent the defendants in the case,

 3        Commissioner Tony Parker and Warden Tony Mays.

 4             And we also represent the Physician here

 5        for the purposes of this deposition.

 6             Also present on the record are Dean Atyia

 7        and Cody Brandon with our office.

 8             And I think that's it, Ms. Nelson-Major,

 9        other than I assume we're going with the standing

10        process of objection to form.  We will reserve all

11        objections as we have in our other depositions,

12        except objections based on privilege.

13             MS. NELSON-MAJOR:  Yes, that's fine by

14        me.

15             MR. SUTHERLAND:  All right.  And ready

16        when you are.

17             THE COURT REPORTER:  At this time, I'll

18        place our witness under oath.

19             (Technical pause.)

20             THE WITNESS:  I've lost audio.

21             MR. SUTHERLAND:  Are you able to hear?

22             THE WITNESS:  Yes.

23             MR. SUTHERLAND:  You can hear.

24                  PHYSICIAN,

25   having been first duly sworn, testified as follows:
```

```
 1                    (Discuss off the record.)

 2                    THE VIDEOGRAPHER:  We're back on record

 3            at 10:06 a.m.

 4                          EXAMINATION

 5   BY MS. NELSON-MAJOR:

 6            Q.       Good morning, Physician.  As I said, my

 7   name is Hayden Nelson-Major.  I'm an attorney with the

 8   Federal Community Defender Office located in

 9   Philadelphia, Pennsylvania.  I represent Terry King,

10   the plaintiff in this matter of King versus Parker

11   currently pending in the Middle District of Tennessee.

12                    Thank you for taking the time to answer

13   these questions today.

14                    You understand you're here today to answer

15   questions related to the King case, right?

16            A.       Yes.

17            Q.       What is your understanding of what that

18   case is about?

19            A.       I'm not sure if I know.

20            Q.       I would like to cover a couple of ground

21   rules before we get started.  Have you ever had your

22   deposition taken before?

23            A.       Yes.

24            Q.       How many times?

25            A.       Two or three.
```

```
 1          Q.      And when did those depositions occur?
 2          A.      Over the past 40 years.
 3          Q.      And when was the most recent deposition?
 4          A.      Guesstimating, 2006.
 5          Q.      And what were those cases about?
 6                  MR. SUTHERLAND:  I'm going to --
 7          Ms. Nelson-Major, I'm going to have -- instruct
 8          the Physician to be very general in his
 9          description of the cases.
10                  So you can give a general description of
11          the cases.  And my instructions are based on the
12          Court's protective order.
13  BY MS. NELSON-MAJOR:
14          Q.      You can go ahead and answer, Physician.
15          A.      In some cases, there was a complication
16  from treatment rendered.  In other cases, I testified
17  for the plaintiff.
18          Q.      Were they medical malpractice cases?
19          A.      Yes.
20          Q.      Were you the defendant in any of those
21  cases?
22          A.      Yes.
23          Q.      And in how many of those two or three
24  cases were you the defendant?
25          A.      Two.
```

```
 1          Q.      And what were the outcome of those two
 2    cases?
 3          A.      I didn't go to trial.  We settled out of
 4    court.
 5          Q.      Physician, I'm having a hard time hearing
 6    that.  Could you repeat your answer, please?
 7          A.      Settled out of court.
 8          Q.      Did both of the cases settle out of
 9    court?
10          A.      Yes.
11          Q.      And was the plaintiff awarded monetary
12    damages?
13          A.      I assume.
14          Q.      I'm sorry, did you say "I assume?"
15                  MS. NELSON-MAJOR:  Rhonda, are you having
16          a hard time hearing the Physician's answers?
17                  (Discussion off the record.)
18                  MR. KURSMAN:  This is Alex Kursman.  Can
19          we go off the record again?
20                  THE VIDEOGRAPHER:  We are off the record.
21                  (Discussion off the record.)
22                  THE VIDEOGRAPHER:  We are back on record
23          at 10:14 a.m.
24    BY MS. NELSON-MAJOR:
25          Q.      The two medical malpractice cases that
```

**Gibson Court Reporting**

1  settled out of court, did either one involve issues
2  related to the setting of IV lines?
3         A.     No.
4         Q.     Did either involve issues related to
5  determining a patient's consciousness?
6         A.     No.
7         Q.     And did either involve issues related to
8  pronouncing death?
9         A.     No.
10        Q.     Have you ever been deposed about your
11 role in executions conducted by Tennessee?
12        A.     No.
13        Q.     And do you understand that you're under
14 oath today?
15        A.     Yes.
16        Q.     Is there any reason you cannot testify
17 truthfully or accurately today?
18        A.     No.
19        Q.     And are you represented by counsel?
20        A.     Not personally.
21        Q.     And even though this deposition is being
22 taken over Zoom, the court reporter is making a record
23 based on what you say.  If you don't understand a
24 question, just let me know and I'll try my best to
25 clarify the question.  However, if you answer a

```
 1    question I will assume you understood.
 2              If you need to take a break at any time,
 3    let me know.  I'll just ask that you answer any pending
 4    questions before we take a break.
 5              Mr. Sutherland may object to my questions
 6    from time to time, but you will need to answer unless
 7    the objection is based on an assertion of privilege.
 8              Is there anyone else in the room with you
 9    today?
10         A.    No.
11         Q.    What did you do to prepare for the
12    deposition today?
13         A.    Reviewed some documents and had a meeting
14    with the Attorney General's Office.
15         Q.    And when did you have that meeting with
16    people from the Attorney General's Office?
17         A.    Within the last two months.
18         Q.    Was it just one meeting?
19         A.    Possibly two.
20         Q.    And who was present at those meetings
21    from the Attorney General's Office?
22         A.    Rob Mitchell and Scott Sutherland come to
23    mind, along with others.
24         Q.    And were all the other people present
25    also with the Attorney General's Office?
```

```
 1          A.      As far as I know, yes.

 2          Q.      And how long did those meetings last?

 3          A.      20 to 30 minutes.

 4          Q.      And what documents did you review?

 5          A.      A contract, the protocol.  That's all

 6   that I recall.

 7          Q.      Did Mr. Mitchell and Mr. Sutherland

 8   provide you with those documents?

 9          A.      I had the contract, and the protocol was

10   reviewed via Zoom.

11          Q.      Did you review any other materials to

12   prepare for the deposition today?

13          A.      Could you repeat your question?

14          Q.      Did you review any other documents in

15   preparation for today's deposition?

16          A.      The Hippocratic Oath.

17          Q.      And why did you review the Hippocratic

18   Oath?

19          A.      In case there were any questions

20   pertaining to it.

21          Q.      Did you meet with anyone else other than

22   personnel from the Attorney General's Office in

23   preparation for today?

24          A.      No.

25          Q.      Did you review transcripts from any of
```

 1   the other depositions taken in this case?

 2        A.      No.

 3        Q.      Did you discuss this deposition with

 4   anyone other than Mr. Sutherland and Mr. Mitchell?

 5        A.      No.

 6        Q.      And how much time in total do you

 7   estimate that you spent preparing for today?

 8        A.      Approximately three or four hours.

 9        Q.      And besides those meetings and reviewing

10   the three documents you listed, what else did you do

11   during that three and four hours?

12        A.      Listened attentively.

13        Q.      What is your highest level of education?

14        A.      M.D.

15        Q.      When did you earn that degree?

16        A.      19- --

17              MR. SUTHERLAND:  I'm going -- I'm going

18         to instruct the Physician not to answer the

19         specific year.  But he can give approximately how

20         many years ago.

21              THE WITNESS:  Approximately 40 years ago.

22   BY MS. NELSON-MAJOR:

23        Q.      And did you complete any coursework

24   subsequent to medical school?

25        A.      I do not understand the question.

```
 1          Q.      Did you have any other training beyond
 2   medical school?
 3          A.      Yes.
 4          Q.      And what was that?
 5                  MR. SUTHERLAND:  You can describe it
 6          generally.
 7                  THE WITNESS:  A residency training.
 8   BY MS. NELSON-MAJOR:
 9          Q.      In what field of medicine was your
10   residency training?
11                  MR. SUTHERLAND:  You can answer the
12          question.
13                  THE WITNESS:  General surgery.
14   BY MS. NELSON-MAJOR:
15          Q.      Do you hold any professional licenses?
16          A.      No.
17          Q.      Do you hold a medical license?
18          A.      Yes.
19          Q.      Is your medical license active?
20          A.      In which state?
21          Q.      I'm not going to ask you to identify a
22   state.
23                  MR. SUTHERLAND:  The question is, you can
24          answer if you have a valid license to practice
25          medicine.
```

```
 1                    THE WITNESS:  Yes.
 2    BY MS. NELSON-MAJOR:
 3          Q.       Do you have a valid medical license to
 4    practice medicine in more than one state?
 5          A.       No.
 6          Q.       Do you have medical licenses in other
 7    states that are no longer active?
 8          A.       Yes.
 9          Q.       And generally, what is your medical
10    specialty?
11          A.       General practice.
12          Q.       And when you say "general practice," is
13    that family medicine?
14          A.       Basically.
15          Q.       And do you hold any certifications?
16          A.       No.
17          Q.       Are you Board certified in any particular
18    medical field?
19          A.       No.
20          Q.       Do you have any military training?
21          A.       No.
22          Q.       Do you participate in any volunteer
23    programs?
24          A.       Not currently.
25          Q.       Are you currently employed?
```

**Gibson Court Reporting**

```
 1          A.      Yes.
 2          Q.      Can you generally describe to me the type
 3   of institution at which you currently practice
 4   medicine?
 5          A.      A primary care clinic.
 6          Q.      And what is your current job title?
 7          A.      Physician.
 8          Q.      And how long have you held that position?
 9          A.      Over ten years.
10          Q.      You're not an anesthesiologist; is that
11   correct?
12          A.      Correct.
13          Q.      Do you have any specialized training in
14   anesthesiology?
15          A.      No.
16          Q.      What about pharmacology?
17          A.      The general training that all physicians
18   get.
19          Q.      And what was your employment prior to the
20   outpatient clinic at which you currently work?
21                  MR. SUTHERLAND:  You can just -- you can
22          answer generally.
23                  THE WITNESS:  Self-employed.
24   BY MS. NELSON-MAJOR:
25          Q.      What do you mean by "self-employed?"
```

 1          A.      I had my own practice.

 2          Q.      Was that also family medicine?

 3          A.      No.

 4          Q.      What type of practice was that?

 5                  MR. SUTHERLAND:  You can answer

 6      generally.

 7                  THE WITNESS:  Generally, surgery.

 8  BY MS. NELSON-MAJOR:

 9          Q.      And what sorts of surgeries did you

10      perform while in your solo practice?

11          A.      Generalized procedures.

12          Q.      And how long did you maintain that solo

13      practice?

14          A.      Four years.

15          Q.      And what types of procedures did you

16      perform while self-employed?

17          A.      Those within the purveyance of a general

18      surgeon.

19          Q.      Can you give me some examples of the

20      types of surgeries that you performed?

21          A.      Herniorrhaphies, laparoscopic

22      cholecystectomies.

23                  MS. NELSON-MAJOR:  I'm sorry, Rhonda,

24          were you able to catch the answer?

25                  Okay.  Rhonda's indicating that she was

1        able to hear that.

2  BY MS. NELSON-MAJOR:

3        Q.      While performing those surgeries, did you

4  monitor the patient for anesthetic death?

5        A.      No.

6        Q.      Was somebody else responsible for doing

7  that during the surgeries you performed?

8        A.      Yes.

9        Q.      And who -- who, without naming names, was

10  responsible for that?

11        A.      The anesthesia department.

12        Q.      And why were you not also performing that

13  function during the surgeries?

14        A.      I was devoting my entire attention to the

15  procedure.

16        Q.      Over the course of your 40-year career,

17  did you have occasion to monitor -- excuse me --

18  monitor anesthetic death of a patient undergoing

19  surgery?

20        A.      I'm sorry, ma'am, I did not understand

21  the question.

22        Q.      Over the course of your medical career,

23  have you ever monitored a patient in surgery for

24  anesthetic death?

25        A.      Yes.

Case 3:18-cv-01234   Document 201-20   Filed 04/13/22   Page 19 of 143 PageID #: 12332

```
 1          Q.      And when was that?
 2          A.      During most endoscopies and minor
 3   procedures, twilight sleep is used.
 4          Q.      You said endoscopies, and what was the
 5   other procedure you mentioned?
 6          A.      Other minor procedures.
 7          Q.      So when performing an endoscopy or other
 8   minor procedures, there was not a separate
 9   anesthesiologist or similarly trained professional in
10   the room with you?
11          A.      No.
12          Q.      And when was the last time that you
13   monitored anesthetic death during one of those
14   procedures?
15          A.      2006.
16          Q.      And during the other surgeries that you
17   performed that are not minor procedures, was there
18   always an anesthesiologist in the room for those
19   procedures?
20          A.      Or a CRNA.
21          Q.      Have you ever monitored a patient to
22   ensure that they were under a surgical plane of
23   anesthesia?
24          A.      No.
25          Q.      Are you aware that the subject of this
```

 1   deposition concerns your involvement in executions

 2   carried out in Tennessee?

 3          A.      Again, could you repeat the question?

 4          Q.      Are you aware that the deposition today

 5   is related to your involvement in executions carried

 6   out in Tennessee?

 7          A.      Yes.

 8          Q.      And what is the title of the role that

 9   you play in Tennessee executions?

10                  MR. SUTHERLAND:  Object to the form.  You

11      can answer.

12                  THE WITNESS:  Physician-slash-provider.

13   BY MS. NELSON-MAJOR:

14          Q.      You said "physician-slash-provider?"

15          A.      Yes.

16          Q.      And do you serve in this role for all

17   executions carried out in Tennessee, regardless of the

18   method?

19          A.      Only the ones since February 2018, I

20   think.

21          Q.      I'm sorry, what year?

22          A.      2018.

23          Q.      Was the first execution that you attended

24   in 2018?

25          A.      I'm assuming.

1          Q.        You're assuming?  Is that what you said?

2          A.        Yes, ma'am.

3          Q.        Prior to 2018, did you have any

4     involvement in executions carried out in Tennessee?

5          A.        I do not recall.

6          Q.        How did you come to serve as the

7     physician-slash-provider in Tennessee executions?

8                    MR. SUTHERLAND:  You can give a very

9               general description of how you came to hold that

10              role, without saying anything that might lead to

11              discovery of your identity.

12                   THE WITNESS:  A conversation with I think

13              he's the Assistant Commissioner, Lee Dotson,

14              inquiring if I would be interested in

15              participating.

16    BY MS. NELSON-MAJOR:

17         Q.        And I was having a bit of trouble

18    hearing.  You had a conversation with an assistant

19    commissioner; is that what you said?

20         A.        Let me use his name in case it wasn't his

21    title, if that's all right.  Lee Dotson.

22         Q.        Lee Dotson?

23         A.        Yes.

24         Q.        And when Lee Dotson approached you, what

25    did Mr. Dotson ask you?

1       A.      I do not remember the specifics of the

2   conversation.

3       Q.      Did Mr. Dotson outline what your duties

4   would be as provider-slash-physician?

5       A.      In a general way, yes.

6       Q.      And what was that general description

7   that was given to you?

8               MR. SUTHERLAND:  Object to the form.

9   BY MS. NELSON-MAJOR:

10      Q.      You can answer.

11      A.      That I would be available to pronounce

12  the time of death and perform any necessary procedures,

13  if needed.

14      Q.      And what was your understanding of what

15  those procedures might be?

16      A.      At that time, a venous cutdown.

17      Q.      You said "At that time."  At some point,

18  did your understanding of what procedures you might be

19  called on to perform change?

20      A.      No.

21      Q.      And did you indicate that you were

22  willing to do that?

23      A.      I don't recall the specifics.  But again,

24  I'm sure I did.

25      Q.      Did you have to provide Mr. Dotson with a

 1   resume?

 2        A.      Could you repeat your question?

 3        Q.      Did you provide Mr. Dotson with a copy of

 4   your resume?

 5        A.      I don't recall now.

 6        Q.      Do you recall whether you had to submit a

 7   copy of your medical license?

 8        A.      Again, I don't recall.

 9        Q.      Other than your conversation with

10   Mr. Dotson, did you discuss this opportunity with

11   anyone else affiliated with TDOC?

12              MR. SUTHERLAND:  You can answer, without

13        identity -- identifying anyone by name.

14              THE WITNESS:  Yes.

15   BY MS. NELSON-MAJOR:

16        Q.      And without providing their names at this

17   point, who were those people?

18        A.      Additional personnel associated with the

19   Tennessee Department of Correction.

20        Q.      Were those people that you spoke with

21   involved in the Execution Team?

22        A.      No.

23        Q.      Were they part of the administration at

24   TDOC?

25        A.      Yes.

```
 1          Q.       And how many such conversations did you
 2    have?
 3          A.       I don't recall an exact number.
 4          Q.       Did those conversations occur prior to
 5    you agreeing to serve as the physician-slash-provider?
 6          A.       Yes, ma'am.
 7          Q.       And what was discussed at those meetings?
 8          A.       Again, I don't recall specifics.
 9          Q.       Were they in person?
10          A.       No.
11          Q.       Were they over the phone?
12          A.       Yes.
13          Q.       Were there email conversations?
14          A.       That, I don't recall.
15          Q.       And I'm going to ask a question.  Who at
16    TDOC -- without naming their names, I'm asking for
17    those roles -- was involved in those conversations?
18          A.       I'm sorry, could you speak a little
19    slower and repeat the question?
20               MR. SUTHERLAND:  I'm sorry to interrupt.
21          So the Physician wears hearing aids, and he is not
22          wearing those right now because we've got the
23          earbuds in.  So I just -- doctor, I didn't want
24          to -- I didn't want to necessarily offer that, but
25          I just want to make everybody aware of that so
```

```
 1          when he keeps asking, it may have to do with that
 2          issue.
 3                   MS. NELSON-MAJOR:  Thank you.  And I'll
 4          try to speak slower and clearer.
 5   BY MS. NELSON-MAJOR:
 6          Q.      My question is:  What were the roles of
 7   the people from TDOC that you met with before deciding
 8   to serve as the Physician?
 9          A.      Administrative roles.
10          Q.      Did you meet with the Warden of Riverside
11   Prison?
12          A.      Not prior to.
13                   MR. SUTHERLAND:  If you know the roles of
14          the persons you can identify the role, the
15          specific role, but not give a name.
16                   THE WITNESS:  All right.
17                   MR. SUTHERLAND:  Or if you know their
18          title.
19                   THE WITNESS:  Are you waiting?
20   BY MS. NELSON-MAJOR:
21          Q.      I'm sorry.  Go ahead.
22          A.      Are you waiting on me?
23          Q.      I am.
24          A.      I'm sorry, is there a question?
25                   MS. NELSON-MAJOR:  Yes.  And
```

```
 1          Mr. Sutherland, because these individuals are
 2          actually part of the administration and not part
 3          of the team responsible for carrying out
 4          executions, I don't believe that the names or the
 5          titles of the individuals from TDOC who met with
 6          the Physician would be subject to the
 7          confidentiality order.
 8               Would it be okay if the Physician went
 9          ahead and named those names?  I don't see how that
10          implicates the confidentiality order.
11               MR. SUTHERLAND:  I'm going to instruct
12          the witness to identify the roles, if he knows, or
13          the position of those individuals, based on the
14          protective order.
15               So if you know the roles to the other
16          people that you spoke with prior to entering into
17          the agreement, if you can state those roles.
18               THE WITNESS:  Tony Parker, Commissioner
19          of TDOC.
20               MR. SUTHERLAND:  And if there's anybody
21          else, if you can state what their role is but not
22          give their name.
23               THE WITNESS:  Understood.
24               MR. SUTHERLAND:  Is that the only person
25          that you spoke with, other than Mr. Dotson?
```

```
 1                    THE WITNESS:  Yes.
 2   BY MS. NELSON-MAJOR:
 3        Q.        And during that conversation with
 4   Commissioner Parker, did you agree to serve as the
 5   Physician?
 6        A.        I don't recall exactly.
 7        Q.        Did you ask Mr. Parker any questions?
 8        A.        Again, I do not recall the specifics of
 9   the conversation.
10        Q.        How many executions have you attended in
11   Tennessee?
12        A.        I don't know the exact number.
13        Q.        And you stated a moment ago that you
14   don't specifically recall what was discussed during
15   that meeting.  Do you have a general recollection of
16   the topics that you might have discussed?
17        A.        Only in a general sense, if I would be
18   willing to function as the Physician.
19        Q.        Did you discuss during that meeting the
20   drugs that Tennessee uses in lethal injection?
21        A.        I don't recall.
22        Q.        And since signing on as the Physician,
23   have you attended both lethal injection and
24   electrocution executions?
25        A.        Yes.
```

Case 3:18-cv-01234   Document 201-20   Filed 04/13/22   Page 28 of 143 PageID #: 12341

1       Q.      Are you aware of an execution that TDOC

2 has conducted since you came on board that you did not

3 attend as the Physician?

4       A.      I'm not aware of it, no.

5       Q.      Are you aware of whether there's another

6 individual who also serves as the Physician or provider

7 for TDOC?

8       A.      No.

9       Q.      At any point in time, did you have a

10 conversation with someone from the general counsel's

11 office about serving as Physician or provider?

12       A.      Not that I recall.

13       Q.      Do you receive compensation for serving

14 as the Physician?

15       A.      Yes.

16       Q.      How much do you receive?

17       A.      $3,000.

18       Q.      $3,000 per execution?

19       A.      Yes.

20       Q.      Did you negotiate that rate with TDOC?

21       MR. SUTHERLAND:   Objection.

22       THE WITNESS:   No.

23 BY MS. NELSON-MAJOR:

24       Q.      Who did you discuss your compensation

25 with before agreeing to be the Physician, without --

```
 1                    MS. NELSON-MAJOR:  You can go ahead.
 2          Sorry, Mr. Sutherland.
 3                    MR. SUTHERLAND:  I was saying, you can
 4          identify generally the role of the person without
 5          identifying them.
 6                    THE WITNESS:  No one.
 7   BY MS. NELSON-MAJOR:
 8          Q.      How did you learn that you would be --
 9   you were to be compensated $3,000 per execution?
10          A.      When I signed the contract.
11          Q.      Has that rate changed at any point in
12   time?
13          A.      If you asked me has it changed at any
14   point in time, the answer is "No."
15                  (Exhibit No. 80 marked.)
16   BY MS. HAYDEN-MAJOR:
17          Q.      Please pull up Exhibit 80 -- eight-zero.
18                  MR. SUTHERLAND:  Ms. Nelson-Major, I
19          provided the Physician with a paper copy of that
20          this morning.  Everything else is on a thumb drive
21          but that -- but that one, so it may not be
22          numbered.
23                  It's the only -- it's the only paper
24          exhibit that was provided.
25                  THE WITNESS:  I have the paper in front
```

```
 1           of me.
 2    BY MS. NELSON-MAJOR:
 3           Q.      Do you recognize this document?
 4           A.      Yes.
 5           Q.      What is it?
 6           A.      An agreement between the Tennessee
 7    Department of Correction and the Physician.
 8           Q.      Is that -- are you referring to yourself
 9    when you say "Physician?"
10           A.      Yes.
11           Q.      Did you sign this contract?
12           A.      Yes.
13           Q.      And when did you sign it?
14           A.      2/20/2018.
15           Q.      When you signed this agreement, did you
16    know which methods of execution TDOC was using to carry
17    out executions?
18           A.      No.
19           Q.      You didn't ask?
20           A.      No.
21           Q.      Has TDOC in fact paid you $3,000 for each
22    of the executions at which you served as the Physician?
23           A.      Yes.
24           Q.      If you could look at Paragraph B, which
25    states:  "TDOC agrees to the following," and I'm
```

```
 1   looking at No. 3 underneath B, which states:
 2                   "In the event the provider is called upon
 3                   to perform his service and a stay of
 4                   execution is granted the inmate, the
 5                   provider will be compensated at the sum of
 6                   $125 per hour.  This will be an hourly rate
 7                   to include travel time and time waiting and
 8                   preparing for the execution.  This same
 9                   rate shall apply to any meetings to discuss
10                   procedures."
11                   What is meant by "meetings to discuss
12   procedures?"
13                   MR. SUTHERLAND:  Object to form.  You can
14          answer.
15                   THE WITNESS:  Some prior procedures where
16          we went through all the protocols that were to be
17          used were practiced.
18   BY MS. NELSON-MAJOR:
19          Q.     When you said "when we went through prior
20   protocols to be used," who is "we?"
21                   MR. SUTHERLAND:  Don't identify anyone by
22          name, just that you can describe what you're
23          talking about.
24                   THE WITNESS:  The team that was to be
25          involved in the procedure would have practice
```

```
 1        sessions.
 2   BY MS. NELSON-MAJOR:
 3        Q.      How many such meetings did you attend?
 4        A.      Two, that I recall.
 5        Q.      And when did those meetings occur?
 6        A.      Within the past three years.
 7        Q.      Did they occur in 2018?
 8                MR. SUTHERLAND:  Objection.
 9                THE WITNESS:  The first --
10                MR. SUTHERLAND:  You can answer.
11                THE WITNESS:  The first one occurred
12        prior to any execution.
13   BY MS. NELSON-MAJOR:
14        Q.      And when did the second one occur?
15        A.      Approximately six to eight months ago.
16        Q.      The meeting that occurred prior to an
17   execution that you mentioned, do you mean prior to any
18   execution at which you attended as Physician?
19        A.      Yes.
20        Q.      What happened at that meeting?
21        A.      Their protocol was reviewed and equipment
22   was examined, made sure it was adequate.  And
23   suggestions were made.
24        Q.      How many people, approximately, were at
25   that meeting?
```

```
 1          A.      It consisted of the entire team of
 2   approximately eight to ten individuals.
 3          Q.      Did you lead that meeting?
 4          A.      No.
 5          Q.      Did someone from TDOC administration lead
 6   that meeting?
 7          A.      No.
 8          Q.      Did someone involved in carrying out the
 9   actual execution lead that meeting?
10          A.      Yes.
11          Q.      Without naming their name, what was their
12   title?
13          A.      I can't even give you the title.
14          Q.      Were they an EMT responsible for setting
15   an IV line?
16          A.      No.
17          Q.      Were they the Executioner, who prepares
18   and administers the drugs?
19          A.      I don't know who prepares and administers
20   the drugs.
21          Q.      I'm sorry, I had trouble hearing.
22          A.      I don't know who prepares and administers
23   the drugs.
24          Q.      What was your understanding of the role
25   that person who led the meeting plays in the
```

1    executions, or did you not have an understanding?

2         A.      He just appeared to be the leader of the

3    group.

4         Q.      But you're unaware of the role that

5    person serves during an execution?

6         A.      I'm unaware of what his official title

7    is.

8         Q.      Are you also unaware of what he does

9    during an execution?

10        A.      Yes.

11        Q.      And you said one of the things you did

12   was to review the protocol.  How did you review the

13   protocol?

14        A.      Went through it with them and suggested

15   changes where appropriate.

16        Q.      And when you say "went through it," did

17   you go through it page by page?

18        A.      I don't recall.

19        Q.      Did someone describe orally the protocols

20   that are followed during an execution?

21        A.      No, they were reviewed on paper; but page

22   by page, I don't recall.

23        Q.      And you said suggestions were made.  By

24   whom, without naming names?

25        A.      By me.

```
 1            Q.       And what changes did you suggest?
 2            A.       Suggested adding if a peripheral vein
 3   access couldn't be obtained to insert a central venous
 4   line.
 5            Q.       Is that the only change you suggested?
 6            A.       Yes.
 7            Q.       And why did you make that suggestion?
 8            A.       Not knowing any of the inmates' history,
 9   if they were unable to obtain IV access to a peripheral
10   venous system maybe scarred from years of drug abuse.
11   And a central venous line seemed like a more reasonable
12   suggestion.
13            Q.       More reasonable suggestion than what?
14            A.       A cutdown.
15            Q.       And after you made that suggestion, what
16   was the response?
17            A.       The equipment is there and available now.
18            Q.       The equipment to perform a central venous
19   line?
20            A.       Yes.
21            Q.       And what equipment would that be?
22            A.       There are standardized kits from the
23   pharmacological/surgical businesses.
24            Q.       And again, without naming names, who
25   informed you that there was a kit on hand to perform a
```

```
 1   central venous line?
 2        A.      Could you repeat the question?
 3        Q.      You stated that one of the meeting
 4   participants indicated there was equipment on hand to
 5   insert a central venous line.  Who informed you that
 6   that equipment was available?
 7                MR. SUTHERLAND:  Don't identify anybody
 8        by name.  You can state what their role is, if you
 9        know.
10                THE WITNESS:  After the suggestion was
11        made, the next time I attended a procedure the
12        equipment was shown to me so I knew it was
13        available.
14   BY MS. NELSON-MAJOR:
15        Q.      When you say "procedure," do you mean an
16   execution?
17        A.      Yes.
18        Q.      Was that at the first execution you
19   attended?
20        A.      Can you define the question?
21        Q.      You were shown a standardized kit, you
22   said, at an execution.  I'm asking you, was -- were you
23   shown that kit at the first execution you attended?
24        A.      I'm assuming it was present after the
25   first practice session.
```

 1        Q.        I'm asking about when you were first

 2   shown that kit.  You said you were shown the kit at an

 3   execution.

 4        A.        No, ma'am.  I gave the suggestion at the

 5   practice session, and then the next time I was there I

 6   was shown the kit.  So since the practice session

 7   happened before the execution, it would have been

 8   available for the first execution.

 9        Q.        I'm still talking about this first

10   meeting in 2018.  You said you reviewed equipment.

11   What equipment did you review?

12        A.        The medical equipment they have for the

13   execution.

14        Q.        And what specifically was that equipment?

15        A.        They have a list and the protocol; and

16   it's up to date, other than the central line set is not

17   included.

18        Q.        You said the central line is not included

19   on that list?

20        A.        No.

21        Q.        Besides the suggestion to perform a

22   central venous line instead of a cutdown, did you make

23   other suggestions?

24              MR. SUTHERLAND:  Object to the form.  You

25        can answer.

```
 1                    THE WITNESS:  Not that I recall.
 2   BY MS. NELSON-MAJOR:
 3        Q.      Was it decided at that meeting that a
 4   central venous line would be the first choice of
 5   procedure if peripheral IV access was not obtained?
 6                    MR. SUTHERLAND:  Object to the form.  You
 7        can answer, if you know.
 8                    THE WITNESS:  I think it was left to the
 9        Physician's discretion.
10   BY MS. NELSON-MAJOR:
11        Q.      And then you said after this meeting in
12   2018 you attended a practice session.  How close in
13   time was this practice session to that initial 2018
14   meeting?
15        A.      I don't recall.
16        Q.      How many practice sessions have you
17   attended since signing on as the Physician?
18        A.      Two.
19        Q.      And the first practice session was before
20   you attended an actual execution?
21        A.      Yes.
22        Q.      And when did the second practice session
23   you attended occur?
24        A.      Approximately six to eight months ago.
25        Q.      And you initially said that you attended
```

1    two protocol review meetings; one -- the second one,

2    which was six to eight months ago.  Is that the same

3    meeting as the practice session that you just referred

4    to?

5         A.     Yes.

6         Q.     Without naming names, who was at that

7    second practice session?

8         A.     All members of the team, including the

9    Warden and the Assistant Warden.

10        Q.     Were the Warden and the Assistant Warden

11   at that first meeting in 2018?

12        A.     I don't recall.

13        Q.     Who invited you to attend these two

14   practice sessions?

15             MR. SUTHERLAND:  Don't identify anyone by

16        name; but you can state -- you can identify them

17        by title, if you know.

18             THE WITNESS:  It would be administration

19        at TDOC would let me know by either call or text

20        message.

21   BY MS. NELSON-MAJOR:

22        Q.     Was it the Warden?

23        A.     No.

24        Q.     Was it the Assistant Warden?

25        A.     No.

1          Q.      Was it Mr. Dotson?

2          A.      Yes.

3          Q.      And when Mr. Dotson called or texted you,

4     what did he say that the meetings would be about?

5          A.      He would just let me know if there was

6     going to be a practice session or the real thing, and

7     when it was scheduled.

8          Q.      Did you ever text about matters other

9     than scheduling?

10          A.      Could you repeat, please?

11          Q.      Did you and Mr. Dotson ever text about

12     anything other than scheduling?

13          A.      No.

14          Q.      And when you say "a practice session," do

15     you mean a rehearsal for a lethal injection execution?

16          A.      Yes.

17          Q.      At the second practice session, which you

18     said occurred six to eight months ago, did you also

19     review the protocol?

20          A.      I don't recall exactly, but I generally

21     do at the practice sessions.

22          Q.      Did you also make suggestions at this

23     practice session?

24          A.      No.

25          Q.      Did you discuss your suggestion that the

1    first alternative choice for IV access be central

2    venous line access?

3              MR. SUTHERLAND:  Objection to the form.

4         You can answer.

5              THE WITNESS:  Again, central venous

6         access is a possible alternative to a cutdown.  It

7         depends on the situation.

8    BY MS. NELSON-MAJOR:

9         Q.    Did you discuss the possibility of

10   performing a central venous access procedure at that

11   second rehearsal?

12        A.    No.

13        Q.    Were the Warden and Assistant Warden

14   present when the protocol was reviewed at that second

15   session?

16        A.    I don't recall the practice session had

17   been limited to what the Physician would do during the

18   real scenario, so I was only in the room for five

19   minutes.

20        Q.    So when you say you were only in the room

21   for five minutes, which room are you referring to?

22        A.    The execution chamber.

23        Q.    Was there any meeting held prior to

24   starting the rehearsal?

25        A.    I don't recall specifically.

1      Q.      Do you recall whether there was a meeting
2  held after the rehearsal?
3      A.      Again, I don't recall.
4              MS. NELSON-MAJOR:  We've been going for a
5          bit over an hour.  Do you want to take a
6          ten-minute break and we can reconvene at 20 after?
7              MR. SUTHERLAND:  Yeah, that'll be fine.
8              THE VIDEOGRAPHER:  We're off record.  The
9          time is 11:07 a.m.
10             (Recess at 11:07 a.m. to 11:19 a.m.)
11             THE VIDEOGRAPHER:  We're back on record
12         at 11:19 a.m.
13  BY MS. NELSON-MAJOR:
14     Q.      Physician, I'm still looking at Exhibit
15  80, Paragraph B, and No. 4 under Paragraph B, which
16  provides:  "TDOC will process payment for services
17  rendered upon receipt of invoice."
18             Have you submitted invoices to TDOC for the
19  services you've performed as Physician?
20     A.      No.
21     Q.      Do you tell TDOC the number of hours you
22  work under this contract in some other way?
23     A.      No.
24     Q.      How does TDOC know how much to pay you?
25             MR. SUTHERLAND:  Object to the form.  You

```
 1          can answer.
 2               THE WITNESS:  That would be a question
 3          for them.
 4   BY MS. NELSON-MAJOR:
 5          Q.      Has TDOC paid you $125 per hour for the
 6   meetings that we just discussed?
 7          A.      I've never submitted an invoice.
 8          Q.      My question was:  Has TDOC paid you for
 9   participation in those meetings we just discussed?
10          A.      Since I haven't submitted any invoices,
11   no.
12          Q.      So the only payment TDOC has provided to
13   you is the $3,000 per execution?
14          A.      Yes.
15          Q.      Why haven't you submitted invoices for
16   your time at the meetings?
17          A.      Personal choice.
18          Q.      And what are the reasons for that
19   personal choice?
20          A.      They're personal.
21          Q.      Can you explain to me those personal
22   reasons?
23          A.      No.
24          Q.      Why not?
25          A.      I don't think it has anything to do with
```

1    this.  I have a friend in Nashville.  How about that?

2         Q.     I posed a question to you, and you're

3    required to answer it unless instructed to not answer

4    by Mr. Sutherland.

5         A.     What's the question?

6         Q.     I'm sorry, I couldn't hear you.

7         A.     What's the question?

8         Q.     The question is:  What are the reasons

9    you have not billed TDOC for your time spent discussing

10   procedures at the meetings?

11        A.     Did not feel like it was justified.

12        Q.     You felt like not submitting your

13   invoices was justified?

14        A.     Yes.

15        Q.     Explain that to me.

16        A.     I'd done nothing of service.

17        Q.     You did nothing of service?

18        A.     Correct.

19        Q.     But you feel differently about the $3,000

20   per execution?

21             MR. SUTHERLAND:  Object to the form.  You

22        can answer.

23             THE WITNESS:  A medical opinion is

24        offered.

25   BY MS. NELSON-MAJOR:

Case 3:18-cv-01234   Document 201-20   Filed 04/13/22   Page 45 of 143 PageID #: 12358

```
 1          Q.      I'm sorry, state that again.  I couldn't
 2   hear your answer.
 3          A.      A medical opinion is offered.
 4          Q.      And what medical opinion is offered?
 5                  MR. SUTHERLAND:  Object to the form.  You
 6          can answer.
 7                  THE WITNESS:  That death has occurred and
 8          the time of death.
 9   BY MS. NELSON-MAJOR:
10          Q.      Are you providing these services to TDOC
11   as a favor to a personal connection of yours?
12          A.      No.
13          Q.      If you're not providing these services as
14   a favor to a personal connection, why are you doing
15   this work pro bono then?
16          A.      Because I also work for farmers for free.
17   I don't charge them.
18          Q.      You provide medical care to farmers for
19   free?  Is that what you're saying?
20          A.      No, I work on their farms for free.
21          Q.      What sorts of work do you provide for
22   farmers?
23          A.      Drive semi trucks, big tractors.  Plant
24   fields.
25          Q.      Do you provide other medical services pro
```

1   bono outside of your work for TDOC?

2         A.      Yes.

3         Q.      In what context?

4         A.      Patient calls.

5         Q.      Prior to joining as Physician, did you

6   ever have a conversation with the prior Physician who

7   performed this role previous to your involvement?

8         A.      I was unaware of any other Physician.

9         Q.      Does anyone report to you in your role as

10  Physician?

11        A.      Where?

12        Q.      Does anyone report to you in your role as

13  Physician in connection with executions in Tennessee?

14        A.      Report to me, no.

15        Q.      Do you report to anyone else in your

16  capacity as Physician?

17        A.      No.

18        Q.      Have you ever attended an execution

19  conducted in a state other than Tennessee?

20        A.      No.

21        Q.      Have you provided training to anyone in

22  conjunction with an execution in another state?

23        A.      No.

24        Q.      Have you discussed proposed changes to

25  Tennessee's lethal injection protocol with anyone

```
 1   affiliated with TDOC?
 2        A.      Please repeat.
 3        Q.      Have you ever had conversations with
 4   anyone affiliated with TDOC about proposed changes to
 5   the execution protocols?
 6        A.      If you're talking about the drug
 7   protocol, no.
 8        Q.      So you've never had a discussion with
 9   anyone affiliated with TDOC about which drugs should be
10   used?
11        A.      No.
12        Q.      Or how to obtain drugs to be used?
13        A.      Or how to obtain?
14        Q.      Yes.
15        A.      I may have had a discussion with
16   Commissioner Parker at one time.
17        Q.      When was that conversation?
18        A.      Three or four years ago.
19        Q.      When you say "Three or four years ago,"
20   did you have conversations with people affiliated with
21   TDOC prior to signing that contract to become the
22   Physician?
23                You can answer.
24        A.      We have -- we have a prison in our
25   county, so I've had conversations with plenty of TDOC
```

1    personnel.

2         Q.      My question was:  Prior to becoming the

3    Physician in executions, did you have conversations

4    about executions with anyone affiliated with TDOC?

5         A.      No.

6         Q.      You said you had -- you might have had a

7    conversation with Commissioner Parker about how to

8    obtain drugs for use in executions.

9         A.      Yes.

10         Q.      What was the nature of that conversation?

11              MR. SUTHERLAND:  Don't state any

12         information that would lead -- could reasonably

13         lead to the identification of any source of lethal

14         injection chemicals.  Otherwise, you can answer.

15              THE WITNESS:  At that time, one of the

16         three drugs was in short supply nationwide, and

17         the conversation was had about whether I could

18         help in obtaining any pharmaceuticals.

19    BY MS. NELSON-MAJOR:

20         Q.      Which drug was in short supply at that

21    time?

22         A.      I don't recall.

23         Q.      Do you recall whether it was

24    pentobarbital?

25         A.      I don't recall.

1          MR. SUTHERLAND:  Object to the form,

2      based on his prior answer.

3  BY MS. NELSON-MAJOR:

4      Q.      And when Commissioner Parker asked you

5  that question, what was your response?

6      A.      I would have to research it.

7      Q.      Research what?

8      A.      Whether it could be obtained from an

9  alternative source.

10      Q.      And did you in fact do that research?

11      A.      I'm sure I did.  I don't recall it

12  specifically.

13      Q.      Did this conversation occur prior to

14  attending an actual execution for the first time?

15      A.      I don't recall.

16      Q.      And did you relay your efforts to

17  Commissioner Parker?

18      A.      I'm sure we had further discussion, yes.

19      Q.      And what were the results of your

20  efforts?

21      A.      I can't recall.

22          MR. SUTHERLAND:  Again, you can -- you

23      can generally respond without any -- providing any

24      information that would -- that could reasonably

25      lead to the identification of a source.

```
 1   BY MS. NELSON-MAJOR:
 2        Q.     You don't recall whether you were
 3   searching for active pharmaceutical ingredients for
 4   TDOC?
 5        A.     No.  At one point, a paper prescription
 6   was generated for TDOC; however, I don't recall for
 7   which drug and where it was to be sent.
 8        Q.     Did you generate that paper prescription?
 9        A.     Yes.
10        Q.     Was it a sample prescription?
11        A.     I'm sorry?
12        Q.     Was the prescription for a particular
13   inmate?
14        A.     No.
15        Q.     Was it a template for future
16   prescriptions?
17        A.     No.
18        Q.     Then what was it?
19        A.     A one-time paper prescription.
20        Q.     Was it for one particular drug?
21        A.     Was it for a drug?
22        Q.     Was it for one single drug?
23        A.     As I recall.
24        Q.     Which drug?
25        A.     I don't recall that.
```

1    Q.     Was it an amount for use in a single

2  execution?

3    A.     I don't recall.

4    Q.     How did you know which drug to write the

5  prescription for?

6    A.     I would have had to have been informed of

7  that.

8    Q.     As a doctor, can you write a prescription

9  that's not under a particular patient's name?

10    A.     At that time, yes.

11    Q.     Did that change at some point?

12    A.     Yes.

13    Q.     How did it change?

14    A.     Electronic health records.

15    Q.     What about electronic health records

16  changed the process for writing a prescription for a

17  patient or not?

18    A.     A prescription is generated with

19  electronic health records.  It has to have that

20  patient's name or institution listed as a patient for

21  the electronic health records.

22    Q.     Did Commissioner Parker ask you to write

23  this prescription?

24    A.     I don't recall.

25    Q.     Did you provide that prescription to a

1    pharmacy?

2           A.      I don't recall.

3           Q.      Did you have this conversation -- a

4    conversation about the prescription with Mr. Dotson?

5           A.      I don't recall.

6           Q.      Do you keep copies of prescriptions that

7    you write in your routine medical practice?

8           A.      No.

9           Q.      Returning to the conversation you had

10   with Commissioner Parker in 2018, did you locate a

11   source of drugs for TDOC?

12          A.      I don't recall.

13          Q.      Do you recall how you looked for a

14   potential source of drugs for TDOC?

15          A.      I'm sure, like everyone, I Googled it.

16          Q.      You Googled it?

17          A.      I'm sure.  I don't recall exactly.

18          Q.      Was it a one-time thing, your search for

19   an alternative source?

20          A.      Yes.

21          Q.      You said you had multiple conversations

22   with people affiliated with TDOC because there's a

23   prison in your county.  Can you explain to me how those

24   conversations have occurred?

25          A.      I --

```
 1                 MR. SUTHERLAND:  I'm going to -- I'm
 2          going to -- so I'm going to object, unless they
 3          have something to do with your contract.  I'm
 4          going to object to anything that's going to lead
 5          to the identification of any prison location,
 6          state or otherwise.
 7                 So don't answer the question, to the
 8          extent that it causes you to identify any specific
 9          prison or location or personnel.
10                 THE WITNESS:  Gotcha.
11   BY MS. NELSON-MAJOR:
12          Q.     You can answer.
13          A.     And the question?
14          Q.     Okay.  You said you've had conversations,
15   multiple conversations, with people at TDOC because
16   there's a prison in your county.  Can you explain to me
17   what those conversations are about?
18          A.     Normal patient-physician conversations.
19          Q.     Do you provide medical services to TDOC
20   other than your contract as Physician?
21          A.     No.
22                 MR. SUTHERLAND:  I'm going to -- yeah.
23          I'm going to object and instruct the witness not
24          to answer.  He's already answered "No."
25   BY MS. NELSON-MAJOR:
```

**Gibson Court Reporting**

1      Q.      Do you provide care to inmates outside of

2  TDOC?

3      A.      No.

4      Q.      What did you discuss during those

5  conversations with TDOC?

6              MR. SUTHERLAND:  Objection to the form,

7         based on his prior answer, which was a general

8         patient care question.

9  BY MS. NELSON-MAJOR:

10     Q.      You can answer.

11     A.      General patient-physician conversations.

12     Q.      If you're not providing medical care to

13 inmates, how do general patient-physician conversations

14 occur?

15     A.      With correctional officers that I've

16 seen.

17     Q.      Do you have any other contracts with

18 TDOC --

19     A.      No.

20     Q.      -- other than the one we've reviewed?

21     A.      No.

22     Q.      And in this other capacity, had you ever

23 had conversations about executions with anyone

24 affiliated with TDOC?

25     A.      No.

1       Q.      The conversation you had with

2  Commissioner Parker, was that in person or --

3       A.      I'm sorry?  The conversation with who?

4       Q.      With Commissioner Parker about finding an

5  alternative source for execution drugs.  Was that in

6  person?

7       A.      No.

8       Q.      Was it over email?

9       A.      No.

10      Q.      Was it on the telephone?

11      A.      Telephone, yes.

12      Q.      Have you ever had a conversation with

13  anyone affiliated with TDOC about how to store the

14  lethal injection chemicals?

15      A.      No.

16      Q.      What about how to prepare the lethal

17  injection chemicals for use in execution?

18      A.      No.

19      Q.      What about establishing IV access?

20      A.      Yes, I've had a discussion.

21      Q.      Other than the discussion at that initial

22  rehearsal in 2018, have you had other conversations

23  about establishing IV access?

24      A.      No.

25      Q.      Have you had conversations with anyone

 1   affiliated with TDOC about how to perform the
 2   consciousness check?
 3        A.      No.
 4        Q.      What about the method used to pronounce
 5   death?
 6        A.      No.
 7        Q.      Have you had conversations with anyone
 8   else affiliated with TDOC about another topic related
 9   to executions that I have not listed?
10        A.      I'm not sure how to answer that, but no.
11        Q.      Can you please turn to Exhibit 1.  At the
12   beginning of the deposition, you stated you reviewed a
13   lethal injection protocol.  Is Exhibit 1 the document
14   that you reviewed?
15        A.      It's certainly similar.
16        Q.      When did you first see this document?
17              MR. SUTHERLAND:  Object to the form.  You
18        can answer.
19              THE WITNESS:  It would be at the first
20        practice session.
21   BY MS. NELSON-MAJOR:
22        Q.      And without naming names, who provided
23   this document to you?
24        A.      I don't recall.
25        Q.      Approximately how many times have you

1   reviewed this document?

2      A.     Twice.

3      Q.     You said "Twice?"

4      A.     Yes, ma'am.

5      Q.     So once was at the practice session in

6   2018. And when was the other time?

7      A.     At the practice session six to eight

8   months ago.

9      Q.     Were you asked to review drafts of this

10   document by anyone?

11      A.     Was I asked to review what?

12      Q.     Drafts.

13      A.     A draft?

14      Q.     Yes.

15      A.     No.

16      Q.     So you didn't write any portion of the

17   lethal injection protocol?

18      A.     Was I responsible for any of its

19   generation?

20      Q.     I asked: Did you write any portion of

21   this protocol?

22      A.     No.

23      Q.     And did you make any edits to any portion

24   of this protocol?

25      A.     I would have to go to the page about

Case 3:18-cv-01234   Document 201-20   Filed 04/13/22   Page 58 of 143 PageID #: 12371

 1   having access.  I don't have another page here.

 2        Q.      If you'd turn to Page 42, you can tell me

 3   whether that is the section you were looking for.

 4        A.      Okay.  42?

 5        Q.      Yes.

 6        A.      Okay.  Yes.

 7        Q.      You provided edits to this section?

 8        A.      No, this is the section where we had --

 9   this was added about the possibility of a central

10   venous insertion.

11        Q.      I'm sorry, can you repeat your answer?

12   There's a fair amount of static right now.

13        A.      This would be where it was added that the

14   Physician may choose an alternative method.

15        Q.      Did you provide a written instruction to

16   someone to change that language in the protocol?

17        A.      No, it was suggested.

18        Q.      Did someone indicate to you that the

19   protocol would be changed to reflect that suggestion?

20        A.      Not specifically.

21        Q.      Generally?

22        A.      Since it showed up later, I assume

23   someone paid attention to it.

24        Q.      So you assume that the protocol had

25   been changed in some way based on the fact that you

```
 1    received --
 2            A.      The necessary --
 3            Q.      -- this document?
 4            A.      Yes.
 5            Q.      When you reviewed the protocol during the
 6    second rehearsal you attended, did you review the
 7    protocol to see whether that had been added to the
 8    protocol?
 9            A.      No, I did not.
10            Q.      But you assumed that it had been?
11            A.      I assumed that I still had the
12    alternative of performing that procedure.
13            Q.      Other than the suggestion regarding the
14    central line, did you make any other edits to a version
15    of the protocol?
16            A.      No.
17            Q.      Did anyone consult with you in connection
18    with the drafting of this protocol?
19            A.      No.
20            Q.      No one asked you for your input on what
21    the Physician role should entail?
22            A.      No one asked for my advice, no.
23            Q.      Did anyone ask for your advice on how to
24    prevent pain and suffering during an execution?
25                    MR. SUTHERLAND:  Object to the form.  You
```

```
 1          can answer.
 2                    THE WITNESS:  No.
 3   BY MS. NELSON-MAJOR:
 4          Q.      Can you please turn to Page 19.
 5          A.      Page 19?
 6          Q.      That's right.  Have you seen this page of
 7   the protocol before?
 8          A.      Yes.
 9          Q.      And what is it?
10          A.      Defines the Physician's primary role.
11          Q.      And "To pronounce death" is listed as
12   your primary role during an execution?
13          A.      Yes.
14          Q.      Is that consistent with your
15   understanding of your primary role during an execution?
16          A.      Yes.
17          Q.      Do you have any other roles?
18          A.      Only if no intravenous access can be
19   obtained.
20          Q.      So Duty No. 1 states:  "To be present at
21   the time of execution in the capital punishment
22   garage."
23                    On the day of execution, what time do you
24   arrive?
25          A.      Before 5:00.
```

```
 1          Q.      Why 5:00?

 2          A.      That's the designated time we go over to

 3   Riverbend.

 4          Q.      Did someone at TDOC convey that to you?

 5          A.      Yes.

 6          Q.      Do you bring anything with you to an

 7   execution?

 8          A.      Two stethoscopes.

 9          Q.      And why do you bring two stethoscopes?

10          A.      One is a normal stethoscope; and the

11   other is electronic, which magnifies heart sounds 27

12   times.

13          Q.      Does TDOC provide you with any other

14   supplies?

15          A.      No.

16          Q.      And once you arrive, where do you go?

17          A.      There's an anteroom adjacent to the

18   garage.

19          Q.      And at some point do you leave the

20   anteroom to go to the garage?

21          A.      After the execution is over.

22          Q.      So you -- where are you during the actual

23   execution, the anteroom or the garage?

24          A.      In the anteroom.

25          Q.      Is there a phone in the anteroom?
```

1      A.      That, I don't know.

2      Q.      Before reporting to the capital

3   punishment garage, do you speak with anyone else

4   involved in carrying out the executions?

5      A.      The team gathers over in a place in the

6   previous penitentiary block.

7      Q.      And when you say "team," without naming

8   names, who is that?  Their roles?

9      A.      The IV Team, the security detail, the

10  Assistant Commissioner.  The Medical Examiner's people.

11     Q.      Is there some sort of discussion that

12  happens at that meeting?

13     A.      With regard to the execution, no.

14     Q.      Is there anyone else with you in the

15  anteroom?

16     A.      The Warden and Assistant Warden will

17  usually visit.

18     Q.      At what point in the process do they

19  visit?

20     A.      Prior to.

21     Q.      And what do you discuss when they visit

22  you in the anteroom?

23     A.      Generalized conversation; "How are you?

24  How are you doing?"

25     Q.      Do you discuss the execution?

```
 1            A.      No.

 2            Q.      Besides the Warden and Assistant Warden,

 3    does anyone else wait in the anteroom with you?

 4            A.      Other than the members of the team I

 5    mentioned.

 6            Q.      The members of the team wait with you in

 7    the anteroom during the execution?

 8            A.      Yes.

 9            Q.      Which members, without naming names, wait

10    with you in the anteroom?

11            A.      The Assistant Commissioner, the Medical

12    Examiner's team, the IV Team.  The prison's team.

13            Q.      Is this all occurring before the

14    execution is underway?

15            A.      Yes.

16            Q.      And once the execution is underway, where

17    do you go?

18            A.      I stay in that room.

19            Q.      Does everyone else leave?

20            A.      No.

21            Q.      So all those people remain with you in

22    the anteroom for the duration of the execution?

23            A.      Yes.

24            Q.      Including the IV Team?

25            A.      The IV Team goes into the execution
```

Case 3:18-cv-01234   Document 201-20   Filed 04/13/22   Page 64 of 143 PageID #: 12377

1  chamber when they're called.  They perform their

2  procedure and then exit.

3      Q.      And when they -- do they return to the

4  anteroom after they're done?

5      A.      Yes.

6      Q.      And when they return, do they -- have

7  they ever told you how -- how obtaining IV access went?

8      A.      No.

9      Q.      So you never discuss their efforts to

10 obtain IV access?

11     A.      No.  I would assume they would only

12 discuss it with me if they had difficulties.

13     Q.      Have you ever seen the Extraction Team

14 transport the inmate to the execution chamber?

15         MR. SUTHERLAND:  Object to the form.  You

16     can answer.

17         THE WITNESS:  Can you repeat the

18     question?

19 BY MS. NELSON-MAJOR:

20     Q.      Have you ever seen the Extraction Team

21 transport the inmate to the execution chamber?

22     A.      No.

23     Q.      Have you ever seen the Extraction Team

24 secure the inmate to the gurney?

25     A.      No.

```
 1        Q.      Have you ever seen the IV Team insert IV
 2   catheters?
 3        A.      No.
 4        Q.      Why aren't you inserting IV catheters in
 5   the first instance?
 6               MR. SUTHERLAND:  Object to the form.  You
 7          can answer.
 8               THE WITNESS:  They have qualified
 9          emergent personnel who are doing it every day and
10          more often than I am.
11   BY MS. NELSON-MAJOR:
12        Q.      In your general medical practice, how
13   frequently do you attempt to achieve IV access?
14        A.      Once every three months.
15        Q.      And is that at a regular interval?
16               MR. SUTHERLAND:  Object to the form.  You
17          can answer.
18               THE WITNESS:  I'm sorry?
19   BY MS. NELSON-MAJOR:
20        Q.      You said "Once every three months."  Is
21   that an approximation of how often it occurs?
22        A.      Absolutely.
23        Q.      And is that peripheral IV access, for the
24   most part?
25        A.      Always.
```

**Gibson Court Reporting**

1      Q.      Always?

2      A.      Yes.

3      Q.      Have you ever witnessed the preparation

4  of the syringes for use in an execution?

5      A.      No.

6      Q.      Have you ever seen the Warden check an

7  inmate for consciousness during an execution?

8      A.      No.

9      Q.      Is there a reason that you aren't

10  performing the consciousness check?

11              MR. SUTHERLAND:  Object to the form.  You

12      can answer.

13              THE WITNESS:  I wasn't asked.  It's not

14      part of my role.

15  BY MS. NELSON-MAJOR:

16      Q.      Do you think you should be the person

17  performing the consciousness check?

18              MR. SUTHERLAND:  Object to the form.  You

19      can answer.

20              THE WITNESS:  I think any medical

21      personnel could perform it.

22  BY MS. NELSON-MAJOR:

23      Q.      And when you say "any medical personnel

24  could perform it," why is that your opinion?

25      A.      We're using very rudimentary tests that

1  you can use in the field without complex machinery.

2      Q.      And what is the minimum level of medical

3  training that someone would need to have to perform

4  that check?

5              MR. SUTHERLAND:  Object to the form.  You

6      can answer.

7              THE WITNESS:  I don't have an opinion.

8  BY MS. NELSON-MAJOR:

9      Q.      And what does a consciousness check

10  entail?

11              MR. SUTHERLAND:  Object to the form.  You

12      can answer.

13              THE WITNESS:  It's a check basically

14      doing a corneal reflex, a trapezius squeeze, a

15      sternal rub, and shouting in the ear.

16  BY MS. NELSON-MAJOR:

17      Q.      You said -- can you say those again?  I

18  lost the second one in the static.

19      A.      Checking the corneal reflex, the

20  trapezius squeeze, a sternal rub, and shouting their

21  name in the eardrum -- or ears, excuse me.

22      Q.      Is that how medical professionals are

23  trained to conduct the consciousness check?

24      A.      It's one of the many ways they are, yes.

25      Q.      Is that how you were trained to conduct

1    the consciousness check?

2        A.      If the situation required.

3        Q.      And what are the other ways to assess

4    consciousness?

5        A.      You can stick people with needles.  Some

6    people use towel clamps nn the earlobes.  You can take

7    a hemostat and twist it between the toes.

8                But those are a little bit more cruel,

9    shall we say.

10               MS. NELSON-MAJOR:  I just want to pause

11           for a moment and see if Ms. Sansom was able to get

12           that answer at all.

13               She's nodding, indicating that she was.

14   BY MS. NELSON-MAJOR:

15       Q.      And what is a corneal reflex?

16       A.      It's basically where you get the finger

17   close to the eye and the patient will blink.

18       Q.      And how is a sternal rub performed?

19       A.      How is it performed?

20       Q.      Yes.

21       A.      In this protocol, they drag their finger

22   across the eyelashes.

23       Q.      I'm asking about you listed four ways

24   that consciousness is checked by medical professionals,

25   and one of them you said was a sternal rub.  I was

```
 1   asking about a sternal rub.
 2         A.      Oh, it's just rubbing the sternum.
 3         Q.      Then you listed three or four ways of
 4   assessing consciousness that you said might be more
 5   cruel.  Can you explain to me why those are more cruel
 6   than the other ways of assessing consciousness?
 7         A.      Because they cause actual pain.
 8         Q.      So they're more painful stimuli than the
 9   other four you listed?
10         A.      Yes.
11         Q.      Under what circumstances would you use
12   those more painful methods of assessing consciousness?
13         A.      I wouldn't.
14         Q.      You wouldn't?
15         A.      No.
16         Q.      Are there circumstances in your medical
17   practice where you perform consciousness checks?
18         A.      No.
19         Q.      Did you receive training in medical
20   school about how to assess consciousness?
21         A.      Since I've had a rotation in
22   anesthesiology, I will reply "Yes."
23         Q.      And are the methods for assessing levels
24   of anesthesia different than the methods for assessing
25   consciousness that you just outlined?
```

1   A.  No.

2   Q.  So those would be the same methods you

3 would use to assess whether a patient is under general

4 anesthesia?

5   A.  Yes.

6   Q.  So a sternal rub, a corneal reflex, a

7 trap squeeze, and shouting someone's name are

8 sufficient ways to assess whether someone is under

9 general anesthesia for surgery?

10   A.  Not surgical anesthesia.

11   Q.  What level of anesthesia are they

12 sufficient to assess?

13   A.  I'm not an anesthesiologist.  That's

14 outside my level of expertise.

15   Q.  How do you assess someone for surgical

16 anesthesia, then?

17     MR. SUTHERLAND:  Object to the form.  You

18   can answer if you know.

19     THE WITNESS:  If they move during the

20   procedure, they're obviously not under surgical

21   anesthesia.

22 BY MS. NELSON-MAJOR:

23   Q.  Short of a patient moving, is there some

24 proactive way to assess for a level of surgical

25 anesthesia?

 1        A.       Again, outside my area of expertise.

 2        Q.       Is there any sort of video feed that

 3   captures the execution chamber that you can see in the

 4   anteroom?

 5        A.       No.

 6        Q.       So Duty No. 3, again on Page 19, states:

 7   "To examine the body for vital signs five minutes after

 8   the LIC has been injected."

 9               Do you remain in the anteroom until it's

10   time to check the inmate for vital signs?

11        A.       I remain until -- in the anteroom until

12   the Warden opens the door for me to come in.

13        Q.       So the Warden comes and gets you when

14   it's time?

15        A.       Yes.

16        Q.       So you don't keep track of the five

17   minutes yourself?

18        A.       I have no idea when the time is started.

19        Q.       Do you agree that five minutes is an

20   appropriate amount of time to wait before assessing the

21   inmate for vital signs?

22        A.       Yes.

23               MR. SUTHERLAND:  Object to the form.  You

24        can answer, which you did.

25   BY MS. NELSON-MAJOR:

Case 3:18-cv-01234   Document 201-20   Filed 04/13/22   Page 72 of 143 PageID #: 12385

```
1          Q.       And what are the bases for that opinion?
2          A.       Four minutes without a heartbeat
3    basically renders irreversible vital signs loss.
4          Q.       I'm sorry, how many minutes without a
5    heartbeat is?
6          A.       Four minutes.
7          Q.       Do you know if the five minutes begins to
8    run on administration of the first drug?
9          A.       That's what the protocol says.
10         Q.       I'm sorry, can you repeat your answer?
11         A.       That's what the protocol says.
12         Q.       So it's your understanding that you're
13   assessing vital signs after the administration of the
14   first drug?
15         A.       My only understanding is when they invite
16   me in.  I don't know the time limit after the drug has
17   been injected.
18         Q.       And what vital signs do you assess?
19         A.       Depending on the type of execution.
20         Q.       Let's start with lethal injection.  In a
21   lethal ejection execution, what sorts of vital signs do
22   you assess?
23         A.       I check corneal reflex, even though they
24   have been given a paralytic.  Check for pulse.  Check
25   for spontaneous respirations.  Check for carotid
```

1   pulses, check for femoral pulses.

2          Q.      You said you would check for corneal

3   reflex, even though they have been given a paralytic?

4          A.      Yes.

5          Q.      Can you explain that answer to me?

6          A.      Just a routine habit.

7          Q.      Is there something about the paralytic

8   that renders the corneal reflex check less meaningful?

9          A.      I don't think they can respond after

10  they've been given the paralytic.

11         Q.      So the inmate would not be able to move

12  their eyes after the paralytic?

13         A.      Right.

14         Q.      And that would be true even if they were

15  still alive?

16         A.      Right.

17         Q.      Does the paralytic interfere with any of

18  the other methods you just outlined for assessing vital

19  signs?

20         A.      Obviously, respirations.

21         Q.      How do you assess the corneal reflex?

22         A.      Run a finger over their eyelids --

23  eyelashes, excuse me.

24         Q.      You said you feel for a pulse.  How long

25  do you feel for a pulse?

Case 3:18-cv-01234   Document 201-20   Filed 04/13/22   Page 74 of 143 PageID #: 12387

1    A.    Well, the entire vascular exam is going

2   to take somewhere between two and three minutes.

3    Q.    I'm sorry, can you repeat that time?

4    A.    The entire vascular exam is going to take

5   two or three minutes.

6    Q.    What are the steps in that vascular exam?

7    A.    Checking for carotid pulses, checking for

8   femoral pulses, listening for any heart sounds.

9    Q.    And how do you listen for a carotid

10  pulse?

11   A.    You feel for a carotid pulse.  You can

12  auscultate for one.

13   Q.    I'm sorry, I missed the second part of

14  that.  You can also what for one?

15   A.    Use your stethoscope to see if there's

16  one.

17   Q.    And when you're assessing an inmate

18  during an execution, how do you check for that carotid

19  pulse?  Which way do you use?

20   A.    Both.

21   Q.    And for how long do you check for the

22  carotid pulse?

23   A.    It's part of the vascular exam.  All of

24  it together takes two or three minutes.

25   Q.    I understand, and I'm asking how much

```
 1    time you devote to each one of the three steps you just
 2    outlined.
 3            A.      One-third for each of the three steps.
 4            Q.      Do you keep track of the time somehow?
 5            A.      There's a clock in the execution chamber.
 6            Q.      Does the clock have seconds on it?
 7            A.      Yes.
 8            Q.      And do you use a stethoscope to listen
 9    for the carotid pulse?
10            A.      Yes.
11            Q.      And which stethoscope?
12            A.      Both.
13            Q.      So you switch at some point?
14            A.      Yes.
15            Q.      And what about for the femoral pulse?
16            A.      Femoral, all you can do is feel.
17            Q.      You can't listen for that one?
18            A.      No.
19            Q.      And how long do you listen for the
20    femoral pulse?
21            A.      I palpate both sides approximately a
22    minute.
23            Q.      A minute each, or a minute total?
24            A.      A minute total.
25            Q.      And how do you listen for heart sounds?
```

**Gibson Court Reporting**

```
 1          A.      With a stethoscope.

 2          Q.      Which stethoscope?

 3          A.      Yes.

 4          Q.      Which one, the electronic or the regular

 5    one?

 6          A.      Both.

 7          Q.      Do you switch?

 8          A.      Yes.

 9          Q.      And how long do you listen for heart

10    sounds, total?

11          A.      A minute.

12          Q.      You said you also check for spontaneous

13    respirations.

14          A.      Yes.

15          Q.      How do you do that?

16          A.      See whether their chest is rising and

17    falling rhythmically.

18          Q.      If the chest is rising and falling, but

19    not rhythmically, what does that indicate?

20          A.      It could be agonal respirations.

21          Q.      And what is that?

22          A.      Respirations one has while they're dying.

23          Q.      And how long do you look for spontaneous

24    respirations?

25          A.      The whole time I'm in the room.
```

1          Q.      So while you're conducting the other

2    checks?

3          A.      Yes, yes, yes.

4          Q.      Have you ever observed spontaneous

5    respirations in an inmate during a vital signs check?

6          A.      No.

7          Q.      Have you ever observed anything during

8    your vascular exam during an execution?

9          A.      Other than negative, no.

10         Q.      Do you check an inmate's blood pressure

11   during the vital signs assessment?

12         A.      No.

13         Q.      Do you use an EKG?

14         A.      No.

15         Q.      Anything else that we haven't covered?

16         A.      No.

17         Q.      You said the process is different when

18   you're assessing for vital signs during an

19   electrocution execution.  How is it different?

20         A.      With an electrocution execution I don't

21   know what the electrical discharge has done to the

22   heart, so I pay more attention with my electronic

23   stethoscope.

24         Q.      You said you pay more attention to the

25   electronic --

```
 1          A.       Yeah.

 2          Q.       -- stethoscope?

 3          A.       Yes.

 4          Q.       Why?

 5          A.       I think it's more accurate.

 6          Q.       Have you followed the same protocol at

 7   every lethal injection execution for assessing vital

 8   signs?

 9          A.       Yes.

10          Q.       Is anyone else in the execution chamber

11   with you when you're assessing vital signs?

12          A.       Only the first time.

13          Q.       And who was that person, without naming

14   names?

15          A.       Another physician.

16          Q.       And what was your understanding of why

17   that other physician was also present?

18          A.       Basically, the contract, I'm supposed to

19   have a substitute if I'm not available.

20          Q.       Did you arrange for that substitute to be

21   present?

22          A.       I was checking to see if they would be

23   interested.

24          Q.       And as a result of that person's

25   attendance did they also sign a contract with TDOC, if
```

1  you know?

2       A.     I don't know the answer to that.

3       Q.     Was that the only execution that person

4  has attended during your tenure?

5       A.     Yes.

6       Q.     Do you know whether that person indicated

7  to TDOC that they were willing to be the substitute?

8       A.     I don't know the answer to that.

9       Q.     Again, without naming names, this is a

10  person that you know outside of your work with TDOC?

11       A.     Yes.

12       Q.     Did you detect signs of life in any of

13  the inmates that you assessed for vital signs?

14       A.     I'm sorry, did I detect signs of life?

15       Q.     In any of the inmates that you assessed

16  for vital signs following a lethal injection execution?

17       A.     No, I have not.

18       Q.     Duty No. 4 states:  "Notify the Warden

19  that the inmate is not legally dead."  What does

20  "legally dead" mean?

21       A.     Does not fit the criteria for legal

22  death.

23       Q.     And what are the criteria for legal

24  death?

25       A.     Depending on which one you use, the

```
 1   irreversible cessation of all vital signs.
 2         Q.      Is that the definition that TDOC supplied
 3   to you?
 4         A.      No.
 5         Q.      Where does that definition come from?
 6         A.      Google.
 7         Q.      Google?
 8         A.      Uh-huh.
 9         Q.      When did you Google the definition of
10   "legally dead?"
11         A.      Six months ago.
12         Q.      And why did you Google that term?
13         A.      I think it had something to do with a
14   COVID patient on ECMO.
15         Q.      I'm sorry, can you repeat that answer?
16   I'm having trouble with the voice modulator.
17         A.      It had something to do with a COVID
18   patient on ECMO.
19         Q.      And prior to six months ago, what
20   definition of "legally dead" were you using?
21         A.      My own.
22         Q.      Did you say "Mine?"
23         A.      My own.
24         Q.      And what is your own definition?
25         A.      Irreversible cessation of all vital signs
```

1    or vital functions.

2          Q.      And where does that -- where did you get

3    that definition from?

4          A.      My years of practice.

5          Q.      And how would you notify the Warden if

6    the inmate was not legally dead?

7          A.      Directly, verbally.

8          Q.      Is the Warden in the execution chamber

9    with you while you are pronouncing death?

10         A.      Yes.

11         Q.      What would you do if the inmate was not

12   dead?

13         A.      Notify the Warden and immediately

14   leave --

15                 MR. SUTHERLAND:  Object to the form.  I'm

16         sorry, object to the form.  You can answer.

17                 THE WITNESS:  Notify the Warden and leave

18         the execution chamber.

19   BY MS. NELSON-MAJOR:

20         Q.      Would you tell the Warden any other

21   instructions if the inmate was not dead?

22         A.      It depends on the situation.

23         Q.      And what is -- what do you mean by

24   "depends on the situation?"

25         A.      There are several hypotheticals that

1   could occur that he would need to know about.  If I saw

2   one of them, I would notify him before I left the

3   execution chamber.

4        Q.     Have you ever discussed with the Warden

5   those hypotheticals?

6        A.     No.

7             MS. NELSON-MAJOR:  I think now is a good

8        time to take a break, if that's okay with you,

9        Mr. Sutherland and Physician.

10            MR. SUTHERLAND:  Just a regular break?

11            MS. NELSON-MAJOR:  I mean, I would be

12       fine pausing for a longer break for lunch.  I

13       don't know if that's too early on your end, but --

14            MR. SUTHERLAND:  No, that's fine.

15            MS. NELSON-MAJOR:  Do you want to come

16       back at 1:00 Eastern, 12:00 Central?

17            MR. SUTHERLAND:  Yup, that'll be fine.

18            MS. NELSON-MAJOR:  All right.  Thank you.

19            MR. SUTHERLAND:  All right.  You bet.

20            THE VIDEOGRAPHER:  We're off record at

21       12:21 p.m.

22            (Recess at 12:21 p.m. to 12:59 p.m.)

23            THE VIDEOGRAPHER:  We are back on record

24       at 12:59 p.m.

25   BY MS. NELSON-MAJOR:

 1          Q.        Physician, when we left off you were

 2     saying that there are a number of hypothetical

 3     situations you could imagine that might occur when an

 4     inmate is not dead when you assess them.  What are some

 5     of those hypothetical situations you had in mind?

 6          A.        Hypothetically, you could have a vein

 7     blow out while the injection was being given and the

 8     medication wouldn't be -- all of it given

 9     intravenously.

10          Q.        Were there other hypothetical situations

11     you had in mind?

12          A.        That was the main one.

13          Q.        And if that had occurred, what would your

14     instructions to the Warden be?

15          A.        I -- I would again inform him of such,

16     leave the room, and the IV Team would come back in.

17          Q.        And back on Page 19 of Exhibit No. 1, I'm

18     looking at No. 5, which states:  "Pronounce death if no

19     vital signs are detected."

20               Do you notify the Warden that the inmate is

21     legally dead?

22          A.        Yes.

23          Q.        And then after you pronounce death, what

24     do you do?

25          A.        Leave the execution chamber.

1       Q.     So you're not present when personnel from

2  the Medical Examiner's Office examines the body?

3       A.     No, I come back in later.

4       Q.     So after you pronounce death, you leave.

5  And then are you summoned back into the execution

6  chamber at some point?

7       A.     No.  When the Extraction Team is called,

8  I go back into the execution chamber and stand in a

9  corner until -- while the body is examined and when it

10  is put on a gurney and taken out.

11       Q.     And do you do anything while that

12  examination is occurring?

13       A.     No.

14       Q.     What's the purpose of you being in the

15  room during that examination?

16            MR. SUTHERLAND:  Object to the form.  You

17       can answer.

18            THE WITNESS:  Make sure there's been

19       error in -- no error in the diagnosis of death.

20  BY MS. NELSON-MAJOR:

21       Q.     And how do you do that?

22       A.     Notify that the body is not moving or

23  having any spontaneous respirations.

24       Q.     So you continue to monitor the body for

25  vital signs while the Medical Examiner's personnel is

 1   doing their examination?

 2         A.      Only a cursory visual exam.

 3         Q.      Do you sign the death certificate?

 4         A.      I don't recall that I ever have.

 5         Q.      Are you present when the body is removed

 6   from the execution chamber?

 7         A.      Yes.

 8         Q.      If you've already pronounced the inmate

 9   legally dead, why are you continuing to monitor the

10   inmate for vital signs on an observational basis?

11         A.      To make sure there was no errors.

12         Q.      And have you ever visually observed vital

13   signs in an inmate during that time?

14         A.      I have never visually observed any

15   movement or spontaneous respirations.

16         Q.      And if you're aware, has the Medical

17   Examiner's Office personnel ever observed that?

18         A.      I can't speak --

19                 MR. SUTHERLAND:  Object to the form.  You

20         can answer.

21                 THE WITNESS:  I can't speak for them.

22   BY MS. NELSON-MAJOR:

23         Q.      Have you ever had a discussion with

24   anyone at TDOC about how a particular execution went

25   after the fact?

```
 1          A.      None that I recall.
 2          Q.      And in the days leading up to an
 3   execution, do you have any involvement?
 4          A.      No.
 5          Q.      So you don't examine the inmate prior to
 6   an execution?
 7          A.      No.
 8          Q.      Or review medical records?
 9          A.      No.
10          Q.      Or assemble supplies?
11          A.      Or what?
12          Q.      Do you assemble any supplies in the days
13   leading up to the execution?
14          A.      No.
15          Q.      If it was reported to you that the IV
16   Team was unable to establish IV access, what would you
17   do?
18          A.      Go in and assess the inmate.
19                  MR. SUTHERLAND:  Object.  Excuse me.
20          Excuse me.  Object to the form, but you can
21          answer.
22                  THE WITNESS:  Go in an assess the inmate
23          and decide whether a cutdown or central venous
24          line was needed.
25   BY MS. NELSON-MAJOR:
```

```
1          Q.      And what would you be looking for during
2   that exam?
3          A.      Track marks, sclerosed veins.  No
4   evidence of peripheral venous veins.
5          Q.      Would you attempt to achieve -- achieve
6   peripheral access yourself?
7          A.      Only by means --
8                  MR. SUTHERLAND:  Object to the -- object
9          to the form.  You can answer.
10                 THE WITNESS:  Only by means of a cutdown.
11  BY MS. NELSON-MAJOR:
12         Q.      Is there an ultrasound available for you
13  to use when attempting to locate a vein during an
14  execution?
15         A.      No.
16         Q.      Have you ever used an ultrasound to
17  locate a vein to establish IV access in your practice
18  outside of your work with TDOC?
19         A.      No.
20         Q.      If peripheral access was not possible,
21  what other methods would you contemplate using during
22  an execution?
23         A.      Central venous access through the femoral
24  vein.
25         Q.      Is that the only alternative procedure
```

1    for obtaining venous access that you would consider

2    using?

3        A.      I'd consider that to be the safest.

4        Q.      And why do you consider that to be the

5    safest?

6        A.      Anyone can do it, and you don't run the

7    risk of a pneumo- or a hemothorax.

8        Q.      And can you explain those medical terms

9    you just used.  What is a pneumothorax?

10       A.      Collapsing a lung or having bleeding into

11   the chest cavity.

12       Q.      And those are risks associated with what

13   type of procedure?

14       A.      Subclavian vein central cannulization.

15       Q.      Are those also types of central venous

16   catheters?

17       A.      Yes.

18       Q.      So the only type of central venous

19   catheter you would attempt is in the femoral artery?

20       A.      Vein.

21       Q.      Excuse me.  Is that the -- is the femoral

22   vein the only type of central venous catheter you would

23   attempt?

24       A.      Yes.

25       Q.      Besides the femoral vein central venous

 1   catheter, are there other alternative methods for
 2   achieving IV access that you might use on an inmate?
 3          A.     No.
 4          Q.     So you wouldn't try a cutdown procedure?
 5          A.     I misunderstood the question.  I thought
 6   you were addressing central venous access.
 7          Q.     Oh, excuse me.  Besides central venous
 8   access through the femoral vein, what other
 9   alternatives to peripheral access would you attempt
10   during an execution?
11          A.     If the situation warranted, a cutdown.
12          Q.     And in what veins would you attempt the
13   cutdown procedure?
14          A.     Whichever vein was available.
15          Q.     And when you say if the situation
16   warranted you would consider a cutdown, what situations
17   would warrant a cutdown?
18          A.     The patient -- excuse me.  The inmate
19   might be so morbidly obese that they couldn't achieve
20   peripheral access and might need a cutdown to expose
21   the vein.
22          Q.     Is central venous catheters in the
23   femoral vein not possible if someone is morbidly obese?
24          A.     Yes.
25          Q.     You stated that you would also examine

1    the inmates for track marks and sclerosed veins.  How

2    would those factor into your decision about which

3    alternative for peripheral access you would choose?

4         A.      If the patient has totally sclerosed

5    veins from the antecubital cuff, a cut- -- peripheral

6    cutdown at the wrist is not going to get the

7    medications delivered.

8         Q.      Would you try intraosseous access during

9    an execution?

10        A.      No.

11        Q.      Why not?

12        A.      Unwarranted.

13        Q.      What do you mean by "unwarranted?"

14        A.      I have alternate means of access before

15   intraosseous would ever be considered.

16        Q.      If possible, would cental venous

17   catheters in the femoral vein be your first choice when

18   peripheral access is not possible?

19        A.      Yes.

20        Q.      And you stated that anyone can do a

21   central venous catheter, I believe I heard.  What did

22   you mean by that statement?

23        A.      It's a minor procedure.  Surely,

24   everybody's been exposed to it.

25        Q.      What do you mean by "everyone's been

1    exposed to it?"

2         A.     I would think that all physicians have

3    been exposed to it during their medical training.

4         Q.     Is a cutdown also a minor procedure?

5         A.     To most people.

6         Q.     "To most people?"  Do you mean people in

7    general, or doctors?

8         A.     To most physicians.

9         Q.     Why would you choose the femoral vein

10   central line over a cutdown, if both are minor

11   procedures?

12        A.     I already answered the question.

13        Q.     Can you repeat?  I'm sorry, I'm having a

14   hard time with the static.

15        A.     If the evidence of all proximal veins

16   were of sclerosis, it would not do any good to perform

17   a distal venous cutdown because the medication couldn't

18   get central.

19        Q.     When you say "the medication couldn't get

20   central," does the central venous line deliver

21   medication more quickly throughout the body?

22        A.     The larger veins are hardly ever involved

23   in sclerosis from drug use.

24        Q.     Are there safety risks associated with a

25   cutdown that are not associated with a central venous

1    catheter?

2           A.      Not that I'm aware of.

3           Q.      Have you ever performed a cutdown during

4    a lethal injection procedure in Tennessee?

5           A.      No.

6           Q.      If you could again turn to Page 19 of

7    Exhibit 1.

8           A.      Somehow I've lost my exhibits, so if you

9    could get them up for me?

10                  MS. NELSON-MAJOR:  Mr. Sutherland, I

11           don't know if you have someone available to locate

12           the files for the Physician.

13                  You're muted, Mr. Sutherland.

14                  MR. SUTHERLAND:  Dean, could you go in

15           and pull the thumb drive up?

16                  MS. NELSON-MAJOR:  Thank you.

17                  David, can we go off the record?  I'm not

18           sure this will take very long, but just in an

19           abundance of caution.  Thank you.

20                  THE VIDEOGRAPHER:  We're off record at

21           1:14 p.m.

22                  (Technical pause.)

23                  THE VIDEOGRAPHER:  We are back on record

24           at 1:16 p.m.

25    BY MS. NELSON-MAJOR:

**Gibson Court Reporting**

1        Q.        If you could turn to Page 19 of Exhibit

2    1.  Do you have that up, Physician?

3        A.        Yes.

4        Q.        Okay.  No. 2, the second duty listed is:

5                  "As an alternate or last option, the

6                  Physician may perform a venous cutdown

7                  procedure should the IV Team be unable to

8                  find a vein adequate to insert the

9                  catheter."

10                 Who determines if the IV Team is unable to

11   find a vein?

12       A.        I'm sorry?

13       Q.        If you know, who determines if the IV

14   Team is unable to find a vein, without naming names?

15       A.        The IV Team.

16       Q.        Is there a time limit on how long the IV

17   Team can attempt to achieve IV access?

18       A.        I don't know the answer to that.

19       Q.        What about a limit on the number of

20   attempts that the IV Team may perform?

21       A.        Again, I don't know their -- their

22   criteria.  I don't know the answer.

23       Q.        Has anyone ever discussed with you how

24   that determination is made?

25       A.        No.

**Gibson Court Reporting**

1        Q.        Do you think you should be the person to

2   determine whether a cutdown or alternative IV access is

3   necessary?

4                  MR. SUTHERLAND:  Object to the form.  You

5           can answer.

6                  THE WITNESS:  I think it should be a

7           joint decision between myself and the IV Team.

8   BY MS. NELSON-MAJOR:

9        Q.        Does the facility at which you work have

10  any limit on the IV attempts that can be made on a

11  patient before moving to a different procedure?

12                 MR. SUTHERLAND:  Object to the form.  You

13          can answer.

14                 THE WITNESS:  Where I work, there's no

15          limits.

16  BY MS. NELSON-MAJOR:

17       Q.        During an execution in which you have

18  served as Physician, was there ever a time that you

19  were told that the IV Team was having trouble

20  establishing IV access?

21       A.        No.

22       Q.        Where on the body is a cutdown procedure

23  performed?

24       A.        Wherever a vein is.

25       Q.        Would you perform a cutdown on an

1   inmate's great -- I might mispronounce this word,

2   excuse me in advance -- saphenous vein?

3        A.     I have done that, yes.

4        Q.     On an inmate?

5        A.     No.

6        Q.     On a patient in your general medical

7   practice?

8        A.     Yes.

9        Q.     Under what circumstances have you done

10  that on a patient?

11       A.     It was a proceeding up in the chest, they

12  needed IV access.  It was the only access I had

13  available to me.

14       Q.     At what location on the leg would you

15  attempt to access the great saphenous vein at an

16  execution?

17       A.     At the ankle.

18       Q.     Would you perform a cutdown on an

19  inmate's basilic vein?

20       A.     Basilic vein?  Yes.

21       Q.     Yes?  I'm sorry.  Was your answer "Yes?"

22       A.     Yes.

23       Q.     What about the brachial vein?

24       A.     Brachial?

25       Q.     Yes.

1       A.      Yes.

2       Q.      And of those veins, what would your order

3  of preference be?

4       A.      Again, depending on the situation,

5  wherever a peripheral vein was present and there

6  appeared to be no proximal venous obstruction.

7       Q.      Would you examine each one of those veins

8  as a potential site before making that decision?

9       A.      I would examine all four extremities.

10      Q.      How is a cutdown performed?

11      A.      A transverse incision is made over the

12 vein.  It's isolated.  Two silk sutures are placed

13 proximally distal.  A small nick is made in the vein,

14 and a catheter is inserted and tied off with silk

15 sutures.

16      Q.      Would you administer an anesthetic before

17 performing a cutdown on an inmate during an execution?

18      A.      Absolutely.

19      Q.      And what kind of anesthetic would you

20 administer?

21      A.      1-percent lidocaine.

22      Q.      Is that a topical anesthesia?

23      A.      It's given subcutaneously.

24      Q.      And what dosage of lidocaine would you

25 administer?

1      A.      1 to 2 ml's would be sufficient.

2      Q.      Do you apply a tourniquet?

3      A.      No.

4      Q.      And how deep is that initial external

5  incision that you make?

6      A.      Skin deep, 2 millimeters.

7      Q.      And how do you isolate the vein?

8      A.      With a hemostat.

9      Q.      And what sort of sutures do you use when

10  making those two tie-offs that you mentioned?

11      A.      They're not tie-offs, they're traction

12  devices.  Any suture would work, but they have silk

13  available.

14      Q.      Do you secure the catheter in some

15  fashion?

16      A.      I'm sorry?

17      Q.      Do you secure the catheter somehow --

18      A.      Yes.

19      Q.      -- after it's inserted?

20      A.      Yes, a proximal suture --

21      Q.      How do --

22      A.      A proximal suture will be tied over the

23  vein and the catheter.

24      Q.      And what gauge catheter would you use?

25      A.      At least an 18 gauge.

1     Q.     Do you suture the -- would you suture the
2   external incision?
3     A.     In a normal situation, I would.  I'm not
4   sure I would in this one.
5     Q.     Why not in this -- "this one," as you put
6   it?
7     A.     It's an execution.
8     Q.     And why would you suture it in a normal
9   medical setting?
10    A.     Because it might be needed for several
11  days.
12    Q.     And during an execution, would you cover
13  the site with anything?
14    A.     Yes.
15    Q.     With what?
16    A.     They have sterile clear dressings that
17  could go over the entire site.
18    Q.     What would you do if you were
19  unsuccessful in obtaining IV access on your first
20  attempt to perform a cutdown procedure?
21    A.     Go elsewhere.
22           MR. SUTHERLAND:  Object to the form.  You
23      can answer.
24  BY MS. NELSON-MAJOR:
25    Q.     What do you mean by "Go elsewhere?"

1       A.      Obviously pick a different site.

2       Q.      Has it ever happened to you in your

3 general medical practice?

4       A.      I don't recall any time.

5       Q.      In your medical practice, has a vein ever

6 ruptured when you were attempting to achieve access via

7 a cutdown procedure?

8       A.      No.

9       Q.      What size scalpel would you use during a

10 cutdown?

11       A.      I would use any they have available,

12 including a 10, 11, and a 15.

13       Q.      Are there different situations in which

14 you would use a different-sized scalpel?

15       A.      No.

16       Q.      So it doesn't matter?

17       A.      No.

18       Q.      Could you please turn to Page 82 of

19 Exhibit 1.

20       A.      82.

21       Q.      Have you seen this page before?

22       A.      I'm sorry, you said 82?

23       Q.      That's correct.

24       A.      Mine stops at Exhibit 79.

25       Q.      Oh.  If you look at the bottom right-hand

```
 1    corner there's page numbers printed at the bottom that
 2    don't correspond to the number of pages in the PDF.  So
 3    look at the bottom right-hand corner for Page 82.
 4         A.      Okay.  Can you give me a minute to open
 5    the file?
 6         Q.      If you turn to the --
 7                 MR. SUTHERLAND:  It's Exhibit 1, Page 82.
 8         Same exhibit we were just --
 9                 THE WITNESS:  Okay.  Yes, sir.
10    BY MS. NELSON-MAJOR:
11         Q.      Have you seen Page 82 of Exhibit 1
12    before?
13         A.      I'm headed that way.
14         Q.      Can you say that again?
15         A.      I'm headed that way.
16         Q.      Okay.  Let me know when you have it up.
17         A.      Okay.
18         Q.      Have you seen Page 82 of Exhibit 1
19    before?
20         A.      Yes.
21         Q.      What is it?
22         A.      "Lethal Injection Execution Recorder
23    Checklist."
24         Q.      I think we're on different pages.  If you
25    look at the bottom right-hand corner of the page.
```

1      A.      Okay.  I'm on 86.  Okay.  Yes.

2      Q.      Have you seen this page before?

3      A.      Yes.

4      Q.      What is it?

5      A.      The "Physician's Inventory Checklist."

6      Q.      Did you come up with the list of items on

7  this sheet?

8      A.      No.

9      Q.      Do you know who did?

10     A.      No.

11     Q.      Have you filled out this checklist

12  before?

13     A.      I'm sorry?

14     Q.      Have you ever filled out this checklist

15  before?

16     A.      Have I filled the template out?  No.

17     Q.      Before an execution starts, do you

18  personally collect the supplies on this list?

19     A.      No.

20     Q.      Does someone else gather the supplies for

21  you?

22     A.      Yes.

23     Q.      And when are you given those supplies?

24     A.      Only if needed.

25     Q.      Who would you ask if you needed these

```
 1    supplies?
 2                    MR. SUTHERLAND:  Don't identify anybody
 3           by name, just position, if you know.
 4                    THE WITNESS:  I can't.  I don't know his
 5           name.  And it's basically the team leader of the
 6           unit.
 7    BY MS. NELSON-MAJOR:
 8           Q.      What supplies do you bring with you when
 9    you enter the chamber to assess vital signs?
10           A.      I know you'll be glad when I put my
11    hearing aids back in.  Now, could you repeat your
12    question?
13           Q.      I'm sorry about that.  I said:  Do you
14    bring any supplies with you when you enter the chamber
15    to assess vital signs?
16           A.      Two stethoscopes.
17           Q.      And that's it?
18           A.      Yes.
19           Q.      Do you see listed on this page "Prep
20    kits?"
21           A.      Yes.
22           Q.      What is a prep kit?
23           A.      Basically, it's a Betadine solution to
24    create a sterile field.
25           Q.      And that's it?
```

Case 3:18-cv-01234  Document 201-20  Filed 04/13/22  Page 103 of 143 PageID #: 12416

```
 1          A.      Yes.

 2          Q.      And what is a "BP cuff?"

 3          A.      Blood pressure cuff.

 4          Q.      Have you ever used a blood pressure cuff

 5     on an inmate on the day of an execution?

 6          A.      No.

 7          Q.      How might you use a BP cuff during an

 8     execution?

 9          A.      If I thought the inmate was still alive.

10          Q.      When you went to visit -- assess the

11     inmate for vital signs?

12          A.      Yes.

13          Q.      If they appeared to still be alive, you

14     might look at their blood pressure?

15          A.      Yes.

16          Q.      What are Chux?

17          A.      They're basically absorbent pads for any

18     bodily fluids that might be spilled.

19          Q.      Why are Chux on the list?

20          A.      I'm sorry, I thought you were asking

21     about the Chux.

22          Q.      I did.  The question was:  Why are Chux

23     on the list?

24                  MR. SUTHERLAND:  Objection.  Object to

25          the form.  You can answer.
```

 1   BY MS. NELSON-MAJOR:

 2        Q.      I can restate.  How might you use Chux

 3   during an execution?

 4        A.      I'm trying to find out where the Chux is.

 5        Q.      It's about halfway down the list.

 6        A.      Again, I see "Chux" but not "Tucks."

 7        Q.      I think it's just something getting lost

 8   in Zoom.  I'm saying it's C-H-U-X.

 9        A.      Okay.  Those -- those are Chux.  Those

10   are absorbent pads that are used to absorb bodily

11   fluids.

12        Q.      And how might you use them during an

13   execution?

14        A.      If one had to do a cutdown, you would

15   spread one under the procedure site to catch any

16   spilled blood.

17        Q.      And why is lidocaine 2 percent on this

18   list?

19        A.      That may be what they had.  It's either

20   lidocaine 1 or 2 percent.

21        Q.      And underneath "Lidocaine 2 percent" is

22   "Lidocaine 2 percent with epinephrine?"

23        A.      Yes.

24        Q.      Are they used for different purposes?

25        A.      No, they're both used for skin

Case 3:18-cv-01234   Document 201-20   Filed 04/13/22   Page 105 of 143 PageID #: 12418

1    anesthesia.

2           Q.      And what are 4-0 VICRYL?

3           A.      Those are just the different sutures they

4    have.  Some are absorbable, some aren't.

5           Q.      Are VICRYL suture absorbable?

6           A.      Yes.

7           Q.      Are ETHILON sutures absorbable?

8           A.      No.

9           Q.      What kind of sutures would you use during

10   a cutdown procedure?

11          A.      Makes no difference.

12          Q.      And what is a cutdown tray?

13          A.      It will have several small hemostats and

14   some sterile towels present.

15          Q.      You said that there is a commercially

16   available kit for central lines.

17          A.      Yes.

18          Q.      Is that right?

19          A.      Yes.

20          Q.      Is that on this list somewhere?

21                  (Witness reviews document.)

22                  MR. SUTHERLAND:  You might want to reask

23          your question, please.

24                  MS. NELSON-MAJOR:  I was giving him time,

25          because I thought he was looking at the list.

```
 1    BY MS. NELSON-MAJOR:

 2          Q.      Physician, are you looking at the list?

 3          A.      I'm trying to get back.  It's 82, right?

 4          Q.      Did you lose the exhibit on the computer?

 5          A.      I'm getting there, slowly but surely.

 6                  Okay.  I do not see it.

 7          Q.      But it's your understanding that one

 8    would be made available to you if necessary?

 9          A.      One is available.

10          Q.      And you've seen it --

11          A.      Yes.

12          Q.      -- at the prison?

13          A.      Yes.

14          Q.      Does the kit contain catheters?

15          A.      Yes.

16          Q.      How often do you perform cutdown

17    procedures during your normal medical practice?

18          A.      Once in 20 years.

19          Q.      So you've performed one total in your

20    medical career?

21          A.      No, ma'am.

22          Q.      How many total would you say you've

23    performed over the course of your medical career?

24          A.      A hundred.

25          Q.      When was the last time you performed a
```

1    cutdown procedure?

2          A.     Probably 20 years ago.

3          Q.     And how often do you achieve IV access

4    through a central line?

5          A.     I'm sorry?

6          Q.     How often do you perform the central line

7    procedure that we discussed earlier?

8          A.     I haven't performed it since 2006.

9          Q.     And how many times in your medical career

10   do you think you've achieved IV access through a

11   central line?

12         A.     Thousands.

13         Q.     Did you change jobs in 2006?

14         A.     Would you repeat?

15         Q.     Did you change jobs in 2006?

16         A.     Yes.

17         Q.     Was performing central lines something

18   you routinely did at that previous job?

19         A.     Yes.

20         Q.     And what sort of medicine did you

21   practice at that point in time?

22         A.     Procedural medicine.

23         Q.     What is procedural medicine?

24         A.     Where procedures are performed.

25         Q.     Are you talking about surgeries?

Case 3:18-cv-01234   Document 201-20   Filed 04/13/22   Page 108 of 143 PageID #: 12421

1        A.        Yes.

2        Q.        So you would establish a central venous

3    line in a patient in conjunction -- conjunction with a

4    surgery you were performing?

5        A.        Or if other patients needed venous access

6    for other physicians.

7        Q.        Were these major surgeries?

8        A.        Yes.

9        Q.        I'm just finding my correct page in the

10   protocol.

11                 Do you have a subspecialty as a surgeon?

12       A.        No.

13       Q.        Could you please turn to Page 34 of

14   Exhibit 1.

15       A.        Okay.  Are we still staying on Exhibit 1?

16       Q.        Yes; Exhibit 1, Page 34.

17       A.        All right.

18       Q.        Before we get to Page 34, I want to ask

19   you one more question about that.  When you say you've

20   performed the central lines in conjunction with

21   surgeries, were those actual surgeries where you were

22   the surgeon?

23       A.        Or putting in central lines for other

24   physicians' patients.

25       Q.        But for some of those patients you were

1    actually performing the surgery?

2           A.      Yes.

3           Q.      What drugs does the current protocol

4    contemplate using?

5                   MS. HAYDEN-MAJORS:  I understand you're

6           having a hard time hearing me with the static in

7           your hearing aids.  I wonder if we should go off

8           the record.

9                   THE VIDEOGRAPHER:  We're off the record

10          at 1:43 p.m.

11                  (Recess at 1:43 p.m. to 1:57 p.m.)

12                  THE VIDEOGRAPHER:  We are on record at

13          1:57 p.m.

14   BY MS. NELSON-MAJOR:

15          Q.      Physician, we're looking at Exhibit 1,

16   Page 34.  Do you have that up still?

17          A.      Bear with me.

18          Q.      Physician, we're looking at Exhibit 1,

19   Page 34.

20          A.      Okay.  Page 34?

21          Q.      Page 34 of Exhibit 1.  Do you have that

22   up?

23          A.      Yes.

24                  MS. NELSON-MAJOR:  I'm getting a

25          significant amount of feedback.  I can somewhat

 1          hear the Physician; but Ms. Sansom, can you hear

 2          okay?

 3                    Yeah, I don't think that this is going to

 4          work.

 5                    (Recess from 1:58 p.m. to 2:13 p.m.)

 6                    THE VIDEOGRAPHER:  We're back on record

 7          at 2:13 p.m.

 8    BY MS. NELSON-MAJOR:

 9          Q.      Physician, what drugs does the current

10    protocol contemplate TDOC using during an execution?

11          A.      I can offer you the answer off the cuff.

12          Q.      I'm sorry, I didn't catch your answer.

13          A.      I can offer you the answer off the cuff,

14    but I haven't gotten to Page 34.

15          Q.      I'm asking you, to your recollection,

16    what drugs does TDOC is?

17          A.      Midazolam, vecuronium, and potassium

18    chloride.

19          Q.      And looking at Page 34 of Exhibit 1,

20    titled "Chemicals Used in Lethal Injection," have you

21    seen this page before?

22          A.      Yes.

23          Q.      What total dosage of midazolam does the

24    protocol call for?

25          A.      A total of 500 milligrams.

```
 1          Q.       And what total dose of vecuronium bromide
 2    does the protocol call for?
 3          A.       A total of 100 milligrams.
 4          Q.       And what about total dose of potassium
 5    chloride?
 6          A.       Total of 240 milligrams --
 7    milliequivalents, excuse me.
 8          Q.       And what is your understanding of the
 9    purpose of including midazolam in the lethal injection
10    protocol?
11          A.       It's a benzodiazepine; an antianxiety,
12    amnestic drug.
13          Q.       And what are the typical uses for
14    midazolam?
15          A.       It's an antianxiety drug.  It's used as
16    part of an anesthetic regimen.  It's also used for
17    procedures that call for twilight sleep.
18          Q.       And what do you mean by "twilight sleep?"
19          A.       Where you don't really need or require an
20    anesthesiologist, and the patient is in a restful state
21    but they don't remember the procedure.
22          Q.       And is that a lighter level of sedation
23    than would be required for a surgical procedure?
24          A.       Americans use it for endoscopies.
25          Q.       I'm sorry, you said who uses it for
```

```
 1   endoscopies?

 2        A.      Americans.

 3        Q.      Americans?

 4        A.      Yes.

 5        Q.      In what part of the body does midazolam

 6   work?

 7                MR. SUTHERLAND:  Can you hit the mute

 8        button when you finish your answer, doctor?

 9                THE WITNESS:  Yes.  That, I don't know.

10        I'm not a pharmacist --

11   BY MS. NELSON-MAJOR:

12        Q.      Do you know --

13        A.      -- or an anesthesiologist.

14        Q.      -- midazolam's mechanism of action?

15        A.      No, I don't know.

16        Q.      How are benzodiazepines and barbiturates

17   different?

18        A.      I can't give you a good answer.

19        Q.      Is midazolam typically used as an

20   anesthetic?

21        A.      It's used as part of an anesthetic

22   regimen.

23        Q.      And what regimen is it part of?

24                MR. SUTHERLAND:  Object to the form.

25   BY MS. NELSON-MAJOR:
```

```
 1         Q.       You can answer.
 2                  MR. SUTHERLAND:  Okay, you can answer.
 3         But when you finish your answers, can you make
 4         sure to mute yourself?
 5                  THE WITNESS:  No, I can't, because I have
 6         to get off the exhibit.
 7  BY MS. NELSON-MAJOR:
 8         Q.       You can close out of the exhibit for now.
 9  We won't be looking at it.
10         A.       All right.
11         Q.       So my question was:  You said that
12  midazolam is used as part of a regimen when used as an
13  anesthetic, and I asked:  What other drugs are part of
14  that regimen?
15         A.       I'm not an anesthesiologist.  I don't
16  know.  They have multiple drugs at their disposal.
17         Q.       Is midazolam ever used by itself to
18  maintain anesthesia during a surgical procedure?
19         A.       Again, I'm not an anesthesiologist.  I
20  don't know.
21         Q.       Is there a difference between induction
22  and maintenance of anesthesia?
23                  MR. SUTHERLAND:  Object to the form.  You
24         can answer, if you know.
25                  THE WITNESS:  I'm not an
```

 1          anesthesiologist.  I don't know.

 2   BY MS. NELSON-MAJOR:

 3          Q.      Have you ever used midazolam by itself to

 4   maintain a plane of general anesthesia?

 5                  MR. SUTHERLAND:  Object to the form.

 6                  THE WITNESS:  No.

 7   BY MS. NELSON-MAJOR:

 8          Q.      Was your answer "No?"  I'm sorry, I lost

 9   your answer in the objection.

10          A.      No.

11          Q.      And you've performed surgeries where

12   you're not monitoring or performing the anesthesia; is

13   that right?

14          A.      Yes.

15          Q.      Are you aware of whether the

16   anesthesiologist performing the anesthesia on those

17   surgeries ever used midazolam by itself to maintain

18   general anesthesia?

19          A.      I'm not aware.

20          Q.      Does midazolam have an analgesic effect?

21                  MR. SUTHERLAND:  Object to the form.  You

22          can answer.

23                  THE WITNESS:  I'm not a pharmacologist.

24          I don't know the answer.

25   BY MS. NELSON-MAJOR:

```
1         Q.      Have you ever prescribed or used
2    midazolam by itself as an analgesic?
3         A.      No.
4         Q.      Have you used midazolam in your medical
5    career before?
6         A.      Personally, no.
7         Q.      You've never given a patient midazolam?
8         A.      No.  A patient has received midazolam at
9    an endoscopy center, but I wasn't giving it.
10        Q.      In the course of your medical practice,
11   are endoscopies the only procedure in which you've been
12   involved that a patient has received midazolam by
13   itself?
14        A.      I don't know the answer to that.
15        Q.      And are endoscopies performed in surgery
16   centers or hospitals?
17                We missed your answer.
18        A.      I'm sorry, could you repeat your
19   question?
20        Q.      Do endoscopies have to be performed in
21   hospitals?
22                I didn't catch your answer.
23                Can you restate your answer?  You were
24   muted when you were answering.
25        A.      An endoscopy can be performed in a
```

```
 1   hospital or as an outpatient procedure.
 2        Q.      Are you aware that midazolam has a
 3   ceiling effect?
 4              MR. SUTHERLAND:  Object to the form.  You
 5        can answer.
 6              THE WITNESS:  No.
 7   BY MS. NELSON-MAJOR:
 8        Q.      You're not aware, or midazolam does not
 9   have a ceiling effect?
10        A.      No, I'm not aware of a ceiling effect.
11        Q.      And you, to be clear, have never used
12   midazolam by itself to maintain general anesthesia?
13              MR. SUTHERLAND:  Object to the form.  You
14        can answer.
15              THE WITNESS:  No.
16   BY MS. NELSON-MAJOR:
17        Q.      Are you aware that midazolam can result
18   in a paradoxical reaction?
19        A.      No.
20        Q.      You're not aware that midazolam can
21   result in a paradoxical reaction?
22        A.      No, I'm not aware.
23        Q.      Is midazolam acidic or alkaline?
24        A.      Don't know the answer.
25        Q.      What kind of drug is vecuronium bromide?
```

```
 1          A.       A paralytic agent.
 2          Q.       And what is your understanding of the
 3   purpose of including the vecuronium bromide in the
 4   lethal injection protocol?
 5          A.       To stop involuntary muscle movement,
 6   which will also stop respiration.
 7          Q.       Have you used vecuronium bromide in your
 8   medical practice?
 9          A.       Yes.
10          Q.       And for what purposes have you used it?
11          A.       For paralyzing patients.
12          Q.       And under what circumstances do you use
13   it to paralyze a patient?
14          A.       If there's a suspected closed-head injury
15   in the emergency department and you have to intubate
16   the patient.  If you have a sick patient on the
17   ventilator and he's fighting it and you can't keep his
18   oxygenation up, you can possibly paralyze them in
19   recovery -- to recover oxygenation.
20          Q.       And what are the therapeutic doses of
21   vecuronium bromide?
22          A.       I haven't used it lately enough to come
23   up with a good answer.
24          Q.       And when a patient is --
25                   (Interruption.)
```

```
 1                    MS. NELSON-MAJOR:  I'm just muting myself
 2          so you don't hear my office intercom.  Let me turn
 3          my do not disturb on.
 4   BY MS. NELSON-MAJOR:
 5          Q.      When vecuronium bromide is administered
 6   in a medical setting, is a patient first given some
 7   form of anesthesia?
 8                  And Physician, you're muted if you're
 9   speaking.
10          A.      It would depend on the situation.
11          Q.      And how would it depend?
12          A.      If the patient were awake and alert and
13   still required to be given a paralytic, you would
14   obviously be giving something prior to.
15                  If a patient is critically ill and
16   totally unconscious, they would probably not require
17   any other agent.
18          Q.      And if the patient was awake and
19   conscious when receiving the vecuronium bromide, why
20   would you give them an anesthesia first?
21          A.      I'm not a pharmacist or anesthesiologist.
22          Q.      You said obviously, if a patient was
23   conscious before giving the vecuronium bromide, they
24   would be given anesthesia.  I'm asking, what are those
25   obvious reasons?
```

**Gibson Court Reporting**

```
 1          A.        I wouldn't want to paralyze a patient who
 2    was totally awake and alert and oriented times three.
 3          Q.        Why not?
 4          A.        I suspect, if nothing else, the psychic
 5    trauma would be a problem.
 6          Q.        And the injection of the medication
 7    itself, does that cause a sensation in a patient who is
 8    conscious?
 9          A.        I don't know the answer to that.
10          Q.        You don't know whether vecuronium bromide
11    causes a burning sensation upon injection if
12    administered without anesthesia?
13                    MR. SUTHERLAND:  Objection to form.
14                    THE WITNESS:  I don't know.
15    BY MS. NELSON-MAJOR:
16          Q.        Is vecuronium bromide acidic or alkaline?
17          A.        I don't know.
18          Q.        Was the administration of vecuronium
19    bromide -- Physician, if you can mute yourself.  I'm
20    afraid you're not going to be able to hear the
21    question.
22          A.        Now I'm on mute.  Go ahead.
23          Q.        Okay.  Will administration of vecuronium
24    bromide impact the ability of an observer to assess
25    someone for consciousness?
```

```
 1          A.      I don't know the answer to that.
 2          Q.      If someone's been administered a
 3   paralytic, is it harder to assess whether that person
 4   is experiencing a reaction to a procedure or a
 5   medication?
 6                  MR. SUTHERLAND:  Objection to the form.
 7        You can answer.
 8                  THE WITNESS:  I would think, yes.
 9   BY MS. NELSON-MAJOR:
10          Q.      And why would you think yes?
11          A.      If they were paralyzed, they couldn't
12   spontaneously --
13          Q.      You muted yourself in the middle of that
14   sentence.
15          A.      If they were paralyzed, they couldn't
16   move and demonstrate any reaction.
17          Q.      And what kind drug is potassium chloride?
18          A.      It's a normal electrolyte.
19          Q.      I'm not sure if we caught your full
20   answer.  Can you repeat that?
21          A.      It's a normal electrolyte.
22          Q.      And what is your understanding of the
23   purpose of including the potassium chloride in the
24   lethal injection protocol?
25          A.      At the dose it's given, it causes
```

1    irregular heartbeats and cardiac asystole.

2        Q.        Is the potassium chloride at the dose

3    it's given, in and of itself, fatal?

4        A.        Yes.

5        Q.        So if an inmate was not administered the

6    vecuronium bromide but instead just midazolam and the

7    potassium chloride, would that be sufficient to kill

8    the inmate?

9                MR. SUTHERLAND:  Object to the form.  You

10       can answer.

11   BY MS. NELSON-MAJOR:

12       Q.        If you're answering, you're muted.

13       A.        I don't know the answer to that.

14       Q.        You stated that the 240 milliequivalents

15   of potassium chloride on its own would be fatal.  Do

16   you have a sense of how quickly it would cause death?

17       A.        Within minutes.

18       Q.        Would it be less than five minutes, in

19   your opinion?

20                If you're answering, you're muted.

21       A.        Yes.

22       Q.        What would a person feel if they were

23   administered potassium chloride without anesthesia?

24                MR. SUTHERLAND:  Object to the form.  You

25       can answer.

1                    THE WITNESS:  Most patients report
2          occasionally burning in their veins when you have
3          a normal dosage.
4    BY MS. NELSON-MAJOR:
5          Q.      Have you ever administered potassium
6    chloride to a patient who has reported feeling burning
7    in their veins?
8          A.      No.
9          Q.      Would you characterize the sensation
10   caused by potassium chloride without anesthesia as a
11   noxious stimulus?
12                   MR. SUTHERLAND:  Object to the form.  You
13         can answer.
14                   THE WITNESS:  It's apparently unpleasant.
15   BY MS. NELSON-MAJOR:
16         Q.      If an individual was administered
17   potassium chloride without anesthesia, would they
18   exhibit a reaction?
19                   MR. SUTHERLAND:  Object to form.  You can
20         answer.
21                   THE WITNESS:  I don't know the answer to
22         that.
23   BY MS. NELSON-MAJOR:
24         Q.      Would a physical reaction to potassium
25   chloride, the burning sensation, signal that they're

1    conscious?

2                    MR. SUTHERLAND:  Object to the form.  You

3        can answer.

4                    THE WITNESS:  Given a normal therapeutic

5        dose, yes.  I don't have any information about

6        getting massive doses.

7    BY MS. NELSON-MAJOR:

8        Q.     What would the reaction look like from a

9    person who was administered a therapy dose to the

10   potassium chloride without an anesthetic?

11                   MR. SUTHERLAND:  Object to the form.  You

12       can answer.

13                   THE WITNESS:  The patient apparently

14       reports a burning sensation in the vein in which

15       the therapeutic drug is being given.

16   BY MS. NELSON-MAJOR:

17       Q.     If a person, that patient, had first

18   received a paralytic, would they be able to exhibit

19   that same reaction to the potassium chloride?

20                   MR. SUTHERLAND:  Object to the form.  You

21       can answer.

22                   THE WITNESS:  I don't know the answer to

23       that.

24   BY MS. NELSON-MAJOR:

25       Q.     If a person is paralyzed but experiencing

```
 1   pain, are they able to physically react?
 2                 MR. SUTHERLAND:  Object to the form.  You
 3        can answer.
 4                 THE WITNESS:  Yes.
 5   BY MS. NELSON-MAJOR:
 6        Q.      They are?
 7        A.      Yes.
 8        Q.      Can you explain that to me?
 9        A.      Tachycardia and elevated blood pressure.
10        Q.      What about to a visual inspection?
11        A.      You wouldn't be able to see those
12   visually.
13                 MR. SUTHERLAND:  I didn't hear the
14        answer.
15   BY MS. NELSON-MAJOR:
16        Q.      Can you repeat that, Physician?  I didn't
17   catch it.
18        A.      You wouldn't be able to see those.
19        Q.      All right.  I'm going to ask you to pull
20   up Exhibit 70.  And I apologize for the interference
21   that's going to cause with the muting and unmuting, but
22   it'll be quick.
23                 And let me know when you have it up.
24        A.      This is a pain.  This is what page?
25        Q.      I'm sorry.  Exhibit 70, the first page.
```

```
 1        A.      Okay, Page 70, Exhibit No. 1.

 2        Q.      No.  Excuse me, Exhibit 70.

 3        A.      Exhibit 70?

 4        Q.      Yes, the first page.

 5        A.      I'm there.

 6        Q.      Do you recognize these documents?

 7        A.      No.

 8        Q.      You did not sign these prescriptions?

 9        A.      No.

10        Q.      Was that "No?"

11        A.      No.  They're redacted on that copy, so I

12   have no idea who signed them.

13        Q.      Do you recall signing prescriptions for

14   the ordering of lethal injection chemicals for

15   particular executions?

16        A.      Do I recall it?  No.

17        Q.      You recall signing the one order we

18   talked about earlier; is that right?

19                MS. NELSON-MAJOR:  Physician, did we lose

20        you?  Physician, are you there?  It seems like

21        something cut off sort of abruptly.  I wonder if

22        he lost audio.

23                MR. SUTHERLAND:  Dean, can you check on

24        that, please?

25                MS. NELSON MAJORS:  Can we go off the
```

 1        record?

 2                THE VIDEOGRAPHER:  We're off record at

 3        12:37 p.m.

 4                (Recess at 2:37 p.m. to 2:39 p.m.)

 5                THE VIDEOGRAPHER:  We're on record at

 6        2:39 p.m.

 7   BY MS. NELSON-MAJOR:

 8        Q.      Physician, the last question I asked was:

 9   Do you recall writing just the single prescription for

10   drugs for TDOC to use during the lethal injection

11   procedure?

12        A.      Yes.

13        Q.      Have you ever seen the drugs in TDOC's

14   possession for use in lethal injection executions?

15                If you're answering, you're muted.

16        A.      I don't recall.

17        Q.      Have you ever been involved in

18   inventorying the drugs in TDOC's possession for use in

19   lethal injection executions?

20        A.      Repeat, please?

21        Q.      Have you ever inventoried the drugs in

22   TDOC's possession for use in lethal injection

23   executions?

24        A.      Not that I recall.

25        Q.      Have you ever discussed how to perform

1    the consciousness check with Warden Tony Mays?

2         A.      No.

3         Q.      Or anyone else involved in carrying out

4    the executions?

5         A.      No.

6         Q.      Have you ever had a conversation with

7    anyone on the Execution Team about contingencies for

8    problems that might arise during an execution?

9         A.      No.

10        Q.      When you initially discussed performing

11   the Physician role with TDOC, did they ask you how long

12   ago you last performed a cutdown procedure?

13        A.      No.

14        Q.      Outside of your role in executions, do

15   you supply medical care to TDOC staff?

16             MR. SUTHERLAND:  I'm going to object and

17        instruct the witness not to answer, based on the

18        Court's protective order.

19   BY MS. NELSON-MAJOR:

20        Q.      Have you ever been dis- -- disciplined by

21   a medical board?

22        A.      Yes.

23        Q.      How many times have you been disciplined

24   by a medical board?

25        A.      Once.

```
 1          Q.       And when was that?

 2          A.       2009.

 3          Q.       And what was the discipline that was

 4   imposed?

 5          A.       Loss of general surgical accreditation.

 6          Q.       You said loss of surgical accreditation?

 7          A.       Yes.

 8          Q.       And what were the circumstances of the

 9   events that led to the loss of your surgical

10   accreditation?

11          A.       Too many malpractice suits.

12          Q.       Did that proceeding impact your medical

13   license?

14          A.       No.

15          Q.       Was there a hearing in that matter?

16          A.       No.

17          Q.       Did you contest this allegation?

18          A.       No.

19          Q.       Have you ever been referred to the

20   Tennessee Medical Foundation?

21               MR. SUTHERLAND:  I'm going to object and

22          instruct the witness not to answer, based on the

23          protective order.

24   BY MS. NELSON-MAJOR:

25          Q.       Why didn't you contest the allegations in
```

1    the disciplinary action?

2         A.       I was tired of the medicolegal system and

3    I was ready to stop.

4         Q.       You previously stated that you have been

5    deposed in two to three medical malpractice suits.

6    Were there additional medical malpractice suits against

7    you in which you did not -- you were not deposed?

8         A.       Yes.

9         Q.       How many medical malpractice suits total

10   would you estimate have been filed against you?

11        A.       As a general surgeon, six.

12        Q.       Were medical malpractice suits filed

13   against you not as a general surgeon?

14        A.       Yes.

15        Q.       And how many were filed against you in

16   capacities other than general surgeon?

17        A.       Ten.

18        Q.       In what capacities were those suits filed

19   against you?

20        A.       I was the defendant.

21        Q.       In what capacity were you providing

22   medicine in relation to those ten suits?

23        A.       I was a cardiac surgeon.

24        Q.       And what were the outcomes of those ten

25   suits?

1      A.      No depositions, never went to trial.  No

2   settlements.

3      Q.      They were settled?

4      A.      No settlements.  They were not settled,

5   never went to trial.  No depositions.

6      Q.      Were the lawsuits dismissed?

7      A.      Yes, they were.  All of them.

8      Q.      And what about the six lawsuits filed

9   against you as a general surgeon?  What were the

10   outcome of those suits?

11      A.      Let's see.  Two were settled.  Well, the

12   last two were settled -- excuse me, the last one was

13   totally dropped.

14      Q.      So two were settled, one was dropped.

15   What about the other three?

16      A.      I'd have to check my records, but they

17   were basically nuisance suits.

18      Q.      If they were nuisance suits, why was your

19   accreditation to perform surgery revoked?

20             MR. SUTHERLAND:  Object to the form.  You

21        can answer generally, if you know.

22             THE WITNESS:  And what was the question?

23   BY MS. NELSON-MAJOR:

24      Q.      If they were nuisance -- if many of these

25   were nuisance suits, as you say, why was your

 1    accreditation to perform surgery revoked?

 2         A.     That was internal surgery.

 3         Q.     Yes.  And if several of the lawsuits

 4    were, as you say, nuisance suits, why was your

 5    accreditation in general surgery revoked?

 6         A.     The ten nuisance suits were when I was a

 7    cardiac surgeon.

 8         Q.     Okay.  And the six lawsuits that were

 9    filed as --

10         A.     A general surgeon.

11         Q.     -- as a general surgeon --

12         A.     Boarded as a general surgeon.

13         Q.     Let me finish my question so you actually

14    know what I'm asking.  Out of the six --

15         A.     Yes.

16         Q.     Out of the six lawsuits that were filed

17    against you as a general surgeon, you said two were

18    settled, one was dropped.  What were the outcome of the

19    other three lawsuits filed against you as a general

20    surgeon?

21         A.     Again, I don't recall without checking in

22    my records.  There was no large settlement in any of

23    them, if there was.

24         Q.     And outside of these lawsuits, were

25    complaints ever filed against you with the Medical

1    Board?

2        A.      No.

3        Q.      You said that you had medical licenses at

4    some point in other jurisdictions.  Were those licenses

5    in other jurisdictions ever subject to a disciplinary

6    action?

7        A.      No.

8        Q.      And the suits that were filed against you

9    as the general surgeon, generally what were the

10   allegations against you?

11              MR. SUTHERLAND:  You can -- you can give

12        very general information about the allegations.

13              THE WITNESS:  Complications occurring

14        during surgical procedures.

15   BY MS. NELSON-MAJOR:

16       Q.      And what were the complications that were

17   alleged to have occurred during your surgeries?

18       A.      Anastomotic breakdowns.

19       Q.      I'm sorry, could you repeat that again?

20   I didn't catch the first word.

21       A.      Anastomotic breakdowns.

22       Q.      And what does that term mean?

23       A.      When you put two sections of the bowel

24   together, you create an anastomosis.  Sometimes, they

25   fall apart.

1      Q.     And as a cardiac surgeon, what were the

2  allegations in general of the ten lawsuits filed

3  against you?

4      A.     People dying.

5      Q.     People dying?

6      A.     Uh-huh.

7      Q.     Were all ten of those lawsuits involving

8  deaths of patients?

9      A.     I suppose.

10        MR. SUTHERLAND:  I'm going to -- yeah.

11  BY MS. NELSON-MAJOR:

12      Q.     And in these lawsuits, was it alleged

13  that you provided medical care below the prevailing

14  standard of care?

15        MR. SUTHERLAND:  Object to the form.  You

16     can answer.

17        THE WITNESS:  And I apologize.  The

18     question again?

19  BY MS. NELSON-MAJOR:

20      Q.     In the lawsuits filed against you, was it

21  alleged that you provided medical care that fell below

22  the standard of care?

23      A.     Yes.

24        MS. NELSON-MAJOR:  If we could take a

25     ten-minute break, we've been going for about

 1        another hour.  Would that be okay?

 2                    And David, how much time do we have left?

 3                    THE VIDEOGRAPHER:  We're at approximately

 4        3 hours, 25 minutes.

 5                    MS. NELSON-MAJOR:  Thank you.

 6                    THE VIDEOGRAPHER:  We're off record at

 7        2:50 p.m.

 8                    (Recess at 2:50 p.m. to 2:59 p.m. )

 9                    THE VIDEOGRAPHER:  We are back on record.

10        The time is 2:59 p.m.

11  BY MS. NELSON-MAJOR:

12        Q.      Is accreditation something different than

13  a Board certification?

14                    If you're answering, Physician, you're on

15  mute?

16        A.      I'm not aware of all the names they have,

17  no.

18        Q.      When you said that your accreditation to

19  perform general surgery had been revoked, was it

20  revoked by a state Board of Medicine?

21                    If you're answering, you're on mute.

22        A.      Yes.  However, the Board of Surgery

23  revoked my Board certification and recertification.

24        Q.      You said the Board of Surgery revoked

25  your certification for general surgery; is that right?

1        A.        And recertification, yes.

2        Q.        Did the state Board of Medicine issue

3  some other discipline against you?

4        A.        No, other than obviously they said I

5  could not perform any surgical procedures.

6        Q.        What does recertification mean?

7        A.        It means if you have kept up with the

8  current education and you retake the Boards ten years

9  later, see if you can pass them.

10        Q.        Were you accredited in both general and

11  cardiac surgery --

12        A.        Yes.

13        Q.        -- at one point in your career?

14        A.        Just general.

15        Q.        Just general?  You did not hold a Board

16  certification or accreditation in cardiac surgery?

17        A.        No.

18        Q.        When did you stop performing cardiac

19  surgery?

20        A.        1996.

21              MR. SUTHERLAND:  Doctor, please -- please

22        let me have an opportunity to speak before you

23        give your answers, all right?  That way, I can

24        object if necessary.

25              I'm going to object to the question and

Case 3:18-cv-01234  Document 201-20  Filed 04/13/22  Page 136 of 143 PageID #: 12449

```
 1          instruct the witness not to answer and move to
 2          strike, just based on the Court's protective
 3          order.
 4  BY MS. NELSON-MAJOR:
 5          Q.      Why did you stop performing cardiac
 6  surgery?
 7          A.      I had trouble with my back and neck.
 8          Q.      Have you ever lost admitting privileges
 9  at a hospital?
10          A.      No.
11          Q.      In the six suits filed against you as a
12  general surgeon, did those patients also die?
13          A.      No.  I think only one did.
14          Q.      And when you agreed to the revocation of
15  your certification and recertification, did you have to
16  stipulate to any of the allegations made against you?
17                  MR. SUTHERLAND:  I'm going to -- I'm
18          going to object and instruct the witness not to
19          answer the question, based on the Court's
20          protective order.
21  BY MS. NELSON-MAJOR:
22          Q.      Were your certification in general and
23  recertification revoked based on the allegations in the
24  six lawsuits you've mentioned?
25                  MR. SUTHERLAND:  I'm going to object.  He
```

1          can generally -- I'm going to object to any

2          specific number that you're talking about, based

3          on the Court's protective order, and instruct the

4          witness not to answer.

5               If you want to ask him something general,

6          you can ask him.

7     BY MS. NELSON-MAJOR:

8          Q.     When you agreed to the revocation of your

9     certification and recertification, did you have to

10    admit that your care fell below the prevailing standard

11    of care?

12         A.     No.

13         Q.     Was your agreement to the revocation of

14    your certification and recertification part of a

15    settlement to any of the lawsuits?

16              MR. SUTHERLAND:  I'm going to object and

17         instruct the witness not to answer that question,

18         based on the Court's protective order.

19    BY MS. NELSON-MAJOR:

20         Q.     Were the settlements -- and again, I'm

21    not asking for the content of the settlements.  Were

22    those settlements confidential?

23         A.     I don't recall.

24         Q.     Did you have to appear before the Board

25    of Medicine in relation to this disciplinary matter?

```
 1          A.      Yes.

 2          Q.      Without discussing details, what was the

 3     nature of those appearances?

 4                  MR. SUTHERLAND:  I think he's answered,

 5             based on your question; and so I'm going to

 6             instruct him not to answer about any specifics

 7             about appearing before a Medical Board, based on

 8             the Court's protective order.

 9     BY MS. NELSON-MAJOR:

10          Q.      Physician, you previously testified that

11     there was no hearing, but you just stated that you have

12     appeared before the Medical Board.  And I'm trying to

13     understand the difference that you're drawing there.

14                  What were the nature of those

15     appearances?  Were you asked questions?

16          A.      Okay, I'm confused.  When you talk about

17     medical boards, are you talking about the General

18     Surgical Board?

19          Q.      Was your accreditation, I believe as you

20     referred to it, revoked by the General Surgery Board or

21     a state Board of Medicine?

22          A.      The General Surgery Board.

23          Q.      When you appeared before the General

24     Surgery Board, were you asked questions about the

25     medical care you provided in particular cases?
```

1      A.      I did not appear in front of the General

2   Surgery Board.

3      Q.      You appeared before the Medical Board?

4      A.      I appeared in front of the state Medical

5   Boards where I had my license.

6      Q.      Was that also in connection with the

7   disciplinary proceeding?

8      A.      I don't recall.

9      Q.      Were you asked questions about medical

10  care you had provided at those appearances?

11     A.      No.

12     Q.      Do you recall what was discussed -- and

13  I'm not asking right now what was discussed, but do you

14  recall what was discussed when you appeared before the

15  state Medical Board?

16     A.      Basically, I think there was a discussion

17  about why so many malpractice suits.

18     Q.      Did you appear with counsel?

19     A.      No.  At that time, I was tired and ready

20  to give it up.

21     Q.      Did those meetings with the state Medical

22  Board ever result in a disciplinary action being filed

23  against you?

24     A.      No, other than no surgical procedures be

25  performed.

1      Q.      So the direction to not perform surgical

2  procedures going forward, that came from the state

3  Medical Board, not the Board of General Surgery?

4      A.      Correct.

5      Q.      And did you contest that direction in any

6  way?

7      A.      No.

8              MR. SUTHERLAND:  Object to the form,

9          based on his prior answer.

10 BY MS. NELSON-MAJOR:

11     Q.      When you agreed to serve as Physician for

12 TDOC, did you inform them of any of these disciplinary

13 proceedings against you?

14     A.      I don't recall.

15     Q.      Did you take any notes during the

16 deposition today?

17     A.      No.

18     Q.      And do you have any documents in the room

19 with you other than the exhibits that we've discussed?

20     A.      No.

21             MS. NELSON-MAJOR:  Those are all the

22         questions I have for the Physician.  Thank you,

23         Physician, for taking the time to answer my

24         questions.

25             MR. SUTHERLAND:  Thank you,

1          Ms. Nelson-Major, Ms. Sansom, Mr. Jenkins.

2               THE VIDEOGRAPHER:  We're off the record

3     at 3:11 p.m.

4               (Proceedings adjourned at 3:11 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         C E R T I F I C A T E

2

3    STATE OF TENNESSEE

4    COUNTY OF KNOX

5              I, Rhonda S. Sansom, RPR, CRR, CRC, LCR #685,

6    licensed court reporter in and for the State of

7    Tennessee, do hereby certify that the above videotaped

8    videoconference deposition of PHYSICIAN was reported by

9    me and that the foregoing 140 pages of the transcript

10   is a true and accurate record to the best of my

11   knowledge, skills, and ability.

12              I further certify that I am not related

13   to nor an employee of counsel or any of the parties to

14   the action, nor am I in any way financially interested

15   in the outcome of this action.

16              I further certify that I am duly licensed

17   by the Tennessee Board of Court Reporting as a Licensed

18   Court Reporter as evidenced by the LCR number and

19   expiration date following my name below.

20   RhondaSansom@gibsonreporters.
     2021.10.15 15:33:27
     Signer:
     CN=RhondaSansom@gibsonreporters.com

21                                    *Rhonda S. Sansom*

22                              _____
                               Rhonda S. Sansom, RPR, CRR, CRC

23                               Tennessee LCR# 0685
                                 Expiration Date:  6/30/22

24

25

**Gibson Court Reporting**